IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., | |
| Plaintiffs, | No. 01-591L |
| v. | |
| | Judge Francis M. Allegra |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

STATUS REPORT OF *AMICUS CURIAE*
NATURAL RESOURCES DEFENSE COUNCIL

*Amicus Curiae* Natural Resources Defense Council ("NRDC") respectfully submits this status report in response to the Court's Order of December 17, 2004. This status report addresses three issues: (1) service of filings in this case on *amicus curiae* NRDC and other *amici*; (2) the appropriateness of a brief stay of consideration of the substantive issues in this case pending a decision by the Supreme Court in *Orff v. United States*, and (3) the possible relevance of the interlocutory ruling on takings liability by the Court of Federal Claims in the recently settled case of *Tulare Lake Basin Irrigation District v. United States*.

## I. SERVICE OF FILINGS

NRDC seeks clarification from the Court on the procedures pursuant to which NRDC can

receive reliable service of all filings in this case. As the records reflects, plaintiffs objected in the past to serving *amici* on the ground that such an obligation would impose a time-consuming and costly burden. In response to these objections, the Court ordered all parties to serve *amici* with notice of all filings. Unfortunately, compliance with that direction has been inconsistent.

NRDC believes that the earlier objections to serving *amici* with filings in this case have been rendered largely if not completely moot by the decision to include this case in the electronic case management system As a result of the use of the electronic case management system, service of electronic filings upon *amici* will impose no further burden and cost beyond that entailed in making filings with the Court using the system. Furthermore, undersigned counsel understands from the Clerk's office that counsel for NRDC and counsel for certain other *amici* parties are already set up on the electronic case management system to receive automatic service of all electronic filings in this case. Accordingly, NRDC believes that no further action by the Court is required to ensure that NRDC and other *amici* registered on the electronic case management system receive service of future electronic filings.

The only remaining issue relates to possible future paper filings in this case. In view of the presumably small number of any such filings, and the potential for confusion if such filings are not served on all of the *amici* as well as the parties, NRDC requests that the Court, in the course of resolving other issues raised by its December 17 Order, order the parties to serve all future paper filings in this case, if any, on all *amici*.

II. <u>STAY OF PROCEEDINGS ON THE MERITS FOR SEVERAL MONTHS</u>

The Court's December 17 Order observes that the Supreme Court "has granted certiorari in a case, *Orff v. United States*, that potentially could impact the resolution of this case, and that

oral argument in that case has been scheduled for February 23, 2005. *See Orff v. United States*, 125 S.Ct. 309 (2004)." Order, at 2. In view of the likelihood that the Supreme Court's decision in *Orff* will provide useful guidance for the resolution of this case, NRDC urges the Court to stay consideration of all the substantive issues in this case pending a decision in *Orff,* which the Supreme Court should hand down no later than July 1, 2005.

First, a stay is appropriate because the outcome of the *Orff* case could be dispositive of the third-party beneficiary issue pending before the Court in this case. The question presented in *Orff* is, in significant part, "whether farmers are 'intended' third-party beneficiaries of their irrigation district's water service and repayment contracts with the United States Bureau of Reclamation and, therefore, entitled to sue the Bureau for breach thereof." *See* Petitioners' Brief on the Merits, at I, 2004 WL 2758215. This question is obviously very closely related to the issue presented in this case by plaintiffs' cross-motion for partial summary judgment on the status of individual plaintiffs as third-party beneficiaries, filed on March 31, 2004. There is a significant risk that an investment of time and effort by the Court in resolving the third-party beneficiary in this case in advance of a ruling by the Supreme Court in *Orff* would be largely if not completely wasted. It appears almost inevitable that resolution of the third-party beneficiary issue in this case will need to take into account, if not be guided by, the Supreme Court's resolution of the third-party beneficiary issue in *Orff*. In view of the fact that it is a virtual certainty that the Supreme Court will render a definitive decision in *Orff* prior to July 1, 2005, only a modest delay is necessary to permit the Court to address the third-party beneficiary issue in this case with the *Orff* decision from the Supreme Court in hand.

Second, the Court should stay consideration of the other merits issues currently pending

before the Court because the *Orff* decision may well provide important guidance on those issues as well. In particular, the claimants and the United States have filed cross-motions in this case addressing the question of the nature of the interests held by recipients of water under Bureau of Reclamation water contracts, including whether such interests are grounded in contract law as opposed to property law, and whether the nature and scope of such interests are determined by state or federal law. The petitioners in *Orff* and several of the *amici* in that litigation have presented arguments to the Supreme Court that touch on many of these same issues. For example, the petitioners in *Orff*, much like the plaintiffs in this case, claim "[t]hey own an equitable right to in the water sold by the Bureau to the District." Petitioners' Brief on the Merits, at 41. The lead plaintiff in this case, the Klamath Irrigation District, has joined in an *amicus* brief in the *Orff* case arguing, just as it is arguing in this case, that water users under reclamation contracts "hold vested property rights to receive their water from Reclamation, quite apart from any contractual provision." *See* Brief Amici Curiae of Central San Joaquin Water Conservation District, at 15, 2004 WL 2758216. On the other hand, the brief of defendant United States disputes this contention. *See* Brief for the United States, at 41-42, 2005 WL 45048 ("The Bureau of Reclamation, and not petitioners, holds the state permits for the water that the United States delivers to Westlands under the Westlands Contract. Accordingly, California courts and the California State Water Resources Control Board have determined that the Bureau, not the irrigation districts or the water users, hold the water rights to CVP water."). *See also* Brief Amicus Curiae of the State of California, at 1, 2005 WL 65493 (disputing petitioners' claim of "an equitable property right in the water they receive from the U.S. Bureau of Reclamation").

It is uncertain to what degree, if at all, the Supreme Court in *Orff* will address questions relating to the legal basis and nature of irrigators' interests in water received under contracts from the Bureau of Reclamation. If the Supreme Court does address those issues, however, its decision might provide useful and important guidance for this Court in resolving the similar issues in this case. Given that a stay is plainly warranted in view of the third-party beneficiary issue presented in *Orff*, the prudent and efficient course is simply to stay consideration of all of the interrelated merits issues until the Supreme Court decides *Orff*.

A final factor supporting a stay of consideration of the merits of this case is that there are a number of other pending motions, including the motion for class certification and the motion for intervention, that require the Court's attention and that logically should be addressed prior to addressing the merits of the case. A stay of consideration of the merits of this case would provide an opportunity for the Court to address those pending motions. Because resolution of these pending procedural motions may take a considerable amount of judicial attention, a stay of consideration of the merits of the case likely will not delay the ultimate disposition of the case.

III. *TULARE LAKE* WAS INCORRECTLY DECIDED

The Court's December 17 Order also observes that "[a]lso potentially affecting this case is the future course of *Tulare Lake Basin*, *et al v. United States*, No. 98-00101, before Judge Weiss, where an opinion on liability and damages has been issued. *See Tulare Lake Basin Water Storage District*, *et al v. United States*, 61 Fed. Cl. 624 (2004); *Tulare Lake Basin*, 59 Fed.Cl. 246 (2003); *Tulare Lake Basin*, 49 Fed.Cl. 313 (2001)." Order, at 2. In an effort to assist the Court in understanding the possible relevance of the *Tulare Lake Basin* case to this case, NRDC devotes the remainder of this status report to addressing this case.

As the Court may be aware from published reports, on December 20, 2004, the United States and the plaintiffs in the *Tulare Lake Basin* case entered into a settlement agreement. In exchange for payment of $16,700,000 by the United States, covering all claims including attorneys' fees, plaintiffs agreed to the voluntary dismissal of their action with prejudice. Of greatest significance for present purposes, the settlement agreement states: "This agreement is the result of compromise and settlement, and shall not be construed as an admission by Defendant of any legal or specific monetary liability as to any or all of Plaintiffs' claims for just compensation, interest, attorneys' fees and other litigation expenses, or any other kind of legal or equitable relief, nor shall this settlement be interpreted to constitute a precedent or argument in this or any other case." Thus, the fact of a settlement in *Tulare Lake Basin*, though obviously a matter of public interest and controversy, has no legal significance for the purpose of the present litigation.

Prior to the execution of the settlement agreement the Judge presiding in the *Tulare Lake Basin* case issued several opinions, including a comprehensive opinion on the issue of liability under the Takings Clause. *See Tulare Lake Basin*, 49 Fed.Cl. 313 (2001). An interlocutory decision of one Judge of the Court of Federal Claims does not represent binding precedent for a separate Judge of this Court in a separate case. *See Adams v. United States,* 42 Fed.Cl. 463, 472-73 (1998). Thus, the Court should refer to the earlier opinion in *Tulare Lake Basin* only to the extent that it is relevant to the issues in this case, logically persuasive, and solidly grounded in Supreme Court and Federal Circuit precedent. In fact, NRDC believes the liability opinion in *Tulare Lake Basin* was wrongly decided and is inconsistent with binding precedent, most notably the U.S. Supreme Court's landmark 2002 decision in *Tahoe-Sierra Preservation League v. Tahoe Regional Planning Agency,* 535 U.S. 302 (2002). Accordingly, to the extent that it is relevant to

the issues presented by this case, NRDC submits that the Court should not follow the analysis in the 2001 opinion on liability in the *Tulare Lake Basin* case.

Rather than burden the Court in this status report with elaborate briefing on the *Tulare Lake Basin* decision, NRDC will merely sketch what we perceive to be the major failings of the Court's opinion on liability. NRDC is prepared to brief these points more fully if and when that becomes necessary in this case.

First, the Court erred in concluding that the plaintiffs in *Tulare Lake Basin* met the threshold requirement of demonstrating that the challenged government action affected a protected property right belonging to them. Specifically, plaintiffs failed to establish a protected property right to use of the irrigation water they were restricted from using because (1) back-ground principles of California law limited the scope of the private rights plaintiffs could claim in the water, and (2) the indemnity language in the contracts between the plaintiffs and the California Department of Water Resources pursuant to which plaintiffs received water expressly stated that the contracts should not be read to create a vested entitlement to any particular quantity of water.

As an initial matter, there was no dispute in *Tulare Lake Basin* – nor could there have been – that background principles of California law greatly restricted the nature of private rights in water, particularly in the context of water uses that threaten the public's wildlife and other natural resources. Relevant background principles include the public trust doctrine, *see National Audubon Society v. Superior Court of Alpine County*, 33 Cal.3d 419, 425 (1983), the reasonable use doctrine, *see Environmental Defense Fund v. East Bay Muni. Util. Dist*, 26 Cal3d 183, 194 (1980), and the doctrine of public ownership of fish and other wildlife, *see People v. Truckee Lumber*, 116 Cal. 397, 399-400 (1897). Nonetheless, the Court believed that it was permitted,

indeed required, to ignore these background principles of California law as a result of the State Water Board's 1978 Order D-1485 allocating certain quantities of water to the Department and, in turn, to the plaintiffs. The Court reasoned that by authorizing the use of certain quantities of water in D-1485, the Board, which has jurisdiction to protect public rights in water resources, created a vested right to exploit the water up to the amount authorized. This analysis was mistaken, however, because it confused the question of the scope of the Board's authority to make a water allocation, and the fundamental limitations on private rights in water imposed by background principles of California law. The California courts have repeatedly recognized that a specific authorization to exploit water resources does not create a vested property right to exploit the resources. *See, e.g.*, *National Audubon Society v. Superior Court of Alpine County*, 33 Cal.3d 419, 437 (1983). The Court in Tulare Lake Basin simply ignored these teachings in concluding that a water allocation made 1978, prior to the determination that fish species in the Sacramento-San Joaquin River Delta were endangered, created a vested right to continue exploiting these resources in a fashion that imperiled the fisheries.

The Court's conclusion that California background principles did not bar the claims was also mistaken for a second reason. According to the Court, a California court (or the State Water Board), faced with evidence of threats to endangered species, would have had an obligation to consider whether additional restrictions above those imposed by the Board in D-1485 might be justified. *See* 49 Fed.Cl. at 322. However, in the Court's view, it, qua *federal* court, could not apply state law doctrines in the same fashion as a state court. In the court's terse words, "That we cannot do." 49 Fed.Cl. at 323. This conclusion was mistaken because it ignored the responsibility of a federal court, in addressing a state law issue in a case properly before it, to

faithfully apply state law. *See Erie Railroad v. Tompkins,* 304 U.S. 64 (1938). In justifying its ruling, the Court indicated that it was avoiding the "displacement of the state regulatory regime" in California by declining to address matters "for which this court is not suited and with which it is not charged." *Id*. at 323. In reality, by declining to address the state law issue on the same basis that the California courts would, the Court in *Tulare Lake Basin* effectively contradicted state law. Far from reflecting respect for the principle of federalism, the court's approach offends that principle.

There is yet another reason why the Court in *Tulare Lake Basin* erred in concluding that plaintiffs had a vested property right to receive a certain quantity of water. The plaintiffs' contracts with the Department provided that neither the state nor its agents may be held liable "for any damage, direct or indirect, arising from shortages in the amount of water to be made available for delivery... under this contract caused by drought, operation of area of origin statutes, or any other cause beyond their control." Relying on *O'Neill v. United States,* 50 F.3d 677 (9th Cir. 1995), the United States contended that this indemnity provision barred plaintiffs from claiming an entitlement to water that might prove undeliverable "for any other cause" beyond the Department's control, including enforcement of the Endangered Species Act by the federal government. The Court rejected this argument, reasoning that the indemnity language merely created a defense to a claim for monetary compensation, available to the State only, in the event the State failed or was unable to deliver water under the contract. This reasoning was incorrect because the indemnity language did not merely create a litigation defense, but also qualified the nature of the plaintiffs' rights themselves. *See United States v. State Water Resources Control Board*, 182 Cal.App.3d 82, 142 (1986). Because the indemnity provision qualified the scope of

the alleged property right itself, it should have been irrelevant for the purpose of takings analysis whether the challenged action was by the federal government or by the State. Accordingly, the indemnity provision established that claimants lacked vested rights sufficient to support their takings claims.[1]

Turning to the merits of the takings claims, the Court also erred in failing to recognize that the Supreme Court decision in *Omnia Commercial Co v. United States,* 261 U.S. 502 (1923), barred the claims. *Omnia* stands for the principle that the United States has broad latitude to take action to advance the general welfare even when it may have the incidental effect of limiting or even destroying the value of private contract rights. As a unanimous Supreme Court said in *Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 642 (1993), "Contracts, however express, cannot fetter the constitutional authority of Congress." *Omnia* was on all fours with *Tulare Lake Basin* and required rejection of the taking claims in that case. In *Omnia*, the Court said, the plaintiff had only a "contract expectancy" to receive a certain quantity of steel plate. By contrast, according to the Court's reasoning in *Tulare Lake Basin,* the plaintiffs could claim "an identifiable interest in a stipulated volume of water." But this purported distinction is illusory. Both in *Omnia* and in *Tulare Lake Basin*, the contracts were executory as of the date of the alleged taking. Water is no less fungible, and arguably a good deal more fungible, than the steel plate at issue in *Omnia.* In addition, plaintiffs' rights to delivery of water under the contracts in the future were no more vested than the plaintiffs' contract rights to the delivery of the steel plates in *Omnia*. Under California water law, ownership of the water always

[1] Significantly, the analysis in *Tulare Lake Basin* implicitly recognizes that a defendant in a taking case based on the alleged taking of a contract right could defend against the claim based on indemnity language that expressly operates for the benefit of the defendant.

remains with the State, as trustee for the public, and private parties obtain, at most, a right to the use of a certain quantity of water during a certain period of time. *See Eddy v. Simpson*, 3 Cal. 249, 252-53 (1853). Lastly, in both cases, the frustration of the contract expectancy was not the result of some government action targeted at the contract itself, but rather the indirect consequence of general government action designed to serve legitimate public purposes. If anything, the government action in *Omnia* was more targeted than the application of the Endangered Species Act in *Tulare Lake Basin,* and therefore a finding of no taking in that case should have followed *a fortiori* from *Omnia*.

Finally, assuming for the sake of argument that plaintiffs had vested property rights to use a certain quantity of water, and assuming the claims need not have been dismissed based on *Omnia*, the Court in *Tulare Lake Basin* erred in evaluating the regulatory restrictions on the use of the water as a "physical occupation" supporting a finding of a *per se* taking. The Court's error is especially apparent in light of the Supreme Court's teachings in *Tahoe-Sierra Preservation League v. Tahoe Regional Planning Agency*, 535 U.S. 302 (2002), about the distinctions between physical takings and regulatory takings. Unfortunately, the Court in *Tulare Lake Basin* did not have the benefit of the 2002 *Tahoe-Sierra* decision when it issued its 2001 ruling on liability.

The Court's use of the physical-occupation theory in *Tulare Lake Basin* runs counter to the Supreme Court's instruction that a categorical taking test is disfavored and should be applied only in narrow circumstances. In *Tahoe-Sierra*, the Supreme Court stated that "[t]he temptation to adopt what amount to per se rules" must be resisted, *id*. at 321, and use of *per se* tests must be tightly cabined to avoid "transform[ing] government regulation into a luxury few governments could afford." *Id.* at 324. Accordingly, the Court said, a *per se* test must be reserved for

"relatively rare" cases in which the physical occupation can be "easily identified." *Id.* The Court also stressed the need to maintain clear analytical lines between the two tests; it is "inappropriate to treat cases involving physical occupations as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Id*. The Court's analysis in *Tulare Lake Basin* reflects no awareness of any of these principles.

Focusing more specifically on the precise claim asserted, the Court's physical-occupation theory is inconsistent with the nature of private rights in water. As discussed, under California law title to water always remains with the State, and a water user, whether it holds its right by virtue of a permit or under a contract, holds merely a usufructary interest in the water. The physical occupation doctrine logically can apply in the context of real property, for example, when the government or its agents actually occupies or invades private property, *see, e g., Dolan v. City of Tigard*, 512 U.S. 374 (1994), or perhaps where government action appropriates an identified monetary fund. *See Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003) (assuming *arguendo* that the case involved a physical occupation of a fund of money). But the physical occupation theory cannot logically be applied to a water right, because there is no property that the government or third parties can be said to occupy. There is merely a right of use. A use right can be restricted, even obliterated, but it cannot be physically occupied.

Finally, the Court's application of physical-occupation theory in the context of water is problematic because it would grant owners of water rights greater protection than owners of land. In particular, a water rights holder subject to the requirements of the Endangered Species Act would have far greater protection under the Takings Clause than real property owners subject to ESA constraints. For example, in *Seiber v. United States,* 364 F.3d 1356 (Fed.Cir. 2004), the

Federal Circuit recently affirmed a claims court decision rejecting a claim that ESA restrictions on logging on 40 acres of property effected a taking. Applying the parcel as a whole rule, the court said the taking claim had to be evaluated in light of the plaintiffs' entire 200-acre property. Yet, under the reasoning of the Court in *Tulare Lake Basin*, water rights holders could recover under the physical occupation theory, no matter how modest or short-term the restriction on the rights as a whole. *But see Tahoe-Sierra Preservation League v. Tahoe Regional Planning Agency*, 535 U.S. 302, 331 (2002) (emphasizing that the parcel as a whole rule applies in the temporal as well as the geographical dimension). On its face, there is nothing to recommend the idea that regulations of the use of water should be subject to dramatically greater scrutiny under the Takings Clause than regulations of the use of land.

Indeed, if anything, private rights in water are properly subject to greater demands on behalf of the public welfare, and therefore are less appropriate for treatment using a *per se* takings rule than other types of property rights. *See* Joseph Sax, "The Constitution, Property Rights, and the Future of Water Law, " 61 *U.Colo.L. Rev*. 257 (1990). Unlike with real property, the State owns title to the water itself, and holders of private rights in water have only use rights. In addition, these limited use rights are cabined by a variety of principles, including the public trust doctrine, the reasonable use doctrine, and the doctrine. of public ownership of fish and other wildlife. In light of the strong legal tradition supporting extensive use of public authority to restrict private rights in water, it is literally incredible to suppose that private water rights actually should hold a special, elevated place in takings jurisprudence.

The Court concluded that because the regulation ostensibly "deprived [plaintiffs] of the entire value of their contract right," *id.* at 318, it effected a physical occupation of plaintiffs'

asserted water rights. Contrary to the court's reasoning, however, a regulatory restriction that destroys all economically viable use is *not* the same thing as a physical occupation of private property. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), involved a regulation that rendered the property valueless, but the Court did not say this converted the government action into a physical occupation. To the contrary, the *Lucas* Court said there are "two discrete categories" of government actions for the purpose of the Takings Clause, *id*. at 1025, physical occupations and regulatory use restrictions. The Court said the "total taking" claim in *Lucas* fell into the regulatory taking category, not the physical occupation category, implicitly rejecting the theory that a denial of all economic use is a physical occupation.

Furthermore, the Court in *Tulare Lake Basin* simply begged the critical question of the impact of the regulation by saying that the ESA restrictions rendered claimants' water rights valueless. The Court said the plaintiffs' water rights were rendered valueless by the ESA restrictions because it assumed, without ever explaining why, that the parcel as a whole rule did not apply. But the parcel rule could properly have been disregarded only if the case involved an actual physical occupation. The Court characterized the ESA restrictions as a physical occupation, but its basis for doing so was that the regulation ostensibly rendered the property valueless. That conclusion necessarily rested on the unstated premise that the parcel rule did not apply, an assumption that would have been appropriate only if the case actually involved a physical invasion in the first place. In other words, the Court in *Tulare Lake Basin* concluded that ESA restrictions made the claimants' water rights valueless because it assumed, from the start, that the parcel rule did not apply. This reasoning was perfectly, and fatally, circular.

Instead of assuming the answer to its question, the Court should have addressed, at the

outset of its analysis, whether the *Tulare Lake Basin* case involved a regulatory restriction or a physical occupation. If the Court had followed the proper approach, and in particular if it had had the benefit of the guidance provided in *Tahoe-Sierra*, it would have recognized that the case involved a regulatory restriction, not a physical occupation. Based on that conclusion it would been required to apply the parcel as a whole rule. Because, under the parcel rule, the economic impact of the ESA regulations on claimants was, in the Court's words, "*de minimis*," 49 Fed.Cl. at 318-19, the basis for the Court's finding of a taking would have evaporated.

## CONCLUSION

NRDC requests that the Court (1) clarify the procedures for service of future filings in this case; (2) stay consideration of all of the merits issues pending the Supreme Court decision in *Orff*, (3) decline to follow the reasoning of the Court in *Tulare Lake Basin* in resolving the related issues in this case.

Respectfully submitted,

s/John D. Echeverria
John D. Echeverria
Georgetown Environmental Law & Policy Institute
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C. 20001

Counsel for *Amicus Curiae*
Natural Resources Defense Council