**IN THE DISTRICT COURT OF THE FIFTH JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF TWIN FALLS**

| | | |
|---|---|---|
| **In Re SRBA** | ) | **Consolidated Subcase: 91-63** |
| | ) | |
| **Case No. 39576** | ) | **MEMORANDUM DECISION AND** |
| | ) | **ORDER ON CROSS-MOTIONS FOR** |
| | ) | **SUMMARY JUDGMENT** |
| | ) | |
| | ) | **NOTICE OF STATUS CONFERENCE** |
| ______________________________ | ) | |

**Summary of Ruling: Irrigation Entities and Conservation Objectors both have standing to participate in proceedings. Irrigation Entities hold equitable title to subject rights for the benefit of the end water user. Partial decrees for the rights should be issued in the name of Bureau of Reclamation with a remark clarifying the equitable ownership interest. The inclusion of a remark addressing equitable title is a clarification of the former licenses and decree and does not constitute a collateral attack on either.**

## I. APPEARANCES

Albert P. Barker, Barker Rosholt & Simpson, LLP, representing Boise Project Board of Control, *et al.*;

Daniel V. Steenson and S. Bryce Farris, Ringert Clark Chartered, representing Ballentyne Ditch Company, *et al.*;

Jerry A. Kiser, Stoppello & Kiser, representing Farmers Union Ditch Company, *et al.*;

Matthew K. Wilde, Assistant City Attorney, representing City of Boise;

Scott L. Campbell and Angela Schaer Kaufmann, Moffatt, Thomas Barrett Rock and Field Chartered, representing Pioneer and Settlers Irrigation Districts;



EXHIBIT A

John K. Simpson, Barker Rosholt & Simpson, LLP, representing Twin Falls and North Side Canal Companies, *et al.* (collectively as "Irrigation Entities");

David Barber, Deputy Attorney General, representing the State of Idaho;

David Gehlert, United States Department of Justice, representing the United States Department of Interior, Bureau of Reclamation: ("BOR")

Lawrence (Laird) J. Lucas, William M. Eddie, Judith M. Brawer and Sara Denniston Eddie, Advocates for the West, representing Amy Williams, *et al.*; "(Conservation Objectors").

## II. PROCEDURAL BACKGROUND

A. The United States Bureau of Reclamation (BOR) filed water right claims for irrigation storage, irrigation from storage, and other storage rights from Arrowrock Dam and Reservoir, Lucky Peak Dam and Reservoir, and Anderson Ranch Dam and Reservoir. All three projects were authorized and developed pursuant to the Reclamation Act of 1902 and its subsequent amendments.[1] The various parties comprising the Irrigation Entities, which have contracts with the BOR for the storage and delivery of the project water, also filed separate claims to the same water rights consistent with their individual respective uses. The Idaho Department of Water Resources (IDWR) recommended the water rights in the name of the BOR, substantially as claimed by the BOR. The corresponding claims filed by the Irrigation Entities were recommended as disallowed. The Irrigation Entities individually filed objections to IDWR's recommendations, all alleging, *inter alia*, that the water rights should be decreed either in the name of the contracting entity or alternatively, that the partial decree should also recognize the entity's beneficial ownership interest in the water right. Objections were also filed to other elements of some of the rights in some of the subcases, however, the issue now before the Court on summary judgment only addresses ownership interest of the respective rights. The other issues will be addressed in subsequent proceedings.[2]

[1] Lucky peak was authorized pursuant to the Flood Control Act of July 24, 1945, 60 Stat. 650. However the United states agreed to appropriate the water pursuant to Idaho law under the Federal reclamation laws.

[2] The breakdown of the rights comprising this consolidated subcase is as follows:

B. After the objection and response period expired and while the issue was pending before the Special Master, counsel for several of the Irrigation Entities jointly moved to consolidate the issue of ownership as between the BOR and the Irrigation Entities, recognizing there were other issues that varied among the water rights for the three facilities and also recognizing the delivery contracts varied between the various entities.

C. Thereafter, then presiding judge, Roger S. Burdick issued an ***Order Separating and Consolidating Common Issue From Subcases; Order Rescinding Order of Reference to Special Master as to Consolidated Issue; Order Designating Issue as Consolidated Subcase 91-63; Notice of Scheduling and Status Conference on Consolidated Issue*** (***June 23, 2003, Order***). That ***June 23, 2003, Order*** also permitted parties to the adjudication not already parties to the consolidated subcase to seek participation and also required the parties to the consolidated subcase and those seeking to participate to file a statement of issues for purposes of determining whether the issue

---

Water right claim 63-00303 was filed by the BOR and pertains to the Arrowrock Dam and Reservoir Project. IDWR recommended the right in the name of BOR based on a former decreed right. The individual corresponding claims filed by the Irrigation Entities recommended as disallowed include 63-05262A (Pioneer Irrigation District), 63-05262B (Settlers Irrigation District), 63-05262C (Nampa Meridian Irrigation District), and 63-00303A (Farmers Cooperative Ditch Co.). The BOR also filed 63-05262 which IDWR recommended as disallowed but included the right in the recommendation for the 63-00303 right.

Water right claim 63-03613 was filed by the BOR and also pertains to the Arrowrock Dam and Reservoir Project. The claim was recommended in the name of the BOR based on a former licensed right. Farmers Union Ditch Co. filed the corresponding claim for 63-03613A, which IDWR recommended as disallowed.

Water right claim 63-03614 was filed by the BOR and pertains to Anderson Ranch Dam and Reservoir Project. The right was recommended in the name of the BOR based on a former licensed right. The individual corresponding rights recommended as disallowed include 63-03614A (Pioneer Irrigation District), 63-03614B (Settlers Irrigation District), 63-03614C (Farmers Union Ditch Co.), 63-03614D (New Dry Creek Ditch Co.), 63-03614E (Boise Valley Irritation District), and 63-03614F (Nampa Meridian Irrigation District).

Water right claim 63-03618, pertaining to rights for Lucky Peak Dam and Reservoir Project was filed by and recommended in the name of the BOR. The basis for the claim and recommendation is a licensed right. The corresponding rights recommended as disallowed include 63-03618A (Pioneer Irrigation District), 63-03618B (Settlers Irrigation District), 63-03618C (Canyon County Water Co.), 63-03618D (Farmers Union Ditch Co.), 63-03618E (Middleton Irrigation Association), 63-03618F (Middleton Mill Ditch Co.), 63-03618G (New Dry Creek Ditch Co.), 63-03618H (Boise Valley Irrigation Ditch Co.), 63-03618J (Nampa Meridian Irrigation District), 63-03618K (South Boise Water Co.), 63-03618L (Eureka Water Co.), 63-03618M (Thurman Mill Ditch Co.), 63-036518N (Eagle Island) and 63-03618P (Ballantyne Ditch Co.). The BOR also filed 63-05263 which was recommended as disallowed but was recommended under the 63-03618 right.

of ownership interest could be decided as a matter of law. All parties characterized the issue of ownership as either a matter of law or a mixed question of fact and law.

D. On November 4, 2003, this Court issued the ***Order Granting Participation To Gene Bray, et al.; City of Boise and State of Idaho; and Order Denying Motion to Conduct Discovery; and Order Modifying July 25, 2003, Scheduling Order***, which granted participation and set forth a scheduling order for motions for summary judgment and related briefing.

E. On April 30, 2004, Farmers Union Ditch Company, *et al.*; the United States Department of Interior, Bureau of Reclamation; Ballentyne Ditch Company, *et al.*; Pioneer and Settlers Irrigation Districts; and Boise Project Board of Control, *et al.*, and the Conservation Objectors all filed motions for summary judgment asserting no genuine issue of material fact on the issue of ownership. Response briefs were filed on or before May 26, 2004. Reply briefs were filed on or before July 2, 2004.

F. Oral argument was heard on the motions on July 22, 2004.

## III. ISSUE(S) PRESENTED

The issue before the Court is the ownership of water rights and/ or storage rights developed pursuant to a Bureau of Reclamation project as between the BOR, which in this case previously had the subject rights licensed or decreed in its name; the Irrigation Entities which entered into contracts with the BOR for the storage and or delivery of the water developed under the project; or the landowner members of the irrigation entity who actually put the right to beneficial use.[3]

---

[3] In the *Motions* and briefing most of the Irrigation Entities argued in the alternative that the subject rights should be decreed solely in the name of the Irrigation Entity (or end water user). However, at oral argument all but two parties proceeded on the argument that title should be split between the BOR and the end user with the BOR holding nominal or legal title and the end user holding equitable title.

## IV. MATTER DEEMED FULLY SUBMITTED FOR DECISION

Oral argument occurred in this matter on July 22, 2004. The parties did not request additional briefing, and the Court does not require any additional briefing on this matter. Therefore, this matter is deemed fully submitted for decision the next business day, or July 23, 2004

## V. JURISDICTION IN THE SRBA IS PROPER FOR DECIDING ISSUE

The BOR and the Conservation Objectors both argue that because the subject water rights were previously decreed or licensed in the name of the BOR in accordance with state law, the water rights should be decreed in the SRBA in the name of the BOR. They assert that any interest the Irrigation Entities have in reclamation project water is a separate issue which stems entirely from the federal delivery and/or storage contracts. Therefore, the extent of the contract interest should be decided outside the SRBA, presumably in federal court.

This Court disagrees that the SRBA lacks jurisdiction over the issue. Both the BOR and the Irrigation Entities filed claims to the same rights in the SRBA. The resolution of all claims arising within the scope of the SRBA is within the exclusive jurisdiction of the SRBA. *Walker v. Big Lost Irr. Dist.*, 124 Idaho 78, 81 (1993). The issue of ownership is an essential element of a water right over which jurisdiction is proper in the SRBA. Further, the BOR is asserting prior state issued licenses and/or decrees as the basis for the water right claims. Clearly this Court has jurisdiction over issues pertaining to the effect of these prior decrees or licenses.

More importantly, the jurisdictional argument presupposes that the contract is the sole basis for establishing what interest, if any, that the Irrigation Entities may have in the subject water rights. As discussed in this memorandum decision, the Court does not view the contracts alone as being determinative of the ownership issue.

The Court acknowledges that general adjudications in other states, when confronted with the same issue, have declined to entertain the issue and reasoned that the matter should be decided in the federal courts. ***See e.g. In Re: The General***

***Adjudication Of All Rights To Water In The Big Horn River System And All Other Sources, State Of Wyoming, Order Dismissing Stutzman's Verified Petition***, Case No. 77-4993 (Sept. 18, 2002). Such determinations are not binding on this Court nor are they persuasive.

Finally, the Court notes that the BOR has settled a similar issue in the SRBA regarding ownership of reclamation project water wherein the BOR agreed to the inclusion of language in the partial decree describing the interest of the Irrigation Entity. This Court acknowledges that the resolution is not binding or even precedential on subsequent cases. However, with respect to jurisdiction over the subject matter, the Court notes that the BOR is taking an inconsistent position in these proceedings, as parties cannot stipulate to subject matter jurisdiction even in conjunction with a settlement.

For the above-stated reasons this Court concludes that jurisdiction over the subject matter is proper in the SRBA.

## VI. STANDING OF CERTAIN PARTIES TO PARTICIPATE

### A. The Irrigation Entities have Standing to Participate in Subcases.

The BOR and the Conservation Objectors both argue that the Irrigation Entities lack standing to participate in the proceedings based on the holding in *Fort Hall Water Users Ass'n v. United States*, 129 Idaho 39, 921 P.2d 739 (1996). *Fort Hall Water Users Ass'n*, like this case, involved a federal irrigation project where the United States had delivery contracts with the Fort Hall Water Users Ass'n (FHWUA) for the delivery of irrigation water. The United States filed claims in the SRBA for the project water rights that were eventually included in the Fort Hall Indian Water Rights Agreement consent decree. The FHWUA filed objections to some of the water rights claimed by the United States. The Supreme Court ruled that the FHWUA lacked standing to file the objections

because it was not a "claimant" in the SRBA as defined by the adjudication statutes (now codified at 42-1401A(1)).[4]

*Fort Hall Water Users Ass'n* is distinguishable from this case. In *Fort Hall* the FHWUA never filed claims to the water rights nor even asserted an ownership interest to the rights in its objections. In the objections the FHWUA stated that its only interest in the water right was a contractual right to use the water. The ownership interest in the rights was never contested or at issue. In this case ownership is the issue: the Irrigation Entities filed separate claims to the water rights and objected to the director's recommendations regarding ownership. Consequently, unlike the situation in *Fort Hall Water Users Ass'n,* the Irrigation Entities are "claimants" and therefore meet the definition of "party to the adjudication." Pursuant to I.C. § 42-1412 any "claimant" can file an objection or response to a water right reported in the director's report. Therefore, the Irrigation Entities have the requisite standing to participate in this consolidated subcase.

**B. The Conservation Objectors have Standing to Participate in Subcases.**

Certain of the Irrigation Entities contest the standing of the Conservation Objector's based on the case or controversy standing requirements set forth in *Boundary Backpackers v. Boundary County*, 128 Idaho 371, 913 P.2d 1141 (1996). They argue that because the water rights held by the Conservation Objectors are unaffected by the outcome of these proceedings, the Conservation Objectors have "failed to demonstrate an injury in fact or a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." This argument is without merit.

*Boundary Backpackers* and related constitutional standing cases do not deal with general adjudications. The case or controversy standing requirements really do not apply to parties to the adjudication because the standing requirements for the SRBA are defined

[4] For purposes of determining standing ***SRBA Administrative Order 1 (AO1)*** defines who is a "Party to the Adjudication" ***AO1*** 2.q. defines "party to the adjudication" as "any claimant as defined in I.C. §§ 42-1401A(1) and (6). I.C. §§ 42-1401A(1) defines "claimant" as "any person asserting ownership of rights to the use of water within the state of Idaho or on whose behalf ownership of rights to the use of water is asserted." I.C. § 42-1401A (6) defines party as "any party who is a claimant or any person who is served or joined."

by the adjudication statutes and ***AO1***. Again, pursuant to I.C. § 42-1412 any "claimant" can file an objection or response to a water right reported in the director's report. The SRBA would never proceed if the Court had to make an initial determination as to how a particular water right may be affected either factually or legally as a precondition to allowing a party to the adjudication to file an objection or response in a particular subcase. This issue has been addressed and readdressed at length over the course of the SRBA. *See* ***Order on Motion to Participate/Intervene, AO1 10k, I.R.C.P. 24(a) & (b), Motion to Dismiss Objections to Amended Claims, I.R.C.P. 12(b)(6),*** **Consolidated Subcase No. 75-13316 Wild & Scenic Rivers Claims (July 29, 2002).**

However, after the time for filing objections and responses has expired, leave of court is necessary to participate in a subcase except through a motion to alter or amend after a special master's recommendation has been issued. In determining whether to allow a party to participate, the Court applies the criteria for intervention set forth in I.R.C.P. 24. In making that determination, the Court can scrutinize how the outcome of the proceedings will affect the intervener's water right and whether the intervener's interest is already being adequately represented by parties already participating in the proceedings. The determination whether to permit permissive intervention is discretionary with the Court and is not an issue of constitutional standing.

This Court, in exercising its discretion, previously opened the subcase to allow parties to the adjudication not already parties to the consolidated subcase the opportunity to participate. When this Court rescinded the ***Order of Reference*** to Special Master Cushman, the proceedings were effectively altered by eliminating the special master's recommendation and ultimately the opportunity to file motions to alter or amend.[5] As a result, parties that did not initially file objections or responses but nonetheless relied on ***AO1*** procedure would be precluded from entering the subcase on a motion to alter or amend. Because the Court viewed the issues raised in this consolidated subcase – as did the parties – as primarily issues of law, the Court opened the subcase up to parties

[5] Any party to the adjudication can file a motion to alter or amend a special master's recommendation. ***AO1*** 13a. However, there is a limit regarding what issues can be raised in a motion to alter or amend. Specifically, motions to alter or amend are limited to the existing record and may raise issues pertaining to alleged errors of law or insufficiency of evidence to support the special master's findings. *See e.g., North Snake Ground Water District v. Gisler*, 136 Idaho 747, 40 P.3d 105 (2002).

seeking to participate to remedy the procedural irregularity. This Court also noted that the legal issue also had the likelihood of extending beyond the facts of this consolidated subcase. ***Order Granting Participation to Gene Bray, Et Al,; City Of Boise; and State of Idaho: and Order Denying Motion To Conduct Limited Discovery; and Order Modifying July 25, 2003, Scheduling Order,*** Consolidated Subcase 91-63 (Nov. 4, 2003).

For these reasons, the argument to dismiss the Conservation Objectors from the consolidated subcase for lack of standing is **Denied**.

## VII. MOTION TO STRIKE

Pioneer and Settlers Irrigation Districts filed a *Motion to Strike* the *Motion for Summary Judgment* and supporting briefing filed by the Conservation Objectors because the Conservation Objectors did not file any supporting affidavits and instead joined in with the BOR, relying on the BOR's affidavits. The Court declines to strike the Conservation Objector's briefing or their *Motion* on this basis. First, the parties filed cross-motions for summary judgment in a case tried before a judge, in essence stipulating that there are no issues of fact to be decided. This Court also views the issue as purely one of law. No party has argued to the contrary. The affidavits filed by the other parties do not put any facts at issue, nor are they dispositive of the issue. Consequently, the failure to file supporting affidavits in this particular case is not fatal to the *Motion*. More importantly, in the past it has been a routine practice in SRBA subcases involving a large number of parties to allow parties with aligned positions join in with the arguments, pleadings, etc. of other parties to preserve the opportunity to be heard while reducing the redundancy and volume in the in the filings. *In Re SRBA Case No 39576 State v. United States*, 128 Idaho 246, 912 P.2d 614 (1995), the Idaho Supreme Court observed that water adjudications present unique circumstances often requiring a departure from established rules of procedure.

> It must be remembered that a suit to determine the priority and amount of water that each user from a stream is entitled to is somewhat different from the ordinary action, and the general rules of pleading have never

> been technically observed or strictly enforced in this class of cases, for if they were, in many cases where there are a hundred or more parties to the action the pleadings would be very voluminous.

*Id.* (quoting *Joyce v Rubin*, 23 Idaho 296, 303, 130 P. 793, 795 (1913) at 254, 912 P.2d at 622). The Court is unwilling to change this policy at this juncture. The *Motion to Strike* is **Denied**.

## VIII. STANDARDS OF REVIEW

### A. Standard of review for summary judgment.

Summary judgment is appropriate where the pleadings, depositions, admissions and affidavits on file show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. I.R.C.P. 56(c); *City of Idaho Falls v. Home Indemnity Co.*, 126 Idaho 604, 606 (1995). The burden of proving the absence of a genuine issue of material fact rests with the moving party. *G and M Farms v. Funk Irrigation Co.*, 119 Idaho 514, 517 (1991). The Court must also liberally construe facts and inferences contained in the existing record in favor of the party opposing the motion. *Bonz v. Sudweeks*, 119 Idaho 539, 541 (1991).

However, to withstand a motion for summary judgment, the opposing party's case must be anchored in something more solid than speculation. A mere scintilla of evidence is insufficient to create a genuine issue of material fact. *Edwards v. Conchemco, Inc.*, 111 Idaho 851, 853 (Ct. App. 1986). The party opposing the motion may not merely rest on the allegations contained in the pleadings, rather evidence by way of affidavit or deposition must be produced to contradict the assertions of the moving party. I.R.C.P. 56(e); *Ambrose v. Buhl Joint School Dist. # 412*, 126 Idaho 581, 584 (Ct. App. 1995). Supporting and opposing affidavits must be made on personal knowledge, must set forth facts as would be admissible in evidence, and must show affirmatively that the affiant is competent to testify to the matters stated therein. I.R.C.P. 56(e).

When cross-motions for summary judgment are filed and evidentiary facts are not disputed and the trial court rather than a jury will be the trier of fact, summary judgment is appropriate, despite the possibility of conflicting inferences because the court alone will be responsible for resolving those inferences. *First Security Bank of Idaho v. Murphy*, 131 Idaho 787, 790, 964 P.2d 654, 657 (1998)( citing Riverside Development Co. v. Ritchie, 103 Idaho 515, 544 P.2d 657 (1982).

**B. The Presumptive Effect of the Director's Report.**

The *Director's Reports* recommended the rights in the name of the BOR and recommended disallowed the corresponding claims filed by the Irrigation Entities. The Director's Report has prima facie weight as set forth in I.C. § 42-1411(4)-(5). The prima facie weight constitutes a rebuttable evidentiary presumption. *See, e.g. State v. Hagerman Water Right Owners, Inc.*, 130 Idaho 736, 745, 947 P.2d 409, 418 (1997). The rebuttable presumption shifts the burden of production, which means the party in whose favor the presumption operates is relieved from having to introduce further evidence of the presumed facts until the opponent introduces substantial evidence to the contrary. *Id.* at 745, 947 P.2d at 418. Once the presumption is rebutted, the facts upon which the presumption are based are weighted with all other relevant facts. *Id.* (citing McCormick, Evidence § 345, at 823 (1972)).

However, the presumptive weight accorded the Director's Report goes only to facts and not to the law or the application of the law to the facts. *In Re SRBA Case No 39576 State v. United States*, 128 Idaho 246, 912 P.2d 614 (1995), the Idaho Supreme Court made this clear in the context of the Court's role with respect to the "unobjected to" portions of the director's report. "Stripping the district court of the ability to review the contents of the Director's report and apply the law to the facts as established in that report is an unconstitutional intrusion of the province of the judicial department of the government." *Id.* at 259, 912 P.2d at 627. Simply put, a party is not entitled to rely on the presumptive weight of the director's report as concerns legal issues or the application of law to presumed facts.

The Conservation Objectors raised the issue that the Irrigation Entities failed to introduce substantial evidence to rebut the *Director's Report and Recommendation*, which relies on former decrees and licenses as the basis for its recommendation. In this case, the facts are not contested; rather, it is the application of the law to the existing facts that is before the Court.

**C. The Effect of a Prior Decree or License in the SRBA.**

The law of the case in the SRBA precludes the outcome of an administrative license proceeding from being collaterally attacked in the SRBA. *See Order on Challenge (Consolidated Issues) of "Facility Volume" Issue and "Additional Evidence" Issue*, p. (Dec. 29, 1999)(citing *Bone v. City of Lewiston*, 107 Idaho 844, 693 P.2d 1046(1984)). The exclusive remedy is (was) to contest the permit application in the proper administrative proceeding and if necessary through judicial review pursuant to the Administrative Procedures Act. *Id.* Prior decrees in private adjudications are only binding on the parties or their privies to the prior adjudication. *State v. Hagerman Water Right Owners*, 130 Idaho 736, 741, 947 P.2d 409, 414 (1997). However, a license or a prior decree is only evidence of the water right in the SRBA, it is not conclusive proof, because the elements of the water right are not insulated from re-examination. Elements can subsequently be changed voluntarily such as through contract or by operation of law (i.e. forfeiture or abandonment). *Id.*

## VII. DISCUSSION

**A. Historical Context, Purpose and Operation of the Reclamation Act.**

**1. Purpose of Reclamation Act.**

In general terms, the Reclamation Act of 1902, ch. 1093, 32 stat. 388 codified at 43 U.S.C. 370 *et seq*., (Act or Reclamation Act) was enacted for the purpose of addressing the need for construction of large scale irrigation projects (dams, canals, and reservoirs, etc.) necessary for the reclamation of lands susceptible to irrigation in

seventeen western arid states, including Idaho. *See generally* Trelease, Frank J. *Reclamation Water Rights*, 32 Rocky Mtn. L. Review 465-66 (1960); 4 Water and Water Rights §§ 41.01 and 41-02 (1996). The Reclamation Act established a means for financing such large scale projects and settlement that private capital had previously been unable to achieve through prior legislative attempts such as the Mining Act of 1866, the Desert Land Act of 1877, the Carey Act of 1894, and the Homestead Act of 1862. *Id.* The common policy underlying each of these prior legislative attempts was to promote the settlement of the west through the disposition of the public domain. These attempts authorized the entry, settlement and eventual ownership of such lands. Implicit in the operation of all of these prior attempts was the acknowledgement of the paramount importance of the water used to develop the land. *See discussion Memorandum Decision and Order on Challenge* (Scope of PWR 107 Reserved Rights), SRBA Case No. 39576, Consolidated Subcase Nos. 23-10872 et seq. (Dec. 28, 2001)(discusses at length the role water played in various entry laws).

The original version of the Reclamation Act authorized the Secretary of Interior ("Secretary") to conduct examinations of public lands suitable for large scale irrigation projects. *Reclamation Act* § 2. Suitable lands would then be withdrawn from entry except under then-existing homestead laws subject to various additional conditions on the entry not required under the Homestead Act. *Reclamation Act* § 3. The large-scale projects were to be constructed on the public lands and initially intended to be financed through the sale of other public lands. *Reclamation Act* § 1. Entries could then be made on the lands within the project area. Project costs would then be apportioned among entrymen within the project and paid back in installments over a ten-year period.[6] *Reclamation Act* § 4. Installments were intended to be paid into a revolving account and used to finance further reclamation projects. After an entryman complied with the entry requirements, including reclaiming at least one-half of the irrigable acreage of the entry as required under the Act, and paid the government the charges apportioned against the land, a patent for the land would then be issued. *Reclamation Act* § 5. Failure to satisfy

[6] Early in the program it became apparent that irrigators had difficulty meeting the 10 year repayment period, and Congress enacted a number of subsequent amendments to address the problem, which among other things, extended the repayment period.

payments would render the entry subject to cancellation and forfeiture of any moneys already paid. *Id.* Pre-existing landowners and entrymen, where entry was made prior to the reclamation withdrawal within a project area, could also purchase water rights developed under the project subject to various conditions and limitations.

**2. Water Rights Under Early Version of Reclamation Act.**

Although the original version of the Reclamation Act expressly provided that the title to reservoirs and irrigation works would remain in the government, (unless otherwise provided), the Reclamation Act, as well as its various subsequent amendments, was vague at best regarding the ownership of the water rights made available by the project. The regulations pertaining to the implementation of provisions of the Act, however, do shed some light on the ownership of water rights.

In practice, under the Reclamation Act, the Secretary of the Interior would apply with the state for the water rights to be developed under the project in accordance with state law procedures governing water rights. Ultimately a water right or rights for the entire project would be issued in the name of the United States. Entrymen and private landowners within the project area would make application for water rights and enter into separate contracts with the Secretary for the payment of installments and the terms and conditions of delivery. Following the satisfaction of installments, except continuing operation and maintenance charges, entrymen within the project would be issued a patent for the land with appurtenant water rights. Pre-existing landowners within the project would be issued water right certificates evidencing a water right subject to a lien by the United States for continuing operation and maintenance charges. Section 5 of the Reclamation Act provided:

> No right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one land owner, and no such sale shall be made to any land owner unless he be an actual *bona fide* resident on such land, or occupant thereof residing in the neighborhood of said land, **and no such right shall permanently attach until all payments therefore are made** (emphasis added).[7]

[7] This provision was clearly an attempt to eliminate the abuses aimed at the monopolization of water that were rampant under previous entry laws. *See discussion Memorandum Decision and Order on Challenge*

Section 8 of the Act provided:

> That nothing in this Act shall be construed as affecting or intending to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested rights acquired there under, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed inconformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any land owner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: ***Provided*, that the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and the beneficial use shall be the basis, the measure, and the limitation of the right** (emphasis added).[8]

---

(Scope of PWR 107 Reserved Rights), SRBA Case No. 39576, Consolidated Subcase Nos. 23-10872 et seq. (Dec. 28, 2001). Nonetheless the language states that water rights would be sold to individual landowners within the project which contemplates that landowners within the project would have an ownership interest in the water rights.

[8] Again, the language implies that the landowners within the project would have an interest in the water rights. First, the statute provides that the right "shall be appurtenant to the land irrigated." In the context of water rights the term "appurtenancy" means more than simply "used in conjunction with." The legal term "appurtenancy" connotes a unity of title relationship between the land and the water right. *See Memorandum Decision and Order on Challenge*, SRBA Case No. 39576, Subcases 55-10288 *et.al.* (April 25, 2000)(discusses use of term "appurtenancy" in holding private stockwater rights perfected on public grazing lands are not as a matter of law *per se* appurtenant to land because of the non-unity of title between landowner and appropriator); see also Clesson S. Kinney, *Kinney On Irrigation and Water Rights* § 1011 (2d Ed. 1912). Kinney's treatise states:

> The doctrine is well settled in the states of the arid region, that a water right used in conjunction with a certain tract of land for the irrigation thereof, where necessary to the beneficial enjoyment of the land, together with the ditch, canal or other works necessary to conduct the water to the place of use, become appurtenances to the land, **provided that they are all owned by the same parties. But they must be the property of the owner of the land to which it is claimed they are appurtenant, and not the property of another.**

Kinney § 1011(emphasis added). Further,

> [W]here one in possession of a tract of land, simply under a contract from the owner, appropriates and uses water upon the land, such a water right does not become appurtenant to such lands, without a conveyance in writing to the owner of the lands, there being no unity of title.

Kinney § 1020. Next, the section 8 provides that "beneficial use shall be the basis, the measure, and the limitation of the right." Accordingly if the scope of the right is to be measured by beneficial use and the land owner, not the BOR, is the party beneficially using the right, again the implication is that the beneficial user would have an interest in the water right.

Although the Reclamation Act has been amended and supplemented since its enactment, none of the amendments expressly alter, supplement or clarify treatment of water rights as expressed in the original version of the Act. [9]

The early regulations governing the implementation of the Reclamation Act did address ownership of water rights. The Department of Interior, *General Reclamation Circular, Laws and Regulations Relating to the Reclamation of Arid Lands by the United States* (*General Reclamation Circular*), approved May 18, 1916, reported at 45 Pub. Lands Dec. 385 (1916), specifically delineated between entrymen who entered project lands under the homestead provisions of the reclamation act and private landowners or those who entered project lands pursuant to homestead or other entry laws prior to the reclamation withdrawal for the project. In the case of lands held in private ownership and homestead entries made prior to the reclamation withdrawal, following proof of reclamation and payment of charges, a "final water right certificate" would issue. The regulations provide **"[t]he execution of a final water right certificate has the effect of vesting in the water-right applicant absolute title to the water right involved, subject in case of partial payment to a lien for the payment of all sums still due, and in all cases to the payment of annual charges for operation and maintenance."** [10] *General Reclamation Circular* at 19, ¶ 64 (emphasis added). In the case of homestead entries made pursuant to the Reclamation Act, following proof of compliance (satisfaction of reclamation and payment of charges) a patent, subject to a lien for continuing charges, could then issue. *Id.* at 19, ¶ 62. Final water right certificates were not required and not issued for lands entered under the provisions of the Reclamation Act, entries on ceded Indian lands and desert-land entries. However, the "patent in each of such cases carries with it the water right to which the lands patented are entitled." *Id.* at 20, ¶ 70. As to all landowners or entrymen within the project the regulations provided:

---

[9] Additionally, none of the delivery contracts entered into between the BOR and the Irrigation Entities involved in this case, define, address or attempt to clarify the ownership of project water rights.

[10] The final water right certificates were recorded in record books maintained by the General land Office. The record books served as "the official record of the United States in respect of water rights under reclamation projects and serve[d] a purpose similar to that of the records of county recorders or of the records of the Recorder of Patents in the General Land Office." *General Reclamation Circular* at 20, ¶¶ 66-69.

> The purpose of the reclamation law is to secure the reclamation of arid or semi-arid lands and to render them productive, and section 8 [of the Reclamation Act] declares that the right to the use of the water acquired under this act shall be appurtenant to the land irrigated and that 'beneficial use shall be the basis, the measure, and the limit of the right.' There can be no beneficial use of water for irrigation until it is actually applied to reclamation of the land. The final and only conclusive test of reclamation is production. This does not necessarily mean the maturing of a crop, but does mean the securing of actual growth of a crop. The requirement as to reclamation imposed upon lands under homestead entries applies likewise to lands in private ownership and land entered prior to the withdrawal – namely, that the landowner shall reclaim his land as required by law, and **no right to the use of water will permanently attach until such reclamation has been shown.**

*Id.* at 23, ¶ 79 (emphasis added). The subsequent amendments to the Reclamation Act regarding the administration of repayment and water service contracts (see *infra* A.2.) also refer to the contracting party having a "permanent right to such share or quantity" upon completion of payment. 43 U.S.C. § 485h-1(6).

The Reclamation Act is somewhat vague as to the specifics of the ownership of water rights. However, it is still apparent from the original version of the Act, its subsequent amendments, accompanying regulations and the early practices of the BOR that landowners within the project were intended to have an interest in the water right, even though the right for the entire project was licensed or decreed in the name of the United States.

### 3. Subsequent Amendments, Irrigation Districts and Delivery Contracts

In 1922, the original version of the Reclamation Act was amended to allow the Secretary to contract with irrigation districts established pursuant to state law and dispense with the water right applications on the part of individual water users. Act of May 15, 1922, ch.190, § 46, 42 Stat. 541 (current version at 43 U.S.C. § 511 (2003)). In 1926, the Act was further amended to require that all future BOR contracts be made with irrigation districts only. Act of May 25, 1926, ch.383, § 46, 44 Stat. 639, 649 (current version at 43 U.S.C. § 423e (2003)). The Act was later broadened in 1939 to allow contracts to be entered into with other types of water delivery entities and associations

organized pursuant to state law under three essentially standard types of contracts based on the repayment status of the project on the Act of Aug 4, 1939, ch.418, § 2, 53 Stat. 1187 (current version at 43 U.S.C. § 485g (2003)).

In general terms, "repayment" or "9(d)" contracts provide that the irrigation entity repay an appropriate share of the project's annual operating costs in advance of delivery and that it will repay the district's share of all construction costs allocated to irrigation in annual installments over a term of not more than forty years. The annual payments may be varied at the discretion of the Secretary in light of economic factors pertinent to the organization's ability to pay. Upon the completion of the capital repayment, the entity obtains a first right to receive a stated share of the project's available water into perpetuity, subject only to the continued payments of the required share of operating costs. 43 U.S.C. § 485h (d)(1)-(4)(2003)(original version Act of Aug 4, 1939, ch.418, § 9(d) 53 Stat. 1187, 1195.

"Water service" or "9(e)" contracts permit the Secretary to enter into a water service contract with the irrigation entity at a rate fixed to cover an appropriate share of the project's operating and maintenance costs and only that share of construction costs as the Secretary deems proper. The term may be for any period up to forty years. Apparently water service contracts were designed for situations where the total repayment of all construction costs in 40 years, as in the case of a repayment contract, would be beyond the ability of the water users to pay. However, in 1956, the statutes were amended to provide for the automatic renewal of 9(e) water service contracts essentially according the same rights as with the 9(d) repayment contract.[11] Act of July 2, 1956, ch. 492, § 1, 70 Stat. 483 (Current version at 43 U.S.C. 485h-1(1)-(6)(2003)). The statute provides for a "permanent right" upon completion of payment of amount assigned subject to payment of appropriate share of costs for operation and maintenance. 43 U.S.C. § 485h-1(4).

[11] The amendment was the result of the California Supreme Court's ruling in *Ivanhoe Irr. Dist. v. All Parties*, 47 Cal. 2d. 597 (1957), rev'd on other grounds, *Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275 (1958). In *Ivanhoe*, project customers challenged water service contracts in part on the grounds that the service contracts did not provide a provision for automatic renewal. The California Supreme Court held that the contracts violated the due process clause by imposing a 'burden under which the customers may suffer the loss of water rights at the discretion of the United States." *Id.* at 643. The U.S. Supreme Court reversed in part because the statue was subsequently amended in the interim.

The Warren Act of 1911, Act of Feb. 21, 1911, ch. 141, §§ 1 and 2, 36 Stat. 925, 926, (current version 43 U.S.C.523, 524 (2003), authorized the Secretary to enter into contracts with a private party already holding a permitted or adjudicated water right to use the excess capacity in existing project facilities for the storage and distribution of that right. Section 1 contracts are limited to the excess capacity or surplus, secondary to rights of lands and entrymen developed under the project and limited to private lands within the project area. Section 2 contracts authorize the Secretary to contract with the private party water right holder to construct facilities in excess of those needed under the project and then be incorporated into the project or to contract for the construction of additional capacity to an existing project. Section 2 contracts do not have the same limitations and restrictions as section 1 contracts. In the case of Warren Act contracts because the contracting party already holds water rights, the right at issue is the complementary storage right.

None of the statutes authorizing the different types of contracts expressly alter the treatment of water rights contained in the original version of the Act or its accompanying regulations. The statutes authorizing repayment and service contracts also speak in terms of permanent or perpetual rights. None of the parties argue that the ownership interest at issue is contingent on the type of delivery contract entered into with the BOR. This question was specifically asked by the Court at oral argument.

**B. The Boise Project**

At issue are the water rights and/or storage rights associated with the Boise Project.

**1. Authorization and Construction**

The initial investigations into the feasibility of the Boise Project took place in the summer of 1902. Those investigations included surveys of the Deer Flat area and potential canal routes. The investigations continued through 1904, when Bureau of Reclamation engineers deemed the project feasible. Wm. Joe Simonds, THE BOISE PROJECT ¶ 6 http://www.usbr.gov/dataweb/projects/idaho/boise/history.html.

Because much of the lands within the project area were privately held or under control of the state, the Bureau of Reclamation felt it was essential to form an association of potential local users before the project was authorized. In December 1903, community leaders in the Boise and Payette Valleys made efforts to form a formal water user association. In March of 1904, a petition signed by land owners and a resolution by the state board of land commissioners pledged cooperation with the Bureau of Reclamation. The private land owners held a total of 90,000 acres, and the state board of land commissioners held an additional 60,000. With the pledges of cooperation, the Secretary of Interior resumed investigations for the project in April 1904.*Id* at ¶ 7.

The Payette-Boise Project was formally authorized Pursuant to the Reclamation Act on March 27, 1905. The project was renamed the Boise Project in 1911. The plan for the Project called for a diversion dam on the Boise River that would transport water to an offstream storage reservoir at Deer Flat (now Lake Lowell) and a second reservoir on the upper Boise River. The upper reservoir would be created by the construction of Arrowrock Reservoir, which was authorized on January 6, 1911. Anderson Ranch Dam and Reservoir were authorized by the Secretary of Interior on August 12, 1940 under the provisions of the Reclamation Project Act of 1939 . Wm. Joe Simonds, THE BOISE PROJECT ¶ 5 http://www.usbr.gov/dataweb/html/boiseh.html.

Construction began on the first portion, Deer Flat or Lake Lowell, on March 6, 1906. The project consisted of a newer diversion dam on the Boise River that would divert water into enlarged existing canals (including the New York Canal) and new canals. This canal system stretched 40 miles to the new Deer Flat Reservoir or Lake Lowell. The majority of the system was completed by the end of 1910, and water was diverted by the Boise River dam into the new system in 1909. *Id* at ¶ 9-22.

Construction began on Arrowrock Dam and Reservoir, on the headwaters of the Boise River, in 1911. When completed in November 1915, Arrowrock Dam was the tallest dam in the world. *Id.* at ¶22-40. In the late 1930's Bureau of Reclamation engineers began investigating ways to furnish additional water to lands within the Arrowrock Division. In August 1941, construction began on the South Fork of the Boise River for the Anderson Ranch Dam. After a series of challenges and delays due to

construction difficulties and World War II, the project was fully operational in mid-1951. *Id.* ¶60-72. In 1955, The U.S. Army Corps of Engineers completed Lucky Peak Dam, located about a mile upstream of the Boise Diversion Dam. The reservoirs created by Arrowrock, Lucky Peak and Anderson Ranch are operated jointly. *Id* at ¶90.

**2. Prior Licenses and Decrees of Project Appropriations**

After Arrowrock Reservoir was authorized, the BOR applied to the Idaho State Engineer for a permit to "appropriate [8,000 cubic feet per second of] the public waters of the state of Idaho" for irrigation and domestic use in connection with Arrowrock Reservoir. The permit was approved in 1911, and license No. 7180 was issued in 1924 for 8,000 cfs of water upon "all lands in the Boise Project . . . as set out in the Contracts made and entered into by and between he said canal companies and the United States Reclamation Service . . ." In 1929, Judge Bryan adjudicated water rights on the Boise River, including those for Arrowrock Reservoir. His ruling, which later became known as the *Bryan Decree,* held that the United States was entitled 8,000 cfs "for storage in Arrowrock Reservoir during the flood water season only and thereafter to be drawn out and used in the irrigation of lands of the Boise Project, and other lands entitled to the same." Many of the parties in this subcase were parties or are successors-in-interest to the parties to the Bryan Decree. In 1938, the BOR applied to the State for an additional permit to appropriate 15,000 additional acre-feet of water after an enlargement of Arrowrock. License No. R-652 (later renumbered 63-3613) was issued in 1955. It does not appear that there were protests filed to these applications.

In 1941, the BOR applied to the State Reclamation Engineer for a permit "to construct a reservoir and store and appropriate" 500,000 acre-feet of water from the South Fork of the Boise River for Anderson Ranch Reservoir. On December 17, 1956, the State issued License No. R-698 (later numbered 63-3614) to the United States to divert and store up to 493,000 acre-feet of water at the reservoir. It does not appear that protests were filed to this application, either.

The BOR applied to the State for a permit to appropriate at Lucky Peak Reservoir in 1963. After several extensions, water right license 63-03618 was issued to the BOR on

September 27, 2002. The license allowed 111,950 acre feet of water for irrigation storage and irrigation from storage, 28,800 acre-feet for recreation/inactive storage and 152,300 acre-feet for stream flow maintenance storage and stream flow maintenance from storage. No protests were filed to the BOR being named the owner of the water right, although apparently protests were filed seeking to clarify that the Lucky Peak water would be limited to supplying supplemental water for presently irrigated lands.

### C. The United States Supreme Court has Defined the Relationship Between the BOR and the End Water Users as Concerns the Water Rights Developed under the Project.

On three separate occasions the United States Supreme Court has addressed the issue of the ownership of water rights developed under reclamation projects as between the BOR and the landowners within the project. The Supreme Court's treatment of the rights is consistent with the historical treatment of project rights by the BOR. Justice Rehnquist observed in *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978):

> The history of the relationship between the Federal Government and the States in the reclamation of the arid lands and the western states is both long and involved, but through it runs the consistent thread of purposeful and continued deference to state water law by Congress.

Recognition of the right of a State to control waters within its boundaries is explicit in Section 8 of the Reclamation Act, 43 U.S.C.A. §383, which provides:

> Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

Further, §372 of the Act provides that use of water from reclamation projects is appurtenant to the land irrigated:

> The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right.

It is not surprising, therefore, that the United States Supreme Court has ruled on three separate occasions spanning nearly fifty years that the land owners who use water diverted, stored and delivered by the United States pursuant to the Reclamation Act have an ownership interest in water rights associated with that water. The nature of that water right has been defined in the cases.

In *Ickes v. Fox*, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937), the United States attempted to reduce water available to irrigators operating pursuant to contracts with the government in a Reclamation Project in order to coerce the irrigators to pay additional fees associated with constructing another reclamation project. The United States claimed that it could control the quantity of water delivered because was the owner of the water rights. The Court held:

> [A]lthough the government diverted, stored and distributed the water, the contention of the petitioner [Secretary of the Interior] that thereby ownership of the water became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the landowners; and by the terms of the law and of the contract already referred to, the water rights became the property of the landowners, wholly distinct from the property right of the government in the irrigation works. Compare *Murphy v. Kerr*, (D.C.) 296 F. 536, 544, 545. The government was and remained simply a carrier and distributor of the water (*Id.*), with the right to receive the sums stipulated in the contracts as reimbursement for the cost of construction and annual charges for operation and maintenance of the works. As security therefore, it was provided that the government should have a lien upon the lands and the water rights appurtenant thereto—a provision which in itself imports that the water rights belong to another than the lienor, that is to say the landowner.

300 U.S. 82, 94, 95, 57 S.Ct. 412, 416, 417.

This holding was reaffirmed in *Nebraska v. Wyoming*, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945). That case involved a dispute between Nebraska, Wyoming and Colorado over the use of water in the North Platte River. The United States intervened, claiming that it was the owner of all unappropriated water in the river by virtue of cessions from France, Spain and Mexico. The United States claimed that it still owned those water rights to the extent that it had not disposed of them, despite the fact that there were projects in the basin constructed and operated under the Reclamation Act. The Court first quoted the provisions of Section 8 of the Reclamation Act, §§372 and 383 as set forth above. The Court then noted that the projects in the basin were constructed pursuant to the Reclamation Act beginning with claims for water rights filed under state law by the Secretary of the Interior. The Court observed:

> [I]ndividual water users contracted with the United States for the use of project water. These contracts were later assumed by the irrigation districts. Irrigation districts submitted proof of beneficial use to the state authorities on behalf of the project water users. The state authorities accepted that proof and issued decrees and certificates in favor of the individual water users. The certificates named as appropriators the original landowners. They designated the number of acres included, the use for which the appropriation was made, the amount of the appropriation, and the priority date. The contracts between the United States and the irrigation districts provided that after the stored water was released from the reservoir it was under the control of the appropriate state officials.
>
> All of these steps make plain that those projects were designed, constructed and completed according to the pattern of state law as provided in the Reclamation Act. We can say here what was said in *Ickes v. Fox*, (Citation omitted):
>
> > "Although the government diverted, stored and distributed the water, the contention of the petitioner [Secretary of the Interior] that thereby ownership of the water became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the landowners; and by the terms of the law and of the contract already referred to, the water rights became the property of the landowners, wholly distinct from the property right of the government in the irrigation works. Compare *Murphy v. Kerr*, (D.C.) 296 F. 536, 544, 545. The government was and remained simply a carrier and distributor of the water (Id.), with the right to receive the sums stipulated in the contracts as reimbursement for

> the cost of construction and annual charges for operation and maintenance of the works."
>
> The property right in the water right is separate and distinct from the property right in the reservoirs, ditches or canals. The water right is appurtenant to the land, the owner of which is the appropriator. The water right is acquired by perfecting an appropriation, i.e., by an actual diversion followed by an application of the water to a beneficial use. (Citations omitted). Indeed, §8 of the Reclamation Act provides as we have seen that "the right to use the water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."
>
> We have then a direction by Congress to the Secretary of the Interior to proceed in conformity with state laws in appropriating water for irrigation purposes. We have a compliance with that direction. Pursuant to that procedure individual landowners have become appropriators of the water rights, the United States being the storer and the carrier. We intimate no opinion whether a different procedure might have been followed so as to appropriate and reserve to the United States all of these water rights. No such attempt was made. Though we assume arguendo that the United States did own all of the unappropriated water, the appropriations under state law were made to the individual landowners pursuant to the procedure which Congress provided in the Reclamation Act. The rights so acquired are as definite and complete as if they were obtained by direct cession from the federal government. Thus even if we assume that the United States owned the unappropriated water rights, they were acquired by the landowners in the precise manner contemplated by Congress.

325 U.S. 589, 613-615, 65 S.Ct. 1332, 1348-1349.

The Court most recently revisited this issue in *Nevada v. United States*, 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). This case had its origins in 1913 when the United States sued in Federal District Court for an adjudication of the water rights on the Truckee River for the benefit of the Pyramid Lake Indian Reservation and for the Newlands Reclamation Project in what became known as the *Orr Ditch* case. Named as defendants were all water users on the Truckee River in Nevada. In 1944, a final decree was entered. Then, in 1973, the United States filed another action on behalf of the Pyramid Lake Indian Reservation claiming additional rights. The suit was dismissed on the grounds of *res judicata.* The Court of Appeals reversed in part allowing the United States to proceed. On appeal, the United States argued that it had been granted irrigation

rights for the reclamation project in the earlier adjudication and that it was simply reallocating that water to use on the reservation with an earlier priority date. The Court observed:

> The Government opens the "Summary of Argument" portion of its brief by stating: "The court of appeals has simply permitted a reallocation of the water decreed in *Orr Ditch* to a single party – the United states – from reclamation uses to a Reservation use with an earlier priority. The doctrine of *res judicata* does not bar a single party from reallocating its water in this fashion…." Brief for United States 21. We are bound to say that the Government's position, if accepted, would do away with half a century of decided case law relating to the Reclamation Act of 1902 and water rights in the public domain of the West.
>
> It is undisputed that the primary purpose of the Government in bringing the *Orr Ditch* suit in 1913 was to secure water rights for the Newlands Project, and that the Government would be acting under the aegis of the Reclamation Act of 1902 in bringing that action.

463 U.S. 110, 121, 103 S.Ct. 2906, 2914. The Court then quoted Section 8 of the Act as set forth herein and stated:

> In *California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), we described in greater detail the history and structure of the Reclamation Act of 1902, and stated:
>
> > "The Projects would be built on federal land and the actual construction and operation of the projects would be in the hands of the Secretary of the Interior. But *the Act clearly provided that state water law would control in the appropriation and later distribution of the water." Id.*, at 664, 98 S.Ct., at 2995 (emphasis added by the Court).

463 U.S. 110, 122, 103 S.Ct. 2906, 2914. The Court then quoted the relevant language from *Ickes v. Fox*, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937), and *Nebraska v. Wyoming*, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945) and held:

> In light of these cases, we conclude that the Government is completely mistaken if it believes that the water rights confirmed to it by the *Orr Ditch* decree in 1944 for use in irrigating lands within the Newlands Reclamation Project were like so many bushels of wheat, to be bartered, sold, or shifted about as the Government might see fit. Once these lands were acquired by settlers in the Project, the Government's "ownership" of the water rights was at most nominal; the beneficial interest in the rights confirmed to the Government resided in the owners of the land within the

> Project to which these water rights became appurtenant upon application of the project water to the land. As in *Ickes v. Fox* and *Nebraska v. Wyoming*, the law of [the] relevant State and the contracts entered into by the landowners and the United States make this point very clear.

463 U.S. 110, 126, 103 S.Ct. 2906, 2916.

The Court's ruling in *Nevada v. United States* summarizes prior rulings and plainly holds that the interest of the United States in water rights acquired for irrigation use in projects constructed and operated pursuant to the Reclamation Act of 1902 is a nominal interest only and that the land owners within the project own a beneficial interest in those water rights. For this Court to rule otherwise would "do away with half a century of decided case law relating to the Reclamation Act of 1902."[12] Accordingly, this Court rules that the United States owns only a "nominal interest" or legal title to the water rights in question and that those rights are held by the United States for the owners of the beneficial interest--the land owners within the Reclamation Projects.

## D. The Relationship between the BOR and the Irrigation Entities is Somewhat Analogous to the Relationship between an Irrigation District and the Water Users Within the District.

The BOR argues that it perfected the rights exclusively pursuant to state law and cites ART 15 §§ 1 and 4 of the Idaho Constitution for the proposition that BOR could perfect water rights for sale, rental or distribution without being the actual beneficial user of the water right. This Court agrees that a water right can be perfected without the

---

[12] In a 1989 Interior Department decision regarding the obligation of the United States in general adjudications with respect to reclamation project water rights, the Solicitor for the Dept. of Interior concluded:

> With the issuance of Nevada v. United States, the Supreme Court, conclusively reaffirmed the concept that beneficial ownership of a reclamation project water right is in the water users who put the water to beneficial use.

*Filings of Claims for Water Rights in General Stream Adjudications*, 97 I.D. 21, 27 (1989). Further,

> In the recent Nevada v. United States decision, the Supreme Court reaffirmed that the beneficial ownership of reclamation project water rights is in the water user who puts the water to beneficial use, and that, when the United States retains legal title to project rights, the Government is obligated to project water supplies.

owner of the right being the actual beneficial user of the right. The SRBA frequently deals with the situation where the appropriator of the water right does not own the land on which the water right is used, such as in the case of the appropriation of water on public lands. The law of the case holds that the ownership of the right is determined based on the nature of the agreement or relationship between the appropriator and the landowner. *See Memorandum Decision and Order on Challenge*, SRBA Case No. 39576, Subcases 55-10288 *et.al.* (April 25, 2000)(addresses situation where non-unity of title exists between landowner and appropriator). A commercial ditch company presents a similar situation. The company owns the water rights and rents or distributes the water to end users. Any interest the end water users have in the water rights is solely limited to their service contracts or leases. The ditch company is not the actual beneficial user of the water right.

The BOR would argue that its relationship with the Irrigation Entities (or end water users) is similar to the relationship between a commercial ditch company and the parties who contracted for use of the water owned by the company. The BOR argues that because the Idaho Constitution allows this manner of appropriation (most states do not) that state law dictates that the BOR should be named the exclusive owner of the water right. The BOR argues that any interest that the Irrigation Entities may have is limited to the contract and that any relief for the BOR's failure to perform is limited to a breach of contract action. The problem with this argument is that was the very issue and concern which was addressed by the United States Supreme Court in *Ickes v. Fox, Nebraska v. Wyoming, and Nevada v. United States.* Those cases specifically defined the relationship between the BOR and the project water users. The very essence of those decisions is that the project water users have more than simply a rental or contractual interest in the project rights. As discussed earlier, the Act, the regulations issued in accordance with the Act and the solicitor's opinion regarding the treatment of project water in general adjudications all support this conclusion. Therefore, the BOR is not free to do as it pleases with the water and leave the water users to resort to a breach of contract action against the BOR as the sole remedy. Simply put, the relationship between the BOR and

---

*Id. at 32.* Apparently the United States acknowledged this same conclusion going into this

the Irrigation Entities or end water user is not the same as the relationship between a commercial ditch company and the water users to which it distributes water.

The Court views the relationship between the BOR and the Irrigation Entities more akin to the relationship between an irrigation district and the water users within the district, wherein water rights are decreed in the name of the irrigation district and by law the irrigation district holds the rights in trust for the water users within the district. *See* I.C. § 43-316. Since the Reclamation Act has passed, it has been interpreted in this fashion. Therefore the Court finds a remark clarifying the right to be appropriate.

**E. The Inclusion of Remark Clarifying the Nature of the Ownership Interest does not Constitute a Collateral Attack on a Former License or Decree.**

The subject rights were previously licensed or decreed. This Court acknowledges the prohibition against collaterally attacking a license as well as the *res judicata* effect on parties to a prior decree. However, the Court does not view all of the relief sought nor the relief ultimately granted as being inconsistent with these principles. The inclusion of a remark regarding equitable interest is not inconsistent with the prior license or the decree. I.C. § 42-1412 and 42-1411(2) and (3) specify what elements to include in a partial decree. One of the elements includes "such remarks and other matters as are necessary for the definition of the right, for clarification of any element of a right, or for the administration of the right by the director." In the interest of uniformity and brevity, referring to existing law in individual partial decrees is the exception and not the rule. The Court generally views it as unnecessary because parties have the right to rely on the backdrop of existing law for the definition and administration of their water right. The exception is when the application of the existing law is at issue. Without clarification of applicable law, the issues raised here potentially make the decree ambiguous without a clarifying remark. In such cases the Court allows a clarifying remark so as to avoid future controversy.

In the instant matter, the issue of the relationship between the BOR and project water users was never raised or litigated in either the licensing proceedings or in

---

adjudication.

conjunction with the *Bryan Decree*. Project water users were entitled to rely on the backdrop of existing law in defining the relationship between the BOR and project water users, irrespective of whether or not it was incorporated into the decree. For example, when water rights are decreed in the name of an irrigation district, the license or partial decree does not contain language to the effect that the rights are held in trust for the water users within the district as the relationship is defined by law. *See* I.C. § 43-316. The fact that the rights are decreed in solely in the name of the irrigation district does not alter that relationship.

In addition, only two of the licenses were issued post *Ickes*. For those that preceded *Ickes* it follows that parties would want this issue clarified or memorialized in a partial decree to avoid future controversy following the United States Supreme Court's clarification of the law. For those licenses issued post *Ickes*, even though the issue was not raised in the licensing proceedings, the parties still had the right to rely on existing law. The Court finds that the position the BOR advocates is inconsistent with the law as it stood either before or after *Ickes*. Even shortly after the commencement of the SRBA the Solicitor for the Department of Interior concluded that *Nevada v. United States* reaffirmed the existing state of the law. *Filings of Claims for Water Rights in General Stream Adjudications*, 97 I.D. 21 (1989). To the extent the Court is now being asked to clarify existing law against which the water right holders were entitled to rely, the Court does not view that as a collateral attack on a prior license or decree. The Court views the matter as a clarification of a prior decree or license. The Court also finds it necessary to include a remark regarding the same so as to avoid having to readdress the issue at some point in the future.

Conversely, to the extent the Irrigation Entities seek to obtain full title (on behalf of their members) to the subject water rights -- that is inconsistent with existing law and would be a collateral attack on the prior decree or license. That issue should have been raised in the former proceedings.

## IX. CONCLUSION

Based upon the foregoing, the court rules as follows:

1. The Pioneer Irrigation District and Settlers Irrigation District *Motion to Strike* is **DENIED.**

2. The *Motion for Summary Judgment* of the United States is **DENIED.** The court rules that the United States Department of Interior, Bureau of Reclamation holds legal title to the water rights at issue subject, to the equitable or beneficial interest of the landowners within the irrigation districts described herein.

3. The *Motion for Summary Judgment* of Gene E. Bray, Thomas Stuart III, Thomas J. Cade and Amy Williams is **DENIED.**

4. The *Motion for Summary Judgment* of Farmer's Union Ditch Company, Ltd., Canyon County Water Company , Ltd., Middleton Irrigation Association, and Middleton Ditch Company is **GRANTED IN PART AND DENIED IN PART.** The water rights claimed by these entities (63-03613A, 63-3614C, 63-03618C, 63-03618D, 63-03618E, and 63-03618F) shall be disallowed. Provided, however, that Water Rights 63-03613, 63-03614 and 63-03618 shall be decreed in the name of the United States of America acting through the Bureau of Reclamation with a remark to the effect that the beneficial use of the water represented by the decree is held for the landowners within the respective irrigation districts as a matter of law and pursuant to contracts between the Bureau of Reclamation and the Irrigation Districts.

5. The *Motion for Summary Judgment* of Pioneer Irrigation District and Settlers Irrigation District is **GRANTED IN PART AND DENIED IN PART.** The water rights claimed by these entities (63-3614A, 63-3618A, 63-5262A, 63-3614B, 63-3618B and 63-5262B) shall be disallowed. Provided, however, that Water Rights 63-03614, 63-03618 and 63-303 shall be decreed in the name of the United States of America acting through the Bureau of Reclamation with a remark to the effect that the beneficial use of the water

represented by the decree is held in trust for the landowners within the respective irrigation districts as a matter of law and pursuant to contracts between the Bureau of Reclamation and the Irrigation Districts.

6. The *Motion for Summary Judgment* of Ballentyne Ditch Company, Boise Valley Irrigation Ditch Co., Eagle Island Water Users Association, Eureka Water Co., Farmer's Cooperative Ditch Co., Nampa & Meridian Irrigation District, New Dry Creek Ditch Company, South Boise Water Company and Thurman Mill Ditch Company is **GRANTED IN PART AND DENIED IN PART.** The water rights claimed by these entities (63-03618P, 63-03618H, 63-03614E, 63-03618N, 63-03618L, 63-00303A, 63-05262C, 63-03614F, 63-03618J, 63-03614D, 63-03618G, 63-03618K, and 63,03618M) shall be disallowed. Provided, however, that Water Rights 63-00303, 63-03614, and 63-03618 shall be decreed in the name of the United States of America acting through the Bureau of Reclamation with a remark to the effect that the beneficial use of the water represented by the decree is held for the landowners within the respective irrigation districts as a matter of law and pursuant to contracts between the Bureau of Reclamation and the Irrigation Districts.

7. The Motion for Summary Judgment of the Boise Project Board of Control and its member Irrigation Districts and Twin Falls Canal Company and others (collectively the Committee of Nine") is **GRANTED.** As set forth in this decision, the court recognizes the rights held by the Irrigation Districts pursuant to statute and also rules that the United States Bureau of reclamation holds legal title to the water rights discussed herein subject to the beneficial ownership of the landowners within the Irrigation Districts. Counsel for the Boise Project Board of Control, *et al.* have suggested a remark to be included in the decrees issued pursuant to this decision. The court notes that the suggested remark is, for the most part, consistent with this decision. The court shall, however, allow the parties a period of thirty days following the entry of this *Order* to stipulate to language for the remark. Unless such stipulation is filed with the Court within thirty days the Court shall determine the appropriate language for the remark. (Stipulating to proposed language

should not be construed as a waiver of the right to appeal from this decision or of any other right provided under the Idaho Rules of Civil Procedure).

8. Notice of Status Conference: This matter shall be set for status hearing on to discuss handling the remaining objections in the subcases and Rule 54(b) certification of this *Order*, if necessary. **The hearing is set for Tuesday, October 19, 2004, at 1:30 p.m., at the Snake River Basin Adjudication Courthouse, 253 – 3rd Avenue North, Twin Falls, Idaho. Parties wishing to participate by telephone may do so by dialing 1-918-583-3445 and, when prompted, entering the access code 406128.**

Dated September 1, 2004

JOHN M. MELANSON
Presiding Judge
Snake River Basin Adjudication