IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., | ) | |
| Plaintiffs, | ) | No. 01-591 L |
| v. | ) | Hon. Francis M. Allegra |
| UNITED STATES OF AMERICA, et al., | ) | |
| Defendants | ) | |

**PLAINTIFFS' MOTION FOR RECONSIDERATION OR CERTIFICATION**

Plaintiffs move this Court for reconsideration of its February 28, 2005, grant of intervention to the Pacific Coast Federation of Fishermen's Association (PCFFA). Plaintiffs submit that the Court's February 28, 2005 Order was based upon errors of law and fact so manifestly erroneous that, if unexamined, will work a grave injustice to Plaintiffs. Alternatively, Plaintiffs ask this Court to certify the question of law raised by the Court's February 28, 2005 Order under 28 U.S.C. 1292(d)(2). Since final judgment has not been entered in this case, this motion for reconsideration of the Court's grant of intervention to PCFFA is timely. *See* RCFC 59(b); *see also* Rules Committee Note, RCFC 59 ("[N]on-final orders . . . can be the subject of motions for reconsideration at any time before final judgment.").[1]

As grounds for its motion, Plaintiffs submit the accompanying Memorandum in Support of Plaintiffs' Motion for Reconsideration or Certification.

Respectfully submitted,

[1] In addition, Defendant counsel's has indicated that Defendant would not oppose the filing of the motion for reconsideration out of time; intervenor PCFFA has indicated that it would oppose the filing of a motion for reconsideration out of time.

s/ Nancie G. Marzulla

Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
202-822-6760
202-822-6774 (facsimile)

Dated: April 12, 2005

Attorneys for Plaintiffs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 01-591 L |
| UNITED STATES OF AMERICA, | ) | Judge Francis M. Allegra |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OR CERTIFICATION**

Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
202-822-6760
202-822-6774 (facsimile)

Dated: April 12, 2005

# TABLE OF CONTENTS


TABLE OF AUTHORITIES......................................................................................………........ii

QUESTIONS PRESENTED……………………………………………………………………v

PROCEDURAL BACKGROUND………………………………………………………..2

SUMMARY OF ARGUMENT…………………………………………………………...…2

REASONS FOR GRANTING THE MOTION FOR RECONSIDERATION OR CERTIFICATION……………………………………………………………………………...7

I. Standard of Review……………………………………………………………..7

II. PCFFA Lacks Any Interest in the Property or Transaction at Issue in This Case as Required by RCFC Rule 24(a)……………………………………………………….8

A. Intervenor Lacks any Property Interest in the Water Stored in Upper Klamath Lake…………………………………………………………..8

1. Reclamation Act of 1902…………………………………………………...11

2. Oregon Act of February 22, 1905……………………………………………..12

3. Reclamation's May 17, 1905 Notice of Appropriation………………………….14

B. PCFFA Has Not Asserted and Does Not Possess a Significant Legally Protectable Interest in the Transaction Related to the Property That is the Subject of This Action……………………………………………………………17

III. In the Alternative, Plaintiffs Ask This Court to Certify This Issue for Review by the Federal Circuit.……………………………………………………………………..21

CONCLUSION……………………………………………………………………………….23

APPENDIX OF EXHIBITS

A. Oregon Act of February 22, 1905, title 43, c. 288...…………………………………………….1

## TABLE OF AUTHORITIES

**Cases**

*Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181 (9th Cir. 2004)……………………….3

*American Maritime Transport, Inc. v. United States*, 870 F.2d 1559 (Fed. Cir. 1989)…...8, 17, 21

*Ammex, Inc. v. United States*, 52 Fed. Cl. 555 (2002) ……………………….………...........7

*Anderson Columbia Envtl. v. United States*, 42 Fed. Cl. 880 (1999)……………………….6-7, 21

*Commonwealth Edison Co. v. Train*, 71 F.R.D. 391 (N.D. Ill. 1976)…………………………...20

*Diamond v. Charles*, 476 U.S. 54 (1986)…………………………………………………………8

*Dill v. Killip*, 147 P.2d 896 (Or. 1944)……………………………………………………………9

*Donaldson v. United States*, 400 U.S. 517 (1971)……………………………………………….8, 17

*Freeman v. United States*, 50 Fed. Cl. 305 (2001)………………………………………………21

*Hage v. United States*, 35 Fed. Cl. 737 (1996)..........................................................................7

*Ickes v. Fox*, 300 U.S. 82 (1937)…………………………………………………………………13

*In Re Water Rights of Deschutes River and Tributaries*, 286 P. 563 (Or. 1930)………………….9

*Kandra v. United States*, 145 F.Supp.2d 1192 (D. Or. 2001)…………………………………20

*Nebraska v. Wyoming*, 325 U.S. 589 (1945)……………………………………………………..13

*Nevada v. United States*, 463 U.S. 110 (1983)…………………………………………………..13

*PCFFA v. Bureau of Reclamation*, 138 F.Supp.2d 1228 (N.D. Cal. 2001)……………………...20

*Skinner v. Silver*, 75 P.2d 21 (Or. 1938)……………………………………………………………10

*United States v. 38.96 Acres of Land*, 100 F.R.D. 78 (N.D. Id. 1983)…………………………..18

*United States v. Alisal Water Corporation*, 370 F.3d 915 (9th Cir. 2004)………………………18

*United States v. Atkinson*, 748 F.2d 659 (Fed. Cir. 1984)……………………………………...7

*Wade v. Goldschmidt*, 673 F.2d 182 (7th Cir. 1982)……………………………………………18

*Westlands Water Dist v. United States*, 700 F.2d 561 (9th Cir. 1983)……………………….17-18

**Federal Statutes**

Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (1902)…………………………..9, 11-12, 16-17

Klamath River Basin Compact, Pub. Law 85-222, 71 Stat. 497 (Aug. 30, 1957)……………….16

Endangered Species Act, 16 U.S.C. § 1533…………………………………………………….1, 3

16 U.S.C. § 1538……………………………………………………………………………..1, 3

28 U.S.C. 1292(d)(2)………………………………………………………………1, 22-23

**State Statutes**

Oregon Act of Feb 22, 1905, title 43, c. 288…………………………………………………….12

Or. Rev. Stat. § 540.510 (2001)………………………………………………………...10, 15

**Rules**

*Policy on Applying the Definition of Species Under the Endangered Species Act to Pacific Salmon*, 56 Fed. Reg. 58,612 (Nov. 20, 1991)……………………………………………3

*Interim Policy on Artificial Propagation of Pacific Salmon Under the Endangered Species Act*, 58 Fed. Reg. 17,573 (Apr. 5, 1993)……………………………………………….3

*Endangered and Threatened Species; Threatened Status for Southern Oregon/ Northern California Coast Evolutionarily Significant Unit (ESU) of Coho Salmon*, 62 Fed. Reg. 24588 (May 6, 1997)…………………………………………………………..3

*Endangered and Threatened Species; Interim Rule Governing Take of the Threatened Southern Oregon/Northern California Coast Evolutionarily Significant Unit (ESU) of Coho Salmon*, 62 Fed. Reg. 38479-01 (July 18, 1997)………………………………………1, 3-4

Fed. R. Civ. P. 24…………………………………………………………………………...21

RCFC 24……………………………………………………………..6, 8, 17, 20, 21-22

RCFC 59…………………………………………………………………………………….7

**Other Authorities**

Biological/Conference Opinion Regarding the Effects of Operation of the Bureau of Reclamation's Klamath Project On the Endangered Lost River Sucker, Endangered

Shortnose Sucker, Threatened Bald Eagle, and Proposed Critical Habitat for the Lost River/Shortnose Suckers, Klamath Falls Fish & Wildlife Office (Fish & Wildlife Service Apr. 5, 2001), *available at* http://www.usbr.gov/mp/kbao/esa/34_final_sucker_bo_4_06_01.pdf……………………………4

Biological Opinion, Ongoing Klamath Project Operations (National Marine Fisheries Service Apr. 6, 2001), *available at* http://swr.nmfs.noaa.gov/psd/klamath/KpopBO2002finalMay31.pdf……………………………4

*Conservation under the Endangered Species Act, A Promise Broken*, *available at* http://www.nwi.org……………………………………………………………………………..2

*Department Reacts to Federal ESA Decisions for Oregon and California Coho Salmon*, (Oct. 25, 1996), *available at* http://wdfw.wa.gov/do/1996/oreesa.htm ("[F]in clipping . . . allows fishers to identify and release wild salmon while keeping hatchery fish.")……………….2

*NOAA's Ark*, Eugene Weekly (Mar. 3, 2005), *available at* www.eugeneweekly.com/2005/03/03/coverstory.html…………………………………………...2

*Water Rights on Lower Klamath Lake*, 53 Interior Dec. 693 (June 9, 1932)………………..10, 15

## QUESTION PRESENTED

Is the Court's February 28, 2005 grant of intervention to PCFFA based upon errors of law and fact that will work a grave injustice upon Plaintiffs if unexamined?

**Memorandum in Support of**
**<u>Plaintiffs' Motion for Reconsideration or Certification</u>**

Plaintiffs ask this Court to reconsider its February 28, 2005, grant of Pacific Coast Federation of Fishermen's Association (PCFFA)'s motion to intervene. Alternatively, Plaintiffs ask this Court to certify the question of law under 28 U.S.C. 1292(d)(2). Plaintiffs submit that this grant of intervention is based upon errors of law and fact that, if unexamined, will work a grave injustice to Plaintiffs. Specifically, Plaintiffs' claims in this case are based on the Bureau of Reclamation's releases and retention of Klamath Project water required to protect fish listed under the Endangered Species Act. PCFFA asserts no claim to the right to the use of water, whether through the Klamath Project or otherwise. Rather, PCFFA members claim an interest in the harvesting of Pacific salmon and commercial fishing. (PCFFA's Mem. in Supp. of Mot. to Intervene as Defs. at 2, 8-9.)

The PCFFA members, however, have no fishing interest in the fish listed under the Endangered Species Act, which are at issue in this case, because PCFFA fishermen are not allowed to catch these listed fish; rather, they can only catch hatchery or non-listed fish. *See* Endangered Species Act, 16 U.S.C. §§ 1533(d), 1538(a)(1)(B), (G); *Endangered and Threatened Species; Interim Rule Governing Take of the Threatened Southern Oregon/Northern California Coast Evolutionarily Significant Unit (ESU) of Coho Salmon*, 62 Fed. Reg. 38479-01 (July 18, 1997) (applying the prohibitions contained in section 9(a) of the ESA to the coho salmon at issue in this case). Indeed, the fins of hatchery fish are often clipped so that fishermen know that they can legally

catch and keep them.[1] There is such an abundance of hatchery fish that they are routinely caught and clubbed to death to avoid overpopulation.[2] To the extent that PCFFA's intervention rests on the possibility that intervenor may one day fish for these evolutionary significant units (ESUs) of fish,[3] if the fish are ever recovered and delisted,[4] that possibility is too remote to support intervention.

**Procedural Background**

On March 7, 2002, PCFFA moved this Court to intervene as of right, or, in the alternative to grant it permissive intervention in this case. Over Plaintiffs' objections, this Court entered an order granting PCFFA's motion to intervene as of right on February 28, 2005.

**Summary of Argument**

This Court's grant of PCFFA's motion to intervene was based on errors of law and fact. In its decision, the Court found that PCFFA's members "derive all or part of their income from Pacific salmon that spawn in the waters of the Klamath Basin." Order at 5 (Feb. 28, 2005). What the Court apparently failed to grasp is that the fish caught by

---

[1] *See Department Reacts to Federal ESA Decisions for Oregon and California Coho Salmon,* (Oct. 25, 1996), *available at* http://wdfw.wa.gov/do/1996/oreesa.htm ("[F]in clipping . . . allows fishers to identify and release wild salmon while keeping hatchery fish.").

[2] *See e.g., NOAA's Ark*, Eugene Weekly (Mar. 3, 2005), *available at* http://www.eugeneweekly.com/2005/03/03/coverstory.html (explaining the life cycle of a hatchery salmon, which includes routinely clubbing them to death: "In early September, staff works club adult females and check their tissue for a highly contagious bacterial kidney disease . . . If they're disease free, workers slice open the females and pour out their 4,000-plus eggs. Workers harvest the "milt," or sperm, from the males before clubbing them. The carcasses are sent to a landfill. The eggs and sperm are mixed together, the fertilized eggs placed in trays, and the hatchery salmon's life cycle begins anew.").

[3] Those fish include the endangered Lost River sucker (*Deltistes luxatus*), the endangered shortnose sucker (*Chasmistes brevirostris*), and the threatened southern Oregon/northern California Coast (SONCC) coho salmon (*Oncorhynchus kisutch*).

[4] Research conducted by the National Wilderness Institute indicated in 1997 that the delisting of most of the species listed as threatened or endangered under the Endangered Species Act has been due to error in the listing process, and that species were not delisted as a result of operation of the Act's provisions. *See Conservation under the Endangered Species Act, A Promise Broken*, *available at* http://www.nwi.org ("No species has recovered primarily as a result of the ESA.").

PCFFA's members do not include the endangered Lost River sucker (*Deltistes luxatus*), the endangered shortnose sucker (*Chasmistes brevirostris*), and the threatened southern Oregon/northern California Coast (SONCC) coho salmon (*Oncorhynchus kisutch*), which were the subjects of the 2001 Biological Opinions. Rather, intervenor's members catch an "unlisted" ESU of chinook salmon, as well as hatchery-bred coho salmon, which were not included in the listing of the Oregon/northern California Coast (SONCC) ESU[5] of coho salmon under the Endangered Species Act. *See Endangered and Threatened Species; Threatened Status for Southern Oregon/Northern California Coast Evolutionarily Significant Unit (ESU) of Coho Salmon*, 62 Fed. Reg. 24588, 24608 (May 6, 1997) (listing the naturally-spawned populations of the SONCC ESU of coho salmon as threatened under the Endangered Species Act, but excluding hatchery-spawned stocks from the listing); *see also Interim Policy on Artificial Propagation of Pacific Salmon Under the Endangered Species Act*, 58 Fed. Reg. 17,573 (Apr. 5, 1993); *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1183 (9th Cir. 2004) (discussing NOAA's hatchery policy prior to exclude "hatchery-spawned" populations from listing decisions regarding "naturally-spawned" populations of coho salmon).

Indeed, the catching of fish listed under the Endangered Species Act is unlawful. 16 U.S.C. § 1538(a)(1)(B), (G); 16 U.S.C. § 1533(d); *Endangered and Threatened Species; Interim Rule Governing Take of the Threatened Southern Oregon/Northern California Coast Evolutionarily Significant Unit (ESU) of Coho Salmon*, 62 Fed. Reg.

[5] On November 20, 1991, NMFS issued its *Policy on Applying the Definition of Species Under the Endangered Species Act to Pacific Salmon,* 56 Fed. Reg. 58,612 (Nov. 20, 1991), introducing the term "evolutionary significant unit" (ESU) to interpret the ESA's meaning of "distinct population segment." In the policy, NMFS explained that a stock of Pacific salmon will be considered a distinct population, and hence a "species" under the ESA, if it represents an Evolutionary significant unit (ESU) of the biological species, and that the stock must satisfy two criteria to be considered an ESU: (1) it must be substantially reproductively isolated from other specific population units; and (2) it must represent an important component in the evolutionary legacy of the species. 56 Fed. Reg. at 58,618.

38479-01 (July 18, 1997) (applying the prohibitions contained in section 9(a) of the ESA to the SONCC ESU of the coho salmon).

Water is not released from or retained in the Upper Klamath Lake for the fish that PCFFA's members catch, but rather for the listed fish that the Endangered Species Act forbids them to catch. *See* Biological/Conference Opinion Regarding the Effects of Operation of the Bureau of Reclamation's Klamath Project on the Endangered Lost River Sucker, Endangered Shortnose Sucker, Threatened Bald Eagle, and Proposed Critical Habitat for the Lost River/Shortnose Suckers, Klamath Falls Fish & Wildlife Office (Fish & Wildlife Service Apr. 5, 2001), *available at* http://www.usbr.gov/mp/kbao/esa/34_final_sucker_ bo_4_06_01.pdf; Biological Opinion, Ongoing Klamath Project Operations (National Marine Fisheries Service Apr. 6, 2001), *available at* http://swr.nmfs.noaa.gov/psd/ klamath/KpopBO2002finalMay31.pdf.

Based upon its erroneous belief that PCFFA's members derive all or part of their income from listed salmon, the Court erroneously determined that PCFFA members "possess[] a legally protectable interest involving the water of the Klamath Basin that is 'related to the property or transaction' at issue, one that lies in maintaining access to that water and ensuring that it is allocated in a fashion that promotes its fishing interests." Order at 5 (Feb. 28, 2005). That belief was wrong, however, because the Court failed to distinguish that PCFFA's members derive their livelihood from fish other than the listed fish that were the subjects of the 2001 Biological Opinions. Accordingly, any economic benefit PCFFA derives from the allocation of water for the listed fish is incidental to rather than intended by the ESA.

Moreover, PCFAA lacks any interest in the property that is the subject of this action: the right to the use of the water which is stored in Upper Klamath Lake for irrigation use, and for no other purpose. Reclamation's 1905 appropriation[6] for Klamath Basin water was for "the operation of works for the utilization of water in the State of Oregon under the provisions of the act of Congress approved June 17, 1902 (32 Stat., 388) known as the Reclamation Act." (Notice of Appropriation (May 17, 1905), Pls.' Ex. 30, App. 231.)[7] And, nearly 100 years later, Reclamation still claims the appropriation "was for purposes of reclamation as established by the Reclamation Act of 1902, Act of June 17, 1902, 32 Stat. 388, and the authorization of the Klamath Project, Act of February 9, 1905, Chapter 567, 33 Stat. 714." (*See* Statement of Stipulated Fact Re: Claims and Contests Consolidated for Hearing in Case 003 [Claimants' Statement Of August 4, 2003] at 19, *In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River, a Tributary of the Pacific Ocean* (Klamath Basin Adjudication) (Aug. 4. 2003), Def.'s Ex. 1, and Claims 293, 294 filed in that proceeding.)

There is not, and never has been, any water lawfully impounded in Upper Klamath Lake for any purpose other than reclamation. As the State of Oregon has stated:

> The rights developed under the Reclamation Act and the 1905 Notice must, therefore, be used for the purpose specified in the Act and the Notice, that is, only for irrigation. . . . I am unaware of any independent grant of statutory authority to the Bureau which would allow the transfer of water from the Klamath Project to protect endangered fish. The Bureau exercised its statutory authority when it filed for all unappropriated water necessary to develop the Klamath Project pursuant to state statute and the 1902 Reclamation Act. It has identified no independent authority to

---

[6] There are additional water rights, based on pre-1905 appropriations, acquired for the benefit of the Klamath Project. These rights are also for irrigation.

[7] Documents labeled as "Pls.' Ex." refer to exhibits previously filed with the Court in conjunction with the Memorandum Supporting Plaintiffs' Revised Motion for Partial Summary Judgment on September 22, 2003, Defendant's Cross-Motion for Summary Judgment filed on October 3, 2003, and Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment on October 29, 2003.

> reallocate water legally obligated to that original purpose. . . . [W]hile I recognize the United States' obligations to both Indian Tribes and endangered species, I do not see how a general governmental obligation can be converted to specific Bureau authority to reallocate water stored under a right acquired for irrigation in the Klamath Project to either of these other uses, absent specific federal authorization for the new use and compliance with state law."

(*See* Letter from Stephen Sanders, Assistant Attorney General, Natural Resources Section to Martha Pagel, Director, Oregon Water Resources Department (Mar. 18, 1996), Pls.' Ex. 43, App. 286.)

Since PCFFA is not an irrigator, it lacks any property interest in Upper Klamath Lake water. In addition to lacking a factual foundation for intervention, there is also no legal basis for intervention. Neither this Court nor PCFFA has ever identified a statute or regulation that grants legal protection to PCFFA's interest in maintaining access to Klamath Project water or the allocation of that water for commercial fishing interests. In fact, this Court specifically notes in its order granting intervention that "there is indication neither that the ESA is designed to protect commercial fishing interests of the sort asserted by the PCFFA, *see* 16 U.S.C. §§ 1532(3), 1533(f), nor that the steps required by the ESA are so clearly identified as to dictate the Bureau's choices in a accomplishing the goals of that statute." Order at 5 (Feb. 28, 2005). This finding by the Court highlights the fact that PCFFA does not possess a significant protectable interest sufficient to support intervention under RCFC 24(a)(2).

Finally, by failing to make any independent point, but rather simply adding a "me too" to the government's arguments (*e.g.*, at the hearing on March 30, 2005), PCFFA has demonstrated that it lacks any independent interest, and has no point to make as intervenor in this case. *See Anderson Columbia Envtl, Inc. v. United States*, 42 Fed. Cl.

880, 882 (1999) ("[W]hen the government is a party, it is presumed to represent the would-be intervenor's interest. To rebut this presumption, the would-be intervenor must show collusion, adversity of interest, or nonfeasance."); *Hage v. United States*, 35 Fed. Cl. 737, 742 (1996) (stating that although applicants had different goals than the government, they presented no evidence that their ultimate objectives were different).

## Reasons for Granting the Motion for Reconsideration or Certification

### I. Standard of Review

Rule 59 of the Rules of this Court provides:

> [R]econsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States. On a motion under this rule, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

RCFC 59(a)(1).

The decision of whether to grant a motion for reconsideration is within the sound discretion of the Court. *Ammex, Inc. v. United States*, 52 Fed. Cl. 555, 557 (2002) (citing *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990)); *United States v. Atkinson*, 748 F.2d 659, 660 (Fed. Cir. 1984) ("The grant or denial of a motion for relief from judgment is discretionary, and the standard of review is therefore whether the trial court abused its discretion.") (citations omitted). A court will grant a motion for reconsideration if the movant shows there was a "manifest (*i.e.*, clearly apparent or obvious) error of law or a mistake of fact." *Ammex*, 52 Fed. Cl. at 557 (citing *Principal Mutual Life Ins. Co. v. United States*, 29 Fed. Cl. 157, 164 (1993)).

## II. PCFFA Lacks Any Interest in the Property or Transaction at Issue in This Case as Required by RCFC 24(a).

Rule of Court of Federal Claims 24(a)(2) states:

> Upon timely application anyone shall be permitted to intervene in an action…when the *applicant claims an interest relating to the property or transaction which is the subject of the action* and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

RCFC 24(a)(2) (emphasis added).

RCFC 24(a)(2) mandates intervention when the applicant claims "[1] an interest relating to the property or transaction which is the subject of the action and [2] he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, [3] unless the applicant's interest is adequately represented by existing parties." *American Maritime Transport, Inc. v. United States*, 870 F.2d 1559, 1560 (Fed. Cir. 1989). Not every claimed interest is sufficient for intervention as of right under Rule 24 because, "[w]hat is obviously meant there is a significantly protectable interest." *Diamond v. Charles*, 476 U.S. 54, 75 (1986); *see also Donaldson v. United States*, 400 U.S. 517, 531 (1971) (holding that to constitute a significant protectable interest, the applicant's interest must relate to the property or transaction that is the subject of the action); *American Maritime Transport*, 870 F.2d at 1562 (requiring "'a legally protectable interest' which has been held to be something more than merely an economic interest") (citation omitted).

### A. Intervenor Lacks any Property Interest in the Water Stored in Upper Klamath Lake.

The property right that Plaintiffs claim has been taken is the right to the use of the water stored in Upper Klamath Lake. In 1905, Reclamation initiated the appropriation of

this water solely for reclamation, or irrigation, purposes: "[T]he United States intends to use the above described waters in the operation of works for the utilization of water in the State of Oregon under the provisions of the act of Congress approved June 17, 1902 (32 Stat., 388) known as the Reclamation Act." (Notice of Appropriation (May 17, 1905), Pls.' Ex. 30, App. 231.)

No party claims that Oregon has ever authorized the use of Upper Klamath Lake water for fish, endangered or otherwise. (*See* Letter from Stephen Sanders, Assistant Attorney General, Natural Resources Section to Martha Pagel, Director, Oregon Water Resources Department (Mar. 18, 1996), Pls.' Ex. 43, App. 286 ("The rights developed under the Reclamation Act and the 1905 Notice must, therefore, be used for the purpose specified in the Act and the Notice, that is, only for irrigation.").) In fact, such a position would be contrary to the underlying principles of prior appropriation.

Specifically, in Oregon, as in all Western States, any right to the use of surface water for irrigation water is appurtenant to the land, subject to beneficial use. *Dill v. Killip*, 147 P.2d 896, 898 (Or. 1944) ("'A water-right is incidental or appurtenant to land when by right used with the land for its benefit.") (quoting 1 WIEL ON WATER RIGHTS IN THE WESTERN STATES 587, § 550 (3rd ed.)); *In Re Water Rights of Deschutes River and Tributaries*, 286 P. 563, 574 (Or. 1930) ("Water for irrigation purposes is appurtenant to the land for which it is appropriated and applied."). This beneficial use limitation is echoed in Section 8 of Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (1902) ("beneficial use shall be the basis, the measure, and the limit of the right").

Oregon law further provides that "all water used in this state for any purpose shall remain appurtenant to the premises upon which it is used and no change in use or place of

use of any water for any purpose may be made . . . ." Or. Rev. Stat. § 540.510 (2001); *see also Water Rights on Lower Klamath Lake*, 53 Interior Dec. 693, 698 (June 9, 1932) (opining that the Klamath appropriation having been made for one purpose can not be "perverted" to another purpose.). "Appurtenances" in the context of water rights have been defined in Oregon as "'things belonging to another thing as principal, and which pass as incident to the principal thing. It is that which belongs to another thing, but which did not belong to it immemorially.'" *Skinner v. Silver*, 75 P.2d 21, 28 (Or. 1938) (quoting 2 KINNEY ON IRRIGATION AND WATER RIGHTS 786, § 1005 (2d ed.)).

Within the frame work of these underlying principles, the scope of Reclamation's appropriation of the water stored in Upper Klamath Lake is explicitly defined by the interrelation of the: (1) Reclamation Act of 1902; (2) Oregon Act of February 22, 1905; and, (3) Reclamation's Notice of Appropriation, dated May 17, 1905.

First, the Reclamation Act of 1902 limited the use of the "reclamation fund" to irrigation works for the reclamation of arid and semiarid lands, thereby, restricting the Secretary of Interior's authority to appropriate water to irrigation purposes and defining the outer boundary of the appropriation. Second, Oregon's Act of February 22, 1905 fostered the Reclamation Act of 1902 by securing the seniority of appropriations initiated by the United States under the Reclamation Act of 1902. In addition, this statute further defines the scope of the Klamath appropriation by specifically limiting its protection to the use of water required in connection with irrigation plans authorized under the Reclamation Act of 1902. Finally, the Notice of Appropriation crystallizes the scope of the Klamath appropriation by specifically stating that the United States intended to utilize

the water in the operation of works authorized under the Reclamation Act of 1902, an act that limits appropriation to irrigation.

**1. Reclamation Act of 1902**

Throughout, the text of the Reclamation Act anchors the property right to irrigation purposes at every available opportunity. The Reclamation Act of 1902 established a "'reclamation fund,' to be used in the examination and survey for and the construction and maintenance of *irrigation works* for the storage, diversion, and development of waters for the *reclamation of arid and semiarid lands* in the said States and Territories…." Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (1902) (emphasis added).

Further,

- Section 2 of the Reclamation Act authorizes the Secretary of the Interior to utilize this fund "to locate and construct, as herein provided, *irrigation works* for the storage, diversion, and development of waters…." *Id.* at § 2 (emphasis added). Section 2 also directs the Secretary of Interior to report "the *quantity of lands which can be irrigated therefrom,* and all facts relative to the practibility of each irrigation project…." *Id.* (emphasis added).

- Section 3 authorizes the Secretary, "at or immediately prior to the time of beginning the surveys for any *contemplated irrigation works*, to withdraw from entry, except under the homestead laws, any public lands believed to be susceptible of irrigation from said works . . . ." *Id.* at § 3 (emphasis added).

- Section 4 indicates that, "upon the determination by the Secretary of the Interior that any *irrigation project* is practicable, he may cause to be let contracts for the construction of the same…." *Id.* at § 4 (emphasis added).

- Section 5 states that "the entryman upon lands *to be irrigated by such works* shall, in addition to compliance with the homestead laws, reclaim at least one-half of the total irrigable area of his entry for agricultural purposes, and before receiving patent for the lands covered by his entry shall pay to the Government the charges apportioned against such tract, as provided in section four." *Id.* at § 5 (emphasis added).

- Section 8 unequivocally directs that, with one exception, nothing in the Act "shall be construed as affecting or intended to affect or to in any war interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right acquired thereunder…." *Id*. at § 8. That exception provides that regardless of the law of the State or Territory, "the right to the use of water acquired under the provisions of this Act shall be appurtenant to the *land irrigated*, and beneficial use shall be the basis, the measure, and the limit of the right." *Id.* (emphasis added).

Conspicuously absent from the 1902 Reclamation Act is any provision suggesting that the Secretary of the Interior was authorized to appropriate waters under state law for fish protection, or for any purpose other than irrigation.

**2. Oregon Act of February 22, 1905**

The Oregon legislature's authorization to Reclamation for the appropriation is not to the contrary. In order to facilitate the development of Reclamation Act projects, the State of Oregon passed an Act addressing appropriations of water by the United States in 1905. *See* Oregon Act of Feb 22, 1905, title 43, c. 288. A copy of the entire Act is attached hereto as Exhibit A. Section 2 of the Act provides:

> Whenever the proper officers of the United States, *authorized by law* to construct works for the utilization of water within this state, shall file in the office of the state engineer a written notice that the United States intends to utilize certain specified waters, the *waters described in such notice* and unappropriated at the date of filing thereof shall not be subject to further appropriation under the laws of this state, but shall be deemed to have been appropriated by the United States; provided, that within a period of three years from the date of filing such notice the proper officer of the United States shall file final plans of the proposed works in the office of the state engineer for his information; and provided, further, that within four years from the date of such notice the United States shall authorize the construction of such proposed work. No adverse claims to the *use of the water required in connection with such plans* shall be acquired under the laws of this state….

*Id.* at § 2 (emphasis added.).

Although Section 2 of Chapter 228, Oregon Laws 1905, states that upon the filing of notice of intent to appropriate water, the filing of plans and the authorization of construction of the works, the water "shall be deemed to have been appropriated by the United States," Section 2 must be read *in pari materia* with the other 13 sections in Chapter 228. Section 3 of the Oregon Act states that where construction under the Reclamation Act is contemplated by the United States, the State Engineer shall, at the request of the Secretary of the Interior, adjudicate the waters of the stream system. *Id*. at § 3. Section 4 provides for payment of the costs of the adjudication. *Id*. at § 4. Section 5 describes the decree adjudicating the rights and provides in pertinent part:

> Such decree shall in every case declare, as to the water right adjudged to each party, whether riparian or by appropriation, the extent, the priority, amount, purpose, place of use, and, *as to water used for irrigation, the specific tracts of land to which it shall be appurtenant*, together with such other conditions as may be necessary to define the right and its priority.

*Id.* at § 5 (emphasis added).

Section 2 of the Oregon Act, therefore, must be read and applied in the context of the entire Chapter 288. When the entire Act is read as a whole, Oregon's law parallels the Reclamation Act and is consistent with the Supreme Court's opinions in *Ickes v. Fox*, 300 U.S. 82 (1937), *Nebraska v. Wyoming*, 325 U.S. 589 (1945), and *Nevada v. United States*, 463 U.S. 110 (1983), holding, as briefed previously, that appropriations under the Act were not initiated by the government for its own benefit but rather by the government on behalf of the landowners who actually perfected the water right by putting the water to beneficial use. (*See* Mem. Supporting Pls.' Rev. Mot. for Partial Summ. J. at 13-18 (Sept. 22, 2003).) The 1905 Oregon Act did not convert the right to the use of the Klamath Project water into a general public asset. Rather, it is Plaintiffs that own the water rights

developed under that legislation. Since PCFFA is not an irrigator, it has no property interest in any Upper Klamath Lake water.

Further, insofar as Section 2 of the Oregon Act relates to the waters impounded in Upper Klamath Lake at issue in this case, the statutory phrase, "the proper officers of the United States, authorized by law to construct works for the utilization of water within this state," refers only to the officers of the Reclamation Service (now the Bureau of Reclamation), and their authorization to initiate the appropriation of such waters was then defined and limited by the Reclamation Act (*i.e*., reclamation purposes). Thus, the Oregon Act also makes clear that the appropriation by Reclamation was only for irrigation purposes.

**3. Reclamation's May 17, 1905 Notice of Appropriation**

Moreover, in its May 17, 1905 Notice of Appropriation, (Pls.' Ex. 30, App. 231), Reclamation defined the extent (all unappropriated waters of the Klamath Basin) as well as the purpose (reclamation), and the place of use (the Reclamation Project works), for which those waters were claimed:

> All of the waters of the Klamath Basin in Oregon, constituting the entire drainage basins of the Klamath River and Lost River, and all of the lakes, streams and rivers supplying water thereto or receiving water therefrom, . . . .
>
> It is the intention of the United States to completely utilize all the waters of the Klamath Basin in Oregon, and to this end this notice includes all lakes, springs, streams, marches, and all other available waters lying or flowing therein.
>
> That the United States intends to use the above described waters in the operation of works for the utilization of water in the State of Oregon under the provisions of the Act of Congress approved June 17, 1902 (32 Stat., 388) known as the Reclamation Act.

(Notice of Appropriation (May 17, 1905), Pls.' Ex. 30, App. 231.) Again, Reclamation made clear that the appropriation was limited to reclamation and irrigation purposes. The United States may change neither the extent nor the purpose of use claimed in its 1905 notice. *See* Or. Rev. Stat. § 540.510(1) ("[A]ll water used in this state for any purpose shall remain appurtenant to the premises upon which it is used and no change in use or place of use of any water for any purpose may be made without compliance with the provisions of ORS 540.520 and 540.530.").

Notably absent from the Reclamation Act of 1902, the Oregon Act of February 22, 1905, and the May 17, 1905 Notice of Appropriation is any language indicating either authority or intent to use the May 17, 1905 appropriation for species habitat maintenance. In fact, in a June 9, 1932 opinion, the Solicitor General stressed that Reclamation's 1905 appropriation had been made for irrigation, not for the flooding of land to provide a refuge for migratory birds: "The appropriation made was for agricultural purposes and the general plan of the irrigation works indicate that the water rights were for agricultural and power development. There has been no appropriation for flooding lands in Lower Klamath Lake and the appropriation made could not be perverted to include this purpose." *Water Rights on Lower Klamath Lake*, 53 Interior Dec. 693, 698 (June 9, 1932).

Further, on March 18, 1996, the Oregon Assistant Attorney General for the Natural Resources Section opined:

> The rights developed under the Reclamation Act and the 1905 Notice must, therefore, be used for the purpose specified in the Act and the Notice, that is, only for irrigation. . . . I am unaware of any independent grant of statutory authority to the Bureau which would allow the transfer

> of water from the Klamath Project to protect endangered fish. The Bureau exercised its statutory authority when it filed for all unappropriated water necessary to develop the Klamath Project pursuant to state statute and the 1902 Reclamation Act. It has identified no independent authority to reallocate water legally obligated to that original purpose. . . . [W]hile I recognize the United States' obligations to both Indian Tribes and endangered species, I do not see how a general governmental obligation can be converted to specific Bureau authority to reallocate water stored under a right acquired for irrigation in the Klamath Project to either of these other uses, absent specific federal authorization for the new use and compliance with state law."

(*See* Letter from Stephen Sanders, Assistant Attorney General, Natural Resources Section to Martha Pagel, Director, Oregon Water Resources Department (Mar. 18, 1996), Pls.' Ex. 43, App. 286.)

In confirmation of the nature of the 1905 appropriation, as late as 1957, the States of Oregon and California, as well as the United States, recognized "vested rights to the use of waters originating in the Upper Klamath River Basin validly established and subsisting as of the effective date of this compact under the laws of the state in which the use or diver made, including rights to the use of waters for domestic and irrigation uses within the Klamath Project." Klamath River Basin Compact, art. III(A), Pub. Law 85-222, 71 Stat. 497 (Aug. 30, 1957) (Pls.' Ex. 1, App. 30.) The compact recognizes no comparable right to the use of water stored in Upper Klamath Lake for any fish protection purpose—let alone to benefit Pacific coast commercial fishermen.

Finally, in the pending Klamath Basin Adjudication, although Plaintiffs and Reclamation may disagree on the name that should go on the water rights certificate, they agree entirely that the sole lawful use of the water appropriated in 1905 is for reclamation and irrigation.[8] (*See* Statement of Stipulated Fact Re: Claims and Contests Consolidated

[8] Plaintiffs assert alternatively that either: (1) the landowner who put the water to beneficial irrigation use on his land owns the water right under Oregon law and Section 8 of the Reclamation Act of 1902, ch. 1093

for Hearing in Case 003 [Claimants' Statement Of August 4, 2003], *In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River, a Tributary of the Pacific Ocean* (Klamath Basin Adjudication) (Aug. 4, 2003), Def.'s Ex. 1 and Claims 293, 294 filed in that proceeding ("The appropriation under the Oregon Act was for purposes of reclamation as established by the Reclamation Act of 1902, Act of June 17, 1902, 32 Stat. 388, and the authorization of the Klamath Project, Act of February 9, 1905, Chapter 567, 33 Stat. 714.").)

In sum, nothing in the 1905 appropriation created any property in which PCFFA might even arguably have an interest, for PCFFA's members do not use water for reclamation purposes nor do they use it on Klamath Project lands.

**B. PCFFA Has Not Asserted and Does Not Possess a Significant Legally Protectable Interest in the Transaction Related to the Property That is the Subject of This Action.**

To provide a basis for intervention, the applicant's interest must be "'a legally protectable interest' which has been held to be something more than merely an economic interest." *American Maritime Transport, Inc. v. United States*, 870 F.2d 1559, 1562 (Fed. Cir. 1989). To constitute a significant protectable interest, the applicant's interest must relate to the property or transaction that is the subject of the action. *See Donaldson v. United States*, 400 U.S. 517, 531 (1971).

Not every "interest" in a pending case is sufficient to support intervention of right under RCFC 24(a). *See e.g., Westlands Water Dist v. United States*, 700 F.2d 561 (9th

§ 8, 32 Stat. 388 (1902) (amended and codified in 43 U.S.C. § 372 (2003)) ("[T]he right to the use of water acquired under the provisions of this act shall be appurtenant to the land irrigated and beneficial use shall be the basis, the measure, and the limit of the right."); or (2) if Reclamation initially owned the water right, it conveyed that right to Plaintiffs by deed or otherwise, (*see* Pls.' Ex. 5 and 6.) Other Plaintiffs own irrigation water rights independent of the 1905 appropriation. (*See* Mem. Supporting Pls.' Opp'n to Def.'s Mot. for Partial Summ. J. and Pls.' Cross-Mot. for Partial Summ. J. at 29-30 (Jan. 16, 2004).)

Cir. 1983) (holding that environmental group failed to meet the requirement for intervention because its interest was not founded on the contracts at issue but on public policy); *Wade v. Goldschmidt*, 673 F.2d 182 (7th Cir. 1982) (holding that the proposed intervenors' interests do not relate to the property or transaction which is the subject of the action); *United States v. 38.96 Acres of Land*, 100 F.R.D. 78 (N.D. Id. 1983) (holding that the owner was the only party with a legal interest and that while the applicant for intervention played a laudatory role in the development of the Indiana Dunes National Lake Shore, with respect to this tract of land, it is essentially a private citizen with no interest in the property sought to be condemned to warrant intervention as a right).

As the Ninth Circuit has recently noted, "[a] mere interest in property that may be impacted by litigation is not a passport to participate in the litigation itself. To hold otherwise would create a slippery slope where anyone with an interest in the property of a party to a lawsuit could bootstrap that stake into an interest in the litigation itself." *United States v. Alisal Water Corporation*, 370 F.3d 915, 920 n.3 (9th Cir. 2004).

In *Wade v. Goldschmidt*, 673 F2d 182 (7th Cir. 1982), property owners challenged the use of federal funds for the construction of a bridge and expressway alleging that a proper environmental impact statement had not been prepared. The Seventh Circuit upheld the district court's denial of intervention to a number of proposed intervenor-defendants. The court held that the applicants for intervention, who alleged an economic benefit from the proposed project at its current location and feared damage if an alternate route were chosen, did not relate to the property or transaction which was the subject of the action and thus did not meet the "interest" requirement for intervention as

of right under Rule 24(a)(2). The court noted that, "[t]he ability of applicants to assert the economic, safety, and environmental interests they allege is not impeded not impaired by refusal to grant them intervention. Applicants can present these interests to the governmental bodies, if these bodies are called upon to determine a site for the proposed project. The defendants, governmental bodies, not the courts, are required by statute to evaluate and make decisions as to the priority of the various considerations." *Id.* at 186.

Like the interests claimed in *Wade v. Goldschmidt*, PCFFA's alleged interests in this case are not related to the property or the transaction that is the subject of this action. The property that is the subject of the case is Plaintiffs' right to the use of the Klamath Project water (a water right) and the "transaction" at issue in this case is the conversion of the right to the use or the right to receive Klamath Project water from irrigation use to fish protection purposes under the Endangered Species Act. PCFFA has no legally protectable interest in this property or conversion, since the possibility it will one day be able to fish these currently listed fish is both contingent and too remote. Further, this is an action to recover just compensation for the taking of Plaintiffs' property rights due to this conversion, damages for breach of contract related to the same conversion, and just compensation under the Klamath Basin Compact related to the same conversion. This is not an action to challenge the validity of an environmental statute, regulation, biological assessment or management plan. Accordingly, PCFFA's access to Klamath Project water and the allocation of Klamath Project water will not be directly impacted by the disposition of this case.

While PCFFA claims an indirect economic interest stemming from the potential that the disposition of this case may factor into the future application of the ESA to the

Klamath Project, PCFFA has failed to assert or identify a legally protectable interest related to the transaction which is the subject matter of this suit. PCFFA has not asserted a competing claim of ownership in the specific appropriation at issue in this case. Nor has PCFFA asserted a senior appropriation of water in the Klamath Basin. Moreover, PCFFA has not asserted a legally protectable statutory, regulatory or contractual right to water in Klamath Basin much less the specific appropriation of water that is the subject of this case.

PCFFA merely asserts an economic preference for particular priority in governmental compliance with the ESA.[9] Like the intervenors' interests in *Wade v. Goldschmidt*, that preference can be presented to the appropriate governmental body, the Bureau of Reclamation, should it be called upon to make decisions related to future use of water in the Klamath Basin. The Bureau of Reclamation, not this Court, is required by statute to evaluate and make the decisions as to the operation of the Klamath Project. Moreover, because Plaintiffs have conceded the validity of BOR's actions for the purposes of this motion, those decisions are not related the subject of this action.

That PCFFA has participated in other Klamath Basin litigation also does not satisfy RCFC 24(a). PCFFA notes, and this Court acknowledges in its order granting intervention, PCFFA's involvement in *Kandra v. United States*, 145 F.Supp.2d 1192 (D. Or. 2001) and *PCFFA v. Bureau of Reclamation*, 138 F.Supp.2d 1228 (N.D. Cal. 2001). In *Commonwealth Edison Co. v. Train*, 71 F.R.D. 391 (N.D. Ill. 1976), the court found that the applicants for intervention lacked a sufficient interest despite the fact that some

[9] In the Motion for Intervention, PCFFA points out that its members "derive all or part of their income from the harvesting of Pacific salmon" and that "[t]he collapse of the salmon fishery in the Klamath Basin has had devastating impacts on the commercial fishing industry and coastal fishing communities in California and Oregon." (PCFFA's Mem. in Supp. of Mot. to Intervene as Defs. at 2, 8-9.)

of the regulations resulting from the prior litigation were at issue in the present case. The court found that one may not acquire an enforceable interest in a statute merely by having obtained a declaratory judgment construing that statute and that the interests of the plaintiff organization's members in the aesthetic, conservational, and recreational, as well as economic, quality of the water which the regulations sought to protect did not rise to the level of a direct, substantial, legally protectable interest in the proceedings sufficient for intervention as of right under Rule 24(a)(2).

Similarly, PCFFA's prior involvement in litigation related to the Klamath Basin does not provide the requisite legally protectable interests in this case. Neither the regulations that were enforced nor biological assessments that were issued in *Kandra* or *PCFFA v. Bureau of Reclamation* are at issue in this case. *A fortiori*, PCFFA's involvement in prior litigation does not provide it with a basis for intervention in this case.

**III. In the Alternative, Plaintiffs Ask This Court to Certify This Issue for Review by the Federal Circuit.**

Much of this Court's Order granting intervention analyzes the distinct standards for intervention that have evolved under Fed. R. Civ. P. 24(a) and RCFC 24(a). Specifically, that the practicable impairment language common to both rules has been construed in favor of intervention under Fed. R. Civ. P. 24(a) but not resulted in the same standard under RCFC 24(a) where intervention is disfavored because the Court of Federal Claims is a court of limited jurisdiction. *Compare American Maritime Transport, Inc. v. United States*, 870 F.2d 1559, 1562 (Fed. Cir. 1989) (concluding that "the requirements for intervention are to be construed in favor of intervention") *with Freeman v. United States*, 50 Fed. Cl. 305, 308 (2001) (noting that "[i]ntervention has historically been

disfavored because the court has no jurisdiction over cases between private parties"); *Anderson Columbia Envtl. v. United States*, 42 Fed. Cl. 880, 881-82 (1999) (noting that due to "the distinct jurisdiction in this court (where the only defendant is the United States government and the plaintiff may sue only if it falls within certain pre-established categories), it is reasonable to question the appropriateness of modeling the court's third-party practice rules on the Federal Rules").

Addressing the disfavored status of intervention under RCFC 24(a), this Court noted in its February 28, 2005 Order that it is "loath to disagree with the cited decisions, but, in the end, it is compelled to conclude that the limitations these cases impose are devoid of substance." Order at 10 (Feb. 28, 2005). This Court, however, concluded that prior decisions of the Court of Federal Claims, holding that intervention is disfavored because of the court's limited jurisdiction, are erroneous and proceeded to grant PCFFA's motion for intervention under FRCP 24(a)'s broader standard for intervention. *Id*. at 10-12. Arguably, in so doing, this Court disposed of a prudent and justifiable limitation on intervention that flows from this Court's limited jurisdiction. More significantly, this Court injected uncertainty into the law that will undoubtedly affect future cases.

Fortunately, 28 U.S.C. 1292(d)(2) provides a means of resolving exactly this sort of uncertainty. Section 1292(d)(2) provides:

> When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

28 U.S.C. 1292(d)(2).

The appropriate standard for intervention under Rule 24(a) is a controlling question of law. The conflict between prior opinions of the Court of Federal Claims and this Court's order granting PCFFA's motion for intervention indicates that there is substantial ground for differences of opinion. If granted, an immediate appeal from the order granting intervention in this case will materially advance the ultimate termination of this litigation by reducing the number of parties authorized to file pleadings, raise issues, conduct discovery or seek various forms of appellate relief.

Should this Court deny Plaintiffs' motion for reconsideration, Plaintiffs request that this Court modify its order granting PCFFA's motion to intervene to include a statement sufficient to meet the requirements of 28 U.S.C. 1292(d)(2), thereby, allowing Plaintiffs to request that the Federal Circuit certify the question regarding the appropriate standard for intervention under Rule 24(a)(2).

**Conclusion**

For all of these reasons, Plaintiffs urge this Court to grant this motion for reconsideration or, in the alternative, certify the question of law for interlocutory appeal pursuant to 28 U.S.C. 1292(d)(2).

Respectfully submitted,

s/ Nancie G. Marzulla

Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
202-822-6760

202-822-6774 (facsimile)
Attorneys for Plaintiffs

Dated: April 12, 2005