IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 01-591 L<br><br>Judge Francis M. Allegra |

**NOTICE OF OREGON ATTORNEY GENERAL'S MEMORANDUM**

On June 15, 2005, plaintiffs notified the Court that the Oregon Attorney General's Office, in its capacity as legal counsel for the Oregon Water Resources Department (OWRD), intended to submit a memorandum in the Klamath Basin Adjudication by July 15, 2005.

Yesterday, July 13, 2005, that Memorandum was filed. A copy of which is attached.

Respectfully submitted,

s/ Nancie G. Marzulla

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, D.C. 20036
202-822-6760
202-822-6774 (facsimile)

Dated: July 14, 2005

Counsel for Plaintiffs

BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF OREGON
for the
WATER RESOURCES DEPARTMENT

In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River, a Tributary of the Pacific Ocean

Edward & Marilyn Livingston, Sylvia G. Bruce, ~~WaterWatch of Oregon, Inc.~~, Horsefly Irrigation District, Langell Valley Irrigation District, Rogue River Valley Irrigation District, Medford Irrigation District, Roger Nicholson, Agri Water, LLC, Richard Nicholson, Jim McAuliffe, McAuliffe Ranches, Maxine Kizer, Ambrose McAuliffe, Susan McAuliffe, ~~Joe McAuliffe Company~~, Dwight and Helen Mebane,[1] Kenneth L. Tuttle and Karen L. Tuttle dba Double K Ranch, ~~Dave Wood~~, Kenneth Zamzow, ~~Anita Nicholson~~[2], Nicholson Investments, L.L.C., Wm. S. Nicholson, John B. Owens, Kenneth Owens, Wm. L. Brewer, Mary Jane Danforth, Jane M. Barnes, Franklin Lockwood Barnes, Jr., Jacob D. Wood, Elmore E. Nicholson, Mary Ann Nicholson, Gerald H. Hawkins, Hawkins Cattle Co., Owens & Hawkins, Harlowe Ranch, Terry M. Bengard, Tom Bengard, Dwight T. Mebane, Helen Mebane, ~~Walter Seput~~,[3] James G. Wayne, Jr., Clifford Rabe, Tom Griffith, William Gallagher, Thomas William Mallams, River Springs Ranch, Pierre A. Kern Trust, William V. Hill, Lillian M. Hill, Carolyn Obenchain, Lon Brooks, William C. Knudtsen, Wayne Jacobs, Margaret Jacobs, Robert Bartell, Rodney Z. James, Hilda Francis for Francis Loving Trust, ~~William J. Rust, Ethel J. Rust~~, James R. Goold for Tillie Goold Trust, Duane F. Martin, Peter M. Bourdet, Vincent Briggs, J.T. Ranch Co., Tom Bentley, Thomas Stephens, John Briggs, ~~Wm. Bryant~~, Klamath Irrigation District, Klamath Drainage District, Tulelake Irrigation District, Klamath Basin

**OREGON WATER RESOURCES DEPARTMENT'S CLOSING BRIEF ON REPLY**

**Lead Case No. 003**

Consolidating Case Nos. 003, 118, 119, 120, 129, 137, 148, ~~149~~, and ~~150~~

Claim Nos. 142, 143, 144, 186, 194, 205, 211, 285, 286, ~~287~~[4], ~~288~~[5], 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321, 322, 323, and 324

Contests 0005, 0006, 0007, 0008, 0033, 0039, 0040, 0047, 0281, 0516, 0986, 1221, 1455, 1804, 2044, 2048, 2049, 2050[6], 2051, 2052, ~~2256~~, 2491, ~~2492~~, ~~2761~~, 2778, 2788, 2789, 2851[7], 2854, 2856[8], 2858, 2859, 2860, 2861, 2862, 2863, 2864, 2865, 2871, 2876, 2880, 2881, 2882, 2883[9], 3136[10], 3137[11], 3138[12],

1 A Change of Ownership form was filed on July 7, 2005, transferring the ownership of Joe McAuliffe Company to Dwight and Helen Mebane.

2 A Change of Ownership form was filed on July 7, 2005, transferring the ownership of Anita Nicholson to Nicholson Investments, L.L.C.

3 Walter Seput filed a Change of Ownership Form on April 18, 2005, transferring his interest to James G. Wayne, Jr.

4 Claim 287 was voluntarily withdrawn by Oregon Department of Fish and Wildlife on September 26, 2003. *See* NOTICE OF WITHDRAWAL OF CLAIM.

5 Claim 288 was voluntarily withdrawn by David P. Henzel on July 1, 2003. *See* NOTICE OF WITHDRAWAL OF CLAIM.

6 Klamath Hills District Improvement Company voluntarily withdrew from Contests 2048, 2049, and 2050 on December 16, 2003. *See* WITHDRAWAL OF CLAIMS BY KLAMATH HILLS DISTRICT IMPROVEMENT COMPANY.

7 WaterWatch of Oregon, Inc. voluntarily withdrew from Contest 2851 on February 19, 2003. *See* WATERWATCH'S VOLUNTARY WITHDRAWAL OF CONTEST 2851.

8 By an Order dated May 20, 2003, WaterWatch of Oregon, Inc. was dismissed as a party contestant from all proceedings in the Klamath Basin Adjudication. *See* ORDER DISMISSING WATERWATCH OF OREGON, INC.'S CONTEST NOS 2820 ET AL.

9 Klamath Project Water Users' Renewed Motion to Strike Contest Nos. 2858, 2859-2865, 2871, 2876, and 2880-2883, and Dismiss WaterWatch as a Party was granted on 4/03/03. *See* ORDER ON RENEWED MOTION TO STRIKE CONTESTS AND DISMISS WATERWATCH AS A PARTY AND MOTION TO RECONSIDER.

---

[10] Langell Valley Irrigation District and Horsefly Irrigation District voluntarily withdrew from Contest 3136 on April 22, 2005. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY LANGELL VALLEY IRRIGATION DISTRICT AND HORSEFLY IRRIGATION DISTRICT.

[11] Langell Valley Irrigation District and Horsefly Irrigation District voluntarily withdrew from Contest 3137 on August 21, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY LANGELL VALLEY IRRIGATION DISTRICT AND HORSEFLY IRRIGATION DISTRICT.

[12] Langell Valley Irrigation District and Horsefly Irrigation District voluntarily withdrew from Contest 3138 on March 21, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY LANGELL VALLEY IRRIGATION DISTRICT AND HORSEFLY IRRIGATION DISTRICT.

[13] Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew from Contest 3176 on December 5, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY MEDFORD AND ROGUE RIVER VALLEY IRRIGATION DISTRICTS.

[14] Horsefly Irrigation District and Langell Valley Irrigation District voluntarily withdrew, without prejudice, from Contests 3184 and 3197 on February 25, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTESTS 3197 AND 3215 [*sic*] BY HORSEFLY AND LANGELL VALLEY IRRIGATION DISTRICTS.

[15] Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew, without prejudice, from Contest 3191 on May 1, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY MEDFORD AND ROGUE RIVER VALLEY IRRIGATION DISTRICTS.

[16] Horsefly Irrigation District and Langell Valley Irrigation District voluntarily withdrew, without prejudice, from Contest 3208 on February 25, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTEST 3208 BY HORSEFLY AND LANGELL VALLEY IRRIGATION DISTRICTS.

[17] Horsefly Irrigation District and Langell Valley Irrigation District voluntarily withdrew, without prejudice, from Contest 3214 on February 25, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTEST 3214 BY HORSEFLY AND LANGELL VALLEY IRRIGATION DISTRICTS.

[18] Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew, without prejudice, from Contests 3184, 3197, 3208, 3212, 3213, 3214, 3215, 3216, 3217, 3218, 3219, 3220, 3221, 3222, 3227, 3232, 3237, 3238, 3239, and 3240 on September 30, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY MEDFORD AND ROGUE RIVER VALLEY IRRIGATION DISTRICTS.

[19] Dave Wood voluntarily withdrew, without prejudice, from Contests 3282-3288 and 3301 (Claims 293-299 and 312) on October 26, 2004. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY DAVE WOOD.

[20] Dave Wood voluntarily withdrew, without prejudice, from Contests 3310-3313 (Claims 321-324) on October 26, 2004. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY DAVE WOOD.

[21] Klamath Irrigation District; Klamath Drainage District; Tulelake Irrigation District; Klamath Basin Improvement District; Ady District Improvement Company; Enterprise Irrigation District; Malin Irrigation District; Midland District Improvement Co.; Pine Grove Irrigation District; Pioneer District Improvement Company; Poe Valley Improvement District; Shasta View Irrigation District; Sunnyside Irrigation District; Don Johnston & Son; Bradley S. Luscombe, Randy Walthall; Inter-County Title Company; Winema Hunting Lodge, Inc.; Van Brimmer Ditch Company; Plevna District Improvement Company; and Collins Products, LLC voluntarily withdrew from Contests 3408, 3417, 3424, 3428 and 3629 on April 7, 2004. *See* NOTICE OF WITHDRAWAL OF CONTEST NOS. 3408, 3417, 3424, 3428 AND 3629.

[22] Klamath Hills District Improvement Company voluntarily withdrew, without prejudice, from Contests 2048, 2050, 2051, 3400, 3407, 3408, 3417, 3424, 3425, 3426, 3427, 3428, 3429, 3624, 3625, 3626, 3627, 3628, 3629, and 3630 on January 16, 2004. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY KLAMATH HILLS DISTRICT IMPROVEMENT COMPANY.

[23] Don Vincent voluntarily withdrew from Contests 2048, 2049, 2050, 2051, 3400, 3407, 3408, 3417, 3424, 3425, 3426, 3427, 3428, 3429, 3624, 3625, 3626, 3627, 3628, 3629, 3630, 3635, and 3640 on November 28, 2000. *See* NOTICE OF WITHDRAWAL OF CLAIMANTS. Berlva Pritchard voluntarily withdrew from Contests 3400, 3407, 3408, 3412, 3417, 3424, 3425, 3426, 3427, 3428, 3429, 3624, 3625, 3626, 3627, 3628, 3629, 3630, 3635, and 3640 on June 24, 2002. *See* NOTICE OF WITHDRAWAL OF CLAIMANT.

[24] The Klamath Tribes withdrew from Contests 4218, 4219, 4220, 4221, 4222, 4223, 4224, 4225, and 4230 on December 3, 2002. *See* CONTEST DISMISSAL AGREEMENT AND STIPULATION BETWEEN KLAMATH PROJECT WATER USERS, THE KLAMATH TRIBES, AND THE UNITED STATES; [Proposed] Order of the Hearing Officer in Case 003.

[25] Contest Nos. 3282, 3283, 3284, 3285, 3286, 3287, 3288, 3301, 3306 3310, 3311, 3312, 3313 held by William J. and Ethel Rust are transferred to David M. Cowan. *See* CHANGE OF OWNERSHIP form dated February 11, 2005.

Improvement District, Ady District Improvement Company, Enterprise Irrigation District, Klamath Hills District Improvement Co., Malin Irrigation District, Midland District Improvement District, Pine Grove Irrigation District, Pioneer District Improvement Company, Poe Valley Improvement District, Shasta View Irrigation District, Sunnyside Irrigation District, Don Johnston & Son, Thomas J. Shaw/Modoc Lumber Co., Bradley S. Luscombe, Randy Walthal and Inter-County Title Co., Winema Hunting Lodge, Inc., Van Brimmer Ditch Co., Plevna District Improvement Company, Travis Huntly/Collins Products, LLC, The Klamath Tribes, Leland Woods Trust, Gary Griffith, Marjorie Divine, Victor Divine, David Griffith, Nora Griffith, John V. Lilly, Edna B. Lilly, Earl Martin Kerns, Shirley F. Kerns, Phyllis Vincent, Don Buffington, Ralph Sterns, Rich Flink/Reams Golf and Country Club, Inc.; Leonard Baio; Gary Strong, David M. Cowan,

**Contestants**,

v.

Marta C. Carpenter; Flowers Bros. Inc.; Robert Flowers; Klamath Sprig and Honker Club, Inc.; Martin Scull; Karen Tucker; Sandral Tucker,

**Claimants,**

And

United States of America, Bureau of Reclamation; Geary Bros Caledonia Ranch, a Co-Tenancy; Jeld-Wen, Inc. (Running Y Ranch),

**Claimants/ Contestants**.

## INTRODUCTION

Pursuant to the April 29, 2004 POST HEARING ORDER and the April 6, 2005 ORDER ON MOTION TO MODIFY BRIEFING SCHEDULE, the Oregon Water Resources Department ("OWRD") hereby provides its Closing Brief on Reply. OWRD provides the following brief concerning only certain aspects of this case. OWRD does not respond to each point made in every brief filed in this matter. OWRD's lack of comment

[26] Contest Nos. 3282 to 3288, 3301, 3306, 3310-3313 held by Roger Nicholson Cattle Company are transferred to Agri Water, LLC. *See* CHANGE OF OWNERSHIP form dated February 2, 2005. Contest Nos. 3282 to 3288, 3301, 3306, 3310-3313 held by Lloyd Nicholson Trust are transferred to Roger Nicholson and Richard Nicholson. *See* CHANGE OF OWNERSHIP form dated February 2, 2005. Contest Nos. 3282 to 3288, 3301, 3306, 3310-3313 held by Dorothy Nicholson Trust are transferred to Roger Nicholson and Richard Nicholson. *See* CHANGE OF OWNERSHIP form dated February 2, 2005.

on any particular issue is not and should not be construed as support for or opposition to any position(s) on any such issue(s).

OWRD files this response to comment on several issues raised in Claimants Klamath Project Water Users' Opening Brief on the Merits ("KPWU Brief"), Claimants Klamath Project Water Users' Opening Brief on the Merits for Claim 321-1 ("KPWU Claim 321-1 Brief"), Contestants Klamath Project Water Users' Response Brief ("KPWU Response"), Van Brimmer Ditch Company's Opening Brief on the Merits ("Van Brimmer Brief"), the United States' Closing Brief as Claimant on behalf of the Bureau of Reclamation and the U.S. Fish and Wildlife Service ("United States' Brief"), the United States' Response Brief as Contestant on behalf of the Bureau of Reclamation and the U.S. Fish and Wildlife Service ("United States' Response"), and the Klamath Tribes' Response to the Opening Briefs of the United States and the Klamath Project Water Users ("Klamath Tribes' Response").

This brief provides a discussion of the elements of a pre-1909 claim. In this context, OWRD then discusses two matters. First, this brief provides a discussion of the United States' and the Klamath Project Water Users' ("KPWU") claimed inchoate rights, concluding that such inchoate rights should not be adjudicated in this proceeding. Second, this brief provides a discussion of the legal principles and other considerations that bear on the question of who is the "owner" or "proper holder" of the rights to the use and storage of water within the Klamath Project.

## DISCUSSION

### I. State Ownership of Water

It is important that the Administrative Law Judge ("ALJ") bear in mind exactly what is being determined in this case: whether claimed rights to the *use* of water should be approved and, if so, in whose name(s) such rights should be adjudicated. The claims in this case, made by the United States and the Klamath

Project Water Users, are for the right to the *use* of water initiated before February 24, 1909, the date that Oregon's Water Rights Act was enacted. ORS 537.010.

As stated, the rights being adjudicated in this proceeding are *use* rights. The corpus of the water—or the water itself—"belongs to the public" and is held in trust by the state. *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 US 142 (1935) (nonnavigable waters); *Shively v. Bowlby*, 152 US 1 (1894) (navigable water held by the United States "in trust for the future States"; title vests in the several States, when organized and admitted to the Union"); *Jones v. Warmsprings Irr. Dist.*, 162 Or 186, 196 (1939) (water in naturally occurring watercourse is "nobody's property" and "belongs to the public"). A water right is a right to the use of the water—a usufructary right. *In re Hood River*, 114 Or 112, 195 (1924) ("No one has any property in the water itself but a simple usufruct."); *In re North Powder River*, 75 Or 83, 93 (1915) ("it is not the water but the use of it for a particular purpose that is the limit of the right"). *See generally* 49 Or Ops Atty Gen 284, 308-09. KPWU agrees with these principles. KPWU Brief at 212, n. 61.

## II. General Principles Governing Claims for Appropriative Uses Made or Initiated Before February 24, 1909

In this particular case, the United States and the Klamath Project Water Users have made claims for the use of water within the Klamath Project.[27] All claimants agree that state law governs the question of whether a water right exists, and what the parameters of that right are. *See* United States' Brief at 68 ("The federal Reclamation Act [32 Stat 390 Ch. 1093, § 8, codified at 43 USC § 372, 383] directs the Secretary of Interior to obtain water rights for the Reclamation projects pursuant to state law.") and 111-113 (discussing

[27] The claims of the United States and the Klamath Project Water Users are similar in a number of—but not all—respects. *See generally* Affidavit and Testimony of Donald E. Kienlen (comparing the US and KPWU Claims). For example, the United States and the Klamath Project Water Users make claims for the right to use water they each believe is necessary to irrigate the lands identified in their claims; in large part, such lands are the same. As pertinent to the discussion herein, the main differences between the claims filed by these entities involve: the date of claimed initiation of the right (priority date), and the nature and extent of claimed inchoate water rights.

elements of a pre-1909 water right under state law); *See* KPWU Brief at 122-124 (discussing elements of a pre-1909 water right under state law).

Under state law, to establish a right to the use of water initiated prior to February 24, 1909 (a "pre-1909 water right"):

> [a]s a general rule … three elements must exist: (1) an intent to apply it to a beneficial use, existing at the time or contemplated in the future; (2) a diversion from the natural channel by means of a ditch, canal or other structure; and (3) an application of it within a reasonable time to some useful industry....

*In re Water Rights of Silvies River*, 115 Or 27, 64-65 (1925); s*ee also Low v. Rizor*, 25 Or 551, 557 (1894). This articulation of the elements of a pre-1909 water right parallels ORS 539.010(4), which provides:

> The right of any person to take and use water shall not be impaired or affected by any provisions of the Water Rights Act ... where appropriations were initiated prior to February 24, 1909, and such appropriators, their heirs, successors or assigns did, in good faith and in compliance with the laws then existing, commence the construction of works for the application of the water so appropriated to a beneficial use, and thereafter prosecuted such work diligently and continuously to completion. However, all such rights shall be adjudicated in the manner provided in this chapter.

*Id.* Thus, this statute articulates a three-part test applicable to a pre-1909 water right: (1) good faith commencement prior to February 24, 1909; (2) of construction of works to apply water to a beneficial use; and (3) prosecuted with due diligence.

These same basic standards have been applied to every pre-1909 claim made in the Klamath Adjudication,[28] and should be applied in this case as well.[29]

---

[28] *See, e.g.*, Proposed Order, Hearing Officer Panel Case No. 014, Claim 167, dated July 19, 2002, at 5; Proposed Order, Hearing Officer Panel Case Nos. 017/018, Claims 213/214, dated October 16, 2002, at 6-7; Proposed Order, Hearing Officer Panel Case No. 019, Claim 218, dated December 31, 2002, at 4; Proposed Order, Office of Administrative Hearings Case Nos. 113, 114, 115, Claims 134, 135, 136, dated July 30, 2003, at 5-6; Proposed Order, Office of Administrative Hearings Case No. 116, Claim 137, dated September 11, 2003, at 5; Proposed Order, Office of Administrative Hearings Case No. 117, Claim 141, dated July 9, 2003, at 7-8; Proposed Order, Office of Administrative Hearings Case No. 123, Claim 173, dated January 27, 2004, at 3; Proposed Order, Office of Administrative Hearings Case No. 125, Claim 178, dated December 8, 2003, at 7-8; Proposed Order, Office of Administrative Hearings Case No. 134, Claim 201, dated January 9, 2004, at 7.

Although OWRD believes that there is little controversy concerning the basic elements of a pre-1909 water right, the precise meaning and scope of these elements has been—and continues to be—the source of some controversy between participants in the Klamath Adjudication. As pertinent to this case, KPWU maintains that a portion of their right (and an associated 1868 priority date) can be established by early uses of land following natural overflow or flooding by the Klamath River. The United States has objected to this assertion. United States' Response at 28-31.

The United States and the Klamath Project Water Users have also made claims for inchoate or undeveloped water rights. The exact nature and extent of these claims differ. However, the same legal principles govern whether such claims should be approved. OWRD maintains that the inchoate claims must fail because there has not been any showing of any intent to develop these lands by applying water to them for a beneficial use, or these rights were not developed within a reasonable time, or both.

In order to provide the necessary framework in which to consider these issues, OWRD next provides a discussion of each of the parameters of each of the elements.

**A. Intent**

**1. Legal Principles**

The *Silvies River* court elaborated upon the element of intent:

> it is the present *bona fide* design or intention of applying it to some immediate beneficial use, or the appropriation must be made in the present *bona fide* contemplation of a future application of it to such a purposes; it should be shown in all its fullness by the facts and circumstances to have been present in the mind of the appropriator at the time the appropriation was made or claimed.

---

[29] The Klamath Tribes argue that the United States' compliance with Section 2 of Oregon's Act of February 22, 1905, Or. Gen Laws, 1905, Ch. 228 ("Act of 1905") vested the United States with title to all the then unappropriated water specified in its notice. Klamath Tribes' Response at 13-14, 18**.** The Tribes argue further that, as a result of the procedure provided for in Section 2, compliance with Oregon common law principles for appropriation of pre-1909 water rights was unnecessary. *Id*. For the reasons outlined in Part III.D.1 of this Reply (pp. 37-39), the Act of 1905 did not disturb the requirement of application to beneficial use within a reasonable time.

115 Or 27, 64-65. *See also Hindman v. Rizor*, 21 Or 112, 120 (1891) ("While (the appropriators) could rightfully appropriate water not only for the present but also for the future needs of the land, the water so appropriated must have been utilized within a reasonable time...."). Thus, while the "use" or application may be present or future, the "intent" or "contemplation" must in either case be contemporaneous with the initial appropriation. The original intention must include that the water will be used on certain lands "then definitely had in mind." *In re Water Rights of Deschutes River and Tributaries*, 134 Or 623, 655 (1930); *see also Nevada Ditch Co. v. Bennett*, 30 Or 59, 89 (1896); *In re Water Rights of Hood River*, 114 Or 112, 137-38 (1924). Although it is necessary that the original appropriator had such intent "in mind" at the time of the original appropriation, it is also essential that the intent continue in the original or subsequent appropriators until actual application to beneficial use. *Nevada Ditch Co.* at 89 (intent may be declared through another); *Hood River* at 137-38 (it must be "*reasonably anticipated* that when the diversion is ultimately completed . . . [the] land will then, or with reasonable diligence thereafter [be] ready to receive it") (Emphasis added).

### 2. Factual Development: No Witness Testifying on Behalf of the United States or the KPWU Could Make a Showing of a Continued Intent to Develop Claimed Inchoate Rights

#### a. The United States' Inchoate Rights Claims

The United States filed claims for inchoate water rights. As the United States' witness, Cecil Lesley, testified:

> The tables in attachment to item 7 of claims 293 and 294 list both irrigated and inchoate lands. The inchoate lands total 15,659 acres out of the 218,654.3 acres claimed in these claims. The inchoate lands in Reclamation's claims are lands that are authorized to be served under an existing contract between Reclamation and another party, but which are not currently served. *See* OWRD Exhibit 1, p. 01262-01264.

United States, Bureau of Reclamation Written Direct Testimony and Exhibits of Cecil Lesley at 10. At the cross-examination hearing, Mr. Lesley testified that the inchoate lands portion of the Bureau of

Reclamation's claim as lands that "have the potential to be irrigable lands" and that water is being claimed "should their status change in the future." April 7, 2004, 4:32:12 – 4:32:55. Mr. Lesley was then asked if he had any knowledge of any plans to bring any of the 15,659 acres of land listed in the United States Claim as inchoate acreage, OWRD Exhibit 1, p. 01262 through 01264, under irrigation, Mr. Lesley said:

> The landscape in the Klamath Basin is constantly changing, and originally a large portion of the lands that were in farmsteads had farm houses and yards on them. Those are inchoate lands under the term as we use it, and that has constantly been changing in the basin, and farm homes are moving off the farmland and being developed as irrigation lands, so the inchoate lands have the potential to be irrigable at any – a large portion of those lands have potential to be irrigable at any time.

Mr. Lesley, however, was unable to testify as to any specific plans or anything else that would show or tend to show any indicia of intent to bring any of claimed 15,659 acre under irrigation:

> Q: But are you aware of any particular land owner, and I mean if you could give me an example, that would be great, of any particular land owner who has a piece of land that's covered by an inchoate claim here, and that land owner is planning on applying water to that land at any particular time … at a specific time in the future? Are you aware of any plans like that?
>
> A: Not specifically at this time.

April 7, 2004, 4:35:47 – 4:36:14.[30] Moreover, Mr. Lesley's written testimony established that the lands claimed as inchoate acreage "are currently not irrigated" and that the lands were merely "within the scope of the Project." United States, Bureau of Reclamation Written Direct Testimony and Exhibits of Cecil Lesley at 70-71. In other words, the only witness testifying on behalf of the United States Bureau of Reclamation did not, and was not able to when given the chance, offer any testimony showing or tending to show any actual intent to irrigate the claimed inchoate acreage. In the absence of being able to make some showing of the intent element necessary to prove a pre-1909 claim, the United States' claim to such a right must fail. ORS 539.110 ("[t]he burden of establishing the claim shall be upon the claimant whose claim is contested.")

**b. The KPWU Inchoate Rights Claims**

The KPWU offered the testimony of Donald E. Kienlen, which included a "summary of the claims filed by the Klamath Project Water Users (KPWU) and a comparison of the KPWU claims with other claims included in Consolidated Case No. 003 which assert the same or substantially the same rights." Affidavit and Testimony of Donald E. Kienlen at 3. The basis of Mr. Keinlen's factual knowledge was that he has been actively involved in the Klamath Adjudication since 1996, and has therefore become very

---

[30] The official record of the cross-examination in this matter is the digital audio recording made by the Office of Administrative Hearings. OWRD uses the following convention for citation to this digital recording: Date, Hour:Minute:Second – Hour:Minute:Second, with the "Hour:Minute:Second" designations being those that appear when listening to the digital recording on the CD ROMs (provided by the Office of Administrative Hearings) using Olympus DSS Player-Lite.

familiar with the Klamath Basin, as well as the historical development of the Klamath Project. April 20, 2004, 1:59:19 - 1:59:39.

As contrasted to the United States' inchoate rights claims for 15,659 acres of land that Mr. Lesley described as being potentially irrigable, the KPWU claimed 2,819.4 acres of land. Affidavit and Testimony of Marc E. Van Camp at 16-17; *See generally* Cross-Examination of Donald E. Kienlen, April 20, 2004, 1:44:09 – 1:51:34.

Mr. Kienlein testified as to the nature of the KPWU claims asserting inchoate rights:

> Q: Okay, do you have any – do you have an understanding that the inchoate acreage claims by the KPWU claimants are, in fact, what have been characterized by some witnesses as in-fill acres, acres that might come under irrigation in the future if roads are removed or ditches are filled in or fence lines are removed and that land becomes irrigated? Does that sound correct?
>
> A: I'm certain that is correct. There would be other areas that are now used for other purposes that might come under irrigation. For example maybe a barn that exists today is removed, and that land becomes subject to irrigation.

April 20, 2004, 1:48:46 – 1:49:32. Mr. Kienlen could not identify any documents, plans or make any specific statements that showed or tended to show that any particular water user has any intent to bring any of the acreage claimed under irrigation:

> Q: Now, as a result of all the conversations you have had and knowledge that you have gained, are you aware of any particular plan to put any of this inchoate acreage under irrigation?
>
> A: No, no detailed plans.
>
> Q: No detailed plans? So you have never seen a written plan, anything like that?
>
> A. No.
>
> Q: And would I be correct in assuming that you cannot point to any documents in this case that would show or tend to show such plans for putting inchoate lands under irrigation?
>
> A: I have never seen any.
>
> Q: Okay. So to your knowledge, there are no such plans?

A: To my personal knowledge. I'm – there may be such plans, but I do not personally know about them.

Q: But we've established that you've got a pretty broad base of personal knowledge about the Klamath Project, right?

A: Well, but Mr. Wirth –

Q: Maybe "pretty broad" is a vague term.

A: We are talking about – we were earlier saying, well if this fence line was removed, or the road was removed, or the ditch became piped.

Q: Sure.

A: Those are the kinds of things that I don't think there is detailed plans. Those occur, and the landowner at that time is then able to irrigate that land that he can't irrigate today.

Q: Okay. But you are not aware of any present intent to do that by and person? I mean if you can name one, I'd be happy to hear about it.

A: I don't have that knowledge, though.

April 20, 2004, 2:02:04 – 2:04:17. Moreover, Mr. Kienlen testified that neither he nor MBK Engineers, with whom he worked in preparing the KPWU claims, prepared the inchoate claims made by the Klamath Project Water Users:

Q: Okay. Well, can you describe for me generally the nature of the inchoate claims made by the Klamath Project Water Users group?

A: Again, MBK did not prepare those. We were given those figures by the various districts or landowners, and we used that data like we use the data on total acreage. We were not responsible for preparing that.

April 20, 2004, 1:48:09 – 1:48:45.

Based on Mr. Kienlen's testimony regarding how the inchoate acreage claims were determined several KPWU witnesses should have had knowledge about these inchoate claims, including how the number of acres claimed was arrived at, and what intent there was to actually develop the claimed inchoate acreage. However, when cross-examined on these matters, it was apparent that no KPWU witness could

offer any testimony that showed or tended to show any intent to actually irrigate any of the claimed inchoate acreage.[31]

Ady District Improvement Company (ADIC) made a claim for two acres of inchoate lands. Affidavit and Testimony of Marc E. Van Camp at 16. Robert Flowers, testifying on behalf of ADIC, was unable to state exactly where these two acres were located, except to say that they are "sparsed out with different spots within the district." April 12, 2004, 1:52:09 – 1:52:14. He could not identify the owner(s) of the land(s) where any of these two acre were located, notwithstanding that he testified that he knew all the landowners within ADIC as "they are all basically family members." April 12, 2004, 1:52:45-1:52:46.

Mr. Flowers then volunteered that ADIC came up with the two acre number by "guessing."

---

[31] The only possible exception is Claimant Bradley Luscombe, who claimed 20 inchoate acres of lands. At hearing he testified that he had brought 10 acres of that under irrigation. April 23, 2004, 2:43:38 – 2:44:34. With respect to the remaining 10 acres, Mr. Luscombe could only testify that five acres not yet irrigated might possibly come under irrigation in the future.

> Q: Thank you. Now, just to orient ourselves here again, we are talking about the 20 acres of your land that are claimed as inchoate in the claim. You told us that you've irrigated 10 of them to date. Are you still working on clearing the lands, the remainder, the 10 acres that have not yet been irrigated?
>
> A: Not most of it, no.
>
> Q: Okay. Do you intend to bring that land under irrigation at any point in the future?
>
> A: Some of it possibly.
>
> Q: Some of it possibly? Could you tell me, do you have any idea how much of that remaining 10 acres –
>
> A: My house is on part of it, and part of it's a steep hill that you can't do anything with. I would say the 10 acres, possibly 15 acres is all it ever would be.
>
> The Administrative Law Judge: Out of the 20?
>
> A: Yes.
>
> Q: Out of the 20. So you are either completely there, or there might be just a few more acres that you haven't got to yet?
>
> A: That's right.

Although Mr. Luscombe *might* be said to have some intent to develop a few more acres, he does not have any specific plan to do so, and it is only a possibility that this will ever occur.

April 12, 2004, 1:57:12 – 1:57:19. When asked what the basis for that guess was, he said "It's so hard. It's almost impossible to measure them accurately…. It's almost impossibility [*sic*] to get an accurate measurement of what we are talking about." April 12, 2004, 1:57:28 - 1:57:54.

Thus, despite personal knowledge, intimate familiarity with all of the ADIC water users and their lands, Mr. Flowers could not identify the location of the claimed inchoate rights, could not identify any plans to bring these lands under irrigation, and was only "guessing" about the number of inchoate acres.

William D. Kennedy, President of the Board of Directors of the Poe Valley Improvement District (PVID), and PVID board member since 1995, April 14, 2004, 4:12:30 – 4:13:00, displayed a striking lack of knowledge concerning any plans or intent to irrigate any of the claimed 112 inchoate acres located within PVID. Affidavit and Testimony of Marc E. Van Camp at 16 (112 inchoate acres claimed by PVID).

> Q: Are you aware of any specific plan to irrigate any of the 112 acres that you've described as inchoate acreage?
>
> A: No (April 14, 2004, 6:17:31 – 6:17:47).
>
> * * * *
>
> Q: And does the district or do any individual land owners, to your knowledge, have any plans to bury that drain or to put a pipe in and put it underground or something of that nature?
>
> A: Not to my knowledge…. (April 14, 2004, 6:18:40 – 6:18:48)
>
> * * * *
>
> Q: Are you aware of any fence lines that are slated for removal?
>
> A: No.
>
> Q: No specific plans? How about roadways? Also mentioned in your testimony, are you aware that any roads that are currently within PVID's boundaries are going to be removed at any time in the future?
>
> A: I don't believe I know of any plans.

April 14, 2004, 6:19:30 – 6:19:49. Mr. Kennedy asserted that the 112-acre number was arrived at by marking up a map, and having HKM Engineers calculate the number from that. April 14, 2004, 6:21:49 –

6:22:05. This statement was contradicted by Donald Kienlen who worked with HKM Engineering, when he testified that "we were given those figures by the various districts or landowners … we were not responsible for preparing that." April 20, 2004, 1:48:24 – 1:48:45. This, along with the testimony of Mr. Flowers, above, who testified that ADIC's inchoate acreage claim was a mere guess, raises substantial questions as to how the amount of inchoate acres in the KPWU claims were arrived at in the first place.

KPWU witness Miles William Moore has been the president of the Board of Directors of Sunnyside Irrigation District (Sunnyside) for 15 years. April 14, 2004, 6:53:26 – 6:53:34. He testified that Sunnyside is making a claim for eight acres of inchoate lands. April 14, 2004, 7:28:35 – 7:29:17. *See also* Affidavit and Testimony of Marc E. Van Camp at 16 (eight inchoate acres claimed by Sunnyside). Mr. Moore testified that he personally knows each of the six landowners within Sunnyside and is personally familiar with their lands. April 14, 2004, 7:30:31 – 7:30:39. He could not offer any testimony that showed, or tended to show, any intent to bring the claimed inchoate acreage within Sunnyside under irrigation:

> Q: Are you aware of any specific plan to bring any of these eight acres, eight inchoate acres, under irrigation?
>
> A: Not at this time, no.

April 14, 2004, 7:30:18 – 7:30:31. He also testified that he is not aware of any plans to cover drainage ditches, cover irrigation canals, remove fence lines, or remove roadways to bring such areas under irrigation. April 14, 2004 7:30:43 – 7:31:25.

Tule Lake Irrigation District (TID) is claiming about 1300 acres of inchoate lands. *See* Affidavit and Testimony of Marc E. Van Camp at 16. Earl Danosky has been the manager of Tule Lake Irrigation District (TID) since 1979. April 20, 2004, 6:17:00 – 6:17:28. Before becoming the manager of TID, he was a ditch rider for about three years. April 20, 2004, 6:17:29 – 6:17:37. Once establishing these matters, Mr. Danosky testified:

> Q: So you have a very good idea of the lay of the land out there, correct?
>
> A: I do believe so.

> Q: Okay, good. Now, based on this knowledge, based on the interactions you have had with people in the field, based on your tenure as a manager, my question for you is, what can you tell me about these lands that would come under irrigation? Are you aware of any specific plans for this to occur in the future?
>
> A: I cannot name a plan that could occur….

April 20, 2004, 6:16:09 – 6:16:40.

KPWU witness Ruth Carland is secretary/treasurer of Midland District Improvement Company (MDIC), which was formed in 1951. She has been familiar with the land within MDIC since 1948. April 21, 2004, 2:27:56 – 2:28:36. MDIC has made a claim for five acres of inchoate lands—which is merely an "estimate" of the land that might come under irrigation in the future. April 21, 2004, 2:28:36 – 2:29:15; *See also* Affidavit and Testimony of Marc E. Van Camp at 16. She knows all four landowners within MDIC. April 21, 2004, 2:29:15 – 2:29:47. She was unable to testify as to any intent by any landowner within MDIC to bring the five inchoate acres under irrigation:

> Q: Okay. Let me ask it this way. Do you know of any specific plans by any of the four land owners you've told us about to do the sorts of work or improvement to bring these five acres under irrigation?
>
> A: No.

April 21, 2004, 2:29:50 – 2:30:10.

Lyle Logan, president of Pioneer District Improvement Company (PDIC), testified (in written direct testimony) that PDIC is claiming 18.4 acres of inchoate lands. Affidavit and Direct Testimony of Lyle Logan at 5. At the cross-examination hearing, Mr. Logan was very confused about this aspect of the claim, and the ALJ had to explain it to him:

> The Hearing Officer: Yeah, these acres, sir, are scattered around the district and are basically property that's out of irrigation because it's being used for driveways and home sites.
>
> Lyle Logan: Oh, I see. Okay.
>
> The Hearing Officer: At least that's what your affidavit says.

April 25, 2004, 4:13:14 – 4:13:29.

When questioned further about the inchoate acreage claim, it was clear that Mr. Logan could not provide any specifics that would demonstrate or tend to show any actual intent to bring the claimed inchoate lands under irrigation:

> Q: You had some discussion about the 18.4 acres claimed for future development. Do you remember that earlier?
>
> A: Yes, yes, I do.
>
> Q: And I just wanted to sort of ask you one or two wrap up questions on that. Do you have any additional information about that 18.4 acres? In other words, I could ask you a series of questions about what you know about it, who owns it, when you expect development to occur, things like that. Would you be able to give me any specifics on that?
>
> A: No, I would not.

April 23, 2004, 4:47:05 – 4:47: 42.

All of the KPWU's witnesses who testified about the inchoate acreage appeared to have significant personal knowledge concerning the claimed lands. In almost every case the witnesses were personally acquainted with the lands at issue in the claims. Several witnesses testified that they knew all of the landowners in their particular irrigation district personally (e.g., Robert Flowers, Miles William Moore). In a number of cases the witnesses had been acquainted with the lands in question for long periods of time—often stretching back several decades (e.g., Ruth Carland—over 55 years of familiarity with the claimed lands; Earl Danosky—over 25 years familiarity with the claimed lands; Miles William Moore—at least 15 years).

Notwithstanding this significant bank of personal knowledge, no KPWU witness could offer any testimony showing or tending to show any actual intent to irrigate the claimed inchoate acreage. Indeed, in the ALJ had to explain to one witness (Lyle Logan) what the nature of the inchoate acreage claim was. Witnesses testified that the number of inchoate acres were either guesses (Robert Flowers) or mere

estimates (Ruth Carland). Moreover, Donald Keinlen and William Kennedy offered inconsistent testimony concerning the method by which the number of inchoate acres was determined.

Taken as a whole, the testimony offered by KPWU utterly fails to make any showing of the required intent element necessary to prove a pre-1909 claim. In fact, the testimony by KPWU witnesses shows that the land is not now, nor will it be within any reasonable period of time, "ready to receive" the claimed water. *Hood River* at 137-138. In the absence of being able to make some showing of intent, KPWU's claims for inchoate rights must fail. ORS 539.110 ("[t]he burden of establishing the claim shall be upon the claimant whose claim is contested.")

**B. Diversion**

**1. In General, a Diversion of Some Type is Required**

As stated above, a "diversion from the natural channel by means of a ditch, canal or other structure," *Silvies River*, 115 Or at 64-65 (1925), or the "construction of works," ORS 539.010(4), for the diversion and delivery of water to a beneficial use is generally a required element of a pre-1909 water right.

However, the *Silvies River* court also elaborated upon the "diversion" element, adding the caveat that no initial diversion is required where the appropriator's land is "naturally irrigated" and the appropriator "in some substantial way indicates that it is his intention to reap the benefit of the fruit of the irrigation." *Id.* at 66. In such case, the priority date is "deemed to be when the proprietor of the land accepts the gift made by nature..." *Id.* Because this exception to the diversion element has been the matter of some controversy and misunderstanding—particularly by the United States—throughout this Adjudication, OWRD provides a detailed analysis on the point.[32]

[32] Claim 321-1 is "based on natural irrigation and use of the natural irrigated area for grazing and haying, followed by construction of works to utilize waters previously providing natural irrigation." Affidavit and Testimony of Donald E. Kienlen at 5. Thus, in order to properly evaluate the claimed priority date and quantity of water associated with this claim, it is necessary to apply the proper principles, as outlined below.

### 2. When no Diversion or Other Construction of Irrigation Works is Necessary, one may Establish a Water Right Based on Natural Overflow; Although what is Established is a Water Right, the Natural Overflow Water User Obtains only a Privilege to the Overflow Method of Diversion

The *Silvies River* court stated that establishment of a diversion is generally a required element of a pre-1909 water right, it did note a significant exception to this rule. As it explained, the requirement of

> diversion of the water has a special application or exception to much of the land in the Harney Valley. It involves the matter of the natural irrigation of the land. Nature has been very generous to the Harney Valley in this respect. With practically no artificial works for irrigation, thousands of acres are naturally watered…. It would seem to be fair and equitable, if not absolutely essential, that such date be deemed to be when the proprietor of the land accepts the gift made by nature, and garners the produce of the irrigation by harvesting or utilizing the crops grown on the land, or making preparation for so doing, or in some substantial way indicated that it is his intention to reap the benefit of the fruit of the irrigation. When no "ditch, canal, or other structure" is necessary to divert the water from its natural channel, the law does not vainly require such works, prior to an appropriation. We do not intend to suggest that in most cases the building of some kind of an irrigation system is not *requisite after the appropriation is made* in order to effect an economical beneficial use of such water and prevent waste. This should be accomplished within a reasonable time as circumstances permit and necessities require....

*Id.* (Emphasis added). This principle was affirmed and clarified in *Warner Valley Stock Co. v. Lynch*, 215 Or 523 (1959), which specifically states that it is "consistent" with the statements of the Oregon Supreme Court in *Silvies River*, 115 Or 27 (1925), as well as *In re Willow Creek*, 74 Or 592 (1915), and *Hough v. Porter*, 51 Or 318 (1908).

The *Warner Valley Stock Co.* case involved interpretation of the findings and order of determination as well as the 1929 decree for the waters of Warner Lakes and their tributaries. 215 Or at 532-33. Plaintiffs filed the suit after the Lake County Circuit Court directed the State Engineer to issue permits to Warner Valley Stock Company for the construction of two reservoirs in Warner Valley. *Id*. at 526. Plaintiffs, who had water rights based on natural overflow from Hart Lake under the 1929 decree, argued the permits would violate their vested water rights. *Id*. at 532. Based on the 1929 decree, the Supreme Court affirmed the circuit court's decision that the method of diversion by overflow was wasteful

and, accordingly, held "the *method of diversion* by way of natural over-flow is a privilege only and cannot be insisted upon by the objectors if it interferes with the appropriation by others of the waters for a beneficial use."[33] *Id*. at 537 (Emphasis added). It is important to note that the Warner Valley court, consistent with other court decisions, such as *Hough v. Porter* and *Silvies River*, specifically states only that the *method* of diversion by natural overflow cannot be insisted upon where it is wasteful. These decisions still allow an appropriator to establish a water right for use of that quantity of water obtained by beneficial use. In fact, the *Warner Valley* court went on to emphasize that the appellants had acquired vested water rights that they retained after the court's decision. *Id*. at 538.

Similarly, in *Masterson v. Pacific Livestock Company*, the court found that prior to the adjudication, the defendants had only irrigated their lands by means of natural overflow. 144 Or 397, 401-2 (1933). The *Masterson* court found that, although the decree had not provided the quantity of water to be taken under the right, the natural irrigation equaled no more than five acres "in the regular way." 144 Or at 406-8.

Thus, the case law indicates that appropriators may acquire pre-1909 water rights using natural overflow as the method of diversion. Based on an abhorrence of wasting water, Oregon courts have held that the natural overflow diversion method is only a privilege. This does not negate the right, but only limits the appropriator's ability to demand delivery of water by the natural overflow method.[34]

The purpose of the rule enunciated in *Warner Valley Stock Co.* is to prevent one water user from holding the entire resource hostage by insisting on a method of diversion that may be wasteful. As stated by the State Engineer in the 1929 water rights decree discussed in *Warner Valley Stock Co.*, and approved by the Lake County Circuit Court:

---

[33] In 1909, the Oregon Supreme Court reached a similar conclusion in *Hough v. Porter*, 51 Or 318, 420 (1909). The *Hough* court found that "wasteful *methods* so common with early settlers can…be deemed only a privilege permitted merely because it could be exercised without substantial injury to any one; and *no right to such methods of use was acquired thereby*." *Id*. (Emphasis added.)

> It is generally conceded that the present *method* of irrigation by natural overflow is an extremely wasteful one. The proposed diversion by pumps through artificial ditches would no doubt tend to conserve the water rather than require the use of a greater quantity. Furthermore, it would seem that *the best interests of the public at large would be served* if the water which is now permitted to lie idle in the lake merely for the purpose of providing a means of diversion for the relatively small quantity actually used, could be drawn from the land and applied to a beneficial use….

*Id. (*Emphasis added). Thus, under Oregon law, it has long been recognized that the purpose of the rule requiring development of artificial diversion works for irrigation is to ensure water is used as efficiently as possible, for the public good. Given the purpose of this rule, as enunciated in *Warner Valley Stock Co.*, the language of *Silvies River* requiring development of such works within a "reasonable time" must be interpreted to require development of such works, as the practicalities and exigencies of the situation reasonably require. That is, where sufficient water is not present to satisfy the needs of all water users.

Thus, the appropriator must employ some technologically reasonable means of appropriation and cannot insist upon a method of delivery involving allowing the system to actually overflow. The right extends only to the amount of water which *would* overflow if no water were removed by junior appropriators.

Notwithstanding the United States' steadfast protestations to the contrary, the ALJs presiding over pre-1909 water right claims have repeatedly issued orders consistent with the above analysis. *See,* e.g., Order on Motion for Ruling on Legal Issues, Hearing Officer Panel Case Nos. 124, 126, 127, Claims 177, 182, 183, dated May 22, 2003, at 3; Order on Motion for Legal Rulings, Office of Administrative Hearings Case No. 128, Claim 185, dated August 20, 2003, at 3-5; Order on Motions for Summary Judgment, Motion to Strike and Motion for Stay, Office of Administrative Hearings Case No. 105, Claim 35, dated September 4, 2003, at 2; Proposed Order, Office of Administrative Hearings Case No. 134, Claim 201,

---

[34] Claim 321-1 does not assert any right to delivery based on natural overflow. *See* Affidavit and Testimony of Donald E. Kienlen at 5 (stating that there has been "construction of works to utilize waters previously providing natural irrigation.").

dated January 9, 2004, at 7-8. OWRD believes that the rulings in the above cases on this particular point are correct and should be followed in this case, consistent with the discussion above.

Whether KPWU's Claim 321-1 and evidence submitted in support thereof make a sufficient showing under the principles discussed above is a question of fact to be resolved based on the evidence. OWRD takes no position on these factual issues.

**C. Reasonable Time**

The requirement of an "application of (the water) within a reasonable time to some useful industry," *Silvies River*, 115 Or 27 at 65, is synonymous with "reasonable diligence," which courts use synonymously with "due diligence." *See, e.g., Teel Irrigation Dist. v. Water Resources Dept.*, 323 Or 663, 669 (1996) (noting a showing of "due" diligence under ORS 537.230, which requires "reasonable" diligence). The *Silvies River* court, for example, defined the "reasonable time" element in terms of "reasonable diligence," explaining that such determination must be fact-specific:

> The test, both in the construction of the necessary works and in the application of the water to a beneficial purpose, is *reasonable diligence*. There must be such assiduity of work of construction as will manifest to the world a *bona fide intention to complete it within a reasonable time*. The question is one of fact and must be determined from the surrounding circumstances.

*Silvies River*, 115 Or 27 at 61 (citations omitted) (emphasis added). *See also, In re Water Rights of Hood River*, 114 Or 112, 131 (1924) ("That which is usual and ordinary with men engaged in like enterprises who desire to speedily effect their designs is required.").[35]

**1. No Oregon Case has Allowed Inchoate Rights to be Developed for a Period Approaching 100 Years**

On several occasions, the Oregon Supreme Court has considered what constitutes a reasonable time given the particular circumstances of the case. Below, OWRD reviews several prominent cases, which lead to the conclusion that the reasonable time or diligence element requires application of water to a

beneficial use much more quickly than the 100-year (or more, in the case of some claims) time period apparently identified by the United States and KPWU.

One of the water rights adjudicated in *In re Water Rights of Deschutes River and Tributaries*, 134 Or 623, 641, 676 (1930), involved several notices of appropriation filed by the Pilot Butte Reclamation Company, predecessor in interest to the Central Oregon Irrigation District. The earliest notice of appropriation, filed in 1900, contemplated that about 140,000 acres would be reclaimed under the appropriation. However, over a period of 20 years, only approximately 48,000 acres of land were reclaimed, and the court determined that this was a reasonable time period for development under the circumstances of that case. *Deschutes* at 635, 655-656. Other land brought under irrigation in excess of the approximately 48,000 acres, were assigned a later priority date under a 1907 notice of appropriation. *Id*. at 635, 655-656.

In *Seaweard v. Pacific Livestock Co.*, 49 Or 157 at 160-61 (1907), the Court stated the general rule succinctly:

> What is a reasonable time in which to apply water originally intended to be used for some beneficial purpose depends upon the magnitude of the undertaking and the natural obstacles to be encountered in executing the design: *Hindman v. Rizor*, 21 Ore. 112 (27 P. 13); *Nevada Ditch Co. v. Bennett*, 30 Ore. 59, 85 (45 P. 472: 60 Am. St. Rep. 777).

The Court applied this rule to facts involving settlement of land by the Pacific Livestock's predecessors, Morgan and Hinkey, in 1886, with first irrigation in 1887. Between 1887 and 1899 Morgan and Hinkey "were constantly enlarging the area of their arable land." *Seaweard* at 161. The Pacific Livestock Company bought Morgan and Hinkey's land in 1899, and for a period of five years "made no attempt whatever to prepare any new land for cultivation, whereby a purpose to expand the appropriation might have been disclosed to persons who desired to make a subsequent use of the water." *Id*. Since no

[35] This articulation of the rule—as do several of the cases discussed below—also highlights the interconnectedness of the first ("intent") and third ("reasonable time") elements.

cause for the delay was given, and therefore "believing it to have been unreasonable," the Court did not allow the Pacific Livestock Company to expand its appropriation based on the early initiation of the right by Morgan and Hinkey. *Id.* at 161 *citing Cole v. Logan*, 24 Or 304.

In *In re Rights to Use of Silvies River*, 115 Or 27 (1925), the predecessor to the Burns Flour Milling Co., Brown, posted a notice of appropriation in 1884. *Id.* at 58-59. Brown dug a ditch (mill race) and took water to a mill site within one to two years. However, local attempts to raise grain largely failed, and there was no grain to grind until about 1899, when the first successful crops were harvested. *Id.* at 59-60. The milling machinery was installed in 1899. The Court held that this was diligence, under the circumstances, since it would have been futile to install the milling machinery when there was nothing to mill. During the intervening time period between 1884 and 1899, certain portions of lands claimed with an 1884 priority date were irrigated out of the mill race, and the Supreme Court allowed an 1884 priority date as to those lands. However, other lands not irrigated, and for which there was no showing of intent to irrigate, were not allowed an 1884 priority, and were instead assigned a 1901 priority, the date that they first came under irrigation. *Id.* at 39-40.

Additionally, two other portions of the *Silvies River* case allow for development of inchoate rights for periods of 43 years each. In both cases, certain irrigators initiated their rights in 1887, the rights were not fully developed by the time of the Supreme Court's decision in 1925, and the Court allowed five years from entry of the Circuit Court's Decree on remand. *See Silvies* at 69-70 and 86-90.

In *Low v. Rizor*, 25 Or 551, 557 (1894), where an irrigator failed to increase the area under irrigation for a period of 13 years, he "abandoned the right to increase the appropriation."

In *Smyth v. Neal*, 31 Or 105 (1897), the plaintiff settled on the land in 1873, and, by 1888, had appropriated and applied water sufficient to raise 120 acres of wild grasses that were cut for hay and also irrigated 18 acres of grain and garden. In 1882 plaintiff recorded a notice of appropriation. Notwithstanding that plaintiff had installed a new dam and partially dug a new ditch, between 1882 and the

institution of the litigation in 1895, plaintiff did not make any additional use of water. Plaintiff also expressly disclaimed any intent to increase his previous (1873) appropriation. Under these circumstances, the Court held that plaintiff's water right was limited to the lands and quantities that were used before 1882. Thus, plaintiff's statements and his failure to expand his irrigated land for a period of 13 years showed lack of reasonable diligence. *Id.* at 108-110.

In *In re Hood River*, 114 Or 112 (1924), the Oregon Supreme Court held that the diligence period for a water right initiated in 1895 expired in 1915, a period of 20 years. *Id* at 147. The Court held that enlargements to the irrigation system in 1914 constituted a new appropriation. *Id*. The Court made this finding even though:

> Owing to the topography of the country being mountainous, the water had to be conducted from the bank of a mountain stream to a point 20 miles away, passing through and crossing over ravines and canyons, falling over a precipice at one place and many flumes, pipes and siphons were necessary. It was a stupendous task.

*Id.* at 138 (Emphasis added). Thus, even where construction of the irrigation system was determined to be a "stupendous task," the Supreme Court set the diligence period at 20 years.

In *Wapinitia Irrigation Co. v. Water Users Corp. of Juniper Flat*, 141 Or 504, 507-08 (1932), a decree was issued in 1923 allowing for development of certain inchoate rights, to be developed in five years, or pursuant to any extension(s) that the State Engineer may allow. Under the decree, the rights were assigned priority dates of 1904 (direct flow) and 1905 (storage), for a maximum of 12,000 acres. *Id.* at 507. Irrigation under these rights occurred first in 1917, covering between 1,000 and 2,000 acres. The project was not complete by 1928 when the five-year period expired, and the State Engineer refused to grant any extension. The Court found that considering the circumstances—which included a drought (*id.* at 519), the great depression and associated difficulties in financing further development of the project at (*id.* at 512-14), the fact that the irrigation project was a "mammoth undertaking" (*id.* at 513), and the existence of delivery contracts (*id.* at 516-17), the State Engineer should have granted the extension under the statutory provisions

of § 517 Or L (§ 47-403, Or Code 1930). Significantly, however, the Court allowed only two additional years for completion of the irrigation system and actual reclamation of land (up to 8,000 acres) on or before June 1, 1938. *Id.* at 522-23. Thus, the court allowed a maximum of 34 years (1905 to 1938) to complete what it characterized as a "mammoth undertaking," even considering drought conditions and severe economic problems that made development difficult.

Another example of these principles may be found in *Oliver v. Skinner*, 190 Or 423, at 437-38 (1951):

> The original appropriator of the water rights now owned by defendant, however, obviously had no intention of enlarging the scope of his appropriation within a reasonable time after the date of such appropriation, or at all. He and his successors in interest, down to and including defendant, followed the original method of irrigating the lands by flooding them and raising thereon crops of tule grasses and wild hay for sixty-seven years before defendant inaugurated his improvements. The elaborate system of irrigation now put into operation by defendant is, in effect, an attempted new appropriation, and is inferior to the rights of the plaintiff, John A. Oliver, which accrued between the time of the original appropriation for the Lodge lands and such attempted new appropriation. [citations omitted].

Thus, taken as a whole, the reported cases in Oregon demonstrate that the failure to expand one's irrigation and bring additional acreage under irrigation for as little as five years may prevent further expansion of the inchoate portion of such a right. *Seaweard v. Pacific Livestock Co.*, 49 Or 157, 161 (1907). On the other end of the spectrum, a "mammoth undertaking" with many financial and historical impediments to complete construction was allowed a period of 34 years for development, *Wapinitia Irrigation Co. v. Water Users Corp. of Juniper Flat*, 141 Or 504, 513 (1932), and in other circumstances, 43 years was allowed for the inchoate development of irrigation projects under *Silvies River*, 115 Or at 69-70 and 86-90. And, along these same lines, the Oregon Supreme Court has ruled that 67 years is too long for one to assert development under a pre-1909 right. *Oliver v. Skinner*, 190 Or 423, at 437-38. To the best of OWRD's knowledge, no reported Oregon case has allowed 100 (or more) years to complete an

appropriation or develop an inchoate water right. Thus, the claims for inchoate rights by KPWU and the United States, involving priorities of 1905 or earlier, must fail for lack of diligence in development.

#### 2. The Klamath Compact does not Alter the Requirement that a Claim of an Inchoate Water Right be Developed more Expeditiously than Within 100 Years

The Klamath Compact, ORS 542.620, provides:

> There are hereby recognized vested rights to the use of waters originating in the Upper Klamath River Basin validly established and subsisting as of the effective date of this compact under the laws of the state in which the use or diversion is made, including the rights to the use of waters for domestic and irrigation uses within the Klamath Project. There are also hereby recognized rights to the use of all waters reasonably required for domestic and irrigation uses which may hereafter be made within the Klamath Project.

Klamath Compact, Art III. A. KPWU and the United States maintain that the last sentence of this provision relieves any water user from the requirement that they put water to use within a reasonable time. In other words, these claimants would have the ALJ believe that a vague statement that merely "recognize[s]" the use of water that might be later made overturns the "reasonable time" or "diligence" element of a water right—one of the foundational elements of Oregon (and western) water law. In other words, these claimants assert that the "hereby recognized" language constitutes an implied repeal of not only ORS 539.010(4), but also over 65 years of case law decided both before and after the enactment of that statute requiring that development of a water right be within a reasonable time or with due diligence. *Hindman v. Rizor*, 21 Or 112, 120 (1891) ("While (the appropriators) could rightfully appropriate water not only for the present but also for the future needs of the land, the water so appropriated must have been utilized within a *reasonable time*....") (Emphasis added); *Cole v. Logan* 24 Or 304 (1893) ("he must have commenced the diversion within a *reasonable time*, and must have prosecuted it with *due and reasonable diligence*" *citing Ophir Min. Co. v. Carpenter*, 4 Nev 534 (1869)) (Emphasis added); *Low v. Rizor*, 25 Or 551, 556 (1894) ("he would be entitled to divert and appropriate a sufficient quantity of water to irrigate his land if his grantors and predecessors in interest prosecuted the cultivation of it with *due and reasonable diligence*") (Emphasis

added); *Nevada Ditch Co. v. Bennett*, 30 Or 59, 91-92 (1896) ("The claimant is entitled to a *reasonable time* after he has diverted and carried the water to the place of use in which to make the application to the contemplated useful; purpose; the prime requirement being that he must use *reasonable diligence* in making that application….") (Emphasis added); *Seaweard v. Pacific Livestock Co.*, 49 Or 157, 160 (1907) ("the law allows a "*reasonable time* in which to complete the appropriation") (Emphasis added); *In re Water Rights of Hood River*, 114 Or 112, 131 (1924) ("That which is usual and ordinary with men engaged in like enterprises who desire to speedily effect their designs is required."); *In re Rights to Use of Silvies River*, 115 Or 27, 65 (1925) ("application of [the water] within a *reasonable time*") (Emphasis added); *In re Water Rights of Deschutes River and Tributaries*, 134 Or 623 (1930) ("application of [water] within a *reasonable time* to some useful purpose") (Emphasis added); *see also Teel Irrigation Dist. v. Water Resources Dept.*, 323 Or 663, 669 (1996) (noting a showing of "due" diligence under ORS 537.230, which requires "reasonable" diligence); Robert E. Beck, Waters and Water Rights § 12.02(b), 1991 ed, 2001 Replacement Volume (discussing "due diligence" and "reasonable diligence" requirements in cases from several states, including the early Colorado case of *Larimer Co. Reservoir Co. v. People*, 8 Colo 614, p 794, 796 (1886)); ORS 539.010(4) (which codifies pre-1909 case law and is consistent with post 1909 case law where it states: "commence the construction of works for the application of the water so appropriated to a beneficial use, and thereafter *prosecuted such work diligently and continuously* to completion") (Emphasis added).

Repeals of statutory provisions are strongly disfavored, and courts will only conclude that such a repeal occurred in very limited circumstances. In *State ex rel Huddleston v. Sawyer*, 324 Or 597, 604 (1997), the Oregon Supreme Court explained:

> The doctrine of implied repeal of statutes is that when the legislature enacts a subsequent statute which is repugnant to or in conflict with a prior statute, but contains no language expressly repealing the prior statute, the prior statute is impliedly repealed.

*Id. citing and quoting State v. Shumway*, 291 Or 153, 160 (1981). Repeal by implication is "not favored." *State ex rel Med. Pear Co. v. Fowler*, 207 Or 182, 195 (1956). An implied repeal can only be established by

"plain, unavoidable, and irreconcilable repugnancy." *Shumway*, 291 Or 153, 162 (quoting *Messick v. Duby*, 86 Or 366, 371 (1917). A court will conclude that a law was meant to override a prior inconsistent law only where "the two are totally irreconcilable"; "but if the statutes can function together, a claim that the earlier statute "is superseded depends on some persuasive indication that the legislature meant the new statute to prevail over a[n] unrepealed . . . one." *Harris v. Craig*, 299 Or 12, 15 (1985). These principles must have even greater force where the statute (in this case ORS 539.010(4)) is supported by many decisions of the Oregon Supreme Court, not to mention federal legislation, such as the Reclamation Act of 1902.

Indeed, there is no indication anywhere in the language or history of the Klamath Compact that an implied repeal of ORS 539.010(4) (and the 65 years of case law consistent therewith) occurred upon its enactment. In fact, rather than being contradictory to the Klamath Compact, a requirement that a water right be developed within a reasonable time or with due diligence is consistent with the Klamath Compact.

On November 10, 1950, Oregon's Attorney General issued a formal opinion, 25 Or Ops Atty Gen 62, (as noted in the KPWU Brief at 129[36]) pointing out what the current (and long standing) state of the law was (and is) with respect to water rights: that water rights are subject to the beneficial use doctrine, including the requirement that a water right—including those in the Klamath Project—must be developed within a reasonable time. 25 Or Ops Atty Gen at 65. Had the legislative bodies that adopted the Klamath Compact, particularly the Oregon Legislature, desired to change this result with respect to the Klamath Project, they surely would have insisted on language that specifically states that the "reasonable time" requirement is not applicable to the Klamath Project. This could only be more true if one accepts KPWU's premise that the impetus for the compact was the 1950 Attorney General Opinion. *See* KPWU Brief at 129.

Instead, the Klamath Compact merely states that there are "hereby recognized rights" to use water "which may hereafter be made." "Recognize" means:

[36] In an apparent effort to downplay the significance of the fact that the Attorney General formally advised the State Engineer that doctrine of beneficial use is, in fact, a limit on the right to the use of water, notwithstanding the overreaching 1905 filing by the United States, KPWU incorrectly identify this document as a mere "memorandum."

> 1.a: to admit the fact, truth or validity of …. 2.b: to perceive clearly : be fully aware of " REALIZE …. 3: to acknowledge in some definite way : take notice of …. c: to admit the fact or existence of

*Webster's Third New Int'l Dictionary* (3rd ed 1993) ("*Webster's*"), 1896. *Portland General Electric v. Bureau of Labor and Industries*, 317 Or 606, 611 (1993) (when interpreting a statute, words of common usage should be given their "plain, natural, and ordinary meaning."); *Carrigan v. State Farm Mut. Ins. Co.*, 326 Or 97, 101-102 (1997) (citing *Webster's* for the "ordinary meaning" of a word). From this definition it is evident that the Klamath Compact merely realizes or acknowledges that some water rights that were inchoate at the time of the enactment of the Compact in 1957 may exist. In other words, it is plain from the face of the Compact that the Compact was confirming, consistent with the 1950 Formal Attorney General Opinion, that some rights might still be able to be developed under the 1905 Notice of Appropriation filed by the United States. *See* 25 Or Ops Atty Gen at 65 (advising the State Engineer that "*if you find from your investigation* that there are surplus waters over and above that required under the original project, *you may honor* the applications and issue your permits in conformance therewith.") (Emphasis added).[37]

Article III. B. of the Klamath Compact does not, as KPWU asserts, change this result. KPWU Brief at 132. KPWU alleges that the Compact "provided for completion of any development within the geographic service area" of the Klamath Project. That, however, is inaccurate: under the beneficial use concept, as explained above, inchoate pre-1909 rights within the geographic service area could be developed *as long as they met all the requirements of a pre-1909 right, i.e., so long as they were developed within a*

[37] KPWU state that there has been no known determination of the limits of the Klamath Project under the 1950 Attorney General Opinion, KPWU Brief at 129, and that as a result of the enactment of the Compact, the project could expand to the full limit of the project service area and obtain a 1905 (or earlier) water right on such land. *Id* at 127-132.

This novel interpretation is at odds with the actions of at least one KPWU claimant – the Klamath Drainage District. The Klamath Drainage District ("KDD") applied for and obtained a permit with a 1977 priority date for lands clearly designated as being within the boundaries of the project service area. *See* 00300041636 (showing project service area under the Klamath Compact). Therefore, it is obvious that at least in 1977, KDD did not believe that it could indefinitely expand its irrigation, or at least it was not confident that this novel legal interpretation would withstand scrutiny in the Klamath Adjudication. The 1977 application also demonstrates the inconsistency in KDD witness Sam Henzel's testimony. Mr. Henzel testified at the Cross-Examination Hearing that no diligence requirement applies to KDD's pre-1909 claims. Of course, if KDD really believed this, it would have had no reason to apply for a permit in 1977.

*reasonable time*. Thus, any such water uses that might be made within the project service area which were not developed within a reasonable time would also be able to obtain a post-1957 priority date, with the type of use preferences set forth in Article III. B. 1. of the Compact. Not only does this interpretation of the Compact avoid making the second sentence of Article III.A "meaningless" as alleged in the KPWU Brief at 132, but it also has the benefit of preserving all of the elements of a pre-1909 water right, as set forth in statute, ORS 539.010(4), and myriad cases decided by the Oregon Supreme Court in the 66 years that elapsed between the 1891 decision in *Hindman v. Rizor*, 21 Or 112 (1891), and the Compact's enactment in 1957. *See* discussion *supra.*

## III. Ownership of the Right to Use Water

Both the United States and the KPWU have submitted arguments asserting that they are the "owner" or "holder" of Klamath Project Water Rights. United States' Brief at 68-104; KPWU Brief 209-237. Additionally, the Klamath Tribes have submitted a brief stating that the United States is the "owner" or "holder." *See generally* Klamath Tribes' Response Brief. The answer to this question is complex, and requires a careful consideration of what each entity involved in the development and maintenance of the water right—including the diversion, delivery, and application of water—brings to the table. As one commentator has noted:

> [t]he federal government, states, districts, and private water users all have some rights and responsibilities with respect to [Reclamation] project water. The specific nature of those rights and responsibilities must be determined case-by-case, based on a number of factors. Most of those factors are variable, and few are constant.
>
> The question, "Whose water is it?" is too involved to be answered on a bumper sticker, and too important to be disregarded or misunderstood.

Reed D. Benson, Whose Water is it? Private Rights and Public Authority over Reclamation Project Water, 16 Va Envtl L J, 363, 426-27 (1997).

One important goal of a water rights adjudication is to definitively determine the nature and extent of the relative rights to the use of water among the various claimants asserting such rights initiated before February 24, 1909 (as well as the reserved rights claims of Indian Tribes and the Federal Government, irrespective of the date of initiation).[38]

### A. ORS Chapter 539 Contemplates that an Adjudication Will Identify the "Owner" of the Water Right

ORS chapter 539 contemplates a sequential process for conducting a water rights adjudication. After preliminary notices are given, OWRD is required to take "testimony as to the *rights of the various claimants* to the use of the waters…." ORS 539.040. (Emphasis added). Those challenging the claims may file contests. ORS 539.100. The statute governing contests also identifies who is a party to an adjudication:

> Any *person* owning any irrigation works, or *claiming any interest* in the stream involved in the determination *shall be a party to, and bound by*, the adjudication.

ORS 539.100 (emphasis added). Once contests are received, OWRD is required to hold a hearing on contests received. Before holding this hearing, OWRD is required to give notice to "*the contestant* and the *person whose rights* are contested to appear before the director" for hearing of contests to claims. ORS 539.110 (emphasis added). OWRD is required to use ALJs from the Office of Administrative Hearings to conduct these hearings, which generally result in issuance of proposed orders. ORS 183.635, 183.650. Once all of the hearings have been completed (or the cases otherwise disposed of through settlement or Motions for Rulings on Legal Issues), OWRD issues "findings of fact and an order of determination, *determining and establishing the several rights to the waters* of the stream." ORS 539.130(1). The findings of fact and order of determination is then filed with the Circuit Court, which is to provide an opportunity for exceptions (objections) to the findings of fact and order of determination, and set a date for a hearing. ORS 539.130. Once the hearing date is set, OWRD must notify each "*claimant or*

38 There are, however, no reserved rights (directly) at issue in this particular case.

*owner* who has appeared in the proceeding of the time and place for hearing."[39] ORS 539.130(3). Once this process is completed, the Circuit Court issues a final judgment (decree) in accordance with ORS 539.150. OWRD then issues water rights certificates that, among other things, set "forth the *name* and post-office address *of the owner of the right*. . . and if the water is for irrigation purposes, a description of the legal subdivisions of land to which the water is appurtenant." ORS 539.140. A water right is conclusive evidence of the priority and extent of the water right described therein. ORS 537.270. Thus, one of the ultimate objectives of an adjudication is to determine the "owner" of a particular water right.

Although water rights are appurtenant to the land on which water is used, ORS 540.510(1), nothing in ORS 539.140 or ORS 537.250 prevents a water right certificate from being issued to an entity, such as an irrigation district, or a governmental entity, such as the United States. In fact, ORS 537.250(2) contemplates that a certificate may be issued to a "district," as defined in ORS 540.505,[40] or to a

---

[39] The place in the process where the nomenclature changes from only "claimant" to "claimant or owner" is significant, because it appears in the first place where there has been some final action where all the evidence and legal arguments (made to OWRD) have been considered and passed on by the agency. Identifying those with further participation rights as unsuccessful "claimants" and successful claimants or "owners" makes sense since, if no exceptions are filed with the Circuit Court with respect to a particular claim, the adjudicator's findings of fact and order of determination on that particular claim must be incorporated into the decree by the Circuit Court. ORS 539.150(3); *see* ORS 539.130(4) (OWRD's determination has full force and effect, and OWRD may regulate in accordance therewith unless stayed by the Circuit Court in accordance with ORS 539.180, requiring posting of what is likely to be a substantial bond).

"government agency," a term broad enough to encompass federal agencies such as the Bureau of Reclamation or the United States Fish and Wildlife Service. Moreover, KPWU, the United States and the Klamath Tribes entered a stipulation in this case that provides:

> With respect to claims 289, 290, 293-299, 312, 317, 321-324, 194, 211, 285-288, and 291-292, the Parties stipulate and agree that where [the Bureau of] Reclamation, the [United States Fish and Wildlife] Service, KPWU, or others have filed separate claims in the Adjudication for the same water right with respect to the same use and the same place of use, and such water right determined in the Adjudication shall be limited to the beneficial use. The Parties further stipulate and agree that only one water right is to be determined in such circumstances in the Adjudication . . . . The Parties further recognize, without admission, *that more than one party or person may hold an interest in that adjudicated water right*.

Contest Dismissal Agreement and Stipulation Between Klamath Project Water Users, the Klamath Tribes, and the United States; Order of the Hearing Officer in Case 003, *nunc pro tunc* December 6, 2002. (Emphasis added).

It is with these considerations in mind that OWRD requests that the ALJ issue a proposed order in this case that has sufficiently detailed factual findings to explain accurately the interests of all parties in the water rights at issue in this case. The legal principles governing this matter are discussed next.

### B. The Question of who "Owns" or "Holds" the Water Rights Claimed in this Case is One of Oregon Law

Under Section 8 of the Reclamation Act of 1902 ("1902 Reclamation Act"), state law controls the question of who "owns" or "holds" project water rights. Section 8 provides, in relevant part:

> Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing

[40] ORS 540.505(1) states that:
"District" means an irrigation district formed under ORS chapter 545, a drainage district formed under ORS chapter 547, a water improvement district formed under ORS chapter 552, a water control district formed under ORS chapter 553 or a corporation formed under ORS chapter 554.

> herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriators, or user of water in, to, or from any interstate stream or the waters thereof.

43 USC § 383, Act of June 17, 1902, 32 Stat 388. Thus, it is necessary to look to *Oregon* law to determine who should "own" or "hold" the rights to Klamath Project Water rights.

Ownership of irrigation rights in projects built pursuant to the Reclamation Act have been the subject of several Supreme Court decisions. *Nevada v. United States*, 463 US 110 (1983); *California v. United States*, 438 US 645 (1978); *Nebraska v. Wyoming*, 325 US 589 (1945); *Ickes v. Fox*, 300 US 82 (1937). These decisions confirm that the question of ownership is one of state law. In *California*, the Court held that state law governs in Reclamation Projects unless there is a specific congressional directive to the contrary. *California*, 438 US at 665, 668, 678. There is no directive to the contrary with regard to the question of ownership of the rights. Under Section 8, the state's law of appropriation is controlling, and this law also bears on the question of ownership. Finally, the Supreme Court has looked to the law of the state in each case considering ownership of project water rights. *Nevada*, 436 US at 126; *Nebraska*, 325 US at 613-15; *Ickes*, 300 US at 94-95.

Because the Supreme Court was applying a particular state's law in each of the above-cited cases, their applicability to the question of ownership of project water rights under Oregon law is necessarily limited. Nonetheless, to the extent that similar principles of law apply, the cases may be regarded as having some persuasive authority.

### C. The Person(s) and/or Entities that are Designated as the "Owner" or "Holder" of the Water Rights Claimed in this case Should Accurately Reflect the Relative Interests Each has, Considering Their Relative role(s) in Establishing the Water Rights and role(s) in Making Continued Beneficial Use of the Water

As explained above, in order to establish a pre-1909 water right, a claimant must satisfy three elements: (1) intent to apply water to a beneficial use at the time of appropriation or to a future

contemplated use; (2) diversion of the water (subject to the exception for uses based on natural overflow); and (3) application of water to a beneficial use within a reasonable time (diligence). *See* discussion *supra* at 5-6. Oregon law also requires that water rights be used continuously, otherwise water rights are subject to loss. *Hale v. Water Resources Department,* 184 Or App 36, 42 (2002) (citing the dissenting opinion in *Withers v. Reed*, 194 Or 541, 571 (1952), which "agree[d] with the majority that the purpose of the Water Rights Act is 'to see that these appropriators make beneficial and continual use of the waters'"). Thus, determination of the "holder" or "owner" of the water rights claimed in this contested case requires a determination not only of the role the various persons or entities played in developing the water use (under the elements above), but also requires examination of the roles that water diverters, distributors, and end users currently play in putting the water to beneficial uses within the Klamath Project.

The United States and KPWU have offered voluminous testimony and briefs summarizing the available evidence on these matters. Consequently, OWRD will not rehash that evidence here. However, OWRD does offer some analysis of the legal framework in which the United States and the various KPWU entities exist that bears on how the evidence developed in this contested case should be evaluated.

### D. Interests of the United States, KPWU Claimants and End Users of Water

#### 1. Land owner/end user interests

Under Oregon law, state water rights arise through application of water to beneficial use. *In re Water Rights of Silvies River*, 115 Or 27, 64-65 (1925). Under Oregon's water code, the actual beneficial use of water is the basis for recognized water rights. *Alexander v. Central Oregon Irrigation District*, 19 Or App 452, 457 (1974). This principle has remained consistent since Oregon's first recognition of appropriative water rights. *See In re Waters of Umatilla River*, 88 Or 376, 168 P 922 (1917), *modified and aff'd on reh'g*, 172 P 97 (1918) (noting that the principle that "beneficial use shall be the basis, the measure, and the limit of all rights to the use of water" had been "well supported by court decisions" before being

"crystallized into statutory form by the Act of February 27, 1913, Chapter 279"). By establishing the water right, the beneficial user thus has an ownership interest in the right for the purpose of the beneficial use.[41]

This conclusion is consistent with Supreme Court precedent determining the relative interests of the Bureau of Reclamation and the end users of the water in Reclamation Projects. As noted above, the question of the ownership of project water rights is one of state law. This necessarily limits the usefulness in the present case of *Ickes* and its progeny, which relied on the water law of states other than Oregon. Nonetheless, *Ickes*, and the cases that have followed it, *Nevada v. United States*, 463 US 110 (1983), *California v. United States*, 438 US 645 (1978), and *Nebraska v. Wyoming* 325 US 589 (1945), reach a common conclusion: under both the Reclamation Act and state laws, the beneficial ownership of the water right is vested in the individual who makes beneficial use of the water. Further, the principles underlying the Supreme Court's decision in each case, that perfection of a water right requires beneficial use and that the right is appurtenant to the land on which it is used, *see, e.g.*, *Nevada*, 463 US at 126, apply also in Oregon. Therefore, a similar result should obtain under Oregon law.

The requirement of beneficial use as the basis of the water right is not altered by Oregon's Act of February 22, 1905, Or. Gen Laws, 1905, Ch. 228 ("Act of 1905"), which sets out a specific method for the Secretary of the Interior to appropriate water for federal irrigation projects. Section 2 of the Act of 1905 imposes the following requirements upon the United States to appropriate water for federal projects:

> Whenever the proper officers of the United States, authorized by law to construct works for the utilization of water within this State, shall file in the office of the State Engineer a written notice that the United States intends to utilize certain specified waters,

[41] The Klamath Tribes, in their Response to the Opening Briefs of the Untied States and the Klamath Project Water Users ("Klamath Tribes' Response"), argue that the first element of a pre-1909 water right, intent to appropriate to a beneficial use, "determines ownership of water rights for irrigation projects in Oregon." Klamath Tribes' Response at 19. Under this theory, the beneficial user does not have an ownership interest in the water right. *Id*. The Klamath Tribes' Response relies heavily on language in *Nevada Ditch Co. v. Bennett*, 30 Or 59, 45 P 472 (1896), which compares Colorado water law, where an intent to appropriate is not required, and Oregon law, which requires such an intent. The Court suggests that, where intent is required, the one with the intent might be considered the "principal" rather than the beneficial user. *Nevada Ditch Co.*, 30 Or at 97. This, however, is dictum. The Court goes on to state: "As to who, in general, would own the appropriation when completed, it is not necessary for us to say at this time." *Id* at 98. The Klamath Tribes' reliance upon statements that may speak to ownership in *Nevada Ditch Co.* is therefore unpersuasive. As in other western states, beneficial use is the basis for a recognized water right.

> the waters described in such notice and unappropriated at the time of the filing thereof shall not be subject to further appropriation under the laws of this State, but shall be deemed to have been appropriated by the United States; provided that within a period of three years from the date of filing such notice the proper officer of the Untied States shall file final plans of the proposed works in the office of the State Engineer for his information; and provided further that within four years from the date of such notice the United States shall authorize the construction of such proposed work.

Upon compliance with these requirements, the United States is deemed to have appropriated the described waters; however, this procedure did not, of itself, vest the United States with title to water rights. Compliance with the procedure established a superior claim to water as against appropriators subsequent in time to their notice, *see Nevada Ditch Co. v. Bennett*, 30 Or 59, 89, 45 P 472 (1896), but it did not alter the common law requirement of application to beneficial use within a reasonable time for the creation of a water right.

A formal Oregon Attorney General opinion issued on November 10, 1950 concluded that the Oregon legislature, in enacting the Act of 1905, had not intended to alter the beneficial use doctrine, including the requirement that a water right must be developed within a reasonable time. 25 Or Ops Atty Gen 62, 64 (1950). The opinion reasoned, in part, that "[i]t is only reasonable to assume that the purpose of filing plans and authorizing construction of such projects was to afford the state engineer an opportunity to determine the specific amount of water that was withdrawn from appropriation and whether or not it may be beneficially used." *Id*. In other words, each of the requirements under the Act of 1905 were indicia of *intent to appropriate*. The Act of 1905 established the means by which the initial intent to appropriate was to be demonstrated.[42]

The Act of 1905 does not speak to beneficial use, and the reasonable inference arises, as the 1950 Attorney General's opinion concluded, that the Act meant not to disturb the beneficial use doctrine. The opposite inference, that the Act of 1905 somehow removed beneficial use requirement as to project water rights, is implausible. It would require an assumption that the Oregon legislature intended to undo one of the core principles of acquiring a water right both in Oregon and throughout the arid west. Absent a clear statement by the legislature, such an inference cannot be countenanced.

The United States and the Klamath Tribes both cite, for the principle that the United States is the "owner" or "holder" of project water rights, to the statement of *In re Waters of Umatilla River*, 88 Or 376, 168 P 922 (1917), *modified and aff'd on reh'g*, 172 P 97 (1918), that the United States' compliance with Section 2 of the Act of 1905 "vest[s] the United States with title to all the then unappropriated water" specified in the notice. *Umatilla*, 168 P at 925. However, the issue of ownership of project water rights as between the United States, the irrigation districts, and the beneficial users was not before the court in *Umatilla*. Rather, the court addressed the question of the relative priority of project and certain non-project rights in the waters of the Umatilla River. *Id*. at 385. All that could have been recognized by the court in *Umatilla* was the United States' compliance with the Act of 1905, and the resulting superior claim to water as against appropriators subsequent in time to its notice.

Further, as noted by KPWU in their Response, a literal reading of the quoted language in *Umatilla* would result in the United States' ownership of certain *water* in the Umatilla Basin. KPWU Response Brief at 22. As discussed *supra*, Part I (pp. 4-5), all water in the state belongs to the public. Water rights are for the *use* of water only.

---

[42] The structure created by the Act of 1905, with one entity appropriating water for the later application to beneficial use by another, was not inconsistent with Oregon's water law prior to 1909. In applying pre-1909 law to the role of an irrigation district in developing water for use on land within the district, the Oregon Supreme Court stated, "an appropriation may be made for the future use of another; and for the future use upon lands which the appropriator does not then own, or which he does not contemplate owning and which he never owns." *In re Waters of Deschutes River*, 134 Or 623, 655, 286 P 563, *modified and reh'g denied*, 294 P 1049 (1930) (citations omitted).

In addition to beneficial use, the principle of appurtenancy also bears on the question of who "owns" or "holds" project water rights. Appurtenancy simply means that appropriative water rights are attached to and travel with land. *Teel Irrigation Dist. v. Water Resources Dept.*, 323 Or 663, 668 (1996). In the Klamath Basin Adjudication, the appurtenant land needs to be described in the findings of fact and order of determination, decree and ultimately water right certificates.

The appurtenancy principle, however, does not make water rights inseparable from land. *See Haney v. Neace-Stark Co.*, 109 Or 93, 114-116 (1923) (citing *Williams v. Altnow*, 51 Or 275 (1908), *Whited v. Calvin*, 55 Or 98 (1909), *Porter v. Hough*, 51 Or 318 (1908) and Or Laws § 5764, predecessor to the current transfer statute, ORS 540.510, *et seq.*, which now states that "all water used in this state shall remain appurtenant to the premises upon which it is used and no change in use or place of use of any water for any purpose may be made without compliance with [enumerated statutory procedures]").

With the adoption of its water code (if not before), Oregon moved from recognition of both riparian and appropriative rights to a code based on the doctrine of prior appropriation. *Lewis v. McClure*, 8 Or 273 (1880); *see also* Janet C. Neuman, 6 *Oregon*, *Water and Water Rights* (Robert E. Beck ed., 1991 & 1994 replacement vol). Whereas riparian rights are based on land ownership, prior appropriation relies on "first in time, first in right." Under both Oregon's pre-1909 law of appropriative water rights and its water code, the actual beneficial use of water is the basis for recognized water rights. *In re Water Rights of Silvies River*, 115 Or 27, 64-65 (1925); *Alexander v. Central Oregon Irrigation District*, 19 Or App 452, 456 (1974). This reflects the principles of the prior appropriation doctrine and sets prior appropriation apart from riparian rights that tie the water right to ownership of land.

Nothing prevents someone from applying water to land that he or she does not own. *See Wilber v. Wheeler*, 273 Or 855, 861 (1975) (stating that ORS chapter 537 contains no such prohibition). From this statement, it can be inferred that there is no requirement that the party putting water to beneficial use must do so on land he or she owns. Or, stated another way, the land to which the water right is appurtenant does

not have to be owned by the party putting the water to beneficial use on that land. There is no requirement in the prior appropriation doctrine that the owner of a water right be the owner of the land to which that right is appurtenant. Thus, the focus, in terms of the element of application of water to a beneficial use necessarily needs to be upon the person or entity responsible for application of water to a beneficial use. The identity of the beneficial user is a factual question, but such person or entity may or may not be the land owner.

Finally, while the beneficial user "holds" or "owns" an interest in the water right for the purpose of beneficial use, beneficial use is only one element of the water right. Attempts to equate beneficial use solely with "ownership" ignore the interests in project water held by the entities responsible for diversion, conveyance, and re-use of return flows. These interests are addressed below.

**2. Federal Interests**

While the beneficial users possess an interest in the water right for the purpose of beneficial use under Oregon law, that is not to say that the beneficial users have full ownership of the water right. The United States may also possess certain interests in the project water rights.

As explained, *supra* Part III.C. (pp. 35-36), Oregon law requires that water rights be used continuously. Irrigation districts and/or the United States divert and convey the water and as such are partners in the maintenance of the water rights. The entity or entities responsible for fulfilling this role cannot be said to be completely without any interest in the water right.

The *Ickes* line of Supreme Court decisions also support at least some interest for the United States in project water rights. *Ickes* specifically notes that "the government diverted, stored and distributed the water." *Ickes*, 300 US at 94. This recognition of diversion, storage, and distribution was reiterated in *Nebraska*, 325 US at 614.

In addition to a potential interest in diversion and delivery (to the extent the facts support the United States' role as diverter and deliverer), the United States, as the owner of the reclamation project, is treated as the "owning" entity for the purpose of re-use of return flows.[43] Under Oregon law, re-use of return flows is permitted within the boundaries of a Federal Reclamation Project. In Oregon "an owner may recapture waste and seepage water before it leaves his land." *Cleaver v. Judd* at 271. For this purpose, where the land lies within the boundaries of a federal reclamation project, the reclamation project is regarded as the "owning" entity. *Id*. at 273. Thus, the United States, as the owner of the project, has an interest in project water rights for the purpose of the re-use of return flows.

Both the United States and the Klamath Tribes argue that the United States' interest in re-use of return flows supports their position that the United States is the sole owner of project water rights. United States' Response at 21-22; Klamath Tribes' Response at 54-58. *Cleaver* does not stand for this principle. Instead, the Oregon Supreme Court carefully qualified its discussion of ownership, holding only that the reclamation project would be "treated" as the owning entity for "the purpose of applying the principle…." *Id*. at 272-73. While the United States has an interest in the re-use of return flows, it does not follow that this interest means that the United States is the sole "owner" or "holder" of the project water rights.

The Klamath Tribes and the United States both cite to *Ide v. United States*, 263 US 497 (1924), as further support for their position. U.S. Response at 22. Klamath Tribes Response at 54-58. *Ide* provides additional support for the principle that the United States, as owner of the reclamation project, has an ownership interest in the re-use of return flows within the project, but it does not support the position that the United States is the sole "owner" or "holder" of project water rights. *Ide* held only that return flows in the Shoshone Project were not subject to appropriation because the United States had the right to reuse the

[43] In these proceedings, the parties have referred to water that has been diverted and applied to land in the project, but not consumptively used by crops, and thus either reapplied to land or available for further application, as "return flows". See, e.g., Klamath Tribes' Response at 47. In Oregon case law, such water is also referred to as "waste" or "seepage" water. OWRD will follow the practice of the other parties in referring to such water as "return flows."

return flows. *Ide*, 263 US at 508. The Court did not further decide the question of ownership of project water rights. Thus, *Ide* provides support for, but does not expand upon the rule of *Cleaver*.

The Klamath Tribes cite several other cases demonstrating that the rule of *Ide* "has become well established." Klamath Tribes' Response at 55. As with *Ide* itself, these cases speak only to the issue of the United States' interest in return flows, and not to other interests in the project water rights. Indeed, the Klamath Tribes cite to *Nebraska v. Wyoming*, which held that, as owner of a federal reclamation project, the United States "has an interest in the appropriative rights to the extent of obtaining the fullest use of the water for the project" and may "retain control over the water until abandonment." 325 US at 637. *Nebraska* of course also held that under the law of Wyoming and Nebraska, the beneficial users had an ownership interest in the project water rights for the purpose of beneficial use. *Id*. at 613-15. *Nebraska* thus underscores the fact that *Ide* was limited to question of the interest in return flows only.[44]

Under Oregon law the United States does not have full ownership of the water right. But to say that means it has *no* interest in the water right does not comport with several decisions by the United States Supreme Court, nor with Oregon law. The United States possesses an interest in the re-use of return flows and may also, depending on the facts, possess an interest as the diverter and deliverer of water.

### 3. KPWU Entity Interests

The Klamath Project Water Users are comprised of several entities and individuals: Klamath Irrigation District (KID); Tule Lake Irrigation District (TID); Klamath Drainage District (KDD); Klamath Basin Improvement District (KBID); Ady District Improvement Company (ADIC); Enterprise Irrigation District (EID); Malin Irrigation District (MID); Midland District Improvement Company (MDIC); Pine

[44] *Nebraska* also reaffirms *Ide*, and thus demonstrates that the *Ickes* line of cases did not somehow alter the United States' interest in return flows, finding that "[t]he right of the United States as storer and carrier is not necessarily exhausted when it delivers the water to grantees under its irrigation projects. Thus in *Ide* v. *United States*, 263 U.S. 497 the right of the United States was held to extend to water which resulted from seepage from the irrigated lands under its project and which was not susceptible of private appropriation under local law." *Nebraska*, 325 US at 615, n11.

Grove Improvement District (PGID); Pioneer District Improvement Company (PDIC); Poe Valley Improvement District (PVID); Reames Golf & Country Club (Reames); Shasta View Irrigation District (SVID); Sunnyside Irrigation District (SID); Don Johnston & Son (Johnston); Modoc Lumber Company (Modoc); Bradley S. Lubscome (Lubscome), Randy Walthall and Inter-County Title Co. (Walthall and Inter-County Title),; Winema Hunting Lodge, Inc. (Winema); and Van Brimmer Ditch Company (VBDC).[45]

Under Oregon law, the KPWU entities may—but are not necessarily required to—"own" or "hold" water rights. The authority of the various entity types is set forth in the statutes governing each type of entity.

Each of these entities is organized under the following provisions of law:

| **Claimant** | **Statutory Entity Type** | **OWRD Exhibit 1 Citation** |
|---|---|---|
| Klamath Irrigation District (KID) | ORS chapter 545 | 07030 |
| Tule Lake Irrigation District (TID), | Cal. Water Code § 20500, et seq. | 07036 |
| Klamath Drainage District (KDD) | ORS chapter 547 | 07029-07030 |
| Klamath Basin Improvement District (KBID) | ORS chapter 554 | 07029 |
| Ady District Improvement Company (ADIC) | ORS chapter 554 | 07028 |
| Enterprise Irrigation District (EID) | ORS chapter 545 | 07028 |
| Malin Irrigation District (MID) | ORS chapter 545 | 07031 |
| Midland District Improvement Company (MDIC) | ORS chapter 554 | 07031 |
| Pine Grove Improvement District (PGID) | ORS chapter 545 | 07033-07034 |
| Pioneer District Improvement Company (PDIC) | ORS chapter 554 | 07034 |
| Poe Valley Improvement District (PVID) | ORS chapter 554 | 07034-07035 |
| Shasta View Irrigation District (SVID) | ORS chapter 545 | 07035 |

45 Certain entities and individuals originally included in the KPWU claims have withdrawn their claims. *See* KPWU Brief at 11-12. Those entities and individuals are not included in this list.

| | | |
|---|---|---|
| Sunnyside Irrigation District (SID), | ORS chapter 545 | 07035-07036 |
| Van Brimmer Ditch Company (VBDC). | ORS chapter 541 | 07037 |

The authorities of each type of entity are discussed in detail below.[46]

### a. Irrigation Districts under ORS Chapter 545

Under ORS chapter 545, an irrigation district may acquire land, water, water works and water rights. ORS 545.239. Title to all property acquired by chapter 545 district vests in the district, and is held in trust for the "uses and purposes" set forth in chapter 545. ORS 545.253. Under these statutes, an irrigation district can "own" or "hold" a water right, and if it does so, that water right is held in trust for irrigation purposes.

The Oregon Supreme Court has described the purpose of the Irrigation District Law as "authoriz[ing] the organization of a public corporation for the *purpose of acquiring and owning* irrigation ditches, canals, reservoirs, works, and *water rights* and distributing water to the settlers within the boundaries of the district." *Little Walla Walla Irrigation Dist. v. Preston*, 46 Or 5, 8 (1904) (emphasis added). Oregon courts have continued to recognize district ownership in water rights. In 1921, a decree of the Deschutes County Circuit Court authorized the Central Oregon Irrigation District to sell 2,500 acres of water rights to landowners. *Alexander v. Central Oregon Irrigation Dist.*, 19 Or App 452, 456 (1974) (recognizing district's authority to sell water rights it owned); *Smith v. Enterprise Irrigation Dist.*, 160 Or 372, 378-79 (1939) (describing the trust ownership by an irrigation district of water rights).[47]

46 Several of the KPWU entities are ordinary corporations, business entities or other types or individuals. These entities and individuals are not included in the chart above nor in the discussion below as the principles applicable to them are discussed in the section above concerning the landowner/end user interests.

47 The same principles apparently apply to California irrigation districts, such as Tule Lake Irrigation District. *Smith* at 379 (quoting *Jenison v. Redfield*, 149 Cal 500, 87 P 62, 64: "The ultimate purpose of a district organized under the irrigation act is the improvement by irrigation, of the lands within the district. It can, under the law, be organized and exist and acquire property only for such purpose. This we think is so clearly apparent as not to require further discussion here. Such a district holds all property acquired by it solely in trust for such ultimate purpose, and can divert it to no other use.").

Although ORS chapter 545 allows irrigation districts to acquire and hold water rights, nothing in that chapter (or other law) requires that a district will necessarily or solely own or hold the water rights for all lands within the district. Ownership of the water right will depend on how the land and/or the water right is acquired, and on the ownership interests prescribed by the contract between the irrigation district and its members. *See In re Waters of Willow Creek*, 119 Or 115 (1925).

Depending on the specific facts, irrigation districts and/or the United States may hold an interest in the water rights for purposes of diversion and delivery of the water. The end user of the water may hold the water rights for purposes of putting the water to beneficial use on the land that is described in the water right certificate. Thus, there may be multiple, separate interests in the single water right that are not easily divorceable from one another. In this scenario, neither can hold the water right on its own nor derive benefit from the water right without the other—the end user of the water has no water if the irrigation district or the United States cannot divert the water, and the irrigation district and/or the United States has no need to divert the water if the end user of the water cannot put the water to beneficial use.

**b. Corporations for Irrigation, Drainage, Water Supply or Flood Control under ORS Chapter 554**

Districts organized under the provisions of ORS Chapter 554 have broad authority to hold or own property. Once formed, a district under ORS chapter 554 has the power:

> To purchase, condemn by the power of eminent domain, possess and dispose of such real and personal property as may be necessary and convenient to carry into effect the objects of the corporation, and to take, hold, possess and dispose of all real an d personal property donated to such corporation by the United States or by any state territory, county, city or other municipal corporation or by any person for the purpose of aiding in the objects of such corporation.

ORS 554.080(4). Such districts unquestionably have broad enough statutory authority to "own" or "hold" water rights. The provisions of ORS chapter 554 also make clear that a district existing under these provisions acts on behalf of landowners, each of whom "is a member of the corporation" by virtue of

owning land within the boundaries of the chapter 554 district. ORS 554.070(1). Thus, though not specifically spelled out in statute like the relationship between Irrigation Districts under ORS chapter 545 and related case law, the relationship between landowners in a 554 district is functionally the same as in the case in the ORS chapter 545 situation. That is, in both cases, the district acts on behalf of the landowners with respect to water rights, and is empowered to hold such rights on behalf of landowners. *See Eldridge v. Mill Ditch Co.*, 90 Or 590, 598 (1919), *citing and quoting Rathfon v. Payette-Oregon Slope Irr. Dist.*, 76 Or 606, for the proposition that "'District improvement companies are also *quasi*-public corporations.' There seem to be no essential differences, which would distinguish them in this regard, between improvement companies and mutual service companies like this one" (the Mill Ditch Co., which was a "mutual corporation" where each water user held a share, purchased for $10 each, that entitled the shareholder to one miner's inch of water).

### c. Drainage Districts under ORS Chapter 547 (Klamath Drainage District)

> Under the provisions of ORS chapter 547, drainage districts have the right to:
>
> (c) Acquire, either by lease, purchase, condemnation or other legal means, all lands, rights of way, easements and other property necessary for the construction, operation or maintenance of any drainage or irrigation works, including the enlargement, improvement or extension of any natural or artificial waterway for such purposes.
>
> (d) Make all necessary water filings or appropriation of water under the general laws of Oregon for irrigation of lands within such district.

ORS 547.305(1)(c) and (d). Thus, drainage districts may obtain property of any type, as well as make filings or appropriation of water for use on lands within the district. Taken together, this means that a drainage district can take steps to obtain water rights and hold or own such rights. Of course, whether a drainage district will own or hold all or some part of such a water right is a question to be resolved based on the principles set forth above.

**d. Water Companies Organized under the 1891 Act (Van Brimmer Ditch Co.)**

Van Brimmer Ditch Company was organized under the provisions of the 1891 Act, now codified in ORS chapter 541. ORS 541.010 declares that such organizations hold a "franchise" to provide water "for general rental, sale or distribution, for purposes of irrigation, and supplying water for household and domestic consumption, and watering livestock upon dry lands of the state…." ORS 541.010(1). The case law concerning how water rights are "owned" or "held" by such entities is inconsistent. *Cf. Eldredge v. Mill Ditch Co.*, 90 Or 590 (1919) ("in cases of public service corporations organized for profit and selling water to the general public, that the water and ditch rights really belong to the individual appropriator and is [*sic*] appurtenant to the lands upon which the same is [*sic*] used, and that the corporation transmitting the same is in the nature of a holding company or agent for the true owners of the water rights.") *and In re Waters of Walla Walla River*, 141 Or 492, 497 (1932) ("When a public corporation complies with all of the provisions of this statute [Oregon Code 1930 § 47-1001, now codified as ORS 541.010], it, and not the owner of the land supplied [with water], acquires the right to the use of the water.").

Fortunately, the facts surrounding the Van Brimmer Ditch Company make it unnecessary to resolve which of these conflicting cases offers the proper analysis. As explained by witnesses for the KPWU:

> 29. Claims 321-6, 321-7 and 298 are claims based on appropriations by the Van Brimmer Brothers in the early 1880s, and subsequent development of the right, including through the Klamath Project.
>
> * * * *
>
> 31. Construction on the Van Brimmer Ditch was commenced in the summer of 1882. Clinton Van Brimmer posted a Notice of Appropriation at his intended point of diversion in Siskiyou County, California for 15,000 miner's inches of water under four inches of pressure (300 cfs) from the Little or Lower Klamath Lake on September 4, 1883….
>
> 32. On September 19, 1884, Clinton and Daniel Van Brimmer posted a notice of location for a water ditch in Klamath County, Oregon called the Van Brimmer Ditch, confirming the appropriation noticed earlier by filing in Siskiyou County,

> California…. The ditch was completed …. [and] supplied water for irrigation, stock watering and other uses to all lands served by the Van Brimmer Ditch, as well as land in an area north of Van Brimmer Ditch now served by KID.
>
> * * * *
>
> 34. The Van Brimmer brothers owned and maintained the canal, supplied their own properties with water, and sold water to farmers located adjacent to the canal. Daniel Van Brimmer and W.P. Whitney incorporated the Van Brimmer Ditch Company (VBDC) on May 22, 1903. They stated the purpose of the new company was to use the waters of Lower Klamath Land and White Lake "such thereof as has heretofore been appropriated and used through what is commonly known as VanBrimmer [*sic*] Ditch"….
>
> 37. The Van Brimmer brothers and their wives conveyed the Van Brimmer canal system, diversion and water rights to VBDC in 1903….
>
> 38. Van Brimmer Ditch Company thus took over delivery of water from the Van Brimmer Brothers to its stockholders, and each landholder under the Van Brimmer Ditch was issued one share of stock in the corporation of each acre of irrigated land owned by the stockholder.

Affidavit and Testimony of Stephen R. Wee at 18-22 (all footnotes omitted). Subsequently:

> 28. On November 6, 1909, VBDC entered into a contract with the United States for the transfer of specified property to the US for the uses and purposes contemplated by the Reclamation Act in consideration for the perpetual delivery of 50 cfs to VBDC by this agreement through the South Branch Canal (now the C-Canal) and for other consideration.
>
> On April 10, 1922, the US entered into a contract with KID by which the latter assumed the liability for the annual cost of carrying and delivering water to the Van Brimmer Ditch Company. Klamath Irrigation District continues to deliver water to Van Brimmer Ditch Company through the C-Canal, with the point of diversion now being the A-Canal.

Affidavit and Testimony of Rand F. Herbert at 22 (all footnotes omitted). The upshot of this history is that the KID now has the obligation to deliver water to the Van Brimmer Ditch Company, and has, in a sense become the functional successor to the Van Brimmer Ditch Company. Thus, the legal principles concerning the "owner" or "holder" under the Van Brimmer notice and appropriation should be functionally the same as in the case of an irrigation district, as discussed above. *See In re Determination of Water Rights of Hood River*, 114 Or 112, 134 (1924) (fact that an irrigation district succeeded to the rights originally established by a company organized under the 1891 Act was "deemed not controlling" in terms of the principles

applicable to establishing that right, although there was "[c]onsiderable space in the record and briefs . . . devoted to the classification of the East Fort Irrigation Company, defendant [irrigation district's] predecessor.")

## IV. Ownership of the Right to Store Water

Under both modern and pre-1909 Oregon law, distinct water rights are issued for storage of water. The current statutory structure provides for application for a reservoir permit, and requires that the applicant follow the same process set forth for other water use permits. ORS 537.400. In the case of storage for irrigation, two permits are granted. *Id*. The permit to establish the reservoir is the "primary" permit, and the permit to irrigate is the "secondary permit." *Id*. OWRD has also recognized rights for storage initiated under pre-1909 law. *See* Final Decree, In the Matter of the Determination of the Relative Rights of the Various Claimants to the Water of the Umatilla River and its Tributaries, a Tributary of the Columbia River, in Umatilla County, Oregon, September 9, 1916, pp. 225-26, 242-43 (decreeing a right for storage in Cold Springs Reservoir) (attached hereto as Appendix A). As a water right, a right for storage of water initiated prior to 1909 is subject to the same requirements for appropriation and vesting as other pre-1909 water rights. Thus, for example, a pre-1909 storage right does not vest unless applied with reasonable diligence to a beneficial use. If the facts of the case demonstrate that these requirements have been met, a separate certificate for storage should be issued.

Because the storage right is distinct from the right to use, different principles governing the determination of ownership apply. Under modern Oregon law, in addition to application to beneficial use, development of a storage right requires (1) an applicant; (2) the applicant's right to use the land where the water will be stored; and (3) construction and operation of the storage facility. *See, e.g.,* OAR 690-310-040(1)(a)(F), 690-330-010. Similarly, pre-1909 principles require an actor with the intent to appropriate, diversion to storage (which of necessity requires the construction and operation of the storage facility), and, in order to construct the storage facility, the right to use the site where the water will be stored.

Where the same entity or individual is the initial appropriator, the constructor and operator of the storage facility, and the owner of the site, that entity or individual possesses sufficient interest in the storage right to be declared the "owner" or "holder" of the right. Depending on the circumstances, certain use rights short of fee simple ownership of a site may also create sufficient interest in the storage right for the holder of the use right to be declared the "owner" or "holder" of the right. While a storage right also requires application to beneficial use in order to vest, the separation of storage and use rights means that the beneficial user maintains an ownership interest in the use right, but does not necessarily possess a similar interest in the storage right by virtue of beneficial use.

Oregon legislation enacted in 1905 granted the United States the right "for the purpose of aiding in the operations of irrigation and Reclamation" to use "any part or all of the beds of said lakes [including Upper Klamath Lake] for the storage of water". General Laws of Oregon at 63 (January 20, 1905) ("1905 Oregon Storage Law"). Effectively, the law granted the United States a statutory license over the named lakes for the purpose of storage of water in connection with the Klamath Project.[48] This statutory license provides the United States with the right to use the bed of the named lakes sufficient to serve as the basis for ownership a right to store water.[49]

Oregon law provides a framework for the issuance of separate certificates for storage and use rights, and determines the ownership interests in each. The ownership of any storage rights held to exist in the present case should be decided along these principles.

---

48 It is important to note, however, that the 1905 Oregon Storage Law does not itself grant a storage right, as the Klamath Tribes appear to argue. *See* Klamath Tribes' Response at 17-18. The language of the 1905 Oregon Storage Law is clear on this point. The legislation granted the right to use the beds "for the storage of water." This is a right that is distinct from the right to actual storage of water. One is a property interest in the lake bed, the other is a property interest in the use of water.

49 OWRD takes no position at this time as to the sufficiency of other types of use rights to serve as the basis for ownership of a right to store water.

## V. Conclusion

OWRD respectfully requests that the ALJ find that neither KPWU nor the United States are entitled to the inchoate rights claimed in this case, and that the ALJ determine the question of ownership of rights to use and store water on the basis of the principles set forth herein.

DATED this 13th day of July 2005.

Respectfully submitted,

HARDY MYERS
Attorney General

________________________________

Jesse D. Ratcliffe, #04394
Stephen E.A. Sanders, #85321
Assistant Attorneys General
Of Attorneys for Oregon Water Resources Department

**CERTIFICATE OF FILING/SERVICE**

I hereby certify that on July 13, 2005, I filed the original of OREGON WATER RESOURCES DEPARTMENT'S CLOSING BRIEF ON REPLY with Maurice L. Russell, Administrative Law Judge, Office of Administrative Hearings, P. O. Box 14020, Salem, OR 97309-4020, by facsimile to (503) 378-4067, by e-mail to klamath.adjudication@wrd.tate.or.us and maurice.russell@state.or.us, and by first-class mail.

DATED this 13th day of July 2005.

__________________________________
Jesse D. Ratcliffe, #04394
Stephen E.A. Sanders, #85321
Assistant Attorneys General

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of July 2005, I served the within OREGON WATER RESOURCES DEPARTMENT'S CLOSING BRIEF ON REPLY on the parties hereby by e-mail, or by regular first-class mail (where no e-mail address is listed below), a true, exact and full copy thereof to:

**SENT VIA SHUTTLE MAIL**
Dwight W. French / Teri Hranac
Klamath Basin Adjudication
Oregon Water Resources Dept.
725 Summer Street NE, Suite A
Salem, OR 97301-1271
dwight.w.french@state.or.us
teri.k.hranac@wrd.state.or.us

Bruce Bernard
General Litigation Section
Environment and Natural Resources Div.
US Department of Justice
999-18th Street, Suite 945
Denver, CO 80202
bruce.bernard@usdoj.gov

Gary Randall, Attorney
United States Bureau of Reclamation
US Department of Justice
PO Box 663
Washington, DC 20044-0663
gary.randall@usdoj.gov

Stephen R. Palmer, Attorney
United States Bureau of Reclamation
Office of the Regional Solicitor
US Department of the Interior
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Fax: 916-978-5694

Cecil Lesley
United States Bureau of Reclamation
Klamath Basin Office
6600 Washburn Way
Klamath Falls, OR 97603
clesley@mp.usbr.gov

Carl V. Ullman
Water Adjudication Project
The Klamath Tribes
PO Box 957
Chiloquin, OR 97624
bullman3@earthlink.net

Walter Echo-Hawk
Native American Rights Fund
1506 Broadway
Boulder, CO 80302
wechohwk@narf.org

Paul S. Simmons / Andrew Hitchings
Somach, Simmons & Dunn
Hall of Justice Building
813 Sixth Street, Third Floor
Sacramento, CA 95814-2403
psimmons@lawssd.com
ahitchings@lawssd.com

Barbara Scott-Brier
Special Attorney, US Dept. of Justice
Office of the Solicitor, Pacific NW Region
US Department of the Interior
500 NE Multnomah Street, Suite 607
Portland, OR 97232
Fax: 503-231-2166

Michael P. Rudd
Brandsness & Rudd, PC
411 Pine Street
Klamath Falls, OR 97601
mike@brandsnessrudd.com

Laura A. Schroeder
Cortney D. Duke
Lynn L. Steyaert
Schroeder Law Office PC
P.O. Box 12527
Portland, OR 97212-0527
schroeder@water-law.com
lls@water-law.com
cortney@water-law.com

Richard Glick / Nanci Klinger
Davis, Wright, Tremaine
1300 SW Fifth Ave, Suite 2300
Portland, OR 97201
rickglick@dwt.com
nanciklinger@dwt.com

Jayne T. Davis
Corporate Counsel
JELD-WEN, Inc.
3250 Lakeport Blvd.
Klamath Falls, OR 97601
jayned@jeld-wen.com

William M. Ganong
Attorney at Law
514 Walnut Street
Klamath Falls, OR 97601
wganong@aol.com

Justin E. Throne
Attorney at Law
280 Main Street
Klamath Falls, OR 97601
justinthrone@yahoo.com

Douglas MacDougal / Timothy M. Sullivan
Schwabe, Williamson & Wyatt, P.C.,
1600-1900 PacWest Center
1211 SW 5th Ave.
Portland, OR 97204
dmacdougal@schwabe.com
tsullivan@schwabe.com

Ronald S Yockim
Attorney at Law
548 SE Jackson, Suite 7
PO Box 2456
Roseburg, OR 97470
ryockim@mcsi.net

Michael Ratliff
Ratliff & Whitney-Smith
905 Main Street, Suite 200
Klamath Falls, OR 97601
dmratlif@aol.com

B.J. Matzen
Attorney at Law
435 Oak Avenue
Klamath Falls, OR 97601
bjmatzen@msn.com

James R. Uerlings
Boivin, Uerlings & DiIaconi
803 Main Street, Suite 201
Klamath Falls, OR 97601
juerlings@qwest.net

Mary Cheyne
Klamath Drainage District
280 Main Street
Klamath Falls, Or 97601
kdd280@cvc.net

Greg D. Corbin / Jennie L. Bricker
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204-1268
gdcorbin@stoel.com
jlbricker@stoel.com

Lanny Fujishin
Oregon Department of Fish & Wildlife
1850 Miller Island Road W
Klamath Falls, OR 97603
lanny.a.fujishin@state.or.us

Edward & Marilyn Livingston
57250 Gerber Road
Bonanza, OR 97623
froghill@mcsi.net

Sylvia G. Bruce
686 South 8th Avenue
Yuma, AZ 85364

Modoc Point Irrigation District
Ray Gienger, Chairman
24444 Modoc Point Road
Chiloquin, OR 97624

Patricia Jill Givan Switzler
Charles W. Switzler
6274 Climax Ave.
Klamath Falls, OR 97603

David Solem, Manager
Klamath Irrigation District
6640 Klamath Irrigation District Lane
Klamath Falls, Or 97603
kid@cvcwireless.net

David E. Filippi / Krista I. Born
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204-1268
defilippi@stoel.com
kiborn@stoel.com

Shelley McIntyre
Oregon Department of Justice
Natural Resources Section
1515 SW Fifth, Suite 410
Portland, OR 97201
shelley.mcintyre@doj.state.or.us

Earle W. Cummings, Secretary
Klamath Sprig and Honker Club, Inc.
PO Box 900
Geyserville, CA 95441
earlec@starband.net

Don Carper, President
Klamath Sprig and Honker Club, Inc.
8346 Woodborough Way
Fair Oaks, CA 95628

Susan G. Boehner
2219 Heights Drive
Boise, ID 83702

McAuliffe Ranches
Jim McAuliffe
P.O. Box 1038
Cottonwood, CA 96022

Kenneth Zamzow
3833 Upper Peoh Pt. Road
Cle Elum, WA 98922-9013

James G. Wayne, Jr.
7200 Hazeltine Blvd.
Excelsior, MN 55331
jimwayne64@aol.com

Mary Jane Danforth
P.O. Box 425
Fort Klamath, OR 97603

William C. Knudtsen
PO Box 307
Beatty, OR 97621

Leland Woods Trust
14121 Matney Road
Klamath Falls, OR 97603

Tom & Althia Stephens
P. O. Box 1251
Chiloquin, OR 97624

Gary Strong
P.O. Box 1213
Klamath Falls, OR 97601

Linda Long
Crater Lake Realty
P. O. Box 545
Chiloquin, OR 97624

TPC LLC
c/o Bob Cook
32041 Cartney Drive
Harrisburg, OR 97446

Ken & Leslie Hufford
64980 North Powder River Lane
North Powder, OR 97867

Gabrielson Cattle Co.
711 Grand Avenue St. 100
San Rafael, CA 94901

Alvin & Peggy Marenco
8475 Marenco Ranch Drive
Red Bluff, CA 96080

Jacob D. Wood
11161 Table Rock Road
Central Point, OR 97502

Jerry L. Neff
4118 Harbor Walk Drive
Ft. Collins, CO 80525

Leonard Baio
P.O. Box 121
Bly, Or 97622

David M. Cowan
7647 Libby Road N.E.
Olympia, WA 98506

Clifford C. Rabe
c/o Chad C. Rabe
22539 Hwy. 140 E
Dairy, OR 97625
andrea@rabeconsulting.com

______________________________
Jesse D. Ratcliffe, #04394
Stephen E.A. Sanders, #85321
Assistant Attorneys General

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR UMATILLA COUNTY.

| | | |
|---|---|---|
| IN THE MATTER OF THE DETERMINATION OF THE RELATIVE RIGHTS OF THE VARIOUS CLAIMANTS TO THE WATERS OF THE UMATILLA RIVER AND ITS TRIBUTARIES, A TRIBUTARY OF THE COLUMBIA RIVER, IN UMATILLA COUNTY, OREGON. | ) | FINAL DECREE. |

Now, at this time this matter came on for hearing upon the Findings of the State Water Board , heretofore filed in the above entitled proceeding and the exceptions filed thereto, and it appearing to the Court that said Findings of the State Water Board should be modified in a large number of particulars, and upon due hearing upon same, the Court made the Findings of Fact and Conclusions of Law, which Findings of Fact and Conclusions of Law do modify the Findings of the State Water Board, and the Court having filed said Findings of Fact and Conclusions of Law in the above named proceeding, and being fully advised in the premises, and based upon the testimony and records in the above entitled proceeding and said Findings of Fact and Conclusions of Law so made by said Court, it is hereby CONSIDERED, ORDERED and DECREED, as follows:

1.

That on the 7th day of May, 1909, there was filed in the office of the State Water Board, State of Oregon, a petition signed by Oliver P. Morton, for and on behalf of the United States of America, a water user upon said stream, requesting a determination of the relative rights of the various claimants to the waters of said stream, and that said petitioner is a user of the waters of the said Umatilla River and its tributaries, as appears from the order of determination herein. That thereupon the said State Water Board, after full investigation and due consideration of said petition, found the facts and conditions such as to justify the making of a determination of the relative rights of the various claimants of the waters of said stream and its tributaries thereto; and made and entered its order in the records of said office, fixing a time and place for the beginning and making of such an examination of said stream by the State Engineer, as would enable the said Board to determine the rights of the said claimants and also the time and place for the beginning and taking of testimony by the Superintendent of Water Division No. 2; that said time when said

The following appropriators have, in their statements and proofs of claim, applied to the State Water Board to prescribe the time within which the full amount of water appropriated shall be applied to a beneficial use, and it appears to the said State Water Board that the appropriations of said appropriators, and each of them, were made prior to February 24th, 1909, and that actual construction work had been commenced in good faith prior to said date, and

It further appears from the statements and proofs of claims filed, and the evidence adduced at the hearing, that the United States has appropriations of Nov. 14, 1894, Feb. 25,1904, and an appropriation and reservation of Sept. 6, 1905. That the appropriation of Nov. 14, 1894, is completely vested as to one second foot; that the appropriation of Feb. 25, 1904, at the time of filing the statement and proof of claim was completely vested for 25 second feet of water, for 2000 acres of land, and that the appropriation of Sept. 6, 1905, is a complete reservation under and by virtue of Chapter 228, Gen. Laws of Oregon for 1905, and that the appropriation and reservation of Sept. 6, 1905 includes the lands covered by the appropriations of Nov. 14, 1894, and Feb. 25, 1904.

That the lands covered by said appropriations and reservation are hereinafter tabulated in this Finding for the purpose of having the water rights of the United States fully set out and described in this Finding, and to the further end, that a compliance with this Finding by the United States so far as the application of water to a beneficial use is concerned within the time limited herein, may have the effect of establishing its date of relative priority as of the date of Feb. 25, 1904, so far as the lands covered by that appropriation are concerned.

The State Engineer is hereby directed to issue a certificate to each of said appropriators showing the time fixed by this finding within which the water appropriated by such appropriators shall be applied to a beneficial use. The extent of such appropriation shall be limited to such an amount or volume of water as shall have been put to a beneficial use by the expiration of the time fixed in this finding. In the column headed "Time Limit for Complete application", in the following tabulation the word "vested" means that water has been completely applied to a beneficial use to the extent described therein, and in all cases where water had not been completely applied to a beneficial use, a limiting date is set for such application to a beneficial use, and such incompleted rights are known and called "inchoate rights."

That the name and address of each appropriator of water from said Umatilla River and its tributaries, who has not completed such appropriation, and who has so applied to the State Water Board to prescribe the time within which the full amount of water shall be applied to a beneficial use, are hereinafter in this Finding arranged in

alphabetical form, together with the date of relative priority of each of such appropriations, the limiting date for the complete application of the full amount of water appropriated to a beneficial use, the use or uses for which such water was appropriated and is to be applied, the number of acres for which the appropriation was made and the number of acres now irrigated, or for which rights are reserved by Statute in case such appropriation is for irrigation or storage, the name of the ditch or ditches, or reservoirs through which such appropriation is to be diverted, the name of the stream from which the water was appropriated, and the description of the land in each legal subdivision for which the appropriation was made, the description of the land upon which such water has been or is to be applied to a beneficial use, and to which such use is limited, arranged in alphabetical order and set opposite the name and post office address of each such appropriator, are as follows, to-wit:

| Name and Postoffice Address of Appropriator | Date of Relative Priority | Time ~~Amount cubic feet per second~~ Limit | Number Acres | Use | Name of Ditch | Stream | Description of Land or Place of Use |
|---|---|---|---|---|---|---|---|
| | | for complete application. | | | | | |
| Stephens, Omer O.<br>Pendleton, Ore. | 1892 | Vested<br>.38<br>sec.ft. | 30 | Irrigation | McKay Ck. Irrig.Co's Ditch & 2 others<br>Belle Miller & J. W. | McKay Creek | 20 a. in NE¼NE¼<br>7 a. in NW¼NE¼<br>3 a. in SW¼NE¼<br>Sec. 26<br>T. 1 N.R. 32 E. |
| (Finding #9 Contest 179) | 1904 | Jan.1<br>1918 | 27 | | " | " | 20 a. in SE¼NE¼<br>7 a. in NE¼NE¼<br>Sec. 26<br>T. 1 N.R. 32 E. |
| UNITED STATES OF AMERICA | Nov.14<br>1894 | Vested<br>1.<br>sec.ft. | 80 | Irrigation | Maxwell | Main | 40 a. in SW¼SW¼<br>35 a. in SE¼SW¼<br>Sec. 10<br>5 a. in NE¼NE¼<br>Sec. 16<br>T. 4 N.R. 28 E. |
| Allowed Vested by Supreme Court Decision 88 ORE 376 | Feb.25<br>1904 | Jan.1<br>1920<br>115<br>sec.ft. | 10435 | 3.28 ac. Cancelled-sp. or Rec. Vol. 25 P. 93 | | | 409 a. in Sec. 1<br>343 a. in Sec. 2<br>490 a. in Sec. 3<br>270.5 a. in Sec. 4<br>54 a. in Sec. 8<br>500 a. in Sec. 9<br>592.5 a. in Sec. 10<br>626 a. in Sec. 11<br>428 a. in Sec. 12<br>131.5 a. in Sec. 14<br>407 a. in Sec. 15<br>404.5 a. in Sec. 16<br>56 a. in Sec. 17<br>151 a. in Sec. 20<br>44 a. in Sec. 21<br>T. 4 N.R. 28 E.<br>22 a. in Sec. 6<br>T. 4 N.R. 29 E.<br>66.5 a. in Sec. 10<br>4 a. in Sec. 14<br>321.5 a. in Sec. 15<br>445 a. in Sec. 16<br>78 a. in Sec. 21<br>533.5 a. in Sec. 22<br>431 a. in Sec. 23<br>357 a. in Sec. 24<br>605 a. in Sec. 25<br>348 a. in Sec. 26<br>67 a. in Sec. 27<br>191 a. in Sec. 36<br>T. 5 N.R. 28 E.<br>343 a. in Sec. 19<br>482 a. in Sec. 20<br>351 a. in Sec. 21<br>63 a. in Sec. 28<br>272 a. in Sec. 29<br>387.5 a. in Sec. 30<br>160 a. in Sec. 31<br>104352 T. 5 N.R. 29 E. |
| | | NOTE: Excepting 25 cu.ft. per second vested for 2000 acres, as shown hereinafter in this schedule. | | | | | |
| | | NOTE: Lands described under appropriation of Feb.25,1904, include the lands described under appropriation of Nov. 14, 1894 | | | | | |
| | Sept.6<br>1905 | Vested<br>350<br>sec.ft.<br>In pursuance of Chapter 228, Gen Laws of Oregon 1905 (See Finding No. 34 | 25072 | Irrigation Storage in Cold Springs Reservoir capacity 50,000 ac.ft. and Irrigation from said reservoir | Feed Canal | Main | 639 a. in Sec. 1<br>641 a. in Sec. 2<br>①600 a. in Sec. 3<br>270.5 a. in Sec. 4<br>54 a. in Sec. 8<br>500 a. in Sec. 9<br>592.5 a. in Sec. 10<br>626 a. in Sec. 11<br>584 a. in Sec. 12<br>123 a. in Sec. 13<br>560 a. in Sec. 14<br>593.5 a. in Sec. 15<br>415.5 a. in Sec. 16 |

① 3.28 ac. Cancelled-sp. or Rec. Vol. 25 P. 93

| Name and Postoffice Address of Appropriator | Date of Relative Priority | Time Limit | Number Acres | Use | Name of Ditch | Stream | Description of Land or Place of Use |
|---|---|---|---|---|---|---|---|
| | | for complete application. | | | | | |
| United States of America, continued. | | NOTE: The lands described under the appropriation and reservation of Sept. 6, 1905 include the lands described under the appropriations of Nov. 14, 1894 and of Feb 25, 1904. Thus the waters appropriated and reserved as of Sept.6, 1905, are to be used jointly or interchangeably as the case may be, with the waters appropriated as of Nov. 14,1894, and Feb. 25, 1904, upon the lands described thereunder. The distribution system has been constructed so as to provide for this. | | | | | 56 a. in Sec. 17<br>39 a. in Sec. 19<br>377 a. in Sec. 20<br>578 a. in Sec. 21<br>551 a. in Sec. 22<br>167 a. in Sec. 23<br>198 a. in Sec. 27<br>464 a. in Sec. 28<br>268 a. in Sec. 29<br>55 a. in Sec. 30<br>T. 4 N.R. 28 E.<br>54 a. in Sec. 3<br>533 a. in Sec. 4<br>640.5 a. in Sec. 5<br>664 a. in Sec. 6<br>417 a. in Sec. 7<br>185 a. in Sec. 8<br>50 a. in Sec. 9<br>T. 4 N.R. 29 E.<br>66.5 a. in Sec. 10<br>4 a. in Sec. 14<br>321.5 a. in Sec. 15<br>445 a. in Sec. 16<br>406.5 a. in Sec. 21<br>594.5 a. in Sec. 22<br>431 a. in Sec. 23<br>357 a. in Sec. 24<br>622 a. in Sec. 25<br>629 a. in Sec. 26<br>603 a. in Sec. 27<br>251.5 a. in Sec. 28<br>307 a. in Sec. 33<br>630 a. in Sec. 34<br>619 a. in Sec. 35<br>632 a. in Sec. 36<br>T. 5 N.R. 28 E.<br>202 a. in Sec. 13<br>212 a. in Sec. 14<br>98 a. in Sec. 15<br>38 a. in Sec. 16<br>343 a. in Sec. 19<br>482 a. in Sec. 20<br>408.5 a. in Sec. 21<br>344 a. in Sec. 22<br>71 a. in Sec. 23<br>36 a. in Sec. 26<br>584 a. in Sec. 27<br>638 a. in Sec. 28<br>592 a. in Sec. 29<br>621.5 a. in Sec. 30<br>594 a. in Sec. 31<br>623 a. in Sec. 32<br>609 a. in Sec. 33<br>183 a. in Sec. 34<br>25072 T. 5 N.R. 29 E. |
| | | | | Part Cancelled [illegible] | | 19[illegible] 163 | |

NOTE: of the 25,072 acres under the appropriation and reservation of Sept. 6, 1905, 4,031 acres had been irrigated prior to the filing of Statement and Proof by the United States in Sept. 1910. Of this area 2,000 acres were also irrigated by way of the appropriation of Feb. 25, 1904, and rights have become vested thereunder as follows:

APPENDIX A
Page 5 of 5