# In The United States Court of Federal Claims

No. 01-591 L

(Filed: August 31, 2005)

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, *et al.*, | * | Motions for partial summary judgment; |
| | * | Takings claims under Fifth Amendment; |
| Plaintiffs, | * | Contract claims; Interests in water of the |
| | * | Klamath Basin; Private property; Federal |
| v. | * | reclamation law – Reclamation Act of |
| | * | 1902; Section 8 - appurtenancy and |
| THE UNITED STATES, | * | beneficial use clause; *California*; Water |
| | * | distribution to be determined under state |
| Defendant, | * | law; *Ickes* line of cases; State law – |
| | * | Oregon Act of 1905; Pre-1905 interests; |
| PACIFIC COAST FEDERATION OF | * | Post-1905 interests; Interests based on |
| FISHERMEN'S ASSOCIATIONS, | * | contracts; Third-party beneficiaries; |
| | * | Standing of districts to sue; Interests |
| Defendant-Intervenor. | * | based on deeds and certificates. |

## OPINION

*Nancie Gail Marzulla and Roger J. Marzulla*, Marzulla & Marzulla, Washington, D.C., for plaintiffs.

*Kristine Sears Tardiff*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Thomas L Sansonetti*, for defendant.

*Todd Dale True*, Earthjustice Legal Defense Fund, Seattle, Washington, and *Robert B. Wiygul*, Waltzer & Associates, Biloxi, Mississippi, for defendant-intervenor.[1]

**ALLEGRA, Judge**:

[1] An *amicus curiae* memorandum was filed by John D. Echeverria, Georgetown Environmental Law & Policy Institute, Georgetown University Law School, on behalf of the Natural Resources Defense Council and in support of defendant. Various other *amici* have participated in this litigation, including the State of Oregon, the Yurok Tribes, the Klamath Tribes, the Sierra Club, the Northcoast Environmental Center, Waterwatch of Oregon, the Oregon Natural Resources Council, the Klamath Forest Alliance, the Wilderness Society, and the Institute for Fisheries Resources.

What is property? The derivation of the word is simple enough, arising from the Latin *proprietas* or "ownership," in turn stemming from *proprius*, meaning "own" or "proper." But, this etymology reveals little. Philosophers such as Aristotle, Cicero, Seneca, Grotius, Pufendorf and Locke each, in turn, have debated the meaning of this term, as later did legal luminaries such as Blackstone, Madison and Holmes, and even economists such as Coase.

Here, the court must give practical meaning to the term "property" as used in a specific legal context, a constitutional one, *to wit*, the Fifth Amendment's mandate "nor shall private property be taken for public use, without just compensation." In the case *sub judice*, a group of water districts and individual farmers seek just compensation under the Fifth Amendment, as well as damages for breach of contract, owing to temporary reductions made in 2001 by the Department of Interior's Bureau of Reclamation (the Bureau) on the use, for irrigation purposes, of the water resources of the Klamath Basin of southern Oregon and northern California. At issue in the pending cross-motions for partial summary judgment is whether plaintiffs' various interests in the use of Klamath River Basin water constitute cognizable property interests for purposes of the Takings Clause. Relatedly, the court must consider the limitations, if any, inherent in such interests, particularly regarding various forms of contract rights possessed by the plaintiffs to receive water from the Klamath Basin reclamation project. As will be seen, it is ultimately these contract rights, and not any independent interests in the relevant waters, that dominate the analysis here.

## TABLE OF CONTENTS


**I. Facts and Background** ....................3

A. Plaintiffs ....................3
B. The Federal Reclamation Laws ....................3
C. The Klamath Project ....................5
D. Water Rights in Oregon and the Klamath Project ....................7
E. History of this Litigation ....................10

**II. Discussion** ....................13

A. Federal Reclamation Law ....................14
B. State Law ....................24

1. Pre-1905 Potential Interests ....................29
2. Post-1905 Potential Interests ....................30
3. The Nature of the Interests Created in the Post-1905 Transactions ....................35
a. Interests based on contracts ....................35
b. Interests based upon applications for water rights or post-1953 grants of water rights by the State of Oregon ....................46

**III Conclusion**.....48

**Appendix**.....49

## I. FACTS AND BACKGROUND[2]

### A. Plaintiffs

Plaintiffs – 13 agricultural landowners and 14 water, drainage or irrigation districts in the Klamath River Basin area of Oregon and northern California – all receive, directly or indirectly, water from irrigation works constructed or operated by the Bureau. They trace their alleged interests in that water to a variety of sources, including federal reclamation law, general state water law principles, water-delivery contracts between the irrigation districts and the United States, deeds to real property purporting to convey a right to receive water, and a federal-state water law compact. The landowning plaintiffs seek just compensation both as beneficiaries of the district plaintiffs' contracts with the United States and as owners of what they describe as "Klamath Project water rights" that exist independently of the district contracts. The districts, in turn, seek breach of contract damages, as well as just compensation on behalf of their members, who are the beneficiaries of the district contracts and the persons ultimately harmed by the Bureau's reduction in water deliveries in 2001.

### B. The Federal Reclamation Laws

The Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (codified, as amended, at 43 U.S.C. §§ 371 *et seq*.) (the Reclamation Act), directed the Secretary of the Interior (the Secretary) to reclaim arid lands in certain states through irrigation projects and then open those lands to entry by homesteaders. As recently recounted by the Supreme Court, this enactment "set in motion a massive program to provide federal financing, construction, and operation of water storage and distribution projects to reclaim arid lands in many Western States." *Orff v. United States*, 125 S.Ct. 2606, 2608 (2005); *see also Nevada v. United States*, 463 U.S. 110, 115 (1983); *California v. United States*, 438 U.S. 645, 650 (1978). Congress originally envisioned that the United States would "withdraw from public entry arid lands in specified western States, reclaim the lands through irrigation projects," and then "restore the lands to entry pursuant to the homestead laws and certain conditions imposed by the Act itself." *Nevada*, 463 U.S. at 115. Nonetheless, Congress specifically directed, in section 8 of the Reclamation Act, that the United States would act in accordance with state law to acquire title to the water used. 32 Stat. 390 (codified, in part, at 43 U.S.C. § 383); *see California*, 438 U.S. at 650-51. It gave the Department of the Interior responsibility for constructing reclamation projects and for administering the distribution of

---

[2] These facts shall be deemed established for purposes of future proceedings in this case. RCFC 56(d).

water to agricultural users in a project service area. *See* Reclamation Act, §§ 2-10, 32 Stat. 388-90.

In 1911, Congress enacted the Warren Act, ch. 141, 36 Stat. 925 (codified at 43 U.S.C. §§ 523-25), section 2 of which authorized the Secretary "to cooperate with irrigation districts, water users' associations, corporations, entrymen or water users . . . for impounding, delivering, and carrying water for irrigation purposes." 43 U.S.C. § 524. Under a 1912 amendment of the Reclamation Act, individual water users served by a reclamation project could acquire a "water-right certificate" by proving that they had cultivated and reclaimed the land to which the certificate applied. Act of Aug. 9, 1912, ch. 278, § 1, 37 Stat. 265 (codified, as amended, at 43 U.S.C. § 541). Congress required that the individual's land patent and water right certificate would "expressly reserve to the United States a prior lien" for the payment of sums due to the United States in connection with the reclamation project. § 2, 37 Stat. 266 (codified at 43 U.S.C. § 542).

In 1922, Congress enacted legislation expanding the United States' options to allow it to contract not only with individual water users, but also with "any legally organized irrigation district." Act of May 15, 1922, ch. 190, § 1, 42 Stat. 541 (codified at 43 U.S.C. § 511). In the event of such a district contract, the United States was authorized to release liens against individual landowners, provided that the landowners agreed to be subject to "assessment and levy for the collection of all moneys due and to become due to the United States by irrigation districts formed pursuant to State law and with which the United States shall have entered into contract therefor." § 2, 42 Stat. 542 (codified at 43 U.S.C. § 512).[3] The Fact-Finders Act of 1924, 43 Stat. 702 (codified at 43 U.S.C. §§ 500-01), required that once two-thirds of a division of a reclamation project was covered by individual water-rights contracts, that division was required to organize itself into an irrigation district or similar entity in order to qualify for certain financial incentives. The newly-formed district would, thereafter, assume the "care, operation, and maintenance" of the project, and the United States would deal directly with the district instead of the individual water users. *Id.*

[3] The legislative history of the 1922 act reflects that Congress viewed these changes as significant. *See* H.R. Rep. No. 662, at 2 (1922) ("the Federal Government is dealing with the irrigation district instead of the individual owner or water users' association"); 62 Cong. Rec. 3573 (1922) (statement of Rep. Kinkaid) ("This language authorizes the taking of the district collectively, taking the lands of the district collectively, for the payment of the cost of the construction of the irrigation works, in lieu of holding each farm unit singly for its proportionate share of the cost of the construction."); *id.* at 3575 (statement of Rep. Mondell) ("The Reclamation Service has for years encouraged the organization of irrigation districts . . . whereby the water users as a body, as a whole, become responsible for all of the charges."); *id.* at 5859 (statement of Sen. McNary) ("the Government is dealing with organized irrigation districts rather than the various individual entrymen who take water in the projects").

In 1926, Congress enacted additional measures providing that, thenceforth, the United States could enter into contracts for reclamation water only with "an irrigation district or irrigation districts organized under State law." Act of May 25, 1926, ch. 383, § 46, 44 Stat. 649 (codified as amended at 43 U.S.C. § 423e). Thereafter, the United States contracted exclusively with irrigation districts. The exclusivity of these arrangements was reemphasized in the Reclamation Act of 1939, ch. 418, 53 Stat. 1187, section 9(d) of which provided that "[n]o water may be delivered for irrigation of lands . . . until an organization, satisfactory in form and powers to the Secretary, has entered into a repayment contract with the United States." 53 Stat. at 1195 (codified at 43 U.S.C. § 485h(d)).

Various provisions in these reclamation laws expressed Congress' desire to create a financing mechanism that would allow the government to recoup the costs of constructing and operating the reclamation projects by requiring the irrigation districts to reimburse the United States for water delivery costs through long-term water service contracts. *See* 43 U.S.C. §§ 391, 419, 423e, 423f, 461, 485a, 485b-1, 492-93. However, there are indications that this financing mechanism has not worked as originally anticipated, leaving significant reclamation costs unamortized. Studies conducted by the General Accounting Office (GAO) have documented this failure and attributed it to several causes: (i) while spreading project repayment obligations over several decades, Congress did not require the payment of interest on the costs of the project, *see* 42 U.S.C. § 485a; (ii) Congress generally has limited the repayment obligation to only those costs that are considered within the irrigation district's ability to pay, *see* 43 U.S.C. § 485b-1(b); and (iii) Congress has enacted charge-offs that selectively eliminate portions of the repayment obligations in the case of certain projects. *See* GAO, Rep. No. 96-109, Bureau of Reclamations: Information on Allocation and Repayment of Costs of Constructing Water Projects 15-22 (1996); GAO, Rep. No. 81-07, Federal Charges for Irrigation Projects Reviewed Do Not Cover Costs 9-12 (1981). The parties disagree as to the existence (and, if so, extent) of such a shortfall as to the Klamath Reclamation Project (the Klamath Project).

**C. The Klamath Project**

The Klamath River Basin, naturally a semi-arid region, has been the site of extensive water reclamation and irrigation projects since the late nineteenth century. The Klamath Project, originally authorized in 1905, was one of the first to be constructed under the Reclamation Act. *See Bennett v. Spear*, 520 U.S. 154, 158-59 (1997); *Tulelake Irrigation Distr. v. United States*, 342 F.2d 447, 448 (Ct. Cl. 1965). The federal legislation authorizing the project provided, *inter alia*, that "the Secretary of the Interior is hereby authorized in carrying out any irrigation project . . . to raise or lower the level of" the lakes and rivers of the Klamath River Basin "as may be necessary and to dispose of any lands which may come into the possession of the United States as a result thereof." Act of February 9, 1905, ch. 567, 33 Stat. 714 (codified at 43 U.S.C. § 601).

The Klamath Project provides water to about 240,000 acres of irrigable land, as well as several national wildlife refuges. It is operated by the Bureau to "serve[] and affect[] a number of interests," including the supply of irrigation water to agricultural interests in the Klamath

River Basin and the supply of water to the Tule Lake and Lower Klamath National Wildlife Refuges "for permanent and seasonal marshlands and irrigated crop lands." *Pacific Coast Federation of Fishermen's Associations v. Bureau of Reclamation*, 138 F. Supp.2d 1228, 1230 (N.D. Cal. 2001) (hereinafter *PCFFA*). Water for the project is stored primarily in Upper Klamath Lake, on the Klamath River in Oregon. *See Kandra v. United States*, 145 F. Supp.2d 1192, 1196 (D. Or. 2001). The Link River Dam regulates water flows from Upper Klamath Lake into the lower portions of the Klamath River. *Id.* The Klamath Project lacks a major water storage reservoir, and because Upper Klamath Lake is itself relatively shallow and "unable to capture and store large quantities of water from spring run-off," the Bureau is unable to store up enough water during wet years for use in subsequent dry years – a fact that apparently makes the Klamath Project more vulnerable to droughts. *Id.* at 1197.

In operating the Klamath Project, the Bureau prepares periodic streamflow forecasts and annual operating plans "in order to provide operating criteria and to assist water users and resource managers in planning for the water year." *Kandra*, 145 F. Supp.2d at 1197. In the late 1990s, the Bureau announced its intent to establish a new, long-term operating plan for the project. As of mid-2001, that plan was still not in place, and the Bureau instead was operating the Project using one-year interim plans. *Id.* at 1197; *see PCFFA*, 138 F. Supp.2d at 1232. Those plans required it to "manage water resources carefully in order to meet . . . competing purposes and obligations," a balance that was particularly difficult to strike because of the limited storage capacity caused by the shallowness of the lake. *PCFFA*, 138 F. Supp.2d at 1231.

In its operations, the Bureau must take into account its obligation, under the Endangered Species Act (ESA), to ensure that project operations are not "likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). In regards to this statute, the Supreme Court has stated: "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978). That obligation requires the agency to perform a biological assessment "for the purpose of identifying any endangered species which is likely to affected" by the operations of the Klamath Project. 16 U.S.C. §1536(c)(1). The Bureau has delegated its authority to conduct such assessments for two species – the coho salmon and suckerfish – to the National Marine Fisheries Service (NMFS) and the Fish and Wildlife Service (FWS), respectively.[4] *See* 50 C.F.R. §§ 17.11, 402.01(b). Under the ESA, if the Bureau determines that an endangered or threatened species may be affected by its proposed action, it must send the NMFS or the FWS a request for a "formal consultation," in response to which the appropriate agency will produce its biological opinion. *See* 16 U.S.C. § 1536(a)(2), (b); 50 C.F.R. § 402.14. "If the Biological Opinion concludes that the proposed action is likely to jeopardize a protected species, the agency must modify its proposal" to alter that result. *See Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1999), *cert. denied*, 526 U.S. 1111 (1999).

[4] NMFS is now part of the National Oceanographic and Atmospheric Administration (NOAA) and known as "NOAA Fisheries." For the sake of clarity and convenience, the court will continue to use this agency's old title in this opinion.

Failure to observe this procedure has led to litigation and injunctive relief against the Bureau for violating the ESA. *See, e.g., PCFFA*, 138 F. Supp.2d at 1248.

**D. Water Rights in Oregon and the Klamath Project**

Shortly after passage of the 1905 federal authorization for the Klamath Project, the State of Oregon enacted legislation permitting an appropriate Federal official to file with the State Engineer "a written notice that the United States intends to utilize certain specified waters . . . unappropriated at the time of the filing." Or. Gen. Laws, 1905, Ch. 228, § 2, p. 401. The filing of such a notice would result in those waters being "deemed to have been appropriated by the United States" and "not . . . subject to further appropriation" under state law. *Id*. at 401-02 On May 17, 1905, the Bureau filed a notice indicating that "the United States intends to utilize . . . [a]ll of the waters of the Klamath Basin in Oregon, constituting the entire drainage basins of the Klamath river and Lost river, and all of the lakes, streams and rivers supplying water thereto or receiving water therefrom" for purposes of the "operation of works for the utilization of water . . . under the provisions of the . . . Reclamation Act." Agents of the United States also posted notices of its appropriation on sites along the Klamath and Link Rivers in Oregon and in the California portions of the Basin.

In 1905, the Oregon legislature passed a second law, providing that "for the purpose of aiding in the operations of irrigation and reclamation . . . the United States is hereby authorized to lower the water level of" various Klamath Basin lakes. Or. Gen. Laws, 1905, ch. 5, § 1, p. 63. This law ceded to the United States "all the right, title, interest, or claim of this State to any land uncovered by the lowering of the water levels." *Id*. The reclaimed lands were ultimately sold or ceded by the United States to homesteaders, including predecessors to some of the plaintiffs in this action. The Bureau required these and other homesteaders who wished to receive deliveries of Project water to file with the Bureau one of two "water rights applications." The first type, a "Form A" water rights application, was used by homesteaders on reclaimed land and, by its terms, generally sought sufficient water as "may be applied beneficially in accordance with good usage in the irrigation of the land." This form included a "water shortage" clause that allowed the applicant an "equitable proportionate share . . . of the water actually available." The second type of application, a "Form B" water rights application, was used by existing landowners in the Basin who were not on reclaimed lands. This form typically provided that "the measure of the water right" applied for was "that quantity of water which shall be beneficially used for the irrigation" of the applicant's land, "but in no case exceeding the share proportionate to irrigable acreage, of the water supply actually available as determined by the Project Manager or other proper officer of the United States."

By 1911, when the Warren Act was passed, apart from the United States, water rights in the Klamath Project were mostly held by individual landowners – although as early as 1905, the Bureau entered into a "repayment contract" with an incorporated entity, the Klamath Water Users Association, which was made up of owners and occupiers of lands within the Project, some of whom were already appropriators of water for irrigation. According to this contract, the

association "guarantee[d] the payments [to the United States] for that part of the cost of the irrigation works apportioned by the Secretary of the Interior to each shareholder" and also undertook to collect shareholders' payments on the government's behalf. It appears that at least ten of the plaintiff irrigation, drainage or water districts in this action initially entered into contracts with the Bureau under the auspices of the Warren Act.[5]

As noted above, the decades that followed saw the reclamation laws shift away from having the Bureau enter into individual water-rights contracts and toward district-level water delivery contracts. As part of this trend, 13 of the 14 districts involved in this action eventually obtained contracts with the Bureau for the delivery of Klamath Project water.[6] The fourteenth district, Klamath Hills District Improvement Company, has no such contract. Of the 13 districts that have water delivery contracts with the Bureau, eight include provisions holding the United States harmless for "any damage, direct or indirect," resulting "[o]n account of drought or other causes" of "a shortage in the quantity of water available" from Project sources.[7] Some of those provisions also require the United States to "use all reasonable means to guard against such shortage[s]." Four other districts' contracts include a similar provision stating that "[t]he United States shall not be liable for failure to supply water under this contract caused by . . . unusual drought."[8] The contract for plaintiff Van Brimmer Ditch Company includes no such shortage provision.

Certain individual water users' application contracts with the Bureau plainly have been superseded by the district-level contracts, under which the districts assumed both the individual water users' repayment obligations and the Bureau's water delivery obligations. The Bureau's

---

[5] Those 10 are Klamath Drainage District, Sunnyside Irrigation District, Klamath Basin Improvement District, Malin Irrigation District, Westside Improvement District No. 4, Shasta View Irrigation District, Poe Valley Improvement District, Midland District Improvement Co., Enterprise Irrigation District, and Pine Grove Irrigation District.

[6] Those 13 are Klamath Irrigation District, Klamath Drainage District, Tulelake Irrigation District, Sunnyside Irrigation District, Klamath Basin Improvement District, Malin Irrigation District, Westside Improvement District No. 4, Shasta View Irrigation District, Poe Valley Improvement District, Midland District Improvement Co., Enterprise Irrigation District, Pine Grove Irrigation District, and Van Brimmer Ditch Company.

[7] Those 8 with the same or substantially similar provisions are Klamath Irrigation District, Tulelake Irrigation District, Klamath Drainage District, Sunnyside Irrigation District, Klamath Basin Improvement District, Malin Irrigation District, Westside Improvement District No. 4, and Shasta View Irrigation District.

[8] Those four are Enterprise Irrigation District, Poe Valley Improvement District, Midland District Improvement Co., and Pine Grove Irrigation District. The Poe Valley and Midland contracts omit the word "unusual" before "drought."

September 10, 1956, contract with Tulelake Irrigation District, for example, states that "[t]he United States hereby consents to the cancellation of individual water right applications issued pursuant to Public Notice No. 13 of September 29, 1922 . . . . [u]pon the furnishing to the United States of the written consent of the person or persons in whose ownership said individual water right application is vested." Likewise, the July 20, 1953, contract between the Bureau and the Poe Valley Improvement District provides that "[t]he United States and the District agree and recognize that certain lands included within the District are subject to contracts with the United States for water supply, and that it is the intent of the parties to such contracts to terminate the same," subject to enumerated conditions. And the November 29, 1954, contract with the Klamath Irrigation District provides that "[t]he District hereby assumes and agrees to carry out . . . all the obligations imposed upon the United States by the contracts listed on Exhibit 'A' . . . for the carriage and delivery of water," and that "the District shall be entitled to collect and retain for its own use . . . all revenues payable to the United States under the hereinabove mentioned contracts." This contract also states, however, that "[a]ll other provisions of said contracts shall remain unaffected hereby." Other district contracts, however, make no mention of the individual water users' contracts and do not explicitly provide for the cancellation of the individual water rights applications of the district members; several do state that the water rights accruing to the district under the contract are "inferior and subject to prior rights reserved for the lands of the Klamath Project."

Several plaintiffs claim other sources of property rights in Klamath Project water. Thus, certain plaintiffs who acquired their land as homesteaders were, after complying with a regulatory scheme, granted title to their land in "patent deeds." To obtain a patent deed, homesteaders were required to file with the Bureau two documents: an Application for Permanent Water Right – Form A, and an affidavit "attesting to the fact that [the homesteader] had put [the] Klamath Project water to beneficial use." Once an applicant met the requirements, he was issued the patent deed conveying the land "together with the right to the use of water from the Klamath Reclamation Project as an appurtenance to the irrigable lands . . . subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes." The parties disagree as to the scope of the interest in irrigation water conveyed by the patent deeds.

Two of the plaintiffs, the Klamath Drainage District and the Klamath Hills District Improvement Company, hold water right permits that they claim evidence their ownership of a "vested and determined water right" under Oregon law. These permits, which were limited both in terms of a specific cubic feet per second of water, as well as to the amount of water that could be applied to beneficial use, were issued after the State of Oregon repealed the 1905 law in 1953. In addition, it should not be overlooked that a number of Oregon tribes, including the Klamath and Yurok, hold fishing and water treaty rights in the Klamath Project waters. In some instances, these rights derive from treaties, *see* Treaty of 1864, 16 Stat. 708; *Or. Dept. of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766-78 (1985), while, in other instances, they were created by statute and executive order, *see* Hoopa-Yurok Settlement Act of 1988, Pub. L. No. 100-580, 102 Stat. 2924 (confirming the existence of these water rights).

Oregon state law has a procedure for sorting out certain competing interests to water. Thus, the Water Rights Act of 1909 authorizes the adjudication of federal reserved and state law water rights initiated prior to the passage of the Act. *See* Or. Rev. Stat. §§ 539.005-240 (2003). All water rights "that had vested prior to 1909, but had never been subject to a judicial determination" were "left intact as 'undetermined vested rights.'" *United States v. Oregon*, 44 F.3d 758, 764 (9th Cir. 1994) (quoting Or. Rev. Stat. § 536.007(11)). Any person holding an "undetermined vested right" or federal reserved right is required to file a "registration statement" with the Oregon Water Resources Department that must state, among other things, the stream from which the claimed water was diverted, the claimed beneficial use to which it was put, and the time the claimed used first began. *See* Or. Rev. Stat. § 539.240(2). All such claims are then entered into the state's records, and are made subject to a final determination of rights in a statutory adjudication process. *See* Or. Rev. Stat. §§ 539.240(8), 539.10-240; *see also United States v. Oregon*, 44 F.3d at 764.

An adjudication process for the Klamath River Basin (the Adjudication) was initiated in 1976 and remains pending. The Bureau, plaintiffs, and a variety of other organizations and individuals have filed competing claims in that proceeding. No final decisions regarding those claims have been rendered.

**E. History of this Litigation**

For decades, Klamath Basin landowners generally received as much water for irrigation as they needed. In severe drought years, they simply received somewhat less. That changed in the spring of 2001, when several federal agencies produced studies indicating that water levels in the basin were so low as to threaten the health and survival of certain endangered species. Water forecasts for 2001 predicted that year would be "critical[ly] dry," with an inflow volume into Upper Klamath Lake of 108,000 acre-feet from April through September – "the smallest amount of inflow on record." *Kandra*, 145 F. Supp. 2d at 1198. In January, 2001, the Bureau forwarded a biological assessment of the Project's operations on the coho salmon and requested the initiation of formal consultation with the NMFS under section 7 of the ESA. *Id*. A similar assessment regarding the endangered shortnose and Lost River suckerfish – two species that "live in Upper Klamath Lake and nearby Project waters and nowhere else," *PCFFA,* 138 F. Supp. 2d at 1230 – was forwarded to the FWS in March 2001. *Kandra*, 145 F. Supp. 2d at 1198. Both assessments concluded that operation of the Project was likely to affect adversely the three species in violation of the ESA, 16 U.S.C. § 1531, *et seq*.

The two agencies then performed their own analyses and delivered draft Biological Opinions in March, 2001. Both draft opinions concluded that the Project's operations in 2001 would jeopardize the endangered species in question. Upon review of those opinions and the "reasonably prudent alternatives" for the benefit of the fish proposed in them, the Bureau advised the agencies that "the forecasted water supplies for 2001 were not adequate to meet the needs" of the proposed alternatives, which involved maintaining water levels and river flows sufficient to increase water quality for the endangered fishes' habitat. On March 28, 2001, the Governor of Oregon issued an executive order declaring a "state of Drought Emergency in Klamath County."

On April 5, 2001, the FWS, acting in furtherance of its statutory duties under the ESA, issued a final biological opinion concluding that the proposed 2001 Operation Plan for Upper Klamath Lake, Link River Dam, Tulelake, and the related irrigation delivery facilities threatened the continued existence of the shortnose and Lost River sucker fish. Noting that 2001 was "likely to be the driest year on record," resulting in "extremely limited water resources" in the Basin, the opinion concluded that the proposed operation plan for 2001 would likely result in "loss of larval and juvenile sucker habitat at critical phases of their life cycle," significantly increased "loss of life" among suckerfish, and potentially lethal water quality conditions. The next day, on April 6, 2001, the NMFS issued a final biological opinion concluding that the proposed Operation Plan threatened the coho salmon. The opinion concluded that the proposed plan would "result in the continued decline in habitat conditions" such that "the survival and abundance of . . . coho salmon would be expected to decrease." *See* NMFS Biological Opinion for Klamath Project Operations 3 (May 31, 2002) (describing conclusions of Biological Opinion issued April 6, 2001).

As required by the ESA, the biological opinions of both agencies included "reasonable and prudent alternatives"[9] to address the threat to the three fish species, including reducing the amount of water available during 2001 for irrigation from Upper Klamath Lake. On April 6, 2001, the Bureau issued a revised Operation Plan that incorporated the "reasonably prudent alternatives" proposed by the agencies. That plan terminated the delivery of irrigation water to plaintiffs for the year 2001.[10] Three days later, on April 9, 2001, two of the plaintiffs herein, the Klamath Irrigation District and the Tulelake Irrigation District, filed a breach-of-contract action in the U.S. District Court for the District of Oregon to challenge the validity of the biological opinions and to enjoin the Bureau from implementing the revised Operation Plan. That court denied a preliminary injunction motion, and the two districts voluntarily dismissed their suit in early October 2001.

On October 11, 2001, plaintiffs then brought suit in this court. Their complaint raised two claims: one for just compensation for their water rights, which they aver were taken by defendant's termination of delivery of irrigation water in 2001; and another for just compensation for the impairment of their water rights, which they allege were recognized and vested by the interstate agreement known as the Klamath Basin Compact.

---

[9] The ESA directs the Secretary of the Interior or the Secretary of Commerce to suggest "reasonable and prudent alternatives" when consulted about Federal activities that might adversely affect endangered species. *See Tulare Lake Basin Storage Dist. v. United States,* 49 Fed. Cl. 313, 315 n.2 (2001) (citing 16 U.S.C. § 1536(b)(3)(A)).

[10] Plaintiffs concede that defendant released 70,000 acre-feet of Klamath Project water to users in July 2001, but assert that this delivery came too late in the growing season to allow them to grow crops.

In May 2002, defendant filed a motion to stay this action, arguing that the rights claimed by plaintiffs are "a matter of state law," and that because the "questions at issue in the Adjudication also are required elements of Plaintiffs' takings claims," this court should stay this action pending resolution of the Adjudication. On March 24, 2003, plaintiffs filed an amended complaint, in which, in addition to their prior takings claims, they added a breach of contract count. In September 2003, plaintiffs filed a motion for partial summary judgment seeking a determination that their interests in Klamath Project water were not property interests at issue in the Adjudication. On October 3, 2003, defendant filed a cross-motion for summary judgment on the issue of the nature and scope of plaintiffs' property interest in Klamath Project water and the question whether that interest was a compensable property interest for purposes of the Takings Clause of the Fifth Amendment. On November 13, 2003, this court denied defendant's motion to stay and granted plaintiff's motion for partial summary judgment, concluding that plaintiffs' claim "assert[ed] no property interest determinable in the Adjudication," because plaintiffs claim not title to, "but only 'vested beneficial interests' in, the Klamath Basin Project water." This action was then permitted to proceed with the understanding that "plaintiffs are barred from making any claims or seeking any relief in this case based on rights, titles, or interests that are or may be subject to determination in the Adjudication."[11]

On January 27, 2004, plaintiffs filed a cross-motion for summary judgment on the issues of the nature and scope of their property interest and whether the United States was liable to pay just compensation for the taking of that interest. On March 23, 2004, the court granted defendant's motion to hold in abeyance the portions of plaintiffs' brief addressing the issue of ultimate liability. This case was transferred to the undersigned on December 9, 2004. On January 11, 2005, plaintiffs were permitted to file a second amended complaint, in which they reduced their damages claim. On February 28, 2005, the court granted a motion to intervene filed by the Pacific Coast Federation of Fishermen's Associations. *See Klamath Irrigation Dist. v. United States*, 64 Fed. Cl. 328 (2005). On March 14, 2005, the parties simultaneously filed supplemental briefs on the property right issue. Two weeks later, on March 30, 2005, the court held oral argument on the parties' cross-motions for summary judgment on the property rights issue.[12]

---

[11] It bears noting at this juncture that there is no *per se* rule requiring this court to abstain in favor of a state water rights adjudication. Indeed, as a general rule, "federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given them." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 15 (1983) (quoting *Colorado River*. 424 U.S. 800, 817 (1976)); *see also New Orleans Public Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 358 (1989) ("The [federal] courts . . . are bound to proceed to judgment . . . in every case to which their jurisdiction extends.").

[12] On April 12, 2005, plaintiff filed a motion to reconsider the court's order granting, in part, and denying, in part, the motion to intervene. On April 21, 2005, the court denied plaintiff's motion to reconsider and, by separate order, invited defendant and defendant-intervenor to file short briefs replying to portions of plaintiff's reconsideration motion that appeared to be directed at the property-rights issue. On May 19, 2005, defendant and defendant-intervenor filed

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In order to prevail on their claim under this amendment, the plaintiff-irrigators must each establish that they had a property interest in the waters of the Klamath Basin as of the date of the alleged taking in 2001.[13] Whether their respective interests in the waters of the Klamath Basin qualified as "private property" protected by the Fifth Amendment is ultimately a question of federal constitutional law. *Powelson*, 319 U.S. at 279. However, "[b]ecause the Constitution protects rather than creates property interests," *Phillips v. Wash. Legal Foundation*, 524 U.S. 156, 164 (1998), "property," for purposes of the Takings Clause, is defined by law independent of the Fifth Amendment. Thus, it has been said that "[t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment," which interests instead are defined by "'existing rules or understandings' and 'background principles' derived from an independent source, such as state, federal, or common law." *Maritrans Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1030 (1992)).[14] Under these principles, it is axiomatic that "not all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them." *United States v. Willow River Power Co.*, 324 U.S. 499, 502 (1945); *see also* Thomas W. Merrill, "The Landscape of Constitutional Property," 86 Va. L. Rev. 885, 970-81 (2000).[15]

---

supplemental briefs in response to the court's order of April 21, 2005. Additional memoranda were filed by the parties on July 14, 2005, and July 22, 2005.

[13] *See Karuk Tribe v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (stating that under a takings analysis, "[f]irst, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action"); *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed. Cir.1993), *cert. denied*, 516 U.S. 870 (1995) (citing *United States ex rel. Tennessee Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943)).

[14] *See also Palazzola v. Rhode Island*, 533 U.S. 606, 626-28 (2001); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *Hansen v. United States*, 65 Fed. Cl. 76, 123 (2005).

[15] Federal constitution law, of course, still impacts the definition of private property interests for purposes of the Takings Clause. In *Lucas*, *supra*, for example, the Supreme Court said that state-law definitions of private property rights must be based on an "objectively reasonable application of relevant precedents." 505 U.S. at 1032 n.18. Such objectivity is vital if the integrity of the Takings Clause is to be preserved as against entirely novel and unprincipled

In applying these principles to water, it is important to understand that the issue here is not who owns the water. Generally speaking, water "belongs to the public" and is held in trust by the states involved. *See, e.g., California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142 (1935); *Shively v. Bowlby*, 152 U.S. 1, 11-14 (1894). This is certainly true in the two States at issue, Oregon and California. *See* Or. Rev. Stat. § 537.110 ("[a]ll water within the state from all sources of water supply belongs to the public"); *Milton v. Coast Property Corp.*, 151 Or. 208, 213 (Or. 1935) (noting that Oregon statute dates to 1909); Cal. Const., Art. 10, § 2. Rather, at least in the first instance, this case involves so-called "usufructuary" rights – a right to use the water, ordinarily for a particular purpose and with specified limitations and priorities. *Rencken v. Young*, 300 Or. 352, 363 (Or. 1985); *Rank v. Krug*, 90 F. Supp. 773, 787 (C.D. Cal. 1950) ("Such water rights are 'usufructuary, and consist not so much of the fluid itself as the advantage of its uses,' and have been so regarded since the earliest day.") (*quoting Eddy v. Simpson*, 3 Cal. 249 (Cal. 1853)).[16]

Based on these principles, the issues whether and, if so, to what extent, the plaintiff-irrigators possess property rights in the waters of the Klamath Basin require the court to look at three possible sources for such rights: Federal law, apart from the Constitution; Oregon, and to the extent relevant, California, law; and, potentially, contract law, looking at whether the farmers acquired rights from a third party. The court will consider these potential sources, and the parties' conflicting arguments with respect thereto, *seriatim*.

**A. Federal Reclamation Law**

Plaintiffs' banner assertion is that their property interests in the Klamath water spring from the Reclamation Act of 1902, 32 Stat. 388 (1902) (codified, as amended, at 43 U.S.C. §§ 371 *et seq*.). Their view is bottomed on section 8 of that Act, which provides, in pertinent part:

---

definitions of property designed artificially to defeat or buttress a takings claim. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980).

[16] As explained in *Rencken*, 300 Ore. at 363 –

> "[W]aters of a natural stream or other natural body of water are not susceptible of absolute ownership as specific tangible property. Prior to the segregation of water from the general source, the proprietary right is usufructuary in character." 1 Clark (ed.), Water and Water Rights 349 (1967) (footnotes omitted). "According to the modern accepted doctrine, it is the use of water, and not the water itself, in which one acquires property in general." *Sherred v. City of Baker*, 63 Or. 28, 39, 125 P. 826 (1912).

*See also Washoe County v. United States*, 319 F.3d 1320, 1322 (Fed. Cir. 2003).

> [N]othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or use of water in, to, or from any interstate stream or the water thereof: Provided, ***That the right to use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right***.

32 Stat. 388, 390 (1902) (codified at 43 U.S.C. §§ 372, 383 (2000)) (emphasis added). Focusing on the highlighted language, the irrigators asseverate that because they own the irrigated land that is appurtenant to the water in question, the statute confers upon them a property interest in that water. Thus, they contend, their interests in the water derive directly from Federal law, rather than the law of Oregon or California. There are sundry reasons, however, why this contention is rootless.

To begin with, there is the statutory language.[17] On its face, section 8 requires the Secretary, in carrying out his responsibilities under the Reclamation Act, to "proceed in conformity with" state laws relating to the "control, appropriation, use, or distribution of water." It is beyond peradventure that, rather than authorizing the Secretary to acquire his water rights independent of state law, this section treats the Secretary as an appropriator under the states' appropriation laws, requiring him to obtain his water rights in the same manner as others. Nothing in this language suggests that third parties, including irrigators, could obtain title to appropriative water rights at Bureau projects other than through state law. Indeed, while the Reclamation Act indicates that the right to the use of certain water "shall be appurtenant to the land irrigated," this language refers only to water "acquired under the provisions of this Act," which "provisions" require the claimant to obtain those rights in accordance with state law. Accordingly, the Reclamation Act does not, as plaintiffs intimate, independently define who owns interests in the water of Bureau projects, including the Klamath Basin. To the contrary, that question is controlled by state law, in this case, that of Oregon, or perhaps, California.

This reading of the statute is confirmed by extensive legislative history. As private and state efforts at irrigating the arid lands of the West failed, pressure mounted during the last decade of the 19th century for some form of federal support for irrigation. Many bills were

---

[17] "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)*; see also BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). In this regard, the Supreme Court has instructed that "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

introduced in Congress during this decade and up until 1902.[18] As reflected in these bills, a primary point of contention was whether the irrigation projects should be built and operated by the Federal government or instead be built by the Western States using land ceded to them for this purpose. Ultimately, those who supported the Reclamation Act's passage, particularly representatives from the Western States that stood to benefit most from the Act's passage, convinced a majority that reclamation was a national function and that the projects should be built by the federal government.[19] A robust secondary debate involved whether the Federal government or the States should control the appropriation and distribution of project water. Opponents of what would become the Reclamation Act espoused the view that, if the Federal government was to build and operate the projects, it should control the appropriation and distribution of the water. Supporters, however, retorted that this control should reside in the Western States, each of which, by this time, had regimes for dealing with water rights. They noted that the creation of a Federal regime for establishing water rights would inevitably compete with the preexisting state regimes, threatening a life-blood issue for the arid states and leading potentially to unintended results.[20] The approach of placing control in the States, these

---

[18] *See, e.g.*, 57th Cong., 1st Sess (1902): H.R. 52, H.R. 63, H.R. 125, S. 595, H.R. 7676, H.R. 9676, and S. 3057; 56th Cong., 2d Sess. (1901): H.R. 13846, S. 5833, H.R. 13993, H.R. 14072, H.R. 14088, H.R. 14165, H.R. 14192, H.R. 14203, H.R. 14241, H.R. 14250, H.R. 14280, H.R. 14388; 56th Cong., 1st Sess. (1900): S. 205, H.R. 5022; 55th Cong., 3d Sess. (1899): H.R. 11795; 55th Cong., 2d Sess. (1898): S. 4017, H.R. 9994. S. 3057 is the bill that ultimately became, as amended, the Reclamation Act.

[19] *See* H. Rep. No. 57-1468, at 3-4 (1902); S. Rep. No. 57-254, at 5 (1902); *see also* 35 Cong. Rec. 6675-76 (1902) (Cong. Mondell); *id.* at 6673, 6734 (Cong. Newlands); *id.* at 6673 (Cong. Shafroth); *id.* at 6740 (Cong. Reeder).

[20] President Roosevelt, a main supporter of this approach, stated in a 1901 message to Congress that "[t]he distribution of the water, the division of the streams among irrigators, should be left to the settlers themselves in conformity with State laws and without interference with those laws or with vested rights." 35 Cong. Rec. 6775 (1902). Senator Clark of Wyoming, the chief senatorial sponsor of S. 3057, which became the Reclamation Act, disclaimed the notion that "a great Government bureau . . . shall have control of all the . . . waters in our arid regions." 35 Cong. Rec. at 2222. In a floor statement, he further explained –

> The question of the conservation of waters is one of national importance; the question of reservoir sites and reservoir building is one that appeals to the Government as a matter of national import, but the question of State or Territorial control of waters after having been released from their bondage in the reservoirs which have been provided is a separate and distinct proposition. . . . [I]t is right and proper that the various States and Territories should control in the distribution. The conditions in each and every State and Territory are different. What would be applicable in one locality is totally and absolutely inapplicable in another. . . . [T]o take from the legislatures of the various States and Territories,

legislators emphasized, had been adopted by Congress in passing the Mining Acts of 1866 and 1870, and the Desert Land Act of 1877.[21]

The legislative history – not to mention the statutory language – reflects that the latter view won out. In this regard, the relevant Senate Report provided that "[b]y section 8 there is to . . . be no interference with State or Territorial laws on the subject of irrigation." S. Rep. No. 254, *supra*, at 2. The accompanying House Report, in much greater detail, adumbrates that "[s]ection 8 recognizes State control over waters of nonnavigable streams such as are used in irrigation, and instructs the Secretary of the Interior in carrying out the provisions of the act to conform to such laws." H. Rep. No. 1468, *supra*, at 6. It emphasizes that "nothing in the act shall be held as changing the rule of priorities on interstate streams," *id*. at 6, noting further that "[u]nder this section uniformity of record of the rights is secured and the rules of priorities of rights are not disturbed," *id*. at 7. Describing the Federalism balance struck by the legislation, this same report reveals that the portions of section 8 requiring appurtenancy and beneficial use, together with those in section 5 of the Reclamation Act, limiting, for example, the size of certain irrigated parcels to 160 acres, were designed not to supplant state water law, but rather to ensure that under that law, monopolistic ownership of public waters (and eventually the lands associated therewith) would not occur. *Id*. at 6-7 (noting that these provisions were designed to "absolutely insure the user in his right and prevent the possibility of speculative use of water rights").[22]

---

> the control of this question at the present time would be something little less than suicidal. They are the men qualified to deal with the question, the laws are written upon their statute books and read of all men . . . .

*Id*. A parallel history is revealed by the debates in the House. *See* 35 Cong. Rec. 6676 (Cong. Mondell) (asserting that section should "reserv[e] control of the distribution of water for irrigation to the respective States and Territories); *id*. at 6678 (Cong. Mondell); *id*. at 6672-73 (Cong., Shafroth); *id*. at 6748 (Cong. Glenn); *id*. at 6752 (Cong. Jones); *id*. at 6763 (Cong. Mercer); *id*. at 6770 (Congressman Sutherland) ("if the appropriation and use were not under the provisions of the State law the utmost confusion would prevail"); *id*. at 6728 (Cong. Burkett).

[21] *See* Mining Act of 1866, ch. 262, 14 Stat. 251, 253, (1866), as amended by Act of July 9, 1870, ch. 235, 16 Stat. 217, 218 (1870) (protecting a miner's claim to water to the extent based on "local customs, laws, and the decisions of the courts"); Desert Land Act of 1877, 19 Stat. 377 (1877) (settlers' water right "shall depend upon bona fide prior appropriation"); *see also* 35 Cong. Rec. 6678 (Cong. Mondell) (noting the desire to "follow[] the well-established precedent in national legislation of recognizing local and State laws relative to the appropriation and distribution of water"); *California*, 438 U.S. at 656-58 (observing this point in construing these statutes); *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 153-58 (1935) (same).

[22] *See also* 35 Cong. Rec. 6679 (1902) (Cong. Mondell) (provision designed to prevent "the evils which come from recognizing a property right in water with power to sell and dispose of the same elsewhere and for other purposes than originally intended"); 35 Cong. Rec. 2222-23

Indeed, the House Report anticipated that the Secretary would not begin construction of works for the irrigation of lands in any State or Territory "until satisfied that the laws of said State or Territory fully recognized and protected water rights of the character contemplated." *Id*. at 7.

Recounting this legislative history, the Supreme Court, in *California*, *supra*, concluded that "the Act clearly provided that state water law would control in the appropriation and later distribution of the water." 438 U.S. at 664. Writing on behalf of the majority, then Justice, now Chief Justice, Rehnquist emphasized that "[f]rom the legislative history of the Reclamation Act of 1902, it is clear that state law was expected to control in two important respects." *Id*. at 665. "First," he noted, "the Secretary would have to appropriate, purchase, or condemn necessary water rights in strict conformity with state law." *Id*. Repudiating *dicta* in earlier cases, Justice Rehnquist then dismissed the notion that state law control over the appropriation of water was a mere technicality, in the process making short shrift of the argument that "§ 8 merely require[s] the Secretary of the Interior to file a notice of his intent to appropriate but to thereafter ignore the substantive provisions of state law." Instead, he found that the legislative history made it "abundantly clear that Congress intended to defer to the substance, as well as the form, of state water law." *Id*. at 675; *see also Nebraska v. Wyoming*, 295 U.S. 40, 42-43 (1935). "Second," Justice Rehnquist continued, "once the waters were released from the Dam, their distribution to individual landowners would again be controlled by state law." *California*, 438 U.S. at 667. The only exceptions to these rules, he indicated, were two specific provisions of the Reclamation Act that were to govern to the extent inconsistent with state law: section 5, which forbade the sale of reclamation water to tracts of land of more than 160 acres, and section 8 of the Act, which required that the water right must be appurtenant to the land irrigated and governed by beneficial use. *Id.* at 668 n.21.

*California* thus authoritatively teaches that defining property rights as to the water in question is a matter of state, not federal, law. Consistent with this view and the statute's legislative history, courts and commentators alike have viewed the appurtenancy/beneficial use clause at the end of section 8 merely as an overlay to state law, designed to prohibit monopolistic control over western waters.[23] If the law were otherwise, a property owner could claim water

---

(1902) (Sen. Clark) (indicating that these provisions were designed to prevent "large areas of public domain" from being "placed in the hands of the larger corporate interests"). Subsequent Supreme Court cases construed these limitations consistent with this legislative history. *See, e.g., Bryant v. Yellen*, 447 U.S. 352, 368 n.19 (1980) (noting that the 160 acres limitation "helps open project lands to settlement by farmers of modest means, insures wide distribution of the benefits of federal projects, and guards against the possibility that speculators will earn windfall profits from the increase in value of their lands resulting from the federal project"); *Ivanhoe Irrig. Dist. v. McCracken*, 357 U.S. 275, 297 (1958) ("The project was designed to benefit people, not land").

[23] *See*, *e.g.*, *Peterson v. United States Dept. of Interior*, 899 F. 2d 799, 802 (9th Cir.), *cert. denied*, 498 U.S. 1003 (1990) ("Congress was particularly concerned that the reclamation

rights under section 8 solely based upon appurtenancy and beneficial use, even without a contract or some other arrangement to receive project water. Yet, such naked claims have been rejected by courts holding that the appurtenancy and beneficial use concepts of section 8 only apply to properties otherwise entitled to receive distributions of project water. Thus, for example, in *United States v. Alpine Land & Reservoir Co.,* 878 F.2d 1217 (9th Cir. 1989), the Ninth Circuit explained –

> [T]he beneficial use requirement occurs only in the context of determining how much water duty is appropriate for lands ***already*** entitled to receive Project water. Section 8 of the Act strictly limits the beneficial use concept to properties that are entitled to receive Project water. Section 8 explains that beneficial use is the measure of the right to the use of water ***acquired under the provisions of this Act***.
>
> The critical defect with the transferee properties involved in this case, however, is that they generally have no right to receive Project water. The landowners do not hold contracts or certificates entitled their properties to be irrigated. The beneficial use discussion . . . is therefore of no consequence to the presumed right of transferee properties to receive transferred water rights.

*Id*. at 1228-29 (emphasis in original); *see also United States v. Clifford Matley Family Trust*, 354 F.3d 1154, 1163 (9th Cir. 2004); Reed D. Benson, "Whose Water Is It? Private Rights and Public Authority Over Reclamation Project Water," 16 Va. Envtl. L.J. 363, 397-98 (1997).

Seeking to sidestep the *California* case, plaintiffs place heavy reliance on a triumvirate of cases – *Ickes v. Fox*, 300 U.S. 82 (1937), *Nebraska v. Wyoming*, 325 U.S. 589 (1945) and *Nevada v. United States*, 463 U.S. 110 (1983). They claim that these cases hold that the Reclamation Act establishes a federal property right to the use of water in the case of irrigation appurtenant to the land, subject to beneficial use. But, even a cursory review of these cases reveals that they hold nothing of the sort, but rather merely reflect the perceived result of the interaction between the Reclamation Act and the particular laws of the states involved. Given the importance of this point, a few words of elaboration are in order.

Plaintiffs cite statements in these cases describing water rights associated with reclamation projects and arising out of appurtenancy as "the property of the land owners," *Ickes*,

---

projects not fuel land speculation in the West or contribute in any way to the monopolization of land in the hands of a few private individuals."); Joseph L. Sax, "Problems of Federalism in Reclamation Law," 37 U. Colo. L. Rev. 49, 67 (1964-65) (appurtenancy/beneficial use was "designed to insure that the benefits of federal irrigation programs went to, and stayed with, small family farmers, and that water did not fall into the hands of large speculators and corporations"); Paul S. Taylor, "The Excess Land Law: Execution of a Public Policy, 64 Yale L.J. 477, 483-86 (1955) (the Reclamation Act was "drawn with unusual care to prevent monopoly of water on reclaimed public lands").

300 U.S. at 95, or a "property right," *Nebraska*, 325 U.S. at 614, or conversely, recognizing that the United States ownership of certain water rights was "at most nominal," *Nevada*, 463 U.S. at 126. But, read in context and in their entirety, these statements only describe either: (i) the impact of section 8 on water rights that were deemed established under state law; or (ii) the fact that that section does not confer independently any significant interest in the reclamation waters upon the United States. In *Ickes*, *supra*, for example, the Supreme Court held that the United States was not an indispensable party to a lawsuit brought by farmers in Washington against the Bureau. *Ickes*, 300 U.S. at 96-97. In concluding that the United States did not become the owner of the water rights at issue, the Court rejected the government's reliance upon the Reclamation Act and instead relied on contracts and a Washington state law that provided that "[t]he right to the use of water which has been applied to a beneficial use in the state shall be and remain appurtenant to the land or place upon which the same is used." 300 U.S. at 94 n.3 (citing Laws of Wash., 1917, c. 117, § 39, p. 465; Laws of Wash., 1929, c. 122, § 6, p. 274; Rem. Rev. Stat. § 7391, vol. 8, p. 425). Likewise in *Nebraska*, *supra*, an original proceeding to apportion the waters of the Platt River, the Supreme Court again refused to find that section 8 granted the United States any water rights, and instead looked to state law on appropriation to determine the existence and nature of the property interest at issue in those cases. *Nebraska*, 325 U.S. at 612-15. Applying Nebraska and Wyoming law, the Court noted the Reclamation Act's "direction . . . to the Secretary of the Interior to proceed in conformity with state laws in appropriating water for irrigation purposes," and stated that it "intimate[d] no opinion whether a different procedure might have been followed so as to appropriate and reserve to the United States all of these water rights," noting that "[n]o such attempt was made." *Id*. at 614-15. Finally in *Nevada*, *supra*, the Court, reaffirming its decision in *California*, focused on "the law of the relevant State [*i.e.*, Nevada] and the contracts entered into by the landowners and the United States" in deciding that beneficial use gave rise to private rights in water. 463 U.S. at 122, 126. Nonetheless, it ultimately resolved this case, which involved an attempted reallocation of reclamation water rights, based upon *res judicata* principles. *Id*. at 145.

While these cases certainly hold that section 8 does not confer water rights on the United States, that conclusion did not spring from the notion that section 8, rather than state law, somehow grants those rights to other parties. Indeed, few, if any, broad principles can be distilled from the Court's comments on the state water rights at issue in these cases because those comments depended upon several key assumptions. In *Ickes*, those assumptions derived from the procedural posture of the case – the sovereign immunity question presented involved a motion to dismiss, requiring the Court, under familiar rules, to treat the allegations made in plaintiffs' amended bills of complaint as true, including those involving their claimed water rights and those of the United States. The latter principle so drove the analysis in *Ickes* that, later in *California*, the Supreme Court characterized *Ickes* as not involving a construction of section 8. *See California*, 438 U.S. at 651 ("so far as we can tell, the first case to come to this Court involving the Act at all was *Ickes* . . . and the first case to require construction of § 8 of the Act was *United States v. Gerlach Live Stock Co.*, *supra*, decided nearly half a century after the enactment of the 1902 statute"). Likewise, in both *Nebraska* and *Nevada*, the genuinely operative portions of those opinions focused not on whether the parties competing with the

United States had perfected interests in the subject water under state law, but rather on how those rights were affected by the Reclamation Act (and the Desert Land Act before it) and whether the United States had somehow obtained a priority interest in such waters.[24] Neither of these cases undertook a comprehensive review of the laws of the states in question, nor addressed whether the United States could have obtained an overriding interest in the waters under some other state procedure. *See, e.g., Nebraska*, 325 U.S. at 615.

To the extent that these cases may be viewed as construing the interrelationship between state laws and the overlaying principles of section 8, they say virtually nothing about the interaction between section 8 and the underlying provisions of Oregon and California law that are at issue here. Suggestions in the *Ickes* line that there is a uniform body of western water rights law must be viewed cautiously, recognizing that the laws in these States largely, but not completely, overlap. Because those differences sometimes are pronounced – particularly, as they apply to the United States, and especially, in terms of reclamation – any attempt to extrapolate the reclamation water rights owned by an individual in one state from cases involving the laws of another state is perilous, at least until relevant congruencies between the two regimes have been established. The Court had no need to make the latter type of comparison in any of the *Ickes* line of cases, and did not do so. Nor did any of these cases mention, even in passing, the laws of Oregon or California. Indeed, while plaintiffs blithely claim otherwise, there is not the slightest hint that any of those cases remotely considered laws similar to those specifically governing reclamation in the two states at issue here.[25] Perhaps for these reasons, in trumpeting certain

---

[24] In *Ickes*, 300 U.S. at 96, the case came before the Supreme Court on defendant's motion to dismiss, which "concede[d] the truth of" plaintiff's allegations that "their water-rights ha[d] become vested" under state law. The Court indicated that given the procedural posture, even if those allegation had been denied, "we should still be obliged to indulge the presumption . . . that respondents might be able to prove them." *Id.* Similarly, in *Nebraska*, 325 U.S. at 612, the Court based its decision, in part, on the premise that "the water rights on which the North Platte [Reclamation] Project and the Kendrick [Reclamation] Project rest have been obtained in compliance with state law." The Court found that Congress, in passing section 8, had chosen to require the Secretary to ensure that "projects were designed, constructed and completed according to the pattern of" state appropriation laws, and found that the Secretary, indeed, had complied with these laws by obtaining permits from state officials. *Id.* at 612-14. Finally, in *Nevada*, *supra*, the Court concluded that the "beneficial interest in the rights confirmed to the Government resided in the owners of the [appurtenant] land," observing "[a]s in *Ickes v. Fox* and *Nebraska v. Wyoming*, the law of the relevant State and the contracts entered into by the landowners and the United States make this point very clear." 436 U.S. at 126.

[25] At oral argument, plaintiffs' counsel asserted that the laws of Oregon mirrored, in pertinent respects, the laws of the states involved in *Ickes*, *Nebraska* and *Nevada*. That proposition, however, is not borne out by the copies of the state statutes which plaintiffs provided subsequent to the argument. Any notion that the water laws of the Western States are uniform can be readily dispelled by even a cursory review of Wells A. Hutchins's seminal treatise *Water Rights Laws in the Nineteen Western States*, which dedicates three volumes and approximately

statements from the *Ickes* line of cases, plaintiffs gloss over the associated references to individual state laws, not to mention the many qualifiers and caveats that the Supreme Court employed in indicating, for example, that a given rule "generally" applied in Western States or represented an approach held "in common with most other states."[26] With these qualifications restored, the *Ickes* troika hardly provides an analytical stepping stone from which to leap to the conclusion that Congress, in passing the reclamation laws, intended to create usufructuary rights independent of state law.

Finally, plaintiff's construction of the *Ickes* line of cases runs headlong into a wide range of precedent. Certainly, nothing in these cases conflicts with the Supreme Court's holding in *California*, that, under the Reclamation Act, state water law controls the appropriation and later distribution of water, and any rights inherent in these functions. Plaintiffs are left to argue that *Ickes* and *Nebraska* were inconsistent with the *California* case, yet somehow survived the latter (and later) decision. That bit of *ipse dixit* is dubious enough on its face, let alone if one gives those cases the broad compass plaintiffs would afford them – a compass that would inevitably bring them all the more into conflict with *California*. And, even though *Nevada* was decided five years after *California*, any notion that the former, *sub silentio*, overruled the latter can best be described as unrealistic – 70 years of decisions in the Supreme Court[27] and elsewhere,[28] which

2,000 pages to describing, in magisterial detail, the many variations in water laws and water rights in those states. Notably, Hutchins divides the Western States and their approaches to water into three broad groups – Oregon and California are placed in a different category than Nevada, Colorado, Wyoming, and Nebraska. The latter, of course, were the states *sub judice* in the triumvirate of Supreme Court cases on which plaintiffs rely. *See* Wells A. Hutchins, I *Water Rights Laws in the Nineteen Western States* 2-3 (1971); *see also, e.g.*, 1 Waters and Water Rights § 8.02 (Robert E. Beck, ed. 1991) (providing "a State-by-State account of the adoption of appropriative rights or of dual [appropriation and riparian] systems" in the Western States, and dividing those states' water laws as falling into three broad categories); 6 Waters and Water Rights, Part XI, Subpart B (Robert E. Beck, ed. 1991) (summarizing the differences and similarities among the water laws of all 50 states); David Getches, Water Law In a Nutshell 192 (1984).

[26] *See (with emphasis added)*: *Nevada*, 463 U.S. at 126 ("[t]he law of Nevada, ***in common with most other western States***, requires for the perfection of a water right for agricultural purposes that the water must be beneficially used by actual application on the land"); *Ickes*, 300 U.S. at 95-96 (in Western states "***generally*** . . . it long has been established law that the right to the use of water can be acquired only by appropriation for beneficial use"); *see also Arizona v. California*, 460 U.S. 605, 620 (1983) ("the ***prevailing law*** in the western states").

[27] *See Bryant v. Yellen*, 447 U.S. 352, 371 n.22 (1980) ("the source of present perfected rights is to be found in state law"); *City of Fresno v. California*, 372 U.S. 627, 630 (1963) ("the effect of § 8 in such a case is to leave to state law the definition of the property interests, if any, for which compensation must be made"); *United States v. Gerlach Live Stock Co.*, 339 U.S. 725,

have consistently construed the Reclamation Act as deferring to state law in determining who has interests in reclamation waters, prove that notion false. In the last analysis, to rule in plaintiffs' favor on this issue, this court would not only have to defenestrate this authority, contraindications in the *Ickes* cases themselves, *see, e.g., Nevada*, 463 U.S. at 121 (reaffirming the ruling in *California*) and a wealth of legislative history, but also be prepared to flip the statute onto its head, treating the majority of the language therein not as the embodiment of an important

---

734 (1950) (under the reclamation laws, "Congress proceeded on the basis of full recognition of water rights having valid existence under state law"); *Silas Mason Co. v. Tax Comm'n of State of Wash*., 302 U.S. 186, 199 (1937) (section 8 "directed the Secretary of the Interior to proceed in conformity with the state laws in carrying out the provisions of the act and provided that nothing therein contained should be construed as interfering with the laws of the State relating to the control, appropriation, use or distribution of water used in irrigation"); *Nebraska v. Wyoming*, 295 U.S. 40, 42 (1935) ("[a]ll of the acts of the Reclamation Bureau in operating the reservoirs so as to impound and release waters of the river are subject to the authority of Wyoming"); *see also California v. FERC*, 495 U.S. 490, 504 (1990) (discussing the holding of *California* as it applies to the Reclamation Act of 1902).

[28] *See, e.g., Westlands Water Dist. v. Natural Resources Defense Council*, 43 F.3d 457, 461 (9th Cir. 1994) (subjecting the United States, as owner of water rights in California, to provisions of California water law restricting the location and use of that water); *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 212 (9th Cir. 1989) (concluding that "[s]tate law regarding the acquisition and distribution of reclamation water applies if it is not inconsistent with congressional directives"); *Jicarilla Apache Tribe v. United States*, 657 F.2d 1126, 1133 (10th Cir. 1981) ("[i]t generally can be said that state law governs the distribution of water from federal projects unless Congress expresses a different approach"); *Grey v. United States*, 21 Cl. Ct. 285, 295 (1990) (quoting *California*, *supra*, for the proposition that the Reclamation Act provides that "state water law would control in the appropriation and later distribution of [Reclamation Project] water"); *Kandra v. United States*, 145 F. Supp. 2d 1192, 1201 (D. Or. 2001) ("[u]nder federal reclamation law, the Secretary of the Interior is required to proceed in conformity with state laws with respect to the control, appropriation, use, or distribution of water used in irrigation"); *Westlands Water Dist. v. United States*, 805 F. Supp. 1503, 1509 (E.D. Cal. 1992) ("federal reclamation projects must be operated in accordance with state water law, when not inconsistent with congressional directives" and requires the United States to "respect [the state's] appropriative water rights hierarchy").

principle of cooperative Federalism, but rather as an empty formalism.[29] While plaintiffs may cling to such a *res ficta*, it remains that Congress enacted no such fantasy.

As such, it is apparent that this court must proceed to consider state law in determining whether plaintiffs have property rights in the waters of the Klamath Project.

**B. State Law**

Under the umbrella of the prerogatives created by the Reclamation Act, the States, in the years following the passage of the Act, began to pass reclamation legislation, often prompted by the desire of luring a project within their borders. Defendant claims that it owns controlling rights to the Klamath Project water based upon one such statute, the Act of the Oregon legislature of February 22, 1905, which read, in relevant part, as follows:

> Whenever the proper officers of the United States, authorized by law to construct works for the utilization of water within this State, shall file in the office of the State Engineer a written notice that the United States intends to utilize certain specified waters, the waters described in such notice and unappropriated at the time of the filing thereof shall not be subject to further appropriation under the laws of this state, but shall be deemed to have been appropriated by the United States; provided, that within a period of three years from the date of filing such notice the proper officer of the United States shall file final plans of the proposed works in the office of the State Engineer for his information; and provided further, that within four years from the date of such notice the United States shall authorize the construction of such proposed work. No adverse claims to the use

---

[29] In searching vainly for evidence of a more sweeping interpretation of the *Ickes* line of cases, plaintiffs rely on documents issued by the Solicitor and a Regional Solicitor of the Department of the Interior in 1989 and 1995, respectively. But, even these documents recognize that the determination and distribution of water rights in reclamation projects is dependent upon state law. *See, e.g.*, Memorandum from the Regional Solicitor, Pacific Southwest Region to the Regional Director, Bureau of Reclamation, Pacific Southwest Region 2 (Jul. 25, 1995). Moreover, in a 1933 decision, the Department of Interior opined that the United States rights to the waters of the Klamath Basin were based upon Oregon law. *See* Water Rights on Lower Klamath Lake, 53 Interior Dec. 693, 695-98 (1932). At all events, by all appearances, the documents cited by plaintiff were not arrived at through formal adjudication or notice-and-comment rule making and thus do not represent any agency's formal position on this issue. *See United States v. Mead Corp*., 533 U.S. 218, 234 (2001); *see also Cuyahoga Metr. Hous. Auth. v. United States*, 65 Fed. Cl. 534, 551 n.19 (2005). Even were these documents indicative of the agency's formal position, it is beyond peradventure that an agency may change its mind, provided, critically, its new position is supported by the law. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 416-17 (1993); *Automobile Club of Mich. v. Commissioner*, 353 U.S. 180, 180-86 (1957). In the court's view, the latter requirement has been met here.

> of the water required in connection with such plans shall be acquired under the laws of this State except as for such amount of said waters described in such notice as may be formally released in writing by an officer of the United States thereunto duly authorized, which release shall also be filed in the office of the State Engineer.

Or. Gen. Laws, 1905, Chap. 228, §2, p. 401-02. In a separate 1905 law, the Oregon Legislature also authorized the raising and lowering of Upper Klamath Lake in connection with the Project, allowed the use of the bed of Upper Klamath Lake for storage of water for irrigation; this law "ceded to the United States all the right, title, interest, or claim of this State to any land uncovered by the lowering of the water levels, or by the drainage of any or all of said lakes not already disposed of by the State." Or. Gen. Laws, 1905, ch. 5, §§ 1-2, p. 63-64.[30]

In February of 1905, the Congress authorized the development of the Klamath Irrigation Project. Act of February 9, 1905, ch. 567, 33 Stat. 714. Pursuant to that legislation, on May 17, 1905, the United States filed a notice of intention to appropriate Klamath River water, stating:

> Notice is hereby given that the United States intends to utilize certain specified waters, as follows, to-wit: All of the waters of the Klamath Basin in Oregon, constituting the entire drainage basins of the Klamath River and Lost River, and all of the lakes, streams and rivers supplying water thereto or receiving water therefrom, including the following and all their tributaries . . . [listing tributaries].
>
> It is the intention of the United States to completely utilize all the waters of the Klamath Basin in Oregon, and to this end this notice includes all lakes, springs, streams, marshes and all other available waters lying or flowing therein.
>
> That the United States intends to use the above described waters in the operation of works for the utilization of water in the state of Oregon under the provisions of the act of Congress approved June 17, 1902 (32 Stat., 388), known as the Reclamation Act.

---

[30] On February 3, 1905, California enacted a statute similar to this provision. It stated – "[t]hat for the purpose of aiding in the operations of irrigation and reclamation conducted by the Reclamation Service of the United States . . . the United States is hereby authorized to lower the water levels of any or all of the following lakes: Lower or Little Klamath lake, Tule or Rhett lake, Goose lake, and Clear lake, . . . and to use any part or all of the beds of said lakes for the storage of water in connection with such operations." 1905 Cal. Stat., p.4. The statute also "ceded to the United States all the right, title, interest, or claim of this State to any lands uncovered by the lowering of the water levels, of any or all of said lakes, not already disposed of by this state." *Id.*

In addition, the Bureau posted notices of appropriation for the Lost River system, which flowed from California to Oregon and back to California. The record reflects that it also acquired, by purchase from private parties, water rights with earlier priorities for the benefit of the Klamath Project.

Every indication is that the May 1905 notice triggered the provisions of the 1905 Oregon legislation, thereby vesting in the United States, as of that time, the appropriative water rights associated with the Klamath project that were unappropriated as of the date of the filing.[31] This conclusion is confirmed by *In re Waters of the Umatilla River*, 168 P. 922, 925 (Or. 1917), in which the Oregon Supreme Court held that, under the 1905 legislation, a similar notice by the United States "vested the United States with title to all the then unappropriated water of the Umatilla River." On rehearing, that court reaffirmed its prior conclusion, explaining further –

> By the statute quoted in the previous opinion the Legislature withdrew from further appropriation the waters of such streams as the United States should elect to utilize in the manner therein pointed out. The United States has accepted the grant and conformed to the terms thereof. The Legislature could not displace water rights which had vested prior to the acceptance by the United States of the provisions of the statute, but the plain precept of the law vests the United States with title to all waters not theretofore appropriated. The claim of the government . . . must be sustained, regardless of the diligence of the government in matters not specified in the statute, and regardless of the amount of water required to irrigate the lands served by the government ditches.

*In re Waters of Umatilla River*, 172 P. 97, 100 (Or. 1918); *see also* Paul S. Simmons, "Klamath Basin: Endangered Species Act and Other Water Management Issues," SJ023-ALI-ABA 127, 133 (2003) (hereinafter "Simmons") (noting that via the notice, "under Oregon law, water was thus 'deemed appropriated' and unavailable for other uses"). Commenting on these opinions, as well as the 1905 Act, a 1933 decision of the United States Department of the Interior stated – "This section of Oregon law was considered by the Supreme Court of Oregon in *Re Waters of Umatilla River* . . . in which it was held that the right of the United States through compliance with this act to all the waters not then appropriated is not affected by its lack of diligence in completing its project or by the fact of all the waters not being required to irrigate the lands served by its ditches, these matters not being conditions of the statute." *Water Rights on Lower Klamath Lake*, 53 Interior Dec. at 698. This decision concluded that "[t]he right conferred upon

---

[31] It should be noted that the United States met the other two requirements imposed by the 1905 Oregon law. Thus, on May 6, 1908, the Bureau filed plans and specifications for the Klamath Irrigation Project with the State Engineer. And, on May 8, 1909, the Bureau filed proof of authorization to construct the necessary works. On May 17, 1909, the Bureau filed supplemental plans with the State Engineer.

the United States by the State of Oregon to appropriate unappropriated waters in that State for agricultural purposes was plenary as to its use. . . ." *Id*. at 698.[32]

In arguing to the contrary, plaintiffs place stock in a 1950 Oregon Attorney General opinion, which found that the United States, by filing its notice under the 1905 Act, acquired the unappropriated water of the Klamath Basin "reasonably necessary" to the Project, but only to the extent the United States put those waters to "beneficial use." *See* Oregon Attorney General Opinion No. 1583, 25 Op. Atty. Gen. 62 (Nov. 10, 1950). Plaintiffs intimate that this "beneficial use" concept limits the scope of the rights obtained by the United States under the 1905 Act, paving the way for them to assert contrary interests under state law. *Per contra*. To the extent the 1950 opinion may be viewed as applying such a use limitation to the United States, it is inconsistent not only with the plain language of the 1905 Act,[33] but also with the holding in *Umatilla*, *supra*, that the United States had "vested" rights in the subject water "regardless of the amount of water required to irrigate the lands served by the government ditches." 172 P. at 100.[34] Perhaps not coincidentally, the 1950 opinion clashes with at least four earlier opinions of

---

[32] Although research reveals no other case that has directly examined this issue, a number of prior opinions proceeded from the uncontested assumption that the United States, in 1905, appropriated all unappropriated water rights in the Basin. *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1209 (9th Cir. 2000) ("In 1905, in accordance with state water law and the Reclamation Act, the United States appropriated all available water rights in the Klamath River and Lost River and their tributaries in Oregon and began constructing a series of water diversion projects."); *Kandra*, 145 F. Supp. 2d at 1196 (same); *PCFFA,* 138 F. Supp.2d at 1230 (same); *Klamath Water Users Ass'n v. Patterson*, 15 F. Supp. 2d 990, 991-92 (D. Or. 1998) (same). Moreover, other state courts construing state law provisions identical to the Oregon law have similarly concluded that the United States obtained all available appropriative water rights in given reclamation water simply by filing an appropriate notice. *See Oklahoma Water Resources Bd. v. Foss Reservoir Master Conservancy Distr*., 527 P.2d 162, 163-65 (Okla. 1974); *City of Stillwater v. Oklahoma Water Resources Bd.*, 524 P.2d 938, 943 (Okla. Civ. App. 1974) (federal government granted "appropriative water rights to unappropriated water simply by filing notice of intent to utilize it").

[33] In holding that interests adverse to those of the United States could arise independently under state law, the 1950 opinion not only clashes with the portion of 1905 Act that provides waters appropriated via the notice "shall not be subject to further appropriation under the laws of this state," but also with the portion that states "[n]o adverse claims to the use of the water required in connection with such plans shall be acquired under the laws of this State" except as "may be formally released in writing by an officer of the United States."

[34] The 1950 opinion appears to proceed from the mistaken view that the *Ickes* line of cases somehow overruled the opinions in *Umatilla, supra*, thus adopting the same overly-expansive interpretation of the *Ickes* line that underlies plaintiffs' claims here. *See* 25 Op. Atty. Gen. at 64. While the opinion also makes a glancing reference to the "beneficial use" language

the Oregon Attorney General. The first of these, issued in 1925, ordered the State Engineer to revoke a water permit that had been provided to a power company, finding, based upon the 1905 Act, that "[i]t is clear, therefore, that the waters of Upper Klamath Lake are thereby withdrawn in favor of the federal government and that no private person or corporation can acquire the right to the use of any thereof except such as may be hereafter specifically released by the federal government." Op. Or. Atty. Gen. 321, 322 (Jul. 1, 1925). Five years later, the Attorney General, in opining against a power company's application for a water appropriation, discussed, at length, the 1905 Act and the *Umatilla* opinions, finding that "based upon the statute as interpreted by the supreme court," "without release by the federal government," there was no water "subject to appropriation at this time." Op. Or. Atty. Gen. 43, 47 (Nov. 14, 1930). Lastly, on two occasions in 1931, when requested to comment on bills involving the Klamath waters pending before the Oregon legislature, the Attorney General responded – "As a matter of law, as decided by the supreme court in the case of *In re Waters of Umatilla River* . . . it seems clear that no such appropriations subsequent to the act of 1905, above cited, are valid, until the United States government releases a portion of the waters above mentioned from the appropriation made by it under the provisions of said act of 1905." Op. Or. Atty. Gen. 134-35 (Feb. 25, 1931) and Op. Or. Atty. Gen. 143, 144 (Mar. 5, 1931). Forced to choose between the solitary 1950 opinion, on the one hand, and the opinions of the Oregon Supreme Court, as well as others of the Oregon Attorney General, on the other, the court opts for the latter, particularly since the analysis therein comports with the plain language of the 1905 Act.[35]

Accordingly, the court concludes that, pursuant to relevant Oregon law, in 1905, the United States obtained rights to the unappropriated water of the Klamath Basin and associated tributaries. Of course, this conclusion only goes so far – at least initially. It does not answer whether any of the individual plaintiffs hold water rights that predate the 1905 notice – in other words, that were already appropriated as of the date of the filing. Nor does it reveal whether any

---

in section 8, *id*. at 63, any notion that the latter section somehow trumps the 1905 Act ignores not only the legislative history of that section, which focuses on preventing monopolistic control by private entities, but also the Supreme Court's admonition that, in implementing the reclamation laws, the Secretary should "follow state law in all respects not directly inconsistent with the[] directives" of section 8. *California*, 438 U.S. at 678. Indeed, if the 1905 Oregon law were viewed as being "directly inconsistent" with the "beneficial use" requirement of section 8, it also would be directly inconsistent with section 8's requirement that water rights be "appurtenant to the land irrigated." The result would be to render the entire 1905 Act invalid. Plaintiffs do not make this argument, perhaps recognizing that Congress did not intend the appurtenancy/ beneficial use clause of section 8 to be wielded in this disruptive fashion.

[35] Flaws similar to those found in the 1950 opinion are exhibited in the position the Oregon Attorney General has taken in the Adjudication. *See* In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River, a Tributary of the Pacific Ocean, Oregon Water Resources Department's Closing Brief on Reply 36-41 (Jul. 14, 2005).

of the individual plaintiffs hold water rights that post-date the 1905 notice – that were obtained from the United States. The court will consider these possibilities *seriatim*.

### 1. Pre-1905 Potential Interests

"Prior to 1909, there was no comprehensive state regulatory system in Oregon for water." Simmons, *supra*, at 130. Under Oregon law, to establish a right to the use of water prior to the adoption of the Water Rights Act of 1909, three elements had to be proven:

> (1) An intent to apply [the water] to a beneficial use, existing at the time or contemplated in the future; (2) a diversion from the natural channel by means of a ditch, canal or other structure; and (3) an application of it within a reasonable time to some useful industry.

*In re Water Rights in Silvies River*, 237 P. 322, 336 (Or. 1925); *see also In re Rights of Deschutes River and Tributaries*, 286 P. 563, 567 (Or. 1930); *Low v. Rizor*, 37 P. 82, 84 (Or. 1894). The Oregon Water Rights Act of 1909 essentially preserves rights obtained in this fashion prior to February 24, 1909, when that statute took effect – such rights are vested, but undetermined pending an adjudication. *See* Or. Rev. Stat. 539.010(4) ("[t]he right of any person to take and use water shall not be impaired or affected by any provisions of the Water Rights Act" where various conditions are met); *see also Staub v. Jensen*, 178 P.2d 931 (Or. 1947).

Defendant asserts that "to the extent that any waters in the Klamath Basin were 'unavailable' because such water already had been appropriated under state law to be used on lands identified as part of the Klamath Project, [the Bureau] acquired all of these 'pre-Project' water rights and integrated them into the Project." These acquisitions are detailed in various documents, including a 1911 report of the Board of Army Engineers,[36] as well as a stipulation of facts filed in the Klamath Basin Adjudication, which involves many of the plaintiffs here and defendant.[37] Plaintiffs do not seriously contest that this occurred and, indeed, have provided no pre-1905 documentary evidence of water rights that they claim are still existing. However, they asseverate that the alleged pre-1905 rights of at least seven parties[38] were exchanged by them (or their antecedents) for a perpetual right to receive water from the Klamath Project, thereby

---

[36] *See* "Fund for Reclamation of Arid Lands: Message of the President of the United States Transmitting a Report of the Board of Army Engineers in Relation to the Reclamation Fund," H. R. Doc. No. 61-1262, at 119-20 (1911).

[37] *See In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River, a Tributary of the Pacific Ocean*, Statement of Stipulated Facts (hereinafter "Adjudication Stipulation of Facts") 49, 54, 58, 63, 66, 73, 77 (Aug. 4, 2003).

[38] The affected parties are the Van Brimmer Ditch Company, Mike J. Byrne, Daniel W. Byrne, Deloris Chin, Daniel G. Chin, Cheryl M. Moore and James L. Moore.

creating, in their view, beneficial interests in the water. In fact, these exchanges appear to have taken the form of a series of post-1905 contracts between the United States and various entities, under which the former made various commitments regarding the Klamath Project waters. It appears that whatever property interests may still exist in those waters derive from, and are limited by, those commitments, a subject to which the court now turns.

### 2. Post-1905 Potential Interests

The 1909 Oregon Water Rights Act established a procedure under which persons could obtain a certificate to divert and use water for specified purposes. *See* Or. Rev. Stat. §§ 537.120, *et seq*. The water rights created under this law were generally characterized by a priority date, an authorized point of diversion, an authorized rate of diversion, a place of use, purpose of use, season of use and a "duty" expressed in acre-feet per acre. *Id*. at § 537.140; *Tudor v. Jaca*, 164 P.2d 680, 686-87 (Or. 1945); *see also* Simmons, *supra*, at 130. But, these provisions did not apply to the Klamath Project water, given the 1905 Oregon law's admonition that "[n]o adverse claim to the use of the water required in connection with such plans shall be acquired under the laws of this state except as for such amount of said waters described in such notice as may be formally released in writing by an officer of the United States thereunto duly authorized which release shall also be filed in the office of the state engineer." Instead, it appears that whatever interests were obtained by the plaintiffs after 1905 were obtained – necessarily so – directly from the United States, as the Klamath Project was constructed.[39] *See Israel v. Morton*, 549 F.2d 128, 132-33 (9th Cir. 1977) ("Project water" is "not there for the taking (by the landowner subject to state law), but for the giving by the United States. The terms upon which it can be put to use, and the manner in which rights to continued use can be acquired, are for the United States to fix.").

These transactions – a subset of the approximately 250 Klamath water distribution arrangements still being administered by the Bureau – occurred at different times and took various forms. Since plaintiffs' rights under Oregon law appear to be inextricably linked to these transactions, it is appropriate to examine them at greater length.

Distribution of interests in the water of the Klamath Project began even before the works were constructed. Early on, owners of riparian or littoral rights to certain water bodies exchanged those rights for a right to receive water from the Klamath Project. Among the earliest such agreements was a November 6, 1909, contract between one of the plaintiffs, the Van Brimmer Ditch Company, and the United States, in which the former agreed to –

---

[39] A detailed description of the construction of the various phases of the Klamath Project is provided in the Adjudication Stipulation of Facts, *supra*, at 76-86. This summary states, in part, that: "[a]s part of the development of the Klamath Project, lands and rights of way were acquired for facilities. In addition, waivers of riparian rights were secured from a large number of landowners on the Lost River, Tule Lake and along Klamath River." *Id*. at 77.

> waive[] and renounce[] to the use and benefit of the United States any and all of its riparian rights, in relation to the waters and shores of Lower Klamath Lake appurtenant or incident to the lands now being irrigated by the Company, or any other lands now owned or controlled by the Company, and also waives and renounces any and all claims for damages consequent upon or arising from any change of the course or water-level of the said Lower Klamath Lake, and its tributaries, due to the operations of the United States.

In exchange, the United States agreed to "deliver to the Company during each and every irrigation season . . . a quantity of water, not to exceed fifty second feet, in which the Company claims the right to the exclusive use to irrigate sufficiently" certain defined pieces or parcels of land.[40] The contract further provided that "[n]o interest in this agreement shall be transferred to any other party, and any such transfer shall cause annulment of the contract so far as the United States is concerned. . . ." Nonetheless, the United States agreed to recognize "the right as existing in the Company to the perpetual use of said fifty (50) second-feet of water, according to the provisions herein set forth, subject, however, to any possible established priority to the use of said fifty (50) second-feet of water, other than such as may be claimed by the United States or those claiming thru it."

While there are indications that other individuals exchanged pre-1905 water rights for a right to receive water from the Klamath Project, the record reveals no details of any such agreements as to any of the plaintiffs, other than the Van Brimmer Ditch Company.

More commonly, the United States or the Bureau agreed to provide water to certain irrigators in exchange for payments designed to cover the cost of the project. On November 6, 1905, the United States entered into such an agreement with the Klamath Water Users Association, an Oregon corporation, whose incorporators and shareholders were owners of land within the Klamath Basin. The agreement, again executed prior to the time the irrigation works were constructed, did not purport to ascertain or determine "the extent of the individual appropriation of such water," or the "relative priority and extent of their several appropriations." Rather, these issues were to be determined under the rules and principles adopted by the Association. The agreement provided that only those who became members of the Association could be "accepted as applicants for rights to the use of water available by means of [the] proposed irrigation works." It further stated that "the aggregate amount of such rights to be issued shall, in no event, exceed the number of acres of land capable of irrigation by the total amount of water available for the purpose," and that "the Secretary of the Interior shall determine

---

[40] Plaintiffs assert that this contract recognized the ditch company's prior vested right to use the water for irrigation purposes. It did not. Instead, it merely recited that "the Company claims that is has established a vested right to the use of fifty second feet of water for irrigation purposes from the water of Lower Klamath Lake . . ."

the number of acres so capable of such irrigation as aforesaid . . ."[41] Payments were to be made for the water rights to be issued to the shareholders of the Association, with the "cost of said proposed irrigation works [to be] apportioned equally per acre among those acquiring such rights." In the agreement, the Association guaranteed these payments and agreed to take various steps to collect them on behalf of the United States.

Following the execution of this contract, various landowners entered into stock subscription agreements and contracts with the Association, which provided for the issuance of one share of stock for each acre of irrigable land owned by the water user within the Klamath Project boundaries. Each such landowner desiring to receive water through Project facilities filed a Water-Right Application for Land in Private Ownership with the Department of Interior. These so-called "Form B" applications typically provided that "the measure of the water right" applied for was "that quantity of water which shall be beneficially used for irrigation" of the applicant's land, "but in no case exceeding the share of proportionate to irrigable acreage, of the water supply actually available as determined by the Project Manager or other proper officer of the United States."

The United States also entered into various water arrangements in conveying or leasing land reclaimed under the Klamath Project to homesteaders. Under Oregon and California law, this land was ceded to the United States and was opened to homesteaders over several decades, beginning in the late 1910s. *See* United States Department of the Interior, "Klamath Project: Historic Operation" 6 (Nov. 2000). The homesteaders obtained a right to the use of water through the Klamath Project in a multi-step process. Upon initial entry, the homesteaders generally filed a temporary water right application in which they agreed to include the land within an irrigation district and to repay a proportionate cost of the construction of the Klamath Project. Upon fulfilling the requirements for a homestead, the settlers filed an application for a permanent water right. In this so-called "Form A" water rights application, the homesteader applied "for a permanent water right for the irrigation of and to be appurtenant to all of the

---

[41] Regarding these water rights, the agreement further provided –

> That in all the relations between the United States and this Association and the members of the Association, the rights of the members of the Association to the use of water where the same have vested, are to be defined, determined and enjoyed in accordance with the provisions of [the Reclamation Act of 1902] and of other acts of Congress on the subject of the acquisition and enjoyment of the right to use water; and also by the laws of the States of Oregon and California where not inconsistent therewith, modified, if modified at all, by the provisions of the articles of incorporation and by-laws of said Association.

It also indicated that any rules or regulations subsequently promulgated by the Secretary for the administration of the water to be supplied were to be treated as if they expressly had been incorporated in the agreement.

irrigable area now or hereafter developed" on the applicant's land. The application further stated that "[t]he quantity of water to be furnished hereunder shall be that quantity which may be applied beneficially in accordance with good usage in the irrigation of the land." However, in case of water shortages, the amount to be delivered would be "an equitable proportionate share . . . of the water actually available at the time," with that proportionate share "to be determined by the project manager," who, "[i]n distributing and apportioning the water," was permitted "to take into consideration the character and necessities of the land." The application further cautioned that "[o]n account of drought, inaccuracy in distribution, or other cause, there may occur at times a shortage in the water supply," and that "such shortages" would in no event result in liability on the part of the United States "for any damage direct or indirect arising therefrom." It was anticipated that certificates would be issued to these homesteaders, but there is no indication that any of the plaintiffs actually received such certificates. Several of the individual irrigators possess patent deeds apparently stemming from these applications, which grant to them a tract described, "together with the right to the use of water from the Klamath Reclamation Project as an appurtenance to the irrigable lands in said tract."

Additional contracts between the United States and certain individuals and entities were entered into under the Warren Act of 1911, ch. 141, 36 Stat. 925 (codified at 42 U.S.C. §§ 523-35), which authorized the Secretary to sell surplus water to non-project irrigators. These contracts provided for a water supply at a given point, but placed the responsibility on the contractor to construct all the necessary conveyance facilities. These contracts typically included clauses holding the United States not liable for the failure to supply water caused by drought.[42]

Over time, many of the above-referenced contracts were subsumed and supplanted by contracts between the United States or the Bureau and various water districts. For example, in 1917, the stockholders of the Association desired to form irrigation districts that would assume the debt to the United States and, on December 8, 1917, created the Klamath Irrigation District (KID). On July 6, 1918, the United States, the KID and the Association entered into an agreement whereby the KID assumed the obligations of the Association and its stockholders.[43] Later, on April 10, 1922, the United States entered into another contract with the KID in which the latter assumed the liability for the annual cost of carrying and delivering water to the Van Brimmer Ditch Company. The Klamath Irrigation District continues to deliver water to Van Brimmer. On November 29, 1954, the United States entered into an "amendatory contract" with KID that restated the parties' obligations regarding the delivery of water and payments therefor. Paragraph 26 of this agreement provided:

---

[42] Examples of such provisions may be found, for example, in a 1952 contract between the United States and the Midland District Improvement Company.

[43] The Contract between KID and the United States was amended six times between 1920 and 1950. In 1954, a seventh amendment of the contract provided that KID would assume the obligation of the United States for the delivery of water to other districts and private Warren Act contractors who received water through the delivery system that served KID.

> On account of drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs and, while the United States will use all reasonable means to guard against such shortage, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom and the payments to the United States provided for herein shall not be reduced because of any such shortage.

Virtually identical clauses absolving the United States from liability associated with "drought or other causes" appeared in contracts between the United States and various other districts in Oregon, including the Sunnyside Irrigation District (entered into in 1922), the Malin Irrigation District (1922), the Shasta View Irrigation District (1948), and the Klamath Basin Improvement District (1962). Somewhat similar, although not identical, "shortage" clauses appeared in other district contracts, including those with the Pine Grove Irrigation District (entered into in 1918), the Enterprise Irrigation District (1920), the Midland District Improvement Co. (1952), and the Poe Valley Improvement District (1953).[44]

In 1956, as authorized by the Act of August 1, 1956, Pub. L. 877, the Bureau also entered into a contract with the Tulelake Irrigation District (TID), which had been formed in 1952 by landowners in Modoc and Siskiyou Counties, California. As with similar contracts, under this contract, TID assumed the responsibility for the operation and maintenance of certain (but not all) project works within the Klamath Project and for delivering water within the district. The contact provided for the collection by TID, and payment to the United States, of outstanding repayment obligations of landowners within the district. As in many of the other district contracts, paragraph 26 of this contract provided –

> On account of drought or other causes, there may occur at times a shortage in the quantity of water available by means of the Project and, while the United States will use all reasonable means to guard against such shortage, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom and the payments to the United States provided for herein shall not be reduced because of any such shortage.

In addition, the contract provided that "[i]n the event a shortage of water available from the Klamath Project arises as a result of drought or other unavoidable causes, the United States may apportion the available supply among the District and others having rights of priority equal to the rights of the District." The repayment obligations subsumed by this contract included those of

---

[44] Commonly, these contracts included a water shortage clause stating that "[t]he United States shall not be liable for failure to supply water under this contract caused by hostile diversion, drought, interruption of service made necessary by repairs, damages caused by floods, unlawful acts, or unavoidable accidents."

certain of the homesteaders discussed above, as well as those associated with the Warren Act contract lands.

Finally, it appears that two of the plaintiffs, the Klamath Drainage District and the Klamath Hills District Improvement Company, hold water right permits that evidence their ownership of a "vested and determined water right" under Oregon law. These permits, which were limited both in terms of a specific cubic feet per second of water, as well as to the amount of water that could be applied to beneficial use, were issued after the State of Oregon repealed the 1905 law in 1953.

### 3. The Nature of the Interest Created in the Post-1905 Transactions

Based on the foregoing, it appears that the various plaintiffs' interests in the Klamath Project water fall into five basic categories: (i) interests based upon an exchange agreement, in which preexisting water rights were exchanged for an interest in the Project water; (ii) interests deriving from district contracts with the United States or the Bureau, claimed by the districts; (iii) interests deriving from the district contracts with the United States, claimed by individual irrigators as alleged third-party beneficiaries; (iv) interests based upon application for the beneficial use of water filed either by homesteaders on reclaimed lands (Form A), or by homesteaders or other landowners whose property does not involve reclaimed lands (Form B), and the patent deeds issued allegedly in response thereto; and (v) interests based upon alleged water rights permits granted by the State Oregon after the repeal of the 1905 Oregon legislation in 1953. As detailed in the accompanying Appendix A, at least one of these categories covers each of the plaintiffs.

#### a. Interests based on contracts

The first three categories listed above all involve claims based upon contracts with the United States. It is, of course, well-established that "[r]ights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch v. United States*, 292 U.S. 571, 579 (1934).[45] Nonetheless, the Federal Circuit "has cautioned against commingling takings compensation and contract damages." *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001). In *Hughes*, the plaintiff asserted that NASA's breach of a contract to launch its satellites amounted to a takings, entitling it to prejudgment interest. The Federal Circuit rejected this claim, reasoning –

---

[45] *See also Bass Enter. Prod. Co. v. United States*, 133 F.3d 893, 896 (Fed. Cir. 1998); *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 737 (2004); *see generally Ruckleshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984).

> If, as Hughes, asserts, the Government's breach of the [contract] was a taking under the Fifth Amendment, then nearly all Government contract breaches would give rise to compensation under the Fifth Amendment . . . Indeed, "the concept of taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." . . . Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. . . . Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights . . .

*Hughes*, 271 F.3d at 1070 (quoting *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978). These principles have been applied by the Federal Circuit and this court in rejecting a wide range of Fifth Amendment takings claims deriving from the alleged interference with contract rights. S*ee J.J. Henry Co. v. United States*, 411 F.2d 1246, 1249 (Ct. Cl. 1969); *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 303 (2003) (noting that it is inappropriate to permit a plaintiff "to pursue a takings remedy in order to circumvent the limitations inherent in its contractual relationship with the Government"); *Home Sav. of Am., F.S.B. v. United States*, 51 Fed. Cl. 487, 494 (2002) (same).

In the *Winstar* context, the refusal to invoke takings principles has been explained as directly resulting from the availability of contract remedies. As Justice Scalia wrote in his concurrence in *Winstar*, "[v]irtually ***every*** contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: 'The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, – and nothing else.'" *United States v. Winstar Corp.*, 518 U.S. 839, 919 (1996) (Scalia, J., concurring) (citations omitted) (emphasis in original); *see also Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379-80 (Fed. Cir. 2001). More recently, in *Castle v. United States*, 301 F.3d 1328 (Fed. Cir. 2002), the Federal Circuit opined that "despite breaching the contract, the government did not take the plaintiffs' property because they retained 'the range of remedies associated with the vindication of a contract.'" *Id*. at 1342 (quoting *Castle v. United States*, 48 Fed. Cl. 187, 219 (2000)). Instead of conferring a right protected from a taking, "the contract promised either to regulate [plaintiffs] consistently with the contract's terms, or to pay damages for breach." *Id*; *see also Baggett Transp. Co. v. United States*, 969 F.2d 1028, 1034 (Fed. Cir. 1992); *Franconia*, 61 Fed. Cl. at 737-38; *Fifth Third Bank of West. Ohio v. United States*, 57 Fed. Cl. 586, 588-89 (2003); *McNabb v. United States*, 54 Fed. Cl. 759, 778-79 (2002). Under this approach, the availability of contract remedies is sufficient to vitiate a takings claim, even if it ultimately is determined that no breach occurred. *See, e.g.*, *Baggett Transp.*

*Co.*, 969 F.2d at 1034 (no breach of contract and no takings); *Canal Elec. Co. v. United States*, 65 Fed. Cl. 650, 656 (2005) (takings claim dismissed, contract claim allowed to proceed).[46]

Both of the rationales favoring the use of contractual remedies over takings remedies apply here – that is, the United States may be viewed as acting in its proprietary capacity in entering into the water contracts in question, and it appears that the affected plaintiffs retain the full range of remedies with which to vindicate their contract rights. It follows that while the contracts between the districts and the United States, as well as that between Van Brimmer and the United States, gave rise to private property rights within the meaning of the Fifth Amendment, the proper remedy for the alleged infringement lies in a contract claim, not one for a takings. *See Franconia*, 61 Fed. Cl. at 739-40; *Allegre Villa v. United States*, 60 Fed. Cl. 11, 18-19 (2004); *Detroit Edison Co.*, 56 Fed. Cl. at 303. The situation here is distinguishable from those encountered by the Federal Circuit in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) and *Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003), in which the court allowed takings claims to proceed. In both those cases, plaintiffs entered into loan agreements with private lenders that were insured by HUD. The government subsequently restricted the plaintiffs' prepayment right, which the appeals court ruled was a takings. However, because their contracts were with private lenders, the plaintiffs in *Cienega Gardens* and *Chancellor Manor* were not in privity with the Government; thus, no contract claim against the Government was available to address the subsequent prepayment limitations by the Government. Such is not the case here as to the contracts involving the districts and Van Brimmer. *See Franconia*, 61 Fed. Cl. at 740 n.34; *Allegre Villa*, 60 Fed. Cl. at 19.

The foregoing analysis, of course, applies to the individual irrigators only to the extent that they actually have contract claims against the United States. For that to be true, "there must be privity of contract between the plaintiff and the United States." *Chancellor Manor*, 331 F.3d

---

[46] To be sure, some cases suggest that, under this rule, a takings claim is resurrected if a breach of contract is not found, *see System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 172-73 (2005). But such suggestions reflect a misunderstanding of the rationale for this rule. At least as described in *Winstar* and *Castle*, the rule favoring contract remedies depends upon there being symmetry between the contract rights to be enforced and the contract damages that are potentially available. Once this symmetry is established, a finding on the merits that no breach occurred does not break that relationship, but merely reflects that the contract rights that were asserted either never existed or were not adversely affected by the government's actions. Under either scenario, those same contract rights cannot provide the predicate for a takings because the government cannot take what the clamant does not have. *See, e.g., Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1579-80 (Fed. Cir. 1997); *see also B& B Trucking, Inc v. U.S. Postal Serv.*, 406 F.3d 766, 769 (6th Cir. 2005) (no taking of a contract right where that right did not exist); *McNabb v. United States*, 54 Fed. Cl. 759, 779 (2002) (same).

at 899.[47] Such privity would exist if the irrigators are properly viewed as third-party beneficiaries to the district contracts. *See Chancellor Manor*, 331 F.3d at 901; *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999). "In order to prove third party beneficiary status," the Federal Circuit has instructed, "a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), *amended on reh'g*, 273 F.3d 1072 (Fed. Cir. 2001); *Anderson v. United States*, 344 F.3d 1343, 1352 (Fed. Cir. 2003). "The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby." *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). The cases thus have distinguished between those instances where a party "show[s] that [the contract] was intended for his direct benefit," *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912), and those in which it is shown only that an individual was an "incidental and indirect beneficiar[y]," *Schuerman v. United States*, 30 Fed. Cl. 420, 433 (1994); *see also Castle*, 301 F.3d at 1337-38; Restatement (Second) of Contracts (Restatement) § 302 & illus. 2 (distinguishing between intended and incidental beneficiaries).[48] The requisite intent may be ascertained by "ask[ing] whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." *Montana*, 124 F.3d at 1273.

Plaintiffs assert that under the plain language of the various district contracts, a number of the irrigators are third-party beneficiaries and thus entitled to enforce those contracts' terms. *See* Restatement § 304; *cf. id.* at § 315. None of the parties disagree that this question may be resolved by reference to the language of the relevant contracts.[49] A review of the relevant district

---

[47] *See also, e.g.*, *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) ("The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity."); *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994) ("Absent privity between [plaintiffs] and the government, there is no case.").

[48] The Restatement explains, in pertinent part –

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement § 302; *see also Klamath Water Users Protective Assn.*, 204 F.3d at 1211.

[49] It is, of course, axiomatic that this court must construe a Federal contract in terms of the parties' intent, primarily based on the plain meaning of the language employed. *See, e.g.*,

contracts reveals that they each express the intent of the relevant district and the United States to benefit the irrigators directly by having the district assume the primary responsibility for providing water within the district in exchange for collecting amounts owed by the irrigator in payment for their water. For example, the 1956 contract between the Tulelake Irrigation District and the United States provides –

> Contracts between the United States and landowners within the District in effect at the time of the execution of this contract are set forth in Exhibit '2' attached to and by this reference made a part of this contract. Said contracts . . . shall remain in full force and effect, except as otherwise modified herein, and the District shall perform, in accordance with the true intent and meaning of such contracts, the obligations of the United States described therein and shall recognize all of the rights as set forth in said contracts.

Similar provisions may be found in each of the district contracts. Moreover, some of these contracts specifically indicate that the district is the "duly authorized representative" of the water users within the district, and provide that the Secretary shall maintain oversight over water deliveries and shall resolve disputes between the districts and the individual irrigators. All of these provisions, of course, are evidence that the purpose of the contracts was to provide benefits to the latter users.

Beyond this, several cases in this circuit have found that similarly-situated irrigators were third-party beneficiaries under drainage district agreements apparently like those at issue here. Principal among these is *H.F. Allen Orchards v. United States*, 749 F.2d 1571 (Fed. Cir. 1984), in which the Federal Circuit reversed a decision of this court which had held that irrigators similarly situated to the irrigators in this case were not third-party beneficiaries. There, the court concluded –

> Finally, we disagree with the Claims Court's determination that appellants were not correct parties to sue under the consent decree and subsequent alleged implied contracts. It is undisputed that appellants have a property right in the water to the extent of their beneficial use thereof. *Fox v. Ickes*, *supra*. The irrigation districts, which contracted with the Bureau, act as a surrogate for the aggregation of farmers. They use no water themselves. The farmers ultimately pay for all the services which the government supplies. It is clear that the appellants, owners of the property at issue, the water, also are intended third-party beneficiaries of the 1945 Consent Decree. Under the rules of the Claims Court "every action shall be

---

*Winstar Corp.*, 518 U.S. at 911 (Breyer, J., concurring); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991); *Franconia*, 61 Fed. Cl. at 729-30. While the question whether a given individual is a third-party beneficiary is a mixed question of law and fact, it has, in appropriate circumstances, been resolved in the context of a motion for summary judgment. *See, e.g., Guardsman Elevator Co., Inc. v. United States*, 50 Fed.Cl. 577, 582 (2001).

> prosecuted in the name of the real party in interest." Claims Court R. 17(a). Here the farmers, owners of the water and beneficiaries of the irrigation projects, are the true parties in interest.

*Id*. at 1576.[50] While defendant correctly notes that *H.F. Allen Orchards* is distinguishable in some regards – most notably in terms of the interests the irrigators had in the pertinent water under Washington law – it appears that the Federal Circuit's decision also was grounded on provisions in the district contract that were viewed as directly benefitting the irrigators there. Indeed, the opinion of this court that was reversed by the Federal Circuit contained a detailed analysis of the provisions of that contract – one with which the Federal Circuit eventually disagreed. *See H.F. Allen Orchards v. United States*, 4 Cl. Ct. 601, 609-13 (1984). Moreover, several other decisions of this court have concluded that irrigators in similar situations had enforceable rights against the United States as third-party beneficiaries. *See Henderson County Drainage Dist. No. 3. v. United States*, 53 Fed. Cl. 48, 52 (2002) ("The court finds that the plaintiff landowners 'would be reasonable in relying on the promise' to the drainage districts, if any, made in the releases and are therefore third party beneficiaries of any contractual undertakings by defendant in the releases."); *see also Barcellos & Wolfsen, Inc. v. Westlands Water Dist*., 899 F.2d 814, 816-17 (9th Cir. 1990); *Henderson County Drainage Dist. No. 3 v. United States*, 60 Fed. Cl. 748, 756 n.9 (2004), *aff'd*, 2005 WL 1395109 (Fed. Cir. Jun. 14, 2005); *Schuerman v. United States*, 30 Fed. Cl. 420, 430 (1994); Benson, *supra*, at 394 ("[A]s third party beneficiaries of such contracts water users can sue to protect their rights to receive project water.").[51]

---

[50] The *Fox* decision cited in *H.F. Allen Orchards* was that of the D.C. Circuit, on remand from the Supreme Court. *See H.F. Allen Orchards*, 749 F.2d at 1575 (citing *Fox v. Ickes*, 137 F.2d 30 (D.C. Cir. 1943)). Consistent with the construction of the *Ickes* line of cases outlined above, this D.C. Circuit opinion heavily relied upon Washington State law. *Fox*, 137 F.2d at 33 (Secretary "must distribute the available water according to the priorities among the different users which are established by the law of the State of Washington.").

[51] To be sure, the Ninth Circuit reached a different conclusion in *Orff v. United States*, 358 F.3d 1137 (9th Cir. 2004). The Supreme Court recently affirmed that decision – not based upon the Ninth Circuit's third-party beneficiary analysis, but rather based upon the conclusion that Congress had not waived the sovereign immunity of the United States to allow such a suit to proceed in the district courts. *See Orff*, 125 S. Ct. at 2609-11. While defendant relies upon the Ninth Circuit's decision in *Orff*, as well as several other Ninth Circuit cases, *see, e.g., Klamath Water Protective Ass'n*, 204 F.3d at 1211-12, this court, of course, is bound to follow the contrary decision of the Federal Circuit. *See also Christopher Village*, *L.P. v. United States*, 360 F.3d 1319, 1329-30 (Fed. Cir. 2004) (holding void a regional circuit's ruling in a case in which that court lacked jurisdiction). Moreover, the circumstances of this case certainly are different from those in which individual members of the public were deemed incidental beneficiaries of government contracts. *Cf.* Restatement § 313; *see also Schuerman*, 30 Fed. Cl. at 429-30.

Accordingly, the court must conclude that the individual irrigators here are third-party beneficiaries of the district contracts. Because of this, their claims against the United States also sound in contract, not in takings. This result makes particular sense in the context of this case, in which, from a contracts perspective, the irrigators claiming interests based upon their contracts with the districts cannot possibly have rights to water that exceed the limitations found in the contracts between those districts and the United States. Simply put, plaintiffs could not obtain an interest from the districts better than what the districts themselves possessed or once possessed – "*nemo dat qui non habet*," the venerable maxim provides, "one who does not have cannot give."[52] Indeed, while "rights that arise independently from the contract may be brought through a takings action," *Allegre Villa*, 60 Fed. Cl. at 18,[53] such is not the case as to the third-party beneficiaries here. Rather, even to the extent that they may claim that there was a taking of their contract rights *vis a vis* the districts, it remains that those rights are entirely subsumed within the contract claim based on the alleged breach, by the United States, of the district contracts. Benson, *supra*, at 397 ("Because users' rights to project water arise from reclamation contracts, the contracts necessarily limit those rights."). As such, the irrigators qualifying as third-party beneficiaries must proceed in contract. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 656 (2003); *Coast Federal Bank, FSB v. United States*, 48 Fed. Cl. 402, 443-44 (2000); *Medina Constr. Ltd. v. United States*, 43 Fed. Cl. 537, 560 (1999).[54]

So where does this leave us? Before this case was reassigned, briefing was stayed on the ultimate issue whether the Bureau breached the district contracts in question in 2001.

---

[52] *See* Black's Law Dictionary 1736 (8th ed. 2004). This common sense principle and a corollary – *nemo plus juris ad alienum transferre potest quam ipse haberet* – have been applied in a variety of contractual contexts. *See, e.g., Wilbur v. Almy*, 53 U.S. 180, 181 (1851); *United States v. Harris*, 246 F.3d 566, 574-76 (6th Cir. 2001); *Commerce Bank, N.A. v. Chrysler Realty Corp.*, 244 F.3d 777, 783 (10th Cir. 2001); *United States v. Lavin*, 942 F.2d 177, 185-86 (3d Cir. 1991); *see also* 3 E. Allan Farnsworth, Farnsworth on Contracts § 11.5 (2d ed. 2001).

[53] *See also, e.g., Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed. Cl. 30, 34-35 (1998).

[54] In a separate motion for partial summary judgment filed on March 14, 2005, plaintiffs asserted that the various districts in this case had the constitutional and prudential standing to assert not only the claims they have in their own right, but also to assert, in a representational fashion, claims on behalf of the individual landowners. While defendant, in its opposition to this motion filed on May 4, 2005, disagreed that the districts had such standing to assert any takings claims, it agreed that the districts had the ability to assert contract claims on their own behalf and on behalf of the individual landowners, provided this court concluded that the landowners were third-party beneficiaries to the district contracts. Based upon its rulings above, as well as defendant's concessions, the court concludes that the districts have standing to assert not only their contract claims, but, to the extent relevant, those of the third-party irrigators.

Accordingly, that issue must await another day. But, based upon arguments fully briefed by the parties, several observations regarding the nature of the contract rights at issue are appropriate.

First, for most of the district contracts *sub judice*, plaintiffs' "beneficial interest" in the Klamath Project water is not, as they claim, an absolute right, limited only by appurtenancy and beneficial use. This is particularly true as to those contracts which provide, either in exact or similar terms, that the government shall not be liable for "water shortages" resulting from "drought or other causes." The plain language of these provisions expressly absolves the United States from liability for all types of water shortages – not only the hydrologic causes, as claimed by plaintiffs, but also any other cause that impacts the availability of water through the system. *See Barcellos and Wolfsen, Inc. v. Westlands Water Dist.*, 849 F. Supp. 717, 723-24 (E.D. Cal. 1993) ("The express language of [the shortage clause] negates any absolute contract right in Movants to the unqualified delivery of irrigation water."); Brian Gray, "The Property Right in Water," 9 Hastings W. – Nw. J. Envtl. L. & Pol'y 1, 26 (2002) ("The Klamath Project water contracts . . . expressly absolve the United States of liability for all types of water shortages – hydrologic, regulatory, or hybrid – that may occur within the system."). From a contractual standpoint, the shortage clauses thus limit plaintiffs contractual rights and thus become the focus of whether a breach occurred when water deliveries were strictly limited in 2001.

Notably, various courts have construed similar water shortage clauses as protecting the United States from damages based upon the enforcement of the ESA. In *O'Neill v. United States*, 50 F.3d 677, 682-84 (9th Cir. 1995), for example, the Ninth Circuit held that the terms of the water delivery contract did not obligate the Bureau to deliver the full contractual amount of water if such delivery would not be consistent with the ESA and a second statute, the Central Valley Project Improvement Act, Pub. L. No. 102-575, 106 Stat. 4706. *Id*. at 681. In terms reminiscent of several of the district contracts here, Article 11(a) of the water service contract at issue provided that the government would not be held liable for "any damage, direct or indirect, arising from a shortage on account of errors in operation, drought, or any other causes." 50 F.3d at 682. The Ninth Circuit concluded that this language absolved the Bureau of any liability for complying with the Congressional mandates, observing that –

> [T]he terms of Article 11(a) admit of one meaning and are internally consistent. On its face, Article 11 (a) unambiguously disclaims any liability for damages in the event the United States is unable to supply water in times of shortage. Clearly captioned "United States Not Liable for Water Shortage," Article 11 explicitly recognizes that "[t]here may occur at times during any year a shortage in the quantity of water available for furnishing to the District" and provides that "in no event shall any liability accrue against the United States . . . for any damages . . . arising from a shortage on account of errors in operation, drought, ***or any other causes***." . . . As the district court duly noted, there are no enumerated exceptions to this provision . . .

*Id*. at 683 (emphasis in original). The court concluded that "the contract's liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation

constitutes a shortage by reason of 'any other causes.'" *Id*. at 684. Other cases, involving shortage clauses like those in various of the district contracts at issue. have reached similar conclusions.[55]

Second, even as to the contracts that do not contain broad water shortage clauses, it is at least arguable that any reductions ordered by the Bureau here did not result in a breach under the so-called sovereign acts doctrine. This doctrine recognizes that "the Government-as-sovereign must remain free to exercise its powers," *Yankee Atomic*, 112 F.3d at 1575, and shields the United States from contract liability based upon its "public and general acts as a sovereign," *Horowitz v. United States*, 267 U.S. 458, 461 (1925); *see also Winstar*, 518 U.S. at 893-96; *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990).[56] The Federal Circuit has indicated

---

[55] *See, e.g., Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109, 1127-31 (10th Cir. 2003), *vacated on other grounds*, 355 F.3d 1215 (10th Cir. 2004) ("the plain terms of the shortage clauses provide the basis for [the Bureau's] retaining discretion to allocate available water to comply with the ESA"); *Klamath Water Users Protective Ass'n*, 204 F.3d at 1213; *Natural Res. Def. Council v. Houston*, 146 F.3d at 118 (under shortage clause, "the total amount of available project water could be reduced in order to comply with the ESA or state law"); *Peterson v. United States Dept. of Interior*, 899 F.2d 799, 812 (9th Cir.), *cert. denied*, 498 U.S. 1003 (1990); *Barcellos and Wolfsen, Inc.*, 849 F. Supp. at 723-24 (water shortage clause "negates any absolute contract right . . . to the unqualified delivery of irrigation water"); *see also Westlands Water District v. U.S. Dept. of Interior*, 805 F. Supp. 1503, 1512-13 (E.D. Cal. 1992). A number of these cases analyzed the shortage clauses in reviewing whether the water delivery contracts prohibited the Bureau from modifying its deliveries to make water available for endangered species. Traditional water users insisted that since the requirements of the ESA only apply to discretionary federal actions, *see* 16 U.S.C. § 1536(a)(1), and the contracts precluded such discretion, the Bureau lacked the ability to reallocate the already-committed water. *See, e.g., Rio Grande Silvery Minnow*, 333 F.3d at 1131, 1333-34. This claim was rejected based, *inter alia,* upon the language of the shortage clauses.

[56] The sovereign acts doctrine dates back to one of the earliest decisions of the Court of Claims, *Deming v. United States*, 1 Ct.Cl. 190, 1865 WL 2004 (1865). In that case, the court, noting the twin character of the United States as contracting party and sovereign, observed that "[t]he United States as a contractor are not responsible for the United States as a lawgiver." *Id.* at 191. In *Jones v. United States*, 1 Ct.Cl. 383, 1865 WL 1976 (1865), the court extended the doctrine to executive branch actions in concluding that the government was not liable when the presence of federal troops hindered a surveyor under contract to the government. It stated: "Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons." *Id*. at 384. The "public and general" language in *Jones* was eventually adopted by the Supreme Court in *Horowitz*. *See Cuyahoga Metr. Housing Auth. v. United States*, 57 Fed. Cl. 751, 763 n.18 (2003). For a further discussion of the history of, and policies underlying, the sovereign acts doctrine, *see* Edward A. Fitzgerald,

that determining whether the government, in passing legislation, is acting as a contractor or a sovereign, requires "a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." *Yankee Atomic*, 112 F.3d at 1575. An act of government will be considered to be sovereign so long as its impact on a contract is "merely incidental to the accomplishment of a broader governmental objective." *Winstar*, 518 U.S. at 898. But, such an act will not be held to be "public and general if it has the substantial effect of releasing the Government from its contractual obligations." *Id.* at 899; *see also Centex Corp. v. United States*, 1283, 1308 (Fed. Cir. 2005); *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 72 (2001).

Several courts have concluded that the enactment and subsequent enforcement of the ESA should be viewed as sovereign acts that override the Bureau's obligations to provide water under various contracts. *See, e.g., Klamath Water Users Protective Ass'n*, 204 F.3d at 1213 (noting "[i]t is well settled that contractual arrangements can be altered by subsequent Congressional legislation"); *see also Madera Irr. Dist. v. Hancock*, 985 F.2d 1397, 1406-07 (9th Cir. 1993) (Hall, J., concurring). Other cases in this court have likewise held that the suspensions of contracts under the ESA qualify as "public and general acts." *See, e.g., Precision Pine & Timber, Inc.*, 50 Fed. Cl. at 72-73 (suspension of timber sales contracts under the ESA); *Croman Corp. v. United States*, 44 Fed. Cl. 796, 806-07 (1999) (same), *withdrawn in part*, 49 Fed. Cl. 776, 782-84 (2001). While these cases suggest that plaintiffs face an uphill battle in showing that the ESA was designed to abrogate their various contracts, that issue, as well as other aspects of the applicability of the sovereign acts doctrine, have not been adequately briefed and, in the court's view, should be decided only in the context of determining whether, in fact, a breach of the various water contracts here occurred in 2001.[57]

---

"Conoco, Inc. v. United States: Sovereign Authority Undermined by Contractual Obligations on the Outer Continental Shelf," 27 Pub. Cont. L.J. 755, 777-81 (1998).

[57] Other courts have examined the language of district contracts and concluded that the United States did not, in unmistakable terms, surrender its rights to exercise its sovereign powers. *See, e.g., O'Neill*, 50 F.3d at 686. These cases, in particular, have noted that most of the district contracts contain language indicating that they were entered into pursuant to the reclamation laws and "all acts amendatory or supplementary thereto." *Rio Grande Silvery Minnow*, 333 F.3d at 1130. Like the sovereign acts doctrine, the so-called "unmistakability doctrine" recognizes that "'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'" *Bowen v. Pub. Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)); *see also Cuyahoga Metr. Hous. Authority*, 57 Fed. Cl. at 764-74. Of course, a prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated. *See Centex Corp.*, 395 F.3d at 1307; *Cuyahoga Metr. Housing Authority*, 57 Fed. Cl. at 774-75. Whether the unmistakability doctrine applies here depends, in the first instance, upon whether the passage of the ESA may be

In arguing, despite the foregoing, that the Bureau effectuated a taking of their contract rights, plaintiffs harken to this court's decision in *Tulare Lake Basin Water Storage District v. United States*, 49 Fed. Cl. 313 (2001). In that case, various districts in California argued that their contractually conferred water rights were taken as a result of the Bureau's restrictions on water use as required by the ESA. *Id*. at 314. This court ruled that a physical taking had occurred as a result of the restrictions and granted the plaintiffs summary judgment. *Id*. at 319, 324. But, with all due respect, *Tulare* appears to be wrong on some counts, incomplete in others and, distinguishable, at all events.

For one thing, *Tulare* failed to consider whether the contract rights at issue were limited so as not to preclude enforcement of the ESA. Rather, the court treated the contract rights possessed by the districts essentially as absolute, without adequately considering whether they were limited in the case of water shortage, either by prior contracts, prior appropriations or some other state law principle. *Tulare*, 49 Fed. Cl. at 318 ("[t]hose contracts confer on plaintiffs a right to the exclusive use of prescribed quantities of water"). Thus, although the court noted that there were agreements between the United States and the State of California creating a coordinated pumping system, *id*. at 315 n.1, it did not examine those agreements to see whether they, like the district contracts here, limited the plaintiffs' rights derivatively. *Id*. at 320-21. Rather, it focused on the districts' contracts with state agencies as if they were free-standing. *Id*. Nor did the court consider whether the plaintiffs' claimed use of water violated accepted state doctrines, including those designed to protect fish and wildlife, finding that issue to be reserved exclusively to the state courts. *Id*. at 321. Because the state courts had not ruled on those issues, this court refused to rule on them, as well. As a result, it awarded just compensation for the taking of interests that may well not exist under state law. Moreover, because it did not view the districts as having a third-party beneficiary contract claim against the United States, the court never reached the issue whether the violations of the contract rights should be analyzed as breaches, not takings, and, as a result, never considered the potential application of the sovereign acts and unmistakability doctrines.[58] On these counts, this court disagrees with the approach

---

viewed as a sovereign act and thus must also be resolved in determining whether an actual breach of the district contracts occurred here.

[58] If the contract rights possessed by the district were subject to the sovereign acts doctrine, and the ESA were viewed as a sovereign act under that doctrine, then the ESA could not effectuate a taking here, as it did not take a right that the district possessed (*i.e.*, the right to water as against the enforcement of the ESA). The Federal Circuit reached a similar conclusion in *Yankee Atomic*, *supra*. There, the court first held that the sovereign acts and unmistakability doctrines precluded the plaintiff utility from claiming that the assessment of an excise tax breached its prior contracts with the government for decommissioning services. 112 F.3d at 1579-80. It then went on to reject the utility's takings claim, stating, *id*. at 1580 n.8 –

> Our conclusion on this point also resolves Yankee Atomic's takings argument. Because the contracts did not contain an unmistakable promise against a future

taken in *Tulare* and concludes that decision lends no support to the views espoused by plaintiffs here.[59]

**b. Interests based upon Patent Deeds and State Permits**

Recall that the fourth and fifth categories of interests in the Klamath Project waters described above derive from two sources: (i) patent deeds for property located in Oregon that were received from the United States by homesteaders and other property owners in response to the filing of various applications; and (ii) state water permits that were received from the State of Oregon by at least two of the districts involved here that were issued by the State after the 1905 legislation was repealed.

Notably, both the patent deeds and water permits contain appropriation dates well after the 1905 period that marks the appropriation of the Klamath waters by the United States. This is significant, as, under its 1909 Water Act, Oregon recognizes the prior appropriation doctrine – "*qui prior in tempore, prior in jure est*" or "first in time, first in right."[60] Under this system, "[t]he person holding the most senior (oldest) right is entitled to have his or her entitlement fully satisfied before the next most senior person receives water, and so on." Simmons, *supra*, at 130.

---

> assessment, Yankee Atomic had no property right (via a vested contract right) which was subsequently taken by the assessment. At most, Yankee Atomic has a vested right to be immune from later attempts to retroactively increase the prices charged. This right has not been taken because, as explained in the sovereign acts discussion, the assessment is a general, sovereign act rather than a retroactive price increase.

[59] *Tulare* has been the subject of intense criticism by commentators who, *inter alia*, have challenged the court's application of a physical taking theory to what was a temporary reduction in water. *See, e.g.*, Michael C. Blumm, Lucas Ritchie, "Lucas's Unlikely Legacy: The Rise of Background Principles as Categorical Takings Defenses," 29 Harv. Envtl. L. Rev. 321, 329 (2005); Cari S. Parobek, "Of Farmers' Takes and Fishes' Takings: Fifth Amendment Compensation Claims When the Endangered Species Act and Western Water Right Collide," 27 Harv. Envtl. L. Rev. 177, 212-23 (2003); Brittany K. T. Kauffman, "What Remains of the Endangered Species Act and Western Water Rights after Tulare Lake Basin Water Storage District v. United States," 74 U. Colo. L. Rev. 837 (2003).

[60] S*ee* Or. Rev. Stat. §§ 537.120, 537.160, 537.250; *United States v. State of Or. Water Resources Dept.*, 774 F. Supp. 1568, 1573 (D. Or. 1991), *aff'd, in part, and rev'd, in part, on other grounds*, 44 F.3d 758 (9th Cir. 1994) ("Under the laws of the State of Oregon, the principle upon which claims of rights to water are based is the doctrine of prior appropriation, which prioritizes claims of rights to water according to a simple rule: first in time, first in right."); *Tudor v. Jaca*, 164 P.2d 680, 686 (Or. 1945); *see also* 1 Waters and Water Rights §§ 348-49, 351-56 (Robert E. Beck ed. 1991).

Thus, "in times of shortage, the most senior right holder is entitled to insist that junior users curtail their use in order that the senior have sufficient water to satisfy his senior right." *Id.*[61] Hence, any water rights provided through these deeds and permits are subservient to the prior interests not only of the United States, but of the various tribes at issue here, whose interests "carry a priority date of time immemorial." *Klamath Waters Protective Ass'n*, 204 F.3d at 1214; *see also United States v. Adair*, 723 F.2d 1394, 1414 (9th Cir. 1984). Therefore, assuming *arguendo* that the patent deeds and water permits actually reflect perfected interests in water,[62] they give rise to interests that could not have been taken or infringed by the failure of the Bureau to deliver water in 2001.[63]

Nor is this reality altered, as plaintiffs claim, by the Klamath River Basin Compact, Pub. L. No. 85-222, 71 Stat. 497 (1957), which was entered into between Oregon and California for the division of the Klamath River water. Although Congress consented to this compact, the United States was not a party thereto. Plaintiffs emphasize Congress' adoption of Article XIII of the Compact, providing that "[t]he United States shall not, without payment of just compensation, impair any rights to the use of water [for domestic or irrigation purposes] within the Upper Klamath River Basin." 71 Stat. at 507. However, Article III of the Compact, 71 Stat. at 498, generally states, in relevant part, that "[t]here are hereby recognized vested rights to the use of waters originating in the Upper Klamath River Basin validly established and subsisting as of the effective date of this compact under the laws of the state in which the use or diversion is made, including rights to the use of waters for domestic and irrigation uses within the Klamath Project." More specifically, as to the United States, the Compact provides that "[n]othing in this compact shall be deemed: [t]o impair or affect any rights, powers or jurisdictions in the United

---

[61] *See Fitzstephens*, 344 P.2d at 227; *Phillips v. Gardner*, 469 P.2d 42, 44 (Or. Ct. App. 1970); Henry B. Lacey, "New Approach or Business as Usual: Protection of Aquatic Ecosystems under the Clinton Administration's Westside Forests Plan," 10 J. Envtl. L. & Litig. 309, 351 n.202 ("Under the prior appropriation doctrine of water law which prevailed in . . . Oregon . . . a diverter of water from a stream who applies the water to a 'beneficial use' is granted priority for his uses in times of shortage over other appropriators who made later diversions."); *see also Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 805 (1976) (under the doctrine of prior appropriation, "[i]n periods of shortage, priority among confirmed rights is determined according to the date of initial diversion").

[62] There are other potential problems with these deeds and permits. For one thing, the permits may not yet been perfected under state law, as there is no evidence that Oregon has issued a water rights certificate. Further, the permit of the Klamath Drainage District indicates that it is entitled to water between October 1 and March 1 of a given year, a period that appears to be outside that during which the suspension of water occurred in 2001.

[63] Indeed, apart from state appropriations law, the patent deeds in question specifically provided that the water rights granted thereunder were "subject to any vested and accrued water rights."

States, its agencies or those acting by or under its authority, in, over and to the waters of the Klamath River Basin." *Id.* at Art. XI, 71 Stat. at 505. The Ninth Circuit construed this language in accordance with its plain meaning, as "preserv[ing] all federal rights, powers and jurisdiction except as explicitly conceded." *Adair*, 723 F.2d at 1419. As such, nothing in the Compact enhances the rights of any of the plaintiffs here as against the United States.

## III. CONCLUSION

Concluding this *tour d'horizon*, the court is mindful that, despite the potential for contractual recovery here, this ruling may disappoint a number of individuals who have long invested effort and expense in developing their lands based upon the expectation that the waters of the Klamath Basin would continue to flow, uninterrupted, for irrigation. But, those expectations, no matter how understandable, do not give those landowners any more property rights as against the United States, and the application of the Endangered Species Act, than they actually obtained and possess. Like it or not, water rights, though undeniably precious, are subject to the same rules that govern all forms of property – they enjoy no elevated or more protected status. In the case *sub judice*, those rights, such as they exist, take the form of contract claims and will be resolved as such.

Based upon the foregoing, the court, **GRANTS, IN PART**, and **DENIES, IN PART**, the parties' cross-motions for partial summary judgment (including the motion filed on March 14, 2005). On or before October 4, 2005, the parties shall file a joint status report indicating how this case should proceed.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

# APPENDIX

**Klamath Irrigation District, et al, v. United States**
**Case No. 01-591**

## Basis of Plaintiffs' Claimed Property Rights

| Plaintiff | Basis of Claim | Shortage Provision |
|---|---|---|
| Klamath Irrigation District | Contract with United States | Drought or "other causes" – see ¶26 |
| Tulelake Irrigation District | Contract with United States | Drought or "other causes" – see ¶26 |
| Sunnyside Irrigation District | Contract with United States | Drought or "other cause" – see ¶ 9 |
| Malin Irrigation District | Contract with United States | Drought or "other cause" – see ¶ 11 |
| Westside Improvement District No. 4 (formerly Colonial Realty Company) | Contract with United States | Drought or "other causes" – see ¶ 13 |
| Shasta View Irrigation District | Contract with United States | Drought or "other causes" – see ¶ 18 (of 1948 contract) |
| Klamath Drainage District | 1. Contract with United States<br>2. State permit dated Sept. 5, 1978 | 1. Drought or "other causes" – see ¶24 |

| Plaintiff | Basis of Claim | Shortage Provision |
|---|---|---|
| Klamath Hills District Improvement Co. | 1. Contract with Klamath Drainage District<br>2. State permit dated May 30, 1984 | Drought or "other cause" – see ¶4 |
| Poe Valley Improvement District | Contract with United States | Drought only – see Art. 11 |
| Midland District Improvement Company | Contract with United States | Drought only – see ¶ 5 |
| Enterprise Irrigation District | Contract with United States | "Unusual" drought only – see ¶ 10 |
| Pine Grove Irrigation District | Contract with United States | "Unusual" drought only – see Art. 10 |
| Klamath Basin Improvement District | Contract with United States | Drought or "other cause" – see ¶4 |
| Van Brimmer Ditch Company | Contract with United States | None |
| Fred A. Robison | 1. Beneficiary of Tulelake Irrigation District contract<br>2. Form A Water Right Application dated Nov. 29, 1951<br>3. Patent deed dated May 14, 1952 | Drought or "other cause" |

| Plaintiff | Basis of Claim | Shortage Provision |
|---|---|---|
| Fred A. Robison and Albert Robison | 1. Beneficiary of Tulelake Irrigation District contract<br>2. Form A Water Right Application dated July 15, 1940<br>3. Patent deed dated Feb. 25, 1941 | Drought "or other cause" |
| Mark Trotman and Lonny Baley and Baley Trotman Farms | 1. Beneficiary of Tulelake Irrigation District contract<br>2. Patent deeds dated January 13, 1928, August 13, 1929, and August 21, 1936 | |
| Michael and Daniel Byrne and Byrne Brothers | 1. Beneficiary of Klamath Irrigation District contract<br>2. Pre-1905 right subsequently exchanged or surrendered | |
| Daniel and Deloris Chin | 1. Beneficiary of Klamath Irrigation District contract<br>2. Pre-1905 right subsequently exchanged or surrendered | |

| Plaintiff | Basis of Claim | Shortage Provision |
|---|---|---|
| Wong Potatoes, Inc. | 1. Beneficiary of Klamath Basin Improvement District contract and Klamath Irrigation District contract<br>2. Pre-1905 right subsequently exchanged or surrendered | |
| James and Cheryl Moore | 1. Beneficiary of Van Brimmer Ditch Company contract<br>2. Pre-1905 right subsequently exchanged or surrendered. | |