IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., Plaintiffs, | ) | |
| v. | ) | No. 01-591 L |
| UNITED STATES OF AMERICA, Defendant, | ) | Judge Francis M. Allegra |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, Defendant-Intervenor. | ) | |

**NOTICE OF RELATED DECISION**

Defendant United States hereby provides notice that an Interim Order was issued on January 12, 2006, by the Oregon Department of Water Resources Department, Office of Administrative Hearings, in the Klamath Basin General Stream Adjudication (Lead Case No. 003). A copy of the Interim Order (without appendices) is attached.

Dated: January 23, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

s/Kristine S. Tardiff

KRISTINE S. TARDIFF
Attorney of Record for the Defendant
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583
Fax: (603) 225-1577
E-Mail: kristine.tardiff@usdoj.gov

STEPHEN M. MACFARLANE
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, CA 95814-232
Tel: (916) 930-2204
Fax: (916) 930-2210

REGINALD T. BLADES, JR.
Commercial Litigation Branch
Civil Division
United States Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-7300
Fax: (202) 307-0972

BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF OREGON
for the
WATER RESOURCES DEPARTMENT

In the Matter of the Determination of the Relative rights of the Waters of the Klamath River, a Tributary of the Pacific Ocean

| | |
|---|---|
| Edward & Marilyn Livingston, Sylvia G. Bruce, ~~WaterWatch of Oregon, Inc.~~, Horsefly Irrigation District, Langell Valley Irrigation District, Rogue River Valley Irrigation District, Medford Irrigation District, Roger Nicholson, Richard Nicholson, AgriWater, LLC; Maxine Kizer, Ambrose McAuliffe, Susan McAuliffe, Kenneth L. Tuttle and Karen L. Tuttle dba Double K Ranch, ~~Dave Wood~~, ~~Kenneth Zamzow~~, Nicholson Investments, LLC; Wm. S. Nicholson, John B. Owens, Kenneth Owens, Wm. L. Brewer, Mary Jane Danforth, Jane M. Barnes, Franklin Lockwood Barnes, Jr., Jacob D. Wood, Elmore E. Nicholson, Mary Ann Nicholson, Gerald H. Hawkins, Hawkins Cattle Co., Owens & Hawkins, Harlowe Ranch, Terry M. Bengard, Tom Bengard, Dwight T. Mebane, Helen Mebane, Sevenmile Creek Ranch, LLC; James Wayne, Jr.; Clifford Rabe, Tom Griffith, William Gallagher, Thomas William Mallams, River Springs Ranch, Pierre A. Kern Trust, William V. Hill, Lillian M. Hill, Carolyn Obenchain, Lon Brooks, ~~William C. Knudtsen~~, Wayne Jacobs, Margaret Jacobs, Robert Bartell, Rodney Z. James, Hilda Francis for Francis Loving Trust, David M. Cowan, James R. Goold for Tillie Goold Trust, Duane F. Martin, Peter M. Bourdet, Vincent Briggs, J.T. Ranch Co., Tom Bentley, Thomas Stephens, John Briggs, ~~Wm. Bryant~~, Klamath Irrigation District, Klamath Drainage District, Tulelake Irrigation District; Klamath Basin Improvement District, Ady District Improvement Company, Enterprise Irrigation District, Klamath Hills District Improvement Co., Malin Irrigation District, Midland District Improvement District, Pine Grove Irrigation District, Pioneer District Improvement Company, Poe Valley Improvement District, Shasta View Irrigation District, Sunnyside Irrigation District, Don Johnston & Son, Thomas J. Shaw/Modoc Lumber Co., Bradley S. Luscombe, Randy Walthal and Inter-County Title Co., Winema Hunting Lodge, Inc., Van Brimmer Ditch Co., Plevna District Improvement Company, Travis Huntly/Collins Products, LLC, The Klamath Tribes, Leland Woods Trust, Gary Griffith, Marjorie Divine, Victor Divine, David Griffith, Nora Griffith, John V. Lilly, Edna B. Lilly, Earl Martin Kerns, Shirley F. Kerns, Phyllis Vincent, Don Buffington, | **INTERIM ORDER**<br><br>**Lead Case No. 003**<br><br>Consolidated Cases: 003, 118, 119, 120, 129, 137, 148, ~~149~~, and ~~150~~<br><br>Claims: 142, 143, 144, 186, 194, 205, 211, 285, 286, ~~287~~[1], ~~288~~[2], 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321, 322, 323, and 324<br><br>Contests: 0005, 0006, 0007, 0008, 0033, 0039, 0040, 0047, 0281, 0516, 0986, 1221, 1455, 1804, 2044, 2048, 2049, 2050, 2051, 2052, ~~2256~~, 2491, ~~2492~~, |

1 Claim 287 was voluntarily withdrawn by Oregon Department of Fish and Wildlife on September 26, 2003. *See* NOTICE OF WITHDRAWAL OF CLAIM.

2 Claim 288 was voluntarily withdrawn by David P. Henzel on July 1, 2003. *See* NOTICE OF WITHDRAWAL OF CLAIM.

| | | |
|---|---|---|
| Ralph Sterns, Rich Flink/Reams Golf and Country Club, Inc.; Leonard Baio;Gary Strong,<br><br>**Contestants**,<br>v.<br><br>Marta C. Carpenter; Flowers Bros. Inc.; Robert Flowers; Klamath Sprig and Honker Club, Inc.; Martin Scull; Karen Tucker; Sandral | | ~~2761~~, 2778, 2788, 2789, ~~2851~~[3], ~~2854~~, ~~2856~~[4], ~~2858~~, ~~2859~~, ~~2860~~, ~~2861~~, ~~2862~~, ~~2863~~, ~~2864~~, ~~2865~~, ~~2871~~, ~~2876~~, ~~2880~~, ~~2881~~, ~~2882~~, ~~2883~~[5], 3136[6], 3137[7], 3138[8], 3176[9], 3184[10], 3191[11], ~~3197~~, ~~3208~~[12], 3209[13], ~~3210~~, ~~3211~~, 3212, 3213, ~~3214~~[14], 3215, 3216, 3217, 3218, 3219, 3220, |

---

3 WaterWatch of Oregon, Inc. voluntarily withdrew from Contest 2851 on February 19, 2003. *See* WATERWATCH'S VOLUNTARY WITHDRAWAL OF CONTEST 2851.

4 By an Order dated May 20, 2003, WaterWatch of Oregon, Inc. was dismissed as a party contestant from all proceedings in the Klamath Basin Adjudication. *See* ORDER DISMISSING WATERWATCH OF OREGON, INC.'S CONTEST NOS. 2820 ET AL.

5 Klamath Project Water Users' Renewed Motion to Strike Contest Nos. 2858, 2859-2865, 2871, 2876, and 2880-2883, and Dismiss WaterWatch as a Party was **GRANTED** on April 3, 2003. *See* ORDER ON RENEWED MOTION TO STRIKE CONTESTS AND DISMISS WATERWATCH AS A PARTY AND MOTION TO RECONSIDER.

6 Langell Valley Irrigation District and Horsefly Irrigation District voluntarily withdrew from Contest 3136 on May 28, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY LANGELL VALLEY IRRIGATION DISTRICT AND HORSEFLY IRRIGATION DISTRICT.

7 Langell Valley Irrigation District and Horsefly Irrigation District voluntarily withdrew from Contest 3137 on August 21, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY LANGELL VALLEY IRRIGATION DISTRICT AND HORSEFLY IRRIGATION DISTRICT.

8 Langell Valley Irrigation District and Horsefly Irrigation District voluntarily withdrew from Contest 3138 on March 21, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY LANGELL VALLEY IRRIGATION DISTRICT AND HORSEFLY IRRIGATION DISTRICT.

9 Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew from Contest 3176 on December 5, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY MEDFORD AND ROGUE RIVER VALLEY IRRIGATION DISTRICTS.

10 Horsefly Irrigation District and Langell Valley Irrigation District voluntarily withdrew, without prejudice, from Contests 3184 and 3197 on February 25, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTESTS 3197 AND 3215 [*SIC*] BY HORSEFLY AND LANGELL VALLEY IRRIGATION DISTRICTS. Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew, without prejudice, from Contest 3184 and 3197 on September 30, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY MEDFORD AND ROGUE RIVER VALLEY IRRIGATION DISTRICTS.

11 Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew, without prejudice, from Contest 3191 on May 1, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY MEDFORD AND ROGUE RIVER VALLEY IRRIGATION DISTRICTS.

12 Horsefly Irrigation District and Langell Valley Irrigation District voluntarily withdrew, without prejudice, from Contest 3208 on February 25, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTEST 3208 BY HORSEFLY AND LANGELL VALLEY IRRIGATION DISTRICTS. Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew, without prejudice, from Contest 3208 on September 30, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY MEDFORD AND ROGUE RIVER VALLEY IRRIGATION DISTRICTS.

13 Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew from Contest 3209. *See* VOLUNTARY WITHDRAWAL OF CONTEST 3209 BY MEDFORD IRRIGATION DISTRICT AND ROGUE RIVER VALLEY IRRIGATION DISTRICT (November 17, 2005).

14 Horsefly Irrigation District and Langell Valley Irrigation District voluntarily withdrew, without prejudice, from Contest 3214 on February 25, 2003. *See* VOLUNTARY WITHDRAWAL OF CONTEST 3214 BY HORSEFLY AND LANGELL VALLEY IRRIGATION DISTRICTS. Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew, without prejudice, from Contest 3214 on September 30, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY MEDFORD AND ROGUE RIVER VALLEY IRRIGATION DISTRICTS.

| | | |
|---|---|---|
| Tucker,<br>**Claimants,**<br><br>and<br><br>United States of America, Bureau of Reclamation; Geary Bros. Caledonia Ranch, a Co-Tenancy; Jeld-Wen, Inc. (Running Y Ranch);<br>**Claimants/Contestants.** | | 3221, 3222, 3227, 3232, 3237, 3238, 3239, 3240[15], 3282, 3283, 3284, 3285, 3286, 3287, 3288, 3301, 3306, 3310, 3311, 3312, 3313[16], 3377, 3378, 3400, 3407, ~~3408, 3417, 3424~~, 3425, ~~3426~~, ~~3427~~, ~~3428~~, 3429, 3624, 3625, 3626, 3627, 3628, ~~3629~~[17], 3630, 3635, 3640[18], 3826, 3827, 3828, 3837, 3839, 3843, 3846, 3851, 3858, 3859, ~~3860~~, ~~3861~~, 3862, 3863, 3864, 3865, 3866, 3867, 3868, 3869, 3870, 3871, 3872, 3873, 3874, 3875, 3876, 3995, 3998, 4167, 4168, 4169, 4179, 4181, 4188, 4193, 4210, 4211, ~~4212~~, ~~4213~~, 4214, 4215, 4216, 4217, 4218, 4219, 4220, 4221, |

---

[15] Medford Irrigation District and Rogue River Valley Irrigation District voluntarily withdrew, without prejudice, from Contests 3212, 3213, 3215-3222, 3227, 3232, and 3237-3240 on September 30, 2002. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY MEDFORD AND ROGUE RIVER VALLEY IRRIGATION DISTRICTS.

[16] William Bryant voluntarily withdrew from Contests 3282-3288, 3301, 3306, and 3310-3313 (Claims 293-299, 312, 317, and 321-324) on October 31, 2003. Dave Wood voluntarily withdrew from Contests 3282-3288, 3301, 3306, and 3310-3313 (Claims 293-299, 312, 317, and 321-324 on October 26, 2004. Change of Title Interest for Contests 3282-3288, 3301, 3306, and 3310-3313 from Roger Nicholson Cattle Co. to AgriWater, LLC (February 4, 2005). Change of Title Interest for Contests 3282-3288, 3301, 3306, and 3310-3313 from Dorothy Nicholson Trust and Lloyd Nicholson Trust to Roger and Richard Nicholson (February 4, 2005). Change of Title Interest for Contests 3282-3288, 3301, 3306, and 3310-3313 from William and Ethel Rust to David Cowan (March 9, 2005). Change of Title Interest for Contests 3282-3288, 3301, 3306, and 3310-3313 from Walter Seput to James Wayne, Jr. (May 2, 2005). Change of Title Interest for Contests 3282-3288, 3301, 3306, and 3310-3313 from Jim McAuliffe, McAuliffe Ranches, and Joe McAuliffe Co. to Dwight and Helen Mebane (July 8, 2005). Change of Title Interest for Contests 3282-3288, 3301, 3306, and 3310-3313 from Anita Nicholson to Nicholson Investments, LLC (July 8, 2005). Change of portion of Title Interest for Contests 3282-3288, 3301, 3306, and 3310-3313 from Dwight and Helen Mebane to Sevenmile Creek Ranch, LLC (August 15, 2005). Kenneth Zamzow voluntarily withdrew from Contests 3282-3288, 3301, 3306, and 3310-3313 (Claims 293-299, 312, 317, and 321-324) on September 2, 2005. Kenneth Zamzow voluntarily withdrew from Contests 3282-3288, 3301, 3306, and 3310-3313 (Claims 293-299, 312, 317, and 321-324) on September 2, 2005. William C. Knudtsen voluntarily withdrew from Contests 3282-3288, 3301, 3306, and 3310-3313 (Claims 293-299, 312, 317, and 321-324) on September 13, 2005.

[17] Klamath Irrigation District; Klamath Drainage District; Tulelake Irrigation District; Klamath Basin Improvement District; Ady District Improvement Company; Enterprise Irrigation District; Malin Irrigation District; Midland District Improvement Co.; Pine Grove Irrigation District; Pioneer District Improvement Company; Poe Valley Improvement District; Shasta View Irrigation District; Sunnyside Irrigation District; Don Johnston & Son; Bradley S. Luscombe, Randy Walthall; Inter-County Title Company; Winema Hunting Lodge, Inc.; Van Brimmer Ditch Company; Plevna District Improvement Company; and Collins Products, LLC voluntarily withdrew from Contests 3408, 3417, 3424, 3428 and 3629 on April 7, 2004. *See* NOTICE OF WITHDRAWAL OF CONTEST NOS. 3408, 3417, 3424, 3428 and 3629.

[18] Don Vincent voluntarily withdrew from Contests 2048, 2050, 2051, 3400, 3407, 3408, 3417, 3424-3429, 3624-3630, 3635, and 3640 on November 28, 2000. *See* NOTICE OF WITHDRAWAL OF CLAIMANTS. Berlva Pritchard voluntarily withdrew from Contests 3400, 3407, 3408, 3412, 3417, 3424-3429, 3624-3630, 3635, and 3640 on June 24, 2002. *See* NOTICE OF WITHDRAWAL OF CLAIMANT. Klamath Hills District Improvement Company voluntarily withdrew, without prejudice, from Contests 2048, 2050, 2051, 3400, 3407, 3408, 3417, 3424-3429, and 3624-3630 on January 16, 2004. *See* VOLUNTARY WITHDRAWAL OF CONTEST BY KLAMATH HILLS DISTRICT IMPROVEMENT COMPANY.

[19] The Klamath Tribes withdrew from Contests 4218, 4219, 4220, 4221, 4222, 4223, 4224, 4225, and 4230 on December 3, 2002. *See* CONTEST DISMISSAL AGREEMENT AND STIPULATION BETWEEN KLAMATH PROJECT WATER USERS, THE KLAMATH TRIBES, AND THE UNITED STATES; [Proposed] Order of the Hearing Officer in Case 003.

| | | |
|---|---|---|
| | | 4222, 4223, 4224, 4225, 4230[19], 4234, 4235, 4236, 4237, 4951, and ~~4952.~~ |

# HISTORY OF THE CASE

This proceeding in the Klamath Basin General Stream Adjudication was commenced by claims filed as follows:

On December 3, 1990, David Griffith, Gary Griffith, Marjorie Divine and Victor Divine filed claim 194 in the Klamath Basin General Stream Adjudication (the Adjudication). On January 25, 1991, Daniel W. O'Brien and Katherine F. Clyde filed claim 211. On March 31, 1997 John V. Lilly and Edna B. Lilly filed claim 285. On April 30, 1997, Plevna District Improvement Co. filed claim 289. On April 30, 1997 Collins Products LLC filed claim 290. On April 4, 1997 Earl Marin Kerns and Shirley F. Kerns filed claim 291. On March 26, 1997 Gary Griffith, Marjorie Divine and Victor Divine filed claim 292. On April 30, 1997, the United States Bureau of Reclamation (BOR) filed claims 293 through 299. On April 30, 1997, the United States Department of the Interior, Fish and Wildlife Service filed claims 312 and 317. On April 30, 1997, Don Johnston & Son, Enterprise Irrigation District, Klamath Hills District Improvement Co., Malin Irrigation District, Midland District Improvement District, Pine Grove Irrigation District, Pioneer District Improvement Company, Poe Valley Improvement District, Shasta View Irrigation District, Sunnyside Irrigation District, Van Brimmer Ditch Co., Klamath Irrigation District, Klamath Drainage District, Tulelake Irrigation District; Klamath Basin Improvement District, Ady District Improvement Company, Thomas J. Shaw, Bradley S. Luscombe, Randy Walthal, Inter-County Title Co., Berlva Pritchard, Don Buffington, Winema Hunting Lodge, Inc., Rich Flink/Reams Golf and Country Club, Inc., Gary Orem, Ralph Stearns, and Phyllis Vincent filed claims 321, 322 and 323.[20] On April 30, 1997 Tulelake Irrigation District, Bradley S. Luscombe, Randy Walthal, Inter-County Title Co., Berlva Pritchard, Don Buffington, Gary Orem, Ralph Stearns, and Phyllis Vincent filed claim 324. On October 4, 1999, the Oregon Water Resources Department (WRD) issued Preliminary Evaluations of the claims, allowing claims 194, 211, 285, 289, 291, 292, 293, 294, 312, 317, 321, 322, 323 as modified, and denying claim 290, and claims 295 through 299. Claims 194, 211, 285, 289, 290, 291, 292, 293, 294 through 299, 321, 322, 323 and 324 and the contests regarding them were consolidated for determination on their merits as Case 003 by order issued March 1, 2001. Claims 312 and 317 and the contests regarding them were consolidated for determination on their merits in Case 003 by order issued May 18, 2001.

On January 31, 1991 Geary Bros. Caledonia Ranch, a cotenancy, filed claim 142. On January 30, 1991 Daryl J. Kollman and Marta C. Kollman filed claim 143. On January 15, 1991, JELD-WEN, Inc. filed claim 144. On January 30, 1991 the Oregon Department of Fish and Wildlife filed claim 186. On January 24, 1991 Robert Flowers, Flowers Bros. Inc. and Martin Scull filed claim 205 in the Adjudication. On April 28, 1997 Klamath Sprig and Honker Club Inc. filed claim 286 in the Adjudication. On October 4, 1999, the Oregon Water Resources Department (WRD) issued Preliminary Evaluations of the claims, allowing claims 143, 144, and 205, as modified, and denying claims 142,186, and 286. Contests were filed regarding these claims as listed in the attached Appendix I. These claims were consolidated into Case 003 by order issued on May 12, 2003 for the limited purpose of making a consolidated determination of

[20] These parties filed together, and are jointly called Klamath Project Water Users, or KPWU in this order.

the following issue:

> **Whether the Bureau of Reclamation (BOR) may claim a water right by virtue of the construction and operation of the Klamath Project.**

Upon a determination of this issue, claims 142, 143 144, 186, 205 and 286, and the contests filed regarding them, will be severed from the remainder of Case 003, and any issues remaining in those severed cases will be set for separate hearings.

On January 9, 2003, an Order was issued denying the Klamath Project Water Users' Motion to Strike Contests and Dismiss Oregon Waterwatch as a party. This motion was renewed, and an Order was issued on April 3, 2003 granting the Motion based on changed circumstances.

After several previous orders setting a schedule for portions of the proceedings in this case, on December 12, 2003, an Amended Scheduling Order was issued, setting a schedule for filing written direct and rebuttal testimony, and a hearing for cross-examination to begin April 6, 2004.

On April 1, 2004, a prehearing order was issued memorializing final arrangements of details of the proceedings that were scheduled to begin April 6, 2004.

On April 6, 2004, a hearing commenced for cross-examination of witnesses who had previously filed written direct or rebuttal testimony in this case. Appendix II is a list of those witnesses, and the dates of their appearance. Appendix III is a list of persons and entities who participated in the hearing, and their representatives.

## ISSUES

Although a number of issues originally present in this case have been resolved by stipulation, the following issues remain to be decided. Numbering of the remaining issues has been retained from the Notice of Hearing because some of the parties referred to these issues by number in their arguments. The issues resolved by stipulation are listed in the end-note.[i]

4. Whether the claims are insufficient for failing to show the capacity of the storage system or the need for the entire amount of water claimed for storage. (Tribes).

**Completion of Construction/ Diligence**

8. Whether the BOR failed to complete construction within a reasonable time as required by ORS 539.010(4). (Whether Reclamation properly followed state law in filing plans for project development and/or obtaining proper authorization.-US)

9. Whether the BOR failed to apply water to a beneficial use within a reasonable amount of time. (Whether Reclamation put the water identified in the claims to beneficial use

within a reasonable time.)

10. Whether the entire Klamath Project should have a 1905 priority, or only some portion of the Project, with the rest of the Project holding a later date because of its later development. (Tribes).

**Compliance with Chapter 228 (1905)**

17. Whether the BOR failed to specify the quantity of water claimed by it in its notice to the state engineer. (Whether Reclamation properly followed state law in filing plans for project development and/or obtaining proper authorization.-US)

19. Whether the BOR failed to file sufficiently detailed plans to enable the State Engineer to determine the lands to be irrigated.

20. Whether the BOR failed to obtain the necessary authorization of construction within four years as required by Or Laws 1905 Ch 228 §2. (Whether Reclamation properly followed state law in filing plans for project development and/or obtaining proper authorization.-US)

**Effect of BOR Contracts**

21. Whether the BOR claimed a 1905 priority date that is inconsistent with its system of internal priorities. (Whether the priority dates claimed by Reclamation are the appropriate ones under state and federal law.-US)

**Improper Claimant**

23. Whether the claims are duplicative of other claims for the same water (and the same water storage-Tribes) from different entities. (Can the BOR hold water rights for wildlife refuges managed by United States Fish and Wildlife Service (USFWS) for which USFWS has made its own claims. Can the BOR be awarded a right for water for use on Refuge lands when those Refuge lands are not included in the BOR's claims. (Tribes.)

24. Whether any water right recognized should be in the name of the BOR or in the name of other entities which have claimed the same water. (Whether the United States is the appropriate entity to hold the water rights for the Klamath Project.-US)

**Purposes**

26. Whether any BOR rights should be limited to reclamation purposes including agricultural purposes. (Whether the water appropriated by the United States for the Klamath Project may only be used for irrigation.-US)

27. Whether the BOR claimed the right to use water for non-irrigation purposes in

contravention of state and federal law. (Whether the water appropriated by the United States for the Klamath Project may only be used for irrigation.-US)

**BOR Acquisition of Non-federal Facilities**

29. Whether the acreages described are inaccurate because they do not recognize lands in the current Klamath Project that were initially irrigated through non-federal facilities.

**<u>Issues Presented by Claims Consolidated by orders of March 1 and May 18, 2001.</u>**

As Stated by the United States:

32. Whether the priority dates as claimed are properly supported.

33. Whether Claim number 324 is a valid claim to storage of Klamath River water or diversion from storage.

34. Whether, in certain claims, the diversion rate exceeds what can be beneficially used at the Place of Use.

35. Whether the diversion rate exceeds the capacity of the ditch system used to serve the Place of Use.

36. Whether any vested water right on all or a portion of the claimed Place of Use is included in the claims filed by the United States for the Klamath Project.

37. Whether the total storage amount is as stated in the claim filed by the United States for the Klamath Project storage.

38. Whether natural flooding/sub-irrigation/natural overflow is a valid water right.

39. Whether only the United States can receive a water right for lands owned by the United States, including lands within the Klamath Basin National Wildlife Refuges and Klamath Project lands owned by the United States.

40. Whether the source of water is as provided in the claims filed by the United States as supplemented.

## EVIDENTIARY RULINGS

OWRD Exhibit 20001 (Also described as OWRD Exhibit 1), submitted January 15, 2002, as supplemented by an additional filing on June 19, 2003, was admitted into the record.

KPWU Exhibits 40000 to 49259 were admitted into the record.

KPWU also offered the following written testimony:

Affidavit and Testimony of Marc E. Van Camp
Affidavit and Testimony of Donald E. Kienlen
Affidavit and Testimony of Rand F. Herbert
Affidavit and Testimony of Stephen R. Wee
Affidavit and Testimony of Rebecca Meta BUnse
Affidavit and Testimony of Earl C. Danosky
Affidavit and Testimony of Gerald Pyle
Affidavit and Testimony of Michael J. Byren
Affidavit and Testimony of Wendell Schey
Affidavit and Testimony of John Crawford
Direct Testimony and Affidavit of Thomas J. Shaw
Direct Testimony and Affidavit of David A. Solem
Direct Testimony and Affidavit of Douglas E. Adkins
Direct Testimony and Affidavit of Harold Hartman
Direct Testimony and Affidavit of Donald Russell
Direct Testimony and Affidavit of Ernie Wigget
Direct Testimony and Affidavit of Richard Flink
Direct Testimony and Affidavit of Augrey Campbell
Affidavit of Cindy Cherry
Affidavit of Jerry Rajnus, Jr.
Affidavit of Edwin Stastny, Sr.
Affidavit of Mary Hastings
Affidavit of Alvin A. Cheyne
Affidavit of Bill Beasly
Affidavit of Joseph Frost Dated September 13, 2002
Affidavit of Joseph Frost Dated September 19, 2002
Affidavit of Jack Liskey
Affidavit of Ruth Carland
Affidavit and Direct Testimony of Sam Henzel On Behalf Of Klamath Drainage District
Affidavit and Direct Testimony of Ruth Carland On Behalf Of Midland District Improvement Company
Affidavit and Direct Testimony of Robert G. Flowers On Behalf Of Ady District Improvement Company
Affidavit and Direct Testimony of Miles William Moore On Behalf Of Sunnyside Irrigation District
Affidavit and Direct Testimony of William D. Kennedy On Behalf Of Poe Valley

Improvement District
Affidavit and Direct Testimony of Thomas E. Bedell
Affidavit and Direct Testimony of Mary Cheyne On Behalf Of Klamath Project Water Users
Amendment to Affidavit and Direct Testimony of Mary Chayne On Behalf Of Klamath Project Water Users
Affidavit and Direct Testimony of Claude Hagerty On Behalf Of Shasta View Irrigation District
Affidavit and Testimony of James R. Ottoman On Behalf Of Shasta View Irrigation District
Affidavit and Direct Testimony of Al Herman
Affidavit and Direct Testimony of Ralph Donald Johnston
Affidavit and Direct Testimony of Scott Johnston
Affidavit and Direct Testimony of Lyle Logan
Affidavit and Direct testimony of Brad Luscombe
Affidavit and Direct Testimony of Darrel Pierce
Affidavit and Direct Testimony of Ralph W. Stearns
Affidavit and Direct Testimony of Donn Jensen On Behalf Of Collins Products LLC and Plevna District Improvement Company
Affidavit and Direct Testimony of Kay Heath On Behalf Of Van Brimmer Ditch Company
Affidavit and Direct Testimony of Lynn R. Pope On Behalf Of Van Brimmer Ditch Company
Affidavit and Testimony of Rand Herbert (Rebuttal)
Affidavit and Testimony of Stephen R. Wee (Rebuttal)
Affidavit and Testimony of Rebecca Meta Bunse (Rebuttal)
Affidavit and Rebuttal Testimony of Donald E. Kienlen
Affidavit and Rebuttal Testimony of Marc E. Van Camp
Affidavit and Rebuttal Testimony of David Solem
Affidavit and Corrected Testimony of Marc E. Van Camp

United States Exhibits 10001 to 10015 were admitted into the record, including the Direct Written Testimony of Cecil Lesley.

United States Exhibits 15003 through 15045, including the Direct Testimony of Timothy D. Mayer and David Mauser.

Nicholson Group Exhibits 50002-5 and 50007-12, together with a supplement to 50003, were admitted into the record.

Nicholson Group also filed the Direct Testimony of David B. Shaw and the Rebuttal and Corrected Rebuttal Testimony of David B. Shaw.

Individual claimants' exhibits 80001-7 were admitted into the record, including the Direct Testimony of Martin Kerns, Marjorie Divine, John Kern Lilly and David Griffith, and the Affidavit of Ronald S. Yockim.

Klamath Tribes' Exhibits 70001 through 70675 were admitted into the record, together with the Direct and Rebuttal Testimony of Allan L. Richards.

Evidence was originally offered by Langell Valley Irrigation District and Horsefly Irrigation District, but upon the withdrawal of these contestants, this evidence was not admitted.

Certain parties cited to matter in their argument that was not admitted into the evidentiary record before the record closed. All such matter has been disregarded in considering this case.

The parties filed cross-motions to strike portions of each others' arguments, asserting that the arguments related to issues that were not raised in the claims and contests. All such motions are denied. However, any argument that is not fairly comprehended within the issues stated in the Hearing Notice in this case, as amended by subsequent stipulation, will not be addressed in this order.

## FINDINGS OF FACT

**Historical Background:**

1. Prior to European settlement of the Klamath River area, the Lost River and Klamath River systems were connected but generally distinct. Lost River water flowed from the Cascade Mountains into Tule Lake. Klamath River water flowed from an area of the Cascade Mountains north of the Lost River watershed. After entering the Klamath Marsh, it eventually flowed into Upper Klamath Lake. Klamath water then passed downstream to Keno, Oregon. (Ex. 10004.)

3. The undeveloped Klamath River was subject to seasonal variation of flow, expanding and overflowing its banks in winter and spring, then lowering its flow in summer and fall. As the water receded after flooding, the exposed soil was saturated with water, which nourished natural grasses and vegetation. The early European settlers in the area took advantage of this to harvest hay or graze cattle in the previously flooded lands. (Direct Test. Bunse, at Para. 10.)

4. A Swamp Act deed was granted by the State of Oregon to John Gleim on August 30, 1882, that included 52.4 acres of the present claim 194 (lots 8 and 9 of Section 8, and lot 9 of Section 17, Township 39S, Range 9E, Willamette Meridian). In order to obtain this deed the grantee was required to prove to the State Lands Commission that he had reclaimed the property. (Ex. 40161.)

5. At times of high flow, some of the Klamath River water spilled into Lower Klamath Lake, where it was captured. (Ex. 15011.) Likewise, some of the Klamath River water flowed through the Lost River Slough into the Lost River at high flood times. (Ex. 10002 at 111.) When the flow was reduced, some of the water that had entered Lower Klamath Lake flowed back into the Klamath River. (Ex. 15011.) However, some water remained in Lower Klamath Lake after it reached this stage, creating lake and marshlands. (Ex. 15001.)

6. As diversion works were developed on the Klamath River after the beginning of

European settlement in the 1860s, the pattern of water flow began to change. Dams were constructed at the outlet of Upper Klamath Lake, and at the reef at Keno.[21]

7. In 1902, the United States Congress passed the Reclamation Act of 1902 (43 USC §372 *et seq.*), authorizing the Secretary of the Interior to examine, survey, locate and construct irrigation works for the storage, diversion and development of waters.

8. Section 8 of the Reclamation Act provided:

> Nothing in this act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof. (43 USC §383.)
>
> The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right. (43 USC §372.)

9. On January 20, 1905, the Oregon Legislature enacted Or Laws 1905 Ch 6, which authorized the United States to lower the water level of Upper Klamath Lake, and lower the level or drain Lower Klamath Lake, Tule Lake and Goose Lake, and ceded to the United States ownership in any land uncovered by the lowering or drainage.

10. On February 2, 1905, the Oregon Legislature enacted Or Laws 1905 Ch 228, Section 2 of that statute provides as follows:

> Whenever the proper officers of the United States, authorized by law to construct works for the utilization of water within this State, shall file in the office of the state engineer a written notice that the United States intends to utilize certain specified waters, the waters described in such notice and unappropriated at the date of the filing thereof shall not be subject to further appropriation under the laws of this State, but shall be deemed to have been appropriated by the United States; provided, that within a period of three years from the date of filing such notice the proper officer of the United States shall file final plans of the proposed works in the office of the State engineer for his information; and provided further, that within 4 years from the date of such notice that United States

[21] Both dams are operated by Pacificorp, successor to the California Oregon Power Company (COPCO) for hydroelectric power generation under contract with the United States. The dams are also used to control the level of water in Upper Klamath Lake, and in Lake Ewauna, the pool behind Keno Dam. (Direct Test. Van Camp at Para 42, 44.)

> shall authorize the construction of such proposed work. No adverse claims to the use of the water required in connection with such plans shall be acquired under the laws of this State except as for such amount of said waters described in such notice as may be formally released in writing by an officer of the United States thereunto duly authorized, which such release shall also be filed in the office of the State engineer.

11. On February 9, 1905, Congress enacted 43 USC § 601, authorizing the Secretary of the Interior to raise or lower lakes and dispose of uncovered lands that were ceded by the states to the United States.

12. On May 17, 1905, T.H. Humphreys, an engineer with the U.S. Reclamation Service, signed the following notice, which was filed on May 19, 1905 with the Oregon State Engineer:

> Notice is hereby given that the United States intends to utilize certain specified waters, as follows, to-wit:-
>
> All of the waters of the Klamath Basin in Oregon, constituting the entire drainage basins of the Klamath River and Lost River, and all of the lakes, streams and rivers supplying water thereto or receiving water therefrom, including the following and all their tributaries:
>
> Upper Klamath Lake, Lower Klamath Lake, Tule or Rhett Lake, Little Klamath Lake, Lake Ewauna, White Lake, Miller Lake, Swan Lake, Alkali Lake, Dry Lake, Sprague River, Sycan River, Williamson River, Crooked River, Wood River, Link River, Seven Mile Creek, Klamath River, Three Mile Creek, Cherry Creek, Rock Creek, Four Mile Creek and the slough or stream connecting Lower or Little Klamath Lake with Klamath River, Clear Creek, Spencer Creek, Lost River, Miller Creek, Prarie [sic] Creek, Barnes Valley Creek and Buck Creek.
>
> It is the intention of the United States to completely utilize all the waters of the Klamath Basin in Oregon, and to this end this notice includes all lakes, springs, streams, marshes and all other available waters lying or flowing therein.
>
> That the United States intends to use the above described waters in the operation of works for the utilization of water in the State of Oregon under the provisions of the act of Congress approved June 17, 1902 (32 Stat. 388) known as the Reclamation Act.
>
> This notice is given under the provisions of Section Two (2) of an act passed by the Legislature of the State of Oregon, filed in the office of the Secretary of State, February 22, 1905, and constituting chapter 228 of the General Laws of Oregon, 1905, as compiled by the Secretary of State.

(Ex. 40961.)

13. On May 6, 1908, the United States filed a letter which enclosed a map of the project, together with contract documents, specifications, blue-prints and drawings related to Klamath Project features. (Ex. 10001 Index 3538-3697, Ex. 50007.)

14. On May 8, 1909, The United States filed a certificate with the State Engineer (Ex. 10005) in which the United States certified that the Klamath Project had been authorized by the Secretary of the Interior. That authorization occurred on May 15, 1905, and included provision for expenditure of $1 million of available funds, with an additional $4.4 million as it became available. (Ex. 10005; 10001 at 9.)

15. These filings were found by the Oregon Attorney General to have completed the appropriation under Or Laws 1905 Ch 228 §2. (Ex. 41642, 41651.)

16. Beginning in 1905, after the authorization of the project, the Bureau of Reclamation acquired some irrigation canals from prior developers,[22] and developed others of its own. (Test. of Cecil Lesley.) During periods of high water, before the beginning of the irrigation season, Lost River water is released through Harpole Dam as a flood control measure. From a point soon after the beginning of the irrigation season, the flow of water from Lost River is completely diverted at the Harpold Dam, and distributed by irrigation districts to water users above the dam. The Lost River Diversion Channel, connecting the Klamath and Lost River systems, allows water to be exchanged between the two basins. Particularly, beginning early in the irrigation season Klamath water flows from upper Klamath Lake through the Lost River Diversion Channel into the channel of the Lost River below the Harpold Dam, whence it flows into Tule Lake, replenishing that lake with Klamath water. (Test. of Van Camp; Ex. 40046 at para. 27.)

17. Previous to the commencement of the Klamath Project, the Van Brimmer Ditch Co. had developed a water appropriation from the Lower Klamath Lake, with a diversion point in Section 15, Township 41 South, Range 10 West of the Willamette Meridian, in Klamath County, Oregon. On November 6, 1909, the Van Brimmer Ditch Co., recognizing that the lowering of the level of Lower Klamath Lake as contemplated by the Project would destroy the Ditch Company's access to water at its diversion point, entered into a contract with the United States, in which the Van Brimmer Ditch Company conveyed all its "ripartian [sic] rights" to water from Lower Klamath Lake, but reserved 50 cubic feet per second (cfs) from its earlier appropriation, and agreed to pay to the United States the sum of $50 per year as its pro-rata share of the costs of the Klamath Project by virtue of its water right. The United States agreed to provide 50 cfs for the use of the ditch company from a different location. (Ex. 40634-40.)

18. The Klamath Straits, connecting the Klamath River and Lower Klamath Lake were blocked by the Bureau of Reclamation through a contract with a railroad, preventing water from flowing into the lake. (Ex. 15016 at 13.) In the 1930s, it became clear that Lower Klamath Lake and the surrounding area had been rendered barren and unusable by the blockage of Klamath River water from that lake. (Ex. 15018.) The Bureau of Reclamation then constructed a tunnel from Tule Lake to the area of Lower Klamath Lake, to pump water into Lower Klamath Lake,

---

[22] Including the Van Brimmer Ditch Co. (Ex. 40634-640), Moore Brothers-West Side Canal Company (Ex. 42174, 47547), Klamath Falls Irrigation Company (Ex. 40625), and Klamath Canal Company (Ex. 40667-73).

allowing development of wildlife refuges and irrigation works in that area. (Ex. 15001.)

19. While the Klamath Project was being developed, the Bureau entered into contracts with a number of local water users. All water users who were included in irrigation districts within the project and had appropriated water rights prior to 1905[23] executed a "Waiver of Riparian Rights" containing the following language:

> In consideration of the premise and of the payment of One Dollar, the receipt whereof is hereby acknowledged, the parties of the first part [the water users] do hereby remise, release and forever quitclaim unto the party of the second part, [The United States] all right, title and interest of the parties of the first part, of whatever nature, in and to the water of [variously Lake Ewauna, Little Klamath Lake, Lower Klamath Lake, Miller Lake, Klamath River, Link River, and/or Lost River] bordering on the above-described lands and the parties of the first part, as owners of the lands first above described, hereby waive and renounce to the use and benefit of the party of the second part, any and all riparian rights appurtenant or incident to the lands first above described ****.

(Ex. 49126-49226.)

20. Some landowners who had not previously appropriated a water right were included in the project and supplied with water, under contracts, including so-called "Warren Act" contracts, whereby the United States engaged to provide them with water in return for periodic payments. (S*ee* OWRD Ex. 1 at 942.)

21. Parts of the Lower Klamath Lake National Wildlife Refuge and Tule Lake National Wildlife Refuge are farmed under agreements containing various conditions, including leases for one-year terms for agriculture, and are supplied with water by the Project in return for payments by the lessees. (Ex. 41156-41171.)

22. Beginning in 1908 wildlife refuges were developed at Lower Klamath Lake and Tule Lake by the United States. Water for these refuges, including water to create wetlands and marshes, is derived from water from Lost River, released through Harpole Dam as a flood

[23] With the exception of Van Brimmer Ditch Co. (*See* Finding of Fact 16)

control measure, or from Klamath River, transported through the Lost River Diversion Channel to the Lost River, thence to Tule Sump, a storage area within the Tule Lake National Wildlife Refuge, and either distributed within the Tule Lake Refuge or transported by tunnel to Lower Klamath Lake for distribution at that location. (Direct Test. Van Camp, para. 28; Direct Test. Danosky, para. 34-36; Direct Test. Solem, para. 30.)

23. The vast majority of the land subject to the Klamath Project is supplied with water through within irrigation districts[24], which stand between the Bureau and the individual water users, maintaining and operating some of the works under contract with the Bureau. (Test. David Solem, Trans at 2485, 2539; Test. Earl Danosky, Trans. 2008-9, 2052)

24. Structures of various sorts have been built within the area subject to these claims that are incompatible with the development of their sites for irrigation. No plans exist, or, insofar as the record establishes, ever existed, to convert any of these properties to cultivation. (Test. Cecil Lesley; Donald Kienlen; William Kennedy; Ruth Carland; Lyle Logan.)

## CONCLUSIONS OF LAW[25]

4. The Federal claims are sufficient in that the claimants are not required to show the capacity of the storage system or the need for the entire amount of water claimed for storage.

**Completion of Construction/ Diligence**

8. The Bureau or Reclamation complied with state law in filing plans and authorization for the project with the State Engineer.

9. The claims of the Bureau of Reclamation are not subject to any specific requirement of beneficial use that could impact the claims at this stage.

10. The entire Klamath Project has a priority date of May 19, 1905.

**Compliance with Chapter 228 (1905)**

17. The Bureau of Reclamation was not required to specify a quantity of water claimed in its notice of appropriation.

19. The plans filed by the Bureau of Reclamation are sufficient to satisfy the requirements of statute.

20. The Bureau of Reclamation obtained the necessary authorizations for construction within

[24] Of roughly 168,000 acres of non-federally owned land in the Project, 160,000 acres are served through irrigation districts (Direct Testimony of Van Camp, at 15)

[25] To avoid confusion, the conclusions of law are listed using the numbers assigned to the corresponding issues as stated in the Notice of Hearing. No conclusion of law has been stated as to those issues that have been resolved by stipulation, which are therefore not addressed in this order.

the requisite time.

**Effect of BOR Contracts**

21. The BOR claimed a 1905 priority date of May 19, 1905, which is the appropriate priority date under state and federal law.

**Improper Claimant**

23. The claims of the Bureau are not duplicative of the claims of the Fish and Wildlife Service, as the claims of the Service are based upon Federal Reserved Rights and are junior to the claims of the Bureau of Reclamation.

24. The United States is the proper holder of all water rights within the Klamath Project.

**Purposes**

26. The water right of the Klamath Project is not limited to irrigation purposes.

27. The BOR's claim for water for non-irrigation purposes does not violate state or federal law.

**BOR Acquisition of Non-Federal Facilities**

29. The acreages as described are accurate.

**Claims Consolidated by orders of March 1 and May 18, 2001.**

32. Claims 193, 194, 211, 285, 289, 290, 291, 292, 321 (other than 321-6 and 7), 322, 323, and 324, are not supported in the record. The portions of Claim 321 designated 321-6 and 7 are supported in the record.

33. Claim number 324 is not a valid claim to storage of Klamath River water or diversion from storage.

34. Since these claims are not supported, the question whether the diversion rate exceeds what can be beneficially used at the Place of Use is not reached.

35. Since these claims are not supported, the question whether the diversion rate exceeds the capacity of the ditch system used to serve the Place of Use is not reached.

36. With the exception of a portion of claim 194, and claims 321-6 and 321-7, all of the claimed Place of Use is included in the vested water right of the United States for the Klamath Project.

37. The total storage amount is as stated in the claim filed by the United States for the Klamath Project storage. Claim 324 for storage is not supported.

38. Natural flooding/sub-irrigation/natural overflow can form the basis for a valid water right.

39. Only the United States can receive a water right for lands owned by the United States, including lands within the Klamath Basin National Wildlife Refuges and Klamath Project lands owned by the United States.

40. The source of water is as provided in the claims filed by the United States as supplemented.

## OPINION

**Summary of Decision:**

This case presents the following main questions:

1. Does the United States, through the Bureau of Reclamation, hold a water right in the Klamath River and its tributaries, by virtue of the Klamath Project?

2. If so, what is the character of that water right, what priority does it have relative to other water rights in the Klamath Basin, and what is its rate and duty?

From the answers to those two questions flows the resolution of most of the issues presented in this case.

For the reasons that follow, with small exceptions, I conclude that the United States is the proper owner of a water right in the Klamath River and its unadjudicated tributaries,[26] that this water right has a priority of May 19, 1905, and includes all water flowing in the Klamath River or its tributaries not subject to a presently existing right in the same waters having a priority before that date.[27]

**THE UNITED STATES AS PROPER HOLDER-Claims 293 and 294.**

This case involves the application of Oregon and Federal Statutes, and, particularly, how Or Laws 1905 Ch 228 §2 is to be construed.

In Oregon, statutes are construed using a methodology prescribed by the Supreme Court in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610 (1993). The primary object of statutory construction is to discern the intention of the legislature. ORS 174.020; *PGE v. Bureau of Labor and Industries, id.* That inquiry begins with the text of the statute, and its statutory context, as "the best evidence of the legislature's intent." *PGE v. Bureau of Labor and Industries, id*. Only if the text of the statute is ambiguous may the legislative history be

[26] The water of several streams, including the Wood River, Sprague River, and Lost River has been previously adjudicated, and is not included in this proceeding, notwithstanding that some of these streams are tributary to the Klamath River.

[27] The phrase "presently existing right in the same waters" describes those rights acquired by prior appropriation before May 17, 1905 that have not been transferred to the United States.

considered, and only if the legislative history does not allow discernment of the legislative intent will maxims of statutory construction be applied. Consequently, if the statute is unambiguous, it must be read literally even if this reading would seemingly produce an absurd result. It is only when a statute has two or more plausible meanings that it may be construed to avoid absurdity. As the court noted in *Young v. State,* 161 Or App 32 (1999): "[T]he legislative power includes the authority to write a seemingly absurd law, so long as the intent to do that is stated clearly."

Words used in a statute should wherever possible be given their "plain, natural and ordinary meaning." *PGE v. Bureau of Labor and Industries, id* at 611. In this case, recourse to the legislative history or maxims of construction is unnecessary. The language of the statute is unambiguous.

As noted above, in 1905 the Oregon Legislature enacted Or Laws 1905 Ch 228 §2, a statute that, on its face, was intended to provide the United States the ability to appropriate large amounts of water to facilitate the development of reclamation projects in this state.

Although the text of the statute is quoted in Finding of Fact 8, above, it is worth quoting it again, here:

> Whenever the proper officers of the United States, authorized by law to construct works for the utilization of water within this State, shall file in the office of the state engineer a written notice that the United States intends to utilize certain specified waters, the waters described in such notice and unappropriated at the date of the filing thereof shall not be subject to further appropriation under the laws of this State, but shall be deemed to have been appropriated by the United States; provided, that within a period of three years from the date of filing such notice the proper officer of the United States shall file final plans of the proposed works in the office of the State engineer for his information; and provided further, that within 4 years from the date of such notice that United States shall authorize the construction of such proposed work. No adverse claims to the use of the water required in connection with such plans shall be acquired under the laws of this State except as for such amount of said waters described in such notice as may be formally released in writing by an officer of the United States thereunto duly authorized which such release shall also be filed in the office of the State engineer.

(Or Laws 1905 Ch 228 §2.)

It is scarcely possible to conceive more unambiguous language. The law authorized the United States to file with the State Engineer a notice of intent to appropriate previously unappropriated waters, and declared, subject to the subsequent filing of certain items with the State Engineer, that once that notice was filed, no further appropriation of the water described in the notice would be permitted, and the United States would be deemed to have appropriated the water described. It also required as a precondition to any claim adverse to at least part of the United States' appropriation that the United States formally release the claim in writing.

There are two main arguments against the United States as the proper holder of some or all the water rights in the Klamath Project. The first, and most comprehensive, is the basis for the claims of the KPWU.[28] Stated in its simplest form, KPWU argues that in Oregon, a water right must include beneficial use of the water, and since, with some exceptions, the United States' claim does not rest on beneficial use by the United States, the persons who do make beneficial use of the water are the proper holders of the water right.

A related position was articulated by the Oregon Attorney General in 1950, as follows:

> This provision [Or Laws 1905 Ch 228 §2] is to be construed in a manner so as to reflect its purpose. (C*ite omitted.*)
>
> It is apparent that the legislature in the enactment of this section had in mind the previously announced sound and reasonable doctrine of beneficial use and did not intend to overthrow such doctrine nor allow all the waters in certain sections of the state to be withdrawn from use.
>
> *****
>
> The use of the word "all" as appears in the notice, under any reasonable construction, could only mean that water which is reasonably necessary and can be beneficially applied to the proposed project. The duty of the water attaches upon the filing of the plans. The plans mark the limit of the area upon which the water is to be used. The state engineer has at his command the necessary means and facilities to determine the quantity of water necessary for the proposed project and the amount to be beneficially used within reasonable limits. To give the word "all" any other construction would lead to absurd results never contemplated by the legislature. (Ex. 41653, 54.)

It is apparent that the Attorney General in 1950 did not have the benefit of the Oregon Supreme Court's opinions in *PGE v. BOLI, id* and *Young v. State, id.* There is not the slightest suggestion in the language of the statute that the legislature "did not intend to overthrow such doctrine****." Any intention of the legislature with respect to beneficial use as a required element in a water right acquired by the United States under Chapter 228 would have to be inferred from the suggested absurdity of the result, and the assumed purpose of the statute, as the plain language of the statute itself is quite to the contrary. Although the Department argues that the silence of the statute as to beneficial use raises the inference that the legislature intended

[28] The precise outlines of these claims are unclear from the record. KPWU generally has asserted that it was filing its claims on behalf of the water users within the Districts. However, recently, KPWU has appeared to modify this position, seeming to assert a water right in KPWU's own right. Both assertions are based on claims that flow from the United States' initial appropriation.

beneficial use to limit the rights of the United States, this is also, at its heart, an argument from absurdity.[29] This is to say that when the legislature says, "[T]he waters described in such notice and unappropriated at the time of the filing thereof shall not be subject to further appropriation under the laws of this State, but shall be deemed to have been appropriated by the United States," that is what the legislature intended to say. This language is simply not amenable to any other interpretation that would allow use of collateral sources to discern the intent of the legislature.

This is particularly true, when in a further passage, the legislature provides: "No adverse claims to the use of the water required in connection with such plans shall be acquired under the laws of this State except as for such amount of said waters described in such notice as may be formally released in writing by an officer of the United States****." In the face of this provision, requiring a formal release in writing before certain claims adverse to the United States may be maintained without regard to the beneficial use of the water subject to the limitation, there cannot be any doubt that the legislature did, in fact, intend to overthrow the doctrine of beneficial use, as to the appropriation of water by the United States under this statute.

This conclusion is bolstered by the opinion of the Oregon Supreme Court in *In re Waters of Umatilla River*, 88 Or 376 (1917) *mod on reh;* 88 Or 390 (1918), which is the only case that has construed this statute. In that case, the court said:

> This portion of the appellant's petition argues a legislative, not a judicial question. By the statute quoted in the previous opinion the legislature withdrew from further appropriation the waters of such streams as the United States should elect to utilize in the manner therein pointed out. The Untied States has accepted the grant and conformed to the terms thereof. The legislature could not displace water rights that had vested prior to the acceptance by the United States of the provisions of the statute, but the plain precept of the law vests the United States with title to all waters not theretofore appropriated.

88 Or at 399.

The parties argue, as the Attorney General suggested in 1950, that the doctrine of beneficial use was necessarily imported into this statute by its reference to the federal Reclamation Act of 1902, and the provision in that act that "beneficial use shall be the basis, the measure, and the limit of the right." 43 USC §372. While it might be suggested that the Reclamation Act of 1902 is part of the "context" of the Oregon statute, this does not compel the conclusion that the legislature intended to require beneficial use as an element of a water right under Oregon Laws 1905 Chap. 228 Sect. 2. It is one thing to recognize that federal law will require the United States to apply the water to beneficial use, it is another entirely to treat such a federal requirement as the basis for imposing that requirement by implication in an Oregon

---

[29] "The opposite inference *** would require an assumption that the Oregon legislature intended to undo one of the core principles of acquiring a water right both in Oregon and throughout the arid west. Absent a clear statement by the legislature, such an inference cannot be countenanced." Oregon Water Resources Closing Brief in Reply at 42. As noted in *PGE v. BOLI,* the language of the statute itself is the clearest statement of the intention of the legislature--particularly in this case. *PGE v. BOLI at* 610, 611.

Statute that is silent as to use. Such an imposition would have the effect, forbidden by ORS 174.010 of inserting "what has been omitted," or omitting "what has been inserted." It is more likely, especially given the lack of any reference to beneficial use in the Oregon Statute, that if the legislature had the terms of the Reclamation Act in mind, the Oregon statute was intended to give the United States the greatest scope possible to its water right, with the confidence that the United States could not abuse the right so allowed because of the limitations imposed on its use by federal law.

Likewise, the parties' reference to the requirement of beneficial use in so-called "pre-1909 water rights," being those water appropriations accomplished under the common law and usage prior to enactment of the Oregon Water Code in 1909, is to no avail.[30] The water right asserted in Claim 294 is entirely a creature of the Oregon Legislature. It is not a "pre-1909 water right"--at least, not as described by the Oregon Supreme Court in *In re Water Rights in Silvies River*, 115 Or 27 (1925).

I therefore conclude that an appropriation by the United States pursuant to Or Laws 1905 Ch 228, §2, once perfected by completion of the steps required by the statute, is not limited by the doctrine of beneficial use, but only by the terms of the notice of appropriation, and any releases that the United States might have executed.

Sprague River and Fort Klamath Groups,[31] however, argue that the steps required to perfect the appropriation were not, in fact, accomplished. In particular, it is argued that the United States did not file the "final plans" as required.

Once again, it is necessary to resort to *PGE v. BOLI, id.* to construe a different portion of the statute. The relevant part is as follows:

> [W]ithin a period of three years from the date of filing such notice the proper officer of the United States shall file final plans of the proposed works in the office of the State engineer for his information; and provided further, that within 4 years from the date of such notice the United States shall authorize the construction of such proposed work. No adverse claims to the use of the water required in connection with such plans shall be acquired under the laws of this State except as for such amount of said waters described in such notice as may be formally released in writing by an officer of the United States.

---

[30] Even the Oregon Department of Justice has made this argument in these proceedings, a position criticized by the United States Court of Federal Claims in *Klamath Irrigation District v. United States* (Slip Op. 01-591-August 31, 2005). "Flaws similar to those found in the 1950 opinion are exhibited in the position the Oregon Attorney General has taken in the Adjudication." -citing the brief filed for the Department in this case. While not binding in these proceedings, the Court of Claims' opinion granting partial Summary Judgment to the United States is of more than passing interest.

[31] Two groups of property owners/contestants who are represented by a single attorney as successors to the so-called "Nicholson Group."

Or Laws 1905 Ch 288, §2.

The operative phrase here is "shall file final plans of the proposed works in the office of the State Engineer for his information." This provision is peculiar in several ways. It is noteworthy that the phrase "water required in connection with such plans" is not treated as synonymous with "said waters described in *such* notice." Thus the water required by the plans is a subset of the water appropriated under the notice, and does not define the amount of the entire appropriation. Also, if complete plans for the project were required to be submitted, one would expect the phrase to read "*the* final plans." Here, by simply requiring the filing of "final plans" the statute appears to require the filing of at least *some* final plans, but apparently not *all* of them.

Moreover, those plans are to be filed with the State Engineer *for his information.* The statute does not provide that the State Engineer will actually do anything with the plans, not review them for sufficiency, not post them for the information of the public, not even announce to the public that they had been filed and that this step in the process of appropriation has been completed. Indeed, the statute does not provide any standard by which the State Engineer could judge if the plans were sufficient to complete the appropriation, if that was what was intended.

The only legal significance of the plans that is clearly specified in the statute is decidedly not what would be expected if the contestants' construction of the statute were correct. The statute does not specify that the appropriation is limited to the water required by the plans as filed or that increases in the amount of the appropriation are cut off at the end of three years. Nor does it, as one might expect, make provision for amendment of the plan to account for unforeseen circumstances encountered in the course of construction. Instead, the statute requires that with respect to any water "required in connection with such plans" an adverse claim can only be acquired, (that is a portion of the appropriation can only be transferred) by a written release signed by an officer of the United States and filed with the State Engineer. The only meaning that can be drawn from such a provision is that any part of the total appropriation that is described in final plans filed within three years of the notice of appropriation has a different degree of protection from adverse claims, requiring a formality different from that required for the transfer of any other part of the appropriation that, for one reason or another, is not described in the initial plan.

To the extent that the plans filed with the State Engineer on May 6, 1908 do not describe the Project as it now exists, a transfer of a portion of the water appropriated by the project but not described in the plans does not require a written release by an officer of the United States to be filed with the State Engineer. This is the only legal effect of the filing of the plans that is expressly stated in the statute itself, aside from their role in the steps needed to perfect the appropriation. However, this does not limit the ability of the United States to appropriate water not required for the plans filed with the State Engineer. It merely reduces the level of formality required to transfer the water right.

The Attorney General's opinion of 1950 concluded that "it is only reasonable to assume that the purpose of filing plans and authorizing construction of such projects was to afford the state engineer an opportunity to determine the specific amount of water that was withdrawn from appropriation and whether or not it may be beneficially applied." Again, in 1950 the Attorney

General was applying principles of statutory construction that are not permissible today. The statute does not instruct, or even authorize, the State Engineer to review the plans submitted to determine the amount of water withdrawn or whether it may be beneficially applied. Nor does it authorize the State Engineer to take any action whatever with respect to the filings, other than store them. It is at least as likely that the legislature intended to avoid encumbrance of water rights by federal notices of appropriation that were never actually developed, and therefore required at least a minimum filing of plans, and an authorization to begin construction, to provide some assurance that the United States would follow through on construction. I conclude that the United States satisfied the second requirement of Or Laws 1905 Ch 228 §2.

On May 8, 1909 a certification was filed with the State Engineer, advising that the Secretary of the Interior had authorized the project. In fact, that order of the Secretary of Interior was dated May 15, 1905 (Ex. 10001 at 9), before the notice was even filed, and authorized commitment of $1 million of currently available funds, plus an additional $4.4 million as it became available, for the development of the project. Thus, the requirements for vesting of the appropriation for the Klamath Project in the United States, according to the terms stated in the Notice of May 17, 1905 were met. The United States is the present owner of the water right appropriated through that Notice.

While the appropriation of the United States under the Notice of May 19, 1905 was not, strictly speaking, limited to the amount that could be put to beneficial use, the United States has since quantified the amount of the claim, and it has not been credibly contested that, except for the so-called "inchoate claims" that will be discussed later, the water is being distributed under contracts through the Water Districts, for beneficial use. Consequently, the appropriation of the United States under claim 293 is for the total amount of water that has not previously been appropriated under a currently existing water right, that is put to beneficial use through the Klamath Project, less such water as may be put to a different use by the United States, as described further herein. Claim 294 is for the storage of that water, and derives from the same authority. Both claims 293 and 294 should be allowed.

**CLAIMS 312 AND 317**

These claims were filed by the United States for the irrigation of the Lower Klamath Lake National Wildlife Refuge and the Tule Lake National Wildlife Refuge, and are based on the same water as was appropriated under the Notice of May 19, 1905 that is the basis for claims 293 and 294. As the United States put it, "The quantity of water claimed in claim nos. 293 and 294 includes the quantity of water that serves the place of use in claim nos. 312 and 317. While the claims overlap to a certain extent, the total claims appropriation is not additive." These claims are based upon the practice of the claimant of arranging for agriculture to be conducted within the refuge, either through annual leases or other cooperative arrangements that produce crops within the refuge, in part to provide shelter, habitat and food for migrating waterfowl.

These claims overlap claims 293 and 294, and, although expressed differently, are for the same use, irrigation. Claims 312 and 317 differ from 293 and 294 primarily in that 293 and 294 claim water supplied by the Project, but applied to land that may, or may not be, owned by the United States, whereas claims 312 and 317 are limited to application of water to land within the

refuges, which are owned by the United States.

It is decidedly awkward from an administrative point of view to have several claims to the same water, with the same priority, by the same claimant, and with partially overlapping places of use. The United States should either withdraw claims 312 and 317, or reduce claims 293 and 294 by the amount of claims 312 and 317. If the United States does not make this election, claims 312 and 317 should be denied, as duplicative of claims 293 and 294.

**CLAIMS 295 THROUGH 299**

These claims are based upon the acquisition by the United States of the works and water rights held by a number of irrigation companies that existed prior to the commencement of the Project. Claims 295 and 296 are based on the rights acquired by the United States from the Klamath Falls Irrigating Company. Claim 297 is based in the rights acquired by the United States from the Little Klamath Water Ditch Company. Claim 298 is based on the rights acquired by the United States from the Van Brimmer Ditch Company. Claim 299 is based on the rights acquired by the United States from the Klamath Canal Company. With the exception of Claim 298, the agreements under which the United States acquired the property and rights of the ditch companies conveyed the appropriations held by the companies. The United States is the proper holder of these rights, which should be allowed.

At the time these acquisitions occurred, Oregon law contemplated the development of water systems by persons other than the owners of the land upon which it was intended to be applied, and, as between the two, assigned the water right to the owner of the system.

> The use of the waters of the lakes and the running streams of the State of Oregon, for general rental, sale or distribution, for purposes of irrigation, and supplying water for household and domestic consumption, and watering livestock upon dry lands of the state, is a public use, and the right to collect rates or compensation for such use, of said water is a franchise. A use shall be deemed general within the purview of this act when the water appropriated shall be supplied to all persons whose lands lie adjacent to or within reach of the line of the ditch or canal or flume in which said water is conveyed, without discrimination other than priority of contract, upon payment of charges therefor as long as there may be water to supply; * * *.

Oregon Code 1930, § 47-1001 (enacted in 1891 as § 6525 L.O.L; *See In re Water Rights of Hood River,* 114 Or 112, 126 (1924).)

> It was the plan of the water law of 1891, and runs all through the cases, that an appropriation may be made by one person for the future use of another; and for the future use upon lands

> which the appropriator does not then own, or which he does not contemplate owning and which he never does own.

*In re Waters of the Deschutes River*, 134 Or 623 (1930).

Thus, to the extent the United States acquired the water rights of the entities when it purchased their works, the United States may lawfully continue to hold those rights separately from the land on which the water is applied. In all cases except the Van Brimmer Ditch Company, the water right was transferred with the works, and is now held by the United States.

As stated in the Findings of Fact, the Van Brimmer Ditch Company, the claimant under claims 321-6 and 7, held a water right to 50 cfs from Lower Klamath Lake.[32] When the company entered into an agreement with the United States, it transferred its riparian rights to the United States, but the company did not convey or release this water right to the United States. Instead, it arranged for the United States to deliver the water from a different diversion point, since the United States, by lowering the level of Lower Klamath Lake, would render the company's diversion works useless. The United States characterizes this agreement as exchanging the water right for a contractual right to the delivery of water by the United States. However, in this particular case, the agreement cannot be interpreted to this effect for two reasons.

First, the agreement is explicit in granting to the United States the company's "riparian" [actually "ripartian"] rights, not appropriative water rights. Riparian rights exist by virtue of the location of land adjacent to a body of water. *Caviness v. La Grande Irr. Co.,* 60 Or 410 (1911). A person cannot hold riparian and appropriative water rights at the same time. *Little Walla Irr. Union v. Finis. Irr. Co.* 62 Or 348 (1912). Indeed, that appropriative and riparian rights are distinct was recognized by the United States in the so-called "riparian waivers" quoted in the Findings of Fact, where a waiver of riparian rights was described separately from the portion of the agreement conveying the water rights of the users.

The water right asserted in the contract is for 50 cfs and is not characterized as a "riparian" right. Thus, the waiver of any riparian rights did not transfer the appropriative rights of the Van Brimmer Ditch Company. It is clear that the parties contemplated that the United States would be lowering the level of Lower Klamath Lake and, by so doing, would render the then-existing diversion-point for the Van Brimmer Ditch Company useless. The agreement contains a waiver of all claims by the Van Brimmer Ditch Company against the United States for damages from the lowering of the lake. The agreement simply does not contain any language that could be construed as a conveyance of this appropriative right to the United States. If the right did not continue to be held by the Van Brimmer Ditch Company, it was extinguished by the operations of the project, rather than being transferred to the United States.

Accordingly, Claim 298 should not be allowed, as the United States did not acquire the right of the Van Brimmer Ditch Co.

---

[32] It is of interest that the United States, while claiming this right to itself in Claim 228, simultaneously denied that it recognized the existence of this right by the terms of the contract. The United States cannot be heard to assert two contrary positions at the same time. .

Claims 295 and 296 are derived from the rights acquired, along with the works, from the Klamath Falls Irrigating Company. These appropriations were made in stages, so that a small amount of the water (1 cfs) has a priority of February 14, 1878, a much larger portion (500 cfs) has a priority of March 21, 1884, and a final portion (again of 500 cfs) has a priority of May 12, 1891.

Claim 297 is derived from the rights acquired, along with the works, of the Little Klamath Water Ditch Company. It is for 80 cfs, and has a priority of 1885.

Claim 299 is derived from the rights acquired, along with the works, of the Klamath Canal Company.[33] Prior to its acquisition by the United States, the company had appropriated 2,500 cfs with a priority of November 30, 1903, and of 3,750 cfs with a priority of June 6, 1904.

As noted above, the United States may lawfully hold the water rights described in claims 295, 296, 297, and 299, because it, like its predecessors in interest, delivers water to the land of others, as described in the statutes existing at the time of the transfers.

**CLAIM 321 (except 321-6 and 7), 322, 323 and 324**

The claims of the KPWU flow from the appropriations made or acquired by the United States. Essentially, these claims assert that because beneficial use is the *sine qua non* of a water appropriation in Oregon, and because the water users within the various districts are the persons and entities that actually put the water to beneficial use, those users are the actual owners of the water right. It is also argued that the agreements whereby the United States promised to provide water to these users through the districts give rise to a water right in the users that should be recognized in this adjudication. Both of these assertions are incorrect.

Claim 321 is a claim for diversion. It has been divided among the various districts and entities having a direct agreement with the United States. With the exception of claim 321-6 and 321-7, by Van Brimmer Ditch Company, these claims are not derived from any appropriation by the claimants, but are based entirely upon the beneficial use of the water previously appropriated or acquired by the United States. It includes both water appropriated by the United States under Chapter 228 by the Notice of May 19, 1905, and water rights appropriated before 1905 by individual landowners through natural irrigation.[34]

[33] In this connection, it is interesting to compare the agreement whereby the United States acquired the Klamath Canal Company assets, which recited in detail the specific appropriations conveyed, "also any other water rights, filings and appropriations***owned by, assigned to, or held in trust for [grantors]" and also included a transfer of riparian rights, with the agreement between the United States and the Van Brimmer Ditch Company, discussed above, in which none of the language of conveyance contained in the Klamath Canal Company agreement is found.

[34] "Natural Irrigation" is best described as irrigation through natural overflow of the banks of a watercourse during times of flood. As the water level in the river fell, and waters receded, water would remain in the soil, where it would nourish grasses that were later harvested by the farmers. As the Oregon Supreme Court stated in *Warner Valley Stock Company v. Lynch*, 215 Or 523 (1959):

> "It should be emphasized that the objectors whose lands are irrigated by the waters from Hart Lake have acquired a vested right in waters of Warner Valley. **** The fact that they no longer have the privilege of a natural overflow method of diversion does not

While the United States has steadfastly opposed recognition of the concept of natural irrigation as the basis for a water right, the Water Resources Department and the Administrative Law Judges who have ruled on the subject in this adjudication have just as firmly concluded that a water appropriation may be based on natural irrigation. (*see e.g.* Order on Motion for Ruling on Legal Issues, Case 124, 125, and 127.) Where the claim is based on natural overflow, the appropriation may be established by evidence that the "proprietor of the land accepts the gift made by nature and garners the produce of the irrigation by harvesting or utilizing the crops grown on the land***." *In re Waters of Silvies River*, 115 Or 27, 66 (1925).

Although a water right can be established by natural overflow, this does not mean that KPWU acquired that right. To the contrary, all such rights were conveyed to the United States by the so-called Riparian Waivers given by water users in return for a supply of water from the Project.

Those waivers contained the following language:

> [T]he parties of the first part [the water users] do hereby remise, release and forever quitclaim unto the party of the second part, [The United States] all right, title and interest of the parties of the first part, of whatever nature, in and to the water of [variously Lake Ewauna, Little Klamath Lake, Lower Klamath Lake, Miller Lake, Klamath River, Link River, and/or Lost River] bordering on the above-described lands***.

The parties clearly intended to convey more than the riparian rights, as they are waived by a separate clause in the contract. The fact that the rights conveyed were to the water of various sources "bordering on the above-described lands" is understandable, if the right existed because the river or other source of water overflowed its banks onto the property. This conveyance effectively conveyed to the United States all water rights the water user might have had based on natural overflow of the adjoining water source.

Since, as discussed above, the United States is the proper holder of rights it appropriated or acquired, if the appropriations by natural overflow are held by anyone, they are held by the United States, not KPWU or its members. The United States has not included them in its claim. Consequently, at the conclusion of this adjudication, they will be, if they have not already been, extinguished.

Claim 322 is a claim of right to storage of water in various lakes and reservoirs within the Project. Claim 323 is a claim to right of use of that stored water. Claim 324 is separately filed by Tulelake Irrigation District as a claim for storage of water in Tule Sump. These claims, and those of the United States, are mutually exclusive.

---

mean that their right to the waters in Warner Valley exists only if the water in fact overflows Hart Lake."

As has been discussed above, the United States is the proper holder of the water rights subject to these claims. It remains to be determined whether these claimants may hold some portion of the water rights in question that can be recognized in this adjudication.

As noted above, at least as to the appropriation of water by the United State through the notice filed May 19, 1905, beneficial use of the water was not specified by the statute to be a necessary element of ownership. To the contrary, the water described in the notice was "deemed appropriated" upon the completion of the three requirements specified in the statute. Those requirements having been met, the appropriation vested in 1909 with a priority date of May 19, 1905, without the requirement under state law that the water be put to beneficial use.

The same is not true of the rights acquired by the United States from others, who had already appropriated water under the general laws applicable to appropriation of water prior to 1909. Respecting those rights, beneficial use is a necessary element of the appropriation. *In re Waters of Silvies River,* 115 Or 27 (1925). The United States is, nonetheless, the proper holder of those rights.

The purpose of this adjudication is to determine the persons or entities which will be issued water right certificates by the Water Resources Department. Those certificates are described in ORS 539.140 as follows:

> **Water right certificates.** Upon the final determination of the rights to the waters of any stream, the Water Resources Department shall issue to each person represented in the determination a certificate setting forth the name and post-office address of the owner of the right; the priority of the date, extent and purpose of the right, and if the water is for irrigation purposes, a description of the legal subdivisions of land to which the water is appurtenant. The original certificate shall be mailed to the owner and a record of the certificate maintained in the Water Resources Department.

In other words, the result of this adjudication will be a document which states the name and address of the holder of the right, the priority of the right relative to other rights in the Klamath Basin, the extent (*i.e.*, the rate and duty) of the right, the purpose for which the water is appropriated, and, if the right is a diversion for irrigation, the place of use.

Once that certificate has been issued, water use on the body of water subject to the certificate is under the regulation of the Watermaster. The Watermaster is required to take action to prevent waste or unlawful use of the water, OAR 690-250-0050, and, in times of shortage, to regulate the use of the water "in accordance with the relative rights *** of the appropriators." OAR 690-250-0100(2). The Watermaster is, however, authorized to disregard the call of a senior appropriator on a junior appropriator if it is determined that if water is denied to the junior appropriator according to the call, it will not reach the senior appropriator in any event. OAR 690-250-0020(1).

Ultimately, then, this adjudication is intended to establish the relative rights of the holders of water rights in the Klamath Basin, so that the Watermaster may regulate the use of water according to the relative rights of the holders of certificates. In other words, it is intended to identify the person or entity who, in the event of unlawful use or water shortage, has the right to make a call on junior water users, and have that call enforced by the Watermaster. While, as the Department has noted, it is possible for more than one person to have an interest in the same water right, this does not mean that all the rights and interest that might be held must be stated in the water right certificate.

With the exception of the Van Brimmer Ditch Company, as noted, all of the entity-members of KPWU base their entire claims on the beneficial use of the water by the ultimate users. While, except as discussed above, the existence of a water right is dependent on the beneficial use of the water, this does not require the beneficial users of the water to be named on the water right certificate.

This is not to say that the water users do not have any rights in the water. Even the United States recognizes that the water users have a beneficial right to the water.[35] However, those rights arise from the agreements between the United States and the Districts, or in some cases the individual users, and those agreements are not regulated by the Water Resources Department. *See* ORS 540.045.

Rather, whatever rights they acquired through their agreements with the United States would have to be enforced in court through litigation. Moreover, it would be impossible to identify the incidents of all the rights. They are rights that are conditional upon payment of annual fees, for the most part through the districts, and are therefore subject to change. This is especially true of the rights claimed by lessees in the refuges which, being under annual leases subject to limited renewal, change from year to year and field to field. Although it would be possible, perhaps, to identify, in "snap-shot" fashion, the various interests of the users on a single date, perhaps the date the claims were filed, this would be a futile enterprise, as in the intervening years many of those interests would have changed.

For these reasons, the claims by water users based upon beneficial use of water supplied by the United States through appropriations of water should not be allowed as rights recognized in this adjudication. To the extent they are enforceable, the holders of those rights have recourse, under contract law, in the courts.

Claims 321-6 and 7 should be allowed. The remainder of Claim 321, and claims 322, 323 and 324 in their entirety should not be allowed.

[35] "The United States does not dispute that the contracts create substantive rights in the contract holders, such as the Klamath Project Water Users. Even where the United States has been decreed water rights for a Reclamation project, it is not free to treat those rights 'like so many bushels of wheat, to be bartered, sold or shifted about as the Government might see fit.'" United States' Closing Brief as Claimant at 83.

**INCHOATE CLAIMS**

The United States, as well as other parties, have claimed a so-called "inchoate" water right, based upon the potential for beneficial use of water in places where it has not yet been applied. The property to which the right is said to attach has been described as the land now occupied by other uses, such as buildings and roads, that are now incompatible with irrigation of the land, but could at some time in the future, be removed and the land placed in production.

The evidence presented at hearing does not establish that any of the parties actually intend to develop any of the land in question for agriculture. Indeed, the witnesses had a great deal of difficulty in identifying precisely what land was included within the classification "inchoate."

One of the necessary components of any water right is "intent." Which is to say, at the time the appropriation is commenced, the appropriator must have a present intent to develop the water right upon lands in the contemplation of the appropriator. *In re Waters of Silvies River, id.* at 64, 65.

In the claims of the United States, this intent was stated in the Notice of May 19, 1905. However, that intent must continue to be operative throughout the development of the appropriation. *Nevada Ditch Co. v. Bennett*, 30 Or 59, 89 (1896). Given the testimony of Cecil Lesley, the United States' witness, this is not the case. There is no present intent, and has not been for some time, to place any of the inchoate lands under cultivation, and to irrigate them.

The claims of the other parties have even less merit, because they do not even have the clear statement of intent that was provided by the United States. Instead, the idea of a claim for inchoate lands seems to be of such recent formulation that the lands in question could not even be identified, much less considered as subject to a change of use.

Given the state of the evidence, any claim for a water right to be used on inchoate lands should not be allowed.

**WARREN ACT CLAIMS**

Claims 211, 285, 289, 290, 291 and 292 asserted claims based upon so-called "Warren Act" contracts. Warren Act contracts were entered into based upon 43 USC §523-525, whereby the United States promised to deliver water to the contractors in return for a payment and annual fees. There is nothing in these contracts that specifies that the United States is transferring any rights to the water user, and, indeed, the contract itself recites that "the contractor proposes to irrigate***acres of land, hereinafter described, by utilizing *Klamath Project water rights****." (*Emphasis added.*) It is apparent that these claims are based upon the same assumption as the claims of Klamath Project Water Users, that the beneficial user is the proper holder of a water right in the Klamath Project. As discussed above, beneficial use is not, of itself, a proper basis for assigning ownership in a water right in the Klamath Basin. These claims should not be allowed.

**CLAIM 194**

Claim 194 is based upon an appropriation through natural irrigation that was not conveyed to the United States. The evidence presented may be fairly summarized as follows:

A Swamp Act deed was granted by the State of Oregon to John Gleim on August 30, 1882, that included 52.4 acres of the present claim (lots 8 and 9 of Section 8, and lot 9 of Section 17, Township 39S, Range 9E, Willamette Meridian). In order to obtain this deed the grantee was required to prove to the State Lands Commission that he had reclaimed the property. This was done in this case, as evidenced by the minutes of the Commission. As to the 52.4 acres noted, claim 194 should be allowed.

The remainder of this claim, however, is not proven. In this connection it is to be noted that much of the evidence cited by claimant for the proposition that the land was originally irrigated by natural overflow was never made a part of the record in this case, but was admitted in another case entirely. That evidence, having been offered, if at all, after the record closed in this case, cannot be considered in deciding the question presented here. The main evidence claimants presented, that could be considered, was of beneficial use *of the property*. Claimant showed that various crops were grown on the property from time to time. Claimant did not show, however, the location upon the property of those crops, or the connection between the presence of those crops and the diversion (or other use) of water on the property. Without that connection, the claim as to the remaining acres is unproven. Claim 194 should be allowed as to 52.4 acres contained in lots 8 and 9 of Section 8, and lot 9 of section 17. The remainder of the claim should not be allowed.

**OTHER CONSOLIDATED CLAIMS**

Claims 142, 143, 144, 186, 205 and 286 were consolidated in these proceedings for a determination of whether the United States was the proper holder of the water right to the water in the Klamath Project. That issue having been resolved, the decision that the United States is the proper holder is the "law of the case" for those claims. Those claims will therefore be severed from Case 003, and proceed to hearing.

**LOST RIVER STIPULATION**

On April 7, 2004, I signed an Order on Motion to Clarify Scope of Proceedings. The Proposed Order in this case will incorporate the language as specified in that Order.

**ORDER**

Claim 194 is allowed in part.

Claims 293 through 297, and 299 are allowed.

Claims 312 and 317 are allowed to the extent they do not overlap claims 293 and 294.

Claim 321-6 and 7 are allowed.

All other claims are not allowed.

The claimants of the allowed claims shall prepare, file with the Office of Administrative Hearings, and serve upon all other participants a statement of the points of diversion, places of use, rate and duty for the allowed claims not later than February 13, 2006. Other participants may submit objections to specific terms stated not later than February 28, 2006. Responses to the objections, if any, will be filed no later than March 15, 2006.

*/s/ Maurice L. Russell, II*
Maurice L. Russell, II, Administrative Law Judge
Office of Administrative Hearings

DATED January 12, 2006.

---

[i] The following issues have been resolved by stipulation and will not be further addressed in this order. In order to avoid confusion the numbers assigned to the remaining issues in the Hearing Notice have been retained, as the parties referred to the issues by those numbers in their briefs.

1. Whether the Bureau of Reclamation (BOR) provided sufficient information to prove its rights to the diversion rate or the diversion amount. (What is the proper legal measure for quantifying the BOR's claims and did the BOR satisfy this measure by providing sufficient information to prove its rights to the diversion rate or the diversion amount? For the storage amount?-Tribes) *Resolved by Stipulation.*

2. Whether the evaluation of the BOR's entitlement should take into account the re-use of water by the BOR. *Resolved by Stipulation.*

3. Whether the claim should be denied because the claims are vague and ambiguous. (*Whether "historic use' is a proper basis for the claims.-US)* (Has the BOR provided sufficient information to allow a determination of whether the claim includes acceptable water loss incident to the storage and transportation of the water? –Tribes) *Resolved by Stipulation*

Rate and Duty

5. Whether the BOR duty should be limited to the amounts specified in the contracts with water contractors. *Resolved bu Stipulation.*

6. Whether the BOR rate and duty should be based on the maximum amount diverted historically, or based on the actual use, crop water need, efficiency of use, avoidance of waste and reasonableness of use. *Resolved by Stipulation*

Season of Use

7. What is the correct season of use? (Is the season limited by provisions in contracts between the BOR and contract holders" Has the BOR provided sufficient information to justify its requested season of use?-Tribes.) *Resolved by Stipulation*

Lost River Basin

11. Whether the WRD must adjudicate both the Klamath and Lost rivers basins in the same proceeding in order for the adjudication to be a comprehensive water rights proceeding as provided for in the MacCarren Amendment. (Can the current proceedings determine the BOR's need for, and thus BOR's right to, Klamath River water without knowing how much of that need can be met by Lost River water? If not, to what extent should Lost River water, or lands irrigable by Lost River water, be incorporated into the present proceedings?-Tribes) *Resolved by*

*Stipulation*

12. Whether the BOR has claimed sources including storage reservoirs within the Lost River Basin and if so, whether that is appropriate. *Resolved by Stipulation*

Scope of Original Project

13. Whether the US intended to, or did in fact, appropriate water in 1905 for refuge waterfowl management purposes. *(Whether the claims filed for the Klamath Project properly included claims to water used on the National Wildlife Refuges.-US) Resolved by Stipulation*

14. Whether the US failed to provide sufficient information to demonstrate that all of the water claimed was entitled to a 1905 priority date, and in particular that the original project included lands which could not be irrigated using the technology available in 1905 (gravity feed). *(Whether the claims filed for the Klamath Project properly included claims to water used on the National Wildlife Refuges.-US) Resolved by Stipulation*

15. Whether the US is entitled to a 1905 priority date for lands put to use under Warren Act contracts. *(Whether the claims filed for the Klamath Project properly included claims to water used on the National Wildlife Refuges.-US) Resolved by Stipulation*

16. Whether the claim seeks approval of a right to store water from Tule Lake and to pump water from the Lost River using pumps located in California. *(Whether diversion and storage of water in California is properly before the Oregon Water Resources Department in this proceeding.-US)* (Does the claim seek rights to the storage of water in and withdrawal of water from sources originating or located in California (for example Clear Lake, the Lost River and Tule Lake) and, if so, does Oregon have jurisdiction to adjudicate, administer, and enforce such rights?-Tribes.) *Resolved by Stipulation*

18. Whether the BOR failed to file final plans with the State Engineer for the works constructed within 3 years of the notice of appropriation as required by section 2 Chapter 228, by failing to file plans with respect to a number of distribution works identified in claim 293 and by filing plans with respect to distribution works which differ in material respects from the distribution works eventually constructed. *Resolved by Stipulation*

22. Whether the BOR season and duty should be limited by the amounts or the dates specified in the contracts with water contractors. *(Whether the claimed points of diversion, place of use, rate, duty and season of use are appropriate.-US) Resolved by Stipulation*

25. Whether the BOR has made claims for instream uses and if so is this permitted under the Reclamation Act of 1905. *(Whether the water appropriated by the United States for the Klamath Project may only be used for irrigation.-US) Resolved by Stipulation*

28. Whether some lands are irrigated for Refuge Act purposes and others for Reclamation Act Purposes. <u>Are some Refuge lands irrigated for production of agricultural crops that are necessary for proper wildlife management and, if so, which lands and how much water are involved?-Tribes.)</u> *(Whether the water appropriated by the United States for the Klamath Project may only be used for irrigation.-US) Resolved by Stipulation*

<u>Abandonment and Forfeiture</u>

30. Whether the BOR has abandoned or forfeited the claimed water. *Resolved by Stipulation*

<u>Limitations on Right</u>

31. Whether the water right recognized in this proceeding must incorporate other legal duties of the BOR including the obligations to senior water rights and federally recognized tribes. *Resolved by Stipulation*

*As Stated by Langell Valley, Horsefly, Medford and Rogue River Valley Irrigation Districts (to the extent these entities remain parties in this case).*

41. Whether the claimants have adequately proved their claims. *Resolved by Stipulation*

42. Whether the United States Fish and Wildlife Service may assert claims to water delivered through Klamath Project facilities to federal wildlife refuges adjacent to irrigate farm lands within the Klamath Project. *Resolved by Stipulation*

43. Whether the United States Fish and Wildlife Service may adjudicate "irrigation" water for the Tule Lake National Wildlife Refuge and Lower Klamath National Wildlife Refuge by nature of appropriations initiated by the Bureau of Reclamation for the Klamath Project. *Resolved by Stipulation*

44. Whether the Fish and Wildlife Service has taken the steps necessary to appropriate water for wildlife uses or agricultural uses in the Refuges. *Resolved by Stipulation*

45. Whether use of water to maintain naturally occurring aquatic and riparian vegetation constitutes an "irrigation" use or whether it constitutes an instream flow use under Oregon law. *Resolved by Stipulation*

46. What is the appropriate season of use? *Resolved by Stipulation*

47. What is the appropriate priority date for the claimed rights? *Resolved by Stipulation*

48. If the United States fish and Wildlife Service is entitled to prosecute a claim for "irrigation" water delivered to the national wildlife refuges through the Klamath Project facilities, what is the proper rate and duty of water for this purpose? *Resolved by Stipulation*

49. What is the maximum amount of water the United States Fish and Wildlife Service may claim for refuge purposes? *Resolved by Stipulation*

50. Whether the United States Fish and Wildlife Service claims are subject to dismissal because they were amended after initial submission and because additional supporting information was submitted after the beginning of the open inspection period. *Resolved by Stipulation*