IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 01-591 L |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Francis M. Allegra |
| Defendant, | ) | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**

Defendant United States hereby moves for summary judgment as to Plaintiffs' contract claims under RCFC 56.

Plaintiffs allege that the United States breached its contracts with them when the Bureau of Reclamation ("BOR") revised is operation plan for the Klamath Project in 2001 in order to comply with the Endangered Species Act ("ESA"). Second Amended Compl. ¶¶ 24-29 (Operative Facts) and 43-48 (Third Claim for Relief) (Doc. 210). Specifically, Plaintiffs allege that actions taken by BOR in response to the ESA led to reduced deliveries of irrigation water from the Klamath Project. Id. Plaintiffs allege that this was a failure to deliver "the quantities of water required by their written contracts[,]" constituting a breach of those contracts. Id., ¶ 47.

Accepting Plaintiffs' factual allegations as correct for the purposes of this motion, this case presents the question of whether actions allegedly taken by Defendant pursuant to the ESA resulted in a breach of the subject contracts. In accordance with the Court's Order of December

20, 2005, Defendant's present motion is further limited to the application "of the sovereign acts and/or unmistakability doctrines[.]" Order, Dec. 20, 2005 (Doc. 257); see also Klamath v. United States, 69 Fed. Cl. 160, 163 (Dec. 20, 2005) (Doc. 256) (defining the next question to be addressed via summary judgment as "whether plaintiffs' contract claims are legally cognizable in the face of the sovereign acts or unmistakability doctrines, that is, whether under those doctrines, the actions taken pursuant to the Endangered Species Act here did not give rise to breaches.").

As set forth in the supporting memorandum filed with this motion for summary judgment, the enactment and enforcement of the ESA is a general and public act of the government that falls squarely within the sovereign acts doctrine. Further, the contracts in question do not contain an unambiguous waiver of the government's sovereign authority to enact and enforce legislation such as the ESA. Accordingly, the contracts do not unmistakably confer a contract right to be immune from subsequent changes in the law, such as the ESA, even when the application of that general and public law affects the availability of water from this particular federal Reclamation Project. Consequently, both the sovereign acts doctrine and the unmistakability doctrine apply and preclude a determination that the United States breached the subject Klamath Project contracts as a result of compliance with the ESA. Defendant's motion for summary judgment as to Plaintiffs' contract claims should therefore be granted.

Dated: February 17, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

s/ Kristine S. Tardiff
KRISTINE S. TARDIFF
Attorney of Record for the Defendant
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583
Fax: (603) 225-1577

STEPHEN M. MACFARLANE
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, CA 95814-232
Tel: (916) 930-2204
Fax: (916) 930-2210

REGINALD T. BLADES, JR.
United States Department of Justice
Civil Division
Commercial Litigation Branch
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-7300
Fax: (202) 307-0972

OF COUNSEL:

STEPHEN PALMER
U.S. Department of the Interior
Office of the Regional Solicitor
Sacramento, CA

MEGAN WALLINE
U.S. Department of the Interior
Office of the Solicitor
Washington, D.C.

CHRISTOPHER KEIFER
U.S. Department of Commerce
NOAA – Office of General Counsel
Long Beach, CA

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 01-591 L |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Francis M. Allegra |
| Defendant, | ) | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

KRISTINE S. TARDIFF
Attorney of Record for Defendant
United States Department of Justice
Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583/Fax: (603) 225-1577

STEPHEN M. MACFARLANE
United States Department of Justice
Environment & Natural Resources Division
501 I Street, Suite 9-700
Sacramento, CA 95814-232
Tel: (916) 930-2204/Fax: (916) 930-2210

REGINALD T. BLADES, JR.
United States Department of Justice
Civil Division, Commercial Litigation Branch
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-7300/Fax: (202) 307-0972

OF COUNSEL:

STEPHEN PALMER
U.S. Department of the Interior
Office of the Regional Solicitor
Sacramento, CA

MEGAN WALLINE
U.S. Department of the Interior
Office of the Solicitor
Washington, D.C.

CHRISTOPHER KEIFER
U.S. Department of Commerce
NOAA – Office of General Counsel
Long Beach, CA

Dated: February 17, 2006

**TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 1

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. The Klamath Project Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. Operation of the Klamath Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

C. The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

D. The Application of the ESA to Klamath Project Operations . . . . . . . . . . . . . . . . 13

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. The Sovereign Acts Doctrine Provides a Complete Defense to Plaintiffs' Contract Claims Because the Enactment and Enforcement of the ESA is a Public and General Act of the United States as Sovereign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1. The Sovereign Acts Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2. The Enactment and Subsequent Enforcement of the ESA . . . . . . . . . . . 22

3. The ESA is a "Public and General" Act That Falls Squarely Within the Sovereign Acts Doctrine . . . . . . . . . . . . . . . . . . . . . 24

B. The Contracts Are Subject to the ESA Under the Unmistakability Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES

### CASES

Allegre Villa v. United States,
60 Fed. Cl. 11 (2004) . . . . . . . . . . 20

Amber Resources Co. v. United States,
68 Fed. Cl. 535 (2005) . . . . . . . . . . 26

Maricopa-Stanfield Irrig. and Drainage Dist. v. United States,
158 F.3d 428 (9th Cir. 1998), cert. denied, 526 U.S. 1130 (1999). . . . . . . . . . 27

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
515 U.S. 687 (1995) . . . . . . . . . . 10, 23

Bennett v. Spear,
520 U.S. 154 (1997) . . . . . . . . . . 11, 12, 14

Bowen v. Pub. Agencies Opposed to Social Security Entrapment,
477 U.S. 41 (1986) . . . . . . . . . . 18

Carabetta Enterprises, Inc. v. United States,
58 Fed. Cl. 563 (2003) . . . . . . . . . . 21

Catron County Bd. of Commrs. v. FWS,
75 F.3d 1429 (10th Cir. 1996) . . . . . . . . . . 24

Centex Corp. v. United States,
395 F.3d 1283 (Fed. Cir. 2005) . . . . . . . . . . 19

Cuyahoga Metr. Housing Authority v. United States,
57 Fed. Cl. 751 (2003) . . . . . . . . . . 19, 20, 21

Defenders of Wildlife v. Environmental Protection Agency,
420 F.3d 946 (9th Cir. 2005) . . . . . . . . . . 23

Deming v. United States,
1 Ct. Cl. 190 (1865) . . . . . . . . . . 20

First Nationwide Bank v. United States,
431 F.3d 1342 (Fed. Cir. 2005) . . . . . . . . . . 19

Franconia Assocs. v. United States,
61 Fed. Cl. 718 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Jones v. United States,
1 Ct. Cl. 383 (1865) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Kandra v. United States,
145 F. Supp. 2d 1192 (D. Or. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13-16, 25

Klamath Irrig. Dist. v. United States,
67 Fed. Cl. 504 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Klamath Irrig. Dist. v. United States,
69 Fed. Cl. 160 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Klamath Water Users Protective Ass'n v. Patterson,
204 F.3d 1206 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13, 17, 25, 28

Langell Valley Irrig. Dist. v. Babbitt,
No. 00-6265-HO (D. Or. Aug. 31, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26, 28

Northwest Resource Info. Center, Inc. v. NMFS,
56 F.3d 1060 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

O'Neill v. United States,
50 F.3d 677 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-28

Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,
138 F. Supp. 2d 1228 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13

Pacific Coast Fed'n of Fishermen's Ass'ns v. Bureau of Reclamation,
426 F.3d 1082 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 17

Peterson v. Dept. of the Interior,
899 F.2d 799 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Rio Grande Silvery Minnow v. Keys,
333 F.3d 1109 (10th Cir. 2003), vacated on other grounds,
355 F.3d 1215 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Sun Oil v. United States,
572 F.2d 786 (Ct. Cl. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Tennessee Valley Authority v. Hill,
437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Transohio Sav. Bank v. Director, Office of Thrift Supervision,
967 F.2d 598 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Westlands Water Dist.,
134 F. Supp. 2d 1111 (E.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

United States v. Winstar,
518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 26

Western Fuels-Utah, Inc. v. Lujan,
895 F.2d 780 (D.C. Cir.), cert. denied, 498 U.S. 811 (1990) . . . . . . . . . . . . . . . . . . . . . . 26

Yankee Atomic Elec. Co. v. United States,
112 F.3d 1569 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998) . . . . . . . 19, 20, 21, 24

**STATUTES**

16 U.S.C. § 1538(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
16 U.S.C. § 1531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23
16 U.S.C. § 1532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15
16 U.S.C. § 1536(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12
16 U.S.C. § 1536(o)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. § 1539 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
16 U.S.C. §§ 1533-1544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
36 Stat. 925 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6
43 U.S.C. § 485 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
43 U.S.C. § 485h(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
43 U.S.C. § 523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**RULES**

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**REGULATIONS**

50 C.F.R. § 17.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
50 C.F.R. Part 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
50 C.F.R. § 402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
50 C.F.R. § 402.16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
50 C.F.R. § 402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

## INDEX OF EXHIBITS IN DEFENDANT'S SUPPLEMENTAL APPENDIX[1]


| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 59 | U.S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Summary of Listed Species, Species and Recovery Plans as of 2/15<br><br>Document generated from FWS website at: http://ecos.fws.gov/tess_public/TESSBoxscore (last visited on February 15, 2006) | 543 |
| 60 | U. S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Map of Listed Species by State/Territory as of January 26, 2006.<br><br>Map available on FWS website at: http://ecos.fws.gov/tess_public/servlet/gov.doi.tess_public.servlets.TESSUsmap?status=listed (last visited on January 26, 2006) | 545 |
| 61 | Klamath Project 2001 Annual Operations Plan (dated April 6, 2001) | 546 |
| 62 | Letters from Bureau of Reclamation to Van Brimmer Ditch Co., and to Klamath Drainage District, dated Sept. 2, 2000 | 551 |


[1]Defendant's Exhibit ("Def. Ex.") numbers 1 through 42 are the exhibits contained in Defendant's Appendix (dated October 3, 2003) and Supplemental Appendix (dated March 31, 2004), both of which were filed in support of its Cross-Motion for Summary Judgment on plaintiffs' takings claims. Defendant's Exhibit numbers 43 through 58 are the exhibits contained in the Appendix filed in support of Defendant's Cross-Motion for Summary Judgment on the Question of Whether the Individual Plaintiffs' Have Standing to Bring Contract Claims as Intended Third-Party Beneficiaries (dated April 26, 2004). To avoid confusion in the numbering of exhibits, the additional exhibits attached hereto begin with exhibit number 59 and appendix page number 543.

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 63 | Letters from Department of the Interior officials responding to letters received by the Department concerning the operation of the Klamath Project in 2001. from early 2001 stating that "[f]orecasts of water supplies in the Klamath basin for the 2001 water year are currently nearly half of average conditions" | 555 |
| 64 | Letter from Bureau of Reclamation to Klamath Project Water Users, dated March 2, 2001. Subject: 2001 Operation Planning Update and Notice that Klamath Project Water Not Currently Available | 561 |
| 65 | Letters from Karl E. Wirkus, Area Manager, Bureau of Reclamation, Klamath Falls, to (A) NMFS, (B) FWS and (C) Klamath Tribes, dated Nov. 22, 2000. Subject: On-going Klamath Project Operations – Draft Biological Assessment | 563 |
| 66 | Letter from BOR to NMFS, dated January 22, 2001. Subject: Request for Initiation of Formal Consultation on the Effects of Ongoing Operations (without attachments) | 572 |
| 67 | Memorandum from BOR to FWS, dated February 13, 2001. Subject: Request for Reinitiation of Formal Consultation on the Effects of Ongoing Operation of the Klamath Project | 575 |
| 68 | Biological Assessment of the Klamath Project's Continuing Operations on the SONCC coho salmon (dated Jan. 22, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 580 |

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 69 | Biological Assessment of the Klamath Project's Continuing Operations on the Endangered Lost River Sucker and Shortnose Sucker (dated Feb. 13, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 593 |
| 70 | Letter from FWS to Bureau of Reclamation, transmitting copy of Biological Opinion, dated April 5, 2001, and excerpt of the Biological Opinion<br><br>Note: a full copy of the FWS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 597 |
| 71 | Letter from NMFS to Bureau of Reclamation transmitting Biological Opinion, dated April 6, 2001, and excerpt of the Biological Opinion<br><br>Noted: a full copy of NMFS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 635 |
| 72 | U.S. Department of the Interior, News Release, "Water Allocation Decision Announced for Klamath Project," dated April 6, 2001 | 651 |
| 73 | Letter from BOR to NMFS, dated April 20, 2001. Subject: BOR's Determination Regarding the Action Addressed in the NMFS April 6, 2001 Biological Opinion | 652 |
| 74 | Department of the Interior, Office of the Secretary, News Release, "Interior Secretary to Order Water Release to Klamath Farmers," dated July 24, 2001 | 654 |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**

Pursuant to RCFC 56 and this Court's Order of December 20, 2005 (Doc. 257), Defendant United States moves for summary judgment as to Plaintiffs' contract claims. Pursuant to that Order, Defendant's motion is limited to the application "of the sovereign acts and/or unmistakability doctrines[.]" This memorandum is submitted in support of that motion.

I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs[2] allege that the United States breached its contracts with them when the Bureau of Reclamation ("BOR") revised its operation plan for the Klamath Project in 2001 in order to comply with the Endangered Species Act ("ESA"). Second Amended Compl. ¶¶ 24-29 (Operative Facts) and 43-48 (Third Claim for Relief) (Doc. 210). Specifically, Plaintiffs allege that actions taken by BOR in response to the ESA led to reduced deliveries of irrigation water from the Klamath Project. Id. Plaintiffs allege that this was a failure to deliver "the quantities of water required by their written contracts[,]" constituting a breach of those contracts. Id., ¶ 47.

Accepting Plaintiffs' factual allegations as correct for the purposes of this motion, this case presents the question of whether actions allegedly taken by Defendant pursuant to the ESA resulted in a breach of the subject contracts. In accordance with the Court's Order of December

[2]Plaintiffs in this case include thirteen irrigation, drainage, or improvement districts (the "district plaintiffs") that have contracts with the United States related to the delivery of water from the Klamath Project, and numerous individual plaintiffs who have no contract with the United States, but receive Project water from one of the district plaintiffs. Second Amended Compl., ¶¶ 1–20, 44-45 (Doc. 210); Klamath Irrig. Dist. v. United States, 67 Fed. Cl. 504, 511 (2005). The Court has ruled that the individual plaintiffs may pursue contract claims as intended third-party beneficiaries; however, the Court has explained that the individual plaintiffs' contractual rights are no greater than the rights possessed or acquired by the districts under their contracts. Klamath, 67 Fed. Cl. at 534; id. at 535 (applying the venerable maxim: "nemo dat qui non habet," or "one who does not have cannot give").

20, 2005, Defendant's present motion is further limited to the application "of the sovereign acts and/or unmistakability doctrines[.]" Order, Dec. 20, 2005 (Doc. 257); see also Klamath v. United States, 69 Fed. Cl. 160, 163 (Dec. 20, 2005) (Doc. 256) (defining the next question to be addressed via summary judgment as "whether plaintiffs' contract claims are legally cognizable in the face of the sovereign acts or unmistakability doctrines, that is, whether under those doctrines, the actions taken pursuant to the Endangered Species Act here did not give rise to breaches.").

As set forth in Section III of this memorandum, the enactment and enforcement of the ESA is a general and public act of the government that falls squarely within the sovereign acts doctrine. Further, the contracts in question do not contain an unambiguous waiver of the government's sovereign authority to enact and enforce legislation such as the ESA. Accordingly, the contracts do not unmistakably confer a contract right to be immune from subsequent changes in the law, such as the ESA, even when the application of that general and public law affects the availability of water from this particular federal Reclamation Project. Consequently, both the sovereign acts doctrine and the unmistakability doctrine apply in this case and preclude a determination that the United States breached the subject Klamath Project contracts as a result of compliance with the ESA. Defendant's motion for summary judgment as to Plaintiffs' contract claims should therefore be granted.

In accordance with the Court's Orders, Defendant's briefing is limited to the foregoing questions. If the Court finds that the sovereign acts and unmistakability doctrines do not apply, Defendant reserves the right to present its other defenses to Plaintiffs' contract claims, including the argument that the Plaintiffs did not have a contractual right to receive irrigation water from the Klamath Project under the circumstances present in 2001. A full examination of this issue

would require consideration of the nature and scope of the government's water rights because, as the Court previously recognized, the government cannot give that which it does not have.[3] Klamath, 67 Fed. Cl. at 535. This examination would necessarily include consideration of any background principles of state law that impact and perhaps limit the scope of the United States' right to use water under state law, and any water rights that are senior in priority to those of the United States for the Klamath Project, such as the water rights of the Klamath Tribes.[4] The determination of the Plaintiffs' contractual rights would also require an examination of the subject contracts. However, these questions are beyond the scope of the present motion.

## II. BACKGROUND

### A. The Klamath Project Contracts

This case involves 13 contracts between the United States, acting through the Bureau of Reclamation (BOR), and the district plaintiffs.[5] These contracts were filed as Exhibits 1 through

---

[3]The determination and scope of the government's water right has been determined preliminarily in the Klamath Basin Adjudication. The Administrative Law Judge in Case 003, concerning Klamath Project water rights, has determined that those rights are held by the United States and that the claims of the Project water users should be disallowed. Klamath Basin Adjudication, Interim Order, Case 003 (Jan. 12, 2006) (attached to Notice of Related Decision, filed by Defendant on Jan. 23, 2006, Doc. 259).

[4]A more complete discussion of the senior tribal water rights at issue in this case, and how those rights impact Klamath Project operations, is included in the prior submissions of Defendant and the tribes (as amicus curiae). See Def.'s Cross-Mot. for Summ. Judgment at 25-27 (Oct. 3, 2003) (Doc. 101); Def.'s Suppl. Brief on the Property Right Question (May 19, 2005) (Doc. 236); Amicus Curiae Memorandum of the Klamath Tribes and Yurok Tribe (Sept. 26, 2003) (Doc. 128-129); Amicus Curiae Brief of Klamath Tribes and Yurok Tribes (May 6, 2004) (Doc. 184).

[5]Certain aspects of these contracts have been addressed by the parties and the Court in connection with the resolution of Plaintiffs' takings claims and the question of whether the individual plaintiffs are intended third party beneficiaries of the subject contracts. See Klamath Irrig. Dist. v. United States, 67 Fed. Cl. 504, 531-36 (2005) (Doc. 246).

14 to Plaintiffs' First Amended Complaint (March 24, 2003) (Doc 67) (hereinafter cited to as "Compl. Ex."). The subject contracts, all of which relate to the Klamath Project, can be generally separated into three categories based on the nature of the contract and the priority of water use within the Project.

The first category consists of the contract with Van Brimmer Ditch Company (VBDC), which is the earliest of the contracts at issue in this case. See Compl. Ex. 13. The VBDC contract was entered into on November 6, 1909. This contract was necessary because the construction of the Klamath Project eliminated VBDC's supply of water from Lower Klamath Lake. See Def. Ex. 4, pp. 206-07;[6] see also Klamath Drainage Dist. Contract (Compl. Ex. 4, pp. 80-85) (addressing reclamation of Lower Klamath Lake and replacement of VBDC's water from the Project). The contract replaced Van Brimmer's pre-Project water supply with a Project water supply, with the United States agreeing to deliver 50 second-feet of water annually to VBDC, subject "to any possible established priority to the use of said fifty (50) second-feet of water, other than such as may be claimed by the United States or those claiming through it." VBDC Contract, Art. 15 (Compl. Ex. 13, p. 351). Consistent with this provision, BOR categorizes the

---

[6]Defendant's Exhibit ("Def. Ex.") numbers 1 through 42 are the exhibits contained in Defendant's Appendix (dated October 3, 2003) and Supplemental Appendix (dated March 31, 2004), both of which were filed in support of its Cross-Motion for Summary Judgment on plaintiffs' takings claims. Defendant's Exhibit numbers 43 through 58 are the exhibits contained in the Appendix filed in support of Defendant's Cross-Motion for Summary Judgment on the Question of Whether the Individual Plaintiffs' Have Standing to Bring Contract Claims as Intended Third-Party Beneficiaries (dated April 26, 2004). To avoid confusion in the numbering of exhibits, the additional exhibits filed in support of Defendant's present motion begin with exhibit number 59 and appendix page number 543. Similarly, unless otherwise indicated, defendant's references herein to Plaintiffs' Exhibits ("Pl. Ex.") are to the exhibits in the appendices previously filed by plaintiffs in support of their cross-motion for partial summary judgment on their takings claims (dated July 21, 2003; Aug. 29, 2003; and Jan. 16, 2004).

VBDC contract as a "Class A" contract, which has first priority of use among all Project contracts. Def. Ex. 4. In addition, VBDC's right to receive Project water is recognized as having first priority among the Project's other "Class A" contracts. Id., pp. 206-7. On April 22, 1922, the United States entered into a contract with the Klamath Irrigation District (KID) under which KID assumed liability for the annual cost of carrying and delivering water to VBDC. Klamath, 67 Fed. Cl. at 529; Def. Ex. 1, p. 61. KID continues to be responsible for the delivery of Project water to VBDC. KID's current contractual rights and obligations, including its obligations with respect to VBDC, are set forth in its amendatory contract with BOR of November 29, 1954.[7] Compl. Ex. 1, pp. 8-39.

A second category consists of contracts entered into pursuant to the Reclamation Act of 1939, 43 U.S.C. § 485, et seq. This group includes BOR's contracts with KID and Tulelake Irrigation District (TID).[8] See Compl. Ex. 1 (KID) and 2 (TID). Under these "repayment contracts," the districts receive deliveries of water from the Project and in return are obligated to pay a proportionate share of the Project's initial construction costs and its annual operation and maintenance costs. See 43 U.S.C. § 485h(d). See also Compl. Ex. 1-2. The KID and TID contracts are also categorized as "Class A" contracts, and thus have priority over other non-Class

[7]Defendant notes that VBDC also has a contractual right to receive deliveries of excess water to additional acreage when such water is available. Specifically, VBDC's amendatory contract of 1943 provides that the United States is not obligated to deliver water in excess of 50 cubic feet per second ("cfs") "when such excess is needed for delivery to the Project lands or to the lands of the contractors with the United States under the Warren Act (36 Stat. 925) whether such contracts antedate or postdate this contract." Compl. Ex. 13, p. 359.

[8]BOR entered into the contract with KID pursuant to Section 9(d) of the Reclamation Act of 1939, 43 U.S.C. § 485h(d). BOR entered into the contract with TID pursuant to § 7 of that Act. Def. Ex. 5 (p. C-1).

A Project contracts when there is a shortage of available water. Def. Ex. 4.

The third category of contracts at issue in this case consists of those contracts entered into pursuant to Section 2 of the Warren Act of 1911, ch. 141, 36 Stat. 925 (codified at 43 U.S.C. § 524). These repayment contracts generally provide for the delivery of Project water to a certain delivery point, with the districts assuming responsibility for constructing all necessary works to deliver water from that point to the irrigable lands within the district. Def. Ex. 3, p. 183. This group includes the remaining 10 contracts at issue in this case, which are the contracts with Plaintiffs Klamath Drainage District, Sunnyside Irrigation District, Klamath Basin Improvement District, Malin Irrigation District, Westside Improvement District No. 4 (Colonial Realty Co.), Shasta View Irrigation District, Poe Valley Improvement District, Midland District Improvement Co., Enterprise Irrigation District, and Pine Grove Irrigation District. Compl. Exs. 3-12 and 14; Def. Ex. 4-5 (KP Historic Op. at B-2 to B-3, C-2).

The Warren Act authorized the Secretary to enter into contracts for the delivery of any excess water, provided that the first right to Project water be preserved to the original lands and entrymen under the Project. 43 U.S.C. § 523. Therefore, the Warren Act contracts for any excess Klamath Project water include language acknowledging the priority of the earlier contracts.[9] In addition, the Warren Act contracts include language indicating that the United

[9]See Poe Valley Contract, Art. 2 ("The United States reserves a first right to the lands and entrymen on the Klamath Project of the water to be made available to the District pursuant to the terms of this contract.") (Compl. Ex. 4, p. 132); Pine Grove Contract (the United States "preserv[es] a first right to the lands and entrymen under the Klamath Project") (Compl., Ex. 10, p. 247); see also Sunnyside Contract, Art. 5 ("Provided, That all rights to the use and delivery of water acquired by the District under this contract are inferior and subject to the prior rights reserved for the lands of the Klamath project.") (Compl. Ex. 5, p. 159); Malin Contract, Art. 7 (same) (Compl. Ex. 8, p. 232); Shasta View Contract, Art. 7 (same) (Compl. Ex. 12, pp. 272 and 288).

States is agreeing to provide "surplus" water to these districts only when such water is available. For example, the Midland District Improvement Company contract provides in its recitals that "the United States has available a supply of water in variable and indefinite quantities which, when available, may be utilized upon the lands of the District[.]"[10] Compl. Ex. 7, p. 218. Similarly, the contract with Westside Improvement District provides that "the United States will furnish, out of such surplus water as may be available from the irrigation works of the said Klamath Project and at such times during the irrigation season as surplus water may be so available, a water supply for irrigation of the above described lands . . . "[11] Compl. Ex. 11, p. 259.

Consistent with the priorities established by the Warren Act and the terms of the contracts entered into thereunder, the Warren Act contracts at issue in this case are classified as "Class B" contracts within the Klamath Project and, as a group, are second in priority of use, behind the Class A contracts (VBDC, KID and TID). Def. Ex. 4. Within Class B, the contracts are prioritized by the date the contract was entered into.[12] Def. Ex. 4, p. 207-208.

---

[10]See also Poe Valley Contract, Art. 3 (providing for the delivery of water "[w]hen and to the extent that water is available") (Compl. Ex. 4, p. 132); Poe Valley Amendatory Contract (referring to the 1953 Poe Valley contract as providing "for a water supply in variable and indefinite quantities at rates established for the Project") (Compl. Ex. 14, p. 371).

[11]See also Klamath Basin Improvement Dist. Contract (indicating that the contract is for the delivery of "surplus water," which is defined as "water available from the Klamath Project in excess of that required to meet the prior rights of lands and entrymen under the Klamath Project") (Compl. Ex. 6, pp. 172, 176); Sunnyside Contract, Art. 5 (providing that the water to be delivered under the contract "shall not exceed the amount that can be furnished, as determined by the Secretary . . . .") (Compl. Ex. 5, p. 159).

[12]In some of these contracts, the United States expressly reserved the right to apportion available surplus water among the Warren Act contractors. See, e.g., Klamath Basin Improvement Dist. Contract, Art. 4 ("In any year in which there may occur a shortage from any

B. Operation of the Klamath Project

As explained in prior briefings, Upper Klamath Lake, a naturally occurring lake which is also the principal water supply source for the Project, is relatively shallow, and its 1917 dam is too low to capture and store large quantities of spring run-off. Def. Ex. 3 (KP Historic Op. at 30); Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation ("PCFFA v. BOR I"), 138 F. Supp. 2d 1228, 1231 (N.D. Cal. 2001); Kandra v. United States, 145 F. Supp. 2d 1192, 1197 (D. Or. 2001); Klamath, 67 Fed. Cl. at 509. Because the Project lacks facilities to store large quantities of water in wet years to meet all water needs in dry years, operation of the Klamath Project requires Reclamation to balance numerous competing legal obligations and demands for limited Project water supply. These obligations have been addressed by district courts and the Court of Appeals for the Ninth Circuit in several cases including: PCFFA v. BOR I, 138 F. Supp. 2d at 1231; Kandra, 145 F. Supp. 2d at 1196-97; Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1209 (9th Cir. 2000); and, Pacific Coast Fed'n of Fishermen's Ass'ns v. Bureau of Reclamation ("PCFFA v. BOR II"), 426 F.3d 1082, 1085-86 (9th Cir. 2005).

For example, in PCFFA v. BOR I, the district court for the Northern District of California described BOR's obligations in managing and operating the Klamath Project as follows:

> The Secretary of the Interior, through the Bureau of Reclamation, must manage and operate the Klamath Project pursuant to various legal responsibilities. Pursuant to the Reclamation Act of 1902 [ ], for example, the Bureau of Reclamation has entered into contracts with various water

---

cause, the United States reserves the right to apportion the available surplus water supply among the District and others entitled, under existing and future contracts made pursuant to the Warren Act, to receive water from the Klamath Project.") (Compl. Ex. 6, p. 178); Klamath Drainage Dist. Contract, Art. 14(a) ("In the event of a shortage of water in any irrigation season there shall be a proration of the supply from the sources above named between the District and others supplied therefrom in a manner deemed equitable by the Secretary.") (Compl. Ex. 3, pp. 111-12).

> districts and individual water users to supply water, subject to availability, for irrigation purposes. Two national wildlife refuges, the Lower Klamath and Tule Lake National Wildlife Refuges, also are dependent on the operations of the Klamath Project and have federal reserved water rights to the amount of water, unreserved at the time of creation of the refuges, necessary to fulfill the primary purpose of the refuges. . . . The Bureau of Reclamation has an obligation to protect Tribal trust resources, including the Klamath River coho salmon. It also has an obligation under the ESA not to engage in any action that is likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of the critical habitat of such a species.

138 F. Supp. 2d at 1231 (statutory and administrative record citations omitted). Similarly, in a recent case involving judicial review of a long-term biological opinion issued by NMFS pursuant to the ESA and as a result of formal consultation with BOR regarding the operation of the Klamath Project, the Ninth Circuit has recognized that:

> A number of factors make water management especially difficult in the Klamath River Basin. See generally [PCFFA] v. BOR, 138 F. Supp.2d 1228, 1230-31 (N.D. Cal. 2001) ("PCFFA I"); Kandra v. United States, 145 F. Supp.2d 1192, 1196-98 (D. Or. 2001). The primary reservoir is relatively shallow, and is home to populations of two different species of endangered fish, known as suckers, that require maintenance of certain minimum water levels. Kandra, 145 F. Supp. 2d at 1196-98. Marshlands in two national wildlife refuges are irrigated by the Klamath Project to create bird habitat. Id. at 1196. Several tribes in the area have treaty rights to Klamath River fish, and the Department of the Interior must meet the United States' fiduciary duty to maintain these resources. Id. at 1197. Numerous farmers have contracts for irrigation water that the BOR must supply each growing season. PCFFA I, 138 F. Supp. 2d at 1231.

PCFFA v. BOR II, 426 F.3d 1082, 1085-86 (9th Cir. 2005). See also Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d at 1209 (describing Reclamation's "various obligations" related to the Klamath Project as including contractual obligations to water users, responsibilities for the national wildlife refuges, the requirements of the ESA, and the responsibility to protect

the rights and resources of certain Klamath Basin tribes).[13]

C. The Endangered Species Act

The ESA, in its current form, was enacted by Congress on December 28, 1973, and is codified at 16 U.S.C. §§ 1533-1544. There are currently 527 species of animals listed as threatened or endangered under the ESA.[14] Def. Ex. 59. Fifty-two of these species are found in Oregon; 299 are found in California. Def. Ex. 60.

Section 9 of the ESA prohibits, *inter alia*, the unauthorized "take" of a listed species, 16 U.S.C. § 1538(a)(1), which is defined to include harassing, harming, pursuing, wounding, or killing. 16 U.S.C. § 1532(19); see also 50 C.F.R. § 17.3 (ESA regulations further defining "harm" as including "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering"). The ESA prohibits both the direct "take" of a protected species, as well as indirect takes that result from otherwise lawful activities. See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 696-708 (1995).

To reconcile the prohibitions of ESA § 9 with beneficial human activities, Congress included several provisions that allow some activities to occur even though they might result in the "take" of a listed species. The relevant provision in this case is found in ESA § 7(a)(2),

---

[13]The decisions of the Ninth Circuit regarding BOR's obligations in managing and operating the Klamath Project are consistent with Department of the Interior memoranda from the Regional Solicitor's Offices that pre-date those decisions. See Pl. Ex. 28; Pl. Ex. 2.

[14]The ESA allows for the "listing" of a species if it is endangered or threatened throughout "all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). See also 16 U.S.C. § 1533 (describing the process for determining whether to list a species).

which requires each federal agency, in consultation with either the FWS or NMFS,[15] to insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the designated "critical habitat" of the species.[16] 16 U.S.C. § 1536(a)(2); see also 50 C.F.R. Part 402 (ESA implementing regulations setting out the consultation process). If a federal agency determines that an "action it proposes to take may adversely affect a listed species, it must engage in formal consultation" with FWS or NMFS under Section 7(a)(2) of the ESA. Bennett v. Spear, 520 U.S. 154, 158 (1997) (citing 50 C.F.R. § 402.14).

The end result of a formal consultation under Section 7 of the ESA is the issuance of a biological opinion in which FWS or NMFS provides its opinion about whether the proposed action is likely to jeopardize the continued existence of listed species. See 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g)-(h). See also Bennett v. Spear, 520 U.S. at 158 and 168-71 (discussing the significance of a biological opinion as a final agency action under the ESA). When the FWS or NMFS concludes that a proposed action is not likely to jeopardize the continued existence of a

---

[15]Because of the broad scope of the ESA, the statute is jointly administered by the Secretary of Commerce and the Secretary of the Interior. The Secretary of Commerce has delegated this authority to the National Marine Fisheries Service ("NMFS"), and the Secretary of the Interior has delegated this authority to the Fish and Wildlife Service ("FWS"). In general, FWS has authority over terrestrial and freshwater species and NMFS has authority over marine species. See, e.g., Northwest Resource Info. Center, Inc. v. NMFS, 56 F.3d 1060, 1065 (9th Cir. 1995) (discussing the division of responsibility for listed species). In 1986, the Services jointly promulgated ESA implementing regulations. See 50 C.F.R. Part 402. Accordingly, the Lost River and shortnose suckers were listed as endangered by the FWS, and the SONCC coho was listed as threatened by NMFS.

[16]Section 7 only applies to federal actions. Private actors that might violate the Section 9 prohibition against the "take" of a listed species may seek a permit under ESA Section 10 that authorizes the taking of a federally listed species if the taking is incidental to an otherwise legal activity. 16 U.S.C. § 1539.

listed species, the action agency generally may proceed as proposed and the FWS or NMFS must include an "incidental take statement" in the biological opinion. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(I). Such a provision authorizes the "take" of a listed species incidental to otherwise lawful activities, and, if followed, permits a certain level of allowable "take" by the action agency, which otherwise would be prohibited by Section 9.

When the FWS or NMFS determines that the proposed action is likely to jeopardize listed species or result in adverse modification of critical habitat, the consulting agency is required to determine whether there are any "reasonable and prudent alternatives" ("RPAs") to the proposed action which would not jeopardize the species or result in the adverse modification of critical habitat, and which can be taken by the action agency or applicant in implementing the proposed action. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3); 50 C.F.R. § 402.14(g)(5). See also 50 C.F.R. § 402.02 (defining the term "reasonable and prudent alternatives"). Here, too, the FWS or NMFS includes an incidental take statement to accompany implementation of any RPAs. After issuance of the biological opinion, the action agency must determine "whether and in what manner to proceed with the action in light of its section 7 obligations and the [regulatory agency's] biological opinion." Bennett v. Spear, 520 U.S. at 168 (quoting 50 C.F.R. § 402.15(a)). If the action agency implements the RPAs and complies with the terms of the incidental take statement, any permitted "take" of the species associated with the action will not be a violation of Section 9 of the ESA. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5). However, if the action agency exceeds the level of authorized "take," it must reinitiate consultation with FWS or NMFS. 50 C.F.R. § 402.14(i)(4); 50 C.F.R. § 402.16.

D. The Application of the ESA to Klamath Project Operations

Listed species that currently live in and around the Klamath Project and are potentially affected by Project operations include: the Lost River sucker and the shortnose sucker, two species of fish that inhabit Upper Klamath Lake and other nearby Klamath Project waters and were listed as endangered in1988; and the Southern Oregon/Northern California Coast (SONCC) coho salmon, which currently use the mainstem and tributaries of the Klamath River between Iron Gate Dam to the Pacific Ocean for spawning and rearing, and were listed as threatened in 1997.[17] See 53 Fed. Reg. 27130 (July 18, 1988) (listing of the suckers); 62 Fed. Reg. 24588 (May 6, 1997) (listing of the SONCC coho salmon). See also Kandra, 145 F. Supp. at 1196-97 (describing the suckers, the SONCC coho salmon, and bald eagles as among the listed species that might be impacted by Klamath Project operations).

BOR's management of Klamath Project operations must comply with Section 7 and other provisions of the ESA. See Def. Ex. 61 (Klamath Project 2001 Annual Operations Plan) (acknowledging that BOR must "assure that its operations are not likely to jeopardize the continued existence of species listed under the [ESA]"); Patterson, 204 F.3d at 1213 (affirming district court's conclusion that BOR had authority to direct Link River Dam operations to comply with the ESA); Kandra, 145 F. Supp. 2d at 1207 (finding, in the context of a request for a preliminary injunction, that BOR has a "legal duty" to operate the Klamath Project consistent with its ESA and tribal trust obligations); PCFFA v. BOR I, 138 F. Supp. 2d at 1243-50 (holding that BOR is required to consult with NMFS under Section 7 of the ESA regarding the operation

[17] Maps of the Klamath Project area showing the various features of the Project that are referenced herein are available at http://www.usbr.gov/mp/kbao/maps/index.html.

of the Klamath Project and enjoining BOR, under certain circumstances, from delivering irrigation water from the Klamath Project until such a consultation is completed). See also Pl. Ex. 28 and Pl. Ex. 2 (Department of the Interior memoranda indicating that BOR must operate the Klamath Project in compliance with its multiple legal obligations, including compliance with the ESA).

During the 1990s and early 2000s, BOR consulted with the FWS and NMFS over ongoing Project operations and annual operations plans, among other actions. See, e.g., Bennett v. Spear, 520 U.S. at 158-60 (discussing application of the ESA to Klamath Project operations in the early 1990s); see also Def. Ex. 68 (Biological Assessment, pp. 2-4, 14-15); Def. Ex. 69 (Biological Assessment, p. 2); Def. Ex. 70 (FWS Biological Opinion, Sect. I, p. 1-6). At the end of the 2000 water year, the Klamath Basin was experiencing drought conditions, and these conditions were affecting the availability of water from the Klamath Project. In the fall of 2000, BOR notified Project water users that the supply of available water was insufficient to allow further deliveries to the Warren Act or "B" contractors or to the annual surplus water rental or "C" contractors.[18] Def. Ex. 62 (Ltr to VBDC, Sept. 2, 2000). BOR informed Project water users that this action was "necessary for operation of the Project to be consistent with the requirements of the [ESA] and Reclamation's obligation to protect Tribal trust resources." Def. Ex. 62. See also Langell Valley Irrig. Dist. v. Babbitt, No. 00-6265-HO (D. Or. Aug. 31, 2000) (denying irrigation district's request for preliminary injunction to prevent BOR from releasing water from Clear Lake and Gerber Reservoir to serve other parts of the Klamath Project because water from Upper Klamath Lake was needed to comply with ESA requirements).

[18]There are no "C" contracts at issue in this case.

Water supply forecasts from the Natural Resources Conservation Service ("NRCS"), which are used by BOR in developing its annual operations plans, indicated that the 2001 water year would be a "critically dry" year on account of drought conditions. See Kandra, 145 F. Supp.2d at 1198 ("Based on NRCS forecasts, Reclamation has defined the 2001 water year as 'critically dry.'"); see also Def. Ex. 63 (various letters from early 2001 stating that "[f]orecasts of water supplies in the Klamath basin for the 2001 water year are currently nearly half of average conditions"); Def. Ex. 64 (letter of March 2, 2001, to water users stating that "if precipitation does not increase significantly over the next few months, severe water shortages are likely during the upcoming 2001 irrigation season"); Def. Ex. 28 (drought declaration issued by Oregon Governor, March 28, 2001). In the face of these forecasts, BOR initiated formal consultation with FWS and NMFS under ESA § 7(a)(2) regarding the potential effects of ongoing operations of the Klamath Project for the 2001 water year on listed species.[19] See 16 U.S.C. § 1536(a)(2); see also Def. Ex. 65–67. In connection with the initiation of formal consultation proceedings under Section 7, BOR prepared and issued a biological assessment for submission to FWS addressing effects of ongoing Project operations on the listed suckers and the bald eagle, and a

---

[19]Because Plaintiffs' contract claims only allege a breach of contract during the 2001 water year, Defendant's discussion of the application of the ESA to BOR's operation of the Klamath Project is limited to the consultations leading up to and including 2001. A detailed description of this consultation process is set forth in Kandra, 145 F. Supp. 2d at 1206-08, in which several of the plaintiffs involved in this case brought an action for breach of contract against the United States alleging that BOR's adoption of the 2001 Operations Plan for the Klamath Project breached its contractual obligations to the Project's water users and sought injunctive relief. See Kandra, 145 F. Supp. 2d at 1199. In considering the likelihood of success on the merits of the breach of contract claim in the context of the plaintiffs' motion for preliminary injunction, the district court concluded that the plaintiffs "cannot assert a breach of contract based on Reclamation's allocation of water to protect the suckers and salmon." Id. at 1201. After the court denied the plaintiffs' motion for preliminary injunction, the plaintiffs voluntarily dismissed their claims without prejudice.

separate biological assessment for submission to NMFS addressing the effects of ongoing Project operations on the listed SONCC coho salmon. Def. Ex. 68-69. These biological assessments concluded that the on-going operation of the Klamath Project was likely to affect the listed species. Def. Ex. 68 (pp. 45-46); Def. Ex. 69 (p. 89); Kandra, 145 F. Supp.2d at 1198.

The ESA Section 7 consultation process led to the issuance of final biological opinions by both FWS and NMFS in early April 2001. The biological opinion issued by the FWS on April 5, 2001, concluded that proposed Project operations in 2001 were likely to jeopardize the two species of endangered sucker fish that inhabit Upper Klamath Lake and its tributaries, and that such operations would cause harm, but not jeopardy, to the continued existence of the bald eagle. Def. Ex. 70; Kandra, 145 F. Supp. 2d at 1198. The biological opinion issued by NMFS on April 6, 2001, concluded that proposed Project operations in 2001 were likely to jeopardize the threatened SONCC coho salmon that inhabit the Klamath River in California. Def. Ex. 71; Kandra, 145 F. Supp. 2d at 1198.

Both biological opinions included reasonable and prudent alternatives ("RPAs") that could be implemented by BOR to avoid jeopardizing the continued existence of those species. The RPA developed by the FWS recommended that, for Water Year 2001, BOR maintain specified minimum lake levels in Upper Klamath Lake and other Project reservoirs to avoid jeopardizing the endangered suckers. Def. Ex. 70. The RPA developed by NMFS recommended the maintenance of specified minimum instream flows in the Klamath River in California below Iron Gate Dam to avoid jeopardizing the threatened SONCC coho salmon. Def. Ex. 71. There proved to be inadequate water available in the Klamath Basin during the drought conditions of 2001 for BOR to comply with both RPAs, and accordingly the FWS and NMFS adjusted their

recommendation on Upper Klamath Lake levels and instream flows below Iron Gate Dam to avoid jeopardizing the three listed fish species. See Kandra, 145 F. Supp. 2d at 1198.

In accordance with the ESA and its implementing regulations, BOR subsequently notified both FWS and NMFS that it would operate the Project consistent with the RPAs, and incorporated the RPAs into its Klamath Project Annual Operations Plan for 2001. See Def. Ex. 61 (2001 Annual Op. Plan); Def. Ex. 73. The implementation of the 2001 Annual Operations Plan for the Klamath Project resulted in a substantial reduction in the amount of water available for irrigation as compared to years of average precipitation in the Klamath Basin. Specifically, on April 6, 2001, BOR announced that there would be no water available from Upper Klamath Lake to supply to the farmers (pursuant to BOR's contracts with the district plaintiffs).[20] Def. Ex. 72. Subsequently, on July 24, 2001, the Secretary of the Interior announced that BOR would be able to release 70,000 to 75,000 acre-feet of water from Upper Klamath Lake to its contractors due in part to improved weather conditions. Def. Ex. 74. Plaintiffs filed their original complaint in this case approximately three months later. Pls.' Complaint (Oct. 11, 2001) (Doc. 1).

---

[20]At the same time, BOR announced that, based on its estimates at the time, that there would be approximately 70,000 acre-feet of water available for the irrigation of "A" lands on the east side of the basin from Clear Lake and Gerber Reservoir. Def. Ex. 72 (Interior Press Release, 4/6/2001).

## III. ARGUMENT

Subject to the availability of water,[21] BOR has a contractual obligation to deliver water to Plaintiffs in accordance with the rights held by the United States for the Klamath Project and the contracts with the districts. The BOR also has an obligation, however, to comply with applicable laws such as the ESA. The question addressed in this brief is whether the sovereign acts doctrine or unmistakability doctrine applies in this case to preclude a determination that BOR breached its contracts as a result of complying with the ESA (as alleged by Plaintiffs).[22]

The application of the sovereign acts and unmistakability doctrines are interrelated. As this Court explained in its decision of August 31, 2005, "the so-called 'unmistakability doctrine' recognizes that "'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'" Klamath, 67 Fed. Cl. at 537 n.57 (quoting Bowen v. Pub. Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52 (1986) (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982))). See also Franconia Assocs. v. United States, 61 Fed. Cl. 718, 733 (2004). As recently explained by the Federal Circuit, "the unmistakability doctrine is a doctrine of contract construction instructing that 'a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the

---

[21] As recognized by decisions of the Ninth Circuit Court of Appeals, the availability of water is subject to a number of factors, including hydrologic conditions in the basin, the need to satisfy senior water rights, and the need to comply with other federal laws. See Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206 (9th Cir. 2000); Pacific Coast Federation Fishermen's Ass'ns v. Bureau of Reclamation, 426 F.3d 1082 (9th Cir. 2005).

[22] As noted previously, pages 2-3, the United States has a number of other defenses that may be asserted if the case proceeds.

application of a subsequent sovereign act, nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of a sovereign power.'" Centex Corp. v. United States, 395 F.3d 1283, 1306 (Fed. Cir. 2005) (quoting United States v. Winstar, 518 U.S. 839, 878 (1996)).

"[A] prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated." Klamath, 67 Fed. Cl. at 537 n.57 (citing Centex Corp., 395 F.3d at 1307; Cuyahoga Metr. Housing Authority v. United States, 57 Fed. Cl. 751, 774-75 (2003)). See also First Nationwide Bank v. United States, 431 F.3d 1342, 1350-51 (Fed. Cir. 2005) (declining to apply the unmistakability doctrine after concluding that the legislation in question was specifically targeted at the subject contracts); Franconia Assocs., 61 Fed. Cl. at 735-36 (holding that the unmistakability doctrine could not be applied because the legislation in question "deliberately targeted" the government's contractual obligations). Here, for the reasons explained below, there is no question that the enactment and enforcement of the ESA qualifies as a "sovereign act."

Once the court finds that the government act at issue is a general, sovereign act, the second part of the inquiry requires the court to determine whether the contracts in question unmistakably precluded the government from subsequently exercising its sovereign power. Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1579 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998). As discussed below, the 13 contracts at issue in this case do not contain terms that expressly and unambiguously exempt those contracts from the application of future laws such as the ESA. Thus, the two doctrines apply in this case and preclude a finding that Defendant breached its contracts with Plaintiffs in 2001. Defendant is therefore entitled to judgment, as a matter of law, on Plaintiffs' contract claims.

A. The Sovereign Acts Doctrine Provides a Complete Defense to Plaintiffs' Contract Claims Because the Enactment and Enforcement of the ESA is a Public and General Act of the United States as Sovereign

Under the sovereign acts doctrine, BOR cannot be held liable for the non-delivery of Klamath Project water under the Plaintiffs' contracts[23] resulting from BOR's compliance with the ESA, a public and general act of Congress.

1. The Sovereign Acts Doctrine

"The sovereign acts doctrine is an affirmative defense under which the United States, when sued as a party to a contract, 'cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.'" Allegre Villa v. United States, 60 Fed. Cl. 11, 16 (2004) (quoting Horowitz v. United States, 267 U.S. 458, 461 (1925)). See also Jones v. United States, 1 Ct. Cl. 383, 385 (1865) ("the United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign"). The sovereign acts doctrine thus draws a distinction between actions taken by the government as a party to a contract and actions taken by the government in its sovereign capacity in a manner that seeks to balance "the Government's need for freedom to legislate with its obligation to honor its contracts." United States v. Winstar, 518 U.S. 839, 896 (1996). In so doing, the sovereign acts doctrine levels the contractual playing field by ensuring that government contractors and private contractors are affected the same way when the government, acting in its sovereign capacity, legislates or otherwise acts in a way that impacts existing contractual rights. See, e.g., Deming v. United States, 1 Ct. Cl. 190, 191 (1865) (holding that the

[23]Again, the question of whether Plaintiffs had a contractual right to receive deliveries of Klamath Project water under the circumstances of 2001 is not addressed in this brief.

government as contractor is not liable for the acts of the government as sovereign in enacting a general law because "[a] contract between the government and a private party cannot be *specially* affected by the enactment of a *general* law."); Cuyahoga Metropolitan Housing Authority, 57 Fed. Cl. at 763 n.18 ("Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct, or violate the particular contracts into which it enters with private persons." (quoting Jones v. United States, 1 Ct. Cl. at 384)). In other words, the government as contractor is not entitled to any special benefit from the acts of the government as sovereign. Yankee Atomic, 112 F.3d at 1575. Likewise, "'the Government in its contracting role, like its private counterpart, should not incur liability for its act done in the governing role.'" Id. at 1574 n.3 (quoting O'Neill v. United States, 231 Ct. Cl. 823, 826 (1982)).

The Federal Circuit's most recent and most comprehensive guidance on the application of the sovereign acts doctrine is set forth in its post-Winstar decision in Yankee Atomic, *supra*. In that decision, the Federal Circuit explains that the application of the sovereign acts doctrine turns on a determination of "'whether the sovereign act is properly attributable to the Government as contractor.'" Yankee Atomic, 112 F.3d at 1575 (quoting Winstar, 518 U.S. at 896). This is "a fact-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior government contracts." Id. As explained in one recent Court of Federal Claims decision, an "inquiry into possible 'targeting' by Congress is relevant to determining whether the alleged breach is merely an incidental effect of a sovereign act designed to promote the public good, or instead is a deliberate attempt by Congress to alter its previous bargain with the contractor." Carabetta Enterprises, Inc. v. United States, 58 Fed. Cl.

563, 568 (2003) (quoting Coast-to-Coast Fin. Corp. v. United States, 45 Fed. Cl. 796, 804 (2000)).

The sovereign acts doctrine does not provide a defense to a contract claim if, as a result of the inquiry described in Yankee Atomic, the court determines that the government's actions "were not the actions of public and general applicability, but were actions directed principally and primarily at plaintiffs' contractual right[.]" Sun Oil v. United States, 572 F.2d 786, 817 (Ct. Cl. 1978). Conversely, "[a]n act of government will be considered sovereign so long as its impact on a contract is 'merely incidental to the accomplishment of a broader governmental objective.'" Klamath, 67 Fed. Cl. at 537 (quoting Winstar, 518 U.S. at 898).

In this case, Plaintiffs allege a breach of contract based on actions taken by BOR to comply with the ESA. Second Amended Compl., ¶¶ 24-29, 43-48 (Doc. 210). Accordingly, the determination of whether the sovereign acts doctrine applies in this particular case requires the Court to determine whether the enactment and enforcement of the ESA is a "public and general" act of the government as sovereign. As we now explain, there can be no doubt that the ESA meets this test, and that the sovereign acts doctrine is therefore applicable to Plaintiffs' contract claims.

2. The Enactment and Subsequent Enforcement of the ESA

As described above in Section II.C., the ESA was enacted by Congress in 1973. The ESA has been recognized as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978). Passage of the ESA stemmed from Congressional concern over the accelerating pace of species extinction and the societal risks that might result therefrom. Reviewing both the plain

language of the statute itself, as well as the legislative history, the Supreme Court found that the "plain intent" of the ESA "was to halt and reverse the trend toward species extinction, whatever the cost." Id., 437 U.S. at 184. See also 16 U.S.C. § 1531 (Congressional findings and declaration of the purpose of the ESA). The broad reach of the ESA is evident from the fact that it applies to both government actions and private actions, and "to all land in the United States and to the Nation's territorial seas." Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 698 (1995); see also Defenders of Wildlife v. Environmental Protection Agency, 420 F.3d 946, 975 (9th Cir. 2005) (noting that the provisions of the ESA "apply to all actors, not only the federal government").

Several of the 527 species of animals presently listed as threatened or endangered under the ESA inhabit the area in and around the Klamath Project. See Section II.C. and II.D., *supra*. Accordingly, the operation of the Klamath Project may impact those species. As a result of this potential, BOR has engaged in a number of consultations with FWS and NMFS under Section 7 of the ESA regarding ongoing Klamath Project operations. This case relates to the consultations that involved the ongoing operations of the Klamath Project during the 2001 water year. As discussed above, the biological opinions issued by FWS and NMFS as a result of these consultations were "jeopardy" opinions and therefore included RPAs intended to avoid jeopardizing the affected species.

BOR managed Klamath Project operations in 2001 in compliance with the ESA. As noted above, the implementation of the 2001 Annual Operations Plan for the Klamath Project, which incorporated the RPAs set forth in the biological opinions issued by FWS and NMFS, resulted in a reduction in the amount of Project water available for irrigation as compared to

years of average precipitation in the Klamath Basin.

3. The ESA is a "Public and General" Act That Falls Squarely Within the Sovereign Acts Doctrine

There is no credible argument that the ESA "targeted" the contracts at issue in this case. To the contrary, the ESA is the epitome of a "public and general" legislative enactment. As explained above, the ESA was enacted in 1973 to "halt and reverse the trend toward species extinction" on a nationwide basis. TVA v. Hill, 437 U.S. at 184; see also 16 U.S.C. § 1531; Catron County Bd. of Commrs. v. FWS, 75 F.3d 1429 (10th Cir. 1996) (ESA's core purpose is to prevent extinction of species by preserving and protecting their habitats from intrusive human activity). The ESA applies to all land in the United States and to the Nation's territorial seas, and thus reaches and affects both federal government actions and private actions far beyond the confines of the Klamath River basin and the Klamath Project. The consultation requirements of Section 7 described above apply nearly without exception to all federal agencies, and contain substantive and procedural requirements which are uniform. As such, the ESA compliance alleged by Plaintiffs to have breached the contracts was "'merely incidental to the accomplishment of a broader governmental objective.'" Yankee Atomic, 112 F.3d at 1576 (quoting Winstar, 518 U.S. at 898). The ESA is not specifically targeted at any pre-existing government contracts, let alone the contracts at issue in this case.

An example of what the courts *have* construed as a "targeting" piece of legislation in the context of a BOR contract with a water district can be found in United States v. Westlands Water Dist., 134 F. Supp. 2d 1111 (E.D. Cal. 2001). There, as here, the BOR had a contract with a water district. Unlike the Klamath contracts, the Westlands contract set a specific price of $8.00

per acre-foot of water and a specific drainage service rate. Id. at 1142. Congress then passed legislation that "abrogate[d]" the water and drainage service rate, requiring that the government charge its "full cost" to the plaintiffs. Id. at 1144. The court determined that the legislation in question had the "singular overriding purpose" of "target[ing] contractors who had contractual promises" for a low fixed price. Id. at 1142; see also id. at 1153 (holding that the legislation at issue specifically targeted the Westlands contracts).

The ESA could not be further removed from what the court in Westlands determined was narrow legislation targeting specific contracts. Indeed, the Ninth Circuit – where the Klamath Project is located – has repeatedly and consistently viewed the enactment of the ESA as a sovereign act. In Klamath Water Users Protective Association v. Patterson, *supra*, the Ninth Circuit found that BOR's contract with a power company regarding operation of the Klamath Project's Upper Klamath Lake dam (the Link River Dam) was subject to the subsequently-enacted ESA. 204 F.3d at 1213. The Ninth Circuit thus held that BOR was required to comply with the ESA in its operation of the Klamath Project, including the operation of the dam. Id.; see also Kandra, 145 F. Supp. 2d at 1201 (denying a preliminary injunction request by Klamath Project water users in 2001, noting that the "plaintiffs' contract rights to irrigation water are subservient to ESA and tribal trust requirements"). The treatment of the ESA as a sovereign act in Patterson was consistent with the Ninth Circuit's earlier decision in O'Neill v. United States, 50 F.3d 677 (9th Cir. 1995). In O'Neill, which involved BOR's operation of the Central Valley Project in California, the Ninth Circuit treated the enactment and enforcement of the ESA as a sovereign act when it held that the water delivery contracts at issue were not immune from subsequently-enacted sovereign acts. 50 F.3d at 686. Accord Precision Pine & Timber, Inc. v.

United States, 50 Fed. Cl. 35, 72-73 (2001) (holding that the suspension of certain timber contracts by the Forest Service due to the agency's compliance with the ESA were "public and general acts" because the Forest Service was required to comply with the ESA).

In sum, the enactment and enforcement of the ESA is a "general and public" act that falls squarely within the sovereign acts doctrine. The ESA compliance alleged by Plaintiffs to have breached the subject contracts in 2001 was merely incidental to the broader objectives of the ESA. Accordingly, the Court should find that the sovereign acts doctrine applies in this case.

B. The Contracts Are Subject to the ESA Under the Unmistakability Doctrine

For a contract to prevent the government from exercising a sovereign power, the agreement must contain terms restricting the exercise of that power that "'admit of no other reasonable interpretation.'" Winstar, 518 U.S. at 876-77 (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. at 148). See also Transohio Sav. Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 618 (D.C. Cir. 1992) ("one who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that contract confers such a right in unmistakable terms" (quoting Western Fuels-Utah, Inc. v. Lujan, 895 F.2d 780, 789 (D.C. Cir.), cert. denied, 498 U.S. 811 (1990)); Amber Resources Co. v. United States, 68 Fed. Cl. 535, 556-57 (2005) (holding that the unmistakability doctrine does not provide a defense when the terms of the contract shift the risk of future statutory changes to the government).

Here, the contracts at issue do *not* unmistakably confer a contract right to be immune from future changes in the law, such as the ESA. See Compl. Ex. 1-14. Nothing in the contracts expressly grants Plaintiffs immunity from the effect of future changes in law such as the ESA, or

shifts the risk of such changes to the government. When reviewing similar Reclamation contracts, courts have consistently held that contractors are subject to future changes in the law, including the ESA. For example, in O'Neill v. United States, 50 F.3d 677 (9th Cir.), cert. denied, 516 U.S. 1028 (1995), water users within the Westlands Water District of the federal government's Central Valley Project (CVP) sought to prevent BOR from reducing deliveries of water under the district's 1963 water service contract (and a related stipulated judgment requiring the government to perform the 1963 contract). In rejecting this claim, the Ninth Circuit relied in part on the unmistakability doctrine, holding that nothing in the 1963 contract surrendered, in "unmistakable terms," Congress's sovereign power to enact subsequent legislation. 50 F.3d at 686. The subsequently-enacted legislation at issue in O'Neill included the ESA and the Central Valley Project Improvement Act (CVPIA), a CVP-specific piece of legislation that sought to achieve "a reasonable balance among competing demands for use of [CVP] water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors[,]" and required the Secretary to dedicate a specific quantity of project water to fish and wildlife purposes. O'Neill, 50 F.3d at 681 (quoting and citing provisions of the CVPIA). See also Maricopa-Stanfield Irrig. and Drainage Dist. v. United States, 158 F.3d 428, 438-39 (9th Cir. 1998) (declining to interpret Reclamation contracts as surrendering in unmistakable terms the sovereign's power to enact subsequent legislation that might affect the allocation of project water), cert. denied, 526 U.S. 1130 (1999).

Similarly, in Peterson v. Dept. of the Interior, 899 F.2d 799 (9th Cir. 1990), BOR contractors in the CVP and the Solano Project sought to prevent BOR from subjecting them to a provision of the Reclamation Reform Act of 1982, which redefined the qualifications for

receiving reclamation water at subsidized rates by imposing acreage limitations on the landholdings of qualified recipients. The water districts holding contracts with BOR argued that they had a contractual right to receive water at a subsidized rate to deliver to their water users without any such acreage limitation, and that the 1982 legislation impaired this right. The Ninth Circuit's rejection of this assertion included consideration of the unmistakability doctrine. Specifically, the Ninth Circuit examined the language of the contracts and found that they "contain no language that can be construed as a 'surrender[] in unmistakable terms' of the sovereign's ability to regulate the quantity of subsidized water that may be provided to leased farm lands." 899 F.2d at 812. The Peterson court also firmly rejected the notion that the right to be free from subsequently enacted legislation can be implied. 899 F.2d at 809-11. See also Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d at 1213 (Ninth Circuit stated that "[i]t is well settled that contractual arrangements can be altered by subsequent Congressional legislation" and held that the Reclamation power contract in question was subject to the ESA as well as tribal water rights (citing Merrion v. Jicarilla Apache Tribe, 455 U.S. at 147; O'Neill, 50 F.3d at 686)).[24]

In accord with these cases, the Court should find that the subject contracts do not waive, in unmistakable terms, the right of the United States to exercise its rights, as sovereign, to enact public and general legislation such as the ESA, and to enforce that legislation. Accordingly, the

---

[24]In Rio Grande Silvery Minnow v. Keys, 333 F.3d 1109 (10th Cir. 2003), vacated on other grounds, 355 F.3d 1215 (10th Cir. 2004), a concurring opinion by one of the three judges on the panel opined that the unmistakability doctrine applied to the Reclamation contracts at issue there, even though that legal issue had not been addressed by any of the parties. Id. at 1139-41. Under the particular facts of that case, the United States unsuccessfully argued that the BOR did not violate the ESA when it refused to reduce water deliveries to contractors.

Court should find that the unmistakability doctrine applies and precludes a finding that the United States breached the subject contracts in 2001.

## IV. CONCLUSION

For the reasons set forth herein, Defendant's motion for summary judgment as to Plaintiffs' contract claims should be granted.

Dated: February 17, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

s/Kristine S. Tardiff
KRISTINE S. TARDIFF
Attorney of Record for the Defendant
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583
Fax: (603) 225-1577
E-Mail: kristine.tardiff@usdoj.gov

STEPHEN M. MACFARLANE
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, CA 95814-232
Tel: (916) 930-2204/Fax: (916) 930-2210

REGINALD T. BLADES, JR.
United States Department of Justice
Civil Division
Commercial Litigation Branch
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-7300/Fax: (202) 307-0972

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 01-591 L |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Francis M. Allegra |
| Defendant, | ) | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S SUPPLEMENTAL APPENDIX**

**FILED IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AS TO PLAINTIFFS' CONTRACT CLAIMS**

**EXHIBITS 59 – 69**

**PAGES 543 – 596**

February 17, 2006

**INDEX OF EXHIBITS IN DEFENDANT'S SUPPLEMENTAL APPENDIX FILED IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**[1]


| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 59 | U.S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Summary of Listed Species, Species and Recovery Plans as of 2/15<br><br>Document generated from FWS website at: http://ecos.fws.gov/tess_public/TESSBoxscore (last visited on February 15, 2006) | 543 |
| 60 | U. S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Map of Listed Species by State/Territory as of January 26, 2006.<br><br>Map available on FWS website at: http://ecos.fws.gov/tess_public/servlet/gov.doi.tess_public.servlets.TESSUsmap?status=listed (last visited on January 26, 2006) | 545 |
| 61 | Klamath Project 2001 Annual Operations Plan (dated April 6, 2001) | 546 |
| 62 | Letters from Bureau of Reclamation to Van Brimmer Ditch Co., and to Klamath Drainage District, dated Sept. 2, 2000 | 551 |


[1]Defendant's Exhibit ("Def. Ex.") numbers 1 through 42 are the exhibits contained in Defendant's Appendix (dated October 3, 2003) and Supplemental Appendix (dated March 31, 2004), both of which were filed in support of its Cross-Motion for Summary Judgment on plaintiffs' takings claims. Defendant's Exhibit numbers 43 through 58 are the exhibits contained in the Appendix filed in support of Defendant's Cross-Motion for Summary Judgment on the Question of Whether the Individual Plaintiffs' Have Standing to Bring Contract Claims as Intended Third-Party Beneficiaries (dated April 26, 2004). To avoid confusion in the numbering of exhibits, the additional exhibits attached hereto begin with exhibit number 59 and appendix page number 543.

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 63 | Letters from Department of the Interior officials responding to letters received by the Department concerning the operation of the Klamath Project in 2001. from early 2001 stating that "[f]orecasts of water supplies in the Klamath basin for the 2001 water year are currently nearly half of average conditions" | 555 |
| 64 | Letter from Bureau of Reclamation to Klamath Project Water Users, dated March 2, 2001. Subject: 2001 Operation Planning Update and Notice that Klamath Project Water Not Currently Available | 561 |
| 65 | Letters from Karl E. Wirkus, Area Manager, Bureau of Reclamation, Klamath Falls, to (A) NMFS, (B) FWS and (C) Klamath Tribes, dated Nov. 22, 2000. Subject: On-going Klamath Project Operations – Draft Biological Assessment | 563 |
| 66 | Letter from BOR to NMFS, dated January 22, 2001. Subject: Request for Initiation of Formal Consultation on the Effects of Ongoing Operations (without attachments) | 572 |
| 67 | Memorandum from BOR to FWS, dated February 13, 2001. Subject: Request for Reinitiation of Formal Consultatin on the Effects of Ongoing Operation of the Klamath Project | 575 |
| 68 | Biological Assessment of the Klamath Project's Continuing Operations on the SONCC coho salmon (dated Jan. 22, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 580 |

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 69 | Biological Assessment of the Klamath Project's Continuing Operations on the Endangered Lost River Sucker and Shortnose Sucker (dated Feb. 13, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 593 |
| 70 | Letter from FWS to Bureau of Reclamation, transmitting copy of Biological Opinion, dated April 5, 2001, and excerpt of the Biological Opinion<br><br>Note: a full copy of the FWS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 597 |
| 71 | Letter from NMFS to Bureau of Reclamation transmitting Biological Opinion, dated April 6, 2001, and excerpt of the Biological Opinion<br><br>Noted: a full copy of NMFS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 635 |
| 72 | U.S. Department of the Interior, News Release, "Water Allocation Decision Announced for Klamath Project," dated April 6, 2001 | 651 |
| 73 | Letter from BOR to NMFS, dated April 20, 2001. Subject: BOR's Determination Regarding the Action Addressed in the NMFS April 6, 2001 Biological Opinion | 652 |
| 74 | Department of the Interior, Office of the Secretary, News Release, "Interior Secretary to Order Water Release to Klamath Farmers," dated July 24, 2001 | 654 |

| Summary of Listed Species<br>Species and Recovery Plans as of 02/15/2006 | | | | | | |
|---|---|---|---|---|---|---|
| | Endangered | | Threatened | | | |
| Group | U.S. | Foreign | U.S. | Foreign | Total Species | U.S. Species with Recovery Plans** |
| Mammals | 68 | 254 | 11 | 20 | 353 | 55 |
| Birds | 77 | 175 | 13 | 6 | 271 | 78 |
| Reptiles | 14 | 64 | 22 | 16 | 116 | 33 |
| Amphibians | 12 | 8 | 9 | 1 | 30 | 16 |
| Fishes | 74 | 11 | 42 | 1 | 128 | 98 |
| Clams | 62 | 2 | 8 | 0 | 72 | 69 |
| Snails | 24 | 1 | 12 | 0 | 37 | 29 |
| Insects | 36 | 4 | 9 | 0 | 49 | 32 |
| Arachnids | 12 | 0 | 0 | 0 | 12 | 5 |
| Crustaceans | 19 | 0 | 3 | 0 | 22 | 13 |
| Animal SubTotal | 398 | 519 | 129 | 44 | 1090 | 428 |
| Flowering Plants | 571 | 1 | 143 | 0 | 715 | 584 |
| Conifers and Cycads | 2 | 0 | 1 | 2 | 5 | 3 |
| Ferns and Allies | 24 | 0 | 2 | 0 | 26 | 26 |



PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT
59

| | | | | | | |
|---|---|---|---|---|---|---|
| **Lichens** | 2 | 0 | 0 | 0 | 2 | 2 |
| **Plant SubTotal** | 599 | 1 | 146 | 2 | 748 | 615 |
| **Grand Total** | 997 | 520 | 275 | 46 | 1838* | 1043 |

**Total U.S. Endangered -- 997 (398 animals, 599 plants)**
**Total U.S. Threatened -- 275 (129 animals, 146 plants)**
**Total U.S. Species -- 1272 (527 animals***, 745 plants)**

***** There are 1868 total listings (1300 U.S.). A listing is an E or a T in the "status" column of 50 CFR 17.11 or 17.12 (The Lists of Endangered and Threatened Wildlife and Plants). The following types of listings are combined as single counts in the table above: species listed both as threatened and endangered (dual status), and subunits of a single species listed as distinct population segments. Only the endangered population is tallied for dual status populations (except for the following: Olive ridley sea turtle ; for which only the threatened U.S. population is tallied) . The dual status U.S. species that are tallied as endangered are: California tiger Salamander , Chinook salmon , Coho salmon , Gray wolf , Green sea turtle , Piping Plover , Roseate tern , Sockeye salmon , Steelhead , Steller sea-lion . The dual status foreign species that are tallied as endangered are: Argali , Chimpanzee , Leopard , Saltwater crocodile . Distinct population segments tallied as one include: California tiger Salamander , Chinook salmon , Chum salmon , Coho salmon , Dugong , Steelhead . Entries that represent entire genera or families include: Alabama lampmussel , Anthony's riversnail , Argali , Birdwing pearlymussel , Black-footed ferret , Bog (=Muhlenberg) turtle , Boulder darter , Brown pelican , Cactus ferruginous pygmy-owl , California condor , California tiger Salamander , Catspaw (=purple cat's paw pearlymussel) , Chimpanzee , Chinook salmon , Chum salmon , Clubshell , Coho salmon , Colorado pikeminnow (=squawfish) , Columbian white-tailed deer , Copperbelly water snake , Cracking pearlymussel , Cumberland bean (pearlymussel) , Cumberland monkeyface (pearlymussel) , Cumberlandian combshell , Delmarva Peninsula fox squirrel , Desert tortoise , Dromedary pearlymussel , Dugong , Duskytail darter , Finerayed pigtoe , Gopher tortoise , Gray whale , Gray wolf , Green sea turtle , Grizzly bear , Guam rail , Leopard , Marbled murrelet , Mariana fruit Bat (=Mariana flying fox) , Mountain yellow-legged frog , Olive ridley sea turtle , Oyster mussel , Piping Plover , Red wolf , Roseate tern , Saltwater crocodile , Shiny pigtoe , Smoky madtom , Sockeye salmon , Southern sea otter , Spotfin Chub , Steelhead , Steller sea-lion , Straight-horned markhor , Tidewater goby , Tubercled blossom (pearlymussel) , Turgid blossom (pearlymussel) , Western snowy plover , Whooping crane , Winged Mapleleaf , Woodland caribou , Woundfin , Yellow blossom (pearlymussel) , Yellowfin madtom .*

*** There are 553 distinct approved recovery plans. Some recovery plans cover more than one species, and a few species have separate plans covering different parts of their ranges. This count include only plans generated by the USFWS or jointly by the USFWS and NMFS, and includes only listed species that occur in the United States.***

****** 11 animal species have dual status in the U.S.***

Format for printing
View an archived box score
Go to the Threatened and Endangered Wildlife and Plants Page
Go to the TESS Home Page

# Threatened and Endangered Species System (TESS)

Threatened and Endangered Species System (TESS)

Note: The species counted include listed pinnipeds (seals, etc.) and anadromous fishes under the sole jurisdiction of the National Marine Fisheries Service that use land or fresh waters within the States and Territories of the United States. Species are not broken up into listing entities as they are in the State List reports. Species not listed in a state are not counted, although these may occur there in a non-protected population.




Go to the Threatened and Endangered Wildlife and Plants Page
Go to the TESS Home Page

DEFENDANT'S EXHIBIT 60

April 6, 2001

# Klamath Project
## 2001 Annual Operations Plan

**Introduction** This memorandum describes the 2001 Annual Operations Plan (Plan) for the Bureau of Reclamation's (Reclamation) Klamath Project (Project), which is located within the Upper Klamath River Basin in southern Oregon and northern California. This Plan describes Project operations from April 7, 2001 through March 31, 2002 based upon current and expected hydrologic conditions.

**Guiding Authorities** Reclamation operates the Project pursuant to authority of the Reclamation Act of 1902, as amended and supplemented. The United States has a trust responsibility to protect rights reserved by or for federally recognized Indian tribes by treaties, statutes and executive orders. Reclamation must operate the Project consistent with its trust obligations to the tribes in the Klamath River basin; assure that its operations are not likely to jeopardize the continued existence of species listed under the Endangered Species Act (ESA); fulfill its contractual obligations to water users within the Project; and act in a manner consistent with obligations under the Migratory Bird Treaty Act and other federal laws that govern the protection of wildlife areas in the Basin.

**Guiding Principles and Objectives** Certain legal rights and obligations related to Reclamation's operations of the Project were described in a memorandum from the Regional Solicitor, Pacific Southwest Region (dated July 25, 1995). These rights and obligations form the legal framework for development and implementation of the Plan. In addition, the Pacific Northwest and Pacific Southwest Regional Solicitors prepared a memorandum (dated January 9, 1997) that further addressed legal principles applicable to Project operations. The guiding principles and objectives include:

Meeting the Requirements of the Endangered Species Act The Lost River and shortnose suckers, Coho salmon, and bald eagles are listed under the ESA. Reclamation will manage Project water supplies in accordance with the April, 2001, biological opinions issued by NMFS and the U.S. Fish and Wildlife Service (FWS) for this year's Project operation. Additionally, to meet ESA conservation obligations, Reclamation is undertaking actions which contribute to the conservation of listed species such as participating in significant habitat and basin restoration efforts, and conducting, funding, and participating in extensive research efforts to better understand the condition and needs of the species.

Trust Responsibility of the United States to Federally Recognized Tribes Within the Klamath River Basin The trust responsibility to the Klamath Basin Tribes is shared by all federal agencies that undertake activities in the Klamath Basin. Fishery and other resources in the Klamath River, Upper Klamath Lake (UKL), and nearby lakes and streams are important tribal trust resources to the Klamath Basin tribes.

PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT
61

Reclamation's Plan provides flow regimes and lake levels for protection of tribal trust resources within the limitations of the available water supply.

Providing Deliveries of Project Water Reclamation has contractual obligations to Project water users to provide water primarily for domestic and irrigation uses. The contracts for the majority of the Project area define this obligation as the amount of water necessary to meet the reasonable beneficial use of water for irrigation. Approximately 220,000 acres of agricultural lands are served by the Project. Objectives for water management include efficient delivery and use of water in growing agricultural products. Due to the requirements of the biological opinions and the ESA and the current drought conditions, only limited deliveries of Project water will be made for irrigation.

Conserving Wetland and Wildlife Values Normally, water is provided to meet the needs of several National Wildlife Refuges (NWR) within the Upper Klamath River Basin managed by the U.S. Fish and Wildlife Service and the states under various Acts, including the Migratory Bird Treaty Act, to provide suitable habitat for migratory birds and bald eagles. Due to the requirements of the biological opinions and the ESA and the current drought conditions, deliveries of Project water to the Tule Lake National Wildlife Refuge will be made only for endangered sucker species needs.

**Water Operations Planning Process** Reclamation has prepared the 2001Plan to serve as a planning aid for interested parties. A long-term planning process for Project operations is ongoing. The long-term plan will help clarify water availability resulting from future Klamath Project operations.

The State of Oregon is proceeding with adjudication of the water rights of the Klamath River Basin. To facilitate coordination with the adjudication, Reclamation currently envisions a three-staged approach to the long-term planning process for the project:

1. This Plan describes project operations from April 2001 through March 2002. The Plan may be modified if additional data or information relevant to the effects of project operation become available.

2. A long-term operations plan is to be developed and implemented in the future. It will guide project operations through completion of the adjudication. The long-term plan will be multi-year and will provide the framework of future annual operations plans.

3. Following the adjudication, the long-term plan will be revised as necessary.

**Coordination and Consultation** Reclamation will continue to seek information from and consult with various groups and individuals concerning the 2001 operations. These groups will include, but not necessarily be limited to: tribal governments, project water

users, PacifiCorp, other Federal agencies, local government agencies, state agencies, and the public.

**Streamflow Forecast** The Natural Resources Conservation Service's (NRCS) April forecast, at a 70% exceedance, indicates the inflow volume to UKL to be 108,000 acre-feet during the period of April through September. This inflow volume will be the smallest amount of inflow during the 40 years from 1961 through 2000. This streamflow forecast was used in the development of this Plan. If the NRCS forecasts for May and June vary significantly from this volume then this plan will be re-evaluated.

The available Project water supply is affected by non-Project diversions which are not controlled by Reclamation. These diversions potentially reduce the availability of water for storage and distribution.

**2001 Operations** Reclamation prepared the 2001 Plan (Table 1) for certain UKL levels and Klamath River flows at Iron Gate Dam consistent with the guiding principles and objectives. Reclamation used the spreadsheet planning model (KPOPFOR) which depicts water distribution among various uses. The model has been extensively reviewed and has been refined to serve as a major tool to assist planning of annual operations of the Project. The model is based on 40 years (1961 through 2000) of hydrologic record, and uses expected comparable preceding year types to predict outcomes.

Prior to listing of endangered and threatened species and the increased scientific understanding of the needs of ESA-listed species and tribal trust resources, the Project was operated to optimize irrigation diversions, with UKL releases and resulting flows at Iron Gate Dam (IGD) targeted to meet Federal Energy Regulatory Commission (FERC) minimums. Lake elevations were the result of hydropower releases judged against irrigation demand.

Minimum UKL levels and Klamath River flows have been specified as a result of ESA consultation on listed species. These values are shown in Table 1. As a result, current conditions indicate water deliveries to farms and refuges within the Project service area will be severely limited. Under the current hydrology, the UKL levels and river flows under this Plan are consistent with requirements of the ESA and Reclamation's obligation to protect Tribal trust resources.

Minimum Clear Lake Reservoir, Tule Lake Sump 1A and Gerber Reservoir elevations have been specified as a result of ESA consultation on listed species. The minimum elevations are as follows:

| | | |
|---|---|---|
| Clear Lake Reservoir | ... | elevation 4521 feet on September 30; |
| Tule Lake Sump 1A | ... | elevation 4034.6 feet for April 1 through September 30 and elevation 4034 feet for October 1 through March 31; and, |
| Gerber Reservoir | ... | elevation 4802 feet on September 30. |

For operational purposes the minimum elevation of Clear Lake for this year will be 4524 feet. As a result of the above, Project water deliveries to areas served by Gerber and Clear Lake Reservoirs are projected to be approximately 70,000 acre feet for irrigation needs. This amount may be affected by changes necessary to meet operational, hydrological and/or other conditions. In addition, stored water from Gerber and Clear Lake reservoirs will be used to meet evaporation needs in Tule Lake Sump 1A.

**Table 1 - Klamath Project 2001 Operations**

| | Klamath River Flows Below Iron Gate Dam (Cubic Feet per Second) | Upper Klamath Lake Minimum Elevations (Feet) (See note 1) | |
|---|---|---|---|
| | ESA Requirements | ESA Requirements | Adjusted Minimums |
| April 7-15 | 1700 | 4142.5 (April 15) | 4142.5 (April 15) |
| April 16-30 | 1700 | | |
| May 1-15 | 1700 | | |
| May 16-31 | 1700 | | 4141.8 (May 31) |
| June 1-15 | 2100 (See note 2) | 4142.5 (June 1) | |
| June 16-30 | 1700 (See note 2) | | |
| July 1-15 | 1000 | 4141.5 (July 15) | 4140.0 (July 15) |
| July 16-31 | 1000 | | |
| August | 1000 | 4141.0 (Aug. 15) | |
| September | 1000 | 4140.5 (Sept. 15) | 4139.0 (Sept. 30) |
| October | (See note 3) | 4140.0 (Oct. 15) | |
| November | (See note 3) | | |
| December | (See note 3) | | |
| January | (See note 3) | 4141.0 (Jan. 1) | |
| February | (See note 3) | 4142.0 (Feb. 15) | 4141.5 (Feb. 15) |
| March | (See note 3) | 4142.0 (Mar. 15) | 4142.0 (Mar. 15) |

Note 1: Adjusted minimums are derived from component number 2 of the Reasonable and Prudent Alternative specified in the biological opinion.
Note 2: Down ramping rates below Iron Gate Dam shall provide: (1) decreases in flows of 300 CFS or less per 24-hour period and no more than 125 CFS per four -hour period when IGD flows are above 1,750 CFS; or (2) decreases in flows of 150 CFS or less per 24-hour period and no more than 50 CFS per two-hour period when IGD flows are 1,750 CFS or less.
Note 3: The values for the months of October through March are anticipated to be provided through further consultation with NMFS. For purposes of this Plan, Reclamation used 1,300 CFS.

**Wetter Than Forecasted** In the event that weather conditions are significantly wetter than the forecasted conditions, water supplies for agriculture and NWR uses may be available after requirements of the biological opinions are met.

**Drier Than Forecasted** If drier than expected conditions result from either variations in snowpack runoff and/or weather conditions, Project operations could be modified by Reclamation as a result of joint recommendations from the FWS and NMFS.

**Future Operations Planning** Reclamation is continuing its efforts to develop a long-term operations plan. The 2001 Operations Plan includes biological measures for fish and wildlife resources that are important tribal trust resources. Reclamation expects the long-term plan to continue this progress. Reclamation will work with other Department of the Interior agencies, the States, and other parties to augment available supplies of water by taking action to implement a comprehensive water supply initiative. Reclamation will consider options that may arise from this water supply initiative and recognizes the need for continued progress in addressing habitat issues prior to making operational commitments that would affect water management in the future.

To support the operations planning effort, and in keeping with its ESA responsibilities, Reclamation is funding or carrying out a numerous studies and activities that will further the scientific knowledge of listed species and aid in developing programs to protect, conserve and recover these species.

# United States Department of the Interior

BUREAU OF RECLAMATION
Klamath Basin Area Office
6600 Washburn Way
Klamath Falls, Oregon 97603

IN REPLY REFER TO:

SEP 2 2000

KO-400
WTR-4.03

Van Brimmer Ditch Co.
Mr. James L. Moore, President
PO Box 419
Merrill, Oregon 97633

Dear Mr. Moore:

As you are likely aware, continued dry conditions in the Upper Klamath Basin have resulted in a critical water supply condition. The 2000 Annual Operation Plan (Plan), identified certain minimum elevations in Upper Klamath Lake and minimum river flows in the Klamath River as measured at Iron Gate Dam necessary for operation of the Project to be consistent with the requirements of the Endangered Species Act and Reclamation's obligation to protect Tribal trust resources. Reclamation has determined based on the available information that Project operations cannot vary from the Plan minimums.

Because conditions have been "Drier than Forecasted" as outlined in the Plan, we have been acquiring water, requesting voluntary reduction of use, and are utilizing water from Clear Lake Reservoir to supplement Project supply. While those actions have extended the available supply, it is not sufficient to complete the irrigation season. Thus, based on current runoff projections irrigation deliveries cannot continue at projected levels. Therefore, Reclamation is taking action consistent with our contract priorities.

At this time, there is insufficient supply for any further delivery to Tule Lake and Lower Klamath National Wildlife Refuges, "Warren Act" (also known as "B") contracts, or annual surplus water rental (also known as "C") contracts. There will be a limited supply available to apportion among lands which receive water under "A" contracts.

Our records show that your District delivers Project supply to "Warren Act" ("B") contractors. Because insufficient supply of Project water is available, you are hereby directed to curtail any diversion or use of Project supply to lands under "B" contracts. You are required to accomplish this curtailment no later than September 6, 2000. Please provide this office with written notice that you intend to comply with this order no later than close of business September 5, 2000.

PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT 62

EXHIBIT "A"
Page 1 of 2

Following completion of curtailments next week we will reassess the water supply available and assist you in apportioning the remaining available supply to A lands within your District.

We recognize that this creates a hardship for you, and will continue to work toward long-term planning that could provide a greater degree of water supply certainty in the future. If you have any questions or wish to discuss this order, please feel free to contact Karl Wirkus or Jim Bryant and the Klamath Basin Area Office (541) 883-6935.

Sincerely,

Karl E. Wirkus
Area Manager

cc: Klamath Irrigation District
Dave Solem, Manager
6640 KID Lane
Klamath Falls, OR 97603

EXHIBIT "A"
Page 2 of 2

# United States Department of the Interior

BUREAU OF RECLAMATION
Klamath Basin Area Office
6600 Washburn Way
Klamath Falls, Oregon 97603

IN REPLY REFER TO:

SEP 2 2000

KO-400
WTR-4.03

Klamath Drainage District
Sam Henzel, President
4901 Lower Klamath Lake Road
Klamath Falls, OR 97603

Dear Water User:

As you are likely aware, continued dry conditions in the Upper Klamath Basin have resulted in a critical water supply condition. The 2000 Annual Operations Plan identified certain minimum elevations in Upper Klamath Lake and minimum river flows in the Klamath River as measured at Iron Gate Dam necessary for operation of the Project to be consistent with the requirements of the Endangered Species Act and Reclamation's obligation to protect Tribal trust resources. Reclamation has determined, based on the available information, that Project operations cannot vary from the Plan minimums.

Because conditions have been "Drier than Forecasted" as outlined in the Plan, we have been acquiring water, requesting voluntary reduction of use, and are utilizing water from Clear Lake Reservoir to supplement Project supply. While those actions have extended the available supply, it is not sufficient to complete the irrigation season. Thus, based on current runoff projections, irrigation deliveries cannot continue at projected levels. Therefore, Reclamation is taking action consistent with our contract priorities.

At this time, there is insufficient supply for any further delivery to Tule Lake and Lower Klamath National Wildlife Refuges, "Warren Act" (also known as "B") contracts, or annual surplus water rental (also known as "C") contracts. There will be a limited supply available to apportion among lands which receive water under "A" contracts.

Our records show that you receive Project supply under a "B" contract. As an insufficient supply of Project water is available, you are hereby directed to curtail all diversion or use of Project supply. You are required to accomplish this curtailment no later than September 6, 2000. Please provide this office with written notice that you intend to comply with this order no later than close of business September 5, 2000.

We recognize that this creates a hardship for you, and we will continue to work toward long-term planning that could provide a greater degree of water supply certainty in the future. If you have any questions or wish to discuss this order, please feel free to contact Karl Wirkus or Jim Bryant of the Klamath Basin Area Office (541) 883-6935.

Sincerely,

Karl E. Wirkus
Area Manager

cc: Joe Frost, Manager
Klamath Drainage District
4901 Lower Klamath Lake Road
Klamath Falls, OR 97603

KO-700
PRJ-1.10 (ENV-7.00)

Allen Foreman, Chairman
The Klamath Tribes
PO Box 436
Chiloquin, OR 97624

Dear Mr. Foreman:

Thank you for your February 16, 2001, letter concerning the serious water situation that has evolved in the Klamath basin. We have noted that The Klamath Tribes, as well as the other tribes in the watershed of the Klamath River, have worked with Department of the Interior (Department) agencies to deal with complex water issues for many years. The Department appreciates your involvement and concerns in this important matter.

Forecasts of water supplies in the Klamath basin for the 2001 water year are currently nearly half of average conditions. If precipitation does not increase significantly over the next few months, severe water shortages are likely during the upcoming 2001 irrigation season.

In managing the Klamath Project (Project), Reclamation has various obligations and responsibilities, to the Klamath basin Indian tribes' trust resources, farmers within the Project, National Wildlife Refuges, and the species listed under the Endangered Species Act (ESA).

Since fall 2000, Reclamation has been consulting with both the US Fish and Wildlife Service (Service) and National Marine Fisheries Service (NMFS) regarding on-going operation of the Project. Draft Biological Assessments on the endangered suckers and threatened coho have been reviewed by those agencies, Project water users, PacifiCorp, and the four tribes in the Klamath basin. Concerns have been raised regarding the effect of lake levels and river flows on the ability of the Project to meet the needs of the species, tribes, refuges and crop production. Reclamation has submitted final Biological Assessments to the Service and NMFS with a request for formal consultation regarding the effects of on-going Project operation.

As in the past, we anticipate sharing information on the consultation process, as well as any draft Biological Opinions, with the Tribes and the water users. Reclamation is in the process of developing our annual Operations Plan for 2001 (Plan). The Biological Opinions that will result from the consultations currently underway with NMFS and the Service will be a critical part of the Plan's formulation. While it is possible that there may be drastic reductions in Project agriculture and refuge deliveries in 2001, Reclamation is working diligently to avoid such an outcome.

In order to help meet the growing water needs in the Klamath River basin, to improve water quality,



PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT
63

and to facilitate efforts to resolve water rights claims, the Secretary of the Interior has been authorized to engage in feasibility studies to restore flexibility in water management in the Klamath Basin. Feasibility studies will include increasing storage capacity, development of additional supplies from groundwater, and innovations in the use of existing water resources. These activities will take a number of years to complete, but implementation of a variety of actions could provide the relief that is so desperately needed.

Reclamation has launched a pilot program to explore opportunities for reducing irrigation water demand within the Klamath basin. Irrigators were asked to submit a cost proposal for not applying surface water to their lands for a 12-month period. The program has received a great deal of interest from the farming community. Funding of this pilot effort is limited. The results of the pilot program will be analyzed for possible use in a future long-term demand reduction program.

Reclamation has also undertaken a groundwater acquisition program to supplement Project surface water supplies. A recent request for proposals resulted in several opportunities for Reclamation to purchase well water from willing sellers. As with the pilot demand reduction program, funding for the groundwater acquisition program is limited.

Increasing Project storage has potential to increase flexibility in Project operations. While feasibility studies on raising Upper Klamath Lake and Gerber Dam are likely to begin in the near future, development of a construction authorization proposal for presentation to the Congress could take several years. Similarly, feasibility studies on additional groundwater development and innovations in the use of existing water resources are likely to begin soon, but a construction authorization proposal for the Congress would likely require several years.

I regret not being able to meet with the Tribes' representatives in February. We appreciate your continued interest in these issues. Should you require additional information, please contact Karl Wirkus at 541/883-6935 (TDD 541/883-6935).

Sincerely,

Gale A. Norton
Secretary of the Interior

WBR:BDavis:KWirkus:lls:03-12-01:MP#1002391:WO#1000315KBAO #1 0361
H:\PUBLIC\Klamath Project Operation Plan\2001 Operations Plan\KlamathTribes_Foreman_02_16_01_ltr.wpd

KO-700
PRJ-1.10 (ENV-7.00)

Mr. Samuel Prescott
P.O. Box 72
Malin, Oregon 97632

Dear Mr. Prescott:

The Secretary asked me to respond to your February 7, 2001, letter concerning water operations on the Klamath Project (Project). The Bureau of Reclamation appreciates your concerns in this important matter.

In managing the Project, Reclamation has many obligations and responsibilities, not only to the farmers in the Project, but also to the Klamath basin Indian tribes who have significant trust resources that may be affected by Project operations, the wildlife refuges within the Project, and the species listed under the Endangered Species Act (ESA). With respect to species listed pursuant to the ESA that may be affected by Project operations, Reclamation is obligated to consult under Section 7(a)(2) of the ESA with the National Marine Fisheries Service (NMFS) for the recently listed coho salmon. Reclamation must also reinitiate consultation with the U.S. Fish and Wildlife Service (Service) on Project operations concerning Lost River and shortnose suckers and bald eagles (currently the subject of a 1992 Biological Opinion) because significant new information is available. The ESA requires that the best scientific and commercial data available be used for consultations. A large amount of data has been collected and will be utilized during the consultations on these species.

Since fall 2000, Reclamation has informally consulted with both the Service and NMFS regarding on-going operation of the Project. We recently prepared draft Biological Assessments that were reviewed by those agencies, Project water users, PacifiCorp, and the four tribes in the Klamath River watershed. Reclamation submitted a final Biological Assessment on January 22, 2001, to NMFS with a request for formal consultation regarding the effects of on-going Project operation on coho salmon. On February 13, 2001, Reclamation submitted a final Biological Assessment and request for formal consultation regarding bald eagles and Lost River and shortnose suckers to the Service.

We are aware of the concerns raised regarding the effect of lake levels and river flows on the delivery of water to the Project, especially with the current dry conditions. As we have done in the past, we anticipate sharing information on the consultation process, as well as any draft Biological Opinions, with the water users and the tribes. Reclamation is in the process of

developing our annual Operations Plan for 2001 (Plan). The Biological Opinions that will result from the consultations currently underway with NMFS and the Service will be a critical part of the Plan's formulation. While it is possible that there may be drastic reductions in Project agriculture and refuge deliveries in 2001, Reclamation is working diligently to avoid such an outcome.

In order to help meet the growing water needs in the Klamath River basin, to improve water quality, and to facilitate efforts to resolve water rights claims, the Secretary of the Interior has been authorized to engage in feasibility studies to restore flexibility in water management in the Klamath basin. Feasibility studies will include increasing storage capacity, development of additional supplies from groundwater, and innovations in the use of existing water resources. Increasing Project storage has potential to increase flexibility in Project operations.

Reclamation has launched a pilot program to explore opportunities for reducing irrigation water demand within the Klamath Basin. Irrigators were asked to submit cost proposals for not applying surface water to their lands for a 12-month period. The program has received a great deal of interest from the farming community; however, funding of this pilot effort is limited. The results of the pilot program will be analyzed for possible use in a future long-term demand reduction program.

Reclamation has also undertaken a groundwater acquisition program to supplement Project surface water supplies. A recent request for proposals resulted in several opportunities for Reclamation to purchase well water from willing sellers. As with the pilot demand reduction program, funding for the groundwater acquisition program is limited.

We appreciate your continued interest in these issues. Should you require additional information, please contact Karl Wirkus at 541/883-6935 (TDD 541/883-6935).

Sincerely,

J. William McDonald
Regional Director
Pacific Northwest Region
(Exercising the Commissioner's authority)

WBR:R.Davis:KWirkus:lls:03-08-01:MP#1002393:WO#1000319:1 0360
H:\PUBLIC\Klamath Project Operation Plan\2001 Operations Plan\SamuelPrescott_02_7_01_ltr.wpd

# United States Department of the Interior

BUREAU OF RECLAMATION
Klamath Basin Area Office
6600 Washburn Way
Klamath Falls, Oregon 97603

IN REPLY REFER TO:

KO-100
RES-3.10 (ENV-6.00)

MAR 02 2001

Subject: 2001 Operation Planning Update and Notice that Klamath Project Water Not Currently Available

Dear Water Users:

Reclamation is currently operating the Klamath Project (Project) in accordance with the 2000 Annual Operations Plan that expires on March 31, 2001. Current conditions indicate a potential for shortage of water in the upper basin and, if precipitation does not increase significantly over the next few months, severe water shortages are likely during the upcoming 2001 irrigation season. **Therefore, you are notified that Project water is not available for use until such time as the 2001 Operations Plan or other such written notification is completed.**

Reclamation submitted a final Biological Assessment on January 22, 2001, to NMFS with a request for formal consultation regarding the effects of on-going Project operation on coho salmon. On February 13, 2001, a final Biological Assessment and request for formal consultation regarding bald eagles and Lost River and shortnose suckers was submitted to the Service. Draft Biological Assessments were reviewed by the Service, NMFS, Project water users, PacifiCorp, and the four Tribes in the Klamath Basin. We anticipate sharing information as the consultation progresses.

Reclamation is in the process of developing the 2001 Annual Operations Plan. Biological opinions resulting from current consultations will be a critical part of the plan's formulation. While it is possible that there may be drastic reductions in project agriculture and refuge deliveries in 2001, Reclamation is working diligently to avoid such an outcome. However, until Reclamation completes the consultation process, no diversion of Project water may occur that would result in a violation of Section 7(d) of the ESA which prohibits "*. . .any irreversible or irretrievable commitment of resources . . .*" pending completion of consultation. To date, Reclamation has not made a determination as to whether and to what extent Project water could be delivered in advance of completed consultations. Thus, until such a determination is made or the consultations are completed, no Project water may be diverted or used unless expressly authorized by Reclamation.

Finally, we wish to acknowledge and extend our gratitude to individuals and organizations within the water user community who have provided cooperation and assistance in the formulation of elements of the 2001 Plan. We expect and intend to continue this inclusive, cooperative relationship during the next few difficult weeks as the consultations are completed and the 2001 Plan is finalized.

If you have questions, or wish to discuss the details of this notice or other elements of the planning process, please feel free to contact me at (541) 883-6935.

Sincerely,

Karl E. Wirkus
Area Manager

DEFENDANT'S EXHIBIT 64

PENGAD-Bayonne, N. J.

DOI0001650

bc: Mr. Duane Sherman
Hoopa Valley Tribe
P.O. Box 1348
Hoopa Valley, CA 95546

Ms. Susan Masten
Yurok Tribe
1034 Sixth St.
Eureka, CA 95501

Mr. Alvis Johnson
Karuk Tribe
P.O. Box 1016
Happy Camp, CA 96039

Mr. Allen Foreman
The Klamath Tribes
P.O. Box 436
Chiloquin, OR 97624

**bc: W-6332, MP-100, MP-105, MP-140, Steve Palmer, SOL**

NOTE: BC'S TO OTHER AGENCIES WERE SENT AS INDIVIDUAL LETTERS

WBR:BobDavis:SPalmer:KWirkus:lls:02-28-01
H:\PUBLIC\ESA\ASSESMNT\Notice to Water Users-Rev.3.wpd
faxed to Donna Darr + RD ofc 3/2/01

NOV 22 2000

KO-700
ENV-6.00

Rebecca Lent
Regional Administrator
National Marine Fisheries Service, Southwest Region
501 West Ocean Blvd., Suite 4200
Long Beach, California 90802-4213

Subject: On-going Klamath Project Operations - Draft Biological Assessment

Dear Ms. Lent:

Please find enclosed a draft biological assessment (BA) prepared by the U.S. Bureau of Reclamation (Reclamation) that describes the effects of the on-going Klamath Project operations on coho salmon, *Oncorhynchus kisutch*, a federally-listed threatened species.

Reclamation would appreciate receiving your comments on the draft BA by December 6, 2000. Copies of this draft are also being provided to the Bureau of Indian Affairs, US Fish and Wildlife Service, tribes, PacifiCorp, and the Klamath Project irrigation Contractors for their comment. Reclamation anticipates issuing a final BA in December 2000, thereby initiating the formal Section 7 Endangered Species Act consultation. It is our intent and understanding that the consultation will be conducted in accordance with the joint Secretarial Order "American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act" dated June 5, 1997.

If you have any questions or need additional information, please contact me at (541) 883-6935. You may also contact Ron Sutton at (303) 445-2495, for discussion of specific biological topics.

Sincerely,

Karl E. Wirkus
Area Manager

Enclosure

DEFENDANT'S EXHIBIT 65 (A)

DESK COPY

cc: Don Reck (w/enclosure)
National Marine Fisheries Service
1655 Heindon Road
Arcata, CA 95521

Irma Lagomarsino (w/enclosure)
National Marine Fisheries Service
1655 Heindon Road
Arcata, CA 95521

Doug Tedrick (w/enclosure)
Bureau of Indian Affairs
1894 C Street, N.W., MS 3061-MIB
Washington, diversion channel 20240

Steve Lewis (w/enclosure)
US Fish and Wildlife Service
6610 Washburn Way
Klamath Falls, Oregon 97603

Allen Foreman (without enclosure)
The Klamath Tribes
P.O. Box 436
Chiloquin, Oregon 97624

Alvis Johnson (without enclosure)
The Karuk Tribe of California
P.O. Box 1016
Happy Camp, California 96039

Duane Sherman (without enclosure)
The Hoopa Valley Tribe
P.O. Box 1348
Hoopa, California 95546

Susan M. Masten (without enclosure)
The Yurok Tribe
1034 Sixth Street
Eureka, California 95501

Dave McCarley (without enclosure)
Langell Valley Irrigation District
9787 East Langell Valley Road
Bonanza, Oregon 97623

Bruce McCoy (without enclosure)
Horsefly Irrigation District
P.O. Box 188
Bonanza, Oregon 97623

Tessa Stuedli (without enclosure)
Klamath Water Users Association
2455 Patterson Road
Klamath Falls, Oregon 97603

Todd Olson (without enclosure)
PacifiCorp
825 NE Multnomah
Portland, Oregon 97232

bc: D-8210, MP-152

WBR:BDavis:KWirkus:11/20/00:kdf:BA
H:\PUBLIC\ESA\ASSESMNT\Ba2000\Salmon BA\Draft BA_letter to NMFS.wpd

NOV 2 2 2000

KO-700
ENV-6.00

Steve Lewis, Field Supervisor
Klamath Falls Fish and Wildlife Office
US Fish and Wildlife Service
6610 Washburn Way
Klamath Falls, Oregon 97603-9365

Subject: On-going Klamath Project Operations - Draft Biological Assessment

Dear Mr. Lewis:

Please find enclosed a draft biological assessment (BA) prepared by the U.S. Bureau of Reclamation (Reclamation) that describes the effects of Klamath Project operations on the shortnose sucker, *Chasmistes brevirostris,* and the Lost River sucker, *Deltistes luxatus*, both federally listed endangered species. This consultation is expected to supersede previous Biological Opinions (BO) issued in 1992 and 1994.

Consultation is being reinitiated because of new scientific data that has become available since the issuance of the previous BO's. Since receipt of prior BO's, Reclamation has operated the Project consistent with their requirements including implementation of the reasonable and prudent alternatives. In addition, since 1996 Reclamation has based its operation plans on this new scientific data that was not considered in the 1994 BO. It is our expectation that the opinion resulting from this re-consultation will include a review of conclusions which supported those operation decisions.

It is important to note that Reclamation has committed considerable resources during the previous ten years to advance the science of the listed species. We believe that we have incorporated this science in the attached draft BA. As new information on the species is developed, that data will be used to better define impacts to the species caused by Project Operations.

Reclamation would appreciate receiving your comments on the draft BA by December 6, 2000. Copies of this draft are also being provided to the Bureau of Indian Affairs, National Marine Fisheries Service, tribes, PacifiCorp, and the Klamath Project Irrigation Contractors for their comment by December 6th. We have received your memorandum dated November 21, 2000 which provided comments on earlier pre-drafts of the BA on suckers. The memorandum is also

DEFENDANT'S EXHIBIT 65 (B)
PENGAD-Bayonne, N. J.



DESK COPY

being provide for others to comment upon. Issues that you have shared in the memorandum will be considered as the final BA is prepared. Reclamation anticipates issuing a final BA in December 2000, thereby initiating the formal Section 7 Endangered Species Act consultation. It is our intent and understanding that the consultation will be conducted in accordance with the joint Secretarial Order "American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act" dated June 5, 1997.

If you have any questions or need additional information, please contact me at (541)883-6935. You may also contact Mark Buettner for discussion of specific biological topics.

Sincerely,

Karl E. Wirkus
Area Manager

Enclosure

cc:

National Marine Fisheries Service (w/enclosures)
Don Reck, Fisheries Biologist
1655 Heindon Road
Arcata, California 95521

Bureau of Indian Affairs (w/enclosures)
Doug Tedrick, Office of Trust Responsibilities
1849 C Street, N.W., MS 3061-MIB
Washington, DC 20240

The Klamath Tribes (without enclosures)
Allen Foreman, Chairperson
P.O. Box 436
Chiloquin, Oregon 97624

The Karuk Tribe of California (without enclosures)
Alvis Johnson, Chairperson
P.O. Box 1016
Happy Camp, California 96039

The Hoopa Valley Tribe (without enclosures)
Duane Sherman, Sr., Chairman
P.O. Box 1348
Hoopa, California 95546

The Yurok Tribe (without enclosures)
Susan Masten, Chairperson
1034 Sixth Street
Eureka, California 95501

Langell Valley Irrigation District (without enclosures)
Dave McCarley, Manager
9787 East Langell Valley Road
Bonanza, Oregon 97623

Horsefly Irrigation District (without enclosures)
Bruce McCoy, Manager
P.O. Box 188
Bonanza, Oregon 97623

Klamath Water Users Association (without enclosures)
Tessa Stuedli, Manager
2455 Patterson
Klamath Falls, Oregon 97603

PacifiCorp (without enclosures)
Todd Olson
825 NE Multnomah
Portland, Oregon 97232

bc: D-8210, MP-152

WBR:RDavis:KWirkus:KEllis:11/20/00:kdf:biological assessment
H:\PUBLIC\ENVIRMNT\LETTERS\Draft #2 BA_letter to USFWS.wpd

NOV 2 2

KO-700
ENV-6.00

Allen Foreman, Chairperson
The Klamath Tribes
64236 2nd Avenue
P.O. Box 436
Chiloquin, Oregon 97624

Subject: On-going Klamath Project Operations - Draft Biological Assessment

Dear Mr. Foreman:

Please find enclosed two draft biological assessments (BA) prepared by the U.S. Bureau of Reclamation (Reclamation) that describes the effects of the on-going Klamath Project operations on coho salmon, *Oncorhynchus kisutch*, a federally-listed threatened species, and the shortnose sucker, *Chasmistes brevirostris*, and the Lost River sucker, *Deltistes luxatus*, both federally-listed endangered species. We are also enclosing a copy of comments that US Fish and Wildlife Service (FWS) has provided to us on an earlier pre-draft of the BA on the suckers. These comments have not been fully incorporated into this draft. Your comments on the issues that the FWS has provided could be helpful in developing the final BA on suckers.

Reclamation would appreciate receiving your comments on the draft BAs by December 6, 2000. Copies of these drafts have also been provided to the Bureau of Indian Affairs, FWS, tribes, PacifiCorp, and the Klamath Project irrigation Contractors for their comment. Reclamation anticipates issuing a final BA in December 2000, thereby initiating the formal Section 7 Endangered Species Act consultation. It is our intent and understanding that the consultation will be conducted in accordance with the joint Secretarial Order "American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act" dated June 5, 1997.

If you have any questions or need additional information, please contact me at (541) 883-6935. You may also contact Ron Sutton at (303) 445-2495 or Mark Buettner at (541) 883-6935, for discussion of specific biological topics.

Sincerely,

Karl E. Wirkus
Area Manager

Enclosures

DEFENDANT'S EXHIBIT 65 (c)

PENGAD-Bayonne, N.J.

DOI0002485

DESK COPY

cc: National Marine Fisheries Service (w/enclosure)
Don Reck, Fisheries Biologist
1655 Heindon Road
Arcata, California 95521

Bureau of Indian Affairs (w/enclosure)
Doug Tedrick, Office of Trust Responsibilities
1849 C Street, N.W., MS 3061-MIB
Washington, DC 20240

Steve Lewis
US Fish and Wildlife Service
6610 Washburn Way
Klamath Falls, Oregon 97603-9365

bc: D-8210, MP-152

WBR:RDavis:KWirkus:11/20/00:kdf:BA
H:\PUBLIC\ESA\ASSESMNT\Ba2000\Draft BA_letter to tribes and contractors.wpd

Identical Letters Sent To:

The Karuk Tribe of California
Alvis Johnson, Chairperson
64236 2nd Avenue
P.O. Box 1016
Happy Camp, California 96039

The Klamath Tribes
Allen Foreman, Chairperson
31725 Highway 97 N
Chiloquin, Oregon 97624

The Hoopa Valley Tribe
Duane Sherman, Sr., Chairman
Highway 96, Neighborhood Facilities
P.O. Box 1348
Hoopa, California 95546

The Yurok Tribe
Susan Masten, Chairperson
1034 Sixth Street
Eureka, California 95501

Langell Valley Irrigation District
Dave McCarley, Manager
9787 East Langell Valley Road
Bonanza, Oregon 97623

Horsefly Irrigation District
Bruce McCoy, Manager
37820 Jones Road
P.O. Box 188
Bonanza, Oregon 97623

Klamath Water Users Association
Tessa Stuedli, Manager
2455 Patterson
Klamath Falls, Oregon 97603

PacifiCorp
Todd Olson
825 NE Multnomah
Portland, Oregon 97232

# United States Department of the Interior

BUREAU OF RECLAMATION
Klamath Basin Area Office
6600 Washburn Way
Klamath Falls, Oregon 97603

IN REPLY REFER TO:

KO-150
ENV-7.00

JAN 22 2001

Ms. Rebecca Lent
Regional Administrator
National Marine Fisheries Service, Southwest Region
501 West Ocean Blvd., Suite 4200
Long Beach, California 90802-4213

Subject: Request for Initiation of Formal Consultation on the Effects of Ongoing Operation of the Klamath Project

Dear Ms. Lent:

The Bureau of Reclamation (Reclamation) requests initiation of formal consultation with the National Marine Fisheries Service (NMFS), pursuant to section 7(a)(2) of the Endangered Species Act of 1973, as amended, on the effects of ongoing operation of the Klamath Project, a Federal Reclamation project, on the southern Oregon/northern California (SONCC) coho salmon (*Orcorhynchus kisutch*),and its designated critical habitat. The SONCC coho salmon was listed as threatened on June 6, 1997, and its critical habitat, which includes the Klamath River downstream from Iron Gate Dam in northern California, was designated in May 1999.

The Klamath Project is located in south-central Oregon and northeastern California. A detailed description of the Project and its ongoing operation is found in the enclosed biological assessment (BA) and the report describing historic operation (also enclosed).

Reclamation has prepared a biological assessment (BA) that describes the effects on the SONCC coho salmon and its designated critical habitat that result from ongoing operation of the Klamath Project. The BA contains: (1) a detailed description of the Project and its operation; (2) a description of the specific area that may be affected by the action; (3) a description of listed species and critical habitat; (4) a description of the effects of the action; and (5) incorporates by reference other relevant available information cited in the BA.

Reclamation believes that the BA contains the best scientific and commercial data available or which can be obtained during the consultation for an adequate review by the NMFS. A draft of the BA was reviewed by other Federal, State, tribal, Project water users, and other interested parties. Copies of their comments are included for your information. Reclamation has reviewed these comments and revised the BA as appropriate in response to the comments.

PENGAD-Bayonne, N. J. DEFENDANT'S EXHIBIT 66

Reclamation has determined that the ongoing operation of the Klamath Project, as described in the BA, is likely to adversely affect the SONCC coho salmon and may adversely modify its designated critical habitat. Reclamation requests that the NMFS formulate its biological opinion as to whether the action is likely to jeopardize the continued existence of the SONCC coho salmon or result in the destruction or adverse modification of critical habitat. Also, to further the cooperative effort of the consultation process, we request that NMFS provide a draft biological opinion for our review.

You may direct questions regarding the BA to Ron Sutton at (303)445-2495, or questions regarding this request for formal consultation to Bob Davis or Dan Fritz at (541)883-6935.

Sincerely,

Karl E. Wirkus
Area Manager

cc: (w/enclosures)
Don Reck
National Marine Fisheries Service
1655 Heindon Road
Arcata, CA 95521

(w/o attachments)
Karuk Tribe
Alvis Johnson, Chair
PO Box 1016
Happy Camp, CA 96039
Klamath Tribes

The Klamath Tribes
Allen Foreman, Chair
PO Box 436
Chiloquin, OR 97624

Hoopa Valley Tribe
Duane Sherman, Chair
PO Box 1348
Hoopa, CA 95546

Yurok Tribe
Susan M. Masten, Chair
1034 Sixth Street
Eureka, CA 95501

Bureau of Indian Affairs
Doug Tedrick
1849 C Street, NW, MS 3061-MIB
Washington, DC 20240

Klamath Water User's Association
Tessa Stuedli, Executive Director
2455 Patterson Street, Suite 3
Klamath Falls, OR 97603

Somach, Simmons & Dunn
Paul Simmons, Attorney
400 Capitol Mall, Suite 1900
Sacramento, CA 95814

US Fish & Wildlife Service
Steve Lewis
6610 Washburn Way
Klamath Falls, OR 97603

PacifiCorp
Todd Olson
825 NE Multnomah Street
Portland, OR 97232

Calif. Dept of Fish & Game
Gary Stacey
601 Locust Street
Redding, CA 96001

Oregon Dept. of Fish & Wildlife
Roger Smith, Fisheries Biologist
1850 Miller Island Road W.
Klamath Falls, OR 97603

Calif. Regional Water Quality Control Board
William Winchester
5550 Skyland Blvd, Suite A
Santa Rosa, CA 95403

Humboldt Co. Board of Supervisors
County Courthouse, 1st Floor
Eureka, CA 95501

Siskiyou Co. Board of Supervisors
PO Box 338
Yreka, CA 96097

Del Norte Co. Board of Supervisors
583 G Street, Suite 1
Crescent City, CA 95531

Modoc County Board of Supervisors
PO Box 131
Alturas, CA 96101

Klamath County Commissioners
305 Main Street, 2nd Floor
Klamath Falls, OR 97601

KWUA

# United States Department of the Interior

BUREAU OF RECLAMATION
Klamath Basin Area Office
6600 Washburn Way
Klamath Falls, Oregon 97603

IN REPLY REFER TO:

KO-150
ENV-7.00

FEB 13 2001

MEMORANDUM

To: Steven A. Lewis
Project Leader, Fish and Wildlife Service, Klamath Falls, Oregon

From: Karl E. Wirkus
Area Manager

Subject: Request for Reinitiation of Formal Consultation on the Effects of Ongoing Operation of the Klamath Project and Response to January 19, 2001 Memorandum Containing Comments on the Draft Biological Assessment

Request for Reinitiation of Formal Consultation

The Bureau of Reclamation (Reclamation) requests reinitiation of formal consultation with the Fish and Wildlife Service (Service), pursuant to section 7(a)(2) of the Endangered Species Act of 1973, as amended, on the effects of ongoing operation of the Klamath Project (Project), a Federal Reclamation project, on the Lost River sucker (*Deltistes luxatus*) and the shortnose sucker (*Chamistes brevirostris*) and their designated critical habitat. The Lost River and shortnose suckers were listed as endangered in 1988, and critical habitat, which includes waters found within the Project area, was designated in 1994. This request for reinitiation of formal consultation is based upon the availability of new information regarding effects of the Project on the endangered suckers. The action described in the BA takes into account new information relevant to the endangered suckers. Reclamation has no new information relevant to bald eagles that would lead us to request reinitiation of formal consultation on this recovering species. Reclamation believes that the effects of ongoing Project operation are similar to those previously described in 1997.

The Klamath Project is located in south-central Oregon and northeastern California. A detailed description of the Project and its ongoing operation are found in the enclosed biological assessment (BA) and the report describing historic operation (also enclosed). Reclamation has prepared a BA that describes the effects on the endangered suckers and their designated critical habitat that result from ongoing operation of the Klamath Project. The BA contains: (1) a detailed description of the Project and its operation; (2) a description of the specific area that may be affected by the action; (3) a description of listed species and critical habitat; (4) a description of the effects of the action; and (5) incorporates by reference other relevant available information cited in the BA.



DEFENDANT'S EXHIBIT 67

Reclamation believes that the BA contains the best scientific and commercial data available or which can be obtained during the consultation for an adequate review by the Service. A draft of the BA was reviewed by other Federal, State, and tribal agencies, Project water users, and other interested parties. Copies of their comments were previously transmitted to the Service for your information. Reclamation reviewed the comments and revised the BA as appropriate in response to them.

Reclamation has determined that the ongoing operation of the Klamath Project, as described in the BA, is likely to adversely affect the Lost River and shortnose suckers and may adversely modify proposed critical habitat. Reclamation requests that the Service formulate its biological opinion (BO) as to whether the action is likely to jeopardize the continued existence of the endangered suckers or result in the destruction or adverse modification of critical habitat. Also, to further the cooperative effort of the consultation process, we request that the Service provide a draft BO for our review. Reasonable and prudent alternatives included in the BO will require careful coordination between the Service and Reclamation.

<u>Response to Service's Memorandum of January 19, 2001</u>

Reclamation has reviewed the Service's January 19, 2001, memorandum regarding our November 22, 2000, draft biological assessment (BA) on operation of the Klamath Project (Project). The Service stated that the action described in the draft BA would likely lead to significant sucker mortality and prevent their recovery. The Service also stated that release of water from Project reservoirs prior to completion of a biological opinion could conflict with section 7(d) of the Endangered Species Act (ESA). The Service included several documents with its memorandum providing a preliminary analysis of effects of the action on bald eagles and suckers. The Service stated that it intends to complete a biological opinion (BO) prior to the 2001 irrigation season, which we interpret to mean on or about April 1, 2001. Reclamation offers the following comments for the Service's consideration during formulation of a BO.

The conclusion stated in your January 19, 2001, memorandum appears to be a precursor to the Service's BO. The Service's comments lead Reclamation to believe the Service anticipates a jeopardy opinion based on the action presented in the draft BA. The Service's comments also lead us to believe that it is the opinion of the Service that a reasonable and prudent alternative (RPA) to avoid jeopardy would be establishment of 4140 as the minimum elevation for Upper Klamath Lake (UKL) in all years. In previous correspondence (your memorandum dated December 19, 2000), the Service asked Reclamation to incorporate the 4140 elevation into the action described in the draft BA.

In addition to the endangered suckers, Reclamation must also consider the needs of the threatened coho salmon downstream from the Project area in the Klamath River. Reclamation has initiated formal consultation with the National Marine Fisheries Service (NMFS) regarding the effects of ongoing Project operation on coho salmon. NMFS stated in a recent letter that it expects Reclamation to implement the Hardy Phase II flow recommendations for the Klamath River downstream from Iron Gate Dam this year. NMFS also stated that if Phase II is not available, then Reclamation should prepare to implement Hardy's Phase I flow recommendation

(please see the attached letter is response to NMFS). Reclamation has completed preliminary Project operation simulations using the low range elevations and the Service's recommended UKL September elevation of 4140 coupled with NMFS's recommended Hardy Phase I flows. The results of those simulations show that this year, and in the majority of years, there would be insufficient inflow to UKL to simultaneously meet UKL elevations and meet the downstream flows, even without any Project or refuge deliveries. Reclamation believes this is not reasonable or prudent and precludes the intended purpose of the Project.

The consultation regulations define RPA's as alternative actions identified during formal consultation that: (1) can be implemented in a manner consistent with the intended purpose of the action; (2) can be implemented consistent with the scope of the federal agency's legal authority and jurisdiction; (3) is economically and technologically feasible; and (4) the Service believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat. We are concerned that requiring an elevation of 4140 does not meet the definition of a RPA for UKL in the BO. If the Service believes that, after reviewing the final BA, it must specify elevation 4140, then Reclamation requests that the Service engage Reclamation in discussing this action.

The Service's recommended UKL minimum elevation of 4140, if implemented in concert with the NMFS Hardy Phase I recommended river flows, would result in Reclamation not being able to implement the action, which is to deliver water for Project contractors and refuges, in most years. This would be contrary to the intended purpose of the action, which is to operate the Klamath Project to supply water for agriculture and refuges while meeting Reclamation's other obligations, such as the Endangered Species Act.

The Service is responsible for evaluating the effects of the action on listed species or critical habitat under Section 7 of Endangered Species Act (ESA). The effects include direct and indirect effects of an action on the species or critical habitat that will be added to the environmental baseline. Please provide us with an explanation in the BO of how the Service has established an environmental baseline to adequately consider the effects of other Federal and non-Federal actions and activities on the endangered suckers and their critical habitat.

Many of the recommendations in your memorandum may have better application in a revised Recovery Plan for the endangered suckers. Reclamation strongly recommends that the Service revise the existing Recovery Plan to incorporate new scientific information collected since 1993. This would allow the Service to engage other non-Project activities in recovery activities.

Finally, Reclamation is committed to utilizing our 7(a)(1) authorities to further the purpose of the ESA. We have been participating in, and promoting the use of a comprehensive ecosystem restoration strategy for conservation and recovery of the species in the Klamath Basin. That program is in its beginning and we believe it will yield positive results over time.

You may direct questions regarding the BA to Mark Buettner at (541)883-6935, or questions regarding this request for formal consultation to Bob Davis or Dan Fritz at (541)883-6935. The BA may be viewed for printing as needed at www.mp.usbr.gov/kbao.

Attachment

Cc: (with attachment)

National Marine Fisheries Service, Donald Reck, Fisheries Biologist, 1655 Heindon Road, Arcata, CA 95521

Cc: (without attachment)

Bureau of Indian Affairs, Office of Trust Responsibilities, Doug Tedrick, , 1849 C Street, NW, MS 3061-MIB, Washington, D. C, 20240

Bureau of Indian Affairs, Karole Overberg, Trust Officer, 911 NE 11th Ave., Portland, OR 97232

Bureau of Indian Affairs, Frank Fryman, , 2800 Cottage Way, Sacramento, CA 95825

Horsefly Irrigation District, Bruce McCoy, Manager, PO Box 188, Bonanza, OR 97623

PacifiCorp, Todd Olson, Licensing Project Manager, 825 NE Multnomah StreetSuite 1500, Portland, OR 97232

Hoopa Valley Tribe, Duane Sherman, Chair, PO Box 1348, Hoopa, CA 95546

Karuk Tribe of California, Alvis Johnson, Chair, PO Box 1016, Happy Camp, CA 96039

Klamath County Commissioner's Office, Steve West, Chairman, Board of Commissioners, 305 Main Street, 2nd Floor, Klamath Falls, OR 97601

Klamath River Intertribal Fish and Water Commission, Merv George, Administrator, PO Box 1449, Hoopa, CA 95546

Klamath Water Users Protective Association, Tessa Stuedli, Executive Director, 2455 Patterson Street, Suite 3, Klamath Falls, OR 97603

Langell Valley Irrigation District, David McCarley, Manager, 9787 East Langell Valley Road, Bonanza, OR 97623

Modoc County Board of Supervisors, Terry Williams, Chair, PO Box 130, Alturas, CA 96101

National Marine Fisheries Service, SW Region, Rebecca Lent, Regional Administrator, 501 West Ocean Blvd., Suite 4200, Long Beach, CA 90802-4213

Pacific Southwest Solicitors Office, Stephen Palmer, Attorney, 2800 Cottage Way, Sacramento, CA 95825-1898

Siskiyou County Board of Supervisors, Bill Hoy, Supervisor Chair, PO Box 338, Yreka, CA 96097

The Honorable Wally Herger, US House of Representatives, 2433 Rayburn House Office Bldg, Washington, DC 20515

The Honorable Barbara Boxer, United States Senate, 112 Hart Senate Bldg., Washington, DC 20510

The Honorable Dianne Feinstein, United States Senate, 331 Hart Senate Bldg, Washington, DC 20510

The Honorable Greg Walden, US House of Representatives, 843 East Main St., #400, Medford, OR 97504

The Honorable Mike Thompson, US House of Representatives, 415 Cannon House Ofc. Bldg. US House of Representatives, Washington, DC 20510

The Klamath Tribes, Allen Foreman, Chair, PO Box 436, Chiloquin, OR 97624

US Fish and Wildlife Service, John Engbring, , 2800 Cottage Way, W-2606, Sacramento, CA 95825

Yurok Tribe Fisheries Program, Dave Hillemeier, , 15900 Highway 101 N., Klamath, CA 95548

Yurok Tribe, Susan M. Masten, Chair, 1034 Sixth Street, Eureka, CA 95501

# BIOLOGICAL ASSESSMENT OF THE KLAMATH PROJECT'S CONTINUING OPERATIONS ON SOUTHERN OREGON/NORTHERN CALIFORNIA ESU COHO SALMON AND CRITICAL HABITAT FOR SOUTHERN OREGON/NORTHERN CALIFORNIA ESU COHO SALMON

U.S. Bureau of Reclamation
Mid-Pacific Region
Klamath Area Office
Klamath Falls, Oregon

January 22, 2001

PENGAD-Bayonne, N. J.
DEFENDANT'S
EXHIBIT
68

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . 2

PROJECT DESCRIPTION . . . . . . . . . . 3

ENDANGERED SPECIES ACT . . . . . . . . . . 14

PROPOSED ACTION . . . . . . . . . . 15

COHO SALMON GENERAL INFORMATION . . . . . . . . . . 19

EFFECTS OF KLAMATH PROJECT ON COHO SALMON IN THE KLAMATH RIVER . . . 23

CUMULATIVE EFFECTS . . . . . . . . . . 41

DETERMINATION OF EFFECTS . . . . . . . . . . 45

LITERATURE CITED . . . . . . . . . . 47

PERSONAL COMMUNICATIONS . . . . . . . . . . 52

## 1.0 INTRODUCTION

The Bureau of Reclamation (Reclamation) is the responsible Federal agency for operation of the Klamath Project (Project). Operation of the Project has been the subject of numerous previous consultations with the U.S. Fish and Wildlife Service (Service) and one with the National Marine Fisheries Service (NMFS) under Section 7 of the Endangered Species Act (ESA). Severe drought conditions in 1992 and 1994 and resultant associated shortages in project water supplies coupled with the 1997 listing of the southern Oregon/northern California (SONCC) coho salmon, *Oncorhynchus kisutch*, as threatened in the Klamath River downstream from the Project led to a review of Reclamation's operations. This biological assessment (BA) describes the effects on federally-listed species (i.e., coho salmon) and its designated critical habitat from on-going operation of the project based on historic operations, as described in this BA. The biological opinion (BO) addressing this BA and any subsequent BA amendments will be among the information that will inform the development of alternatives of the long-term operations plan and environmental impact statement (EIS). Reclamation is developing a long-term operations plan and EIS for the Project. The preferred alternative for implementation from the long-term operations plan would be the subject of a separate future ESA consultation.

This BA describes the needs of anadromous fish with emphasis on SONCC coho salmon. It was developed using the best available scientific and commercial information on anadromous fish in the Klamath River.

Coho salmon were listed as threatened on June 6, 1997 (NMFS 1997). The NMFS published a final rule designating critical habitat for SONCC coho salmon in May, 1999 (NMFS 1999a). Designated critical habitat for SONCC coho salmon encompasses accessible reaches of all rivers (including estuarine areas and tributaries) between the Mattole River in California and the Elk River in Oregon. Critical habitat includes all waterways, substrate, and adjacent riparian zones below longstanding, naturally impassable barriers. The areas upstream from Iron Gate Dam (IGD) (river mile 190) were not proposed critical habitat because areas downstream were considered sufficient for the conservation of the species.

Reclamation has not evaluated whether the action that is the subject of this BA is consistent with its trust responsibility to Klamath Basin Indian Tribes. There are several important scientific reports and analyses (e.g., Phase II flow study) currently not available to Reclamation concerning threatened coho salmon, their habitat, and water quality as it relates to appropriate river flows that may be necessary to operate the Project consistent with the trust responsibility to Klamath Basin Indian Tribes. When this additional information becomes available, Reclamation intends to consider it during the development of the Project operations plans and include it in subsequent consultations with NMFS, as appropriate.

## 2.0 KLAMATH PROJECT DESCRIPTION

### 2.1 General Operations

The Project develops a water supply used for irrigation of approximately 220,000 acres in three counties in south-central Oregon and northeastern California. The location of the Project is shown on Figure 1. The Project delivers water primarily from Upper Klamath Lake in the headwaters of the Klamath River Basin and Gerber and Clear Lake Reservoirs in the Lost River watershed. A detailed description of Project operations was included in the 1992 BA for Long-Term Operations of the Klamath Project (Reclamation 1992) and the report describing historic project operation (Reclamation 2000a).

Figure 1. Klamath Project–location map




### 2.2 Project Authorities and Institutional Restraints

There are authorities, responsibilities and obligations that affect or influence Project operations. These include:

1) Project construction was authorized by the Secretary of the Interior on May 15, 1905, in accordance with the Reclamation Act of 1902. The Act of February 9, 1905 provides; *"The*

*Secretary of the Interior is hereby authorized in carrying out any irrigation project that may be undertaken by him under the terms and conditions of the national reclamation act and which may involve the changing of the levels of Lower or Little Klamath Lake, Tule or Rhett Lake, and Goose Lake, or any river or other body of water connected therewith, in the States of Oregon and California, to raise or lower the level of said lakes as may be necessary..."*

2) The Klamath River Compact of 1957 entered into between the states of Oregon and California and approved by the U.S. Congress which established goals and objectives for the development and management of water resources of the Klamath River Basin.

3) FERC license, Project No. 2082, establishes terms and conditions for operation of the Eastside and Westside Powerplants at Link River Dam, J.C. Boyle, Copco No. 1 and No. 2, and Iron Gate hydroelectric projects and Keno Dam, all of which are operated by PacifiCorp in accordance with its FERC license. This license sets certain minimum flows for the Klamath River at IGD (Table 1). Minimum flows, however, are subject to water availability and senior water rights. Pursuant to a 1956 contract with Reclamation, PacifiCorp operates Link River Dam and its appurtenant power generation facilities. Reclamation and PacifiCorp entered into a Letter Agreement on June 5, 1997, to clarify for FERC that PacifiCorp was operating Link River Dam pursuant to Reclamation authority under the 1956 contract, because the 1997 Klamath Project operations plan required Klamath River flows that were both greater and less than those included in PacifiCorp's FERC license. The Agreement has been extended each year to include that year's operation.

Table 1. FERC instantaneous minimum flows at Iron Gate Dam.

| **Month** | **Flow (cfs)** | **Month** | **Flow (cfs)** | **Month** | **Flow (cfs)** |
|---|---|---|---|---|---|
| April | 1,300 | August | 1,000 | December | 1,300 |
| May | 1,000 | September | 1,300 | January | 1,300 |
| June | 710 | October | 1,300 | February | 1,300 |
| July | 710 | November | 1,300 | March | 1,300 |

4) Endangered Species Act - Project operations affect four threatened and endangered species including the Lost River and shortnose sucker, SONCC coho salmon and bald eagle. In 1992 and 1994, Service issued BOs on the effects of the Project on the endangered suckers and bald eagles. The Service provided "reasonable and prudent alternatives" (RPAs) regarding water elevations in project reservoirs that would allow Project operation to continue without jeopardy to the listed species. A 1996 ESA consultation was on PacifiCorp and New Earth activities, as permitted by Reclamation (Service 1996a).

5) The United States has a trust responsibility to protect tribal trust resources. In general, the trust responsibility requires the United States to protect tribal fishing, gathering, hunting, and water rights, which are held in trust for the benefit of the tribes. Reclamation is obligated to

ensure that Project operations not interfere with the tribes' senior water rights. With respect to the tribes' fishing rights, Reclamation must, pursuant to its trust responsibility and consistent with its other legal obligations, prevent activities under its control that would adversely affect those rights, even though those activities take place off reservation. Fishery and other resources in the Klamath River and Upper Klamath Lake provide religious, cultural, subsistence, and commercial support values for the Klamath Basin Indian tribes. The Klamath Basin Indian tribes include the Klamath, Hoopa Valley, Karuk, and Yurok Tribes.

6) Reclamation has contractual obligations to Project water users to provide water primarily for domestic and irrigation uses. The contracts for the majority of the Project area define this obligation as the amount of water necessary to meet the reasonable beneficial use of water for irrigation. Approximately 220,000 acres of agricultural lands are served by the Klamath Project.

7) Refuge Water Supplies - Four national wildlife refuges lie adjacent to or within Project boundaries--Lower Klamath, Tule Lake, Clear Lake, and Upper Klamath Lake National Wildlife Refuges. The refuges either receive water from, or are associated with Project facilities.

2.3 KPOPSIM Model and Project Operation

Reclamation developed a water accounting spreadsheet model (KPOPSIM) that simulates project operations to help evaluate the impacts of varying water deliveries to overall project operations. It defines the available water supply including monthly runoff into Upper Klamath Lake and water demands at various locations. In addition, estimates of flow accretions downstream of project facilities have been developed. Criteria for operations, including administrative, legislative, legal, or contractual requirements, are incorporated into the model. Using the model, monthly estimates of water deliveries to the various users, reservoir releases, instream flows at specific locations, reservoir storage, Upper Klamath Lake levels and pumping quantities can be determined. The model allows alternative operation scenarios to be analyzed with key operations indicators used to determine the ability of the project to meet various water users' demands. Detailed description of the model components, inputs, and assumptions are found in CH2M Hill (1997). The model has been presented for preliminary review and comment, and will undergo further review and refinement. The model is based on 37 years (1961 through 1997) of hydrological record, and uses expected comparable preceding year types to predict outcomes.

2.4 Project History and Operation

Project facilities, contracts, water rights and operation are described in the 1992 BA (Reclamation 1992) and the report on historic operation (Reclamation 2000a). They are also described in the 1995 and 1997 Regional Solicitor's memorandums.

Table 2 describes historic operation of the project data regarding Klamath River flows from 1961 through 1997. This period encompasses the time when existing project features/facilities have been in operation and it is the period of hydrological and project operation records incorporated into the water accounting spreadsheet model (KPOPSIM) for the Project.

Table 2. Historic Iron Gate Dam flows (1961 through 1997-- values in cfs).

| | 19 Above Average Water Years | | | | 11 Below Average Water Years | | | |
|---|---|---|---|---|---|---|---|---|
| Time Step | Maximum | Minimum | Average | St. Dev. | Maximum | Minimum | Average | St. Dev. |
| Oct | 3353 | 1329 | 1912 | 586 | 2511 | 1308 | 1592 | 345 |
| Nov | 5254 | 1337 | 2547 | 1071 | 2986 | 1324 | 1999 | 621 |
| Dec | 6735 | 1387 | 2987 | 1213 | 6653 | 1435 | 2835 | 1507 |
| Jan | 9553 | 1127 | 3249 | 1785 | 9489 | 1334 | 3166 | 2337 |
| Feb | 9150 | 910 | 4143 | 2244 | 5656 | 1546 | 2532 | 1156 |
| Mar 1-15 | 12447 | 1953 | 4864 | 2851 | 5017 | 1439 | 2501 | 1006 |
| Mar 16-31 | 9219 | 2101 | 5268 | 2008 | 3682 | 1748 | 2391 | 591 |
| Apr 1-15 | 9254 | 1781 | 4805 | 1906 | 3067 | 1455 | 2009 | 587 |
| Apr 16-30 | 7205 | 1629 | 3860 | 1179 | 2493 | 1305 | 1701 | 426 |
| May 1-15 | 5005 | 1730 | 3383 | 1088 | 2083 | 1010 | 1351 | 372 |
| May 16-31 | 6247 | 1026 | 2761 | 1329 | 1714 | 1003 | 1188 | 228 |
| Jun 1-15 | 4495 | 760 | 1764 | 1150 | 1480 | 728 | 912 | 230 |
| Jun 16-30 | 2084 | 742 | 1031 | 365 | 1295 | 696 | 806 | 163 |
| Jul 1-15 | 2194 | 705 | 870 | 327 | 940 | 709 | 758 | 69 |
| Jul 16-31 | 1122 | 680 | 772 | 107 | 1023 | 682 | 784 | 94 |
| Aug | 1208 | 1011 | 1049 | 46 | 1094 | 701 | 995 | 104 |
| Sep | 2052 | 1035 | 1457 | 206 | 1428 | 725 | 1272 | 184 |

Table 2. Continued

| | 5 Dry Water Years | | | | 2 Critical Dry Water Years | | | |
|---|---|---|---|---|---|---|---|---|
| Time Step | Maximum | Minimum | Average | St. Dev. | Maximum | Minimum | Average | St. Dev. |
| Oct | 1382 | 852 | 1094 | 220 | 937 | 904 | 920 | 16 |
| Nov | 1390 | 873 | 1218 | 189 | 915 | 909 | 912 | 3 |
| Dec | 3903 | 889 | 2290 | 1305 | 944 | 914 | 929 | 15 |
| Jan | 4348 | 888 | 2588 | 1307 | 1191 | 1011 | 1101 | 90 |
| Feb | 2217 | 747 | 1554 | 505 | 730 | 525 | 627 | 103 |
| Mar 1-15 | 2790 | 725 | 1683 | 817 | 712 | 501 | 607 | 106 |
| Mar 16-31 | 2148 | 724 | 1464 | 545 | 572 | 521 | 547 | 26 |
| Apr 1-15 | 1767 | 728 | 1183 | 381 | 843 | 569 | 706 | 137 |
| Apr 16-30 | 1325 | 754 | 1039 | 241 | 636 | 574 | 605 | 31 |
| May 1-15 | 1025 | 761 | 968 | 104 | 741 | 525 | 633 | 108 |
| May 16-31 | 1039 | 924 | 996 | 41 | 714 | 501 | 608 | 106 |
| Jun 1-15 | 931 | 712 | 782 | 77 | 706 | 476 | 591 | 115 |
| Jun 16-30 | 735 | 612 | 700 | 45 | 702 | 536 | 619 | 83 |
| Jul 1-15 | 739 | 547 | 669 | 76 | 572 | 429 | 501 | 71 |
| Jul 16-31 | 742 | 542 | 678 | 75 | 575 | 427 | 501 | 74 |
| Aug | 1033 | 647 | 824 | 152 | 636 | 398 | 517 | 119 |
| Sep | 1048 | 749 | 953 | 112 | 906 | 538 | 722 | 184 |

Historic Project operation has been influenced by events and actions such as: (1) varying hydrological conditions in the watershed from year to year; (2) changes in the Klamath River watershed and lands adjacent to Upper Klamath Lake; (3) changes in agricultural cropping patterns; (4) changes in national wildlife refuge operations; (5) previous consultations under Section 7(a)(2) of the ESA; (6) increased scientific understanding of fish habitat needs has led to a better understanding of trust responsibilities for

Klamath Basin Indian tribes, both upstream and downstream of the project; and (7) its obligations and responsibilities described in the July 25, 1995 and January 9, 1997 Regional Solicitor's memorandum.

2.5 Water Year Type Description and Development

"Water Year Type" refers to the type of water year predicted based upon hydrologic conditions that vary from year to year. These conditions determine the volume and timing of water available for Project use. Annual operation plans are developed in response to the water year type. Annually, water year types are determined on April 1 based on Natural Resource Conservation Service (NRCS) forecasts, and revised monthly thereafter based on these forecasts.

Thirty-seven years (1961-1997) of historic April through September net inflow data to Upper Klamath Lake (using 1996 bathymetric data) were used in statistical analyses that shaped the definition of water year types. The net inflow data was found to have a normal distribution with an arithmetic mean (average) of 500,400 acre-feet (af) and a standard deviation of 187,600 af. This suggests that approximately 68% of the water year types have an inflow that is within the range of 500,400 +/- 187,600 af. The "above average" water year type is defined as any water year with an April-September net inflow of over 500,400 af. The average inflow, less one standard deviation, equals 312,800 af. A "below average" water year type is defined as having an inflow between 500,000 af and 312,800 af.

Subtracting the standard deviation again from 312,800 results in a value lower than the driest year on record, so some other methodology was needed to determine the delineation between "dry" and "critical" water year types. Percentile ranking of the net inflow data show that the third percentile falls at 185,000 af, and this value was used for the dry water year indicator. A "critical dry" water year type is defined as having an inflow less than 185,000 af[1].

In summary, the net inflows for the four water year types (April through September) are: above average >500,400 af; below average 312,800-500,400 af; dry 185,000-312,800 af; and critical <185,000 af.

2.6 Project Operation Description

Since 1995, Reclamation has operated the Klamath Project according to an annual operations plan. Each of these years were above average water year conditions. The most recent annual operations plan is dated April 26, 2000 and covers the period of April 1, 2000 through March 31, 2001. The annual operation plans have been developed to assist Reclamation in operating the Klamath Project consistent with its obligations and responsibilities, given varying annual hydrological conditions. The relationship between forecast inflow for plan development and actual inflow in September can be illustrated with the 2000 operations. Forecasted inflow in April was 397,000

---

[1] Due to the relatively small sample size, the same delineation between dry and critical is achieved by using the 5th percentile as well as the 3rd percentile.

## 3.0 ENDANGERED SPECIES ACT

### 3.1 Endangered Species Consultation History

In 1995, Reclamation conferred with the NMFS regarding effects of the 1995 Klamath Project Operations Plan on Klamath Mountains Province steelhead (*O. mykiss*) which was proposed for listing at that time. On April 7, 1995, NMFS sent Reclamation a letter of concurrence stating that the Project's operations for 1995 were not likely to jeopardize Klamath Mountains Province steelhead. The concurrence was based on: 1) an expectation that 1995 Project operations would meet the minimum flow schedule outlined in the IGD FERC license; and 2) an understanding that proposed operation of the Project included development and implementation of a long-term operating plan for the Project that would fully consider the needs of anadromous fish downstream from IGD. Subsequent to April 7, 1995, Reclamation revised the schedule and scope of the long-term operations plan.

Reclamation coordinated with NMFS regarding 1996 Project operations, including the downstream flows that were implemented that year. A technical review was provided by NMFS of Reclamation's memoranda supporting the 1996 Klamath Project Operations Advisory. NMFS provided similar coordination for the1997 Annual Operations Plan.

Reclamation coordinated with NMFS regarding the1998 Project operations and its consequences on threatened coho salmon, the proposed Klamath Mountain Province steelhead and candidate species chinook salmon (*O. tshawytscha*). On February 11, 1998, Reclamation requested formal consultation on coho salmon pursuant to the ESA for the 1998 Project operations. On April 1, 1998, Reclamation provided a BA to NMFS on coho salmon pursuant to ESA for the 1998 Project operations (Reclamation 1998). The 1998 Project operations met or exceeded the minimum flow schedule for the Klamath River at IGD as required by the FERC license, August and September excepted.

In March 1999, Reclamation submitted a draft Environmental Assessment (EA) on the 1999 Project operations to NMFS. The preferred alternative in the 1999 EA was virtually identical to the Project operations described in the 1998 BA. NMFS agreed that for the purposes of ESA Section 7 consultation, the 1998 BA adequately described proposed 1999 Project operation and potential impact to coho salmon. NMFS delivered a draft BO to Reclamation regarding the 1999 Project operations in July 1999 (NMFS 1999b). Reclamation provided a written supplement to the EA/proposed action (i.e., flows higher than the 1998 Plan minimums). NMFS issued a BO on the amended proposed action and concluded that the amended proposed action was not likely to jeopardize SONCC coho salmon. The 1999 BO acknowledged the close operational relation between the Project and PacifiCorp's IGD and accordingly the incidental take statement authorized PacifiCorp's IGD operations pursuant to Reclamation's 1999 Plan.

In November 1999, Reclamation provided funding to the Bureau of Indian Affairs and cooperated with Utah State University (USU), USGS, and the Service to examine incremental changes in flow and available total habitat (microhabitat plus macrohabitat) in the Klamath River. Dr. Thom Hardy is with the Institute for Natural Systems Engineering (INSE) of USU and he is the principal investigator for Phase II. Reclamation anticipates that the results of Phase II analyses will be used in future

Section 7 Consultations and for the long-term operations plan EIS.

On January 31, 2000, USU informed Reclamation that the Phase II instream flow report would not be completed until late 2000[3]. However, Reclamation's ESA coverage on coho salmon expired April 1, 2000. Reclamation sent a letter, dated September 14, 2000, to NMFS requesting an updated species list. On September 25, 2000, NMFS provided Reclamation with a list of Federally listed species and critical habitat that may occur downstream of IGD on the Klamath River. This BA describes the Project's effects on those species. This BA is intended to cover the time period from when a BO is issued by NMFS until that BO is superceded by another consultation.

## 4.0 PROPOSED ACTION

Reclamation proposes ongoing operation of the Klamath Project. A detailed description of project operations is presented in the BA prepared in 1992 (Reclamation 1992) and the report describing historic project operation (Reclamation 2000a). The IGD flow releases summarized in Table 4 are the average minimum flows for each time step taken from historic operations (Table 2). Reclamation proposes to operate the project to meet these minimum or greater flows, depending on water year type. In addition, Reclamation will work to develop a plan of closer operational coordination and data sharing with PacifiCorp to reduce the scope and impacts of depressed flows that occur during the April to June period (Figure 2). For purposes of this BA, the action area is defined as the mainstem Klamath River downstream from IGD (river mile190), in northern California.

### 4.1 <u>PacifiCorp Hydrofacilities Operations</u>

PacifiCorp operates facilities to generate hydroelectrical power at the Westside and Eastside Plants at Link River Dam, Keno Dam, J. C. Boyle Dam, Copco No. 1 and Copco No. 2 Dams, and IGD. This operation is in accordance with Reclamation's annual operations plan for the Project, FERC license requirements, and the applicable Service BO for Upper Klamath Lake levels (T. Olson, PacifiCorp pers. comm. 1998). During the last 39 years, project operations pursuant to the contract between Reclamation and PacifiCorp have been influenced by the FERC license minimum flow schedule for IGD (FPC 1961). During below average and above average water years, IGD releases usually exceeded the FERC minimums during the fall and winter while during dry years releases occasionally dropped below the minimums particularly during the summer months. In critically dry years (i.e., 1992 and 1994), releases were less than the FERC minimums almost every month of the year. Between 1962 and 1992, the FERC minimum flows were violated about 30 percent of the total number of months in this period.

---

[3] Presently, the Phase II report is scheduled to be finalized in early 2001.

## 8.0 DETERMINATION OF EFFECTS

Reclamation has determined that the effects of on-going operation of the Project, that is the subject of this BA, is likely to adversely affect the SONCC coho salmon. Further, Reclamation has determined the proposed action may adversely modify critical habitat for that species. PacifiCorp's operation of IGD, subject to the FERC license restrictions, Reclamation's annual plans, and Conditions 1 and 2 described in Section 6.7 will not jeopardize coho salmon. These determinations are made considering the following information:

- On-going operation of the Project will result in flows in the Klamath River downstream from IGD that may affect rearing and outmigrating fry and juvenile coho salmon.

- On-going operation of the Project could place rearing salmonids at risk (depending on water year type) because the operation could result in a combination of high water temperature (≥15° C), low dissolved oxygen, and low flows. The relationship between the Project's effects on water temperature and summer/fall mainstem river flows is complex (Balance Hydrologics 1996), thus limiting Reclamation's ability to assess the Project's effects.

- The Klamath River has likely always been a relatively warm river system. Insolation (solar radiation) and ambient air temperatures are primary factors affecting water temperatures in most rivers, including the Klamath. These climatic factors are completely independent and are not affected by Project operations. These factors influence water temperatures as distance increases downstream from IGD (Balance Hydrologics 1996; Hanna 1997). Currently-depressed salmonid populations combined with successful introduction of numerous warm water fish species into the reservoir system suggests that natural climatic factors combined with major landscape alterations in the Klamath River watershed and its tributaries have caused higher water temperatures, thus favoring fish species other than salmonids.

- Additional research is needed to assess the impact of on-going Project operations and other activities in the Klamath Basin on anadromous fish. Over the last 50 years, much information has been collected by federal, state, tribal, and corporate entities regarding Klamath River salmonids. The information describes fish habitat and their populations in the Klamath River watershed dating back to the 1940's. Recent studies by CCFWO, the Yurok Tribe of California and the Karuk Tribe are valuable in understanding the Klamath River fisheries and the overall mechanics of the watershed. Additional studies are needed to gain a comprehensive understanding of the Klamath Basin aquatic ecosystem and should focus on obtaining 1) information on spatial distribution and temporal abundance of fish (all life stages) within the mainstem river and it's tributaries, 2) the relationship of flow and the availability of spawning, incubation, rearing, and outmigration habitat, 3) the effects of water quality on egg to smolt survival, 4) reliable data on run strength in the mainstem using direct enumeration, 5) detailed information on pollution sources and relative contribution of each source to the nutrient loads in the Klamath River, and 6) diurnal temperature effects on fish.

- Macrohabitat conditions, primarily elevated water temperature from late June through September, may outweigh the benefits of suitable microhabitat (depth, velocity and cover) for

YOY and juvenile salmonids. Phase II results will hopefully provide additional information on this issue. Microhabitat appears to be most limiting during the spring (March, April, May, and early June) and relates to river stage and availability of mainstem Klamath River edge habitat. Reclamation will work to develop a plan of closer operational coordination and data sharing with PacifiCorp to reduce the scope and impacts of depressed flows that occur during the April to June period. In addition, ramping rate conditions implemented by PacifiCorp may minimize potential stranding impacts and should benefit coho salmon.

- Elevated water temperatures in the river downstream from IGD from late June through September create a population bottleneck because water temperature exceeds chronic (> 15° C) and acute (>20° C) thermal thresholds for YOY and juvenile salmonids. Bartholow (1995) reported acute thermal effects on salmonids, especially egg and larval life stages, could be expected at mean daily water temperatures of 20° C, or for consecutive exposures at a weekly mean temperature at 15° C.

- Implementing river flows greater than those resulting from on-going Project operation downstream from IGD from July through September (Table 4) will not likely reduce mean water temperature to levels below chronic and acute levels for salmonids (Table 6). Deas and Orlob (1999) reported that higher flows from IGD in August resulted in water temperatures being reduced approximately 0.6° C, but not reduced below the chronic or acute levels typical of summer conditions. The temperature of water released from IGD and temperature records at Seiad from late June through early September in many water year types approach or exceed acute thermal thresholds and may be a contributing factor to fish kills in the mainstem[5]. Although fish do survive these temperatures, the complex relationship of river flows and water temperatures, and their effects on the fishery in the Klamath River warrants further investigation. Phase II results will hopefully provide additional information on this issue[6].

---

[5] A fish kill in 2000 coincided with a water temperature of 24.03° C and a discharge of about 1,500 cfs in July. Releases at IGD were approximately 1,000 cfs.

[6] Care should be exercised when applying laboratory results of thermal preferences of wild fish because there may be unquantified interactive effects from other factors including predation, inter- and intra-specific competition for microhabitat, availability of food for maintaining high metabolic rates, and instream hydraulics. These factors can influence the temperature regimes tolerated by wild and hatchery fish (Myrick, 1998).

# BIOLOGICAL ASSESSMENT OF KLAMATH PROJECT'S CONTINUING OPERATIONS ON THE ENDANGERED LOST RIVER SUCKER AND SHORTNOSE SUCKER

U.S. Bureau of Reclamation
Mid-Pacific Region
Klamath Basin Area Office
Klamath Falls, Oregon
February 13, 2001

TABLE OF CONTENTS

1.0 INTRODUCTION..........2

2.0 DESCRIPTION OF THE ACTION..........3

3.0 DESCRIPTION OF HISTORIC OPERATIONS..........6

4.0 ENDANGERED SPECIES POTENTIALLY AFFECTED BY THE KLAMATH PROJECT..........16

5.0 ENVIRONMENTAL BASELINE..........60

6.0 EFFECTS OF KLAMATH PROJECT ON BALD EAGLES..........60

7.0 EFFECTS OF KLAMATH PROJECT ENDANGERED SUCKERS..........63

8.0 PROPOSED CRITICAL HABITAT FOR ENDANGERED SUCKERS..........82

9.0 CUMULATIVE EFFECTS..........84

10.0 DETERMINATION OF EFFECTS..........89

11.0 LITERATURE CITED..........90

12.0 PERSONAL COMMUNICATIONS..........100

13.0 APPENDIX 1 – ESA CONSULTATION REVIEW..........101



PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT
69

# 1.0 INTRODUCTION

## 1.1 Overview

The Bureau of Reclamation (Reclamation) is the responsible Federal agency for operation of the Klamath Project (Project). Operation of the Project has been subject to numerous previous consultations with the U.S. Fish and Wildlife Service under Section 7 of the Endangered Species Act. This biological assessment (BA) describes the effects of the action on federally listed species (shortnose sucker, Lost River sucker, bald eagle). The BA considers new scientific information regarding the endangered suckers in Upper Klamath Lake and other project waters. The implementation of a preferred alternative from the long-term operations plan (presently under development) would be the subject of future ESA consultation.

## 1.2 General Operation

The Klamath Project develops a water supply used for irrigation of approximately 220,000 acres in three counties in Oregon and California. Water supply for project deliveries comes from Upper Klamath Lake on the Klamath River and Gerber Reservoir on Miller Creek and Clear Lake Reservoir at the head of the Lost River in California. A detailed description of project facilities and their operation is included in the biological assessment prepared in 1992 (Reclamation 1992a) and the report describing historic project operation (Reclamation 2000a).

## 1.3 Background

There are various authorizations, responsibilities and obligations that affect or influence project operations. These include:

1) Project construction was authorized by the Secretary of the Interior on May 15, 1905, in accordance with the Reclamation Act of 1902. The Act of February 9, 1905 provides; "The Secretary of the Interior is hereby authorized in carrying out any irrigation project that may be undertaken by him under the terms and conditions of the national reclamation act and which may involve the changing of the levels of Lower or Little Klamath Lake, Tule or Rhett Lake, and Goose Lake, or any river or other body of water connected therewith, in the States of Oregon and California, to raise or lower the level of said lakes as may be necessary...";

2) The Klamath River Compact of 1957 entered into between the states of Oregon and California and approved by the U.S. Congress that established goals and objectives for the development and management of water resources of the Klamath River Basin;

3) FERC license, Project No. 2082, establishes terms and conditions for operation of the Eastside and Westside Powerplants at Link River Dam, J.C. Boyle, Copco No. 1 and No. 2, and Iron Gate hydroelectric projects and Keno Dam. This license sets certain minimum flows at IGD. Minimum flows, however, are subject to water availability and senior water rights. Pursuant to 1956 contract with Reclamation, PacifiCorp operates Link River Dam and its appurtenant power generation facilities. Reclamation and PacifiCorp entered into a Letter Agreement on June 5, 1997, to clarify for FERC that PacifiCorp was operating Link River Dam pursuant to Reclamation authority and directives under the 1956 contract, because the 1997 Klamath Project annual operations plan required Klamath River flows that were both greater and less than those included in PacifiCorp's FERC license. The Agreement has been extended each year to include that year's operation;

4) Endangered Species Act - Project operations affect four threatened and endangered species including the Lost River and shortnose sucker, southern Oregon/northern California coho salmon and bald eagle. In 1992, 1994, and 1996, the U.S. Fish and Wildlife Service (Service) issued biological opinions (BO) on the effects of the Project on the endangered suckers and bald eagles. The Service provided "reasonable and prudent alternatives" (RPAs) regarding water elevations in project reservoirs that would allow Project operation to continue without jeopardy to the listed species;

5) Tribal Trust - The United States has a trust responsibility to protect tribal trust resources. In general, the trust responsibility requires the United States to protect tribal fishing, gathering, hunting, and water rights, which are held in trust for the benefit of the tribes. Reclamation is obligated to ensure that Project operations not interfere with the

tribes' senior water rights. With respect to the tribes' fishing rights, Reclamation must, pursuant to its trust responsibility and consistent with its other legal obligations, prevent activities under its control that would adversely affect those rights, even though those activities take place off reservation. Fishery and other resources in the Klamath River and Upper Klamath Lake provide religious, cultural, subsistence, and commercial support for the Klamath Basin Indian tribes. The Klamath Basin Indian tribes include the Klamath, Hoopa Valley, Karuk, and Yurok Tribes; and

6) Refuge Water Supplies - Four national wildlife refuges lie adjacent to or within Project boundaries--Lower Klamath, Tule Lake, Clear Lake, and Upper Klamath Lake National Wildlife Refuges. The refuges either receive water from, or are associated with Project facilities.

1.4 Contracts and Water Rights

The Project supplies water to irrigation districts and individual irrigators pursuant to contracts entered into with Reclamation, subject to the availability of water. These contracts and water rights are described in the 1992 Biological Assessment (Reclamation 1992a) and Report on Historic Operation (Reclamation 2000a).

2.0 DESCRIPTION OF THE ACTION

Reclamation proposes continuing operation of the Klamath Project to supply water to project users and refuges. A detailed description of project operations is presented in the biological assessment prepared in 1992 (Reclamation 1992a) and the report describing historic project operation (Reclamation 2000a). This assessment focuses on water operations at the three main project reservoirs: Upper Klamath Lake, Clear Lake, and Gerber reservoir. Further, other operations associated with the Klamath Project are also described and assessed.

In addition to ongoing operation of the Project facilities, Reclamation proposes to support implementation of the Water Supply Initiative and Klamath Basin Water Supply Enhancement Act (P.L. 106-498). These activities would allow Reclamation to potentially increase and/or enhance Project water supplies.

2.1 Upper Klamath Lake

Reclamation proposes to operate the project to meet or exceed the elevations summarized in Table 1, depending on the water year type. These levels are the minimum end of the month values taken from historic operations (1960-1998). Water operations at Upper Klamath Lake are achieved through a combination of Eastside/Westside power canal releases, Link River Dam releases, A Canal releases, Lost River Diversion Canal releases, and Agency Lake Ranch diversions.

Table 1. Proposed minimum end of the month Upper Klamath Lake elevations by water year type (1960-1998).

| Time Step | Above Average Water Years | Below Average Water Years | Dry Water Years | Critical Dry Water Years |
|---|---|---|---|---|
| October | 4138.98 | 4138.36 | 4138.18 | 4136.93 |
| November | 4139.55 | 4138.99 | 4138.96 | 4137.80 |
| December | 4139.58 | 4138.80 | 4139.66 | 4138.58 |
| January | 4139.54 | 4139.41 | 4140.26 | 4140.01 |
| February | 4140.56 | 4140.15 | 4140.41 | 4140.94 |
| March | 4141.10 | 4141.35 | 4141.70 | 4141.80 |
| April | 4142.26 | 4142.15 | 4141.68 | 4141.68 |
| May | 4142.85 | 4142.22 | 4141.40 | 4140.70 |
| June | 4142.17 | 4141.30 | 4140.39 | 4139.45 |
| July | 4140.83 | 4140.00 | 4139.10 | 4138.77 |
| August | 4139.66 | 4138.85 | 4138.38 | 4137.52 |
| September | 4138.95 | 4138.18 | 4137.55 | 4136.84 |

2.2 Clear Lake Reservoir

Reclamation proposes to operate Clear Lake Reservoir to meet or exceed the elevations listed in Table 2, depending on the water year type. These elevations are the minimum end of the month values taken from historic operations (1960-1998).

9.8 Keno Reservoir

At least 55 unscreened private and irrigation district agricultural diversions exist on Keno Reservoir. Oregon Department of Fish and Wildlife has eight diversions for the Miller Island Wildlife Area, three of which are screened and plans are underway to screen others.

Further downstream agricultural diversions from the main stem of the Klamath River between the California-Oregon border and Copco Reservoir #1 provide water to private landowners through a lease of water rights (Beak Consultants, 1987). While these structures are relatively large, they probably do not impede fish passage in this river reach (F. Shrier, PacifiCorp, per. com.). More detailed information about these diversions are described in the 1996 biological assessment (Reclamation 1996a). The timing, volume, and the pattern of use of these irrigation diversions as well as their impact, on sucker populations are unknown although the impacts due to water quality and entrainment are likely. No other agricultural diversions are known in this vicinity (D. Maria, California Department of Fish and Game, per. com.).

Water quality on Keno Reservoir can at times be degraded due to treated sewage from two municipal sewage treatment plants, storm water and non-point source runoff from the City of Klamath Falls. Lumber mills along the Klamath River near Klamath Falls also contribute to water quality problems in the river. The Klamath Straits Drain, which receives return flows and storm runoff from private agricultural lands, municipalities, dairies, and refuges and the Klamath Project, contributes nutrients, sediment, herbicides and pesticides to the Klamath River. Other inputs include the Lost River Diversion Canal, Link River, and sediment sources. The highly enriched sediments were caused in part by decades of intensive lumber mill operations and log rafting on Lake Ewauna during the first 60-70 years of the 20th century. The impoundment of the nutrient rich waters in the reservoirs are known to contribute to algae blooms within the reservoirs and cause downstream algal nuisance conditions in the river.

Except for natural erosion along the banks of the Klamath River, there appears to be no other major source of sediment input to the Klamath River below Keno. The river reach below the J.C. Boyle Dam in Oregon to the California border was designated as the Klamath Scenic Waterway in 1988. The subsequent reach below the state line to Copco Reservoir is designated "Wild Trout Waters" by the CFDG.

9.9 Other Cumulative Effects

The transportation of hazardous materials by truck and train along the eastern and southern margin of UKL and over tributaries could result in spills and negative impacts to the listed and unlisted species in the basin's waters. Algae and Daphnia harvesting in UKL may result in the take of larval and juvenile suckers. The use of chemicals such as pesticides, herbicides, and mosquito or midge control chemicals could result in negative impacts to listed species throughout the basin. The diversion of water directly from UKL by private (non-Project) water users may result in the taking of suckers and reduction of habitat.

10.0 DETERMINATION OF EFFECTS

Reclamation's on-going operation of the Klamath Project may adversely affect the endangered Lost River and shortnose suckers due to: (1) loss of spawning and larval, juvenile, and adult rearing habitat and degradation of water quality related to regulation of water levels in reservoirs; (2) insularization of sucker populations increasing the risk of hybridization, introgression and loss of genetic variability due to dams and other facilities that have decreased the connectivity between different reservoirs and rivers in the Upper Klamath Basin; and (3) entrainment and loss of fish through diversions including irrigation canals and pumping plants. Reclamation has operated the Project in accordance with previous biological opinions and has initiated or completed most of the Priority 1 and 2 action items identified in the Lost River and Shortnose Sucker Recovery Plan. Reclamation has funded over 10.5 million dollars in ecosystem restoration projects that assist or benefit recovery of these species and purchased the 7,200-acre Agency Lake Ranch. Although the Project has affected, and continues to affect endangered suckers, Reclamation believes that sufficient progress is being made to complete the requirements of previous biological opinions and Recovery Plan action items. However, continuing operation of the Klamath Irrigation Project is still likely to adversely affect the shortnose and Lost River sucker and its proposed critical habitat. Continuing Project operations may affect likely to adversely affect threatened bald eagles due to loss of lake and marsh habitat supporting waterfowl and fish populations in the Basin during dry years.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 01-591 L |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Francis M. Allegra |
| Defendant, | ) | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S SUPPLEMENTAL APPENDIX**

**FILED IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AS TO PLAINTIFFS' CONTRACT CLAIMS**

**EXHIBITS 70 – 74**
**PAGES 597 – 655**

February 17, 2006

**INDEX OF EXHIBITS IN DEFENDANT'S SUPPLEMENTAL APPENDIX FILED IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**[1]


| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 59 | U.S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Summary of Listed Species, Species and Recovery Plans as of 2/15<br><br>Document generated from FWS website at: http://ecos.fws.gov/tess_public/TESSBoxscore (last visited on February 15, 2006) | 543 |
| 60 | U. S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Map of Listed Species by State/Territory as of January 26, 2006.<br><br>Map available on FWS website at: http://ecos.fws.gov/tess_public/servlet/gov.doi.tess_public.servlets.TESSUsmap?status=listed (last visited on January 26, 2006) | 545 |
| 61 | Klamath Project 2001 Annual Operations Plan (dated April 6, 2001) | 546 |
| 62 | Letters from Bureau of Reclamation to Van Brimmer Ditch Co., and to Klamath Drainage District, dated Sept. 2, 2000 | 551 |


[1]Defendant's Exhibit ("Def. Ex.") numbers 1 through 42 are the exhibits contained in Defendant's Appendix (dated October 3, 2003) and Supplemental Appendix (dated March 31, 2004), both of which were filed in support of its Cross-Motion for Summary Judgment on plaintiffs' takings claims. Defendant's Exhibit numbers 43 through 58 are the exhibits contained in the Appendix filed in support of Defendant's Cross-Motion for Summary Judgment on the Question of Whether the Individual Plaintiffs' Have Standing to Bring Contract Claims as Intended Third-Party Beneficiaries (dated April 26, 2004). To avoid confusion in the numbering of exhibits, the additional exhibits attached hereto begin with exhibit number 59 and appendix page number 543.

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 63 | Letters from Department of the Interior officials responding to letters received by the Department concerning the operation of the Klamath Project in 2001. from early 2001 stating that "[f]orecasts of water supplies in the Klamath basin for the 2001 water year are currently nearly half of average conditions" | 555 |
| 64 | Letter from Bureau of Reclamation to Klamath Project Water Users, dated March 2, 2001. Subject: 2001 Operation Planning Update and Notice that Klamath Project Water Not Currently Available | 561 |
| 65 | Letters from Karl E. Wirkus, Area Manager, Bureau of Reclamation, Klamath Falls, to (A) NMFS, (B) FWS and (C) Klamath Tribes, dated Nov. 22, 2000. Subject: On-going Klamath Project Operations – Draft Biological Assessment | 563 |
| 66 | Letter from BOR to NMFS, dated January 22, 2001. Subject: Request for Initiation of Formal Consultation on the Effects of Ongoing Operations (without attachments) | 572 |
| 67 | Memorandum from BOR to FWS, dated February 13, 2001. Subject: Request for Reinitiation of Formal Consultatin on the Effects of Ongoing Operation of the Klamath Project | 575 |
| 68 | Biological Assessment of the Klamath Project's Continuing Operations on the SONCC coho salmon (dated Jan. 22, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 580 |

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 69 | Biological Assessment of the Klamath Project's Continuing Operations on the Endangered Lost River Sucker and Shortnose Sucker (dated Feb. 13, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 593 |
| 70 | Letter from FWS to Bureau of Reclamation, transmitting copy of Biological Opinion, dated April 5, 2001, and excerpt of the Biological Opinion<br><br>Note: a full copy of the FWS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 597 |
| 71 | Letter from NMFS to Bureau of Reclamation transmitting Biological Opinion, dated April 6, 2001, and excerpt of the Biological Opinion<br><br>Noted: a full copy of NMFS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 635 |
| 72 | U.S. Department of the Interior, News Release, "Water Allocation Decision Announced for Klamath Project," dated April 6, 2001 | 651 |
| 73 | Letter from BOR to NMFS, dated April 20, 2001. Subject: BOR's Determination Regarding the Action Addressed in the NMFS April 6, 2001 Biological Opinion | 652 |
| 74 | Department of the Interior, Office of the Secretary, News Release, "Interior Secretary to Order Water Release to Klamath Farmers," dated July 24, 2001 | 654 |

United States Department of the Interior

FISH AND WILDLIFE SERVICE
**California/Nevada Operations Office**
**2800 Cottage Way, Room W-2606**
**Sacramento, California 95825**

In Reply Refer To: 1-10-01-F-018-4

**APR - 5 2001**

Memorandum

To: Regional Director, Bureau of Reclamation
Sacramento, California

From: Manager, California/Nevada Operations Office
Sacramento, California

Subject: Bureau of Reclamation's Proposed Operation of the Klamath Project

This document transmits the Fish and Wildlife Service's (Service or FWS) biological/conference opinions (BO) based on our review of the subject action in accordance with section 7 of the Endangered Species Act of 1973, as amended (Act; 16 U.S.C. 1531 et seq.). At issue are the effects of the proposed action on the endangered Lost River sucker (*Deltistes luxatus*; LRS), endangered shortnose sucker (*Chasmistes brevirostris*; SNS), threatened bald eagle (*Haliaeetus leucocephalus*), and proposed critical habitat for the Lost River and Shortnose suckers (collectively referred to as "suckers").

This BO was prepared with the knowledge that project inflow for 2001 indicates this is likely to be the driest year on record. The allocation of extremely limited water resources will inevitably result in major impacts to the Klamath Project and the Klamath River Basin. Very little water will be available for agriculture this year, and there is insufficient water to fully provide for the needs of species in project reservoirs and the Klamath River. Water will be largely unavailable for the National Wildlife Refuges located within the Project boundaries, where water supply for waterfowl and the food supply for resident and wintering eagles will be severely depleted.

Drought conditions in the Klamath Basin are severe this year, but scarce water availability is not unique to the Klamath Project and the Klamath River Basin. The extreme conditions this year emphasize the urgent need to engage all parties with interests in the water resources of the Klamath Project and the Klamath River Basin in serious discussions regarding long-term goals for Project operations and water allocation in the River basin, including upstream and downstream water diverters. Long-term solutions regarding water quality and quantity must be developed.

Defendant's Exhibit 70

The Service and Reclamation are charged with ensuring that operation of the Klamath Project does not jeopardize continued existence of endangered and threatened species or adversely modify their critical habitat. Incorporated in this BO are conservation recommendations intended to encourage long-term solutions to water resource allocation in the Project and in the Klamath River Basin. The Service supports the initiation of a process to develop long-term solutions and stands ready to participate and assist in developing solutions that will help avert the need to make difficult decisions with major impacts in the Klamath Project and in the Klamath River Basin during low water years.

This BO is issued in response to the Bureau of Reclamation's (Reclamation or USBR) final biological assessment (BA) for operation of the Klamath Project, which was received by the Service on February 13, 2001. Although the Bureau's request for consultation did not include the bald eagle, an analysis of Project effects on the eagle is included in this BO for the reasons discussed in the "Consultation History" section of this document.

On March 30, 2001, Reclamation formally requested that this BO remain valid only until April 1, 2002. Reinitiation of formal consultation will be necessary to address Reclamation's continued operation of the Project beyond April 1, 2002. To assist Reclamation in planning for long-term operation of the Project and in recognition of Reclamation's request to complete this consultation by April 2, 2001, we have retained the scope of analysis of effects of the proposed action on listed species/proposed critical habitat used in the March 13, 2001, draft of this BO which was based on the project description in Reclamation's final BA, dated February 13, 2001.

This BO is based on: (1) information presented in Reclamation's final BA dated February 13, 2001; (2) information presented in previous BAs and BOs addressing operation of the Project; (3) information obtained from Reclamation in meetings regarding operation of the Project, and from the results of ongoing field research activities; (4) information provided in published and unpublished reports on the biology, distribution, systematics, and status of the affected listed species and the ecosystems upon which they depend; (5) communications with field researchers who have conducted, or are now conducting, research on the biology of affected listed species or the ecosystems upon which they depend; (6) other available commercial and scientific information; and (7) comments and reports received in response to reviews of the March 13, 2001, draft BO. A complete administrative record of this consultation is on file at the Service's Klamath Falls Fish and Wildlife Office.

This BO supercedes all previous Project-related BOs, except for those related to acrolein and other chemical applications, and portions of the 1996 BO addressing operations of PacifiCorps and the New Earth Company. It is our understanding that Reclamation is currently consolidating new information regarding the chemical application-related BOs and will reinitiate consultation on these actions in the near future. Based on new information developed since 1996, consultation on actions related to the operations of PacifiCorps and the New Earth Company addressed under the 1996 BO will be reinitiated as well.

# BIOLOGICAL/CONFERENCE OPINION
# REGARDING THE
# EFFECTS OF OPERATION OF THE
# BUREAU OF RECLAMATION'S KLAMATH PROJECT
# ON THE
# ENDANGERED LOST RIVER SUCKER (*Deltistes luxatus*)
# ENDANGERED SHORTNOSE SUCKER (*Chasmistes brevirostris*)
# THREATENED BALD EAGLE (*Haliaeetus leucocephalus*)
# AND
# PROPOSED CRITICAL HABITAT FOR THE LOST RIVER/SHORTNOSE SUCKERS

**Prepared**
**by**
**Klamath Falls Fish and Wildlife Office**
**April 2001**

Executive Summary

This document addresses the effects of operation of the Bureau of Reclamation's (Reclamation) Klamath Project (Project) for 2001 on the endangered Lost River sucker (LRS), endangered shortnose sucker (SNS), threatened bald eagle, and proposed critical habitat for the LRS and SNS (collectively, suckers). The Project delivers water to about 220,000 acres of irrigated agriculture in the upper Klamath River Basin (Basin) in south-central Oregon (Klamath County) and northern California (Modoc and Siskiyou counties), as well as to the Tule Lake and Lower Klamath National Wildlife Refuges (NWRs). The Project consists of three main reservoirs with a total surface area of about 100,000 acres, many miles of canals and ditches, and numerous water control structures, pumps, and other structures. Interrelated and interdependent with the proposed action is operation of Pacific Corps's hydroelectric facilities on the Link River and New Earth Corporation's algae harvest facility at the "C-drop" off of the A-canal.

Previous biological opinions (BOs) for the Project included determinations by the Fish and Wildlife Service (Service) that implementation of the action, as proposed, was likely to jeopardize the continued existence of the LRS and SNS. The two endangered sucker species are endemic to the Basin. The three major Project reservoirs [Upper Klamath Lake (UKL), Clear Lake, and Gerber Reservoir] represent their primary habitats. Tule Lake once supported a large population of suckers but habitat conditions there are now so degraded that only a few hundred suckers remain. Sucker populations in Clear Lake and Gerber Reservoir appear healthy, but are vulnerable to the adverse effects of droughts. Sucker populations in the Tule Lake sump are extremely small and population viability is at risk from reductions in water depth, adverse water quality, and lack of access to spawning areas. Sucker populations in UKL are at risk of extirpation from adverse water quality, loss of habitat, entrainment, and lack of passage. Populations of LRS are most at risk because self-reproducing populations are found in only two reservoirs and the viability of these populations is not assured.

The environmental baseline for the suckers is characterized by degraded aquatic ecosystems throughout the Basin. The baseline has been adversely affected over the past 150 years by agriculture, grazing, forestry, and to a smaller degree, urbanization. Development of the Project and interrelated and interdependent actions have been the major factors contributing to the loss and degradation of aquatic habitats in the Basin, and the endangered status of the two suckers. Nearly all Basin streams and rivers have been degraded, some seriously, by the loss of riparian vegetation, geomorphic changes, introduction of return flows from agricultural drainage ditches and water pumped from drained wetlands, stream channelization, dams, and flow reductions from agricultural and hydroelectric diversions. Most water bodies in the Basin fail to meet state water quality criteria. Wetland losses have been especially significant since they provide habitat for larval and juvenile suckers and have crucial water quality functions. Along the perimeter of UKL, about 40,000 acres of wetlands have been diked and drained for agriculture; elsewhere in the Basin, wetland losses are even larger.

Restoration of wetlands and riparian habitats on private and public lands, and implementation of Clean Water Act regulations (e.g., Total Maximum Daily Load limits) will bring much needed water quality and habitat improvements and will reduce threats and contribute to the conservation

of the suckers. However, it has taken over a century to create the current conditions in the Basin, and it will take decades for restorative actions to be fully implemented and functional.

At UKL, implementation of the action, as proposed, is likely to have the following effects on the suckers and their proposed critical habitat:

1. Significantly increase the loss of larval and juvenile sucker habitat at critical phases of their life cycle which will reduce the frequency and magnitude of year-class development;

2. Significantly increase the loss of all life stages, but especially larvae, through entrainment;

3. Block passage of suckers into areas of preferred habitat or to spawning areas which will reduce their survival and reproduction;

4. Increase the frequency and magnitude of potentially lethal water quality conditions by lowered lake levels which will optimize light and nutrient conditions that will facilitate algal blooms. These blooms adversely affect the survival of all life history stages of the suckers, and the reproduction of adults;

5. Contribute to poor water quality conditions during algal decay cycles by reducing lake volume/surface ratios that influence dissolved oxygen concentrations. These conditions will adversely affect the survival of all sucker life history stages, but will especially reduce the number of adults, and limit their longevity and reproductive potential;

6. Contribute to the loss of or reduction of access of suckers to water quality refuge areas that are critical to ensure adult sucker survival; and

7. Reduce lake volume/surface ratios during winter ice-cover conditions that influence dissolved oxygen concentrations which will contribute to potentially lethal water quality conditions that could adversely affect adult and juvenile survival.

At Clear Lake, Gerber Reservoir, and the Tule Lake sump, implementation of the action, as proposed, is likely to have the following effects on the suckers and their proposed critical habitat:

1. Block passage of suckers into areas of preferred habitat or to spawning areas in Clear Lake and the Tule Lake sump, which will reduce sucker survival and reproduction;

2. Reduce water volume in summer and fall when water temperatures and respiration rates are high and lead to stressful/lethal conditions for suckers, and also make them more vulnerable to disease and predators; and

3. Reduce water volume/surface ratios during winter ice-cover conditions that influence dissolved oxygen concentrations which will contribute to potentially lethal water quality conditions that are likely to reduce adult and juvenile sucker survival.

Collectively, these effects are likely to appreciably reduce the survival and recovery of the suckers and appreciably diminish the value of the primary constituent elements of proposed sucker critical habitat. On that basis, the Service concludes that implementation of the Project, as proposed, in calendar year 2001 is likely to jeopardize the continued existence of the suckers and adversely modify their proposed critical habitat.

The proposed action is likely to result in a significant reduction or elimination of the prey base for the bald eagle in the Basin due to reduced or curtailed water deliveries to areas that contain important eagle feeding habitat. Water deliveries to critical wetlands in Tule Lake and Lower Klamath NWRs attract millions of migrating waterfowl and hold a portion of them through the winter, thereby providing food for bald eagles. The wintering population of bald eagles on the refuges is one of the largest outside of Alaska. It includes birds from Canada, the Pacific Northwest, and California and consists of 150 to 900 eagles annually. Although these effects are considered significant, the Service has concluded that they are not likely to jeopardize the continued existence of the bald eagle.

A RPA has been developed for the proposed action that avoids effects that are likely to jeopardize the continued existence of the suckers and adverse modification of their proposed critical habitat. The RPA requires: (a) maintenance of minimum lake elevations in Project reservoirs; (b) coordination with the Service and the National Marine Fisheries Service in the development of Project operation plans during low water years; (c) adaptive management of water quality through monitoring and reporting; (d) installation of screens at the A-canal and Link River Dam; (e) adequate passage facilities at Link River Dam; (f) habitat and water quality improvements; and (g) additional studies to be completed to obtain information that Reclamation can use to refine reservoir management to adequately protect the suckers and their proposed critical habitat.

With implementation of the RPA, incidental take of suckers is anticipated. Under the Incidental Take Statement in this BO, Reclamation is required to implement reasonable and prudent measures (RPMs) to minimize the impacts of that take. Some of these measures were previously required, but have not yet been implemented or completed. Incidental take of bald eagles is also anticipated and this opinion also includes RPMs to minimize the impacts of that take.

This BO supercedes all previous Project-related BOs, including that portion of the Service's 1996 BO on Pacific Corp's operation of the Link River Dam and New Earth Company's operation of the C-drop harvest site, and excepting those BOs associated with Reclamation's application of acrolein and other chemicals.

## I.1 CONSULTATION HISTORY

### Consultation History

The Bureau's request for reinitiation of consultation on the 1992 BO was received by the Service on December 18, 1999, and acknowledged in writing on December 29, 1999.

On April 26, 2000, Reclamation provided the Service with a memorandum stating "the BA will be provided to the Service on about June 1, 2000."

On June 20, 2000, the Service provided written clarification on what the Act required in an adequate BA, including comments on the draft "Preliminary Report Describing Historic Project Operations."

On September 2, 2000, Reclamation provided the Service with a letter stating that "Reclamation now anticipates that the BA will be provided to the Service on October 1, 2000."

On September 27, 2000, the Service received a schedule from Reclamation outlining the on-going consultation on the Project showing that the draft BA would be provided to the Service in October 2000.

A draft BA was provided to the Service on November 8, 2000, and the Service provided written comments on November 21, 2000.

A second draft BA was provided to the Service on November 22, 2000, and the Service provided additional written comments on December 19, 2000. Additional written comments were sent to Reclamation on January 19, 2001.

The final BA was received on February 13, 2001, about 45 days prior to the start of Project operations in April.

New information on the potential adverse effects of low lake levels on suckers, developed since the1992 BO, and massive sucker die-offs in UKL in the 1990s, indicated that higher minimum UKL levels were necessary to reduce the risk of extinction of the suckers. Some of the new information was utilized by Reclamation to manage UKL, beginning in 1997, with a new minimum September 30 elevation of 4139 ft (Table I-2). This new information was also used by Reclamation in September 2000, when it sent a letter to the Service describing the need to maintain a minimum surface elevation of 4139.0 ft in UKL by September 30 to avoid violation of section 7(d) of the Act (Table I-2).

Table I-2. Upper Klamath Lake minimum surface elevations (in feet above mean sea level).

| Date | 1992 BO | 1997-200 "Low Range Elevations" | 2001 BA Minimums |
|---|---|---|---|
| April | 4141 | 4142.6 | 4141.1 |
| May | 4141 | 4142.6 | 4140.4 |
| June | 4139 (4137)[1] | | 4139.5 |
| July | 4139 (4137)[1] | 4141.6 | 4138.8 |
| August | 4139 (4137)[1] | | 4137.5 |
| September | 4139 (4137)[1] | 4139 | 4136.8 |
| October | 4139 | | 4136.9 |
| November | 4139 | | 4137.8 |
| December | 4139 | 4140 | 4138.6 |
| January | 4139 | | 4139.5 |
| February | 4139 | 4141.5 | 4140.1 |
| March | 4141 | | 4141.1 |

[1] The minimum surface elevation of 4139 ft could be compromised in no more than 4 of 10 years with a minimum elevation of 4137 ft. The lowest proposed minimum September 30 surface elevation in the final BA is 4136.8 ft. (Table I-2), which is more than 2 ft below the elevation Reclamation previously considered minimally necessary to protect the suckers, and is more than 3 ft below the level that the Service recommended in its informal consultation stage, technical assistance memos dated December 19, 2000, and January 19, 2001.

Table I-3, below, summarizes previous section 7 consultations on the Klamath Project. A portion of the information used in this BO is available on Reclamation's web site: http://www.mp.usbr.gov/kbao/esa/index.html.

Table 3. Consultation history for the Klamath Project.

| Date | Subject of Consultation | Affected Listed Species | Determination |
|---|---|---|---|
| June 14, 1989 (superceded by this BO) | Formal Consultation--Use of Acrolein in Canals and Drains within the Klamath Project Service area. | Shortnose sucker<br>Lost River sucker | Likely to jeopardize. |
| August 14, 1991 (superceded by this BO) | Formal Consultation-- Effects of the 1991 operation of the Klamath Project. | Shortnose sucker<br>Lost River sucker<br><br>Bald Eagle<br><br>American Peregrine Falcon | Likely to jeopardize the sucker species.<br><br>No jeopardy to the Bald Eagle.<br><br>No effect to the American Peregrine Falcon. |
| January 6, 1992 (superceded by this BO) | Formal Consultation-- Effects of the 1992 operation of the Klamath Project (interim biological opinion) | Shortnose sucker<br>Lost River sucker<br>Bald Eagle<br><br>American Peregrine Falcon | Not likely to jeopardize the sucker species or the Bald Eagle.<br><br>No effect to the American Peregrine Falcon. |
| March 27, 1992 (superceded by this BO) | Reinitiation of Formal Consultation-- Effects of the 1992 operation of the Klamath Project. | Shortnose sucker<br>Lost River sucker<br><br>Bald Eagle<br><br>American Peregrine Falcon | Likely to jeopardize the sucker species.<br><br>No jeopardy to the Bald Eagle.<br><br>No effect to the American Peregrine Falcon. |
| May 1, 1992 (superceded by this BO) | Reinitiation of Formal Consultation-- Effects of the 1992 operation of the Klamath Project at Clear Lake Reservoir. | Shortnose sucker<br>Lost River sucker<br>Bald Eagle<br>American Peregrine Falcon | No jeopardy to the affected species. |
| July 22, 1992 (superceded by this BO) | Formal Consultation--Effect of the long-term operation of the Klamath Project. | Shortnose sucker<br>Lost River sucker<br><br>Bald Eagle<br><br>American Peregrine Falcon | Likely to jeopardize the sucker species.<br><br>No jeopardy to the Bald Eagle.<br><br>No effect to the American Peregrine Falcon. |
| February 22, 1993 (superceded by this BO) | Reinitiation of Formal Consultation on the long-term operation of the Klamath Project - Upper Klamath Lake operations. | Shortnose sucker<br>Lost River sucker | One-year modification of lake elevation 4141.0 on March 1, 1993. |
| August 11, 1994 (superceded by this BO) | Reinitiation of Formal Consultation on the long-term operation of the Klamath Project, with special reference to operations at Clear Lake Reservoir. | Shortnose sucker<br>Lost River sucker<br>Bald Eagle<br>American Peregrine Falcon | Established new minimum elevation for Clear Lake Reservoir. |
| February 9, 1995 (superceded by this BO) | Formal Consultation on the use of pesticides and fertilizers on Federal lease lands and acrolein and herbicide use on the Klamath Project rights-of-way located on the Klamath Project (reinitiation of consultation on the use of acrolein for aquatic weed control in Reclamation canals and drains). | Shortnose sucker<br>Lost River sucker<br><br>Bald Eagle<br>American Peregrine Falcon<br>Applegate's milkvetch | Not likely to jeopardize the sucker species.<br><br>No effect to the Bald Eagle, American Peregrine Falcon, or Applegate's milkvetch. |

| | | | |
|---|---|---|---|
| February 2, 1996 (superceded by this BO) | Reinitiation of Consultation on the use of pesticides and fertilizers on federal lease lands and acrolein and herbicide use on the Klamath Project rights-of-way located on the Klamath Project. | Shortnose sucker<br>Lost River sucker<br>Bald Eagle<br>American Peregrine Falcon | Not likely to jeopardize the affected species. |
| July 15, 1996 (superceded in part by this BO) | Reintiation of Consultation on PacifiCorp and The New Earth Company Operations, as Permitted by the Bureau of Reclamation on the Klamath Project | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| April 2, 1998 (superceded by this BO) | Amendment to July 22, 1992 BO to extend date for completion of A-canal screen until 2002 | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| April 20, 1998 (superceded by this BO) | Amendment to the 1992 BO to cover Operation of Agency Lake Ranch Impoundment | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| April 21, 1998 (superceded by this BO) | Amendment to July 15, 1996 consultation on PacifiCorp and The New Earth Company Operations, as Permitted by the Bureau of Reclamation on the Klamath Project | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| July 13, 1998 (superceded by this BO) | Amendment to the 1992 BO dealing with Anderson-Rose releases | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| April 15, 1999 (superceded by this BO) | Amendment to the 1996 BO addressing lowered water levels in Upper Klamath Lake to reduce risk of flooding in spring 1999 | Lost River sucker<br>Shortnose sucker | Not likely to jeopardize the affected species. |
| August 18, 1999 (superceded by this BO) | Amendment to the 1995 BO on use of pesticides and fertilizers on leased lands and use of acrolein in canals operated by the Langell Valley Irrigation | Lost River sucker<br>Shortnose sucker | Not likely to jeopardize the affected species. |
| September 10, 1999 (superceded by this BO) | Revised amendment to the 1992 BO to cover operations and maintenance of Agency Lake Ranch impoundment | Lost River sucker<br>Shortnose sucker | Not likely to jeopardize the affected species. |

## History of Previous Biological Opinion Requirements Being Incorporated

The BA describes Reclamation's compliance with reasonable and prudent alternatives, and terms and conditions associated with 1992, 1994, and 1996 BOs (Service 1992, 1994b, 1996). For the most part, Reclamation has complied with those requirements (USBR 2001). However, several requirements from previous biological opinions that were not completely satisfied, as discussed below, are incorporated in this BO.

## A-Canal Screening

Reclamation was required to reduce entrainment of larval, juvenile, and adult suckers into the A-Canal by July 1997. In 1995, Reclamation provided a grant to the Klamath Irrigation District (KID) to evaluate sucker entrainment and identify alternatives for entrainment reduction. A final report was completed in 1997 (Natural Resource Scientists 1997). Several meetings were held in 1995 and 1996 to discuss this issue with representatives of the KID, Tule Lake Irrigation District (TID),

Oregon Department of Fish and Wildlife (ODFW), Cell Tech, Reclamation and the Service. From these meetings, the group agreed that entrainment reduction strategies and associated fish passage issues at Link River Dam should be integrated.

Subsequently, the UKL Entrainment and Fish Passage Working Group was formed to integrate all fish entrainment and passage issues. The working group consists of Reclamation, Klamath Tribes, Service, KID, Cell Tech, PacifiCorp, TID, and ODFW. Reclamation facilitated meetings 2-3 times per year from 1997 through 1999 to discuss progress and recommend future activities.

In 1997, the Service requested that Reclamation conduct additional entrainment monitoring on the A-Canal to compare with entrainment monitoring data from Link River Dam and B- and C-Canals. Reclamation funded an A-Canal fish entrainment monitoring study in 1997 and 1998 (Gutermuth et al. 2000a). In 1998, Cell Tech evaluated several mesh sizes of wedge-wire screen material to determine debris loading characteristics and sizes of fish that were excluded (Gutermuth 1999). On April 2, 1998, the Service amended the July 22, 1992, BO extending the date for entrainment reduction to July 22, 2002.

In 1999, Reclamation's Klamath Basin Area Office hired a fish passage biologist to coordinate Reclamation's fish entrainment and passage activities. The University of Wyoming was contracted to conduct swimming performance tests of juvenile LRS suckers in a range of water temperatures to help with the development of fish screen facility criteria (Meyer 1999). In 1999, Reclamation also performed field evaluations of Reclamation's Universal Stream Bottom Retrievable Flat Plate Fish Screen. Preliminary results were promising and plans were made to test two, 100 cubic feet per second (cfs), Reclamation-designed screens in the A-Canal during the 2000 irrigation season. Reclamation proceeded with the development of preliminary designs for the test installation during the fall of 1999 and developed draft specification and final drawings of the screens in the spring of 2000.

In a March 29, 2000, letter to Reclamation, KID did not support the testing of Reclamation's prototype screen and instead wanted to pursue other flat plate screen alternatives. Reclamation and KID met with the Service and ODFW to discuss the conceptual screen designs and identify acceptable design criteria. Reclamation has provided KID with a grant to develop preliminary designs for A-Canal screens.

On June 29, 2000, the Service met with ODFW and KID to develop screening criteria. The agreed-upon screening criteria was to be that used by the National Marine Fisheries Service (NMFS) in the Pacific Northwest, with several minor exceptions (Appendix 1).

**Link River Dam Fish Ladder**

A July 15, 1996, BO addressing PacifiCorp and New Earth Corporation operations as permitted by Reclamation required that Reclamation complete a fish ladder report by December 31, 1998 (Service 1996). That report has not been completed. Reclamation has been working on fish passage issues since early 1998, when the Service requested Reclamation lead the UKL Entrainment and Fish Passage Working Group. Reclamation, with assistance from fish passage engineers from the

Denver Technical Service Center, developed conceptual designs for a new ladder at Link River Dam in the fall of 1999 (USBR, unpubl. data). The Service has not seen these designs.

**Other Biological Opinion Requirements**

The 1992 BO required that Reclamation develop and implement a long-term plan to avoid and minimize incidental take associated with the Project. A draft plan was developed during the summer of 1995 and circulated to the Service and state resource agencies. The Service is not aware that Reclamation has taken any action to finalize or implement this plan.

The 1992 BO also required that Reclamation conduct a comprehensive survey of the Project service area to delineate the location of potential sources of take, develop and implement a program to reduce or eliminate this take, and for education purposes notify landowners and/or irrigation districts that the potential for take exists and advise them of protection afforded listed species under the Act. This activity was to be completed by July 22, 1995. On February 15, 2001, Reclamation provided the Service with an inventory of Project water diversions that potentially entrain endangered suckers; 193 diversions were identified. According to the BA, Reclamation plans to complete the written report by September 2001. Reclamation has not notified the Service of when it plans to take actions to reduce entrainment at these diversions.

**Reclamation's Contributions to Sucker Recovery**

According to the BA, Reclamation has initiated or completed most of the Priority 1 and 2 action items identified in the *Lost River and Shortnose Sucker Recovery Plan*. Reclamation has funded over $10.5 M in ecosystem restoration projects benefitting the recovery of these species and has purchased the 7,200-acre Agency Lake Ranch.

## II.1 DESCRIPTION OF THE PROPOSED ACTION

### A. Definition of the Action Area

The "action area" is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action" 50 CFR 402.02. Based on information contained in the description of the proposed action, the status of the species, and the effects of the action, we have determined that the action area for this consultation extends from Iron Gate Dam upstream in the Klamath River to Link River Dam, including Lake Ewauna and Link River; Upper Klamath Lake to its highwater line, and tributaries as far upstream as are affected by Project operations; Clear Lake and Gerber Reservoir to their high water lines, and tributaries as far upstream as are affected by Project operations; the entire Lost River from Clear Lake Dam to the Tule Lake sumps, including all of Miller Creek, and any tributaries of the Lost River that are affected by Project actions. Also included in the action area are dams, canals, drains, and facilities owned or operated, or related by contract or agreement to Reclamation's Klamath Project, and the approximate 220,000 acres of irrigated land serviced by the Project. Service actions on Refuge lands serviced by the Project are not included because they will undergo separate section 7 consultation.

### B. Authorizations/Responsibilities/Obligations that Affect or Influence Project Operations

These include:

1. Reclamation Act of 1902. Project construction was authorized by the Secretary of the Interior on May 15, 1905, in accordance with the Reclamation Act of 1902. The Act of February 9, 1905 provides: "The Secretary of the Interior is hereby authorized in carrying out any irrigation project that may be undertaken by him under the terms and conditions of the national reclamation act and which may involve the changing of the levels of Lower or Little Klamath Lake, Tule or Rhett Lake, and Goose Lake, or any river or other body of water connected therewith, in the States of Oregon and California, to raise or lower the level of said lakes as may be necessary...";

2. The Klamath River Compact of 1957. Entered into between the states of Oregon and California and approved by the U.S. Congress, the compact establishes goals and objectives for the development and management of water resources of the Klamath River Basin;

3. Federal Energy Regulatory Commission (FERC) license, Project No. 2082. The license establishes terms and conditions for operation of the Eastside and Westside Powerplants at Link River Dam, J.C. Boyle, Copco No. 1 and No. 2, and Iron Gate hydroelectric projects and Keno Dam. This license sets certain minimum flows at IGD. Minimum flows, however, are subject to water availability and senior water rights. Pursuant to1956 contract with Reclamation, PacifiCorp operates Link River Dam and its appurtenant power generation facilities. Reclamation and PacifiCorp entered into a Letter Agreement on June 5, 1997, to clarify for FERC that PacifiCorp was operating Link River Dam pursuant to Reclamation authority and directives under the 1956 contract, because the 1997 Klamath Project annual operations plan required Klamath River flows that were both greater and less than those in PacifiCorp's FERC license. The Agreement has been extended each year to include that year's operation;

4. Endangered Species Act. Project operations affect four threatened and endangered species including the Lost River and shortnose suckers, southern Oregon/northern California coho

salmon and the bald eagle. In 1992, the Service issued BOs on the effects of the Project on the endangered suckers and the bald eagle; this opinion was amended in 1994. The Service provided "reasonable and prudent alternatives" (RPAs) regarding minimum water elevations in project reservoirs that would allow Project operation to continue without jeopardy to the listed species. A 1996 BO addresses the effects of operations by Reclamation permittees on suckers;

5. Tribal Trust. The United States has a trust responsibility to protect tribal trust resources. In general, the trust responsibility requires the United States to protect tribal fishing, gathering, hunting, and water rights, which are held in trust for the benefit of the tribes. Reclamation is obligated to ensure that Project operations not interfere with the tribes' senior water rights. With respect to the tribes' fishing rights, Reclamation must, pursuant to its trust responsibility and consistent with its other legal obligations, prevent activities under its control that would adversely affect those rights, even though those activities take place off reservation. Fishery and other resources in the Klamath River and Upper Klamath Lake provide religious, cultural, subsistence, and commercial support for the Klamath Basin Indian tribes. The Klamath Basin Indian tribes include the Klamath, Hoopa Valley, Karuk, and Yurok Tribes;

6. Refuge Water Supplies. Four national wildlife refuges lie adjacent to or within Project boundaries-Lower Klamath, Tule Lake, Clear Lake, and Upper Klamath Lake National Wildlife Refuges. The refuges either receive water from, or are associated with Project facilities; and

7. Contracts and Water Rights. The Project supplies water to irrigation districts and individual irrigators pursuant to contracts entered into with Reclamation, subject to the availability of water. These contracts and water rights are described in Reclamation's 1992 BA (Reclamation 1992a) and Report on Historic Operation (Reclamation 2000a). They are further discussed below as well.

**C. Reclamation's Proposed Action**

The proposed action consists of Reclamation's operation of the Project, as a single entity, in accordance with historic operations. The Project includes a vast array of facilities (e.g., reservoirs, canals, pumping plants, diversions, and drains). These are all managed in concert for the unified purpose of running the Project. A partial description of project operations is presented in the BA prepared in 1992 (USBR 1992a) and a report (USBR 2000a) briefly describing historic project operations. More detailed descriptions of the project features and their operations are presented below under "Project Facilities and Operations".

In 1992 and1994 Bos, the Service determined that the Project would jeopardize the continued existence of the suckers and specified minimum lake and reservoir levels to avoid that effect, but since 1997, Reclamation has been operating at even higher minimum lake/reservoir levels to protect suckers. In this consultation, Reclamation proposes to operate the Project in a manner that meets or exceeds minimum lake levels that occurred during the period from 1960 to 1998. Under this proposal, Reclamation would maintain minimum lake levels that are lower than the levels it agreed to meet or exceed since 1997.

Four water year types are proposed for evaluation based upon inflows: (1) above average (>500,000 acre feet of inflow); (2) below average (312,000-500,000 acre feet); (3) dry (185,000 acre feet); and (4) critical dry (<185,000acre feet). These are determined using Reclamation's

benefit from these lands is that management will emphasize water quality improvement. Management actions on these lands that once contributed nutrients to UKL have been stopped or significantly reduced. Restoration on the Running Y Ranch Resort has included up to 1000 acres of marsh habitat. Other activities likely to occur include extensive riparian restoration along the major tributaries of UKL through fencing and improved grazing practices, and wetland restoration. The Nature Conservancy (TNC) and other partners recently purchased Tulana and Goose Bay Farms, totaling 8000 acres at the mouth of the Williamson River. Acquisition and restoration of this property has great potential for restoring sucker habitat and improving water quality in UKL. TNC has also purchased an additional 7,000 acres at Sycan Marsh, expanding its preserve to over 25,000 acres. This acquisition and restoration of the Marsh should improve water quality and hydrologic function in the Sycan and Sprague Rivers, tributaries to UKL. Other restoration projects are underway by ODFW and by private land owners. Restoration of aquatic habitats and uplands to improve watershed function will be essential for recovery of the suckers and other aquatic species. Such activities also will increase stream flows, raise the water table in pastures, increase wildlife habitat, and have other general benefits. Walker (2001) states that some improvement in water quality has already been detected since TP levels in UKL have been reduced by about 10% in the past decade. If anthropogenic phosphorus can be cut another 20 to 40%, it is anticipated that water quality in UKL will significantly improve.

## 5.0 CONCLUSION

After reviewing the current status of the LRS and SNS, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service’s biological and conference opinion that implementation of the Reclamation’s operation plan for the Klamath Project is likely to jeopardize the continued existence of the LRS and SNS and adversely modify their proposed critical habitat. The Service reached these conclusions for the following reasons:

At Upper Klamath Lake, implementation of the action, as proposed, is likely to:

1. Significantly increase the loss of larval and juvenile sucker habitat at critical phases of their life cycle which will reduce the frequency and magnitude of year-class development;

2. Significantly increase the loss of all life stages, but especially larvae, through entrainment;

3. Block passage of suckers into areas of preferred habitat or to spawning areas which will reduce their survival and reproduction;

4. Increase the frequency and magnitude of potentially lethal water quality conditions by lowered lake levels which will optimize light and nutrient conditions that will facilitate algal blooms. These blooms adversely affect the survival of all life history stages of the suckers, and the reproduction of adults;

5. Contribute to poor water quality conditions during algal decay cycles by reducing lake volume/surface ratios that influence dissolved oxygen concentrations. These conditions will adversely affect the survival of all sucker life history stages, but will especially reduce the

number of adults, and limit their longevity and reproductive potential;

6. Contribute to the loss of or reduction of access of suckers to water quality refuge areas that are critical to ensure adult sucker survival; and
7. Reduce lake volume/surface ratios during winter ice-cover conditions that influence dissolved oxygen and un-ionized ammonia concentrations which will contribute to potentially lethal water quality conditions that could adversely affect adult and juvenile survival.

At Clear Lake, Gerber Reservoir, and the Tule Lake sump, implementation of the action, as proposed, is likely to:

5. Block passage of suckers into areas of preferred habitat or to spawning areas in Clear Lake and the Tule Lake sump, which will reduce sucker survival and reproduction;

6. Reduce water volume in summer and fall when water temperatures and respiration rates are high and lead to stressful/lethal conditions for suckers, and also make them more vulnerable to disease and predators; and

7. Reduce water volume/surface ratios during winter ice-cover conditions that influence dissolved oxygen concentrations and un-ionized ammonia will contribute to potentially lethal water quality conditions that are likely to reduce adult and juvenile sucker survival.

Collectively, these effects are likely to appreciably reduce the survival and recovery of the suckers and preclude the conservation needs of these species from being met, and appreciably diminish the value of critical habitat constituent elements essential to the conservation of the suckers.

## 6.0 REASONABLE AND PRUDENT ALTERNATIVES

Regulations implementing section 7 define reasonable and prudent alternatives as alternative actions identified during formal consultation that: (a) can be implemented in a manner consistent with the intended purpose of the action; (b) can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction; (c) are economically and technically feasible; and (d) would avoid the likelihood of jeopardizing the continued existence of listed species or result in the destruction or adverse modification of critical habitat (50 CFR 402.02). A reasonable and prudent alternative (with 8 elements) with respect to the proposed operation of the Klamath Project is as follows:

1. *Maintenance of Minimum Surface Elevations in Upper Klamath Lake*

Reclamation shall not divert water from UKL for irrigation purposes if surface elevations are anticipated to go below 4141.0 ft on January 1, 4141.5 ft on February 15, 4142.0 ft on March 15, 4142.5 ft on April 15 and June 1, 4141.5 ft on July 15, 4141.0 on August 15, 4140.5 ft on September 15, and 4140.0 ft on October 15, regardless of inflow year type.

Reclamation shall formally notify the Service as to how it will ensure that these levels will not be violated owing to gage error or malfunction, such as occurred in 2000. Reclamation shall be responsible for verification that UKL water level readings are accurate, at least to 0.05 ft.

Implementation of the Project with these minimum elevations is necessary to avoid jeopardy and adverse modification of proposed critical habitat for the following reasons:

A. Minimum surface elevations of 4141.0 ft on January 1, 4141.5 ft on February 15, 4142.0 ft on March 15, and 4142.5 ft on April 15 are necessary to provide adequate water depth in shoreline spawning habitat along the UKL eastern shore from February-May to ensure adequate development of LRS and SNS year classes. Suckers that spawn along the east shore of UKL represent a unique population that must be maintained to allow for survival and recovery of both LRS and SNS. Year-class development is essential to provide for future generations of suckers as adults die from fish kills, predation, or from other factors. These minimum surface elevations will provide adequate spawning habitat which constitutes a primary constituent element of proposed critical habitat. In this way, operation of the Project will provide, in part, for functional critical habitat.

B. Minimum surface elevations of 4142.5 ft on April 15 and June 1, 4141.5 ft on July 15, and 4141.0 on August 15 are necessary to provide adequate water depth in emergent vegetation habitat in the lower Williamson River and in UKL for larval and juvenile suckers to ensure adequate year-class development. Emergent vegetation habitat is critical for survival of larval and juvenile suckers which are essential to provide for future generations of suckers as adults die from fish kills, predation, or from other factors. These minimum surface elevations will avoid jeopardy and adverse modification of proposed critical habitat, in part, by providing adequate rearing habitat where young suckers feed and avoid predators.

C. Minimum surface elevations of 4142.5 ft on June 1, 4141.5 ft on July 15, 4141.0 on August 15, 4140.5 ft on September 15, and 4140.0 ft on October 15 are necessary to maintain adequate water depths in UKL to reduce the magnitude and frequency of fish kills resulting from lethal water-quality conditions as a result of algal blooms occurring between June and October. If the frequency and magnitude of the fish kills are not reduced LRS and SNS populations will decline and reproduction will be reduced. Without adequate adult survival and reproduction, extirpation of UKL populations is likely to occur due to a reduction in individuals of sufficient age (up to 10 years for LRS) to spawn, which are essential for long-term survival and recovery of the species.

   Implementation of the Project with these minimum surface elevations will avoid jeopardy, in part, by reducing the frequency and magnitude of fish kills involving the LRS and SNS and provide for a diverse year-class population structure that will be more resilient to stochastic events. Maintenance of good water quality will provide for adequate functioning of one of the primary constituent elements of proposed critical habitat.

D. Minimum surface elevations of 4141.5 ft on July 15, 4141.0 on August 15, 4140.5 ft on September 15, and 4140.0 ft on October 15 are needed to maintain adequate water depths in

water quality refuge habitat in Pelican Bay-Fish Bank areas in UKL from July to October to protect adult suckers from the lethal effects of adverse water quality conditions as a result of algal blooms. By ensuring adequate water depths in this refuge area, it will allow some suckers to find good water quality during periods when lethal water quality conditions exist over most of UKL. Without adequate adult survival, which is essential for survival and recovery of these species, extirpation of UKL sucker populations is likely to occur.

Implementation of the Project with these minimum surface elevations will avoid jeopardy, in part, by reducing the numbers of adult suckers that die in water quality-related fish kills and provide for a diverse year-class population structure that will be more resilient to stochastic events. Maintenance of good water quality will provide for adequate functioning of one of the primary constituent elements of proposed critical habitat.

E. Minimum surface elevations of 4140.0 ft on October 15, 4141.0 ft on January 1, 4141.5 ft on February 15, and 4142.0 ft on March 15 are needed to maintain adequate water depths in UKL to reduce risk of lethal water quality under ice-cover conditions from December to March to protect juvenile and adult suckers. High lake levels in October will ensure that adequate levels of dissolved oxygen (DO) will be present in the water column once UKL freezes in November or December. High water levels during freeze-up (generally November to March), will ensure adequate DO to support adult and juvenile suckers in winter when DO is decreased by sediment oxygen demand and an ice cover prevents atmospheric reaeration. These higher lake levels will also dilute and toxic un-ionized ammonia that might also build up under ice cover conditions when mixing is reduced. Without adequate winter survival, extirpation of these populations, which are essential for survival and recovery of these species, is likely to occur. These minimum surface elevations are also necessary to ensure there is some year-to-year carryover of water to address, in part, drought conditions. Carry-over will help maintain UKL elevations in critically-dry years when inflow might be inadequate to do so.

Implementation of the Project with these minimum surface elevations will avoid jeopardy, in part, by reducing the numbers of adult and juvenile suckers that die during the winter when UKL is covered by ice and oxygen is not reaching the water column, will help dilute un-ionized ammonia which becomes more toxic at lower temperatures, and will help maintain adequate depths during droughts; this will provide for a diverse year-class population structure that will be more resilient to stochastic events. Maintenance, in part, of adequate water quality will provide for adequate functioning of one of the primary constituent elements of proposed critical habitat.

2. *Operation Plan for Low Water Year*

The Service has determined that a minimum surface elevation of 4140 ft in UKL, as set forth in RPA component 1 above, is necessary to avoid Project effects that jeopardize the suckers and and adversely modify their proposed critical habitat. However, the Service anticipates there will be low water years where inflow is inadequate for Reclamation to meet both RPA component 1 and NMFS's RPA requirement for Klamath River flows downstream for the threatened coho salmon. When Reclamation anticipates, based on the best available information (e.g., the April 15, NRCS

forecasts and associated model output), that it will be unable to satisfy RPA component 1 and requirements for Klamath River flows for coho salmon, this RPA component 2 shall be implemented.

The coordination procedures set forth below outline the method by which FWS and NMFS shall develop a plan that will best satisfy the requirements of listed species in low water years where inflow is inadequate to satisfy both RPA component 1 and Klamath River flows downstream for the coho salmon. Reclamation shall incorporate the plan developed by FWS and NMFS into the Project operation plan for a low water year.

Coordination Procedure for Low Water Years:

1. Data Collection, Dissemination, and Analysis

   A. Reclamation shall provide FWS and NMFS with a projection of total available water in all Project lakes and reservoirs; this total will identify total available water for satisfaction of RPA component 1 and Klamath River flows downstream for coho salmon; and

   B. Reclamation, FWS, and NMFS shall provide and use current data and information to determine the status of listed species.

2. Coordination Between Federal, Tribal, and Other Parties

Representatives from Reclamation, FWS, and NMFS shall coordinate with representatives from USGS, OSU, ODFW, CDFG, BIA, affected Tribes, and other parties, as appropriate, to consider and discuss available options for Project operation during a low water year that maximize implementation of RPA components for FWS and NMFS listed species. FWS and NMFS shall consider the results of this discussion when the agencies coordinate to determine how to best satisfy RPA component 1 and Klamath River flows downstream for the coho salmon in order to best protect each listed species.

3. FWS and NMFS Coordination

FWS and NMFS shall coordinate to determine how to best satisfy RPA component number 1 and Klamath River flows downstream for the threatened coho salmon, and how to best protect each listed species. The agencies shall employ a risk analysis process to be concluded in no more than two or three days during which the following factors shall be considered:

   A. Data collected, disseminated, and analyzed during step 1 of this Coordination Procedure;

   B. Results of discussions with Federal, Tribal, and other parties;

   C. Minimum UKL surface levels required by RPA component 1 and NMFS's RPA

requirement for Klamath River flows downstream for the threatened coho salmon;

D. Current status of affected listed species, including:

1. Location, size and movement of young-of-the-year and juvenile fish;

2. Water quality in Project lakes and reservoirs and Klamath River below IGD in relation to anticipated water supply; and

3. Other risk factors, such as status of *AFA* blooms and potential DO demands; observed or anticipated fish kills; presence of pathogens; anticipated discharges of UKL springs that could affect water quality refuge areas; and any other relevant factors.

E. Implementation of emergency contingency measures to avoid impending extirpation or extinction for each listed species:

1. For suckers: FWS, NMFS, BOR, and other relevant Federal and State agencies and Tribes, potentially including USGS, ODFW, CDFG, and BIA, will immediately convene to determine most appropriate course of action, relating to: (1) adverse water quality most likely to occur between July and October resulting from low DO levels; and (2) lake and reservoir levels below those minimums specified in RPA component 1 likely to occur between September and October. Potential ways to improve DO levels to be considered include: oxygenation, aeration, and artificial mixing. Reclamation, in coordination with the Service and the agencies listed above, should develop a plan by August 2001 to use the best method to increase DO levels for each project lake and reservoir that can be immediately implemented should that need arise. Ongoing water quality monitoring in Project lakes and reservoirs (see RPA component 3 and RPM 4) will provide advance warning that DO levels are reaching levels where corrective action will be necessary.

2. Reclamation shall coordinate with the Service to ensure that a salvage plan for each reservoir is available for implementation by August 2001 should that become necessary to salvage suckers and move them to secure areas. Supplemental oxygenation, aeration, or mixing may be needed to minimize risk of hypoxia.

4. FWS and NMFS Coordination with Reclamation

FWS and NMFS shall provide, in writing, the results of the coordination and risk analysis process to Reclamation with detailed instructions regarding measures that must be implemented to best protect each listed species.

Results of Implementing the Coordination Procedure for 2001

In March 2001, Reclamation informed the Service that water supplies were inadequate to satisfy RPA component 1 and NMFS's RPA requirement for Klamath River flows downstream for the threatened coho salmon. Consequently, the Service and NMFS implemented the coordination procedure described above.

As a result of implementing the Coordination Procedure, the Service determines that, based on the available water supply for 2001 identified by Reclamation, a deviation from the required minimum surface elevation of 4140 ft in UKL under RPA component 1 is warranted in order to address the conservation needs of both suckers and coho salmon during this low water year so long as the minimum surface elevation of 4140 ft in UKL is sustained on a long-term basis. In addition, the Service and NMFS may direct implementation of the contingency measures identified as a result of this Coordination Procedure in order to ensure that long-term viability of the species are maintained.

The information considered during this Coordination Procedure is presented in Appendix 2 of this BO, along with the specific instructions for allocating available water supplies.

3. *Adaptive Management through Water Quality Monitoring and Reporting*

Reclamation shall, in coordination with the Service, plan and implement a water-quality/algal growth and nutrient cycling study/monitoring program for UKL that will provide information to be used by Reclamation to manage UKL. The plan shall focus on factors such as how lake levels affect: AFA growth, light availability, internal nutrient loading, DO levels, and how DO levels are affected by sediment DO demand during the summer and below an ice cover.

Because of the highly technical nature of these physical/chemical/biological interactions, and consistent with available funding, Reclamation, in cooperation with the Service and the U.S. Geological Survey (USGS), if available, shall convene a scientific review panel comprised of recognized experts in the field of freshwater primary production, especially scientists that have worked with algae, and nutrient cycling in shallow, hypereutrophic lakes. The panel's objective shall be to develop a multi-year study/monitoring plan for UKL that would further refine knowledge regarding lake management to reduce the frequency and/or magnitude of water quality-related fish kills. Based on recommendations from the panel, agencies, and Klamath Tribes, a draft multi-year monitoring plan shall be prepared by August 1, 2001.

Annual progress reports shall be prepared by Reclamation that synthesize monitoring data and make recommendations on ways to improve management of UKL so as to avoid catastrophic fish kills. The reports shall be distributed by January 1 of each year to the Service, Klamath Tribes, USGS and other Federal and State agencies [e.g., BIA, NMFS, ODEQ, ODFW, CDFG, and the North Coast Water Quality Control Board (NCWQCB)] for review and comment. The annual reports shall also be sent to the scientific panel for their comments. The comments will be used to revise the monitoring studies, if needed. Final reports shall be prepared as soon as projects are completed. Reclamation shall use the comments to revise the monitoring studies, if needed.

Reclamation shall seek funding for these monitoring and reporting requirements on an annual basis. The studies and reporting shall continue until water quality in UKL has improved to a point where it no longer is a significant threat to the survival and recovery of the suckers. These studies are necessary to provide better information on factors that cause lethal water quality in UKL in summer and below ice cover in winter. Adverse water quality is a major threat to the continued existence of the suckers. This information will avoid jeopardy by providing information that is crucial for better management of UKL to prevent water quality-related sucker die-offs.

4. *Entrainment Reduction and Fish Passage at A-Canal and Link River Dam and Monitoring and Restoration of Sucker Habitats from Keno to Link River*

A. Reclamation shall reduce sucker entrainment at A-Canal using criteria developed by the Service and ODFW at a June 29, 2000, meeting (Appendix 1). A-Canal screening shall be completed by July 22, 2002, as previously required under the July 22, 1992, BO, as amended on April 2, 1998. A draft plan and implementation schedule have already been presented to the Service and ODFW.

B. Reclamation or its designee shall reduce sucker entrainment at Link River Dam using screening or some comparable means of entrainment reduction by January 1, 2004. Unless consultation is reinitiated on the 1996 BO, a draft entrainment reduction plan and implementation schedule shall be presented to the Service and ODFW for approval by July 1, 2001.

In the interim, operational measures shall be implemented at the Link River Dam by Reclamation or its designee to reduce entrainment until screening is completed. PacifiCorp may be Reclamation's designee with respect to these requirements by virtue of the interrelated nature of its operations at Link River Dam. Because most of the entrainment appears to occur during a few months, primarily August and September, and is concentrated at night, entrainment shall be reduced by not diverting water through the west side hydrofacilities during August and September, and water diversions shall be reduced to the greatest extent possible at east side hydrofacilities (not more than 200 cfs) at night (dusk to dawn during periods when entrainment is likely to be most significant (>100 age 0 and older suckers/day). Incidental take monitoring shall be performed annually from July through October to determine when hydropower diversions need to be temporarily suspended or reduced.

C. By January 1, 2004, Reclamation or its designee shall provide adequate passage at Link River Dam for mature LRS and SNS. A draft of the Link River fish passage plan shall be provided to the Service by July 1, 2001, for review and comment. Passage facilities shall be adequate to pass LRS and SNS of all spawning sizes, approximately 25-30 cm FL and above. Reclamation or its designee shall conduct a study in the Link River to determine what instream flows will be necessary to allow passage and if there are other passage barriers in the Link River. In support of the plan, Reclamation or its designee shall monitor suckers in the lower Link River for a minimum of two years (with a provision for extending the study if the two-year data set is inadequate) beginning in 2002, to determine the timing of sucker movements in relationship to season and flows, sizes and species composition of suckers in the river, and the ability of

suckers to pass obstructions in the river below Link River Dam at different flows. Radio-tracking of adult suckers in the Keno-Link River reach is recommended as a means to determine when adult suckers migrate, and to provide information on habitat use in this reach, as described below.

Available entrainment data indicate that tens of thousands of juvenile suckers will annually be by-passed into the reach extending from lower Link River to Keno Dam, when necessary screening is in place. It is critical to determine if these fish have adequate habitat to ensure their survival. Therefore, Reclamation shall plan and implement a study to examine habitat requirements for suckers in the Link River, Lake Ewauna, and the Keno Reservoir. The study shall focus on what habitats are available to suckers and monitor sucker survival in these areas. If insufficient/inadequate habitat are available, Reclamation shall determine what restoration actions are needed and begin taking corrective actions after coordination with ODFW, ODEQ, Klamath Tribes, and the Service. The study plan shall be provided to the State resource agencies, Tribes, and the Service by September 1, 2001, for review and comment. The study and any necessary restoration shall continue until goals are achieved, as determined by the Service. Annual progress reports shall be provided to the Service, State resource agencies, and Klamath Tribes by January 1.

These actions are necessary to avoid jeopardy and adverse modification of proposed critical habitat for the following reasons. This biological opinion identifies entrainment by the Project as a major threat to suckers in UKL, amounting to the take of millions of suckers annually. Entrainment reduction is needed to prevent suckers from being harmed or killed in Project irrigation canals or in the Link River hydroproject diversions. Passage at Link River is needed to allow suckers, by-passed downstream by the Project, the ability to migrate back into UKL and upstream tributaries where they can complete their life cycle and spawn. There is no known spawning habitat between Link River and Keno Dam, nor is it known that larval habitat is present in this reach. Without adequate passage long-term survival and recovery of suckers in UKL is not likely to occur. Habitat studies are necessary to provide better information on habitat quality in the reach between Link River Dam and Keno Dam. Information obtained in the studies will be used to manage suckers in this reach and to direct habitat restoration and improvement actions. Implementation of these actions is likely to improve survival of suckers and ensure that downstream suckers spawn, which will provide for long-term population viability.

5. *Management of UKL Water Quality Refuge Areas and Emergent Vegetation Habitats*

A. Reclamation shall prepare a draft study plan for Service review and comment by August 1, 2001. The plan shall better determine the role of "water quality refuge" areas for adult sucker survival. The role of water quality refuge areas for suckers in UKL needs to be better understood because it has important ramifications for adult sucker survival. The plan shall build on existing radio-telemetry and water quality data and make necessary recommendations for additional studies. As soon as the plan is approved, Reclamation shall undertake the study and have a draft report with management recommendations prepared for the Service review and approval by January 1, 2003, and shall begin implementation once the plan is approved.

Annual progress reports are due each January 1 until completion.

These actions are necessary to avoid jeopardy and adverse modification of proposed critical habitat for the following reasons. In this biological opinion, the Service identifies water quality refuge habitats in UKL as essential for the long-term survival and recovery of LRS and SNS. Lake management is needed to ensure adequate water depths in these refuge areas to allow suckers to survive lethal water quality conditions. Adult survival is essential for the continued existence of the suckers. These studies are needed to further refine knowledge regarding management of water quality refuge areas so that the Project can be implemented in a manner that is compatible with the conservation needs of the suckers and their proposed critical habitat.

B. Reclamation shall draft a plan, by a mutually agreeable date, for Service, ODFW, and Klamath Tribes' review, to determine the role of emergent vegetation in larval/juvenile survival. Habitat needs for larval and juvenile suckers in UKL, including lower Williamson River, are not adequately known. This has direct bearing on water quality management because an elevation of 4140.0 ft represents a threshold where, at lower levels, emergent vegetation becomes unavailable to larvae and juveniles in UKL. The plan shall also address emergent wetland restoration needs. Reclamation shall provide the Service, ODFW, and Klamath Tribes with a draft final report by January 1, 2003.

6. *Maintain Minimum Lake Levels in Clear Lake, Gerber Reservoir, and the Tule Lake Sump*

A. *Clear Lake*. Reclamation shall not divert water from Clear Lake for irrigation in any year if surface elevations are anticipated to go below 4521 ft on September 30. This surface elevation is necessary to ensure that during severe droughts there is sufficient end-of-year carry over of water and to ensure sufficient water depths in winter to adequately provide for sucker survival and reproduction and to maintain the primary constituent elements of their proposed critical habitat.

Clear Lake is very shallow and this minimum surface elevation will protect the suckers by: increasing water depth to improve water quality, especially DO during summer months when DO levels and respiration rates of suckers are highest; reduce risk of disease, which is increased by crowding; reduce predation and parasitism; and reduce risk of low DO under ice-cover conditions in winter.

Clear Lake is very prone to drought conditions because of low precipitation, seepage, and evaporation. The most extended drought occurred in the 1922-1937 period, when only one year of above-average inflow occurred in 15 years. In the drought of 1987-1992, inflow was above average in only one of six years. Estimated inflows were only 51,310 acre-ft during the 1990-1991 water year and 23,350 acre-ft in the 1991-1992 water year. Up to 1993, the surface water elevation in Clear Lake at the end of October had steadily declined from 4,531.8 ft in 1989 to 4,526.8 ft in 1990, 4,522.5 ft in 1991, and 4,519.2 ft in October 1992 as a result of a drought and irrigation water deliveries. Clear Lake reached a minimum elevation of 4,519.2 ft,

representing 28,380 acre-ft in lake volume, in October 1992, the lowest elevation for this reservoir since 1935 and only 5% of the reservoir's total capacity. The east lobe of Clear Lake was completely dry except for a small pool of water near the dam. Surface elevations lower than 4524 ft in the months of February and March reduce sucker access to Willow Creek for spawning. In 1992, low lake levels in Clear Lake prevented suckers from migrating upstream in Willow Creek to spawn.

A primary concern for fish populations in a high elevation, shallow lake such as Clear Lake is the threat of low DO under an ice cover. In October 1992, the water surface elevation was 4519.2 ft before the onset of a hard winter, and no fish kills were observed. On that basis, the Service is assuming that 4519.0 ft is the minimum surface elevation (the "hard-floor") at which the sucker populations can survive through the winter. However, such low water levels create poor water quality conditions, particularly during cold winters when the ice cover is extensive, such as 1993. As a result, the Clear Lake populations of both sucker species were in poor condition in the spring of 1993 (Service 1994b).

B. *Gerber Reservoir*. Reclamation shall not divert water from Gerber Reservoir for irrigation in any year if surface elevations are anticipated to go below 4802 ft on September 30. This elevation is necessary to ensure that during severe droughts there will be sufficient end-of-year carry over of water, and to help ensure adequate DO levels are maintained in summer that adequately provide for sucker survival and reproduction, and maintenance of the primary constituent elements of their proposed critical habitat. Below an elevation of 4800 ft, Gerber Reservoir is a relatively deep 500-acre pool, which in the summer months is stratified and prone to be hypoxic. Suckers confined to this pool in summer are at risk because of low DO levels. In winter, there is less of a threat because the pool will likely be oxygenated prior to freeze-up.

In October 1992, following a 6-year drought, Gerber Reservoir reached a minimum elevation of 4796.4 ft, which is <1% of its maximum capacity. Aeration was used to maintain water quality during the summer. Reclamation biologists found that SNS in the reservoir at that time showed signs of stress including low body weight, poor gonadal development, and reduced juvenile growth rates (Buettner, USBR, pers. comm.). SNS captured in 1992 and spring 1993 were very thin compared to SNS from Clear Lake, Tule Lake Sump and UKL. Extremely low water levels, high turbidity, and low DO concentrations probably contributed to their poor condition.

C. *Tule Lake Sump 1 A*. Reclamation shall maintain a minimum surface elevation of 4034.6 ft in Sump 1-A from April l to September 30 of each year to provide suckers spawning access, dispersal of larvae, and rearing habitat. A minimum surface elevation of 4034.0 ft must be maintained from October l to March 31 of each year to ensure adequate depths to protect the suckers from predation and freezing.

Tule Lake Sumps are extremely shallow, averaging only a few feet deep. Sedimentation has removed approximately 90 percent of the water depth in emergent wetlands in these sumps and at this rate sucker habitat will disappear in a few years if nothing is done to stop sedimentation.

Radio-tracking data show that suckers use very little of the available habitat, probably as a result of low lake levels, and perhaps adverse water quality. Adequate depth is needed to ensure adult sucker habitat is maintained. A plan shall be developed and implemented, as discussed below, to reduce sedimentation, increase water depths, and allow for some variation in water levels that will promote the development of emergent wetlands.

*Finding that the RPA is Reasonable and Prudent*

Implementation of the RPA will adequately address the following conservation needs of the suckers and their proposed critical habitat: loss of larval habitat owing to low reservoir levels; take of juvenile suckers by entrainment; lack of adequate fish passage preventing suckers from reaching spawning habitat; water level management contributing to adverse water quality that leads to fish kills; sedimentation and poor water quality; access to water quality refuge areas (needed to protect adult suckers from adverse water quality conditions); and winter kill of suckers from low lake levels and ice cover conditions preventing reaeration to replace DO consumed by the sediment. Implementation of the RPA allows the Project to provide water for irrigation and Refuge use in most years and to provide to listed species in low water years.

Actions identified under the RPA such as managing lake levels, providing screening and passage, collecting water quality data and preparing reports, and planning to reduce water demand are actions within Reclamation's authority and jurisdiction.

Many of the actions identified in the RPA have been identified in previous jeopardy BOs for the Klamath Project as part of the RPA, but were not implemented. Costs of these actions, when amoritized over the long life of the Project, do not reach a level that is unreasonable. Under the authority of the Klamath Basin Water Supply Enhancement Act of 2000 (P.L. 106-498), Reclamation can undertake studies to reduce Project water demand and augment supply. Screening and fish passage are economically and technically feasible since they have been widely implemented by other Federal water development projects in the West, including most other Reclamation projects.

These Reasonable and Prudent Alternatives apply to calendar year 2001 operations and beyond. Pursuant to Reclamation's, request to limit the duration of this BO to one year, Reclamation's compliance with section 7(a)(2) provided herein will expire on April 2, 2002, unless Reclamation requests formal adoption of this BO for continued operation of the Project.

Because this biological opinion has found jeopardy, Reclamation is required to notify the Service of its final decision on the implementation of the reasonable and prudent alternative.

## 7.0 INCIDENTAL TAKE

This incidental take statement applies to incidental take of Lost River suckers and/or shortnose suckers resulting from the operation of the Project. It replaces the incidental take statements for all previous BOs addressing Reclamation's operation of the Klamath Project.

Sections 4(d) and 9 of the Act, as amended, prohibit taking (harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct) of listed species of fish or wildlife without a special exemption. Harm is further defined to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering. Harassment is defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is any take of listed animal species that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or the applicant. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered a prohibited taking provided that such taking is in compliance with the terms and conditions of this incidental take statement.

The measures described below are non-discretionary, and must be implemented by Reclamation so they become binding conditions of project authorization for the exemption under 7(o)(2) to apply. Reclamation has a continuing duty to regulate the activity that is covered by this incidental take statement. If Reclamation (1) fails to adhere to the terms and conditions of the incidental take statement through enforceable terms, and/or (2) fails to retain oversight to ensure compliance with these terms and conditions, the protective coverage of 7(o)(2) may lapse. In order to monitor the impact of incidental take, Reclamation must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement 50 CFR §402.14(i)(3).

The Service developed this incidental take statement based on the premise that the reasonable and prudent alternative will be implemented. In operating the Project as specified, the Service anticipates that LRS and/or SNS could be taken in the form of harassment, harm, or mortality.

**Quantification of Incidental Take**

The Service anticipates that take will occur in the form of harassment, harm, or mortality of LRS and/or SNS adults, juveniles, larvae, and eggs as a result of operating the Project in accordance with this BO. We anticipate that take will likely occur as a result of the following actions related to Project operations:

(a) Entrainment (resulting in harassment and/or mortality) from Clear Lake and Gerber Reservoir into the Lost River and any associated water delivery systems.

(b) Entrainment from Upper Klamath Lake through the A-canal and into any of the associated water delivery systems.

(c) Entrainment from Tule Lake via pumps or diversions into associated water delivery systems.

(d) Negative effects of poor water quality, chemical vegetation control, entrainment in pumps, increased predation, and desiccation (resulting in harassment and/or mortality) of suckers trapped in the water delivery systems including canals, drains, fields, head-

gates and turnouts, including Straits Drain.

(e) Entrapment (resulting in harassment and/or mortality) of suckers in the outlet structures of Gerber or Clear Lake Reservoirs when the water flow is reduced or stopped.

(f) Negative effects on suckers inhabiting the Project lakes and reservoirs when water quality or quantity is reduced to stressful/lethal levels (resulting in harassment and/or mortality).

(g) Entrainment at the Link River Dam hydrodiversions and blockage of passage at the Link River Dam (resulting in harassment and/or mortality).

(h) Entrainment at C-Drop harvest facility.

(i) Loss of habitat in Project reservoirs owing to water diversions (resulting in harm related to habitat loss).

Some quantification of incidental take has been described as a result of requirements in previous BOs. The results of that effort are briefly summarized below and are described in greater detail above in section 4.0 "Effects of the Action."

**A-Canal Entrainment**

A-canal larval entrainment in1990 was estimated at approximately 400,000 individuals. In 1991, it was estimated that 800,000 sucker larvae were entrained into the A-Canal (Markle and Simon 1993). The 1996 and 1997 entrainment estimate for larval and early juvenile suckers was 3,000,000 (Gutermuth et al. 1997) and 1,700,000 (Gutermuth et al. 1998b), respectively. The total 1997 A-Canal entrainment index for juvenile and adult suckers was estimated at 47,000 suckers in 1997, and in1998 the entrainment index was 250,000 suckers (Gutermuth et al. 2000a). These values are best viewed as gross estimates of actual take. Given field conditions, these data are probably as good as can be expected. Because Klamath largescale suckers comprise some of the suckers and some suckers are salvaged, it might be argued that the entrainment estimates for LRS and SNS may be smaller than the totals provided above. However, owing to the short duration of the studies and low sampling efficiency of nets, and other factors, these estimates likely do not represent the maximum number of suckers entrained.

**Link River Dam Diversions Entrainment**

Fish entrainment studies were conducted at the two hydropower diversions on Link River Dam in 1997, 1998, and 1999 (Gutermuth et al. 1999, 2000b). An average of about 50,000 suckers per year, including Klamath largescale suckers, were entrained in the diversions. About 74% of these were <7.5 cm FL, 25% 7.5 to 15 cm FL, and 1% >15 cm FL. The East- and Westside powerhouses utilize Francis-type turbines. According to Reclamation's entrainment mortality analysis, based on Eicher Associates (1987), between 10 and 26 percent of entrained fish at

Eastside and 20 to 26 percent of entrained fish at Westside perish. Mortality is related to size, with larger fish generally suffering higher rates of turbine mortality. Entrainment injury rates and delayed mortality are unknown, and assumed significant. Delayed mortality is a concern for most fish entrained at PacifiCorp's facility and passing downstream due to poor downstream water quality and habitat conditions in Link River and Lake Ewauna.

**Salvage Operations**

Reclamation has conducted salvage operations in Klamath Project canals receiving water from UKL yearly since 1991. Between 1996 and 1999, the numbers of suckers salvaged were 11,000 (1996), 2,400 (1997), 2,700 (1998), and 27,000 (1999) (USBR 2000b). Age 0 fish dominated the 1996, 1998 and 1999 salvage operations and age 1+ were predominant in 1997. From 6 to 354 suckers have been salvaged annually below Clear Lake Dam between 1991 and 1999. Observed mortalities during salvage operations are low (Peck 2000).

**Summary**

Known take of suckers as a result of Project operation amounts to approximately 1-4 million suckers annually, mostly larvae and juveniles. This estimate is best viewed as preliminary owing to temporal limitations, sampling biases, species identification difficulties, and other factors that provide uncertainty. Furthermore, these data are primarily for entrainment losses and do not quantify the other potential sources of mortality listed above. Therefore, we assume that total annual take of endangered suckers is about 2 to 6 million LRS and SNS, when all other sources of Project-related take are added. This level of take is significant, especially since it consists primarily of age 0 suckers from populations in UKL, and this is approximately the level of annual production of age 0 suckers in UKL. However, these losses are likely to be directly correlated with annual sucker production and only be at the highest level during years when reproduction and larval survival is highest.

In order for the Service to provide an RPA, the Service must have sufficient reason to conclude that any associated incidental take would not lead to jeopardy. Any associated RPMs would further reduce or eliminate such incidental take. In five previous opinions the Service has determined that the operation of the Klamath Project would likely jeopardize the continued existence of the LRS and SNS. In these opinions, the Service concluded that if the RPAs were implemented, jeopardy could be avoided. However, the RPAs have not been fully implemented and evidence now indicates that the two endangered sucker species are more imperilled than when previous opinions were issued.
The Service anticipates that up to 6 million total individuals of Lost River and shortnose suckers may be taken annually by Project operations. Approximately 75% of these would be age 0 suckers. Actions addressed by this incidental take statement, and the corresponding levels of take, comprise:

1) entrainment from Clear Lake and Gerber Reservoir into the Lost River and any associated water delivery systems (up to 0.1 million suckers annually);

2) entrainment from UKL through the A-Canal and Link River Dam hydropower diversions and into any of the associated water delivery systems (up to 4 million suckers annually);

(3) entrainment from Tule Lake via pumps or diversions into associated water delivery systems (up to 0.01 million suckers annually);

4) negative effects of poor water quality, chemical vegetation control, entrainment in pumps, increased predation, and desiccation of suckers trapped in the water delivery systems including canals, drains, fields, head-gates, turnouts and pumps (up to 0.01 million suckers annually);

5) entrapment of suckers in the outlet structures of Gerber or Clear Lake reservoirs when the water flow is stopped (100 suckers annually);

6) negative effects on suckers inhabiting the Project lakes and reservoirs when water quality or quantity is reduced to stressful levels (1 million suckers annually);

7) negative effects of annual salvage operations in Project canals (30,000 suckers annually);

8) sedimentation of Tule Lake Sump 1A (1,000 suckers);

9) all incidental take at Link River Dam hydrodiversions and the C-drop harvest facility (0.1 million suckers annually) and;

10) all incidental take in the three Project reservoirs that result from habitat loss resulting from lower water levels caused by water diversions; and

The BA does not address, nor does the Service have any information on, the level of incidental take caused by the Straits Drain.

The Service establishes the following reasonable and prudent measures to minimize anticipated incidental take of listed suckers. The Service concludes these measures are needed because Project operations are directly or indirectly resulting in substantial incidental take of suckers by: entrainment; passage blockage; habitat loss/degradation, including adversely impacting water quality and through dessication, blockage of passage, increasing frequency of disease, parasites, and predators.

**Effect of the Take**

This level of take (6 million larval, juvenile and adult LRS and SNS annually) is not anticipated to jeopardize the continued existence of LRS and SNS because: (1) this is the maximum potential take that would ever occur and it should not occur at this level every year; (2) take will mostly be of larvae which would show high levels of natural mortality owing to starvation and predation; (3) some take will be in the form of harm and will not necessarily lead to mortality; (4) some take will occur multiple times as suckers are harmed by Project operations that seasonally degrade habitat and water quality; and (5) salvage of suckers in Project canals can reduce the adverse effects of

take, other than direct mortality, by returning suckers to safe areas. However, in making this statement, we do anticipate significant adverse effects of this take to sucker populations in terms of numbers, reproduction, and distribution, but conclude that timely and full implementation of the RPA elements can reduce these adverse effects to a level that will avoid jeopardy.

### 7.1 Reasonable and Prudent Measures

The Service believes the following reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take of LRS and SNS:

1. Minimize entrainment losses of suckers by conducting salvage operations in the canal systems that emanate from UKL, Clear Lake, Tule Lake, and Gerber Reservoir after these canals have been drawn down.

2. Minimize all types of take associated with operation of the Klamath Project related to actions permitted or otherwise authorized by Reclamation.

3. Provide minimum instream flows downstream from Clear Lake and Gerber Reservoir to minimize incidental take associated with end-of-season dewatering.

4. Monitor water quality in all Project lakes and reservoirs, and other features such as canals and drains where water quality is likely to adversely affect endangered suckers and provide the Service with monthly summaries and analyses, and prepare annual reports that recommend solutions. Take actions to minimize incidental take associated with identified problems.

5. Take actions at Agency Lake Ranch to minimize entrainment of suckers and adverse effects of poor water quality.

6. Minimize incidental take in the Lost River.

7. Improve water quality in lower Link River and provide adequate minimum flows in Link River.

In order to be exempt from the prohibitions of section 9 of the Act, compliance with the following terms and conditions, which implement the reasonable and prudent measures described above, is required. These terms and conditions are non-discretionary.

### 7.2 Terms and Conditions

The following term and condition is provided to implement RPM #1:

1a. Reclamation shall continue to conduct annual salvage of suckers stranded in the canal systems and below outlet structures of dams. Salvage plans have been developed annually since 1991. A new plan is not necessary unless the 2001 plan is found to be inadequate. Annual reports describing salvage operations are to be sent to the Service, CDFG, ODFW, and

Klamath Tribes by January 1 each year.

The following term and condition is provided to implement RPM #2:

2a. Reclamation, in coordination with the Service, the Klamath Tribes, appropriate state agencies, USGS, state universities, and/or Reclamation's designees, shall provide the Service with a draft incidental-take minimization plan for review and comment. The plan shall address all facilities where endangered suckers may be taken where operations are permitted or otherwise authorized by Reclamation, such as operations by irrigation districts, and private uses of Project water, canals, and drains. Because nearly the entire Lost River system from Clear Lake and Gerber dams to the Tule Lake sumps have been severely altered, directly or indirectly, as a result of the Project, the plan must address measures throughout that system that will reduce take, including sedimentation of Sump 1A. The objective of this plan will be to minimize incidental take as much as is possible with a focus on all forms of incidental take including but not limited to: entrainment, loss of passage, and habitat loss and degradation, such as adverse water quality, dewatering of lake, river, and streams, loss of cover, sedimentation, and other forms of loss and degradation.

The plan will describe or provide: (1) an implementation schedule of take determination monitoring; (2) a list of all Project features, including private pumps, canals and drains that are interrelated or interdependent to the Project, as described above, where take is occurring, describing the extent and mechanism of take, and ranked according to level of take; (3) a description of take reduction measures and an implementation schedule of commencement and completion of take reduction measures; and (4) a monitoring plan to measure take-reduction effectiveness. Annual progress reports shall be sent to the Service, ODFW, CDFG, and Klamath Tribes on 1 January of each year, until implementation is successfully completed.

The following term and condition is provided to implement RPM #3:

3a. Reclamation shall develop and implement a plan (with coordination of affected irrigation districts) to provide annual minimum instream flows below Clear Lake and Gerber Reservoir dams following termination of irrigation releases, if water levels in the reservoirs are above minimums required by this BO, or otherwise deemed necessary to protect suckers by Reclamation and the Service. Once the plan is developed and approved by the Service, minimum flows will be released at the end of the irrigation season and water quality and habitat monitoring will be conducted to determine if flows are adequate to protect suckers in downstream reaches of Miller Creek and Lost River.

The following term and condition is provided to implement RPM #4:

4a. Reclamation shall monitor water quality in all Project lakes and reservoirs, and other features such as canals and drains, as well as water bodies affected by Project operations where water quality is likely to adversely affect endangered suckers. This includes Clear Lake, Gerber Reservoir, the entire Lost River and Tule Lake sumps, and UKL and Link River to Keno Dam. Reclamation, with available assistance of the Klamath Tribes, appropriate state

agencies, and water quality experts from USGS, state universities, and one or more water quality experts designated by Reclamation representing its contractors, licensees, or permittees, shall develop a draft water-quality monitoring and implementation plan to be presented to the Service, state resource agencies, and interested Indian tribes for review and approval by a mutually agreeable date.

Reclamation shall monitor Project water quality and develop monthly water-quality summaries and annual reports. The report will summarize and analyze water quality data and will provide detailed analyses relating to causes and effects. A monthly report shall be provided to the Service, CDFG, ODFW, ODEQ, NCWQB, and interested Indian Tribes on the first day following each month where water quality is a concern, but must include the months of June through October. Annual reports shall be delivered to the Service, CDFG, ODFW, ODEQ, NCWQB, and interested Indian Tribes, summarizing monthly reports with in-depth analyses of data, with emphasis on how water quality affects upon listed species and habitats, and recommendations for corrective actions to be implemented by Reclamation. Annual reports will also indicate which water-quality improvements have been implemented that year along with the status of those that have not been completed.

The following term and condition is provided to implement RPM #5:

5a. Reclamation shall develop and subsequently implement, upon Service approval, a long-term method to reduce entrainment at the Agency Lake Ranch diversion by January 1, 2002.

5b. Reclamation shall implement the September 7, 1999, salvage plan during periods of pumping at Agency Lake Ranch.

5c. Reclamation shall implement the existing, Service-approved water quality monitoring plan in the Ranch impoundment and at the point of discharge in Agency Lake during periods of pumping. The objective of the plan will be to avoid pumping water into Agency Lake that might adversely affect listed suckers. No water will be released from Agency Lake if it could lead to incidental take of suckers or degrade water quality in UKL to a point exceeding ODEQ-established criteria.

5d. Reclamation shall provide the Service with an annual fish salvage and fish and water quality monitoring report. The report shall analyze monitoring and salvage data and provide any recommendations that will minimize incidental take.

5e. Reclamation shall develop a comprehensive management plan for Agency Lake Ranch, specifically addressing how incidental take of listed species (suckers and bald eagles) will be minimized which shall be provided to the Service, ODEQ, ODFW, and Klamath Tribes.

The following terms and conditions are provided to implement RPM #6:

6a. Reclamation shall prepare a report on sucker habitat use in the Lost River system and document threats to suckers. A preliminary report using existing data will identify what

additional data are needed and shall be presented to the Service for review and comment. The report should include recommendations for: better management of Reclamation's Lost River dams to reduce take; improving habitat in the channelized reach in Langell Valley; improving spawning habitat in Big and Bonanza springs; reducing rapid changes in river stage owing to an imbalance between irrigation deliveries and withdrawals; and reducing sediment and nutrient loading. Reclamation, in consultation with the Service, shall determine if, based on the preliminary report, additional data must be collected to prepare a final report.

The following terms and conditions are provided to implement RPM #7:

7a. Reclamation shall take actions under its authority to ensure that water quality in lower Link River and adjacent Lake Ewauna is adequate to protect suckers by providing minimum flows of at least 250 cfs at Link River Dam during the summer when water quality is adverse. Reclamation shall determine how DO changes with flows from Link River Dam by continuously monitoring DO and levels of flow during June through October 2001. The results of those studies will be used to develop minimum flow schedules. Reclamation will provide the Service with a report on the water quality/flow monitoring and make recommendations on necessary minimum flows based on an analysis of the data. Reclamation shall maintain minimum flows for out years based on recommendations in the report and input from the Service, ODEQ, ODFW, and the Klamath Tribes.

This Incidental Take Statement applies to calendar year 2001 Project operations and beyond. Pursuant to Reclamation's, request to limit the duration of this BO to one year, the section 9 exemptions provided herein will expire on April 2, 2002, unless Reclamation requests formal adoption of this BO for continued operation of the Project.

### 7.2.1 Monitoring Requirements Under the Terms and Conditions

When incidental take is anticipated, the terms and conditions must include provisions for monitoring to report the progress of the action and its impact on the species. 50 CFR, 402.14(i)(3).

Since there is currently no on-going, Project-wide incidental take monitoring of listed suckers, Reclamation shall develop an incidental take monitoring/reporting plan. Implementation of this plan will focus on quantifying as much of the incidental take as is feasible. The Service recognizes that incidental take of larvae is difficult to monitor. Also, it may not be feasible to monitor all project activities because of the numerous Project facilities that result in incidental take. The Service will determine what is reasonable, based in part on Reclamation's analysis of what incidental take can be monitored.

Because monitoring will rely on estimates of incidental take developed by appropriate sampling, the plan should be reviewed by an expert in biostatistics, to ensure the estimates are as accurate as possible. The Service recommends that existing monitoring reports be reviewed by Reclamation to determine how best to proceed. The sampling and statistical analyses must be adequate for Reclamation and the Service to determine if/when incidental take levels are being

approached/have been exceeded.

Reclamation shall provide the Service, for review and comment, with a draft incidental take monitoring plan to be implemented upon Service approval. Annual reports will be sent to this office and to Service law enforcement in Klamath Falls each year. If Reclamation determines that authorized incidental take is exceeded, this office and the Service's law enforcement office in Klamath Falls must be notified. Reclamation will be responsible for ensuring that its licensees, contractors, or designees do not exceed authorized incidental take levels.

### 7.3 Reporting Requirements

Upon locating a dead, injured, or sick endangered or threatened species specimen, initial notification must be made to the nearest Service Law Enforcement Office. In Oregon, contact the U.S. Fish and Wildlife Service, Division of Law Enforcement, 301 Post Office Bldg., Klamath Falls, Oregon 97601 (phone: 541/883-6900). In California, contact the U.S. Fish and Wildlife Service, Division of Law Enforcement, District 1, 2800 Cottage Way, Room W-2928, Sacramento, California 95825 (phone: 916/414-6660). Care should be taken in handling sick or injured specimens to ensure effective treatment and care and in handling dead specimens to preserve biological material in the best possible state for later analysis of cause of death. In conjunction with the care of sick or injured endangered species or preservation of biological materials from a dead animal, the finder has the responsibility to ensure that evidence intrinsic to the specimen is not unnecessarily disturbed.

The Service is to be notified within three (3) working days of the finding of any endangered or threatened species found dead or injured in the Klamath Project service area. Notification must include the date, time, and precise location of the injured animal or carcass, and any other pertinent information. In California and Oregon, the Service contact person for this information is Mr. Steven A. Lewis (541/885-8481). Any LRS or SNS found dead or injured in California shall be turned into the CDFG. The agency contact is Susan Cochrane (916/322-2493).

If, during the course of the action, the amount or extent of the incidental take limit is exceeded, the Federal agency must reinitiate consultation with the Service immediately.

## 8.0 CONFERENCE REPORT

Critical habitat was proposed in 1994, but has not yet been finalized. The primary constituent elements identified in the proposal are as follows: (1) water of sufficient quantity and suitable quality; (2) sufficient physical habitat, including water quality refuge areas, and habitat for spawning, feeding, rearing, and travel corridors; and (3) a sufficient biological environment, including: adequate food levels, and natural patterns of predation, parasitism, and competition.

The proposed action will adversely affect the primary constituent elements of the proposed critical habitat in Project reservoirs by: reducing water levels; adversely affecting water quality; and reduce access to water quality refuge areas, spawning, and larval and juvenile rearing habitats. Lower lake levels in Project reservoirs will likely make larval and juvenile suckers more

susceptible to fish predation by forcing them to use habitat away from the protective cover of shallow water and any associated wetlands. Lower lake levels also likely make juvenile and adult suckers more vulnerable to birds predators because of the shallow depths in some Project reservoirs, such as Clear Lake, Tule Lake sump, and UKL. A lack of passage at Klamath Project dams, blocks natural travel corridors to spawning and rearing habitats. Adverse water quality alters the natural pattern of disease and parasitism within the sucker populations, increasing their frequency and intensity.

The Service has examined the effects of the proposed action and determines that proposed critical habitat for the LRS and SNS will be modified by: (1) temporary reductions of water levels by water diversions during critical periods making seasonally habitats unsuitable; (2) longer-term reductions in water levels by sedimentation making habitat permanently unsuitable; (2) reductions of water quality sufficient to make habitats unsuitable over short and long time periods; (3) blockage of passage preventing suckers from using habitats necessary for completion of life cycle; and (4) other factors. The Service's preliminary determination is that these adverse effects will be of a sufficiently high degree and extent that they will likely lead to adverse modification of proposed critical habitat.

## 9.0 CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. The term "conservation recommendations" is defined as suggestions from the Service regarding discretionary measures to: (1) minimize or avoid adverse effects of a proposed action on listed species or critical habitat; (2) conduct studies and develop information; and (3) promote the recovery of listed species. The recommendations provided here relate only to the proposed action and do not necessarily represent complete fulfillment of the agency's 7(a)(1) responsibilities under the Act.

1. The Service recommends that Reclamation survey all of its properties for the presence of Applegate's milk-vetch or its suitable habitat.

2. The Service recommends that Reclamation survey for spotted frogs on its Agency Lake Ranch property and consider if it could develop suitable habitat there for this species as a conservation action.

3. The Service recommends that Reclamation investigate the feasibility of establishing a population of Lost River suckers in Gerber Reservoir with broodstock from Clear Lake. If deemed feasible, Reclamation should work with BLM, ODFW, and the Service to plan and implement this effort.

4. Water quality/quantity in UKL has gotten worse over time owing to anthropogenic changes in its watershed. The Service recommends that Reclamation evaluate the role watershed/riparian/floodplain has in providing high quality/quantity flows into UKL, and implement a long-term restoration plan to restore degraded and lost functions.

5. Emergent wetlands in UKL and in tributary streams appear to have played an important function in nutrient cycling and in producing humic substances that may retard *AFA* growth. The Service recommends that Reclamation fund additional studies on wetland functions.

6. Chiloquin Dam has a poorly functioning fish ladder. The Service recommends that Reclamation work with the Service, The Klamath Tribes, the Modoc Irrigation District, and others to secure funding to repair the ladder. If implemented, this could provide additional valuable spawning habitat for UKL suckers.

7. The Service recommends that Reclamation serve as a clearing house for water quality data from the Upper Klamath Basin, especially for those basins which directly affect water quality in Project lakes, reservoirs, rivers, canals, and drains. Reclamation is the agency with the most control of water in the upper basin. It should be proactive in efforts to share data among all interested parties. This would make data more available to anyone and would facilitate management. Currently data are scattered among numerous agencies and organizations.

8. *Water Conservation/Reduction of Project Water Consumption Plan*

   Reclamation should reduce water consumption by the Project consistent with Reclamation's legal authority and jurisdiction. Reclamation should develop a draft water conservation and Project water consumption reduction plan by a mutually agreeable date for Service review and comment. Reclamation should incorporate the approved plan into all future Project operation plans. Annual reports describing water conservation and use reduction progress shall be prepared.

9. *Planning to Improve Water Quality in the Tule Lake Sumps*

   Reclamation should work with the Service to develop a plan by a mutually agreeable date that will protect suckers in the sumps from the adverse effects of sedimentation and poor water quality. The plan is needed to increase water depths and allow varying water levels so that emergent vegetation can be reestablished. Over the last 30 years, under a management regime that allowed for only a one foot annual fluctuation in water levels, Tule Lake wetland areas have declined dramatically, including areas with bulrush. These types of habitat are essential to provide for sucker survival, reproduction, and the primary constituent elements of their proposed critical habitat.

In order to be kept informed of actions that either minimize or avoid adverse effects or that benefit listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.

## 10. REINITIATION NOTICE

This concludes the conference for the Klamath Project. You may ask the Service to confirm the conference opinion as a biological opinion issued through formal consultation if the critical habitat

is designated. The request must be in writing. If the Service reviews the proposed action and finds that there have been no significant changes in the action as planned or in the information used during the conference, the Service will confirm the conference opinion as the biological opinion on the project and no further section 7 consultation will be necessary.

Reclamation shall request reinitiation of consultation if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect the critical habitat in a manner or to an extent not considered in this conference opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the critical habitat that was not considered in this conference opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action.

The Service appreciates the efforts made by Reclamation staff to assist completion of this consultation. The Service also appreciates the assistance of individuals in the following agencies/organizations who provided us with critical scientific information and/or reviewed parts of this opinion: BIA, CDFG, The Klamath Tribes, NMFS, ODFW, ODEQ, OSU, PacifiCorp, and USGS (BRD and Water Resources Div.).

If you have any questions regarding this opinion, please contact the Klamath Falls Fish and Wildlife office Project Leader at (541) 885-8481.

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Southwest Region
501 West Ocean Boulevard, Suite 4200
Long Beach, California 90802-4213

APR 6 2001

Mr. Karl E. Wirkus
Bureau of Reclamation
Klamath Basin Area Office
6600 Washburn Way
Klamath Falls, Oregon 97603

Dear Mr. Wirkus,

The purpose of this letter is to transmit our biological opinion regarding the impacts of the ongoing Klamath Project operations on Southern Oregon/Northern California Coasts (SONCC) coho salmon, a species listed as threatened under the Endangered Species Act (see enclosure).

On January 22, 2001, the Bureau of Reclamation (Reclamation) requested formal section 7 consultation on the effects of the on-going operations of the Klamath Project on SONCC coho salmon. After reviewing the current status of SONCC coho salmon, the environmental baseline for the action area, the effects of the proposed action and cumulative effects, the National Marine Fisheries Service (NMFS) provided Reclamation a draft jeopardy opinion and reasonable and prudent alternative on March 19, 2001. Following review and consideration of comments and information received on our March 19, 2001, draft opinion and reasonable and prudent alternative, it is NMFS's opinion that the ongoing operation of the Klamath Project into the future, as proposed, is likely to jeopardize the continued existence of SONCC coho salmon and adversely modify its designated critical habitat. Our jeopardy determination is generally based on the expectation that the proposed operation of the Project would result in a continued decline in habitat conditions in the Klamath River below Iron Gate Dam (IGD) relative to Project operations during previous decades. As a result, the survival and abundance of several freshwater life history stages of coho salmon would be expected to decrease–appreciably reducing the likelihood of survival and recovery of SONCC coho salmon.

Regulations (50 CFR §402.02) implementing section 7 of the Endangered Species Act require "jeopardy" biological opinions to identify any "reasonable and prudent alternatives" to the proposed action. A "reasonable and prudent alternative" is an alternative action, identified during formal consultation, that: (1) can be implemented in a manner consistent with the intended purpose of the action; (2) can be implemented consistent with the scope of the action agency's legal authority and jurisdiction; (3) are economically and technologically feasible; and (4) would avoid the likelihood of jeopardizing the continued existence of listed species or result in the destruction or adverse modification of critical habitat. Although several factors present difficulties in identifying reasonable and prudent alternatives for the Reclamation's proposed

DEFENDANT'S EXHIBIT 71

action, the enclosed biological opinion identifies one reasonable and prudent alternative (RPA) that NMFS believes meets these criteria. For instance, the minimum Iron Gate Dam flow releases and ramping rates identified in the RPA are actions within the Reclamation's authority and jurisdiction and would allow the Klamath Project to meet its intended purpose in most years. NMFS believes that the RPA would provide necessary and adequate survival levels to avoid the likelihood of jeopardizing the continued existence of SONCC coho and adversely modifying its critical habitat.

Because NMFS expects additional information and analyses relevant to the relationship between Iron Gate Dam (IGD) flows and suitable habitat for salmonid habitat to become available over the next few months, the RPA includes specific IGD minimum flows for the April through September 2001 period only, based on the best information currently available. We intend to develop and provide Reclamation a comprehensive biological opinion and RPA, addressing all water year types, on or before June 7, 2001--the statutory deadline to complete this consultation. This comprehensive biological opinion and RPA could include a different and more refined minimum IGD flow regime for future "critically dry" water years, based on new information and analyses that we expect to be available in the near future.

Since this biological opinion has concluded that your proposed action is likely to jeopardize the continued existence of SONCC coho salmon, Reclamation is required to notify NMFS of its final decision on the implementation of the RPA. The NMFS looks forward to further coordination with Reclamation as existing efforts toward salmonid restoration activities continue, and new cooperative opportunities are identified.

Sincerely,

Rebecca Lent
Regional Administrator

Enclosure

# Biological Opinion

## Ongoing Klamath Project Operations

April 6, 2001

National Marine Fisheries Service
Southwest Region

# TABLE OF CONTENTS


Consultation History . . . . . . . . . . 1

Background . . . . . . . . . . 2

Description of the Proposed Action . . . . . . . . . . 2
- Description of the Action Area. . . . . . . . . . 3

Species Description . . . . . . . . . . 3

Life History . . . . . . . . . . 4

Population Trends . . . . . . . . . . 5

Current Status . . . . . . . . . . 8
- Listing History . . . . . . . . . . 8
- Threats . . . . . . . . . . 8

Environmental Baseline . . . . . . . . . . 9
- Land Management . . . . . . . . . . 10
- Current Federal Land Management . . . . . . . . . . 12
- Water Management . . . . . . . . . . 12
- Summary of Water Quality Conditions . . . . . . . . . . 14
- Coho Salmon Harvest . . . . . . . . . . 16
- Hatchery Programs . . . . . . . . . . 17
- Integration and Synthesis of the Environmental Baseline . . . . . . . . . . 17

Effects of the Action . . . . . . . . . . 18
- Analysis Approach . . . . . . . . . . 18
- Effects of Flow Regulation . . . . . . . . . . 19
- Water Temperature and Quality Modeling . . . . . . . . . . 19
- Flow Study Activities and Recommendations . . . . . . . . . . 20
- Effects of Ongoing Project Operations . . . . . . . . . . 22
  - October through March . . . . . . . . . . 22
  - April through June . . . . . . . . . . 24
  - July through September . . . . . . . . . . 25
- Summary of Effects . . . . . . . . . . 26
- SONCC Coho Salmon Critical Habitat . . . . . . . . . . 28

Cumulative Effects . . . . . . . . . . 28

Conclusion . . . . . . . . . . 29

Reasonable and Prudent Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Reasonable and Prudent Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Incidental Take Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Reasonable and Prudent Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Terms and Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Conservation Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Reinitiation of Consultation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Literature Cited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Figures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**Consultation History**

The Bureau of Reclamation (Reclamation) forwarded a final biological assessment (BA) addressing its 1998 Operations Plan for its Klamath Project (Project) to the National Marine Fisheries Service (NMFS) on June 2, 1998 (Reclamation 1998). The June 2, 1998, transmittal letter stated that the "...BA fulfills Reclamation's responsibilities...under Section 7 of the Endangered Species Act [ESA] regarding preparation of the BA and for providing information for determining the need for formal consultation." Although NMFS considered this, functionally, as a request for formal consultation under the ESA, insufficient human resources precluded proceeding with formal consultation until preparation of Reclamation's 1999 Project Operations Plan.

On March 9, 1999, Reclamation forwarded a draft Klamath Project 1999 Annual Operations Plan Environmental Assessment (EA) to NMFS (and the public), and requested formal consultation under section 7 of the ESA (Reclamation 1999a). The March 9, 1999, transmittal letter stated that the "...preferred alternative in the 1999 EA is virtually the same as...[that] presented in the 1998 EA." On June 18, 1999, Reclamation modified their proposed April 1999 through March 2000 operations of the Project as described in a letter from K. Wirkus to D. Reck (Reclamation 1999b). On July 12, 1999, NMFS issued a biological opinion on operation of the Project through March 2000 (1999 Opinion, NMFS 1999).

On April 4, 2000, NMFS informed Reclamation that the 1999 Opinion and associated incidental take statement had expired on March 31, 2000, and that they should request ESA section 7 consultation regarding operation of the Klamath Project (NMFS 2000).

On April 26, 2000, Reclamation acknowledged that section 7(d) of the ESA prohibits the irreversible and irretrievable commitment of resources that foreclose the formulation of reasonable and prudent alternatives which would avoid violating section 7(a)(2) of the ESA (Reclamation 2000). Specifically, the April 26, 2000, letter stated that "[b]ased on the information available to Reclamation at this date, we have determined that the proposed flows [included in the April 26, 2000, letter]...are both sufficient and necessary to avoid possible 7(d) foreclosures and to fulfill Reclamation's obligation to protect Tribal trust resources."

Subsequently, on January 22, 2001, Reclamation requested initiation of formal ESA section 7 consultation regarding the ongoing operation of the Klamath Project. The January 22, 2001, letter included a "biological assessment of the Klamath Project's continuing operations on Southern Oregon/Northern California ESU coho salmon and critical habitat for Southern Oregon/Northern California ESU coho salmon" (ongoing Project operations BA, Reclamation 2001).

**Background**

The Project is located in southern Oregon and provides irrigation water for approximately 220,000 acres in three counties located in Oregon and California. Project water is stored primarily in Upper Klamath Lake in the headwaters of the Klamath River Basin and Gerber and Clear Lake reservoirs in the Lost River watershed. Project facilities are located upstream of Iron Gate Dam (IGD), owned and operated by PacifiCorp, which is currently a barrier to anadromous salmonid migrations in the mainstem Klamath River. The development of dams in this location of the Klamath River began with Klamathon Dam prior to 1900. Copco No. 1 dam was completed in 1918, and by 1921 Link River Dam was constructed to supply water for irrigated agriculture and wildlife refuges, and to supply power. The construction of Copco No. 2 dam was completed in 1925, supplying more hydroelectric power. Due to high fluctuations in flow releases from Copco, the United States Bureau of Fisheries recommended an "equalizing dam" be constructed below Copco No. 2 dam to stabilize flows. IGD construction was completed in 1962 and is located at approximately river mile 190. A minimum flow regime was prescribed in the Federal Energy Regulatory Commission (FERC) license covering operation of IGD.

Although a myriad of human induced and natural factors affect fish species of concern in the Klamath River, Project operation largely affects water available for release from IGD during portions of the year. In turn, flow releases from IGD affect the quantity and quality of aquatic habitat in the mainstem Klamath River in California. Investigations into an appropriate flow regime below IGD have resulted in several recommendations, and ongoing data collection and analysis efforts are expected to provide for refined recommendations in the future. These topics are discussed in the "Effects of the Action" section of this biological opinion (Opinion).

Since 1996, Reclamation has been planning their operations of the Project annually. During this same period, Reclamation has been working to develop a multi-year operations plan and more recently has been preparing a draft Environmental Impact Statement describing the effects of future alternative Project operations.

The objective of this Opinion is to determine whether the proposed ongoing operation of the Klamath Project is likely to jeopardize the continued existence of threatened Southern Oregon/Northern California Coasts (SONCC) coho salmon (*Oncorhynchus kisutch*). Klamath Mountains Province (KMP) steelhead occur in the Klamath River, but are not currently listed under the ESA (April 4, 2001; 66 FR 12845).

Critical habitat has been designated for SONCC coho salmon. Conclusions regarding destruction or adverse modification of designated critical habitat are included in this Opinion.

**Description of the Proposed Action**

Reclamation prepared a BA (Reclamation 2001) describing proposed ongoing Project operations from the present until such time as additional ESA consultation addressing a future operations scenario analyzed in an Environmental Impact Statement (EIS) supercedes the resulting 2001 NMFS biological opinion. Actions proposed within the ongoing Project operations BA included

providing water for agriculture, National Wildlife Refuges, and downstream aquatic habitat. In addition, Upper Klamath Lake is managed to maintain habitat for endangered fish under the United States Fish and Wildlife Service's (USFWS) ESA jurisdiction. Other actions proposed included participation in salmon and steelhead monitoring activities in the Klamath River, the continued implementation of Reclamation's Water Supply Initiative aimed at obtaining additional water supplies, conducting a feasibility study on raising the maximum operating water surface elevation of Upper Klamath Lake by up to 2 feet, implementation of several groundwater investigations, conducting an appraisal study on raising Gerber Dam by 3 feet, and development of a management plan for Agency Lake Ranch.

PacifiCorp operates Link River Dam in accordance with Reclamation's annual operations plans for the Klamath Project, and owns and operates Keno Dam, J.C. Boyle Dam, Copco No. 1 and Copco No. 2 Dams, and Iron Gate Dam, downstream of Reclamation's Klamath Project. In their ongoing Project operations BA, Reclamation also proposes to work to develop a plan of closer operational coordination and data sharing with PacifiCorp to reduce the scope of impacts of depressed flows that occur during the April through June period. NMFS believes that this is intended to address IGD flow ramping concerns during this period.

The ongoing Project operations BA includes specific proposed average minimum flows for release at Iron Gate Dam, by four water year types (see Table 1). These water year types are defined in terms of April through September inflow to Upper Klamath Lake: Above Average (>500,400 acre feet [af]); Below Average (312,800 - 500,400 af); Dry (185,000 - 312,800 af); and Critical (<185,000 af). These proposed minimum flows are the average monthly or biweekly (as applicable) minimums that were measured below Iron Gate Dam during the 1961 through 1997 period, by water year type (Reclamation 2001).

Description of the Action Area

For the purposes of this Opinion, the action area is defined as the Klamath River downstream of IGD, located at approximately river mile 190, in northern California.

**Species Description**

The coho salmon is an anadromous salmonid species that was historically widely distributed throughout the North Pacific Ocean from central California to Point Hope, Alaska, through the Aleutian Islands, and from Anadyr River, Russia, south to Hokkaido, Japan. Coho salmon are very similar in appearance to chinook salmon (*O. tshawytscha*) while at sea (blue-green back with silver flanks), but they are smaller than chinook salmon. Coho salmon adults can be distinguished from small chinook salmon by the lack of spots on the lower portion of the tail. During the twentieth century, naturally-producing populations of coho salmon have declined or have been extirpated in California, Oregon, and Washington. The coho salmon status review identified six distinct population segments (Evolutionarily Significant Units - ESUs) in these states and noted that natural runs in all ESUs are substantially below historical levels (Weitkamp et al. 1995). The action area is within the range of the SONCC coho salmon ESU.

Future Federal actions, including the ongoing operation of hydropower systems, hatcheries, fisheries, and land management activities are being (or have been) reviewed through separate section 7 consultation processes.

**Conclusion**

After reviewing the current status of SONCC coho salmon, the environmental baseline for the action area, the effects of the proposed action (i.e., ongoing operation of the Klamath Project), and cumulative effects, NMFS' biological opinion is that the action, as proposed, is likely to jeopardize the continued existence of SONCC coho salmon. The NMFS has also determined that the action, as proposed, is likely to adversely modify critical habitat for the SONCC coho salmon.

**Reasonable and Prudent Alternative**

Regulations (50 CFR §402.02) implementing section 7 of the ESA define reasonable and prudent alternatives as alternative actions, identified during formal consultation, that: (1) can be implemented in a manner consistent with the intended purpose of the action; (2) can be implemented consistent with the scope of the action agency's legal authority and jurisdiction; (3) are economically and technologically feasible; and (4) would, NMFS believes, avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

This biological opinion has identified one reasonable and prudent alternative that NMFS believes meets the criteria outlined above. A basic premise for this reasonable and prudent alternative is that operation of the Klamath Project substantially affects flows, fish habitat, and water quality in the Klamath River below IGD. The second premise is that the existence and operation of the Klamath Project is not the only factor and human activity that adversely affects aquatic habitat and anadromous salmonid populations in the Klamath River. Accordingly, NMFS prepared this reasonable and prudent alternative with an awareness of the larger context of actions that will affect threatened salmon in the Klamath River.

Our jeopardy determination is generally based on the conclusion that the proposed operation of the Project would result in a continued decline in habitat conditions in the Klamath River. Further, Reclamation's proposed minimum flows (see Reclamation 2001) are not based on the biological requirements of the species. The reasonable and prudent alternative is intended to prevent further decline of the listed fish that we concluded were likely to be jeopardized by the proposed action while longer-term protections can be implemented to affect the recovery of the species. The NMFS expects that further aquatic habitat studies, restoration planning, and restoration accomplishments will necessitate occasional adjustments to this reasonable and prudent alternative, or perhaps other reasonable and prudent alternatives will be identified over time.

<u>Reasonable and Prudent Alternative</u>

Several factors present difficulties in identifying a reasonable and prudent alternative to the river flow-related component of Reclamation's proposed action, both in the short-term (e.g., April

through September 2001) and long-term include: (1) the limited availability of specific information on the effects of IGD releases on water temperature and quality during the April through September period in critically dry years such as is forecast for 2001, (2) the lack of quantitative tools to estimate the probability of coho salmon persistence and recovery in the Klamath River under various Project operational scenarios, (3) uncertainty regarding the amount of water that will be available during the April through September 2001 period, (4) uncertainty about the timing of inflow to Project facilities, and (5) the current practical necessity to, at least initially, plan for April through September Project operations by early April 2001.

Given that NMFS expects additional information and analyses relevant to the relationship between IGD flows and fish habitat to become available over the next few months, and the fact that NMFS is in the process of developing a comprehensive biological opinion and reasonable and prudent alternative, addressing all water year types, to be provided to Reclamation on or before June 7, 2001 (the statutory deadline consistent with 50 CFR § 402.12), this biological opinion constitutes a subset of the comprehensive biological opinion for this year's operations. This reasonable and prudent alternative includes specific IGD minimum flows for the April through September 2001 period only, based on the best available information. In essence, this biological opinion constitutes a subset component of the comprehensive biological opinion for this year's operations. Since the NMFS anticipates it will be incorporating new scientific data in the opinion to be provided by June, this opinion may include a minimum IGD flow regime for future "critically dry" water years that differ form this RPA (as currently defined by Reclamation [2001]).

Because of the limited and uncertain amount and timing of available water, NMFS and the USFWS also had to consider the potential biological risks and consequences of various Upper Klamath Lake elevation and Klamath River flow regimes in preparing their biological opinions. Given the immediate need to plan for the April through September 2001 Project operations under these circumstances, NMFS has developed the following reasonable and prudent alternative including a minimum flow regime for this period, designed to provide for the biological requirements of Klamath River Basin coho salmon. Because of limited Project inflow and storage, the risks presented by providing additional spring river flows that may preclude providing adequate summer flows later in the year were also considered.

During the months of April and May 2001, coho salmon fry are the most vulnerable life stage in the mainstem Klamath River, and require adequate suitable physical habitat and adequate water temperatures and quality. Preliminary physical habitat modeling results indicate that in the IGD to Shasta River reach of the Klamath River, approximately 50 percent of maximum habitat for coho salmon fry and 65 percent of maximum habitat for chinook salmon fry would be available during April and May 2001 under IGD releases of 1,700 CFS (Figure 10). Under 1,700 CFS IGD releases, approximately 41 percent of the maximum habitat for coho salmon fry and 50 percent of maximum habitat for chinook salmon fry would be available in the Shasta River to Scott River reach (Figure 11). During this period, water temperatures below IGD are generally within the optimum range for coho salmon described by Bell (1991).

Coho smolts also outmigrate to the ocean during this period, and substantially higher flows (e.g., 1,700 CFS) are expected to result in increased smolt survival. This expectation is due to the

decreased travel time under significantly higher water velocities and associated lower mortality due to migratory delays and predation (as discussed in the 'Effects of the Action' section of this opinion). Because elevated Klamath River water temperatures are not generally a problem at this time, an extended exposure of smolts to mainstem river water conditions are not a concern.

Although higher flows during this period would provide additional suitable habitat for coho salmon fry, the reality of a finite but uncertain available water supply, forecast to be the lowest in the relevant period of record (1961-2000), must also be considered. If a relatively large volume of water is used to provide for additional coho salmon fry habitat and increased smolt survival during this period, adequate water to provide for better habitat conditions later in the summer may not be available. After considering the risk of potential competing habitat requirements between coho salmon fry in the spring, and juvenile coho salmon in the summer, it is NMFS judgement that providing 40 to 50 percent of maximum fry habitat between IGD and the Scott River under flows of 1,700 CFS during April and May 2001 is appropriate to maximize coho salmon survival during this critically dry year and will not jeopardize the species.

During June 2001, coho salmon fry will continue to grow larger and will typically transition to the juvenile life stage, will develop better swimming abilities, and become better equipped to survive potential displacement to alternative areas in the river. Also during this period, coho salmon smolts continue to migrate to the ocean. As previously discussed in this biological opinion, high Klamath River water temperatures typically become a concern by late June. As previously discussed, coho salmon smolt survival would be expected to be higher for those smolts that are prepared for migration to the ocean prior to exposure to elevated mainstem water temperatures in late June. Substantially higher flows that provide significantly higher amounts of suitable coho salmon fry habitat (e.g., greater than 50 percent of maximum) and associated increased water velocity and decreased travel time are expected to result in decreased exposure of smolts to elevated water temperatures. Although higher flows are expected to generally result in higher smolt survival during this period, again the risk of insufficient water availability later in the summer and fall must be considered. In order to better facilitate moving coho salmon smolts downstream to the ocean prior to experiencing elevated water temperatures, it is NMFS judgement that 2,100 CFS flows during the June 1-15, 2001 period will be adequate to provide a reasonable level of smolt survival during this critically dry year and will not jeopardize the species. As the ability of IGD releases to decrease ambient water temperatures diminishes and mainstem temperatures become a concern, it is NMFS judgement that IGD releases of 1,700 CFS flows during the June 16-30 period are sufficient to avoid jeopardizing the species.

During the July through August 2001 period, coho juveniles rear in the mainstem Klamath River. Although necessary suitable physical habitat (in terms of water depth and velocity) must be provided for these fish, high water temperatures and poor water quality are also of concern at this time. Water temperature modeling results generally indicate that IGD releases have a limited ability to moderate high water temperatures and diurnal temperature fluctuations in the mainstem river during the July and August period. Available water temperature modeling results for various Klamath River flow scenarios used 1996 and 1997 water temperature and meteorological conditions as model inputs (Deas and Orlob 1999). The NMFS is unaware of any modeling analyses that have considered the expected Upper Klamath Lake inflows, Project operational limitations, and reservoir/river responses upstream of the modeled area (Iron Gate Reservoir to

Seiad Valley) associated with the currently-forecast extremely dry conditions likely to occur during the April through September 2001 period. Therefore, available modeling information provides a limited and incomplete understanding of system behavior with respect to water temperature during the mid-June through September 2001 period. Accordingly, NMFS believes it is necessary to also consider the summer base flow recommendations previously developed by fishery biologists. For example, a July and August river flow of at least 1,000 CFS is generally consistent with the summer flow recommendations of CDFG biologists (e.g., Wales 1944) and Trihey and Associates (1996).

Although the recommended flows included in the Phase 1 flow study report (INSE 1999) recommended higher flows during the July through August period, this recommendation did not specifically consider the risk of insufficient water supplies in the summer and fall period. As previously discussed, NMFS believes it is necessary to consider these risks in 2001. Given the available information and analyses, it is NMFS judgement that IGD releases of 1,000 CFS during the July through August 2001 period are both necessary and appropriate in this critically dry year and will not jeopardize the species.

During September 2001, coho salmon adults will be migrating into the Klamath River. The habitat requirements of adult coho salmon include a migratory corridor with suitable water depth and velocities, resting pools, and adequate water quality conditions. Successful immigration also depends on adequate fish passage conditions in the mainstem river and access to tributaries. Observations of adult salmon migrating upstream in the Klamath River indicate that passage problems in the mainstem typically occur during IGD flow releases lower than about 900 CFS (T. Fletcher, Yurok Tribe, pers. comm., March 21, 2001). There are no studies that indicate the preferred flow regime of Klamath River coho salmon for this time period during a critically dry year. Based on available information, it is NMFS judgment that minimum IGD releases of 1,000 CFS are appropriate in September 2001 to provide minimally sufficient adult migration conditions that will lead to sufficient spawning success during this critically dry year and which will not jeopardize the species.

In summary, this reasonable and prudent alternative includes the following instantaneous minimum IGD water releases, by time step, for the April through September 2001 period:

| Time Step | Iron Gate Dam Discharge (CFS) |
|---|---|
| April 2001 | 1,700 |
| May 2001 | 1,700 |
| June 1-15 2001 | 2,100 |
| June 16-30 2001 | 1,700 |
| July 2001 | 1,000 |

| | |
|---|---|
| August 2001 | 1,000 |
| September 2001 | 1,000 |

In addition, in order to prevent potential coho salmon stranding, Reclamation will operate the Project to provide for the following down ramping rates below IGD: (1) decreases in flows of 300 CFS or less per 24-hour period and no more than 125 CFS per four-hour period when IGD flows are above 1,750 CFS; or (2) decreases in flows of 150 CFS or less per 24-hour period and no more than 50 CFS per two-hour period when IGD flows are 1,750 CFS or less.

If, based on the best available information (e.g., NRCS forecasts, and associated model output and interpretation), Reclamation expects they will be unable to operate the Project to provide for the above minimum flow regime and maximum down ramping rates below IGD, while also complying with the ESA requirements regarding listed species under the jurisdiction of the USFWS, NMFS and USFWS in will determine how best to meet the biological requirements of all species of concern. Specifically, when this situation exists, representatives from Reclamation, USFWS, and NMFS shall coordinate with representatives from the Bureau of Indian Affairs and appropriate Indian tribes and states to consider and discuss available options for Project operation and necessary levels of protection for listed species. The following process will be used:

1. Data Collection and Analysis

    A. Reclamation shall provide NMFS and FWS with a projection of available water to satisfy river flow requirements of coho salmon and lake level management for listed suckers.

    B. The agencies shall conduct risk analyses, based on available information including the results of discussions between relevant Federal, tribal, and state representatives.

2. Potential development and use of in-season management techniques to allocate scarce water resources to protect aquatic resources; these may include, but are not limited to:

    A. Consideration of the current status of species of concern and risks associated with critically dry years;

    B. Consideration of the most up-to-date information regarding the location, size, and movements of young-of-the-year and juvenile fish;

    C. Consideration of the most up-to-date expectations of water temperature and quality parameters in Upper Klamath Lake and the Klamath River below IGD, given the expected water supply outlook;

    D. Consideration of pro-rating IGD releases or Upper Klamath Lake elevation regimes based on "within water year type" exceedance levels for critically dry years;

E. Consideration of reserving a volume of water for release below IGD during particularly hot period(s) to improve water quality.

3. The NMFS and USFWS will provide the results of the coordination and risk analysis process to Reclamation in writing with detailed instructions regarding measures to employ in order to best protect each listed species.

Because this biological opinion has found jeopardy and adverse modification of critical habitat, Reclamation is required to notify NMFS of its final decision on implementation of the reasonable and prudent alternative.

**Incidental Take Statement**

Section 9 of the ESA and federal regulations adopted pursuant to section 4(d) of the ESA prohibit the take of endangered and threatened species, respectively, without special exemption. "Take" is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by NMFS to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass is defined as intentional or negligent actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the ESA provided that such taking is in compliance with the terms and conditions of this incidental take statement.

Adverse effects of management actions such as these are largely unquantifiable in the short-term, given the lack of relevant studies and quantitative tools available to develop such estimates. The NMFS expects some level of incidental take to occur due to implementation of some of the actions outlined in the reasonable and prudent alternative. However, the best scientific and commercial data available are not sufficient to enable NMFS to estimate a specific amount of incidental take of Klamath River coho salmon. The NMFS anticipates that water quality and habitat conditions for various coho salmon life stages that would result from implementation of the reasonable and prudent alternative would likely result in a level of take that does not constitute jeopardy to SONCC coho salmon. Take of individual coho salmon would be difficult to detect because finding a dead or injured salmon is unlikely due to the fact that salmonids occur in dynamic habitat, (i.e., flowing water, that makes such detection difficult). Water quality and habitat conditions resulting from the reasonable and prudent alternative, while somewhat predictable, would have an impact that is not precisely known, and by extension, the impact to a quantity of coho salmon expected to be present in the mainstem Klamath River is not precisely known. However, while the water quality and habitat impacts resulting from Project operations have been reduced by the reasonable and prudent alternative, and precise impacts to coho salmon and their habitat are

unknown, each incremental reduction in water quality and habitat in the stream channel represents a portion of the combined impacts to salmon in a given watershed.

As stated earlier in the biological opinion, some take may occur due to down ramping of releases from IGD and associated stranding of small coho salmon. However, the reasonable and prudent alternative requires Reclamation to provide sufficient flows to enable PacifiCorp to implement conservative ramping rates at IGD. It is difficult to determine the actual down ramping rates that will be implemented during the April through July 2001 period, because at levels above 1,750 cfs PacifiCorp does not have the capability to regulate flows in small increments. Therefore, predicting the potential for stranding of coho salmon and potential take is difficult. However, NMFS expects that several flow study and water temperature and quality data collection efforts will be ongoing during this period, and observations may provide in-season information regarding actual fish strandings that may occur. If the proposed conservative down ramping rates of IGD implemented, NMFS expects that low levels of coho salmon stranding will occur and consequently this risk would not pose jeopardy to the species.

This incidental take statement is effective provided that Reclamation implements the flow and ramping rate components of the reasonable and prudent alternative above, but this conditional take coverage is only effective until September 30, 2001. This incidental take statement is expected to be superceded by a new incidental take statement with NMFS' issuance of the long-term, comprehensive biological opinion and reasonable and prudent alternative, as described earlier in this opinion.

<u>Reasonable and Prudent Measures</u>
The NMFS believes that the following reasonable and prudent measures are necessary and appropriate to minimize the likelihood of take of SONCC coho salmon resulting from the ongoing operation of the Project.

Reclamation shall:

1. Arrange for the ongoing collection and analysis of information to further understand the relationship between IGD water releases and suitable downstream salmon habitat in the Klamath River;

2. Continue its efforts to identify additional water supplies in the Klamath Basin.

<u>Terms and Conditions</u>
In order to enjoy the protections provided under section 7(b)(4) or 7(o)(2) of the ESA, Reclamation must comply with the following terms and conditions, which implement and document implementation of the reasonable and prudent measures described above. These terms and conditions are non-discretionary. Reclamation shall do the following:

1. In coordination with PacifiCorp, provide for the completion, integration, and/or modifications of water routing and water quality models that potentially provide an increased understanding of water temperature and quality conditions in Upper Klamath Lake and in the lower Klamath River. Development of this integrated model(s) should be

coordinated with fishery co-managers and other water quality experts, and shall be completed by January 2002.

2. Provide a summary report outlining the status of the water supply initiative, identifying opportunities with regard to water supplies, and identifying current scoping of implementation strategies. This report will be provided to NMFS by February 2002.

**Conservation Recommendations**

Section 7(a)(1) of the ESA directs Federal agencies to utilize their authorities to further the purposes of the ESA by carrying out conservation programs for the benefit of threatened and endangered species. Conservation recommendations are discretionary measures suggested to minimize or avoid adverse effects of a proposed action on listed species, to minimize or avoid adverse modification of critical habitat, or to develop additional information.

The NMFS believes the following conservation recommendations are consistent with these obligations, and therefore recommends that the following conservation measures be implemented by Reclamation:

1. Reclamation should aggressively seek sufficient funding to continue with, and to enhance, their Klamath Basin Water Supply Initiative.

2. Reclamation should actively participate in restoration planning activities with other entities with an active interest in addressing Klamath River fishery, habitat, and water quality restoration.

**Reinitiation of Consultation**

This concludes formal consultation on Reclamation's proposed ongoing operation of the Project. As provided in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action.

# NEWS

U.S. DEPARTMENT OF THE INTERIOR

Klamath Basin Area Office KBAO-01-01
Jeffrey S. McCracken
6600 Washburn Way
Klamath Falls, OR 97603-9365
Friday calls: 541/883-6935
After Friday: 916/978-5100

**FOR IMMEDIATE RELEASE: April 6, 2001**

## WATER ALLOCATION DECISION ANNOUNCED FOR KLAMATH PROJECT

Federal officials have finalized the biological opinions for the operation of the Klamath Project for this critically dry water year. Based on those opinions and the requirements of Endangered Species Act, the Bureau of Reclamation announced today that no water will be available from Upper Klamath Lake to supply the farmers of the Klamath Project. Furthermore, based on current estimates, Reclamation projects that there will be only about 70,000 acre-feet available for the irrigation of "A" lands on the east side of the basin. That water will be supplied by Clear Lake and Gerber Reservoirs. A full supply for the Project would be about 500,000 acre-feet.

To provide some assistance to farmers affected by what is expected to be one of the driest years since the Project began in 1907, the United States Department of Agriculture (USDA) announces that most crops in the affected area are eligible for Federal crop insurance (if it had been purchased before the sales closing date) or other assistance. Crop insurance protection is made available by USDA through private insurance agents and companies. For producers carrying coverage, a portion of their otherwise irrigated crop losses resulting from the determination announced by the Bureau of Reclamation may be eligible for prevented planting payments. Producers should contact their crop insurance agent for details. Assistance is also provided through the Non-insured Crop Disaster Assistance Program (NAP) to producers growing crops that are currently uninsurable. Details on producer eligibility for NAP assistance can be obtained at local Farm Service Agency offices. General information on the programs may be found at http://www.usda.gov .

Oregon and California members of the United States Senate and House were extremely helpful during this crisis. For days, since the draft biological opinions were made public, they worked tirelessly with Bush Administration officials to respond to the probable effects of this situation. Representatives of Interior Secretary Gale Norton noted that the dry water year combined with the needs of the environment demonstrates why a long-term solution to the water needs of the basin is required.

Reclamation's Klamath Project serves approximately 1,400 farms totaling some 210,000 acres. Farmers here grow a large variety of crops including barley, oats, wheat, potatoes, sugar beets and forage. According to Bureau of Reclamation data for the year 2000, approximately 110,000 acres were planted in forage; 57,000 acres in cereal crops (including barley, oats, and wheat); 16,000 acres in vegetables (including potatoes); 7,000 acres in miscellaneous field crops (including sugar beets); 298 acres in seed crops; and 227 acres in nursery crops.

###

PENGAD-Bayonne, N.J. DEFENDANT'S EXHIBIT 72

| Circulate | Initial |
|---|---|
| KO-150 | |
| KO-400 | |
| KO-100 | |
| KO-700 | |
| Outgoing | |
| KO-103 | |

APR 20 2001

KO-150
ENV-7.00

Ms. Irma Lagomarsino, Supervisor
National Marine Fisheries Service
1655 Heindon Road
Arcata, California 95521

Subject: Bureau of Reclamation (Reclamation) Determination Regarding the Action Addressed in the National Marine Fisheries Service (NMFS) April 6, 2001 Biological Opinion on Ongoing Klamath Project Operations.

Dear Ms. Lagomarsino:

The Bureau of Reclamation (Reclamation) has reviewed the subject final biological opinion (BO). This letter serves to notify the National Marine Fisheries Service (NMFS) of Reclamation's decision on the action, consistent with its responsibilities as a Federal agency following issuance of a biological opinion as required by 40 CFR 402.15.

The NMFS' biological opinion is that the action, as proposed for this year, is likely to jeopardize the continued existence of threatened Southern Oregon/Northern California Coasts (SONCC) coho salmon (*Oncorhynchus kisutch*) and adversely modify its critical habitat. A Reasonable and Prudent Alternative (RPA) which is for Project operation only during this critically dry year to avoid the likelihood of jeopardy to the threatened coho salmon was included in the final BO. The final BO also includes non-discretionary reasonable and prudent measures (RPMs) with terms and conditions that authorize and reduce incidental take.

Determination Regarding the Proposed Action

Reclamation, after considering its obligations under the Endangered Species Act and the RPA in the NMFS final BO, incorporated that RPA into the April 6, 2001, Klamath Project 2001 Annual Operations Plan. Reclamation will operate the Klamath Project (Project) from April through September 2001, to meet the requirements of the RPA. Should conditions change such that Reclamation needs to take an action inconsistent with the above, Reclamation will confer with NMFS and reinitiate consultation as appropriate.

Reclamation will continue to work cooperatively with NMFS to meet our obligations under the Endangered Species Act. We understand that NMFS intends to issue a comprehensive BO and RPA, addressing all water year types by June 7, 2001. Reclamation will be providing additional comments to NMFS to assist in completing that comprehensive final BO.

Sincerely,

Karl E. Wirkus
Area Manager

DEFENDANT'S EXHIBIT 73

PENGAD-Bayonne, N. J.

cc:
Ady District Improvement Co., 18110 Keno-Worden Road, Klamath Falls, OR 97603
Enterprise Irrigation District, 4806 Highway 39, Klamath Falls, OR 97603
Horsefly Irrigation District, PO Box 188, Bonanza, OR 97623
Klamath Basin Improvement District, 6640 K.I.D. Lane, Klamath Falls, OR 97603
Klamath Water Users Association, 2455 Patterson Street, Klamath Falls, OR 97603
Klamath Drainage District, 4901 Lower Klamath Lake Road, Klamath Falls, OR 97603
Klamath Irrigation District, 6640 K.I.D. Lane, Klamath Falls, OR 97603
Langell Valley Irrigation District, 9787 East Langell Valley Road, Bonanza, OR 97623
Malin Irrigation District, PO Box 355, Malin, OR 97632
Midland District Improvement Co., PO Box 63, Midland, OR 97634
Pine Grove Irrigation District, 4806 Highway 39, Klamath Falls, OR 97603
Pioneer District Improvement Co., 12951 Highway 66, Klamath Falls, OR 97601
Plevna District Improvement Co., PO Box 16, Klamath Falls, OR 97601
Poe Valley Improvement District, 6640 K.I.D. Lane, Klamath Falls, OR 97603
Shasta View Irrigation District, PO Box 46, Malin, OR 97632
Sunnyside Irrigation District, PO Box 1009, Merrill, OR 97633
Tulelake Irrigation District, PO Box 699, Tulelake, CA 96134
Upper Van Brimmer Drainage District, 11443 Buesing Road, Klamath Falls, OR 97603
Van Brimmer Ditch Company, PO Box 419, Merrill, OR 97633
Klamath County Commissioners, 305 Main Street, 2nd Floor, Klamath Falls, Oregon 97601
Duane Sherman, Chair, Hoopa Valley Tribe, P.O. Box 1348, Hoopa Valley, CA 95546
Susan Masten, Chair, Yurok Tribe, 1034 Sixth St., Eureka, CA 95501
Alvis Johnson, Chair, Karuk Tribe, P.O. Box 1016, Happy Camp, CA 96039
Allen Foreman, Chair, The Klamath Tribes, P.O. Box 436, Chiloquin, OR 97624
Steve Lewis, Project Leader, U.S. Fish and Wildlife Service, 6610 Washburn Way, Klamath Falls, Oregon 97603
Michael J. Spear, U.S. Fish and Wildlife Service, 2800 Cottage Way, Room , Sacramento, California 95825
Phil Norton, Refuge Manager, U.S. Fish and Wildlife Service, 4009 Hill Road, Tulelake, California 96134
Rebecca Lent, PhD, Regional Director, National Marine Fisheries Service, 501 West Ocean Blvd, suite 4200, Long Beach, California 90802
Donald Reck, Fisheries Biologist, National Marine Fisheries Service, 1655 Heindon Road, Arcata, California 95521
Frank Fryman, Bureau of Indian Affairs, U.S. Department of the Interior, 2800 Cottage Way, Sacramento, California 95825
Karole Overberg, Bureau of Indian Affairs, U.S. Department of the Interior, 911 NE 11th Avenue, Portland, Oregon 97232
Doug Tedrick, Bureau of Indian Affairs, Office of Trust Responsibilities, 1849 C Street, NW, MS 3061-MIB, Washington, DC 20240
Randy Landolt, Director, Hydro Resources, 825 NE Multnomah, Suite 1500, Portland, Oregon 97232

bc: W-6332, MP-100, MP-105, MP-140 (J.McCracken), MP-152 (F.Michny), Steve Palmer-SOL

WBR:D.Fritz:J.Bryant:kme:04/20/01 (1-0517 Biological Opinion)
H:\PUBLIC\ESA\OPINION\2001 Opinions\Salmon\NMFS BO final response 04-20-01.wpd

4/20/01 fax to NMFS + Palmer + S. MacFarlane

# NEWS

U.S. DEPARTMENT OF THE INTERIOR

OFFICE OF THE SECRETARY
FOR IMMEDIATE RELEASE
July 24, 2001

Stephanie Hanna (O) 202/501-4633

## INTERIOR SECRETARY TO ORDER WATER RELEASE TO KLAMATH FARMERS

(PORTLAND) Secretary of the Interior Gale Norton made the following statement today at a media briefing in Portland, Oregon:

"I am happy to announce that about 70,000 to 75,000 acre feet of water will be released from Upper Klamath Lake to assist farmers in the Klamath Basin Project in desperate need. They may be able to use the water for their livestock, to provide some critical recharge for some wells, and perhaps save pastures, alfalfa and hay, or even row crops that have recently lost their well water supply.

"The reason I am taking this action is because the Bureau of Reclamation (BOR) has been taking measurements and has determined that Upper Klamath Lake is at a higher level than projected. This is due in part to irrigators above the Klamath Basin Project who have been able to conserve more water than previously projected and, thanks to Mother Nature, the scattered thunderstorms that have provided much-needed rain to the area and the Lake.

"Water could be released as early as tomorrow, but the timing will be coordinated between the Bureau of Reclamation and the Irrigation Districts.

"The Bureau of Reclamation will divert all the water released to contractors within the Klamath Basin Project. The Irrigation Districts will then be responsible for deciding on the allocation and distribution of the water, under their contracts with BOR. It's estimated that about 10,000 acre feet of the total will be needed to prime the canal system for the releases.

"Unfortunately, none of this water will reach the National Wildlife Refuges because there simply is not enough water to do more than provide a little relief to some desperate farm families during the remainder of this season. In the months ahead, we'll be looking at a number of options to assist the over-wintering bald eagles. These may include seeking new sources of groundwater, purchasing water from willing sellers and developing plans for supplemental feeding.

"I recognize that this is a only a small step toward providing help to farming communities in great need.

**(more)**



PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT
74

"We are committed to working with all interested parties in the current mediation process. We hope that this process will ultimately lead us to solutions that avoid a repeat of this situation next year and in the future. And we're grateful to the Oregon delegation and particularly Senator Gordon Smith and Congressman Greg Walden for the long hours of hard work that they and their staffs have put in to help the people of the Klamath Basin."

**-DOI-**