IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KLAMATH IRRIGATION DISTRICT, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant,

PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,

Defendant-Intervenor.

No. 01-591 L

Judge Francis M. Allegra

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

KRISTINE S. TARDIFF
Attorney of Record for Defendant
United States Department of Justice
Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583/Fax: (603) 225-1577

STEPHEN M. MACFARLANE
United States Department of Justice
Environment & Natural Resources Division
501 I Street, Suite 9-700
Sacramento, CA 95814-232
Tel: (916) 930-2204/Fax: (916) 930-2210

REGINALD T. BLADES, JR.
United States Department of Justice
Civil Division, Commercial Litigation Branch
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-7300/Fax: (202) 307-0972

OF COUNSEL:

STEPHEN PALMER
U.S. Department of the Interior
Office of the Regional Solicitor
Sacramento, CA

MEGAN WALLINE
U.S. Department of the Interior
Office of the Solicitor
Washington, D.C.

CHRISTOPHER KEIFER
U.S. Department of Commerce
NOAA – Office of General Counsel
Long Beach, CA

Dated: February 17, 2006

## TABLE OF CONTENTS


I. INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 1

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. The Klamath Project Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. Operation of the Klamath Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

C. The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

D. The Application of the ESA to Klamath Project Operations . . . . . . . . . . . . . . . 13

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. The Sovereign Acts Doctrine Provides a Complete Defense to Plaintiffs' Contract Claims Because the Enactment and Enforcement of the ESA is a Public and General Act of the United States as Sovereign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1. The Sovereign Acts Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2. The Enactment and Subsequent Enforcement of the ESA . . . . . . . . . . . 22

3. The ESA is a "Public and General" Act That Falls Squarely Within the Sovereign Acts Doctrine . . . . . . . . . . . . . . . . . . . . . 24

B. The Contracts Are Subject to the ESA Under the Unmistakability Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES

**CASES**

Allegre Villa v. United States,
60 Fed. Cl. 11 (2004) . . . . . . . . . . 20

Amber Resources Co. v. United States,
68 Fed. Cl. 535 (2005) . . . . . . . . . . 26

Maricopa-Stanfield Irrig. and Drainage Dist. v. United States,
158 F.3d 428 (9th Cir. 1998), cert. denied, 526 U.S. 1130 (1999). . . . . . . . . . 27

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
515 U.S. 687 (1995) . . . . . . . . . . 10, 23

Bennett v. Spear,
520 U.S. 154 (1997) . . . . . . . . . . 11, 12, 14

Bowen v. Pub. Agencies Opposed to Social Security Entrapment,
477 U.S. 41 (1986) . . . . . . . . . . 18

Carabetta Enterprises, Inc. v. United States,
58 Fed. Cl. 563 (2003) . . . . . . . . . . 21

Catron County Bd. of Commrs. v. FWS,
75 F.3d 1429 (10th Cir. 1996) . . . . . . . . . . 24

Centex Corp. v. United States,
395 F.3d 1283 (Fed. Cir. 2005) . . . . . . . . . . 19

Cuyahoga Metr. Housing Authority v. United States,
57 Fed. Cl. 751 (2003) . . . . . . . . . . 19, 20, 21

Defenders of Wildlife v. Environmental Protection Agency,
420 F.3d 946 (9th Cir. 2005) . . . . . . . . . . 23

Deming v. United States,
1 Ct. Cl. 190 (1865) . . . . . . . . . . 20

First Nationwide Bank v. United States,
431 F.3d 1342 (Fed. Cir. 2005) . . . . . . . . . . 19

Franconia Assocs. v. United States,
61 Fed. Cl. 718 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Jones v. United States,
1 Ct. Cl. 383 (1865) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Kandra v. United States,
145 F. Supp. 2d 1192 (D. Or. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13-16, 25

Klamath Irrig. Dist. v. United States,
67 Fed. Cl. 504 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Klamath Irrig. Dist. v. United States,
69 Fed. Cl. 160 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Klamath Water Users Protective Ass'n v. Patterson,
204 F.3d 1206 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13, 17, 25, 28

Langell Valley Irrig. Dist. v. Babbitt,
No. 00-6265-HO (D. Or. Aug. 31, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26, 28

Northwest Resource Info. Center, Inc. v. NMFS,
56 F.3d 1060 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

O'Neill v. United States,
50 F.3d 677 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-28

Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,
138 F. Supp. 2d 1228 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13

Pacific Coast Fed'n of Fishermen's Ass'ns v. Bureau of Reclamation,
426 F.3d 1082 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 17

Peterson v. Dept. of the Interior,
899 F.2d 799 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Rio Grande Silvery Minnow v. Keys,
333 F.3d 1109 (10th Cir. 2003), vacated on other grounds,
355 F.3d 1215 (10th Cir. 2004) . . . . . . . . . . 28

Sun Oil v. United States,
572 F.2d 786 (Ct. Cl. 1978) . . . . . . . . . . 22

Tennessee Valley Authority v. Hill,
437 U.S. 153 (1978) . . . . . . . . . . 22, 23

Transohio Sav. Bank v. Director, Office of Thrift Supervision,
967 F.2d 598 (D.C. Cir. 1992) . . . . . . . . . . 26

United States v. Westlands Water Dist.,
134 F. Supp. 2d 1111 (E.D. Cal. 2001) . . . . . . . . . . 24, 25

United States v. Winstar,
518 U.S. 839 (1996) . . . . . . . . . . 19, 20, 26

Western Fuels-Utah, Inc. v. Lujan,
895 F.2d 780 (D.C. Cir.), cert. denied, 498 U.S. 811 (1990) . . . . . . . . . . 26

Yankee Atomic Elec. Co. v. United States,
112 F.3d 1569 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998) . . . . . . . 19, 20, 21, 24

**STATUTES**

16 U.S.C. § 1538(a)(1) . . . . . . . . . . 10
16 U.S.C. § 1531 . . . . . . . . . . 22, 23
16 U.S.C. § 1532 . . . . . . . . . . 10
16 U.S.C. § 1533 . . . . . . . . . . 10
16 U.S.C. § 1536(a)(2) . . . . . . . . . . 11, 15
16 U.S.C. § 1536(b) . . . . . . . . . . 11-12
16 U.S.C. § 1536(o)(2) . . . . . . . . . . 12
16 U.S.C. § 1539 . . . . . . . . . . 11
16 U.S.C. §§ 1533-1544 . . . . . . . . . . 10
36 Stat. 925 . . . . . . . . . . 5, 6
43 U.S.C. § 485 . . . . . . . . . . 5
43 U.S.C. § 485h(d) . . . . . . . . . . 5
43 U.S.C. § 523 . . . . . . . . . . 6

**RULES**

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**REGULATIONS**

50 C.F.R. § 17.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
50 C.F.R. Part 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
50 C.F.R. § 402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
50 C.F.R. § 402.16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
50 C.F.R. § 402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

**INDEX OF EXHIBITS IN DEFENDANT'S SUPPLEMENTAL APPENDIX**[1]


| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 59 | U.S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Summary of Listed Species, Species and Recovery Plans as of 2/15<br><br>Document generated from FWS website at: http://ecos.fws.gov/tess_public/TESSBoxscore (last visited on February 15, 2006) | 543 |
| 60 | U. S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Map of Listed Species by State/Territory as of January 26, 2006.<br><br>Map available on FWS website at: http://ecos.fws.gov/tess_public/servlet/gov.doi.tess_public.servlets.TESSUsmap?status=listed (last visited on January 26, 2006) | 545 |
| 61 | Klamath Project 2001 Annual Operations Plan (dated April 6, 2001) | 546 |
| 62 | Letters from Bureau of Reclamation to Van Brimmer Ditch Co., and to Klamath Drainage District, dated Sept. 2, 2000 | 551 |


[1]Defendant's Exhibit ("Def. Ex.") numbers 1 through 42 are the exhibits contained in Defendant's Appendix (dated October 3, 2003) and Supplemental Appendix (dated March 31, 2004), both of which were filed in support of its Cross-Motion for Summary Judgment on plaintiffs' takings claims. Defendant's Exhibit numbers 43 through 58 are the exhibits contained in the Appendix filed in support of Defendant's Cross-Motion for Summary Judgment on the Question of Whether the Individual Plaintiffs' Have Standing to Bring Contract Claims as Intended Third-Party Beneficiaries (dated April 26, 2004). To avoid confusion in the numbering of exhibits, the additional exhibits attached hereto begin with exhibit number 59 and appendix page number 543.

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 63 | Letters from Department of the Interior officials responding to letters received by the Department concerning the operation of the Klamath Project in 2001. from early 2001 stating that "[f]orecasts of water supplies in the Klamath basin for the 2001 water year are currently nearly half of average conditions" | 555 |
| 64 | Letter from Bureau of Reclamation to Klamath Project Water Users, dated March 2, 2001. Subject: 2001 Operation Planning Update and Notice that Klamath Project Water Not Currently Available | 561 |
| 65 | Letters from Karl E. Wirkus, Area Manager, Bureau of Reclamation, Klamath Falls, to (A) NMFS, (B) FWS and (C) Klamath Tribes, dated Nov. 22, 2000. Subject: On-going Klamath Project Operations – Draft Biological Assessment | 563 |
| 66 | Letter from BOR to NMFS, dated January 22, 2001. Subject: Request for Initiation of Formal Consultation on the Effects of Ongoing Operations (without attachments) | 572 |
| 67 | Memorandum from BOR to FWS, dated February 13, 2001. Subject: Request for Reinitiation of Formal Consultation on the Effects of Ongoing Operation of the Klamath Project | 575 |
| 68 | Biological Assessment of the Klamath Project's Continuing Operations on the SONCC coho salmon (dated Jan. 22, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 580 |

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 69 | Biological Assessment of the Klamath Project's Continuing Operations on the Endangered Lost River Sucker and Shortnose Sucker (dated Feb. 13, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 593 |
| 70 | Letter from FWS to Bureau of Reclamation, transmitting copy of Biological Opinion, dated April 5, 2001, and excerpt of the Biological Opinion<br><br>Note: a full copy of the FWS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 597 |
| 71 | Letter from NMFS to Bureau of Reclamation transmitting Biological Opinion, dated April 6, 2001, and excerpt of the Biological Opinion<br><br>Noted: a full copy of NMFS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 635 |
| 72 | U.S. Department of the Interior, News Release, "Water Allocation Decision Announced for Klamath Project," dated April 6, 2001 | 651 |
| 73 | Letter from BOR to NMFS, dated April 20, 2001. Subject: BOR's Determination Regarding the Action Addressed in the NMFS April 6, 2001 Biological Opinion | 652 |
| 74 | Department of the Interior, Office of the Secretary, News Release, "Interior Secretary to Order Water Release to Klamath Farmers," dated July 24, 2001 | 654 |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**

Pursuant to RCFC 56 and this Court's Order of December 20, 2005 (Doc. 257), Defendant United States moves for summary judgment as to Plaintiffs' contract claims. Pursuant to that Order, Defendant's motion is limited to the application "of the sovereign acts and/or unmistakability doctrines[.]" This memorandum is submitted in support of that motion.

I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs[2] allege that the United States breached its contracts with them when the Bureau of Reclamation ("BOR") revised its operation plan for the Klamath Project in 2001 in order to comply with the Endangered Species Act ("ESA"). Second Amended Compl. ¶¶ 24-29 (Operative Facts) and 43-48 (Third Claim for Relief) (Doc. 210). Specifically, Plaintiffs allege that actions taken by BOR in response to the ESA led to reduced deliveries of irrigation water from the Klamath Project. Id. Plaintiffs allege that this was a failure to deliver "the quantities of water required by their written contracts[,]" constituting a breach of those contracts. Id., ¶ 47.

Accepting Plaintiffs' factual allegations as correct for the purposes of this motion, this case presents the question of whether actions allegedly taken by Defendant pursuant to the ESA resulted in a breach of the subject contracts. In accordance with the Court's Order of December

[2]Plaintiffs in this case include thirteen irrigation, drainage, or improvement districts (the "district plaintiffs") that have contracts with the United States related to the delivery of water from the Klamath Project, and numerous individual plaintiffs who have no contract with the United States, but receive Project water from one of the district plaintiffs. Second Amended Compl., ¶¶ 1–20, 44-45 (Doc. 210); Klamath Irrig. Dist. v. United States, 67 Fed. Cl. 504, 511 (2005). The Court has ruled that the individual plaintiffs may pursue contract claims as intended third-party beneficiaries; however, the Court has explained that the individual plaintiffs' contractual rights are no greater than the rights possessed or acquired by the districts under their contracts. Klamath, 67 Fed. Cl. at 534; id. at 535 (applying the venerable maxim: "nemo dat qui non habet," or "one who does not have cannot give").

20, 2005, Defendant's present motion is further limited to the application "of the sovereign acts and/or unmistakability doctrines[.]" Order, Dec. 20, 2005 (Doc. 257); see also Klamath v. United States, 69 Fed. Cl. 160, 163 (Dec. 20, 2005) (Doc. 256) (defining the next question to be addressed via summary judgment as "whether plaintiffs' contract claims are legally cognizable in the face of the sovereign acts or unmistakability doctrines, that is, whether under those doctrines, the actions taken pursuant to the Endangered Species Act here did not give rise to breaches.").

As set forth in Section III of this memorandum, the enactment and enforcement of the ESA is a general and public act of the government that falls squarely within the sovereign acts doctrine. Further, the contracts in question do not contain an unambiguous waiver of the government's sovereign authority to enact and enforce legislation such as the ESA. Accordingly, the contracts do not unmistakably confer a contract right to be immune from subsequent changes in the law, such as the ESA, even when the application of that general and public law affects the availability of water from this particular federal Reclamation Project. Consequently, both the sovereign acts doctrine and the unmistakability doctrine apply in this case and preclude a determination that the United States breached the subject Klamath Project contracts as a result of compliance with the ESA. Defendant's motion for summary judgment as to Plaintiffs' contract claims should therefore be granted.

In accordance with the Court's Orders, Defendant's briefing is limited to the foregoing questions. If the Court finds that the sovereign acts and unmistakability doctrines do not apply, Defendant reserves the right to present its other defenses to Plaintiffs' contract claims, including the argument that the Plaintiffs did not have a contractual right to receive irrigation water from the Klamath Project under the circumstances present in 2001. A full examination of this issue

would require consideration of the nature and scope of the government's water rights because, as the Court previously recognized, the government cannot give that which it does not have.[3] Klamath, 67 Fed. Cl. at 535. This examination would necessarily include consideration of any background principles of state law that impact and perhaps limit the scope of the United States' right to use water under state law, and any water rights that are senior in priority to those of the United States for the Klamath Project, such as the water rights of the Klamath Tribes.[4] The determination of the Plaintiffs' contractual rights would also require an examination of the subject contracts. However, these questions are beyond the scope of the present motion.

## II. BACKGROUND

### A. The Klamath Project Contracts

This case involves 13 contracts between the United States, acting through the Bureau of Reclamation (BOR), and the district plaintiffs.[5] These contracts were filed as Exhibits 1 through

---

[3]The determination and scope of the government's water right has been determined preliminarily in the Klamath Basin Adjudication. The Administrative Law Judge in Case 003, concerning Klamath Project water rights, has determined that those rights are held by the United States and that the claims of the Project water users should be disallowed. Klamath Basin Adjudication, Interim Order, Case 003 (Jan. 12, 2006) (attached to Notice of Related Decision, filed by Defendant on Jan. 23, 2006, Doc. 259).

[4]A more complete discussion of the senior tribal water rights at issue in this case, and how those rights impact Klamath Project operations, is included in the prior submissions of Defendant and the tribes (as amicus curiae). See Def.'s Cross-Mot. for Summ. Judgment at 25-27 (Oct. 3, 2003) (Doc. 101); Def.'s Suppl. Brief on the Property Right Question (May 19, 2005) (Doc. 236); Amicus Curiae Memorandum of the Klamath Tribes and Yurok Tribe (Sept. 26, 2003) (Doc. 128-129); Amicus Curiae Brief of Klamath Tribes and Yurok Tribes (May 6, 2004) (Doc. 184).

[5]Certain aspects of these contracts have been addressed by the parties and the Court in connection with the resolution of Plaintiffs' takings claims and the question of whether the individual plaintiffs are intended third party beneficiaries of the subject contracts. See Klamath Irrig. Dist. v. United States, 67 Fed. Cl. 504, 531-36 (2005) (Doc. 246).

14 to Plaintiffs' First Amended Complaint (March 24, 2003) (Doc 67) (hereinafter cited to as "Compl. Ex."). The subject contracts, all of which relate to the Klamath Project, can be generally separated into three categories based on the nature of the contract and the priority of water use within the Project.

The first category consists of the contract with Van Brimmer Ditch Company (VBDC), which is the earliest of the contracts at issue in this case. See Compl. Ex. 13. The VBDC contract was entered into on November 6, 1909. This contract was necessary because the construction of the Klamath Project eliminated VBDC's supply of water from Lower Klamath Lake. See Def. Ex. 4, pp. 206-07;[6] see also Klamath Drainage Dist. Contract (Compl. Ex. 4, pp. 80-85) (addressing reclamation of Lower Klamath Lake and replacement of VBDC's water from the Project). The contract replaced Van Brimmer's pre-Project water supply with a Project water supply, with the United States agreeing to deliver 50 second-feet of water annually to VBDC, subject "to any possible established priority to the use of said fifty (50) second-feet of water, other than such as may be claimed by the United States or those claiming through it." VBDC Contract, Art. 15 (Compl. Ex. 13, p. 351). Consistent with this provision, BOR categorizes the

[6]Defendant's Exhibit ("Def. Ex.") numbers 1 through 42 are the exhibits contained in Defendant's Appendix (dated October 3, 2003) and Supplemental Appendix (dated March 31, 2004), both of which were filed in support of its Cross-Motion for Summary Judgment on plaintiffs' takings claims. Defendant's Exhibit numbers 43 through 58 are the exhibits contained in the Appendix filed in support of Defendant's Cross-Motion for Summary Judgment on the Question of Whether the Individual Plaintiffs' Have Standing to Bring Contract Claims as Intended Third-Party Beneficiaries (dated April 26, 2004). To avoid confusion in the numbering of exhibits, the additional exhibits filed in support of Defendant's present motion begin with exhibit number 59 and appendix page number 543. Similarly, unless otherwise indicated, defendant's references herein to Plaintiffs' Exhibits ("Pl. Ex.") are to the exhibits in the appendices previously filed by plaintiffs in support of their cross-motion for partial summary judgment on their takings claims (dated July 21, 2003; Aug. 29, 2003; and Jan. 16, 2004).

VBDC contract as a "Class A" contract, which has first priority of use among all Project contracts. Def. Ex. 4. In addition, VBDC's right to receive Project water is recognized as having first priority among the Project's other "Class A" contracts. Id., pp. 206-7. On April 22, 1922, the United States entered into a contract with the Klamath Irrigation District (KID) under which KID assumed liability for the annual cost of carrying and delivering water to VBDC. Klamath, 67 Fed. Cl. at 529; Def. Ex. 1, p. 61. KID continues to be responsible for the delivery of Project water to VBDC. KID's current contractual rights and obligations, including its obligations with respect to VBDC, are set forth in its amendatory contract with BOR of November 29, 1954.[7] Compl. Ex. 1, pp. 8-39.

A second category consists of contracts entered into pursuant to the Reclamation Act of 1939, 43 U.S.C. § 485, et seq. This group includes BOR's contracts with KID and Tulelake Irrigation District (TID).[8] See Compl. Ex. 1 (KID) and 2 (TID). Under these "repayment contracts," the districts receive deliveries of water from the Project and in return are obligated to pay a proportionate share of the Project's initial construction costs and its annual operation and maintenance costs. See 43 U.S.C. § 485h(d). See also Compl. Ex. 1-2. The KID and TID contracts are also categorized as "Class A" contracts, and thus have priority over other non-Class

---

[7]Defendant notes that VBDC also has a contractual right to receive deliveries of excess water to additional acreage when such water is available. Specifically, VBDC's amendatory contract of 1943 provides that the United States is not obligated to deliver water in excess of 50 cubic feet per second ("cfs") "when such excess is needed for delivery to the Project lands or to the lands of the contractors with the United States under the Warren Act (36 Stat. 925) whether such contracts antedate or postdate this contract." Compl. Ex. 13, p. 359.

[8]BOR entered into the contract with KID pursuant to Section 9(d) of the Reclamation Act of 1939, 43 U.S.C. § 485h(d). BOR entered into the contract with TID pursuant to § 7 of that Act. Def. Ex. 5 (p. C-1).

A Project contracts when there is a shortage of available water. Def. Ex. 4.

The third category of contracts at issue in this case consists of those contracts entered into pursuant to Section 2 of the Warren Act of 1911, ch. 141, 36 Stat. 925 (codified at 43 U.S.C. § 524). These repayment contracts generally provide for the delivery of Project water to a certain delivery point, with the districts assuming responsibility for constructing all necessary works to deliver water from that point to the irrigable lands within the district. Def. Ex. 3, p. 183. This group includes the remaining 10 contracts at issue in this case, which are the contracts with Plaintiffs Klamath Drainage District, Sunnyside Irrigation District, Klamath Basin Improvement District, Malin Irrigation District, Westside Improvement District No. 4 (Colonial Realty Co.), Shasta View Irrigation District, Poe Valley Improvement District, Midland District Improvement Co., Enterprise Irrigation District, and Pine Grove Irrigation District. Compl. Exs. 3-12 and 14; Def. Ex. 4-5 (KP Historic Op. at B-2 to B-3, C-2).

The Warren Act authorized the Secretary to enter into contracts for the delivery of any excess water, provided that the first right to Project water be preserved to the original lands and entrymen under the Project. 43 U.S.C. § 523. Therefore, the Warren Act contracts for any excess Klamath Project water include language acknowledging the priority of the earlier contracts.[9] In addition, the Warren Act contracts include language indicating that the United

---

[9]See Poe Valley Contract, Art. 2 ("The United States reserves a first right to the lands and entrymen on the Klamath Project of the water to be made available to the District pursuant to the terms of this contract.") (Compl. Ex. 4, p. 132); Pine Grove Contract (the United States "preserv[es] a first right to the lands and entrymen under the Klamath Project") (Compl., Ex. 10, p. 247); see also Sunnyside Contract, Art. 5 ("Provided, That all rights to the use and delivery of water acquired by the District under this contract are inferior and subject to the prior rights reserved for the lands of the Klamath project.") (Compl. Ex. 5, p. 159); Malin Contract, Art. 7 (same) (Compl. Ex. 8, p. 232); Shasta View Contract, Art. 7 (same) (Compl. Ex. 12, pp. 272 and 288).

States is agreeing to provide "surplus" water to these districts only when such water is available. For example, the Midland District Improvement Company contract provides in its recitals that "the United States has available a supply of water in variable and indefinite quantities which, when available, may be utilized upon the lands of the District[.]"[10] Compl. Ex. 7, p. 218. Similarly, the contract with Westside Improvement District provides that "the United States will furnish, out of such surplus water as may be available from the irrigation works of the said Klamath Project and at such times during the irrigation season as surplus water may be so available, a water supply for irrigation of the above described lands . . . "[11] Compl. Ex. 11, p. 259.

Consistent with the priorities established by the Warren Act and the terms of the contracts entered into thereunder, the Warren Act contracts at issue in this case are classified as "Class B" contracts within the Klamath Project and, as a group, are second in priority of use, behind the Class A contracts (VBDC, KID and TID). Def. Ex. 4. Within Class B, the contracts are prioritized by the date the contract was entered into.[12] Def. Ex. 4, p. 207-208.

---

[10]See also Poe Valley Contract, Art. 3 (providing for the delivery of water "[w]hen and to the extent that water is available") (Compl. Ex. 4, p. 132); Poe Valley Amendatory Contract (referring to the 1953 Poe Valley contract as providing "for a water supply in variable and indefinite quantities at rates established for the Project") (Compl. Ex. 14, p. 371).

[11]See also Klamath Basin Improvement Dist. Contract (indicating that the contract is for the delivery of "surplus water," which is defined as "water available from the Klamath Project in excess of that required to meet the prior rights of lands and entrymen under the Klamath Project") (Compl. Ex. 6, pp. 172, 176); Sunnyside Contract, Art. 5 (providing that the water to be delivered under the contract "shall not exceed the amount that can be furnished, as determined by the Secretary . . . .") (Compl. Ex. 5, p. 159).

[12]In some of these contracts, the United States expressly reserved the right to apportion available surplus water among the Warren Act contractors. See, e.g., Klamath Basin Improvement Dist. Contract, Art. 4 ("In any year in which there may occur a shortage from any

B. Operation of the Klamath Project

As explained in prior briefings, Upper Klamath Lake, a naturally occurring lake which is also the principal water supply source for the Project, is relatively shallow, and its 1917 dam is too low to capture and store large quantities of spring run-off. Def. Ex. 3 (KP Historic Op. at 30); Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation ("PCFFA v. BOR I"), 138 F. Supp. 2d 1228, 1231 (N.D. Cal. 2001); Kandra v. United States, 145 F. Supp. 2d 1192, 1197 (D. Or. 2001); Klamath, 67 Fed. Cl. at 509. Because the Project lacks facilities to store large quantities of water in wet years to meet all water needs in dry years, operation of the Klamath Project requires Reclamation to balance numerous competing legal obligations and demands for limited Project water supply. These obligations have been addressed by district courts and the Court of Appeals for the Ninth Circuit in several cases including: PCFFA v. BOR I, 138 F. Supp. 2d at 1231; Kandra, 145 F. Supp. 2d at 1196-97; Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1209 (9th Cir. 2000); and, Pacific Coast Fed'n of Fishermen's Ass'ns v. Bureau of Reclamation ("PCFFA v. BOR II"), 426 F.3d 1082, 1085-86 (9th Cir. 2005).

For example, in PCFFA v. BOR I, the district court for the Northern District of California described BOR's obligations in managing and operating the Klamath Project as follows:

> The Secretary of the Interior, through the Bureau of Reclamation, must manage and operate the Klamath Project pursuant to various legal responsibilities. Pursuant to the Reclamation Act of 1902 [ ], for example, the Bureau of Reclamation has entered into contracts with various water

---

cause, the United States reserves the right to apportion the available surplus water supply among the District and others entitled, under existing and future contracts made pursuant to the Warren Act, to receive water from the Klamath Project.") (Compl. Ex. 6, p. 178); Klamath Drainage Dist. Contract, Art. 14(a) ("In the event of a shortage of water in any irrigation season there shall be a proration of the supply from the sources above named between the District and others supplied therefrom in a manner deemed equitable by the Secretary.") (Compl. Ex. 3, pp. 111-12).

> districts and individual water users to supply water, subject to availability, for irrigation purposes. Two national wildlife refuges, the Lower Klamath and Tule Lake National Wildlife Refuges, also are dependent on the operations of the Klamath Project and have federal reserved water rights to the amount of water, unreserved at the time of creation of the refuges, necessary to fulfill the primary purpose of the refuges. . . . The Bureau of Reclamation has an obligation to protect Tribal trust resources, including the Klamath River coho salmon. It also has an obligation under the ESA not to engage in any action that is likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of the critical habitat of such a species.

138 F. Supp. 2d at 1231 (statutory and administrative record citations omitted). Similarly, in a recent case involving judicial review of a long-term biological opinion issued by NMFS pursuant to the ESA and as a result of formal consultation with BOR regarding the operation of the Klamath Project, the Ninth Circuit has recognized that:

> A number of factors make water management especially difficult in the Klamath River Basin. See generally [PCFFA] v. BOR, 138 F. Supp.2d 1228, 1230-31 (N.D. Cal. 2001) ("PCFFA I"); Kandra v. United States, 145 F. Supp.2d 1192, 1196-98 (D. Or. 2001). The primary reservoir is relatively shallow, and is home to populations of two different species of endangered fish, known as suckers, that require maintenance of certain minimum water levels. Kandra, 145 F. Supp. 2d at 1196-98. Marshlands in two national wildlife refuges are irrigated by the Klamath Project to create bird habitat. Id. at 1196. Several tribes in the area have treaty rights to Klamath River fish, and the Department of the Interior must meet the United States' fiduciary duty to maintain these resources. Id. at 1197. Numerous farmers have contracts for irrigation water that the BOR must supply each growing season. PCFFA I, 138 F. Supp. 2d at 1231.

PCFFA v. BOR II, 426 F.3d 1082, 1085-86 (9th Cir. 2005). See also Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d at 1209 (describing Reclamation's "various obligations" related to the Klamath Project as including contractual obligations to water users, responsibilities for the national wildlife refuges, the requirements of the ESA, and the responsibility to protect

the rights and resources of certain Klamath Basin tribes).[13]

C. The Endangered Species Act

The ESA, in its current form, was enacted by Congress on December 28, 1973, and is codified at 16 U.S.C. §§ 1533-1544. There are currently 527 species of animals listed as threatened or endangered under the ESA.[14] Def. Ex. 59. Fifty-two of these species are found in Oregon; 299 are found in California. Def. Ex. 60.

Section 9 of the ESA prohibits, *inter alia*, the unauthorized "take" of a listed species, 16 U.S.C. § 1538(a)(1), which is defined to include harassing, harming, pursuing, wounding, or killing. 16 U.S.C. § 1532(19); see also 50 C.F.R. § 17.3 (ESA regulations further defining "harm" as including "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering"). The ESA prohibits both the direct "take" of a protected species, as well as indirect takes that result from otherwise lawful activities. See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 696-708 (1995).

To reconcile the prohibitions of ESA § 9 with beneficial human activities, Congress included several provisions that allow some activities to occur even though they might result in the "take" of a listed species. The relevant provision in this case is found in ESA § 7(a)(2),

---

[13]The decisions of the Ninth Circuit regarding BOR's obligations in managing and operating the Klamath Project are consistent with Department of the Interior memoranda from the Regional Solicitor's Offices that pre-date those decisions. See Pl. Ex. 28; Pl. Ex. 2.

[14]The ESA allows for the "listing" of a species if it is endangered or threatened throughout "all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). See also 16 U.S.C. § 1533 (describing the process for determining whether to list a species).

which requires each federal agency, in consultation with either the FWS or NMFS,[15] to insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the designated "critical habitat" of the species.[16] 16 U.S.C. § 1536(a)(2); see also 50 C.F.R. Part 402 (ESA implementing regulations setting out the consultation process). If a federal agency determines that an "action it proposes to take may adversely affect a listed species, it must engage in formal consultation" with FWS or NMFS under Section 7(a)(2) of the ESA. Bennett v. Spear, 520 U.S. 154, 158 (1997) (citing 50 C.F.R. § 402.14).

The end result of a formal consultation under Section 7 of the ESA is the issuance of a biological opinion in which FWS or NMFS provides its opinion about whether the proposed action is likely to jeopardize the continued existence of listed species. See 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g)-(h). See also Bennett v. Spear, 520 U.S. at 158 and 168-71 (discussing the significance of a biological opinion as a final agency action under the ESA). When the FWS or NMFS concludes that a proposed action is not likely to jeopardize the continued existence of a

---

[15]Because of the broad scope of the ESA, the statute is jointly administered by the Secretary of Commerce and the Secretary of the Interior. The Secretary of Commerce has delegated this authority to the National Marine Fisheries Service ("NMFS"), and the Secretary of the Interior has delegated this authority to the Fish and Wildlife Service ("FWS"). In general, FWS has authority over terrestrial and freshwater species and NMFS has authority over marine species. See, e.g., Northwest Resource Info. Center, Inc. v. NMFS, 56 F.3d 1060, 1065 (9th Cir. 1995) (discussing the division of responsibility for listed species). In 1986, the Services jointly promulgated ESA implementing regulations. See 50 C.F.R. Part 402. Accordingly, the Lost River and shortnose suckers were listed as endangered by the FWS, and the SONCC coho was listed as threatened by NMFS.

[16]Section 7 only applies to federal actions. Private actors that might violate the Section 9 prohibition against the "take" of a listed species may seek a permit under ESA Section 10 that authorizes the taking of a federally listed species if the taking is incidental to an otherwise legal activity. 16 U.S.C. § 1539.

listed species, the action agency generally may proceed as proposed and the FWS or NMFS must include an "incidental take statement" in the biological opinion. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(I). Such a provision authorizes the "take" of a listed species incidental to otherwise lawful activities, and, if followed, permits a certain level of allowable "take" by the action agency, which otherwise would be prohibited by Section 9.

When the FWS or NMFS determines that the proposed action is likely to jeopardize listed species or result in adverse modification of critical habitat, the consulting agency is required to determine whether there are any "reasonable and prudent alternatives" ("RPAs") to the proposed action which would not jeopardize the species or result in the adverse modification of critical habitat, and which can be taken by the action agency or applicant in implementing the proposed action. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3); 50 C.F.R. § 402.14(g)(5). See also 50 C.F.R. § 402.02 (defining the term "reasonable and prudent alternatives"). Here, too, the FWS or NMFS includes an incidental take statement to accompany implementation of any RPAs. After issuance of the biological opinion, the action agency must determine "whether and in what manner to proceed with the action in light of its section 7 obligations and the [regulatory agency's] biological opinion." Bennett v. Spear, 520 U.S. at 168 (quoting 50 C.F.R. § 402.15(a)). If the action agency implements the RPAs and complies with the terms of the incidental take statement, any permitted "take" of the species associated with the action will not be a violation of Section 9 of the ESA. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5). However, if the action agency exceeds the level of authorized "take," it must reinitiate consultation with FWS or NMFS. 50 C.F.R. § 402.14(i)(4); 50 C.F.R. § 402.16.

D. The Application of the ESA to Klamath Project Operations

Listed species that currently live in and around the Klamath Project and are potentially affected by Project operations include: the Lost River sucker and the shortnose sucker, two species of fish that inhabit Upper Klamath Lake and other nearby Klamath Project waters and were listed as endangered in1988; and the Southern Oregon/Northern California Coast (SONCC) coho salmon, which currently use the mainstem and tributaries of the Klamath River between Iron Gate Dam to the Pacific Ocean for spawning and rearing, and were listed as threatened in 1997.[17] See 53 Fed. Reg. 27130 (July 18, 1988) (listing of the suckers); 62 Fed. Reg. 24588 (May 6, 1997) (listing of the SONCC coho salmon). See also Kandra, 145 F. Supp. at 1196-97 (describing the suckers, the SONCC coho salmon, and bald eagles as among the listed species that might be impacted by Klamath Project operations).

BOR's management of Klamath Project operations must comply with Section 7 and other provisions of the ESA. See Def. Ex. 61 (Klamath Project 2001 Annual Operations Plan) (acknowledging that BOR must "assure that its operations are not likely to jeopardize the continued existence of species listed under the [ESA]"); Patterson, 204 F.3d at 1213 (affirming district court's conclusion that BOR had authority to direct Link River Dam operations to comply with the ESA); Kandra, 145 F. Supp. 2d at 1207 (finding, in the context of a request for a preliminary injunction, that BOR has a "legal duty" to operate the Klamath Project consistent with its ESA and tribal trust obligations); PCFFA v. BOR I, 138 F. Supp. 2d at 1243-50 (holding that BOR is required to consult with NMFS under Section 7 of the ESA regarding the operation

[17] Maps of the Klamath Project area showing the various features of the Project that are referenced herein are available at http://www.usbr.gov/mp/kbao/maps/index.html.

of the Klamath Project and enjoining BOR, under certain circumstances, from delivering irrigation water from the Klamath Project until such a consultation is completed). See also Pl. Ex. 28 and Pl. Ex. 2 (Department of the Interior memoranda indicating that BOR must operate the Klamath Project in compliance with its multiple legal obligations, including compliance with the ESA).

During the 1990s and early 2000s, BOR consulted with the FWS and NMFS over ongoing Project operations and annual operations plans, among other actions. See, e.g., Bennett v. Spear, 520 U.S. at 158-60 (discussing application of the ESA to Klamath Project operations in the early 1990s); see also Def. Ex. 68 (Biological Assessment, pp. 2-4, 14-15); Def. Ex. 69 (Biological Assessment, p. 2); Def. Ex. 70 (FWS Biological Opinion, Sect. I, p. 1-6). At the end of the 2000 water year, the Klamath Basin was experiencing drought conditions, and these conditions were affecting the availability of water from the Klamath Project. In the fall of 2000, BOR notified Project water users that the supply of available water was insufficient to allow further deliveries to the Warren Act or "B" contractors or to the annual surplus water rental or "C" contractors.[18] Def. Ex. 62 (Ltr to VBDC, Sept. 2, 2000). BOR informed Project water users that this action was "necessary for operation of the Project to be consistent with the requirements of the [ESA] and Reclamation's obligation to protect Tribal trust resources." Def. Ex. 62. See also Langell Valley Irrig. Dist. v. Babbitt, No. 00-6265-HO (D. Or. Aug. 31, 2000) (denying irrigation district's request for preliminary injunction to prevent BOR from releasing water from Clear Lake and Gerber Reservoir to serve other parts of the Klamath Project because water from Upper Klamath Lake was needed to comply with ESA requirements).

[18]There are no "C" contracts at issue in this case.

Water supply forecasts from the Natural Resources Conservation Service ("NRCS"), which are used by BOR in developing its annual operations plans, indicated that the 2001 water year would be a "critically dry" year on account of drought conditions. See Kandra, 145 F. Supp.2d at 1198 ("Based on NRCS forecasts, Reclamation has defined the 2001 water year as 'critically dry.'"); see also Def. Ex. 63 (various letters from early 2001 stating that "[f]orecasts of water supplies in the Klamath basin for the 2001 water year are currently nearly half of average conditions"); Def. Ex. 64 (letter of March 2, 2001, to water users stating that "if precipitation does not increase significantly over the next few months, severe water shortages are likely during the upcoming 2001 irrigation season"); Def. Ex. 28 (drought declaration issued by Oregon Governor, March 28, 2001). In the face of these forecasts, BOR initiated formal consultation with FWS and NMFS under ESA § 7(a)(2) regarding the potential effects of ongoing operations of the Klamath Project for the 2001 water year on listed species.[19] See 16 U.S.C. § 1536(a)(2); see also Def. Ex. 65–67. In connection with the initiation of formal consultation proceedings under Section 7, BOR prepared and issued a biological assessment for submission to FWS addressing effects of ongoing Project operations on the listed suckers and the bald eagle, and a

[19]Because Plaintiffs' contract claims only allege a breach of contract during the 2001 water year, Defendant's discussion of the application of the ESA to BOR's operation of the Klamath Project is limited to the consultations leading up to and including 2001. A detailed description of this consultation process is set forth in Kandra, 145 F. Supp. 2d at 1206-08, in which several of the plaintiffs involved in this case brought an action for breach of contract against the United States alleging that BOR's adoption of the 2001 Operations Plan for the Klamath Project breached its contractual obligations to the Project's water users and sought injunctive relief. See Kandra, 145 F. Supp. 2d at 1199. In considering the likelihood of success on the merits of the breach of contract claim in the context of the plaintiffs' motion for preliminary injunction, the district court concluded that the plaintiffs "cannot assert a breach of contract based on Reclamation's allocation of water to protect the suckers and salmon." Id. at 1201. After the court denied the plaintiffs' motion for preliminary injunction, the plaintiffs voluntarily dismissed their claims without prejudice.

separate biological assessment for submission to NMFS addressing the effects of ongoing Project operations on the listed SONCC coho salmon. Def. Ex. 68-69. These biological assessments concluded that the on-going operation of the Klamath Project was likely to affect the listed species. Def. Ex. 68 (pp. 45-46); Def. Ex. 69 (p. 89); Kandra, 145 F. Supp.2d at 1198.

The ESA Section 7 consultation process led to the issuance of final biological opinions by both FWS and NMFS in early April 2001. The biological opinion issued by the FWS on April 5, 2001, concluded that proposed Project operations in 2001 were likely to jeopardize the two species of endangered sucker fish that inhabit Upper Klamath Lake and its tributaries, and that such operations would cause harm, but not jeopardy, to the continued existence of the bald eagle. Def. Ex. 70; Kandra, 145 F. Supp. 2d at 1198. The biological opinion issued by NMFS on April 6, 2001, concluded that proposed Project operations in 2001 were likely to jeopardize the threatened SONCC coho salmon that inhabit the Klamath River in California. Def. Ex. 71; Kandra, 145 F. Supp. 2d at 1198.

Both biological opinions included reasonable and prudent alternatives ("RPAs") that could be implemented by BOR to avoid jeopardizing the continued existence of those species. The RPA developed by the FWS recommended that, for Water Year 2001, BOR maintain specified minimum lake levels in Upper Klamath Lake and other Project reservoirs to avoid jeopardizing the endangered suckers. Def. Ex. 70. The RPA developed by NMFS recommended the maintenance of specified minimum instream flows in the Klamath River in California below Iron Gate Dam to avoid jeopardizing the threatened SONCC coho salmon. Def. Ex. 71. There proved to be inadequate water available in the Klamath Basin during the drought conditions of 2001 for BOR to comply with both RPAs, and accordingly the FWS and NMFS adjusted their

recommendation on Upper Klamath Lake levels and instream flows below Iron Gate Dam to avoid jeopardizing the three listed fish species. See Kandra, 145 F. Supp. 2d at 1198.

In accordance with the ESA and its implementing regulations, BOR subsequently notified both FWS and NMFS that it would operate the Project consistent with the RPAs, and incorporated the RPAs into its Klamath Project Annual Operations Plan for 2001. See Def. Ex. 61 (2001 Annual Op. Plan); Def. Ex. 73. The implementation of the 2001 Annual Operations Plan for the Klamath Project resulted in a substantial reduction in the amount of water available for irrigation as compared to years of average precipitation in the Klamath Basin. Specifically, on April 6, 2001, BOR announced that there would be no water available from Upper Klamath Lake to supply to the farmers (pursuant to BOR's contracts with the district plaintiffs).[20] Def. Ex. 72. Subsequently, on July 24, 2001, the Secretary of the Interior announced that BOR would be able to release 70,000 to 75,000 acre-feet of water from Upper Klamath Lake to its contractors due in part to improved weather conditions. Def. Ex. 74. Plaintiffs filed their original complaint in this case approximately three months later. Pls.' Complaint (Oct. 11, 2001) (Doc. 1).

---

[20]At the same time, BOR announced that, based on its estimates at the time, that there would be approximately 70,000 acre-feet of water available for the irrigation of "A" lands on the east side of the basin from Clear Lake and Gerber Reservoir. Def. Ex. 72 (Interior Press Release, 4/6/2001).

## III. ARGUMENT

Subject to the availability of water,[21] BOR has a contractual obligation to deliver water to Plaintiffs in accordance with the rights held by the United States for the Klamath Project and the contracts with the districts. The BOR also has an obligation, however, to comply with applicable laws such as the ESA. The question addressed in this brief is whether the sovereign acts doctrine or unmistakability doctrine applies in this case to preclude a determination that BOR breached its contracts as a result of complying with the ESA (as alleged by Plaintiffs).[22]

The application of the sovereign acts and unmistakability doctrines are interrelated. As this Court explained in its decision of August 31, 2005, "the so-called 'unmistakability doctrine' recognizes that "'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'" Klamath, 67 Fed. Cl. at 537 n.57 (quoting Bowen v. Pub. Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52 (1986) (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982))). See also Franconia Assocs. v. United States, 61 Fed. Cl. 718, 733 (2004). As recently explained by the Federal Circuit, "the unmistakability doctrine is a doctrine of contract construction instructing that 'a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the

---

[21]As recognized by decisions of the Ninth Circuit Court of Appeals, the availability of water is subject to a number of factors, including hydrologic conditions in the basin, the need to satisfy senior water rights, and the need to comply with other federal laws. See Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206 (9th Cir. 2000); Pacific Coast Federation Fishermen's Ass'ns v. Bureau of Reclamation, 426 F.3d 1082 (9th Cir. 2005).

[22]As noted previously, pages 2-3, the United States has a number of other defenses that may be asserted if the case proceeds.

application of a subsequent sovereign act, nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of a sovereign power.'" Centex Corp. v. United States, 395 F.3d 1283, 1306 (Fed. Cir. 2005) (quoting United States v. Winstar, 518 U.S. 839, 878 (1996)).

"[A] prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated." Klamath, 67 Fed. Cl. at 537 n.57 (citing Centex Corp., 395 F.3d at 1307; Cuyahoga Metr. Housing Authority v. United States, 57 Fed. Cl. 751, 774-75 (2003)). See also First Nationwide Bank v. United States, 431 F.3d 1342, 1350-51 (Fed. Cir. 2005) (declining to apply the unmistakability doctrine after concluding that the legislation in question was specifically targeted at the subject contracts); Franconia Assocs., 61 Fed. Cl. at 735-36 (holding that the unmistakability doctrine could not be applied because the legislation in question "deliberately targeted" the government's contractual obligations). Here, for the reasons explained below, there is no question that the enactment and enforcement of the ESA qualifies as a "sovereign act."

Once the court finds that the government act at issue is a general, sovereign act, the second part of the inquiry requires the court to determine whether the contracts in question unmistakably precluded the government from subsequently exercising its sovereign power. Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1579 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998). As discussed below, the 13 contracts at issue in this case do not contain terms that expressly and unambiguously exempt those contracts from the application of future laws such as the ESA. Thus, the two doctrines apply in this case and preclude a finding that Defendant breached its contracts with Plaintiffs in 2001. Defendant is therefore entitled to judgment, as a matter of law, on Plaintiffs' contract claims.

A. The Sovereign Acts Doctrine Provides a Complete Defense to Plaintiffs' Contract Claims Because the Enactment and Enforcement of the ESA is a Public and General Act of the United States as Sovereign

Under the sovereign acts doctrine, BOR cannot be held liable for the non-delivery of Klamath Project water under the Plaintiffs' contracts[23] resulting from BOR's compliance with the ESA, a public and general act of Congress.

1. The Sovereign Acts Doctrine

"The sovereign acts doctrine is an affirmative defense under which the United States, when sued as a party to a contract, 'cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.'" Allegre Villa v. United States, 60 Fed. Cl. 11, 16 (2004) (quoting Horowitz v. United States, 267 U.S. 458, 461 (1925)). See also Jones v. United States, 1 Ct. Cl. 383, 385 (1865) ("the United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign"). The sovereign acts doctrine thus draws a distinction between actions taken by the government as a party to a contract and actions taken by the government in its sovereign capacity in a manner that seeks to balance "the Government's need for freedom to legislate with its obligation to honor its contracts." United States v. Winstar, 518 U.S. 839, 896 (1996). In so doing, the sovereign acts doctrine levels the contractual playing field by ensuring that government contractors and private contractors are affected the same way when the government, acting in its sovereign capacity, legislates or otherwise acts in a way that impacts existing contractual rights. See, e.g., Deming v. United States, 1 Ct. Cl. 190, 191 (1865) (holding that the

[23]Again, the question of whether Plaintiffs had a contractual right to receive deliveries of Klamath Project water under the circumstances of 2001 is not addressed in this brief.

government as contractor is not liable for the acts of the government as sovereign in enacting a general law because "[a] contract between the government and a private party cannot be *specially* affected by the enactment of a *general* law."); Cuyahoga Metropolitan Housing Authority, 57 Fed. Cl. at 763 n.18 ("Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct, or violate the particular contracts into which it enters with private persons." (quoting Jones v. United States, 1 Ct. Cl. at 384)). In other words, the government as contractor is not entitled to any special benefit from the acts of the government as sovereign. Yankee Atomic, 112 F.3d at 1575. Likewise, "'the Government in its contracting role, like its private counterpart, should not incur liability for its act done in the governing role.'" Id. at 1574 n.3 (quoting O'Neill v. United States, 231 Ct. Cl. 823, 826 (1982)).

The Federal Circuit's most recent and most comprehensive guidance on the application of the sovereign acts doctrine is set forth in its post-Winstar decision in Yankee Atomic, *supra*. In that decision, the Federal Circuit explains that the application of the sovereign acts doctrine turns on a determination of "'whether the sovereign act is properly attributable to the Government as contractor.'" Yankee Atomic, 112 F.3d at 1575 (quoting Winstar, 518 U.S. at 896). This is "a fact-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior government contracts." Id. As explained in one recent Court of Federal Claims decision, an "inquiry into possible 'targeting' by Congress is relevant to determining whether the alleged breach is merely an incidental effect of a sovereign act designed to promote the public good, or instead is a deliberate attempt by Congress to alter its previous bargain with the contractor." Carabetta Enterprises, Inc. v. United States, 58 Fed. Cl.

563, 568 (2003) (quoting Coast-to-Coast Fin. Corp. v. United States, 45 Fed. Cl. 796, 804 (2000)).

The sovereign acts doctrine does not provide a defense to a contract claim if, as a result of the inquiry described in Yankee Atomic, the court determines that the government's actions "were not the actions of public and general applicability, but were actions directed principally and primarily at plaintiffs' contractual right[.]" Sun Oil v. United States, 572 F.2d 786, 817 (Ct. Cl. 1978). Conversely, "[a]n act of government will be considered sovereign so long as its impact on a contract is 'merely incidental to the accomplishment of a broader governmental objective.'" Klamath, 67 Fed. Cl. at 537 (quoting Winstar, 518 U.S. at 898).

In this case, Plaintiffs allege a breach of contract based on actions taken by BOR to comply with the ESA. Second Amended Compl., ¶¶ 24-29, 43-48 (Doc. 210). Accordingly, the determination of whether the sovereign acts doctrine applies in this particular case requires the Court to determine whether the enactment and enforcement of the ESA is a "public and general" act of the government as sovereign. As we now explain, there can be no doubt that the ESA meets this test, and that the sovereign acts doctrine is therefore applicable to Plaintiffs' contract claims.

2. The Enactment and Subsequent Enforcement of the ESA

As described above in Section II.C., the ESA was enacted by Congress in 1973. The ESA has been recognized as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978). Passage of the ESA stemmed from Congressional concern over the accelerating pace of species extinction and the societal risks that might result therefrom. Reviewing both the plain

language of the statute itself, as well as the legislative history, the Supreme Court found that the "plain intent" of the ESA "was to halt and reverse the trend toward species extinction, whatever the cost." Id., 437 U.S. at 184. See also 16 U.S.C. § 1531 (Congressional findings and declaration of the purpose of the ESA). The broad reach of the ESA is evident from the fact that it applies to both government actions and private actions, and "to all land in the United States and to the Nation's territorial seas." Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 698 (1995); see also Defenders of Wildlife v. Environmental Protection Agency, 420 F.3d 946, 975 (9th Cir. 2005) (noting that the provisions of the ESA "apply to all actors, not only the federal government").

Several of the 527 species of animals presently listed as threatened or endangered under the ESA inhabit the area in and around the Klamath Project. See Section II.C. and II.D., *supra*. Accordingly, the operation of the Klamath Project may impact those species. As a result of this potential, BOR has engaged in a number of consultations with FWS and NMFS under Section 7 of the ESA regarding ongoing Klamath Project operations. This case relates to the consultations that involved the ongoing operations of the Klamath Project during the 2001 water year. As discussed above, the biological opinions issued by FWS and NMFS as a result of these consultations were "jeopardy" opinions and therefore included RPAs intended to avoid jeopardizing the affected species.

BOR managed Klamath Project operations in 2001 in compliance with the ESA. As noted above, the implementation of the 2001 Annual Operations Plan for the Klamath Project, which incorporated the RPAs set forth in the biological opinions issued by FWS and NMFS, resulted in a reduction in the amount of Project water available for irrigation as compared to

years of average precipitation in the Klamath Basin.

3. The ESA is a "Public and General" Act That Falls Squarely Within the Sovereign Acts Doctrine

There is no credible argument that the ESA "targeted" the contracts at issue in this case. To the contrary, the ESA is the epitome of a "public and general" legislative enactment. As explained above, the ESA was enacted in 1973 to "halt and reverse the trend toward species extinction" on a nationwide basis. TVA v. Hill, 437 U.S. at 184; see also 16 U.S.C. § 1531; Catron County Bd. of Commrs. v. FWS, 75 F.3d 1429 (10th Cir. 1996) (ESA's core purpose is to prevent extinction of species by preserving and protecting their habitats from intrusive human activity). The ESA applies to all land in the United States and to the Nation's territorial seas, and thus reaches and affects both federal government actions and private actions far beyond the confines of the Klamath River basin and the Klamath Project. The consultation requirements of Section 7 described above apply nearly without exception to all federal agencies, and contain substantive and procedural requirements which are uniform. As such, the ESA compliance alleged by Plaintiffs to have breached the contracts was "'merely incidental to the accomplishment of a broader governmental objective.'" Yankee Atomic, 112 F.3d at 1576 (quoting Winstar, 518 U.S. at 898). The ESA is not specifically targeted at any pre-existing government contracts, let alone the contracts at issue in this case.

An example of what the courts *have* construed as a "targeting" piece of legislation in the context of a BOR contract with a water district can be found in United States v. Westlands Water Dist., 134 F. Supp. 2d 1111 (E.D. Cal. 2001). There, as here, the BOR had a contract with a water district. Unlike the Klamath contracts, the Westlands contract set a specific price of $8.00

per acre-foot of water and a specific drainage service rate. Id. at 1142. Congress then passed legislation that "abrogate[d]" the water and drainage service rate, requiring that the government charge its "full cost" to the plaintiffs. Id. at 1144. The court determined that the legislation in question had the "singular overriding purpose" of "target[ing] contractors who had contractual promises" for a low fixed price. Id. at 1142; see also id. at 1153 (holding that the legislation at issue specifically targeted the Westlands contracts).

The ESA could not be further removed from what the court in Westlands determined was narrow legislation targeting specific contracts. Indeed, the Ninth Circuit – where the Klamath Project is located – has repeatedly and consistently viewed the enactment of the ESA as a sovereign act. In Klamath Water Users Protective Association v. Patterson, *supra*, the Ninth Circuit found that BOR's contract with a power company regarding operation of the Klamath Project's Upper Klamath Lake dam (the Link River Dam) was subject to the subsequently-enacted ESA. 204 F.3d at 1213. The Ninth Circuit thus held that BOR was required to comply with the ESA in its operation of the Klamath Project, including the operation of the dam. Id.; see also Kandra, 145 F. Supp. 2d at 1201 (denying a preliminary injunction request by Klamath Project water users in 2001, noting that the "plaintiffs' contract rights to irrigation water are subservient to ESA and tribal trust requirements"). The treatment of the ESA as a sovereign act in Patterson was consistent with the Ninth Circuit's earlier decision in O'Neill v. United States, 50 F.3d 677 (9th Cir. 1995). In O'Neill, which involved BOR's operation of the Central Valley Project in California, the Ninth Circuit treated the enactment and enforcement of the ESA as a sovereign act when it held that the water delivery contracts at issue were not immune from subsequently-enacted sovereign acts. 50 F.3d at 686. Accord Precision Pine & Timber, Inc. v.

United States, 50 Fed. Cl. 35, 72-73 (2001) (holding that the suspension of certain timber contracts by the Forest Service due to the agency's compliance with the ESA were "public and general acts" because the Forest Service was required to comply with the ESA).

In sum, the enactment and enforcement of the ESA is a "general and public" act that falls squarely within the sovereign acts doctrine. The ESA compliance alleged by Plaintiffs to have breached the subject contracts in 2001 was merely incidental to the broader objectives of the ESA. Accordingly, the Court should find that the sovereign acts doctrine applies in this case.

B. The Contracts Are Subject to the ESA Under the Unmistakability Doctrine

For a contract to prevent the government from exercising a sovereign power, the agreement must contain terms restricting the exercise of that power that "'admit of no other reasonable interpretation.'" Winstar, 518 U.S. at 876-77 (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. at 148). See also Transohio Sav. Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 618 (D.C. Cir. 1992) ("one who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that contract confers such a right in unmistakable terms" (quoting Western Fuels-Utah, Inc. v. Lujan, 895 F.2d 780, 789 (D.C. Cir.), cert. denied, 498 U.S. 811 (1990)); Amber Resources Co. v. United States, 68 Fed. Cl. 535, 556-57 (2005) (holding that the unmistakability doctrine does not provide a defense when the terms of the contract shift the risk of future statutory changes to the government).

Here, the contracts at issue do *not* unmistakably confer a contract right to be immune from future changes in the law, such as the ESA. See Compl. Ex. 1-14. Nothing in the contracts expressly grants Plaintiffs immunity from the effect of future changes in law such as the ESA, or

shifts the risk of such changes to the government. When reviewing similar Reclamation contracts, courts have consistently held that contractors are subject to future changes in the law, including the ESA. For example, in O'Neill v. United States, 50 F.3d 677 (9th Cir.), cert. denied, 516 U.S. 1028 (1995), water users within the Westlands Water District of the federal government's Central Valley Project (CVP) sought to prevent BOR from reducing deliveries of water under the district's 1963 water service contract (and a related stipulated judgment requiring the government to perform the 1963 contract). In rejecting this claim, the Ninth Circuit relied in part on the unmistakability doctrine, holding that nothing in the 1963 contract surrendered, in "unmistakable terms," Congress's sovereign power to enact subsequent legislation. 50 F.3d at 686. The subsequently-enacted legislation at issue in O'Neill included the ESA and the Central Valley Project Improvement Act (CVPIA), a CVP-specific piece of legislation that sought to achieve "a reasonable balance among competing demands for use of [CVP] water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors[,]" and required the Secretary to dedicate a specific quantity of project water to fish and wildlife purposes. O'Neill, 50 F.3d at 681 (quoting and citing provisions of the CVPIA). See also Maricopa-Stanfield Irrig. and Drainage Dist. v. United States, 158 F.3d 428, 438-39 (9th Cir. 1998) (declining to interpret Reclamation contracts as surrendering in unmistakable terms the sovereign's power to enact subsequent legislation that might affect the allocation of project water), cert. denied, 526 U.S. 1130 (1999).

Similarly, in Peterson v. Dept. of the Interior, 899 F.2d 799 (9th Cir. 1990), BOR contractors in the CVP and the Solano Project sought to prevent BOR from subjecting them to a provision of the Reclamation Reform Act of 1982, which redefined the qualifications for

receiving reclamation water at subsidized rates by imposing acreage limitations on the landholdings of qualified recipients. The water districts holding contracts with BOR argued that they had a contractual right to receive water at a subsidized rate to deliver to their water users without any such acreage limitation, and that the 1982 legislation impaired this right. The Ninth Circuit's rejection of this assertion included consideration of the unmistakability doctrine. Specifically, the Ninth Circuit examined the language of the contracts and found that they "contain no language that can be construed as a 'surrender[] in unmistakable terms' of the sovereign's ability to regulate the quantity of subsidized water that may be provided to leased farm lands." 899 F.2d at 812. The Peterson court also firmly rejected the notion that the right to be free from subsequently enacted legislation can be implied. 899 F.2d at 809-11. See also Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d at 1213 (Ninth Circuit stated that "[i]t is well settled that contractual arrangements can be altered by subsequent Congressional legislation" and held that the Reclamation power contract in question was subject to the ESA as well as tribal water rights (citing Merrion v. Jicarilla Apache Tribe, 455 U.S. at 147; O'Neill, 50 F.3d at 686)).[24]

In accord with these cases, the Court should find that the subject contracts do not waive, in unmistakable terms, the right of the United States to exercise its rights, as sovereign, to enact public and general legislation such as the ESA, and to enforce that legislation. Accordingly, the

[24]In Rio Grande Silvery Minnow v. Keys, 333 F.3d 1109 (10th Cir. 2003), vacated on other grounds, 355 F.3d 1215 (10th Cir. 2004), a concurring opinion by one of the three judges on the panel opined that the unmistakability doctrine applied to the Reclamation contracts at issue there, even though that legal issue had not been addressed by any of the parties. Id. at 1139-41. Under the particular facts of that case, the United States unsuccessfully argued that the BOR did not violate the ESA when it refused to reduce water deliveries to contractors.

Court should find that the unmistakability doctrine applies and precludes a finding that the United States breached the subject contracts in 2001.

IV. CONCLUSION

For the reasons set forth herein, Defendant's motion for summary judgment as to Plaintiffs' contract claims should be granted.

Dated: February 17, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

s/Kristine S. Tardiff
KRISTINE S. TARDIFF
Attorney of Record for the Defendant
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583
Fax: (603) 225-1577
E-Mail: kristine.tardiff@usdoj.gov

STEPHEN M. MACFARLANE
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, CA 95814-232
Tel: (916) 930-2204/Fax: (916) 930-2210

REGINALD T. BLADES, JR.
United States Department of Justice
Civil Division
Commercial Litigation Branch
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-7300/Fax: (202) 307-0972