IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 01-591 L |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Francis M. Allegra |
| Defendant, | ) | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S SUPPLEMENTAL APPENDIX**

**FILED IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AS TO PLAINTIFFS' CONTRACT CLAIMS**

**EXHIBITS 70 – 74**
**PAGES 597 – 655**

February 17, 2006

**INDEX OF EXHIBITS IN DEFENDANT'S SUPPLEMENTAL APPENDIX FILED IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**[1]


| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 59 | U.S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Summary of Listed Species, Species and Recovery Plans as of 2/15<br><br>Document generated from FWS website at: http://ecos.fws.gov/tess_public/TESSBoxscore (last visited on February 15, 2006) | 543 |
| 60 | U. S. Fish & Wildlife Service, Threatened and Endangered Species System (TESS), Map of Listed Species by State/Territory as of January 26, 2006.<br><br>Map available on FWS website at: http://ecos.fws.gov/tess_public/servlet/gov.doi.tess_public.servlets.TESSUsmap?status=listed (last visited on January 26, 2006) | 545 |
| 61 | Klamath Project 2001 Annual Operations Plan (dated April 6, 2001) | 546 |
| 62 | Letters from Bureau of Reclamation to Van Brimmer Ditch Co., and to Klamath Drainage District, dated Sept. 2, 2000 | 551 |


[1]Defendant's Exhibit ("Def. Ex.") numbers 1 through 42 are the exhibits contained in Defendant's Appendix (dated October 3, 2003) and Supplemental Appendix (dated March 31, 2004), both of which were filed in support of its Cross-Motion for Summary Judgment on plaintiffs' takings claims. Defendant's Exhibit numbers 43 through 58 are the exhibits contained in the Appendix filed in support of Defendant's Cross-Motion for Summary Judgment on the Question of Whether the Individual Plaintiffs' Have Standing to Bring Contract Claims as Intended Third-Party Beneficiaries (dated April 26, 2004). To avoid confusion in the numbering of exhibits, the additional exhibits attached hereto begin with exhibit number 59 and appendix page number 543.

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 63 | Letters from Department of the Interior officials responding to letters received by the Department concerning the operation of the Klamath Project in 2001. from early 2001 stating that "[f]orecasts of water supplies in the Klamath basin for the 2001 water year are currently nearly half of average conditions" | 555 |
| 64 | Letter from Bureau of Reclamation to Klamath Project Water Users, dated March 2, 2001. Subject: 2001 Operation Planning Update and Notice that Klamath Project Water Not Currently Available | 561 |
| 65 | Letters from Karl E. Wirkus, Area Manager, Bureau of Reclamation, Klamath Falls, to (A) NMFS, (B) FWS and (C) Klamath Tribes, dated Nov. 22, 2000. Subject: On-going Klamath Project Operations – Draft Biological Assessment | 563 |
| 66 | Letter from BOR to NMFS, dated January 22, 2001. Subject: Request for Initiation of Formal Consultation on the Effects of Ongoing Operations (without attachments) | 572 |
| 67 | Memorandum from BOR to FWS, dated February 13, 2001. Subject: Request for Reinitiation of Formal Consultatin on the Effects of Ongoing Operation of the Klamath Project | 575 |
| 68 | Biological Assessment of the Klamath Project's Continuing Operations on the SONCC coho salmon (dated Jan. 22, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 580 |

| EXHIBIT NO. | DESCRIPTION | BEGINNING PAGE NUMBER |
|---|---|---|
| 69 | Biological Assessment of the Klamath Project's Continuing Operations on the Endangered Lost River Sucker and Shortnose Sucker (dated Feb. 13, 2001) (excerpt)<br><br>Note: A full copy of this biological assessment is available at http://www.usbr.gov/mp/kbao/esa/index.html | 593 |
| 70 | Letter from FWS to Bureau of Reclamation, transmitting copy of Biological Opinion, dated April 5, 2001, and excerpt of the Biological Opinion<br><br>Note: a full copy of the FWS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 597 |
| 71 | Letter from NMFS to Bureau of Reclamation transmitting Biological Opinion, dated April 6, 2001, and excerpt of the Biological Opinion<br><br>Noted: a full copy of NMFS biological opinion for 2001 is available at http://www.usbr.gov/mp/kbao/esa/index.html | 635 |
| 72 | U.S. Department of the Interior, News Release, "Water Allocation Decision Announced for Klamath Project," dated April 6, 2001 | 651 |
| 73 | Letter from BOR to NMFS, dated April 20, 2001. Subject: BOR's Determination Regarding the Action Addressed in the NMFS April 6, 2001 Biological Opinion | 652 |
| 74 | Department of the Interior, Office of the Secretary, News Release, "Interior Secretary to Order Water Release to Klamath Farmers," dated July 24, 2001 | 654 |

United States Department of the Interior

FISH AND WILDLIFE SERVICE
**California/Nevada Operations Office**
**2800 Cottage Way, Room W-2606**
**Sacramento, California 95825**

In Reply Refer To: 1-10-01-F-018-4

APR - 5 2001

Memorandum

To: Regional Director, Bureau of Reclamation
Sacramento, California

From: Manager, California/Nevada Operations Office
Sacramento, California

Subject: Bureau of Reclamation's Proposed Operation of the Klamath Project

This document transmits the Fish and Wildlife Service's (Service or FWS) biological/conference opinions (BO) based on our review of the subject action in accordance with section 7 of the Endangered Species Act of 1973, as amended (Act; 16 U.S.C. 1531 et seq.). At issue are the effects of the proposed action on the endangered Lost River sucker (*Deltistes luxatus*; LRS), endangered shortnose sucker (*Chasmistes brevirostris*; SNS), threatened bald eagle (*Haliaeetus leucocephalus*), and proposed critical habitat for the Lost River and Shortnose suckers (collectively referred to as "suckers").

This BO was prepared with the knowledge that project inflow for 2001 indicates this is likely to be the driest year on record. The allocation of extremely limited water resources will inevitably result in major impacts to the Klamath Project and the Klamath River Basin. Very little water will be available for agriculture this year, and there is insufficient water to fully provide for the needs of species in project reservoirs and the Klamath River. Water will be largely unavailable for the National Wildlife Refuges located within the Project boundaries, where water supply for waterfowl and the food supply for resident and wintering eagles will be severely depleted.

Drought conditions in the Klamath Basin are severe this year, but scarce water availability is not unique to the Klamath Project and the Klamath River Basin. The extreme conditions this year emphasize the urgent need to engage all parties with interests in the water resources of the Klamath Project and the Klamath River Basin in serious discussions regarding long-term goals for Project operations and water allocation in the River basin, including upstream and downstream water diverters. Long-term solutions regarding water quality and quantity must be developed.

The Service and Reclamation are charged with ensuring that operation of the Klamath Project does not jeopardize continued existence of endangered and threatened species or adversely modify their critical habitat. Incorporated in this BO are conservation recommendations intended to encourage long-term solutions to water resource allocation in the Project and in the Klamath River Basin. The Service supports the initiation of a process to develop long-term solutions and stands ready to participate and assist in developing solutions that will help avert the need to make difficult decisions with major impacts in the Klamath Project and in the Klamath River Basin during low water years.

This BO is issued in response to the Bureau of Reclamation's (Reclamation or USBR) final biological assessment (BA) for operation of the Klamath Project, which was received by the Service on February 13, 2001. Although the Bureau's request for consultation did not include the bald eagle, an analysis of Project effects on the eagle is included in this BO for the reasons discussed in the "Consultation History" section of this document.

On March 30, 2001, Reclamation formally requested that this BO remain valid only until April 1, 2002. Reinitiation of formal consultation will be necessary to address Reclamation's continued operation of the Project beyond April 1, 2002. To assist Reclamation in planning for long-term operation of the Project and in recognition of Reclamation's request to complete this consultation by April 2, 2001, we have retained the scope of analysis of effects of the proposed action on listed species/proposed critical habitat used in the March 13, 2001, draft of this BO which was based on the project description in Reclamation's final BA, dated February 13, 2001.

This BO is based on: (1) information presented in Reclamation's final BA dated February 13, 2001; (2) information presented in previous BAs and BOs addressing operation of the Project; (3) information obtained from Reclamation in meetings regarding operation of the Project, and from the results of ongoing field research activities; (4) information provided in published and unpublished reports on the biology, distribution, systematics, and status of the affected listed species and the ecosystems upon which they depend; (5) communications with field researchers who have conducted, or are now conducting, research on the biology of affected listed species or the ecosystems upon which they depend; (6) other available commercial and scientific information; and (7) comments and reports received in response to reviews of the March 13, 2001, draft BO. A complete administrative record of this consultation is on file at the Service's Klamath Falls Fish and Wildlife Office.

This BO supercedes all previous Project-related BOs, except for those related to acrolein and other chemical applications, and portions of the 1996 BO addressing operations of PacifiCorps and the New Earth Company. It is our understanding that Reclamation is currently consolidating new information regarding the chemical application-related BOs and will reinitiate consultation on these actions in the near future. Based on new information developed since 1996, consultation on actions related to the operations of PacifiCorps and the New Earth Company addressed under the 1996 BO will be reinitiated as well.

# BIOLOGICAL/CONFERENCE OPINION
# REGARDING THE
# EFFECTS OF OPERATION OF THE
# BUREAU OF RECLAMATION'S KLAMATH PROJECT
# ON THE
# ENDANGERED LOST RIVER SUCKER (*Deltistes luxatus*)
# ENDANGERED SHORTNOSE SUCKER (*Chasmistes brevirostris*)
# THREATENED BALD EAGLE (*Haliaeetus leucocephalus*)
# AND
# PROPOSED CRITICAL HABITAT FOR THE LOST RIVER/SHORTNOSE SUCKERS

**Prepared**
**by**
**Klamath Falls Fish and Wildlife Office**
**April 2001**

# Executive Summary

This document addresses the effects of operation of the Bureau of Reclamation's (Reclamation) Klamath Project (Project) for 2001 on the endangered Lost River sucker (LRS), endangered shortnose sucker (SNS), threatened bald eagle, and proposed critical habitat for the LRS and SNS (collectively, suckers). The Project delivers water to about 220,000 acres of irrigated agriculture in the upper Klamath River Basin (Basin) in south-central Oregon (Klamath County) and northern California (Modoc and Siskiyou counties), as well as to the Tule Lake and Lower Klamath National Wildlife Refuges (NWRs). The Project consists of three main reservoirs with a total surface area of about 100,000 acres, many miles of canals and ditches, and numerous water control structures, pumps, and other structures. Interrelated and interdependent with the proposed action is operation of Pacific Corps's hydroelectric facilities on the Link River and New Earth Corporation's algae harvest facility at the "C-drop" off of the A-canal.

Previous biological opinions (BOs) for the Project included determinations by the Fish and Wildlife Service (Service) that implementation of the action, as proposed, was likely to jeopardize the continued existence of the LRS and SNS. The two endangered sucker species are endemic to the Basin. The three major Project reservoirs [Upper Klamath Lake (UKL), Clear Lake, and Gerber Reservoir] represent their primary habitats. Tule Lake once supported a large population of suckers but habitat conditions there are now so degraded that only a few hundred suckers remain. Sucker populations in Clear Lake and Gerber Reservoir appear healthy, but are vulnerable to the adverse effects of droughts. Sucker populations in the Tule Lake sump are extremely small and population viability is at risk from reductions in water depth, adverse water quality, and lack of access to spawning areas. Sucker populations in UKL are at risk of extirpation from adverse water quality, loss of habitat, entrainment, and lack of passage. Populations of LRS are most at risk because self-reproducing populations are found in only two reservoirs and the viability of these populations is not assured.

The environmental baseline for the suckers is characterized by degraded aquatic ecosystems throughout the Basin. The baseline has been adversely affected over the past 150 years by agriculture, grazing, forestry, and to a smaller degree, urbanization. Development of the Project and interrelated and interdependent actions have been the major factors contributing to the loss and degradation of aquatic habitats in the Basin, and the endangered status of the two suckers. Nearly all Basin streams and rivers have been degraded, some seriously, by the loss of riparian vegetation, geomorphic changes, introduction of return flows from agricultural drainage ditches and water pumped from drained wetlands, stream channelization, dams, and flow reductions from agricultural and hydroelectric diversions. Most water bodies in the Basin fail to meet state water quality criteria. Wetland losses have been especially significant since they provide habitat for larval and juvenile suckers and have crucial water quality functions. Along the perimeter of UKL, about 40,000 acres of wetlands have been diked and drained for agriculture; elsewhere in the Basin, wetland losses are even larger.

Restoration of wetlands and riparian habitats on private and public lands, and implementation of Clean Water Act regulations (e.g., Total Maximum Daily Load limits) will bring much needed water quality and habitat improvements and will reduce threats and contribute to the conservation

of the suckers. However, it has taken over a century to create the current conditions in the Basin, and it will take decades for restorative actions to be fully implemented and functional.

At UKL, implementation of the action, as proposed, is likely to have the following effects on the suckers and their proposed critical habitat:

1. Significantly increase the loss of larval and juvenile sucker habitat at critical phases of their life cycle which will reduce the frequency and magnitude of year-class development;

2. Significantly increase the loss of all life stages, but especially larvae, through entrainment;

3. Block passage of suckers into areas of preferred habitat or to spawning areas which will reduce their survival and reproduction;

4. Increase the frequency and magnitude of potentially lethal water quality conditions by lowered lake levels which will optimize light and nutrient conditions that will facilitate algal blooms. These blooms adversely affect the survival of all life history stages of the suckers, and the reproduction of adults;

5. Contribute to poor water quality conditions during algal decay cycles by reducing lake volume/surface ratios that influence dissolved oxygen concentrations. These conditions will adversely affect the survival of all sucker life history stages, but will especially reduce the number of adults, and limit their longevity and reproductive potential;

6. Contribute to the loss of or reduction of access of suckers to water quality refuge areas that are critical to ensure adult sucker survival; and

7. Reduce lake volume/surface ratios during winter ice-cover conditions that influence dissolved oxygen concentrations which will contribute to potentially lethal water quality conditions that could adversely affect adult and juvenile survival.

At Clear Lake, Gerber Reservoir, and the Tule Lake sump, implementation of the action, as proposed, is likely to have the following effects on the suckers and their proposed critical habitat:

1. Block passage of suckers into areas of preferred habitat or to spawning areas in Clear Lake and the Tule Lake sump, which will reduce sucker survival and reproduction;

2. Reduce water volume in summer and fall when water temperatures and respiration rates are high and lead to stressful/lethal conditions for suckers, and also make them more vulnerable to disease and predators; and

3. Reduce water volume/surface ratios during winter ice-cover conditions that influence dissolved oxygen concentrations which will contribute to potentially lethal water quality conditions that are likely to reduce adult and juvenile sucker survival.

Collectively, these effects are likely to appreciably reduce the survival and recovery of the suckers and appreciably diminish the value of the primary constituent elements of proposed sucker critical habitat. On that basis, the Service concludes that implementation of the Project, as proposed, in calendar year 2001 is likely to jeopardize the continued existence of the suckers and adversely modify their proposed critical habitat.

The proposed action is likely to result in a significant reduction or elimination of the prey base for the bald eagle in the Basin due to reduced or curtailed water deliveries to areas that contain important eagle feeding habitat. Water deliveries to critical wetlands in Tule Lake and Lower Klamath NWRs attract millions of migrating waterfowl and hold a portion of them through the winter, thereby providing food for bald eagles. The wintering population of bald eagles on the refuges is one of the largest outside of Alaska. It includes birds from Canada, the Pacific Northwest, and California and consists of 150 to 900 eagles annually. Although these effects are considered significant, the Service has concluded that they are not likely to jeopardize the continued existence of the bald eagle.

A RPA has been developed for the proposed action that avoids effects that are likely to jeopardize the continued existence of the suckers and adverse modification of their proposed critical habitat. The RPA requires: (a) maintenance of minimum lake elevations in Project reservoirs; (b) coordination with the Service and the National Marine Fisheries Service in the development of Project operation plans during low water years; (c) adaptive management of water quality through monitoring and reporting; (d) installation of screens at the A-canal and Link River Dam; (e) adequate passage facilities at Link River Dam; (f) habitat and water quality improvements; and (g) additional studies to be completed to obtain information that Reclamation can use to refine reservoir management to adequately protect the suckers and their proposed critical habitat.

With implementation of the RPA, incidental take of suckers is anticipated. Under the Incidental Take Statement in this BO, Reclamation is required to implement reasonable and prudent measures (RPMs) to minimize the impacts of that take. Some of these measures were previously required, but have not yet been implemented or completed. Incidental take of bald eagles is also anticipated and this opinion also includes RPMs to minimize the impacts of that take.

This BO supercedes all previous Project-related BOs, including that portion of the Service's 1996 BO on Pacific Corp's operation of the Link River Dam and New Earth Company's operation of the C-drop harvest site, and excepting those BOs associated with Reclamation's application of acrolein and other chemicals.

## I.1 CONSULTATION HISTORY

### Consultation History

The Bureau's request for reinitiation of consultation on the 1992 BO was received by the Service on December 18, 1999, and acknowledged in writing on December 29, 1999.

On April 26, 2000, Reclamation provided the Service with a memorandum stating "the BA will be provided to the Service on about June 1, 2000."

On June 20, 2000, the Service provided written clarification on what the Act required in an adequate BA, including comments on the draft "Preliminary Report Describing Historic Project Operations."

On September 2, 2000, Reclamation provided the Service with a letter stating that "Reclamation now anticipates that the BA will be provided to the Service on October 1, 2000."

On September 27, 2000, the Service received a schedule from Reclamation outlining the on-going consultation on the Project showing that the draft BA would be provided to the Service in October 2000.

A draft BA was provided to the Service on November 8, 2000, and the Service provided written comments on November 21, 2000.

A second draft BA was provided to the Service on November 22, 2000, and the Service provided additional written comments on December 19, 2000. Additional written comments were sent to Reclamation on January 19, 2001.

The final BA was received on February 13, 2001, about 45 days prior to the start of Project operations in April.

New information on the potential adverse effects of low lake levels on suckers, developed since the1992 BO, and massive sucker die-offs in UKL in the 1990s, indicated that higher minimum UKL levels were necessary to reduce the risk of extinction of the suckers. Some of the new information was utilized by Reclamation to manage UKL, beginning in 1997, with a new minimum September 30 elevation of 4139 ft (Table I-2). This new information was also used by Reclamation in September 2000, when it sent a letter to the Service describing the need to maintain a minimum surface elevation of 4139.0 ft in UKL by September 30 to avoid violation of section 7(d) of the Act (Table I-2).

Table I-2. Upper Klamath Lake minimum surface elevations (in feet above mean sea level).

| Date | 1992 BO | 1997-200 "Low Range Elevations" | 2001 BA Minimums |
|---|---|---|---|
| April | 4141 | 4142.6 | 4141.1 |
| May | 4141 | 4142.6 | 4140.4 |
| June | 4139 (4137)[1] | | 4139.5 |
| July | 4139 (4137)[1] | 4141.6 | 4138.8 |
| August | 4139 (4137)[1] | | 4137.5 |
| September | 4139 (4137)[1] | 4139 | 4136.8 |
| October | 4139 | | 4136.9 |
| November | 4139 | | 4137.8 |
| December | 4139 | 4140 | 4138.6 |
| January | 4139 | | 4139.5 |
| February | 4139 | 4141.5 | 4140.1 |
| March | 4141 | | 4141.1 |

[1] The minimum surface elevation of 4139 ft could be compromised in no more than 4 of 10 years with a minimum elevation of 4137 ft. The lowest proposed minimum September 30 surface elevation in the final BA is 4136.8 ft. (Table I-2), which is more than 2 ft below the elevation Reclamation previously considered minimally necessary to protect the suckers, and is more than 3 ft below the level that the Service recommended in its informal consultation stage, technical assistance memos dated December 19, 2000, and January 19, 2001.

Table I-3, below, summarizes previous section 7 consultations on the Klamath Project. A portion of the information used in this BO is available on Reclamation's web site: http://www.mp.usbr.gov/kbao/esa/index.html.

Table 3. Consultation history for the Klamath Project.

| Date | Subject of Consultation | Affected Listed Species | Determination |
|---|---|---|---|
| June 14, 1989 (superceded by this BO) | Formal Consultation--Use of Acrolein in Canals and Drains within the Klamath Project Service area. | Shortnose sucker<br>Lost River sucker | Likely to jeopardize. |
| August 14, 1991 (superceded by this BO) | Formal Consultation-- Effects of the 1991 operation of the Klamath Project. | Shortnose sucker<br>Lost River sucker<br><br>Bald Eagle<br><br>American Peregrine Falcon | Likely to jeopardize the sucker species.<br><br>No jeopardy to the Bald Eagle.<br><br>No effect to the American Peregrine Falcon. |
| January 6, 1992 (superceded by this BO) | Formal Consultation-- Effects of the 1992 operation of the Klamath Project (interim biological opinion) | Shortnose sucker<br>Lost River sucker<br>Bald Eagle<br><br>American Peregrine Falcon | Not likely to jeopardize the sucker species or the Bald Eagle.<br><br>No effect to the American Peregrine Falcon. |
| March 27, 1992 (superceded by this BO) | Reinitiation of Formal Consultation-- Effects of the 1992 operation of the Klamath Project. | Shortnose sucker<br>Lost River sucker<br><br>Bald Eagle<br><br>American Peregrine Falcon | Likely to jeopardize the sucker species.<br><br>No jeopardy to the Bald Eagle.<br><br>No effect to the American Peregrine Falcon. |
| May 1, 1992 (superceded by this BO) | Reinitiation of Formal Consultation-- Effects of the 1992 operation of the Klamath Project at Clear Lake Reservoir. | Shortnose sucker<br>Lost River sucker<br>Bald Eagle<br>American Peregrine Falcon | No jeopardy to the affected species. |
| July 22, 1992 (superceded by this BO) | Formal Consultation--Effect of the long-term operation of the Klamath Project. | Shortnose sucker<br>Lost River sucker<br><br>Bald Eagle<br><br>American Peregrine Falcon | Likely to jeopardize the sucker species.<br><br>No jeopardy to the Bald Eagle.<br><br>No effect to the American Peregrine Falcon. |
| February 22, 1993 (superceded by this BO) | Reinitiation of Formal Consultation on the long-term operation of the Klamath Project - Upper Klamath Lake operations. | Shortnose sucker<br>Lost River sucker | One-year modification of lake elevation 4141.0 on March 1, 1993. |
| August 11, 1994 (superceded by this BO) | Reinitiation of Formal Consultation on the long-term operation of the Klamath Project, with special reference to operations at Clear Lake Reservoir. | Shortnose sucker<br>Lost River sucker<br>Bald Eagle<br>American Peregrine Falcon | Established new minimum elevation for Clear Lake Reservoir. |
| February 9, 1995 (superceded by this BO) | Formal Consultation on the use of pesticides and fertilizers on Federal lease lands and acrolein and herbicide use on the Klamath Project rights-of-way located on the Klamath Project (reinitiation of consultation on the use of acrolein for aquatic weed control in Reclamation canals and drains). | Shortnose sucker<br>Lost River sucker<br><br>Bald Eagle<br>American Peregrine Falcon<br>Applegate's milkvetch | Not likely to jeopardize the sucker species.<br><br>No effect to the Bald Eagle, American Peregrine Falcon, or Applegate's milkvetch. |

| | | | |
|---|---|---|---|
| February 2, 1996 (superceded by this BO) | Reinitiation of Consultation on the use of pesticides and fertilizers on federal lease lands and acrolein and herbicide use on the Klamath Project rights-of-way located on the Klamath Project. | Shortnose sucker<br>Lost River sucker<br>Bald Eagle<br>American Peregrine Falcon | Not likely to jeopardize the affected species. |
| July 15, 1996 (superceded in part by this BO) | Reintiation of Consultation on PacifiCorp and The New Earth Company Operations, as Permitted by the Bureau of Reclamation on the Klamath Project | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| April 2, 1998 (superceded by this BO) | Amendment to July 22, 1992 BO to extend date for completion of A-canal screen until 2002 | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| April 20, 1998 (superceded by this BO) | Amendment to the 1992 BO to cover Operation of Agency Lake Ranch Impoundment | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| April 21, 1998 (superceded by this BO) | Amendment to July 15, 1996 consultation on PacifiCorp and The New Earth Company Operations, as Permitted by the Bureau of Reclamation on the Klamath Project | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| July 13, 1998 (superceded by this BO) | Amendment to the 1992 BO dealing with Anderson-Rose releases | Shortnose sucker<br>Lost River sucker | Not likely to jeopardize the affected species. |
| April 15, 1999 (superceded by this BO) | Amendment to the 1996 BO addressing lowered water levels in Upper Klamath Lake to reduce risk of flooding in spring 1999 | Lost River sucker<br>Shortnose sucker | Not likely to jeopardize the affected species. |
| August 18, 1999 (superceded by this BO) | Amendment to the 1995 BO on use of pesticides and fertilizers on leased lands and use of acrolein in canals operated by the Langell Valley Irrigation | Lost River sucker<br>Shortnose sucker | Not likely to jeopardize the affected species. |
| September 10, 1999 (superceded by this BO) | Revised amendment to the 1992 BO to cover operations and maintenance of Agency Lake Ranch impoundment | Lost River sucker<br>Shortnose sucker | Not likely to jeopardize the affected species. |

## History of Previous Biological Opinion Requirements Being Incorporated

The BA describes Reclamation's compliance with reasonable and prudent alternatives, and terms and conditions associated with 1992, 1994, and 1996 BOs (Service 1992, 1994b, 1996). For the most part, Reclamation has complied with those requirements (USBR 2001). However, several requirements from previous biological opinions that were not completely satisfied, as discussed below, are incorporated in this BO.

## A-Canal Screening

Reclamation was required to reduce entrainment of larval, juvenile, and adult suckers into the A-Canal by July 1997. In 1995, Reclamation provided a grant to the Klamath Irrigation District (KID) to evaluate sucker entrainment and identify alternatives for entrainment reduction. A final report was completed in 1997 (Natural Resource Scientists 1997). Several meetings were held in 1995 and 1996 to discuss this issue with representatives of the KID, Tule Lake Irrigation District (TID),

Oregon Department of Fish and Wildlife (ODFW), Cell Tech, Reclamation and the Service. From these meetings, the group agreed that entrainment reduction strategies and associated fish passage issues at Link River Dam should be integrated.

Subsequently, the UKL Entrainment and Fish Passage Working Group was formed to integrate all fish entrainment and passage issues. The working group consists of Reclamation, Klamath Tribes, Service, KID, Cell Tech, PacifiCorp, TID, and ODFW. Reclamation facilitated meetings 2-3 times per year from 1997 through 1999 to discuss progress and recommend future activities.

In 1997, the Service requested that Reclamation conduct additional entrainment monitoring on the A-Canal to compare with entrainment monitoring data from Link River Dam and B- and C-Canals. Reclamation funded an A-Canal fish entrainment monitoring study in 1997 and 1998 (Gutermuth et al. 2000a). In 1998, Cell Tech evaluated several mesh sizes of wedge-wire screen material to determine debris loading characteristics and sizes of fish that were excluded (Gutermuth 1999). On April 2, 1998, the Service amended the July 22, 1992, BO extending the date for entrainment reduction to July 22, 2002.

In 1999, Reclamation's Klamath Basin Area Office hired a fish passage biologist to coordinate Reclamation's fish entrainment and passage activities. The University of Wyoming was contracted to conduct swimming performance tests of juvenile LRS suckers in a range of water temperatures to help with the development of fish screen facility criteria (Meyer 1999). In 1999, Reclamation also performed field evaluations of Reclamation's Universal Stream Bottom Retrievable Flat Plate Fish Screen. Preliminary results were promising and plans were made to test two, 100 cubic feet per second (cfs), Reclamation-designed screens in the A-Canal during the 2000 irrigation season. Reclamation proceeded with the development of preliminary designs for the test installation during the fall of 1999 and developed draft specification and final drawings of the screens in the spring of 2000.

In a March 29, 2000, letter to Reclamation, KID did not support the testing of Reclamation's prototype screen and instead wanted to pursue other flat plate screen alternatives. Reclamation and KID met with the Service and ODFW to discuss the conceptual screen designs and identify acceptable design criteria. Reclamation has provided KID with a grant to develop preliminary designs for A-Canal screens.

On June 29, 2000, the Service met with ODFW and KID to develop screening criteria. The agreed-upon screening criteria was to be that used by the National Marine Fisheries Service (NMFS) in the Pacific Northwest, with several minor exceptions (Appendix 1).

**Link River Dam Fish Ladder**

A July 15, 1996, BO addressing PacifiCorp and New Earth Corporation operations as permitted by Reclamation required that Reclamation complete a fish ladder report by December 31, 1998 (Service 1996). That report has not been completed. Reclamation has been working on fish passage issues since early 1998, when the Service requested Reclamation lead the UKL Entrainment and Fish Passage Working Group. Reclamation, with assistance from fish passage engineers from the

Denver Technical Service Center, developed conceptual designs for a new ladder at Link River Dam in the fall of 1999 (USBR, unpubl. data). The Service has not seen these designs.

**Other Biological Opinion Requirements**

The 1992 BO required that Reclamation develop and implement a long-term plan to avoid and minimize incidental take associated with the Project. A draft plan was developed during the summer of 1995 and circulated to the Service and state resource agencies. The Service is not aware that Reclamation has taken any action to finalize or implement this plan.

The 1992 BO also required that Reclamation conduct a comprehensive survey of the Project service area to delineate the location of potential sources of take, develop and implement a program to reduce or eliminate this take, and for education purposes notify landowners and/or irrigation districts that the potential for take exists and advise them of protection afforded listed species under the Act. This activity was to be completed by July 22, 1995. On February 15, 2001, Reclamation provided the Service with an inventory of Project water diversions that potentially entrain endangered suckers; 193 diversions were identified. According to the BA, Reclamation plans to complete the written report by September 2001. Reclamation has not notified the Service of when it plans to take actions to reduce entrainment at these diversions.

**Reclamation's Contributions to Sucker Recovery**

According to the BA, Reclamation has initiated or completed most of the Priority 1 and 2 action items identified in the *Lost River and Shortnose Sucker Recovery Plan*. Reclamation has funded over $10.5 M in ecosystem restoration projects benefitting the recovery of these species and has purchased the 7,200-acre Agency Lake Ranch.

## II.1 DESCRIPTION OF THE PROPOSED ACTION

### A. Definition of the Action Area

The "action area" is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action" 50 CFR 402.02. Based on information contained in the description of the proposed action, the status of the species, and the effects of the action, we have determined that the action area for this consultation extends from Iron Gate Dam upstream in the Klamath River to Link River Dam, including Lake Ewauna and Link River; Upper Klamath Lake to its highwater line, and tributaries as far upstream as are affected by Project operations; Clear Lake and Gerber Reservoir to their high water lines, and tributaries as far upstream as are affected by Project operations; the entire Lost River from Clear Lake Dam to the Tule Lake sumps, including all of Miller Creek, and any tributaries of the Lost River that are affected by Project actions. Also included in the action area are dams, canals, drains, and facilities owned or operated, or related by contract or agreement to Reclamation's Klamath Project, and the approximate 220,000 acres of irrigated land serviced by the Project. Service actions on Refuge lands serviced by the Project are not included because they will undergo separate section 7 consultation.

### B. Authorizations/Responsibilities/Obligations that Affect or Influence Project Operations

These include:

1. Reclamation Act of 1902. Project construction was authorized by the Secretary of the Interior on May 15, 1905, in accordance with the Reclamation Act of 1902. The Act of February 9, 1905 provides: "The Secretary of the Interior is hereby authorized in carrying out any irrigation project that may be undertaken by him under the terms and conditions of the national reclamation act and which may involve the changing of the levels of Lower or Little Klamath Lake, Tule or Rhett Lake, and Goose Lake, or any river or other body of water connected therewith, in the States of Oregon and California, to raise or lower the level of said lakes as may be necessary...";

2. The Klamath River Compact of 1957. Entered into between the states of Oregon and California and approved by the U.S. Congress, the compact establishes goals and objectives for the development and management of water resources of the Klamath River Basin;

3. Federal Energy Regulatory Commission (FERC) license, Project No. 2082. The license establishes terms and conditions for operation of the Eastside and Westside Powerplants at Link River Dam, J.C. Boyle, Copco No. 1 and No. 2, and Iron Gate hydroelectric projects and Keno Dam. This license sets certain minimum flows at IGD. Minimum flows, however, are subject to water availability and senior water rights. Pursuant to1956 contract with Reclamation, PacifiCorp operates Link River Dam and its appurtenant power generation facilities. Reclamation and PacifiCorp entered into a Letter Agreement on June 5, 1997, to clarify for FERC that PacifiCorp was operating Link River Dam pursuant to Reclamation authority and directives under the 1956 contract, because the 1997 Klamath Project annual operations plan required Klamath River flows that were both greater and less than those in PacifiCorp's FERC license. The Agreement has been extended each year to include that year's operation;

4. Endangered Species Act. Project operations affect four threatened and endangered species including the Lost River and shortnose suckers, southern Oregon/northern California coho

salmon and the bald eagle. In 1992, the Service issued BOs on the effects of the Project on the endangered suckers and the bald eagle; this opinion was amended in 1994. The Service provided "reasonable and prudent alternatives" (RPAs) regarding minimum water elevations in project reservoirs that would allow Project operation to continue without jeopardy to the listed species. A 1996 BO addresses the effects of operations by Reclamation permittees on suckers;

5. Tribal Trust. The United States has a trust responsibility to protect tribal trust resources. In general, the trust responsibility requires the United States to protect tribal fishing, gathering, hunting, and water rights, which are held in trust for the benefit of the tribes. Reclamation is obligated to ensure that Project operations not interfere with the tribes' senior water rights. With respect to the tribes' fishing rights, Reclamation must, pursuant to its trust responsibility and consistent with its other legal obligations, prevent activities under its control that would adversely affect those rights, even though those activities take place off reservation. Fishery and other resources in the Klamath River and Upper Klamath Lake provide religious, cultural, subsistence, and commercial support for the Klamath Basin Indian tribes. The Klamath Basin Indian tribes include the Klamath, Hoopa Valley, Karuk, and Yurok Tribes;

6. Refuge Water Supplies. Four national wildlife refuges lie adjacent to or within Project boundaries-Lower Klamath, Tule Lake, Clear Lake, and Upper Klamath Lake National Wildlife Refuges. The refuges either receive water from, or are associated with Project facilities; and

7. Contracts and Water Rights. The Project supplies water to irrigation districts and individual irrigators pursuant to contracts entered into with Reclamation, subject to the availability of water. These contracts and water rights are described in Reclamation's 1992 BA (Reclamation 1992a) and Report on Historic Operation (Reclamation 2000a). They are further discussed below as well.

## C. Reclamation's Proposed Action

The proposed action consists of Reclamation's operation of the Project, as a single entity, in accordance with historic operations. The Project includes a vast array of facilities (e.g., reservoirs, canals, pumping plants, diversions, and drains). These are all managed in concert for the unified purpose of running the Project. A partial description of project operations is presented in the BA prepared in 1992 (USBR 1992a) and a report (USBR 2000a) briefly describing historic project operations. More detailed descriptions of the project features and their operations are presented below under "Project Facilities and Operations".

In 1992 and1994 Bos, the Service determined that the Project would jeopardize the continued existence of the suckers and specified minimum lake and reservoir levels to avoid that effect, but since 1997, Reclamation has been operating at even higher minimum lake/reservoir levels to protect suckers. In this consultation, Reclamation proposes to operate the Project in a manner that meets or exceeds minimum lake levels that occurred during the period from 1960 to 1998. Under this proposal, Reclamation would maintain minimum lake levels that are lower than the levels it agreed to meet or exceed since 1997.

Four water year types are proposed for evaluation based upon inflows: (1) above average (>500,000 acre feet of inflow); (2) below average (312,000-500,000 acre feet); (3) dry (185,000 acre feet); and (4) critical dry (<185,000acre feet). These are determined using Reclamation's

benefit from these lands is that management will emphasize water quality improvement. Management actions on these lands that once contributed nutrients to UKL have been stopped or significantly reduced. Restoration on the Running Y Ranch Resort has included up to 1000 acres of marsh habitat. Other activities likely to occur include extensive riparian restoration along the major tributaries of UKL through fencing and improved grazing practices, and wetland restoration. The Nature Conservancy (TNC) and other partners recently purchased Tulana and Goose Bay Farms, totaling 8000 acres at the mouth of the Williamson River. Acquisition and restoration of this property has great potential for restoring sucker habitat and improving water quality in UKL. TNC has also purchased an additional 7,000 acres at Sycan Marsh, expanding its preserve to over 25,000 acres. This acquisition and restoration of the Marsh should improve water quality and hydrologic function in the Sycan and Sprague Rivers, tributaries to UKL. Other restoration projects are underway by ODFW and by private land owners. Restoration of aquatic habitats and uplands to improve watershed function will be essential for recovery of the suckers and other aquatic species. Such activities also will increase stream flows, raise the water table in pastures, increase wildlife habitat, and have other general benefits. Walker (2001) states that some improvement in water quality has already been detected since TP levels in UKL have been reduced by about 10% in the past decade. If anthropogenic phosphorus can be cut another 20 to 40%, it is anticipated that water quality in UKL will significantly improve.

## 5.0 CONCLUSION

After reviewing the current status of the LRS and SNS, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's biological and conference opinion that implementation of the Reclamation's operation plan for the Klamath Project is likely to jeopardize the continued existence of the LRS and SNS and adversely modify their proposed critical habitat. The Service reached these conclusions for the following reasons:

At Upper Klamath Lake, implementation of the action, as proposed, is likely to:

1. Significantly increase the loss of larval and juvenile sucker habitat at critical phases of their life cycle which will reduce the frequency and magnitude of year-class development;

2. Significantly increase the loss of all life stages, but especially larvae, through entrainment;

3. Block passage of suckers into areas of preferred habitat or to spawning areas which will reduce their survival and reproduction;

4. Increase the frequency and magnitude of potentially lethal water quality conditions by lowered lake levels which will optimize light and nutrient conditions that will facilitate algal blooms. These blooms adversely affect the survival of all life history stages of the suckers, and the reproduction of adults;

5. Contribute to poor water quality conditions during algal decay cycles by reducing lake volume/surface ratios that influence dissolved oxygen concentrations. These conditions will adversely affect the survival of all sucker life history stages, but will especially reduce the

number of adults, and limit their longevity and reproductive potential;

6. Contribute to the loss of or reduction of access of suckers to water quality refuge areas that are critical to ensure adult sucker survival; and
7. Reduce lake volume/surface ratios during winter ice-cover conditions that influence dissolved oxygen and un-ionized ammonia concentrations which will contribute to potentially lethal water quality conditions that could adversely affect adult and juvenile survival.

At Clear Lake, Gerber Reservoir, and the Tule Lake sump, implementation of the action, as proposed, is likely to:

5. Block passage of suckers into areas of preferred habitat or to spawning areas in Clear Lake and the Tule Lake sump, which will reduce sucker survival and reproduction;

6. Reduce water volume in summer and fall when water temperatures and respiration rates are high and lead to stressful/lethal conditions for suckers, and also make them more vulnerable to disease and predators; and

7. Reduce water volume/surface ratios during winter ice-cover conditions that influence dissolved oxygen concentrations and un-ionized ammonia will contribute to potentially lethal water quality conditions that are likely to reduce adult and juvenile sucker survival.

Collectively, these effects are likely to appreciably reduce the survival and recovery of the suckers and preclude the conservation needs of these species from being met, and appreciably diminish the value of critical habitat constituent elements essential to the conservation of the suckers.

## 6.0 REASONABLE AND PRUDENT ALTERNATIVES

Regulations implementing section 7 define reasonable and prudent alternatives as alternative actions identified during formal consultation that: (a) can be implemented in a manner consistent with the intended purpose of the action; (b) can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction; (c) are economically and technically feasible; and (d) would avoid the likelihood of jeopardizing the continued existence of listed species or result in the destruction or adverse modification of critical habitat (50 CFR 402.02). A reasonable and prudent alternative (with 8 elements) with respect to the proposed operation of the Klamath Project is as follows:

1. *Maintenance of Minimum Surface Elevations in Upper Klamath Lake*

Reclamation shall not divert water from UKL for irrigation purposes if surface elevations are anticipated to go below 4141.0 ft on January 1, 4141.5 ft on February 15, 4142.0 ft on March 15, 4142.5 ft on April 15 and June 1, 4141.5 ft on July 15, 4141.0 on August 15, 4140.5 ft on September 15, and 4140.0 ft on October 15, regardless of inflow year type.

Reclamation shall formally notify the Service as to how it will ensure that these levels will not be violated owing to gage error or malfunction, such as occurred in 2000. Reclamation shall be responsible for verification that UKL water level readings are accurate, at least to 0.05 ft.

Implementation of the Project with these minimum elevations is necessary to avoid jeopardy and adverse modification of proposed critical habitat for the following reasons:

A. Minimum surface elevations of 4141.0 ft on January 1, 4141.5 ft on February 15, 4142.0 ft on March 15, and 4142.5 ft on April 15 are necessary to provide adequate water depth in shore-line spawning habitat along the UKL eastern shore from February-May to ensure adequate development of LRS and SNS year classes. Suckers that spawn along the east shore of UKL represent a unique population that must be maintained to allow for survival and recovery of both LRS and SNS. Year-class development is essential to provide for future generations of suckers as adults die from fish kills, predation, or from other factors. These minimum surface elevations will provide adequate spawning habitat which constitutes a primary constituent element of proposed critical habitat. In this way, operation of the Project will provide, in part, for functional critical habitat.

B. Minimum surface elevations of 4142.5 ft on April 15 and June 1, 4141.5 ft on July 15, and 4141.0 on August 15 are necessary to provide adequate water depth in emergent vegetation habitat in the lower Williamson River and in UKL for larval and juvenile suckers to ensure adequate year-class development. Emergent vegetation habitat is critical for survival of larval and juvenile suckers which are essential to provide for future generations of suckers as adults die from fish kills, predation, or from other factors. These minimum surface elevations will avoid jeopardy and adverse modification of proposed critical habitat, in part, by providing adequate rearing habitat where young suckers feed and avoid predators.

C. Minimum surface elevations of 4142.5 ft on June 1, 4141.5 ft on July 15, 4141.0 on August 15, 4140.5 ft on September 15, and 4140.0 ft on October 15 are necessary to maintain adequate water depths in UKL to reduce the magnitude and frequency of fish kills resulting from lethal water-quality conditions as a result of algal blooms occurring between June and October. If the frequency and magnitude of the fish kills are not reduced LRS and SNS populations will decline and reproduction will be reduced. Without adequate adult survival and reproduction, extirpation of UKL populations is likely to occur due to a reduction in individuals of sufficient age (up to 10 years for LRS) to spawn, which are essential for long-term survival and recovery of the species.

   Implementation of the Project with these minimum surface elevations will avoid jeopardy, in part, by reducing the frequency and magnitude of fish kills involving the LRS and SNS and provide for a diverse year-class population structure that will be more resilient to stochastic events. Maintenance of good water quality will provide for adequate functioning of one of the primary constituent elements of proposed critical habitat.

D. Minimum surface elevations of 4141.5 ft on July 15, 4141.0 on August 15, 4140.5 ft on September 15, and 4140.0 ft on October 15 are needed to maintain adequate water depths in

water quality refuge habitat in Pelican Bay-Fish Bank areas in UKL from July to October to protect adult suckers from the lethal effects of adverse water quality conditions as a result of algal blooms. By ensuring adequate water depths in this refuge area, it will allow some suckers to find good water quality during periods when lethal water quality conditions exist over most of UKL. Without adequate adult survival, which is essential for survival and recovery of these species, extirpation of UKL sucker populations is likely to occur.

Implementation of the Project with these minimum surface elevations will avoid jeopardy, in part, by reducing the numbers of adult suckers that die in water quality-related fish kills and provide for a diverse year-class population structure that will be more resilient to stochastic events. Maintenance of good water quality will provide for adequate functioning of one of the primary constituent elements of proposed critical habitat.

E. Minimum surface elevations of 4140.0 ft on October 15, 4141.0 ft on January 1, 4141.5 ft on February 15, and 4142.0 ft on March 15 are needed to maintain adequate water depths in UKL to reduce risk of lethal water quality under ice-cover conditions from December to March to protect juvenile and adult suckers. High lake levels in October will ensure that adequate levels of dissolved oxygen (DO) will be present in the water column once UKL freezes in November or December. High water levels during freeze-up (generally November to March), will ensure adequate DO to support adult and juvenile suckers in winter when DO is decreased by sediment oxygen demand and an ice cover prevents atmospheric reaeration. These higher lake levels will also dilute and toxic un-ionized ammonia that might also build up under ice cover conditions when mixing is reduced. Without adequate winter survival, extirpation of these populations, which are essential for survival and recovery of these species, is likely to occur. These minimum surface elevations are also necessary to ensure there is some year-to-year carryover of water to address, in part, drought conditions. Carry-over will help maintain UKL elevations in critically-dry years when inflow might be inadequate to do so.

Implementation of the Project with these minimum surface elevations will avoid jeopardy, in part, by reducing the numbers of adult and juvenile suckers that die during the winter when UKL is covered by ice and oxygen is not reaching the water column, will help dilute un-ionized ammonia which becomes more toxic at lower temperatures, and will help maintain adequate depths during droughts; this will provide for a diverse year-class population structure that will be more resilient to stochastic events. Maintenance, in part, of adequate water quality will provide for adequate functioning of one of the primary constituent elements of proposed critical habitat.

2. *Operation Plan for Low Water Year*

The Service has determined that a minimum surface elevation of 4140 ft in UKL, as set forth in RPA component 1 above, is necessary to avoid Project effects that jeopardize the suckers and and adversely modify their proposed critical habitat. However, the Service anticipates there will be low water years where inflow is inadequate for Reclamation to meet both RPA component 1 and NMFS's RPA requirement for Klamath River flows downstream for the threatened coho salmon. When Reclamation anticipates, based on the best available information (e.g., the April 15, NRCS

forecasts and associated model output), that it will be unable to satisfy RPA component 1 and requirements for Klamath River flows for coho salmon, this RPA component 2 shall be implemented.

The coordination procedures set forth below outline the method by which FWS and NMFS shall develop a plan that will best satisfy the requirements of listed species in low water years where inflow is inadequate to satisfy both RPA component 1 and Klamath River flows downstream for the coho salmon. Reclamation shall incorporate the plan developed by FWS and NMFS into the Project operation plan for a low water year.

<u>Coordination Procedure for Low Water Years</u>:

1. Data Collection, Dissemination, and Analysis

   A. Reclamation shall provide FWS and NMFS with a projection of total available water in all Project lakes and reservoirs; this total will identify total available water for satisfaction of RPA component 1 and Klamath River flows downstream for coho salmon; and

   B. Reclamation, FWS, and NMFS shall provide and use current data and information to determine the status of listed species.

2. Coordination Between Federal, Tribal, and Other Parties

Representatives from Reclamation, FWS, and NMFS shall coordinate with representatives from USGS, OSU, ODFW, CDFG, BIA, affected Tribes, and other parties, as appropriate, to consider and discuss available options for Project operation during a low water year that maximize implementation of RPA components for FWS and NMFS listed species. FWS and NMFS shall consider the results of this discussion when the agencies coordinate to determine how to best satisfy RPA component 1 and Klamath River flows downstream for the coho salmon in order to best protect each listed species.

3. FWS and NMFS Coordination

FWS and NMFS shall coordinate to determine how to best satisfy RPA component number 1 and Klamath River flows downstream for the threatened coho salmon, and how to best protect each listed species. The agencies shall employ a risk analysis process to be concluded in no more than two or three days during which the following factors shall be considered:

   A. Data collected, disseminated, and analyzed during step 1 of this Coordination Procedure;

   B. Results of discussions with Federal, Tribal, and other parties;

   C. Minimum UKL surface levels required by RPA component 1 and NMFS's RPA

requirement for Klamath River flows downstream for the threatened coho salmon;

D. Current status of affected listed species, including:

1. Location, size and movement of young-of-the-year and juvenile fish;

2. Water quality in Project lakes and reservoirs and Klamath River below IGD in relation to anticipated water supply; and

3. Other risk factors, such as status of *AFA* blooms and potential DO demands; observed or anticipated fish kills; presence of pathogens; anticipated discharges of UKL springs that could affect water quality refuge areas; and any other relevant factors.

E. Implementation of emergency contingency measures to avoid impending extirpation or extinction for each listed species:

1. For suckers: FWS, NMFS, BOR, and other relevant Federal and State agencies and Tribes, potentially including USGS, ODFW, CDFG, and BIA, will immediately convene to determine most appropriate course of action, relating to: (1) adverse water quality most likely to occur between July and October resulting from low DO levels; and (2) lake and reservoir levels below those minimums specified in RPA component 1 likely to occur between September and October. Potential ways to improve DO levels to be considered include: oxygenation, aeration, and artificial mixing. Reclamation, in coordination with the Service and the agencies listed above, should develop a plan by August 2001 to use the best method to increase DO levels for each project lake and reservoir that can be immediately implemented should that need arise. Ongoing water quality monitoring in Project lakes and reservoirs (see RPA component 3 and RPM 4) will provide advance warning that DO levels are reaching levels where corrective action will be necessary.

2. Reclamation shall coordinate with the Service to ensure that a salvage plan for each reservoir is available for implementation by August 2001 should that become necessary to salvage suckers and move them to secure areas. Supplemental oxygenation, aeration, or mixing may be needed to minimize risk of hypoxia.

4. FWS and NMFS Coordination with Reclamation

FWS and NMFS shall provide, in writing, the results of the coordination and risk analysis process to Reclamation with detailed instructions regarding measures that must be implemented to best protect each listed species.

Results of Implementing the Coordination Procedure for 2001

In March 2001, Reclamation informed the Service that water supplies were inadequate to satisfy RPA component 1 and NMFS's RPA requirement for Klamath River flows downstream for the threatened coho salmon. Consequently, the Service and NMFS implemented the coordination procedure described above.

As a result of implementing the Coordination Procedure, the Service determines that, based on the available water supply for 2001 identified by Reclamation, a deviation from the required minimum surface elevation of 4140 ft in UKL under RPA component 1 is warranted in order to address the conservation needs of both suckers and coho salmon during this low water year so long as the minimum surface elevation of 4140 ft in UKL is sustained on a long-term basis. In addition, the Service and NMFS may direct implementation of the contingency measures identified as a result of this Coordination Procedure in order to ensure that long-term viability of the species are maintained.

The information considered during this Coordination Procedure is presented in Appendix 2 of this BO, along with the specific instructions for allocating available water supplies.

3. *Adaptive Management through Water Quality Monitoring and Reporting*

Reclamation shall, in coordination with the Service, plan and implement a water-quality/algal growth and nutrient cycling study/monitoring program for UKL that will provide information to be used by Reclamation to manage UKL. The plan shall focus on factors such as how lake levels affect: AFA growth, light availability, internal nutrient loading, DO levels, and how DO levels are affected by sediment DO demand during the summer and below an ice cover.

Because of the highly technical nature of these physical/chemical/biological interactions, and consistent with available funding, Reclamation, in cooperation with the Service and the U.S. Geological Survey (USGS), if available, shall convene a scientific review panel comprised of recognized experts in the field of freshwater primary production, especially scientists that have worked with algae, and nutrient cycling in shallow, hypereutrophic lakes. The panel's objective shall be to develop a multi-year study/monitoring plan for UKL that would further refine knowledge regarding lake management to reduce the frequency and/or magnitude of water quality-related fish kills. Based on recommendations from the panel, agencies, and Klamath Tribes, a draft multi-year monitoring plan shall be prepared by August 1, 2001.

Annual progress reports shall be prepared by Reclamation that synthesize monitoring data and make recommendations on ways to improve management of UKL so as to avoid catastrophic fish kills. The reports shall be distributed by January 1 of each year to the Service, Klamath Tribes, USGS and other Federal and State agencies [e.g., BIA, NMFS, ODEQ, ODFW, CDFG, and the North Coast Water Quality Control Board (NCWQCB)] for review and comment. The annual reports shall also be sent to the scientific panel for their comments. The comments will be used to revise the monitoring studies, if needed. Final reports shall be prepared as soon as projects are completed. Reclamation shall use the comments to revise the monitoring studies, if needed.

Reclamation shall seek funding for these monitoring and reporting requirements on an annual basis. The studies and reporting shall continue until water quality in UKL has improved to a point where it no longer is a significant threat to the survival and recovery of the suckers. These studies are necessary to provide better information on factors that cause lethal water quality in UKL in summer and below ice cover in winter. Adverse water quality is a major threat to the continued existence of the suckers. This information will avoid jeopardy by providing information that is crucial for better management of UKL to prevent water quality-related sucker die-offs.

4. *Entrainment Reduction and Fish Passage at A-Canal and Link River Dam and Monitoring and Restoration of Sucker Habitats from Keno to Link River*

A. Reclamation shall reduce sucker entrainment at A-Canal using criteria developed by the Service and ODFW at a June 29, 2000, meeting (Appendix 1). A-Canal screening shall be completed by July 22, 2002, as previously required under the July 22, 1992, BO, as amended on April 2, 1998. A draft plan and implementation schedule have already been presented to the Service and ODFW.

B. Reclamation or its designee shall reduce sucker entrainment at Link River Dam using screening or some comparable means of entrainment reduction by January 1, 2004. Unless consultation is reinitiated on the 1996 BO, a draft entrainment reduction plan and implementation schedule shall be presented to the Service and ODFW for approval by July 1, 2001.

In the interim, operational measures shall be implemented at the Link River Dam by Reclamation or its designee to reduce entrainment until screening is completed. PacifiCorp may be Reclamation's designee with respect to these requirements by virtue of the interrelated nature of its operations at Link River Dam. Because most of the entrainment appears to occur during a few months, primarily August and September, and is concentrated at night, entrainment shall be reduced by not diverting water through the west side hydrofacilities during August and September, and water diversions shall be reduced to the greatest extent possible at east side hydrofacilities (not more than 200 cfs) at night (dusk to dawn during periods when entrainment is likely to be most significant (>100 age 0 and older suckers/day). Incidental take monitoring shall be performed annually from July through October to determine when hydropower diversions need to be temporarily suspended or reduced.

C. By January 1, 2004, Reclamation or its designee shall provide adequate passage at Link River Dam for mature LRS and SNS. A draft of the Link River fish passage plan shall be provided to the Service by July 1, 2001, for review and comment. Passage facilities shall be adequate to pass LRS and SNS of all spawning sizes, approximately 25-30 cm FL and above. Reclamation or its designee shall conduct a study in the Link River to determine what instream flows will be necessary to allow passage and if there are other passage barriers in the Link River. In support of the plan, Reclamation or its designee shall monitor suckers in the lower Link River for a minimum of two years (with a provision for extending the study if the two-year data set is inadequate) beginning in 2002, to determine the timing of sucker movements in relationship to season and flows, sizes and species composition of suckers in the river, and the ability of

suckers to pass obstructions in the river below Link River Dam at different flows. Radio-tracking of adult suckers in the Keno-Link River reach is recommended as a means to determine when adult suckers migrate, and to provide information on habitat use in this reach, as described below.

Available entrainment data indicate that tens of thousands of juvenile suckers will annually be by-passed into the reach extending from lower Link River to Keno Dam, when necessary screening is in place. It is critical to determine if these fish have adequate habitat to ensure their survival. Therefore, Reclamation shall plan and implement a study to examine habitat requirements for suckers in the Link River, Lake Ewauna, and the Keno Reservoir. The study shall focus on what habitats are available to suckers and monitor sucker survival in these areas. If insufficient/inadequate habitat are available, Reclamation shall determine what restoration actions are needed and begin taking corrective actions after coordination with ODFW, ODEQ, Klamath Tribes, and the Service. The study plan shall be provided to the State resource agencies, Tribes, and the Service by September 1, 2001, for review and comment. The study and any necessary restoration shall continue until goals are achieved, as determined by the Service. Annual progress reports shall be provided to the Service, State resource agencies, and Klamath Tribes by January 1.

These actions are necessary to avoid jeopardy and adverse modification of proposed critical habitat for the following reasons. This biological opinion identifies entrainment by the Project as a major threat to suckers in UKL, amounting to the take of millions of suckers annually. Entrainment reduction is needed to prevent suckers from being harmed or killed in Project irrigation canals or in the Link River hydroproject diversions. Passage at Link River is needed to allow suckers, by-passed downstream by the Project, the ability to migrate back into UKL and upstream tributaries where they can complete their life cycle and spawn. There is no known spawning habitat between Link River and Keno Dam, nor is it known that larval habitat is present in this reach. Without adequate passage long-term survival and recovery of suckers in UKL is not likely to occur. Habitat studies are necessary to provide better information on habitat quality in the reach between Link River Dam and Keno Dam. Information obtained in the studies will be used to manage suckers in this reach and to direct habitat restoration and improvement actions. Implementation of these actions is likely to improve survival of suckers and ensure that downstream suckers spawn, which will provide for long-term population viability.

5. *Management of UKL Water Quality Refuge Areas and Emergent Vegetation Habitats*

A. Reclamation shall prepare a draft study plan for Service review and comment by August 1, 2001. The plan shall better determine the role of "water quality refuge" areas for adult sucker survival. The role of water quality refuge areas for suckers in UKL needs to be better understood because it has important ramifications for adult sucker survival. The plan shall build on existing radio-telemetry and water quality data and make necessary recommendations for additional studies. As soon as the plan is approved, Reclamation shall undertake the study and have a draft report with management recommendations prepared for the Service review and approval by January 1, 2003, and shall begin implementation once the plan is approved.

Annual progress reports are due each January 1 until completion.

These actions are necessary to avoid jeopardy and adverse modification of proposed critical habitat for the following reasons. In this biological opinion, the Service identifies water quality refuge habitats in UKL as essential for the long-term survival and recovery of LRS and SNS. Lake management is needed to ensure adequate water depths in these refuge areas to allow suckers to survive lethal water quality conditions. Adult survival is essential for the continued existence of the suckers. These studies are needed to further refine knowledge regarding management of water quality refuge areas so that the Project can be implemented in a manner that is compatible with the conservation needs of the suckers and their proposed critical habitat.

B. Reclamation shall draft a plan, by a mutually agreeable date, for Service, ODFW, and Klamath Tribes' review, to determine the role of emergent vegetation in larval/juvenile survival. Habitat needs for larval and juvenile suckers in UKL, including lower Williamson River, are not adequately known. This has direct bearing on water quality management because an elevation of 4140.0 ft represents a threshold where, at lower levels, emergent vegetation becomes unavailable to larvae and juveniles in UKL. The plan shall also address emergent wetland restoration needs. Reclamation shall provide the Service, ODFW, and Klamath Tribes with a draft final report by January 1, 2003.

6. *Maintain Minimum Lake Levels in Clear Lake, Gerber Reservoir, and the Tule Lake Sump*

A. *Clear Lake*. Reclamation shall not divert water from Clear Lake for irrigation in any year if surface elevations are anticipated to go below 4521 ft on September 30. This surface elevation is necessary to ensure that during severe droughts there is sufficient end-of-year carry over of water and to ensure sufficient water depths in winter to adequately provide for sucker survival and reproduction and to maintain the primary constituent elements of their proposed critical habitat.

Clear Lake is very shallow and this minimum surface elevation will protect the suckers by: increasing water depth to improve water quality, especially DO during summer months when DO levels and respiration rates of suckers are highest; reduce risk of disease, which is increased by crowding; reduce predation and parasitism; and reduce risk of low DO under ice-cover conditions in winter.

Clear Lake is very prone to drought conditions because of low precipitation, seepage, and evaporation. The most extended drought occurred in the 1922-1937 period, when only one year of above-average inflow occurred in 15 years. In the drought of 1987-1992, inflow was above average in only one of six years. Estimated inflows were only 51,310 acre-ft during the 1990-1991 water year and 23,350 acre-ft in the 1991-1992 water year. Up to 1993, the surface water elevation in Clear Lake at the end of October had steadily declined from 4,531.8 ft in 1989 to 4,526.8 ft in 1990, 4,522.5 ft in 1991, and 4,519.2 ft in October 1992 as a result of a drought and irrigation water deliveries. Clear Lake reached a minimum elevation of 4,519.2 ft,

representing 28,380 acre-ft in lake volume, in October 1992, the lowest elevation for this reservoir since 1935 and only 5% of the reservoir's total capacity. The east lobe of Clear Lake was completely dry except for a small pool of water near the dam. Surface elevations lower than 4524 ft in the months of February and March reduce sucker access to Willow Creek for spawning. In 1992, low lake levels in Clear Lake prevented suckers from migrating upstream in Willow Creek to spawn.

A primary concern for fish populations in a high elevation, shallow lake such as Clear Lake is the threat of low DO under an ice cover. In October 1992, the water surface elevation was 4519.2 ft before the onset of a hard winter, and no fish kills were observed. On that basis, the Service is assuming that 4519.0 ft is the minimum surface elevation (the "hard-floor") at which the sucker populations can survive through the winter. However, such low water levels create poor water quality conditions, particularly during cold winters when the ice cover is extensive, such as 1993. As a result, the Clear Lake populations of both sucker species were in poor condition in the spring of 1993 (Service 1994b).

B. *Gerber Reservoir*. Reclamation shall not divert water from Gerber Reservoir for irrigation in any year if surface elevations are anticipated to go below 4802 ft on September 30. This elevation is necessary to ensure that during severe droughts there will be sufficient end-of-year carry over of water, and to help ensure adequate DO levels are maintained in summer that adequately provide for sucker survival and reproduction, and maintenance of the primary constituent elements of their proposed critical habitat. Below an elevation of 4800 ft, Gerber Reservoir is a relatively deep 500-acre pool, which in the summer months is stratified and prone to be hypoxic. Suckers confined to this pool in summer are at risk because of low DO levels. In winter, there is less of a threat because the pool will likely be oxygenated prior to freeze-up.

In October 1992, following a 6-year drought, Gerber Reservoir reached a minimum elevation of 4796.4 ft, which is <1% of its maximum capacity. Aeration was used to maintain water quality during the summer. Reclamation biologists found that SNS in the reservoir at that time showed signs of stress including low body weight, poor gonadal development, and reduced juvenile growth rates (Buettner, USBR, pers. comm.). SNS captured in 1992 and spring 1993 were very thin compared to SNS from Clear Lake, Tule Lake Sump and UKL. Extremely low water levels, high turbidity, and low DO concentrations probably contributed to their poor condition.

C. *Tule Lake Sump 1 A*. Reclamation shall maintain a minimum surface elevation of 4034.6 ft in Sump 1-A from April l to September 30 of each year to provide suckers spawning access, dispersal of larvae, and rearing habitat. A minimum surface elevation of 4034.0 ft must be maintained from October l to March 31 of each year to ensure adequate depths to protect the suckers from predation and freezing.

Tule Lake Sumps are extremely shallow, averaging only a few feet deep. Sedimentation has removed approximately 90 percent of the water depth in emergent wetlands in these sumps and at this rate sucker habitat will disappear in a few years if nothing is done to stop sedimentation.

Radio-tracking data show that suckers use very little of the available habitat, probably as a result of low lake levels, and perhaps adverse water quality. Adequate depth is needed to ensure adult sucker habitat is maintained. A plan shall be developed and implemented, as discussed below, to reduce sedimentation, increase water depths, and allow for some variation in water levels that will promote the development of emergent wetlands.

*Finding that the RPA is Reasonable and Prudent*

Implementation of the RPA will adequately address the following conservation needs of the suckers and their proposed critical habitat: loss of larval habitat owing to low reservoir levels; take of juvenile suckers by entrainment; lack of adequate fish passage preventing suckers from reaching spawning habitat; water level management contributing to adverse water quality that leads to fish kills; sedimentation and poor water quality; access to water quality refuge areas (needed to protect adult suckers from adverse water quality conditions); and winter kill of suckers from low lake levels and ice cover conditions preventing reaeration to replace DO consumed by the sediment. Implementation of the RPA allows the Project to provide water for irrigation and Refuge use in most years and to provide to listed species in low water years.

Actions identified under the RPA such as managing lake levels, providing screening and passage, collecting water quality data and preparing reports, and planning to reduce water demand are actions within Reclamation's authority and jurisdiction.

Many of the actions identified in the RPA have been identified in previous jeopardy BOs for the Klamath Project as part of the RPA, but were not implemented. Costs of these actions, when amoritized over the long life of the Project, do not reach a level that is unreasonable. Under the authority of the Klamath Basin Water Supply Enhancement Act of 2000 (P.L. 106-498), Reclamation can undertake studies to reduce Project water demand and augment supply. Screening and fish passage are economically and technically feasible since they have been widely implemented by other Federal water development projects in the West, including most other Reclamation projects.

These Reasonable and Prudent Alternatives apply to calendar year 2001 operations and beyond. Pursuant to Reclamation's, request to limit the duration of this BO to one year, Reclamation's compliance with section 7(a)(2) provided herein will expire on April 2, 2002, unless Reclamation requests formal adoption of this BO for continued operation of the Project.

Because this biological opinion has found jeopardy, Reclamation is required to notify the Service of its final decision on the implementation of the reasonable and prudent alternative.

## 7.0 INCIDENTAL TAKE

This incidental take statement applies to incidental take of Lost River suckers and/or shortnose suckers resulting from the operation of the Project. It replaces the incidental take statements for all previous BOs addressing Reclamation's operation of the Klamath Project.

Sections 4(d) and 9 of the Act, as amended, prohibit taking (harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct) of listed species of fish or wildlife without a special exemption. Harm is further defined to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering. Harassment is defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is any take of listed animal species that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or the applicant. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered a prohibited taking provided that such taking is in compliance with the terms and conditions of this incidental take statement.

The measures described below are non-discretionary, and must be implemented by Reclamation so they become binding conditions of project authorization for the exemption under 7(o)(2) to apply. Reclamation has a continuing duty to regulate the activity that is covered by this incidental take statement. If Reclamation (1) fails to adhere to the terms and conditions of the incidental take statement through enforceable terms, and/or (2) fails to retain oversight to ensure compliance with these terms and conditions, the protective coverage of 7(o)(2) may lapse. In order to monitor the impact of incidental take, Reclamation must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement 50 CFR §402.14(i)(3).

The Service developed this incidental take statement based on the premise that the reasonable and prudent alternative will be implemented. In operating the Project as specified, the Service anticipates that LRS and/or SNS could be taken in the form of harassment, harm, or mortality.

**Quantification of Incidental Take**

The Service anticipates that take will occur in the form of harassment, harm, or mortality of LRS and/or SNS adults, juveniles, larvae, and eggs as a result of operating the Project in accordance with this BO. We anticipate that take will likely occur as a result of the following actions related to Project operations:

(a) Entrainment (resulting in harassment and/or mortality) from Clear Lake and Gerber Reservoir into the Lost River and any associated water delivery systems.

(b) Entrainment from Upper Klamath Lake through the A-canal and into any of the associated water delivery systems.

(c) Entrainment from Tule Lake via pumps or diversions into associated water delivery systems.

(d) Negative effects of poor water quality, chemical vegetation control, entrainment in pumps, increased predation, and desiccation (resulting in harassment and/or mortality) of suckers trapped in the water delivery systems including canals, drains, fields, head-

gates and turnouts, including Straits Drain.

(e) Entrapment (resulting in harassment and/or mortality) of suckers in the outlet structures of Gerber or Clear Lake Reservoirs when the water flow is reduced or stopped.

(f) Negative effects on suckers inhabiting the Project lakes and reservoirs when water quality or quantity is reduced to stressful/lethal levels (resulting in harassment and/or mortality).

(g) Entrainment at the Link River Dam hydrodiversions and blockage of passage at the Link River Dam (resulting in harassment and/or mortality).

(h) Entrainment at C-Drop harvest facility.

(i) Loss of habitat in Project reservoirs owing to water diversions (resulting in harm related to habitat loss).

Some quantification of incidental take has been described as a result of requirements in previous BOs. The results of that effort are briefly summarized below and are described in greater detail above in section 4.0 “Effects of the Action.”

**A-Canal Entrainment**

A-canal larval entrainment in1990 was estimated at approximately 400,000 individuals. In 1991, it was estimated that 800,000 sucker larvae were entrained into the A-Canal (Markle and Simon 1993). The 1996 and 1997 entrainment estimate for larval and early juvenile suckers was 3,000,000 (Gutermuth et al. 1997) and 1,700,000 (Gutermuth et al. 1998b), respectively. The total 1997 A-Canal entrainment index for juvenile and adult suckers was estimated at 47,000 suckers in 1997, and in1998 the entrainment index was 250,000 suckers (Gutermuth et al. 2000a). These values are best viewed as gross estimates of actual take. Given field conditions, these data are probably as good as can be expected. Because Klamath largescale suckers comprise some of the suckers and some suckers are salvaged, it might be argued that the entrainment estimates for LRS and SNS may be smaller than the totals provided above. However, owing to the short duration of the studies and low sampling efficiency of nets, and other factors, these estimates likely do not represent the maximum number of suckers entrained.

**Link River Dam Diversions Entrainment**

Fish entrainment studies were conducted at the two hydropower diversions on Link River Dam in 1997, 1998, and 1999 (Gutermuth et al. 1999, 2000b). An average of about 50,000 suckers per year, including Klamath largescale suckers, were entrained in the diversions. About 74% of these were <7.5 cm FL, 25% 7.5 to 15 cm FL, and 1% >15 cm FL. The East- and Westside powerhouses utilize Francis-type turbines. According to Reclamation’s entrainment mortality analysis, based on Eicher Associates (1987), between 10 and 26 percent of entrained fish at

Eastside and 20 to 26 percent of entrained fish at Westside perish. Mortality is related to size, with larger fish generally suffering higher rates of turbine mortality. Entrainment injury rates and delayed mortality are unknown, and assumed significant. Delayed mortality is a concern for most fish entrained at PacifiCorp's facility and passing downstream due to poor downstream water quality and habitat conditions in Link River and Lake Ewauna.

**Salvage Operations**

Reclamation has conducted salvage operations in Klamath Project canals receiving water from UKL yearly since 1991. Between 1996 and 1999, the numbers of suckers salvaged were 11,000 (1996), 2,400 (1997), 2,700 (1998), and 27,000 (1999) (USBR 2000b). Age 0 fish dominated the 1996, 1998 and 1999 salvage operations and age 1+ were predominant in 1997. From 6 to 354 suckers have been salvaged annually below Clear Lake Dam between 1991 and 1999. Observed mortalities during salvage operations are low (Peck 2000).

**Summary**

Known take of suckers as a result of Project operation amounts to approximately 1-4 million suckers annually, mostly larvae and juveniles. This estimate is best viewed as preliminary owing to temporal limitations, sampling biases, species identification difficulties, and other factors that provide uncertainty. Furthermore, these data are primarily for entrainment losses and do not quantify the other potential sources of mortality listed above. Therefore, we assume that total annual take of endangered suckers is about 2 to 6 million LRS and SNS, when all other sources of Project-related take are added. This level of take is significant, especially since it consists primarily of age 0 suckers from populations in UKL, and this is approximately the level of annual production of age 0 suckers in UKL. However, these losses are likely to be directly correlated with annual sucker production and only be at the highest level during years when reproduction and larval survival is highest.

In order for the Service to provide an RPA, the Service must have sufficient reason to conclude that any associated incidental take would not lead to jeopardy. Any associated RPMs would further reduce or eliminate such incidental take. In five previous opinions the Service has determined that the operation of the Klamath Project would likely jeopardize the continued existence of the LRS and SNS. In these opinions, the Service concluded that if the RPAs were implemented, jeopardy could be avoided. However, the RPAs have not been fully implemented and evidence now indicates that the two endangered sucker species are more imperilled than when previous opinions were issued.
The Service anticipates that up to 6 million total individuals of Lost River and shortnose suckers may be taken annually by Project operations. Approximately 75% of these would be age 0 suckers. Actions addressed by this incidental take statement, and the corresponding levels of take, comprise:

1) entrainment from Clear Lake and Gerber Reservoir into the Lost River and any associated water delivery systems (up to 0.1 million suckers annually);

2) entrainment from UKL through the A-Canal and Link River Dam hydropower diversions and into any of the associated water delivery systems (up to 4 million suckers annually);

(3) entrainment from Tule Lake via pumps or diversions into associated water delivery systems (up to 0.01 million suckers annually);

4) negative effects of poor water quality, chemical vegetation control, entrainment in pumps, increased predation, and desiccation of suckers trapped in the water delivery systems including canals, drains, fields, head-gates, turnouts and pumps (up to 0.01 million suckers annually);

5) entrapment of suckers in the outlet structures of Gerber or Clear Lake reservoirs when the water flow is stopped (100 suckers annually);

6) negative effects on suckers inhabiting the Project lakes and reservoirs when water quality or quantity is reduced to stressful levels (1 million suckers annually);

7) negative effects of annual salvage operations in Project canals (30,000 suckers annually);

8) sedimentation of Tule Lake Sump 1A (1,000 suckers);

9) all incidental take at Link River Dam hydrodiversions and the C-drop harvest facility (0.1 million suckers annually) and;

10) all incidental take in the three Project reservoirs that result from habitat loss resulting from lower water levels caused by water diversions; and

The BA does not address, nor does the Service have any information on, the level of incidental take caused by the Straits Drain.

The Service establishes the following reasonable and prudent measures to minimize anticipated incidental take of listed suckers. The Service concludes these measures are needed because Project operations are directly or indirectly resulting in substantial incidental take of suckers by: entrainment; passage blockage; habitat loss/degradation, including adversely impacting water quality and through dessication, blockage of passage, increasing frequency of disease, parasites, and predators.

**Effect of the Take**

This level of take (6 million larval, juvenile and adult LRS and SNS annually) is not anticipated to jeopardize the continued existence of LRS and SNS because: (1) this is the maximum potential take that would ever occur and it should not occur at this level every year; (2) take will mostly be of larvae which would show high levels of natural mortality owing to starvation and predation; (3) some take will be in the form of harm and will not necessarily lead to mortality; (4) some take will occur multiple times as suckers are harmed by Project operations that seasonally degrade habitat and water quality; and (5) salvage of suckers in Project canals can reduce the adverse effects of

take, other than direct mortality, by returning suckers to safe areas. However, in making this statement, we do anticipate significant adverse effects of this take to sucker populations in terms of numbers, reproduction, and distribution, but conclude that timely and full implementation of the RPA elements can reduce these adverse effects to a level that will avoid jeopardy.

### 7.1 Reasonable and Prudent Measures

The Service believes the following reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take of LRS and SNS:

1. Minimize entrainment losses of suckers by conducting salvage operations in the canal systems that emanate from UKL, Clear Lake, Tule Lake, and Gerber Reservoir after these canals have been drawn down.

2. Minimize all types of take associated with operation of the Klamath Project related to actions permitted or otherwise authorized by Reclamation.

3. Provide minimum instream flows downstream from Clear Lake and Gerber Reservoir to minimize incidental take associated with end-of-season dewatering.

4. Monitor water quality in all Project lakes and reservoirs, and other features such as canals and drains where water quality is likely to adversely affect endangered suckers and provide the Service with monthly summaries and analyses, and prepare annual reports that recommend solutions. Take actions to minimize incidental take associated with identified problems.

5. Take actions at Agency Lake Ranch to minimize entrainment of suckers and adverse effects of poor water quality.

6. Minimize incidental take in the Lost River.

7. Improve water quality in lower Link River and provide adequate minimum flows in Link River.

In order to be exempt from the prohibitions of section 9 of the Act, compliance with the following terms and conditions, which implement the reasonable and prudent measures described above, is required. These terms and conditions are non-discretionary.

### 7.2 Terms and Conditions

The following term and condition is provided to implement RPM #1:

1a. Reclamation shall continue to conduct annual salvage of suckers stranded in the canal systems and below outlet structures of dams. Salvage plans have been developed annually since 1991. A new plan is not necessary unless the 2001 plan is found to be inadequate. Annual reports describing salvage operations are to be sent to the Service, CDFG, ODFW, and

Klamath Tribes by January 1 each year.

The following term and condition is provided to implement RPM #2:

2a. Reclamation, in coordination with the Service, the Klamath Tribes, appropriate state agencies, USGS, state universities, and/or Reclamation's designees, shall provide the Service with a draft incidental-take minimization plan for review and comment. The plan shall address all facilities where endangered suckers may be taken where operations are permitted or otherwise authorized by Reclamation, such as operations by irrigation districts, and private uses of Project water, canals, and drains. Because nearly the entire Lost River system from Clear Lake and Gerber dams to the Tule Lake sumps have been severely altered, directly or indirectly, as a result of the Project, the plan must address measures throughout that system that will reduce take, including sedimentation of Sump 1A. The objective of this plan will be to minimize incidental take as much as is possible with a focus on all forms of incidental take including but not limited to: entrainment, loss of passage, and habitat loss and degradation, such as adverse water quality, dewatering of lake, river, and streams, loss of cover, sedimentation, and other forms of loss and degradation.

The plan will describe or provide: (1) an implementation schedule of take determination monitoring; (2) a list of all Project features, including private pumps, canals and drains that are interrelated or interdependent to the Project, as described above, where take is occurring, describing the extent and mechanism of take, and ranked according to level of take; (3) a description of take reduction measures and an implementation schedule of commencement and completion of take reduction measures; and (4) a monitoring plan to measure take-reduction effectiveness. Annual progress reports shall be sent to the Service, ODFW, CDFG, and Klamath Tribes on 1 January of each year, until implementation is successfully completed.

The following term and condition is provided to implement RPM #3:

3a. Reclamation shall develop and implement a plan (with coordination of affected irrigation districts) to provide annual minimum instream flows below Clear Lake and Gerber Reservoir dams following termination of irrigation releases, if water levels in the reservoirs are above minimums required by this BO, or otherwise deemed necessary to protect suckers by Reclamation and the Service. Once the plan is developed and approved by the Service, minimum flows will be released at the end of the irrigation season and water quality and habitat monitoring will be conducted to determine if flows are adequate to protect suckers in downstream reaches of Miller Creek and Lost River.

The following term and condition is provided to implement RPM #4:

4a. Reclamation shall monitor water quality in all Project lakes and reservoirs, and other features such as canals and drains, as well as water bodies affected by Project operations where water quality is likely to adversely affect endangered suckers. This includes Clear Lake, Gerber Reservoir, the entire Lost River and Tule Lake sumps, and UKL and Link River to Keno Dam. Reclamation, with available assistance of the Klamath Tribes, appropriate state

agencies, and water quality experts from USGS, state universities, and one or more water quality experts designated by Reclamation representing its contractors, licensees, or permittees, shall develop a draft water-quality monitoring and implementation plan to be presented to the Service, state resource agencies, and interested Indian tribes for review and approval by a mutually agreeable date.

Reclamation shall monitor Project water quality and develop monthly water-quality summaries and annual reports. The report will summarize and analyze water quality data and will provide detailed analyses relating to causes and effects. A monthly report shall be provided to the Service, CDFG, ODFW, ODEQ, NCWQB, and interested Indian Tribes on the first day following each month where water quality is a concern, but must include the months of June through October. Annual reports shall be delivered to the Service, CDFG, ODFW, ODEQ, NCWQB, and interested Indian Tribes, summarizing monthly reports with in-depth analyses of data, with emphasis on how water quality affects upon listed species and habitats, and recommendations for corrective actions to be implemented by Reclamation. Annual reports will also indicate which water-quality improvements have been implemented that year along with the status of those that have not been completed.

The following term and condition is provided to implement RPM #5:

5a. Reclamation shall develop and subsequently implement, upon Service approval, a long-term method to reduce entrainment at the Agency Lake Ranch diversion by January 1, 2002.

5b. Reclamation shall implement the September 7, 1999, salvage plan during periods of pumping at Agency Lake Ranch.

5c. Reclamation shall implement the existing, Service-approved water quality monitoring plan in the Ranch impoundment and at the point of discharge in Agency Lake during periods of pumping. The objective of the plan will be to avoid pumping water into Agency Lake that might adversely affect listed suckers. No water will be released from Agency Lake if it could lead to incidental take of suckers or degrade water quality in UKL to a point exceeding ODEQ-established criteria.

5d. Reclamation shall provide the Service with an annual fish salvage and fish and water quality monitoring report. The report shall analyze monitoring and salvage data and provide any recommendations that will minimize incidental take.

5e. Reclamation shall develop a comprehensive management plan for Agency Lake Ranch, specifically addressing how incidental take of listed species (suckers and bald eagles) will be minimized which shall be provided to the Service, ODEQ, ODFW, and Klamath Tribes.

The following terms and conditions are provided to implement RPM #6:

6a. Reclamation shall prepare a report on sucker habitat use in the Lost River system and document threats to suckers. A preliminary report using existing data will identify what

additional data are needed and shall be presented to the Service for review and comment. The report should include recommendations for: better management of Reclamation's Lost River dams to reduce take; improving habitat in the channelized reach in Langell Valley; improving spawning habitat in Big and Bonanza springs; reducing rapid changes in river stage owing to an imbalance between irrigation deliveries and withdrawals; and reducing sediment and nutrient loading. Reclamation, in consultation with the Service, shall determine if, based on the preliminary report, additional data must be collected to prepare a final report.

The following terms and conditions are provided to implement RPM #7:

7a. Reclamation shall take actions under its authority to ensure that water quality in lower Link River and adjacent Lake Ewauna is adequate to protect suckers by providing minimum flows of at least 250 cfs at Link River Dam during the summer when water quality is adverse. Reclamation shall determine how DO changes with flows from Link River Dam by continuously monitoring DO and levels of flow during June through October 2001. The results of those studies will be used to develop minimum flow schedules. Reclamation will provide the Service with a report on the water quality/flow monitoring and make recommendations on necessary minimum flows based on an analysis of the data. Reclamation shall maintain minimum flows for out years based on recommendations in the report and input from the Service, ODEQ, ODFW, and the Klamath Tribes.

This Incidental Take Statement applies to calendar year 2001 Project operations and beyond. Pursuant to Reclamation's, request to limit the duration of this BO to one year, the section 9 exemptions provided herein will expire on April 2, 2002, unless Reclamation requests formal adoption of this BO for continued operation of the Project.

### 7.2.1 Monitoring Requirements Under the Terms and Conditions

When incidental take is anticipated, the terms and conditions must include provisions for monitoring to report the progress of the action and its impact on the species. 50 CFR, 402.14(i)(3).

Since there is currently no on-going, Project-wide incidental take monitoring of listed suckers, Reclamation shall develop an incidental take monitoring/reporting plan. Implementation of this plan will focus on quantifying as much of the incidental take as is feasible. The Service recognizes that incidental take of larvae is difficult to monitor. Also, it may not be feasible to monitor all project activities because of the numerous Project facilities that result in incidental take. The Service will determine what is reasonable, based in part on Reclamation's analysis of what incidental take can be monitored.

Because monitoring will rely on estimates of incidental take developed by appropriate sampling, the plan should be reviewed by an expert in biostatistics, to ensure the estimates are as accurate as possible. The Service recommends that existing monitoring reports be reviewed by Reclamation to determine how best to proceed. The sampling and statistical analyses must be adequate for Reclamation and the Service to determine if/when incidental take levels are being

approached/have been exceeded.

Reclamation shall provide the Service, for review and comment, with a draft incidental take monitoring plan to be implemented upon Service approval. Annual reports will be sent to this office and to Service law enforcement in Klamath Falls each year. If Reclamation determines that authorized incidental take is exceeded, this office and the Service's law enforcement office in Klamath Falls must be notified. Reclamation will be responsible for ensuring that its licensees, contractors, or designees do not exceed authorized incidental take levels.

### 7.3 Reporting Requirements

Upon locating a dead, injured, or sick endangered or threatened species specimen, initial notification must be made to the nearest Service Law Enforcement Office. In Oregon, contact the U.S. Fish and Wildlife Service, Division of Law Enforcement, 301 Post Office Bldg., Klamath Falls, Oregon 97601 (phone: 541/883-6900). In California, contact the U.S. Fish and Wildlife Service, Division of Law Enforcement, District 1, 2800 Cottage Way, Room W-2928, Sacramento, California 95825 (phone: 916/414-6660). Care should be taken in handling sick or injured specimens to ensure effective treatment and care and in handling dead specimens to preserve biological material in the best possible state for later analysis of cause of death. In conjunction with the care of sick or injured endangered species or preservation of biological materials from a dead animal, the finder has the responsibility to ensure that evidence intrinsic to the specimen is not unnecessarily disturbed.

The Service is to be notified within three (3) working days of the finding of any endangered or threatened species found dead or injured in the Klamath Project service area. Notification must include the date, time, and precise location of the injured animal or carcass, and any other pertinent information. In California and Oregon, the Service contact person for this information is Mr. Steven A. Lewis (541/885-8481). Any LRS or SNS found dead or injured in California shall be turned into the CDFG. The agency contact is Susan Cochrane (916/322-2493).

If, during the course of the action, the amount or extent of the incidental take limit is exceeded, the Federal agency must reinitiate consultation with the Service immediately.

## 8.0 CONFERENCE REPORT

Critical habitat was proposed in 1994, but has not yet been finalized. The primary constituent elements identified in the proposal are as follows: (1) water of sufficient quantity and suitable quality; (2) sufficient physical habitat, including water quality refuge areas, and habitat for spawning, feeding, rearing, and travel corridors; and (3) a sufficient biological environment, including: adequate food levels, and natural patterns of predation, parasitism, and competition.

The proposed action will adversely affect the primary constituent elements of the proposed critical habitat in Project reservoirs by: reducing water levels; adversely affecting water quality; and reduce access to water quality refuge areas, spawning, and larval and juvenile rearing habitats. Lower lake levels in Project reservoirs will likely make larval and juvenile suckers more

susceptible to fish predation by forcing them to use habitat away from the protective cover of shallow water and any associated wetlands. Lower lake levels also likely make juvenile and adult suckers more vulnerable to birds predators because of the shallow depths in some Project reservoirs, such as Clear Lake, Tule Lake sump, and UKL. A lack of passage at Klamath Project dams, blocks natural travel corridors to spawning and rearing habitats. Adverse water quality alters the natural pattern of disease and parasitism within the sucker populations, increasing their frequency and intensity.

The Service has examined the effects of the proposed action and determines that proposed critical habitat for the LRS and SNS will be modified by: (1) temporary reductions of water levels by water diversions during critical periods making seasonally habitats unsuitable; (2) longer-term reductions in water levels by sedimentation making habitat permanently unsuitable; (2) reductions of water quality sufficient to make habitats unsuitable over short and long time periods; (3) blockage of passage preventing suckers from using habitats necessary for completion of life cycle; and (4) other factors. The Service's preliminary determination is that these adverse effects will be of a sufficiently high degree and extent that they will likely lead to adverse modification of proposed critical habitat.

## 9.0 CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. The term "conservation recommendations" is defined as suggestions from the Service regarding discretionary measures to: (1) minimize or avoid adverse effects of a proposed action on listed species or critical habitat; (2) conduct studies and develop information; and (3) promote the recovery of listed species. The recommendations provided here relate only to the proposed action and do not necessarily represent complete fulfillment of the agency's 7(a)(1) responsibilities under the Act.

1. The Service recommends that Reclamation survey all of its properties for the presence of Applegate's milk-vetch or its suitable habitat.

2. The Service recommends that Reclamation survey for spotted frogs on its Agency Lake Ranch property and consider if it could develop suitable habitat there for this species as a conservation action.

3. The Service recommends that Reclamation investigate the feasibility of establishing a population of Lost River suckers in Gerber Reservoir with broodstock from Clear Lake. If deemed feasible, Reclamation should work with BLM, ODFW, and the Service to plan and implement this effort.

4. Water quality/quantity in UKL has gotten worse over time owing to anthropogenic changes in its watershed. The Service recommends that Reclamation evaluate the role watershed/riparian/floodplain has in providing high quality/quantity flows into UKL, and implement a long-term restoration plan to restore degraded and lost functions.

5. Emergent wetlands in UKL and in tributary streams appear to have played an important function in nutrient cycling and in producing humic substances that may retard *AFA* growth. The Service recommends that Reclamation fund additional studies on wetland functions.

6. Chiloquin Dam has a poorly functioning fish ladder. The Service recommends that Reclamation work with the Service, The Klamath Tribes, the Modoc Irrigation District, and others to secure funding to repair the ladder. If implemented, this could provide additional valuable spawning habitat for UKL suckers.

7. The Service recommends that Reclamation serve as a clearing house for water quality data from the Upper Klamath Basin, especially for those basins which directly affect water quality in Project lakes, reservoirs, rivers, canals, and drains. Reclamation is the agency with the most control of water in the upper basin. It should be proactive in efforts to share data among all interested parties. This would make data more available to anyone and would facilitate management. Currently data are scattered among numerous agencies and organizations.

8. *Water Conservation/Reduction of Project Water Consumption Plan*

   Reclamation should reduce water consumption by the Project consistent with Reclamation's legal authority and jurisdiction. Reclamation should develop a draft water conservation and Project water consumption reduction plan by a mutually agreeable date for Service review and comment. Reclamation should incorporate the approved plan into all future Project operation plans. Annual reports describing water conservation and use reduction progress shall be prepared.

9. *Planning to Improve Water Quality in the Tule Lake Sumps*

   Reclamation should work with the Service to develop a plan by a mutually agreeable date that will protect suckers in the sumps from the adverse effects of sedimentation and poor water quality. The plan is needed to increase water depths and allow varying water levels so that emergent vegetation can be reestablished. Over the last 30 years, under a management regime that allowed for only a one foot annual fluctuation in water levels, Tule Lake wetland areas have declined dramatically, including areas with bulrush. These types of habitat are essential to provide for sucker survival, reproduction, and the primary constituent elements of their proposed critical habitat.

In order to be kept informed of actions that either minimize or avoid adverse effects or that benefit listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.

## 10. REINITIATION NOTICE

This concludes the conference for the Klamath Project. You may ask the Service to confirm the conference opinion as a biological opinion issued through formal consultation if the critical habitat

is designated. The request must be in writing. If the Service reviews the proposed action and finds that there have been no significant changes in the action as planned or in the information used during the conference, the Service will confirm the conference opinion as the biological opinion on the project and no further section 7 consultation will be necessary.

Reclamation shall request reinitiation of consultation if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect the critical habitat in a manner or to an extent not considered in this conference opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the critical habitat that was not considered in this conference opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action.

The Service appreciates the efforts made by Reclamation staff to assist completion of this consultation. The Service also appreciates the assistance of individuals in the following agencies/organizations who provided us with critical scientific information and/or reviewed parts of this opinion: BIA, CDFG, The Klamath Tribes, NMFS, ODFW, ODEQ, OSU, PacifiCorp, and USGS (BRD and Water Resources Div.).

If you have any questions regarding this opinion, please contact the Klamath Falls Fish and Wildlife office Project Leader at (541) 885-8481.

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Southwest Region
501 West Ocean Boulevard, Suite 4200
Long Beach, California 90802-4213

APR 6 2001

Mr. Karl E. Wirkus
Bureau of Reclamation
Klamath Basin Area Office
6600 Washburn Way
Klamath Falls, Oregon 97603

Dear Mr. Wirkus,

The purpose of this letter is to transmit our biological opinion regarding the impacts of the on-going Klamath Project operations on Southern Oregon/Northern California Coasts (SONCC) coho salmon, a species listed as threatened under the Endangered Species Act (see enclosure).

On January 22, 2001, the Bureau of Reclamation (Reclamation) requested formal section 7 consultation on the effects of the on-going operations of the Klamath Project on SONCC coho salmon. After reviewing the current status of SONCC coho salmon, the environmental baseline for the action area, the effects of the proposed action and cumulative effects, the National Marine Fisheries Service (NMFS) provided Reclamation a draft jeopardy opinion and reasonable and prudent alternative on March 19, 2001. Following review and consideration of comments and information received on our March 19, 2001, draft opinion and reasonable and prudent alternative, it is NMFS's opinion that the ongoing operation of the Klamath Project into the future, as proposed, is likely to jeopardize the continued existence of SONCC coho salmon and adversely modify its designated critical habitat. Our jeopardy determination is generally based on the expectation that the proposed operation of the Project would result in a continued decline in habitat conditions in the Klamath River below Iron Gate Dam (IGD) relative to Project operations during previous decades. As a result, the survival and abundance of several freshwater life history stages of coho salmon would be expected to decrease–appreciably reducing the likelihood of survival and recovery of SONCC coho salmon.

Regulations (50 CFR §402.02) implementing section 7 of the Endangered Species Act require "jeopardy" biological opinions to identify any "reasonable and prudent alternatives" to the proposed action. A "reasonable and prudent alternative" is an alternative action, identified during formal consultation, that: (1) can be implemented in a manner consistent with the intended purpose of the action; (2) can be implemented consistent with the scope of the action agency's legal authority and jurisdiction; (3) are economically and technologically feasible; and (4) would avoid the likelihood of jeopardizing the continued existence of listed species or result in the destruction or adverse modification of critical habitat. Although several factors present difficulties in identifying reasonable and prudent alternatives for the Reclamation's proposed

DEFENDANT'S EXHIBIT 71
PENGAD-Bayonne, N.J.

action, the enclosed biological opinion identifies one reasonable and prudent alternative (RPA) that NMFS believes meets these criteria. For instance, the minimum Iron Gate Dam flow releases and ramping rates identified in the RPA are actions within the Reclamation's authority and jurisdiction and would allow the Klamath Project to meet its intended purpose in most years. NMFS believes that the RPA would provide necessary and adequate survival levels to avoid the likelihood of jeopardizing the continued existence of SONCC coho and adversely modifying its critical habitat.

Because NMFS expects additional information and analyses relevant to the relationship between Iron Gate Dam (IGD) flows and suitable habitat for salmonid habitat to become available over the next few months, the RPA includes specific IGD minimum flows for the April through September 2001 period only, based on the best information currently available. We intend to develop and provide Reclamation a comprehensive biological opinion and RPA, addressing all water year types, on or before June 7, 2001--the statutory deadline to complete this consultation. This comprehensive biological opinion and RPA could include a different and more refined minimum IGD flow regime for future "critically dry" water years, based on new information and analyses that we expect to be available in the near future.

Since this biological opinion has concluded that your proposed action is likely to jeopardize the continued existence of SONCC coho salmon, Reclamation is required to notify NMFS of its final decision on the implementation of the RPA. The NMFS looks forward to further coordination with Reclamation as existing efforts toward salmonid restoration activities continue, and new cooperative opportunities are identified.

Sincerely,

Rebecca Lent
Regional Administrator

Enclosure

# Biological Opinion

## Ongoing Klamath Project Operations

April 6, 2001

National Marine Fisheries Service
Southwest Region

# TABLE OF CONTENTS

Consultation History . . . . . . . . . . 1

Background . . . . . . . . . . 2

Description of the Proposed Action . . . . . . . . . . 2
Description of the Action Area. . . . . . . . . . 3

Species Description . . . . . . . . . . 3

Life History . . . . . . . . . . 4

Population Trends . . . . . . . . . . 5

Current Status . . . . . . . . . . 8
Listing History . . . . . . . . . . 8
Threats . . . . . . . . . . 8

Environmental Baseline . . . . . . . . . . 9
Land Management . . . . . . . . . . 10
Current Federal Land Management . . . . . . . . . . 12
Water Management . . . . . . . . . . 12
Summary of Water Quality Conditions . . . . . . . . . . 14
Coho Salmon Harvest . . . . . . . . . . 16
Hatchery Programs . . . . . . . . . . 17
Integration and Synthesis of the Environmental Baseline . . . . . . . . . . 17

Effects of the Action . . . . . . . . . . 18
Analysis Approach . . . . . . . . . . 18
Effects of Flow Regulation . . . . . . . . . . 19
Water Temperature and Quality Modeling . . . . . . . . . . 19
Flow Study Activities and Recommendations . . . . . . . . . . 20
Effects of Ongoing Project Operations . . . . . . . . . . 22
October through March . . . . . . . . . . 22
April through June . . . . . . . . . . 24
July through September . . . . . . . . . . 25
Summary of Effects . . . . . . . . . . 26
SONCC Coho Salmon Critical Habitat . . . . . . . . . . 28

Cumulative Effects . . . . . . . . . . 28

Conclusion . . . . . . . . . . 29

Reasonable and Prudent Alternatives . . . . . . . . . . 29
Reasonable and Prudent Alternative . . . . . . . . . . 29

Incidental Take Statement . . . . . . . . . . 35
Reasonable and Prudent Measures . . . . . . . . . . 36
Terms and Conditions . . . . . . . . . . 36

Conservation Recommendations . . . . . . . . . . 37

Reinitiation of Consultation . . . . . . . . . . 38

Literature Cited . . . . . . . . . . 38

Tables . . . . . . . . . . 45

Figures . . . . . . . . . . 48

**Consultation History**

The Bureau of Reclamation (Reclamation) forwarded a final biological assessment (BA) addressing its 1998 Operations Plan for its Klamath Project (Project) to the National Marine Fisheries Service (NMFS) on June 2, 1998 (Reclamation 1998). The June 2, 1998, transmittal letter stated that the "...BA fulfills Reclamation's responsibilities...under Section 7 of the Endangered Species Act [ESA] regarding preparation of the BA and for providing information for determining the need for formal consultation." Although NMFS considered this, functionally, as a request for formal consultation under the ESA, insufficient human resources precluded proceeding with formal consultation until preparation of Reclamation's 1999 Project Operations Plan.

On March 9, 1999, Reclamation forwarded a draft Klamath Project 1999 Annual Operations Plan Environmental Assessment (EA) to NMFS (and the public), and requested formal consultation under section 7 of the ESA (Reclamation 1999a). The March 9, 1999, transmittal letter stated that the "...preferred alternative in the 1999 EA is virtually the same as...[that] presented in the 1998 EA." On June 18, 1999, Reclamation modified their proposed April 1999 through March 2000 operations of the Project as described in a letter from K. Wirkus to D. Reck (Reclamation 1999b). On July 12, 1999, NMFS issued a biological opinion on operation of the Project through March 2000 (1999 Opinion, NMFS 1999).

On April 4, 2000, NMFS informed Reclamation that the 1999 Opinion and associated incidental take statement had expired on March 31, 2000, and that they should request ESA section 7 consultation regarding operation of the Klamath Project (NMFS 2000).

On April 26, 2000, Reclamation acknowledged that section 7(d) of the ESA prohibits the irreversible and irretrievable commitment of resources that foreclose the formulation of reasonable and prudent alternatives which would avoid violating section 7(a)(2) of the ESA (Reclamation 2000). Specifically, the April 26, 2000, letter stated that "[b]ased on the information available to Reclamation at this date, we have determined that the proposed flows [included in the April 26, 2000, letter]...are both sufficient and necessary to avoid possible 7(d) foreclosures and to fulfill Reclamation's obligation to protect Tribal trust resources."

Subsequently, on January 22, 2001, Reclamation requested initiation of formal ESA section 7 consultation regarding the ongoing operation of the Klamath Project. The January 22, 2001, letter included a "biological assessment of the Klamath Project's continuing operations on Southern Oregon/Northern California ESU coho salmon and critical habitat for Southern Oregon/Northern California ESU coho salmon" (ongoing Project operations BA, Reclamation 2001).

**Background**

The Project is located in southern Oregon and provides irrigation water for approximately 220,000 acres in three counties located in Oregon and California. Project water is stored primarily in Upper Klamath Lake in the headwaters of the Klamath River Basin and Gerber and Clear Lake reservoirs in the Lost River watershed. Project facilities are located upstream of Iron Gate Dam (IGD), owned and operated by PacifiCorp, which is currently a barrier to anadromous salmonid migrations in the mainstem Klamath River. The development of dams in this location of the Klamath River began with Klamathon Dam prior to 1900. Copco No. 1 dam was completed in 1918, and by 1921 Link River Dam was constructed to supply water for irrigated agriculture and wildlife refuges, and to supply power. The construction of Copco No. 2 dam was completed in 1925, supplying more hydroelectric power. Due to high fluctuations in flow releases from Copco, the United States Bureau of Fisheries recommended an "equalizing dam" be constructed below Copco No. 2 dam to stabilize flows. IGD construction was completed in 1962 and is located at approximately river mile 190. A minimum flow regime was prescribed in the Federal Energy Regulatory Commission (FERC) license covering operation of IGD.

Although a myriad of human induced and natural factors affect fish species of concern in the Klamath River, Project operation largely affects water available for release from IGD during portions of the year. In turn, flow releases from IGD affect the quantity and quality of aquatic habitat in the mainstem Klamath River in California. Investigations into an appropriate flow regime below IGD have resulted in several recommendations, and ongoing data collection and analysis efforts are expected to provide for refined recommendations in the future. These topics are discussed in the "Effects of the Action" section of this biological opinion (Opinion).

Since 1996, Reclamation has been planning their operations of the Project annually. During this same period, Reclamation has been working to develop a multi-year operations plan and more recently has been preparing a draft Environmental Impact Statement describing the effects of future alternative Project operations.

The objective of this Opinion is to determine whether the proposed ongoing operation of the Klamath Project is likely to jeopardize the continued existence of threatened Southern Oregon/Northern California Coasts (SONCC) coho salmon (*Oncorhynchus kisutch*). Klamath Mountains Province (KMP) steelhead occur in the Klamath River, but are not currently listed under the ESA (April 4, 2001; 66 FR 12845).

Critical habitat has been designated for SONCC coho salmon. Conclusions regarding destruction or adverse modification of designated critical habitat are included in this Opinion.

**Description of the Proposed Action**

Reclamation prepared a BA (Reclamation 2001) describing proposed ongoing Project operations from the present until such time as additional ESA consultation addressing a future operations scenario analyzed in an Environmental Impact Statement (EIS) supercedes the resulting 2001 NMFS biological opinion. Actions proposed within the ongoing Project operations BA included

providing water for agriculture, National Wildlife Refuges, and downstream aquatic habitat. In addition, Upper Klamath Lake is managed to maintain habitat for endangered fish under the United States Fish and Wildlife Service's (USFWS) ESA jurisdiction. Other actions proposed included participation in salmon and steelhead monitoring activities in the Klamath River, the continued implementation of Reclamation's Water Supply Initiative aimed at obtaining additional water supplies, conducting a feasibility study on raising the maximum operating water surface elevation of Upper Klamath Lake by up to 2 feet, implementation of several groundwater investigations, conducting an appraisal study on raising Gerber Dam by 3 feet, and development of a management plan for Agency Lake Ranch.

PacifiCorp operates Link River Dam in accordance with Reclamation's annual operations plans for the Klamath Project, and owns and operates Keno Dam, J.C. Boyle Dam, Copco No. 1 and Copco No. 2 Dams, and Iron Gate Dam, downstream of Reclamation's Klamath Project. In their ongoing Project operations BA, Reclamation also proposes to work to develop a plan of closer operational coordination and data sharing with PacifiCorp to reduce the scope of impacts of depressed flows that occur during the April through June period. NMFS believes that this is intended to address IGD flow ramping concerns during this period.

The ongoing Project operations BA includes specific proposed average minimum flows for release at Iron Gate Dam, by four water year types (see Table 1). These water year types are defined in terms of April through September inflow to Upper Klamath Lake: Above Average (>500,400 acre feet [af]); Below Average (312,800 - 500,400 af); Dry (185,000 - 312,800 af); and Critical (<185,000 af). These proposed minimum flows are the average monthly or biweekly (as applicable) minimums that were measured below Iron Gate Dam during the 1961 through 1997 period, by water year type (Reclamation 2001).

Description of the Action Area

For the purposes of this Opinion, the action area is defined as the Klamath River downstream of IGD, located at approximately river mile 190, in northern California.

**Species Description**

The coho salmon is an anadromous salmonid species that was historically widely distributed throughout the North Pacific Ocean from central California to Point Hope, Alaska, through the Aleutian Islands, and from Anadyr River, Russia, south to Hokkaido, Japan. Coho salmon are very similar in appearance to chinook salmon (*O. tshawytscha*) while at sea (blue-green back with silver flanks), but they are smaller than chinook salmon. Coho salmon adults can be distinguished from small chinook salmon by the lack of spots on the lower portion of the tail. During the twentieth century, naturally-producing populations of coho salmon have declined or have been extirpated in California, Oregon, and Washington. The coho salmon status review identified six distinct population segments (Evolutionarily Significant Units - ESUs) in these states and noted that natural runs in all ESUs are substantially below historical levels (Weitkamp et al. 1995). The action area is within the range of the SONCC coho salmon ESU.

Future Federal actions, including the ongoing operation of hydropower systems, hatcheries, fisheries, and land management activities are being (or have been) reviewed through separate section 7 consultation processes.

**Conclusion**

After reviewing the current status of SONCC coho salmon, the environmental baseline for the action area, the effects of the proposed action (i.e., ongoing operation of the Klamath Project), and cumulative effects, NMFS' biological opinion is that the action, as proposed, is likely to jeopardize the continued existence of SONCC coho salmon. The NMFS has also determined that the action, as proposed, is likely to adversely modify critical habitat for the SONCC coho salmon.

**Reasonable and Prudent Alternative**

Regulations (50 CFR §402.02) implementing section 7 of the ESA define reasonable and prudent alternatives as alternative actions, identified during formal consultation, that: (1) can be implemented in a manner consistent with the intended purpose of the action; (2) can be implemented consistent with the scope of the action agency's legal authority and jurisdiction; (3) are economically and technologically feasible; and (4) would, NMFS believes, avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

This biological opinion has identified one reasonable and prudent alternative that NMFS believes meets the criteria outlined above. A basic premise for this reasonable and prudent alternative is that operation of the Klamath Project substantially affects flows, fish habitat, and water quality in the Klamath River below IGD. The second premise is that the existence and operation of the Klamath Project is not the only factor and human activity that adversely affects aquatic habitat and anadromous salmonid populations in the Klamath River. Accordingly, NMFS prepared this reasonable and prudent alternative with an awareness of the larger context of actions that will affect threatened salmon in the Klamath River.

Our jeopardy determination is generally based on the conclusion that the proposed operation of the Project would result in a continued decline in habitat conditions in the Klamath River. Further, Reclamation's proposed minimum flows (see Reclamation 2001) are not based on the biological requirements of the species. The reasonable and prudent alternative is intended to prevent further decline of the listed fish that we concluded were likely to be jeopardized by the proposed action while longer-term protections can be implemented to affect the recovery of the species. The NMFS expects that further aquatic habitat studies, restoration planning, and restoration accomplishments will necessitate occasional adjustments to this reasonable and prudent alternative, or perhaps other reasonable and prudent alternatives will be identified over time.

Reasonable and Prudent Alternative

Several factors present difficulties in identifying a reasonable and prudent alternative to the river flow-related component of Reclamation's proposed action, both in the short-term (e.g., April

through September 2001) and long-term include: (1) the limited availability of specific information on the effects of IGD releases on water temperature and quality during the April through September period in critically dry years such as is forecast for 2001, (2) the lack of quantitative tools to estimate the probability of coho salmon persistence and recovery in the Klamath River under various Project operational scenarios, (3) uncertainty regarding the amount of water that will be available during the April through September 2001 period, (4) uncertainty about the timing of inflow to Project facilities, and (5) the current practical necessity to, at least initially, plan for April through September Project operations by early April 2001.

Given that NMFS expects additional information and analyses relevant to the relationship between IGD flows and fish habitat to become available over the next few months, and the fact that NMFS is in the process of developing a comprehensive biological opinion and reasonable and prudent alternative, addressing all water year types, to be provided to Reclamation on or before June 7, 2001 (the statutory deadline consistent with 50 CFR § 402.12), this biological opinion constitutes a subset of the comprehensive biological opinion for this year's operations. This reasonable and prudent alternative includes specific IGD minimum flows for the April through September 2001 period only, based on the best available information. In essence, this biological opinion constitutes a subset component of the comprehensive biological opinion for this year's operations. Since the NMFS anticipates it will be incorporating new scientific data in the opinion to be provided by June, this opinion may include a minimum IGD flow regime for future "critically dry" water years that differ form this RPA (as currently defined by Reclamation [2001]).

Because of the limited and uncertain amount and timing of available water, NMFS and the USFWS also had to consider the potential biological risks and consequences of various Upper Klamath Lake elevation and Klamath River flow regimes in preparing their biological opinions. Given the immediate need to plan for the April through September 2001 Project operations under these circumstances, NMFS has developed the following reasonable and prudent alternative including a minimum flow regime for this period, designed to provide for the biological requirements of Klamath River Basin coho salmon. Because of limited Project inflow and storage, the risks presented by providing additional spring river flows that may preclude providing adequate summer flows later in the year were also considered.

During the months of April and May 2001, coho salmon fry are the most vulnerable life stage in the mainstem Klamath River, and require adequate suitable physical habitat and adequate water temperatures and quality. Preliminary physical habitat modeling results indicate that in the IGD to Shasta River reach of the Klamath River, approximately 50 percent of maximum habitat for coho salmon fry and 65 percent of maximum habitat for chinook salmon fry would be available during April and May 2001 under IGD releases of 1,700 CFS (Figure 10). Under 1,700 CFS IGD releases, approximately 41 percent of the maximum habitat for coho salmon fry and 50 percent of maximum habitat for chinook salmon fry would be available in the Shasta River to Scott River reach (Figure 11). During this period, water temperatures below IGD are generally within the optimum range for coho salmon described by Bell (1991).

Coho smolts also outmigrate to the ocean during this period, and substantially higher flows (e.g., 1,700 CFS) are expected to result in increased smolt survival. This expectation is due to the

decreased travel time under significantly higher water velocities and associated lower mortality due to migratory delays and predation (as discussed in the 'Effects of the Action' section of this opinion). Because elevated Klamath River water temperatures are not generally a problem at this time, an extended exposure of smolts to mainstem river water conditions are not a concern.

Although higher flows during this period would provide additional suitable habitat for coho salmon fry, the reality of a finite but uncertain available water supply, forecast to be the lowest in the relevant period of record (1961-2000), must also be considered. If a relatively large volume of water is used to provide for additional coho salmon fry habitat and increased smolt survival during this period, adequate water to provide for better habitat conditions later in the summer may not be available. After considering the risk of potential competing habitat requirements between coho salmon fry in the spring, and juvenile coho salmon in the summer, it is NMFS judgement that providing 40 to 50 percent of maximum fry habitat between IGD and the Scott River under flows of 1,700 CFS during April and May 2001 is appropriate to maximize coho salmon survival during this critically dry year and will not jeopardize the species.

During June 2001, coho salmon fry will continue to grow larger and will typically transition to the juvenile life stage, will develop better swimming abilities, and become better equipped to survive potential displacement to alternative areas in the river. Also during this period, coho salmon smolts continue to migrate to the ocean. As previously discussed in this biological opinion, high Klamath River water temperatures typically become a concern by late June. As previously discussed, coho salmon smolt survival would be expected to be higher for those smolts that are prepared for migration to the ocean prior to exposure to elevated mainstem water temperatures in late June. Substantially higher flows that provide significantly higher amounts of suitable coho salmon fry habitat (e.g., greater than 50 percent of maximum) and associated increased water velocity and decreased travel time are expected to result in decreased exposure of smolts to elevated water temperatures. Although higher flows are expected to generally result in higher smolt survival during this period, again the risk of insufficient water availability later in the summer and fall must be considered. In order to better facilitate moving coho salmon smolts downstream to the ocean prior to experiencing elevated water temperatures, it is NMFS judgement that 2,100 CFS flows during the June 1-15, 2001 period will be adequate to provide a reasonable level of smolt survival during this critically dry year and will not jeopardize the species. As the ability of IGD releases to decrease ambient water temperatures diminishes and mainstem temperatures become a concern, it is NMFS judgement that IGD releases of 1,700 CFS flows during the June 16-30 period are sufficient to avoid jeopardizing the species.

During the July through August 2001 period, coho juveniles rear in the mainstem Klamath River. Although necessary suitable physical habitat (in terms of water depth and velocity) must be provided for these fish, high water temperatures and poor water quality are also of concern at this time. Water temperature modeling results generally indicate that IGD releases have a limited ability to moderate high water temperatures and diurnal temperature fluctuations in the mainstem river during the July and August period. Available water temperature modeling results for various Klamath River flow scenarios used 1996 and 1997 water temperature and meteorological conditions as model inputs (Deas and Orlob 1999). The NMFS is unaware of any modeling analyses that have considered the expected Upper Klamath Lake inflows, Project operational limitations, and reservoir/river responses upstream of the modeled area (Iron Gate Reservoir to

Seiad Valley) associated with the currently-forecast extremely dry conditions likely to occur during the April through September 2001 period. Therefore, available modeling information provides a limited and incomplete understanding of system behavior with respect to water temperature during the mid-June through September 2001 period. Accordingly, NMFS believes it is necessary to also consider the summer base flow recommendations previously developed by fishery biologists. For example, a July and August river flow of at least 1,000 CFS is generally consistent with the summer flow recommendations of CDFG biologists (e.g., Wales 1944) and Trihey and Associates (1996).

Although the recommended flows included in the Phase 1 flow study report (INSE 1999) recommended higher flows during the July through August period, this recommendation did not specifically consider the risk of insufficient water supplies in the summer and fall period. As previously discussed, NMFS believes it is necessary to consider these risks in 2001. Given the available information and analyses, it is NMFS judgement that IGD releases of 1,000 CFS during the July through August 2001 period are both necessary and appropriate in this critically dry year and will not jeopardize the species.

During September 2001, coho salmon adults will be migrating into the Klamath River. The habitat requirements of adult coho salmon include a migratory corridor with suitable water depth and velocities, resting pools, and adequate water quality conditions. Successful immigration also depends on adequate fish passage conditions in the mainstem river and access to tributaries. Observations of adult salmon migrating upstream in the Klamath River indicate that passage problems in the mainstem typically occur during IGD flow releases lower than about 900 CFS (T. Fletcher, Yurok Tribe, pers. comm., March 21, 2001). There are no studies that indicate the preferred flow regime of Klamath River coho salmon for this time period during a critically dry year. Based on available information, it is NMFS judgment that minimum IGD releases of 1,000 CFS are appropriate in September 2001 to provide minimally sufficient adult migration conditions that will lead to sufficient spawning success during this critically dry year and which will not jeopardize the species.

In summary, this reasonable and prudent alternative includes the following instantaneous minimum IGD water releases, by time step, for the April through September 2001 period:

| Time Step | Iron Gate Dam Discharge (CFS) |
|---|---|
| April 2001 | 1,700 |
| May 2001 | 1,700 |
| June 1-15 2001 | 2,100 |
| June 16-30 2001 | 1,700 |
| July 2001 | 1,000 |

| | |
|---|---|
| August 2001 | 1,000 |
| September 2001 | 1,000 |

In addition, in order to prevent potential coho salmon stranding, Reclamation will operate the Project to provide for the following down ramping rates below IGD: (1) decreases in flows of 300 CFS or less per 24-hour period and no more than 125 CFS per four-hour period when IGD flows are above 1,750 CFS; or (2) decreases in flows of 150 CFS or less per 24-hour period and no more than 50 CFS per two-hour period when IGD flows are 1,750 CFS or less.

If, based on the best available information (e.g., NRCS forecasts, and associated model output and interpretation), Reclamation expects they will be unable to operate the Project to provide for the above minimum flow regime and maximum down ramping rates below IGD, while also complying with the ESA requirements regarding listed species under the jurisdiction of the USFWS, NMFS and USFWS in will determine how best to meet the biological requirements of all species of concern. Specifically, when this situation exists, representatives from Reclamation, USFWS, and NMFS shall coordinate with representatives from the Bureau of Indian Affairs and appropriate Indian tribes and states to consider and discuss available options for Project operation and necessary levels of protection for listed species. The following process will be used:

1. Data Collection and Analysis

   A. Reclamation shall provide NMFS and FWS with a projection of available water to satisfy river flow requirements of coho salmon and lake level management for listed suckers.

   B. The agencies shall conduct risk analyses, based on available information including the results of discussions between relevant Federal, tribal, and state representatives.

2. Potential development and use of in-season management techniques to allocate scarce water resources to protect aquatic resources; these may include, but are not limited to:

   A. Consideration of the current status of species of concern and risks associated with critically dry years;

   B. Consideration of the most up-to-date information regarding the location, size, and movements of young-of-the-year and juvenile fish;

   C. Consideration of the most up-to-date expectations of water temperature and quality parameters in Upper Klamath Lake and the Klamath River below IGD, given the expected water supply outlook;

   D. Consideration of pro-rating IGD releases or Upper Klamath Lake elevation regimes based on "within water year type" exceedance levels for critically dry years;

E. Consideration of reserving a volume of water for release below IGD during particularly hot period(s) to improve water quality.

3. The NMFS and USFWS will provide the results of the coordination and risk analysis process to Reclamation in writing with detailed instructions regarding measures to employ in order to best protect each listed species.

Because this biological opinion has found jeopardy and adverse modification of critical habitat, Reclamation is required to notify NMFS of its final decision on implementation of the reasonable and prudent alternative.

**Incidental Take Statement**

Section 9 of the ESA and federal regulations adopted pursuant to section 4(d) of the ESA prohibit the take of endangered and threatened species, respectively, without special exemption. "Take" is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by NMFS to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass is defined as intentional or negligent actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the ESA provided that such taking is in compliance with the terms and conditions of this incidental take statement.

Adverse effects of management actions such as these are largely unquantifiable in the short-term, given the lack of relevant studies and quantitative tools available to develop such estimates. The NMFS expects some level of incidental take to occur due to implementation of some of the actions outlined in the reasonable and prudent alternative. However, the best scientific and commercial data available are not sufficient to enable NMFS to estimate a specific amount of incidental take of Klamath River coho salmon. The NMFS anticipates that water quality and habitat conditions for various coho salmon life stages that would result from implementation of the reasonable and prudent alternative would likely result in a level of take that does not constitute jeopardy to SONCC coho salmon. Take of individual coho salmon would be difficult to detect because finding a dead or injured salmon is unlikely due to the fact that salmonids occur in dynamic habitat, (i.e., flowing water, that makes such detection difficult). Water quality and habitat conditions resulting from the reasonable and prudent alternative, while somewhat predictable, would have an impact that is not precisely known, and by extension, the impact to a quantity of coho salmon expected to be present in the mainstem Klamath River is not precisely known. However, while the water quality and habitat impacts resulting from Project operations have been reduced by the reasonable and prudent alternative, and precise impacts to coho salmon and their habitat are

unknown, each incremental reduction in water quality and habitat in the stream channel represents a portion of the combined impacts to salmon in a given watershed.

As stated earlier in the biological opinion, some take may occur due to down ramping of releases from IGD and associated stranding of small coho salmon. However, the reasonable and prudent alternative requires Reclamation to provide sufficient flows to enable PacifiCorp to implement conservative ramping rates at IGD. It is difficult to determine the actual down ramping rates that will be implemented during the April through July 2001 period, because at levels above 1,750 cfs PacifiCorp does not have the capability to regulate flows in small increments. Therefore, predicting the potential for stranding of coho salmon and potential take is difficult. However, NMFS expects that several flow study and water temperature and quality data collection efforts will be ongoing during this period, and observations may provide in-season information regarding actual fish strandings that may occur. If the proposed conservative down ramping rates of IGD implemented, NMFS expects that low levels of coho salmon stranding will occur and consequently this risk would not pose jeopardy to the species.

This incidental take statement is effective provided that Reclamation implements the flow and ramping rate components of the reasonable and prudent alternative above, but this conditional take coverage is only effective until September 30, 2001. This incidental take statement is expected to be superceded by a new incidental take statement with NMFS' issuance of the long-term, comprehensive biological opinion and reasonable and prudent alternative, as described earlier in this opinion.

<u>Reasonable and Prudent Measures</u>
The NMFS believes that the following reasonable and prudent measures are necessary and appropriate to minimize the likelihood of take of SONCC coho salmon resulting from the ongoing operation of the Project.

Reclamation shall:

1. Arrange for the ongoing collection and analysis of information to further understand the relationship between IGD water releases and suitable downstream salmon habitat in the Klamath River;

2. Continue its efforts to identify additional water supplies in the Klamath Basin.

<u>Terms and Conditions</u>
In order to enjoy the protections provided under section 7(b)(4) or 7(o)(2) of the ESA, Reclamation must comply with the following terms and conditions, which implement and document implementation of the reasonable and prudent measures described above. These terms and conditions are non-discretionary. Reclamation shall do the following:

1. In coordination with PacifiCorp, provide for the completion, integration, and/or modifications of water routing and water quality models that potentially provide an increased understanding of water temperature and quality conditions in Upper Klamath Lake and in the lower Klamath River. Development of this integrated model(s) should be

coordinated with fishery co-managers and other water quality experts, and shall be completed by January 2002.

2. Provide a summary report outlining the status of the water supply initiative, identifying opportunities with regard to water supplies, and identifying current scoping of implementation strategies. This report will be provided to NMFS by February 2002.

**Conservation Recommendations**

Section 7(a)(1) of the ESA directs Federal agencies to utilize their authorities to further the purposes of the ESA by carrying out conservation programs for the benefit of threatened and endangered species. Conservation recommendations are discretionary measures suggested to minimize or avoid adverse effects of a proposed action on listed species, to minimize or avoid adverse modification of critical habitat, or to develop additional information.

The NMFS believes the following conservation recommendations are consistent with these obligations, and therefore recommends that the following conservation measures be implemented by Reclamation:

1. Reclamation should aggressively seek sufficient funding to continue with, and to enhance, their Klamath Basin Water Supply Initiative.

2. Reclamation should actively participate in restoration planning activities with other entities with an active interest in addressing Klamath River fishery, habitat, and water quality restoration.

**Reinitiation of Consultation**

This concludes formal consultation on Reclamation's proposed ongoing operation of the Project. As provided in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action.

# NEWS
U.S. DEPARTMENT OF THE INTERIOR

Klamath Basin Area Office KBAO-01-01
Jeffrey S. McCracken
6600 Washburn Way
Klamath Falls, OR 97603-9365
Friday calls: 541/883-6935
After Friday: 916/978-5100

**FOR IMMEDIATE RELEASE: April 6, 2001**

## WATER ALLOCATION DECISION ANNOUNCED FOR KLAMATH PROJECT

Federal officials have finalized the biological opinions for the operation of the Klamath Project for this critically dry water year. Based on those opinions and the requirements of Endangered Species Act, the Bureau of Reclamation announced today that no water will be available from Upper Klamath Lake to supply the farmers of the Klamath Project. Furthermore, based on current estimates, Reclamation projects that there will be only about 70,000 acre-feet available for the irrigation of "A" lands on the east side of the basin. That water will be supplied by Clear Lake and Gerber Reservoirs. A full supply for the Project would be about 500,000 acre-feet.

To provide some assistance to farmers affected by what is expected to be one of the driest years since the Project began in 1907, the United States Department of Agriculture (USDA) announces that most crops in the affected area are eligible for Federal crop insurance (if it had been purchased before the sales closing date) or other assistance. Crop insurance protection is made available by USDA through private insurance agents and companies. For producers carrying coverage, a portion of their otherwise irrigated crop losses resulting from the determination announced by the Bureau of Reclamation may be eligible for prevented planting payments. Producers should contact their crop insurance agent for details. Assistance is also provided through the Non-insured Crop Disaster Assistance Program (NAP) to producers growing crops that are currently uninsurable. Details on producer eligibility for NAP assistance can be obtained at local Farm Service Agency offices. General information on the programs may be found at http://www.usda.gov .

Oregon and California members of the United States Senate and House were extremely helpful during this crisis. For days, since the draft biological opinions were made public, they worked tirelessly with Bush Administration officials to respond to the probable effects of this situation. Representatives of Interior Secretary Gale Norton noted that the dry water year combined with the needs of the environment demonstrates why a long-term solution to the water needs of the basin is required.

Reclamation's Klamath Project serves approximately 1,400 farms totaling some 210,000 acres. Farmers here grow a large variety of crops including barley, oats, wheat, potatoes, sugar beets and forage. According to Bureau of Reclamation data for the year 2000, approximately 110,000 acres were planted in forage; 57,000 acres in cereal crops (including barley, oats, and wheat); 16,000 acres in vegetables (including potatoes); 7,000 acres in miscellaneous field crops (including sugar beets); 298 acres in seed crops; and 227 acres in nursery crops.

###

PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT
72

| Circulate | Initial |
|---|---|
| KO-150 | |
| KO-400 | |
| KO-100 | |
| KO-700 | |
| Outgoing | |
| KO-103 | |

APR 20 2001

KO-150
ENV-7.00

Ms. Irma Lagomarsino, Supervisor
National Marine Fisheries Service
1655 Heindon Road
Arcata, California 95521

Subject: Bureau of Reclamation (Reclamation) Determination Regarding the Action Addressed in the National Marine Fisheries Service (NMFS) April 6, 2001 Biological Opinion on Ongoing Klamath Project Operations.

Dear Ms. Lagomarsino:

The Bureau of Reclamation (Reclamation) has reviewed the subject final biological opinion (BO). This letter serves to notify the National Marine Fisheries Service (NMFS) of Reclamation's decision on the action, consistent with its responsibilities as a Federal agency following issuance of a biological opinion as required by 40 CFR 402.15.

The NMFS' biological opinion is that the action, as proposed for this year, is likely to jeopardize the continued existence of threatened Southern Oregon/Northern California Coasts (SONCC) coho salmon (*Oncorhynchus kisutch*) and adversely modify its critical habitat. A Reasonable and Prudent Alternative (RPA) which is for Project operation only during this critically dry year to avoid the likelihood of jeopardy to the threatened coho salmon was included in the final BO. The final BO also includes non-discretionary reasonable and prudent measures (RPMs) with terms and conditions that authorize and reduce incidental take.

Determination Regarding the Proposed Action

Reclamation, after considering its obligations under the Endangered Species Act and the RPA in the NMFS final BO, incorporated that RPA into the April 6, 2001, Klamath Project 2001 Annual Operations Plan. Reclamation will operate the Klamath Project (Project) from April through September 2001, to meet the requirements of the RPA. Should conditions change such that Reclamation needs to take an action inconsistent with the above, Reclamation will confer with NMFS and reinitiate consultation as appropriate.

Reclamation will continue to work cooperatively with NMFS to meet our obligations under the Endangered Species Act. We understand that NMFS intends to issue a comprehensive BO and RPA, addressing all water year types by June 7, 2001. Reclamation will be providing additional comments to NMFS to assist in completing that comprehensive final BO.

Sincerely,

Karl E. Wirkus
Area Manager

DEFENDANT'S EXHIBIT 73
PENGAD-Bayonne, N.J.

cc:
Ady District Improvement Co., 18110 Keno-Worden Road, Klamath Falls, OR 97603
Enterprise Irrigation District, 4806 Highway 39, Klamath Falls, OR 97603
Horsefly Irrigation District, PO Box 188, Bonanza, OR 97623
Klamath Basin Improvement District, 6640 K.I.D. Lane, Klamath Falls, OR 97603
Klamath Water Users Association, 2455 Patterson Street, Klamath Falls, OR 97603
Klamath Drainage District, 4901 Lower Klamath Lake Road, Klamath Falls, OR 97603
Klamath Irrigation District, 6640 K.I.D. Lane, Klamath Falls, OR 97603
Langell Valley Irrigation District, 9787 East Langell Valley Road, Bonanza, OR 97623
Malin Irrigation District, PO Box 355, Malin, OR 97632
Midland District Improvement Co., PO Box 63, Midland, OR 97634
Pine Grove Irrigation District, 4806 Highway 39, Klamath Falls, OR 97603
Pioneer District Improvement Co., 12951 Highway 66, Klamath Falls, OR 97601
Plevna District Improvement Co., PO Box 16, Klamath Falls, OR 97601
Poe Valley Improvement District, 6640 K.I.D. Lane, Klamath Falls, OR 97603
Shasta View Irrigation District, PO Box 46, Malin, OR 97632
Sunnyside Irrigation District, PO Box 1009, Merrill, OR 97633
Tulelake Irrigation District, PO Box 699, Tulelake, CA 96134
Upper Van Brimmer Drainage District, 11443 Buesing Road, Klamath Falls, OR 97603
Van Brimmer Ditch Company, PO Box 419, Merrill, OR 97633
Klamath County Commissioners, 305 Main Street, 2nd Floor, Klamath Falls, Oregon 97601
Duane Sherman, Chair, Hoopa Valley Tribe, P.O. Box 1348, Hoopa Valley, CA 95546
Susan Masten, Chair, Yurok Tribe, 1034 Sixth St., Eureka, CA 95501
Alvis Johnson, Chair, Karuk Tribe, P.O. Box 1016, Happy Camp, CA 96039
Allen Foreman, Chair, The Klamath Tribes, P.O. Box 436, Chiloquin, OR 97624
Steve Lewis, Project Leader, U.S. Fish and Wildlife Service, 6610 Washburn Way, Klamath Falls, Oregon 97603
Michael J. Spear, U.S. Fish and Wildlife Service, 2800 Cottage Way, Room , Sacramento, California 95825
Phil Norton, Refuge Manager, U.S. Fish and Wildlife Service, 4009 Hill Road, Tulelake, California 96134
Rebecca Lent, PhD, Regional Director, National Marine Fisheries Service, 501 West Ocean Blvd, suite 4200, Long Beach, California 90802
Donald Reck, Fisheries Biologist, National Marine Fisheries Service, 1655 Heindon Road, Arcata, California 95521
Frank Fryman, Bureau of Indian Affairs, U.S. Department of the Interior, 2800 Cottage Way, Sacramento, California 95825
Karole Overberg, Bureau of Indian Affairs, U.S. Department of the Interior, 911 NE 11th Avenue, Portland, Oregon 97232
Doug Tedrick, Bureau of Indian Affairs, Office of Trust Responsibilities, 1849 C Street, NW, MS 3061-MIB, Washington, DC 20240
Randy Landolt, Director, Hydro Resources, 825 NE Multnomah, Suite 1500, Portland, Oregon 97232

bc: W-6332, MP-100, MP-105, MP-140 (J.McCracken), MP-152 (F.Michny), Steve Palmer-SOL

WBR:D.Fritz:J.Bryant:kme:04/20/01 (1-0517 Biological Opinion)
H:\PUBLIC\ESA\OPINION\2001 Opinions\Salmon\NMFS BO final response 04-20-01.wpd

4/20/01 fax to NMFS + Palmer + S. MacFarlane

# NEWS

U.S. DEPARTMENT OF THE INTERIOR

OFFICE OF THE SECRETARY
FOR IMMEDIATE RELEASE
July 24, 2001

Stephanie Hanna (O) 202/501-4633

## INTERIOR SECRETARY TO ORDER WATER RELEASE TO KLAMATH FARMERS

(PORTLAND) Secretary of the Interior Gale Norton made the following statement today at a media briefing in Portland, Oregon:

"I am happy to announce that about 70,000 to 75,000 acre feet of water will be released from Upper Klamath Lake to assist farmers in the Klamath Basin Project in desperate need. They may be able to use the water for their livestock, to provide some critical recharge for some wells, and perhaps save pastures, alfalfa and hay, or even row crops that have recently lost their well water supply.

"The reason I am taking this action is because the Bureau of Reclamation (BOR) has been taking measurements and has determined that Upper Klamath Lake is at a higher level than projected. This is due in part to irrigators above the Klamath Basin Project who have been able to conserve more water than previously projected and, thanks to Mother Nature, the scattered thunderstorms that have provided much-needed rain to the area and the Lake.

"Water could be released as early as tomorrow, but the timing will be coordinated between the Bureau of Reclamation and the Irrigation Districts.

"The Bureau of Reclamation will divert all the water released to contractors within the Klamath Basin Project. The Irrigation Districts will then be responsible for deciding on the allocation and distribution of the water, under their contracts with BOR. It's estimated that about 10,000 acre feet of the total will be needed to prime the canal system for the releases.

"Unfortunately, none of this water will reach the National Wildlife Refuges because there simply is not enough water to do more than provide a little relief to some desperate farm families during the remainder of this season. In the months ahead, we'll be looking at a number of options to assist the over-wintering bald eagles. These may include seeking new sources of groundwater, purchasing water from willing sellers and developing plans for supplemental feeding.

"I recognize that this is a only a small step toward providing help to farming communities in great need.

(more)



DEFENDANT'S EXHIBIT 74

PENGAD-Bayonne, N.J.

"We are committed to working with all interested parties in the current mediation process. We hope that this process will ultimately lead us to solutions that avoid a repeat of this situation next year and in the future. And we're grateful to the Oregon delegation and particularly Senator Gordon Smith and Congressman Greg Walden for the long hours of hard work that they and their staffs have put in to help the people of the Klamath Basin."

**-DOI-**