IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant,<br><br>PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,<br><br>Defendant-Intervenor | No. 01-591 L<br><br>Judge Francis M. Allegra |

**_AMICUS_ NATURAL RESOURCES DEFENSE COUNCIL'S NOTICE OF SUPPLEMENTAL AUTHORITY**

*Amicus* Natural Resources Defense Council, Inc. ("NRDC") respectfully requests the Court to grant NRDC leave to file a copy of the decision issued by the California Court of Appeals on February 9, 2006, in State Water Resources Control Board, 39 Cal.Rptr.3d 189 (Cal.Ct.App. 2006). NRDC 's lead counsel was unaware of this decision at the time of its last filing in this case. In this decision, consistent with the decision of the U.S. Court of Appeals for the Ninth Circuit in O'Neill v. United States, 50 F.3d 677 (9th Cir. 1995), the Court ruled that modifying the operations of a Bureau of Reclamation project to address environmental concerns did not interfere with a water user's contract rights. See Cal. Rptr. at 293-94. In addition, although the Court did not directly address the application of the public trust doctrine to the case, it observed: "It should be noted, however, that because the rights of an appropriator are always subject to the public trust doctrine (see National Audubon Society v. Superior Court []), the same is true of the rights of a person who contracts with an appropriator for the use of the water appropriated. An appropriator cannot give away more rights than he or she has." Id. at 294 n.54. This recently issued decision discussing reclamation contracts and the relevance of background principles of state law in the context of defining contract rights may be of assistance

to the Court in reaching its decision in this case.

For these reasons, NRDC respectfully requests the Court to grant leave to file this supplementary authority.

Respectfully submitted,

/s/John D. Echeverria
John D. Echeverria
Georgetown Environmental Law & Policy Institute
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9850

Hamilton Candee
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
(415) 777-0220

Counsel for Amicus Curiae NRDC

March 15, 2006

C

Briefs and Other Related Documents

Court of Appeal, Third District, California.
STATE WATER RESOURCES CONTROL BOARD CASES.
**No. C044714.**

Feb. 9, **2006.**

**Background:** In coordinated water rights proceedings, the Superior Court, Sacramento County, JCCP No. 4118, Roland L. Candee, J., upheld State Water Resources Control Board's Decision 1641 with specified exceptions. Eight notices of appeal and three notices of cross-appeal were filed by Board and other interested parties.

**Holdings:** The Court of Appeal, Robie, J., held that:
(1) Board failed to fully implement pulse flow objectives of 1995 Bay-Delta Plan in Board's decision;
(2) Board failed to adequately implement southern Sacramento-San Joaquin Delta salinity objectives at three locations;
(3) Board gave adequate notice that instream flow requirements on Mokelumne River were to be established;
(4) substantial evidence supported Board's decision to authorize Bureau of Reclamation to permit release of stored water from New Melones Reservoir in order to meet salinity standards;
(5) Board's implementation environmental impact report (EIR) adequately examined and discussed effects associated with impact of joint points of diversion on water quality in San Joaquin River; and
(6) landholders lacked standing to challenge habitat mitigation requirement for addition of encroachment lands to authorized place of use.
Affirmed in part, modified in part, and reversed in part.

West Headnotes

**[1] Evidence 48**
157k48 Most Cited Cases
On appeal from water rights proceeding, Court of Appeal would take judicial notice of decision issued by State Water Resources Control Board establishing new water quality objectives.

**[2] Waters and Water Courses 133**
405k133 Most Cited Cases
Appropriation
In undertaking to allocate water rights, the State Water Resources Control Board performs an adjudicatory function.

**[3] Administrative Law and Procedure 784.1**
15Ak784.1 Most Cited Cases
The trial court is authorized by law to exercise its independent judgment on the evidence when the right or interest affected by the administrative decision is a vested one.

**[4] Administrative Law and Procedure 744.1**
15Ak744.1 Most Cited Cases

**[4] Administrative Law and Procedure 788**
15Ak788 Most Cited Cases

**[4] Administrative Law and Procedure 796**
15Ak796 Most Cited Cases
If right affected by decision of administrative agency is vested, decision is reviewed by means of a limited trial de novo; if right is not vested, trial court's scope of review extends only to matters of law appearing on record of administrative proceeding, and accordingly its review of the evidence is limited to a determination of whether it is legally sufficient to sustain decision.

**[5] Administrative Law and Procedure 744.1**
15Ak744.1 Most Cited Cases

**[5] Administrative Law and Procedure 788**
15Ak788 Most Cited Cases

**[5] Administrative Law and Procedure 796**
15Ak796 Most Cited Cases
In a case wherein the trial court is authorized to conduct a limited trial de novo following an administrative decision, the province of the appellate court is analogous to that assumed by it in an ordinary civil appeal: only errors of law are subject to its cognizance, and a factual finding can be overturned only if the evidence received by the trial court, including the record of the administrative

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceeding, is insufficient as a matter of law to sustain the finding.

**[6] Administrative Law and Procedure 683**
15Ak683 Most Cited Cases

**[6] Administrative Law and Procedure 751**
15Ak751 Most Cited Cases

**[6] Administrative Law and Procedure 796**
15Ak796 Most Cited Cases
In a case wherein the trial court is not authorized to conduct a limited trial de novo following an administrative decision, the trial court itself exercises an essentially appellate function in that only errors of law appearing on the administrative record are subject to its cognizance; the trial and appellate courts occupy identical positions with regard to the administrative record, and the function of the appellate court, like that of the trial court, is to determine whether that record is free from legal error.

**[7] Administrative Law and Procedure 796**
15Ak796 Most Cited Cases
On appeal from an administrative decision, questions of law are subject to de novo review.

**[8] Statutes 219(1)**
361k219(1) Most Cited Cases
On appeal from an administrative decision, the proper interpretation of a statute, and its application to undisputed facts, is a question of law.

**[9] Administrative Law and Procedure 413**
15Ak413 Most Cited Cases

**[9] Statutes 219(1)**
361k219(1) Most Cited Cases
An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to "make law," and which, if authorized by the enabling legislation, bind the courts as firmly as statutes themselves, the binding power of an agency's interpretation of a statute or regulation is contextual: its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation.

**[10] Administrative Law and Procedure 416.1**
15Ak416.1 Most Cited Cases

**[10] Statutes 219(1)**
361k219(1) Most Cited Cases
On review of an agency's decision, courts must independently judge the text of the statute at issue, taking into account and respecting the agency's interpretation of its meaning, whether embodied in a formal rule or less formal representation.

**[11] Environmental Law 708**
149Ek708 Most Cited Cases
In a mandate proceeding to review an agency's decision for compliance with California Environmental Quality Act (CEQA), the appellate court reviews the administrative record to determine whether the agency abused its discretion.
West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[12] Environmental Law 689**
149Ek689 Most Cited Cases
In a mandate proceeding to review an agency's decision for compliance with California Environmental Quality Act (CEQA), abuse of discretion by the agency is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[13] Environmental Law 689**
149Ek689 Most Cited Cases
When the informational requirements of California Environmental Quality Act (CEQA) are not complied with, an agency has failed to proceed in a manner required by law, and has therefore abused its discretion. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[14] Environmental Law 690**
149Ek690 Most Cited Cases
When an agency fails to proceed as required by California Environmental Quality Act (CEQA), harmless error analysis is inapplicable. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[15] Environmental Law 577**
149Ek577 Most Cited Cases

**[15] Environmental Law 690**
149Ek690 Most Cited Cases
Failure to comply with California Environmental Quality Act (CEQA) subverts the purposes of CEQA if such failure omits material necessary to informed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

decisionmaking and informed public participation, and in such cases, the error is prejudicial. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[16] Environmental Law 708**
149Ek708 Most Cited Cases
In reviewing an agency's decision to certify an environmental impact report (EIR), the appellate court presumes the correctness of the decision; the project opponents thus bear the burden of proving that the EIR is legally inadequate. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[17] Environmental Law 708**
149Ek708 Most Cited Cases
While appellate court may not substitute its judgment for that of the decision makers in certifying an environmental impact report (EIR), court must ensure strict compliance with procedures and mandates of California Environmental Quality Act (CEQA). West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[18] Waters and Water Courses 133**
405k133 Most Cited Cases
State Water Resources Control Board failed to fully implement pulse flow objectives of 1995 Bay-Delta Plan in Board's water right decision, when it adopted a different flow regime in lieu of the pulse flow objective provided for by that decision; Board's decision to adopt temporary, experimental flow regime that might not provide as much water as the pulse flow objectives of plan resulted in a de facto amendment of the plan without complying with the procedural requirements for amending a water quality control plan. West's Ann.Cal.Water Code § 13247.

**[19] Administrative Law and Procedure 413**
15Ak413 Most Cited Cases
The interpretation of a regulation, like the interpretation of a statute, is a question of law, and while an administrative agency's interpretation of its own regulation deserves great weight, the ultimate resolution of such legal questions rests with the courts.

**[20] Administrative Law and Procedure 413**
15Ak413 Most Cited Cases
A court generally will not depart from an agency's interpretation of a regulation unless it is clearly erroneous or unauthorized.

**[21] Environmental Law 190**
149Ek190 Most Cited Cases
State Water Resources Control Board failed to adequately implement southern Sacramento-San Joaquin Delta salinity objectives at three locations, as provided in 1995 Bay-Delta Plan, by delaying implementation of objectives at those locations; in delaying implementation, Board effectively amended the 1995 Bay-Delta Plan without complying with procedural requirements for amending a water quality control plan.

**[22] Waters and Water Courses 145**
405k145 Most Cited Cases
Substantial evidence supported State Water Resources Control Board's findings, in support of decision to approve petitions by irrigation districts to add upstream location as a place of use and to add fish and wildlife enhancement as a purpose of use in their licenses, that such long-term changes to irrigation districts' licenses would not unreasonably affect or substantially injure any legal user of water; since riparians and appropriators had no right to water stored by irrigation districts, Board properly concluded they could not be injured or unreasonably affected, within the meaning of applicable statutes, by changes in the use of that water. West's Ann.Cal.Water Code § § 1707, 1736.

**[23] Waters and Water Courses 140**
405k140 Most Cited Cases
In the absence of a court order actually imposing a physical solution to a water rights dispute, riparian right holders could not claim any right under the physical solution doctrine to water stored upstream.

**[24] Waters and Water Courses 152(11)**
405k152(11) Most Cited Cases
Under the "physical solution doctrine," a court adjudicating a water rights dispute may, within limits, exercise its equitable powers to impose a physical solution to achieve a practical allocation of water to competing interests.

**[25] Waters and Water Courses 145**
405k145 Most Cited Cases
Changes permitted by State Water Resources Control Board with regard to water right permits that affected the reach of the San Joaquin River did not violate statutes pertaining to diversion of water from that river; licenses of irrigation districts that were the subject of the long-term change petitions were all issued on applications to appropriate water that were filed prior to the date the applicable statutes went into effect. West's Ann.Cal.Water Code § 12230 et seq.

**[26] Waters and Water Courses 145**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

405k145 Most Cited Cases
Adequate notice was given in water rights proceeding that instream flow requirements on the Mokelumne River were to be established; State Water Resources Control Board's original notice of public hearing provided notice that Board would consider implementing flow-dependent objectives in 1995 Bay-Delta Plan by allocating responsibility among water right holders to meet water flows and by requiring changes in operations of facilities used in the diversion and use of water, including the license and permit held by water district pertaining to Mokelumne River.

**[27] Waters and Water Courses 133**
405k133 Most Cited Cases
Parties who challenged State Water Resources Control Board's action with respect to instream flow requirements on the Mokelumne River in water rights proceeding forfeited that challenge by offering a one-sided recitation of the evidence; challenging parties were required to set forth in their brief all the material evidence on the point at issue and not merely their own evidence.

**[28] Administrative Law and Procedure 750**
15Ak750 Most Cited Cases
When an appellant challenges an administrative decision as unsupported by substantial evidence in light of the record as a whole, it is the appellant's burden to demonstrate that the administrative record does not contain sufficient evidence to support the agency's decision.

**[29] Waters and Water Courses 133**
405k133 Most Cited Cases
In adopting water rights decision, State Water Resources Control Board had no duty to give policy declarations contained in Davis-Dolwig Act, which deals with fish and wildlife and recreation in connection with state water projects, their full force and effect, since substantive provisions of Davis-Dolwig Act imposed no obligation on Board whatsoever. West's Ann.Cal.Water Code § § 11900-11925.

**[30] Waters and Water Courses 143**
405k143 Most Cited Cases
State Water Resources Control Board could impose export pumping limits as part of 1995 Bay-Delta Plan, notwithstanding alleged injury to legal users of water, since "no injury" rule applied only as required by statute, and export pumping limits at issue were not subject to any such statute. West's Ann.Cal.Water Code § § 1707, 1736.

**[31] Waters and Water Courses 133**
405k133 Most Cited Cases
Central Valley Project Act statute that protected specified water sources did not support challenges to implementation of 1995 Bay-Delta Plan stemming from decision by State Water Resources Control Board that imposed conditions on Bureau of Reclamation's New Melones Reservoir permits for meeting salinity and flow objectives; Board did not specifically require Bureau to meet Delta flow objectives by releases from New Melones, and, in any event, Bureau chose to release New Melones water for beneficial use within the Delta rather exporting the water outside the area, and challengers to Board's decision could not assert any priority to that water under statute. West's Ann.Cal.Water Code § 11460.

**[32] Waters and Water Courses 133**
405k133 Most Cited Cases
Challengers to decision by State Water Resources Control Board, which permitted
Bureau of Reclamation to use water from New Melones Reservoir to meet salinity and flow objectives, failed to demonstrate that Board's decision resulted in an unreasonable and unconstitutional use of water. West's Ann.Cal. Const. Art. 10, § 2.

**[33] Waters and Water Courses 133**
405k133 Most Cited Cases
For purposes of the constitutional requirement that the unreasonable use or unreasonable method of use of water is to be prevented, what constitutes a reasonable use or method of use of water is a question of fact to be determined according to the circumstances in each particular case. West's Ann.Cal. Const. Art. 10, § 2.

**[34] Waters and Water Courses 133**
405k133 Most Cited Cases
In the context of reviewing a decision by the State Water Resources Control Board for substantial evidence, to be substantial, evidence must be reasonable in nature, credible, and of solid value; it must actually be substantial proof of the essentials which the law requires in a particular case.

**[35] Waters and Water Courses 133**
405k133 Most Cited Cases
Unless it can be demonstrated that actions by the State Water Resources Control Board are not grounded upon any reasonable factual basis, the

courts should not interfere with its discretion or substitute their discretion for that of the Board.

**[36] Administrative Law and Procedure 🔑750**
15Ak750 Most Cited Cases
When an appellant challenges an administrative decision as unsupported by substantial evidence, it is the appellant's burden to demonstrate that the administrative record does not contain sufficient evidence to support the agency's decision.

**[37] Waters and Water Courses 🔑133**
405k133 Most Cited Cases
Substantial evidence supported decision by State Water Resources Control Board to authorize Bureau of Reclamation to use its discretion to permit release of stored water from New Melones Reservoir in order to meet salinity standards for water with salinity problems; Board observed that New Melones project was in a location close to site with salinity problems, and that it could conveniently meet the objectives at that site by water releases, which was a reasonable factual basis for Board's decision.

**[38] Waters and Water Courses 🔑133**
405k133 Most Cited Cases
Challengers to decision by State Water Resources Control Board failed to show that, as a matter of law, operations approved by Board to meet salinity objectives, including water exports, would injure water users in violation of Delta Protection Act; nothing in Act purported to grant any kind of water right to any particular party, Act provided no clear standard for determining what constituted an "adequate" water supply for users in Delta, and such a determination was a matter within Board's judgment, balancing all relevant factors and all competing interests in the water that flowed through Delta. West's Ann.Cal.Water Code § § 12200-12205.

**[39] Environmental Law 🔑536**
149Ek536 Most Cited Cases
Decision by State Water Resources Control Board that failed to implement specified flow objectives resulted in failure to establish minimum flows necessary to achieve salmon-doubling standard that Board had previously established as part of 1995 Bay-Delta Plan, thereby entitling opponents of Board's actions to a writ of mandate.

**[40] Environmental Law 🔑190**
149Ek190 Most Cited Cases
Approval by Environmental Protection Agency (EPA) of 1995 Bay-Delta Plan resulted in that plan supplanting standards promulgated by EPA; federal statute provided that after EPA determined that state standard met requirements of federal law, such standard became the water quality standard for applicable waters. Federal Water Pollution Control Act, § 303(c)(2)(A), (c)(3), 33 U.S.C.A. § 1313(c)(2)(A), (c)(3).

**[41] Waters and Water Courses 🔑133**
405k133 Most Cited Cases
State Water Resources Control Board did not violate the public trust doctrine by failing to do more in water rights proceeding to implement a narrative salmon protection objective; it was for Board in its discretion and judgment to balance all competing interests in adopting water quality objectives and formulating a program of implementation to achieve those objectives, and parties challenging Board's actions failed to show that Board acted inconsistently with its duty to protect public trust values so far as consistent with the public interest.

**[42] Navigable Waters 🔑2**
270k2 Most Cited Cases
The "public trust doctrine" recognizes that the sovereign owns all of its navigable waterways and the lands lying beneath them as trustee of a public trust for the benefit of the people.

**[43] Waters and Water Courses 🔑5**
405k5 Most Cited Cases
Under the public trust doctrine, the state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible.

**[44] Waters and Water Courses 🔑5**
405k5 Most Cited Cases
Under the public trust doctrine, the protection of recreational and ecological values is among the purposes of the public trust.

**[45] Waters and Water Courses 🔑133**
405k133 Most Cited Cases
On appeal in water rights proceeding from decision by State Water Resources Control Board that joint points of diversion would not operate to the injury of any legal user of the water involved by increasing the salinity of water at issue, Court of Appeal would presume that Board's finding was supported by substantial evidence, where challengers to Board's decision failed to show otherwise. West's Ann.Cal.Water Code § 1702.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[46] Waters and Water Courses 🔑133**
405k133 Most Cited Cases
Appropriation
State Water Resources Control Board did not improperly defer or delegate the decision in water rights proceeding as to whether joint points of diversion would operate to the injury of agricultural users by lowering water levels in the areas at issue; rather, Board determined that there would be no injury as long as Bureau of Reclamation and Department of Water Resources would ensure that their operations of the joint points of diversion did not cause water levels in the area to recede to a point where agricultural users could not divert water for their agricultural use.

**[47] Environmental Law 🔑604(3)**
149Ek604(3) Most Cited Cases
Implementation environmental impact report (EIR) prepared by State Water Resources Control Board adequately examined and discussed the effects associated with the impact of joint points of diversion on water quality in San Joaquin River for purposes of California Environmental Quality Act (CEQA); implementation EIR showed that, with the exception of one alternative, all joint points of diversion alternatives would result in decreased water deliveries compared to existing conditions, which would not increase salt load discharges into San Joaquin River. West's Ann.Cal.Pub.Res.Code § 21000 et seq.; 14 CCR § 15151.
*See 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 831 et seq.*; *Cal. Jur. 3d, Pollution and Conservation Laws, § 497 et seq.*

**[48] Environmental Law 🔑604(3)**
149Ek604(3) Most Cited Cases
Implementation environmental impact report (EIR) prepared by State Water Resources Control Board adequately discussed mitigation impacts of the joint points of diversion on water levels on Delta of Sacramento and San Joaquin Rivers for purposes of California Environmental Quality Act (CEQA); EIR acknowledged that reduced water level could have an adverse effect on water diversion downstream and recommended mitigation measure, and EIR discussed both beneficial and adverse impacts on wildlife, and mitigation measures. West's Ann.Cal.Pub.Res.Code § 21000 et seq.; 14 CCR § 15151.

**[49] Environmental Law 🔑665**
149Ek665 Most Cited Cases
Parties who alleged that State Water Resources Control Board failed to prepare an adequate environmental impact report (EIR) pursuant to California Environmental Quality Act (CEQA) with regard to San Joaquin River agreement did not fail to exhaust their administrative remedies; parties brought to Board's attention their position that the record before the Board did not contain an adequate analysis of the potential impact of the San Joaquin River agreement on return flows, and Board was given an adequate opportunity to address any deficiency in the implementation EIR regarding the return flow issue. West's Ann.Cal.Pub.Res.Code § 21000 et seq.; 14 CCR § 15151.

**[50] Environmental Law 🔑665**
149Ek665 Most Cited Cases
Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of an action under the California Environmental Quality Act (CEQA). West's Ann.Cal.Pub.Res.Code § 21177.

**[51] Administrative Law and Procedure 🔑229**
15Ak229 Most Cited Cases
The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review; the decisionmaking body is entitled to learn the contentions of interested parties before litigation is instituted.

**[52] Environmental Law 🔑604(3)**
149Ek604(3) Most Cited Cases
Parties challenging sufficiency of environmental impact report (EIR) required under California Environmental Quality Act (CEQA), as prepared by State Water Resources Control Board with regard to impacts on San Joaquin River agreement, failed to show that studies on which EIR was based were clearly inadequate or unsupported based on studies' exclusion of a change in return flows; irrigation districts anticipated that there would be little, if any, change in return flows as a result of their performance of the San Joaquin River agreement, which was a sufficient basis for exclusion of any such change from modeling study. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[53] Environmental Law 🔑615**
149Ek615 Most Cited Cases

**[53] Environmental Law 🔑689**
149Ek689 Most Cited Cases

When a challenge is brought to studies on which an environmental impact report (EIR) is based, as required under California Environmental Quality Act (CEQA), the issue is not whether the studies are irrefutable or whether they could have been better; the relevant issue is only whether the studies are sufficiently credible to be considered as part of the total evidence that supports the agency's decision, and a clearly inadequate or unsupported study will be entitled to no judicial deference. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[54] Environmental Law 599**
149Ek599 Most Cited Cases
The party challenging an environmental impact report (EIR) as required under the California Environmental Quality Act (CEQA) bears the burden of demonstrating that the studies on which the EIR is based are clearly inadequate or unsupported. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[55] Environmental Law 604(3)**
149Ek604(3) Most Cited Cases
Parties challenging sufficiency of environmental impact report (EIR) required under California Environmental Quality Act (CEQA), which was prepared by State Water Resources Control Board with regard to how San Joaquin River agreement would affect hydropower release schedules for reservoirs affected by the agreement, failed to show that Board's response to hydropower issue was unreasonable under the circumstances; although exact source of the flows was not identified in EIR, Board explained the assumptions of the water sources the irrigation districts would use on which Board based its analysis of potential impacts of San Joaquin River agreement, and further explained that, because the agreement gave districts flexibility in determining where to come up with the water, it was not feasible to analyze all possible operational decisions available to districts. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[56] Waters and Water Courses 144**
405k144 Most Cited Cases
Bureau of Reclamation was entitled to add fish and wildlife enhancements as an authorized purpose of use in various of Bureau's water permits, notwithstanding water district's assertion that a change in permits would operate to the injury of district as a legal user of water from the Central Valley Project (CVP); since district had no right to CVP water that Congress directed Bureau to put to other uses in the Central Valley Project Improvement Act, changes in Bureau's permits that would allow Bureau to comply with the Central Valley Project Improvement Act would not interfere with district's rights, and therefore the changes would not operate to the injury of district as a legal user of CVP water. West's Ann.Cal.Water Code § 1702.

**[57] Waters and Water Courses 144**
405k144 Most Cited Cases
State Water Resources Control Board properly construed the provisions governing authorized place of use in Bureau of Reclamation's water rights permits within county as the service areas shown on the maps attached to the application for those permits, rather than the entire county. West's Ann.Cal.Water Code § § 1260, 1261.

**[58] Estoppel 62.2(2)**
156k62.2(2) Most Cited Cases
State Water Resources Control Board was not estopped from asserting that the provisions governing authorized place of use in Bureau of Reclamation's water rights permits within county were the service areas shown on the maps attached to the application for those permits, rather than the entire county; county failed to demonstrate that it relied to its injury on Board's alleged error.

**[59] Estoppel 52.15**
156k52.15 Most Cited Cases
Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he or she must intend that his or her conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he or she must rely upon the conduct to his or her injury.

**[60] Waters and Water Courses 144**
405k144 Most Cited Cases
Merger Law did not exceed State Water Resources Control Board's authority under Water Code to limit Central Valley Project (CVP) water delivery within specified region to the places of use described in CVP permits; plain meaning of Merger Law failed to indicate any intent by Legislature to accomplish, by legislative fiat, a change in the authorized place of use in Bureau of Reclamation's CVP permits, or to impose on Water Rights Board a ministerial duty to approve such a change, in circumvention of the usual procedures and requirements of the Water Code. West's Ann.Cal.Water Code § § 37801, 37802,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

37805, 37820.

**[61] Estoppel 68(2)**
156k68(2) Most Cited Cases
Doctrine of judicial estoppel did not preclude State Water Resources Control Board from arguing that Merger Law did not exceed Board's authority under Water Code to limit Central Valley Project (CVP) water delivery within specified
region to the places of use described in CVP permits, where Board maintained a consistent position throughout the water rights proceedings regarding intent behind Merger Law.

**[62] Estoppel 68(2)**
156k68(2) Most Cited Cases
Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding; the doctrine serves to protect the integrity of the judicial process.

**[63] Estoppel 68(2)**
156k68(2) Most Cited Cases
The doctrine of judicial estoppel applies when: (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position; (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.

**[64] Appeal and Error 878(4)**
30k878(4) Most Cited Cases
A party who advocates the affirmance of a judgment does not have to file a cross-appeal to assert the judgment was correct on grounds other than the one on which the trial court relied.

**[65] Waters and Water Courses 144**
405k144 Most Cited Cases
Landholders in water rights proceeding lacked standing to challenge habitat mitigation requirement for addition of encroachment lands to the authorized place of use, where landholders failed to show that they would suffer an immediate, pecuniary, and substantial injury as a result of decision by State Water Resources Control Board due to a decline in property value. West's Ann.Cal.Water Code § 1126.

**[66] Appeal and Error 174**
30k174 Most Cited Cases
The issue of standing may be raised for the first time on appeal.

**[67] Mandamus 23(1)**
250k23(1) Most Cited Cases
Writ of mandate will issue only at the request of one who is beneficially interested in the subject matter of the action. West's Ann.Cal.C.C.P. § 1086.

**[68] Mandamus 23(1)**
250k23(1) Most Cited Cases
In determining whether a petitioner seeking a writ of mandate is beneficially interested in the subject matter for purposes of establishing standing, "beneficially interested" generally means the petitioner has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. West's Ann.Cal.C.C.P. § 1086.

**[69] Mandamus 23(1)**
250k23(1) Most Cited Cases
The standard used for determining whether a petitioner seeking a writ of mandate is beneficially interested in the subject matter for purposes of establishing standing is equivalent to the federal "injury in fact" test, which requires a party to prove by a preponderance of the evidence that it has suffered an invasion of a legally protected interest that is both concrete and particularized, and actual or imminent. West's Ann.Cal.C.C.P. § 1086.

**[70] Waters and Water Courses 133**
405k133 Most Cited Cases
In the context of water rights proceedings, one is considered "aggrieved" whose rights or interests are injuriously affected by the judgment, and the appellant's interest must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment.

**[71] Waters and Water Courses 144**
405k144 Most Cited Cases
In water rights proceeding, State Water Resources Control Board properly excluded expansion lands within the authorized place of use in Bureau of Reclamation's Central Valley Project (CVP) permits, where evidence supporting inclusion of expansion lands included only a programmatic review of the potential environmental impacts of that action.

**[72] Environmental Law 707**
149Ek707 Most Cited Cases
Parties in water rights proceeding forfeited their right on appeal to challenge a change environmental

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

impact report (EIR) required under California Environmental Quality Act (CEQA), where they failed to address trial court's ruling on exhaustion of administrative remedies in their opening appellate briefs. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[73] Appeal and Error 762**
30k762 Most Cited Cases
Generally, the appellate court will not consider points raised for the first time in an appellant's reply brief, unless good reason is shown for the failure to present them earlier.

**[74] Environmental Law 708**
149Ek708 Most Cited Cases
On review of a California Environmental Quality Act (CEQA) action, the appellate court's role is generally the same as that of the trial court and thus, the conclusions of the superior court, and its disposition of the issues are not conclusive on appeal. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[75] Appeal and Error 1078(1)**
30k1078(1) Most Cited Cases
Issues not raised in an appellant's brief are deemed waived or abandoned.

**[76] Appeal and Error 900**
30k900 Most Cited Cases
The most fundamental rule of appellate review is that an appealed judgment or order is presumed to be correct.

**[77] Administrative Law and Procedure 314**
15Ak314 Most Cited Cases
The contention that a fair hearing requires a neutral and unbiased decision maker is a fundamental component of a fair adjudication.

**[78] Administrative Law and Procedure 314**
15Ak314 Most Cited Cases
Bias and prejudice in administrative proceedings are not implied and must be clearly established; the challenge to the fairness of the adjudicator must set forth concrete facts demonstrating bias or prejudice.

**[79] Administrative Law and Procedure 314**
15Ak314 Most Cited Cases
Advance knowledge of adjudicative facts in an administrative hearing that are in dispute does not disqualify the members of an adjudicatory body from adjudicating a dispute; there must be a commitment to a result before the process will be found violative of due process.

**[80] Administrative Law and Procedure 314**
15Ak314 Most Cited Cases
Powers.

**[80] Waters and Water Courses 133**
405k133 Most Cited Cases
State Water Resources Control Board staff member's arrangement of and participation in a meeting aimed at developing water quality objectives failed to demonstrate bias or prejudice on the part of Board members five years later, in allocating responsibility for meeting the objectives that were eventually adopted.

***199** Baker, Manock & Jensen, John L.B. Smith, Christopher L. Campbell, Glenn J. Holder, and Kathleen A. Meehan, Fresno, for Plaintiffs and Appellants Angela Anderson et al.

Nomellini, Grilli & McDaniel, Dante John Nomellini, Dante John Nomellini, Jr.; John Herrick, Stockton; and Thomas M. Zuckerman, for Plaintiffs and Appellants Central Delta Water Agency, R.C. Farms, Inc., Reclamation District No. 2072, Reclamation District No. 2039, Zuckerman-Mandeville, Inc., and South Delta Water Agency.

Law Offices of Reid W. Roberts and Reid W. Roberts, for Plaintiff and Appellant Central San Joaquin Water Conservation District.

Richard E. Nosky, Jr., City Attorney, Douglas H. Calkins and John Luebberke, Deputy City Attorneys, for Plaintiff and Appellant City of Stockton.

Law Offices of Stephan C. Volker, Stephan C. Volker, San Francisco, Joshua A.H. Harris, Oakland, and Marnie E. Riddle, for Plaintiffs and Appellants Golden Gate **Audubon** Society, Marin **Audubon** Society, San Joaquin **Audubon** Society, California Sportfishing Protection Alliance, and Committee to Save the Mokulumne.

Neumiller & Beardslee, Thomas J. Shephard, Sr., and Deeanne Gillick, Stockton, for Plaintiffs and Appellants San Joaquin County and San Joaquin County Flood Control and Water Conservation District.

Squire, Sanders & Dempsey, Kevin T. Haroff and Olive **Lee** Thaler; Sonnenschein Nath & Rosenthal, Kevin T. Haroff, San Francisco, for Plaintiff and Appellant Santa Clara Valley Water District.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Herum Crabtree Brown, Jeanne M. Zolezzi, Stockton, Karna E. Harrigfeld, and Jennifer L. Spaletta, for Plaintiff and Appellant Stockton East Water District.

Kronick, Moskovitz, Tiedemann & Girard, Daniel J. O'Hanlon, Jon D. Rubin, and ***200** Andrew P. Tauriainen, Sacramento, for Plaintiff and Appellant **Westlands** Water District.

Bill Lockyer, Attorney General, Mary E. Hackenbracht, Senior Assistant Attorney General, Mark W. Poole and Clifford T. **Lee**, Deputy Attorneys General, for Defendant and Appellant State Water Resources Control Board.

O'Laughlin & Paris, Tim O'Laughlin and William C. Paris, III, Chico, for Real Parties in Interest and Appellants San Joaquin River Group Authority, Oakdale Irrigation District, Modesto Irrigation District, Turlock Irrigation District, Merced Irrigation District, San Joaquin River Exchange Contractors Water Authority, Central California Irrigation District, San Luis Canal Company, Firebaugh Canal Water District, Columbia Canal Company, and Friant Water Users Authority, City and County of San Francisco.

Bold, Polisner, Maddow, Nelson & Judson and Carl P.A. Nelson, Walnut Creek, for Real Party in Interest and Respondent Contra Costa Water District.

Nancy Saracino, David B. Anderson, and David Sandino, Sacramento, for Real Party in Interest and Respondent Department of Water Resources.

Robert C. Helwick, Oakland, Craig S. Spencer, and Fred S. Etheridge, for Real Party in Interest and Respondent East Bay Municipal Utility District.

Best Best & Krieger, Gregory K. Wilkinson, Riverside and L. John Nelson IV, for Real Parties in Interest and Appellants State Water Contractors, Kern County Water Agency, and Metropolitan Water District of Southern California.

Kronick, Moskovitz, Tiedemann & Girard, Daniel J. O'Hanlon, Jon D. Rubin, and Andrew P. Tauriainen, Sacramento, for Real Parties in Interest and Respondents **Westlands** Water District, San Luis & Delta-Mendota Water Authority, and San Benito County Water District.

ROBIE, J.

The history of California is written on its waters--from the Eel River, to the Salton Sea, to the Colorado River, to Lake Tahoe. But no area has been more critical than the Sacramento and San Joaquin Rivers and their great Delta and San Francisco Bay estuary.

Before us are eight appeals and three cross-appeals in seven coordinated cases known collectively as the "SWRCB Cases," Judicial Council Coordinated Proceeding No. 4118. These cases arose out of an omnibus water rights proceeding before the State Water Resources Control Board (the Board) that ostensibly began with notices issued in July 1995, and ostensibly ended in March 2000 with Revised Water Right Decision 1641 (Decision 1641).

In truth, however, the water rights proceeding from which these appeals arose is but a small part of a process that has been ongoing for more than four decades to solve the problems of water quality in the San Francisco Bay/Sacramento-San Joaquin Delta Estuary. [FN1] In the water rights proceeding, the Board sought to allocate responsibility among various water rights holders for meeting the flow-dependent water quality objectives in the Water Quality Control Plan for the Bay-Delta, which the Board had approved in May 1995 (the 1995 Bay-Delta Plan). [FN2] As will be seen, ***201** Decision 1641 assigned much of that responsibility to the two great water projects in the state--the Central Valley Project (CVP), operated by the United States Bureau of Reclamation (the Bureau), and the State Water Project (SWP), operated by the Department of Water Resources (the Department)--which, in normal water years, export about 30 percent of the water that reaches the Delta. Many of the issues on appeal involve this allocation of responsibility.

FN1. We will refer to the entire area as the Bay-Delta. When it is necessary to refer only to the Sacramento-San Joaquin Delta, we will refer to the Delta. (See Wat.Code, § 12220 [setting forth the boundaries of the Sacramento-San Joaquin Delta].)

FN2. The Board defined "flow-dependent objectives" as "all objectives that could be met by the flow of water or by changes in the operations of [diversion] facilities, notwithstanding that such objectives also could be met entirely or partially through other means, such as management measures and waste discharge requirements."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The water rights proceeding giving rise to these appeals also dealt with two other long-standing issues: first, a petition filed by the Bureau and the Department in 1995 to use each other's points of diversion in the southern Delta (the joint points of diversion petition), which had its origin in a similar petition filed by the Bureau in 1981; and second, a petition filed by the Bureau in 1985 (and thereafter amended) to change the places of use and conform the purposes of use in many of its CVP permits (the change petition).

On the joint points of diversion petition, the Board, in Decision 1641, conditionally granted the Bureau and the Department the right to use each other's pumping plants in the southern Delta to export water to the south and west. On the change petition, the Board took two actions. Decision 1641 approved the Bureau's request to conform the purposes of use in its CVP permits, which had the effect of adding fish and wildlife enhancement as an authorized purpose of use for water appropriated under 14 of those permits. Decision 1641 also approved the Bureau's request to change the places of use in its CVP permits, but only in part. The Board authorized the addition of lands that were previously outside the permits' authorized places of use but were already being served by CVP water, subject to mitigation requirements imposed on the Bureau for all of that land first converted to irrigated agricultural use by the delivery of that water. The Board did not, however, authorize the addition of lands that were not already being served by CVP water but were within the service districts of various CVP contractors. Instead, the Board determined those lands could be added later on a case-by-case basis.

Not surprisingly, given that water from the Delta is diverted to meet the needs of two-thirds of the population of California and to irrigate 4.5 million acres, many individuals and entities interested in Delta water appeared before the Board in the water rights proceeding at issue here. Again not surprisingly, not all of those parties were satisfied with the Board's Decision 1641, which is what brings us here today. Originally, four cases challenging different aspects of the Board's decision were coordinated and assigned to Judge Roland L. Candee. Ultimately, seven more cases were added, and three were dismissed, leaving eight.

In May 2003, Judge Candee issued his statement of decision in the coordinated cases, upholding Decision 1641 with two exceptions. First, Judge Candee concluded the Board erred when it failed to allocate responsibility for meeting all of the flow objectives in the 1995 Bay-Delta Plan. [FN3] Second, he concluded the Board ***202** erred as to the change petition, when it refused to include all of the lands within the service area of **Westlands** Water District (**Westlands**) for authorized place of use in the Bureau's CVP permits without any mitigation requirement. This latter conclusion rested on Judge Candee's determination that a 1965 statute that merged **Westlands** with another water district [FN4] "effectuated a statutory authorization for the delivery of federal CVP water to all of the lands of the combined ... district."

FN3. As we will explain more fully later, a flow objective is a water quality objective based on the amount of water (measured in cubic feet per second) flowing in a watercourse at a given time.

FN4. This statute is the **Westlands** Water District Merger Law (Wat.Code, § § 37800-37856), sometimes referred to as the Merger Statute or Merger Law.

From the resulting judgments, eight timely notices of appeal and three timely notices of cross-appeal were filed in seven of the coordinated cases. The Board and two other groups of parties challenge Judge Candee's ruling that Decision 1641 failed to implement all of the flow objectives in the 1995 Bay-Delta Plan. The Board also challenges Judge Candee's ruling that it must expand the authorized place of use in the Bureau's CVP permits to include all of the **Westlands** service area without any mitigation requirement. Various other parties challenge other aspects of Judge Candee's ruling, in which he upheld the remainder of Decision 1641. These challenges raise numerous issues regarding the law of water rights, as well as issues regarding the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). [FN5]

FN5. We will refer to the CEQA statutes in the format of CEQA, section ___. All other statutory references are to the Water Code unless otherwise indicated.

Following this introduction, we will begin by setting forth the factual and procedural background of the coordinated cases, starting with brief descriptions of the CVP and SWP and continuing with a summary of the efforts to address the problems of water quality in the Delta, which led to the Board's adoption of the 1995 Bay-Delta Plan. From there, we will summarize

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the underlying water rights proceeding in which the Board sought to allocate responsibility for meeting the flow-dependent objectives in the 1995 Bay-Delta Plan among the various water rights holders with interests in water that flows into the Delta. [FN6] We will also describe the joint points of diversion petition and the change petition, the reasons behind those petitions, and the Board's actions on them. We then will turn to the trial court proceedings.

FN6. This opinion does not purport to provide a comprehensive summary of either the 1995 Bay-Delta Plan or the water rights proceeding underlying these coordinated cases. Instead, our summary will focus on those aspects of the 1995 Bay-Delta Plan and those aspects of the proceeding that are relevant to the arguments before us on appeal, most of which relate to the San Joaquin River.

The discussion section of our opinion will first address arguments on appeal relating to the Board's implementation of the 1995 Bay-Delta Plan in the water rights proceeding. We will then address challenges relating to the joint points of diversion petition. Following this, we will address challenges to the environmental impact report (EIR) the Board prepared for the implementation of the 1995 Bay-Delta Plan and for the joint points of diversion petition. After addressing challenges relating to the change petition and to the EIR the Board prepared for that petition, we will conclude by addressing challenges to the Board's impartiality.

We agree with Judge Candee in most respects, but disagree with him in a few instances. Most significantly, we agree with Judge Candee that the Board erred ***203** when it failed to allocate responsibility for meeting all of the flow objectives in the 1995 Bay-Delta Plan. As will be seen, we conclude the Board was not entitled to implement alternate flow objectives agreed to by various interested parties in lieu of the flow objectives actually provided for in the 1995 Bay-Delta Plan. We also conclude that the Board failed to adequately implement certain salinity objectives in the 1995 Bay-Delta Plan and failed to implement the minimum flows necessary to achieve the narrative objective for salmon protection in the 1995 Bay-Delta Plan.

Unlike Judge Candee, however, we conclude the Merger Law did not impose a ministerial duty on the Board to augment the authorized place of use in the Bureau's CVP permits to include all of the lands within the **Westlands** service area without mitigation. We also reject all of the alternate arguments for upholding this aspect of Judge Candee's decision.

Based on our conclusions, we will affirm, modify, and reverse the judgments in the seven coordinated cases as appropriate.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

### *The CVP And The SWP*

Nearly 20 years ago, in an opinion authored by former Presiding Justice John T. Racanelli that is often identified simply as *Racanelli*, the Court of Appeal, First Appellate District, Division One, addressed an earlier attempt by the Board to adopt water quality objectives for the Delta. (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 227 Cal.Rptr. 161.) Rather than reinvent the wheel, we will draw on that opinion extensively, particularly in setting forth the background necessary to understand the issues in these coordinated cases.

We begin with Justice Racanelli's description of the two great California water projects--the CVP and the SWP.

### A

### *The CVP*

"The history of California water development and distribution is a story of supply and demand. California's critical water problem is not a lack of water but uneven distribution of water resources. The state is endowed with flowing rivers, countless lakes and streams and abundant winter rains and snowfall. But while over 70 percent of the stream flow lies north of Sacramento, nearly 80 percent of the demand for water supplies originates in the southern regions of the state. And because of the semiarid climate, rainfall is at a seasonal low during the summer and fall when the demand for water is greatest; conversely, rainfall and runoff from the northern snowpacks occur in late winter and early spring when user demand is lower. [Citation.] Largely to remedy such seasonal and geographic maldistribution, while simultaneously providing relief from devastating floods and droughts, the California water projects were ultimately conceived and formed.

"In 1933 the California Legislature adopted a plan for transfer of surplus water from the Sacramento River and its northern tributaries to the water-

deficient areas of the San Joaquin Valley through construction of a 'Central Valley Project': Shasta Dam, the central feature, to store and regulate waters of the Sacramento River; Friant Dam, on the western edge of the Sierra, to divert water from the San Joaquin River to southern regions of the valley; and various other units designed to transfer water from the Sacramento River system to the San Joaquin Valley. (Wat.Code, § 11100 et seq.) However, ***204** due to the pervasive unfavorable economic conditions during the Great Depression, the state turned to the federal government to finance and construct the massive project.

"Construction of the CVP began in 1937. It is now one of the world's most extensive water transport systems.[ [FN7]] As noted, Shasta Dam on the upper Sacramento River is the focal point of the CVP. Shasta Dam was completed in 1945 but began storing water and generating electric power in 1944. The waters of the Sacramento River which flow past the Shasta Dam are augmented by additional water supplies brought through a tunnel from the Trinity River and from reservoirs formed by Folsom and Nimbus Dams on the American River. About 30 miles south of Sacramento, the Delta Cross Channel regulates the passage of Sacramento River water through the Delta to the Tracy Pumping Plant.

FN7. Appendix A attached to this opinion depicts the major facilities of the CVP.

"At Rock Slough, a portion of the water is pumped into the Contra Costa Canal for municipal uses in Contra Costa County. At the Tracy Pumping Plant, the water is lifted nearly 200 feet above sea level into the Delta[-]Mendota Canal and flows 117 miles southward to the Mendota Pool. Here, the waters from the north replace the natural flow of the San Joaquin River. At Friant Dam, the flow of the San Joaquin River is impounded and diverted through the Friant-Kern Canal 152 miles south to the southern reaches of the San Joaquin Valley." (*United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at pp. 98-99, 227 Cal.Rptr. 161, fn. omitted.)

In addition to providing water to replace the flow of the San Joaquin River at the Mendota Pool, the Delta-Mendota Canal also supplies water for agricultural users on the west side of the San Joaquin Valley and conveys water for storage in San Luis Reservoir. That reservoir provides water to CVP contractors in the San Joaquin Valley as well as to Santa Clara and San Benito Counties through the Pacheco Tunnel.

Another part of the CVP significant to this proceeding is New Melones Dam on the Stanislaus River, which joins the San Joaquin River near Vernalis. Completed in 1979, New Melones provides flood control and maintains water quality conditions in the Stanislaus and San Joaquin Rivers. Water from New Melones is also delivered to local CVP contractors.

The CVP supplies water to over 250 long-term water contractors under contracts with the Bureau. Most of those contractors put the water to agricultural use; as of 1999, CVP water was used to irrigate approximately 19,000 farms covering three million acres. The CVP also supplies water to many urban areas in northern and central California, including Redding, Sacramento, most of Santa Clara County, Stockton, and Fresno.

"Under section 8 of the Reclamation Act of 1902 (43 U.S.C. § 383), the ... Bureau is required to comply with state law and to acquire water rights for diversion and storage of water by the CVP." (*United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at p. 106, 227 Cal.Rptr. 161; see also *California v. United States* (1978) 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 [a state may impose any condition on control, appropriation, use or distribution of water in a federal reclamation project which is not inconsistent with clear congressional directives respecting the project].) Permit applications to appropriate water for the CVP, initially filed on behalf of the state, were assigned ***205** to the Bureau when the federal government assumed responsibility for constructing the CVP. (*United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at p. 106, 227 Cal.Rptr. 161.) "The CVP was actually completed and in operation before permits [to appropriate water for the project] were issued: the first permits were issued to the ... Bureau in 1958 ... and the principal permits were issued in 1961...." (*Ibid.*)

B

*The SWP*

"Following World War II, state authorities renewed their efforts to develop a comprehensive statewide water plan. In 1951 the Legislature authorized the Feather River and Sacramento-San Joaquin Delta Diversion Project. (§ 11260.) This project--referred to as the SWP--began operations in 1967 under management of the [Department].[ [FN8]] Water from the Feather River is stored behind Oroville Dam

and is released into the Feather River and its eventual confluence with the Sacramento River." (*United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at pp. 99-100, 227 Cal.Rptr. 161, fn. omitted.) In the northern Delta, water is diverted from Barker Slough into the North Bay Aqueduct for municipal use in Solano and Napa Counties. "The water flow continues through the Delta to the Clifton Court Forebay [in the southern Delta] where a portion of it enters the South Bay Aqueduct for delivery to [urban and agricultural areas in Alameda and Santa Clara Counties]. A much greater portion is lifted [at the Harvey O. Banks Delta Pumping Plant] into the California Aqueduct for transport through the San Joaquin Valley [and for use by contractors in the southern San Joaquin Valley] and eventually again lifted by a series of pumping stations over the Tehachapi Mountains for delivery and use in the Southern California region." (*Id.* at p. 100, 227 Cal.Rptr. 161.)

FN8. Appendix B attached to this opinion depicts the major facilities of the SWP.

SWP water is delivered to 29 long-term contractors, including agricultural users in the San Joaquin Valley, with Kern County Water Agency having the contract for the greatest amount of water. SWP water transported to Southern California is used primarily for municipal and industrial purposes; Metropolitan Water District of Southern California is the SWP's largest contractor.

The permits to appropriate water for operation of the SWP were issued to the Department in 1967. (*United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at p. 106, 227 Cal.Rptr. 161.)

II

*Water Quality In The Delta*

Obviously, the Delta plays a major role in both of California's great water projects, as water exported by both projects to the San Francisco Bay Area, the San Joaquin Valley, and Southern California is diverted from the southern Delta for transportation to the west and south. Thus, the quality of water in the Delta is important to the projects and their contractors, as well as to other water users in and around the Delta, and to the maintenance and enhancement of fish and wildlife in the Delta.

Once again, we turn to Justice Racanelli's opinion:

"The Delta generally describes a large lowland area with a labyrinth of natural channels in and around the confluence of the Sacramento and San Joaquin Rivers. The combined river water passes through ***206** the Delta into Suisun Bay and then into San Francisco Bay. In 1959, the legal boundaries of the Delta were fixed by the Legislature. (§ 12220.) The bounded area is roughly triangular, with Sacramento at the north, Vernalis at the south and Pittsburg at the west.

"The major factor affecting water quality in the Delta is saltwater intrusion. Delta lands, situated at or below sea level, are constantly subject to ocean tidal action. Salt water entering from San Francisco Bay extends well into the Delta, and intrusion of the saline tidal waters is checked only by the natural barrier formed by fresh water flowing out from the Delta.

"But as fresh water was increasingly diverted from the Delta for agricultural, industrial and municipal development, salinity intrusion intensified, particularly during the dry summer months and in years of low precipitation and runoff into the river systems. One of the major purposes of the projects was containment of maximum salinity intrusion into the Delta. By storing waters during periods of heavy flow and releasing water during times of low flow, the freshwater barrier could be maintained at a constant level." (*United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at p. 107, 227 Cal.Rptr. 161.)

A

*Before The 1995 Bay-Delta Plan*

Efforts to address water quality problems in the Delta date back more than 40 years. In 1961, the State Water Rights Board [FN9] (the Water Rights Board) adopted Decision 990, which approved the Bureau's applications for permits to appropriate water from the Sacramento River and the Delta for the CVP. In that decision, the Water Rights Board recognized the problem of salinity incursion into the Delta, but the Water Rights Board did not attach any specific water quality standards as terms and conditions of the CVP permits. Instead, the Water Rights Board reserved jurisdiction to impose such requirements later, allowing the Bureau, the state, and water users in the Delta an opportunity to reach agreement on salinity control for the Delta in the interim.

FN9. The State Water Rights Board, one of the predecessors to the current State Water Resources Control Board, was created by the Legislature in 1956 as a constituent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

entity within the state's Resources Agency, independent from the Department, to serve as a quasi-judicial body with the responsibility for administering water rights. (See Stats.1957, 1st Ex.Sess.1956, ch. 52, § 7, pp. 425-427; Assem. Interim Com. on Water, A Proposed Water Resources Control Board for California: A Staff Study (July 1966) pp. 19-21.)

In 1965, various interested parties reached agreement on water quality criteria for the Delta--the so-called Tracy standards. (See *United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at p. 110, 227 Cal.Rptr. 161.) Two years later, the Water Rights Board issued Decision 1275, which approved the Department's applications for permits to appropriate water from the Feather River and the Delta to operate the SWP. In that decision, the Water Rights Board noted that "both federal and state agencies are conducting extensive studies regarding the problem of water quality in the San Francisco Bay and the Delta for the purpose of determining what standards of water quality should be maintained and recommending how this is to be accomplished." Because it lacked "sufficient information ... to finally determine the terms and conditions regarding water quality in the Delta which will reasonably protect vested rights without resulting in waste of water," the Water Rights Board reserved jurisdiction to impose terms and conditions on the ***207** SWP permits for water quality control. In the interim, the Water Rights Board limited the Department's diversion and storage of water from April 1 through June 30 in certain circumstances and conditioned the permits on compliance with the Tracy standards.

Meanwhile, in 1966, a proposal was made to consolidate the then existing State Water Quality Control Board with the Water Rights Board into a new agency--the State Water Resources Control Board. (See generally Assem. Interim Com. on Water, A Proposed Water Resources Control Board for California: A Staff Study, *supra*.) The purpose of this consolidation was "to provide for the orderly and efficient administration of the water resources of the state [by] establish[ing] a control board which shall exercise the adjudicatory and regulatory functions of the state in the field of water resources" and "to combine the water rights and the water pollution and water quality functions of state government to provide for consideration of water pollution and water quality, and availability of unappropriated water whenever applications for appropriation of water are granted or waste discharge requirements or water quality objectives are established." (§ 174.) Legislation creating the consolidated Board was enacted in 1967, and the Board came into existence on December 1, 1967. (Stats.1967, ch. 284.)

In 1969, the Legislature enacted a new water quality control law--the Porter-Cologne Water Quality Control Act (Porter-Cologne Act; § 13000 et seq.). (Stats.1969, ch. 482; see also Robie, *Water Pollution: An Affirmative Response by the California Legislature* (1970) 1 Pacific L.J. 2.) A summary of some of the provisions of that act will assist in understanding the efforts to address water quality in the Delta that followed.

"[T]he Porter-Cologne Water Quality Control Act ... establishes a comprehensive statewide program for water quality control administered by nine regional boards and coordinated by the state Board. The regional boards are primarily responsible for formulation and adoption of water quality control plans covering the state's 16 planning basins (§ 13240) subject to the Board's review and approval (§ 13245). But the Board alone is responsible for setting statewide policy concerning water quality control (§ § 13140-13147).

"And in its capacity as the designated state water pollution control agency for purposes of the Federal Water Pollution Control Act (§ 13160), the Board is empowered to formulate its own water quality control plans which supersede conflicting regional basin plans. (§ 13170.)" (*United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at p. 109, 227 Cal.Rptr. 161.)

Under the Porter-Cologne Act, " '[w]ater quality control' means the regulation of any activity or factor which may affect the quality of the waters of the state ...." (§ 13050, subd. (i).) " 'Quality of the water' ... refers to chemical, physical, biological, bacteriological, radiological, and other properties and characteristics of water which affect its use." (*Id.*, subd. (g).) A water quality control plan "consists of a designation or establishment for the waters within a specified area of all of the following: [¶ ] (1) Beneficial uses to be protected. [¶ ] (2) Water quality objectives. [¶ ] (3) A program of implementation needed for achieving water quality objectives." (*Id.*, subd. (j).) " 'Water quality objectives' means the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(*Id.*, subd. (h).)

***208** "In formulating a water quality control plan, the Board is invested with wide authority 'to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible.' (§ 13000.) In fulfilling its statutory imperative, the Board is required to 'establish such water quality objectives ... as in its judgment will ensure the reasonable protection of beneficial uses ...' (§ 13241), a conceptual classification far-reaching in scope.[ [FN10]] ' "Beneficial uses" of the waters of the state that may be protected against quality degradation include, but are not necessarily limited to, domestic, municipal, agricultural and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves.' (§ 13050, subd. (f).) Thus, in carrying out its water quality planning function, the Board possesses broad powers and responsibilities in setting water quality [objectives]." [FN11] (*United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at pp. 109-110, 227 Cal.Rptr. 161.)

FN10. Although on its face section 13241 applies only to water quality objectives established by the regional boards, section 13170 provides that the Board "may adopt water quality control plans in accordance with the provisions of Sections 13240 to 13244."

FN11. The opinion authored by Justice Racanelli frequently refers to "water quality standards," but the term used in the Porter-Cologne Act is "water quality objectives." (See § 13241.) Accordingly, in quoting Justice Racanelli's opinion, we have substituted the word "objectives" for the word "standards" where appropriate.

The program of implementation that must be included in every water quality control plan must "include, but not be limited to: [¶ ] (a) A description of the nature of actions which are necessary to achieve the objectives, including recommendations for appropriate action by any entity, public or private. [¶ ] (b) A time schedule for the actions to be taken. [¶ ] (c) A description of surveillance to be undertaken to determine compliance with objectives." (§ 13242.) Also, the Board may "not adopt any water quality control plan unless a public hearing is first held, after the giving of notice...." (§ 13244.)

"In performing its regulatory function of ensuring water quality by establishing water quality objectives, the Board acts in a legislative capacity." (*United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at p. 112, 227 Cal.Rptr. 161.) "[W]ater quality control plans ... are quasi-legislative." (*State Water Resources Control Bd. v. Office of Admin. Law* (1993) 12 Cal.App.4th 697, 701-702, 16 Cal.Rptr.2d 25.)

[1] In 1971, following the enactment of the Porter-Cologne Act, "the Board issued Decision 1379 establishing new water quality [objectives] purportedly applicable to both the CVP and the SWP. The decision was stayed as a result of litigation challenging the Board's authority to impose conditions on permits held by a federal agency.[ [FN12]]

FN12. We have been asked to take judicial notice of Decision 1379; that request is granted.

"At about the same time, the regional water quality control boards (see § 13240) formulated plans for the 16 'basins' of the state, including the Delta and the Suisun Marsh. The Basin 5B Plan, setting water quality [objectives] for the Delta, and the Basin 2 Plan, setting [objectives] for the San Francisco Bay Basin, were finally approved by the Board in 1975.

"In approving the Basin 5B Plan, the Board indicated its intention to convene ***209** hearings no later than July 1, 1978, for the purpose of receiving further evidence relating to salinity control and protection of fish and wildlife. [Over an 11-month period], the Board held an extended evidentiary hearing culminating in [August 1978 with the] adoption of the 1978 Water Quality Control Plan for the Sacramento-San Joaquin Delta and Suisun Marsh. The Plan [wa]s intended to remain in effect for 10 years with new hearings to be scheduled in 1986 to reevaluate the Delta [objectives].

"In conducting the 1978 proceedings, the Board for the first time acted pursuant to its combined authority to determine water rights and to establish water quality [objectives]. (§ 174.) In discharging its dual functions, the Board reconsidered existing water quality [objectives] in light of current data concerning the effects on the Delta of the operations of the two water projects--the users with the greatest

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

impact. The Board also undertook to modify the existing water rights permits of the projects--the water rights holders with the lowest seniority--in order to implement the enacted water quality [objectives].

"The final product of the Board's efforts was the Water Quality Control Plan for the Sacramento-San Joaquin Delta and Suisun Marsh and Water Right Decision 1485. In the Plan, the Board set new water quality [objectives] to protect fish and wildlife and to protect agricultural, industrial and municipal uses of Delta waters. In the Decision, the Board modified the permits held by the ... Bureau and the [Department] to compel the projects to release enough water into the Delta or to reduce their exports from the Delta so as to maintain the water quality [objectives] set in the Plan." (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at pp. 110-111, 227 Cal.Rptr. 161.)

A number of parties filed mandamus petitions seeking to invalidate the water quality control plan and Decision 1485. (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 111, 227 Cal.Rptr. 161.) In the coordinated proceeding on those petitions, the trial court rejected the Board's water quality objectives as inadequate and issued a writ of mandate commanding the Board to set aside the plan and the decision and to reconsider the plan. (*Id.* at pp. 111, 120, 227 Cal.Rptr. 161.)

On appeal, in the 1986 opinion authored by Justice Racanelli, the appellate court concluded "that the modification of the projects' permits in order to implement the water quality [objectives] was a proper exercise of the Board's water rights authority," but "in establishing only such water quality [objectives] as will protect Delta water users against the effects of project activities, the Board misconceived the scope of its water quality planning function." (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 98, 227 Cal.Rptr. 161.) According to the court, "the Board has the power and duty to provide water quality protection to the fish and wildlife that make up the delicate ecosystem within the Delta." (*Ibid.*) The appellate court also concluded that "the procedure followed--combining the water quality and water rights functions in a single proceeding--was unwise" because in doing so "the Board compromised its important water quality role by defining its scope too narrowly in terms of enforceable water rights." (*Id.* at pp. 119, 120, 227 Cal.Rptr. 161.)

Because the Board had already announced its "intention to conduct hearings during 1986 to establish new and revised" ***210** water quality objectives, the appellate court determined that "remand to the Board could serve no useful purpose." (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 120, 227 Cal.Rptr. 161.) Accordingly, the court reversed the judgment commanding the Board to reconsider the water quality control plan and instead simply expressed its expectation that "the renewed proceedings [would] be conducted in light of the principles and views expressed in [the court's] opinion." (*Ibid.*) As a result, Decision 1485 remained in effect.

A description of the next phase in the history of water quality control in the Delta can be found in the 1995 Bay-Delta Plan:

"In July 1987, the [Board] began proceedings to reexamine water quality objectives for the Bay-Delta Estuary and consider how water right permits would be modified to meet the new objectives. In May 1991, the [Board] adopted the 1991 Bay-Delta Plan with objectives for salinity, dissolved oxygen, and temperature. The 1991 Bay-Delta Plan was subsequently submitted to the U.S. Environmental Protection Agency (USEPA) for approval. In September 1991, the USEPA approved all of the salinity objectives for municipal, industrial, and agricultural beneficial uses, and the dissolved oxygen objective for fish and wildlife beneficial uses. The USEPA stated that the other fish and wildlife objectives were disapproved because of their failure to protect estuarine habitat and other fish and wildlife beneficial uses. As required under federal regulations [citation] when a state does not adopt changes in standards recommended by the USEPA upon notification of approval or disapproval of a state's standards, the USEPA initiated promulgation of water quality standards for the Bay-Delta Estuary. In January 1994, the USEPA published draft standards for the Estuary in the Federal Register [citation].

"To coordinate the parallel State and federal Bay-Delta resource management activities, the Governor's Water Policy Council of the State of California (Council) and the Federal Ecosystem Directorate (FED), comprised of State and federal resource agencies collectively known as CALFED, entered into a Framework Agreement in June 1994. The purpose of the agreement is to establish a comprehensive program for coordination and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

communication between the Council and the FED regarding environmental protection and water supply dependability in the Bay-Delta Estuary and its watershed. The CALFED agreement identifies three areas where both State and federal interests and responsibilities are interrelated, and coordination and cooperation are particularly important: (1) formulation of water quality standards for the Estuary; (2) improved coordination of federal and State water project operations with regulatory requirements; and (3) development of a long-term solution to fish and wildlife, water supply reliability, flood control, and water quality problems in the Bay-Delta Estuary. In accordance with the Framework Agreement, the administrator of the USEPA signed final federal standards for the Estuary on December 14, 1994." (1995 Bay-Delta Plan, pp. 5-6, fn. omitted.)

Meanwhile, in March 1994, the Board commenced a proceeding to revise the water quality objectives for the Bay-Delta. During public workshops, the Board encouraged interested parties to develop alternatives for revising the objectives. Eventually, various representatives of the state and federal governments and certain urban, agricultural, and environmental interests reached agreement on recommendations to the Board for the revised objectives. This agreement is embodied in a ***211** document entitled "Principles for Agreement on Bay-Delta Standards between the State of California and the Federal Government" (principles for agreement), which was signed on December 15, 1994. Among the signatories were the Secretary of the California Resources Agency and the Secretary for the California Environmental Protection Agency.

The same day the principles for agreement were signed, the Board released the first draft of its new water quality control plan for the Bay-Delta. The Board used several elements of the principles for agreement, as well other recommendations from interested parties, in preparing the draft plan.

B

*The 1995 Bay-Delta Water Quality Control Plan*

The Board adopted the new water quality control plan for the Bay-Delta in May 1995. The 1995 Bay-Delta Plan identified 17 beneficial uses, both within the Delta and throughout the state, to be served by the waters of the Delta. These uses fall into three broad categories: municipal and industrial, agricultural, and fish and wildlife. The 1995 Bay-Delta Plan then identified water quality objectives with respect to each of these categories of uses "to attain the highest water quality which is reasonable, considering all demands being made on the waters of the Estuary." The Board established various salinity objectives "for the reasonable protection of [agriculture as a beneficial use] from the effects of salinity intrusion and agricultural drainage in the western, interior, and southern Delta." To protect fish and wildlife uses, the Board's plan established objectives for six parameters: dissolved oxygen, salinity, amounts of Delta outflow, river flows, export limits, and Delta cross-channel gate operation. The plan also included a narrative objective for salmon protection. The objectives at issue in these coordinated cases are described below.

1. *The Southern Delta Salinity Objectives*

The Board adopted various salinity objectives in the plan (expressed as electrical conductivity or EC) to protect agricultural uses in the western, interior, and southern Delta. To protect agricultural uses in the southern Delta, the Board adopted salinity objectives to be met at four different locations: (1) San Joaquin River at Airport Way Bridge, Vernalis (the Vernalis salinity objective); (2) San Joaquin River at Brandt Bridge; (3) Old River near Middle River; and (4) Old River at Tracy Road Bridge. The 1995 Bay-Delta Plan specified the objectives as 0.7 EC from April through August and 1.0 EC from September through March at all four locations, but specified in a footnote that the objectives were to be met at the two Old River locations by December 31, 1997. (1995 Bay-Delta Plan, p. 17.)

2. *The Delta Outflow Objective*

Water flow can be regulated as a water quality objective because, as the Board explained in the 1995 Bay-Delta Plan, "the rate and quantity of flow ... are physical properties or characteristics of the water" which "have an impact on the beneficial uses of" water in the Bay-Delta. (See § 13050, subd. (g).) Thus, a flow objective sets the amount of water that must be flowing in a watercourse at a given time "for the reasonable protection of beneficial uses of [the] water." (*Id.*, subd. (h).) Obviously, meeting such an objective may be achieved, among other ways, by reducing the amount of water that upstream water right holders divert from the watercourse ***212** or by increasing the amount of water released into the watercourse.

In the 1995 Bay-Delta Plan, the Board explained that "Delta outflow objectives are included for the protection of estuarine habitat for anadromous fishes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and other estuarine-dependent species." The parameter for those objectives was the net delta outflow index (outflow index). The outflow index was a number representing the net amount of water flowing out of the Delta, which was to be calculated by taking the amount of water flowing into the Delta and subtracting from that figure the amount of water being consumed in the Delta and the amount of water being exported from the Delta. For example, every year in September, the 1995 Bay-Delta Plan required a minimum monthly average outflow index of 3,000 cubic feet per second (cfs) of water to be flowing out of the Delta to protect estuarine habitat within the Delta. (1995 Bay-Delta Plan, pp. 15, 19, 25.)

3. *The Vernalis Flow Objectives*

As part of the river flow objectives in the 1995 Bay-Delta Plan, the Board set minimum monthly average flow rates on the San Joaquin River at Vernalis (the Vernalis flow objectives). The Board explained that "Sacramento and San Joaquin river flow objectives are included to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." One part of the Vernalis flow objectives was a "pulse" flow during a 31-day period in April and May of each year (the Vernalis pulse flow objective). The 1995 Bay-Delta Plan called for an average flow rate during that period ranging from 3,110 to 8,620 cfs, depending on the type of water year and on certain salinity measurements. [FN13] The 1995 Bay-Delta Plan also specified that while the default period for the pulse flow was April 15 to May 15, "[t]his time period may be varied based on real-time monitoring. One pulse, or two separate pulses of combined duration equal to the single pulse, should be scheduled to coincide with fish migration in San Joaquin River tributaries and the Delta. The time period for this 31-day flow requirement will be determined by the operations group established under the Framework Agreement." (1995 Bay-Delta Plan, p. 29.)

FN13. The 1995 Bay-Delta Plan identified five different types of water years: wet, above normal, below normal, dry, and critical. For each water year, the 1995 Bay-Delta Plan specified two different flow objectives. According to the plan, "[t]he higher flow objective applies when the 2 ppt isohaline (measured as 2.64 mmhos/cm surface salinity) is required to be at or west of Chipps Island." (1995 Bay-Delta Plan, pp. 19, 21, 23.)

4. *The Salmon Protection Objective*

The 1995 Bay-Delta Plan also included a narrative objective for the protection of salmon, which provided: "Water quality conditions shall be maintained, together with other measures in the watershed, sufficient to achieve a doubling of natural protection of chinook salmon from the average production of 1967-1991, consistent with the provisions of State and federal law." (1995 Bay-Delta Plan, p. 18.)

5. *The Program Of Implementation*

In addressing implementation of the objectives in the 1995 Bay-Delta Plan, the Board divided the program of implementation into "four general components: (1) measures within [the Board's] authority over water diversion and use which implement the water quality objectives; (2) measures requiring a combination of [the Board's] water quality and water rights authorities and actions by other agencies to implement the objectives; (3) recommendations to other agencies to improve ***213** fish and wildlife habitat conditions; and (4) a monitoring and special studies program." The Board then explained: "The specific actions identified within these components include time schedules for implementation, if appropriate. If no time schedule is included, implementation should be immediate." (1995 Bay-Delta Plan, p. 27.)

The Board included within the first component of its program of implementation the agricultural salinity objectives (with the exception of those for the protection of the southern Delta), the Delta outflow objectives, and the river flow objectives for the protection of fish and wildlife, including the Vernalis pulse flow objective. In describing "the nature of [the] actions ... necessary to achieve the[se] objectives" (§ 13242, subd. (a)), the Board explained that it would "initiate a water rights proceeding following adoption of this water quality control plan" that would "address the water supply-related objectives in this plan through the amendment of water rights under the authority of the [Board]." According to the Board, "[t]he water right decision ... will allocate responsibility for meeting the objectives among water rights holders in the Bay-Delta Estuary watershed and establish terms and conditions in appropriate water rights." The Board noted that pending adoption of that decision, which the Board anticipated would occur before June 1998, "the [Bureau] intends to meet San Joaquin River flow

requirements, in accordance with the March 6, 1995 U.S. Fish and Wildlife Service (USFWS) biological opinion for the threatened Delta smelt, which are consistent with the San Joaquin River flow objectives in this plan. These flows are interim flows and will be reevaluated as to timing and magnitude, up or down, within the next three years. During the three-year period, decisions by the FERC [the Federal Energy Regulatory Commission] or other regulatory orders may increase flows to the Estuary required of upstream water users. These flows will be considered by the [Board] in its allocation of responsibility among the water rights holders in the watershed during the water rights proceeding." (1995 Bay-Delta Plan, p. 29.)

The Board included within the second component of the program of implementation--"measures requiring a combination of [the Board's] water quality and water rights authorities and actions by other agencies to implement the objectives"--the agricultural salinity objectives for the southern Delta, including the Vernalis salinity objective. The Board explained: "Elevated salinity in the southern Delta is caused by low flows, salts imported in irrigation water by the State and federal water projects, and discharges of land-derived salts, primarily from agricultural drainage. Implementation of the objectives will be accomplished through the release of adequate flows to the San Joaquin River and control of saline agricultural drainage to the San Joaquin River and its tributaries. Implementation of the agricultural salinity objectives for the two Old River sites shall be phased in so that compliance with the objectives is achieved by December 31, 1997." (1995 Bay-Delta Plan, pp. 27, 29.)

With respect to the Vernalis salinity objective in particular, the Board explained: "This plan's objectives for flows in the San Joaquin River at Vernalis are expected to contribute to achieving the salinity objectives in the southern Delta. Presently, the [Bureau] is responsible for meeting Vernalis salinity objectives through the release of water from New Melones Reservoir, as required under Water Right Decision 1422. Additional releases from other reservoirs for fish and wildlife protection in San Joaquin River tributaries may be required through ongoing FERC proceedings. Implementation of the [Board]'s ***214** Nonpoint Source Management Plan, adopted in 1988, and recommended activities of the multi-agency San Joaquin Valley Drainage Program (SJVDP), discussed below, will also contribute to achieving the salinity objectives. Additionally, the Central Valley [Regional Water Quality Control Board] should continue its salt load reduction program, initiated in response to adoption of the 1991 Bay-Delta Plan, to reduce annual salt loads discharged to the San Joaquin River by at least 10 percent and to adjust the timing of such discharges from low flow to high flow periods. These source control and drainage management measures will decrease the need for releases of water from New Melones. The [Board] will evaluate implementation measures for the southern Delta agricultural salinity objectives in the water rights proceeding." (1995 Bay-Delta Plan, p. 29.)

The plan also included, in the second component of the program of implementation, the narrative objective for salmon protection. The Board explained: "It is uncertain whether implementation of the numeric objectives in this plan alone will result in achieving the narrative objective for salmon protection. Therefore, in addition to the timely completion of a water rights proceeding to implement river flow and operational requirements which will help protect salmon migration through the Bay-Delta Estuary, other measures may be necessary to achieve the objective of doubling the natural production of chinook salmon from average 1967-1991 levels. This narrative objective is consistent with the anadromous fish doubling goals of the [Central Valley Project Improvement Act]; thus, prompt and efficient actions taken to implement this [Central Valley Project Improvement Act] goal, in concert with other recommended actions in this plan, are important to achieving the narrative salmon protection objective. Monitoring results will be considered in the ongoing review to evaluate achievement of this objective and the development of numeric objectives to replace it." (1995 Bay-Delta Plan, pp. 28-29.)

In discussing the third component of the program of implementation-- "recommendations to other agencies to improve fish and wildlife habitat conditions"--the plan recommended the development of "an experimental study program on the effects of pulse flows on fish eggs and larvae in the Delta." More specifically, the Board stated: "The [Department] and the [Bureau] should conduct experiments to investigate and evaluate the biological benefits of pulse flows to move planktonic fish eggs and larvae into Suisun Bay. These experiments, which should be conducted as soon as feasible, should: (1) involve flows released from both the Sacramento and San Joaquin rivers; (2) include real-time biological monitoring to determine the most favorable times for the pulse flows and the effects of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the pulse flows on the eggs and larvae; (3) determine whether short-term pulse flows have a lasting benefit or whether, when outflows are reduced after a pulse flow, the larval fish are drawn back into interior Delta areas; and (4) take into account base flows and availability of water supplies. If results of the experiments were obtained soon enough, they could be used to refine potential pulse flow requirements in a water right decision implementing this water quality control plan." (1995 Bay-Delta Plan, p. 38.)

C

*The Water Rights Proceeding To Implement The 1995 Bay-Delta Plan*

In November 1997, the Board issued a draft environmental impact report for implementation of the 1995 Bay-Delta Plan ***215** (the implementation EIR). The following month, the Board issued a notice of public hearing, setting hearing dates for the water rights proceeding in which the Board would allocate responsibility for implementing the flow-dependent objectives of the 1995 Bay-Delta Plan. (As discussed more fully below, this water rights proceeding also encompassed the petitions by the Bureau and the Department for certain changes in their CVP and SWP permits.)

Ultimately, the Board divided the public hearing into eight phases. The hearing convened on July 1, 1998, and continued off and on until July 6, 1999. On December 29, 1999, the Board certified the final implementation EIR and issued Decision 1641. On March 15, 2000, following the filing of various petitions for reconsideration, the Board issued its order denying petitions for reconsideration and amending SWRCB Decision 1641 (order on reconsideration) and issued the revised decision that we refer to as Decision 1641. (<http://www . wat errights.ca.gov /Decisions/D164 1rev.pdf> (as of Jan. 10, **2006).)** With respect to its allocation of responsibility for meeting the flow-dependent objectives in the 1995 Bay-Delta Plan, we describe the most pertinent parts of Decision 1641 below.

1. *Responsibility For Meeting The Vernalis Flow Objectives--The San Joaquin River Agreement And The Vernalis Adaptive Management Plan*

In a revised notice of public hearing issued in May 1998, the Board explained that "[s]everal agreements have been negotiated among the parties interested in this proceeding, proposing allocations of responsibility to meet the flow-dependent objectives in the 1995 Bay-Delta Plan. The [Board] will receive evidence on these agreements during the hearing and will consider adopting water right terms and conditions consistent with these agreements." One such agreement was the proposed San Joaquin River Agreement--an agreement between "some, but not all, of the parties who have an interest in the allocation of responsibility to provide the San Joaquin River's share of water for meeting the Bay-Delta flow objectives." [FN14] (Decision 1641, p. 18.)

FN14. As relevant here, the parties to the San Joaquin River Agreement included: (1) San Joaquin River Group Authority and its member agencies, Modesto Irrigation District, Turlock Irrigation District, Merced Irrigation District, South San Joaquin Irrigation District, and Oakdale Irrigation District; (2) San Joaquin River Exchange Contractors Water Authority and its member agencies, Central California Irrigation District, San Luis Canal Company, Firebaugh Canal Water District, and Columbia Canal Company; (3) Friant Water Users Authority; (4) the City and County of San Francisco; (5) State Water Contractors; (6) Kern County Water Agency; and (7) Metropolitan Water District of Southern California.

As the Board explained in Decision 1641: "The [San Joaquin River Agreement] was presented to the [Board] as a settlement agreement proposing an allocation of responsibility for meeting the April-May objective for pulse flows from the San Joaquin River." "For a twelve-year period, the [San Joaquin River Agreement] proposes to allocate responsibility for meeting the April-May pulse flow objectives in the 1995 Bay-Delta Plan to certain water right holders in the watershed of the San Joaquin River." Under the San Joaquin River Agreement, "[t]he members of the [San Joaquin River Group Authority] who provide the water will receive $3 million per year from the [Bureau], ... and $1 million per year from the [Department].... The [San Joaquin River Agreement] would assign responsibility to the [Department] ***216** and the [Bureau] to meet the flows it specifies during the pulse flow period in the southern Delta." (Decision 1641, pp. 12, 17, 18.) In addition, "[t]he [Department] and the [Bureau] have committed themselves to provide 'backup' during the term of the [San Joaquin River Agreement] for any responsibility that otherwise would be placed on the San Joaquin basin water right holders as a result of an allocation of responsibility in the Bay-Delta Water Rights Hearing." [FN15] (*Id.*, p. 18, fn. 26.)

FN15. In the absence of the San Joaquin River Agreement, the Board could have ordered water right holders upstream from Vernalis (in addition to the Bureau) to provide water to help meet the Vernalis flow objectives throughout the year. Thus, it was not inappropriate for the Bureau and those other water right holders to agree among themselves on a plan for releases to meet the flow objectives. Of course, as we will explain further below, in approving any such agreement, the Board was obligated to ensure that the flow objectives were, in fact, met.

The San Joaquin River Agreement, however, did not provide sufficient flows to meet all of the Vernalis flow objectives in the 1995 Bay-Delta Plan. Nevertheless, to induce the Board to approve the San Joaquin River Agreement as part of Decision 1641, the Bureau and the Department committed to provide additional water, beyond what was required by the agreement, to meet all of the Vernalis flow objectives *except* the Vernalis pulse flow objective.

The reason the parties to the San Joaquin River Agreement were not proposing to meet the Vernalis pulse flow objective was ostensibly to conduct an experiment known as the Vernalis Adaptive Management Plan, which had been developed "to gather better scientific fisheries information on the lower San Joaquin River"--specifically, "information on the relative effects of flows in the San Joaquin River, CVP and SWP pumping rates, and operation of a fish barrier at the head of Old River on the survival and passage of salmon smolts through the Delta." According to the San Joaquin River Agreement, the flows and pumping regimen provided for in the agreement would not only allow the conduct of the Vernalis Adaptive Management Plan but would "provide environmental benefits in the lower San Joaquin River and Delta at a level of protection equivalent to the San Joaquin River Portion of the" 1995 Bay-Delta Plan.

To implement the San Joaquin River Agreement, four petitions were filed for long-term changes in licenses held by Merced, Turlock, Modesto, Oakdale, and South San Joaquin Irrigation Districts (the irrigation districts). [FN16] The petitions proposed to add the San Joaquin River upstream of Vernalis as a place of use and add fish and wildlife enhancement as a purpose of use. These changes would allow these irrigation districts to contribute water toward the Vernalis pulse flow.

FN16. A change petition was also filed by the San Joaquin River Exchange Contractors Water Authority for changes in certain pre-1914 water rights, but that petition was later withdrawn as unnecessary.

As Decision 1641 explained: "Pursuant to the [San Joaquin River Agreement], [the irrigation districts] along with the [San Joaquin River Exchange Contractors Water Authority] would provide up to 110 taf [thousand acre-feet] per year during a 31-day pulse flow period in April and May of each year, for instream flows in the lower San Joaquin River above Vernalis.... The [irrigation districts] and the Exchange Contractors would decide each year how to allocate the water required during the pulse flow period." (Decision 1641, p. 14, fn. omitted.)

In evaluating the Vernalis Adaptive Management Plan, the Board concluded it ***217** provided "a unique opportunity for collecting data under controlled conditions because of the commitment of the [Department] and [the Bureau] to control exports and releases from New Melones Reservoir, and operate the head of Old River barrier as needed for the experiment." (Decision 1641, p. 21.) The Board also noted, however, that "[t]here are differences in the flow targets between the [Vernalis Adaptive Management Plan] and the [San Joaquin River Agreement]," and "the [San Joaquin River Agreement] does not fully provide for conducting the experiment as designed." (*Id.*, pp. 20, 22.) Among other things, "the [San Joaquin River Agreement] provides flow targets of 2,000 cfs, but the minimum flow targets under the [Vernalis Adaptive Management Plan] are 3,200 cfs." (*Id.*, p. 20, fn. omitted.) The Board "urges the [Bureau] to supplement the flows required under the [San Joaquin River Agreement] as needed to ensure that the experiment is completed," but the Board did not require the Bureau to do so. (*Id.,* p. 22.)

In evaluating the San Joaquin River Agreement, the Board declined a request by its proponents to find that the agreement provided environmental protection equivalent to the Vernalis pulse flow objective in the 1995 Bay-Delta Plan. According to the Board: "A finding of equivalent protection would be premature at this time. The purpose of the [San Joaquin River Agreement] and [the Vernalis Adaptive Management Plan] is to determine through experimentation alternative measures to protect the beneficial uses in the 1995 Bay-Delta Plan designated to be protected

by the Vernalis pulse flow objectives. Until the experiment is complete, there will not be adequate information to know whether the measures provide equivalent protection." (Decision 1641, p. 23.)

The Board went on to note that "the Vernalis flow objectives in the 1995 Bay-Delta Plan do not contain a provision allowing a different set of objectives to be met if it is demonstrated that they provide equivalent protection for the beneficial uses protected by the objectives. In cases where equivalent protection can be provided, the objectives normally so state. Instead of providing for equivalent protection, the 1995 Bay-Delta Plan provides that the Vernalis flow objectives will be reevaluated in a future review of the plan." (Decision 1641, p. 23.)

The Board candidly acknowledged that "[m]eeting the flows specified in the [Vernalis Adaptive Management Plan] will not meet the pulse flow objectives" in the 1995 Bay-Delta Plan and "it is not certain that the [Vernalis Adaptive Management Plan] will provide protection for the chinook salmon equivalent to that provided by the objectives." Nonetheless, the Board "approves the [San Joaquin River Agreement] for the purpose of conducting the [Vernalis Adaptive Management Plan] experiment" on the theory that "[u]nder Water Code section 13242, an objective can be implemented in stages over a period of time" and "[t]he [Vernalis Adaptive Management Plan] experiment ... will serve as a step toward implementation of the Vernalis pulse flow objectives." According to the Board, by approving the agreement, it was "authoriz[ing] a staged implementation of the Vernalis pulse flow objectives so that experimental operations can be conducted in lieu of meeting the objectives as the first stage of implementation." (Decision 1641, pp. 23, 24, 48.)

To allow for performance of the San Joaquin River Agreement, the Board in Decision 1641 amended two of the Bureau's permits for New Melones storage to require the Bureau to meet the Vernalis flow objectives during the term of the ***218** agreement, with the exception of the Vernalis pulse flow objective. In lieu of the Vernalis pulse flow objective, the Bureau was required to meet the alternate pulse flow objectives from the agreement. The Board specifically explained that this was an interim requirement and that it would "consider a permanent allocation of responsibility with respect to the San Joaquin River basin after the [San Joaquin River Agreement] has expired." The new permit term provided that "[i]f the San Joaquin River Agreement ... is dissolved by the signatory parties before it expires, then Permittee shall meet the San Joaquin River flow objective set forth in [the 1995 Bay-Delta Plan] until the Board establishes alternative implementation of the San Joaquin River flow." (Decision 1641, pp. 132, 162.) The Board also explained that the Bureau was not required to "use water under [the New Melones] permits to meet [the Vernalis flow objectives] if it uses other sources of water or other means to meet these" objectives. (*Id.*, p. 160, fn. 87.)

The Board also approved the petitions by the irrigation districts to add the San Joaquin River upstream of Vernalis as a place of use and add fish and wildlife enhancement as a purpose of use in their licenses during the period of the San Joaquin River Agreement. Consistent with the terms of the San Joaquin River Agreement, the Board required the irrigation districts to contribute up to 110,000 acre-feet of water annually toward the alternate pulse flow objectives from the agreement. The Board further specified that "[w]hen the [San Joaquin River Agreement] expires or is terminated, the Board will give notice and will commence a proceeding to determine the responsibility of the [irrigation districts] to meet the objectives." (Decision 1641, p. 166.)

2. *Responsibility For Meeting The Southern Delta Salinity Objectives*

In Decision 1641, the Board determined that salinity concentrations at Vernalis are caused by "a combination of upstream water diversions, discharges of saline drainage water to the San Joaquin River and subsurface accretions to the river from groundwater." The Board further determined "that the actions of the CVP are the principal cause of the salinity concentrations exceeding the objectives at Vernalis." This is so because "[t]he source of much of the saline discharge to the San Joaquin River is from lands on the west side of the San Joaquin Valley which are irrigated with water provided from the Delta by the CVP," and "[t]he capacity of the lower San Joaquin River to assimilate the agricultural drainage has been significantly reduced through the diversion of high quality flows from the upper San Joaquin River by the CVP at Friant." (Decision 1641, pp. 80, 83.)

Because the Board viewed the CVP as the cause of the salinity concentration at Vernalis, the Board required the Bureau to meet the Vernalis salinity objective. The Board specified that the Bureau would have "wide latitude in developing a program to achieve this result" and "could consider sources of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dilution water other than New Melones Reservoir and other means of reducing the salinity concentration in the southern Delta." To this end, the Board inserted a condition in all of the Bureau's CVP permits, except those relating to New Melones, which "conditioned [those permits] on implementation of the water quality objectives for agricultural beneficial uses in the southern Delta," including the Vernalis salinity objective. This condition specified that the Bureau could meet the Vernalis salinity objective "through flows or other measures."

***219** The Board added a term to the two New Melones storage permits, which provided that "[i]n conjunction with other measures to control salinity, Permittee shall release water from New Melones Reservoir to maintain the Vernalis agricultural salinity objective." The Board added a condition to the New Melones direct diversion permit which provided that "[f]or the protection of water quality, no diversion is authorized for consumptive uses under this permit unless [the Vernalis salinity objective] is met...." In all three of these New Melones permits, Decision 1641 specified that the Bureau could "meet these objectives through flows or other measures." In addition, in the two New Melones storage permits, the Board provided that the Bureau did not have to "use water under these permits to meet [the Vernalis salinity objective] if it uses other sources of water or other means." (Decision 1641, pp. 160 & fn. 87, 161, 162.)

With respect to the three other agricultural salinity objectives for the southern Delta downstream of Vernalis, the Board determined the Department and the Bureau were partially responsible for the salinity problems at those locations because of export pumping. Decision 1641 noted that "[m]easures that affect circulation in the Delta, such as barriers, can help improve the[se] salinity concentrations" and that the Department and the Bureau were working together on a barrier program. The Board amended all of the Department's SWP permits and all of the Bureau's CVP permits to require the Department and the Bureau to implement the salinity objectives at the three locations. The Board, however, did not require immediate implementation of the 0.7 EC objective for April through August at any of the three locations. Instead, in a revision to the footnote in the 1995 Bay-Delta Plan that previously allowed the salinity objectives at the two Old River locations to be implemented by December 31, 1997, the Board now specified that at all three locations the 0.7 EC objective "becomes effective on April 1, 2005" (Decision 1641, Table 2, p. 182, fn [5] ) and that the Department and the Bureau were to meet the 1.0 EC objective year round until that date. The Board further specified: "The 0.7 EC objective is replaced by the 1.0 EC objective from April through August after April 1, 2005 if permanent barriers are constructed, or equivalent measures are implemented, in the southern Delta and an operations plan that reasonably protects southern Delta agriculture is prepared by the [Department] and the [Bureau] and approved by the Executive Director of the [Board]. The [Board] will review the salinity objectives for the southern Delta in the next review of the Bay-Delta objectives following construction of the barriers." (*Ibid.*)

3. *Responsibility For Meeting The Delta Outflow Objective*

The Board assigned responsibility for meeting the Delta outflow objective to both the Bureau and the Department by adding a term to all of the CVP and SWP licenses and permits, requiring the Bureau and the Department to ensure that the Delta outflow objective was met "on an interim basis ... until the Board adopts a further decision in the Bay-Delta Water Rights Hearing assigning responsibility for meeting these objectives." [FN17]

> FN17. Decision 1641 provided that the interim period would expire "not later than November 30, 2001." In April 2001, however, the Board adopted Order WR 2001-05, which eliminated this deadline and provided that the interim period would continue until the Bureau or the Department filed a written request for the Board to convene a further water right proceeding.

***220** III

*The Joint Points Of Diversion Petition And The Change Petition*

In addition to allocating responsibility for meeting the flow-dependent objectives in the 1995 Bay-Delta Plan, the Board used the public hearing held between July 1998 and July 1999 to consider petitions by the Department and the Bureau for certain changes in their water right permits. To better understand the issues raised by those petitions, a brief review of California law on the appropriation of water is necessary.

To acquire the right to appropriate water, "an application for appropriative rights must ... be made to the Board for a permit authorizing construction of necessary water works and the taking and use of a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

specified quantity of water." (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 102, 227 Cal.Rptr. 161.) Among other things, an application for a permit to appropriate water must include "[t]he nature and amount of the proposed use," "[t]he proposed place of diversion," and "[t]he place where it is intended to use the water." (§ 1260, subds.(c), (e), (f).)

The Board "shall allow the appropriation for beneficial purposes of unappropriated water under such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest the water sought to be appropriated." (§ 1253.) "The issuance of a permit gives the right to take and use water only to the extent and for the purpose allowed in the permit." (§ 1381.) "Water appropriated ... for one specific purpose shall not be deemed to be appropriated for any other or different purpose, but the purpose of the use of such water may be changed as provided in [the Water C]ode." (§ 1700.)

"At any time after notice of an application is given, an applicant, permittee, or licensee may change the point of diversion, place of use, or purpose of use from that specified in the application, permit, or license; but such change may be made only upon permission of the board." (§ 1701.) "Before permission to make such a change is granted the petitioner shall establish, to the satisfaction of the board, and it shall find, that the change will not operate to the injury of any legal user of the water involved." (§ 1702.)

With that legal framework in mind, we turn to the petitions at issue here.

A

*The Joint Points Of Diversion Petition*

In the late 1970's and early 1980's, the Bureau filed petitions for temporary use of the SWP's pumping plant in the southern Delta to take advantage of excess capacity at that plant. In Decision 1485, which the Board implemented in 1979 (and which remained in effect through the adoption of Decision 1641), the Board authorized the Bureau to use the SWP's pumping plant to make up export deficiencies caused by limits imposed on the Bureau's pumping plant in May and June of each year for the protection of striped bass.

In December 1981, the Bureau filed a petition for the permanent right to use the SWP's pumping plant. In 1985, the Bureau renewed this request in its petition to consolidate and expand the places of use in 15 of its CVP permits (discussed more fully below). Finally, in February 1995, the Bureau and the Department filed with the Board a petition to add to the permits for the CVP and the SWP "points of diversion and rediversion at each project's diversion facilities in the southern Delta to allow the projects to use those facilities interchangeably" (the joint points of diversion ***221** petition). Specifically, the Bureau sought to add the SWP's Harvey O. Banks Delta Pumping Plant as a point of diversion and rediversion in the permits for the CVP, and the Department sought to add the CVP's Tracy Pumping Plant as a point of diversion and rediversion in the permits for the SWP.

In the water rights proceeding underlying these coordinated cases, the Board addressed the requests for joint points of diversion made in 1981, 1985, and 1995. The draft implementation EIR issued by the Board in November 1997 included an analysis of the potential environmental impacts of granting the joint points of diversion petition. The revised notice of public hearing issued by the Board in May 1998 gave notice that phase 6 of the hearing would address the joint points of diversion petition.

The Board received evidence regarding the joint points of diversion petition over seven days in May 1999. As previously noted, the Board certified the implementation EIR on December 29, 1999. In Decision 1641, the Board approved the joint points of diversion petition in three stages, imposing "[o]perations plans and other requirements ... on changes in use of the [joint points of diversion] from one stage to the next. The operations plan must be protective of fish and wildlife and of the rights of other legal users of water. It will be subject to approval of the Chief of the Division of Water Rights of the [Board]. With these requirements, the [joint points of diversion] will not cause injury to other legal users of the water, and will not have a significant effect on the environment." (Decision 1641, p. 91.)

B

*The Change Petition*

In September 1985, the Bureau filed a petition with the Board to consolidate and expand the places of use in 15 of its CVP permits (the change petition). In its petition, the Bureau offered the following explanation for the expansion aspect of its request:

"The expansion requested is to resolve several problems. The first is that when boundaries of the existing places of use were established, small-scale

maps were used, and the irrigable areas of the valley floor were not completely covered. As a result, the areas served by the CVP have expanded to that boundary and have, in fact, gone beyond the boundary in a number of places. This presents a dilemma to the United States in that to supply these areas in fulfillment of the commitment to meet inbasin demands, such service may be in technical noncompliance with the project's water rights. The expansion resolves this problem.

"The second is that certain areas that were authorized to and now receive CVP service were not included in the existing place of use. Notably, certain parts of the San Luis Unit and of the Sacramento Valley Canals Unit as authorized by Congress are not within the existing place of use. The expansion of the place of use will conform it to the CVP service area intended by various [Congressional] authorizations. This expansion also anticipates certain future authorizations for areas which can logically and easily be served by the CVP."

The Bureau proposed a new consolidated and expanded place of use, the boundary of which "generally follows township and range lines, section lines, county lines, or physical boundaries such as stream channels or watersheds."

In February 1986, the Bureau amended the change petition to include a request to conform the purposes of use in 19 of its CVP permits. The Board described that ***222** amendment as follows: "Most of the 19 permits authorize the same major purposes of use. However, different minor purposes of use are authorized in several of the permits. An amendment to the petition requests that the purposes of use be amended and conformed so that permitted uses of water from all sources are the same."

In June 1995, the Bureau further amended the change petition to exclude three of the 19 permits. Thus, the Bureau ultimately sought to conform the purposes of use in 16 of its permits. At that time, only two of those 16 permits (permits Nos. 11969 and 11973, both involving the Trinity River) listed "fish & wild life enhancement" or "fish & wildlife propagation" as an authorized purpose of use.

The Bureau explained its request to conform the purposes of use in its permits as follows:

"[The Bureau] received assignments of state-filed applications or filed applications for water rights in accordance with acceptable practices at the time the various facilities of the CVP were being planned. It was necessary at the time to request separate permits for different beneficial uses. With the magnitude of the CVP and its integrated operations, however, it was not practical to try to match up a particular beneficial water use to a specific permit. In addition, in 1992, Congress passed the Central Valley Project Improvement Act (CVPIA), which amended the CVP authorizations to include fish and wildlife mitigation, protection and restoration purposes. Consequently, it is important that all of the CVP permits in this petition include the state-defined beneficial use of 'fish and wildlife preservation and enhancement' to maximize operational flexibility in order to comply with the CVPIA. [The Bureau] requests that the 16 CVP permits in this petition be amended so that each permit includes the following beneficial uses: irrigation, domestic, municipal, industrial, frost protection, heat control, fish and wildlife preservation and enhancement, salinity control, water quality control, stockwatering and recreation. No changes in operations are contemplated as a result of this request. The Central Valley Project will continue to be operated according to federal legislation including the CVPIA and our water service and settlement contractual arrangements as well as our permit conditions."

Also in June 1995, the Bureau amended the change petition to request that the place of use in its permits be changed only "to conform to the authorized service areas of districts with existing long-term water service contracts with [the Bureau]." The Bureau characterized this request as one to "conform" or "correct" the existing place of use boundary, rather than as a request to expand that boundary.

In connection with this amendment, the Bureau took "the existing boundary lines on the maps submitted with [the Bureau's] various CVP [water right] applications" and "digitized" those lines through the Bureau's GIS (geographical information system) to create a single line. The Bureau then compared the area inside that line to the authorized district services areas of its contractors and determined that "[t]he present service areas of 26 of [the Bureau's] contractors have some lands outside of the existing place of use boundary as now defined by [the Bureau's] GIS system." One of those districts was Santa Clara Valley Water District (Santa Clara); another was **Westlands.**

In December 1997, the Board released a draft EIR for the change petition (the change EIR). In analyzing the potential significant environmental

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

effects of approving the Bureau's request to conform the places of use in its permits to the ***223** authorized district service areas, the change EIR distinguished between "encroachment" lands and "expansion" lands. The change EIR defined encroachment lands as "lands that have already received CVP water within the 26 CVP water contractor service areas but are presently outside the authorized [place of use]." Expansion lands were defined as "lands outside the authorized [place of use] that have never received CVP water but are entitled to service under one of the existing 26 CVP water contracts." The change EIR explained that "[e]ncroached lands are discussed at the project-specific level," but "[p]otential environmental impacts associated with the expansion areas are discussed on a programmatic level because future land and water uses cannot be readily determined at this time, and would require speculation. Prior to [Board] authorization for delivery of CVP water to expansion lands, more detailed site-specific environmental analysis and site-specific environmental documentation meeting CEQA requirements may be required." Elsewhere, the change EIR stated: "At present the [Board] and [the Bureau] do not know where water may be used and for what purposes by contractors on the expansion lands. Therefore, no approval to deliver water to expansion lands can be granted until adequate site-specific environmental documentation on expansion land water delivery proposals are completed."

With respect to the encroachment lands, the change EIR determined that "the development and land use conversion of 49,602 acres was facilitated by delivery of CVP water," resulting in the alteration of six different kinds of natural habitat. The change EIR concluded that "[t]he impact to these habitats and the associated wildlife species, designated as endangered or threatened in accordance with federal and state endangered species protection mandates, is considered a significant adverse impact" and that "[m]itigation for compensating past impacts to encroachment lands must provide similar environmental/habitat values that were associated with the affected lands." The change EIR further observed that "[the Bureau] is currently implementing several programs capable of achieving the mitigation requirements described in the PEIR [*sic* ]. These programs consist of ongoing, adaptive management efforts that will, overtime [*sic* ], restore, create and maintain targeted environmental habitat values which would mitigate impacts associated with the construction and operation of the CVP. This program is recognized by the [Board] as the appropriate means to obtain mitigation for the impacts to encroachment lands, provided that portions of the funds and management efforts of these ongoing programs would be specifically assigned to mitigating those environmental/habitat values adversely affected by the encroachment of CVP water supplies to the 49,602 acres outside the authorized [place of use]."

The revised notice of public hearing issued by the Board in May 1998 gave notice that phase 7 of the public hearing would address the change petition. "During Phase 7, it became apparent that the maps prepared by the [Bureau] to depict the boundaries of the currently authorized places of use were not consistent with the official place of use maps in the files of the [Board]. [¶ ] Consequently, the [Board] received in evidence the official place of use maps and based its technical analysis on a comparison of the official maps with the areas currently being served by the CVP.... The analysis shows that seven of the twenty-six CVP contractors whose use of water was addressed in the [draft change EIR] as encroachment outside the ***224** place of use are entirely within the current place of use." (Decision 1641, p. 118.)

Under the Board's revised analysis, Santa Clara--which has a total service area of 835,200 acres--included 20,912 acres of encroachment lands and 561,199 acres of expansion lands. **Westlands**--which has a total service area of 605,548 acres--included 30,718 acres of encroachment lands and 9,664 acres of expansion lands.

The Board certified the final change EIR on December 29, 1999.

In Decision 1641, the Board determined the expansion lands could not "be added to the CVP place of use at this time" because the change EIR "analyze[d] the environmental effects of expansion at the programmatic level, which does not provide enough information to approve the expansion areas under CEQA." The Board noted that these areas "can be added on a case-by-case basis in the future, subject to appropriate CEQA documentation and the approval of the [Board] under Water Code section 1700, et seq., or other provisions of the Water Code." (Decision 1641, p. 121.)

The Board approved the addition of all the encroachment lands to the authorized place of use in the Bureau's permits, but imposed habitat mitigation requirements on the Bureau "for all the encroachment

land that was first converted to irrigated agriculture due to CVP water deliveries" unless the Bureau could demonstrate the particular encroachment in question was "not subject to CEQA because it occurred before the effective date of CEQA, or that an exemption from mitigation requirements is justified because the impacts of encroachment have already been mitigated."

With respect to the Bureau's request to conform the purposes of use in its permits, the Board approved that request (over **Westlands's** objection), which had the effect of adding fish and wildlife enhancement as an authorized purpose of use in 14 of the Bureau's permits. (Decision 1641, pp. 122-130.)

IV

*The Trial Court Proceedings*

In January 2000, following the Board's issuance of its original Decision 1641 but before its issuance of the revised decision, four mandamus petitions were filed challenging the Board's decision: (1) *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 309539); (2) *Anderson v. State Water Resources Control Board* (Super. Ct. Fresno County, 2003, No. 645385-6); (3) *San Luis Water District v. State Water Resources Control Board* (Super. Ct. Merced County, 2002, No. 143845); and (4) *Glenn-Colusa Irrigation District v. State Water Resources Control Board* (Super.Ct.Sac.County, 2000, No. 00CS00201). The Board petitioned to have the four cases coordinated. (See Code Civ. Proc., § 404 et seq.) In April 2000, the Chief Justice of California and Chair of the Judicial Council authorized the presiding judge of the Sacramento County Superior Court to assign a coordination motion judge to determine whether coordination of the four actions was appropriate. The Judicial Council gave the coordination proceeding the special title of "SWRCB Cases."

Meanwhile, that same month, following the Board's issuance of its revised Decision 1641 in March 2000, another seven mandamus petitions were filed challenging the Board's actions: (1) *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502); (2) *County of San Joaquin v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311499); (3) *Golden Gate* ***Audubon *225*** *Society v. State Water Resources Control Board* (Super. Ct. Alameda County, 2003, No. 825585-9); (4) *Pacific Coast Federation of Fishermen's Associations v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311507); (5) *Santa Clara Valley Water District v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311549); (6) *State Water Contractors v. State Water Resources Control Board* (Super.Ct.Sac.County, 2001, No. 00CS00602); and (7) ***Westlands*** *Water District v. State Water Resources Control Board* (Super.Ct.Sac.County, 2003, No. 00CS00603).

In May 2000, the presiding judge of the Sacramento County Superior Court assigned Judge Brian R. Van Camp as the coordination motion judge for the first four cases. In July 2000, Judge Van Camp ordered the cases coordinated, designated this court as the reviewing court with appellate jurisdiction and recommended that the coordinated proceeding be assigned to the Sacramento County Superior Court.

In August, the Chief Justice of California and Chair of the Judicial Council authorized the presiding judge of the Sacramento County Superior Court to assign a coordination trial judge. The presiding judge assigned the coordinated proceeding to Judge Roland L. Candee.

In September 2000, *Glenn-Colusa Irrigation District v. State Water Resources Control Board* (Super.Ct.Sac.County, 2000, No. 00CS00201) was dismissed by stipulation, leaving three cases in the coordinated proceeding.

The next month, the Board filed a petition for coordination of the seven additional cases filed in April 2000 as add-on cases. (See Cal. Rules of Court, rule 1544.) In November 2000, the trial court ordered those seven cases coordinated with the three remaining original cases.

Over the next two and one-half years, two more of the coordinated cases--*State Water Contractors v. State Water Resources Control Board* (Super.Ct.Sac.County, 2001, No. 00CS00602) and *San Luis Water District v. State Water Resources Control Board* (Super. Ct. Merced County, 2002, No. 143845)--were dismissed, leaving eight cases.

In May 2003, the trial court issued its statement of decision in the coordinated cases. The trial court upheld Decision 1641 with two exceptions.

First, the court concluded that "while the [Vernalis Adaptive Management Plan] and the [San Joaquin River Agreement] are appropriate and permissible steps toward implementation of the 1995 [Bay-Delta]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plan, they do not satisfy at all times of the year the flow requirements of the 1995 Plan. These are the legal minimum flow objectives that must be satisfied unless changed in an appropriate proceeding to modify the 1995 Plan itself." Accordingly, the court granted relief on the twelfth cause of action in the mandamus petition in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502) and ordered that a writ issue directing the Board to conduct further proceedings to fully assign responsibility for meeting all of the flow objectives in the 1995 Bay-Delta Plan or modify the objectives in the plan. [FN18]

FN18. "To allow for certainty" while the Board responded to the writ, the trial court further ordered the parties "to comply with any and all obligations to meet flow objectives to the same extent as if [Decision] 1641 had been fully validated by th[e][c]ourt until further order by the [Board] or th[e][c]ourt." In a similar vein, on October 14, 2003, this court granted the Board's request for relief from the automatic stay on appeal of the trial court's decision and ordered that "Water Rights Decision 1641 shall remain in full effect during the pendency of this appeal."

***226** Second, the trial court concluded that when the Legislature merged **Westlands** with another water district in 1965, "the [L]egislature effectuated a statutory authorization for the delivery of federal CVP water to all of the lands of the combined ... district." Accordingly, the trial court granted the mandamus petition in *Anderson v. State Water Resources Control Board* (Super. Ct. Fresno County, 2003, No. 645385-6) and ordered the issuance of a writ directing the Board to conform the places of use under the Bureau's CVP permits to include both the encroachment and expansion lands within **Westlands** without any mitigation requirement.

Judgments in seven of the coordinated cases were entered on June 19, 2003. The judgment in the eighth case (*Anderson* ) was entered on July 16, 2003.

Eight timely notices of appeal and three timely notices of cross-appeal were filed in seven of the cases. No appeal was taken in *Pacific Coast Federation of Fishermen's Associations v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311507).

DISCUSSION

I

*Standard Of Review*

We begin our discussion by setting out the standards of review that apply to the appeals in these coordinated cases.

A

*Water Rights Decisions*

[2] "In undertaking to allocate water rights, the Board performs an adjudicatory function." *(United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at p. 113, 227 Cal.Rptr. 161.) Accordingly, Code of Civil Procedure section 1094.5 applies to a writ proceeding seeking to challenge a water rights decision by the Board. (§ 1126.) "The inquiry in such a case shall extend to the questions whether the [Board] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [Board] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (*Id.,* subd. (c).)

[3][4] The trial court is authorized by law to exercise its independent judgment on the evidence when "the right or interest affected by the administrative decision is a 'vested' one." *(Merrill v. Department of Motor Vehicles* (1969) 71 Cal.2d 907, 914, 80 Cal.Rptr. 89, 458 P.2d 33, fn. omitted.) "If the right affected is 'vested' the decision is reviewed by means of a limited trial de novo in which the trial court not only examines the record for errors of law but also exercises its independent judgment upon the weight of the evidence produced before the administrative agency together ***227** with any further evidence properly admitted by the court. [Citations.] If, on the other hand, the right is not 'vested' the trial court's scope of review extends only to matters of law appearing on the record of the administrative proceeding, and accordingly its review of the evidence produced below is limited to a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

determination of whether it is legally sufficient to sustain the decision." (*Id.* at pp. 914-915, 80 Cal.Rptr. 89, 458 P.2d 33, fns. omitted.)

[5][6] "In a case wherein the trial court is authorized to conduct a limited trial de novo ... the province of the appellate court is analogous to that assumed by it in an ordinary civil appeal: only errors of law are subject to its cognizance, and a factual finding can be overturned only if the evidence received by the trial court, including the record of the administrative proceeding, is insufficient as a matter of law to sustain the finding. [Citations.] In a case wherein no limited trial de novo is authorized by law, however, the trial court itself exercises an essentially appellate function in that only errors of law appearing on the administrative record are subject to its cognizance. In such a case, therefore, the trial and appellate courts occupy identical positions with regard to the administrative record, and the function of the appellate court, like that of the trial court, is to determine whether that record is free from legal error." (*Merrill v. Department of Motor Vehicles, supra*, 71 Cal.2d at pp. 915-916, 80 Cal.Rptr. 89, 458 P.2d 33.)

[7][8] Of course, questions of law are subject to de novo review. (E.g., *Pollak v. State Personnel Bd.* (2001) 88 Cal.App.4th 1394, 1404, 107 Cal.Rptr.2d 39.) The proper interpretation of a statute, and its application to undisputed facts, is a question of law. (*Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 357, 127 Cal.Rptr.2d 516, 58 P.3d 367.)

The Board argues that the interpretations it has given to various Water Code provisions in Decision 1641 and its order on reconsideration are entitled to deference and "should not be overturned, unless clearly erroneous." We disagree. As our Supreme Court recently explained:

[9] "An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation. Justice Mosk may have provided the best description when he wrote ... that ' "The appropriate degree of judicial scrutiny in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other." [Citation.] Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions do not merit such deference, and therefore lie toward the opposite end of the continuum.' ...

[10] "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. ***228** Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.] Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. To quote the statement of the Law Revision Commission in a recent report, 'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8, 78 Cal.Rptr.2d 1, 960 P.2d 1031.)

Based on the foregoing, in interpreting the various Water Code provisions at issue in this case, we will exercise our independent judgment, giving deference to the Board's interpretation only if the Board shows that such deference is warranted by the circumstances.

B

*CEQA Actions*

[11][12][13][14][15] In a mandate proceeding to review an agency's decision for compliance with CEQA, we review the administrative record to determine whether the agency abused its discretion. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116-117, 104 Cal.Rptr.2d 326.) "Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375, 43 Cal.Rptr.2d 170.) "When the informational requirements of CEQA are not complied with, an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agency has failed to proceed in 'a manner required by law' and has therefore abused its discretion." (*Save Our Peninsula Committee*, at p. 118, 104 Cal.Rptr.2d 326.) Furthermore, "when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 946, 91 Cal.Rptr.2d 66.)

[16][17] "In reviewing an agency's decision to certify an EIR, we presume the correctness of the decision. The project opponents thus bear the burden of proving that the EIR is legally inadequate." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors*, *supra*, 87 Cal.App.4th at p. 117, 104 Cal.Rptr.2d 326.) However, "[w]hile we may not substitute our judgment for that of the decision makers, we must ensure strict compliance with the procedures and mandates of the statute." (*Id.* at p. 118, 104 Cal.Rptr.2d 326.)

II

*Challenges To Implementation Of The 1995 Water Quality Control Plan For The Bay-Delta*

A

*The Central Delta Parties' Challenges To Implementation Of The 1995 Bay-Delta Plan*

In April 2000, six parties with interests in the central Delta [FN19] filed a petition for writ of mandate seeking to vacate Decision ***229** 1641 on non-CEQA grounds. [FN20] (*Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).) This *Central Delta* case was one of the cases added to the coordinated proceeding in November 2000.

FN19. Those parties are Central Delta Water Agency, R.C. Farms, Inc., Reclamation District No. 2072, Reclamation District No. 2039, Zuckerman-Mandeville, Inc., and South Delta Water Agency. We will refer to them collectively as the Central Delta parties.

FN20. The Central Delta parties also filed a writ petition limited to CEQA issues, which we discuss later in this opinion.

The Central Delta parties' non-CEQA writ petition raised many issues, most of which we address directly below. Some of the issues we will address later, in conjunction with related issues raised by other parties.

1. *Challenges To The San Joaquin River Agreement*

a. *Implementing The Vernalis Pulse Flow Objective And The Southern Delta Salinity Objectives*

In the twelfth cause of action in their non-CEQA writ petition, the Central Delta parties alleged, among other things, that in adopting Decision 1641, the Board "failed to implement the 1995 Water Quality Control Plan," including the "Vernalis Salinity objectives" and the "Vernalis Fish Flow objectives." They further alleged that the Board "wrongfully modified" the 1995 Bay-Delta Plan "through inadequate implementation."

Although acknowledging that "[m]any factors weigh in support of" the San Joaquin River Agreement and the Vernalis Adaptive Management Plan, the trial court concluded the Vernalis flow objectives were "the legal minimum flow objectives that must be satisfied unless changed in an appropriate proceeding to modify the 1995 Plan itself." The court explained that "[t]o sanction the Board's action here would effectively allow the Board to change the no longer challengeable 1995 Plan's objectives unilaterally without completing the necessary legal steps allowing for interested parties' input, comments, and challenges." Accordingly, the court entered a judgment granting the Central Delta parties' mandamus petition "on the ground that the approval of the San Joaquin River Agreement and the Vernalis Adaptive Management Plan flows for the April-May pulse flow period do not fully satisfy the flow-dependent objectives of the 1995" Bay-Delta Plan. The judgment ordered the issuance of a writ of mandate "commanding the ... Board to commence further proceedings consistent with the STATEMENT OF DECISION. As to all other causes of action, the petition for writ of mandate is DENIED." In its statement of decision, the court explained that the writ of mandate would "remand[ ] this portion of D-1641 to the [Board] for further proceedings [to either] fully assign responsibility for meeting all of the flow-dependent objectives or modify the 1995 Plan objectives."

The trial court did not address the issue of whether Decision 1641 adequately implemented the southern Delta salinity objectives.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Some of the parties to the San Joaquin River Agreement--namely, San Joaquin River Group Authority and its member agencies, San Joaquin River Exchange Contractors Water Authority and its member agencies, Friant Water Users Authority, and the City and County of San Francisco (collectively San Joaquin River Group)--filed a timely notice of appeal from the part of the judgment that granted the Central Delta parties' writ petition. After the Central Delta parties filed a timely notice of appeal from the remainder of the judgment (i.e., from the denial of ***230** their mandamus petition on all other grounds), three other parties to the San Joaquin River Agreement--State Water Contractors, Kern County Water Agency, and Metropolitan Water District of Southern California (collectively State Water Contractors)--filed a timely notice of cross-appeal from the part of the judgment that granted the mandamus petition. The Board also filed a timely notice of cross-appeal from that part of the judgment. Thus, one appeal and two cross-appeals challenge the trial court's ruling that the Board's approval of the San Joaquin River Agreement does not fully satisfy the flow-dependent objectives of the 1995 Bay-Delta Plan.

For their part, in their appeal the Central Delta parties argue, among other issues, that the Board failed to implement the southern Delta salinity objectives from the 1995 Bay-Delta Plan.

i. *The Vernalis Pulse Flow Objective*

[18] We first address the trial court's ruling that the Board failed to implement the Vernalis pulse flow objective. In their challenges to that ruling, San Joaquin River Group, State Water Contractors, and the Board each argue that the 1995 Bay-Delta Plan allowed for staged implementation of the Vernalis pulse flow objective, and the Board's decision to adopt the San Joaquin River Agreement and its alternate flows during an interim, experimental stage was both authorized and reasonable. We disagree.

[19][20] Because a water quality control plan is quasi-legislative (*State Water Resources Control Bd. v. Office of Admin. Law, supra*, 12 Cal.App.4th at pp. 701-702, 16 Cal.Rptr.2d 25), we construe the requirements of the 1995 Bay-Delta Plan independently of the trial court, with appropriate deference to the Board's interpretation. " 'The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law, and while an administrative agency's interpretation of its own regulation obviously deserves great weight, the ultimate resolution of such legal questions rests with the courts.' (Citations omitted.) [Citation.] However, the court generally will not depart from the agency's interpretation unless it is clearly erroneous or unauthorized." (*Physicians & Surgeons Laboratories, Inc. v. Department of Health Services* (1992) 6 Cal.App.4th 968, 986-987, 8 Cal.Rptr.2d 565.)

We begin by addressing the Board's characterization of its action as a "staged implementation" of the Vernalis pulse flow objective. We believe that characterization is inaccurate. In our view, the Board's action was a *delayed* implementation of the objective, accompanied by the immediate implementation of an alternate (albeit temporary) experimental flow regime which, by the Board's own admission, provided for the possibility of a lesser flow than the Vernalis pulse flow objective.

Nevertheless, regardless of whether the Board's implementation of the Vernalis pulse flow objective was "staged" or "delayed," the real question is whether anything in the 1995 Bay-Delta Plan authorized the Board to implement a temporary, experimental flow regime that might not provide as much water as the Vernalis pulse flow objective. We find no such provision.

As we have previously explained, a water quality control plan must include water quality objectives and a program of implementation needed for achieving those objectives. (§ 13050, subd.(j).) Moreover, the program of implementation must include "[a] description of the nature of actions which are necessary to achieve the objectives" and "[a] time schedule for the ***231** actions to be taken." (§ 13242, subds.(a), (b).)

In Decision 1641, the Board relied on the "time schedule" provision of section 13242 to justify its approval of the San Joaquin River Agreement flow regime as an "interim" requirement. On appeal, the Board likewise argues that "[t]he [Vernalis Adaptive Management Plan] experimental period constitutes a 'time schedule' for meeting the [flow] objectives" in the 1995 Bay-Delta Plan. The first flaw in that argument is that, by law, the time schedule for the actions to be taken to achieve objectives in a water quality control plan must be included *as part of the plan itself*. (§ 13242.) The 1995 Bay-Delta Plan contains nothing about "[t]he [Vernalis Adaptive Management Plan] experimental period." The Board must point to a time schedule *in the 1995 Bay-Delta Plan* that authorized it to postpone implementing the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Vernalis pulse flow objective. The Board has failed to identify any such provision.

The second flaw in the Board's argument is that, regardless of the timing issue, the Board has failed to identify anything in the plan that authorized it to implement a flow objective *other* than the Vernalis pulse flow objective, even temporarily. The Vernalis pulse flow objective required a minimum monthly average flow of water at a particular point in the San Joaquin River for a 31-day period in April and May each year, ranging from 3,110 to 8,620 cubic feet per second. Nothing in the 1995 Bay-Delta Plan authorized the Board to implement a different flow regime that could provide less than that amount of water.

This same flaw defeats arguments made by San Joaquin River Group and State Water Contractors. San Joaquin River Group contends that under the 1995 Bay-Delta Plan, because there was no specific schedule for achieving the Vernalis pulse flow objective, the Plan provided that implementation "***should*** be immediate." San Joaquin River Group then argues at length about the meaning of the word "should," concluding that because "should" is generally permissive and advisory, the Board had the power *not* to implement the Vernalis pulse flow objective immediately and instead provide for a staged implementation. San Joaquin River Group points to nothing in the plan, however, that authorized the Board to implement a *different* flow objective than the Vernalis pulse flow objective, even on a temporary basis.

For its part, State Water Contractors point to the provision in the 1995 Bay-Delta Plan where the Board recommended that the Department and the Bureau "should conduct experiments to investigate and evaluate the biological benefits of pulse flows to move planktonic fish eggs and larvae into Suisun Bay." According to State Water Contractors, this provision supports a reading of the 1995 Bay-Delta Plan allowing for staged implementation of the Vernalis pulse flow requirement, because "when the Board ... embraced the Vernalis Adaptive Management Plan ... it did exactly what it said it would do in the implementation program of the" 1995 Bay-Delta Plan. Like the Board and San Joaquin River Group, however, State Water Contractors fail to point to anything in the plan that authorized the Board to implement a flow objective different than the Vernalis pulse flow objective. Contrary to State Water Contractors' suggestion, it is far from apparent that the experiments the Board recommended could not be conducted under the flow objectives provided for in the 1995 Bay-Delta Plan. In any event, even if those experiments did require flows that were less than those required by the 1995 Bay-Delta Plan, the 1995 Bay-Delta Plan cannot reasonably be read as authorizing the Board to implement ***232** a lesser flow regime during the water rights proceeding that was to follow the plan's adoption.

It is critical to note that the recommended experiments to which State Water Contractors refer were not part of the component of the program of implementation designed to achieve the flow objectives of the 1995 Bay-Delta Plan. Instead, they were part of a different component--recommendations to improve habitat conditions. In introducing those recommendations, the Board explained that "[t]here are numerous actions that can be taken, *in addition to establishing and implementing water quality objectives for the Bay-Delta Estuary*, to improve fish and wildlife beneficial uses in the Estuary." (1995 Bay-Delta Plan, p. 33, italics added.) One such action was the recommended experiments. Thus, the experiments were expressly intended as actions *additional* to those needed to achieve the flow objectives of the 1995 Bay-Delta Plan. The Board's recommendation of these experiments in the plan cannot reasonably be read as allowing the Board to implement in Decision 1641 an experimental flow regime in lieu of the plan's Vernalis pulse flow objective, even temporarily.

We agree with State Water Contractors, in the abstract, that the "careful, sequential implementation of a water quality objective important to fish and other competing beneficial uses of water is compatible with the requirements of the Porter-Cologne Act." We cannot agree, however, that the 1995 Bay-Delta Plan actually *provided* for a sequential implementation of the Vernalis pulse flow objective, with the first stage to consist of an experimental flow regime that could provide smaller flows. In the plan of implementation in the 1995 Bay-Delta Plan, the Board specified that it would "address the water supply-related objectives in this plan"--including the objectives for "river flow"--in a later "water rights proceeding ... through the amendment of water rights under the authority of the [Board]." The Board further stated that "[t]he water right decision ... *will* allocate responsibility for meeting the objectives among water rights holders in the Bay-Delta Estuary watershed." (1995 Bay-Delta Plan, p. 27, italics added.) No provision was made

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for allocating responsibility to meet any objectives other than those specified in the 1995 Bay-Delta Plan.

Of course, had the proposal for the San Joaquin River Agreement and the Vernalis Adaptive Management Plan been made during the hearings on the 1995 Bay-Delta Plan, the Board might have adopted the temporary, experimental flow regime as a part of the river flow objectives in the 1995 Bay-Delta Plan, based on a determination that the experimental flows would help "ensure the reasonable protection of beneficial uses" by helping the Board determine what flows are most optimal to enhance the survival of fish in the San Joaquin River. (§ 13241.) Or, perhaps, when the proposal for the San Joaquin River Agreement and the Vernalis Adaptive Management Plan was presented to the Board in the water rights proceeding, the Board could have sought to conduct a regulatory proceeding to amend the 1995 Bay-Delta Plan before completing the water rights proceeding. But the Board could not properly adopt the San Joaquin River Agreement's alternate flow regime, even on a temporary basis, in the water rights proceeding under the guise of a "staged implementation" of the objectives in the 1995 Bay-Delta Plan, because that "staged implementation" fundamentally altered those objectives, and such an alteration could be accomplished only through a properly noticed and conducted regulatory ***233** proceeding. [FN21] (See § 13244.)

FN21. Nothing in *United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d 82, 227 Cal.Rptr. 161, *prohibits* the Board from conducting a regulatory proceeding to amend a water quality control plan in the midst of an adjudicative proceeding to assign responsibility for meeting the water quality objectives in that plan. In that case, the court concluded that "combining the water quality and water rights functions in a single proceeding ... was unwise," not impermissible. (*Id.* at p. 119, 227 Cal.Rptr. 161.) The reason the combination of functions was unwise was that "the Board compromised its important water quality role by defining its scope too narrowly in terms of enforceable water rights." (*Id.* at p. 120, 227 Cal.Rptr. 161.) As long as the Board avoided any such compromise, we see no reason the Board could not have commenced a regulatory proceeding to amend the 1995 Bay-Delta Plan to modify the flow objectives in the plan for the purpose of authorizing the San Joaquin River Agreement and the Vernalis Adaptive Management Plan.

Contrary to State Water Contractors' assertion, the trial court's decision does not rest on "the assumption that water right decisions adopted by the ... Board must provide for full and immediate implementation of the water quality objectives set forth in any applicable water quality control plan." The trial court's decision rests on the conclusion (with which we agree) that when a water quality control plan calls for a particular flow objective to be achieved by allocating responsibility to meet that objective in a water rights proceeding, and the plan does *not* provide for any alternate, experimental flow objective to be met on an interim basis, the decision in that water rights proceeding must fully implement the flow objective provided for in the plan. The guiding principle is that the Board's power to act in a water rights proceeding commenced to implement a water quality control plan is constrained by the terms of the plan it is implementing.

The Board disagrees, contending that "[n]othing in the Porter-Cologne Act mandates the ... Board to adopt all of the flow-dependent objectives in a water quality control plan when it issues a water right decision." According to the Board, it is required only to "consider" such objectives; it is not required to implement them.

Section 13247--part of the Porter-Cologne Act--provides that "[s]tate offices, departments, and boards, in carrying out activities which may affect water quality, *shall* comply with water quality control plans approved or adopted by the state board unless otherwise directed or authorized by statute...." (Italics added.) Here, in the plan of implementation in the 1995 Bay-Delta Plan, the Board specifically stated that "[t]he water right decision ... *will* allocate responsibility for meeting the [water supply-related] objectives among water rights holders in the Bay-Delta Estuary watershed." (1995 Bay-Delta Plan, p. 27, italics added.) Thus, the 1995 Bay-Delta Plan specifically identified this water rights proceeding and Decision 1641 as the action "necessary to achieve the [river flow] objectives" of the 1995 Bay-Delta Plan, including the Vernalis pulse flow objective. (§ 13242, subd. (a).) Certainly, in conducting a water rights proceeding for the express purpose of allocating responsibility for meeting a water quality objective in a water quality control plan, the Board is "carrying out [an] activit[y] which

may affect water quality." (§ 13247.) Accordingly, the Board was compelled by section 13247 to comply with the 1995 Bay-Delta Plan unless another statute authorized the Board *not* to comply with the plan.

The Board first challenges the premise that it committed itself in the 1995 Bay-Delta Plan to implementing the flow objectives ***234** of the plan. The Board points to language in the last paragraph of the part of the program of implementation that addressed river flows, which stated, "These flows will be considered by the [Board] in its allocation of responsibility among the water rights holders in the watershed during the water rights proceeding." (1995 Bay-Delta Plan, p. 28.) According to the Board, this language "acknowledges that the ... Board's implementation responsibility as to the San Joaquin River flows is to 'consider' such objectives in the follow-on water right proceedings."

This argument fails because the Board takes the language on which it relies out of context. The paragraph on which the Board relies expressly addresses the "interim flows" that the Bureau was to provide "[p]rior to adoption of the water rights decision." Thus, the Board was merely stating that it would consider those interim flows when it allocated responsibility for the plan's flow objectives in the water rights proceeding. The Board was *not* stepping back from its commitment to actually allocate responsibility for the flow objectives in that proceeding.

The Board also refers to portions of the EIR that it prepared in connection with the 1995 Bay-Delta Plan and contends that those passages show "the ... Board expressly envisioned that [it] might reevaluate the San Joaquin River pulse flow requirements in the follow-on water right decision." This argument is meaningless. Whether the Board envisioned a reevaluation of the Vernalis pulse flow objective during the water rights proceeding, we have decided already that the Board had no power to *change* that objective in that proceeding. The question that remains is whether the Board had the statutory authority not to comply with its own water quality control plan, in which it committed itself to implement a flow objective by allocating the responsibility for meeting that objective among the appropriate water right holders in a water rights proceeding. The Board has failed to identify any such authority.

To provide such authority, the Board relies on sections 1257 and 1258, which specify what factors the Board must consider "[i]n acting upon applications to appropriate water." (§ 1257.) Section 1257 requires the Board to "consider the relative benefit to be derived from (1) all beneficial uses of the water concerned including, but not limited to ... any uses specified to be protected in any relevant water quality control plan...." More directly, section 1258 provides that the Board "shall consider water quality control plans which have been established pursuant to Division 7 (commencing with Section 13000) of this code, and *may* subject such appropriations to such terms and conditions as it finds are necessary to carry out such plans." (Italics added.) According to the Board, these provisions "expressly grant the ... Board the discretionary authority to apply the quasi-legislative requirements of the water quality control plans when adopting quasi-judicial water right decisions such as D-1641."

Even assuming for the sake of argument that in conducting the water rights proceeding at issue here the Board was "acting upon applications to appropriate water," [FN22] we conclude the Board's reliance on sections 1257 and 1258 is misplaced. In effect, the Board's position is that the word "may" in section 1258 gives it the discretion to decide whether "to implement all aspects of a water quality control plan," ***235** even if (as here) the plan itself evidences a commitment by the Board to do so. This position is based on the unspoken premise that "may," in this context, denotes the right, but not the obligation, to act.

FN22. In our view, the Board was not acting on applications to appropriate water, so much as it was acting on *permits* that already allowed the appropriation of water.

This premise is contrary to well-established precedent. As our Supreme Court explained in *Mass v. Board of Education* (1964) 61 Cal.2d 612, 39 Cal.Rptr. 739, 394 P.2d 579, in response to another public entity's attempt to avoid a statutory obligation, "Although the word 'may' customarily implies permissiveness [citation], words must be construed in their textual context. [Citation.] The word 'may' here occurs in a statute defining a public duty. ' "Words permissive in form, when a public duty is involved, are considered mandatory." ' " (*Id.* at pp. 616, 622-623, 39 Cal.Rptr. 739, 394 P.2d 579, quoting *Harless v. Carter* (1954) 42 Cal.2d 352, 356, 267 P.2d 4.) " '[W]here the purpose of the law is to cloth public officers with power to be exercised for the benefit of third persons, or for the public at large--that is, where the public interest or private right requires that a

thing should be done--then the language, though permissive in form, is peremptory.' " (*Harless v. Carter*, *supra*, 42 Cal.2d at p. 357, 267 P.2d 4, quoting *County of Los Angeles v. State* (1923) 64 Cal.App. 290, 295, 222 P. 153.)

Here, the power to be exercised--the power to subject appropriative water rights to terms and conditions necessary to carry out water quality control plans--is undoubtedly a power to be exercised for the public at large. Thus, the word "may" in section 1258 is mandatory, not permissive, and that statute did not exempt the Board from the obligation imposed by section 13247 to comply with its own water quality control plan.

It has been noted that "the principal enforcement mechanism available to the Board [to enforce compliance with water quality control plans] is its regulation of water rights." (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 125, 227 Cal.Rptr. 161, italics omitted.) It would be strange if the Board, having determined in a water quality control plan that a water rights proceeding was necessary to achieve the water quality objectives in that plan, could simply decide *not* to take action in that proceeding and thereby refuse to enforce its own plan. Fortunately, the Legislature has not authorized the Board to do any such thing. Thus, the Board cannot--as it attempted to do here--make a de facto amendment to a water quality objective in a water quality control plan by simply refusing to take the action that it has identified as necessary to achieve that objective.

The Board contends the decision in *United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at pages 143-144, 227 Cal.Rptr. 161, "has affirmed the ... Board's water right discretion regarding plan objectives." In the combined regulatory/adjudicatory proceeding underlying that decision, the Board generally employed "a so-called 'without project' level of protection" in adopting revised water quality objectives for the Delta. (*Id.* at p. 115, 227 Cal.Rptr. 161.) The Board did not employ that level of protection in all of its water quality objectives, however. For example, "the Board determined that to maintain 'without project' standards of water quality at Antioch to protect the rights of the Antioch riparians [who used the water for an industrial use that was sensitive to salt] would require a wasteful release of 25 acre-feet of outflow for each acre-foot diverted." (*Id.* at p. 143, 227 Cal.Rptr. 161.) Rather than require such an unreasonable waste of water, "the Board eliminated the Antioch standard from the Plan," "accepted the ***236** offer of [the Department] to provide a substitute supply to the Antioch riparians through the Contra Costa Canal," "and required the projects only to meet the standards for the canal." (*Id.* at pp. 143-144, 227 Cal.Rptr. 161.) On appeal, the court concluded, "the Board had little choice but to exempt the projects from the Antioch standards" "[i]n light of the constitutional mandate proscribing unreasonable or wasteful use of water (Cal. Const., art. X, § 2)." (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 144, 227 Cal.Rptr. 161.)

The Board interprets this part of the court's decision as "affirm[ing] the ... Board's deviation from the 'without project' standard" based on "the [constitutional] prohibition against waste and unreasonable use." Thus, according to the Board, the decision in *United States v. State Water Resources Control Bd.* affirms the Board's power to disregard objectives in a water quality control plan.

The Board has misread the case on which it relies. The fact that the proceeding underlying that case encompassed both the regulatory proceeding to amend the water quality control plan for the Delta, and the adjudicatory proceeding to implement that plan by modifying existing water rights, may have led to the Board's confusion. Although the court did, at one point, characterize the Board's action as "declining to impose the Antioch standards upon the projects" and "exempt[ing] the projects from the Antioch standards," at an earlier point the court made it clear that what the Board did was "eliminate ... the Antioch standard from the Plan." (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 144, 227 Cal.Rptr. 161.) In other words, the Board did not deviate from an established water quality objective in the water rights proceeding brought to achieve that objective. Instead, in the exercise of its regulatory powers, the Board decided not to include a water quality objective in the plan in the first place because achieving that objective would have required the projects to release an unreasonable amount of water to maintain the salinity level the Antioch riparians required for their industrial activities.

Even if *United States v. State Water Resources Control Bd.* could be read to sanction deviations from a water quality control plan to prevent the unreasonable or wasteful use of water, the Board does not argue that such a deviation was proper here. The deviation from the plan at issue here was the Board's substitution of the San Joaquin River

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Agreement flow regime for the Vernalis pulse flow objective. The Board cannot seriously argue that compliance with the Vernalis pulse flow objective would have resulted in the unreasonable or wasteful use of water, especially given the fact that that objective is to take effect when the San Joaquin River Agreement expires or is terminated by the parties. Thus, *United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d 82, 227 Cal.Rptr. 161, provides no support for the Board's argument.

In conclusion, we agree with the trial court that by adopting the San Joaquin River Agreement flow regime in lieu of the Vernalis pulse flow objective in Decision 1641, even on a temporary basis, the Board failed to fully implement the 1995 Bay-Delta Plan and instead accomplished a de facto amendment of that plan without complying with the procedural requirements for amending a water quality control plan. In so acting, the Board failed to proceed in the manner required by law and thus abused its discretion. Accordingly, the trial court properly granted the mandamus petition of the Central Delta parties to the extent they challenged this ***237** aspect of Decision 1641, and we will affirm that portion of the judgment in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).

ii. *The Southern Delta Salinity Objectives*

[21] The Central Delta parties contend the Board "did not in fact implement a plan to achieve" the salinity objectives for salinity in the southern Delta because "[a]lthough the Board assigned the responsibility for meeting the salinity standards to the Bureau and [the Department], the evidence as well as the statements of the Board clearly show that the Bureau ... does not plan to implement any actions which will improve its ability to meet the salinity standards." In their reply brief, the Central Delta parties emphasize the effect of the change the Board made to the footnote in the 1995 Bay-Delta Plan with respect to the southern Delta salinity objectives, noting that this change results in delayed implementation of the salinity objectives at the three locations downstream of Vernalis.

We find no merit in the broader argument of the Central Delta parties that the Board failed to implement the southern Delta salinity objectives by assigning responsibility for meeting them to the Department and the Bureau. Contrary to the suggestion of the Central Delta parties, the Board was not required to tell the Bureau and the Department exactly *how* they were to meet the salinity objectives. For our purposes, it is enough that Decision 1641 directed the Bureau and the Department *to* meet those objectives, and the Central Delta parties have not shown the Bureau and the Department *cannot* meet those objectives. Obviously, if such a showing were made, then the Decision 1641's allocation of responsibility to the Bureau and the Department would have been illusory and would not have complied with the Board's obligation to implement its own water quality control plan. In the absence of such a showing, however, we cannot conclude the Board failed to implement the 1995 Bay-Delta Plan by directing the Bureau and the Department to meet the salinity objectives in that 1995 Bay-Delta Plan.

We do find merit, however, in the narrower argument that the Board failed to adequately implement the southern Delta salinity objectives at the three locations downstream of Vernalis by delaying implementation of the 0.7 EC objective at those locations. The 1995 Bay-Delta Plan specified that implementation of the 0.7 EC objective at the two locations on Old River would be phased in so that full compliance would be achieved by the end of 1997. No delayed implementation was provided for the San Joaquin River at the Brandt Bridge site. In this water rights proceeding, however, the Board extended the delayed implementation at the Old River sites by more than seven years, to April 1, 2005, and authorized this same delayed implementation for the Brandt Bridge site. Furthermore, Decision 1641 specified that the 0.7 EC objective would be "replaced" by the 1.0 EC objective after April 1, 2005, "if permanent barriers are constructed, or equivalent measures are implemented, in the southern Delta and an operations plan that reasonably protects southern Delta agriculture is prepared by the [Department] and the [Bureau] and approved by the Executive Director of the [Board]."

There is nothing in the 1995 Bay-Delta Plan that allowed the Board to further delay implementation of the 0.7 EC objective at the two Old River sites, or that allowed the Board to delay implementation of that objective at the Brandt Bridge site, or that allowed the Board to replace that ***238** objective with a different objective under any circumstances. In taking these actions, the Board failed to adequately implement the 1995 Bay-Delta Plan and instead effectively amended the 1995 Bay-Delta Plan without complying with the procedural requirements for amending a water quality control plan.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Since the extended implementation date of April 1, 2005, has already passed, the Board's delay in implementing the 0.7 EC objective until that date is a moot issue. However, the provision in Decision 1641 that replaces the 0.7 EC objective with the 1.0 EC objective under certain conditions *after* April 1, 2005, is not moot. As with the Vernalis pulse flow objective, the Board must either fully implement the southern Delta salinity objectives as set forth in the 1995 Bay-Delta Plan or must duly amend the plan. Accordingly, we will direct the trial court to modify its judgment in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502) to accomplish this result.

b. *Approving The Petitions For Long-Term Changes*

As previously noted, to allow for performance of the San Joaquin River Agreement, the Board, in Decision 1641, approved petitions by the irrigation districts to add the San Joaquin River upstream of Vernalis as a place of use and add fish and wildlife enhancement as a purpose of use in their licenses. These long-term changes, which were to last during the period of the San Joaquin River Agreement, would allow the irrigation districts to contribute up to 110,000 acre-feet of water per year for instream flows in the lower San Joaquin River above Vernalis to assist the Bureau in meeting the April-May pulse flow objectives in the San Joaquin River Agreement.

i. *The "No Injury" Rule*

The Board's approval of the petitions was governed by sections 1707 and 1736. Sections 1735 and 1736 authorize the Board to approve "a petition for a long-term transfer of water or water rights involving a change of point of diversion, place of use, or purpose of use" "where the change would not result in substantial injury to any legal user of water and would not unreasonably affect fish, wildlife, or other instream beneficial uses." A long-term transfer is one "for any period in excess of one year." (§ 1735.)

Subdivision (a)(1) of section 1707 provides that "[a]ny person entitled to the use of water, whether based upon an appropriative, riparian, or other right, may petition the board ... for a change for purposes of preserving or enhancing wetlands habitat, fish and wildlife resources, or recreation in, or on, the water." Subdivision (b) of the statute authorizes the Board to approve such a petition if the Board determines that the proposed change "[w]ill not increase the amount of water the person is entitled to use," "[w]ill not unreasonably affect any legal user of water," and "[o]therwise meets the requirements of this division."

In addressing the petitions of the irrigation districts, the Board noted that "[i]n general, the [irrigation districts] will not decrease consumptive use in their districts. Rather, the water provided under the proposed changes will come from conservation efforts, substitute groundwater pumping, stored water or reservoir reoperation." (Decision 1641, p. 28.)

As the Board observed, the Central Delta parties "argued that the proposed changes would injure other legal users of water because the changes would result in poorer water quality at Vernalis during the summer irrigation season. Because ***239** the water to be supplied under the petitioned changes will not be from a reduction in consumptive use, they attempted to show that there would be adverse effects on downstream water right holders as a result of reduction or elimination of return flows, decreased groundwater accretions in the tributaries, and storage reductions in New Melones Reservoir (leading to a decreased supply of water to meet the Vernalis salinity objective)."

In addressing these arguments, the Board first observed that downstream riparian users "cannot ... require that water stored [upstream] in another season be released for their benefit" and therefore they could not be injured by any change in the use of stored water by the irrigation districts. Because riparian users might be injured by changes in the use of natural flow, however, the Board determined the "fundamental issue" was "whether there is sufficient natural flow to satisfy the diversion requirements of riparian right holders in the southern Delta." The Board concluded that, on average, natural flow is insufficient to meet agricultural demands in the southern Delta in August, September, and October of most years. Accordingly, any further reductions in summer flows due to the long-term changes in the licenses of the irrigation districts would not injure Delta riparians.

With respect to appropriative users in the Delta, the Board observed that, like riparian users, they "cannot require that the owner of an upstream reservoir release water appropriated during another season." As for natural flow, the Board stated that "[i]f the [San Joaquin River Agreement] water suppliers make water available under the petitioned changes by causing a reduction in return flows from direct diversions of water, and conserved water is held in storage in New Melones Reservoir, downstream

appropriators could be injured" "if inadequate water reaches the downstream right holders during the time period when natural flows occur." The Board noted that while Oakdale and South San Joaquin Irrigation Districts might use direct diversion rights between May 1 and October 1 to provide water under the San Joaquin River Agreement, "[a]ny legal injury [from such use] will depend on relative seniority of the water rights involved and the presence of natural flow. It is unlikely, however, that either defacto [*sic* ] or legal injury will occur, since the water provided for instream flows will be available to water right holders in the Delta after it passes Vernalis." (Decision 1641, pp. 33, 34.)

Ultimately, the Board found that "the changes, as conditioned, will not unreasonably affect or substantially injure any legal user of water." (Decision 1641, p. 49.)

In the second cause of action in their non-CEQA writ petition, the Central Delta parties alleged the Board's "no injury" findings were "not supported by the evidence and ... contrary to law" because the long-term changes would "allow for shifting of river flows from late spring and summer to the period from approximately April 15 to May 15" and "[s]uch shift in flows degrades the quality of water for irrigation in downstream areas."

The trial court rejected this claim, concluding that "the [San Joaquin River Agreement], in conjunction with other D-1641 measures, actually improves water quality."

[22] On appeal, the Central Delta parties renew their challenges to the Board's approval of the long-term changes to the irrigation districts' licenses to allow for performance of the San Joaquin River Agreement. They first contest the Board's determination that downstream riparian users cannot be injured by a change ***240** in the use of water stored upstream. According to them, the Board erred in determining that the changes "would not result in substantial injury to any legal user of water" under section 1736 and would "not unreasonably affect any legal user of water" under subdivision (b)(2) of section 1707 because the Board "substitute[d] the question of water rights for the question of injury to legal users."

In *Lindblom v. Round Valley Water Co.* (1918) 178 Cal. 450, 173 P. 994, our Supreme Court explained that a downstream riparian user may not claim any benefit from the storage of water by an upstream appropriator. "[The riparian user] is not in a position to demand that the [upstream appropriator] shall, by its artificial works, furnish a constant flow of water in [the watercourse] throughout the year. His only rights are those which he would have had under the natural conditions existing before the dam was erected, subject to the deduction of so much of the water as [the upstream appropriator] has continuously applied to a beneficial use. In other words, he cannot require the [upstream appropriator] to discharge any water into the stream during those months in which there would be no flow if no dam had ever been built. He may merely insist that, during the months of natural flow, the [upstream appropriator] shall permit the escape into the [watercourse] of the surplus of the natural flow over and above what is required to enable the [upstream appropriator] to meet its reasonable needs...." (*Id.* at p. 457, 173 P. 994.)

According to the Central Delta parties, the foregoing rule has no application here because whether downstream riparian users have any legal "right" to water stored by others upstream, they may still claim "injury" from changes in the use of that water under sections 1707 and 1736. We disagree.

Sections 1707 and 1736 are two of many sections in the Water Code that codify what we will refer to as the "no injury" rule. (See § § 1702, 1706, 1707, 1725, 1736.) [FN23] The Central Delta parties contend that the concept of "injury" has nothing to do with the legal right to use water. According to them, in these statutes "the Legislature directs the Board to look into how the consequences of changes to permit conditions might affect others, *not* whether others have water rights to the water which is affected by the requested permit changes." But "injury" can mean "[t]he invasion of a[ ] legally protected interest" (Black's Law Dict. (5th ed.1979) p. 706, col. 2), and this meaning would require a determination of the extent of a downstream riparian's "legally protected interest" in the water that is the subject of the change petition to determine if that interest will be invaded by the change.

FN23. Although the wording of these statutes is not identical, all but one (§ 1707) incorporate the concept of "injury." Although section 1707 prohibits a change that will "unreasonably affect" a legal user of water, rather than a change that will "injure" such a user, the Central Delta parties urge us to construe all of the statutes consistently. We see no reason not to do so.

Since the word "injury" is ambiguous (i.e.,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

susceptible of more than one reasonable interpretation) in the context of these Water Code sections, " 'we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history' " in construing these statutes. (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227, 120 Cal.Rptr.2d 795, 47 P.3d 639.) Ultimately, we must "choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting ***241** rather than defeating the general purpose of the statute[s]." (*Ibid.*)

To understand the intended meaning of the "no injury" rule, we must go back to the common law rules that governed water rights in the early days of statehood, before any legislation on the subject. Specifically, we begin by looking at the principles that governed changes to an established appropriation of water at common law.

An early, albeit brief, discussion of the subject appears in *Maeris v. Bicknell* (1857) 7 Cal. 262, 1857 WL 703. One question in that case was "whether a party who makes a prior appropriation of water can change the place of its use, without losing that priority as against those whose rights have attached before the change." (*Id.* at p. 264.) The Supreme Court responded to that question simply, stating: "This question, we think, can admit of but one answer. It would seem clear that a mere change in the use of water, from one mining locality to another, by the extension of the ditch, or by the construction of branches of the same ditch, would by no means affect the prior right of the party. It would destroy the utility of such works were any other rule adopted. As to the question whether a party can change the use of the water from one purpose to another, without affecting his prior right, we express no opinion, as the point does not arise in this case." (*Ibid.*)

If the decision in *Maeris* suggested that a prior appropriator could, *without restriction*, change the place where he uses the water he appropriates, that suggestion was repudiated in *Kidd v. Laird* (1860) 15 Cal. 162, 1860 WL 1069, where the Supreme Court drew on existing common law authority to address the question of changes to an established appropriation. *Kidd* involved "an action to recover damages for the diversion of water from Deer Creek, in Nevada county," which was premised on the defendants' construction of a new diversion ditch upstream from the plaintiffs' established ditches. (The defendants had previously been diverting water through a ditch that was downstream from the plaintiffs' ditches.) (*Id.* at pp. 177-178.) On appellate review, the case turned on the correctness of a jury instruction "that a person entitled to divert a given quantity of the water of a stream, may take the same at any point on the stream, and may change the point of diversion at pleasure, if the rights of others are not injuriously affected by the change." (*Id.* at pp. 167, 179.) In concluding the instruction was proper, the Supreme Court wrote: " 'In this country, the doctrine is well settled' ... 'that where a right has been acquired by virtue of twenty years' enjoyment to use a certain quantity of water, a change in the mode and objects of use is justifiable; and here, as in England, the only restriction is, that the alterations made from time to time shall not be injurious to those whose interests are involved.' [Citation.] 'All that the law requires is, that the mode or manner of using the water should not have been materially varied, to the prejudice of others.' [Citation.] The case of *Whittier v. Cocheco Manuf. Co.*, 9 N.H. 454, is directly in point. It was there decided that a change may be made in the place, as well as in the mode and objects of the use, if the quantity of water used is not increased, and the change is not to the prejudice of others. It was held that a party who had acquired by prescription a right to take a certain quantity of water at a particular dam, might open his gates and draw that quantity, without using it there, in order to use it at other works below on the same stream. These authorities show conclusively, that in all cases the effect of the change upon the rights of others is the controlling consideration, and that in the absence of injurious consequences to others, any change which the party chooses to ***242** make is legal and proper." (*Id.* at pp. 180-181.)

What is most significant about *Kidd* is its statement that "in all cases the effect of the change upon the *rights* of others is the controlling consideration." (*Kidd v. Laird, supra,* 15 Cal. at p. 181, italics added.) Under *Kidd's* articulation of the "no injury" rule, only those "others" who had "rights" to the water involved could claim "injury," and they could show "injury" only by showing an injurious effect on their "rights" to the water involved in the change.

This formulation of the "no injury" rule also appears in other California cases predating any water rights legislation. For example, in *Hill v. Smith* (1865) 27 Cal. 476, 1865 WL 424, the court stated that neither an appropriator nor a riparian user "can so use the water as to injure or prejudice the prior *rights* to a like use by the other." (*Id.* at p. 482, italics added.)

In 1872, the Legislature codified (as former Civil

Code sections 1410-1422) some of the common law principles governing the appropriation of water, including the "no injury" rule. (Stats. 1871-1872, ch. 424, § 1, p. 622; *Lux v. Haggin* (1886) 69 Cal. 255, 374-375, 10 P. 674; Hutchins, The California Law of Water Rights (1956) pp. 49-50, 89-92.) Former Civil Code section 1410 provided that " '[t]he right to the use of running water flowing in a river or stream, or down a cañon or ravine, may be acquired by appropriation.' " (*Lux v. Haggin, supra*, 69 Cal. at p. 368, 10 P. 674.) Former Civil Code section 1411 provided that " '[t]he appropriation must be for some useful or beneficial purpose, and when the appropriator or his successor in interest ceases to use it for such a purpose the right ceases.' " (*Lux*, at p. 369, 10 P. 674.) And, as most pertinent here, former Civil Code section 1412 provided that " '[t]he person entitled to the use may change the place of diversion if others are not injured by such change, and may extend the ditch, flume, pipe, or aqueduct by which the diversion is made to places beyond that where the first use was made.' " (*Lux*, at p. 369, 10 P. 674.)

Although former Civil Code section 1412 applied the "no injury" rule only to changes in the place of diversion, the California Supreme Court continued to apply that rule more broadly, as in *Ramelli v. Irish* (1892) 96 Cal. 214, 31 P. 41. There, citing both former Civil Code section 1412 and *Kidd v. Laird, supra*, 15 Cal. 162, the court stated: "It is ... settled law that the person entitled to the use of water may change the place of diversion, or the place where it is used, or the use to which it was first applied, if others are not injured by such change." (*Ramelli v. Irish, supra*, 96 Cal. at p. 217, 31 P. 41.)

Moreover, even though former Civil Code section 1412 and *Ramelli* did not expressly refer to injury to the *rights* of others, it is apparent that the "no injury" rule continued to apply as first stated in *Kidd*--that is, that the "injury" in question was an adverse effect on the *rights* of others to the water involved. Thus, for example, in *Hargrave v. Cook* (1895) 108 Cal. 72, 41 P. 18, the court noted that a prior appropriator had "the right to change the place and purpose of use so long as the change did not injuriously affect the *rights* of the subsequent appropriators and claimants." (*Id.* at p. 80, 41 P. 18, italics added.)

In 1911, the Conservation Commission of California was created with the specific charge of " 'prepar[ing] and recommend[ing] to the Legislature laws, statutes, and constitutional amendments revising, systematizing, and reforming the laws of this State upon ... water, [and] the use of water....' (Chandler, *The "Water Bill" Proposed by the Conservation Commission* ***243** *of California* (1912-1913) 1 Cal. L.Rev. 148, 148, quoting Stats.1911, p. 822.) One of the results of that effort was the Water Commission Act, which went into effect in 1914. [FN24] "The main purpose of the Water Commission Act was to provide an orderly method for the appropriation of unappropriated waters," and "[i]t supplanted the alternative nonstatutory and Civil Code procedures" for appropriating water. (Hutchins, The California Law of Water Rights, *supra*, p. 95.)

> FN24. "The Water Commission Act was enacted in 1913 and, after being withheld by referendum, it was approved by vote of the people and went into effect December 19, 1914." (Hutchins, The California Law of Water Rights, *supra*, p. 94.)

For the first time, the Water Commission Act gave control over appropriations of water to an administrative agency and required a person seeking to appropriate water to submit an application to the agency identifying, among other things, "the nature and the amount of the proposed use" and "the proposed place of diversion and the place where it is intended to use the water." (Stats.1913, ch. 586, § 16, p. 1021.) Sections 16 and 39 of the Water Commission Act imported the "no injury" rule into the administrative setting. Section 16 provided that once an application was filed, any change in the point of diversion could be made only with the permission of the commission, which could be granted only on a finding "that such change in the place of diversion will not operate to the injury of any other appropriator or legal user of such waters." (Stats.1913, ch. 586, § 16, p. 1022.) Section 39 of the Water Commission Act provided that "water appropriated for one purpose under the provisions of this act may be subsequently appropriated for other purposes under the provisions of this act; *provided*, that such subsequent appropriation shall not injure any previous appropriation." (Stats.1913, ch. 586, § 39, p. 1032.)

As originally enacted, the Water Commission Act provided for inconsistent application of the "no injury" rule. Unlike section 16, which applied to changes in the place of diversion, section 39 of the Water Commission Act, which governed changes in the purpose of use of appropriated water, did not employ the term "legal user." (Stats.1913, ch. 586, § 39, p. 1032.) Instead, section 39 limited the application of the "no injury" rule in that context to injuries to "any previous appropriation." And the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Water Commission Act made no provision whatsoever for changes in the place of use.

The Legislature corrected these inconsistencies by twice amending the "no injury" provisions in the Water Commission Act between 1914 and 1943. In 1921, the Legislature amended section 16 to treat changes in the place of use the same as changes in the place of diversion--that is, making them subject to the commission's approval based on a finding of no injury to "any other appropriator or legal user of such waters." (Stats.1921, ch. 329, § 2, pp. 443-444.) In 1925, the Legislature amended section 39 to make changes in purpose of use subject to the same provisions that governed changes in points of diversion and places of use. (Stats.1925, ch. 339, § 7, p. 595.) At the same time, apparently recognizing that the phrase "legal user" was broad enough to encompass another appropriator, the Legislature amended section 16 to delete the phrase "other appropriator," leaving the phrase "legal user" as the sole operative phrase in the statute. (Stats.1925, ch. 339, § 2, p. 591.) Thus, by 1925, changes in the place of diversion, place of use, and purpose of use were all subject to approval by the Water Commission on a finding that the ***244** change would not operate to the injury of any legal user.

This was the state of the law when the Water Code was enacted in 1943, and section 1702 of that code was drawn from the then current version of section 16 of the Water Commission Act. (Stats.1943, ch. 368, § 16, p. 1628.) In enacting the Water Code, the Legislature specified that "[t]he provisions of this code, in so far as they are substantially the same as existing statutory provisions relating to the same subject matter, shall be construed as restatements and continuations thereof, and not as new enactments." (*Id.*, p. 1604.) Thus, section 1702 of the Water Code carried the same meaning that section 16 of the Water Commission Act carried before it.

The Central Delta parties have not pointed us to anything to suggest that later manifestations of the "no injury" rule--including sections 1707 and 1736 [FN25]--were intended to have a different meaning than the original common law rule that became part of the Water Commission Act and then the Water Code. Thus, in determining whether the petitioned changes to the licenses of the irrigation districts would cause "substantial injury" to or would "unreasonably affect" riparian and appropriative users in the Delta, the Board properly focused on the effect of those changes on the *rights* of those users. Since Delta riparians and appropriators have no right to water stored by the irrigation districts, the Board properly concluded they cannot be injured or unreasonably affected within the meaning of sections 1707 and 1736 by changes in the use of that water. [FN26]

FN25. Section 1707 was enacted in 1991 (Stats.1991, ch. 663, § 2, pp. 3043-3044); section 1736 was enacted in 1988 (Stats.1988, ch. 1145, § 3, p. 3678), and was derived from former section 1738, which was enacted in 1980 (Stats.1980, ch. 933, § 12, pp. 2957-2958).

FN26. To the extent the Central Delta parties contend Delta riparians and appropriators have a right to water stored upstream by others based on the physical solution doctrine, we address that argument separately below. To the extent the Central Delta parties offer the same contention based on the Delta Protection Act (§ 12200 et seq.), we address that argument below in connection with arguments made by other parties based on that act.

As we have noted, the Board observed that downstream appropriators could be injured if Oakdale and South San Joaquin Irrigation Districts varied their direct diversion of water between May 1 and October 1 in such a manner as to cause a reduction in return flows during that period. The Board first stated it was "unlikely ... that either defacto [*sic* ] or legal injury will occur, since the water provided for instream flows will be available to water right holders in the Delta after it passes Vernalis." Ultimately, however, the Board found that "the changes, as conditioned, will not unreasonably affect or substantially injure any legal user of water." (Decision 1641, pp. 34, 49.)

Given the Board's ultimate finding, the Central Delta parties' argument that the Board did not make the required findings under sections 1707 and 1736 and instead deferred making those findings is without merit. The only question is whether the Board's findings are supported by substantial evidence. The Central Delta parties contend they are not; we conclude otherwise.

The Board contends the Central Delta parties' "arguments regarding the water quality impacts of the San Joaquin River Agreement are ... beside the point" because the Board "has expressly directed [the Bureau] to meet the Vernalis salinity objective." In

other words, according to ***245** the Board, any alterations to the operations of the irrigation districts under the long-term changes to their licenses cannot injure agricultural users in the southern Delta by degrading water quality in the Delta during the summer because the Bureau is obligated to meet the salinity objective at Vernalis in any event, thereby negating any effects of the changes upstream.

This argument has merit, and the Central Delta parties have no answer for it. The southern Delta agricultural salinity objectives in the 1995 Bay-Delta Plan, including the Vernalis salinity objective, were formulated specifically to maintain an adequate level of protection for agriculture in the southern Delta. The Central Delta parties have not shown that southern Delta water users have any right to water with less salinity than they will receive if those objectives are met. Thus, if the Bureau ensures the salinity objective is met at Vernalis, southern Delta agriculture will be protected against any adverse effects on salinity upstream of Vernalis caused by the long-term changes in the licenses of the irrigation districts.

To the extent the Central Delta parties complain the Bureau will not comply with its obligations to meet the Vernalis salinity objective, this complaint does not provide a basis for challenging the Board's decision to approve the long-term changes to the irrigation districts' licenses. The Board was entitled to approve the requested changes as long as it found "the change would not result in substantial injury to any legal user of water" and "[w]ill not unreasonably affect any legal user of water." (§ § 1707, subd. (b)(2), 1736.) Decision 1641 essentially determined that any injury to the agricultural users in the southern Delta from the requested changes would be avoided if the Bureau meets the agricultural salinity objective at Vernalis during the period of the change--that is, while the San Joaquin River Agreement is in effect. Thus, the Board approved the requested changes subject to the requirement that the Bureau meet that objective.

The Central Delta parties have not shown that the Bureau cannot meet that objective. They contend the Bureau "expects to not meet the [Vernalis salinity] objective ... because of how it allocates its limited supply for water quality purposes." The document they cite, however, does not support their assertion. That document--an exhibit submitted by the Bureau--refers to a study of compliance with the Vernalis salinity objective under the San Joaquin River Agreement. According to that document, for a study period of 71 years, the Vernalis salinity objective would be exceeded under the San Joaquin River Agreement in 8 percent of the months.

Whatever the Bureau may have postulated would occur under the San Joaquin River Agreement, Decision 1641 *requires* the Bureau to meet the Vernalis salinity objective through whatever means necessary. We must presume the Bureau will comply with the legal obligation the Board has placed on it and that the Board will enforce that obligation. Since the Central Delta parties have not shown the Bureau cannot meet the Vernalis salinity objective, all they have is their fear the Bureau will not do so. Their fear, however, is not sufficient to show injury to a legal user of water and therefore not sufficient to challenge the Board's decision to approve the long-term changes to the irrigation districts' licenses. Accordingly, the trial court properly rejected the second cause of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).

***246** ii. *The Physical Solution Doctrine*

[23] In the tenth cause of action in their non-CEQA writ petition, the Central Delta parties alleged the Board erred when it concluded that "riparian right holders cannot require that water stored in another season be released for their benefit" because the Board's decision "ignores the physical solution adjustments to natural flow inherent in water development and use which offset injury to downstream riparians while at the same time fostering maximum beneficial use of the water." The trial court implicitly rejected these allegations.

On appeal, the Central Delta parties reassert this argument. In essence, their claim appears to be that riparian users can be injured by changes in the use of water stored upstream by another because a riparian has a right to that stored water under the physical solution doctrine.

[24] Under the physical solution doctrine, a court adjudicating a water rights dispute may, "within limits," exercise its equitable powers to "impose a physical solution to achieve a practical allocation of water to competing interests." (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1249-1250, 99 Cal.Rptr.2d 294, 5 P.3d 853.) Whether, and under what circumstances, such a physical solution could include requiring an upstream appropriator to release stored water for the benefit of a downstream riparian is a question we need not answer here. For

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

our purposes, it is sufficient to note that in the absence of a court order actually *imposing* such a physical solution, a riparian user cannot claim any right under the physical solution doctrine to water stored upstream by another. The Central Delta parties have not identified any such court order here.

Furthermore, as we have concluded already, with the Bureau ordered to meet the Vernalis salinity objective through whatever means necessary, riparians and appropriators in the southern Delta are protected against any adverse effects on salinity caused by the long-term changes in the licenses of the irrigation districts.

For the foregoing reasons, the trial court properly rejected the tenth cause of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).

iii. *Section 12230 et seq.*

Section 12230 is a statement of findings and a declaration by the Legislature that "a serious problem of water quality exists in the San Joaquin River between the junction of the San Joaquin River and the Merced River and the junction of the San Joaquin River with Middle River; that by virtue of the nature and causes of the problem and its effect upon water supplies in the Sacramento-San Joaquin Delta, it is a matter of statewide interest and is the responsibility of the State to determine an equitable and feasible solution to this problem."

Section 12231 declares it "to be the policy of the State that no person, corporation or public or private agency or the State or the United States should divert water from the San Joaquin River and its tributaries to which the users along the portion of the San Joaquin River described in Section 12230 are entitled."

Section 12232 directs that the Board and other state agencies "shall do nothing, in connection with their responsibilities, to cause further significant degradation of the quality of water in that portion of the San Joaquin River between the points specified in Section 12230."

Finally, section 12233 provides in relevant part that "[n]othing in this part shall ***247** be construed ... as affecting any vested right to the use of water, regardless of origin, or any water project for which an application to appropriate water was filed with the State Water Resources Control Board prior to June 17, 1961."

In its order on reconsideration, the Board addressed an argument by San Joaquin County that the Board's Decision 1641 violated section 12230 et seq. "by making changes in water right permits that affect the reach of the San Joaquin River between its junctions with the Merced River and Middle River." Conceding that all of the relevant water right applications (including those of the irrigation districts) were filed before the date specified in section 12233, the county argued that "if the [Board] subsequently authorizes a change in the permits, [section 12230 et seq. are] applicable to the change." The Board's order on reconsideration rejected this argument, stating: "Section 12233 refers to the date of *application* for a water right, not to the permit date, which necessarily must be subsequent to the application. As a result, the permits issued after June 17, 1961 on applications filed before June 17, 1961 were not affected.... It follows that if the original permits could be issued ... after June 17, 1961 without being constrained under [section 12230 et seq.], changes in those permits also should not be affected...." (Fn.omitted.)

[25] In the fifth cause of action in their non-CEQA writ petition, the Central Delta parties took up the argument formerly made by San Joaquin County that Decision 1641 violated section 12230 et seq. The trial court rejected this argument in part for the same reason the Board did--because "there is no legal right under th[ese] statute[s] to modify pre-1961 water rights."

On appeal, the issue is joined over whether the limitation in section 12233 applies when the Board authorizes a change to a permit or license based on an application to appropriate water filed before June 17, 1961. The Central Delta parties argue that "[t]he better interpretation of these sections is that new places of use and purposes of use do not constitute a 'vested right to the use of water' for any application to appropriate water that was filed prior to June 17, 1961." They contend, "[t]he resolution of this issue turns on the definition of 'vested water rights.' " Citing the dictionary definition of "vested," they argue that while the irrigation districts may have had vested rights "to divert or store water from the tributaries of the San Joaquin River, at certain places, at certain times, for certain purposes, and in certain amounts as specified in their permits and licenses," "[w]hat was *not* vested were *changes* to the licenses as requested through the D-1641 hearings."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Central Delta parties have misread section 12233. That statute provides that section 12230 et seq. is to have no effect on "any vested right to the use of water, regardless of [the source of] origin" of that vested right, *or* on "any water project for which an application to appropriate water was filed with the State Water Resources Control Board prior to June 17, 1961." Thus, any right to use water that was vested when section 12230 et seq. went into effect in 1961 (see Stats.1961, ch. 1454, § 1, p. 3300) was immune from those statutes, and so are any water projects for which applications to appropriate water were filed before June 17, 1961.

The licenses of the irrigation districts that were the subject of the long-term change petitions here were all issued on applications to appropriate water that were filed between 1920 and 1954. Thus, those licenses pertained to "water project[***248** s] for which ... application[s] to appropriate water w [ere] filed ... prior to June 17, 1961." (§ 12233.) By virtue of the limitation in section 12233, section 12230 et seq. has no effect on those projects.

There is no basis for concluding that a water project which is protected from the effects of section 12230 et seq. because an application to appropriate water for that project was filed before June 17, 1961, suddenly loses that protection when a petition is filed to make a long-term change in the license that was issued based on that application. If the Legislature had intended such a result, it could have said so, but it did not. Apparently the Legislature concluded that the new burdens it intended to impose on water users by virtue of section 12230 et seq. should not be visited on any water projects that were already in the works by June 1961. Since the licenses at issue here pertain to such projects, the Board properly concluded that section 12230 et seq. had no bearing on its approval of the long-term change petitions of the irrigation districts. By the same token, the trial court properly rejected the fifth cause of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).

2. *Challenge To The Mokelumne Agreement*

East Bay Municipal Utility District (East Bay MUD) holds appropriative rights to divert and store water from the Mokelumne River under a license and a permit. In a proceeding before the Federal Energy Regulatory Commission, East Bay MUD entered into a settlement agreement with the United States Fish and Wildlife Service and the California Department of Fish and Game to establish conditions in its FERC license to protect fish and wildlife resources in the Mokelumne River system (the Mokelumne Agreement). East Bay MUD's FERC license was subsequently amended to include the schedule of flows from the Mokelumne Agreement.

In the water rights proceeding to implement the flow-dependent objectives in the 1995 Bay-Delta Plan, East Bay MUD proposed that its responsibility to help meet those objectives be limited to the flow requirements established in the Mokelumne Agreement. The Board compared those flow requirements to various alternatives analyzed in the implementation EIR and determined that "it would not be in the public interest to require more water from the Mokelumne River system than will be provided under the" Mokelumne Agreement. The Board amended East Bay MUD's license and permit accordingly.

The Central Delta parties challenged the Board's action with respect to the Mokelumne Agreement in a petition for reconsideration, but the Board rejected that challenge.

In the eleventh cause of action in their non-CEQA writ petition, the Central Delta parties alleged that the Board's "findings regarding the Mokelumne Agreement are not supported by substantial evidence and are inappropriate." The Central Delta parties also argued to the trial court that "[n]o notice was given that instream flow requirements on the Mokelumne River were to be established."

The trial court rejected these arguments, concluding that "[t]he Board's notice of the D-1641 proceeding was sufficient to alert other water users and interested persons of the Mokelumne River flow changes ultimately adopted by the Board" and that "[s]ubstantial evidence supports the Board's decision ***249** to adopt the flow releases it did for" East Bay MUD.

[26] On appeal, the Central Delta parties assert the identical arguments they made before the trial court, claiming lack of notice and insufficiency of the evidence. On the notice issue, we find the trial court's reasoning-- unchallenged by the Central Delta parties--persuasive. Adequate notice was given that the Board would consider flow requirements for the Mokelumne River because the Board's original notice of public hearing provided notice that the Board would "consider implementing the flow-dependent objectives in the 1995 Bay-Delta Plan by allocating

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

responsibility among water right holders to meet water flows and by requiring changes in the operations of facilities used in the diversion and use of water. The hearing will focus on the responsibilities under the water rights listed in Enclosure 2(a)." [FN27] Among the water rights listed on that enclosure were the license and permit belonging to East Bay MUD.

FN27. The revised notice of public hearing contained almost identical language, differing only in the following respect: "The hearing will focus on the responsibilities *of the holders of* the water rights listed in Enclosure 2(a)." (Italics added.)

[27][28] On the substantial evidence issue, East Bay MUD contends the Central Delta parties have forfeited that challenge by offering a one-sided recitation of the evidence. We agree. "When an appellant challenges an administrative decision as unsupported by substantial evidence in light of the record as a whole, it is [the] appellant's burden to demonstrate that the administrative record does not contain sufficient evidence to support the agency's decision." (*International Brotherhood of Electrical Workers v. Aubry* (1996) 42 Cal.App.4th 861, 870, 50 Cal.Rptr.2d 1.) A recitation of only the part of the evidence that supports the appellant's position "is not the 'demonstration' contemplated under the above rule. [Citation.] Accordingly, if, as [the Central Delta parties] here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error is deemed to be waived.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881, 92 Cal.Rptr. 162, 479 P.2d 362; see *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2, 13 Cal.Rptr.3d 786, 90 P.3d 746 [loss of right to challenge ruling on appeal properly termed forfeiture, not waiver].) Essentially, this rule rests on the premise that if the appellants fail to present us with all the relevant evidence, then the appellants *cannot* carry their burden of showing the evidence was insufficient to support the agency's decision because support for that decision may lie in the evidence the appellants ignore.

Such is the case here. In asserting insufficiency of the evidence, the Central Delta parties ignore evidence that the flows in the Mokelumne Agreement "were developed based on information gathered during extensive monitoring and research regarding anadromous fish in the lower Mokelumne River" and evidence that requiring additional flows from East Bay MUD's reservoirs would "substantially deplete storage levels in some years, increasing the risk that water supply will become unavailable for instream uses and increasing the likelihood that the hypolimnion (cold water) portion of those reservoirs would be lost." Without addressing this evidence, the Central Delta parties simply cannot prevail on their challenge to the sufficiency of the evidence. " 'Unless it can be demonstrated that the board's actions are not grounded upon any reasonable ***250** factual basis the courts should not interfere with its discretion or substitute their discretion for that of the board.' " (*Bank of America v. State Water Resources Control Bd.* (1974) 42 Cal.App.3d 198, 208, 116 Cal.Rptr. 770.) Here, the Central Delta parties have failed show the absence of a reasonable factual basis for Decision 1641's adoption of the flow requirements in the Mokelumne Agreement. Accordingly, the trial court properly rejected the eleventh cause of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).

3. *Challenge Based On The Davis-Dolwig Act*

[29] Section 11900 is a statement of findings and a declaration by the Legislature supporting the Davis-Dolwig Act (§ § 11900-11925), which deals with fish and wildlife and recreation in connection with state water projects. [FN28] Essentially, the purpose of the Davis-Dolwig Act was to ensure: (1) that in the planning and construction of state water projects, the Department would include features for recreation and the enhancement of fish and wildlife; and (2) that the costs of constructing and maintaining those features would not be borne by the agencies that contracted to receive water from the projects. (See § § 11901, 11910, 11912.) Instead, those costs would be paid from the state general fund or from bonds (see § § 11913, 11922- 11922.6), because, as section 11900 makes clear, "providing for the enhancement of fish and wildlife and for recreation ... benefits all of the people of California." On the other hand, the costs of the projects attributable to the *preservation* of fish and wildlife (as opposed to their enhancement) would be passed on to the contractors. (See § 11912.)

FN28. Section 11900 provides in full:
"The Legislature finds and declares it to be necessary for the general public health and welfare that preservation of fish and wildlife be provided for in connection with the construction of state water projects.
"The Legislature further finds and declares it to be necessary for the general public health

and welfare that facilities for the storage, conservation or regulation of water be constructed in a manner consistent with the full utilization of their potential for the enhancement of fish and wildlife and to meet recreational needs; and further finds and declares that the providing for the enhancement of fish and wildlife and for recreation in connection with water storage, conservation, or regulation facilities benefits all of the people of California and that the project construction costs attributable to such enhancement of fish and wildlife and recreation features should be borne by them. "The Legislature further finds and declares it to be the policy of this State that recreation and the enhancement of fish and wildlife resources are among the purposes of state water projects; that the acquisition of real property for such purposes be planned and initiated concurrently with and as a part of the land acquisition program for other purposes of state water projects; and that facilities for such purposes be ready and available for public use when each state water project having a potential for such uses is completed."

In commenting on the draft implementation EIR, the Central Delta parties asserted that the EIR failed to set forth and evaluate the requirements of the Davis-Dolwig Act. In response, the Board asserted that the upcoming hearing was "the appropriate forum in which to address water right legal issues."

If the Davis-Dolwig Act was raised again during the hearing, it has not been brought to our attention. In the ninth cause of action in their non-CEQA writ petition, however, the Central Delta parties alleged that in adopting Decision 1641, the Board failed to comply with section 11900 because the Board "failed to determine and quantify the portion of the water ***251** required to meet the 1995 [Bay-Delta] Plan" (1) "which represents the obligations of the SWP and CVP to preserve fish and wildlife" and (2) "which constitutes enhancement of fish and wildlife or is necessary to meet recreational needs which is the burden of the people of the State of California (general fund)."

If the trial court expressly ruled on these allegations, again it has not been brought to our attention. Nevertheless, at the very least the trial court implicitly found no merit in these allegations, and neither do we. The Central Delta parties argue that the Board "has a duty to give the policy declarations contained [in section 11900] their full force and effect" and therefore "should as a prerequisite to allocation of any of the burden of meeting the 1995 [Bay-Delta Plan] to any water user other than the SWP and CVP be first required to establish the portion of the requirements required for mitigation, preservation, and enhancement." They are wrong. The substantive provisions of the Davis-Dolwig Act impose no obligation on the Board whatsoever. Moreover, while the statement of findings and declaration in section 11900 is obviously of assistance in interpreting the substantive provisions of the Davis-Dolwig Act, that section does not, on its own, impose any requirement on anyone, let alone the Board. Accordingly, this argument fails, and the trial court properly rejected the ninth cause of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).

4. *Challenge To Implementation Of The Export Pumping Limits*

In the 1995 Bay-Delta Plan, to protect fish and wildlife, the Board adopted objectives limiting the rate at which water can be pumped from the Delta for export. In Decision 1641, the Board implemented the export limit objectives permanently by amending the pertinent permits of the Bureau and the Department to require that those objectives be met. [FN29]

FN29. The Board noted that the Bureau and the Department had been "operating in accordance with [the objectives for export pumping rates] since the [Board] adopted the 1995 Bay-Delta Plan."

In the first cause of action in their non-CEQA writ petition, the Central Delta parties alleged the export pumping limits implemented in Decision 1641 would result in injury to legal users of water. The trial court implicitly rejected these allegations.

[30] On appeal, the Central Delta parties again argue that "[t]he Board allowed exports to increase over what was previously authorized, an increase which will harm legal users."

This argument need not detain us long. The "no injury" rule the Central Delta parties seek to invoke applies only to the Board's approval of petitions that, by statute, require a finding of no injury to other water users--like the petitions for long-term changes by the irrigation districts we have discussed already.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Board's implementation of the objectives for export pumping limits in the 1995 Bay-Delta Plan was not subject to any such statute. Perhaps more importantly, the Central Delta parties' complaint about the implementation of those objectives is really an untimely attack on the objectives themselves. If the Central Delta parties believed the objectives for export pumping limits in the 1995 Bay-Delta Plan were too high, that was an argument they needed to raise in a challenge to the 1995 Bay-Delta Plan itself.

For these reasons, the trial court properly rejected this aspect of the first cause ***252** of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).

B

*The San Joaquin County Parties' Challenges To Implementation Of The 1995 Bay-Delta Plan*

In April 2000, various parties interested in water from New Melones filed a petition for writ of mandate seeking to modify Decision 1641. [FN30] (*County of San Joaquin v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311499).) The County of San Joaquin case was one of the cases added to this coordinated proceeding in November 2000.

FN30. These parties were the County of San Joaquin, San Joaquin County Flood Control and Water Conservation District, City of Stockton, Stockton East Water District, and Central San Joaquin Water Conservation District. We will refer to them collectively as the San Joaquin County parties. North San Joaquin Water Conservation District (NSJWCD) was also a petitioner in the County of San Joaquin case; however, NSJWCD was specifically named as a petitioner in only one cause of action in the petition. The trial court ruled against NSJWCD on that cause of action, but NSJWCD was not named as an appellant in the notice of appeal filed by the San Joaquin County parties, and the San Joaquin County parties do not raise any issue on appeal with respect to that aspect of the trial court's ruling.

In their petition, [FN31] the San Joaquin County parties set forth various challenges to the Board's decision to the extent the Board imposed terms and conditions on the Bureau's New Melones permits for meeting the Vernalis salinity objective, the Delta outflow objective, and the Vernalis flow objectives. The trial court rejected all of those challenges and entered judgment denying the San Joaquin County parties' writ petition.

FN31. The allegations of the San Joaquin County parties that we recount hereafter are taken from the second amended petition for writ of mandate they filed in June 2001. For some reason, the San Joaquin County parties called this document a "supplement" to their first amended writ petition.

Before we address the specific arguments of the San Joaquin County parties, we reiterate the substance of the Board's Decision 1641 regarding the New Melones permits.

With respect to the Vernalis flow objectives, the Board amended the Bureau's New Melones storage permits to require the Bureau to meet those objectives, except for the Vernalis pulse flow objective, during the term of the San Joaquin River Agreement, but the Board specifically provided that the Bureau was not required to "use water under these permits to meet [the Vernalis flow objectives] if it uses other sources of water or other means to meet these" objectives. (Decision 1641, p. 160, fn. 87.)

With respect to the Vernalis salinity objective, the Board added a term to the New Melones storage permits which provided that "[i]n conjunction with other measures to control salinity, Permittee shall release water from New Melones Reservoir to maintain the Vernalis agricultural salinity objective." The Board added to the New Melones direct diversion permit a condition which provided that "[f]or the protection of water quality, no diversion is authorized for consumptive uses under this permit unless [the Vernalis salinity objective] is met...." For all three of these permits, the Board specified that the Bureau could "meet these objectives through flows or other measures." In addition, for the two New Melones storage permits, the Board provided that the Bureau ***253** did not have to "use water under these permits to meet [the Vernalis salinity objective] if it uses other sources of water or other means."

Finally, the Board assigned responsibility for meeting the Delta outflow objective to both the Bureau and the Department by adding a term to all of the CVP and SWP licenses and permits requiring the Bureau and the Department to ensure that the Delta outflow objective be met on an interim basis.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Decision 1641, p. 146.)

1. *Section 11460*

Section 11460, which was "originally enacted as part of the Central Valley Project Act of 1933" (29 Ops.Cal.Atty.Gen. 136, 137 (1957)), provides: "In the construction and operation by the department of any project under the provisions of this part a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall not be deprived by the department directly or indirectly of the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed, area, or any of the inhabitants or property owners therein." [FN32]

FN32. At least one court has referred to sections 11460-11463 as "the Watershed Protection Act." *(United States v. State Water Resources Control Bd., supra, 182* Cal.App.3d at p. 138, 227 Cal.Rptr. 161.) That court erroneously stated the statutes were enacted "contemporaneous[ly] with [the] legislation authorizing construction of the CVP" *(ibid.),* when in fact those statutes were enacted as *part* of that legislation--namely, section 11 of the Central Valley Project Act of 1933. (Stats.1933, ch. 1042, § 11, pp. 2650-2651.) The provisions of section 11 were later divided into separate sections on the enactment of the Water Code. (1943 Stats., ch. 368, p. 1751.) It has apparently been a long practice to refer to sections 11460-11463 as "the 'watershed protection' statute." (25 Ops.Cal.Atty.Gen. 8, 9 (1955).) To avoid confusion, however, we will simply refer to these statutes by their section numbers.

Although on its face section 11460 applies only to the Department, section 11128 makes the statute applicable to the Bureau as well. [FN33]

FN33. "The limitations prescribed in Section 11460 and 11463 shall also apply to any agency of the State or Federal Government which shall undertake the construction or operation of the project, or any unit thereof, including, besides those specifically described, additional units which are consistent with and which may be constructed, maintained, and operated as a part of the project and in furtherance of the single object contemplated by this part." (§ 11128.)

In seeking reconsideration of the original Decision 1641, the San Joaquin County parties argued that section 11460 required the Bureau "to provide New Melones water to them" "in preference to meeting the objectives" in the 1995 Bay-Delta Plan. In essence, they claimed releasing water from New Melones to address Delta water quality objectives would deprive them of the prior right to that water, which was reasonably required to supply their beneficial needs. [FN34] The Board disagreed, concluding that section 11460 did not apply because that statute "protects the areas of origin from *exports* of water to other areas" and no water was being exported from New Melones. [FN35]

FN34. In their arguments under section 11460, the Central Delta parties do not rely on their own right to New Melones water, but instead rest their arguments on the rights of the San Joaquin County parties.

FN35. Like the Board, we will use the term "area of origin" in place of the more cumbersome phrase--"a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom"--used in section 11460.

***254** In the first and fourth causes of action in their writ petition, the San Joaquin County parties reasserted that by amending the Bureau's New Melones permits to impose responsibility on the Bureau for meeting the Vernalis salinity objective, the Delta outflow objective, and the Vernalis flow objectives with releases from New Melones, the Board, in adopting Decision 1641, violated section 11460. The Central Delta parties made similar allegations in the seventh cause of action in their non-CEQA writ petition.

The trial court disagreed, stating: "By its terms, [section 11460] strictly applies to [the Department] or other state and federal agencies actually operating units of the Central Valley Project. The [Board] does not operate projects, and the protections of [section 11460] cannot be directly enforced against that regulatory agency in this writ proceeding."

[31] On appeal, the San Joaquin County parties contend section 11460 "is not one of the policies entrusted to the [Board] to weigh and balance;

rather, it acts as an absolute restriction on the projects' operations and part of the 'laws of the state' that must be adhered to when the [Board] administers water rights." They further contend "[t]he ... Board cannot impose permit terms requiring [the Bureau] to operate the CVP in a manner violating Section 11460 any more than it could direct [the Bureau] to operate the CVP in a manner that allows it to take an endangered species." In their appeal, the Central Delta parties argue more generally that the Board "has failed to carry out its duty not to approve changes in the terms and conditions of the water rights under its jurisdiction which violated" section 11460.

No party to this proceeding, not even the Board itself, has offered any argument in support of the trial court's reasoning regarding section 11460. Nevertheless, there is a reasonable basis for the court's view. Read in conjunction with section 11128, section 11460 operates as a prohibition only on a state or federal government agency that constructs or operates part of the CVP. On its face at least, the statute does not purport to limit the Board's power in administering water rights. This reading of the statute is bolstered by section 11461, which, as the trial court observed, provides that "the provisions of this article shall be strictly limited to the acts and proceedings of the department, as such, and shall not apply to any persons or state agencies." Significantly, the San Joaquin County parties do not address section 11461.

Although section 11460 does not directly apply to the Board in its role as an administrator of water rights, this does not mean the statute is altogether inapplicable to the Board. If the Board were to impose a term or condition in a permit that *required* the Bureau to operate the CVP in violation of section 11460, we have little doubt that an interested party could seek relief from that term or condition on the ground that the Board had not proceeded in the manner required by law. But if the terms of a permit issued by the Board give the Bureau a range of choices in operating the CVP--only one of which might violate section 11460--there is no basis for challenging *the Board's decision* based on section 11460. As long as the Bureau has the right under its permit to operate the CVP consistently with section 11460, any violation of the statute would result solely from the Bureau's actions, rather than from the Board's decision.

Such is the case here. In Decision 1641, the Board did not *require* the Bureau to release water from New Melones to meet the Vernalis salinity objective, the Delta outflow objective, or the Vernalis flow objectives. ***255** The Board did use mandatory language in the permit term that it added to the New Melones storage permits, when providing that the Bureau "shall release water from New Melones Reservoir to maintain the Vernalis agricultural salinity objective" "[i]n conjunction with other measures to control salinity." When that permit term is read as a whole, however, it is clear that what appears to be mandatory is actually optional. The permit term goes on to specify that the Bureau "may meet [the Vernalis salinity objective] through flow or other measures." The permit term also specifies that the Bureau is "not mandate[d to] use water under these permits to meet these conditions if it uses other sources of water or other means to meet these conditions." Thus, if the Board can meet the Vernalis salinity objective through measures other than releases from New Melones, it has the right to do so.

The same is true of the Bureau's obligation to meet the Delta outflow objective and the Vernalis flow objectives. The Board imposed on *all* the permits and licenses relating to the CVP and the SWP the obligation to meet the Delta outflow objective. Accordingly, the Bureau was not required to meet that objective by releases from New Melones. As for the Vernalis flow objectives, it is subject to the same provision as the Vernalis salinity objective--if the Bureau uses "other sources of water or other means" to meet those objectives, then it need not use water released from New Melones.

The Central Delta parties contend that even "allowing the Bureau the election to take water from New Melones Reservoir ... to meet water quality and fishery requirements in the Lower San Joaquin River and Delta" "is a clear violation of Water Code section 11460." In a similar vein, the San Joaquin County parties contend that "[o]ffering the United States a narrow opportunity to operate in a manner that would comply with [section 11460] does not cure the ... Board's violation" because "[t]he ... Board knew that the United States would operate to meet the standards with releases from New Melones." In support of this argument, the San Joaquin County parties cite the fact that one of the flow alternatives analyzed in the implementation EIR "assume[d] that the [Bureau would] meet the flows using New Melones Reservoir."

Even if we assume the San Joaquin County and Central Delta parties are entitled to pursue their arguments under section 11460 on this basis, those

arguments go nowhere. At their core, those arguments are based on the premise that section 11460 gives priority to the San Joaquin County parties in their use of New Melones water [FN36] over the beneficial uses the Board sought to protect with the Vernalis flow objectives, the Delta outflow objective, and the Vernalis salinity objective. That premise is false.

FN36. Stockton East Water District and Central San Joaquin Water Conservation District both have contracts with the Bureau for New Melones water. The City of Stockton and San Joaquin County claim to be third party beneficiaries of those contracts. The interest of San Joaquin County Flood Control and Water Conservation District in New Melones water is unclear.

Before reaching that issue, however, we pause to address an argument made by the Board and others. According to the Board, the San Joaquin County parties cannot claim the protection of section 11460 because that statute does not guarantee watershed protection to CVP contractors.

The Board's construction of section 11460 rests on a 50-year-old opinion by ***256** the Attorney General. (25 Ops.Cal.Atty.Gen. 8 (1955).) In that opinion, the Attorney General stated that section 11460 grants "to the entire body of inhabitants and property owners in watersheds of origin" an "inchoate" priority, rather than "any presently vested title or right to any specific quantity of water." (25 Ops.Cal.Atty.Gen., *supra*, at pp. 20-21.) The Attorney General then stated that "[a]s the need of such an inhabitant develops he must comply with the general water law of the state, both substantively and procedurally, *to apply for and perfect a water right* for water which he then needs and can then put to beneficial use...." (*Id.*, p. 21, italics added.)

Relying on the italicized language from the Attorney General's opinion, the Board contends "the perfection of the inchoate right granted by Section 11460 *require[s]* the filing of an appropriative water right application." (Italics added.) In other words, according to the Board, section 11460 does not give any priority to an inhabitant of an area of origin who already has (or seeks) a contract with the Bureau (or the Department) for water from the area of origin. Instead, to claim the benefit of section 11460, the inhabitant *must* apply for and obtain an appropriative water right of his or her own.

We cannot agree with this construction of section 11460. Nothing in the statute itself imposes such a limitation, nor is the Attorney General's opinion persuasive authority for the proposition that a CVP contractor cannot claim the benefit of section 11460 because nowhere in the opinion did the Attorney General address that issue. (Cf. *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195, 81 Cal.Rptr.2d 521, 969 P.2d 613 ["[a]n opinion is not authority for propositions not considered"].) To the extent section 11460 reserves an inchoate priority for the beneficial use of water within its area of origin, we see no reason why that priority cannot be asserted by someone who has (or seeks) a contract with the Bureau for the use of that water. (See Robie & Kletzing, *Area of Origin Statutes--The California Experience* (1979) 15 Idaho L.Rev. 419, 436-438 [discussing right of area of origin users to contract with Department for SWP water].) This does not mean a user within the area of origin can compel the Bureau to deliver a greater quantity of water than the user is otherwise entitled under the contract. It simply means the Bureau cannot reduce that user's contractual allotment of water to supply water for uses outside the area of origin, absent some other legal basis for doing so that trumps section 11460.

As between competing uses within the area of origin, however, section 11460 grants no priority. As the Board explained in its order on reconsideration: "Section 11460 does not establish a preference for any particular type of use within the area of origin, such as irrigation or municipal use, over other uses within the area of origin, such as protection and enhancement of water quality." Thus, all beneficial uses within the area of origin stand on equal footing under section 11460.

Here, the San Joaquin County parties seek to elevate *their* beneficial use of water from New Melones over other beneficial uses of that water within the area of origin. As we have noted, the Vernalis salinity objective protects agricultural uses in the southern Delta, while the Delta outflow objective and the Vernalis flow objectives protect fish and wildlife in the Delta. Thus, water released from New Melones to meet these objectives is used to supply the beneficial needs of agriculture and fish and wildlife in the Delta. Even if we were to assume the Delta is not within ***257** the "watershed" of the Stanislaus River, [FN37] the Delta certainly is "an area immediately adjacent [to that watershed] which can conveniently be supplied with water therefrom."

Thus, the Delta is within the area of origin for water from the Stanislaus River, and section 11460 grants no priority to the beneficial uses to which the San Joaquin County parties seek to put that water over beneficial uses of that water in the Delta.

FN37. This proposition is dubious, at best. In 1957, the Attorney General issued an opinion concluding that, for purposes of section 11460, "[i]n the case of rivers which flow into the ocean, the watershed is 'the whole region or area contributing to the supply' of such a river." (29 Ops.Cal.Atty.Gen. 136, 138 (1957).) The Attorney General further concluded that the Feather River does not have a separate watershed from the Sacramento River. According to the Attorney General, "there can be no separate or subsidiary 'watersheds of origin' within the watershed of the Sacramento River in its entirety. All of the lands in the region are within the one 'watershed' to which the statute is capable of practical application." (*Ibid.*)
Under this reasoning, the Stanislaus River does not have a separate watershed from the San Joaquin River, and the watershed of the San Joaquin River encompasses at least that part of the Delta into which water from the river flows on its way to the ocean through the San Francisco Bay.

The San Joaquin County parties seek to avoid the impact of this conclusion by arguing that water from New Melones is needed to meet the Vernalis salinity objective, the Delta outflow objective, and the Vernalis flow objectives only because of the adverse effects from the export of other water from the Delta. According to them, water originating in the Trinity, Sacramento, and American Rivers is exported from the Delta "into the Delta-Mendota Canal where it is used in the San Joaquin Valley." This water is then used to irrigate lands on the west side of the valley, which results in the discharge of saline drainage water into the San Joaquin River. This excess salinity is then mitigated by the release of water from New Melones, which results in less water for the San Joaquin County parties to use. According to the San Joaquin County parties, "there is no functional difference if water needed within the watershed is appropriated for direct export or used by the project indirectly to mitigate adverse project impacts within the Delta."

Although this argument may have some surface appeal, it does not withstand scrutiny. Section 11460 is not concerned with *why* a particular beneficial need for water exists within the area of origin. For example, it does not matter why there is excess salinity at Vernalis or why there is reduced outflow from the Delta. What matters is that these conditions exist, they have adverse impacts on beneficial uses of water in the Delta, and releases from New Melones can be used to mitigate those impacts. To the extent water from New Melones is being used for those purposes, it is being used to supply the beneficial needs of the area of origin, and the San Joaquin County parties cannot assert any priority to that water under section 11460 for their consumptive use of the water. Even if more New Melones water might be available for consumptive use by the San Joaquin County parties if the Bureau found other ways to mitigate the adverse impacts of exports on the Delta, that does not mean the Bureau is violating section 11460 by using New Melones water to mitigate those impacts. [FN38] The fact that the ***258** Bureau is releasing New Melones water for beneficial use in the Delta, instead of exporting that water outside its area of origin, makes all the difference for purposes of section 11460 because the area of origin is not being deprived of that water, either directly or indirectly. [FN39]

FN38. Stockton East Water District has asked us to take judicial notice of "historical CVP [water supply] allocations" from 1997 through 2005, purportedly to show "disparate impact to the New Melones Contracts after implementation of Decision 1641." We deny that request because whether Decision 1641 has had a "disparate impact" on users of New Melones water like the San Joaquin County parties is irrelevant to the legal issues we resolve in this opinion. For the same reason--irrelevance--we deny Stockton East Water District's requests that we take judicial notice of a stipulation and order in a federal case the district is involved in and of pages from a federal government report on the Stanislaus River basin.

FN39. Even if the Bureau were "exporting" water from New Melones to irrigate the saline lands on the west side of the San Joaquin Valley, it is questionable whether the San Joaquin County parties would have any ground for complaint under section 11460. If the reasoning from the Attorney General's 1957 opinion is correct (29 Ops.Cal.Atty.Gen., *supra*, at p. 138), then

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> those lands are part of the watershed of the San Joaquin River, and the San Joaquin County parties cannot assert any priority against another beneficial use within the watershed.

For the foregoing reasons, the trial court properly rejected the first and fourth causes of action in *County of San Joaquin v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311499) and the seventh cause of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502) to the extent that cause of action was based on section 11460.

2. *Unreasonable Use Of Water*

Article X, section 2 of the California Constitution provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

In seeking reconsideration of Decision 1641, the San Joaquin County parties argued that "requiring the [Bureau], as a condition of its New Melones permits, to meet the objectives [in the 1995 Bay-Delta Plan] requires an unreasonable use of water." The Board rejected this argument "because the [Bureau] is not required to release the water from New Melones; it is simply required to make sure water gets to Vernalis in the amounts and at the times specified." The Board's order on ***259** reconsideration further noted that "the New Melones project, unlike the other CVP facilities, is in a location close to Vernalis where it can conveniently meet the objectives at Vernalis by water releases, and has historically been required to meet Vernalis objectives, whereas other CVP facilities have less influence on Vernalis flows."

In the twelfth cause of action in their writ petition, the San Joaquin County parties renewed their argument that using water from New Melones "to dilute polluted [i.e., saline] water without implementation of other available management controls constitute[s] an unreasonable use of water under the Constitution." In the eighth cause of action in their non-CEQA writ petition, the Central Delta parties alleged that Decision 1641 allows the unreasonable use of water by permitting continued exports to the west side of the San Joaquin Valley, thus allowing the continued degradation of the waters of the San Joaquin River.

Like the Board, the trial court rejected these arguments, stating: "While certain areas contribute more salinity to the river than others, there is no reason why New Melones and the contractors for its water should be exempt from a strategy for addressing salinity in the lower river.... [¶ ] This is not a situation ... where the Board has blatantly ignored both a wasteful water practice and its own responsibilities under the law. The record indicates that the Board has initiated (perhaps belatedly, in the view of some) a series of reasonably based and phased regulatory requirements to meet the 1995 Plan's salinity objectives in the lower river."

[32] On appeal, the San Joaquin County parties once again contend that requiring the use of water from New Melones, rather than other "non-flow alternatives," to control salinity at Vernalis amounts to "an unreasonable use of water" in violation of article X, section 2 of the California Constitution. The primary flaw in this argument is that it is based on a misrepresentation of what Decision 1641 requires. As we have explained, in its decision the Board authorized the Bureau to meet that objective "through flow or other measures" and instructed the Bureau that it was not mandated to use water under its New Melones permits if it used other sources of water or other means to meet the salinity objective.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[33] To the extent the San Joaquin County parties can be understood to argue that *any* use of New Melones water to dilute salinity levels at Vernalis amounts to an unreasonable use of water, that argument fails. "What is a reasonable use or method of use of water is a question of fact to be determined according to the circumstances in each particular case." (*Joslin v. Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 139, 60 Cal.Rptr. 377, 429 P.2d 889.) Here, the Board determined that permitting the Bureau to use water from New Melones to dilute salinity levels at Vernalis was reasonable, and the San Joaquin County parties have not shown any error in that determination. Their reliance on *Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1270, 54 Cal.Rptr.2d 340, is misplaced because the court's assertion in that case that "[u]se of upstream water to wash out salts downstream is an unreasonable use of water" was an overstatement, given that reasonable use is a question of fact depending on the particular circumstances in each case. There certainly may be cases in which the release of water to dilute saline levels is unreasonable, [FN40] but that is not always the case. ***260** Here, the San Joaquin County parties have not shown by citing anything in the record that allowing the Bureau to use New Melones water, "[i]n conjunction with other measures to control salinity," necessarily results in an unreasonable use of water.

FN40. For example, in *United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at pages 143-144, 227 Cal.Rptr. 161, the court concluded that where the maintenance of the necessary salinity level for a riparian industrial user would require the release of 25 acre-feet of water in outflow for every acre-foot of water the riparian diverted, such a use of water would be unreasonable.

The argument of the Central Delta parties that "the continued and increased delivery of water to the CVP service areas along the west side of the San Joaquin River" "[w]ithout a specific plan to address the degraded condition of the San Joaquin River and at least meet the 1995 [Bay-Delta Plan] objectives at Vernalis" "result[s] in an unreasonable and unconstitutional use of water," fails for the same reason. The Central Delta parties have not shown that Decision 1641 necessarily results in an unreasonable use of water.

For the foregoing reasons, the trial court properly rejected the twelfth cause of action in *County of San Joaquin v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311499) and the eighth cause of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).

3. *Substantial Evidence To Support The Board's Decision*

In the third and fifth causes of action in their writ petition, the San Joaquin County parties raised the issue of substantial evidence. They first alleged, "[t]here is no reasonable factual basis for the action of the [Board] imposing a condition solely upon New Melones to release stored water to dilute salinity levels in the San Joaquin River in order to meet the Vernalis Salinity Standard" because "the [Board] expressly found that the actions of the CVP projects other than that of New Melones are the principal causes of the salinity concentrations exceeding the objectives at Vernalis." They further alleged there was no substantial evidence to support the Board's decision to impose responsibility on the Bureau's New Melones permits to meet the Delta outflow objective and the Vernalis flow objectives. The trial court rejected these arguments, concluding that "[o]ne of the system-wide obligations of the CVP, both under federal and state law, is to satisfy its environmental requirements; and [Decision 1641] properly allows, but does not require, the use of New Melones water for that purpose."

Before addressing the San Joaquin County parties' substantial evidence arguments on appeal, we reiterate our agreement with the Board and the trial court that Decision 1641 permits, but does not require, the Bureau to release water from New Melones to meet the flow and salinity objectives about which the San Joaquin County parties complain. To the extent the arguments of the San Joaquin County parties are premised on their mistaken belief that the Bureau *must* meet those objectives with New Melones water, those arguments fail from the outset.

[34][35] To be substantial, evidence " 'must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' " (*Bank of America v. State Water Resources Control Bd., supra,* 42 Cal.App.3d at p. 213, 116 Cal.Rptr. 770.) " 'Unless it can be demonstrated that the board's actions are not grounded upon any reasonable ***261** factual basis the courts should not interfere with its

discretion or substitute their discretion for that of the board.' " (*Id.* at p. 208, 116 Cal.Rptr. 770.)

[36] In their reply brief, the San Joaquin County parties suggest that in applying the substantial evidence standard of review, "it is the agency that must support imposition of water right conditions with precise and specific reasons founded on tangible record evidence." While this statement accurately reflects the Board's obligation in making its decision in the first place (*Bank of America v. State Water Resources Control Bd., supra,* 42 Cal.App.3d at p. 213, 116 Cal.Rptr. 770), it does not accurately reflect who bears the burden when a party challenges the Board's decision for lack of substantial evidence. The San Joaquin County parties have it backward, because when an appellant challenges an administrative decision as unsupported by substantial evidence, "it is [the] *appellant's* burden to demonstrate that the administrative record does not contain sufficient evidence to support the agency's decision." (*International Brotherhood of Electrical Workers v. Aubry, supra,* 42 Cal.App.4th at p. 870, 50 Cal.Rptr.2d 1, italics added.) Thus, before the court it is not the Board's responsibility to prove its decision was supported by substantial evidence, it is the responsibility of the San Joaquin County parties to prove it was not. They have not met that burden.

[37] In arguing there is no substantial evidence to support imposition of the Vernalis salinity objective on the New Melones permits, the San Joaquin County parties assert that "[n]owhere has the [Board] identified a single statement of factual evidence showing that the operations of New Melones Reservoir are materially responsible for the salinity problems in the San Joaquin River." The gist of this argument is that, for a permit term to be supported by substantial evidence and grounded on a reasonable factual basis, it must be shown that the problem the Board is trying to address with that permit term was caused by the appropriation of water under that particular permit.

This is incorrect. Under the law, as long as there is any reasonable factual basis for the Board's action, we must defer to its judgment. Here, the Board found that "the actions of the CVP are the principal cause of the salinity concentrations exceeding the objectives at Vernalis." Given this finding, it was reasonable for the Board to impose responsibility for meeting the Vernalis salinity objective on the Bureau and to authorize the Bureau to use its discretion in deciding how to achieve that objective, including using water from New Melones. In its order on reconsideration, the Board observed that "the New Melones project, unlike the other CVP facilities, is in a location close to Vernalis where it can conveniently meet the objectives at Vernalis by water releases, and has historically been required to meet Vernalis objectives, whereas other CVP facilities have less influence on Vernalis flows." This is a reasonable factual basis for permitting the Bureau to meet the Vernalis salinity objective with water from New Melones. Therefore, substantial evidence supports the Board's decision.

That the San Joaquin County parties may receive less water than they otherwise would from the Bureau if New Melones water is used to meet the Vernalis salinity objective does not alter this conclusion. The Board was not required to implement the objectives in the 1995 Bay-Delta Plan in a manner that provided the most water for the San Joaquin County parties. As long as there was a reasonable factual basis for the Board's decision, it was for the Board to weigh all the competing interests in CVP water and decide ***262** how best to assure compliance with the objectives to protect, as much as possible, all beneficial uses of water in and around the Delta. The San Joaquin County parties have failed to show that the Board's decision lacked a reasonable factual basis.

With regard to the Delta outflow objective and the Vernalis flow objectives, the San Joaquin County parties make the same argument that we have rejected already. They also argue that the Delta outflow objective "requires that the water from New Melones reservoir be released for use so far out into the Delta that is not even within the Place of Use for the New Melones Project!" They base this argument on the assertion that the place of use in the New Melones permits "is limited to Tuolumne, Stanislaus, San Joaquin and Calaveras Counties" and on the fact that the outflow index (the measure of Delta outflow) "is measured at three measuring points located within Solano County."

The first flaw in that argument is that the places where the outflow index is measured are not the same as the place where the water required to meet the Delta outflow objective is put to beneficial use. The purpose of the Delta outflow objective is to protect estuarine habitat in the Delta--the theory being that if a certain amount of water is flowing *out* of the Delta (as measured at three places in Solano County), then that water has already served its purpose *within* the Delta of protecting estuarine habitat. Thus, the fact that the outflow index is measured in Solano County

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

does not mean the water is being put to beneficial use there.

The second flaw in the argument is that the San Joaquin County parties have misread the New Melones permits. Two of the permits do provide for the water appropriated under those permits to be used for irrigation, domestic, municipal, and industrial purposes in Stanislaus, Calaveras, Tuolumne, and San Joaquin Counties. In addition, however, those two permits and the third New Melones permit also provide for the water to be used for the enhancement of fish and wildlife in the downstream reaches of the Stanislaus and San Joaquin Rivers. The San Joaquin County parties do not contend that the Delta is not part of the downstream reaches of the San Joaquin River, nor could they. As defined by the Legislature, the Delta encompasses the San Joaquin River upstream to its convergence with (or just below its convergence with) the Stanislaus River. [FN41] Thus, the San Joaquin County parties have failed to establish that water from New Melones used to meet the Delta outflow objective is being used outside the place of use authorized in the New Melones permits.

FN41. The boundaries of the Delta are set forth in section 12220, which references an "attached map prepared by the Department of Water Resources titled 'Sacramento-San Joaquin Delta,' dated May 26, 1959." That map can be found at Statutes 1959, chapter 1766, page 4248.

Under the substantial evidence heading, the San Joaquin County parties seek to challenge the trial court's treatment of "the entire CVP as one integrated project." Relying on a document entitled "Long-Term Central Valley Project Operations Criteria and Plan CVP-OCAP" (of which this court has taken judicial notice), the San Joaquin County parties assert that "the New Melones Project is not operationally integrated with the CVP." This assertion is apparently based on a statement in the document that the East Side Division, which includes New Melones, "is a part of the CVP, [but] its operation is not included in the [coordinated operating agreement] and it is operated as a separate***263** feature. It is therefore not discussed in this document." [FN42]

FN42. According to the San Joaquin County parties, the coordinated operating agreement is the agreement under which the Bureau and the Department have "determined the water supplies of the CVP and SWP and the satisfaction of in-basin obligations between the two projects."

The San Joaquin County parties fail to explain how this statement regarding New Melones has any bearing on the Board's decision. That the Bureau may have chosen to operate New Melones separately from the rest of the CVP, which it operates in coordination with the Department's operation of the SWP under the coordinated operating agreement, has no bearing on the Board's authority to allow the Bureau to use New Melones water in meeting the objectives in the 1995 Bay-Delta Plan. Accordingly, we do not consider this argument further.

Also under the substantial evidence heading, the San Joaquin County parties argue that treating the CVP as an integrated project would render the "no injury" rule in section 1702 meaningless. The point of this argument escapes us. Section 1702 applies when an applicant, permittee, or licensee seeks to change "the point of diversion, place of use, or purpose of use from that specified in the application, permit, or license." (§ § 1701, 1702.) Here, the Bureau did not seek to make any such change in its New Melones permits; rather, the Board, in adopting Decision 1641, imposed terms and conditions on those permits to implement the flow-dependent water quality objectives of the 1995 Bay-Delta Plan. Section 1702 has no bearing here. Indeed, elsewhere in their opening brief, the San Joaquin County parties acknowledge that their challenges to the Board's decision "*do not* rely on any form of standing derived from Water Code section 1702 and are not impacted by" the analysis of who is a "legal user of water" for purposes of that statute. [FN43]

FN43. In this separate argument, the San Joaquin County parties challenge an assertion by the trial court that "[s]ince [they] are contractors of the Bureau, they do not have standing to challenge or complain of the characteristics of the permits held by the Bureau." Since the trial court addressed the merits of the arguments made by the San Joaquin County parties, despite their supposed lack of "standing," we need not consider whether the trial court's assertion about their standing is correct.

For the foregoing reasons, the trial court properly rejected the third and fifth causes of action in *County of San Joaquin v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311499).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4. *The Delta Protection Act*

a. *The Law*

Sections 12200-12205 are commonly known as the Delta Protection Act. (See, e.g., *United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at p. 139, 227 Cal.Rptr. 161.) Section 12200 contains: (1) a statement of findings by the Legislature regarding the salinity problem in the Delta and the role of the Delta in providing a supply of fresh water for water-deficient areas to the south and west; and (2) a declaration of the need for a special law "for the protection, conservation, development, control and use of the waters in the Delta for the public good."

Section 12201 contains a statement of findings by the Legislature of the need for maintaining "an adequate water supply in the Delta sufficient to maintain and expand agriculture, industry, urban, and recreational development in the Delta ... and to provide a common source of fresh water for export to areas of water deficiency."

***264** Section 12202 provides in relevant part: "Among the functions to be provided by the State Water Resources Development System,[ [FN44]] in coordination with the activities of the United States in providing salinity control for the Delta through operation of the Federal Central Valley Project, shall be the provision of salinity control and an adequate water supply for the users of water in the Sacramento-San Joaquin Delta." [FN45]

FN44. Essentially, the State Water Resources Development System consists of all the facilities making up the SWP and the CVP. (See § § 12931, 12934, subd. (d).)

FN45. The remainder of section 12202, which is not relevant here, deals with the provision of "a substitute water supply" to Delta water users.

Section 12203 provides: "It is hereby declared to be the policy of the State that no person, corporation or public or private agency or the State or the United States should divert water from the channels of the Sacramento-San Joaquin Delta to which the users within said Delta are entitled."

Section 12204 provides: "In determining the availability of water for export from the Sacramento-San Joaquin Delta no water shall be exported which is necessary to meet the requirements of Sections 12202 and 12203 of this chapter."

Section 12205 provides: "It is the policy of the State that the operation and management of releases from storage into the Sacramento-San Joaquin Delta of water for use outside the area in which such water originates shall be integrated to the maximum extent possible in order to permit the fulfillment of the objectives of this part."

As we read these rather vague statutes, the Delta Protection Act recognizes the importance of providing salinity control and an adequate water supply in the Delta to serve dual goals: (1) maintaining and expanding agriculture, industry, urban, and recreational development in the Delta; and (2) providing fresh water for export to areas of water deficiency. As between these two goals, however, the Delta Protection Act gives preference to the first. Thus, no one may divert water from the Delta that is necessary for salinity control or to provide an adequate water supply for users within the Delta. What the Delta Protection Act does *not* specify is: (1) what is an adequate supply of water for users within the Delta; and (2) what level of salinity control must be provided. (See *United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at p. 139, 227 Cal.Rptr. 161.)

b. *Factual Background*

At some point in the water rights proceeding before the Board, South Delta Water Agency apparently asserted an argument in opposition to the petitions for long-term changes in the licenses of the irrigation districts based on the Delta Protection Act. [FN46] In its response to that argument in its original Decision 1641, the Board stated that "if water users in the Delta do not have existing water rights adequate for their uses, the Delta Protection Act does not ensure the water users in the Delta a water supply unless they buy the water and provide adequate compensation to the [Department] for the water, pursuant to Water Code section 11462."

FN46. Although we must presume the argument was made because the Board responded to it, we have been unable to locate the argument in the administrative record, and no party has brought its location to our attention.

In petitions for reconsideration, various parties--including the Central Delta parties ***265** and some of

the San Joaquin County parties--complained about the Board's treatment of the Delta Protection Act. With little analysis, Stockton East Water District argued the Board had committed an error of law by narrowly construing the Delta Protection Act. The City of Stockton likewise argued that the Board's decision contained an "overly narrow interpretation of the Delta Protection Act." The County of San Joaquin and the San Joaquin County Flood Control and Water Conservation District argued that the Board had "fail [ed] to implement" the Delta Protection Act because the Board's decision did not ensure sufficient water supply and water quality for water users in the Delta. For their part, the Central Delta parties argued that the Delta Protection Act "mandates ... releases from storage for the benefit of the Delta ... even if such flow would not have been available under 'natural flow' conditions."

In response to the petitions for reconsideration, the Board deleted its original analysis of the Delta Protection Act and substituted the following in Decision 1641: "[South Delta Water Agency] claims to represent legal users of water who would be injured as a result of the long-term water right changes. [South Delta Water Agency] argues that in-Delta water users have a right to have water provided to them by the [Department] and the [Bureau] pursuant to the Delta Protection Act, even if they have no water available to them under riparian or appropriative water rights at a given time. Whether or not the [Department] and the [Bureau] have an obligation to provide water to in-Delta water users, however, is irrelevant to the question of whether the long-term changes will cause injury to a legal user of water."

In the fourth cause of action in their non-CEQA writ petition, the Central Delta parties alleged that Decision 1641 violates the Delta Protection Act because it allows for the diversion of water that is not surplus to the needs of Delta water users and "causes water level and water quality degradations ... and harms fish and wildlife." They also alleged in their seventh cause of action that the Board had failed to enforce the requirements of the Delta Protection Act.

In the eighth cause of action in their writ petition, the San Joaquin County parties similarly alleged that Decision 1641 violates the Delta Protection Act because, in essence, the decision "allows for increased rates of diversion and increased total exports of water from the Delta by the SWP and the CVP over what would have been allowed without the Decision," thus "decreasing the amount of water available [to water users in the Delta], lowering the levels of water, ... and ... worsening water quality."

The trial court rejected these arguments, stating that under the Delta Protection Act, "[i]n-Delta users can contest new proposals to export water as potential violations of this act. In-Delta users can enforce their riparian rights and pre-project appropriative rights in a water rights enforcement proceeding. They can also apply for a new in-Delta permit or project that would have automatic priority over existing and future exports. [¶ ] What in-Delta users cannot do is to challenge [Decision 1641] as violating the Delta Protection Act. The ambiguity of the statute's salinity control protection invites a specific determination by the [Board] to be afforded deference by the Court. [Citation.] The competing purposes of section 12201 further invites a public interest balancing of in-Delta needs and export needs by the [Board], which it has done reasonably in [Decision 1641]. Petitioners have failed to demonstrate that the decision was reached in an arbitrary or capricious fashion.... ***266** [¶ ] Additionally, the record is convincing that salinity conditions in the Delta will improve and annual CVP and SWP exports will be reduced as the result of [Decision 1641]. [Citation.] Modest salinity exceedances may occur in drought years when exporters face as much as 745,000 [acre-feet] reductions. [Citation.] Water quality and conditions for fish and aquatic resource generally improve for many areas within the Delta."

c. *Legal Analysis*

[38] On appeal, the San Joaquin County parties argue, "[t]he record is replete with evidence that the operations approved by the [Board] will injure Delta water users in violation of the Delta Protection Act." They contend, "there is no evidence in the record that the Bureau will [meet the Vernalis salinity objective] or is capable of doing so." They also argue that the Board authorized exports "despite the evidence that Delta water users do not receive adequate water supply."

For their part, the Central Delta parties argue that the Delta Protection Act gives Delta riparians and appropriators a right to water stored upstream by others.

Addressing first the arguments of the San Joaquin County parties, since the adequacy of the water quality objectives in the 1995 Bay-Delta Plan is not before us we must presume that the Vernalis salinity objective from the 1995 Bay-Delta Plan adequately

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provides for salinity control consistent with the requirements of the Delta Protection Act. In our view, the question is whether the Board adequately allocated responsibility for meeting the Vernalis salinity objective in Decision 1641 and whether its allocation of responsibility overall for meeting the objectives in the 1995 Bay-Delta Plan left the water users in the Delta with an adequate water supply. We are not concerned with possible violations of the Vernalis salinity objective that *may* occur under the Board's decision, because the San Joaquin County parties have not shown that *any* allocation of responsibility by the Board could guarantee 100 percent compliance with that objective. Moreover, we must reiterate that the Delta Protection Act provides no clear standard for determining what is an adequate supply of water for users in the Delta. We agree with the trial court that since the Delta Protection Act seeks to serve the dual goals: (1) maintaining and expanding agriculture, industry, urban, and recreational development in the Delta; and (2) providing fresh water for export to areas of water deficiency, it is for the Board in the first instance to balance "in-Delta needs and export needs" and to determine whether in-Delta needs receive an adequate supply of water. So long as the Board had a reasonable factual basis for its action, we should not interfere with its discretion or substitute our discretion for that of the Board. (*Bank of America v. State Water Resources Control Bd., supra,* 42 Cal.App.3d at p. 208, 116 Cal.Rptr. 770.) Furthermore, as the parties seeking to overturn the Board's decision, the San Joaquin County parties bore the burden of showing that there is no such basis. They have not met that burden.

The San Joaquin County parties fail to provide any comprehensive overview of the evidence the Board had before it in deciding how to allocate responsibility for meeting the water quality objectives of the 1995 Bay-Delta Plan. Instead, they pick and choose pieces of the record in an attempt to demonstrate the Board's action did not comply with the Delta Protection Act. For example, the San Joaquin County parties assert that "the Bureau will ... violate the salinity standards as much as 15 percent of the time during the irrigation season." In support of that assertion, they cite a passage ***267** from the trial court's statement of decision, where the trial court noted the *argument* of the Central Delta parties "that, in their view, the Bureau will violate the salinity standards as much as 15 percent of the time during the irrigation season." Obviously, an argument by a party, restated in the trial court's decision, is not *evidence* that was before the Board.

On another point, the San Joaquin County parties contend the Board authorized exports from the Delta "despite the evidence that Delta water users do not receive adequate water supply." In support of that contention, they cite testimony by a farmer with riparian rights in the Delta in which he recounted problems he had experienced in the past, including "[l]ower water levels [that] can actually prevent the operation of syphons and pumps." They also cite what apparently purport to be pictures of low water conditions in the Delta in 1996.

The problem is that these isolated bits of evidence cannot establish, as a matter of law, that the Board violated the Delta Protection Act by not assuring an "adequate" water supply for users in the Delta. What is "adequate" was a matter within the Board's judgment, balancing all of the relevant factors and all of the competing interests in the water that flows through the Delta. The San Joaquin County parties have failed to show that, as a matter of law, on the record as a whole, the Board's action did not provide an "adequate" supply for Delta users. Accordingly, the trial court properly rejected the eighth cause of action in *County of San Joaquin v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311499).

As for the argument of the Central Delta parties that the Delta Protection Act gives Delta riparians and appropriators a right to water stored upstream by others, we disagree. Nothing in the Delta Protection Act purports to grant any kind of water right to any particular party. The Delta Protection Act does preclude the diversion of water from the Delta that is necessary for salinity control or to provide an adequate water supply for users within the Delta; however, it is for the Board to decide, in the exercise of its judgment, what level of salinity control should be provided and what is an adequate supply of water for users in the Delta. Like the San Joaquin County parties, the Central Delta parties have failed to show that, as a matter of law, on the record as a whole, the Board did not adequately ensure the Vernalis salinity objective would be met or provide an "adequate" supply for Delta users. Accordingly, the trial court properly rejected the fourth and seventh causes of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502).

With respect to the San Joaquin County parties, because we have found no merit in any of their challenges to Decision 1641, we will affirm the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgment in *County of San Joaquin v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311499) denying their mandamus petition.

C
*The **Audubon** Society Parties' Challenges To Implementation Of The 1995 Bay-Delta Plan*

As previously explained, the 1995 Bay-Delta Plan included a narrative objective for the protection of salmon, which provided for the maintenance of water quality conditions, "together with other measures in the watershed, sufficient to achieve a doubling of natural protection of chinook salmon from the average production of ***268** 1967-1991, consistent with the provisions of State and federal law." The program of implementation in the 1995 Bay-Delta Plan identified "timely completion of a water rights proceeding to implement river flow and operational requirements" as well as "other measures" as the means for achieving the narrative salmon protection objective.

In petitions for reconsideration of the original Decision 1641, various parties argued that the Board was "obligated to implement the narrative salmon doubling objective in the southern Delta in the current proceeding." Echoing language in the 1995 Bay-Delta Plan, the Board responded: "The narrative salmon doubling objective may not be fully implemented as a result of this proceeding. The current proceeding addresses implementation of the objectives in the 1995 Bay-Delta Plan that can be implemented through flows. If the requirements in D-1641 and any future decision in this proceeding do not incidentally result in the objectives being met, measures in addition to flow will be needed. Such measures are outside the scope of the current proceeding. Other agencies are working toward meeting the objective. Water Code section 13242, subdivision (a), provides that entities in addition to the [Board] may need to take actions to achieve water quality objectives. Pursuant to section 13242, the program of implementation in the 1995 Bay-Delta Plan states that actions of other agencies will be needed to implement this objective."

In April 2000, five nonprofit organizations [FN47] filed a petition for writ of mandate and complaint for declaratory relief seeking to set aside Decision 1641. (*Golden Gate **Audubon** Society v. State Water Resources Control Board* (Super. Ct. Alameda County, 2003, No. 825585-9).) The *Golden Gate* case was one of the cases added to this coordinated proceeding in November 2000.

FN47. These organizations are Golden Gate **Audubon** Society, Marin **Audubon** Society, San Joaquin **Audubon** Society, California Sportfishing Protection Alliance, and Committee to Save the Mokelumne. We will refer to them collectively as the **Audubon** Society parties.

In the first cause of action in their petition, the **Audubon** Society parties alleged Decision 1641 was "contrary to law and is not supported by substantial evidence because it" "purport[s] to authorize water rights inconsistent with applicable water quality objectives of the 1995 Bay-Delta Plan." The **Audubon** Society parties further alleged that Decision 1641 "ignored" the salmon-doubling objective.

In its statement of decision, the trial court framed the issue (raised by the **Audubon** Society parties and others) as "whether ... the [Board] has taken sufficient steps to enforce, as a water rights matter, the narrative salmon objective set forth in the 1995 Bay-Delta ... Plan." [FN48] The court concluded that "substantial evidence in the record demonstrates that D-1641 supports and advances the narrative goal of doubling salmon survival."

FN48. The **Audubon** Society parties did not file a brief of their own in the trial court in support of their writ petition, but they did join in the brief filed by the Central Delta parties and a brief filed by the petitioners in *Pacific Coast Federation of Fishermen's Associations v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311507), from which no appeal was taken. The brief from the *Pacific Coast Federation* case raised the same arguments the **Audubon** Society parties now pursue on appeal in their challenge to the Board's implementation of the narrative salmon protection objective in Decision 1641.

Based on its rejection of this and other arguments by the **Audubon** Society parties (some of which we will discuss later in this ***269** opinion), the trial court entered judgment denying the **Audubon** Society parties' writ petition and complaint.

[39] On appeal, the **Audubon** Society parties renew their argument that the Board "failed to address and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

implement the salmon doubling requirements ... established by the Board itself in the 1995 Bay-Delta Plan." [FN49] They point out that the Board "approved the [San Joaquin River Agreement]/[Vernalis Adaptive Management Plan] in lieu of" the Vernalis flow objectives, and they contend that because the Vernalis flow objectives themselves were insufficient to "achieve the required chinook salmon-doubling," it follows that "the flows called for in the [San Joaquin River Agreement] and [Vernalis Adaptive Management Plan] experiment [will not] achieve the doubling standard, since they are even *less* than the Vernalis standard flows." They also assert that "the [San Joaquin River Agreement] is illusory and unenforceable" because it "provides that if any year any party deems the operations plans for that year to be unacceptable, then the export limitations contained in the [San Joaquin River Agreement]/[Vernalis Adaptive Management Plan] 'shall not apply during the calendar year' " and it is subject to termination at the will of the parties. Based on these assertions, the **Audubon** Society parties argue that the Board "prejudicially abused its discretion, when it adopted the [San Joaquin River Agreement] and [Vernalis Adaptive Management Plan] in lieu of flows sufficient to double chinook salmon production."

FN49. The **Audubon** Society parties asked to withdraw some of the arguments made in their opening brief because they did not raise them in the trial court, and we granted that request. Accordingly, we do not address those arguments.

[40] Before turning to the substantive arguments of the **Audubon** Society parties, we pause to consider their assertion that the Board's action in this water rights proceeding had to be consistent not only with the water quality objectives in the 1995 Bay-Delta Plan, but also with federal "Bay-Delta water quality standards adopted by the Environmental Protection Agency."

As the Board itself explained in the 1995 Bay-Delta Plan, the Environmental Protection Agency disapproved some of the fish and wildlife objectives of the 1991 Bay-Delta Plan because of their failure to protect estuarine habitat and other fish and wildlife. Pursuant to federal law, the Environmental Protection Agency then promulgated its own water quality standards for the Bay-Delta in 1994.

The **Audubon** Society parties contend that "[t]he supremacy of these federal standards [over the objectives in the 1995 Bay-Delta Plan] is clear." The Board disagrees, pointing out that in September 1995, the Environmental Protection Agency approved the 1995 Bay-Delta Plan, and this approval "means that the 1995 Plan supplants the standards promulgated by EPA."

The Board is correct. Federal law provides that whenever a state revises or adopts a new water quality standard, the new or revised standard must be submitted to the administrator of the Environmental Protection Agency, and "[i]f the Administrator ... determines that such standard meets the requirements of [federal law], such standard shall thereafter be the water quality standard for the applicable waters of that State." (33 U.S.C. § 1313(c)(2)(A), (c)(3).) Thus, the Board correctly asserts that "as a matter of law, the applicable standards guiding the ... Board in Decision 1641 are those in the 1995 [Bay-Delta] Plan."

***270** Turning now to the substantive claims of the **Audubon** Society parties, we begin by noting that their complaint that the San Joaquin River Agreement is "illusory and unenforceable" provides no basis for challenging Decision 1641. As we have previously explained, while the Board allowed performance of the San Joaquin River Agreement, in doing so the Board *required* the Bureau to meet the Vernalis flow objectives during the term of the agreement, with the exception of the Vernalis pulse flow objective. More importantly, the Board required the Bureau to meet *all* of the Vernalis flow objectives if the San Joaquin River Agreement was dissolved before it expired. Thus, even if the San Joaquin River Agreement *is* unenforceable, it makes no difference, because the Board's decision assures the Vernalis flow objectives will be met if the agreement is canceled.

To the extent the **Audubon** Society parties contend the Board abused its discretion because it failed to do more in this water rights proceeding to achieve the salmon protection objective than implement the Vernalis flow objectives, we agree with the trial court that the **Audubon** Society parties failed to establish an abuse of discretion by the Board.

The **Audubon** Society parties argue that the Board had a duty in this water rights proceeding "to determine, based on the record evidence, what flows were necessary to implement the salmon-doubling standard, and then adopt those flows in Decision 1641, to assure their 'immediate' implementation." This argument misapprehends the relationship between this water rights proceeding and the 1995

Bay-Delta Plan.

Determining what actions were required to achieve the narrative salmon protection objective was part of the Board's obligation in formulating the 1995 Bay-Delta Plan in the first place. (See § § 13050, subd. (j)(3) [a water quality control plan must include "[a] program of implementation needed for achieving water quality objectives"], 13242, subd. (a) [a "program of implementation for achieving water quality objectives" must include "[a] description of the nature of actions which are necessary to achieve the objectives"].) Once the Board established specific flow objectives and the narrative salmon protection objective as part of the 1995 Bay-Delta Plan and then established that part of its program of implementation for the salmon objective would be to allocate responsibility for meeting *those* flow objectives in a water rights proceeding, the Board had no obligation in this water rights proceeding to determine whether *other* flow objectives should be imposed to achieve the salmon objective. Instead, its obligation was to actually implement the specific flow objectives it had committed itself to implementing.

The Board's acknowledgement in the 1995 Bay-Delta Plan of the "uncertain[ty]" that "implementation of the numeric objectives ... alone will result in achieving the narrative objective for salmon protection" did not compel the Board to consider adopting other flow objectives in this proceeding. This uncertainty was simply offered as the reason why "other measures" "in addition to timely completion of a water rights proceeding" might "be necessary to achieve the [salmon protection] objective."

Nor was the Board obligated to consider adopting other flow objectives because, as the **Audubon** Society parties put it, "implementation of [the salmon protection] standard [had to] be 'immediate.' " Again, the **Audubon** Society parties have misapprehended the requirements of the 1995 Bay-Delta Plan.

***271** In the program for implementation in the 1995 Bay-Delta Plan, the Board stated generally that "[t]he specific actions [to achieve the objectives] identified within [this program of implementation] include time schedules for implementation, if appropriate. If no time schedule is included, implementation should be immediate." (See § 13242, subds. (a), (b) [a "program of implementation for achieving water quality objectives" must include "[a] time schedule for the actions to be taken" "which are necessary to achieve the objectives"].) As we have explained already, with respect to the narrative objective for salmon protection, the program for implementation identified "timely completion of a water rights proceeding to implement river flow and operational requirements" as one of the actions that would need to be taken to implement the salmon protection objective. Thus, the "time schedule" for taking this particular action would be met as long as the proceeding was, in fact, timely completed.

Even if the "immediacy" provision in the 1995 Bay-Delta Plan could be deemed to apply in this context, nothing in the 1995 Bay-Delta Plan required the Board to consider or adopt flow requirements in this water rights proceeding other than those it had set in the 1995 Bay-Delta Plan. The Board's commitment to implement "river flow and operational requirements" was a commitment to implement the river flow and operational objectives set within the 1995 Bay-Delta Plan itself. Thus, at most, the 1995 Bay-Delta Plan contemplated the immediate commencement and timely completion of a water rights proceeding to allocate responsibility for meeting the flow objectives set in the plan; it did not contemplate that the water rights proceeding would include the investigation of or allocation of responsibility for meeting flow objectives *other* than those set in the 1995 Bay-Delta Plan.

If the **Audubon** Society parties are correct in their contention that scientific evidence shows the flows needed to achieve the narrative salmon protection objective must be greater than the Vernalis flow objectives of the 1995 Bay-Delta Plan, then that evidence may provide a basis for *changing* the Vernalis flow objectives in the next regulatory proceeding to review and revise the water quality control plan for the Bay-Delta. It does not, however, provide a basis for challenging the Board's action here. In the 1995 Bay-Delta Plan, the only action to which the Board committed itself in this water rights proceeding with respect to the narrative salmon protection objective was allocating responsibility for meeting the flow objectives *in the 1995 Bay-Delta Plan.*

Of course, as we have previously concluded in connection with the challenges of the Central Delta parties, the Board did not actually carry through on that commitment. By authorizing compliance with the alternate pulse flow objectives of the San Joaquin River Agreement in lieu of the Vernalis pulse flow objective of the 1995 Bay-Delta Plan, the Board failed to do all it had committed itself to do in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1995 Bay-Delta Plan to implement its objectives. Thus, we agree with the **Audubon** Society parties that by failing to implement all of the Vernalis flow objectives while the San Joaquin River Agreement is in effect, the Board "fail[ed] to establish the minimum flows necessary to achieve the salmon-doubling standard." Accordingly, the **Audubon** Society parties were entitled to a writ of mandate on this narrow basis, even though the trial court, in response to the non-CEQA writ petition by the Central Delta parties, ordered a writ to issue that would have the same practical effect.

[41] To the extent the **Audubon** Society parties argue that by failing to do ***272** more in the water rights proceeding to implement the narrative salmon protection objective, the Board violated the public trust doctrine, we disagree.

[42][43][44] The public trust doctrine recognizes that "the sovereign owns 'all of its navigable waterways and the lands lying beneath them "as trustee of a public trust for the benefit of the people." ' " (*National* ***Audubon*** *Society v. Superior Court* (1983) 33 Cal.3d 419, 434, 189 Cal.Rptr. 346, 658 P.2d 709.) "The state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (*Id.* at p. 446, 189 Cal.Rptr. 346, 658 P.2d 709.) The protection of recreational and ecological values "is among the purposes of the public trust." (*Id.* at p. 435, 189 Cal.Rptr. 346, 658 P.2d 709.)

Seizing on the phrase "whenever feasible," the **Audubon** Society parties contend that "conflicts between public trust values and competing water uses must, whenever possible, be resolved in favor of public trust protection." They further contend that by failing to do more to implement the narrative salmon protection objective, the Board "failed to comply with its duties under the public trust doctrine to protect the Bay-Delta's fishery resources 'whenever feasible.' "

We are not persuaded. Essentially, the position of the **Audubon** Society parties appears to be that notwithstanding the flow objectives of the 1995 Bay-Delta Plan, the Board was obligated under the public trust doctrine to implement more generous flow objectives in this water rights proceeding because it would have been "feasible" to do so. What is "feasible," however, is a matter for the Board to determine. In a passage from *National* ***Audubon*** *Society* that the **Audubon** Society parties ignore, our Supreme Court concluded that when the state, acting through the Board, approves appropriations of water "despite foreseeable harm to public trust uses," "the state must bear in mind its duty as trustee to consider the effect of the taking on the public trust [citation], and to preserve, *so far as consistent with the public interest,* the uses protected by the trust." (*National* ***Audubon*** *Society v. Superior Court, supra,* 33 Cal.3d at pp. 446-447, 189 Cal.Rptr. 346, 658 P.2d 709, italics added.) Thus, in determining whether it is "feasible" to protect public trust values like fish and wildlife in a particular instance, the Board must determine whether protection of those values, or what level of protection, is "consistent with the public interest."

In formulating the 1995 Bay-Delta Plan, the Board set out "to attain the highest water quality which is reasonable, considering *all* demands being made on the water of the [Bay-Delta]." (1995 Bay-Delta Plan, p. 14, italics added.) While the Board had a duty to adopt objectives to protect fish and wildlife uses and a program of implementation for achieving those objectives, in doing so the Board also had a duty to consider and protect all of the other beneficial uses to be made of water in the Bay-Delta, including municipal, industrial, and agricultural uses. It was for the Board in its discretion and judgment to balance all of these competing interests in adopting water quality objectives and formulating a program of implementation to achieve those objectives.

Even disregarding the untimeliness of such a challenge, the **Audubon** Society parties have not shown that the Board's adoption of the 1995 Bay-Delta Plan was inconsistent with its duty to protect public trust values "so far as consistent with the public interest." If the Board's adoption of a water quality control plan fulfills the Board's duties under the public trust doctrine, then the Board's implementation of ***273** that plan--as long as the Board *does* implement that plan--likewise fulfills the Board's duties. To the extent the Board has *failed* to implement all of the flow objectives of the 1995 Bay-Delta Plan, we have determined already that the **Audubon** Society parties are entitled to writ relief. The public trust doctrine entitles them to nothing more.

In summary, we conclude the trial court erred in rejecting the first cause of action in the **Audubon** Society parties' writ petition. By failing to implement all of the Vernalis flow objectives while the San Joaquin River Agreement is in effect, the Board failed to implement the minimum flows necessary to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

achieve the narrative salmon protection objective and thereby abused its discretion. Accordingly, we will reverse the judgment in *Golden Gate* ***Audubon*** *Society v. State Water Resources Control Board* (Super. Ct. Alameda County, 2003, No. 825585-9) to the extent it denied the **Audubon** Society parties relief on their first cause of action.

III

*Challenges To The Joint Points Of Diversion Petition*

Under sections 1701 and 1702, the Board could approve the joint points of diversion petition only if it found that adding points of diversion and rediversion to the permits for the CVP and the SWP would "not operate to the injury of any legal user of the water involved." (§ 1702.) In the underlying water rights proceeding, the Board considered arguments by the Central Delta parties that use of the joint points of diversion by the Bureau and the Department would, among other things, lower water levels and adversely affect salinity in the southern Delta.

The Board recognized that under various scenarios, use of the joint points of diversion could lower water levels in the southern Delta. To avoid harming agricultural users in the Delta, the Board determined that "[p]rior to using the [joint points of diversion], the [Department] or the [Bureau] will be required to consult with [South Delta Water Agency] and prepare and submit to the Chief of the Division of Water Rights a response plan specifying actions the [Department] or the [Bureau] will take to ensure that water levels in southern Delta Channels are not lowered to elevations inadequate for diversion of water for agricultural uses because of increased pumping resulting from the use of the [joint points of diversion]. The [Department] or the [Bureau] will not be authorized to divert water using the [joint points of diversion] until the response plan has been approved by the Chief of the Division of Water Rights. The [Department] or the [Bureau] will be required to implement the response plan." (Decision 1641, p. 105, fn. omitted.)

On the salinity issue, the Board, in Decision 1641, concluded that the evidence did not support the argument that agricultural users in the southern Delta would be adversely impacted by salinity increases due to use of the joint points of diversion. The Board noted that under average flow conditions, any exceedances of the southern Delta salinity objective in June, July, and August that would occur with the joint points of diversion in effect would also have occurred under the conditions in effect before implementation of the 1995 Bay-Delta Plan. The Board also noted that "salinity generally is improved as a result of implementing the 1995 Bay-Delta Plan." With one minor exception, which the Board found "so slight as to be within modeling error," the Board determined that any worsening in conditions would not be the result of the joint points of diversion.

***274** Based on the foregoing conclusions, the Board inserted terms and conditions in the Bureau's CVP permits (except for the permits for New Melones and Friant) allowing the Bureau to divert or redivert water at the SWP's Banks Pumping Plant "only if a response plan to ensure that water levels in the southern Delta will not be lowered to the injury of water users in the southern Delta has been approved by the Executive Director of the [Board]. [The Bureau] shall prepare the response plan with input from the designated representative of the South Delta Water Agency." The new terms and conditions also required the Bureau to "develop a response plan to ensure that the water quality in the southern and central Delta will not be significantly degraded through operations of the Joint Points of Diversion to the injury of water users in the southern and Central Delta. Such a plan shall be prepared with input from the designated representative of the Contra Costa Water District and approved by the Chief, Division of Water Rights." (Decision 1641, pp. 150- 151.)

The Board further authorized the Bureau to use the SWP's Banks Pumping Plant in three stages. In stage 1, the Bureau was authorized to divert or redivert water at the Banks Pumping Plant to serve a limited number of contractors, to support a recirculation study, and to recover export reductions taken to benefit fish. In stage 2, the Bureau was authorized to use the Banks Pumping Plant for any purpose authorized under its permits, subject to the development of an operations plan, to be approved by the Board's executive director, "to protect fish and wildlife and other legal users of water." A similar limitation applied to stage 3. In addition, the Bureau was required to "protect water levels in the southern Delta through measures to maintain water levels at elevations adequate for diversion of water for agricultural uses. This requirement can be satisfied through construction and operation of three permanent tidal barriers in the southern Delta or through other measures that protect water quality in the southern and central Delta and protect water levels at elevations adequate to maintain agricultural diversions." (Decision 1641, p. 153.)

In authorizing the Department to use the CVP's

Tracy Pumping Plant, the Board inserted terms and conditions in the Department's SWP permits essentially identical to those set forth above.

In the first cause of action in their non-CEQA writ petition, the Central Delta parties alleged use of the joint points of diversion would injure legal users of water as a result of lowered water levels and increased salinity. The trial court rejected these allegations.

[45] On appeal, the Central Delta parties press both of these points again. On the salinity issue, they contend "[t]he modeling results for the [joint points of diversion] clearly show numerous instances where there will be substantial water quality violations at the various measuring points in the Delta." What the Central Delta parties *fail* to address, however, is the Board's finding that these "violations" are "due to implementation of the 1995 Bay-Delta Plan or due to restrictions on New Melones Reservoir releases for salinity control ..., *not* due to [the joint points of diversion]." (Decision 1641, p. 108, italics added.) In other words, the Board found that any increased salinity in the southern Delta would not be caused by the joint points of diversion. Because the Central Delta parties have not shown otherwise, we must presume this finding is supported by substantial evidence in the record. Accordingly, the Board was justified in concluding the joint points of diversion would "not operate to the injury of any legal user of the water involved" by ***275** increasing the salinity of water in the southern Delta. (§ 1702.)

[46] As for the issue of water levels, the Central Delta parties' complaint is that the Board "simply deferred" deciding whether the joint points of diversion would operate to the injury of agricultural users in the southern Delta by lowering water levels. According to them, "Under Water Code section 1702, it was the [Board's] obligation to determine if the proposed permit changes ... would cause harm to other legal users. The Board simply deferred this determination hoping that later proposals or actions developed *after* the hearings would prevent the expected harm. Not knowing when or under what conditions [use of the joint points of diversion] will occur, the [Board] had no basis on which to find there would be no harm to other legal users."

We are not persuaded. Under subdivision (a) of section 1704, the Board is authorized to *conditionally* approve a petition for changes in a permit to appropriate water. That is what the Board did here. Essentially, the Board determined that approving the joint points of diversion petition unconditionally might injure agricultural users in the southern Delta because increased pumping resulting from the use of the joint points of diversion might lower water levels to a point where water could not be diverted for agricultural uses in the Delta. To avoid this result, the Board required the Bureau and the Department, before any use of the joint points of diversion, to prepare an operations plan, in consultation with South Delta Water Agency and to be approved by the Board's executive director, "to ensure that water levels in the southern Delta will not be lowered to the injury of water users in the southern Delta." The Board further required that in stages 2 and 3 of the operation of the joint points of diversion, the Bureau and the Department develop an operations plan, to be approved by the Board's executive director, "to protect fish and wildlife and other legal users of water." (Decision 1641, pp. 150, 152.)

Certainly the Board had the power to approve the joint points of diversion petition on the condition that the Bureau and the Department ensure that operations of the joint points of diversion would not lower water levels in the southern Delta to a point where agricultural users could not divert water for their agricultural use. For all intents and purposes, that is what the Board did by requiring the Bureau and the Department to prepare response plans and operations plans for approval by the Board's executive director. Not only do the terms and conditions the Board imposed properly seek to ensure that agricultural users will not be injured by lower water levels as a result of the joint points of diversion, they have the added benefit of keeping the Board involved in the development of the operational plans of the Bureau and the Department that are the means of ensuring that result.

This is not a case--like *Central Delta Water Agency v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 245, 20 Cal.Rptr.3d 898--where the Board has wrongfully delegated its authority to its staff. In that case, the Board approved applications to appropriate water that did not "set forth the actual uses or uses [to be made] of the impounded waters." (*Id.* at p. 261, 20 Cal.Rptr.3d 898.) This court concluded that the Board "may not delegate the authority to determine the merits of an application to appropriate water, except as provided by statute." (*Ibid.*)

Here, the Board did not improperly delegate its responsibility for determining that the approval of the joint points of diversion petition would not operate to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the injury of any legal user of the water involved. ***276** Instead, the Board determined there would *be* no injury as long as the Bureau and the Department ensure that their operations of the joint points of diversion do not cause water levels in the southern Delta to recede to a point where agricultural users cannot divert water for their agricultural use. Requiring the Bureau and the Department to provide this assurance through response plans and operations plans approved by the Board's executive director was a valid condition on approval under section 1704 and not an unlawful delegation of the Board's authority.

For the foregoing reasons, the trial court properly rejected the first cause of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502) to the extent the Central Delta parties challenged the Board's approval of the joint points of diversion petition.

One issue relating to the joint points of diversion petition remains to be addressed. In their opening brief, the **Audubon** Society parties complain that Decision 1641 "fails to adopt any specific mitigation measures that would assure" that adverse impacts to fish and wildlife from increased rates of pumping under the joint points of diversion "are avoided." According to them, the Board's deferral "of an appropriate mitigation measure to a future 'operations plan' ... abdicates the ... Board's statutory responsibility to address this problem now."

The **Audubon** Society parties fail to identify the source of the "statutory responsibility" they contend the Board abdicated. In any event, whatever the source of that responsibility, we conclude that in conditioning its approval of the joint points of diversion petition on the submission and approval of operations plans "to protect fish and wildlife," the Board acted properly. Accordingly, the **Audubon** Society parties' challenge to the Board's approval of the joint points of diversion petition is without merit.

IV

*Challenges To The Implementation EIR*

A

*Challenges Relating To The Joint Points Of Diversion*

In January 2000, the Central Delta parties filed a petition for writ of mandate challenging the Board's certification of the implementation EIR (the CEQA writ petition). (*Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 309539).) In their first cause of action, the Central Delta parties alleged (among other things) that the Board "failed to prepare and [*sic* ] adequate EIR by not examining the effects associated with the source and amount of water used for increase[s] in export pumping approved under the joint point operations." In the second cause of action in their writ petition, the **Audubon** Society parties included an identical allegation.

In their brief in the trial court, the Central Delta parties framed their CEQA arguments relating to the joint points of diversion petition differently. They first asserted that the implementation EIR "unlawfully and unacceptably failed to even mention, much less investigate, discuss and analyze the [joint points of diversion]'s potential impacts on the water quantity and quality in the San Joaquin River." They also asserted that the implementation EIR unlawfully deferred and delegated the formulation of mitigation measures to protect water users and the environment in the central and southern Delta from the effects of the joint points of diversion.

***277** As previously noted, the **Audubon** Society parties did not file their own brief in the trial court but did join in the Central Delta parties' brief.

In response to the foregoing challenges by the Central Delta parties, the trial court found "no error."

On appeal, the Central Delta parties press both points again. The **Audubon** Society parties join in these arguments. [FN50] We will address each argument in turn. First, however, we set forth the basic legal principles governing EIR's.

FN50. Because the arguments made by the **Audubon** Society parties add nothing to the arguments made by the Central Delta parties, the discussion that follows focuses on the latter.

As this court explained in *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1106, 11 Cal.Rptr.3d 104: " 'An environmental impact report is an informational document,' the purpose of which 'is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment;....' (CEQA, § 21061.) 'The purpose of an environmental impact report is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided.'

(CEQA, § 21002.1, subd. (a).) 'The EIR has been repeatedly recognized as the " ' "heart of CEQA." ' " ' (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 107, 126 Cal.Rptr.2d 441.)"

"The EIR shall focus on the significant effects on the environment. The significant effects should be discussed with emphasis in proportion to their severity and probability of occurrence." (Cal.Code Regs., tit. 14, § 15143 (Guidelines).) "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible." (*Id.*, § 15151.) "The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR." (*Id.*, § 15146.)

1. *Impact Of The Joint Points Of Diversion On Water Quality*

[47] The Central Delta parties first assert that the implementation EIR fails to adequately discuss the impact of the joint points of diversion on water quality in the San Joaquin River. They contend that because use of the joint points of diversion "affords the capability to substantially increase CVP exports from the Delta," the Board was obligated to consider where those increased exports might be delivered and what effect that delivery might have on salinity levels in the San Joaquin River. In particular, the Central Delta parties' concerns relate to the potential increase in exports to the west side of the San Joaquin Valley under the joint points of diversion, because of the saline discharge back into the San Joaquin River from the irrigation of those lands. The **Audubon** Society parties make similar arguments.

The final implementation EIR considered nine different alternatives relating to the joint points of diversion petition. Alternative 1 was the "base case" or "no project" alternative, under which the water quality objectives from Decision 1485 would remain in effect and the Bureau would be authorized to use the SWP's ***278** pumping plant only to make up export deficiencies in May and June caused by export restrictions. Alternative 2 assumed the water quality objectives from the 1995 Bay-Delta Plan would be in effect and *no* use of joint points of diversion would be authorized. The remaining alternatives assumed various levels of operation of the joint points of diversion.

The final implementation EIR devotes 33 pages to the analysis of salinity levels within the Delta under the various alternatives. This includes a discussion of salinity levels at various points on the San Joaquin River, including Vernalis. Accordingly, the Central Delta parties' assertion that the EIR does not discuss the impact of the joint points of diversion on water quality in the San Joaquin River is baseless.

Faced with this fact, the Central Delta parties argue the implementation EIR is inadequate because "there is absolutely no discussion or even mention of potential drainage impacts on the San Joaquin River from [use of the joint points of diversion]." In other words, according to the Central Delta parties, while the implementation EIR discusses salinity levels under the various joint points of diversion alternatives, it does not specifically discuss the extent to which those levels are affected by drainage back into the San Joaquin River of water exported from the Delta to the west side of the San Joaquin Valley.

The Central Delta parties raised this issue before the Board when, in a comment on the draft implementation EIR, they asserted: "It is not clear whether or not the impacts of the increased amounts of salts delivered with the increased CVP deliveries to the west side of the San Joaquin Valley is accounted for in the models." In response to that comment, the Board included the following explanation in the final implementation EIR: "The use of joint points of diversion will not increase salt load discharges to the San Joaquin River in comparison to JPOD [joint points of division] Alternative 1. In comparison to JPOD Alternative 2, salt loads will increase. This increase is reflected in the model studies by increased return flows from the west side of the San Joaquin Valley. The increased flows, however, result in a decreased modeled salt concentration in the San Joaquin River at Maze Road because the salt concentration at this location is modeled using a salinity/flow relationship. In any event, the change in salt levels due to the use of the joint points of diversion [is] expected to be insignificant because the change in return flows is very small."

Belatedly acknowledging this response in their reply brief, the Central Delta parties contend it is inadequate because it omits details. Challenging the first sentence--in which the Board stated that "[t]he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

use of joint points of diversion will not increase salt load discharges to the San Joaquin River in comparison to JPOD Alternative 1"--the Central Delta parties contend that "[i]n order to enable the public and the decision makers to make 'an independent, reasoned judgment' of the validity of that conclusion, the public and the decision makers would, at a minimum, need a good faith disclosure of what factors and assumptions the EIR preparers took into consideration in arriving at that conclusion." They contend the EIR is inadequate because it fails to make any such disclosure.

We are not persuaded. In its analysis of the impacts of the various joint points of diversion alternatives on the delivery of CVP water, the implementation EIR shows that, with the exception of one alternative, all of the joint points of diversion alternatives would result in *decreased* CVP water deliveries compared to existing conditions--that is, alternative 1. Obviously, ***279** decreased water exports compared to existing conditions "will not increase salt load discharges to the San Joaquin River." No further explanation was necessary regarding these alternatives.

As for the one alternative (alternative 8) that would result in increased CVP water deliveries compared to existing conditions, the sufficiency of the EIR is best analyzed in conjunction with the challenge of the Central Delta parties to the remainder of the Board's response to their comment. In the remainder of its response, the Board essentially explained that compared to alternative 2-- under which *no* use of joint points of diversion would be authorized--the seven alternatives for operation of the joint points of diversion would result in "increased return flows from the west side of the San Joaquin Valley," which in turn would result in increased salt load discharges to the San Joaquin River (with the exception of one location); however, the increase was expected to be "insignificant because the change in return flows is very small."

The Central Delta parties complain that the Board's statement about the size of the change in return flows is not supported by an adequate explanation or by substantial evidence. As they point out, "The EIR must contain facts and analysis, not just the bare conclusions of a public agency." (*Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 831, 173 Cal.Rptr. 602.) Upon further examination, however, the final implementation EIR does contain an adequate explanation for and substantial evidence to support the Board's determination that the change in return flows under the seven alternatives for operation of the joint points of diversion would be small compared to no use of the joint points of diversion.

According to the final implementation EIR, alternatives 3 through 9 for operation of the joint points of diversion alternatives would, on average, result in increased annual CVP water deliveries ranging from 45,000 acre-feet (alternative 9) to 247,000 acre-feet (alternative 8) when compared with no use of the joint points of diversion (alternative 2). Given that CVP deliveries under alternative 2 amount to 2,591,000 acre-feet per year, this means the seven joint points of diversion alternatives would result in approximate increases in CVP deliveries ranging from 1.7 to 9.5 percent over alternative 2.

Similarly, alternative 8 would result in increased CVP water deliveries of 68,000 acre-feet annually when compared with existing conditions (alternative 1). Given existing CVP deliveries of 2,770,000 acre-feet per year, this means alternative 8 would result in a delivery increase of approximately 2.5 percent.

Assuming increased CVP deliveries were allocated equally to all users, including the agricultural users on the west side of the San Joaquin Valley, the Board reasonably could have concluded that increases in CVP deliveries of less than 10 percent would not result in significant changes to the return flows to the San Joaquin River and therefore would not result in a significant increase in salt levels in the river. Thus, there is an adequate basis for the conclusion the Central Delta parties challenge.

It should be noted, however, that agricultural users on the west side of the San Joaquin Valley would not necessarily receive a proportionate share of any increased deliveries, so the return flows would not necessarily increase proportionally. The hydrological model the Board used to analyze the various alternatives for the joint points of diversion assumes an annual demand for CVP exports totaling 3,573,000 acre-feet, approximately 35 percent of which-- 1,260,000 acre-feet--is attributed ***280** to the San Luis unit of the CVP, which is the part of the CVP that supplies the west side of the San Joaquin Valley. Even under the joint points of diversion alternative with the greatest increase in CVP water deliveries (alternative 8), however, a total of only 2,838,000 acre-feet of water would be delivered annually, which is less than 80 percent of the total demand. This is significant because the lack of water to meet export demands falls heaviest on agricultural users. As the implementation EIR explains, "CVP

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

South-of-Delta deficiencies are imposed when needed by contract priority," with agricultural users having the lowest priority. Indeed, supplies for agricultural users are reduced up to 50 percent before deficiencies are allocated to any other users.

What this means is that the deficiency in water for export, even under the joint points of diversion alternative that would provide the greatest increase in CVP water deliveries (alternative 8), would fall heaviest on agricultural uses, such as the use of CVP water from the San Luis unit to irrigate farm lands on the west side of the San Joaquin Valley. Thus, increased deliveries to that area would probably be less than the overall increase of between 1.7 and 9.5 percent.

We conclude the foregoing information is sufficient to support and explain the Board's conclusion that the change in salt levels in the San Joaquin River due to the use of the joint points of diversion would be insignificant because the change in return flows from the saline lands on the west side of the San Joaquin Valley would be very small. The challenge to the implementation EIR on this basis by the Central Delta parties fails.

2. *Mitigation Of Impacts On Water Levels And Fish And Wildlife*

[48] The Central Delta parties' next challenge to the implementation EIR is that the Board "mishandl[ed] its CEQA obligation with respect to describing, evaluating and ultimately adopting feasible mitigation measures to 'mitigate or avoid' " impacts of the joint points of diversion on water levels in the vicinity of the SWP and CVP pumps, as well as impacts on fish and wildlife. The **Audubon** Society parties echo this challenge.

This challenge is related to the argument we addressed (and rejected) above that the Board improperly deferred and delegated deciding whether the joint points of diversion would operate to the injury of agricultural users in the southern Delta by lowering water levels. The focus here, however, is not on what the Board ultimately decided to do in Decision 1641, but on the sufficiency of the implementation EIR as an informational document. To the extent the Central Delta parties challenge the Board's ultimate decision under the guise of challenging the EIR, we reject those challenges as misplaced. The only issue we are concerned with here is the adequacy of the EIR on the mitigation issue.

As this court explained in *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027, 280 Cal.Rptr. 478:

"Public Resources Code section 21002 requires agencies to adopt feasible mitigation measures to substantially lessen or avoid otherwise significant adverse environmental impacts.

"[¶ ] ... [¶ ]

"For each significant effect, the EIR must identify specific mitigation measures; where several potential mitigation measures are available, each should be discussed separately, and the reasons for choosing one over the others should be stated."

***281** This court continued, " '[I]n situations in which the formulation of precise means of mitigating impacts is truly infeasible or impractical at the time of project approval ..., the approving agency should commit itself to eventually working out such measures as can be feasibly devised, but should treat the impacts in question as being significant at the time of project approval. Alternatively, for kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process ..., the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated.' " (*Sacramento Old City Assn. v. City Council, supra*, 229 Cal.App.3d at pp. 1028-1029, 280 Cal.Rptr. 478.)

The Central Delta parties complain that the implementation EIR does not satisfy the foregoing requirements with respect to mitigation of impacts of the joint points of diversion on water levels and fish and wildlife. In analyzing those complaints, it is important to do something the Central Delta parties fail to do--focus on the EIR. We begin with the water level issue.

The final implementation EIR identifies only one significant impact on water levels in the Delta resulting from the various joint points of diversion alternatives. Specifically, the EIR notes that at a location on the Grant Line Canal, downstream (west) of the proposed Grant Line Canal barrier, alternatives

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 and 8 would cause the average minimum water level in June, July, and August to be one-half foot to one foot lower than under existing conditions. The EIR acknowledges that this reduced water level could "have an adverse effect on water diversion downstream of the Grant Line barrier." Because the problem results from the barrier, the EIR recommends moving the barrier as far as feasible to the west end of the canal.

The Central Delta parties' ostensible challenge to the EIR relating to the water level issue fails to address the foregoing discussion in the EIR. Instead, the Central Delta parties complain about Decision 1641, asserting that by providing for a "response plan" to be prepared in the future by the Bureau or the Department before any operation of the joint points of diversion, the Board improperly "deferred and delegated the identification, evaluation, and ultimate adoption of mitigation measures." What the Board ultimately decided to do in Decision 1641, however, is not determinative of the adequacy of the implementation EIR. To successfully challenge the EIR, the Central Delta parties need to show that *the EIR* does not adequately address specific mitigation measures for the significant environmental impacts of the project-- here, the impact on water levels in the Delta. They cannot make that showing if they ignore the EIR, as they have here.

The next issue is mitigation of impacts of the joint points of diversion on fish and wildlife. The final implementation EIR observes that "[i]n general, ... Alternatives 2 through 9 are predicted to have slight beneficial effects on through-Delta survival of juvenile chinook salmon and steelhead, and on abundance of delta smelt, Sacramento splittail, starry flounder, longfin smelt, and *Crangon franciscorum*, compared to the D-1485 based case (Alternative 1). In addition, for most of these species, no significant adverse effects were predicted for [Alternatives 3 through 9] compared to Alternative 2." The EIR ***282** further observes: "Alternatives 7 and 8 are predicted to have slight adverse impacts on young-of-the-year striped bass abundance compared to the base cases (Alternatives 1 and 2). Potential impacts on striped bass under ... Alternatives 7 and 8 could be mitigated through funding of additional stocking."

In ostensibly challenging the EIR's discussion of mitigation of impacts of the joint points of diversion on fish and wildlife, the Central Delta parties again fail to address the discussion *in the EIR.* Instead, as with the water level issue, they complain about what the Board did in Decision 1641. As we have explained, however, the Central Delta parties cannot show the EIR is inadequate if they ignore it, which they do. Accordingly, the challenge of the Central Delta parties to the implementation EIR based on its discussion of mitigation for impacts of the joint points of diversion on fish and wildlife fails.

B

*Challenges Relating To The San Joaquin River Agreement*

In the first cause of action in their CEQA writ petition, the Central Delta parties also alleged that the Board failed to prepare an adequate EIR by "not examining the environmental effects resulting from the reduction in return flows and accretions to surface streams and groundwater/surface water exchanges both in the base case and in the alternatives" and "not examining the environmental effects resulting from shifts in hydro power releases both in the base case and in the alternatives." In the second cause of action in their writ petition, the **Audubon** Society parties offered identical allegations.

In their brief in the trial court, the Central Delta parties fleshed out their allegations, explaining that they related to the impacts of the San Joaquin River Agreement on return flows in the San Joaquin River system and hydropower releases to that system. As previously noted, the **Audubon** Society parties offered no independent argument of their own, but joined the Central Delta parties' trial court brief. The trial court rejected these challenges to the implementation EIR as without merit.

On appeal, the Central Delta parties renew their arguments, asserting that the implementation EIR was insufficient because it did not include: "(1) an investigation, discussion, and analysis of the [San Joaquin River Agreement]'s impacts on surface and subsurface 'return flows' within the affected river systems; and (2) an investigation and description of the affected reservoirs' historic and current release schedules and an analysis of how those release schedules would be affected by the [San Joaquin River Agreement]." The **Audubon** Society parties offer similar arguments.

1. *Exhaustion Of Administrative Remedies*

[49] The Board first contends that the Central Delta and **Audubon** Society parties failed to exhaust their administrative remedies regarding these complaints. The Board asserts that the **Audubon** Society parties "did not participate in the administrative hearing conducted by the ... Board, and failed to provide a

single comment on the EIRs." The Board further asserts that "the comments submitted on the EIRs by the *Central Delta* parties ... are wholly inadequate to exhaust their administrative remedies" regarding their complaints about the San Joaquin River Agreement.

[50] "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." ***283**(*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199, 22 Cal.Rptr.3d 203.) Subdivision (a) of CEQA section 21177 sets forth the exhaustion requirement on which the Board relies here. [FN51] That requirement is satisfied if "the alleged grounds for noncompliance with [CEQA] were presented ... by any person during the public comment period provided by [CEQA] *or* prior to the close of the public hearing on the project before the issuance of the notice of determination." (CEQA, § 21177, subd. (a), italics added.) Thus, in challenging the certification of the implementation EIR, the Central Delta and **Audubon** Society parties are not limited to grounds for noncompliance they themselves presented to the Board, nor are they limited to comments submitted to the Board during the public comment period on the draft implementation EIR. As long as the alleged grounds for noncompliance were presented by *someone* at *sometime* prior to the close of the public hearing, then the exhaustion requirement is satisfied.

FN51. There is a second exhaustion requirement in subdivision (b) of CEQA section 21177, which provides that "[n]o person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by [CEQA] or prior to the close of the public hearing on the project before the issuance of the notice of determination." Although the Board contends the **Audubon** Society parties "did not participate in the administrative hearing conducted by the ... Board," the Board does not rely on the exhaustion requirement in subdivision (b) of section 21177, and therefore we do not address whether the **Audubon** Society parties satisfied that requirement.

The **Audubon** Society parties contend it is too late for the Board to argue that they failed to exhaust their administrative remedies because the Board "failed to press [this issue] during the trial court proceedings" by "fil[ing] a demurrer, motion to dismiss, or motion for summary judgment alleging [the **Audubon** Society parties'] failure to exhaust [their] administrative remedies." We disagree. In its opposition brief in the trial court, the Board asserted that the Central Delta parties had failed to exhaust their administrative remedies with respect to "the alleged failure [of the implementation EIR] to analyze impacts of the [San Joaquin River Agreement] on surface/subsurface flows and hydropower." Although the Board did not direct a similar argument to the **Audubon** Society parties specifically, this is understandable because the **Audubon** Society parties did not file their own brief to argue the CEQA issues alleged in their petition; instead, as we have previously noted, they simply joined in the brief filed by the Central Delta parties. Under these circumstances, we conclude the Board adequately raised the exhaustion issue in the trial court as to both the Central Delta and **Audubon** Society parties.

Furthermore, contrary to the **Audubon** Society parties' argument, the Board was not required to "appeal from the trial court's failure to address" the exhaustion issue in order to pursue that issue on appeal. It is true that in rejecting the CEQA arguments related to the San Joaquin River Agreement as without merit, the trial court implicitly rejected the Board's argument that the Central Delta parties failed to exhaust their administrative remedies with respect to those arguments. But because the trial court's ultimate decision to reject those arguments was in the Board's favor, the Board was not *aggrieved* by that decision and therefore had no right to challenge it on appeal. (See *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737, 97 Cal.Rptr. 385, 488 P.2d 953.) It was only after the Central ***284** Delta and **Audubon** Society parties appealed the trial court's decision that the Board had occasion to raise the exhaustion issue again, this time as an alternative basis for upholding the trial court's decision. Accordingly, the exhaustion issue is properly before us.

To decide whether the Central Delta and **Audubon** Society parties exhausted their administrative remedies, we must first determine the true character of their challenges to the EIR relating to the San Joaquin River Agreement. Assuming they did exhaust their administrative remedies, we can then consider the validity of their challenges. We will begin with the challenge relating to return flows.

2. *Return Flows*

On the return flow issue, the Central Delta and **Audubon** Society parties contend that the implementation EIR failed to adequately discuss the effect of the San Joaquin River Agreement on return flows to the San Joaquin River. According to them, under the agreement the irrigation districts could redirect up to 137,500 acre-feet of water annually from existing irrigation use to provide instream flows, and this redirection could have a substantial impact on the timing and amount of water flowing back into the San Joaquin River system, both on the surface and below the surface, which in turn could have a substantial impact on the quantity and quality of the water in that river system. They contend the implementation EIR did not adequately analyze this potential impact. (See Guidelines, § 15125, subd. (c) ["The EIR must demonstrate that the significant environmental impacts of the proposed project were adequately investigated and discussed"].)

To further understand this challenge, it is necessary to examine the content of the EIR relating to the San Joaquin River Agreement and what happened during phase 2B of the public hearing.

The implementation EIR considered two alternatives involving performance of the San Joaquin River Agreement: one based on the assumption that "combined use of SWP and CVP points of diversion in the Delta is authorized" ("Joint POD Alternative 9") and one based on the assumption that the joint points of diversion were not authorized ("flow alternative 8"). As to each alternative, the EIR discussed the potential impacts on water supply, as well as on hydrology and salinity in the Delta. The EIR also discussed the potential impacts of Joint POD alternative 9 on water levels in the Delta.

The Board conducted phase 2B of the hearing for the express purpose of receiving evidence on the long-term change petitions by the irrigation districts that had to be granted to allow performance of the San Joaquin River Agreement. During phase 2B, attorneys for the Central Delta parties elicited testimony from Dan Steiner, the individual who modeled the hydrological effects of the San Joaquin River Agreement, that in conducting his modeling, he simply assumed there would be no changes in return flows as a result of the long-term changes to the irrigation districts' licenses. In their phase 2B closing argument, the Central Delta parties specifically pointed out that the irrigation districts had admitted "that their modeling does not address the impacts on return flows and accretions to the river and that they have made no analysis of such impacts."

It is this argument the Central Delta parties now pursue on appeal as a challenge to the implementation EIR. In essence, the complaint of the Central Delta parties is that the EIR's discussion of the potential impacts of the San Joaquin River Agreement on water supply, hydrology, ***285** salinity, and water levels in the Delta failed to account for changes in return flow as a result of performance of the agreement, because the modeling on which the EIR was based did not take such changes into account. Thus, the Central Delta parties are actually challenging the validity of the modeling study on which the EIR was based.

The question is whether this alleged ground for noncompliance with CEQA was adequately presented to the Board before the close of the public hearing. We conclude it was.

[51] "The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review. [Citation.] The decisionmaking body ' "is entitled to learn the contentions of interested parties before litigation is instituted. If [plaintiffs] have previously sought administrative relief ... the Board will have had its opportunity to act and to render litigation unnecessary, if it had chosen to do so." ' " (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 384, 110 Cal.Rptr.2d 579.)

The Central Delta parties point out that in the written briefing they submitted to the Board in August and September 1999, including their closing argument on phase 2B, they "discussed extensively" the Board's "failure to address the [San Joaquin River Agreement's] impacts on return flows." They also contend they exhausted their administrative remedies on the return flow issue through their "extensive cross-examination of witnesses" during the public hearing.

We agree. Although the Central Delta parties did not use the magic words "the EIR is inadequate," they did bring to the Board's attention their position that the record before the Board did not contain an adequate analysis of the potential impact of the San Joaquin River Agreement on return flows. Under these circumstances, we believe the Board was given an adequate opportunity to address any deficiency in the implementation EIR regarding the return flow issue. Accordingly, the Central Delta parties

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adequately exhausted their administrative remedies on this issue.

[52][53][54] We turn now to the substance of their complaint. As we have noted, the Central Delta parties essentially challenge the validity of the modeling on which the implementation EIR was based. When a challenge is brought to studies on which an EIR is based, "the issue is not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports the" agency's decision. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 409, 253 Cal.Rptr. 426, 764 P.2d 278.) "A clearly inadequate or unsupported study is entitled to no judicial deference." (*Id.* at p. 409, fn. 12, 253 Cal.Rptr. 426, 764 P.2d 278.) The party challenging the EIR, however, bears the burden of demonstrating that the studies on which the EIR is based "are clearly inadequate or unsupported." (*Ibid.*)

The Central Delta parties have not met that burden here. In responding to cross-examination by the Central Delta parties, Steiner testified that his modeling assumed no effect on return flow "[b]ecause [he] had nothing to lead [him] to believe there was" (or would be) such an effect. Steiner further testified that he discussed his assumption "with each of the operating agencies" (i.e., the irrigation districts) and ***286** they told him to "go with the assumption that had been historically assumed, which is no change."

Also in the record is a copy of an EIR prepared by the Bureau and the San Joaquin River Group Authority regarding the San Joaquin River Agreement. In commenting on the draft of that EIR, the Central Delta parties offered the same argument they now advance here: that the EIR did not adequately assess the potential reduction in return flows as a result of performance of the San Joaquin River Agreement. The response to those comments included these statements: "The participants who are providing flows for the proposed action have stated that the majority, if not all of the flow provided would not affect the flow leaving their respective systems via surface returns.... The proponents do not anticipate the occurrence of reduced summer-time return flows as a result of the proposed action; ..."

From the foregoing evidence, it appears the irrigation districts anticipated there would be little, if any, change in return flows as a result of their performance of the San Joaquin River Agreement. This was a sufficient basis for Steiner to exclude any such change from his modeling study. The Central Delta and **Audubon** Society parties have pointed to no evidence in the record contradicting this evidence or anything else to suggest the decision not to include a change in return flows in the modeling was unreasonable. Accordingly, they have failed to show that the modeling on which the implementation EIR was based was "clearly inadequate or unsupported" (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at p. 409, fn. 12, 253 Cal.Rptr. 426, 764 P.2d 278), and thus their challenge to the EIR based on the return flow issue fails.

3. *Hydropower*

[55] The Central Delta and **Audubon** Society parties' challenge to the implementation EIR based on the hydropower issue is that the EIR failed to analyze how the San Joaquin River Agreement would affect hydropower release schedules for reservoirs affected by the agreement. In essence, they complain that "[w]ithout knowing where the water will come from [for the irrigation districts to supply to meet their obligations under the San Joaquin River Agreement] it is essentially impossible to meaningfully evaluate and compare the impacts to the river systems with and without the [agreement]."

In a comment on the draft EIR, South Delta Water Agency (one of the Central Delta parties) raised this issue when it asserted the following: "It is impossible to model the [San Joaquin River Agreement], or indeed any Alternative unless one knows the source of the flows to be provided. The results of any modeling will change depending on whether the water provided is from a decrease in consumption, a rescheduled power generation release, or recaptured return flow. Even if the technical appendices contain such assumptions (we do not find any such) the actual effects will change unless the source of the water is mandated." Accordingly, the Central Delta parties exhausted their administrative remedies on this challenge to the implementation EIR.

Turning to the merits of the challenge, the Board offered the following response to the comment by South Delta Water Agency: "Reasonable assumptions are made regarding the source of water from individual water right holders under each of the alternatives. The EIR assumes for flow Alternatives 3, 4, and 5 the water provided to meet Bay/Delta

obligations comes first from reservoir re-operation ***287** and then, to the extent necessary, from diversion reduction. Alternative 6 assumes water comes from the Delta via releases from the Delta-Mendota Canal. Alternatives 7 and 8 assume that water comes from reservoir reoperation for Merced [Irrigation District] and [Modesto Irrigation District]/[Turlock Irrigation District], and from returns to the system of diverted water for [Oakdale Irrigation District], [South San Joaquin Irrigation District], and the Exchange Contractors. The commenter is correct that an individual water user, especially a reservoir operator, has flexibility in incorporating a new demand into its operation, but it is not feasible to analyze all possible operational decisions available to the water user."

As we have noted, "the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible." (Guidelines, § 15151.) Furthermore, as the Central Delta parties themselves point out, "an agency must use its best efforts to find out and disclose all that it reasonably can." (*Id.*, § 15144.)

The key word in section 15144 of the Guidelines is "reasonably." That section also acknowledges the commonsense proposition that "foreseeing the unforeseeable is not possible." (Guidelines, § 15144.) Here, the Board explained the assumptions of the water sources the irrigation districts would use on which the Board based its analysis of potential impacts of the San Joaquin River Agreement and further explained that, because the agreement gave the districts flexibility in determining where to come up with the water, "it is not feasible to analyze all possible operational decisions available to the" districts. The Central Delta and **Audubon** Society parties have failed to show that the Board's response on this issue was unreasonable under the circumstances. (Indeed, neither group of parties even mentions the Board's response.) Accordingly, their challenge to the EIR based on the hydropower issue fails as well.

In summary, we find no merit in the challenges of the Central Delta and **Audubon** Society parties to the implementation EIR. Accordingly, we will affirm the judgment in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 309539) to the extent it denied the Central Delta parties relief on their first cause of action and will affirm the judgment in *Golden Gate **Audubon** Society v. State Water Resources Control Board* (Super. Ct. Alameda County, 2003, No. 825585-9) to the extent it denied the **Audubon** Society parties relief on their second cause of action.

V

*Challenges To The Change Petition*

A

*The **Westlands** Challenge To The Board's Purposes Of Use Determination*

**Westlands** is a water district located on the west side of the San Joaquin Valley in Fresno and Kings Counties. By contract, **Westlands** is entitled to receive up to 1,150,000 acre-feet of CVP water from the Bureau annually to irrigate approximately 600,000 acres.

In response to the change petition, **Westlands** urged the Board to deny the Bureau's request to conform the purposes of use in its permits. **Westlands** asserted that under section 1702, "before the ... Board can grant [the Bureau]'s petition, [the Bureau] must demonstrate and the ... Board must find that the requested changes will not injure any person with a legally protectable right to use the water involved." **Westlands** further argued that "[i]t is beyond reasonable dispute that **Westlands** and other CVP contractors that ***288** receive [CVP] water ... have an existing legally protectible right to use the water." According to **Westlands,** approval of the Bureau's request would injure **Westlands** and other CVP contractors because allowing the Bureau to use more CVP water for fish and wildlife enhancement would reduce the amount of water available for irrigation.

In Decision 1641, the Board posed the dispositive question as whether "CVP contractors [are] protected from changes in the amount of their contractual water supplies by Water Code section 1702." The Board answered that question in the negative. Essentially, the Board concluded that the Bureau holds the water rights to water appropriated under its permits, and the "no injury" rule of section 1702 does not protect those users of water "whose contractual entitlements are dependent on the water rights of the water right holder." According to the Board, "Application of the 'no injury' rule is not the proper basis for determining contractual or other claims between a water service contractor and the water right holder who supplies water under contract where those claims are not based on the proprietary water rights of the water service contractor." Consequently, the Board approved the Bureau's request to conform the purposes of use in its permits. (Decision 1641, pp. 125, 129.)

In April 2000, **Westlands** filed a petition for writ of

mandate seeking to set aside the Board's approval of the change in 10 of the Bureau's CVP permits "to include fish and wildlife enhancement as a permitted purpose of use for water appropriated under said permits." [FN52] (***Westlands*** *Water District v. State Water Resources Control Board* (Super.Ct.Sac.County, 2003, No. 00CS00603).) The ***Westlands*** case was one of the cases added to this coordinated proceeding in November 2000.

FN52. **Westlands's** writ petition listed 13 different permits, but only 10 of those permits were actually involved in the Bureau's request to conform the purposes of use. One of the remaining three permits (No. 13776), which relates to Black Butte Dam, was initially involved in the change of use request but was excluded from the request by amendment to the change petition in June 1995. The other two permits listed in **Westlands's** writ petition (Nos. 11886 and 11887) relate to Friant Dam and were *never* involved in the change of use request. It is not clear why **Westlands** did not seek to challenge the change in the other four Bureau permits that were involved in the change of use request, but we need not concern ourselves with that question because it has no bearing on our resolution of this appeal.

In addressing **Westlands's** petition, the trial court framed the initial question as whether **Westlands** and other contractors receiving CVP water "have standing as 'legal user[s] of the water involved' under section 1702, to challenge the Board's disposition of the Bureau['s] place of use petition." Determining that the term " 'legal user' is ambiguous on its face in this water law context," the court examined the legislative history of section 1702 and concluded that "the [L]egislature, in using the concept of 'legal user,' did not intend to include those persons who use water provided under contract with a water supplier entity." Based on this conclusion, the court entered a judgment denying **Westlands's** writ petition. **Westlands** filed a timely notice of appeal from that judgment.

[56] On appeal, **Westlands** frames the primary issue as "[w]hether **Westlands** and the landowners within **Westlands** are 'legal users of the water involved' in changes to the authorized purposes of use in the water rights permits applicable to the CVP." In our view, however, the dispositive issue in **Westlands's** appeal is properly framed more broadly: namely, whether the Board ***289** erred in approving the Bureau's request to add fish and wildlife enhancement as an authorized purpose of use in various of the Bureau's permits because the record showed the change in the permits would operate to the injury of a legal user of the water involved. For the reasons that follow, we conclude the answer to that question is "no."

In arguing over the meaning of section 1702, and whether that statute precluded the Board from approving the change in the purposes of use in the Bureau's permits, the parties have focused their attention on the phrase "legal user of the water involved" and whether that phrase encompasses CVP contractors like **Westlands.** **Westlands** contends that it and its constituent landowners are "legal users" who can claim injury under section 1702 based on the "ordinary, everyday" meaning of the phrase "legal user of the water involved." According to **Westlands,** "The phrase 'water involved' is straightforward; it means the water that is subject to the proposed change in the permit. 'User' is the person or entity putting that water to use. The qualifier 'legal' before user limits the scope to persons using the water legally."

The Board offers a different interpretation of the "legal user" language. In Decision 1641, the Board concluded that "a person or entity can use water legally without being a 'legal user of water' within the meaning of ... section 1702." On appeal, the Board expounds on that conclusion by arguing that "the term 'legal user of water' ... does not apply to federal contractors such as **Westlands** and, instead, only applies to holders of traditional water rights such as appropriative, riparian, or prescriptive rights." Thus, according to the Board, if a person holds a permit to appropriate water, that person is a "legal user" of the water he appropriates, but if that person contracts with another to allow the other person to use the water instead, the other person is not a "legal user" of the water because he has only a *contractual* right, rather than a "traditional water right," to use the water.

The initial problem with the Board's argument is that it ignores the first--and sometimes dispositive--step in statutory interpretation: giving the words of the statute their "plain meaning." "Because the statutory language is generally the most reliable indicator of th[e Legislature's] intent, we look first at the words themselves, giving them their usual and ordinary meaning and construing them in context. [Citation.] If the plain language of the statute is clear and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unambiguous, our inquiry ends, and we need not embark on judicial construction. [Citations.] If the statutory language contains no ambiguity, the Legislature is presumed to have meant what it said, and the plain meaning of the statute governs." (*People v. Johnson* (2002) 28 Cal.4th 240, 244, 121 Cal.Rptr.2d 197, 47 P.3d 1064.)

The Board makes no effort to explain how its interpretation of the term "legal user of the water involved" as meaning a "traditional water rights holder," and excluding a person who lawfully uses water under a contract with a "traditional water rights holder," fits within the "plain meaning" of the simple words the Legislature used in the statute--"legal user of the water involved." Instead, the Board disregards these rules and leaps past the statutory language into an examination of the legislative history of section 1702 to support its construction of the statute.

The Board points out that a review of the case law addressing the "no injury" rule before the advent of the Water Commission Act in 1914 "discloses that all of the cases involved claims of injury raised by traditional water right holders." From this observation, the Board suggests it follows ***290** that the "no injury" rule must have applied *only* to "traditional water right holders," and not to those "who do not hold water rights, but who, instead, take their water as contractors from water right holders."

We have a different explanation for the absence of case law the Board has noted. Before the enactment of the Water Commission Act, any party who had a complaint about a change in an established appropriation of water had to seek relief in court, because there was no administrative agency with jurisdiction over such disputes. As between two "traditional water rights holders"--whether appropriators, riparians, or prescriptive users--only the common law of water rights, or the Civil Code provisions regarding appropriations, would have provided a basis for one water right holder to seek legal redress against another for a claimed "injury." As between an appropriator and a water user bound together by contract, however, the contract itself would have served as the basis for legal redress in a dispute between the parties. (See, e.g., *Stanislaus Water Co. v. Bachman* (1908) 152 Cal. 716, 730, 93 P. 858 [water appropriator sought to compel water user to pay market rate for water, rather than contract rate; court held that "the terms of the contract ... constitute the measure of the rights of the parties"].) Thus, prior to the advent of administrative control over water rights, there would have been no occasion for a person who had a contractual right to use water appropriated by another to invoke the "no injury" rule in a dispute with the appropriator. This explains why the Board found no case law applying the "no injury" rule to a contractor's claim of injury before the advent of the Water Commission Act.

The question we must answer is whether, when the Legislature decided to give control over the administration of water rights to an administrative agency, it intended to allow only "traditional water rights holders" to claim the benefit of the "no injury" rule in the administrative setting, while leaving those who use water by contract with "traditional water rights holders" no choice but to pursue their contractual remedies in court.

As we have previously observed in connection with one of the challenges by the Central Delta parties to the Board's approval of the long-term change petitions of the irrigation districts to allow performance of the San Joaquin River Agreement, sections 16 and 39 of the Water Commission Act imported the "no injury" rule into the administrative setting. According to the Board, "Sections 16 and 39 of the [Water Commission] Act ... confirm the view that the Legislature intended to apply the term 'legal user of water' to traditional water right holders and to no one else." We cannot agree. The Board points to no legislative history supporting such an interpretation, nor does it follow from the language used in the Water Commission Act.

The Board contends the term "user of water" was first introduced in section 12 of the Water Commission Act, and because the term in that context plainly refers to "an appropriative water right holder," the term "legal user" in section 16 must have been intended to apply only to "traditional water rights holders." Not so. The *complete* phrase used in section 12 is "any appropriator or user of water under an appropriation." (Stats.1913, ch. 586, § 12, p. 1018.) Given the complete phrase in the statute, there is absolutely no logic to the Board's assertion that the term "user of water" in section 12 refers to "an appropriative water right holder." Since the term "any appropriator" already describes the holder of a right to appropriate water, the ***291** term "user of water under an appropriation" must have been intended to refer to someone else. Indeed, a more thorough examination of section 12 confirms this conclusion.

As the Board points out, section 11 of the Water Commission Act declared that water that had been

appropriated but had not been put to beneficial use with due diligence was to be treated as unappropriated water. (Stats.1913, ch. 586, § 11, pp. 1017-1018.) Section 12 then authorized the Water Commission to "prescribe the time in which the full amount of water appropriated shall be applied to a useful or beneficial purpose," "upon the application of any appropriator or user of water under an appropriation made and maintained according to law prior to the passage of this act." (Stats.1913, ch. 586, § 12, pp. 1018-1019.) Since the focus of section 12 is on the time allowed to put appropriated water to beneficial *use*, it made sense to allow a petition to determine the amount of time allowed to complete that purpose to be filed by the appropriator *or by the person using the water under the appropriation*--that is, the person who was ultimately responsible for putting the water to its beneficial use. By differentiating between the appropriator and the user of the appropriated water, section 12 recognized that the person appropriating the water might not be the person who actually used it--as in the case of an appropriator who provided water to a number of different users under contract. Indeed, one water law commentator in 1914 who was addressing the water titles of corporations, observed that, at that time, there was "a large proportion of irrigation by farmers who do not go to any stream for their water, but get it out the canal of some distributing system." (Wiel, *Water Titles of Corporations and Their Consumers* (1914) 2 Cal. L.Rev. 273.) Thus, it appears the Legislature expressly recognized the existence of such contractual "users of water" in enacting the Water Commission Act.

This interpretation of section 12 of the Water Commission Act further undermines the Board's conclusion that "the Legislature intended to apply the term 'legal user of water' to traditional water right holders and to no one else." The fact that the term "user of water" in section 12 referred to a person who uses water under an appropriation but is not the appropriator tends to support the conclusion that the term "legal user of such water" in section 16 of the Water Commission Act encompassed such a person as well. Of course, the term "legal user" was broader still, since it encompassed not only persons who legally used water under an appropriation, but also riparians, those who had acquired their water rights by prescriptive use, and indeed anyone else who legally used the water involved. Unlike the Board, we find no indication in the Water Commission Act that the Legislature intended the broad term "legal user" to exclude those who lawfully use water under a contract with an appropriator.

It is important to remember, however, that the concept of "injury" embodied in the "no injury" rule is a narrow one. We have concluded already that the "no injury" rule in section 16 of the Water Commission Act was a codification of the common law rule that prohibited only those changes that would injure the *rights* of another water user. Accordingly, we must conclude that section 16 of the Water Commission Act allowed anyone who had a legal right to use water to oppose a change in the point of diversion of an appropriation on the ground the change would interfere with his or her legal right to use the water involved.

***292** In a previous section of this opinion, we have explained the changes the Legislature made to the "no injury" statutes between the enactment of the Water Commission Act in 1914 and the enactment of the Water Code in 1943. None of those changes reveals any intent by the Legislature to exclude from the broad term "legal user" parties who lawfully use water pursuant to a contract with the person who holds the permit to appropriate that water. Nor do we find any such intent in any other legislative enactment.

The Board argues that "in more modern times, the Legislature has amended the water right change provisions of the Water Code to affirm the ... Board's 'water rights' reading of Section 1702." Under subdivision (c) of section 1703.6 (enacted in 2001) (Stats.2001, ch. 315, § 15), the Board may cancel a protest to a change petition that "is based on injury to a legal user of water ... if the protestant fails to submit" certain information to the Board, including "[i]nformation that is reasonably necessary to determine if the protestant has a valid water right" and "[i]nformation concerning the protestant's historical, current, or proposed future diversion and use of water that is reasonably necessary to determine if the proposed change will result in injury to the protestant's exercise of its water right." (§ 1703.6, subd. (c)(2) & (3).) According to the Board, if it has "the authority to cancel a protest to a water right change application for failure to show a 'valid water right', then the possession of a 'valid water right' must be a necessary condition for an injury claim under Section 1702."

The first flaw in the Board's argument is that the Board offers no explanation of what the Legislature intended by the phrase "valid water right." The Board simply assumes that a "water right" for purposes of section 1703.6 must be the same as what

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Board has referred to as a "traditional water right" and must exclude the *contractual* right to use water appropriated by another. The Board offers no basis for that assumption.

More importantly, however, the Board's argument reads too much into section 1703.6. Even if a "water right" for purposes of section 1703.6 must be, in the Board's parlance, a "traditional water right," the statute does not authorize the Board to cancel a protest if the protestant fails to demonstrate that he has such a right. Instead, section 1703.6 authorizes the Board to cancel a protest if the protestant fails to submit information reasonably necessary to determine *if* it has a valid "water right" or to determine if the proposed change will result in injury to the protestant's exercise of its water rights. Section 1703.6 cannot be reasonably read as making possession of a "traditional water right" a requirement to protest a change petition and therefore this statute, enacted in 2001, casts no light on the meaning of section 1702, which has remained virtually unchanged since 1943, and which was expressly intended to retain the meaning of preexisting law dating back even further.

Reading section 1702 as applying the "no injury" rule to all "legal users of the water involved" in the change request, including those who lawfully use water under contract with the appropriator who seeks the change, not only comports with the legislative history of the statute, but also properly recognizes the importance of *all* those who are ultimately responsible for putting water to beneficial use in California. California law has long recognized that the fundamental basis of a right to appropriate water is that the water must be put to beneficial use. Section 1240, which mirrors former Civil Code section 1411 and therefore embodies California ***293** law dating back to 1872, expressly provides that the right to appropriate water ceases when the appropriator ceases to use the water for a useful or beneficial purpose.

When a person obtains a permit to appropriate water for a specific beneficial purpose, and that purpose is to be accomplished by others who put the water to use under the terms of a contract with the permit holder, the persons who use the water are an integral part of the appropriator's right to take that water from its natural course in the first place. Without their beneficial use of the water, the appropriator would have no right to take the water. If the permit holder seeks the Board's permission to change the purpose of use that provided the basis for the acquisition of its permit in the first place, there is no reason the persons who, through contracts with the permit holder, actually put the water to the beneficial use sought to be changed should be precluded from asserting to the Board that the change will operate to the injury of their rights, simply because those rights derive from a contract. [FN53]

FN53. In support of alternate bases for its argument that a CVP contractor can be a "legal user" of water under section 1702, **Westlands** has asked us to take judicial notice of two permits issued by the Board. That request is denied as moot because we do not reach the alternate bases for **Westlands's** argument.

At the same time, it must be emphasized that, as the Supreme Court explained almost 150 years ago, "in all cases the effect of the change upon the *rights* of others is the controlling consideration." (*Kidd v. Laird, supra*, 15 Cal. at pp. 180-181, italics added.) Thus, a person who claims injury from a change in the terms of a permit to appropriate water must show the change will interfere with his or her *right* to use the water, whatever the source of that right may be.

Accordingly, to show that the Board erred in approving the Bureau's request to change the purposes of use in its permits to include fish and wildlife enhancement, it is not enough for **Westlands** to show that the change will result in **Westlands** receiving less water. **Westlands** must show that it has a *right* under its contract with the Bureau to the greater amount of water and that the redirection of CVP water to fish and wildlife will interfere with that right. **Westlands** has not made that showing.

Before the Board, the Bureau asserted that changing the purposes of use in the Bureau's permits would "not deprive any CVP contractors of their respective contractual entitlements to CVP water." The Bureau pointed out that neither **Westlands** nor any other CVP contractor is entitled to a fixed supply of CVP water every year. The Bureau specifically pointed to a provision in **Westlands's** contract (article 11a) which provides "for reduced annual water deliveries to [**Westlands**] for any cause, including situations in which [the Bureau] is required, by law, to make CVP water available for other purposes." In essence, the Bureau asserted that **Westlands** has no right under its contract to water that Congress has directed must be used for other purposes.

The Bureau's position is supported by the decision of

the Ninth Circuit Court of Appeals in *O'Neill v. U.S.* (9th Cir.1995) 50 F.3d 677. *O'Neill* arose out of a reduction in the amount of water the Bureau provided to **Westlands** in 1993, following the enactment of the Central Valley Project Improvement Act. (*Id.* at p. 681.) When the Bureau announced that **Westlands** would receive only 50 percent of its contractual supply of water, **Westlands** sued to enforce a stipulated judgment which ***294** required the Bureau to perform its water service contract with **Westlands.** (*Ibid.*) The Bureau contended "that compliance with ESA [Endangered Species Act] and CVPIA required it to reduce the amount of water supplied to [**Westlands**] and that such a reduction was covered by the liability limitation in Article 11 of the contract." (*Id.* at pp. 681-682.)

On appeal from a district court's ruling in favor of the Bureau, the Ninth Circuit agreed with the district court that "the contract [between **Westlands** and the Bureau] does not obligate the government to furnish to **Westlands** the full contractual amount of water when that water cannot be delivered consistently with the requirements of the Endangered Species Act ... and the Central Valley Project Improvement Act." (*O'Neill v. U.S., supra,* 50 F.3d at p. 680.) The appellate court also agreed with the district court that because "the contract was executed pursuant to the 1902 Reclamation Act and all acts amendatory or supplementary thereto," "[t]he contract contemplates future changes in reclamation laws ... and ... limits the government's liability for shortages due to any causes." (*Id.* at p. 686.) The court went on to explain that the Central Valley Project Improvement Act "marks a shift in reclamation law modifying the priority of water uses," and "[t]here is nothing in the contract that precludes such a shift." (*Ibid.*)

The interpretation of **Westlands's** water service contract in *O'Neill* is dispositive here. The reason the Bureau sought to add fish and wildlife enhancement as an authorized purpose of use in 14 of its permits was to allow the Bureau "to maximize operational flexibility in order to comply with the [Central Valley Project Improvement Act]." Because **Westlands** has no right to CVP water that Congress directed the Bureau to put to other uses in the Central Valley Project Improvement Act, changes in the Bureau's permits that will allow the Bureau to comply with the Central Valley Project Improvement Act will not interfere with **Westlands's** rights, and therefore the changes will not operate to the injury of **Westlands** as a legal user of CVP water within the meaning of section 1702. Consequently, the Board did not err in approving the Bureau's petition to change the purposes of use in its permits, and we will affirm the judgment in ***Westlands*** *Water District v. State Water Resources Control Board* (Super.Ct.Sac.County, 2003, No. 00CS00603) denying **Westlands's** mandamus petition. [FN54]

FN54. Because **Westlands** has no right under its contract with the Bureau to water that Congress allocated to fish and wildlife under the Central Valley Project Improvement Act, we have no occasion to directly address the public trust doctrine as a basis for allocating CVP water to fish and wildlife purposes. It should be noted, however, that because the rights of an appropriator are always subject to the public trust doctrine (see *National* ***Audubon*** *Society v. Superior Court, supra,* 33 Cal.3d at p. 447, 189 Cal.Rptr. 346, 658 P.2d 709), the same is true of the rights of a person who contracts with an appropriator for the use of the water appropriated. An appropriator cannot give away more rights than he or she has.

B

*Santa Clara's Challenge To The Board's Place Of Use Determination*

Santa Clara is a water district that serves all of Santa Clara County; the district's boundaries are contiguous with the county's. A substantial amount of the water supplied by Santa Clara comes from the CVP under a contract with the Bureau, which the parties entered into in June 1977. As noted above, under the Board's revised analysis, Santa Clara included 20,912 ***295** acres of encroachment lands and 561,199 acres of expansion lands.

Because over two-thirds of Santa Clara's total service area qualified as expansion lands, Santa Clara urged the Board to approve the Bureau's request to include all of Santa Clara's service area within the authorized place of use in the Bureau's permits.

As previously noted, the Board declined to extend the authorized place of use to include any of the expansion lands. Accordingly, in April 2000, Santa Clara filed a petition for a writ of mandate and complaint for declaratory relief seeking to set aside the Board's decision "insofar as it attempts to limit the authorized place of use of CVP water delivered by the Bureau to any geographic area less than the entirety of Santa Clara County" and seeking a declaration that "the authorized place of use for CVP water within Santa Clara County pursuant to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consolidated permits held by the Bureau for the CVP to be the entire gross service area of the District." (*Santa Clara Valley Water District v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311549).) The *Santa Clara* case was one of the cases added to this coordinated proceeding in November 2000.

In its writ petition, Santa Clara argued that the Board had abused its discretion "[i]n limiting the CVP's authorized place of use to less tha[n] Santa Clara's entire service area" because "the express language in the Bureau's CVP permits ... defines place of use explicitly in terms of water district service areas." The trial court disagreed, concluding the Board had not abused its discretion in interpreting the language of the permits. Accordingly, the court entered a judgment denying Santa Clara's writ petition and complaint for declaratory relief.

[57] On appeal, Santa Clara contends the Board erred in "constru [ing] the provisions governing place of use in the Bureau's water right permits solely in terms of the maps attached to the Bureau's original applications." For the reasons that follow, we find no error.

Santa Clara contends that eight of the Bureau's permits "originally identified Santa Clara County as within the authorized place of use." [FN55] Before we examine the applications and permits, we pause to examine the pertinent provisions of the Water Code and related regulations.

FN55. The eight permits on which Santa Clara relies are the following:
(1) Permit No. 11315, issued in April 1958 on application No. 13370 (filed Oct. 1949); (2) Permit No. 11316, issued in April 1958 on application No. 13371 (filed Oct. 1949); (3) Permit No. 11968, issued in September 1959 on application No. 15374 (filed June 1953); (4) Permit No. 11969, issued in September 1959 on application No. 15375, (filed June 1953); (5) Permit No. 11971, issued in September 1959 on application No. 16767, (filed Dec. 1955); (6) Permit No. 11973, issued in September 1959 on application No. 17374, (filed Nov. 1956); (7) Permit No. 12364, issued in July 1960 on application No. 17376, (filed Nov. 1956); and (8) Permit No. 12860, issued around July 1961 on application No. 15764 (filed Mar. 1954).

Section 1260 requires every application for a permit to appropriate water to set forth "[t]he place where it is intended to use the water." (§ 1260, subd. (f).) Section 1261 provides that "[a]ll applications shall be accompanied by as many copies of such maps, drawings, and other data as may be prescribed or required by the board, and such maps, drawings, and other data are part of the application." [FN56] Presently, ***296** Board regulations require the filing of a "general project map," which "should show ... the place of use." (Cal.Code Regs., tit. 23, § 715, subd. (a).) This requirement of a map showing the place of use dates back to at least the 1920's. [FN57] (See *Rich v. McClure* (1926) 78 Cal.App. 209, 212-213, 248 P. 275 [quoting former regulation 5 of the Water Commission Act as requiring the filing of " '[m]aps in duplicate ... showing ... the location of the ... places of use' "].)

FN56. These provisions derive from section 16 of the Water Commission Act; the pertinent language has remained unchanged since 1913. (Stats.1913, ch. 586, § 16, p. 1021.)

FN57. Although neither side has cited the actual regulation in effect between 1949 and 1956, when the Bureau filed the applications at issue here, neither side disputes that the regulations of the Board and its predecessors have always required the filing of a map showing the place of use.

We now turn to the permits on which Santa Clara relies.

1. *The American River Permits*

The Bureau filed applications Nos. 13370 and 13371 in October 1949 to appropriate water from the American River. The Bureau later filed amended applications in 1952.

Application No. 13370 stated that the water appropriated under that application was to be used for irrigation. On the second page of the application, under the heading "Description of Proposed Use," in the space provided to identify the "Place of Use," the application stated "(see supplement and accompanying maps)." Another part of this section stated: "Irrigation Use. The area to be irrigated is any 500,000 acres during a single year within acres [*sic* ] the gross service area as shown on the accompanying maps."

The supplemental portion of the application contained the following pertinent provisions. The first paragraph (labeled "*GENERAL* ") stated: "The service areas of the Santa Clara and Pacheco Pass Conduits are included at present within the scope of this application. However, more refined planning studies on these conduits are being conducted which may show that it will be more desirable to use portions of the water supply available under this application in parts of the potential service area other than those shown under the Santa Clara and Pacheco Pass Conduits. The details concerning these two conduits will be supplied after the present planning studies are completed."

Under "*Paragraph 11: PLACE OF USE*," the application stated: "The water will be used within the service areas of districts, municipalities, water companies, corporations, and other legal entities within the gross area of the place of potential use delineated on maps No. 353-205-105 and No. 353-205-106, provided that the delivery of the water is conditioned upon execution of valid contracts for such deliveries."

Maps Nos. 353-205-105 and 353-205-106, which were prepared in August 1951, together depicted an area identified as the "Potential Service Area" for the Bureau's American River applications Nos. 13370 and 13371. (For reference, we will refer to this area as the map service area.) A note on both maps stated: "The service area shown on this map is the gross area capable of receiving water applied for in applications 13370 and 13371." As depicted on map No. 353-205-106, that portion of the map service area located in Santa Clara County consisted of only a part of the county. The map also showed a "tentative location" for the Santa Clara Conduit.

Application No. 13371 stated that the water appropriated under that application was to be used for municipal, industrial, domestic, and recreation purposes. On ***297** the second page of the application, under the heading "Description of Proposed Use," the application designated as the "Place of Use," "Parts of the service areas delineated on the accompanying maps." The accompanying maps were the same maps that accompanied application No. 13370, discussed above. The supplemental portion of the application contained the same "*GENERAL* " paragraph as application No. 13370. Also, under the heading "*Paragraphs 15 and 17: MUNICIPAL AND INDUSTRIAL USES*," the following appeared: "Water demands for municipal and industrial uses will be supplied as required to cities, towns, and other municipalities presently in existence, or as may be created within the place of use." The application then identified various counties in which the water would be used, including Santa Clara County, and provided the estimated population of those counties for every decade from 1950 through 2000.

In March 1958, in Decision 893, the Water Rights Board approved the Bureau's American River applications with various conditions that are not relevant here. The Water Rights Board issued permits Nos. 11315 and 11316 a month later.

Notwithstanding that the map service area encompassed only a part of Santa Clara County, Santa Clara argues that permits Nos. 11315 and 11316 must be read as authorizing the use of the water appropriated under those permits in *all* of Santa Clara County. Santa Clara first points to the initial paragraph in the supplemental portion of the applications, labeled "*GENERAL*." Santa Clara contends that all of Santa Clara County was to be included in the authorized place of use because the applications stated that "[t]he service areas of the Santa Clara and Pacheco Pass Conduits are included at present within the scope of this application." Santa Clara acknowledges that the " 'Santa Clara Conduit' is not expressly defined in the permit," but contends that "other documents make clear that the conduit was intended to serve the entirety of Santa Clara County."

We are not persuaded. Santa Clara does not point to any evidence contemporaneous with the Bureau's applications in 1949 or with the issuance of the permits in 1958 that even tends to suggest, let alone prove, that the service area of the planned Santa Clara Conduit at that time encompassed anything more than the *portion* of Santa Clara County that fell within the map service area. Instead, the only evidence Santa Clara cites to support its argument is a final EIR relating to the San Felipe water distribution system from March 1976, nearly 20 years after the permits were issued. Santa Clara apparently relies on a passage from that document that states: "The Pacheco Canal will be the 1.25-mile connecting link between the Pacheco Tunnel and the Santa Clara Tunnel and Conduit (*serving Santa Clara County* ), and the Hollister Conduit (serving San Benito County)." (Italics added.)

This isolated passage from an EIR prepared *by Santa Clara* in 1976 provides absolutely no insight into what *the Bureau* intended the service area of the

Santa Clara Conduit to be in 1949 when the Bureau first filed its American River applications, or what *the Water Rights Board* intended the authorized place of use to be in the American River permits when the Board issued those permits in 1958. Given that the maps attached to the Bureau's applications showed a tentative location for the Santa Clara Conduit feeding into a depicted service area in Santa Clara County that consisted of only part of the county, the reasonable conclusion is that the portion of the map service area within Santa Clara County was the service area of the Santa Clara Conduit referenced in the ***298** "*GENERAL* " paragraph of the supplemental portion of the applications.

Santa Clara next relies on the language in paragraph 11 of the supplemental portion of application No. 11370. According to Santa Clara, "[a] careful reading of this paragraph confirms that place of use was never intended to be limited to areas depicted on a map. The reference to maps is simply a limitation on which districts and other entities may be entitled to receive CVP water under the permit.... So long as the entity is within th[e] gross area [depicted on the maps], the only limitation the paragraph imposed on place of use is the requirement that the water be used within the entity's service area."

Santa Clara's argument relies on a parsing of paragraph 11 that we cannot accept. Santa Clara contends that the first part of the paragraph--"The water will be used within the service areas of districts, municipalities, water companies, corporations, and other legal entities"--identified the place where the water would be used as the service areas of the various entities with which the Bureau was going to contract for use of the water, while the second part of the paragraph--"within the gross area of the place of potential use delineated on maps No. 353-205-105 and No. 353-205-106"--identified the location of those entities. In Santa Clara's view, so long as some part of an entity's service area fell within some part of the map service area, that entity was "within" the map service area and was therefore one with which the Bureau might contract for use of the water. The water could then be used in *all* of that entity's service area, even in parts that are outside the map service area.

Paragraph 11 can reasonably be read another way, however. Instead of reading the second modifying phrase--"within the gross area of the place of potential use delineated on [the] maps"--as identifying the location of the entities with which the Bureau intended to contract, that phrase can be read as further identifying the place the water would be used. In other words, the second modifying phrase does not refer to the "entities" themselves but to "the service areas" of those entities. Under this construction of paragraph 11, the water would be used "within the service areas" of various entities in places where those service areas fell "within [the map service area]." This alternate construction of paragraph 11 is more consistent with two other parts of application No. 13370 than Santa Clara's construction.

First, as we have already noted, on page 2 of the application, under the heading "Description of Proposed Use" and the subheading "Irrigation Use," the application states that "[t]he area to be irrigated is any 500,000 acres during a single year *within acres [sic] the gross service area as shown on the accompanying maps.*" (Italics added.) This part of the application makes clear that the water appropriated under the application--which was to be used solely for irrigation--was to be used *within the map service area,* and not within the service areas of entities which themselves were located, either in whole or in part, within the map service area.

Second, the alternate construction of paragraph 11 is more consistent with the note on each of the maps, which stated: "The service area shown on this map is the gross area capable of receiving water applied for in applications 13370 and 13371." The meaning of this note is clarified by evidence the Bureau submitted to the Board explaining the genesis of the maps that were attached to the Bureau's applications:

"The planning lines [on the maps] included with our various applications came from field surveys conducted by [the Bureau] identifying lands under irrigation ***299** and potentially irrigable lands.... [¶ ] By using [those planning lines], [the Bureau] focused on defining the potential service areas for irrigation and not other purposes.... Of course, the focus of [the Bureau] in those days was on providing water for irrigation. Other purposes were considered secondary. So, the proposed gross area boundary line was consistent with [the Bureau]'s main purpose at the time."

Other evidence from the Bureau established that it was unlikely CVP water could be delivered to much of Santa Clara County "due to mountainous terrain." Taken together, this evidence tends to show that the part of the map service area that fell within Santa Clara County represented all of the lands in the county that were under irrigation or considered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

potentially irrigable lands when the Bureau filed its applications. Only that portion of the county was eligible to receive water appropriated under permit No. 11315 because the sole purpose of use that permit authorized was irrigation. The remainder of the county consisted of mountainous terrain that was not considered irrigable and therefore could not receive the water appropriated under that permit. Thus, the more reasonable construction of paragraph 11 is the one that recognizes the water appropriated under permit No. 11315 would be used only within those portions of the service areas of the entities with which the Bureau contracted that fell within the map service area.

Limiting the authorized place of use to the map service area also makes sense from a practical standpoint. By referring to the maps, the Water Rights Board would have been able to determine with a reasonable degree of certainty where the Bureau intended to use the water it was seeking to appropriate. If we were to accept Santa Clara's argument, however, the Water Rights Board would have had no way of knowing where the water would be used. (Cf. *Central Delta Water Agency v. State Water Resources Control Bd., supra,* 124 Cal.App.4th at p. 261, 20 Cal.Rptr.3d 898 [Board erred in granting permit to appropriate water where applications "fail[ed] to set forth the actual use or uses of the impounded water" because "it was not possible for the Board to estimate the reasonable amount of water that could be put to any specific beneficial use"].) When the Bureau submitted its application, it was not even able to identify the entities with which it intended to contract for use of the water, let alone the extent of the service areas of those unknown entities. Thus, the place of use would have been an amorphous area, subject to change with each new contract.

The only reading of permit No. 11315 that makes sense from a practical standpoint and that harmonizes the various parts of the underlying application and the evidence relevant to that application is one which recognizes that the authorized place of use for the water appropriated under permit No. 11315 was the map service area, not the service areas of entities the Bureau had not yet even identified.

We likewise conclude that the authorized place of use for the water appropriated under permit No. 11316 was the map service area. Application No. 13371 plainly identified the place of use as "[p]arts of the service areas delineated on the accompanying maps." The application also specified that the water would be supplied "to cities, towns, and other municipalities presently in existence, or as may be created *within the place of use*." (Italics added.)

Santa Clara contends that "[i]nclusion of ... references to Santa Clara County and its entire population would make no sense if the intent was to *exclude* substantial parts of the County and its population." But the reference to the population of ***300** Santa Clara County does not alter the meaning of the parts of application No. 13371 set forth above, which Santa Clara has ignored. The application expressly identified the place of use by reference to the accompanying maps. Therefore, we conclude the authorized place of use for the water appropriated under permit No. 11316 was the service area depicted on those maps.

Santa Clara tries to find support for its reading of the American River permits in Decision 893, the decision of the Water Rights Board that authorized the issuance of those permits. Santa Clara points out that "[a]t the same time it approved the Bureau's American River applications in D893, the [Water Rights] Board denied [four] other" applications to appropriate water from the American River for use in Santa Clara County, including two applications filed by Santa Clara's predecessor, the Santa Clara Valley Water Conservation District. According to Santa Clara, the Water Rights Board denied these applications because the service areas of the applicants "were within the authorized place of use of water appropriated under the Bureau's American River permits."

A thorough review of the part of Decision 893 on which Santa Clara relies reveals the flaw in Santa Clara's argument. In its decision, the Water Rights Board addressed 20 different applications filed by entities ranging from the City of Roseville to the City of Stockton to the Elk Grove Irrigation District. Among those 20 applications were the two filed by Santa Clara's predecessor. The Water Rights Board concluded all of the applications "should be denied, the evidence indicating that the approval of those applications would serve no useful purpose. The point or points of diversion under each of those applications is Folsom Dam and/or Nimbus Dam to which right of access has not been acquired by the applicants. Accordingly, issuance of permits to those applicants would be meaningless in view of the obvious necessity of contracting with the United States for a supply of water from the Federal facilities. The service areas which those applicants desire to supply may be supplied equally well and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with less administrative confusion by contract with the United States. Permits are being issued to the United States to appropriate enough American River water to adequately supply the applicants naturally dependent on that source and availability of water to such applicants is reasonably assured by the terms to be contained in the permits to be issued to the United States restricting exportation of water under those permits insofar as exportation interferes with fulfillment of needs within Placer, Sacramento and San Joaquin Counties. Other applicants in more remote areas must if necessary seek water from other sources."

Santa Clara emphasizes the Water Rights Board's assertion that "*availability of water to such applicants is reasonably assured by the terms to be contained in the permits to be issued to the United States*," but Santa Clara ignores the obvious meaning of the term "such applicants" and the language following "United States." "Such applicants" refers to "the applicants naturally dependent on" the American River. Understandably, Santa Clara does not claim that Santa Clara County is an area *naturally* dependent on water from the American River. Moreover, the language following "United States" refers to a permit condition that, as the decision states, was imposed to protect the "fulfillment of needs within Placer, Sacramento and San Joaquin Counties." [FN58] ***301** Thus, the Water Rights Board was explaining that the availability of water to applicants within Placer, Sacramento, and San Joaquin Counties who were naturally dependent on the American River was "reasonably assured" by the permit condition that restricted the export of water appropriated under the American River permits until the needs of those counties were fully met. Obviously, understood properly, this portion of Decision 893 provides no support for Santa Clara's argument that the authorized place of use in the American River permits extended to all of Santa Clara County.

> FN58. That permit condition, which appears in permits Nos. 11315 and 11316, states: "Deliveries of water under this permit shall be limited to deliveries for beneficial use within Placer, Sacramento and San Joaquin Counties and shall not be made beyond the westerly or southerly boundaries thereof, except on a temporary basis, until the needs of those counties, present or prospective, are fully met provided, however, that agreements in accordance with Federal Reclamation laws between permitee and parties desiring such service within said counties are executed by July 1, 1968."

For the foregoing reasons, we conclude the Board did not err in construing the authorized place of use in permits Nos. 11315 and 11316 as the service area shown on the maps attached to the applications for those permits.

2. *The Trinity River/Clear Creek Permits*

Permits Nos. 11968, 11969, 11971, and 11973 to appropriate water from the Trinity River, were issued in September 1959. Permit No. 12364 to appropriate water from Clear Creek was issued in July 1960. When initially issued, these five permits allowed use of the water "within a gross area of 4,031,000 acres as shown on Map 416-208-341." That map depicts an area extending south from Trinity County down the Central Valley to around Kettlemen City, in Kings County; it does not include any portion of Santa Clara County.

In December 1959--before permit No. 12364 was even issued--the Bureau filed petitions to change the place of use in all five of the permits. Following two amendments, the petitions proposed to "consolidate the place of use and add new lands as shown on Maps 214-208-3330 and 214-208-3331 revised as of July 19, 1960." In change order No. 38, issued in December 1960, the Water Rights Board approved the petitions and ordered that the permits be amended so that the place of use was described as follows:

"p) The place of use under Permits 11968, 11969, 11971, and 11973 is within a gross area of 10,925,000 acres to be served by Trinity River water as shown on maps numbered 214-208-3330 and 214-208-3331 revised as of July 19, 1960.

"q) The place of use under Permit 12364 is within a gross area of 10,821,000 acres to be served by Clear Creek water as shown on said maps numbered 214-208- 3330 and 214-208-3331 revised as of July 19, 1960."

Map No. 214-208-3331 depicts a service area covering part, but not all, of Santa Clara County. This service area appears to be coextensive with the service area depicted on the maps attached to the Bureau's American River applications, discussed above.

Santa Clara notes that all five of the permits contained "place of use" language like that contained

in paragraph 11 of application No. 13370, discussed above. Noting the difference between the gross area to be served under the permits originally (4,031,000 acres) and the gross area to be served under the amended permits (over 10,000,000 acres), Santa Clara argues that "[i]f the authorized place of use was limited only to the areas depicted on maps, ***302** such a significant expansion in the acreage of authorized use would not be possible." According to Santa Clara, "[t]he only way to achieve such an expansion--from 4 million to 20 million acres--requires an interpretation of Paragraph 11 to reflect the intent that CVP water would be available for use throughout the service areas of districts and other legal CVP contractors."

We disagree. First, Santa Clara overstates the extent of the expansion. It is true the service area for the Trinity River permits was expanded to a gross area of 10,925,000 acres, while the service area for the Clear Creek permit was expanded to a gross area of 10,821,000 acres. But these service areas were not mutually exclusive; instead, the service area for the Clear Creek permit was subsumed in the service area for the Trinity River permits. As the Water Rights Board explained in change order No. 38, water from the Trinity River could be directly diverted at Lewiston Dam *or* could be conveyed through a tunnel and released into Whiskeytown Reservoir on Clear Creek. Thus, Trinity River water could either be used in the area serviced by direct diversions from Lewiston Dam or could be conveyed to Whiskeytown Reservoir, where it would be added to the water from Clear Creek and used in the area serviced by that water. The service area for the Trinity River permits *had* to be larger than the service area for the Clear Creek permit to include the land serviced by the water diverted at Lewiston Dam. Consequently, the expansion at issue was an expansion from 4 million to 10 million acres, not 4 million to 20 million acres.

Santa Clara fails to show that an expansion from 4 million to 10 million acres would have been impossible based on the areas depicted on the maps. A comparison of map No. 416-208-341 (the map depicting the original service area for the Trinity River and Clear Creek permits) and maps Nos. 214-208-3330 and 214-208-3331 (the maps depicting the new service area for those permits) shows that a significant amount of land was added to the service area. In addition to the parts of Santa Clara County and San Benito County that were added, the part of the service area covering the San Joaquin Valley was substantially expanded to include parts of Merced, Madera, Fresno, and Kings Counties that were not previously covered, and to include for the first time parts of Tulare and Kern Counties.

Santa Clara points to no evidence to show that the service area referenced in change order No. 38 as being more than 10 million acres must be something other than the service area delineated on maps Nos. 214-208- 3330 and 214-208-3331. Thus, we conclude the Board did not err in construing the authorized place of use in permits Nos. 11968, 11969, 11971, 11973, and 12364 as the service area shown on those maps.

3. *The Delta-Mendota Canal And San Luis Reservoir Permit*

Application No. 15764, which was originally filed by **Westlands** in March 1954, sought to appropriate water from Old River, a channel of the Delta, for diversion through the Delta-Mendota Canal to the San Luis Reservoir. **Westlands** assigned the application to the Bureau in 1960, and the Bureau filed petitions to amend the purposes of use and places of use in the original application. As amended, the application proposed to divert water for irrigation, incidental domestic and stockwatering, municipal, industrial, and recreational uses. The place of use was described as "San Joaquin Valley and Alameda, Santa Clara, and San Benito Counties; see attached maps numbered 214-208-3348, 214-208-3349 and 214-208-3350, all dated December ***303** 1, 1960." It appears, however, that the original application filed by **Westlands** encompassed only the San Joaquin Valley, and the Bureau sought to add the three counties, including Santa Clara County, by amendment.

The Water Rights Board approved the Bureau's application in June 1960 in Decision 1020 and issued permit No. 12364 to the Bureau. The Water Rights Board did not approve the application in its entirety, however. In Decision 1020, the Water Rights Board noted that it had entered into a stipulation with certain protestants to the application, which provided, in part, that "the [Bureau's] petition to include lands within Alameda, Santa Cruz [*sic* ] and San Benito Counties" was deferred indefinitely. This appears to explain why, on the amended application, a line was drawn through "Alameda, Santa Clara, and San Benito Counties" in the place of use, with a direction to see Decision 1090. The reference to "Santa Cruz County" in Decision 1090 appears to have been a mistake; the reference should have been to Santa Clara County. This conclusion is supported by the fact that on the maps attached to the application, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

depicted service area does not include any part of Santa Cruz County, but does include part of Santa Clara County.

Santa Clara has provided no evidence that the Water Rights Board ever took up the deferred issue of whether to include Santa Clara County within the authorized place of use in permit No. 12364.

In any event, even if the Water Rights Board had approved the application with respect to Santa Clara County, the application and permit would not support Santa Clara's argument that the place of use extended to all of Santa Clara County. Santa Clara contends that under application No. 15764, the "authorized place of use is ... defined in terms of contractor service areas, not historical maps," but we disagree. In a space on the application made available to give the name and address of the owner of the land on which the water would be used, and to state what arrangements had been made with the owner, the Bureau stated: "Irrigation and water districts existing or to be formed within the service area service contracts being negotiated." Santa Clara relies on this to argue that the place of use was intended to encompass the entirety of its district. What Santa Clara ignores, however, is the fact that the application specifically refers to the attached maps in identifying the place of use. One of those maps, No. 214-208-3349, depicts the "San Luis Unit Place of Use" as covering the same *part* of Santa Clara County depicted on the maps relating to the American River, Trinity River, and Clear Creek permits, rather than the entire county. Santa Clara also ignores the fact that the reference to "[i]rrigation and water districts existing or to be formed within the service area" does not purport to be a description of the place of use, but an identification of the owners of the land on which the water was to be used. The extent of that land, however, is the service area depicted on the attached map. Accordingly, we conclude the Board did not err in construing the authorized place of use in permit No. 15764 as the service area shown on that map.

4. *The Testimony Of The Bureau's Representative*

Santa Clara quotes extensively from the testimony of a Bureau representative (Connie Rupp), who testified that the Bureau understood the authorized place of use in its permits extended further than the service areas depicted on the various maps. The Bureau's understanding of what the permits authorized is irrelevant, ***304** however, unless that understanding is based on a reasonable interpretation of the permits. Rupp testified that the Bureau believed it was "inappropriate to use [the map] lines as the basis for analyzing the authorized place of use" because "the [Board] authorized use of CVP water within district service areas at the time initial long-term contracts were signed with [the Bureau]." Although this statement is not entirely clear, it appears from Rupp's testimony that the Bureau's understanding of the authorized place of use in its permits was based on the same interpretation of paragraph 11 that Santa Clara has advanced in this appeal. We have rejected that interpretation already. The only *reasonable* interpretation of the permits is that the authorized place of use in each permit was the service area depicted on the map filed with the application.

5. *Estoppel*

[58] Santa Clara contends the Board is equitably estopped from asserting that the authorized place of use in the Bureau's permits is anything less than all of Santa Clara County. We disagree.

[59] "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305, 61 Cal.Rptr. 661, 431 P.2d 245.)

Santa Clara contends the first element is met because the Board knew as early as 1985, when the Bureau filed its request to consolidate and expand the places of use in its permits, "of the possibility that water deliveries might be in 'technical noncompliance with the project's water rights.' " Santa Clara suggests the second element is met because, despite this knowledge, the Board "never questioned the delivery of CVP water throughout Santa Clara's contractor service area based on place of use considerations." Santa Clara contends the fourth element is met because it has "developed an integrated water delivery system that blends CVP water with water from other sources for distribution throughout the District's service area." Santa Clara does not address the third element.

Under these circumstances, no estoppel has been shown. Among other things, Santa Clara points to no evidence that it relied *to its injury* on the Board's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alleged failure to limit the use of CVP water in Santa Clara County to the portion of the county depicted on the maps attached to the Bureau's applications. Santa Clara asserts that it "cannot physically operate its water distribution system in a manner consistent with" "[a]n interpretation of place of use in terms of [the] historical maps," "and it *would be* injured irreparably *if* it were required to do so" because it would have to develop a duplicate water delivery system. (Italics added.) From this assertion, it is apparent Santa Clara has not yet suffered any injury; nor does it appear Santa Clara *will* suffer any injury. To the extent Santa Clara has delivered water to locations in its service area that were outside the authorized place of use in the Bureau's permits before Decision 1641, those locations are encroachment lands which have now been *included* in the authorized place of use. Thus, Santa Clara's continued delivery of CVP water to those encroachment lands (not expansion lands) is now authorized under the Bureau's permits, and there is no risk Santa Clara will have to develop a duplicate water system ***305** or dismantle its existing system to continue serving those encroachment lands. Under these circumstances, there is simply no basis for estopping the Board from asserting an interpretation of the Bureau's permits that we have found to be correct.

For the reasons set forth above, we conclude the Board did not err in determining that the authorized place of use in the Bureau's permits was the service area shown on the maps attached to the Bureau's applications. Accordingly, the trial court correctly denied Santa Clara's mandamus petition and complaint for declaratory relief, and we will affirm the judgment in *Santa Clara Valley Water District v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311549).

C

*The Board's Challenge To The Trial Court's Interpretation Of The Merger Law*

As we have explained, in Decision 1641 the Board approved the addition of the encroachment lands to the authorized place of use in the Bureau's permits, subject to certain mitigation requirements. The Board refused to include the expansion lands, but determined they could be added on a case-by-case basis in the future.

As we have also noted, under the Board's revised analysis **Westlands** included 30,718 acres of encroachment lands and 9,664 acres of expansion lands. According to the change EIR, the availability of CVP water facilitated the development of 30,607 acres of the encroachment lands in **Westlands** from annual grassland, alkali scrub, and riparian habitats into irrigated agriculture land uses.

In January 2000, **Westlands** and a number of individuals, partnerships, and corporations who own or lease land within the encroachment and expansion lands of **Westlands** [FN59] filed a first amended petition for writ of mandate and complaint for declaratory relief asserting 13 causes of action against the Board. (*Anderson v. State Water Resources Control Board* (Super. Ct. Fresno County, 2003, No. 645385-6).) This was one of the four cases originally coordinated in this proceeding in July 2000

FN59. We will refer to these encroachment and expansion landholders collectively as the Anderson parties because Angela G. Anderson was the first plaintiff listed in the amended petition. To the extent we need to distinguish between those of the Anderson parties who are already receiving CVP water and those who are not, we will refer to them, respectively, as the encroachment landholders and the expansion landholders.

In their petition, **Westlands** and the Anderson parties alleged (among other things) that "[c]onforming the [place of use] to the **Westlands** boundary is a ministerial act because the delivery of CVP water ... to the whole of **Westlands** ... was authorized by the Legislature in 1965 pursuant to" the Merger Law. They sought a writ directing the Board to unconditionally conform the place of use in the Bureau's CVP permits to the boundaries of **Westlands.**

The trial court agreed with **Westlands** and the Anderson parties about the effect of the Merger Law. Accordingly, the court entered a judgment ordering the issuance of a writ of mandate "directing the [Board] to conform the places of use under the Bureau of Reclamation's Central Valley Project permits to include both the encroachment and expansion lands within **Westlands** Water District. The Board shall not require mitigation for this ministerial confirmation. In all other respects, the petition for writ of mandate is denied."

***306** The Board filed a timely notice of appeal, and the Anderson parties filed a cross-appeal.

1. *The Merger Law*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[60] On appeal, the Board contends "the trial court erred in reading the Merger Law as trumping the ... Board's authority under the Water Code to limit CVP water delivery within **Westlands** ... to the places of use described in the CVP permits." We agree.

The trial court's statement of decision provides a succinct description of the historical context for the enactment of the Merger Law. As the court explained: "The original **Westlands** was formed in 1952 and consisted of approximately 400,000 acres located on the eastern two-thirds of the present-day district. The original **Westlands** obtained a CVP contract in 1963. West Plains Water Storage District was formed in 1962 and originally covered 200,000 [acres] in the western one-third of today's [**Westlands**] district. West Plains itself was divided into an area entitled to receive CVP water and a second area qualified for SWP water. The Solicitor of the U.S. Department of Interior opined that federal water could be delivered only to **Westlands** and that portion of West Plains entitled to receive CVP water. Because of this problem, federal and state officials began discussing the merger of the two districts so that water could be provided to West Plains. In a 1964 memorandum from the Department of the Interior ('Holum memorandum'), the department suggested a merger and pledged to provide water to a combined district under **Westlands'** original 1963 contract, plus the remaining yield of the CVP San Luis Unit." [FN60]

FN60. We understand that the area of West Plains entitled to receive CVP water was within the authorized place of use for the Bureau's CVP permits at that time (as shown on the maps attached to the Bureau's applications), while the area that qualified only for SWP water lay outside that authorized place of use. The Anderson parties all hold land within the latter area--that is, outside the authorized place of use under the Bureau's permits at that time.

It was in this context that the Legislature enacted the Merger Law, which took effect immediately in June 1965. (Stats.1965, ch. 746, § 1, p. 2159.) The Merger Law merged the West Plains district into **Westlands.** (§ 37820.)

It must be recalled that when the Legislature enacted the Merger Law, the pertinent provisions of the Water Code provided that a permittee (like the Bureau) could "change the ... place of use ... from that specified in [its] permit ... only upon permission of the board" (at that time, the Water Rights Board). (§ 1701.) Moreover, before the Water Rights Board could grant that permission, it had to find "that the change [would] not operate to the injury of any legal user of the water involved." (§ 1702.)

The trial court agreed with the Anderson parties, however, that by enacting the Merger Law, the Legislature "effectuated a statutory authorization for the delivery of federal CVP water to all of the lands of the combined **Westlands**-West Plains district," including that portion of West Plains that was then outside the place of use authorized in the Bureau's CVP permits. According to the trial court, this "statutory authorization" imposed a ministerial duty on the Board to include all of **Westlands** within the authorized place of use in the Bureau's CVP permits without considering whether the change would injure any legal user of the water and without imposing any mitigation requirement. (See CEQA, § 21080, subd. ***307** (b)(1) [CEQA does not apply to "[m]inisterial projects"].) In effect, the trial court concluded that by enacting the Merger Law, the Legislature intended to circumvent the usual procedures and requirements for changing the place of use in a permit to appropriate water. The trial court concluded the legislative intent to accomplish this result could be found in numerous provisions of the Merger Law. We turn now to those provisions.

Section 37801 identifies the state interest behind the Merger Law: "The state and the people thereof have a primary and supreme interest in securing to the inhabitants and property owners within and adjacent to the federal service area of the San Luis unit of the Central Valley project now under construction by the United States the greatest possible use and conservation of the waters to be made available from said unit and the greatest use thereof to the area, thereby assuring that the greatest productivity of the largest possible area may be accomplished and safely carried on within reasonable limits of economy."

Section 37802 identifies the need for a special law: "Investigation having shown that conditions in and surrounding the federal service area of the San Luis unit of the Central Valley project are peculiar to that area, it is hereby declared that a general law cannot be made applicable thereto and that this part is therefore necessary for the proper distribution, uses, and control of the natural supplies of water now available for said area and of the water to be made available from the San Luis unit of the Central Valley project, and for elimination of duplication of governmental authority, the securing of greater

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

economy of administration, and the more efficient and effective utilization of ground water and imported water supplies."

Section 37821 provides that the new **Westlands** district will consist of "all land in the water district immediately following the merger plus inclusion, and less exclusions, of land thereafter made pursuant to law."

Section 37826 provides that "[u]pon the merger," the new **Westlands** district will succeed "to all properties, rights, and contracts of each of the two districts."

Section 37856 gives "[l]ands which were within [**Westlands**] immediately prior to the merger ... a prior right with respect to water to which [**Westlands**] was entitled under any contract with the United States in effect on the date of [the] merger over (1) lands added to [**Westlands**] as a result of the merger and (2) lands annexed to [**Westlands**] subsequent to the merger."

Finally, section 37805 provides that the Merger Law is to "be given a liberal construction for the purpose of sustaining any and all proceedings taken hereunder."

Based on the foregoing provisions, the trial court concluded: "The [L]egislature may not have explicitly said that the place of use under the Bureau's CVP permits was accordingly modified, but the normal and intended consequences of what the [L]egislature did say are to require and effectuate such a place of use modification." We cannot agree.

"Our role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law." (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000, 90 Cal.Rptr.2d 236, 987 P.2d 705.) As we have previously stated, in construing statutes "we look first at the words themselves, giving them their usual and ordinary meaning and construing them in context." (*People v. Johnson, supra*, 28 Cal.4th at p. 244, 121 Cal.Rptr.2d 197, 47 P.3d 1064.)

***308** Nowhere in the provisions of the Merger Law do we find any expression of intent by the Legislature to accomplish, by legislative fiat, a change in the authorized place of use in the Bureau's CVP permits, or to impose on the Water Rights Board a ministerial duty to approve such a change, in circumvention of the usual procedures and requirements of the Water Code. Even the most liberal construction of the Merger Law does not allow us to discern in its provisions such a command. (See *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 844, 102 Cal.Rptr.2d 719, 14 P.3d 930 ["As a rule, a command that ... a statute be liberally construed 'does not license either enlargement or restriction of its evident meaning' "].)

The most substantive provision of the Merger Law on which the trial court relied is section 37826, which provided that the new **Westlands** district would succeed to all of the "properties, rights, and contracts" of the two existing districts. According to the trial court, this provision "authoriz[ed] the use of contract water on all district lands." We cannot accept this overly broad construction of that statute.

It is certainly true that by virtue of section 37826, the landholders in West Plains became entitled to the benefits of the 1963 water service contract between **Westlands** and the Bureau. But that contract was itself subject to the terms of the Bureau's permits, including the place of use authorized in those permits. To the extent the landholders in West Plains were already within the place of use authorized in the Bureau's CVP permits, section 37826 made those landholders eligible to receive CVP water because all that remained for them to achieve that eligibility was a contract with the Bureau. Landholders like the Anderson parties, however, needed two things to be eligible to receive CVP water: they needed a contract with the Bureau, *and* they needed their lands to be added to the authorized place of use in the Bureau's permits. Section 37826 accomplished the former, but not the latter. Nothing in that statute purports to make any change in the Bureau's permits to appropriate water for the CVP or purports to impose on the Water Rights Board a ministerial duty to make such a change. Had the Legislature intended to make such a change or impose such a duty, it could have said so, but it did not, and we are powerless to add words to the statute that the Legislature omitted. (See Code Civ. Proc., § 1858 ["In the construction of a statute ... the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted...."].)

Citing section 37856--which gave priority in the use of CVP water under the 1963 contract to those landholders in the original **Westlands** district--the trial court concluded, "the [L]egislature was aware the Merger Statute would have immediate, actual water distribution consequences." We disagree that any such consequences would be "immediate," since

the San Luis unit that would supply CVP water to **Westlands** was still under construction at the time. (See § 37801.) And though the grant of priority would eventually have "actual" consequences, those consequences do not justify the conclusion that the Legislature intended to mandate a change in the Bureau's CVP permits in circumvention of the usual Water Code procedures and requirements. Section 37856 ensured that when the San Luis unit was completed, the landholders in the original **Westlands** district would have priority over any West Plains landholders who were then eligible to receive CVP water. That section, however, did nothing to *establish* that eligibility. As we have explained, section ***309** 37826 made those West Plains landholders who were already in the authorized place of use for the Bureau's CVP permits eligible to receive CVP water because all they needed to be eligible was a contract with the Bureau. But the West Plains landholders who were *not* in the authorized place of use needed to secure a change in that place of use also. Nothing prevented the Bureau from filing with the Water Rights Board a petition for such a change, nor is there any reason to believe that the administrative process to secure the change could not have been completed while the San Luis unit was finished. Most importantly, however, nothing in section 37856--or any other part of the Merger Law--shows a legislative intent to circumvent that normal administrative process.

As for the declaration of the state interest behind the Merger Law in section 37801, we have no doubt that in referring to "the inhabitants and property owners ... adjacent to the federal service area of the San Luis unit of the Central Valley Project," the Legislature was referring to those landholders (like the Anderson parties) who held land in that portion of West Plains that was eligible to receive only SWP water. But by noting the "primary and supreme interest" in securing to those landholders "the greatest possible use" of the CVP water that was going to be available to **Westlands** upon completion of the San Luis unit, the Legislature did not accomplish a legislative circumvention of the existing procedures and requirements under the Water Code for obtaining a change in a permit to appropriate water. The statement of the intent behind the Merger Law must be read as expressing the intent behind the substantive provisions of the law; it cannot reasonably be read as having any substantive effect of its own--certainly not the effect of changing or mandating a change in the Bureau's CVP permits by legislative fiat.

The same is true of the declaration of the need for a special law in section 37802. By noting that a special law combining **Westlands** with West Plains was necessary "for the proper distribution, use, and control ... of the water to be made available from the San Luis unit of the Central Valley project" and for the "elimination of duplication of governmental authority," the Legislature did not legislatively circumvent the existing procedures and requirements under the Water Code for obtaining a change in a permit to appropriate water. Much like the declaration of state interest in section 37801, this declaration of need must be read as expressing the need for the substantive provisions of the law; it cannot reasonably be read as effecting any substantive change itself.

The Anderson parties argue that the "[t]he language regarding the 'elimination of duplication of government authority' expresses an intent the District not be subject to a duplication of government authority with respect to where the water is authorized to be used." We do not agree. This language is more reasonably read as recognizing that the merger of the two districts would eliminate the duplication of government authority that is necessarily present where two districts--which themselves have "government authority"--exist instead of one. In any event, as we have explained, a statement of intent or need like those in sections 37801 and 37802 does not itself accomplish any substantive change; it merely explains the purpose behind the substantive provisions that do so. None of the substantive provisions in the Merger Law accomplish (or mandate) a change in the terms of the Bureau's CVP permits.

Finally, section 37805's requirement that the Merger Law "be given a liberal construction" ***310** adds nothing to the analysis. As we have explained already, even the most liberal construction of the Merger Law does not allow us to discern in its provisions the legislative intent to accomplish or mandate a change in the Bureau's CVP permits in circumvention of the usual administrative procedures and requirements for accomplishing such a change. The rule of liberal construction does not allow us to add language to a statute that the Legislature omitted. (See *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles, supra*, 24 Cal.4th at p. 844, 102 Cal.Rptr.2d 719, 14 P.3d 930.)

Because we find nothing in the language of the Merger Law to support the result the trial court reached, we need not consider the legislative history

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the law. No amount of legislative history could change the fact that the language of the Merger Law cannot reasonably be read as the Anderson parties and the trial court would read it. Accordingly, we conclude the trial court erred in determining that the Merger Law imposed a ministerial duty on the Board to include all of **Westlands** (including encroachment and expansion lands) within the authorized place of use in the Bureau's CVP permits.

2. *Judicial Estoppel*

[61] The Anderson parties contend the Board "should be precluded from arguing against the Trial Court's interpretation of the Merger Law" by the doctrine of judicial estoppel. We disagree.

[62][63] " 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. The doctrine serves a clear purpose: to protect the integrity of the judicial process.' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181, 70 Cal.Rptr.2d 96.) The doctrine applies "when: (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*Id.* at p. 183, 70 Cal.Rptr.2d 96.)

We find nothing inconsistent in the position the Board has taken regarding the legislative intent behind the Merger Law. In commenting on the change EIR, the Anderson parties argued that "[c]onforming the authorized [place of use] to **Westlands** boundaries is essentially a clerical recognition of existing conditions authorized by prior approvals. The decision to expand the authorized [place of use] to include the entire district was made as early as 1965, as evidenced by the Water Code Sections 37800 et seq. (the 'Merger Statute')." In the final change EIR, the Board responded: "Regardless of when other parties historically decided to include the entire water district within the [place of use], the pending petition before the Board requires that a formal decision be made at this time. As part of this decision, the Board is obligated to comply with the requirements of CEQA."

The Anderson parties contend this position is inconsistent with the positions the Board has taken in the trial court and in this court because "the phrase 'other parties' is an unmistakable reference to the Legislature." According to the Anderson parties, in the change EIR the Board admitted that the Legislature intended in the Merger Law to include the entire **Westlands** in the authorized place of use for the Bureau's CVP permits, and the Board is estopped from now asserting that the Legislature did not have that intent.

***311** This argument fails for two reasons. First, we do not agree that the phrase "other parties" must be read as referring to the Legislature and its enactment of the Merger Law. The phrase is more reasonably read as referring to the Bureau and **Westlands** itself, both of which must have decided at some point that all of **Westlands** was within the place of use authorized in the Bureau's permits, because the Bureau began delivering CVP water to parts of **Westlands** that were, in fact, *not* within the place of use, and landholders in those areas accepted that water.

Secondly, even if the Board could be deemed to be an advocate that asserted in the proceedings before itself that the Legislature intended in the Merger Law to include the entire **Westlands** in the authorized place of use for the Bureau's CVP permits, the Board *as advocate* plainly was not successful in asserting that position because the Board *as tribunal* did not adopt that position or accept it as true. If the Board had adopted that position, it would have included all of the encroachment and expansion lands in **Westlands** within the authorized place of use in the Bureau's CVP permits without any mitigation requirement, as the Anderson parties wanted it to do. That it did not do so only shows that the Board has maintained a consistent position throughout these proceedings regarding the intent behind the Merger Law. Accordingly, the doctrine of judicial estoppel does not apply here.

3. *The Anderson Parties' Alternate Arguments*

[64] The Anderson parties contend that even if the trial court erred in its interpretation of the Merger Law, the trial court's judgment--requiring the Board to include all of **Westlands** within the authorized place of use in the Bureau's CVP permits without any mitigation requirement--should be affirmed on several alternate bases. [FN61] These alternate arguments are logically divided into those that apply to the encroachment lands within **Westlands** and those that apply to the expansion lands. [FN62] We will address them in that order.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN61. The Anderson parties assert these alternate bases for affirming the trial court's judgment in their cross-appellant's opening brief, but no cross-appeal was necessary to make these arguments. A party who advocates the affirmance of a judgment does not have to file a cross-appeal to assert the judgment was correct on grounds other than the one on which the trial court relied. (See *Warmington Old Town Associates v. Tustin Unified School Dist.* (2002) 101 Cal.App.4th 840, 864, 124 Cal.Rptr.2d 744.)

FN62. To the extent the Anderson parties argue, in their reply brief, that the Board had a ministerial duty to include all of **Westlands** within the authorized place of use because the maps attached to the Bureau's applications were never intended to define the place of use, we have rejected that argument already in addressing Santa Clara's appeal, and we will not address that issue further.

a. *The Anderson Parties' Standing To Challenge The Mitigation Requirement For Addition Of The Encroachment Lands To The Place Of Use*

[65] The Anderson parties offer numerous arguments why the Board had a ministerial duty to add the encroachment lands to the authorized place of use without any habitat mitigation requirement. Among other things, the Anderson parties argue that CEQA does not apply to actions occurring before its adoption in 1972 and that the Board does not have the authority to condition the approval of a change petition on the mitigation of adverse impacts to native habitat.

***312** [66] Before we may reach these alternate arguments, we must consider the issue of standing. The effect of Decision 1641 was to *include* the encroachment lands within the authorized place of use in the Bureau's permits, subject only to a habitat mitigation requirement. The Board argues that because the mitigation requirement was imposed on the Bureau, as the permit holder, and because the Anderson parties "cannot point to any evidence in the record that the mitigation will affect them," the Anderson parties lacked standing to seek a writ of mandate directing the Board to add the encroachment lands to the place of use without the habitat mitigation condition. [FN63] We agree.

FN63. The Anderson parties observe that the Board did not raise this argument in the trial court, or in its opening brief (which addressed only the Merger Law), but they do not contend the Board's failure to raise this argument earlier resulted in a forfeiture of the argument. The issue of standing may be raised for the first time on appeal. (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 973, fn. 3, 132 Cal.Rptr.2d 635.)

[67][68][69] "A writ of mandate 'must be issued upon the verified petition of the party beneficially interested.' (Code Civ. Proc., § 1086.) 'This provision has been held to establish a standing requirement-- the writ will issue only at the request of one who is beneficially interested in the subject matter of the action.' " (*Lindelli v. Town of San Anselmo* (2003) 111 Cal.App.4th 1099, 1107, 4 Cal.Rptr.3d 453.) " 'Beneficially interested' generally means the petitioner 'has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' " (*Embarcadero Mun. Improvement Dist. v. County of Santa Barbara* (2001) 88 Cal.App.4th 781, 786- 787, 107 Cal.Rptr.2d 6.) According to the Supreme Court, "This standard ... 'is equivalent to the federal "injury in fact" test, which requires a party to prove by a preponderance of the evidence that it has suffered "an invasion of a legally protected interest that is [both] '(a) concrete and particularized, and (b) actual or imminent....' " ' " (*People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 986, 32 Cal.Rptr.3d 109, 116 P.3d 567.)

[70] Subdivision (b) of section 1126 provides more specifically that any party "aggrieved" by a water rights decision of the Board may file a petition for a writ of mandate for review of that decision. In the context of an appeal from a civil judgment, our Supreme Court has stated that "[o]ne is considered 'aggrieved' whose rights or interests are injuriously affected by the judgment. [Citations.] Appellant's interest ' "must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment." ' " (*County of Alameda v. Carleson, supra,* 5 Cal.3d at p. 737, 97 Cal.Rptr. 385, 488 P.2d 953.) A party is not aggrieved by an "error that injuriously affected only nonappealing coparties." (*Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1128, 269 Cal.Rptr. 844.) "This is no mere technicality, but is grounded in the most basic notion of why courts entertain civil appeals. We are here to

provide relief for appellants who have been wronged by trial court error. Our resources are limited and thus are not brought to bear when appellants have suffered no wrong but instead seek to advance the interests of others who have not themselves complained. The guiding principle is one often encountered in daily life: no harm, no foul." (*Id.* at p. 1132, 269 Cal.Rptr. 844.)

The same reasoning applies with equal force to a party claiming to be aggrieved by a water rights decision by the Board. Thus, the question here is whether the ***313** rights or interests of the Anderson parties suffered an immediate, pecuniary, and substantial injury because of the Board's decision to include the encroachment lands within the authorized place of use in the Bureau's permits subject to a mitigation requirement. The Anderson parties have not identified any such injury. We are not concerned, at this point, with the exclusion of the expansion lands from the place of use. Plainly those of the Anderson parties who are expansion landholders are injured by that decision because they are excluded from receiving CVP water by that decision. In contrast, the encroachment landholders *are* entitled to receive CVP water; their lands have been *included* in the authorized place of use. Of course, the encroachment landholders could have claimed injury, and standing, if the Board had imposed the mitigation requirement on them, but the Board imposed that requirement only on the Bureau. The Bureau has not contested that requirement, nor is there any evidence in the record the Bureau intends to pass on the cost of mitigation to the encroachment landholders. Furthermore, there remains the possibility that it can be shown some or all of the encroachment lands within **Westlands** were converted to agricultural use before CEQA took effect, in which case not even the Bureau will face any mitigation costs with respect to those lands.

Recognizing their inability to prove that the cost of mitigation will ever be visited on them, the Anderson parties contend that "**Westlands** and Anderson (and their suppliers, their lenders and purchasers of their lands) now hold and deal with the Encroachment Lands subject to great uncertainty as to whether [the Bureau] will implement [the Board]'s habitat mitigation condition at [the Bureau]'s sole expense." They further argue that "[t]hese uncertainties, coupled with the expense, delay and risk of going through another prolonged and expensive administrative proceeding to prove that the Encroachment Lands were being farmed prior to the adoption of CEQA ... render these lands less desirable than identical farm lands east of the [original place of use boundary] ... and, therefore, less valuable now."

We are not persuaded. The flaw in this argument is that it is based completely on speculation, not evidence, that the cost of the mitigation requirement will ultimately be visited on the encroachment landholders alone. On the record before us, we do not know whether the Bureau will choose to bear all the costs of mitigation itself or pass those costs on (in whole or in part) to all the users of CVP water, or just to those users within **Westlands,** or just to the encroachment landholders within **Westlands.** The Anderson parties have not shown that the uncertainty as to what the Bureau intends to do falls more heavily on their lands than on any other lands using CVP water. Thus, there is no evidentiary basis for their assertion that the encroachment lands in **Westlands** are less valuable because of the mitigation requirement imposed on the Bureau than other lands within the district. We cannot conclude that the encroachment landholders have suffered an immediate, pecuniary, and substantial injury as result of the Board's decision due to a decline in property value, based on mere speculation and surmise that such a decline has in fact occurred.

The Anderson parties suggest that subdivision (e) of section 1126 gave them standing to challenge the mitigation requirement. That subdivision provides: "In any court case reviewing a decision or order by the state board relating to a permit or license to appropriate water held by the state through the department or any other state agency, or to a permit or license to appropriate water held by the United States through the Bureau of Reclamation ***314** or any other federal agency, the election by the United States, or any agency thereof, not to be a party shall not, in and of itself, be the basis for dismissal pursuant to Section 389 of the Code of Civil Procedure or any other provision of law." According to the Anderson parties, "[t]his [provision] recognizes standing in parties such as Anderson and **Westlands,** because they would otherwise have no adequate remedy, since [the Bureau] did not sue to challenge Decision 1641, and did, in fact, exercise its sovereign immunity to extricate itself from this litigation."

This argument fails because nothing in subdivision (e) of section 1126 purports to override the requirement in subdivision (b) of that statute that only a party "aggrieved" by a water rights decision of the Board may challenge that decision in an administrative mandate proceeding. Subdivision (e)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

simply ensures that the election of the Bureau not to participate in a court case will not, "in and of itself," provide the basis for a dismissal, under section 389 of the Code of Civil Procedure for failure to join an indispensable party. Here, to the extent the rejection of claims advanced on behalf of the encroachment landholders can be deemed a "dismissal," that action is not taken because the Bureau elected not to participate in the court proceedings; it is taken because the Anderson parties were not injured by the Board's decision to impose a mitigation requirement on the Bureau for including the encroachment lands in the authorized place of use in the Bureau's CVP permits.

Because we conclude the Anderson parties do not have standing to challenge the mitigation requirement imposed on the Bureau, we need not address any further their challenges to that aspect of the Board's decision. Accordingly, we turn to their arguments that challenge the Board's refusal to include the expansion lands in the authorized place of use. [FN64]

FN64. Our conclusion that the Anderson parties did not have standing to challenge the Board's imposition of a mitigation requirement on the Bureau has no effect on our previous discussion of the Merger Law, because the expansion landholders had standing to raise that issue. As we have noted, the expansion landholders suffered injury as a result of the Board's exclusion of the expansion lands from the place of use in the Bureau's CVP permits. In challenging that aspect of the Board's decision, they were entitled to argue that the Board should have included their lands in the place of use because the Merger Law required that result.

b. *The Anderson Parties' Challenge To The Exclusion Of The Expansion Lands*

As we have noted, in Decision 1641 the Board explained that the change EIR discussed the expansion lands only at the programmatic level, not at the project level, "because future land and water uses in those areas cannot be readily determined, and would require speculation. More detailed site-specific environmental documents may be necessary before the [Board] can authorize delivery of water to the expansion lands." The Board explained that "[t]he expansion lands can be considered in future proceedings when any required environmental documentation has been prepared." In effect, the Board decided that it did not have adequate information before it to decide whether to grant the Bureau's request to add the expansion lands to the authorized place of use in the CVP permits.

[71] The Anderson parties contend this aspect of the Board's decision is not supported by the evidence in the record. According to the Anderson parties, "the Expansion Lands were addressed extensively throughout [the Board]'s administrative ***315** proceedings, and a determination as to their inclusion within the place of use should have been made."

In addressing a similar argument made by Santa Clara, the trial court stated: "[CEQA] requires a lead agency to utilize its independent judgment and determine whether an EIR has been completed in compliance with the statute. [Citations.] The courts afford those agencies having CEQA experience with substantial discretion in determining whether they have sufficient environmental information to satisfy the statute. In this instance, the Board indicated the environmental information concerning expansion lands was incomplete."

We review, for abuse of discretion, the Board's decision that the change EIR provided an inadequate basis for determining whether to add the expansion lands to the authorized place of use. (See *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra*, 87 Cal.App.4th at pp. 116-117, 104 Cal.Rptr.2d 326; *Gentry v. City of Murrieta, supra*, 36 Cal.App.4th at pp. 1375-1376, 43 Cal.Rptr.2d 170.) We find no such abuse.

The Anderson parties assert that "[e]vidence regarding **Westlands** Expansion Lands was received by [the Board] throughout its administrative proceedings." As the Board observes, however, the Anderson parties fail "to point to any evidence in the record that describes with any measure of detail or specificity the nature and scope of future land and water uses that would occur if the ... Board included expansion lands in the CVP's place of use." The Board is also correct in observing that the Anderson parties "cannot point to any evidence in the record that would demonstrate the likely environmental consequences of the inclusion of expansion lands."

In discussing the potential significant environmental impacts of approving the change petition, the change EIR explained: "Because the Proposed Project and alternatives would delineate only the general area where CVP water could be delivered and the purposes for which it may be used, site-specific

impacts resulting from future CVP water deliveries to expansion area lands cannot be estimated. To the degree possible, potential impacts to the lands and environmental resources within the CVP water contractor service areas are discussed; however, it is acknowledged that this discussion may be speculative. [¶ ] Additional decisions by local land use authorities and the individual CVP water contractors would be needed prior to the delivery and future use of CVP water to expansion lands outside the authorized [place of use]. Therefore, the actual places and purposes for which CVP water would be used is not known at this time, except as restricted by the individual water delivery contracts between [the Bureau] and the CVP water contractors."

In the end, the Anderson parties acknowledge that the change EIR analyzed inclusion of the expansion lands only at the programmatic level. What they appear to contend is that because the Board analyzed the expansion lands, albeit at the programmatic level, the Board was obligated to grant the Bureau's request to include the expansion lands in the place of use. We cannot agree.

The Anderson parties first suggest that the Board could not refuse to include the expansion lands within the place of use in the Bureau's CVP permits because "there was no evidence [of] any harm to a legal user of the water involved" and "no evidence that [adding the expansion lands] poses any threat to the environment." What the Anderson parties fail to appreciate, however, is that the lack of such evidence ***316** could well be due to the fact that, before the Board even began receiving evidence, it had decided to consider adding the expansion lands to the place of use only at the programmatic level, because the future land and water uses in those areas could not readily be determined and would require speculation.

The Anderson parties also contend that approval of the Bureau's change request with respect to the expansion lands was required because "[c]onfirmation of the Expansion Lands as being within the place of use of CVP water within **Westlands** is a step precedent to--and distinct from--actual delivery of the CVP water to the Expansion Lands." By this argument, the Anderson parties appear to suggest that some further approval by the Board would be necessary to begin actual water delivery and the Board could have conditioned its further approval on "further site-specific environmental review, as appropriate." The Anderson parties, however, do not identify any further approval the Board would have to give for the delivery of CVP water to the expansion lands once the Board changed the place of use in the Bureau's permits to include those lands. Thus, this argument fails, and we conclude the Anderson parties have failed to show any abuse of discretion by the Board in declining to include the expansion lands within the authorized place of use in the Bureau's CVP permits based on only a programmatic review of the potential environmental impacts of that action.

For the foregoing reasons, the trial court erred in granting the petition by **Westlands** and the Anderson parties for a writ of mandate directing the Board to conform the places of use under the Bureau's CVP permits to include both the encroachment and expansion lands within **Westlands** without any mitigation requirement. Accordingly, we will reverse the judgment in *Anderson v. State Water Resources Control Board* (Super. Ct. Fresno County, 2003, No. 645385-6) and direct the trial court to enter a new and different judgment denying the petition in its entirety.

VI

*Challenge To The Change EIR*

[72] In the second cause of action in their CEQA writ petition, the Central Delta parties challenged the Board's certification of the change EIR. Among other things, the Central Delta parties alleged the Board had "failed to examine potentially significant impacts of water quality and quantity in the San Joaquin River and Sacramento-San Joaquin Delta which were raised by commenting parties." They sought a writ of mandate directing the Board to set aside its certification of the change EIR and Decision 1641.

In the third cause of action in their writ petition, the **Audubon** Society parties offered identical allegations. As previously noted, in the trial court the **Audubon** Society parties did not offer any independent briefing of their own in support of their petition, but instead joined in the Central Delta parties' trial court brief.

In its statement of decision, the trial court explained that despite "an extensive menu of alleged CEQA violations" in their petition, in their briefing the Central Delta parties "limit[ed] [their] discussion to the alleged failure of the [change] EIR to analyze the impact of approval of the Bureau's change petition on salinity in the lower San Joaquin River, as well as the agency's failure to mitigate for this impact." Accordingly, the trial court deemed the other allegations abandoned.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citing subdivision (a) of CEQA section 21177, the trial court decided the Central Delta parties had "failed to exhaust their ***317** administrative remedies" on the salinity issue. The court explained: "Central Delta and its associated entities commented on the Draft EIR on March 31, 1998. They did not raise the issue of increased salinity in the lower river due to the application of water on saline-prone encroachment lands.... The Court has reviewed all the comments on the [change] EIR. While other commentators discussed salinity issues in other contexts, the issue of applying water to saline-prone, Westside lands apparently was not raised by anyone before the close of the public comment period associated with this EIR, although Central Delta apparently made some mention of this narrow issue in closing briefs. The Court is of the opinion that, under the facts of this case, the mention of this issue in closing comments was insufficient to raise the issue when these same petitioners made specific and numerous comments on March 31, 1998, and failed to raise this issue."

The Central Delta parties alleged in their mandamus petition that they had exhausted their administrative remedies by "appear[ing] before the [Board] at its hearings leading to certification of the [change EIR] and rais[ing] before the [Board] each and every point now presented to this Court and submitt[ing] evidence pertinent thereto." Similarly, the **Audubon** Society parties alleged that "[t]he violations of CEQA alleged herein were presented to the [Board] orally or in writing during the public comment period." The trial court determined this issue against the Central Delta and **Audubon** Society parties and thus never reached the merits of their challenge to the change EIR, because they had failed to establish this jurisdictional prerequisite to bringing a CEQA action in the first place.

In their opening briefs on appeal, the Central Delta and **Audubon** Society parties ignore the trial court's ruling that they failed to exhaust their administrative remedies with respect to their challenge to the change EIR. Only in their reply briefs, after the Board raised the exhaustion issue in its respondent's brief, do they address the issue. Accordingly, the first question is whether the Central Delta and **Audubon** Society parties forfeited their challenge to the change EIR by failing to address the trial court's ruling on the exhaustion issue in their opening briefs. We conclude they did.

[73] Generally, we will not consider points raised for the first time in an appellant's reply brief, unless good reason is shown for the failure to present them earlier. *(Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8, 265 Cal.Rptr. 788.) " 'Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission.' " *(Ibid.)*

Here, the Board did address the exhaustion issue in its respondent's brief; however, because the Central Delta and **Audubon** Society parties did not present in their opening briefs the arguments on why (contrary to the trial court's conclusion) they had exhausted their administrative remedies, the Board did not have the opportunity to respond to those arguments. By reserving those arguments for their reply briefs, the Central Delta and **Audubon** Society parties thus deprived the Board of the opportunity to prepare an adequate response on the exhaustion issue.

[74][75] It is true that, on review of a CEQA action, our role is generally "the same as that of the trial court" and "[t]hus, the conclusions of the superior court, and its disposition of the issues ... are not ***318** conclusive on appeal." *(Long Beach Sav. & Loan Assn. v. Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 260, 232 Cal.Rptr. 772.) In this context, however, that rule means only that we would not be bound by, or be required to show any deference to, the trial court's conclusion on the exhaustion issue. It does not mean the Central Delta and **Audubon** Society parties, as the appellants aggrieved by the trial court's determination that they had not exhausted their administrative remedies, were entitled to ignore the exhaustion issue in their opening briefs. Even when our review on appeal "is de novo, it is limited to issues which have been adequately raised and supported in [the appellant's opening] brief. [Citations.] Issues not raised in an appellant's brief are deemed waived or abandoned." *(Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6, 76 Cal.Rptr.2d 457.)

[76] To succeed in their appeals with respect to the change EIR, the Central Delta and **Audubon** Society parties bore the burden of convincing us the trial court erred in denying their mandamus petitions. "The most fundamental rule of appellate review is that an appealed judgment or order is *presumed to be correct.*" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2004) ¶ 8:15, pp. 8-4 to 8-5.) It is the appellant who bears the burden of overcoming that presumption. *(Stevens v.*

*Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1657, 57 Cal.Rptr.2d 525.) Where the trial court based its judgment on the determination that petitioners failed to exhaust their administrative remedies, petitioners could not simply overcome the presumption of correctness by ignoring that issue in their opening briefs.

Because the Central Delta and **Audubon** Society parties failed to address the exhaustion issue in their opening briefs, and because they failed to offer any reason (good or otherwise) for that failure, we conclude they forfeited their challenge to the change EIR. Accordingly, having previously rejected the other arguments of the Central Delta parties related to their CEQA writ petition, we will affirm the judgment in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 309539) in its entirety. As for the judgment in *Golden Gate **Audubon** Society v. State Water Resources Control Board* (Super. Ct. Alameda County, 2003, No. 825585- 9), we affirm that judgment to the extent it denied the **Audubon** Society parties relief on their third cause of action.

VII

*Prejudgment And Bias*

A

*Factual Background*

To understand the claims of prejudgment and bias made by the Central Delta and **Audubon** Society parties, it is necessary to first examine more closely the joint state-federal program known as CALFED.

In December 1992, Governor Pete Wilson established the Water Policy Council (the Council), to be chaired by the Secretary of the Resources Agency, and to be comprised of the heads of eight other state agencies, including (as relevant here) the Directors of the Department of Fish and Game, and the Department of Water Resources, and the Chair of the State Water Resources Control Board. (Governor's Exec. Order No. W-38-92 (Dec. 9, 1992).) The role of the Council was to "provide for coordination and information exchange among member agencies, boards, and departments necessary for the continued development and implementation of various components of the State's long-term, comprehensive ***319** water management policy and program." (*Ibid.*)

In September 1993, the Bureau signed an agreement with three other federal agencies creating the Federal Ecosystem Directorate (Directorate) to coordinate federal resource protection and management decisions regarding the Bay-Delta.

In June 1994, the Council and the Directorate entered into an agreement known as the framework agreement "to establish a comprehensive program for coordination and communication between the Council and the [Directorate] with respect to environmental protection and water supply dependability in the" Bay-Delta. This program is known as CALFED.

The framework agreement identified the formulation of water quality standards as one of three areas in which federal and state coordination and cooperation with respect to the Bay-Delta was particularly important. The other two areas were coordination of CVP and SWP operations with regulatory requirements and pursuing long-term solutions to Bay-Delta issues. In the framework agreement, the Council and the Directorate endorsed and concurred with certain "Points of Agreement on State and Federal Processes for Setting Water Quality Standards for the Bay-Delta."

As we have previously explained, in December 1994 various representatives of the state and federal governments and certain urban, agricultural, and environmental interests signed the "Principles for Agreement on Bay-Delta Standards between the State of California and the Federal Government." This document described changes to a previous proposal for water quality standards and operational constraints in the Delta to be adopted and implemented by the Board. On the same day the principles for agreement were signed, the Board released the first draft of its new water quality control plan for the Bay-Delta. The Board used several elements of the principles for agreement, as well other recommendations from interested parties, in preparing the draft plan.

We turn now to the more immediate factual background of the prejudgment and bias issue. In June 1998, before the commencement of the public hearing in the water rights proceeding underlying these coordinated cases, the Central Delta parties filed a "Request for Recusal" with the Board seeking the recusal of any Board members or staff "who have reviewed communications or correspondence from or otherwise communicated with the Water Policy Council staff or Water Policy Council members regarding Delta Water Right matters including without limitation allocation among water right holders of the burden of meeting Bay/Delta water quality standards, restrictions on rates of export

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pumping, and release or alteration of the pattern of releases or use of water."

On July 1, 1998, the first day of the public hearing, the Board addressed the Central Delta parties' request. The attorney for the Central Delta parties explained they were making the recusal request because they had "been denied access to the Water Policy Council documents that [they] found went to [the] Board." In essence, as characterized by one of the Board's attorneys, the recusal request was based on alleged ex parte communications between members of the Board (or its staff) and the Council on matters at issue before the Board.

The Board's attorney then explained to the Board the provisions of the Administrative Procedure Act (Gov.Code, § 11340 et esq.) governing disqualification. The attorney asked the Board members to "think about whether during pendency of this current proceeding, in other words, ***320** since the original hearing notice was released in December of 1997 the Board Member has received any ex parte communication from the Water Policy Council regarding any matter of substance or in controversy" and to "decide whether they're aware of any reason why the [Board's Member is] biased or prejudice[d] with respect to the issues in this hearing." All of the board members then stated on the record that they had no reason to recuse themselves.

Later that day, the Central Delta parties' attorney was allowed to question two Board staff members--Jerry Johns, the assistant division chief for the division of water rights, and Walter Pettit, the executive director of the Board--on the record about meetings they had in March 1995 with parties interested in Delta water issues. He also questioned Pettit in particular about Pettit's notes from a meeting in November 1994 that Pettit organized at the Board's direction. On cross-examination, Pettit testified that the November 1994 meeting was a continuation of the Board's workshops leading to development of the 1995 Bay-Delta Plan. The discussion at that meeting related solely to the water quality objectives for the proposed plan and did not address "any kind of water rights decision."

Seven months later, on January 25, 1999, the Central Delta parties made a motion to "Establish Conditions Conducive to [Board] Impartiality." The motion proposed that the Board take five different actions, including withdrawing all Board members and staff from the Council, withdrawing from the framework agreement, and prohibiting staff members who communicated or met with members of the Council from any further participation in the water rights proceeding.

In March 1999, the Board denied the motion on the grounds that the actions the Central Delta parties requested "exceed the applicable statutory requirements, are unsupported by your pleadings, are overbroad, and are unnecessary for the purpose of maintaining impartiality."

In the thirteenth cause of action in their non-CEQA writ petition, the Central Delta parties alleged the Board failed to provide them a fair hearing and deprived them of due process of law. Among other things, they complained that the Board entered into the framework agreement with the Bureau and the Department and that the Secretary of the California Environmental Protection Agency signed the principles for agreement. They also complained that the Board's executive officer and principal staff members participated in negotiations with the parties to the principles for agreement.

The trial court rejected the Central Delta parties' claims of bias based on staff activities, concluding that "any statement by or communication to the [Board] staff is legally irrelevant, for due process purposes, absent a showing of that staff person's direct involvement in the decisionmaking process resulting in [Decision] 1641." The court went on to note that the Board staff members examined by the Central Delta parties "indicated that their job functions required interactions with other agencies and water users, but they disclaimed any substantive communications with Board members during the hearing process."

The trial court also rejected the claims of bias based on "certain official commitments made by the Board chair or the Board's superior agency." The court concluded that the provisions of the framework agreement were not "sufficient to suggest either a prejudgment of adjudicative facts or an actual or perceived bias by the Board to rule a certain way on the merits of Bay-Delta water quality standards ***321** and water user responsibilities." The trial court further concluded that the commitment of the Secretary of the California Environmental Protection Agency to the principles for agreement could not be attributed to the Board.

B

*Legal Analysis*

On appeal, the Central Delta parties reiterate all of their claims of prejudgment and bias. [FN65] Like

the trial court, we conclude those claims are without merit.

FN65. The **Audubon** Society parties did not offer any allegations of bias or prejudgment in their writ petition. On appeal, however, they offer arguments in support of the Central Delta parties on this issue. We address their arguments together with those of the Central Delta parties.

[77] "The contention that a fair hearing requires a neutral and unbiased decision maker is a fundamental component of a fair adjudication...." (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1234, 97 Cal.Rptr.2d 467.) Under the Administrative Procedure Act and the Board's regulations, when conducting an evidentiary hearing to determine facts pursuant to which the Board will formulate and issue a decision, the members of the Board are subject to disqualification for bias, prejudice, or interest in the proceeding. (Gov.Code, § 11425.40, subds.(a), (c); Cal.Code Regs., tit. 23, § 648, subd. (b).)

[78] "Bias and prejudice are not implied and must be clearly established. A party's unilateral perception of bias cannot alone serve as a basis for disqualification. Prejudice must be shown against a particular party and it must be significant enough to impair the adjudicator's impartiality. The challenge to the fairness of the adjudicator must set forth concrete facts demonstrating bias or prejudice." (*Gray v. City of Gustine* (1990) 224 Cal.App.3d 621, 632, 273 Cal.Rptr. 730.)

[79] "[A]dvance knowledge of adjudicative facts that are in dispute ... does not disqualify the members of an adjudicatory body from adjudicating a dispute.... [T]here must be ... a commitment to a result (albeit, perhaps, even a tentative commitment), before the process will be found violative of due process." (*BreakZone Billiards v. City of Torrance, supra*, 81 Cal.App.4th at p. 1236, 97 Cal.Rptr.2d 467.)

[80] Initially, the Central Delta parties contend that evidence of the Board's prejudgment of issues in this water rights proceeding can be found in the framework agreement, which was signed by the chair of the Board in his role as one of the members of the Council. They first cite the following provision from the agreement: "We agree that it is essential for the State and Federal agencies with regulatory and resources management responsibilities in the Bay-Delta Estuary to reach consensus, consistent with applicable procedural limitations, on the appropriate level of protection to be achieved for the Bay-Delta Estuary." According to the Central Delta parties, this provision reflects the Board "agree[ing] in advance of the judicial proceeding that [it] will not impose any burden for protection of the Bay-Delta that is not agreed to by the State and Federal Agencies who are some but not all of the parties to the adversary proceedings."

The Central Delta parties' perception of bias from this part of the framework agreement is misplaced. It must be recalled that the framework agreement was signed in June 1994, when the Board was in the midst of a *rulemaking* proceeding to ***322** revise the water quality objectives for the Bay-Delta. In referring to "reach[ing] consensus ... on the appropriate level of protection," the framework agreement was plainly referring to a consensus on what the water quality objectives should be, not a consensus on the entirely separate question of how responsibility for meeting those as-yet-undetermined objectives should be allocated in a future water rights proceeding. The Board chair's recognition of the importance a consensus in a rulemaking proceeding on the level of protection to be achieved in setting water quality objectives for the Bay-Delta, through his signing of the framework agreement, does not evidence bias or prejudice on the question of who should be held responsible for meeting those objectives, which was to be addressed in the later adjudicative proceeding.

To the extent the water quality objectives adopted by the Board in the rulemaking proceeding that resulted in the 1995 Bay-Delta Plan included export limits that only the Bureau and the Department could be held responsible for meeting, this fact provides no basis for establishing prejudgment or bias on the part of the Board in the water rights proceeding underlying these consolidated cases. If, as it appears, the Central Delta parties are concerned the Board colluded with the Bureau and the Department in setting limits on exports, that was a challenge they needed to raise to the 1995 Bay-Delta Plan itself. They cannot raise such a challenge now, in a water rights proceeding where the Board did nothing more than implement the water quality objectives embodying the export limits it had previously set and which were unchallenged at that time.

The Central Delta parties also rely on a provision from the "Points of Agreement on State and Federal Processes for Setting Water Quality Standards for the Bay-Delta" that were part of the framework agreement to demonstrate prejudgment and bias on

the part of the Board. That provision reads: "The [Board] will seek agreement with the California Department of Water Resources and the U.S. Department of the Interior [i.e., the Bureau] to operate the SWP and CVP to make an equitable contribution to meeting the standards, starting in calendar year 1995, while the [Board] is working on a water rights decision to equitably allocate responsibility among water right holders in the Bay-Delta watershed." According to the Central Delta parties, "[c]ertainly such an agreement evidences prejudgment and bias."

We cannot agree. In effect, this provision did nothing more than evidence the Board chair's concurrence that the Board would "seek agreement" with the Department and the Bureau to make an "equitable contribution" to meeting the Board's new water quality objectives on an interim basis, "while the [Board wa]s working on a water rights decision to equitably allocate responsibility among water right holders in the Bay-Delta watershed" for meeting those objectives on a more permanent basis. The Central Delta parties fail to provide any rational explanation of how this shows prejudgment and bias on the part of the chair in the water rights proceeding underlying these coordinated cases. According to them, this provision "constrains the subsequent proceedings," but we find no logical basis for that conclusion. Even assuming the Board chair, alone or in conjunction with other Board members, did "seek" such an agreement, the Central Delta parties utterly fail to explain how those efforts constrained them from fairly allocating responsibility for meeting the water quality objectives in the subsequent water rights proceeding. The Central Delta parties' contention that this provision constituted a "mere agreement ... to ***323** negotiate rather than impose the result" is simply an unreasonable reading of the provision.

In an attempt to bolster their argument, the Central Delta parties refer to a comment made by the Department on the Board's draft decision in the water rights proceeding, in which the Department contended "it would be inconsistent with ... the CALFED process to impose a regulatory responsibility upon the projects, again, even on an interim basis," "[u]ntil the Board is prepared to fully allocate responsibility for meeting the [1995 Bay-Delta Plan objectives] among water users." Whatever this comment may show about *the Department's* view of the framework agreement and of the Board's adjudicative responsibilities, it is of no value in meeting the Central Delta parties' burden to show "concrete facts demonstrating bias or prejudice" (*Gray v. City of Gustine*, *supra*, 224 Cal.App.3d at p. 632, 273 Cal.Rptr. 730) on the part of the Board and its members.

The Central Delta parties next contend that prejudgment and bias are shown by the principles for agreement, which "purports to bind the [Board], in advance of the proceedings." As the trial court noted, however, the Board "is not a signatory to this agreement. The only question can be whether the commitment by the Secretary of the California EPA is attributable to, and thereby biases, the [Board]. The [Board] is contained within the California EPA for administrative convenience. The Secretary does not participate in or review the Board's decisions. No evidence has been adduced indicating the Secretary pressured the Board or the Board feared adverse consequences if it failed to rule in a certain way."

The Central Delta parties offer no response to these observations, instead turning to the argument that "principal [Board] staff members participated in the private negotiations and [acted] as a conduit for communications to the [Board] members" about the principles for agreement. The only support for that argument is the meeting the Board's executive director, Walter Pettit, acknowledged organizing at the Board's direction in November 1994, and Pettit's notes of that meeting. What the Central Delta parties ignore, however, is Pettit's testimony that the November 1994 meeting was a continuation of the Board's workshops leading to development of the 1995 Bay-Delta Plan, which related solely to the water quality objectives for the proposed plan and did not address "any kind of water rights decision." The Central Delta parties fail to show how a Board staff member's arrangement of and participation in a meeting aimed at developing water quality objectives for the Bay-Delta demonstrate bias or prejudice on the part of the Board members five years later in allocating responsibility for meeting the objectives that were eventually adopted.

In summary, we agree with the trial court that the Central Delta parties' claims of prejudgment and bias are entirely without substance. Accordingly, the trial court did not err in rejecting the thirteenth cause of action in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502). [FN66]

FN66. The Central Delta parties and the Board have both requested that we take judicial notice of various documents that we

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have not had occasion to refer to previously. Inasmuch as we have found none of those documents pertinent to our decision herein, we deny those requests.

DISPOSITION

The judgment in *Central Delta Water Agency v. State Water Resources Control* ****324*** *Board* (Super. Ct. S.F. City and County, 2003, No. 309539) is affirmed.

The judgment in *Anderson v. State Water Resources Control Board* (Super. Ct. Fresno County, 2003, No. 645385-6) is reversed, and the trial court is directed to enter a new and different judgment denying the petition for writ of mandate and complaint for declaratory relief.

The judgment in *Central Delta Water Agency v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311502) is modified to provide that a writ of mandate shall issue commanding the Board to commence further appropriate proceedings to either assign responsibility for meeting the Vernalis pulse flow objective and the southern Delta salinity objectives or to modify those objectives. As modified, the judgment is affirmed.

The judgment in *County of San Joaquin v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311499) is affirmed.

The judgment in *Golden Gate* ***Audubon*** *Society v. State Water Resources Control Board* (Super. Ct. Alameda County, 2003, No. 825585-9) is reversed, and the trial court is directed to enter a new and different judgment: (1) granting the petition for writ of mandate on the ground that the Board's failure to implement the Vernalis pulse flow objective in the 1995 Bay-Delta Plan while the San Joaquin River Agreement is in effect constituted an abuse of discretion; and (2) denying the petition on all other grounds. The new judgment shall order the issuance of a writ of mandate commanding the Board to commence further appropriate proceedings to either assign responsibility for meeting the Vernalis pulse flow objective or to modify the Vernalis pulse flow objective.

The judgment in *Santa Clara Valley Water District v. State Water Resources Control Board* (Super. Ct. S.F. City and County, 2003, No. 311549) is affirmed.

The judgment in ***Westlands*** *Water District v. State Water Resources Control Board* (Super.Ct.Sac.County, 2003, No. 00CS00603) is affirmed.

The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 27(a).)

We concur: SCOTLAND, P.J., and CANTIL-SAKAUYE, J.

***325**

APPENDIX A

*State Water Resources Control Board* *Environmental Setting*




*FEIR for Implementation of the 1995 Bay/Delta Water Quality Control Plan* *November 1999*

***326**

APPENDIX B




**Briefs and Other Related Documents** [**(Back to top)**]

• 2005 WL 1248071 (Appellate Brief) Cross-appellant State Water Resources Control Board's Reply Brief in Superior Court Case Number 311502 (Apr. 25, 2005)Original Image of this Document (PDF)

• 2005 WL 1248072 (Appellate Brief) Cross-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Appellants' Reply Brief (Apr. 25, 2005)Original Image of this Document (PDF)

• 2005 WL 1841681 (Appellate Brief) Reply Brief of Cross-Appellants State Water Contractors, et al. (Apr. 22, 2005)Original Image of this Document (PDF)

• 2005 WL 1124541 (Appellate Brief) Central Delta Water Agency, et Al.'s Combined Appellants' Reply Brief (In Their Appeals of Case Nos. 309539 And 311502), Respondents' Brief (In San Joaquin River Group Authority, et Al.'s Appeal of Case No. 311502), and Cross-Respondents' Brief (In S tate Water Contractors, et Al. and State Water Resources Control Board's Cross-Appeals of Case No. 311502) (Apr. 05, 2005)Original Image of this Document (PDF)

• 2005 WL 1124540 (Appellate Brief) State Water Resources Control Board Combined Appellant's Reply Brief And Cross-Respondent's Brief (Mar. 23, 2005)Original Image of this Document with Appendix (PDF)

• 2005 WL 1048522 (Appellate Brief) Appellant Golden Gate Aubudon Society, Et Al.'s Reply Brief (Mar. 08, 2005)Original Image of this Document (PDF)

• 2005 WL 622822 (Appellate Brief) Cross-Appellant's Opening Brief in Superior Court Case Number 311502 and State Water Resources Control Board's Respondent's Brief in Superior Court Cases Numbers 311502, 309539, 311549, 311499, 00CS00603, and 825585-9 (Jan. 06, 2005)Original Image of this Document (PDF)

• 2005 WL 723722 (Appellate Brief) Respondent California Department of Water Resource' Brief in Reply to Appellants Central Delta Water Agency, San Joaquin County, Golden Gate Audubon Society and Westlands Water District (Jan. 05, 2005)Original Image of this Document (PDF)

• 2004 WL 3251955 (Appellate Brief) Response Brief of Real Party in Interest and Respondent East Bay Municipal Utility District (Dec. 17, 2004)Original Image of this Document (PDF)

• 2004 WL 3251956 (Appellate Brief) Respondent's Brief of Real Party in Interest Contra Costa Water District (Dec. 14, 2004)Original Image of this Document (PDF)

• 2004 WL 3251959 (Appellate Brief) Respondent's Brief by Westlands Water District, San Luis & Delta-Mendota Water Authority and San Benito County Water District (Dec. 13, 2004)Original Image of this Document (PDF)

• 2004 WL 3251958 (Appellate Brief) Combined Respondents' and Cross-Appellants' Opening Brief of State Water Contrators, ET AL. (Dec. 10, 2004)Original Image of this Document (PDF)

• 2004 WL 3251960 (Appellate Brief) Respondents San Joaquin River Group Authority and its individual member entities' Oakdale Irrigation District, South San Joaquin Irrigation District, Turlock Irrigation District, Merced Irrigation District Modesto Irrigation District, San Joaquin Riv er Exchange Contractors Water Authority, City and County of San Francisco, and Friant Water Users Authority Opposition Brief (Dec. 10, 2004)Original Image of this Document (PDF)

• 2004 WL 3251957 (Appellate Brief) Respondents' Brief and Cross-Appellants' Opening Brief (Dec. 09, 2004)Original Image of this Document (PDF)

• 2004 WL 2944814 (Appellate Brief) Respondents' Brief and Cross-Appellants' Opening Brief (Nov. 15, 2004)Original Image of this Document (PDF)

• 2004 WL 2944813 (Appellate Brief) Respondents Central Delta Water Agency, et al.'s Responsive Brief to Appellants San Joaquin River Group Authority, et al.'s Opening Brief (In San Joaquin River Group Authority, et al.'s Appeal of Superior Court Case No. 311502) (Nov. 12, 2004)Original Image of this Document (PDF)

• 2004 WL 2825067 (Appellate Brief) Appellant Golden Gate Aubudon Society, Et Al.'s Opening Brief (Oct. 05, 2004)Original Image of this Document (PDF)

• 2004 WL 2836524 (Appellate Brief) Appellant Westlands Water District's Opening Brief (Sep. 30, 2004)Original Image of this Document (PDF)

• 2004 WL 2461105 (Appellate Brief) Appellants Stockton East Water District, San Joaquin County, San Joaquin County Flood Control and Water Conservation District, the City of Stockton, and Central San Joaquin Water Conservation District's Opening Brief (Sep. 13, 2004)Original Image of this Document with Appendix (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

• 2004 WL 2474697 (Appellate Brief) Appellants San Joaquin River Group Authority and its individual member entities' Oakdale Irrigation District, South San Joaquin Irrigation District, Merced Irrigation District, Modesto Irrigation District, San Joaquin River Exchange Contractors Water Authority, City and County of San Francisco, Friant Water Users Authority Opening Brief (Sep. 13, 2004)Original Image of this Document (PDF)

• 2004 WL 2825068 (Appellate Brief) Appellants and Cross-Respondents Central Delta Water Agency, Et Al's Opening Brief (In their Appeal of Superior Court Case No. 309539 (May. 10, 2004)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.