Filed 3/28/06; pub. order 4/26/06 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALLEGRETTI & COMPANY,<br>Plaintiff and Appellant,<br>v.<br>COUNTY OF IMPERIAL,<br>Defendant and Respondent. | D045156<br><br>(Super. Ct. No. 94756) |

APPEAL from a judgment of the Superior Court of Imperial County, Jeffrey B. Jones, Judge. Affirmed.

Allegretti & Company (Allegretti) appeals a judgment entered under Code of Civil Procedure section 631.8 in favor of the County of Imperial (County) on Allegretti's inverse condemnation action seeking just compensation for County's alleged taking of Allegretti's right to use groundwater underlying its property. County had approved Allegretti's application for a conditional use permit to activate a well on its property on the condition, imposed under a County ordinance, that Allegretti extract no more than 12,000 acre/feet per year of water from the aquifer underlying its property. At the close

of Allegretti's liability case, the trial court ruled there was no compensable taking and entered judgment on specific findings, inter alia, that County's restriction did not deprive Allegretti of all economically viable use of its property, and Allegretti had not shown County's regulation did not advance a legitimate state interest.

On appeal, Allegretti contends County's action was without jurisdiction and constituted a physical taking of its water rights, mandating just compensation under the federal and state Constitutions. Allegretti further contends that assuming County's action amounted to a regulatory taking, compensation was mandated because (1) the regulation deprived it of all economically beneficial or productive use of its land; (2) the *Penn Central*[1] factors of economic impact, interference with investment-backed expectations, and character of the governmental action compel a finding that the regulation effected a taking; and (3) County's unauthorized action failed to substantially advance a legitimate state interest. Finally, Allegretti contends the trial court misapplied the law pertaining to temporary takings in reaching its conclusions, requiring reversal of the judgment.

We conclude County's actions, either during the course of the permitting process, in approving the permit with the use restriction, or in defending against Allegretti's inverse condemnation action, did not effect a physical or regulatory taking. Accordingly, we affirm the judgment.

---

1 *Penn Central Transp. Co. v. City of New York* (1978) 438 U.S. 104.

## FACTUAL AND PROCEDURAL BACKGROUND

Allegretti owns property in Imperial County that overlies groundwater basins, which are accessed by Allegretti and its farmer tenant for irrigation purposes via deep-water wells and pumps. In October 1994, Allegretti filed with County an application for a conditional use permit to redrill an inoperable well, one of several existing wells on the property, so that it could add approximately 200 acres of land for crop production. Allegretti's tenant used the remaining operating wells to actively farm portions of the land between 1993 and 2004. In June 1997, County approved the conditional use permit for Allegretti's redrilling project subject to certain conditions, including one limiting Allegretti's draw of groundwater to 12,000 acre/feet per year from all production wells on site. Allegretti did not record the permit and it never took effect. Allegretti acknowledges there are no present restrictions on the use of water from its existing wells.

In November 1997, Allegretti sued County for inverse condemnation.[2] In part, it alleged County had no jurisdiction to require Allegretti to obtain a conditional use permit, and that a regulatory taking resulted from County's requirement that Allegretti obtain a permit and show reactivation of its well would not significantly or adversely affect either the environment or the groundwater basin.[3] County successfully demurred to the

---

2 This was apparently Allegretti's second inverse condemnation lawsuit. It had previously filed suit against County in May 1996 concurrently with a petition for writ of mandate, but the court sustained County's demurrer without leave to amend on grounds the action was premature.

3 Allegretti had also alleged County's delay in issuing the permit caused a taking; the parties stipulated before trial that this cause of action was no longer at issue.

complaint on the ground Allegretti had failed to seek a writ of administrative mandamus and thus it did not state a cause of action since County had jurisdiction under Imperial County Ordinance sections 56350 et seq. (hereafter the ordinance) to issue a conditional use permit for the well's reactivation.[4] In an unpublished opinion on Allegretti's appeal of that order (*Allegretti I*, *supra*, D031154), we reversed the judgment. We concluded that although County had general regulatory authority to control Allegretti's use of the water underlying its property (Wat. Code, §§ 104, 105; see *Baldwin v. County of Tehama* (1994) 31 Cal.App.4th 166, 173, 175-182), the record on appeal did not show County was acting on standards specific enough to permit it to limit Allegretti's groundwater use. (*Allegretti I*, *supra*, D031154.) The sole question resolved by our decision in *Allegretti I* was whether Allegretti was required to pursue a writ of administrative mandate before filing its action for inverse condemnation. (*Ibid*.)

Following remand, the matter proceeded to a bifurcated trial on Allegretti's inverse condemnation cause of action, with a first phase bench trial on liability to precede a second phase on the issue of just compensation. At the close of Allegretti's liability case, County moved for judgment under Code of Civil Procedure section 631.8. The court granted the motion. In its statement of decision, the court ruled, inter alia, County's application of section 56352 of the ordinance did not deprive Allegretti of all economically viable use of its property. The court found "[t]he sole evidence at trial was

---

4 We take judicial notice of our prior unpublished opinion in this case, *Allegretti & Company v. County of Imperial* (Apr. 19, 2000, D031154) [nonpub. opn.] (*Allegretti I*). (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

that a significant portion of the property is farmed by a tenant who is paying rent to [Allegretti] – there is no evidence that [Allegretti] has been denied all viable use of the property." The court further found "[Allegretti's] evidence failed to show that the conditions placed on issuance of the permit would have any economic impact at all. C[ounty] restricted total groundwater removal to 12,000 acre/feet per year as a condition to re-activating Well No. 3 – [Allegretti] offered no evidence that it had the ability to extract water in excess of 12,000 acre/feet absent the restriction." Finally, the court ruled Allegretti did not show County's regulation failed to advance a legitimate state interest.

The court entered judgment accordingly. Allegretti appeals.

## DISCUSSION

### I. *Standard of Review*

"The standard of review of a judgment and its underlying findings entered pursuant to [Code of Civil Procedure] section 631.8 is the same as a judgment granted after a trial in which evidence was produced by both sides. In other words, the findings supporting such a judgment 'are entitled to the same respect on appeal as are any other findings of a trial court, and are not erroneous if supported by substantial evidence.' " (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc*. (1999) 73 Cal.App.4th 517, 528.) When the decisive facts are undisputed, however, the reviewing court is confronted with a question of law and is not bound by the findings of the trial court. [Citation.] In other words, the appellate court is not bound by a trial court's interpretation of the law based on undisputed facts, but rather is free to draw its own conclusion of law." (*Ibid*.)

Whether there was a compensatory taking is a question of law, and we are not bound by the lower court's interpretation of the evidence presented on the question below. (*Yee v. Mobilehome Park Rental Review Bd.* (1998) 62 Cal.App.4th 1409, 1418; see also *Bass Enter. Prod. C. v. United States* (1998) 133 F.3d 893, 895 ["Whether a taking is compensable under the Fifth Amendment is a question of law based on factual underpinnings"].)

II. *General Principles of Takings Law*

The state and federal Constitutions guarantee real property owners "just compensation" when their land is "taken . . . for public use. . . ." (13 Cal. Const., art. I, § 19; U.S. Const., 5th Amend.; *Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, ___ [125 S.Ct. 2074, 2081] (*Lingle*); *Herzberg v. County of Plumas* (2005) 133 Cal.App.4th 1, 12-13.) The Fifth Amendment's Takings Clause, made applicable to the states through the Fourteenth Amendment, does not prohibit the taking of private property, but instead places a condition on the exercise of that power. (*Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2080].) "In other words, it 'is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking.' " (*Ibid*.)

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." (*Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2081].) But "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster – and . . . such 'regulatory takings' may be compensable under the Fifth

Amendment." (*Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2081].) Supreme Court precedents recognize two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes. (*Ibid*.) First, where government requires an owner to suffer a "permanent physical invasion" of his property – even as minor as cable lines and boxes bolted onto an apartment building's roof and exterior walls – it must provide just compensation. (*Id.* at p. ___ [125 S.Ct. at p. 2081], citing *Loretto v. Teleprompter Manhattan CATV Corp*. (1982) 458 U.S. 419 (*Loretto*); see also *Yee v. City of Escondido* (1992) 503 U.S. 519, 527 ["The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land"].) "A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial use' of her property." (*Lingle, supra*, at p. ___ [125 S.Ct. at p. 2081], quoting *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1019 (*Lucas*).) "[I]n *Lucas* [the high court held] that the government must pay just compensation for such 'total regulatory takings,' except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." (*Lingle*, 544 U.S. at p. ___ [125 S.Ct. at p. 2081].)

Outside these two categories, regulatory takings challenges are governed by the "essentially ad hoc, factual inquiries" set forth in *Penn Central, supra*, 438 U.S. 104. (*Lingle, supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2081]; *Penn Central*, at p. 124; *Herzberg*, *supra*, 133 Cal.App.4th at p. 14.) There is no set formula, but " 'several factors . . . have particular significance.' [Citation.] Primary among those factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which

the regulation has interfered with distinct investment-backed expectations.' [Citation.] In addition, the 'character of the governmental action' – for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good' – may be relevant in discerning whether a taking has occurred. [Citation.] The *Penn Central* factors – though each has given rise to vexing subsidiary questions – have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules." (*Lingle*, 544 U.S. at p. ___ [125 S.Ct. at pp. 2081-2082]; see *Herzberg*, at p. 14.)

Each of these *Penn Central* inquiries aims to "identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights." (*Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2082]; *Herzberg*, *supra*, 133 Cal.App.4th at p. 14.)

III. *County's Permit Condition Does Not Constitute a Physical Taking*

We first address Allegretti's contention that County's action effected a physical taking of Allegretti's "water rights"[5] mandating compensation as a per se taking. Relying

---

5 Allegretti's right to extract groundwater is as an "overlying" owner. As the California Supreme Court has explained, "overlying water rights are usufructuary only, and while conferring the legal right to use the water that is superior to all other users, confer no right of private ownership in public waters." (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1237; *Central and West Basin Water Replenishment*

on air rights cases, cases involving the government's diversion of water from landowners, and the decision of the Federal Circuit Court of Claims in *Tulare Lake Basin Water Storage Dist. v. United States* (2001) 49 Fed.Cl. 313 (*Tulare Lake*), Allegretti maintains County's regulation, which it characterizes as denying it access to the aquifer on its land, physically took Allegretti's right to use the water as if it had diverted it elsewhere. Allegretti argues "when one is precluded from exercising the right to use water today, the right to use that particular water is gone forever."

In response, County points out its sole actions were (1) refusal to issue a well drilling permit in the absence of full compliance with the California Environmental Quality Act (CEQA) and (2) issuance of an alternative permit with conditions that would have placed a limit on Allegretti's groundwater extractions. It, as well as amicus Attorney General, argues those actions did not physically invade, impound or appropriate Allegretti's property and convert it to some other use, and thus it is not a categorical physical taking under United States Supreme Court precedents. Both County and the Attorney General challenge Allegretti's reliance on *Tulare Lake* as misplaced; they maintain *Tulare Lake* conflates physical and regulatory takings analyses and was wrongly decided.

---

*Dist. v. Southern Cal. Water Co.* (2003) 109 Cal.App.4th 891, 905 ["there is no private ownership of groundwater"].) Water rights carry no specific property right in the corpus of the water itself. (*Big Rock M.W. Co. v. Valyermo Ranch Co.* (1926) 78 Cal.App. 266, 275.)

The United States Supreme Court in *Loretto, supra*, carefully distinguished permanent physical takings from both temporary physical invasions and regulations merely restricting the use of private property. (*Loretto, supra*, 458 U.S. at pp. 427-435.) It pointed out that a compensable physical taking would occur in circumstances where "real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it" (*id*. at p. 427); flooding results in an " 'actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property' " (*id*. at p. 428); telegraph or telephone lines, rails and underground pipes or wires are placed above or below an owner's property (*id*. at pp. 428-429); or where the government causes frequent aircraft flights immediately above an owner's property, as such action is analogous to construction of an elevated railway causing an " 'intrusion so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it.' " (*Id*. at p. 431, citing *U.S. v. Causby* (1946) 328 U.S. 256, 264-265.) Such circumstances are not the same as where, for example, the government orders nonessential gold mines to cease operations for the purpose of conserving equipment or manpower (*Loretto*, at p. 431, citing *United States .v Central Eureka Mining Co.* (1958) 357 U.S. 155, 165-166 [government "did not occupy, use, or in any manner take physical possession of the gold mines or of the equipment connected with them"].)

More recently, in *Brown v. Legal Foundation of Wash.* (2003) 538 U.S. 216 the court explained: " 'When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former

owner, [citation], regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary. [Citations.] Similarly, when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants [citation]; or when its planes use private airspace to approach a government airport [citation], it is required to pay for that share no matter how small.' " (*Brown v. Legal Foundation of Wash., supra,* 538 U.S. at p. 235, quoting *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 321-323.) California authority abides by these distinctions. (See *Erlich v. City of Culver City* (1996) 12 Cal.4th 854, 888-889; *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 9-10; *NJD, Ltd. v. City of San Dimas* (2003) 110 Cal.App.4th 1428, 1435 [categorical taking requires that the government physically take possession of an interest in property for a public purpose]; *Loewenstein v. City of Lafayette* (2002) 103 Cal.App.4th 718, 728.)

In the context of water rights, our highest court has found a physical taking where the government diverted water for its own consumptive use or decreased the amount of water accessible by the owner of the water rights. (*Washoe County v. United States* (2003) 319 F.3d 1320, 1326, citing *Dugan v. Rank* (1963) 372 U.S. 609, 614, 625-626 [government's upstream impounding of water at a dam constitutes a taking of water rights from downstream owners, analogizing government action to taking of airspace over land]; *Int'l Paper County. v. United States* (1931) 282 U.S. 399, 407-408 [taking found

where the Secretary of War ordered a private power company to withdraw water from the petitioner's mill to increase power production for government uses].)

County's action with respect to Allegretti in the present case – imposition of a permit condition limiting the total quantity of groundwater available for Allegretti's use – cannot be characterized as or analogized to the kinds of permanent physical occupancies or invasions sufficient to constitute a categorical physical taking. The County did not physically encroach on Allegretti's property or acquifer and did not require or authorize any encroachment (e.g. *Yee v. City of Escondido*, *supra*, 503 U.S. 519, 527); it did not appropriate, impound or divert any water. The County's permit decision does not effect a per se physical taking under any reasonable analysis.

We are not persuaded by Allegretti's reliance on the U.S. Court of Federal Claims's decision in *Tulare Lake*, *supra*, 49 Fed.Cl. 313, as support for the proposition that use restrictions on underground water rights are analogous to a categorical physical taking. In *Tulare Lake*, water districts argued that their water rights, which were contractually conferred by certain governmental agencies, were taken in violation of the Fifth Amendment by use restrictions imposed by the State Water Resources Control Board (the Board) under the Endangered Species Act. (*Id*. at pp. 314-316.) Comparing the circumstances to the overflights of aircraft found to constitute a taking in *United States v. Causby*, *supra*, 328 U.S. 256, the *Tulare Lake* court held the restrictions caused

a physical taking of the plaintiffs' contractual entitlement to a particular amount of water from the Board's facilities.[6]

Allegretti has provided no authority compelling us to follow the holding of an intermediate federal court. To the contrary, we are not bound by lower federal court decisions. (*People v. Gray* (2005) 37 Cal.4th 168, 226.) Even if we found it appropriate to consider *Tulare Lake,* we would find it distinguishable by virtue of the existence of identifiable contractual rights between the plaintiffs and water rights holder, rights that are not present in this case.

In any event, the persuasive value of *Tulare Lake* has been undercut in *Klamath Irrigation District v. United States* (2005) 67 Fed.Cl. 504 (*Klamath*), in which the court rejected the underpinnings of its *Tulare Lake* decision. (*Id*. at p. 538 ["with all due respect, *Tulare* appears to be wrong on some counts, incomplete on others, and distinguishable, in all events"].) In *Klamath*, the court criticized *Tulare Lake*'s treatment

---

6 The *Tulare Lake* court stated: "In the context of water rights, a mere restriction on use – the hallmark of a regulatory action – completely eviscerates the right itself since plaintiffs' sole entitlement is to the use of the water. [Citation.] Unlike other species of property where use restrictions may limit some, but not all of the incidents of ownership, the denial of a right to the use of water accomplishes a complete extinction of all value. Thus, by limiting plaintiffs' ability to use an amount of water to which they would otherwise be entitled, the government has essentially substituted itself as the beneficiary of the contract rights with regard to that water and totally displaced the contract holder. That complete occupation of property – an exclusive possession of plaintiffs' water-use rights for preservation of the fish – mirrors the invasion present in *Causby*[, *supra*, 328 U.S. 256]. To the extent, then, that the federal government, by preventing plaintiffs from using the water to which they would otherwise have been entitled, have rendered the usufructuary right to that water valueless, they have thus effected a physical taking." (*Tulare Lake, supra*, 49 Fed. Cl. at p. 319.)

of the plaintiffs' contracts as absolute and "confer[ring] on plaintiffs a right to the exclusive use of prescribed quantities of water," without adequately considering whether the contracts were limited in the event of water shortage by prior contracts, prior appropriations or other state law principles. (*Klamath*, 67 Fed.Cl. at p. 538.) The court further faulted *Tulare Lake* for neglecting to consider whether the plaintiffs' claimed use of water violated state doctrines including those designed to protect fish and wildlife, noting as a consequence *Tulare Lake* awarded just compensation "for the taking of interests that may well not exist under state law." (*Klamath*, 67 Fed.Cl. at p. 538.) Finally, the court noted the *Tulare Lake* decision did not consider numerous decisions vitiating takings claims by the availability of contract remedies. (*Ibid*., citing *Hughes Communications Galaxy, Inc. v. United States* (Fed.Cir. 2001) 271 F.3d 1060, 1070 [" 'the concept of taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim' "]; *United States v. Winstar Corp*. (1996) 518 U.S. 839, 919; *Glendale Fed. Bank, FSB v. United States* (2001) 239 F.3d 1374, 1379-1380; *Castle v. United States* (Fed.Cir. 2002) 301 F.3d 1328, 1342.) For these reasons, *Klamath* rejected *Tulare Lake*'s approach and supporting rationales.

We likewise decline to rely on *Tulare Lake*'s reasoning to find a physical taking under the circumstances presented by County's action. Aside from the deficiencies noted in *Klamath, supra*, 67 Fed.Cl. at p. 504, we disagree with *Tulare Lake*'s conclusion that the government's imposition of pumping restrictions is no different than an actual

physical diversion of water. (*Tulare Lake*, *supra*, 49 Fed.Cl. at pp. 319-320.) The reasoning is flawed because in that case the government's passive restriction, which required the water users to leave water in the stream, did not constitute a physical invasion or appropriation like the government's diversion in *International Paper Co. v. United States*, *supra*, 282 U.S. 399 or its low flight of army and navy airplanes in *Causby*, *supra*, 328 U.S. at page 259. *Tulare Lake*'s reasoning disregards the hallmarks of a categorical physical taking, namely actual physical occupation or physical invasion of a property interest.[7]

IV. *County's Action is Not a Regulatory Taking*

Allegretti contends that if we conclude County's permit decision must be analyzed as regulatory action, we should nevertheless hold it constitutes a categorical taking because it denied Allegretti all economically beneficial or productive use of its land by "preventing the full utilization of water that Allegretti had a right to access." Alternatively, Allegretti contends County's action constitutes a taking under *Penn Central*'s factual analysis.

County's act in conditioning Allegretti's permit on certain water use limitations is of a regulatory nature, and as we previously held in *Allegretti I*, it is an act taken under

---

[7] We deny County's request for judicial notice of letters from California's Chief Deputy Attorney General for Legal Affairs and the Chair of the California State Water Resources Control Board. County does not provide explanation why these letters written by governmental employees constitute "official acts" in contrast to mere correspondence. Moreover, given our reliance on *Klamath*, it is not necessary to our decision to take judicial notice of these items.

the authority of its police powers. A government regulation that restricts certain private uses of a portion of an owner's property does not constitute a categorical taking; it is to be analyzed under regulatory takings jurisprudence. (See *Brown v. Legal Foundation of Wash., supra*, 538 U.S. at p. 235; *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, supra*, 535 U.S. at pp. 321-323; *Hensler v. City of Glendale, supra*, 8 Cal.4th at pp. 9-10.)

A. *Total Regulatory Taking*

When government regulation completely deprives an owner of " '*all* economically beneficial us[e]' " of its land, a taking is established and just compensation is due. (*Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2081]; *Lucas*, *supra*, 505 U.S. at p. 1015; see also *Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 617; *NJD, Ltd. v. City of San Dimas*, *supra*, 110 Cal.App. 4th at pp. 1436-1438; *Loewenstein v. City of Lafayette*, *supra*, 103 Cal.App.4th at p. 728.)

Allegretti maintains it presented evidence that "demonstrated a deprivation of 'economically beneficial or productive use' " by showing: (1) productive use of Allegretti's 2400 acre farm had been "restricted by lack of the ability to pump sufficient water from underground to irrigate and cultivate more than 800 acres, sometimes less"; (2) the owner had a reasonable belief and expectation he could farm the full 2400 acres and make a substantial profit on his investment; and (3) the owner and his tenant farmer would be able to farm more land if they could gain access to additional water for irrigation. Allegretti argues: "Being able to farm 400 or 600 or 800 acres out of a 2400 acre farm may be some 'use,' but it is not 'economically beneficial or productive' use of a

multi-million dollar investment that was made nearly a quarter-century ago in anticipation of farming the entire ownership."

Allegretti concedes an ability to irrigate and farm four to eight hundred acres of its property even if County's permit condition were in effect and therefore this has not been a total regulatory taking. Allegretti misstates the requisite economic deprivation to constitute a categorical regulatory taking: we do not assess whether a regulation deprives some or even a vast majority of economic use; as *Lingle* most recently emphasized it must deprive an owner of *all* economically beneficial use of the land. (*Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2081].) The trial court ruled County's permit condition did not result in such a deprivation on a finding that a significant portion of the property is farmed by a tenant who was paying Allegretti rent. Allegretti does not challenge the evidence to support this factual finding and indeed, Michael Morgan, Allegretti's tenant, who leased 1686 acres of Allegretti's property at $75 per acre, testified he had "upwards of 800 acres" in production at the time of trial.[8]

B. *Penn Central Analysis*

When a regulation does not result in a physical invasion and does not deprive the property owner of all economic use of the property, a reviewing court must evaluate the regulation in light of the *Penn Central* factors. (*Kavanau v. Santa Monica Rent Control*

---

[8] 800 acres was one half the cultivatable portion of the property. Joseph Allegretti, who purchased the property in 1981, testified that out of the 2400 acres presently encompassing Allegretti's farm, the most its tenant had ever farmed was 900 acres in 1988; at the time of trial only 1,800 acres were cleared for farming, and 1600 acres were cultivatable.

*Board* (1997) 16 Cal.4th 761, 775 (*Kavanau*).) "*Penn Central* emphasized three factors in particular: (1) '[t]he economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.' " (*Kavanau*, 16 Cal.4th at p. 775; accord, *Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at pp. 2081-2082]; *Palazzolo v. Rhode Island*, *supra*, 533 U.S. at p. 633.)

These above-enumerated factors are the sole criteria on which Allegretti relies in asserting its taking claim. We may dispose of a takings claim on the basis of one or two of these factors. (*Bronco Wine v. Jolly* (2005) 129 Cal.App.4th 988, 1035, citing *Maritrans Inc. v. United States* (Fed.Cir.2003) 342 F.3d 1344, 1359 [where the nature of the governmental action and the economic impact of the regulation did not establish a taking, the court need not consider investment-backed expectations] & *Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1005 [disposing of takings claim relating to trade secrets solely on absence of reasonable investment-backed expectations] & *Andrus v. Allard* (1979) 444 U.S. 51, 65-68.)

Applying the three *Penn Central* factors relied upon by Allegretti does not persuade us to find County's action constitutes a regulatory taking. Importantly, the basis for this factual inquiry "is the owner's entire property holdings at the time of the alleged taking, not just the adversely affected portion." (*Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 193, citing *Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 497.) Thus the relevant parcel is Allegretti's 2400 acres, and not

merely its right to draw water from it. (E.g., *Florida Rock Indus. Inc. v. United States* (Fed. Cl. 1999) 45 Fed.Cl. 21, 33.)

Beginning with the last mentioned *Penn Central* factor, the character of the governmental action, County's action did not physically invade or appropriate Allegretti's property or groundwater. Accordingly, that factor does not support a taking. (See *Connolly v. Pension Ben. Guar. Corp.* (1986) 475 U.S. 211, 225; *Golden Cheese Co. v. Voss* (1991) 230 Cal.App.3d 727, 738-739.)

As for the economic impact of County's regulation, Allegretti concedes it did not establish the precise amount of such an impact through expert testimony at trial, but maintains such testimony is unnecessary because it is plain that County's action has restricted Allegretti's ability to draw water to the capacity of its existing wells, thus limiting its farm production to between 400 and 800 acres of a 2,400 parcel. Allegretti criticizes the trial court's reliance on the fact Allegretti was receiving rental income on a portion of the property, claiming the preservation of "some economically beneficial use" is not sufficient to constitute a defense in the County's favor.

In addressing economic impact, we ask whether the regulation "unreasonably impair[s] the value or use of [the] property" in view of the owners' general use of their property. (E.g., *PruneYard Shopping Center v. Robbins* (1980) 447 U.S. 74, 83.) Not only is the use to which the property owner puts his or her property important, but the economic impact needs to be considered in the context of other laws and regulatory schemes. (*See Connolly v. Pension Benefit Guar. Corp.*, *supra*, 475 U.S. 211, 225-226 [evaluating economic impact of imposing withdrawal fees on employers who leave

pension funds within context of entire ERISA scheme].) We note the U.S. Supreme Court has repeatedly upheld land use regulations that destroy or adversely affect real property interests. (*Keystone Bituminous Coal Assn. v. DeBenedictis*, *supra*, 480 U.S. at p. 489, fn. 18.)

Allegretti has not demonstrated any economic impact from County's 12,000 acre/feet per year limitation other than unspecific lay testimony regarding reduced profits via a below market rental rate or diminution in value as a result of its inability to use the entirety of its 2400-acre property for farming. It is well established that mere diminution in value of property, however serious, does not constitute a taking. (*Concrete Pipes and Products of California, Inc. v. Construction Laborers Pension Trust for Southern Cal.* (1993) 508 U.S. 602, 645, citing *Village of Euclid v. Ambler Realty Co.* (1926) 272 U.S. 365 [approximately 75% diminution in value]; *Hadacheck v. Sebastian* (1915) 239 U.S. 394, 405 [92.5% diminution]; see also *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1036; *Penna. Coal Co. v. Mahon* (1922) 260 U.S. 393, 413 ["[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law"].) Under *Penn Central*, regulations that prohibit the "most beneficial use of the property" or which prohibit "a beneficial use to which individual parcels had previously been devoted and thus cause[] substantial individualized harm" are not takings. (*Penn Central, supra*, 438 U.S. at p. 125.) Like most land use regulations, the ordinance may have " ' "the inevitable effect of reducing the value of regulated properties," ' " but even a " ' "significant diminution in value is insufficient to establish a confiscatory taking." ' "

(*Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 912, quoting *Griffin Development Co. v. City of Oxnard* (1985) 39 Cal.3d 256, 267.)

Allegretti has not demonstrated compensable interference with "distinct investment backed expectations" (*Penn Central*, *supra*, 438 U.S. at p. 124; *Kavanau*, *supra*, 16 Cal.4th at p. 781) by County's 12,000 acre/feet per year limitation. The sole evidence on which it relies is Joe Allegretti's testimony that he purchased the land for $2.5 million and made improvements with the expectation he could farm all 2,400 acres and make a substantial profit off the investment. It also points to Joe Allegretti's testimony that he could farm more acres if he had more operable wells, and testimony from Allegretti's tenant that he intended to farm all 1686 acres, but could not because there was not enough water. Citing *City of Barstow v. Mohave Water Agency*, *supra*, 23 Cal.4th at p. 1224, Allegretti asserts it "has the right to put to use as much of that water as it needs in order to irrigate its cropland."

There are several flaws in this argument. First, the evidence does not reveal distinct, as opposed to abstract, expectations. Joe Allegretti's testimony was only that he had purchased the farm having been given "lots of reassurances that it *could be* a viable farming operation" (emphasis added) and that his investment had not yet reached expectation.[9] A " 'reasonable investment-backed expectation' " must be more than a

---

[9] Joe Allegretti further testified: "When we originally purchased the property we thought that we could farm at least as much land as the previous owner had farmed. We didn't give a lot of thought to farming on the north side of the highway. But we thought that everything we owned on the south side of the highway was doable." The evidence of Allegretti's expectation is too general to meet the requisite *Penn Central* factor.

" 'unilateral expectation or an abstract need.' " (*Ruckelshaus v. Monsanto Co.*, *supra*, 467 U.S. at pp. 1005-1006.) Further, as our high court in *City of Barstow* acknowledged, although an overlying user such as Allegretti may have superior rights to others lacking legal priority, Allegretti's water "right" is nonetheless restricted to a reasonable beneficial use consistent with article X, section 2 of the California Constitution. (*City of Barstow v. Mohave Water Agency*, *supra*, 23 Cal.4th at p. 1240.) Allegretti's claim to an unlimited right to use as much water as it needs to irrigate flies in the face of that standard, and it has not pointed to any evidence in the record that its proposed irrigation of all 2400 acres would be reasonable within the meaning of the constitutional restriction. Second, Allegretti's claim is essentially that it has lost "at least the potential for substantial profits." Allegretti's claim of loss of anticipated profits or gain is not compensable, as it "demonstrate[s] no more than a possible restriction upon more economic uses of its property." (*Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 912.) Because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests. (*Andrus v. Allard*, *supra*, 444 U.S. at p. 66.) For the foregoing reasons, Allegretti's claim of a regulatory taking under *Penn Central* is not persuasive.

C. *Whether County's Action Substantially Advances a State Interest Is No Longer A Valid Standard to Assess An Unconstitutional Taking Under the Fifth Amendment*

Applying the standard of *Agins v. City of Tiburon* (1980) 447 U.S. 255, 260 (*Agins*), that a regulatory taking be found when an ordinance "does not substantially advance legitimate state interests," Allegretti maintains County's permit condition effects

a taking because an act taken without jurisdiction and arbitrary as a matter of law is incapable of furthering or advancing any legitimate governmental objective.

In *Lingle*, the court reconsidered the validity of *Agins*'s "substantially advance[s] state interests" standard as a "stand-alone regulatory takings test" and disavowed it, concluding it "prescribes an inquiry in the nature of a due process, not a takings test, and that it has no proper place in our takings jurisprudence." (*Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2083].) The "substantially advances" inquiry, the Court explained, "reveals nothing about the *magnitude or character of the burden* a particular regulation imposes upon private property rights. Nor does it provide any information about how any regulatory burden is *distributed* among property owners. In consequence, this test does not help to identify those regulations whose effects are functionally comparable to government appropriation or invasion of private property; it is tethered neither to the text of the Takings Clause nor to the basic justification for allowing regulatory actions to be challenged under the Clause." (*Id.* at p. ___ [125 S.Ct. p. 2084].)

Further, the " 'substantially advances' inquiry is prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose . . . . Conversely, if a government action is found to be impermissible – for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process – that is the end of the inquiry. No amount of compensation can authorize such action." (*Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2085].) Finally, application of the *Agins* formula is practically difficult to apply, requiring courts to scrutinize the efficacy of a vast array of

state and federal regulations, and empowers courts to improperly substitute their judgments for that of the legislature or expert administrative agencies. (*Lingle*, *supra*, 544 U.S. at p. ___ [125 S.Ct. at p. 2085].)

In its reply brief, Allegretti maintains while the *Agins* formula is no longer viable under the Fifth Amendment, it remains part of California takings law, in part based on the use of that standard by the California Supreme Court in *Landgate, Inc. v. California Coastal Com*. (1998) 17 Cal.4th 1006 (*Landgate*). Even if that were the case, the test does not assist it. As we explain below, applying *Landgate's* test, County's action does not constitute a taking.

V. *Application of Landgate*

The Attorney General, as amicus curiae for County, contends we need not reach the question whether County's action constitutes a taking under *Penn Central* because any regulatory taking claim by Allegretti is one involving a temporary taking that is procedurally barred by the California Supreme Court's decision in *Landgate*, *supra*, 17 Cal.4th 1006. County reiterated that position at oral argument before us. While Allegretti criticized the trial court's analysis of *Landgate* in its appellate briefs, it urged us to apply *Landgate* at oral argument on this matter, arguing it supports its assertion of an unconstitutional taking under *Agins*, *supra*, 447 U.S. 255 as a matter of California law. Although it is not clear whether Allegretti proceeds on the theory of a permanent or temporary taking, we nonetheless address *Landgate* because Allegretti seeks to apply *Agins*' substantially-advances-state interests test on the ground *Landgate* retains its

viability. We conclude that Allegretti's takings claim cannot succeed even under *Landgate*'s standards.[10]

*Landgate* assessed whether an erroneous land use decision – in that case, a permit denial by the California Coastal Commission – could be the foundation for the owner to recover damages for a temporary taking,[11] or whether it was a noncompensable " 'normal delay' " in development. (*Id*. at pp. 1010, 1018.) In that case, the landowner had obtained a court judgment that the Coastal Commission had no permit jurisdiction over a lot line adjustment, and contended the delay in development denied it all viable use of its property for two years. (*Id*. at pp. 1014-1015.)

The Court of Appeal, after concluding the permit denial was erroneous, held there was a temporary taking because the agency had an improper motive for denying the permit. (*Landgate*, *supra*, 17 Cal.4th at pp. 1015-1016.) The California Supreme Court reversed, holding a delay in the regulatory process as the result of a mistaken assertion of jurisdiction could not constitute a taking: "[G]overment land use regulations and

---

10 Given our conclusion, we need not address the duration of any such temporary taking or its beginning and endpoints, i.e., whether it was triggered by the County's grant of the conditional permit or by our decision in *Allegretti I*, and whether it endures until the trial court's order for judgment is final on appeal.

11 In *First English Evangelical Lutheran Church of Glendale v. Los Angeles County* (1987) 482 U.S. 304, the United States Supreme Court identified two reasons why a regulation temporarily denying an owner all use of her property might not constitute a taking, one involving questions that "arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like," issues that were not before the court in that case. (*Id.* at p. 321; *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, *supra*, 535 U.S. at pp. 328-329.)

decisions . . . which, despite their ultimately determined statutory defect, are part of a reasonable regulatory process designed to advance legitimate government interests, are not takings of property . . . ." (*Id*. at p. 1021, citing *Agins*, *supra*, 447 U.S. at p. 260.) The court analogized the situation to that in *Agins*, where the government's abandonment of condemnation proceedings, causing a substantial delay in the development approval process and leading to losses in the property's value, did not constitute a taking. (*Landgate*, *supra*, 17 Cal.4th at p. 1021.)

In *Landgate*, the court pointed out the landowner had "not demonstrated that the development delay . . . was due to anything other than a bona fide dispute over the legality of [the landowner's] lot and the [Coastal] Commission's jurisdictional authority over the lot line adjustment. Such delay is an incident of property ownership and not a taking of property. [Citation.] Although [the landowner] was in the unfortunate position of suffering from a delay not of its own making, the same can be said of any governmental mistake or, for that matter, any number of possible bottlenecks in the development process." (*Landgate, supra,* 17 Cal.4th at pp. 1031-1032.)

Under *Landgate*, no taking occurs if objectively there is "sufficient connection between the land use regulation in question and a legitimate governmental purpose, so that the former may be said to substantially advance the latter." (*Landgate, supra*, 17 Cal.4th at p. 1022, citing *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825, 836-837 & *Dolan v. City of Tigard* (1994) 512 U.S. 374, 391.) The court distinguished situations where government action is "so unreasonable from a legal standpoint as to lead to the conclusion that it was taken for no purpose other than to delay the development

project before it. Such a delaying tactic would not advance any valid government objective." (*Landgate*, at p. 1024.)

The Attorney General compares this situation to *Landgate*, characterizing our prior decision in *Allegretti I* as holding County did not have jurisdiction to impose water use restrictions due to inadequate standards in the ordinance. Assuming the correctness of the Attorney General's characterization of our decision, we agree *Landgate* is dispositive of any taking alleged by Allegretti to have occurred during the permit process and resulting litigation. The permit condition, imposed under County's police power for the purpose of conserving groundwaters and preventing their undue waste, had an objectively sufficiently connection to that valid governmental interest. (See *In re Maas* (1933) 219 Cal. 422, 424-425 [general police powers of counties permit them to adopt ordinances for the conservation of groundwater when such ordinances do not conflict with any general law of the State]; *Baldwin v. County of Tehama*, *supra*, 31 Cal.App.4th at pp. 173-174.) Allegretti does not identify and thus does not meaningfully challenge County's underlying *reasons* for its action, nor does it explain why County's limitation is in any way arbitrary; it merely asserts County' action "*could not* substantially advance *any* interest" because it was without jurisdiction. But as stated, *Landgate* merely requires that we objectively assess whether there exists a "sufficient connection between the land use regulation in question and a legitimate governmental purpose." (*Landgate, supra,* 17 Cal.4th at p. 1022.) We find such a connection here.

Citing Wisconsin authority that does not bind us (*Eberle v. Dane County Bd. of Adjustment* (Wis. 1999) 595 N.W.2d 730), Allegretti criticizes *Landgate* for reasoning

that litigation can be part of the normal regulatory process. It also seeks to distinguish *Landgate*, pointing out the delay in that case was only two years, whereas the delay here was more than 10 years. We find neither of Allegretti's points persuasive. As for the first, we are bound by *Landgate*'s analysis. (*Landgate*, *supra*, 17 Cal.4th at p. 1019 [approving authority involving delay caused by process of presenting a judicial challenge to regulation].) As to the latter, as County points out, such lengthy delays can be part of the normal regulatory process. (E.g. *Calprop Corp. v. City of San Diego* (2000) 77 Cal.App.4th 582, 600-601.)

Allegretti's main argument as to *Landgate*'s application is that County's acts were "so unreasonable from a legal standpoint" that they had no true, legitimate purpose. Allegretti also suggests the litigation between it and County does not constitute a "bona fide dispute." (*Landgate*, *supra*, 17 Cal.4th at p. 1031.) Comparing the circumstances to those in *Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246 (*Ali*), it argues "County's insistence initially in asserting jurisdiction, and then in continuing to assert jurisdiction after this Court explained its total absence, and then failing to take any measures to augment its ordinance after this Court explained its utter inadequacy . . . demonstrates that the County cannot bring itself within the shelter of *Landgate*."

This case is not comparable to *Ali*, in which the City's action in denying a demolition permit under a single room occupancy (SRO) ordinance, temporarily depriving the property owner of *all* economically viable use of his land, was held to be prohibited by the Ellis Act (Govt. Code, § 7060, subd. (a)). (*Ali*, *supra*, 77 Cal.App.4th

at pp. 248, 252-253, 255.)[12] The appellate court concluded that the City's continued invocation of the SRO ordinance was not a normal delay in the development process within the meaning of *Landgate*, observing that because the illegality of the City's action was apparent from case authority existing *before* the City initially withheld the permit, its position was " 'so unreasonable from a legal standpoint' . . . as to be arbitrary, not in furtherance of any legitimate governmental objective, and for no other purpose than to delay any development other than for an SRO hotel." (*Ali*, at p. 255.) Here, County's initial action in imposing the permit condition under its police power was not objectively unreasonable, particularly where the trial court had initially accepted its argument, and its arguments before us in *Allegretti I* were plausible. (See *Landgate*, *supra*, 17 Cal.4th at p. 1020, citing *Littoral Development Co. v. San Francisco Bay Conservation Etc. Com.* (1995) 33 Cal.App.4th 211, 221 [government's actions "were facially valid and supported by a plausible though erroneous legal argument [that] the trial court accepted"].) Nor can we say County's continued defense against Allegretti's inverse condemnation action following our decision in *Allegretti I* was objectively unreasonable. Our conclusion in *Allegretti I* was on its face based solely on the standards set out in Imperial County Ordinance sections 56350 et seq.; our opinion expressly acknowledged the possible existence outside the record of further standards by which County could regulate Allegretti's groundwater use. That County ultimately did not present additional standards

---

12 One court has noted criticism of *Ali*'s reasoning. (*Loewenstein v. City of Lafayette*, *supra*, 103 Cal.App.4th at p. 735, citing Alperin, *The "Takings" Clause: When Does Regulation "Go Too Far?"* (2002) 31 Sw.U.L.Rev. 169, 221-225.)

at trial on Allegretti's inverse condemnation action did not render its defense of that action objectively unreasonable. This is particularly true where, in its inverse condemnation action, Allegretti did not seek to merely litigate the validity of County's restriction (indeed, by the time of trial Allegretti had already rejected County's permit); it sought *damages* for County's purported physical taking of its groundwater. County had every right to maintain a defense based on its perceived lack of a constitutionally compensable taking.

Assuming the circumstances of this case warrant application of *Landgate*, our conclusion ends the analysis: "Once a court determines that a governmental entity engaged in decision-making whose purpose is not delay for delay's sake but legitimate oversight, the question of whether a landowner has a reasonable investment-backed expectation that is impacted in a manner requiring compensation is, of necessity, answered in the negative. A landowner can have no reasonable expectation that there will be no delays or bona fide differences of opinion in the application process for development permits. Sometimes the application process must detour to the court process to resolve a genuine disagreement. Because such delay comes within the *Landgate* category of normal delays in the development approval process, there is no taking even if the value of the subject property is diminished in some way." (*Loewenstien v. City of LaFayette*, *supra*, 103 Cal.App.4th at pp. 736-737.)

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALLEGRETTI & COMPANY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF IMPERIAL,<br><br>Defendant and Respondent. | D045156<br><br><br><br>(Super. Ct. No. 94756)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion filed March 28, 2006, is ordered certified for publication.

The attorneys of record are:

Manatt, Phelps & Phillips, Michael M. Berger; and Jeffrey L. Marcus for Plaintiff and Appellant.

Imperial County Counsel, Ralph Cordova, Joanne Yeager; Rossmann & Moore, Antonio Rossmann, Roger B. Moore, David R. Owen; Gibbs & Fuerst, Michael T. Gibbs; Stephenson, Worley, Garratt, Schwartz, Garfield & Prairie and Donald R. Worley for Defendant and Respondent.

Bill Lockyer, Attorney General, Thomas Greene, Assistant Attorney General, J. Matthew Rodriquez, Joseph Barbieri and Tara L. Mueller, Deputy Attorneys General as Amicus Curiae on behalf of Defendant and Respondent.

____________________________

HUFFMAN, Acting P. J.