**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | No. 01-591 L |
| | ) | Hon. Francis M. Allegra |
| Defendant, | ) | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | ) | |
| Defendant-Intervenor. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 5

PROCEDURAL BACKGROUND ........ 16

STANDARD OF REVIEW ........ 17

ARGUMENT ........ 18

I. RECLAMATION'S VOLUNTARY REFUSAL TO SUPPLY WATER TO PLAINTIFFS IN 2001 WAS NOT A SOVEREIGN ACT ........ 18

A. The Endangered Species Act Did Not Require Reclamation to Refuse to Deliver Water to Plaintiffs in 2001 ........ 19

B. Reclamation's Voluntary Decision to Withhold Water From Plaintiffs Was Not Supported by Sound Biological Science ........ 22

C. Compliance With the ESA Does Not Require or Authorize Reallocation of Stored Water to Instream Use ........ 23

D. Reclamation's Failure to Prepare For a Critically Dry Water Year, Including a Long-Term Operations Plan Created the 2001 Klamath Water Crisis ........ 26

II. SINCE THE ENDANGERED SPECIES ACT DID NOT MAKE DEFENDANT'S PERFORMANCE IMPOSSIBLE, THE SOVEREIGN ACTS DOCTRINE HAS NO APPLICABILITY TO THE FACTS OF THIS CASE ........ 29

A. The Sovereign Acts Doctrine Shields the United States from Liability Only Where Passage of a Statute (or Other Sovereign Act) Makes Performance of the Government's Contract Illegal or Impossible ........ 30

B. Defendant Fails to Demonstrate that the United States Did Not Assume the Risk of Subsequent Impossibility Under the Water Supply Contracts ........ 31

C. The Government's Actions Under the Endangered Species Act were Specifically Targeted at Plaintiffs' Contracts ........ 37

III. THE UNMISTAKABILITY DOCTRINE HAS NO APPLICATION TO THIS CLAIM FOR DAMAGES, WHICH DOES NOT IMPLICATE THE SOVEREIGN INTERESTS OF THE UNITED STATES ........................................................38

CONCLUSION.......................................................................................................................42

## TABLE OF AUTHORITIES


**Federal Statues**

Reclamation Act of 1902, 32 Stat. 388, 390 ....................11

Act of Feb. 9, 1905, 33 Stat 714 ....................5

Klamath River Basin Compact, art. XIII (B) (1), Pub. Law 85-222, 71 Stat. 497 (Aug. 30, 1957) ....................17

16 U.S.C. § 1536 ....................24

16 U.S.C. § 1535 ....................24

16 U.S.C. § 1534 ....................22

16 U.S.C. § 1533 ....................24

**Oregon Statues**

Or. Gen. Laws, 1905, Ch. 228, § 2, p. 401 ....................6

Or. Gen. Laws, 1905, Ch. 5, § 1, p. 63 ....................6

Or. Rev. Stat. 537.400 ....................26

**Federal Regulations**

50 C.F.R. § 402.03 ....................21

50 C.F.R. § 402.02 ....................22, 25

**Cases**

*Amino Bros. Co. v. United States*, 372 F.2d 485 ....................42

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) ....................18

*Arizona Cattle Growers' Ass'n v. Bureau of Land Management*, 273 F.3d 1229 (9th Cir. 2001) ....................3

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................3, 20, 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................18

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005) ....................30, 39

*Cookinham v. Lewis*, 58 Or. 484, 114 P. 88 (1911) ....................26

*Crown Operations Int'l v. Solutia Inc.*, 289 F.3d 1367 (Fed. Cir. 2002)..........................18

*Day v. United States*, 245 U.S. 159 (1917) ..........................................................41

*Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073, 1080-1081 (9th Cir. 2001)..........................................................22

*Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221 (Fed. Cir. 2005)................19

*Franconia Assoc. v. United States*, 61 Fed. Cl. 718 (2004).......................................30, 34

*Freedman v. United States*, 320 F.2d 359 (Ct. Cl. 1963) ................................................40

*Haehn Mgmt. Co. v. United States*, 15 Cl. Ct. 50 (1988) ................................................32

*Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972 (Ct. Cl. 1965)............................. 18

*Horowitz v. United States*, 267 U.S. 458 (1925).................................................32, 33, 40

*Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369 (Fed. Cir. 2002)....................32

*Jones v. United States*, 1 Ct. Cl. 383 (1865).....................................................................31

*Kandra v. United States*, 145 F.Supp.2d 1192 (D.Or. 2001)...........................................29

*Klamath v. United States*, 69 Fed. Cl. 160 (2005).......................................................3, 22

*Klamath Irrigation District et al., v. United States*, No. 01-591 L, Order, Dec. 20, 2005 (Doc. 257).......................................................................................................................2

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994).....................................................21

*Lynch v. United States*, 292 U.S. 571 (1934)...........................................................31, 43

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........................18

*Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747 (Fed. Cir. 1999)...........................................................................................18

*Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000)...........................................................................................19, 38

*Natural Resources Defense Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998).............20

*O'Neill v. United States*, 231 Ct. Cl. 823 (1982)............................................................31

*Pacific Coast Federation of Fishermen's Ass'n v. United States Bureau of Reclamation*, 138 F.Supp.2d 1228 (N.D. Cal. 2001) ....................28

*Perry v. United States*, 294 U.S. 330 (1935) ....................42

*Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109 (10th Cir. 2003)....................21

*Scott Timber Co. v. United States*, 40 Fed. Cl. 492 (1998) ....................38

*Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995) ....................20, 22

*St. Louis v. United Railways Co.*, 210 U.S. 266 (1908)....................42

*Temple-Inland, Inc. v. United States*, Fed. Cl. 550 (259 F 004 ....................36

*Town of Port Deposit v. United States*, 21 Cl. Ct. 204 (1990)....................32

*Transatlantic Financing Corp. v. United States*, 363 F.2d 312 (D.C. Cir. 1966)....................35

*United States v. Winstar*, 518 U.S. 839 (1996 .................... *passim*

*Walcek v. United States*, 44 Fed. Cl. 462 (1999) ....................18

*Winstar Corp. v. United States*, 64 F.3d 1531 (Fed. Cir. 1995) ....................31, 40

*Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed. Cir. 1997)....................19

**Secondary Authority**

Restatement (Second) of Contracts § 346, Comment *a* (1981) ....................42

*Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin* at xvi (2002) ....................12, 23

In their third cause of action Plaintiffs seek damages for Defendant's breach of their repayment contracts in 2001, which together cover almost the entire Klamath Project (other than those areas that receive water from the Lost River only).[1] The essential *quid pro quo* of Plaintiffs' contracts was that the Plaintiffs would reimburse the United States for the construction costs associated with the Klamath Reclamation Project, the project water delivery facilities, and the cost of maintaining the Klamath Project facilities, in exchange for a specifically bargained for quantity of water from the Klamath Project to be used by the farmers for irrigating their land.[2] Solem Decl. ¶ 4. In 2001, Defendant did not deliver this water to Plaintiffs.

Defendant asserts in its motion for summary judgment, however, that even if Plaintiffs can show that in 2001 Defendant deliberately repudiated the specifically negotiated, unambiguous, express contractual commitments for which Defendant has received valuable consideration, Defendant is nonetheless shielded from liability under the sovereign acts and unmistakability doctrines. Not only do Plaintiffs disagree with Defendant's legal arguments in its motion for summary judgment, Plaintiffs also submit that the material facts on which Defendant relies for its motion are in dispute, thus making summary judgment inappropriate.

## INTRODUCTION

On December 20, 2005, this Court entered an order requiring that "defendant shall file a motion for summary judgment concerning the application herein of the sovereign acts and/or unmistakability doctrines." Order, Dec. 20, 2005 (Doc. 257). In compliance with this order, on

---

[1] Plaintiffs are thirteen water, drainage, or irrigation districts, Van Brimmer Ditch Company, and thirteen individual water users who are third-party beneficiaries of the contracts between the water districts and the United States.

[2] The Klamath Irrigation District and the Tule Irrigation District's water contracts specify beneficial use as the measure of the quantity of water. Other water districts, including Malin and Shasta View, measure quantities of water in acre-feet.

February 17, 2006, Defendant filed a motion seeking summary judgment in its favor on Plaintiffs' contract claims with respect to the sovereign acts and unmistakability doctrines.[3]

Defendant's motion elaborately describes the Endangered Species Act and its general implementation. The brief marches through pages of detail about the ESA, noting, for example, that there are 527 species listed under the ESA, including the species listed in the Klamath Basin; that Section 9 prohibits the unauthorized take of any of these species; how under Section 7 federal agencies initiate formal or informal consultations with either the Fish and Wildlife Service or the National Marine Fisheries Service; how these regulations prescribe the manner in which these consultations shall proceed; when and how consultations are required by the statute and regulations; and how Reclamation must balance its contractual duties to plaintiffs with all of its other responsibilities to the tribes, federal wildlife refuges, and to endangered species. Long on generalities and short on specifics, Defendant's motion never reaches the critical point of analyzing, as this Court ordered, "whether Plaintiffs' contract claims are legally cognizable in the face of the sovereign acts or unmistakability doctrines, that is, whether, under those doctrines, the actions taken pursuant to the Endangered Species Act (ESA) here did not give rise to breaches." *Klamath v. United States*, 69 Fed. Cl. 160, 163 (2005). In particular, Defendant never describes what contractual duties it contends that it owed to Plaintiffs, how the Endangered Species Act made performance of these contractual duties impossible, nor how the thirteen contracts at issue in this case allocated the risk of such a sovereign act to either Plaintiffs or to Defendant—all essential elements of a successful sovereign acts defense. *See United States v. Winstar*, 518 U.S. 839, 904 (1996).

---

[3] The question of whether Plaintiffs had a contractual right to receive deliveries of Klamath Project water under the circumstances of 2001 is not addressed in Defendant's brief.

Had Defendant attempted this showing, it is a certainty that this effort would have spotlighted substantial issues of fact not resolvable in a summary judgment motion. For example, as Defendant admits, the Bureau of Reclamation was not obligated to follow the recommendations put forward by FWS and NMFS in their 2001 biological opinions: "[a]fter issuance of the biological opinion, the action agency [here, the Bureau] must determine 'whether and in what manner to proceed with the action in light of its section 7 obligations and the [regulatory agency's] biological opinion.'" Def.'s Memo in Support at 11 (quoting *Bennett v. Spear*, 520 U.S. 154, 168 (1997)). The case law confirms that the ESA does not obligate Reclamation to follow the recommendations made in a biological opinion. *See Bennett*, 520 U.S. at 154; *Arizona Cattle Growers' Ass'n v. Bureau of Land Management*, 273 F.3d 1229, 1239 (9th Cir. 2001). Reclamation itself helped cause the disastrous water year of 2001 by failing, for many years prior to 2001, to institute measures to guard against the shut-off of irrigation water in critically dry years. *See* Solem Decl. ¶ 6. Nor did Reclamation possess any legal right to use the water stored in Upper Klamath Lake, appropriated by the United States for irrigation purposes only, for the wholly unauthorized purpose of species protection. As subsequent peer-reviewed science commissioned by the government itself has demonstrated, the lake level and flow measures recommended by FWS and NMFS in 2001, and implemented by Reclamation, were of no benefit to the fish—and thus not required by the Endangered Species Act. *See* National Academies of Science, Board on Environmental Studies and Toxicology, *Endangered and Threatened Fishes in the Klamath River Basin: Causes of Decline and Strategies for Recovery* (2004), at 34-35 ("NRC Report"), *available at* http://newton.nap.edu/books/0309090970/html/.

Moreover, even had Defendant demonstrated that performance were impossible, that would not satisfy Defendant's burden in this motion. For a party (including the government)

which seeks discharge of its contractual obligation must also demonstrate that the contract itself allocated responsibility for the event to the non-breaching party. Defendant here has not even attempted to do so in its motion, nor could it do so in light of the language of the contracts and the substantial body of historical events surrounding these contracts.

Finally, in cases where protection of a species under the Endangered Species Act has in fact made contract performance impossible, precedent holds that it is the biological opinion and other actions taken pursuant to the ESA and not the statute itself which must be examined in the sovereign acts analysis. Applying this precedent to this case, it becomes clear that the listing of the fish is targeted at Plaintiffs' contracts, depriving the sovereign acts doctrine of any ability to shield Defendant from liability in this case. In addition, Defendant does not even attempt to analyze which party bore the contractual risk of the events of 2001.[4] That the Endangered Species Act is comprehensive does not *ipso facto* relieve the United States of liability for a breach of contract. Finally, the government's actions under the biological opinions were specifically targeted at Plaintiffs' contracts.

The motion Defendant filed, thus, falls far short of the demonstration required to grant summary judgment, particularly at this early stage in discovery and the development of factual evidence on how and why Reclamation refused to deliver water to Plaintiffs in 2001. Although Plaintiffs would like nothing better than to promptly resolve this litigation, they respectfully urge that summary judgment simply cannot be granted at this time, and that the case instead be set on a schedule to prepare it for trial on the merits.

---

[4] Because Defendant has not broached the contract interpretation issue in its motion, it would be inappropriate for Plaintiffs to launch a comprehensive analysis of their thirteen contracts here. In any case, interpretation of these contracts, bound up as it is with nearly a century of historic performance, will raise so many issues of material fact that resolution on summary judgment will be impossible.

## FACTUAL BACKGROUND

The Klamath Project, one of the first projects constructed under the Reclamation Act, was authorized in 1905 and, in accordance with its authorization, is limited to the irrigation and reclamation purpose of the 1902 Act. Act of Feb. 9, 1905, 33 Stat. 714 ("[T]he Secretary of the Interior is hereby authorized in carrying out any irrigation project that may be undertaken by him under the terms and conditions of the national reclamation Act and which may involve changing the levels of Lower or Little Klamath Lake . . . .") After the passage of the federal authorization for the Klamath Project, the States of Oregon and California ceded land to the United States for irrigation purposes. The Oregon statute provided that an appropriate Federal official could file with the State "a written notice that the United States intends to utilize certain specified waters . . . unappropriated at the time of the filing." Or. Gen. Laws, 1905, Ch. 228, § 2, p. 401. On May 17, 1905, the Bureau filed a notice indicating that "the United States intends to utilize . . . [a]ll of the waters of the Klamath Basin in Oregon, constituting the entire drainage basins of the Klamath river and Lost river, and all of the lakes, streams and rivers supplying water thereto or receiving water therefrom" for purposes of the "operation of works for the utilization of water . . . under the provisions of the . . . Reclamation Act." *Klamath v. United States*, 67 Fed. Cl. 504, 510 (2005). A second act passed by Oregon in 1905 provided that "for the purpose of aiding in the operations of irrigation and reclamation ... the United States is hereby authorized to lower the water level of" various Klamath Basin lakes. Or. Gen. Laws, 1905, ch. 5, § 1, p. 63.

The Klamath Compact, enacted as Act of August 30, 1957, 71 Stat. 497, provides that

> There are hereby recognized vested rights to the use of waters originating in the Upper Klamath River Basin validly established and subsisting as of the effective date of this compact under the laws of the state in which the use or diversion is made, including rights to the use of waters for domestic and irrigation uses within the Klamath Project. There are also hereby recognized rights to the use of all

> waters reasonably required for domestic and irrigation uses which may hereafter be made within the Klamath Project.

Act of August 30, 1957, 71 Stat. 497.

These waters are stored in Upper Klamath Lake, using facilities paid for by the Klamath Project water users, who also manage and operate at their own expense the canals, pumps, and ditches through which the water is distributed. *See generally* Ganong Decl. Thirteen agricultural landowners and fourteen water, drainage or irrigation districts in the Klamath River Basin area of Oregon and northern California, each with a contract to receive, directly or indirectly, water from irrigation works constructed or operated by Reclamation, are Plaintiffs in this lawsuit. Although the contracts contain different provisions, each of the thirteen contracts, which were entered into between 1918 and 1956, have certain characteristics in common, as required by the Reclamation Act. *Id*. These include the duty of the plaintiff-districts to repay to the United States the entire cost of the Reclamation project, and the duty of the United States to supply water to Plaintiffs. *Id*.[5]

Two species of suckerfish, and coho salmon, live in the Klamath River Basin. Endemic freshwater fishes that live in the basin include the shortnose sucker (*Chasmistes brevirostris*) and the Lost River sucker (*Deltistes luxatus*). These species were listed as endangered under the Endangered Species Act in 1988. *See* 53 Fed. Reg. 27130-27133 (1988). Also, the genetically distinctive Southern Oregon/Northern California Coast (SONCC) coho salmon (*Oncorhynchus kisutch*), an evolutionary significant unit (ESU) of the coho salmon, lives in the basin. The coho salmon was listed as threatened under the ESA in 1997. *See* 70 Fed.Reg. 37,160, 37,193 (June 28, 2005).

---

[5] The determination of Plaintiffs' contractual rights would require an examination of these contracts. However, these questions are beyond the scope of the present motion.

Factors thought to have contributed to the decline of the suckerfish include: degradation of spawning habitat, deterioration in the quality of water in Upper Klamath Lake, overexploitation by commercial and noncommercial fishing (now regulated), introduction of competitive or predaceous exotic species, blockage of migration routes, and entrainment of fish of all ages in water-management structures. National Academies of Science, Board on Environmental Studies and Toxicology, *Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin: 2002 Interim Report*, at 1 ("2002 Report"), *available at* http://newton.nap.edu/books/0309083249/html/. Factors thought to have contributed to the decline of the coho salmon include: earlier overexploitation by fishing as well as continuing degradation of tributary habitat and reduced access to spawning areas, and may also include changes in hydrologic regime, substantial warming of the main stem and tributaries, and continuing introduction of large numbers of hatchery-reared coho, which are derived only partly from native stock. *Id*. at 2. During 2001, a severe drought occurred in the Klamath River Basin. *Id*. at 3. In February 2001, Reclamation issued a proposed one-year operations plan for 2001 and a biological assessment with respect to the operation of the Klamath Project, proposing to deliver water to Klamath Project irrigators and wildlife refuges, in accordance with historical practice. *See* Bureau of Reclamation Biological Assessment at 6-10 (Feb. 13, 2001), attached to Def's Supp. App. at Ex. 69. Reclamation, however, directed irrigation water users not to take water until the FWS and NMFS had completed their biological opinions. Solem Decl. ¶ 7.

In April 2001, the United States Fish and Wildlife Service (FWS) issued a biological opinion relating to the suckerfish (FWS BO). That BO:

> [S]tates that the endangered suckers would be in jeopardy under USBR'S proposed Klamath Project operations. The USFWS proposed a reasonable

> and prudent alternative (RPA) for operation of the Klamath Project. The RPA requires screening of water-management structures to prevent entrainment of suckers, adequate dam passage facilities, habitat restoration, adaptive management of water quality, interagency coordination in the development plans for operating the Klamath Project during dry years, further studies of the sucker populations, and a schedule of lake levels higher than those recommended by the USBR in its assessment.

Def's Supp. App. at Ex. 70. Also in April 2001, NMFS, which assumes responsibility for the coho because it is anadromous, issued a BO relating to the coho (NMFS BO). That BO:

> Indicat[es] that the operation of the Klamath Project as proposed by the USBR assessment of January 2001 would leave the coho population in jeopardy. The NMFS formulated an RPA incorporating reduced rates of change in flow (ramping rates) below main-stem dams to prevent stranding of coho, interagency coordination intended to optimize use of water for multiple purposes, and minimum flows in the Klamath River main stem higher than those proposed by USBR.

*Id.* at Ex. 71.

Thus, each agency found that the proposed action of water delivery was likely to jeopardize the continued existence of the species. The RPAs recommended that Reclamation both provide greater flows of water for the Klamath River (in order to benefit Coho salmon) and maintain higher elevations in the Upper Klamath Lake (in order to protect the Lost River and Shortnose suckers). Tragically, both of these recommendations had no scientific bases, and Reclamation's adherence to them may actually have injured the fish:

> Water level in Upper Klamath Lake shows no relationship to water quality conditions that result in mass mortality of adult suckers or other potentially adverse water-quality conditions. In addition, water level shows no relationship to year-class strength or to abundance of fry or juveniles over the years during which standardized sampling is available. Thus, maintenance of water levels above recent historical levels in order to increase the abundance of suckers by maximizing the area of habitat where young suckers are found is not supported by the currently available evidence. Water levels lower than recent historical levels could have undocumented adverse effects and therefore are inadvisable.

2004 NRC Report at 248.

Reclamation had many alternatives available to it that could have potentially improved water delivery, better protected the fish, and certainly avoided disastrous water years such as 2001. Among the measures which could have been taken by Reclamation prior to 2001 to avoid the complete shutdown of Klamath Project water deliveries are the following:

- Institution of the Klamath Project Pilot Water Bank , which Reclamation started in 2002, including the leasing of the Barnes Ranch for water storage. This program compensates landowners for land idling and groundwater substitution and makes up to 100,000 acre feet of water available for irrigation uses. *See* Solem Decl. Attachment 1 (Bureau of Reclamation, 2006 Klamath Basin Pilot Water Bank Instructions).

- Institution of the Conservation Implementation Program (CIP), which was begun in 2002. This program is designed to implement recovery of the fish species, and is a main reasonable and prudent alternative of the current biological opinions. The concept of the CIP is to avoid jeopardy opinions by instituting a fish recovery planning program. *See* Solem Decl. Attachment 2 (Letter from D. Sabo to D. Solem, dated Oct. 22, 2002, regarding Klamath Basin Conservation Implementation Program).

- Preparation of a coho recovery plan. Incredibly, NOAA Fisheries has never prepared one, although it is required by the Endangered Species Act and, in fact, a bill has just been introduced to require its preparation. *See* Solem Decl. Attachment 3 (House Resolution regarding Klamath River salmon).

- Construction of the A-Canal fish screens to protect sucker fish from being entrained into irrigation canals. The government in fact constructed the fish screens in winter 2002-2003, just after the 2001 water disaster.

- Construction of the Link River Dam Fish passage, which was completed in winter 2005. The purpose of this facility is to enable suckers to migrate upstream to spawn.

- Development of the Klamath Lake Incremental Adjustment Methodology (IAM), which allows flexibility in meeting monthly levels of Upper Klamath Lake. This methodology is approved by the Fish and Wildlife Service.

- Commencement of Section 7 Consultations for the Rogue River Project, operated by Reclamation, did not commence until 2003. The Rogue operations impact the Klamath Project by diverting water out of the Klamath Basin.

- Moreover, there are many other federal projects within the Klamath basin (*e.g.*, the Klamath Marsh Wildlife Refuge), which affect the flows of the Klamath River, and yet have never been the subject of ESA consultation. The result is that the Klamath Project bears the entire burden of mitigating for all of these other projects, which operate the same without consideration of endangered species.

- Institution of the NRCS program in 2002 for farmers, *see* Solem Decl. Attachment 4 (Conservation in the Klamath Basin: Partnership Accomplishments, December 2003), and Reclamation programs to provide pipe and water measuring equipment to Project districts to save water.

- Institution of a new review of flow studies by the National Academy of Sciences (*see* Solem Decl. Attachment 5, (National Academy of Sciences, Proposal 05-DELS-204-01: Further Studies on the Klamath Basin)), not to mention the Academy's 2002 report (*see* National Academies of Science, Board on Environmental Studies and Toxicology, *Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin: 2002 Interim Report*, at 1 ("2002 Report"), available at http://newton.nap.edu/books/0309083249/html/ examining whether the operational regime required by the 2001 biological opinions made any scientific sense, or helped the fish.

- Preparation of a long-term operations plan incorporating conservation, water bank, well drilling, and other measures which could have ameliorated the water shortage in 2001. The need for such a plan was expressed as early as 1992, yet Reclamation did not complete it until 2002.

Solem Decl. ¶ 6. The choice of any or all of these alternatives could have made more water available to Plaintiffs in 2001: preparation of a long-term operations plan incorporating conservation, water bank, well drilling, and other measures which would have ameliorated the water shortage in 2001. Instead, Reclamation chose to deliver no water to plaintiffs in 2001. Reclamation adopted these RPAs and on April 6, 2001, announced that there would be no water delivered to plaintiffs from Upper Klamath Lake.

As a result of the significant public outcry from Reclamation's refusal to deliver the Klamath Basin water users their irrigation water, in late July 2001, Interior Secretary Norton came out to the headgates and ordered the release of approximately 70,000 acre feet of water. Needless to say, the release of this small amount of water after the growing season was over was of no benefit to the water users. Solem Decl. ¶ 8.

Throughout the 2001 irrigation season, Upper Klamath Lake contained large quantities of water that should have been released to Klamath Project water users. However, Reclamation

maintained the Upper Klamath Lake level between 4,143.3 and 4,139.5 feet above sea level. Further, Reclamation released flows down the Klamath River as required by the NMFS biological opinion much larger than the historical practice. Had Reclamation managed Upper Klamath Lake levels and downstream flows according to historic practices, Klamath Project water users would have received sufficient water to grow their crops. Solem Decl. ¶ 9.

The severe economic consequences of this change in water management led DOI to request that the National Research Council (NRC) independently review the scientific and technical validity of the government's biological opinions and their RPAs. More specifically:

> The cessation of water deliveries through the Klamath Project during 2001 as required by the jeopardy opinions on coho salmon and the two endangered sucker species of the Klamath River basin motivated the U.S. Department of the Interior and the U.S. Department of Commerce to seek an outside evaluation of the scientific basis of the requirements set by USFWS and NMFS for higher water levels in Upper Klamath Lake and higher main-stem flows in the Klamath River. These federal agencies therefore asked the NRC to create a committee to be charged with external, independent review of the biological opinions and assessments and of the long-term needs of the endangered and threatened fishes in the Klamath River basin. As a result of the request, the NRC formed the Committee on Endangered and Threatened Fishes in the Klamath River Basin.

2004 NRC Report at 33-34. The National Academy of Sciences appointed a committee to review the actions of Reclamation, FWS, and NMFS in the Klamath Basin. That committee produced an interim report in 2002 and a final report in 2004. The committee found in both its 2002 and 2004 reports that there was no link—neither a causal link nor even a correlation—between increased water levels and increased survival of fish. 2002 NRC Report at 1.

The interim, 2002 report focuses on the biological assessments of the USBR (2001) and the USFWS and NMFS biological opinions of 2001 regarding the effects of Klamath Project operations on the three listed fish species. *Id.* The committee conducted a preliminary assessment of the scientific information used by the agencies and other relevant scientific

information, and considered the degree to which the biological opinions were supported by this information. *Id.* The report concluded:

> The committee found strong scientific support for all components of the reasonable and prudent alternatives given by USFWS in 2001 for the endangered suckers except for recommendations on maintenance of higher water levels in Upper Klamath Lake, for which the committee found no empirical support. At the same time, however, the committee found that USBR's recommendations, which could have caused mean water levels in Upper Klamath Lake to be lower than in the recent past, also were without scientific support. Thus, the committee's overall conclusion was that there was no substantial scientific evidence to support deviation from the water levels produced by operational principles that were in effect during the 1990s. Similarly, in reviewing the biological opinion of NMFS on the coho salmon, the committee concluded that all components of the reasonable and prudent alternative were supported scientifically except the one calling for higher flows in the Klamath River main stem. The committee found little scientific support for these recommendations in relation to coho salmon, nor did it find any scientific justification for the proposals of USBR, which would have allowed the river to be operated at lower mean flows than had been the case for specific categories of water availability applicable during the 1990s. The committee, in drawing conclusions for its interim report, was bound by its charge to evaluate and comment on the scientific strength of evidence underlying various proposals. Its charge kept it from weighing economic concerns or weighing the advisability of minimizing risk by using professional judgment in place of scientific evidence to support particular recommendations. As explained more fully in Chapter 9, agencies charged with ESA responsibilities can be expected to use professional judgment when no scientifically supportable basis is available for a decision, or where they judge the scientific support to be inadequate. Thus, the agencies may recommend practices for which the committee would find virtually no direct scientific support. The committee acknowledges the necessity of this practice in many situations where information is inadequate for development of scientifically rigorous decisions.

2004 NRC Report at 34-35.

**Committee's Report Regarding the FWS Biological Opinion Relating to Suckerfish**

The committee analyzed the FWS BO and the conditions relating to suckerfish. It found that suckerfish are present in Upper Klamath Lake on the north side of the Klamath River drainage, within Clear Lake, and in Gerber Reservoir on the Lost River to the southeast. 2002 NRC Report at 11. Small groups may also be present elsewhere in the Klamath River drainage

and in Tule Lake sump. The committee found that the water quality of Upper Klamath Lake has changed substantially over the past several decades and that "[e]vidence indicates that changes in the water quality of Upper Klamath Lake have increased mass mortality among adult suckers." *Id.* at 12. The committee summarized the FWS BO, and its conclusions on the BO, as follows:

> The USFWS biological opinion states that the Klamath Project contributes directly to mortality and adverse environmental conditions for the endangered suckers. On this basis, USFWS presents a reasonable and prudent alternative (RPA) consisting, in summary, of requirements for minimum lake levels, interagency coordination and adaptive management, screening to prevent entrainment of fish, creation of improved passage facilities, steps toward improvement of habitat and water quality, and additional studies. The RPA is intended to avoid jeopardizing listed species either directly or through adverse modification of critical habitat (50 CFR 402.02). With the exception of the recommendation on lake-level maintenance, there is good scientific or technical support for all the requirements listed in the RPA.

*Id.* at 13. The committee went on to discuss its analysis of the lake-level maintenance, explaining that "[c]ontrol of lake levels as a means of advancing the welfare of the endangered suckers raises more difficult scientific issues than the other requirements listed by the USFWS in its RPA." *Id.* at 16. Impairment of water quality, according to the committee, is a cause of mortality and stress for sucker populations. *Id.* But low water *quality* cannot be causally associated with low water *quantity*:

> Impairment of water quality, primarily through eutrophication of Upper Klamath Lake, is a cause of mortality and stress for sucker populations. As indicated above, the present scientific evidence for this association is credible. An essential premise of the lake-level recommendations is that the adverse water-quality conditions known to stress or kill the endangered suckers are associated with the lowest water levels within the recent historical range of levels (since 1990, when consistent documentation first began). Presumption of this connection, which is essential to the arguments for specific lake levels proposed in the RPA, is inconsistent with present information on Upper Klamath Lake.

*Id.* at 16-17 (citation omitted).

The committee also found that many factors may contribute to low water quality. First, population densities of algae may deteriorate water quality. *Id.* at 17. But, "[n]o relationship between lake levels and population densities of algae (as shown by chlorophyll) is evident, however, in the 9-year water-quality monitoring record that has been fully analyzed. Thus, the idea of relieving eutrophication through phosphorus dilution caused by higher lake levels is not consistent with the irregular relationship between chlorophyll and lake level." *Id.* Extremes of dissolved oxygen or pH also may contribute to low water quality. But again,

> [L]ake level fails to show any quantifiable association with extremes of dissolved oxygen or pH. For example, the most extreme pH conditions recorded for the lake over the past 10 years occurred in 1995 and 1996, which were years of intermediate water level, and not in 1992 and 1994, when water levels were lowest. (These two years had the lowest recorded water levels since 1950.) Furthermore, a substantial mass mortality occurred in 1971, the year of highest recorded water levels since 1950, and within the last ten years, mortality of adults was highest in 1995, 1996, and 1997, none of which were years of low water level.

*Id.* (citations omitted). The committee went so far as to suggest that low water levels might actually help the fish, observing that "[t]he absence of notable adult mortality in any year of low water during the 1990s might in fact suggest an association the reverse of the one postulated in the biological opinion, although the evidence is statistically inconclusive." *Id.* And, it noted that FWS itself had never found a connection between mass mortality of suckerfish and lake levels. *See id.* The committee noted that higher water levels might have been justified if they indicated an increased survival rate in young suckerfish. But it found no such connection:

> Higher water levels could reduce the likelihood that spawning areas around the lake would be dewatered and could be favorable to fry or juveniles. Abundance of juvenile suckers has been monitored since 1991 on the basis of seining. This information, which must be used cautiously because it is not quantitative, indicates low abundances of juveniles in the drought years 1992 and 1994 but not in drought year 1991. Abundances also were low in non-drought years 1997 and 1998. Simon et al. have reported generally declining abundance during the non-drought interval 1995–1998. They have also

> shown that the abundance of age 1+ suckers consistently has been very low, suggesting a bottleneck at this life stage, but interpretation of the data is complicated by very low efficiency for catching fish older than one year. Overall, the study of young fish shows no clear pattern associated with lake level.

*Id.* (citations omitted). Thus, the committee concluded that "the presumed causal connections between lake levels and recruitment of the sucker populations in Upper Klamath Lake do not have strong scientific support at present." *Id.* at 18.

The committee suggested that suckerfish mortality could have several causes—among them water column stability interacting with sudden weather events. *See id.* at 19. But low water levels were not among them: "Despite a monitoring record of substantial length, there is no clear evidence of a connection between the lake levels and the welfare of the two sucker species in Upper Klamath Lake." *Id.*

**Committee Report Regarding the NMFS Biological Opinion Relating to Coho Salmon**

In its analysis of the NMFS BO, the committee observed that "[t]he reduction in stocks of native coho salmon in the Klamath River Basin has been caused by multiple interactive factors." *Id.* at 22. The committee described the NMFS BO as follows:

> The biological opinion issued by the NMFS for the Klamath Basin coho salmon states that the Klamath Project harms coho in the Klamath main stem. The NMFS presents an RPA with three components: (1) higher monthly minimum flows for the main stem of the Klamath River for April through November as a means of maximizing habitat space in the main stem and suppressing maximum water temperatures, (2) suppression of ramping rates below Iron Gate Dam, and (3) coordination involving other agencies.

*Id.* at 23 (citation omitted). The committee observed that the NMFS RPA proposed flows were well above historical operating conditions, and that the proposed low-flow limits on the Klamath River "might not benefit the coho population significantly." *Id.* This was so because "[a]lthough the provision of additional flow seems intuitively to be a prudent measure for

expanding habitat, the total habitat expansion that is possible with the limited water available in dry years is not demonstrably important to maintenance of the population." *Id.* Thus, factors other than dry-year low flows, in the opinion of the committee, limited the survival and maintenance of the coho. *See id.* Indeed, the committee concluded that higher flows between July and September might even disadvantage the coho population if the source for those flows were warmer than the water to which they were added. *Id.* at 23-24. The committee concluded:

> Progressive depletion of flows in the Klamath River main stem would at some point be detrimental to coho salmon through stranding or predation losses. Thus, incremental depletions beyond those reflected in the recent historical record could be accomplished only with increased risk to coho salmon. At the same time, the available information provides little support for benefits presumed to occur through the increase of flows beyond those of the past decade. While single-year or multiple-year averages of low-flow extremes beyond those presently reflected in the record cannot be supported, there also is presently little evidence of a scientific nature that increased low flows will improve the welfare of the coho salmon. Modeling of temperature and habitat might be useful, but convincing evidence of a relation between the welfare of the coho and environmental conditions must be drawn to some extent from direct observation.

*Id.* at 25.

## PROCEDURAL BACKGROUND

On October 11, 2001, Plaintiffs filed this lawsuit, seeking just compensation for the taking of their property rights in Klamath Project water under the Fifth Amendment, and for impairment of their vested rights to the use of water under the Klamath Compact. Klamath River Basin Compact, art. XIII(B)(1), Pub. Law 85-222, 71 Stat. 497 (Aug. 30, 1957). On March 24, 2003, Plaintiffs filed an amended complaint adding a breach of contract count.

On August 31, 2005, this Court issued its decision on partial summary judgment, determining that Plaintiffs lack any constitutionally protected property right under the Fifth Amendment, and any vested right to the use of water as defined in the Klamath Compact. On

December 20, 2005, the Court denied Plaintiffs' motion to certify that decision to the Federal Circuit Court of Appeals for review. Now pending for review by this Court is Defendant's motion for summary judgment on the question of whether the sovereign acts and unmistakability doctrines shield it from liability for the breach of Plaintiffs' water delivery contracts filed on February 17, 2006.

**STANDARD OF REVIEW**

Summary judgment is not appropriate where there are disputes over facts that might affect the outcome of the suit under governing law. RCFC 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Thus, summary judgment will not be granted if "the dispute about a material fact is 'genuine.'" *Id*. A genuine issue of material fact exists when a rational trier-of-fact could only arrive at more than one reasonable conclusion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *see also Walcek v. United States*, 44 Fed. Cl. 462, 465 (1999) ("[S]ummary judgment will not be granted if 'the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party.'") (quoting *Liberty Lobby*, 477 U.S. at 248). "The moving party in a summary judgment motion has the burden to show 'that there is an absence of evidence to support the non-moving party's case.'" *Crown Operations Int'l v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment. *Matsushita Elec. Indus.*, 475 U.S. at 587-88.

The facts surrounding the creation and performance of a contract are relevant to its interpretation. "This court adheres to the principle that 'the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person

acquainted with the contemporaneous circumstances.'" *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965)). Although "context alone does not create a presumption in favor of any particular outcome, context is relevant to the problem of contract interpretation." *Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221, 1233 (Fed. Cir. 2005).

The determination of whether the government is acting as a private contractor and not as a sovereign, in which case the sovereign acts doctrine would not be applicable is inherently fact-intense, and therefore must be determined by a "case-specific inquiry." *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997). Defendant bears the burden of showing that performance under the contracts was impossible because of the ESA. *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 619 (2000).

Because Defendant cannot meet its burdens of proof in this case, Defendant's motion for summary judgment should be denied.

## ARGUMENT

### I. RECLAMATION'S VOLUNTARY REFUSAL TO SUPPLY WATER TO PLAINTIFFS IN 2001 WAS NOT A SOVEREIGN ACT.

Defendant's motion completely misses the mark, for it was not the Endangered Species Act of 1973 but the operational decision of Reclamation in 2001 which breached the contracts at issue in this case. Nothing in the Endangered Species Act prohibited Reclamation from delivering water to Plaintiffs in 2001, nor does the science even support Reclamation's stated rationale for withholding Plaintiffs' contractual water entitlement (protection of the fish). Moreover, it was Reclamation's own failure to develop a long-term plan for operating the Klamath Project which led to the 2001 water crisis—a tragedy which could have been avoided

by Reclamation. As the United States told the Supreme Court in attempting to defeat Klamath farmers' standing to challenge a 1992 biological opinion, "If the petitioners have suffered injury," the Government contends, "the proximate cause of their harm is an (as yet unidentified) decision by the Bureau regarding the volume of water allocated to petitioners, not the biological opinion itself." Brief of Respondent at 22, *Bennett v. Spear*, 520 U.S. 154 (1997). This 2001 decision by the Bureau regarding the volume of water allocated to Plaintiffs is not a sovereign act but a breach of contract, for which the United States is liable.

**A. The Endangered Species Act Did Not Require Reclamation to Refuse to Deliver Water to Plaintiffs in 2001.**

Nothing in the Endangered Species Act obligated Reclamation to consult on whether or not to perform its existing contractual obligations to Plaintiffs. A government agency is not required to consult with respect to binding contracts it has already entered into before passage of the Endangered Species Act. *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995) ("[W]e conclude that where, as here, the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species."); *see also* 1995 Regional Solicitor's Opinion ("Reclamation has an obligation to deliver water to the project water users in accordance with the project water rights and the contracts between Reclamation and the water user (which may be through a water district) subject to the availability of water . . . . Reclamation is not free to disregard these rights, and its discretion to determine the necessary means to protect and fulfill each of these rights is limited.")

To be sure, after the passage of the ESA, the execution or renewal of a contract such as those at issue here would require consultation under Section 7 of the ESA. *See Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998) (holding that

Reclamation must consult on contract renewals where it retains discretion to take actions to protect endangered species from jeopardy). However, nothing in the ESA suggests an exception to the longstanding "presumption against retroactive legislation." *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994). Absent an explicit directive that the ESA apply retroactively, a federal agency's duty under Section 7(a)(2) to ensure that its "actions" do not jeopardize an endangered species is limited to "actions" taken *after* the passage of the ESA. Put another way, the time to determine the effect of a contract on endangered species is before, and not after, entering into it.[6]

Moreover, because a reduction in contract deliveries below what is required to be delivered to contractors and use of that water for endangered species is not within Reclamation's discretion, it could not form the basis for any "reasonable and prudent alternatives" (RPAs), because "alternative actions" that can form the basis of RPAs must be actions in which there is

---

[6] The government made this precise argument to the Tenth Circuit in *Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109 (10th Cir. 2003), stating:

> Under 50 C.F.R. § 402.03, "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control." Once a federal agency has entered into a commitment to do a particular thing at a particular time, the physical execution of that commitment will not be regarded as a federal "action" for purposes of Section 7 unless Reclamation has retained discretion to alter its performance for the benefit of endangered species. Under that reasoning, Reclamation's delivery of water to commercial users pursuant to contract is not a federal "agency action" for Section 7 purposes because Reclamation had previously relinquished any discretion it might have had to use the water for endangered species. If the delivery of water to contractors is not a federal "agency action," it does not violate Section 7(a)(2)'s substantive requirement, even if the consequence is jeopardy to the species. Our argument thus is not that Reclamation's contractual commitments somehow override its obligation to comply with the ESA or excuse the agency's non-compliance. Rather, the argument is that the existence of a binding contract helps to define what Reclamation's ESA obligations are.

Brief of Federal Appellants, 2002 WL 32879498 *25-26 (November 20, 2002).

discretionary Federal involvement or control. 50 C.F.R. § 402.03. RPAs are defined as "alternative actions identified during consultation" that are within the agency's authority, consistent with the purpose of the proposed action, and economically feasible. 50 C.F.R. § 402.02. The use of project water for endangered species is not an "alternative action" for Section 7 purposes because in signing the water delivery contracts, Reclamation relinquished any discretion it might have had to use for endangered species purposes the water that it is required to release from storage for contracting parties. *Cf. Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073, 1080-1081 (9th Cir. 2001) (where FWS did not retain discretionary control in permit documents to enable it to impose new requirements to protect endangered species, FWS has no such power); *Sierra Club*, 65 F.3d at 1509 (where BLM did not retain discretion to affect timber company's action in right of way agreement, BLM could not take any action to protect spotted owl from effects of agreement).

Finally, nothing in the Endangered Species Act obligated Reclamation in 2001 to convert Klamath Project water rights, which were authorized by the State and appropriated by the Secretary for reclamation purposes, to fish protection purposes instead. As this Court has noted, the Secretary obtained Klamath Project water rights "for purposes of the 'operation of works for the utilization of water . . . under the provisions of the . . . Reclamation Act.'" *Klamath*, 67 Fed. Cl. at 510. As the United States itself described its water right in the Adjudication, "[t]he purposes for which water is used and claimed, as stated in the May 17, 1905 'Notice of Intention to Utilize all Waters of the Klamath Basin,' are those provided for by the . . . Reclamation Act, as amended and supplemented, including irrigation, reclamation, domestic and other authorized uses." Pls.' Ex. 29. To be sure, the Endangered Species Act authorizes the purchase of water for endangered species. 16 U.S.C. § 1534 (stating that "to conserve fish . . . which are listed as

endangered or threatened species . . . the appropriate Secretary . . . is authorized to acquire . . . waters, or interest therein"). But nothing in the statute purports to override the limitations on use of water imposed by the State of Oregon. *Cf.* 32 Stat. 388, 390 ("[N]othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State . . . relating to the control, appropriation, use, or distribution of water . . . .")

**B. Reclamation's Voluntary Decision to Withhold Water From Plaintiffs Was Not Supported by Sound Biological Science.**

As late as February 13, 2001, Reclamation intended to deliver irrigation water to Plaintiffs: "Reclamation proposes continuing operation of the Klamath Project to supply water to project users." Def.'s Ex. 69 at § 2.0. "Reclamation's proposed action calls for continued diversion of water for irrigation from Upper Klamath Lake through the A-Canal, Klamath River through the Lost River Diversion Channel, the Lost River and also from Tule Lake to Lower Klamath Lake via Pumping Plant D." *Id.* at § 3.0.

On April 7, 2001, Reclamation did an abrupt about-face, deciding instead that "only limited deliveries of Project water will be made for irrigation." Def.'s Ex. 61 at 2. However, while that decision was purportedly made for the protection of endangered fish, as the National Research Council concluded, this decision did not help the fish. The NRC Report,[7] released in February 2002, concluded that

> Extensive field data on the fish and environmental conditions in Upper Klamath Lake do not provide scientific support for the underlying premise of the RPA that higher lake levels will help maintain or lead to the recovery of [the shortnose and Lost River suckers] . . . [Moreover,] [t]he committee does not find scientific

---

[7] The NRC Report was the result of the Department of the Interior and Department of Commerce's request "for the National Research Council to form the Committee on Endangered and Threatened Fishes in the Klamath River Basin, whose charge is to conduct an external review of the scientific basis for the biological opinions that resulted in changes of water management for year 2001." National Research Council, *Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin* at xvi (2002).

> support for the proposed minimum flows as a means of enhancing the maintenance and recovery of the coho population.

National Research Council, *Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin* at 26-27 (2002).

The Endangered Species Act specifically requires that decisions be made based on the "best scientific and commercial data available." 16 U.S.C. § 1536. As the NRC Report concludes, "the available information provides little support for benefits presumed to occur through the increase of flows beyond those of the last decade"; thus, the best scientific and commercial data did not require that Reclamation withhold Plaintiffs' water in 2001—and thus neither did the Endangered Species Act.

### C. Compliance With the ESA Does Not Require or Authorize Reallocation of Stored Water to Instream Use.

Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a), does not compel or authorize the release of stored water from Upper Klamath Lake, water that in 2001 could have been used for performance of the contracts at issue. Rather than creating an affirmative duty to protect species, section 7(a)(2) is a *limitation* on certain actions that could harm species. The ESA consists of a combination of provisions to promote protection and recovery of threatened and endangered species. Under section 4(f) of the ESA, the U.S. Fish and Wildlife Service must "develop and implement" recovery plans. 16 U.S.C. § 1533(f). Section 6 authorizes cooperative agreements with states for species conservation. 16 U.S.C. § 1535. Section 7 requires that agencies exercise their existing authorities to further conservation purposes and establishes a limitation, under section 7(a)(2), on certain actions. 16 U.S.C. § 1536(a). Defendant's assertion that the ESA made performance of the contracts impossible effectively shoehorns all of these authorities and responsibilities as a single, affirmative duty to do anything necessary to create favorable conditions for listed species, no matter what. This is not what section 7 provides.

Section 7(a)(2) requires that Reclamation "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence" of the species. 16 U.S.C. § 1536(a)(2). Plainly, this provision focuses only on Reclamation's actions. It does not require Reclamation to protect a species from natural stream conditions. Thus, because Reclamation is not required to enhance natural flows, Reclamation does not harm the fish by using stored water, even if the natural flow is less than what the fish require, as long as the water was stored at a time when the fish did not require it. For this reason, the use of stored water does not change baseline flows,[8] and cannot violate Reclamation's obligation to avoid jeopardy.[9] Consequently, the use of stored water for ESA purposes was discretionary and, therefore, may not be the basis of an impossibility defense. *See* 1995 Regional Solicitor's Opinion ("Water lawfully stored in the project's reservoirs can be used for domestic and irrigation purposes to the extent the water is applied to beneficial use within the project.")

The use of previously stored water does not have negative effects on the fish. When water flows into Upper Klamath Lake, Reclamation has three choices: 1) it may let the water

[8] Reclamation 2002 Biological Assessment confirms this: "The delivery of water from Upper Klamath Lake storage does not adversely affect baseline conditions on the Klamath River below Iron Gate Dam." 2002 Biological Assessment § 5.3.5 at 78.

[9] This conclusion is reinforced by an examination of the ESA regulations. The regulations implementing the ESA specify the methodology for determining the effect of an action and whether it would cause jeopardy. Use of stored water necessarily has no effects. Under 50 C.F.R. § 402.14(g)(3), the Service must determine the effects of an action. Under 50 C.F.R. § 402.02, the "effects" of an action are determined by identifying the "environmental baseline" and then evaluating the impacts of the action when it is added to the environmental baseline. In essence, the environmental baseline is the world as it exists or would exist without the action by the federal agency that is to be the subject of section 7 consultation. 50 C.F.R. § 402.02. A stream flow regimen would occur under the environmental baseline: typically, higher flows in the winter and spring, and lower flows in the summer. Where storage facilities exist, an "action" may consist of diverting or transmitting surplus or floodwater into storage and using the stored water later. The subsequent use of the stored water (whether one day, one month, or six months later) does not alter the summer flow that would occur under the environmental baseline (flow would continue to equal the baseline flow). Thus, there is no "effect" and, necessarily, no jeopardy caused by the action. Such action cannot violate section 7(a)(2).

flow downstream, 2) it may divert the water to immediate use, or 3) it may store the water in the reservoir for use at some later time. Bypassing all inflows down stream would leave fish in the river in the same position as if there were no federal action at all; the fish would receive the natural flow of the river. This flow, under the ESA, is the environmental baseline flow. Immediate diversion or storage of the water for later use has the potential to alter the amount of natural flow. Thus, if water is diverted or stored at time when fish need the water, there is the potential for harm to the fish in the river.

However, the use of water *previously* stored in the reservoir is a very different situation. *See, e.g.*, *Cookinham v. Lewis*, 114 P. 88 (Or. 1911) (holding that stored water is a new source of water, physically and legally distinct from the natural flow of a stream); Or. Rev. Stat. 537.400 ("natural" flow and stored water are legally distinct, and separate sources of water). As long as the water was stored in the reservoir at a time when the river had sufficient flows for the needs of the fish, merely storing the surplus will not harm the species. Accordingly, using that surplus water at a later time will also not harm species. An example may help to clarify this point.

Suppose that rather than storing water in Upper Klamath Lake, Reclamation stored water in a tank located away from the river. During the wet times of the year, Reclamation would pump the excess water that the fish did not require and store it in the tank. Since, at the time the water was stored the fish did not require it, storage of the water did not harm the fish. Suppose, however, that later, during the dry part of the year, natural flows in the river are less than the fish require. If, at this time, Reclamation uses stored water from its off stream tank, Reclamation does not cause any harm to the fish, because low flows in the river are a natural condition of the river, rather than a condition created by Reclamation. The ESA does not require Reclamation to enhance the flows in the river beyond what Mother Nature provides.

The Klamath Project works exactly like this, the only difference being that Reclamation's storage facility is the Upper Klamath Lake reservoir. When the project stores water in Upper Klamath Lake at a time when the fish do not require it, project operations do not adversely affect the fish. If this stored water is used later, this use also does not adversely affect the fish because it has no effect on natural stream conditions. Because of this, operation of the Klamath Project has the potential to harm the fish only when the project diverts or stores natural inflows of water at a time when the fish require the water.

In short, the use of water stored in Upper Klamath Lake for ESA purposes was not required by the ESA; therefore, the use of that water for ESA purposes was a discretionary action. A discretionary action cannot be the basis for an impossibility defense. Accordingly, Defendant's sovereign acts defense must fail.

**D. Reclamation's Failure to Prepare For a Critically Dry Water Year, Including a Long-Term Operations Plan Created the 2001 Klamath Water Crisis.**

The Klamath tragedy of 2001 did not have to occur. It was neither compelled by the Endangered Species Act, nor was it the inevitable product of the weather. Had Reclamation prepared its long term operating plan in the 1990s, as sound management principles (not to mention the urging of the district court) required, at least some water would have been available to Klamath farmers in 2001. As the Supreme Court had noted nine years earlier in 1992, Fish and Wildlife had concluded that "'long-term operation of the Klamath Project was likely to jeopardize the continued existence of the Lost River and shortnose suckers.'" *Bennett*, 520 U.S. at 159.

Instead of developing a long-term plan for the Klamath Project, however, Reclamation operated the Project on a year-to-year basis despite repeated requests from NMFS to prepare a

long-term plan for the Project. As Judge Armstrong noted in 1999, NMFS warned Reclamation that a long-term plan was necessary to avoid a possible collision with species protection:

> The NMFS expressly noted that, while it concluded the 1999 Operations Plan was not likely to "appreciably diminish the value of [the coho salmon's] designated critical habitat for both the survival and recovery of the species," the same could not be said of operations after March, 2000, and it emphasized the importance of the Bureau of Reclamation's "timely development and implementation of a multi-year operations plan that consider [ed] various water types (e.g., wet, dry) and maintenance of adequate aquatic habitat through multi-year time scales."

*Pacific Coast Federation of Fishermen's Ass'n v. United States Bureau of Reclamation*, 138 F.Supp.2d 1228, 1233-34 (N.D. Cal. 2001) (citations omitted). This Court, too, commented on Reclamation's failure to prepare this critical management tool: "In the late 1990s, the Bureau announced its intent to establish a new, long-term operating plan for the project. As of mid-2001, that plan was still not in place, and the Bureau instead was operating the Project using one-year interim plans." *Klamath*, 67 Fed. Cl. at 509.

In other words, Defendant's failure to develop a long-term plan caused water resources to have to be managed more carefully than they otherwise would have resulting in Defendant's failure to deliver water to Plaintiffs in 2001 as required by their contracts. For reasons never adequately explained, Reclamation failed to prepare a long-term operations plan and in March 2000 the Biological Opinion expired. *PCFFA*, 138 F.Supp.2d at 1237. At that point, Reclamation was operating in violation of the Endangered Species Act, precipitating a suit by PCFFA and others that led to Judge Armstrong's issuance of an injunction requiring the 2001 consultation: "Because the Bureau did not initiate consultation, it had no basis or authority to implement the 2000 Operations Plan and it violated the ESA when it did so." *Id*. at 1245.

In issuing this injunction, the court expressed concern that Reclamation's failure to prepare a long-term plan was an intentional attempt to avoid the ESA consultation which would

be required upon its completion:

> This failure to reach a final conclusion easily might be construed as a deliberate (and successful) effort to avoid formal consultation and a possible "jeopardy" finding, especially given the Bureau's subsequent admission that formal consultation was warranted. Whether this is true or not, the Court need not decide, because regardless of the Bureau's motive, by operating Klamath Project for an entire year pursuant to the 2000 Operations Plan without finally determining whether the flow levels provided for therein might affect a listed species or its critical habitat, it failed to insure that its action "was not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the critical habitat of such a species. In so doing, the Bureau of Reclamation clearly violated section 7(a)(2) of the ESA.

*Id*. at 1245-1248 (citations omitted).

The district court also expressed frustration at Reclamation's failure to prepare an environmental impact statement for the long-term plan:

> I am disturbed, however, that Reclamation has failed to complete an EIS analyzing the effects and proposed alternatives of a long-term plan. Reclamation represented in past proceedings that such a plan would be completed long before 2001. Yet, no plan exists. In essence, Reclamation is avoiding its duties under NEPA by relying on annual plans to which NEPA cannot realistically apply. During oral argument, government counsel represented that the long-term EIS is scheduled to be completed in February 2002. However, it awaits the completion of an updated NMFS BiOp, slated to be completed in June 2001. The court intends to monitor Reclamation's compliance with its representations.

*Kandra v. United States*, 145 F.Supp.2d 1192, 1206 (D.Or. 2001). The district court, like the government agencies, recognized the importance of a multi-year operations plan in avoiding water crises, such as the one which precipitated this suit: "This dispute highlights the need for long-term planning to minimize the effects of future dry years." *Id*.

Had Reclamation developed such a long-term plan, it could have instituted conservation measures, put in a water bank sooner, and ground water supplementation, all of which would have eased the 2001 demand on Klamath Project water supplies and made water available to Plaintiffs. Solem Decl. ¶ 6. It could also have implemented sound science, recognizing that

refusal to deliver Plaintiffs' water was of little or no benefit to the fish. *See* Section I.B, *supra*. In short, it was Reclamation's failure to competently operate the Klamath Project through the late 1990s and through the turn of the century which caused the water crisis of 2001, and not the passage of the Endangered Species Act. This series of unfortunate operational decisions by Reclamation is not a sovereign act, and the breach of contract it caused is not shielded by the sovereign acts doctrine.

## II. SINCE THE ENDANGERED SPECIES ACT DID NOT MAKE DEFENDANT'S PERFORMANCE IMPOSSIBLE, THE SOVEREIGN ACTS DOCTRINE HAS NO APPLICABILITY TO THE FACTS OF THIS CASE.

Unlike the cases on which Defendant relies, here it is the voluntary act of the agency (Reclamation) and not the passage of a statute by Congress which caused the breach of contract. Hence the rule of law applicable in this case is not the sovereign acts doctrine, but the more common rule that "[t]he United States are as much bound by their contracts as are individuals." *The Sinking Fund Cases*, 99 U.S. 700, 719 (1878), *cited in Franconia Assoc. v. United States*, 61 Fed. Cl. 718, 721 (2004). In contrast to the landmark sovereign act cases on which Defendant relies, here Congress did not pass a statute which made performance of Plaintiffs' contracts illegal. *See, e.g.*, *United States v. Winstar*, 518 U.S. 839 (1996) (FIRREA prohibited recognition of supervisory good will, which had been promised in the contracts); *Franconia Associates v. United States*, 61 Fed. Cl. 718 (2004) (EHLIPA prohibited mortgage payoff after 20 years, as promised by the contract); *Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005) (Guarini amendment eliminated the built-in loss deduction, a deduction for which acquiring thrifts contracted). As demonstrated in Section I, *supra*, the Endangered Species Act did not prohibit Reclamation from supplying water to Plaintiffs in 2001; hence, the question of whether the statute was targeted at Plaintiffs' contracts is irrelevant.

**A. The Sovereign Acts Doctrine Shields the United States from Liability Only Where Passage of a Statute (or Other Sovereign Act) Makes Performance of the Government's Contract Illegal or Impossible.**

The sovereign acts defense arose to protect the government as contractor from being held liable for the acts of its twin, the government as sovereign. The purpose of the doctrine is to insure that the government is simply treated like any other contractor. *See Jones v. United States*, 1 Ct. Cl. 383, 385 (1865) ("Wherever the public and private acts of the government seem to commingle, a citizen or corporate body must by supposition be substituted in its place, and then the question be determined whether the action will lie against the supposed defendant"); *O'Neill v. United States*, 231 Ct. Cl. 823, 826 (1982) (sovereign acts doctrine applies where, "[w]ere those contracts exclusively between private parties, the party hurt by such governing action could not claim compensation from the other party for the governing action"). Thus, the mere fact that a statute touches on performance of a contract, or makes it more difficult, is not sufficient to relieve the government of liability for breach. As the *Winstar* court stated:

> allowing the Government to avoid contractual liability merely by passing any "regulatory statute" would flout the general principle that, "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Careful attention to the cases shows that the sovereign acts doctrine was meant to serve this principle, not undermine it.

*Winstar*, 518 U.S. at 895 (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)).

To prevail in this motion, therefore, the United States must demonstrate that a sovereign act (here Defendant has identified only the Endangered Species Act) has rendered performance of its contracts impossible, and further that Plaintiffs' water supply contracts did not allocate the risk of this impossibility to Defendant:

> the object of the sovereign acts defense is to place the Government as contractor on par with a private contractor in the same circumstances, the Government, like any other defending party in a contract action, must show that the passage of the statute rendering its performance impossible

> was an event contrary to the basic assumptions on which the parties agreed, and must ultimately show that the language or circumstances do not indicate that the Government should be liable in any case.

*Winstar*, 518 U.S. at 904 (citing *Horowitz v. United States*, 267 U.S. 458, 461 (1925)).

Defendant's motion falls far short of this showing, for (as Plaintiffs demonstrated in Section I, *supra*) Reclamation possessed the discretion to supply water to Plaintiffs in 2001 and voluntarily decided not to do so. Having failed to demonstrate that the Endangered Species Act made performance of its repayment contracts impossible, Defendant cannot prevail on summary judgment.

**B. Defendant Fails to Demonstrate that the United States Did Not Assume the Risk of Subsequent Impossibility Under the Water Supply Contracts.**

It is difficult to know how the United States thinks it can prevail in a breach of contract case without examining the contracts themselves, but that is precisely the course it has chosen in this case. Before the Court can determine whether Defendant's performance was made impossible by the Endangered Species Act, it would seem that Defendant would wish to tell the Court what performance the thirteen contracts required of it. Likewise, it would seem that Defendant would explore the contract language allocating the risk of statutory change in order to argue that the government had not assumed that risk. Defendant's failure to discuss contract language dooms its motion from the outset as incomplete and incapable of prevailing.

The starting point for an analysis of this breach of contract claim is the plain language of the agreement. *Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002); *see also Town of Port Deposit v. United States*, 21 Cl. Ct. 204, 212 (1990) (holding that contract language should be construed using its "ordinary and commonly accepted meaning"); *Haehn Mgmt. Co. v. United States*, 15 Cl. Ct. 50, 59 (1988) ("[C]ontract language should be given its plain meaning without rewriting or varying terms of the contract.")

Since Defendant has not raised contract interpretation in its opening brief, Plaintiffs will not undertake an extended analysis of the thirteen contracts here. Plaintiffs have, however, provided the declaration of William Ganong, which provides some of the important contract language necessary to resolution of this motion. *See* Ganong Decl. Perhaps the important point to be drawn from Mr. Ganong's declaration is that these are lengthy contracts with long histories, and that only a careful analysis will yield a proper interpretation of their provisions.

Mere demonstration that the Endangered Species Act is public and general falls far short of the showing required to relieve Defendant of liability for breach of contract. As the *Winstar* Court stated:

> Even if FIRREA were to qualify as 'public and general,' however, other fundamental reasons would leave the sovereign acts doctrine inadequate to excuse the Government's breach of these contracts. As *Horowitz* makes clear, that defense simply relieves the Government as contractor from the traditional blanket rule that a contracting party may not obtain discharge if its own act rendered performance impossible. But even if the Government stands in the place of a private party with respect to "public and general" sovereign acts, it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach.

*Winstar*, 518 U.S. at 904.

To prevail on summary judgment the government (like any other party seeking discharge under the impossibility doctrine) must also demonstrate that the water supply contracts allocated to Plaintiffs liability for the event making performance impossible: "the Government, like any other defending party in a contract action, must show that the passage of the statute rendering its performance impossible was an event contrary to the basic assumptions on which the parties agreed, and must ultimately show that the language or circumstances do not indicate that the Government should be liable in any case." *Id*. Here, Defendant has not even attempted in this

motion to analyze which party bore the contractual risk of the events of 2001. As this Court has noted, contract interpretation can be a substantial undertaking in itself:

> To determine whether plaintiff's contractual rights were breached, the court first must determine what those rights were. Several interpretational guides mark this decisional path. First, as an overarching matter, the court, in interpreting a contract, seeks to "effectuate its spirit and purpose." Toward that end, contract interpretation "begins with the plain meaning of the agreement." "[A]n interpretation which gives a reasonable meaning to all parts," the law provides, "will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result."
>
> * * *
>
> Of course, unlike private contractual undertakings, the contracts here originated in legislation passed by Congress, requiring the court to consider that legislation in construing them.

*Franconia Assoc.*, 61 Fed. Cl. at 730-31 (citations omitted).

In this case, whether or not the ESA in particular was anticipated by the contracting parties, there can be no doubt that the parties, as the four corners of the contracts themselves demonstrate, anticipated some changes in the regulatory structure governing the Klamath Project. *Cf. Winstar*, 518 U.S. at 906 ("In this particular case, whether or not the reach of the FIRREA reforms was anticipated by the parties, there is no doubt that some changes in the regulatory structure governing thrift capital reserves were both foreseeable and likely when these parties contracted with the Government, as even the Government agrees.") The contracts here evidence an ever changing structure of Reclamation law at the time the contracts were entered into. As the ongoing modifications to Reclamation law changed the legal circumstances related to the water users' contractual rights to water,[10] Defendant cannot possibly demonstrate that the

[10] For example, as the three Klamath Irrigation District (formerly Klamath Water Users Association) contracts demonstrate, individual water users first contracted directly with the United States for water, then contracted to become shareholders in the Klamath Water Users

nonoccurrence of regulatory change affecting Plaintiffs contractual rights to water, *e.g.*, the ESA, was a basic assumption upon which the contracts at issue in this case were made. Simply put, the parties had to have anticipated legal change and had to have allocated that risk.

As Defendant itself has acknowledged in this case, the contracts at issue "track[] the evolution of federal reclamation law during the first half of the twentieth century, and even anticipate[] the role that contracts with irrigation districts would play in defining rights to receive water from federal projects from the 1920s on." Def.'s Memo. (Takings) at 24. Given the fluctuations in Reclamation law reflected just in the various contracts in this case, anticipation of legal change was undoubtedly anticipated by the parties. Moreover, the opening clause of all the contracts reference, in some form or another, the Reclamation Act and all acts "amendatory thereof and supplementary thereto," the words "amendatory" and "supplementary" further demonstrating the fact that the parties were aware that laws change.

Given that the parties assumed that there would be subsequent change in the law affecting the contracts at issue in this case, the parties, as a matter of law, must have assigned that risk. The contracts at issue in this case demonstrate that Defendant assumed the risk of subsequent changes in the law affecting the Bureau's ability to perform these contracts; therefore, an impossibility (or so-called "sovereign acts defense") will not lie. First, the contracts at issue clearly shift certain risks to Plaintiffs, per forcing the fact that other risks, *expressio unis est exclusio alterius*, are shifted to Defendant. *See Transatlantic Financing Corp. v. United States***,** 363 F.2d 312 (D.C. Cir. 1966) ("Proof that the risk of a contingency's occurrence has been allocated may be expressed in or implied from the agreement.") Second, to the extent the contracts are silent regarding the shifting of the risk of regulatory change the Court should infer

---

Association to receive water and finally, received water through the Klamath Irrigation District. *See* Compl. Ex. 1.

that the risk has been shifted to Defendant as Defendant is the party seeking to discharge its contractual obligations. Finally, had Defendant "wished to retain the broad authority to retroactively reduce or eliminate the bargained-for fruits of the agreement . . . it was defendant's responsibility to spell out such power in the express terms of the agreement." *Temple-Inland, Inc. v. United States*, 59 Fed. Cl. 550, 562 (2004).

Certain specific risks in all of the contracts at issue in this case are allocated to Plaintiffs. For example, the Bureau's contract with Midland District Improvement Company provides that the "United States shall not be liable for failure to supply water under the terms of this contract caused by hostile diversion, drought, interruption of service made necessary by repairs, damages caused by floods, unlawful acts, or unavoidable accidents." Compl. Ex. 7 at 221 (Contract ¶ 5); *accord* Compl. Ex. 1 at 33 (Contract ¶ 26) (the United States shall not be liable for shortage "[o]n account of drought or other causes"). Furthermore, the contracts provide that Plaintiffs were liable for nonpayment by individual water users, for instance: "The District as a whole is obligated to pay to the United States the full amount herein agreed upon according to the terms stated, regardless of individual default in the payment of any assessment levied by the District." Compl. Ex. 5 at 166 (Contract ¶ 18); *accord* Compl. Ex. 1 at 25 (Contract ¶ 17) (District has repayment obligations to the United States "notwithstanding the individual default in payment by any of the individual water users"). Moreover, the contracts allocate the risk that Congress would fail to appropriate money to support the construction costs to Plaintiffs, for example: "This contract is subject to appropriations being made by Congress, from year to year, of moneys sufficient to do the work provided herein. No liability shall accrue against the United States by reason of such moneys necessary to complete the work be so provided. . . ." Compl. Ex. 5 at 168

(Contract ¶ 23); *accord* Compl. Ex. 2 at 78 (Contract ¶ 40) ("The expenditure of any money . . . shall be contingent upon [congressional] appropriations or allotments being made.")

In short, Plaintiffs assumed these and other risks in the contracts; however, as a matter of contract interpretation by assuming these specific risks, other risks within the contemplation of the parties were necessarily assumed by Defendant. Moreover, the risks assumed by Plaintiffs are especially significant when one considers that it was the water users who paid for the facilities, even though the United States retains title to those facilities. *E.g.*, Compl. Ex. 2 at 77 (Contract ¶ 39) ("Title to all of the project works . . . shall be and remain in the name of the United States . . . notwithstanding the transfer hereafter of any of such works to the District for operation and maintenance.") The water users through their respective irrigation districts paid for all the costs of maintaining the facilities. Yet, the water users, after paying the significant costs of building and maintaining the facilities, bore the risk of water shortage due to drought. Moreover, the irrigation districts had to make the re-payments for the construction of the facilities and ongoing maintenance costs irrespective of whether individual water users paid their bills. In other words, the allocation of the risks to the water users and irrigation districts was significant, but it did not include the risk of passage of the Endangered Species Act.

In this case, as in *Winstar*, a thoughtful analysis of the contract language, informed by surrounding circumstances and the statutory framework under which the contracts were entered into, demonstrates that it was the government, and not the Plaintiffs, who assumed the risk of impossibility in this case:

> Just as we have long recognized that the Constitution "bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," so we must reject the suggestion that the Government may simply shift costs of legislation onto its contractual partners who are adversely affected by the change in the law, when the Government has assumed the risk of such

change.

*Winstar*, 518 U.S. at 883.

**C. The Government's Actions Under the Endangered Species Act were Specifically Targeted at Plaintiffs' Contracts.**

When the ESA is the act invoked by the Government to support a sovereign acts defense, it is not a sufficient analysis for the Court to determine whether the ESA itself is or is not public and general. Rather, the Court must examine the individual government actions taken pursuant to the ESA, and determine whether those individual government actions are public and general. *See, e.g.*, *Scott Timber Co. v. United States*, 40 Fed. Cl. 492, 507 (1998) ("The government argues that numerous acts—the listing of the marbled murrelet, . . . and the actions of the forest service pursuant to the ESA and its implementing regulations—were 'sovereign acts.'") Were the Court examining the Outer Banks Protection Act (OBPA), *see Mobil Oil v. United States*, 530 U.S. 604 (2000), the Boundary Waters Canoe Area Wilderness Act (BWCAWA), *see Hedstrom Lumber Co. v. United States*, or other acts that are specifically directed at a particular problem in a particular geographic area, the proper analysis would be decide whether the act itself is entirely public and general. But when the sovereign acts defense is invoked regarding the ESA, the proper focus is to examine the individual government acts taken pursuant to the ESA, not the ESA itself.

Here, Defendant took water from Plaintiffs and allegedly allocated it toward fish protection; thus, specifically targeting the contracts at issue in this case. The biological opinions recommended certain Klamath River flows and the maintenance of water levels in Upper Klamath Lake. As the 2001 Operations Plan states, the federal agencies involved realized this water would only come from the irrigators. As the Operations Plan states, Klamath Project "was operated to optimize irrigation diversions." Def.'s Ex. 61. In 2001, however, the aim of the

Operations Plan was changed to ensure that the Plan was "consistent with requirements of the ESA and Reclamation's obligation to protect Tribal trust resources." *Id*. Thus, as the Operations Plan recognized, Defendant had to competing obligations—contractual water deliveries and ESA requirements. Defendant chose to satisfy the latter, thereby targeting the contracts at issue in this case. There was nothing incidental about the effects of the biological opinions or the 2001 Operations Plan on the contracts at issue in this case; accordingly, the actions taken pursuant to the ESA in this case should not be found to be general and public.

## III. THE UNMISTAKABILITY DOCTRINE HAS NO APPLICATION TO THIS CLAIM FOR DAMAGES, WHICH DOES NOT IMPLICATE THE SOVEREIGN INTERESTS OF THE UNITED STATES.

The unmistakability doctrine, which instructs that "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act," *Centex Corp. v. United States*, 395 F.3d 1283, 1306 (Fed. Cir. 2005), has no application to these ordinary repayment contracts, which did not purport to prohibit Congress from passing endangered species legislation (nor any other kind of legislation, for that matter). Like the thrifts in *Winstar*, Plaintiffs here do not claim that their contracts ossified the law, exempting them from the operation of the Endangered Species Act.[11]

[11] As the Supreme Court noted in *Winstar*:

> The thrifts do not claim that the Bank Board and FSLIC purported to bind Congress to ossify the law in conformity to the contracts; they seek no injunction against application of FIRREA's new capital requirements to them and no exemption from FIRREA's terms. They simply claim that the Government assumed the risk that subsequent changes in the law might prevent it from performing, and agreed to pay damages in the event that such failure to perform caused financial injury. The question, then, is not whether Congress could be constrained but whether the doctrine of unmistakability is applicable to any contract claim against the Government for breach occasioned by a subsequent Act of Congress. The answer to this question is no.

Instead, Plaintiffs assert the mundane principle that the contracts contain a promise that the United States would deliver water to Plaintiffs (except for shortage caused by drought and other acts of God), and that the United States is liable for damages for breach of this promise.

Thus, Defendant's vain search for contract language unmistakably surrendering the sovereign legislative power of Congress, *see* Def.'s Memo at 26-29, as well as Defendant's lengthy exegesis of the general reach of the Endangered Species Act, *see* Def.'s Memo at 10-13, utterly miss the true issue: Did the United States promise to pay damages in the event it could not or did not deliver the water as promised?

The fact that the Endangered Species Act is comprehensive does not *ipso facto* relieve the United States of contractual liability for breach of its water delivery contracts. "[W]e know of no authority for . . . [the proposition] that the government has a sovereign right to disavow its contractual obligations through comprehensive national legislation." *Winstar Corp. v. United States*, 64 F.3d 1531, 1550 (Fed. Cir. 1995); *see also Freedman v. United States*, 320 F.2d 359, 366 (Ct. Cl. 1963) ("The doctrine of 'public and general' 'sovereign acts,' laid down in *Horowitz* . . . does not relieve the Government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused.") If the United States promised to deliver water to Plaintiffs and then, without contractual excuse, failed to do so, the United States must pay damages—even if the non-delivery resulted from legislation:

> We read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence. Holmes's example is famous: "[i]n the case of a binding promise that it shall rain tomorrow, the immediate legal effect of what the promisor does is, that he takes the risk of the event, within certain defined limits, as between himself and the promisee."

*Winstar*, 518 U.S. at 871.

*Winstar*, 518 U.S. at 868-69 (quoting Holmes, *The Common Law*, *in* 3 THE COLLECTED WORKS OF JUSTICE HOLMES 268 (S. Novick ed. 1995)).

The United States, as water delivery contractor, takes the same risk as any other contractors. *Day v. United States*, 245 U.S. 159, 161 (1917) ("One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking.") This is hardly a novel proposition, as the *Winstar* court made clear citing:

> *See*, *e.g.*, *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 957-959 (Fed. Cir. 1993) (interpreting contractual incorporation of then-current Government policy on space shuttle launches not as a promise not to change that policy, but as a promise "to bear the cost of changes in launch priority and scheduling resulting from the revised policy"); *Hills Materials Co. v. Rice*, 982 F.2d 514, 516-517 (Fed. Cir. 1992) (interpreting contract to incorporate safety regulations extant when contract was signed and to shift responsibility for costs incurred as a result of new safety regulations to the Government); *see generally* 18 W. Jaeger, Williston on Contracts § 1934, pp. 19-21 (3d ed. 1978) ("Although a warranty in effect is a promise to pay damages if the facts are not as warranted, in terms it is an undertaking that the facts exist. And in spite of occasional statements that an agreement impossible in law is void there seems no greater difficulty in warranting the legal possibility of a performance than its possibility in fact . . . [T]here seems no reason of policy forbidding a contract to perform a certain act legal at the time of the contract if it remains legal at the time of performance, and if not legal, to indemnify the promisee for non-performance" (footnotes omitted)); 5A A. Corbin, Corbin on Contracts § 1170, p. 254 (1964) (noting that in some cases where subsequent legal change renders contract performance illegal, "damages are still available as a remedy, either because the promisor assumed the risk or for other reasons," but specific performance will not be required).

*Winstar*, 518 U.S. at 870.

Moreover, in a case like this one, which seeks only damages and not injunctive relief against the application of a statute, sovereign power is not implicated and there is, therefore, no infringement on sovereign power for the unmistakability doctrine to guard against. These

contracts are akin to

> contracts, say, to buy food for the army; no sovereign power is limited by the Government's promise to purchase and a claim for damages implies no such limitation. That is why no one would seriously contend that enforcement of humdrum supply contracts might be subject to the unmistakability doctrine. . . . So long as such a contract is reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of that power, the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it.

*Id*. at 880. Except for taxing cases (where an award of damages effectively nullifies the tax amount),[12] an award of damages for breach of contract raises no unmistakability issues: once general jurisdiction to make an award against the Government is conceded, a requirement to pay money supposes no surrender of sovereign power by a sovereign with the power to contract. *See, e.g.*, *Amino Bros. Co. v. United States*, 372 F.2d 485, 491 (court) ("The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act.")

Accordingly, this case is governed not by the unmistakability doctrine, but by the ordinary rule of contract law that "[e]very breach of contract gives the injured party a right to damages against the party in breach" unless "[t]he parties . . . by agreement vary the rules." Restatement (Second) of Contracts § 346, Comment *a* (1981). The United States, no less than a private party, has the right to make binding contracts obligating itself to pay damages in the event of breach, for "the right to make binding obligations is a competence attaching to sovereignty." *Perry v. United States*, 294 U.S. 330, 352 (1935). And, "[w]hen the United States,

[12] Damages awards will have the same effect as an injunction only in cases, like *Bowen*, where a private party seeks the return of payments to the Government. The classic examples, of course, are tax cases such as *St. Louis v. United Railways Co.*, 210 U.S. 266 (1908).

with constitutional authority, makes contracts, it . . . incurs responsibilities similar to those of individuals who are parties to such instruments." *Id*. at 352; *see also Lynch v. United States*, 292 U.S. 571, 579 (1934) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.")

In sum, it may be that at trial, following a reasonable discovery period, the government will introduce evidence intended to prove that it did not, in fact, breach these contracts. To a certainty, Plaintiffs will introduce contrary evidence that the government did breach, and will seek an award of appropriate damages. This Court's determination of Plaintiff's claim of breach of contract, informed by a detailed examination of the contracts and of the government's actions which resulted in the 2001 water cutoff, will apply ordinary rules of contract interpretation. What the government may not do, however, is to escape liability merely by reason of the existence of the Endangered Species Act, without reference to which party bears the risk of such legislation—or whether the legislation even barred Defendant's performance of the contracts. Certainly, the Bureau's performance of these contracts could be impacted by a myriad of federal statutes—the Reclamation Act, the Clean Water Act, and the Fish and Wildlife Coordination Act, to name a few. The mere existence of these comprehensive statutes, however, without more, will not of itself relieve the government of liability for damages if it has breached its contracts with Plaintiffs. The federal government, like any other contracting party, may elect to breach its contract obligations, but it must pay damages, like any other contracting party.

**CONCLUSION**

For all of these reasons, Defendant's motion for summary judgment as to Plaintiffs' contract claims should be denied.

Respectfully submitted,

s/ Nancie G. Marzulla

Nancie G. Marzulla
Roger J. Marzulla
Zachary N. Somers
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
202-822-6760
202-822-6774 (fax)

Dated: April 28, 2006

Counsel for Plaintiffs

Of Counsel:

William M. Ganong
General Counsel
Klamath Irrigation District
514 Walnut Avenue
Klamath Falls, OR 97601
Phone: 541-882-7228
Fax: 541-883-1923

Paul S. Simmons
Somach, Simmons & Dunn
813 6th Street, 3rd Floor
Sacramento, CA 95814-2403
Phone: (916) 446-7979
Fax: (916) 446-8199

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT et al., | |
| Plaintiffs, | No. 01-591L |
| v. | Hon. Francis M. Allegra |
| UNITED STATES, | |
| Defendant. | |

**DECLARATION OF WILLIAM M. GANONG**

I, William M. Ganong, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am licensed to practice law in Oregon, and I am admitted to practice before the State and Federal Courts in the state of Oregon. I have been in private practice in Klamath Falls, Oregon since September 1978. My Oregon State Bar Number is 78213. I have served as General Counsel to the Klamath Irrigation District for the past 16 years. My primary practice areas are water law, real estate, land use, estate planning, and municipal government law.

2. My grandfather, William Ganong, and my father William Ganong, Jr., also served as General Counsel to the Klamath Irrigation District. My grandfather began that service in approximately 1932, and he was replaced by my father in 1968. I began assisting my father with District issues upon graduation from law school in 1978.

3. Reclamation's contractual obligations for delivery of irrigation water through the Klamath Project consist of a series of thirteen interlocking and interdependent contracts (including several amendments) between Reclamation and the districts which, in turn, can only be understood within the framework of the Reclamation Act, the Klamath Project water rights,

and the historical evolution of Project contractual relationships among Reclamation, the districts and the water users. As Reclamation admits, " Reclamation has contractual obligations to Project water users to provide water primarily for domestic and irrigation uses. The contracts for the majority of the Project area define this obligation as the amount of water necessary to meet the reasonable beneficial use of water for irrigation." Def.'s Ex. 61.

4. Over the years I have had the occasion to review all of these contracts. A brief summary of their relevant provisions follows:

**A. Klamath Water Users Association**

Pursuant to the practice then followed by the Reclamation Service, the United States entered into an agreement with the Klamath Water Users Association (KWUA) dated November 6, 1905. The Contract acknowledged the legal existence of KWUA as an Oregon corporation formed for the purpose of entering into Contracts with the United States for the repayment of costs of the Klamath Reclamation Project. The Contract provides in part:

> Whereas the territory within the lands to be irrigated by the works hereafter described, includes all land within the boundaries [of Klamath Reclamation Project] . . .; and the said lands are in part naturally arid or semi-arid and incapable of proper cultivation without irrigation; and the lands above described, or a greater part thereof, will remain in such condition unless the waters of Upper Klamath Lake in Oregon and Clear Lake in California and their tributaries and outlet streams be utilized and the flows thereof regulated and controlled; and Whereas, the Secretary of the Interior contemplates the construction of certain irrigation works under the provisions of an act of Congress entitled 'An Act Appropriating the Receipts From the Sale and Disposal of Public Lands in Certain States and Territories to the Construction of Irrigation Works for the Reclamation of Arid Lands,' approved June 17, 1902 for the irrigation and reclamation of the lands described in said articles; and Whereas, the incorporators and shareholders of said Klamath Water Users Association are . . ., owners and occupants of land in said area, and in some cases are appropriators of water for irrigation thereof, and in addition thereto such incorporators and shareholders and their successors and assigns must initiate rights to the use of water from said proposed irrigation works, to be constructed by the Secretary of the Interior, as soon as such rights may be initiated, and

> thereafter complete the acquisition thereof in the manner and upon the terms and conditions to be prescribed therefore by the Secretary of the Interior, which rights shall be, and thereafter continue to be, forever appurtenant to the designated lands owned by such shareholders; and Whereas, neither the relative priority nor the extent of the individual appropriation of such water, which may have heretofore been made by said irrigators and shareholders for the lands described in said articles or by-laws, and which are now vested rights, have been ascertained or determined, but such irrigators and shareholders have agreed among themselves, by the terms and provisions of said Articles of Incorporation and By-Law, upon the rules and principles by and upon which the relative priority and extent of their several appropriations invest rights to the use of said waters shall be determined in case such appropriation and right should hereafter be recognized:
>
> Therefore, it is agreed and understood by the parties hereto:
>
> 1. That if the Secretary of the Interior shall authorize and shall cause the construction of said irrigation works, then in the determination of the relative rights of shareholders of said association, and of their respective rights to the use of water acquired from the government under said act of Congress, the rules and principles set out in said by-laws, for such determination, shall be deemed the established rules and principles for that purpose.
>
> 2. That only those who are or who may become members of said association, under the provisions of its said articles and by-laws, shall be accepted as applicants for rights to the use of water available by means of said proposed irrigation works.
>
> 3. That the aggregate amount of such rights to be issued shall, in no event, exceed the number of acres of land capable of irrigation by the total amount of water available for that purpose, being (1) the amount now appropriated by the shareholders of said association; and (2) the amount to be delivered from all sources in excess of the water now appropriated; and the Secretary of the Interior shall determine the number of acres so capable of irrigation as aforesaid, his determination to be made upon due and expert consideration of all available data, and to be based upon and measured and limited by beneficial use of water.

The Contract required KWUA to guarantee the repayment to the United States of the cost of constructing facilities necessary and appropriate for the diversion and delivery of water to KWUA shareholders.

KWUA's shareholders entered into Stock Subscription Agreements with KWUA whereby they agreed to pay their proportionate share of the costs of reimbursing the United States for the construction of the Klamath Project and for the operation and maintenance of the Klamath Project facilities. Said Stock Subscription Agreements provided that the landowner shall be entitled to delivery of water to the lands described on the Stock Subscription Agreements in an amount not to exceed that necessary for the irrigation of the land, and they agreed to make application to the United States for a water right.

For lands already in private ownership, the Water Right Application was made on Form B. The application was "for a water right for the irrigation of and to be appurtenant to _____ acres of irrigable land as shown on the plats approved by the Secretary of the Interior . . . They further provided:

> 2. the measure of the water right for said land is the quantity of water which shall be beneficially used for the irrigation thereof, but in no case exceeding the share proportionate to irrigated acreage, of the water supply actually available as determined by the Project Manager or other proper officer of the United States, or its successor in control of the Project, during the irrigation season for irrigation of lands under said unit . . .

The application obligated the applicant landowner to pay a stated cost per acre to reimburse construction costs of the Project and, in addition, obligated the landowner to pay annual charges for operation and maintenance of the Project. The application also conveyed to the United States all land and facilities reasonably required by the United States necessary for the United States to discharge its duties of distributing water to the applicant. The application provided in part:

> 8. And I do hereby grant, bargain, sell, convey and confirm to the United States of America and its successors in charge of the Project, all rights of way for ditches, canals, flumes, pipelines, telegraph and telephone transmission lines, and other structures now constructed by or under authority of the United States for or in connection with

> said Project, and all rights of way that may be or become necessary and suitable, and that may be required for the prosecution and operation of said Project, and for the construction, maintenance, and operation of the ditches, canals, flumes, pipelines, telegraph and telephone transmission lines, or other structures that may be constructed by or under authority of the United States and its successors in charge of the Project for and in connection with such Project, to have and hold the same, together with all tenements, herediments, privileges, and appurtenances thereunto belonging or in anywise appertaining to the United States of America and its assigns and successors in charge of the Project forever, subject notwithstanding to the conditions upon which this application is made.

By applying for a water right from the United States, each applicant bound himself or herself to repay the costs of constructing the facilities necessary to deliver irrigation water to his or her land, agreed to pay the costs of operating and maintaining the facilities, and conveyed valuable interests in his or her land for the construction and maintenance of those facilities. The only expectation of the grantor landowner was the permanent delivery of irrigation water in an amount that could be beneficially applied to his or her land by the United States.

**B. Klamath Irrigation District**

Klamath Irrigation District (KID) was formed to assume the obligations of Klamath Water Users Association (KWUA) under its Contract with the United States. By Contract dated July 6, 1918, KID assumed the obligations of KWUA and its stockholders to pay the United States for the construction of those portions of the Klamath Project facilities that provided irrigation water to the irrigable land within KID, and the operation and maintenance charges of those facilities. The United States agreed to release its liens against the land of the individual stockholders, and KWUA agreed to assign to KID all of its rights and obligations and then dissolve. Further, the KWUA agreed to discharge its liens of record arising under the stock subscription agreements between the KWUA and its stockholders, and did so in 1919.

Relevant provisions of the 1918 Contract include Article 2, which provided:

> Nothing in this contract contained or in the formation of the district shall be deemed in anywise to have abrogated, enlarged or modified the said water right applications to the United States, except as herein provided.

Article 4:

> There is reserved to the Secretary the right to make reasonable rules and regulations and to modify the same in his discretion, in harmony, however, with this contract, to the end that the true intent of the law and of this contract shall be carried into effect and the district agrees to use its powers for the purpose of carrying out such rules and regulations and this contract.

Article 6 of the Contract provided for the ultimate transfer of the obligation and authority to operate and maintain the irrigation facilities to the district. Other articles of the Contract provided that the District would assume the obligation for collecting the amounts necessary from the members of the district to repay the construction charges for the facilities to the United States and to pay the United States for the costs of operating and maintaining those facilities.

The 1954 Contract between the United States and KID provided for the transfer to KID for operation and maintenance the real and personal property owned by the United States used for the diversion and delivery of water to KID and to the other districts and contractors described in the Contract. The 1954 Contract contains the following relevant provisions:

> 13. (a) The district shall take the water supply for the lands within the limits of the district, as the same are now or hereafter defined, to be served by or through the transferred works, at the head works of the main canal and other delivery locations now in existence or that may be constructed in the future, and shall distribute the same to the water users entitled thereto.
>
> (b) The district hereby assumes and agrees to carry out during the terms of this contract, to the satisfaction of the secretary, all of the obligations imposed upon the United States by the contracts listed on exhibit 'A' , or any amendments or supplements thereto, and appended to or made part of this contract, for the carriage and delivery of water, in force as of the effective date of this agreement, insofar as said contracts relate to the delivery and carriage of irrigation and drainage water through the transferred works.

The contracts referred to on “exhibit ‘A’” include the contracts between the United States and PGID, VBDC, EID, MID, SVID, and SID, together with numerous individual Warren Act Contracts between the United States and individual landowners. Article 13(e) provides:

> The district shall deliver water to district lands at the points the United States is now delivering water. For lands outside the district boundaries, and served through the transferred works, water shall be delivered in quantities, at the times and at the points of diversion from the transferred works as required from time to time by the contractors that have executed contracts with the United States in such manner as to meet the obligations the United States has assumed under said contracts.

Other articles of the Contract require KID to deliver water to certain lands within the Tulelake Irrigation District and to certain lands in the cities of Klamath Falls, Malin, and Merrill. Article 17 provides that the obligation of KID to pay the costs of the United States incurred in operating the reserve works and for the remaining portion of the cost of construction of the Klamath Project are general repayment obligations and require KID to pay said obligations notwithstanding the default of individual members or contractors to pay their proportionate share of the costs and charges to KID. Article 18(a) of the contract requires KID to exercise all authority it has for the purpose of collecting the amounts necessary to pay the obligations to the United States. Article 20 provides that the United States may refuse to deliver water to KID if KID fails to pay the amounts owed to the United States for a period of 12 months. Article 25 requires KID to indemnify the United States for damages or claims arising out of KID’s care, operation, and maintenance of the transferred works. Article 26 states:

> On account of drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs, and, *while the United States will use all reasonable means to guard against such shortage*, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom and the payments to the United States provided herein shall not be reduced because of any such shortage.

(emphasis added). Article 27 provides:

> Neither party shall be considered to be in default in respect to any obligation hereunder, if prevented from fulfilling such obligation by reason of an uncontrollable force. For the purpose of this contract, the term 'uncontrollable force' means any cause beyond the control of the party affected, including, but not limited to, failure of facilities, flood, earthquake, storm, lightning, fire, epidemic, war, riot, civil disturbance, labor disturbance, sabotage, and restraint by court or public authority, *which by the exercise of due diligence and foresight, such party could not reasonably been expected to avoid. Either party rendered unable to fulfill any obligation by reason of an uncontrollable force shall exercise due diligence to remove such inability with all reasonable dispatch.*" (Emphasis added).

Article 26 requires the United States to "use all reasonable means to guard against such shortage" of water. Article 27 releases each party from liability for uncontrollable forces "which by exercise of due diligence or foresight such party could not reasonably have been expected to avoid."

The fixed expectations and intent of the parties from the initial execution of the agreement between KWUA and the United States through the execution and performance of the 1954 Contract between the United States and KID was that the United States would deliver water from the Klamath Project to the land owners within the Project unless prevented by drought or uncontrollable force.

Tulelake Irrigation District (TID) was formed to assume the obligations of the homesteaders and entry men on that portion of the Project located in California and within the boundaries of TID in a manner similar to the assumption by KID of the obligations of KWUA. In both cases, homesteaders and entry men applied for water rights from the Klamath Project consistent with public notices published by the Department of Interior. The notice published November 18, 1908 provides in part:

> In pursuance of the provisions of section 4 of the Reclamation Act of June 17, 1902, (32 Stat., 338), notice is hereby given as follows:

> Water will be furnished from the Klamath Project, Oregon-California, under the provisions of the Reclamation Act, in the irrigation season of 1909 for irrigable lands shown on farm units of . . . approved November 16, 1908 by the Secretary of the Interior and on file in local land offices at Lakeview, Oregon, and Redding, California.
>
> Homestead entries, accompanied by applications for water rights and the first installment of building and operation and maintenance charges, may be made under the provisions of said act for farm units shown on said plats. Water-right applications may also be made for lands heretofore entered and for lands in private ownership, and the time when payments will be due therefore is hereafter stated.

The notices provided that each applicant could apply for water rights for 160 acres of irrigable land. The notice required that the applicant pay a construction charge of $30 per irrigable acre in ten annual installments, and that the applicant pay a proportionate share of the costs of operating and maintaining the irrigation system.

The provisions of the Contract between the United States and TID dated September 10, 1956 are similar to those of the 1954 United States KID Contract. Article 6 of the TID Contract provides in part:

> (a) Contracts between the United States and land owners within the district in effect at the time of the execution of this contract are set forth in Exhibit '2' attached to and by this reference made a part of this contract. Said contracts described in Exhibit '2' shall remain in full force and effect, except as otherwise modified herein, and the district shall perform, in accordance with the true intent and meaning of such contracts, the obligations of the United States described therein and shall recognize all of the rights set forth in said contracts.

Like the KID Contract, Article 26 of TID Contract requires the United States to "use all reasonable means to guard against shortage in the quantity of water available in the Project," and Article 27 requires the United States to "exercise due diligence and foresight" to avoid loss from uncontrollable forces. Further, it requires the United States to "exercise due diligence" to remove any inability to perform the Contract with all reasonable dispatch. Article 33 grants to TID a

right in perpetuity to "receive from the Klamath Project all water needed by the District for beneficial irrigation uses within the District. Said water shall be delivered from the works under the control of the United States or its designee or agents at such times and in such amounts as the District may demand, subject only to the limit of the capacity of the facilities available therefore and the amount required for beneficial use within the District." Subsection (c) of said article allows the United States to apportion the available supply in times of shortage "as a result of drought or unavoidable cause among TID and the other Districts having rights of priority equal to that of TID." In addition to supplying water to the lands described in its Contract, TID also supplies water by Contract to the Westside Improvement District.

The plain intention of the parties under the Contracts assumed by TID was that the land owner would receive irrigation water from the Klamath Project in consideration for the payments of the amount stipulated in the Contracts and as otherwise provided by law.

### C. Pine Grove and Enterprise Irrigation Districts

By Contract dated December 21, 1918, the United States entered into an agreement with the Pine Grove Irrigation District. The agreement provides in part:

> 1. The United States will impound, store, or provide, and carry such excess water for use as hereinafter provided in full compliance with all of the terms and provisions of Section 2 of the above mentioned act of Congress of February 21, 1911 and will deliver said water through the main canal. . . .
>
> 2. It is agreed that the District shall receive said water at the point of delivery hereinabove described and take the same from the East Branch Canal at such point. . . .
>
> 3. The District upon receiving the water delivered as herein provided will at its own cost convey the same to the place of use and perform all acts required by law or custom in order to maintain its control over such water and to secure its lawful and proper diversion . . . as herein provided for and the beneficial application of the same to District lands. . . .

Article 4 limited the use of the water to irrigation and domestic purposes on private land. Article 5 provided in part:

> 5. It is agreed that beneficial use shall be the basis and limit of all right acquired by the District hereunder and that that water herein supplied to be delivered shall be supplied solely to the District lands within the limits of the District as now organized; . . .

Article 6 provided in part:

> 6. It is expressly understood and agreed that the amount of water to be delivered hereunder shall be two (2) acre-feet per acre of irrigable land during the usual irrigation season as established on said Klamath Project . . . provided that the United States shall not be obligated to make delivery of water as herein specified except upon written demand of the Project manager by the District . . .

Other articles of the Contract obligated the District to pay charges specified therein to the United States in repayment of the costs of constructing the facilities necessary to deliver the water to the District, and the cost of operating and maintaining those facilities. Article 10 provides:

> The United States shall not be liable for failure to supply water under this Contract caused by hostile diversion, unusual drought, interruption of service made necessary by repairs, damages caused by flood, unlawful acts or unavoidable accidents.

The Contract between the Enterprise Irrigation District and the United States is dated October 5, 1920 and is essentially the same as the Contract between the United States and the Pine Grove Irrigation District.

**D. Malin, Shasta View, and Sunnyside Irrigation Districts**

The remaining Plaintiff-districts were formed to secure a permanent supply of irrigation water from the United States for the lands in the districts. The Contracts between the United States and the Malin Irrigation District, the United States and the Shasta View Irrigation District,

and the United States and the Sunnyside Irrigation District were all made in 1922 and are essentially the same as to their material provisions. In each case, the explanatory recitals state:

> 2. Whereas, the United States is now constructing the Klamath Irrigation Project in Oregon and California, and after provided water sufficient for irrigating lands within the limits of said Project, will have available from Upper Klamath Lake an additional supply of water, and
>
> 3. Whereas, the District was organized for the purpose of securing and distributing water for the irrigation of its lands, and desires the United States to construct certain irrigation works and supply irrigation water from the Klamath Project for such District lands . . .

The Sunnyside Irrigation District Contract dated October 24, 1922, provides:

> 4. NOW, THEREFORE, for and in consideration of the mutual and dependent stipulations herein set forth it is hereby covenanted and agreed as follows:
>
> 5. The United States will impound, store, or otherwise provide water for the irrigation of District lands and deliver same to the District through (canal) . . .

The Contracts provide that the United States would deliver two-acre feet of water per irrigable acre during the usual irrigation season. The rights of the Districts to receive water under the Contract was subordinate to the land in KID and TID. The agreements provide that the water will be delivered by the United States upon demand and require that the Districts deliver the water to the land entitled thereto. Each of the Contracts require the District to comply with all provisions of the Reclamation law and to "operate and maintain its irrigation system to be constructed hereunder to the satisfaction of the United States." Each Contract requires the District to pay significant sums to reimburse the United States for the construction of the facilities necessary to divert and deliver the water to the District, and each Contract requires the District to pay a proportional share of the costs of operating and maintaining the irrigation system. Each Contract contains the following provision:

> On account of drought, inaccuracy in distribution or other cause, there may occur at times a shortage in the quantity of water

> provided for herein, and *while the United States will use all reasonable means to guard against such shortage*, in no event shall any liability accrue against the United States, its officers, agents or employees, for any damage, direct or indirect, arising therefrom, and the payments due hereunder shall not be reduced because of any such shortage." (emphasis added)

### E. Klamath Drainage District

By Contract dated November 30, 1917, the Klamath Drainage District and the United States agreed that the United States would undertake to stop the free flow of Klamath River water onto the swamp and overflow lands of the District by constructing gates in the railroad levy constructed by the Southern Pacific Railroad. In addition, the parties agreed to the payment by KDD of the cost to the United States of providing 50 cubic feet of water to Van Brimmer Ditch Company through the Reclamation Project's main canal. Finally, KDD agreed to pay the cost incurred by the United States in developing the facilities to control the flow of water onto KDD lands and the costs of operating and maintaining those facilities. By Contract dated August 24, 1921, KDD purchased from the United States a water right for the lands of said District. Article 5 of said Contract provides in part:

> 5. The United States shall deliver to the district during the irrigation season each year at the strait opening in the railroad embankment on the northern boundary of the district, a sufficient quantity of water for the irrigation of irrigable lands of the district, not exceeding 27,500 acres. The United States shall not be liable for failure to supply water under this contract caused by hostile diversion, drought, interruption of service made necessary by repairs, damages caused by flood, unlawful act or unavoidable accidents.

Article 7 provides:

> 7. Beneficial use shall be the basis and limit of all rights acquired by the district hereunder. The water herein specified to be delivered shall be supplied solely to the district lands within the limits of the district as now organized and shall be used solely for irrigation and purposes incidental thereto.

The Contract was made in contemplation of the construction of a dam at the mouth of Upper Klamath Lake on Link River by the California-Oregon Power Company and provided that if said dam was constructed, the District would pay $50,000 to the United States. The agreement also requires the District to pay a portion of the cost to the United States of operating and maintaining the facilities regulating the water level in Upper Klamath Lake and the cost of delivering the water to the District's head gate. The District was obligated to construct an irrigation and drainage system capable of delivering the water to the lands within the District. KDD also provides water through its system to the Midland District Improvement Company.

**F. Klamath Basin Improvement District**

By Contract dated April 25, 1962, the United States and the Klamath Basin Improvement District (KBID) entered into an agreement whereby the United States agreed to furnish water to the District and to finance the construction of certain improvements by the District necessary to provide additional supplies of water to District lands. The District agreed to construct said improvements and to repay the loan to the United States for the construction of the improvements and to pay a portion of the costs of operating and maintaining Project works. The use of the water was limited by Article 5 of the Contract to delivery to lands within the District for irrigation and domestic purposes. Article 4 of the Contract provides:

> 4. On account of drought, inaccuracy in distribution, or other cause, there may occur at times a shortage in the quantity of water that is available for delivery hereunder and in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom. In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available surplus water supply among the Districts and others entitled, under existing or future contracts made pursuant to the Warren Act, to receive water from the Klamath Project.

Article 32 of the Contract provides:

> 32. In the event that the Congress of the United States may repeal or amend any pertinent provisions of the federal reclamation laws, the United States agrees, at the option of the District, to negotiate amendments of appropriate articles of this contract, all consistently with the provisions of such repeal or amendment.

**G. Poe Valley Improvement District**

By Contract dated July 20, 1953, the United States agreed to make water available in Lost River to Poe Valley Improvement District for irrigation of lands within the District. The District agreed, at its own cost, to deliver the water to the lands in the District for irrigation. The Contract replaced several existing Contracts made between the United States and private land owners. The District agreed to pay the United States' a portion of the cost of operating and maintaining the Klamath Project. Article 11 of the Contract provides:

> 11. The United States shall not be liable for failure to supply water under this contract caused by hostile diversion, drought, interruption of service made necessary by repairs, damages caused by flood, unlawful acts, or unavoidable accidents.

**H. Van Brimmer Ditch Company**

The Contract of the Van Brimmer Ditch Company is unique. The Van Brimmer Ditch Company was formed in 1883 for the purpose of diverting water from White Lake, a tributary of Lower Klamath Lake, a tributary of the Klamath River, to lands owned by the Van Brimmer brothers and other land in the general area of Merrill, Oregon. The Van Brimmer brothers, together with partner J. Frank Adams, constructed a canal and began irrigating lands on both sides of the Lost River around Merrill.

In investigating and designing the Klamath Project, the United States Reclamation Service determined it appropriate to block the flow of water from the Klamath River to Lower Klamath Lake and White Lake, thereby interfering with the Van Brimmers' appropriation. To

complete construction of the Project, the United States then entered into an agreement with Van Brimmer Ditch Company dated November 6, 1909. The agreement provides in part:

> WHEREAS, the United States Reclamation Service proposes to change the course or lower the water-level of Lower Klamath Lake, Oregon-California, in the construction, operation and maintenance of the reclamation, irrigation and drainage system, now being constructed in the Klamath Basin, which basin is situated in Klamath County, Oregon, and Siskiyou and Modoc Counties, California and
>
> WHEREAS, the changing by the United States of the course or water-level of said Lower Klamath Lake will in all probability completely destroy or impair the present source of water supply used for irrigation purposes of the Company at its present intake or diversion point on the margin of Lower Klamath Lake . . . and
>
> WHEREAS, the Company claims that it has established a vested right to the use of 50 second-feet of water for irrigation purposes from the water of Lower Klamath Lake.
>
> 1. NOW, THEREFORE, in consideration of the mutual promises hereinafter stipulated, the Company hereby waives and renounces to the use and benefit of the United States any and all of its riparian rights, in relation to the waters and shores of Lower Klamath Lake appurtenant or incident to the lands now being irrigated by the Company, or any other lands now owned or controlled by the Company, and also waives and renounces any and all claims for damages consequent upon or arising from any change of the course or water-level of said Lower Klamath Lake, and its tributaries, due to the operations of the United States.
>
> 2. It is understood and agreed that the United States and its assigns, will deliver to the Company during each and every irrigation season, that is from May first to October fifteenth of each year, a quantity of water, not to exceed fifty second feet in which the Company claims the right to the exclusive use to irrigate sufficiently those certain pieces or parcels of land and being situated west of Lost River, Klamath County, Oregon, and east of the present canals or ditches of the Company as now existing and constructed . . .

I declare under penalty of perjury that what I have said in this declaration is true and correct.

Executed on April 28, 2006

s/ William M. Ganong
William M. Ganong, General Counsel
Klamath Irrigation District

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT et al., Plaintiffs, v. UNITED STATES, Defendant. | No. 01-591L<br>Hon. Francis M. Allegra |

**THIRD DECLARATION OF DAVID A. SOLEM**

I, David A. Solem, pursuant to 28 U.S.C. §1746, declare:

1. I am, and have been for the past 23 years, the Manager and the Secretary for the Board of Directors of plaintiff, Klamath Irrigation District (KID), which is located in Klamath County, Oregon. I have firsthand knowledge of the operations of KID, and am generally familiar with the Klamath Reclamation Project (Klamath Project). My responsibilities include overseeing all irrigation and drainage functions of KID, supervising all of its employees, and reporting to and advising KID's Board of Directors. I am also the custodian of KID's records.

2. KID is an Oregon municipal corporation, located in Klamath County, Oregon, organized and existing under Oregon Revised Statutes, ch. 545. KID operates and maintains irrigation and drainage facilities that convey irrigation water for beneficial use to approximately 2,500 water users on roughly 40,000 acres of agricultural land within the boundaries of KID and to water users on an additional 35,000 acres of agricultural land outside the district. *See* Klamath Project Map (Plfs.' Mot. for Summ. J. Ex. at 3 (July 21, 2003)).

3. KID was created by state statute in 1918 to deliver water to landowners holding water rights within the Klamath Project, and to collect and pay to the Bureau of Reclamation

(Reclamation) the construction costs and operation and maintenance charges of the Klamath Project. In 1918, the amount owed to Reclamation for construction costs of the Klamath Project totaled $1,363,036.26, plus delinquency penalties. KID took over that responsibility from the Klamath Water Users Association (Association), which had operated under a contract it had entered into with the United States in 1905. *See* KID 1905 Contract (Pls.' Amended Compl. App. at Ex. 1, pp.1).

4. The essential *quid pro quo* of KID's contract with the government (and the same is true of the contracts of the other districts in this case) is that the districts would reimburse the United States for the construction costs associated with the Klamath Reclamation Project, the project water delivery facilities, and would themselves bear the cost of operating and maintaining the Klamath Project facilities, in exchange for water from the Klamath Project for beneficial use by farmers for irrigating their land. By 1954, KID had paid to Reclamation all of the outstanding construction costs of the KID transferred works. Accordingly, in the 1954 contract, the United States transferred to KID all of the care, operation, and maintenance of facilities within KID and downstream of the headgates of Upper Klamath Lake for delivery to water users in accordance with the Reclamation Act. KID 1954 Contract (Pls.' Amended Compl. App. at Ex. 1, pp. 2). Today, through those facilities, approximately 75,000 acres of land are irrigated with Klamath Project water. KID collects money from the water users and other irrigation districts to reimburse KID for its operation and maintenance costs; KID also collects and pays to Reclamation the amount the water users owe to Reclamation for its continuing maintenance and operation of those facilities (notably Lost River Diversion Channel and the Straits Drain), which the federal government continues to operate.

5. As the Manager of KID, I am ultimately responsible for KID's care, management and operation of the KID facilities downstream from Upper Klamath Lake. Accordingly, I am intimately familiar with the operation of these facilities, and understand how they operate to deliver water to Klamath Project water users.

6. Among the measures which could have been taken by Reclamation prior to 2001 to avoid the complete shutdown of Klamath Project water deliveries are the following:

- Institution of the Klamath Project Pilot Water Bank , which Reclamation started in 2002, including the leasing of the Barnes Ranch for water storage. This program compensates landowners for land idling and groundwater substitution and makes up to 100,000 acre feet of water available for environmental uses. *See* Attachment 1 (Bureau of Reclamation, 2006 Klamath Basin Pilot Water Bank Instructions).

- Institution of the Conservation Implementation Program (CIP), which was begun in 2002. This program is designed to implement recovery of the fish species, and is a main reasonable and prudent alternative of the current biological opinions. The concept of the CIP is to avoid jeopardy opinions by instituting a fish recovery planning program. *See* Attachment 2 (Letter from D. Sabo to D. Solem, dated Oct. 22, 2002, regarding Klamath Basin Conservation Implementation Program).

- Preparation of a coho recovery plan. Incredibly, NOAA Fisheries has never prepared one, although it is required by the Endangered Species Act and, in fact, a bill has just been introduced to require its preparation. *See* Attachment 3 (House Resolution regarding Klamath River salmon).

- Construction of the A-Canal fish screens to protect sucker fish from being entrained into irrigation canals. The government in fact constructed the fish screens in winter 2002-2003, just after the 2001 water disaster.

- Construction of the Link River Dam Fish passage, which was completed in winter 2005. The purpose of this facility is to enable suckers to migrate upstream to spawn.

- Development of the Klamath Lake Incremental Adjustment Methodology (IAM), which allows flexibility in meeting monthly levels of Upper Klamath Lake. This methodology is approved by the Fish and Wildlife Service.

- Commencement of Section 7 Consultations for the Rogue River Project, operated by Reclamation, did not commence until 2003. The Rogue operations impact the Klamath Project by diverting water out of the Klamath Basin.

- Moreover, there are many other federal projects within the Klamath basin (*e.g.*, the Klamath Marsh Wildlife Refuge), which affect the flows of the Klamath River, and yet have never been the subject of ESA consultation. The result is that the Klamath Project bears the entire burden of mitigating for all of these other projects, which operate without the same consideration of endangered species.

- Institution of the NRCS program in 2002 for farmers, *see* Attachment 4 (Conservation in the Klamath Basin: Partnership Accomplishments, December 2003), and Reclamation programs to provide pipe and water measuring equipment to Project districts to save water.

- Institution of a new review of flow studies by the National Academy of Sciences (*see* Attachment 5, (National Academy of Sciences, Proposal 05-DELS-204-01: Further Studies on the Klamath Basin)), not to mention the Academy's 2002 report (*see* National Academies of Science, Board on Environmental Studies and Toxicology, *Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin: 2002 Interim Report*, at 1 ("2002 Report"), available at http://newton.nap.edu/books/0309083249/html/ examining whether the operational regime required by the 2001 biological opinions made any scientific sense, or helped the fish.

- Preparation of a long-term operations plan incorporating conservation, water bank, well drilling, and other measures which could have ameliorated the water shortage in 2001. The need for such a plan was expressed as early as 1992, yet Reclamation did not complete it until 2002.

7. In February 2001, Reclamation issued a proposed one-year operations plan for 2001 and a biological assessment with respect to the operation of the Klamath Project, proposing to deliver water to Klamath Project irrigators and wildlife refuges, in accordance with historical practice. *See* Bureau of Reclamation Biological Assessment at 6-10 (Feb. 13, 2001), attached to Def's Supp. App. at Ex. 69. Reclamation, however, directed irrigation water users not to take water until the FWS and NMFS had completed their biological opinions.

8. On April 6, 2001, the NMFS and FWS issued their biological opinions with respect to the operation of the Klamath Project on Coho salmon and Lost River and Shortnose suckers, respectively. Each agency found that the proposed action of water delivery was likely to jeopardize the continued existence of the species. The agencies, however, identified

"reasonable and prudent alternatives" (RPAs) to avoid jeopardy. These RPAs required that Reclamation both provide greater flows of water for Klamath River (in order to benefit Coho salmon) and maintain higher elevations in the Upper Klamath Lake (in order to protect the Lost River and Shortnose suckers). To do this, Reclamation concluded that it must deliver no water to plaintiffs in 2001. Reclamation adopted these RPAs and on April 6, 2001, announced that there would be no water delivered to plaintiffs from Upper Klamath Lake. As a result of the significant public outcry from Reclamation's refusal to deliver the Klamath Basin water users their irrigation water, in late July 2001, Interior Secretary Norton ordered the release of approximately 70,000 acre feet of water. Needless to say, the release of this small amount of water late in the growing season was of little benefit to the water users.

9. Throughout the 2001 irrigation season, Upper Klamath Lake contained large quantities of water that should have been released to Klamath Project water users. However, Reclamation maintained the Upper Klamath Lake level between 4,143.3 and 4,139.5 feet above sea level. Further, Reclamation released flows down the Klamath River as required by the NMFS biological opinion much larger than the historical practice. Had Reclamation managed Upper Klamath Lake levels and downstream flows according to historic practices, Klamath Project water users would have received sufficient water to grow their crops.

I declare under penalty of perjury that what I have said in this declaration is true and correct.

Executed on April 28, 2006

s/ David A. Solem
David A. Solem, Manager
Klamath Irrigation District

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**Bureau of Reclamation**
**Klamath Falls, Oregon**

**2006 Klamath Basin Pilot Water Bank**
**Instructions**

The Bureau of Reclamation announces a request for bids for the 2006 Pilot Water Bank (Water Bank). The purpose of the Water Bank is to comply with the 2002 NOAA-Fisheries Biological Opinion on Klamath Project Operations, which requires Reclamation to make 100,000 acre-feet of water available to benefit endangered coho salmon. Participation is open to all users of surface water above Keno Dam, including non-Project users, EXCEPT lands above Harpold Dam on the Lost River, Federal lease lands, and lands under temporary surplus water contracts ("C lands"). Reclamation is accepting applications from individuals, groups of individuals, partnerships, and companies who desire to participate in this program in exchange for a payment.

**A. Program Definitions and Eligibility**

1. The open bid portion of the Water Bank will consist of two components:
   a. Dryland Operation – Field units accepted under this program are not to be irrigated by any method between the date of application and October 31, 2006.
   b. Groundwater Substitution Options – Field units accepted under this program are to shift between surface water irrigation and groundwater irrigation at Reclamation's discretion any time between the date of application and October 31, 2006.
      i. This represents a change from previous years, in which groundwater was substituted for surface water for the entire irrigation season. For 2006, groundwater will be substituted for surface water ONLY at Reclamation's specific request. Payment will be based on the documented quantity of groundwater pumped.
      ii. It is possible Reclamation may not make a request for groundwater substitution at any time during the irrigation season. In that event, no payment will be made.
      iii. Oregon landowners **MUST** hold a Supplemental Water Right for the groundwater sources and fields in this program and provide documentation, as no Drought Permits will be issued this year.
2. Eligibility is limited to field units which have been irrigated in the recent past. Lands **MUST** have been irrigated (surface or ground water) in at least one of the past three years (2003, 2004, or 2005). Proof of irrigation must be provided in the form of district water bills, pumping logs, irrigation diaries, etc.
3. Only complete field units of at least 20 contiguous acres are eligible.

**B. Ranking and Selection Process**

1. Applicants are to submit a **bid price per acre** on the attached application.
2. The ranking and selection process will be the same as for 2005.
   a. Applications for Dryland Operation will be scored on the basis of consumptive use of irrigation water, *i.e.*, irrigation water lost to evapotranspiration ($ET_{iw}$), which varies primarily according to crop type and soil texture. Irrigation water which is not lost to $ET_{iw}$ remains available for irrigation use elsewhere and offsets diversions for those areas. $ET_{iw}$ will be estimated for each application using a Geographic Information System (GIS) model that incorporates crop and soil surface texture. The bid price per acre will be divided by $ET_{iw}$ to calculate a bid price per acre-foot of consumed irrigation water.
   b. Applications for Groundwater Substitution Options will be scored on the basis of estimated irrigation requirement (EIR), which varies primarily according to crop and soil type. EIR will be estimated for each application using a GIS model that incorporates crop and soil types. The bid price per acre will be divided by EIR to calculate a bid price per acre-foot of irrigation water.

c. Selection of applications will favor the least expensive water, but preference will also be given to applications or groups of applications representing large contiguous acreages that minimize edge effects. Collaboration among adjacent landowners is encouraged.

3. Reclamation must make assumptions about the 2006 crop types based on the 2005 crop type or the cover/crop residue existing at the time of application. Applicants **MUST** submit a map with the application that clearly indicates the 2005 crop or current cover on **EVERY** field unit offered for this program.

4. If you would like to discuss the technical aspects of your application and/or see how Reclamation estimates the irrigation water consumption for the unique combination of crops and soils on your property, please call our office at 541-883-6935 to schedule an appointment with Mike Neuman, GIS Specialist.

**C. Land Management**

1. Grazing and harvesting of non-irrigated crops on field units will be allowed.
2. Participants are responsible to ensure establishment and maintenance of cover to sufficiently control soil erosion by wind or water on bare field units no later than April 30, 2006, unless Reclamation determines a later date.
3. **Noxious weeds and pests must be controlled at the participant's expense in compliance with State and County ordinances. All common weeds must be kept less than 12 inches tall by methods other than tilling.**
4. For fire control purposes, plants located within 30 feet of buildings shall be mowed to a height of not more than 6 inches subsequent to reaching a height of 24 inches.
5. Participants are responsible for all taxes, assessments, and any other obligations related to any field units included in the Water Bank.

**D. Contracts and Payments**

1. All selected applicants will be offered a contract with the United States covering the period from which the contract is executed through October 31, 2006.
2. All Selected applicants will be required to register with the Central Contractor Registration database (CCR) to comply with Federal Acquisition Regulations.
3. Compensation will be paid in a lump sum no later than November 30, 2006.

**E. Application Procedure**

1. A single application should include all the field units within a common irrigation system (i.e., wheel line, center pivot, etc.), to simplify operation if the application is accepted. It is **not** necessary to submit a separate application for each crop type in a group of fields under the same irrigation system.
2. Use the attached form to submit one application per contiguous block of fields. If you have questions, please contact Jennifer Birri, Mike Neuman, or Jon Hicks by phone at 541-883-6935 or by e-mail at jbirri@mp.usbr.gov, mneuman@mp.usbr.gov, or jhicks@mp.usbr.gov.
3. Completed and signed applications and **all** of the documentation must be received using the attached form (facsimiles NOT accepted) by 4 p.m. PST on Thursday, February 16, 2006. **Incomplete applications will not be processed.**

Application(s) must be submitted to:Klamath Basin Area Office
U.S. Bureau of Reclamation
Attention: 2006 Pilot Water Bank
6600 Washburn Way
Klamath Falls, Oregon 97603
Phone (541) 883-6935, Fax (541) 884-9053

# United States Department of the Interior

RECEIVED

OCT 24 2002

Klamath Irrigation District

BUREAU OF RECLAMATION
Klamath Basin Area Office
6600 Washburn Way
Klamath Falls, Oregon 97603

IN REPLY REFER TO:

KO-700
RES-3.10

OCT 22 2002

David Solem
Klamath Irrigation District
6640 KID Lane
Klamath Falls, OR 97603

Subject: Klamath Basin Conservation Implementation Program

This letter serves as an invitation to you and to your organization to participate in the development of an extremely important program to assist in the long-term recovery of threatened coho salmon and the endangered Lost River and shortnose suckers in the Klamath Basin.

On May 31, 2002, the National Marine Fisheries Service (NOAA Fisheries) issued its jeopardy biological opinion on the effects of the Bureau of Reclamation's 10-year Klamath Project. That opinion's reasonable and prudent alternative (RPA), among other requirements, requires Reclamation to convene a "Conservation Implementation Committee" to: (1) establish a science review panel; (2) identify and implement recovery actions beyond the operation of the Klamath Project to supplement main-stem flows and improve habitat conditions for coho salmon; and (3) further develop information to define the relative importance of mainstem habitat to coho salmon.

As required under the NOAA Fisheries' RPA, Reclamation is in the process of developing the concept of a Conservation Implementation Program for the Klamath Basin and we need your organization's help. To facilitate this effort, Reclamation is convening a one-day workshop to introduce the concept of a Klamath basin-wide program to assist in the recovery of listed salmon and suckers. Because Reclamation is considering using the Upper Colorado Recovery Implementation Program as a model for the Klamath basin, the workshop will include a panel discussion on the Upper Colorado Program. Panel members will explain the history of that program and answer questions from meeting participants. The workshop will also include agency representatives from Reclamation, NOAA Fisheries and the U.S. Fish and Wildlife Service to explain agency views regarding a Klamath Basin Conservation Implementation Program.

We anticipate that implementation of the requirements from NOAA Fisheries will require the coordinated and cooperative efforts of federal, state, and tribal governments, and many of the stakeholders involved in the Klamath Basin. The workshop will begin at 8:30 am on November 14, 2002 at Oregon Institute of Technology's Shasta Room.

Please confirm your attendance by contact my office at (541) 883-6935 or by e-mail to dsabo@mp.usbr.gov

Sincerely,

Dave Sabo
Area Manager

Enclosures

..........................................................................
(Original Signature of Member)

109TH CONGRESS
2D SESSION

# H. R. ____

To direct the Secretary of Commerce to provide emergency disaster assistance to mitigate the economic losses caused by declining Klamath River salmon and to develop and implement a research and recovery plan for Klamath River salmon, and for other purposes.

---

IN THE HOUSE OF REPRESENTATIVES

Mr. THOMPSON of California introduced the following bill; which was referred to the Committee on ______________________________

---

# A BILL

To direct the Secretary of Commerce to provide emergency disaster assistance to mitigate the economic losses caused by declining Klamath River salmon and to develop and implement a research and recovery plan for Klamath River salmon, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. IMPLEMENTATION OF KLAMATH RIVER SALMON PROTECTION MEASURES AND DISASTER ASSISTANCE.**

(a) KLAMATH RIVER FALL CHINOOK AND COHO SALMON PROTECTION MEASURES.—

(1) IN GENERAL.—The Secretary of Commerce shall develop and implement a coordinated, comprehensive research and recovery program for Klamath River Fall Chinook salmon and Klamath River Fall Coho salmon.

(2) PROGRAM FEATURES.—The program shall be designed to study or implement—

(A) in-river monitoring of Ceratomyxa Shasta and Parvicapsula minibicornus, and implementation of any immediate protective measures against such pathogens;

(B) additional ocean and in-river fisheries population monitoring;

(C) completion of a recovery plan for Coho salmon on the Klamath River;

(D) operation and maintenance of stream gauges for flow monitoring on the Klamath River and its tributaries, including the Shasta, Scott, Salmon and Trinity Rivers;

(E) fish passage in the Klamath National Forest, and Six Rivers National Forest; and

(F) restoration of aquatic habitats in the Klamath River basin with emphasis on the Klamath and its tributaries below Iron Gate Dam.

(3) DEADLINE FOR ISSUANCE OF RECOVERY PLAN.—The Secretary shall issue a recovery plan for Coho salmon on the Klamath River for purposes of paragraph (2)(C) by not later than 6 months after the date of the enactment of this Act.

(4) APPROPRIATION.—

(A) IN GENERAL.—To implement out the program developed under this subsection, there is appropriated to the Secretary of Commerce $45,000,000, which shall remain available until expended.

(B) LIMITATION ON USE OF FUNDS.—None of the amounts appropriated under this paragraph may be distributed before the date the Secretary issues a salmon recovery plan under paragraph (3).

(b) EMERGENCY DISASTER ASSISTANCE.—

(1) AUTHORIZATION OF PAYMENT.—The Secretary of Commerce shall make a direct payment to the Pacific States Marine Fisheries Commission to distribute to fishing communities, Indian tribes,

businesses, holders of community development quotas issued under the Magnuson-Stevens Fishery Conservation and Management Act, individuals, and other entities as emergency disaster assistance to mitigate the economic losses caused by declining Klamath River Fall Chinook salmon.

(2) PAYMENT RECIPIENT REPORTS.—The Secretary of Commerce shall require that the Pacific States Marine Fisheries Commission shall, within 6 months after receiving a payment under this subsection, submit to the Secretary of Commerce and the Committee on Appropriations of the House of Representatives and the Senate a report describing the persons to whom the payment was distributed and the rationale for such distributions.

(3) EXCLUSION OF PAYMENTS FROM GROSS INCOME.—For purposes of the Internal Revenue Code of 1986—

(A) EXCLUSION.—Gross income shall not include any amount received as a payment or distribution under paragraph (1).

(B) DENIAL OF DOUBLE BENEFIT.—Rules similar to the rules of subsections (g)(3) and (h) of section 139 of such Code shall apply with

respect to any amount excluded under subparagraph (A).

(4) APPROPRIATION.—There is appropriated to the Secretary of Commerce $81,000,000 to make payments under this subsection.

(e) REPORTS BY SECRETARIES.—Not later than one year after the date of the enactment of this Act, and annually thereafter, the Secretary of Commerce shall report to the Congress on progress in implementing subsection (a) and specifically note how projects under subsection (a) have increased water quantity, improved water quality, increased salmon populations, and specifically benefited salmon spawning habitat.

# Conservation in the Klamath Basin...

# Partnership Accomplishments

The Klamath River Basin presents numerous challenges as well as opportunities for its many water users. For many years, farmers and ranchers in the Klamath Basin have recognized the vital role they play in the health of their watershed. Working with conservation districts, NRCS and others, local landowners continue to proactively find ways to enhance natural resources in the basin, benefiting wildlife and the environment. However, as it has across the western United States, drought hit home in the Klamath for those who depend on every drop of water to sustain their livelihood, culture and community.



Photographer: Tupper Blake

In the spring of 2001, the combination of drought and the impact of the Endangered Species Act triggered a shutdown of irrigation water during the growing season, drying up water resources to more than 2,000 farms and ranches. USDA's Natural Resources Conservation Service, in cooperation with local conservation districts, provided a quick infusion of technical assistance and $2 million in cost-share funding for cover crops through the Emergency Watershed Protection Program. As cover crops took hold, the seeds of a long-term solution took root in the NRCS/conservation district partnership. The ability of the local office to receive funding, engage community members and other partners, plan resource improvements, implement actions, and monitor success proved to be an invaluable asset for the community.

In the face of an increasingly complex and politically polarized situation, a clear purpose and direction arose from those early actions. Local communities gained trust in the conservation partnership's ability to identify the impacts of drought on farms and ranches, and find solutions to improve and sustain agriculture.

Helping private landowners develop and apply practical, common-sense solutions to complex resource issues will be the challenge of the conservation partnership well into the future. USDA, in concert with the locally led conservation districts, will continue to play a critical role by delivering technical and financial assistance to Klamath Basin farmers and ranchers.

## *Conservation Partnership Highlights*

Significant improvements continue to be made to the landscape in the Klamath Basin. Conservation districts lead the way, guiding the work of the partnership to conserve and enhance natural resources in the basin, using a variety of Farm Bill and other conservation programs.

**In the last two years, over 2,700 landowners have received assistance** from the conservation partnership to improve the condition of natural resources on their land.

**Conservation systems have been planned on 66,869 acres** to address natural resource concerns in the basin, including conserving water from livestock and irrigation practices, thinning juniper stands, and managing pests and nutrients.

The NRCS Water Resource Planning staff in Oregon and California began an assessment process of the natural resource conditions and trends in the basin. **The assessment was completed on over 3.4 million acres of private land** and presented to the districts and NRCS staff to assist in setting priorities and determining the best conservation activities to create and maintain a healthy watershed.

The conservation partnership will continue to work closely with landowners in the Klamath Basin as their livelihood depends on their commitment to conserving and protecting the natural resources of their landscape.

## *Local Conservation Goals*

In the fall of 2001, the Klamath Soil & Water Conservation District (SWCD) in Oregon and the Lava Beds/Butte Valley Resource Conservation District (RCD) in California met with NRCS in the first of a series of strategic planning sessions. From these meetings, locally elected leaders developed a list of mutual resource goals and objectives for the Basin.

The conservation districts' primary goal is a reliable water supply for agriculture. Their core objectives are to **decrease water demand, increase water storage, improve water quality, and develop fish and wildlife habitat**. With these objectives in mind, potential outcomes have been identified from conservation activities in the Klamath Basin.

Currently, a coalition of the six districts and two Resource Conservation and Development Areas in the Klamath Basin are working to establish a strategy to address resource concerns, set priorities and obtain funding to achieve the conservation districts' goals across the entire watershed.

## *Conservation Assistance*

Farmers and ranchers recognize the importance of their role in conserving natural resources in the basin. Well-maintained farmland creates fish and wildlife habitat, improves water quality and quantity and contributes to a healthy watershed.

Working with local landowners, during the 2002 and 2003 fiscal years the conservation partnership has:

- **Assisted over 2,700 landowners** in applying for financial assistance, completing natural resource inventories, installing conservation systems and improving the condition of natural resources on their land.
- **Planned conservation systems on 66,869 acres** and applied these practices to 25,950 acres to manage soil, water, air, plants and animals on private lands in the basin. When implemented, the systems (three or more conservation practices) will address all resource concerns on the land through such measures as establishing livestock watering facilities, conserving irrigation water, thinning juniper stands, managing pests and nutrients and improving pasture.
- **Conserved irrigation water on 16,006 acres.** With proper irrigation management and application landowners can meet their crop needs and increase profits, while lowering their on-farm water use by 6,700 acre-feet. Converting from flood systems to more efficient irrigation systems can result in an average of 30 percent on-farm water savings.
- **Created and enhanced wetlands on 2,241 acres.** The application of these wetland practices works to enhance and create additional habitat for fish and wildlife.
- **Improved wildlife habitat and upland watersheds on over 13,358 acres,** including 9,689 acres of upland habitat management. The application of these wildlife habitat practices benefits both aquatic and upland wildlife species.
- **Developed habitat for fish and other aquatic species on 2,786 acres,** establishing riparian forest buffers on 2,692 acres and filter strips on 94 acres. Water quality has improved from streambanks stabilized with vegetation, and soil in water runoff filtered through planted vegetation.
- **Improved the quality and production of vegetation on 17,515 acres of pastures.** Grazing plans were developed with landowners to identify proper stocking rates and grazing rotations that work in conjunction with irrigation schedules. The majority of landowners have seen an increase in the production and quality of their pastures.
- **Decreased soil erosion on 1,971 acres of cropland,** eliminated 8,522 tons of soil wind erosion.
- **Accelerated the ongoing Humboldt and Del Norte counties' soil survey,** which will provide resource planners with the tool they need to reduce erosion, maintain long-term land productivity, improve water quality, and restore wildlife habitat.






*The Klamath Basin, located on the border between Oregon and California, covers slightly more than 10 million acres. There are approximately 3.8 million acres of private land, 6.1 million acres of public land and 90,000 acres of tribal land in the basin. On the private land, there are more than 2,000 farms/ranches operating on 581,800 acres.*

## *Locally Led Conservation*

It is critical that NRCS and the conservation districts work jointly in this effort with other government agencies, special interest groups, organizations, and individuals. Resolution of the current water problems in the Klamath Basin requires cooperation, compromise, and creativity. To that end, NRCS and the conservation districts have included numerous other agencies, organizations, and individuals to assist private landowners with their natural resource goals.

Some collaborative projects already occurring include:

- Local conservation districts assisted with the Environmental Quality Incentives Program (EQIP) development, landowner workshops, tours, and the development of the basinwide planning process.
- A new Tulelake Partnership office was established in July 2002. This joint effort was accomplished by NRCS, FSA, The Tulelake Partnership, and the Lava Beds-Butte Valley Resource Conservation District.
- Grants and donations from a local equipment company and the Bureau of Reclamation allowed the Klamath SWCD to purchase a no-till drill; 67 landowners have used the drill on 3,600 acres to plant their crops.
- The Klamath SWCD received a grant from the Oregon Watershed Enhancement Board to assist in landowner conservation projects. This was used to assist landowners with juniper removal, erosion control, irrigation systems, and weed eradication.
- NRCS is working with The Nature Conservancy to reestablish over 5,843 acres of wetlands.
- NRCS staff worked with the US Fish and Wildlife Service and Oregon Department of Fish and Wildlife with various issues concerning threatened and endangered species in the area.
- NRCS worked with the Yurok Indian Tribe to decrease erosion and protect their watershed with EQIP.
- NRCS worked with the Hoopa Valley Tribal Council and Hoopa Valley Public Utilities to develop an irrigation water supply design for the Hoopa Valley to meet their irrigation needs efficiently in a fish-friendly manner.
- NRCS Plant Materials center has tested various plant species to use for creating buffers along irrigation ditches that would compete out weeds, provide wildlife habitat, and not require a significant amount of water.
- The Ore-Cal RC&D has hosted "Biomass to Energy in the Klamath Basin" workshops.

NRCS Natural Resources Conservation Service

**Conservation in the Klamath Basin...**
**Partnership Accomplishments**
*December 2003*

## 2002 Farm Bill Benefits Farmers, Fish and Economy

The Klamath SWCD, the Lava Beds/Butte Valley RCD, and others requested funds from Congress to achieve their conservation objectives. These efforts led to a Congressional earmark for $50 million in the 2002 Farm Bill for on-farm/ranch water conservation in the Klamath Basin. The basinwide planning process allows the utilization of these dollars to be directed locally.

In cooperation with various agencies, landowners and others, NRCS, FSA, and the districts are also utilizing a variety of Farm Bill programs to work with private landowners to conserve their natural resources. These include the Environmental Quality Incentives Program, Wetland Reserve Program, Wildlife Habitat Incentives Program, Conservation Reserve Enhancement Program and Grassland Reserve Program. NRCS technical assistance combined with Farm Bill programs enable private landowners to enhance and conserve the basin's natural resources.



## NRCS Basinwide Planning

At the request of the local conservation districts, the NRCS Water Resources Planning staff in Oregon and California quickly initiated an assessment of natural resource conditions and trends in the basin. These rapid subbasin assessments include estimates of present resource conditions, conservation treatment recommendations, costs, resource effects, and identification of programs for addressing resource concerns.

The initial data has been presented to the districts and NRCS staff to assist local decision-makers in setting priorities and determining the best conservation activities to achieve their goals. Klamath landowners can use the assessments to determine the most appropriate management actions for conserving their natural resources.

Future planning assistance will include determinations of cumulative effects and specialized conservation applications to meet the districts' designated goals and objectives.

## The Future

Although the work of NRCS and the conservation districts has been far-reaching, there continues to be a large need as well as a demand for conservation assistance.

Because they live on the land, and their livelihood is based on its sustainability, agricultural producers have the best opportunity to conserve and protect resources on private lands in the basin. NRCS and its partners will continue to work closely with them to conserve resources for future generations.

Public participation in providing cost share funds will be necessary to implement conservation practices as profit margins in the agriculture sector continue to be marginal to non-existent. More producers implement practices when it is cost effective to do so.

As NRCS and others learn more about the effectiveness of the conservation practices being applied through monitoring, their priorities, practices, funding, and policies can be adapted to continually improve future efforts. Additional watershed assessments are needed to provide detailed resource data in order to determine the accumulative effects of conservation treatments.

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, sex, religion, age, disability, political beliefs, sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW, Washington, DC 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an equal opportunity provider and employer.

**The National Academies**
**Division on Earth and Life Studies**
**Board on Environmental Studies and Toxicology**

**Proposal No. 05-DELS-204-01**

# Further Studies on the Klamath Basin

A multidisciplinary committee will be established to evaluate new scientific information that has become available since the National Research Council issued its 2004 report on Endangered and Threatened Fishes in the Klamath River Basin. The new information to be evaluated by the committee will include two new reports on (1) the hydrology of the Klamath Basin and (2) habitat needs for anadromous fish in the Klamath River, including coho salmon. The committee will also identify additional information needed to better understand the basin ecosystem.

To complete its charge, the committee will:

1. Review and evaluate the methods and approach used in the Natural Flow Study to create a representative estimate of historical flows and the Hardy Phase II studies, to predict flow needs for coho and other anadromous fishes.

2. Review and evaluate the implications of those studies' conclusions within the historical and current hydrology of the upper basin; for the biology of the listed species; and separately for other anadromous fishes.

3. Identify gaps in the knowledge and in the available scientific information.

Questions for the committee to consider might include the following:

Natural Flow Study

- Is the period of record used in the Natural Flow Study (1949-2000) appropriate, or is it too wet, too dry, too variable, or otherwise potentially capable of producing misleading results?

- Would extending the period of record to include unverifiable or incomplete data sets affect the reliability of the study's outcome?

- Do the data sets identified for use in the study represent a thorough and comprehensive search or are there potential sources that were not considered?

- Are the data used in the evaluations of pre-agricultural development conditions reasonable in terms of completeness, accuracy, and areal coverage?

- Are the methods of reconstructing the historical record where data are not available reasonable?

- Are there other factors that would affect the water budgets for the river and the lakes that should have been considered?

- Are the data and methods used to estimate evaporation and evapotranspiration of both natural vegetation and crops appropriate for the climate and geographic location of this study?

- Are the supporting spreadsheets, maps, and other reference materials sufficient to evaluate how the study results were derived and to evaluate or recreate the results?

- Are the hydrology and engineering techniques used in the study sufficiently established as standard methods to apply in this model/study?

- Is the sensitivity analysis complete and accurate?

- Has the model been sufficiently verified and/or calibrated to allow confidence in the output?

- What role do depletions above and below the Klamath Project play in creating the current flow conditions in the mainstem Klamath River?

Hardy Phase II

- Are the data used in Hardy Phase II properly representative of predevelopment and current conditions?

- Is there merit in using an approach which utilizes habitat modeling with two sets of hydrologies for estimating the suitable habitat for coho salmon, i.e., historic river conditions and current hydrologic conditions with no depletions? Is one approach more reasonable? Should other approaches be considered?

- Is the methodology utilized appropriate for setting instream flows or is there a better method?

- Do the habitat-suitability assessments accurately reflect the biological needs of the anadromous fish including the listed coho salmon?

- Are the type, number, and location of study sites for cross-sections used in the application of the habitat suitability curves representative of the Klamath River main stem below Iron Gate Dam?

- To what degree are the tributaries of the main stem Klamath below Iron Gate Dam critical to a complete analysis?

- Are the hydrology and engineering techniques used in the study sufficiently established as standard methods to apply in this model/study?

- Is the sensitivity analysis complete and accurate?

- Has the model been sufficiently verified and/or calibrated to allow confidence in the output?

- What role do depletions above and below the Klamath Project play in creating the current flow conditions in the mainstem Klamath River?

- Are the supporting spreadsheets, maps, and other reference materials sufficient to evaluate how the study results were derived and to evaluate and recreate the results?

- Are the scientific and engineering techniques used in the study sufficiently established as standard methods to apply in this model/study?

- Has the model been sufficiently verified and/or calibrated to allow confidence in the results/output?

- Should distinctions be made for the various anadromous fishes' flow and habitat requirements, particularly for the coho salmon as compared to other species?

In its evaluations, the committee will consider water quality as well as flow volumes and seasonal flow patterns.