IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT et al., | |
| Plaintiffs, | No. 01-591L |
| v. | Hon. Francis M. Allegra |
| UNITED STATES, | |
| Defendant. | |

**DECLARATION OF WILLIAM M. GANONG**

I, William M. Ganong, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am licensed to practice law in Oregon, and I am admitted to practice before the State and Federal Courts in the state of Oregon. I have been in private practice in Klamath Falls, Oregon since September 1978. My Oregon State Bar Number is 78213. I have served as General Counsel to the Klamath Irrigation District for the past 16 years. My primary practice areas are water law, real estate, land use, estate planning, and municipal government law.

2. My grandfather, William Ganong, and my father William Ganong, Jr., also served as General Counsel to the Klamath Irrigation District. My grandfather began that service in approximately 1932, and he was replaced by my father in 1968. I began assisting my father with District issues upon graduation from law school in 1978.

3. Reclamation's contractual obligations for delivery of irrigation water through the Klamath Project consist of a series of thirteen interlocking and interdependent contracts (including several amendments) between Reclamation and the districts which, in turn, can only be understood within the framework of the Reclamation Act, the Klamath Project water rights,

and the historical evolution of Project contractual relationships among Reclamation, the districts and the water users. As Reclamation admits, " Reclamation has contractual obligations to Project water users to provide water primarily for domestic and irrigation uses. The contracts for the majority of the Project area define this obligation as the amount of water necessary to meet the reasonable beneficial use of water for irrigation." Def.'s Ex. 61.

4. Over the years I have had the occasion to review all of these contracts. A brief summary of their relevant provisions follows:

**A. Klamath Water Users Association**

Pursuant to the practice then followed by the Reclamation Service, the United States entered into an agreement with the Klamath Water Users Association (KWUA) dated November 6, 1905. The Contract acknowledged the legal existence of KWUA as an Oregon corporation formed for the purpose of entering into Contracts with the United States for the repayment of costs of the Klamath Reclamation Project. The Contract provides in part:

> Whereas the territory within the lands to be irrigated by the works hereafter described, includes all land within the boundaries [of Klamath Reclamation Project] . . .; and the said lands are in part naturally arid or semi-arid and incapable of proper cultivation without irrigation; and the lands above described, or a greater part thereof, will remain in such condition unless the waters of Upper Klamath Lake in Oregon and Clear Lake in California and their tributaries and outlet streams be utilized and the flows thereof regulated and controlled; and Whereas, the Secretary of the Interior contemplates the construction of certain irrigation works under the provisions of an act of Congress entitled 'An Act Appropriating the Receipts From the Sale and Disposal of Public Lands in Certain States and Territories to the Construction of Irrigation Works for the Reclamation of Arid Lands,' approved June 17, 1902 for the irrigation and reclamation of the lands described in said articles; and Whereas, the incorporators and shareholders of said Klamath Water Users Association are . . ., owners and occupants of land in said area, and in some cases are appropriators of water for irrigation thereof, and in addition thereto such incorporators and shareholders and their successors and assigns must initiate rights to the use of water from said proposed irrigation works, to be constructed by the Secretary of the Interior, as soon as such rights may be initiated, and

> thereafter complete the acquisition thereof in the manner and upon the terms and conditions to be prescribed therefore by the Secretary of the Interior, which rights shall be, and thereafter continue to be, forever appurtenant to the designated lands owned by such shareholders; and Whereas, neither the relative priority nor the extent of the individual appropriation of such water, which may have heretofore been made by said irrigators and shareholders for the lands described in said articles or by-laws, and which are now vested rights, have been ascertained or determined, but such irrigators and shareholders have agreed among themselves, by the terms and provisions of said Articles of Incorporation and By-Law, upon the rules and principles by and upon which the relative priority and extent of their several appropriations invest rights to the use of said waters shall be determined in case such appropriation and right should hereafter be recognized:
>
> Therefore, it is agreed and understood by the parties hereto:
>
> 1. That if the Secretary of the Interior shall authorize and shall cause the construction of said irrigation works, then in the determination of the relative rights of shareholders of said association, and of their respective rights to the use of water acquired from the government under said act of Congress, the rules and principles set out in said by-laws, for such determination, shall be deemed the established rules and principles for that purpose.
>
> 2. That only those who are or who may become members of said association, under the provisions of its said articles and by-laws, shall be accepted as applicants for rights to the use of water available by means of said proposed irrigation works.
>
> 3. That the aggregate amount of such rights to be issued shall, in no event, exceed the number of acres of land capable of irrigation by the total amount of water available for that purpose, being (1) the amount now appropriated by the shareholders of said association; and (2) the amount to be delivered from all sources in excess of the water now appropriated; and the Secretary of the Interior shall determine the number of acres so capable of irrigation as aforesaid, his determination to be made upon due and expert consideration of all available data, and to be based upon and measured and limited by beneficial use of water.

The Contract required KWUA to guarantee the repayment to the United States of the cost of constructing facilities necessary and appropriate for the diversion and delivery of water to KWUA shareholders.

KWUA's shareholders entered into Stock Subscription Agreements with KWUA whereby they agreed to pay their proportionate share of the costs of reimbursing the United States for the construction of the Klamath Project and for the operation and maintenance of the Klamath Project facilities. Said Stock Subscription Agreements provided that the landowner shall be entitled to delivery of water to the lands described on the Stock Subscription Agreements in an amount not to exceed that necessary for the irrigation of the land, and they agreed to make application to the United States for a water right.

For lands already in private ownership, the Water Right Application was made on Form B. The application was "for a water right for the irrigation of and to be appurtenant to _____ acres of irrigable land as shown on the plats approved by the Secretary of the Interior . . . They further provided:

> 2. the measure of the water right for said land is the quantity of water which shall be beneficially used for the irrigation thereof, but in no case exceeding the share proportionate to irrigated acreage, of the water supply actually available as determined by the Project Manager or other proper officer of the United States, or its successor in control of the Project, during the irrigation season for irrigation of lands under said unit . . .

The application obligated the applicant landowner to pay a stated cost per acre to reimburse construction costs of the Project and, in addition, obligated the landowner to pay annual charges for operation and maintenance of the Project. The application also conveyed to the United States all land and facilities reasonably required by the United States necessary for the United States to discharge its duties of distributing water to the applicant. The application provided in part:

> 8. And I do hereby grant, bargain, sell, convey and confirm to the United States of America and its successors in charge of the Project, all rights of way for ditches, canals, flumes, pipelines, telegraph and telephone transmission lines, and other structures now constructed by or under authority of the United States for or in connection with

> said Project, and all rights of way that may be or become necessary and suitable, and that may be required for the prosecution and operation of said Project, and for the construction, maintenance, and operation of the ditches, canals, flumes, pipelines, telegraph and telephone transmission lines, or other structures that may be constructed by or under authority of the United States and its successors in charge of the Project for and in connection with such Project, to have and hold the same, together with all tenements, heredïments, privileges, and appurtenances thereunto belonging or in anywise appertaining to the United States of America and its assigns and successors in charge of the Project forever, subject notwithstanding to the conditions upon which this application is made.

By applying for a water right from the United States, each applicant bound himself or herself to repay the costs of constructing the facilities necessary to deliver irrigation water to his or her land, agreed to pay the costs of operating and maintaining the facilities, and conveyed valuable interests in his or her land for the construction and maintenance of those facilities. The only expectation of the grantor landowner was the permanent delivery of irrigation water in an amount that could be beneficially applied to his or her land by the United States.

**B. Klamath Irrigation District**

Klamath Irrigation District (KID) was formed to assume the obligations of Klamath Water Users Association (KWUA) under its Contract with the United States. By Contract dated July 6, 1918, KID assumed the obligations of KWUA and its stockholders to pay the United States for the construction of those portions of the Klamath Project facilities that provided irrigation water to the irrigable land within KID, and the operation and maintenance charges of those facilities. The United States agreed to release its liens against the land of the individual stockholders, and KWUA agreed to assign to KID all of its rights and obligations and then dissolve. Further, the KWUA agreed to discharge its liens of record arising under the stock subscription agreements between the KWUA and its stockholders, and did so in 1919.

Relevant provisions of the 1918 Contract include Article 2, which provided:

> Nothing in this contract contained or in the formation of the district shall be deemed in anywise to have abrogated, enlarged or modified the said water right applications to the United States, except as herein provided.

Article 4:

> There is reserved to the Secretary the right to make reasonable rules and regulations and to modify the same in his discretion, in harmony, however, with this contract, to the end that the true intent of the law and of this contract shall be carried into effect and the district agrees to use its powers for the purpose of carrying out such rules and regulations and this contract.

Article 6 of the Contract provided for the ultimate transfer of the obligation and authority to operate and maintain the irrigation facilities to the district. Other articles of the Contract provided that the District would assume the obligation for collecting the amounts necessary from the members of the district to repay the construction charges for the facilities to the United States and to pay the United States for the costs of operating and maintaining those facilities.

The 1954 Contract between the United States and KID provided for the transfer to KID for operation and maintenance the real and personal property owned by the United States used for the diversion and delivery of water to KID and to the other districts and contractors described in the Contract. The 1954 Contract contains the following relevant provisions:

> 13. (a) The district shall take the water supply for the lands within the limits of the district, as the same are now or hereafter defined, to be served by or through the transferred works, at the head works of the main canal and other delivery locations now in existence or that may be constructed in the future, and shall distribute the same to the water users entitled thereto.
>
> (b) The district hereby assumes and agrees to carry out during the terms of this contract, to the satisfaction of the secretary, all of the obligations imposed upon the United States by the contracts listed on exhibit ‘A’ , or any amendments or supplements thereto, and appended to or made part of this contract, for the carriage and delivery of water, in force as of the effective date of this agreement, insofar as said contracts relate to the delivery and carriage of irrigation and drainage water through the transferred works.

The contracts referred to on "exhibit 'A'" include the contracts between the United States and PGID, VBDC, EID, MID, SVID, and SID, together with numerous individual Warren Act Contracts between the United States and individual landowners. Article 13(e) provides:

> The district shall deliver water to district lands at the points the United States is now delivering water. For lands outside the district boundaries, and served through the transferred works, water shall be delivered in quantities, at the times and at the points of diversion from the transferred works as required from time to time by the contractors that have executed contracts with the United States in such manner as to meet the obligations the United States has assumed under said contracts.

Other articles of the Contract require KID to deliver water to certain lands within the Tulelake Irrigation District and to certain lands in the cities of Klamath Falls, Malin, and Merrill. Article 17 provides that the obligation of KID to pay the costs of the United States incurred in operating the reserve works and for the remaining portion of the cost of construction of the Klamath Project are general repayment obligations and require KID to pay said obligations notwithstanding the default of individual members or contractors to pay their proportionate share of the costs and charges to KID. Article 18(a) of the contract requires KID to exercise all authority it has for the purpose of collecting the amounts necessary to pay the obligations to the United States. Article 20 provides that the United States may refuse to deliver water to KID if KID fails to pay the amounts owed to the United States for a period of 12 months. Article 25 requires KID to indemnify the United States for damages or claims arising out of KID's care, operation, and maintenance of the transferred works. Article 26 states:

> On account of drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs, and, *while the United States will use all reasonable means to guard against such shortage*, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom and the payments to the United States provided herein shall not be reduced because of any such shortage.

(emphasis added). Article 27 provides:

> Neither party shall be considered to be in default in respect to any obligation hereunder, if prevented from fulfilling such obligation by reason of an uncontrollable force. For the purpose of this contract, the term 'uncontrollable force' means any cause beyond the control of the party affected, including, but not limited to, failure of facilities, flood, earthquake, storm, lightning, fire, epidemic, war, riot, civil disturbance, labor disturbance, sabotage, and restraint by court or public authority, *which by the exercise of due diligence and foresight, such party could not reasonably been expected to avoid. Either party rendered unable to fulfill any obligation by reason of an uncontrollable force shall exercise due diligence to remove such inability with all reasonable dispatch*." (Emphasis added).

Article 26 requires the United States to "use all reasonable means to guard against such shortage" of water. Article 27 releases each party from liability for uncontrollable forces "which by exercise of due diligence or foresight such party could not reasonably have been expected to avoid."

The fixed expectations and intent of the parties from the initial execution of the agreement between KWUA and the United States through the execution and performance of the 1954 Contract between the United States and KID was that the United States would deliver water from the Klamath Project to the land owners within the Project unless prevented by drought or uncontrollable force.

Tulelake Irrigation District (TID) was formed to assume the obligations of the homesteaders and entry men on that portion of the Project located in California and within the boundaries of TID in a manner similar to the assumption by KID of the obligations of KWUA. In both cases, homesteaders and entry men applied for water rights from the Klamath Project consistent with public notices published by the Department of Interior. The notice published November 18, 1908 provides in part:

> In pursuance of the provisions of section 4 of the Reclamation Act of June 17, 1902, (32 Stat., 338), notice is hereby given as follows:

> Water will be furnished from the Klamath Project, Oregon-California, under the provisions of the Reclamation Act, in the irrigation season of 1909 for irrigable lands shown on farm units of . . . approved November 16, 1908 by the Secretary of the Interior and on file in local land offices at Lakeview, Oregon, and Redding, California.
>
> Homestead entries, accompanied by applications for water rights and the first installment of building and operation and maintenance charges, may be made under the provisions of said act for farm units shown on said plats. Water-right applications may also be made for lands heretofore entered and for lands in private ownership, and the time when payments will be due therefore is hereafter stated.

The notices provided that each applicant could apply for water rights for 160 acres of irrigable land. The notice required that the applicant pay a construction charge of $30 per irrigable acre in ten annual installments, and that the applicant pay a proportionate share of the costs of operating and maintaining the irrigation system.

The provisions of the Contract between the United States and TID dated September 10, 1956 are similar to those of the 1954 United States KID Contract. Article 6 of the TID Contract provides in part:

> (a) Contracts between the United States and land owners within the district in effect at the time of the execution of this contract are set forth in Exhibit '2' attached to and by this reference made a part of this contract. Said contracts described in Exhibit '2' shall remain in full force and effect, except as otherwise modified herein, and the district shall perform, in accordance with the true intent and meaning of such contracts, the obligations of the United States described therein and shall recognize all of the rights set forth in said contracts.

Like the KID Contract, Article 26 of TID Contract requires the United States to "use all reasonable means to guard against shortage in the quantity of water available in the Project," and Article 27 requires the United States to "exercise due diligence and foresight" to avoid loss from uncontrollable forces. Further, it requires the United States to "exercise due diligence" to remove any inability to perform the Contract with all reasonable dispatch. Article 33 grants to TID a

right in perpetuity to "receive from the Klamath Project all water needed by the District for beneficial irrigation uses within the District. Said water shall be delivered from the works under the control of the United States or its designee or agents at such times and in such amounts as the District may demand, subject only to the limit of the capacity of the facilities available therefore and the amount required for beneficial use within the District." Subsection (c) of said article allows the United States to apportion the available supply in times of shortage "as a result of drought or unavoidable cause among TID and the other Districts having rights of priority equal to that of TID." In addition to supplying water to the lands described in its Contract, TID also supplies water by Contract to the Westside Improvement District.

The plain intention of the parties under the Contracts assumed by TID was that the land owner would receive irrigation water from the Klamath Project in consideration for the payments of the amount stipulated in the Contracts and as otherwise provided by law.

**C. Pine Grove and Enterprise Irrigation Districts**

By Contract dated December 21, 1918, the United States entered into an agreement with the Pine Grove Irrigation District. The agreement provides in part:

> 1. The United States will impound, store, or provide, and carry such excess water for use as hereinafter provided in full compliance with all of the terms and provisions of Section 2 of the above mentioned act of Congress of February 21, 1911 and will deliver said water through the main canal. . . .
>
> 2. It is agreed that the District shall receive said water at the point of delivery hereinabove described and take the same from the East Branch Canal at such point. . . .
>
> 3. The District upon receiving the water delivered as herein provided will at its own cost convey the same to the place of use and perform all acts required by law or custom in order to maintain its control over such water and to secure its lawful and proper diversion . . . as herein provided for and the beneficial application of the same to District lands. . . .

Article 4 limited the use of the water to irrigation and domestic purposes on private land. Article 5 provided in part:

> 5. It is agreed that beneficial use shall be the basis and limit of all right acquired by the District hereunder and that that water herein supplied to be delivered shall be supplied solely to the District lands within the limits of the District as now organized; . . .

Article 6 provided in part:

> 6. It is expressly understood and agreed that the amount of water to be delivered hereunder shall be two (2) acre-feet per acre of irrigable land during the usual irrigation season as established on said Klamath Project . . . provided that the United States shall not be obligated to make delivery of water as herein specified except upon written demand of the Project manager by the District . . .

Other articles of the Contract obligated the District to pay charges specified therein to the United States in repayment of the costs of constructing the facilities necessary to deliver the water to the District, and the cost of operating and maintaining those facilities. Article 10 provides:

> The United States shall not be liable for failure to supply water under this Contract caused by hostile diversion, unusual drought, interruption of service made necessary by repairs, damages caused by flood, unlawful acts or unavoidable accidents.

The Contract between the Enterprise Irrigation District and the United States is dated October 5, 1920 and is essentially the same as the Contract between the United States and the Pine Grove Irrigation District.

**D. Malin, Shasta View, and Sunnyside Irrigation Districts**

The remaining Plaintiff-districts were formed to secure a permanent supply of irrigation water from the United States for the lands in the districts. The Contracts between the United States and the Malin Irrigation District, the United States and the Shasta View Irrigation District,

and the United States and the Sunnyside Irrigation District were all made in 1922 and are essentially the same as to their material provisions. In each case, the explanatory recitals state:

> 2. Whereas, the United States is now constructing the Klamath Irrigation Project in Oregon and California, and after provided water sufficient for irrigating lands within the limits of said Project, will have available from Upper Klamath Lake an additional supply of water, and
>
> 3. Whereas, the District was organized for the purpose of securing and distributing water for the irrigation of its lands, and desires the United States to construct certain irrigation works and supply irrigation water from the Klamath Project for such District lands . . .

The Sunnyside Irrigation District Contract dated October 24, 1922, provides:

> 4. NOW, THEREFORE, for and in consideration of the mutual and dependent stipulations herein set forth it is hereby covenanted and agreed as follows:
>
> 5. The United States will impound, store, or otherwise provide water for the irrigation of District lands and deliver same to the District through (canal) . . .

The Contracts provide that the United States would deliver two-acre feet of water per irrigable acre during the usual irrigation season. The rights of the Districts to receive water under the Contract was subordinate to the land in KID and TID. The agreements provide that the water will be delivered by the United States upon demand and require that the Districts deliver the water to the land entitled thereto. Each of the Contracts require the District to comply with all provisions of the Reclamation law and to "operate and maintain its irrigation system to be constructed hereunder to the satisfaction of the United States." Each Contract requires the District to pay significant sums to reimburse the United States for the construction of the facilities necessary to divert and deliver the water to the District, and each Contract requires the District to pay a proportional share of the costs of operating and maintaining the irrigation system. Each Contract contains the following provision:

> On account of drought, inaccuracy in distribution or other cause, there may occur at times a shortage in the quantity of water

> provided for herein, and *while the United States will use all reasonable means to guard against such shortage*, in no event shall any liability accrue against the United States, its officers, agents or employees, for any damage, direct or indirect, arising therefrom, and the payments due hereunder shall not be reduced because of any such shortage." (emphasis added)

**E. Klamath Drainage District**

By Contract dated November 30, 1917, the Klamath Drainage District and the United States agreed that the United States would undertake to stop the free flow of Klamath River water onto the swamp and overflow lands of the District by constructing gates in the railroad levy constructed by the Southern Pacific Railroad. In addition, the parties agreed to the payment by KDD of the cost to the United States of providing 50 cubic feet of water to Van Brimmer Ditch Company through the Reclamation Project's main canal. Finally, KDD agreed to pay the cost incurred by the United States in developing the facilities to control the flow of water onto KDD lands and the costs of operating and maintaining those facilities. By Contract dated August 24, 1921, KDD purchased from the United States a water right for the lands of said District. Article 5 of said Contract provides in part:

> 5. The United States shall deliver to the district during the irrigation season each year at the strait opening in the railroad embankment on the northern boundary of the district, a sufficient quantity of water for the irrigation of irrigable lands of the district, not exceeding 27,500 acres. The United States shall not be liable for failure to supply water under this contract caused by hostile diversion, drought, interruption of service made necessary by repairs, damages caused by flood, unlawful act or unavoidable accidents.

Article 7 provides:

> 7. Beneficial use shall be the basis and limit of all rights acquired by the district hereunder. The water herein specified to be delivered shall be supplied solely to the district lands within the limits of the district as now organized and shall be used solely for irrigation and purposes incidental thereto.

The Contract was made in contemplation of the construction of a dam at the mouth of Upper Klamath Lake on Link River by the California-Oregon Power Company and provided that if said dam was constructed, the District would pay $50,000 to the United States. The agreement also requires the District to pay a portion of the cost to the United States of operating and maintaining the facilities regulating the water level in Upper Klamath Lake and the cost of delivering the water to the District's head gate. The District was obligated to construct an irrigation and drainage system capable of delivering the water to the lands within the District. KDD also provides water through its system to the Midland District Improvement Company.

**F. Klamath Basin Improvement District**

By Contract dated April 25, 1962, the United States and the Klamath Basin Improvement District (KBID) entered into an agreement whereby the United States agreed to furnish water to the District and to finance the construction of certain improvements by the District necessary to provide additional supplies of water to District lands. The District agreed to construct said improvements and to repay the loan to the United States for the construction of the improvements and to pay a portion of the costs of operating and maintaining Project works. The use of the water was limited by Article 5 of the Contract to delivery to lands within the District for irrigation and domestic purposes. Article 4 of the Contract provides:

> 4. On account of drought, inaccuracy in distribution, or other cause, there may occur at times a shortage in the quantity of water that is available for delivery hereunder and in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom. In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available surplus water supply among the Districts and others entitled, under existing or future contracts made pursuant to the Warren Act, to receive water from the Klamath Project.

Article 32 of the Contract provides:

> 32. In the event that the Congress of the United States may repeal or amend any pertinent provisions of the federal reclamation laws, the United States agrees, at the option of the District, to negotiate amendments of appropriate articles of this contract, all consistently with the provisions of such repeal or amendment.

**G. Poe Valley Improvement District**

By Contract dated July 20, 1953, the United States agreed to make water available in Lost River to Poe Valley Improvement District for irrigation of lands within the District. The District agreed, at its own cost, to deliver the water to the lands in the District for irrigation. The Contract replaced several existing Contracts made between the United States and private land owners. The District agreed to pay the United States' a portion of the cost of operating and maintaining the Klamath Project. Article 11 of the Contract provides:

> 11. The United States shall not be liable for failure to supply water under this contract caused by hostile diversion, drought, interruption of service made necessary by repairs, damages caused by flood, unlawful acts, or unavoidable accidents.

**H. Van Brimmer Ditch Company**

The Contract of the Van Brimmer Ditch Company is unique. The Van Brimmer Ditch Company was formed in 1883 for the purpose of diverting water from White Lake, a tributary of Lower Klamath Lake, a tributary of the Klamath River, to lands owned by the Van Brimmer brothers and other land in the general area of Merrill, Oregon. The Van Brimmer brothers, together with partner J. Frank Adams, constructed a canal and began irrigating lands on both sides of the Lost River around Merrill.

In investigating and designing the Klamath Project, the United States Reclamation Service determined it appropriate to block the flow of water from the Klamath River to Lower Klamath Lake and White Lake, thereby interfering with the Van Brimmers' appropriation. To

complete construction of the Project, the United States then entered into an agreement with Van Brimmer Ditch Company dated November 6, 1909. The agreement provides in part:

> WHEREAS, the United States Reclamation Service proposes to change the course or lower the water-level of Lower Klamath Lake, Oregon-California, in the construction, operation and maintenance of the reclamation, irrigation and drainage system, now being constructed in the Klamath Basin, which basin is situated in Klamath County, Oregon, and Siskiyou and Modoc Counties, California and
>
> WHEREAS, the changing by the United States of the course or water-level of said Lower Klamath Lake will in all probability completely destroy or impair the present source of water supply used for irrigation purposes of the Company at its present intake or diversion point on the margin of Lower Klamath Lake . . . and
>
> WHEREAS, the Company claims that it has established a vested right to the use of 50 second-feet of water for irrigation purposes from the water of Lower Klamath Lake.
>
> 1. NOW, THEREFORE, in consideration of the mutual promises hereinafter stipulated, the Company hereby waives and renounces to the use and benefit of the United States any and all of its riparian rights, in relation to the waters and shores of Lower Klamath Lake appurtenant or incident to the lands now being irrigated by the Company, or any other lands now owned or controlled by the Company, and also waives and renounces any and all claims for damages consequent upon or arising from any change of the course or water-level of said Lower Klamath Lake, and its tributaries, due to the operations of the United States.
>
> 2. It is understood and agreed that the United States and its assigns, will deliver to the Company during each and every irrigation season, that is from May first to October fifteenth of each year, a quantity of water, not to exceed fifty second feet in which the Company claims the right to the exclusive use to irrigate sufficiently those certain pieces or parcels of land and being situated west of Lost River, Klamath County, Oregon, and east of the present canals or ditches of the Company as now existing and constructed . . .

I declare under penalty of perjury that what I have said in this declaration is true and correct.

Executed on April 28, 2006

s/ William M. Ganong
William M. Ganong, General Counsel
Klamath Irrigation District