**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES,<br>Defendant. | No. 01-591L<br>Hon. Francis M. Allegra |

**<u>THIRD DECLARATION OF DAVID A. SOLEM</u>**

I, David A. Solem, pursuant to 28 U.S.C. §1746, declare:

1. I am, and have been for the past 23 years, the Manager and the Secretary for the Board of Directors of plaintiff, Klamath Irrigation District (KID), which is located in Klamath County, Oregon. I have firsthand knowledge of the operations of KID, and am generally familiar with the Klamath Reclamation Project (Klamath Project). My responsibilities include overseeing all irrigation and drainage functions of KID, supervising all of its employees, and reporting to and advising KID's Board of Directors. I am also the custodian of KID's records.

2. KID is an Oregon municipal corporation, located in Klamath County, Oregon, organized and existing under Oregon Revised Statutes, ch. 545. KID operates and maintains irrigation and drainage facilities that convey irrigation water for beneficial use to approximately 2,500 water users on roughly 40,000 acres of agricultural land within the boundaries of KID and to water users on an additional 35,000 acres of agricultural land outside the district. *See* Klamath Project Map (Plfs.' Mot. for Summ. J. Ex. at 3 (July 21, 2003)).

3. KID was created by state statute in 1918 to deliver water to landowners holding water rights within the Klamath Project, and to collect and pay to the Bureau of Reclamation

(Reclamation) the construction costs and operation and maintenance charges of the Klamath Project. In 1918, the amount owed to Reclamation for construction costs of the Klamath Project totaled $1,363,036.26, plus delinquency penalties. KID took over that responsibility from the Klamath Water Users Association (Association), which had operated under a contract it had entered into with the United States in 1905. *See* KID 1905 Contract (Pls.' Amended Compl. App. at Ex. 1, pp.1).

4. The essential *quid pro quo* of KID's contract with the government (and the same is true of the contracts of the other districts in this case) is that the districts would reimburse the United States for the construction costs associated with the Klamath Reclamation Project, the project water delivery facilities, and would themselves bear the cost of operating and maintaining the Klamath Project facilities, in exchange for water from the Klamath Project for beneficial use by farmers for irrigating their land. By 1954, KID had paid to Reclamation all of the outstanding construction costs of the KID transferred works. Accordingly, in the 1954 contract, the United States transferred to KID all of the care, operation, and maintenance of facilities within KID and downstream of the headgates of Upper Klamath Lake for delivery to water users in accordance with the Reclamation Act. KID 1954 Contract (Pls.' Amended Compl. App. at Ex. 1, pp. 2). Today, through those facilities, approximately 75,000 acres of land are irrigated with Klamath Project water. KID collects money from the water users and other irrigation districts to reimburse KID for its operation and maintenance costs; KID also collects and pays to Reclamation the amount the water users owe to Reclamation for its continuing maintenance and operation of those facilities (notably Lost River Diversion Channel and the Straits Drain), which the federal government continues to operate.

5. As the Manager of KID, I am ultimately responsible for KID's care, management and operation of the KID facilities downstream from Upper Klamath Lake. Accordingly, I am intimately familiar with the operation of these facilities, and understand how they operate to deliver water to Klamath Project water users.

6. Among the measures which could have been taken by Reclamation prior to 2001 to avoid the complete shutdown of Klamath Project water deliveries are the following:

- Institution of the Klamath Project Pilot Water Bank , which Reclamation started in 2002, including the leasing of the Barnes Ranch for water storage. This program compensates landowners for land idling and groundwater substitution and makes up to 100,000 acre feet of water available for environmental uses. *See* Attachment 1 (Bureau of Reclamation, 2006 Klamath Basin Pilot Water Bank Instructions).

- Institution of the Conservation Implementation Program (CIP), which was begun in 2002. This program is designed to implement recovery of the fish species, and is a main reasonable and prudent alternative of the current biological opinions. The concept of the CIP is to avoid jeopardy opinions by instituting a fish recovery planning program. *See* Attachment 2 (Letter from D. Sabo to D. Solem, dated Oct. 22, 2002, regarding Klamath Basin Conservation Implementation Program).

- Preparation of a coho recovery plan. Incredibly, NOAA Fisheries has never prepared one, although it is required by the Endangered Species Act and, in fact, a bill has just been introduced to require its preparation. *See* Attachment 3 (House Resolution regarding Klamath River salmon).

- Construction of the A-Canal fish screens to protect sucker fish from being entrained into irrigation canals. The government in fact constructed the fish screens in winter 2002-2003, just after the 2001 water disaster.

- Construction of the Link River Dam Fish passage, which was completed in winter 2005. The purpose of this facility is to enable suckers to migrate upstream to spawn.

- Development of the Klamath Lake Incremental Adjustment Methodology (IAM), which allows flexibility in meeting monthly levels of Upper Klamath Lake. This methodology is approved by the Fish and Wildlife Service.

- Commencement of Section 7 Consultations for the Rogue River Project, operated by Reclamation, did not commence until 2003. The Rogue operations impact the Klamath Project by diverting water out of the Klamath Basin.

- Moreover, there are many other federal projects within the Klamath basin (*e.g.*, the Klamath Marsh Wildlife Refuge), which affect the flows of the Klamath River, and yet have never been the subject of ESA consultation. The result is that the Klamath Project bears the entire burden of mitigating for all of these other projects, which operate without the same consideration of endangered species.

- Institution of the NRCS program in 2002 for farmers, *see* Attachment 4 (Conservation in the Klamath Basin: Partnership Accomplishments, December 2003), and Reclamation programs to provide pipe and water measuring equipment to Project districts to save water.

- Institution of a new review of flow studies by the National Academy of Sciences (*see* Attachment 5, (National Academy of Sciences, Proposal 05-DELS-204-01: Further Studies on the Klamath Basin)), not to mention the Academy's 2002 report (*see* National Academies of Science, Board on Environmental Studies and Toxicology, *Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin: 2002 Interim Report*, at 1 ("2002 Report"), available at http://newton.nap.edu/books/0309083249/html/ examining whether the operational regime required by the 2001 biological opinions made any scientific sense, or helped the fish.

- Preparation of a long-term operations plan incorporating conservation, water bank, well drilling, and other measures which could have ameliorated the water shortage in 2001. The need for such a plan was expressed as early as 1992, yet Reclamation did not complete it until 2002.

7. In February 2001, Reclamation issued a proposed one-year operations plan for 2001 and a biological assessment with respect to the operation of the Klamath Project, proposing to deliver water to Klamath Project irrigators and wildlife refuges, in accordance with historical practice. *See* Bureau of Reclamation Biological Assessment at 6-10 (Feb. 13, 2001), attached to Def's Supp. App. at Ex. 69. Reclamation, however, directed irrigation water users not to take water until the FWS and NMFS had completed their biological opinions.

8. On April 6, 2001, the NMFS and FWS issued their biological opinions with respect to the operation of the Klamath Project on Coho salmon and Lost River and Shortnose suckers, respectively. Each agency found that the proposed action of water delivery was likely to jeopardize the continued existence of the species. The agencies, however, identified

"reasonable and prudent alternatives" (RPAs) to avoid jeopardy. These RPAs required that Reclamation both provide greater flows of water for Klamath River (in order to benefit Coho salmon) and maintain higher elevations in the Upper Klamath Lake (in order to protect the Lost River and Shortnose suckers). To do this, Reclamation concluded that it must deliver no water to plaintiffs in 2001. Reclamation adopted these RPAs and on April 6, 2001, announced that there would be no water delivered to plaintiffs from Upper Klamath Lake. As a result of the significant public outcry from Reclamation's refusal to deliver the Klamath Basin water users their irrigation water, in late July 2001, Interior Secretary Norton ordered the release of approximately 70,000 acre feet of water. Needless to say, the release of this small amount of water late in the growing season was of little benefit to the water users.

9. Throughout the 2001 irrigation season, Upper Klamath Lake contained large quantities of water that should have been released to Klamath Project water users. However, Reclamation maintained the Upper Klamath Lake level between 4,143.3 and 4,139.5 feet above sea level. Further, Reclamation released flows down the Klamath River as required by the NMFS biological opinion much larger than the historical practice. Had Reclamation managed Upper Klamath Lake levels and downstream flows according to historic practices, Klamath Project water users would have received sufficient water to grow their crops.

I declare under penalty of perjury that what I have said in this declaration is true and correct.

Executed on April 28, 2006

s/ David A. Solem
David A. Solem, Manager
Klamath Irrigation District