**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT et al., Plaintiffs, v. | ) | |
| UNITED STATES OF AMERICA, Defendant, | ) | No. 01-591 L<br>Hon. Francis M. Allegra |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, Defendant-Intervenor. | ) | |

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Plaintiffs respond to Defendant's proposed findings of fact as follows:

1. Plaintiffs in this case include fourteen "district plaintiffs" consisting of irrigation, drainage or improvement districts organized under either Oregon or California law. Second Amended Compl., ¶¶ 1–14.

**Plaintiffs' Response:**

There are 27 Plaintiffs in this lawsuit. They are eleven irrigation, drainage or improvement districts: Klamath Irrigation District, Tulelake Irrigation District, Klamath Drainage District, Poe Valley Improvement District, Sunnyside Irrigation District, Klamath Basin Improvement District, Malin Irrigation District, Enterprise Irrigation District, Pine Grove Irrigation District, Westside Improvement District No. 4, and Shasta View Irrigation District. The individual water users are the third party beneficiaries on these contracts. *Klamath Irrigation Dist. v. United States*, 67 Fed. Cl. 504, 534 (2005). There are ten named individual Plaintiffs: Fred A. Robison, Albert J. Robison, Lonny E.

Baley, Mark R. Trotman, James L. Moore, Cheryl L. Moore, Daniel G. Chin, Deloris D. Chin, Michael J. Byrne, and Daniel W. Byrne; two partnerships: Baley Trotman Farms and Byrne Brothers; and four corporations: Wong Potatoes, Inc., Klamath Hills District Improvement Company, Van Brimmer Ditch Company, and Midland District Improvement Company. Second Amended Compl., ¶¶ 1–20.

2. The following district plaintiffs have contracts with the United States related to the delivery of water from the Klamath Project: Van Brimmer Ditch Company, Klamath Irrigation District, Tulelake Irrigation District, Klamath Drainage District, Sunnyside Irrigation District, Klamath Basin Improvement District, Malin Irrigation District, Westside Improvement District No. 4 (Colonial Realty Co.), Shasta View Irrigation District, Poe Valley Improvement District, Midland District Improvement Co., Enterprise Irrigation District, and Pine Grove Irrigation District. Second Amended Compl. ¶¶ 44-45. The contracts were filed as Exhibits 1 through 14 to Plaintiffs' First Amended Complaint (March 24, 2003) (Doc 67) (hereinafter cited to as "Compl. Ex.").

**Plaintiffs' Response:**

The plaintiffs named in this proposed finding have repayment contracts with the United States. These contracts obligate the districts to repay the United States for the construction, operation, and maintenance costs associated with the Klamath Project in exchange for certain quantities of water.

3. Plaintiff Klamath Hills District Improvement Company does not have a contract with the United States related to the delivery of water from the Klamath Project. Second Amended Compl.; Compl. Ex. 1-14.

**Plaintiffs' Response:**

Plaintiffs agree that the Klamath Hills District Improvement Company does not have a repayment contract with the United States but object to this proposed finding because it fails to adequately describe the water rights held by Plaintiff Klamath Hills District Improvement Company. Specifically, Plaintiff Klamath Hills District Improvement Company holds vested and determined water rights from the State of Oregon. Second Waldrip Decl. ¶ 5 and attached exhibits (July 16, 2003), Pls. Ex. 19, App. 117 (Docket Nos. 81, 99).

4. The United States, acting through the Bureau of Reclamation ("BOR") entered into contracts with plaintiff Klamath Irrigation District pursuant to Section 9(d) of the Reclamation Act of 1939, 43 U.S.C. § 485h(d). Reclamation entered into contracts with plaintiff Tulelake Irrigation District under Section 7 of that same 1939 Act. See Def. Ex. 5 (KP Historic Op., Appendix C, p. C-1); Amended Compl., Exs. 1-2.

**Plaintiffs' Response:**

Plaintiffs disagree with this proposed finding. First, Plaintiff Klamath Irrigation District had one contract with the United States dated November 6, 1905, and a subsequent contract with the United States dated July 6, 1918. Thus, these contracts could not have been entered into "pursuant to Section 9(d) of the Reclamation Act of 1939." Plaintiff Klamath Irrigation District's third contract with the United States, dated November 29, 1954, was entered into "pursuant to the Federal reclamation laws" generally. First Amended Compl. Ex. 1. Likewise, Reclamation's contract with Tulelake Irrigation District, dated September 10, 1956, makes no reference to "Section 7 of that same 1939 Act." The contract was entered into "in pursuance of the Act of Congress of

June 17, 1902 (32 Stat. 388), and acts amendatory thereof and supplementary thereto, and particularly the Act of August 1, 1956 (Public Law 877, 84th Congress, 2d Session), collectively styled the Federal reclamation laws . . . ." First Amended Compl. Ex. 2. Although both contracts reference other federal reclamation laws, neither contract makes any reference whatsoever to the Reclamation Act of 1939.

5. BOR entered into contracts with plaintiffs Klamath Drainage District, Sunnyside Irrigation District, Klamath Basin Improvement District, Malin Irrigation District, Westside Improvement District No. 4 (Colonial Realty Co.), Shasta View Irrigation District, Poe Valley Improvement District, Midland District Improvement Co., Enterprise Irrigation District, and Pine Grove Irrigation District pursuant to Section 2 of the Warren Act of 1911, 43 U.S.C. § 524. See Plaintiffs' First Amended Complaint, Exhibits 3–14; see also Def. Ex. 4 (KP Historic Op., Appendix B, at B-2 to B-3); Def. Ex. 5 (KP Historic Op., Appendix C, at C-2).

**Plaintiffs' Response:**

Plaintiffs agree that these contracts were entered into pursuant to Section 2 of the Warren Act of 1911, with the exception of the contract between the United States and Klamath Drainage District, dated November 30, 1917 (First Amended Compl. Ex. 3), but note that the contracts were also entered into pursuant to the Reclamation Act of 1902 (32 Stat. 388) and other federal reclamation laws (with the exception of the contract between the United States and Westside Improvement District No. 4 (Colonial Realty Company) dated October 20, 1936 (First Amended Compl. Ex. 11)). Plaintiffs further note that the contract between the United States and Van Brimmer Ditch Co. was entered into pursuant

to the Federal Reclamation Act of 1902 and not pursuant to the Warren Act. First Amended Compl. Ex. 13.

6. The Endangered Species Act ("ESA") was enacted by Congress on December 28, 1973, and is codified at 16 U.S.C. §§ 1533-1544.

**Plaintiffs' Response**:

Plaintiffs agree with this proposed finding of fact.

7. There are currently 527 species of animals listed as threatened or endangered under the ESA. Def. Ex. 59. Fifty-two listed U.S. species are found in Oregon; 299 are found in California. Def. Ex. 60.

**Plaintiffs' Response:**

Plaintiffs have no knowledge of precisely how many species of animals are listed as endangered, nor how many are located in Oregon and California. These facts are, however, irrelevant to the outcome of this case, as only the three species of fish (long and short nosed suckers and coho salmon) were cited by the government as grounds for refusing to deliver water to Plaintiffs in 2001. Importantly, subsequent scientific investigation by the National Academy of Sciences, at Defendant's request, demonstrated no causal relationship between the water level and flow requirements recommended by the biological opinions (Reclamation's cited reason for refusing to deliver water to Plaintiffs) and the welfare of these three species. National Academies of Science, Board on Environmental Studies and Toxicology, *Endangered and Threatened Fishes in the Klamath River Basin: Causes of Decline and Strategies for Recovery* (2004), at 34-35, *available at* http://newton.nap.edu/books/0309090970/html/ ("NRC Report"). Moreover, it was Reclamation's choice to use Plaintiffs' water to satisfy the biological opinion,

which led to the 2001 water crisis—a tragedy which could have been avoided by Reclamation, and has been avoided by Reclamation in every year but 2001.

8. Listed species that currently live in and around the Klamath Project and are potentially affected by Project operations include: the Lost River sucker, the shortnose sucker, and the Southern Oregon/Northern California Coast (SONCC) coho salmon. See 53 Fed. Reg. 27130 (July 18, 1988) (listing of the suckers); 62 Fed. Reg. 24588 (May 6, 1997) (listing of the SONCC coho salmon); see also Kandra v. United States, 145 F. Supp. 1192, 1196-97 (D. Or. 2001). See also Def. Ex. 61, 66-71.

**Plaintiffs' Response:**

Plaintiffs object to this proposed finding of fact. Nothing in the Endangered Species Act prohibited Reclamation from delivering water to Plaintiffs in 2001, nor does the science support Reclamation's stated rationale for withholding Plaintiffs' contractual water entitlement (protection of the fish). NRC Report at 34-35. Moreover, it was Reclamation's choice to use Plaintiffs' water to satisfy the biological opinion, which led to the 2001 water crisis—a tragedy which could have been avoided by Reclamation, and has been avoided by Reclamation in every year but 2001.

9. The Klamath Project lacks facilities to store large quantities of water in wet years to meet all water needs in dry years. Upper Klamath Lake, a naturally occurring lake which is also the principal water supply source for the Project, is relatively shallow, and its 1917 dam is too low to capture and store large quantities of spring run-off. Def. Ex. 3 (KP Historic Op. at 30); Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation ("PCFFA v. BOR I"), 138 F. Supp. 2d 1228, 1231 (N.D. Cal. 2001);

Kandra, 145 F. Supp. 2d at 1197; Klamath Irrigation Dist. v. United States, 67 Fed. Cl. 504, 509 (2005).

**Plaintiffs' Response:**

Plaintiffs agree that the Klamath Lake is relatively shallow, but note that for almost 100 years, including 2001, there has been sufficient water in the Lake to allow Reclamation to deliver Plaintiffs' water. There were minor exceptions for some Plaintiffs in 1992 and 1994. *See, e.g.*, Second Essig Decl. ¶ 6 (July 14, 2003), Pls.' Ex. 11, App. at 91; Second Hartman Decl. ¶ 9 (July 16, 2003), Pls.' Ex. 12, App. at 95; Second Campbell Decl. ¶ 7 (July 16, 2003), Pls.' Ex. 14, App. at 101; Second Hagerty Decl. ¶ 8 (July 14, 2003), Pls.' Ex. 16, App. at 108; Second Kandra Decl. ¶ 5 (July 18, 2003), Pls. Ex. 18, App. at 115; Second Chin Decl. ¶ 4 (July 17, 2003), Pls.' Ex. 22, App. at 150; Second Robison Decl. ¶ 15 (July 17, 2003), Pls.' Ex. 23, App. at 152; Second Baley and Trotman Decl. ¶ 6 (July 17, 2003), Pls.' Ex. 24, App. at 185 (Docket Nos. 81, 99).

Reclamation's own failure to timely prepare a long-term plan for the Klamath Project and to develop water conservation measures and a water bank, not the shallowness of Klamath Lake, contributed directly to Defendant's breach of Plaintiffs' water delivery contracts in 2001. The facts show that Reclamation dragged its feet for almost five years, and finally, after it was sued by PCFFA and ordered to do so by a federal district judge, came up with a plan of operations for the Klamath Project. That plan, which resulted in Plaintiffs getting essentially no water from the Klamath Project in 2001, contained none of the conservation and water banking alternatives in place today, the purpose of which is to avoid the breaching of Plaintiffs' contracts in water years where there is a water shortage. Had Reclamation timely prepared the long-term plan of

operations, Reclamation could have avoided breaching Plaintiffs' contracts in 2001, leaving Plaintiffs without any water for crops and causing severe economic damages as a result. There were also a number of other measures, which were in fact taken after the disastrous water year of 2001, which have avoided and will avoid water shut-offs in the future. There is no reason why these measures were not taken sooner. Third Solem Decl. ¶ 6.

10. Because the Klamath Project is unable to store large quantities of water in wet years to meet all demands for water in dry years, operation of the Klamath Project requires Reclamation to balance numerous competing legal obligations and demands for limited Project water supply. These obligations have been addressed by district courts and the Court of Appeals for the Ninth Circuit in several cases including: PCFFA v. BOR I, 138 F. Supp. 2d at 1231; Kandra, 145 F. Supp. 2d at 1196-97; Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1209 (9th Cir. 2000); and, PCFFA v. Bureau of Reclamation ("PCFFA v. BOR II"), 426 F.3d 1082, 1085-86 (9th Cir. 2005).

**Plaintiffs' Response:**

Plaintiffs object to this proposed finding of fact. Nothing in the Reclamation Act or the Endangered Species Act (ESA) obligated Reclamation in 2001 to convert all of its Klamath Project water rights, which were authorized by the State and appropriated by the Secretary for reclamation purposes, to fish protection purposes instead. Rather, the Secretary obtained Klamath Project water rights "for purposes of the 'operation of works for the utilization of water . . . under the provisions of the . . . Reclamation Act.'" *Klamath Irrigation Dist. v. United States*, 67 Fed. Cl. 504, 510 (2005). As the United States itself described its water right in the Adjudication, "[t]he purposes for which water

is used and claimed, as stated in the May 17, 1905 'Notice of Intention to Utilize all Waters of the Klamath Basin,' are those provided for by the . . . Reclamation Act, as amended and supplemented, including irrigation, reclamation, domestic and other authorized uses." Pls.' Ex. 29. Finally, nothing in the ESA purports to override the limitations on use of water imposed by the State of Oregon. *See, e.g.*, 32 Stat. 388, 390 ("[N]othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State . . . relating to the control, appropriation, use, or distribution of water . . . .").

11. Water supply forecasts used by BOR in developing its annual operations plans indicated that the 2001 water year would be a "critically dry" year on account of drought conditions. Def. Ex. 63; Def. Ex. 64; Def. Ex. 28. See also Kandra, 145 F. Supp.2d at 1198 ("Based on NRCS forecasts, Reclamation has defined the 2001 water year as 'critically dry.'").

**Plaintiffs' Response:**

Plaintiffs agree that 2001 was a dry year, but object to Defendant's implication that Reclamation's failure to deliver Plaintiffs' water in 2001 was compelled by the dry weather. Defendant's breach of Plaintiffs' water delivery contracts in 2001 was compelled neither by the Endangered Species Act, nor was it the inevitable product of the weather. Had Reclamation prepared its long term operating plan in the 1990's, and put in place sound management principles (as the district court urged) which are in place today, some water would have been available to Klamath farmers in 2001.

12. BOR initiated formal consultation with FWS and NMFS under ESA § 7(a)(2) regarding the potential effects of the ongoing operations of the Klamath Project for the 2001 water year on listed species. Def. Ex. 65–67.

**Plaintiffs' Response:**

Plaintiffs agree that Reclamation initiated consultation with FWS and NMFS under §7 of the ESA, but Plaintiffs further note that Reclamation dragged its feet with respect to preparing a long-term plan of operation for Klamath Project to avoid breaching Plaintiffs' water delivery contracts as occurred in 2001. Indeed, a federal district court in Oregon expressed frustration at Reclamation's failure to prepare an environmental impact statement for the long-term plan:

> I am disturbed, however, that Reclamation has failed to complete an EIS analyzing the effects and proposed alternatives of a long-term plan. Reclamation represented in past proceedings that such a plan would be completed long before 2001. Yet, no plan exists. In essence, Reclamation is avoiding its duties under NEPA by relying on annual plans to which NEPA cannot realistically apply. During oral argument, government counsel represented that the long-term EIS is scheduled to be completed in February 2002. However, it awaits the completion of an updated NMFS BiOp, slated to be completed in June 2001. The court intends to monitor Reclamation's compliance with its representations.

*Kandra v. United States*, 145 F. Supp. 2d 1192, 1206 (D. Or. 2001). *See also id.* ("This dispute highlights the need for long-term planning to minimize the effects of future dry years.").

13. In connection with the consultation proceedings under Section 7 of the ESA, BOR prepared and issued a biological assessment for submission to FWS addressing effects of proposed ongoing Project operations on the listed suckers and the bald eagle, and a separate biological assessment for submission to NMFS addressing the effects of ongoing Project operations on the listed SONCC coho salmon. Def. Ex. 65-69.

**Plaintiffs' Response:**

Plaintiffs admit that Reclamation prepared the biological assessments identified in Proposed Finding No. 13, but object to this proposed finding for the reasons stated in Plaintiffs' Response to Proposed Finding No. 10.

14. The biological assessments prepared by BOR concluded that the ongoing operation of the Klamath Project for 2001 was likely to affect the listed species. Def. Ex. 68-69 (relevant excerpt of each BA); Kandra, 145 F. Supp.2d at 1198.

**Plaintiffs' Response:**

Plaintiffs admit that Reclamation prepared the biological assessments identified in Proposed Finding No. 14, but object to this proposed finding for the reasons stated in Plaintiffs' Response to Proposed Finding No. 10.

15. On April 5, 2001, the FWS issued a biological opinion concluding that the ongoing operation of the Klamath Project in 2001 was likely to jeopardize the two species of endangered sucker fish that inhabit Upper Klamath Lake and its tributaries, and that such operations would cause harm, but not jeopardy, to the continued existence of the bald eagle. Def. Ex. 70; Kandra, 145 F. Supp. 2d at 1198.

**Plaintiffs' Response:**

Plaintiffs agree that FWS issued a biological opinion on April 5, 2001 as stated, but note that the recommendations contained in that biological opinion were scientifically unsupportable and wrong. *See* NRC Report at 34-35.

Moreover, this biological opinion specifically targeted the contracts at issue in this case. The biological opinions recommended certain Klamath River flows and the maintenance of water levels in Upper Klamath Lake. As the 2001 Operations Plan states,

the federal agencies involved realized this water could only come from irrigators. The Operations Plan also states that Klamath Project "was operated to optimize irrigation diversions." Def.'s Ex. 61 (Klamath Project 2001 Annual Operations Plan). In 2001, however, the aim of the Operations Plan was changed to ensure that the Plan was "consistent with requirements of the ESA and Reclamation's obligation to protect Tribal trust resources." *Id.* Thus, as the Operations Plan recognized, Defendant had competing obligations—contractual water deliveries and ESA and Tribal requirements. Defendant chose to satisfy the latter, thereby targeting the contracts at issue in this case.

16. On April 6, 2001, NMFS issued a biological opinion concluding that the ongoing operation of the Klamath Project in 2001 were likely to jeopardize the threatened SONCC coho salmon that inhabit the Klamath River in California. Def. Ex. 71; Kandra, 145 F. Supp. 2d at 1198.

**Plaintiffs' Response:**

Plaintiffs agree that NMFS issued a biological opinion on April 6, 2001 as stated, but note that the recommendations contained in that biological opinion were scientifically unsupportable and wrong. *See* NRC Report at 34-35. Moreover, this biological opinion specifically targeted the contracts at issue in this case. The biological opinions recommended certain Klamath River flows and the maintenance of water levels in Upper Klamath Lake. As the 2001 Operations Plan states, the federal agencies involved realized this water could only come from irrigators. The Operations Plan also states that Klamath Project "was operated to optimize irrigation diversions." Def.'s Ex. 61 (Klamath Project 2001 Annual Operations Plan). In 2001, however, the aim of the Operations Plan was changed to ensure that the Plan was "consistent with requirements

of the ESA and Reclamation's obligation to protect Tribal trust resources." *Id.* Thus, as the Operations Plan recognized, Defendant had competing obligations – contractual water deliveries and ESA and Tribal requirements. Defendant chose to satisfy the latter, thereby targeting the contracts at issue in this case.

17. Both biological opinions included reasonable and prudent alternatives ("RPAs") that could be implemented by BOR to avoid jeopardizing the continued existence of those species. Def. Ex. 70-71.

**Plaintiffs' Response:**

Plaintiffs agree that the biological opinions included such RPAs as stated, but note that the recommendations contained in those biological opinions were scientifically unsupportable and wrong. *See* NRC Report at 34-35. Plaintiffs note further that Defendant has also stated that the Bureau of Reclamation was not obligated to follow these scientifically unsupportable recommendations put forward by FWS and NMFS in their 2001 biological opinions: "[a]fter issuance of the biological opinion, the action agency [here, the Bureau] must determine 'whether and in what manner to proceed with the action in light of its section 7 obligations and the [regulatory agency's] biological opinion.'" Def.'s Mem. in Support of Mot. for Summ. J. at 12 (February 17, 2006) (Docket No. 261-2) (quoting *Bennett v. Spear*, 520 U.S. 154, 168 (1997)).

18. BOR notified both FWS and NMFS that it would operate the Project consistent with the RPAs, and incorporated the RPAs into its Klamath Project Annual Operations Plan for 2001. Def. Ex. 61; Def. Ex. 73.

**Plaintiffs' Response:**

Plaintiffs agree with this proposed finding noting, however, that as late as February 13, 2001, Reclamation intended to deliver irrigation water to Plaintiffs: "Reclamation proposes continuing operation of the Klamath Project to supply water to project users." Def.'s Ex. 69 at § 2.0. "Reclamation's proposed action calls for continued diversion of water for irrigation from Upper Klamath Lake through the A-Canal, Klamath River through the Lost River Diversion Channel, the Lost River and also from Tule Lake to Lower Klamath Lake via Pumping Plant D." *Id*. at § 3.0. On April 7, 2001, Reclamation did an abrupt about-face, deciding instead that "only limited deliveries of Project water will be made for irrigation." Def.'s Ex. 61 at 2. While Reclamation's decision was purportedly made for the protection of endangered fish, as the National Research Council concluded in its first report, this decision did not help the fish: "The NRC Report, released in February 2002, found that there was no scientific support for the flow recommendations in the NMFS's coho salmon BiOp." *PCFFA II*, 426 F.3d at 1087. The Endangered Species Act specifically requires that decisions be made based on the "best scientific and commercial data available." 16 U.S.C. § 1536. As the report concludes, "the available information provides little support for benefits presumed to occur through the increase of flows beyond those of the last decade", *PCFFA II*, 426 F.3d at 1087; thus, the best scientific and commercial data did not require that Reclamation withhold Plaintiffs' water in 2001—and thus neither did the Endangered Species Act.

19. The implementation of the 2001 Annual Operations Plan for the Klamath Project resulted in a substantial reduction in the amount of water available for irrigation as

compared to years of average precipitation in the Klamath Basin. Def. Ex. 72; Def. Ex. 64; Def. Ex. 74.

**Plaintiffs' Response:**

Plaintiffs agree with this proposed finding of fact.

Respectfully submitted,

s/ Nancie G. Marzulla
Nancie G. Marzulla
Roger J. Marzulla
Zachary N. Somers
MARZULLA & MARZULLA
1350 Connecticut Ave., NW,
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Counsel for Plaintiffs

Dated: April 28, 2006

Of Counsel:

William M. Ganong
General Counsel
Klamath Irrigation District
514 Walnut Avenue
Klamath Falls, OR 97601
Phone: (541) 882-7228
Fax: (541) 883-1923

Paul S. Simmons
Somach, Simmons & Dunn
813 6th Street, 3rd Floor
Sacramento, CA 95814-2403
Phone: (916) 446-7979
Fax: (916) 446-8199