IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 01-591 L |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Judge Francis M. Allegra |
| Defendant, | ) | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CONTRACT CLAIMS**

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

KRISTINE S. TARDIFF
Attorney of Record for Defendant
United States Department of Justice
Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583/Fax: (603) 225-1577

STEPHEN M. MACFARLANE
United States Department of Justice
Environment & Natural Resources Division
501 I Street, Suite 9-700
Sacramento, CA 95814-232
Tel: (916) 930-2204/Fax: (916) 930-2210

REGINALD T. BLADES, JR.
United States Department of Justice
Civil Division, Commercial Litigation Branch
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-7300/Fax: (202) 307-0972

OF COUNSEL:

STEPHEN PALMER
U.S. Department of the Interior
Office of the Regional Solicitor
Sacramento, CA

MEGAN WALLINE
U.S. Department of the Interior
Office of the Solicitor
Washington, D.C.

CHRISTOPHER KEIFER
U.S. Department of Commerce
NOAA – Office of General Counsel
Long Beach, CA

Dated: June 26, 2006

## TABLE OF CONTENTS


I. Summary of Reply Arguments . . . . . . . . . . 1

II. Reply Arguments . . . . . . . . . . 3

A. The United States Was Required to Comply With the ESA in its Operation of the Klamath Project in 2001 . . . . . . . . . . 3

B. Plaintiffs' Challenge to the Government's Actions in 2001 is Not Properly Presented and Need Not Be Considered At This Time . . . . . . . . . . 10

C. Plaintiffs' Argument That Their Contracts Were Specifically Targeted by the ESA is Based on an Erroneous Interpretation of the Sovereign Acts Doctrine . . . . . . . . . . 14

D. The Subject Contracts Did Not Assign the Risk of Future Statutory Changes to the Government . . . . . . . . . . 17

III. Conclusion . . . . . . . . . . 20

# TABLE OF CONTENTS

## CASES

Adams v. United States,
42 Fed. Cl. 463 (1998) . . . . . . . . . . 18, 19, 20

Allustiarte v. United States,
256 F.3d 1349 (Fed. Cir. 2001), cert. denied, 534 U.S. 1042 (2001) . . . . . . . . . . 7

American Forest & Paper Ass'n v. EPA,
137 F.3d 291 (5th Cir. 1998) . . . . . . . . . . 4

Aulston v. United States,
823 F.2d 510 (Fed. Cir. 1987) . . . . . . . . . . 13

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
515 U.S. 687 (1995) . . . . . . . . . . 15

Bennett v. Spear,
520 U.S. 154 (1997) . . . . . . . . . . 10, 11

Camp v. Pitts,
411 U.S. 138 (1973) . . . . . . . . . . 12

Crocker v. United States,
125 F.3d 1475 (Fed. Cir. 1997) . . . . . . . . . . 10

Defenders of Wildlife v. EPA,
420 F.3d 946 (9th Cir. 2005) . . . . . . . . . . 4

Envtl Coalition of Ojai v. Brown,
72 F.3d 1411 (9th Cir. 1995), cert. denied, 517 U.S. 1245 (1996) . . . . . . . . . . 12

Franklin Sav. Corp. v. United States,
56 Fed. Cl. 720 (2003), aff'd per curiam, 97 Fed. Appx. 331 (Fed. Cir. 2004),
cert. denied, 544 U.S. 947 (2005) . . . . . . . . . . 13

Int'l Fabricare Inst. v. EPA,
972 F.2d 384 (D.C. Cir. 1992) . . . . . . . . . . 12

Kandra v. United States,
145 F. Supp.2d 1192 (D. Or. 2001) . . . . . . . . . . 7, 8, 11, 12

Klamath Water Users Protective Association v. Patterson,
204 F.3d 1206 (9th Cir. 2000), cert. denied, 531 U.S. 812 (2000) . . . . . . . . . . . . . . . 5, 8, 9

Langell Valley Irrig. Dist. v. Babbitt,
No. 00-6265-HO, slip. op. (D.Or. Aug. 31, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Lion Raisins, Inc. v. United States,
416 F.3d 1356 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

M&J Coal Co. v. United States,
47 F.3d 1148 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995) . . . . . . . . . . . . . . . . . . . . . . 14

Merrion v. Jicarilla Apache Tribe,
455 U.S. 130 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Mount Graham Red Squirrel v. Espy,
986 F.2d 1568 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

O'Neill v. United States,
50 F.3d 677 (9th Cir.), cert. denied, 516 U.S. 1038 (1995) . . . . . . . . . . . . . . . . . . . . 17, 19

PCFFA v. BOR I,
138 F. Supp.2d 1228 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9

PCFFA v. BOR II,
426 F.3d 1082 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

PCFFA v. BOR,
No. CIV C02-2006 SBA, 2006 WL 798920, 7 (N.D. Cal. March 27, 2006) . . . . . . . . . . 9

PCFFA v. BOR,
No. CIV C02-2006 SBA, 2006 WL 1469390, 7 (N.D. Cal. May 25, 2006) . . . . . . . . . . 9

Platte River Whooping Crane Trust v. Federal Energy Regulatory Comm'n,
962 F.2d 27 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Rio Grande Silvery Minnow v. Bureau of Reclamation,
No. 05-2399 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Scott Timber Co. v. United States,
40 Fed. Cl. 492 (1998), vacated on reconsid., 44 Fed. Cl. 170 (1999),
aff'd in part and rev'd in part, 333 F.3d 1358 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . 15

Sierra Club v. Babbitt,
65 F.3d 1502 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Tennessee Valley Auth. v. Hill,
437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Transatlantic Fin. Corp. v. United States,
363 F.2d 312 (D.C. Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States v. Cherokee Nation of Okla.,
480 U.S. 700 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States v. Winstar,
518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Yankee Atomic Elec. Co. v. United States,
112 F.3d 1569 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998) . . . . . . . 15, 17, 18, 19

**STATUTES**

5 U.S.C. § 701-706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 12
5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12
16 U.S.C. § 1536(1)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**RULES**

RCFC 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**OTHER AUTHORITIES**

Daniel J. McGarvey & Brett Marshall, Making Sense of Scientists and "Sound Science": Truth and Consequences for Endangered Species in the Klamath Basin and Beyond,
32 Ecology Law Quarterly 73 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I. Summary of Reply Arguments

Pursuant to the Court's Order of December 20, 2005 (Doc. 257), Defendant filed a motion for summary judgment on the contract claims set forth in Plaintiffs' Second Amended Complaint that was limited to the application of the sovereign acts and/or unmistakability doctrines. In their Second Amended Complaint, Plaintiffs allege that the Bureau of Reclamation's ("BOR") compliance with the Endangered Species Act ("ESA") in 2001 reduced the amount of irrigation water available from the Klamath Project, resulting in a breach of their contracts with BOR. Specifically, Plaintiffs allege that the biological opinions issued by the Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") in April 2001 concluded that implementation of BOR's proposed 2001 Operation Plan for the Klamath Project would jeopardize the continued existence of several species of fish listed under the ESA. Second Amended Compl. ¶¶ 27-28 (Doc. 210). Plaintiffs further allege that "[i]n direct response to these biological opinions, on April 6, 2001, defendant, acting by and through its agent, the Bureau [of Reclamation], issued its revised 2001 Operation Plan for Upper Klamath Lake, Link River Dam, Tulelake and the related irrigation delivery facilities. Under that Plan, plaintiffs would receive no water from Upper Klamath Lake, the Klamath River, Lake Ewauna, Tulelake and the related irrigation facilities in 2001."[1] Id. ¶ 29.

In response to Defendant's summary judgment motion, however, Plaintiffs now present a

[1]Other filings by Plaintiffs in this case present the same breach of contract theory. For example, in their proposed findings of fact filed in support of their motion for partial summary judgment on their takings claims, Plaintiffs asserted that it was uncontroverted that the biological opinions issued by FWS and NMFS in 2001 "prohibited Reclamation from delivering water to plaintiffs in accordance with historical practices on the ground that it was 'likely to jeopardize the continued existence' of the Lost River and Shortnose sucker fish and the coho salmon." Pls.' Proposed Finding of Fact No. 24 (Aug. 29, 2003) (Doc. 104). See also Pls.' SJ. Mem. at 8-9 and at 9 n.5 (Aug. 29, 2003) (Doc. 104); Corrected Suppl. JPSR at 7 (Sept. 16, 2003 (Doc. 97).

revised contract claim that is premised on the contention that BOR was not required to comply with the ESA, that the ESA did not require BOR to reduce deliveries of Klamath Project water to its contractors, and that BOR's decision to "withhold water" from Plaintiffs was therefore a "voluntary" operational decision. Pls.' Opp. at 18-26. Plaintiffs then assert that because BOR's actions were not required by the ESA, those actions can not be regarded as a sovereign act, rendering Defendant's defenses under the sovereign acts doctrine and the unmistakability doctrine inapplicable to this case. Pls.' Opp. at 29-42.

Even assuming for the purposes of this summary judgment proceeding that Plaintiffs' revised contract claim is properly presented for the first time in their response brief, this revised contract claim fails as a matter of law. As set forth below, Plaintiffs' assertions that BOR was not required to comply with the ESA in 2001, that BOR was not required to consult on Project operations under Section 7 of the ESA, and that BOR could have managed Project operations without regard to the jeopardy determinations of the FWS and NMFS, directly conflicts with court rulings that were binding on BOR or were significant parts of the legal backdrop for BOR's decisionmaking in 2001.

Consistent with these rulings, this Court should conclude that BOR's compliance with the ESA, including those provisions of Section 7 directing agencies to avoid jeopardy to listed species, resulted in the reduced water deliveries that form the basis of Plaintiffs' contract claims. Consequently, the sovereign acts doctrine and unmistakability doctrines are applicable in this case and preclude a finding that the United States is liable under a contract theory for the reduction in water deliveries from the Klamath Project in 2001. To the extent that Plaintiffs have challenged the underlying basis for the biological opinions issued by FWS and NMFS in 2001 and BOR's compliance with those biological opinions, that challenge is not relevant to the

applicability of the sovereign acts doctrine and the unmistakability doctrine, which are the only two questions presently before the Court.[2] Accordingly, the Court need not and should not reach Plaintiffs' challenge to the agencies' actions.[3]

## II. Reply Arguments

### A. The United States Was Required to Comply With the ESA in its Operation of the Klamath Project in 2001

Plaintiffs contend that BOR was not obligated to comply with the ESA in 2001, that nothing in the ESA prohibited BOR from delivering water to Plaintiffs in 2001, and that the decisions BOR made with respect to Project operations in 2001 were "voluntary" and thus do not constitute a sovereign act. Pls.' Opp. at 3, 18-20. This argument must be rejected because it ignores the effect of court decisions in framing BOR's compliance with the ESA in its management of Klamath Project operations in 2001. As set forth below, there was extensive litigation involving the operation of the Klamath Project in the years leading up to and including 2001. The decisions in these cases, including an injunction issued in April 2001 that prohibited

[2]Since the scope of the present briefing is limited per the Court's directive, Defendant's motion does not address the separate questions of whether Plaintiffs had a contractual right to receive deliveries of Klamath Project water in 2001 and whether, but for the application of the sovereign acts and unmistakability doctrines, Defendant breached a duty to deliver water under the circumstances present in 2001. Accordingly, Defendant has not addressed herein whether Plaintiffs' challenge to the agencies' actions is relevant to either of these separate questions, or the merits of that challenge.

[3]Plaintiffs' decision to mount a collateral attack on the agencies' actions in 2001 in its opposition to Defendant's motion for summary judgment may be an effort to create genuine issues of material fact. However, Plaintiffs' extended discussion of issues that are not relevant to the limited questions before the Court does not create a genuine issue of material fact. Moreover, although Plaintiffs suggest that summary judgment is premature "particularly at this early stage of discovery and the development of factual evidence," Pls.' Opp. at 4, they have not met their burden under RCFC 56(f) of establishing why further discovery is needed on the limited questions presently before the Court.

BOR from delivering water to Project irrigators until it had complied with the ESA, make it clear that BOR was legally obligated to comply with the ESA in connection with Klamath Project operations in 2001. Plaintiffs' contention that Reclamation had no such legal obligation ignores and conflicts with this project-specific litigation history.

BOR and the courts have recognized that the operation of the Klamath Project requires the exercise of discretion in balancing several legal obligations, including obligations to three Tribes, irrigators, and two national wildlife refuges. See Def.'s SJ Mem. at 8-10 (summarizing the case law on the various legal obligations). In exercising this discretion, as discussed below, the courts have required BOR to comply with the ESA.[4] To do so, in the decade leading up to the 2001 water year, BOR engaged in a number of consultations under Section 7 of the ESA with respect to ongoing Klamath Project operations and the operation of specific facilities such as Link River Dam. Id. Although there have been numerous legal challenges to BOR's compliance with the ESA on the Klamath Project, in all cases the courts have recognized that the ESA's

[4]Plaintiffs correctly argue that the ESA does not expand the existing authority or discretion of an agency. American Forest & Paper Ass'n v. EPA, 137 F.3d 291, 299 (5th Cir. 1998); Platte River Whooping Crane Trust v. Federal Energy Regulatory Comm'n, 962 F.2d 27, 34 (D.C. Cir. 1992); but see Defenders of Wildlife v. EPA, 420 F.3d 946, 968-69 (9th Cir. 2005). Plaintiffs are also correct that a pre-ESA contract may have binding terms that do not retain discretion that would trigger the ESA. Sierra Club v. Babbitt, 65 F.3d 1502, 1509 (9th Cir. 1995) (where agency did not retain discretion to affect timber company's action in right of way agreement, agency could not take any action to protect spotted owl from effects of agreement). As Plaintiffs repeatedly point out, the United States asserts these very arguments in the ongoing litigation concerning the endangered Silvery Minnow in New Mexico. See Rio Grande Silvery Minnow v. Bureau of Reclamation, No. 05-2399 (10th Cir. 2005) (pending). Plaintiffs are incorrect, however, in asserting that the Klamath Project presents the identical issues and requires the same conclusion. Unlike the Silvery Minnow situation, in the Klamath Project BOR has discretion (and hence the obligation to comply with the ESA) arising from the need to comply with numerous obligations, including Trust obligations owed to Indian Tribes that predate the reclamation contracts (and for that matter, predate reclamation law). As discussed below, the courts have repeatedly recognized that the ESA is triggered under these circumstances.

requirements apply to the operation of the Klamath Project.

For example, Klamath Water Users Protective Association v. Patterson, 204 F.3d 1206 (9th Cir. 2000), involved the operation of Link River Dam, which is part of the Klamath Project and was "built to help the United States satisfy its contractual obligations to water users in the basin, including the Irrigators." Id. at 1209. Link River Dam, located at the outlet of Upper Klamath Lake, regulates water levels in the Lake and flows into the Klamath River. In this case, Klamath Project irrigators claimed, *inter alia*, that the company operating the Dam under contract with the United States (PacfiCorp) did not have a legal duty to operate the Dam to comply with BOR's obligations to avoid jeopardy to the endangered Lost River and Shortnose suckers in Upper Klamath Lake and the threatened coho salmon in Klamath River in California. Id. at 1213. The Ninth Circuit, in the context of ruling on whether the irrigators were intended third-party beneficiaries of BOR's contract with PacifiCorp regarding Link River Dam, found that "the district court did not err in concluding that [BOR] has the authority to direct Dam operations to comply with the ESA[,]" and that the requirements of the ESA "override the water rights of the Irrigators." Id. The Patterson court also found that BOR has responsibility to direct dam operations and to "divert the water and resources needed to fulfill the [Klamath Basin] Tribes' rights, rights that take precedence over any alleged rights of the Irrigators." Id. at 1214.

In 2000, two irrigation districts and an individual farmer within the Klamath Project brought suit alleging that BOR was breaching water delivery contracts by releasing water from Clear Lake and Gerber Reservoir to serve other parts of the Klamath Project because water from Upper Klamath Lake was needed to comply with the ESA. Langell Valley Irrig. Dist. v. Babbitt, No. 00-6265-HO, slip op. at 10 (D. Or. Aug. 31, 2000). The plaintiffs' request for a preliminary injunction to prohibit BOR from continuing to release water from Clear Lake and Gerber

Reservoir for use in other areas of the Project was denied by the district court. Id.

While the Langell Valley litigation was underway, the Pacific Coast Federation of Fishermen's Associations and several other plaintiffs (collectively referred to herein as "PCFFA") filed suit alleging that BOR had violated the ESA by failing to consult with NMFS concerning the impact of the Klamath Project 2000 Operations Plan.[5] PCFFA v. BOR I, 138 F. Supp.2d 1228 (N.D. Cal. 2001). The Klamath Water Users' Association ("KWUA") intervened as a defendant.[6] The PCFFA plaintiffs specifically alleged that BOR had violated Section 7(a)(2) of the ESA by failing to consult with NMFS regarding its 2000 Operations Plan and sought to enjoin BOR from sending irrigation deliveries from the Klamath Project under certain conditions "until the NMFS issues a legally valid biological opinion and [BOR] complies with the terms of it." Id. at 1240.

On cross-motions for summary judgment, the district court concluded that BOR's failure to initiate consultation with NMFS over its 2000 Operations Plan for the Klamath Project violated the ESA. Id. at 1242-46. The district court specifically stated that "[b]ecause the Bureau did not initiate consultation, it had no basis or authority to implement the 2000 Operations Plan

---

[5]BOR had consulted with NMFS regarding its Klamath Project 1999 Operations Plan and NMFS had issued a biological opinion that covered the anticipated effects of the 1999 Plan through March 2000. PCFFA v. BOR I, 138 F. Supp. at 1233-34. At the time of the PCFFA lawsuit, this biological opinion had expired.

[6]KWUA "is a non-profit corporation that has represented Klamath Irrigation Project farmers and ranchers since 1953." See http://www.kwua.org/background/background.htm (last visited on June 26, 2006). All of the 14 district plaintiffs in this case are members of KWUA and the KWUA board of directors includes representatives from each of the district plaintiffs. See http://www.kwua.org/boardcommittees/board_committees.htm (last visited on June 26, 2006). Declarant David Solem is plaintiff KID's representative on the KWUA board of directors and also serves on KWUA's legal committee. Id.

and it violated the ESA when it did so." Id. at 1245. Having found that the ESA had been violated in 2000, the district court then turned its attention to Klamath Project operations for 2001 and to the plaintiffs' request for injunctive relief. The district court granted that request for injunctive relief on April 3, 2001, holding that:

> the Bureau of Reclamations hereby is enjoined from sending irrigation deliveries from Klamath Project whenever Klamath River flows at Iron Gate Dam drop below the minimum flows recommended in the Hardy Phase I report, until such time as the Bureau completes a concrete plan to guide operations in the new water year [2001], and consultation concerning that plan is completed, either by (1) formal consultation to a "no jeopardy" finding by the NMFS, or (2) the Bureau's final determination, with the written concurrence of the NMFS, that the proposed plan is unlikely to adversely affect the threatened coho salmon.

Id. at 1250; see also id. at 1251. Pursuant to this injunction, BOR was required to comply with the ESA by consulting with NMFS regarding the operation of the Klamath Project in 2001, and it was precluded from making deliveries of irrigation water under the conditions stated until it had complied. The issuance of this injunction was not appealed by any of the parties, including KWUA, and that injunction is not subject to judicial review in this Court. See Allustiarte v. United States, 256 F.3d 1349, 1352 (Fed. Cir.), cert. denied, 534 U.S. 1042 (2001). Plaintiffs' repeated assertions that BOR made a purely voluntary decision to comply with the ESA in April 2001 completely overlooks the indisputable fact that BOR was under an injunction to complete Section 7 consultation before delivering any water from the Project for irrigation at the time BOR issued its Annual Operations Plan on April 6, 2001.

The operation of the Klamath Project in 2001 was also the subject of Kandra v. United States, 145 F. Supp.2d 1192 (D. Or. 2001). The Kandra plaintiffs, which included Klamath Irrigation District ("KID"), Tulelake Irrigation District ("TID") and KWUA, alleged that BOR's

2001 Operations Plan for the Klamath Project breached their contractual rights to receive irrigation water from the Project. The plaintiffs also alleged that the biological opinions issued by FWS and NMFS regarding the operations proposed in the 2001 Plan violated the ESA and should be set aside as "arbitrary and capricious" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-706. Id. at 1195-96. The Kandra plaintiffs sought to enjoin BOR from implementing its 2001 Operations Plan and requested an order requiring BOR to instead "release unspecified 'historic' amounts of irrigation water."[7] Id.

On the Kandra plaintiffs' motion for a preliminary injunction, the district court found that the plaintiffs were unlikely to succeed on the merits of their breach of contract claims, noting that "as recognized by this court and the Ninth Circuit, plaintiffs' contract rights to irrigation water are subservient to ESA and tribal trust requirements." Id. at 1201 (citing Patterson, 204 F.3d at 1214). The district court also found that the plaintiffs were unlikely to succeed on the merits of their claims under the APA and the ESA, noting in the process that BOR has a legal duty to operate the Klamath Project "consistent with its ESA and tribal trust obligations[.]" Id. at 1207. Based on these findings, the plaintiffs' request for injunctive relief was denied. The district court further noted that even if it were to eventually set aside the biological opinions, plaintiffs would

[7]Similarly, in the instant action Plaintiffs also allege that BOR should have delivered irrigation water in accordance with historic practices rather than in compliance with the ESA, and that its failure to do so is a breach of contract. Pls.' Opp. at 11; see also Decl. of David A. Solem, ¶¶ 7-9 (Apr. 28, 2006) (attached to Pls.' Opp.) (stating that the April 2001 operations plan for the Klamath Project provided for water deliveries in accordance with historic practices and that "[h]ad Reclamation managed the Upper Klamath Lake levels and downstream flows according to historic practices, Klamath Project water users would have received sufficient water to grow their crops."); Corrected Suppl. JPSR at 7 (Sept. 16, 2003) (Doc. 97) (Plaintiffs assert that BOR's 2001 operations plan "describes the contract performance to which plaintiffs were entitled. Defendant's refusal to deliver water in accordance with the operations plan constituted a breach of their water delivery contracts, for which damages are due.").

not be entitled to the relief they seek (*i.e.*, the delivery of "historic" amounts of irrigation water) because the requirements set forth in the injunction issued in PCFFA v. BOR, *supra*, "would not be met, and in all likelihood the injunction enjoining releases of irrigation water, if lifted, would be reinstated" Id. at 1210-11. The Kandra plaintiffs voluntarily dismissed their claims after the district court denied their request for injunctive relief and found that, even if they prevailed on the merits of their ESA claims, "the ESA explicitly prohibits the relief they seek." Id. at 1211.

It is against this extensive litigation backdrop that the operation of the Klamath Project proceeded in 2001. The federal court orders issued in these cases required BOR to comply with the ESA in its operation of the Klamath Project in 2001. Plaintiffs' contention in this case that BOR was not required to comply with the ESA in 2001 and that "[n]othing in the [ESA] prohibited Reclamation from delivering water to Plaintiffs in 2001" must be rejected in light of this litigation history.[8]

B. Plaintiffs' Challenge to the Government's Actions in 2001 is Not Properly Presented and Need Not Be Considered At This Time

Although Plaintiffs purport to be pursuing a contract claim in this case, their opposition

---

[8]Litigation over ESA compliance and the operation of the Klamath Project has continued since 2001. In 2002, a coalition of environmental groups and the Yurok and Hoopa Valley Tribes challenged the 10-year biological opinion issued by NMFS on May 31, 2002, relating to BOR's management of the Klamath Project for the period 2002-2012. KWUA and TID have intervened in this case as defendants. In this case, the Ninth Circuit found portions of this 10-year biological opinion to be arbitrary and capricious, and remanded the matter to the district court for appropriate injunctive relief. PCFFA v. BOR II, 426 F.3d 1082 (9th Cir. 2005). On remand, the district court ordered NMFS and BOR to reinitiate consultation regarding Klamath Project operations under section 7 of the ESA so that NMFS can issue a new biological opinion. PCFFA v. BOR, No. CIV C02-2006 SBA, 2006 WL 798920, *7-8 (N.D. Cal. March 27, 2006), amended by 2006 WL 1469390 (N.D. Cal. May 25, 2006). Pending the completion of this ESA process, the district court has issued an injunction that requires BOR "to limit Klamath Project irrigation deliveries if they would cause water flows in the Klamath River at and below Iron Gate Dam to fall below 100% of the Phase III flow levels specifically identified by NMFS in the Biological Opinion as necessary to prevent jeopardy . . . ." Id., 2006 WL 798920, *8.

brief once again seeks to challenge the actions taken by FWS, NMFS and BOR under the ESA in 2001. Indeed, a significant portion of their opposition brief is devoted to challenging the basis upon which NMFS and FWS issued the biological opinions in 2001, and challenging BOR's compliance with those biological opinions. See Pls.' Opp. at 7-16, 18-29. As noted above, these attacks on the basis of the agencies' actions in 2001 have no relevance to the application of the sovereign acts doctrine or the unmistakability doctrine. Accordingly, it is not necessary at this time to reach or address these issues. Moreover, as set forth below, Plaintiffs cannot collaterally attack the agencies' actions under the guise of a contract claim.

To begin with, the APA contains a limited waiver of sovereign immunity in actions seeking relief other than money damages under which a "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. §§ 702, 704. The APA authorizes district courts to set aside final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The Supreme Court has held that a final agency action taken under the ESA, such as the issuance of a biological opinion, is reviewable under the APA. Bennett v. Spear, 520 U.S. 154, 174-79 (1997); PCFFA v. BOR II, 426 F.3d at 1084-85. It is also well established that such challenges must be brought in federal district court, and that this Court lacks jurisdiction to review final agency actions under the APA. Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005); Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997). Here, Plaintiffs seek to avoid these jurisdictional limitations by presenting their challenge to the agencies' actions under the ESA within the context of their contract claims.

For example, in a consultation initiated under Section 7 of the ESA regarding a proposed federal agency action, each agency is required to "use the best scientific and commercial data

available." 16 U.S.C. § 1536(a)(2). In this case, a significant portion of Plaintiffs' brief is devoted to challenging the scientific data upon which the agencies' decisions were made in 2001. See Pls.' Opp. at 3 (contending that "subsequent peer-reviewed science" demonstrated that the actions taken under the ESA in 2001 "were of no benefit to the fish"); id. at 8 (relying on a 2004 NRC Report to support the assertion that the reasonable and prudent alternatives included in the biological opinions issued for 2001 "had no scientific bases"); id. at 18 ("nor does science even support Reclamation's stated rationale for withholding Plaintiffs' contractual water entitlement"); id. at 22-23 (relying on 2002 NRC Report to support assertion that "the best scientific and commercial data did not require that Reclamation withhold Plaintiffs' water in 2001").

A claim by Plaintiffs that the biological opinions issued by FWS and NMFS in this case failed to comply with the ESA's requirement for use of best scientific and commercial data available is a claim that is only reviewable under the APA. Bennett v. Spear, 520 U.S. at 176-79. In fact, several of the Plaintiffs in this case did bring such a claim in 2001 in Kandra v. United States,[9] arguing that the reasonable and prudent alternatives in the biological opinions "are not based on the best scientific evidence available, and that other alternatives supported by scientific evidence should be employed by Reclamation to preserve water for irrigation releases." Kandra, 145 F. Supp.2d at 1208. The Kandra court rejected this argument, noting that "[a]n agency has wide latitude to determine what is 'the best scientific and commercial data available.'" Id. The Kandra court further found that the record before it demonstrated "that plaintiffs simply disagree with the scientific conclusions reached by FWS and NMFS." Id. at 1210. The court thus declined to issue the injunction requested by the plaintiffs, finding that they were unlikely to

[9]The Kandra plaintiffs included KID, TID and KWUA.

prevail on their claim that the alleged failures of the government "render the [biological opinions] and their adoption by Reclamation arbitrary and capricious." Id. at 1206-10.

Having failed to obtain an injunction requiring BOR to deliver irrigation water to them in 2001, the Kandra plaintiffs elected to voluntarily dismiss their APA and other claims rather than proceeding on the merits in district court. Plaintiffs now seek to revive their APA claim by making the same challenge to the agencies' actions under the guise of "contract claims," thereby avoiding the deferential standard of review that their claims would be subject to under the APA.[10] In so doing, Plaintiffs engage in speculation as to what the BOR might have done to avoid curtailing water deliveries to the Project in a severe drought year. They go well beyond the information that was available and that was considered by the government in 2001, which was the best scientific evidence available at that time, and they now seek to challenge the actions taken in 2001 by relying on information developed and studies conducted in the years since 2001.[11] See Pls.' Opp. at 3 (relying on "subsequent peer-reviewed science" to challenge the government's actions in 2001); id. at 8 and 22-23 (relying on a 2002 NRC Report and a 2004 NRC Report to challenge the government's actions in 2001).[12]

---

[10]The scope of review under the APA's "arbitrary and capricious" standard is a "highly deferential" one under which the agency action is presumed to be valid. Int'l Fabricare Inst. v. EPA, 972 F.2d 384, 389 (D.C. Cir. 1992). This standard mandates heightened deference to the agency's judgment when a court is asked to review scientific decisions made by the agency. Id.; see also Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993).

[11]Judicial review under the APA is limited to the administrative record on which the challenged decision was made. 5 U.S.C. § 706; see also Envtl Coalition of Ojai v. Brown, 72 F.3d 1411, 1414 (9th Cir. 1995), cert. denied, 517 U.S. 1245 (1996); Camp v. Pitts, 411 U.S. 138, 142 (1973). Information developed in the years following a decision is *ipso facto* outside that record.

[12]Although not relevant to Defendant's present motion for summary judgment, Defendant notes that Plaintiffs' description of the NRC reports cited in their opposition brief is misleading

Plaintiffs should not be permitted to avoid the limitations of judicial review under the APA by challenging the agencies' actions in 2001 within the context of their contract claims. As this court aptly noted in a decision rejecting a similar attempt to bypass the APA:

> No plaintiff worth their salt would challenge agency action under the more deferential arbitrary and capricious standard [of the APA] when they could alternatively challenge the same conduct under a hypothetically more lenient breach of contract theory. At least it would give litigants another crack at challenging agency actions.

Franklin Sav. Corp. v. United States, 56 Fed. Cl. 720, 745 (2003), aff'd per curiam, 97 Fed. Appx. 331 (Fed. Cir. 2004), cert. denied, 544 U.S. 947 (2005). Accord Aulston v. United States, 823 F.2d 510, 513 (Fed. Cir. 1987) (holding, in the context of a takings claim, that "without a previous test of validity under the [APA], the correctness of the administrative action must be taken as a 'given' in this Tucker Act suit."); M&J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir.) (holding that "[n]either the Court of Federal Claims nor this court may entertain a collateral challenge to the validity of the [agency's] actions."), cert. denied, 516 U.S. 808 (1995).

---

and their reliance on those reports as a basis for challenging the agencies actions in 2001 is misplaced. For example, Plaintiffs conclude from the NRC's 2004 Report that the Upper Klamath Lake levels and Klamath River flow measures set forth in the biological opinions were "not required by the [ESA]." Pls.' Opp. at 3. The NRC did not make such a conclusion, nor does that conclusion follow from the NRC Report. Indeed, the NRC acknowledged that, "in drawing conclusions for its interim report, [the NRC] was bound by its charge to evaluate and comment on the scientific strength of evidence underlying various proposals." 2004 NRC Report at 34-34 (quoted in Pls.' Opp. at 12). Section 7 of the ESA, of course, requires agencies to "use the best scientific and commercial data available." 16 U.S.C. § 1536(1)(2). The NRC readily acknowledged that the sound science standard it was applying and the standard that agencies charged with ESA responsibilities must apply differs. 2004 NRC Report at 34-35 (quoted in Pls.' Opp. at 12). The distinction between the "sound scientific" standard applied by NRC in its scientific peer review, and the standard that the United States was required to apply in determining whether the operation of the Klamath Project in 2001 complied with the ESA is explained in more detail in Daniel J. McGarvey & Brett Marshall, *Making Sense of Scientists and "Sound Science": Truth and Consequences for Endangered Species in the Klamath Basin and Beyond*, 32 ECOLOGY LAW QUARTERLY 73 (2005).

Alternatively, even assuming *arguendo* that Plaintiffs' various challenges to BOR's compliance with the ESA in 2001 can somehow be considered within the framework of their contract claims, those challenges are not relevant to the limited issues presently before the Court. Plaintiffs' arguments thus exceed the scope of Defendant's motion and do not require a response.[13]

C. Plaintiffs' Argument That Their Contracts Were Specifically Targeted by the ESA is Based on an Erroneous Interpretation of the Sovereign Acts Doctrine

Plaintiffs contend that the sovereign acts doctrine does not apply because the actions taken by the government under the ESA specifically targeted their contracts. In so arguing, Plaintiffs do not contend that the enactment of the ESA specifically targeted their contracts, nor could they, given the public and general nature of this legislation. See Def.'s SJ Brief at 24-26. Instead, Plaintiffs assert that the sovereign acts doctrine requires the Court to "examine the individual government actions taken pursuant to the ESA, and determine whether those individual government actions are public and general." Pls.' Opp. at 37. This argument is not supported by the cases cited by Plaintiffs in their opposition brief and conflicts with the Federal Circuit's rulings on nature and scope of the court's inquiry under the sovereign acts doctrine.

First, Plaintiffs assert that "precedent holds that it is the biological opinion and other actions taken pursuant to the ESA and not the statute itself which must be examined in the sovereign acts analysis." Pls.' Opp. at 4. However, the only case they cite to in support of this assertion is Scott Timber Co. v. United States, 40 Fed. Cl. 492, 507-508 (1998), which does not analyze or resolve the question of whether the application of the sovereign acts doctrine requires examination of the legislation in question (the ESA) or of the specific actions taken under the ESA because the plaintiff had conceded in that case that the listing of the marbled murrelet as an

[13]Plaintiffs have not filed a cross-motion for summary judgment on their contract claims.

endangered species under the ESA was a sovereign act.[14] Pls.' Opp. at 37.

Second, Plaintiffs' assertion that the applicability of the sovereign acts doctrine focuses on individual actions taken under the legislation in question rather than on the scope of the legislation itself conflicts with the Federal Circuit's post-Winstar guidance on this doctrine. Specifically, in Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1575 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998), the Federal Circuit explained that the application of the sovereign acts doctrine involves "a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior government contracts." The Federal Circuit's subsequent analysis of the Energy Policy Act confirms that the focus of its inquiry was the scope of that Act in order to determine "whether the Act is designed with the purpose of affecting or altering the Government's prior contracts." Id. at 1575. Although the Energy Policy Act in question was narrower in scope than the ESA,[15] the Federal Circuit found that any impact the Act might have on utilities that had prior contracts with the government was "'merely incidental to the accomplishment of a broader governmental

---

[14]To the extent that Scott Timber can be read as holding that the listing of the marbled murrelet was a sovereign act, Defendant notes Plaintiffs' assertion that "the listing of the fish is targeted at Plaintiffs' contracts," Pls.' Opp. at 4, conflicts with that holding. Scott Timber, 40 Fed. Cl. at 507-508. Plaintiffs are apparently unable to identify any other cases to support their assertion that the focus of the sovereign acts inquiry should be the implementation and enforcement of the ESA, nor is Defendant aware of any.

[15]The Energy Policy Act at issue in Yankee Atomic imposed an assessment on utilities that had benefitted from the government's uranium enrichment service. Yankee Atomic, 112 F.3d at 1575-76. In contrast, the ESA applies to both government actions and private action, and to "all land in the United States and to the Nation's territorial seas." Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 698 (1995). The broad scope of the ESA led the Supreme Court to comment that the Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).

objective.'" Id. at 1576 (quoting United States v. Winstar, 518 U.S. 839, 898 (1996)). Here, for the reasons set forth in Defendant's opening brief, the ESA is the very epitome of a "public and general" legislative enactment and the ESA compliance alleged to have breached the contracts at issue in this case was merely incidental to the accomplishment of the broader objectives of that legislation. Def.'s SJ Brief at 24-26. The sovereign acts doctrine thus applies in this case and is a complete defense to Plaintiffs' contract claims.

Finally, even to the extent that the Court were to find that the application of the sovereign acts doctrine requires some consideration of the specific actions taken by the government in this case under the ESA, the Court should find that actions taken to comply with legislation that is "public and general" are also "public and general acts." Indeed, in a similar case involving timber contracts that were suspended by the Forest Service pending its compliance with the ESA, the Court of Federal Claims remarked that "there can be no doubt that the Forest Service's suspensions were taken to comply with its statutory duties (and a court order), and therefore that the acts were 'public and general' acts." Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 72-73 (2001). Here, too, BOR was required to comply with the ESA and was under a court order to do so in 2001. Accordingly, the government's compliance with the ESA in 2001 was a "public and general" act that fall within the scope of the sovereign acts doctrine.[16]

---

[16]Notably, Plaintiffs' interpretation of the sovereign acts doctrine, if accepted, would render that doctrine a nullity. Under Plaintiffs' theory, all government actions that implement or enforce a piece of legislation that is "public and general" would be regarded as "specifically targeting" any contracts that are affected by such actions. Contrary to this rather novel and legally unsupported interpretation of the sovereign acts doctrine, that doctrine recognizes that "'the Government's actions, otherwise legal, will occasionally incidentally impair the performance of contracts.'" Yankee Atomic, 112 F.3d at 1574 n.3 (quoting O'Neill v. United States, 231 Cl. Ct. 823, 826 (1982)). The very purpose of the sovereign acts doctrine is to protect the United States from contractual liability when such incidental impairments occur.

D. The Subject Contracts Did Not Assign the Risk of Future Statutory Changes to the Government

The second defense addressed in Defendant's motion is based on the unmistakability doctrine, a long-standing principle of contract interpretation under which the Government does not surrender its sovereign power in entering into contracts, unless it does so in unmistakable terms. Def.'s SJ Brief at 26–29. As set forth in Defendant's opening brief, the subject contracts do not waive the right of the United States to exercise its rights, as sovereign, to enact public and general legislation, such as the ESA, or to implement and enforce that legislation. Id.

Plaintiffs first contend that this defense is not properly supported. This argument is based on the erroneous assertion that Defendant fails in its motion "to analyze which party bore the contractual risk of the events of 2001." Pls.' Opp. at 32-33. In fact, Defendant addressed this precise point at pages 26-27 of its summary judgment memorandum. The brevity of Defendant's analysis is due to the complete absence of any language in the contracts at issue that can be read as expressly granting Plaintiffs immunity from the effect of future changes in the law or as shifting the risk of such changes to the government. Plaintiffs, in turn, do not point to any language in any of the contracts that expressly shifts this risk to the government. See Pls.' Opp. at 31-37.

Instead, Plaintiffs' argument hinges on the assertion that because the Plaintiffs undertook certain risks that were expressly stated in the subject contracts, those contracts must be read as shifting all other unstated risks to the government.[17] Id. at 34-36. Plaintiffs' argument is based

---

[17] The only case cited by Plaintiffs in support of their contention that a waiver of sovereign power can be implied in a contract to which the United States is a party is Transatlantic Fin. Corp. v. United States, 363 F.2d 312 (D.C. Cir. 1966), a case that did not involve an application of the unmistakability doctrine and thus offers no guidance on the question before this Court.

on the misconception that a waiver of the government's right to exercise its sovereign power to enact subsequent legislation can be implied. It is well established that "sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982). See also United States v. Cherokee Nation of Okla., 480 U.S. 700, 707 (1987) ("[A] waiver of sovereign authority will not be implied, but instead must be 'surrendered in unmistakable terms'"). As Justice Souter summarized in his plurality opinion in United States v. Winstar,

> a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an act of Congress), nor will an unambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power.

518 U.S. at 878. See also Yankee Atomic, 112 F.3d at 1578 n.2 (explaining that "the remaining justices in Winstar essentially agreed with this formulation of the doctrine, although they disagreed with its application to the facts of that case"). Consistent with these precedential decisions, the Court of Federal Claims continues to find, in post-Winstar decisions, that the surrender of sovereign power cannot be implied. For example, in Adams v. United States, 42 Fed. Cl. 463, 483 (1998), the court rejected the plaintiff's contention that the government's promise that its subsequent actions would not frustrate the prepayment terms of its contract "is contained implicitly within the prepayment terms." Instead, the court found that

> such a surrender of sovereign power must be done in unmistakable terms. Implying a surrender of the sovereign's power from the contract's prepayment terms cannot be termed unmistakable. Indeed, if the surrender of sovereign power were to be implied, such a promise would be no different than what applies to private parties, but more than this is required under the unmistakability

doctrine.

Id. at 483 (citing Winstar, 518 U.S. at 935 (Rehnquist, C.J., dissenting)).

Based on this well-established precedent, which is not contradicted by any of the cases relied on by Plaintiffs, the Plaintiffs' assertion that the subject contracts should be read as including an implied waiver of the government's sovereign power, or that the risk that the future exercise of such power would impact contractual obligations was implicitly shifted to the government, should be rejected.[18]

Plaintiffs also appear to be arguing that the unmistakability doctrine doesn't apply in this case because they are only seeking damages for an alleged breach of contract, and they are not seeking injunctive relief to preclude the application of the ESA in this case. Pls.' Opp. at 38-41. Again, Plaintiffs' analysis, which is based on Justice Souter's plurality opinion in Winstar, misses the mark. To begin with, five justices disagreed with the portion of Justice Souter's plurality opinion that Plaintiffs rely on. See Yankee Atomic, 112 F.3d at 1578-79 (addressing this disagreement); Cuyahoga Metro. Housing Auth. v. United States, 57 Fed. Cl. 751, 770 (2003) (same); see also Adams, 42 Fed. Cl. at 482-83 (finding, after analyzing the discussion of the unmistakability doctrine contained in the various Winstar opinions, that five justices believed that the doctrine "applies even if the contract can be reasonably construed as a risk-shifting agreement and the enforcement of the agreement would not effectively bar the exercise of a

[18]Plaintiffs' contention that the subject contracts implicitly shift the risk of future legislative changes to the government because the contracts expressly allocate other risks is also contrary to the holding of the Ninth Circuit in O'Neill v. United States, 50 F.3d 677, 686 (9th Cir.), cert. denied, 516 U.S. 1038 (1995) (analyzing contracts with similar shortage provisions and still finding that nothing in these contracts surrendered in unmistakable terms Congress's sovereign power to enact subsequent legislation – or shift risks associated with the exercise of such power to the government).

sovereign power."). Accordingly, the interpretation of the unmistakability doctrine relied on by Plaintiffs has not been adopted by the Federal Circuit or the Court of Federal Claims in their post-Winstar applications of that doctrine.

Moreover, Plaintiffs' analysis is premised on a determination that the contract in question can be "reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of that [sovereign] power. . . ." Winstar, 580 U.S. at 880 (quoted in Pls.' Opp. at 41). Here, as set forth above, Plaintiffs do not contend that their contracts contain express terms that shift the risk of contractual loss due to the future exercise of sovereign power, such as the enactment of the ESA, to the government. Instead, Plaintiffs' contention that this risk was shifted to the government is based on its erroneous argument that such risk-shifting can be implied. As set forth above, such terms may not be implied in this context.

## III. Conclusion

For the reasons set forth above and in Defendant's motion, Defendant respectfully requests that the Court grant its motion for summary judgment as to Plaintiffs' contract claims.

Dated: June 26, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

s/Kristine S. Tardiff
KRISTINE S. TARDIFF
Attorney of Record for the Defendant
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583/Fax: (603) 225-1577

STEPHEN M. MACFARLANE
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, CA 95814-232
Tel: (916) 930-2204/Fax: (916) 930-2210

REGINALD T. BLADES, JR.
United States Department of Justice
Civil Division
Commercial Litigation Branch
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-7300/Fax: (202) 307-0972