IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, *et al.*, | ) | |
| Plaintiffs, | ) | No. 01-591 L |
| v. | ) | |
| | ) | Judge Francis M. Allegra |
| UNITED STATES OF AMERICA | ) | |
| Defendant, | ) | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | ) | |
| Defendant-Intervenor | ) | |

AMICUS NRDC'S REPLY MEMORANDUM AS TO
PLAINTIFFS' CONTRACT CLAIMS

Amicus Natural Resources Defense Council ("NRDC") respectfully submits this reply memorandum in response to (1) Plaintiffs' Supplemental Brief in Response to the Brief Amicus Curiae of Natural Resources Defense Council ("Pls.Suppl.Opp.") and (2) Plaintiffs' Opposition to Defendant's Motion for Summary Judgment as to Plaintiffs' Contract Claims ("Pls. Opp."). In accordance with the Court's instructions, this reply memorandum is confined to application of the sovereign acts and/or unmistakability doctrines to these breach of contract claims.[1]

[1] NRDC notes that two recent, published decisions of the California Court of Appeals provide considerable support to one of the government's alternative arguments for dismissal of these claims, that is, that plaintiffs' asserted contract rights are subordinate to applicable background principles of Oregon and/or California law. See State Water Resources Control Board Cases, 136 Cal.App.4th 674, 806 n.54, 39 Cal. Rptr.3d 189, 294 n.54 (2006) (observing

I. The Enormous Taxpayer Subsidies Received by Klamath Water Users Support the Government's Unmistakability Defense.

The most striking feature of plaintiffs' response to NRDC's opening memorandum is not what they say but what they fail to address. Section I of NRDC's memorandum laid out extensive information, supported by several exhibits, demonstrating that Klamath Project water users have been the beneficiaries of enormous subsidies underwritten by U.S. taxpayers (and ratepayers). As NRDC made clear in its memorandum (at 3, 32), NRDC submitted this information because it is relevant to the issue of whether the United States can successfully defend against the contract claims based on the unmistakabilty doctrine. NRDC explained that the circumstances surrounding a contract, including in particular the level of consideration paid, see United States v.Winstar, 518 U.S. 839, 863 (1996) (Souter, J., plurality), are highly relevant to the question of whether a contract can reasonably be read to contain an "unmistakable" commitment on the part of the government not to exercise its sovereign powers.

Plaintiffs' response to this argument is to ignore it. Plaintiffs interpret the Court's instructions, correctly, as requiring them to focus their attention on the potential applicability of the sovereign acts and/or unmistakability doctrines. But since NRDC's presentation regarding Klamath Project subsidies is directly related to the defense of unmistakability, as NRDC

---

that "because the rights of an appropriator are always subject to the public trust doctrine (see National Audubon Society v. Superior Court, [33 Cal. 3d 419, 447 (1983)]), the same is true of the rights of a person who contracts with an appropriator for the use of the water appropriated. An appropriator cannot give away more rights than he or she has."); Allegretti & Co. v. County of Imperial, 138 Cal.App.4th 1261, 1274, 42 Cal.Rptr.3d 122, 131-32 (2006) (concluding, based in part on this Court's analysis in Klamath Irrigation District v. United States, 67 Fed.Cl. 504 (2005), that the definition of a contractual water right requires consideration of "whether the contracts were limited in the event of water shortages by prior contracts, prior appropriations or other state law principles," and of "whether the plaintiffs' claimed use of water violated state doctrines including those designed to protect fish and wildlife").

explained in its memorandum, there was no reason for Plaintiffs not to respond to NRDC's presentation concerning the subsidies received by Klamath water users.[2]

Plaintiffs' failure to respond to NRDC's presentation concerning the subsidies is all the more remarkable because Plaintiffs affirmatively rely on their version of how much of the project costs they paid in arguing, in the course of discussing the sovereign acts doctrine, that the United States assumed the risk of liability in the event of a change in the law. Thus, on the first page of their opposition to the government's motion for summary judgment, they assert: "The essential quid pro quo of Plaintiffs' contracts was that the Plaintiffs would reimburse the United States for the construction costs associated with the Klamath Reclamation Project, the project water delivery facilities, and the cost of maintaining the Klamath Project facilities, in exchange for a specifically bargained for quantity of water from the Klamath Project to be used by the farmers for irrigating the land." Pls.Op. at 1. Later, they assert that "the risk assumed by Plaintiffs [under the contract] are especially significant when one considers that it was the water

[2] Plaintiffs state in footnote 3 of their supplemental brief in response to NRDC's memorandum, "[T]o the extent the Court should deem any portion of NRDC's filings other than Argument III of its February 27, 2006 brief relevant to determination of the pending cross motions for summary judgment, Plaintiffs request an opportunity to respond to those filings as well." The Court should reject this request. First, as discussed in text, because it was completely self-evident that Section I of NRDC's memorandum related to the unmistakability defense, plaintiffs have no good reason for failing to address this argument. Second, plaintiffs have had more than ample opportunity to do so. In Plaintiffs' Motion for Leave to File a Consolidated Response to Filings by Amicus Curiae Natural Resources Defense Council, filed April 28, 2006, they requested additional time to respond to NRDC's arguments on the ground that NRDC had filed a "lengthy" memorandum that "raises complex arguments" requiring "additional time and preparation for plaintiffs to adequately respond." Apparently plaintiffs subsequently made the tactical decision to ignore NRDC's presentation on the subsidies, perhaps in the hope that the Court would ignore the argument as well. The Court should not reward such gamesmanship by permitting Plaintiffs another bite at the apple. Furthermore, even if Plaintiffs might raise some quibble about the magnitude of the subsidies, they can hardly deny the basic fact that the Klamath Project has been heavily subsidized. Thus, Plaintiffs' request is not only unfair and unwarranted, it is pointless.

users who paid for the facilities, even though the United States retains title to those facilities." Pls.Op. at 36. Further down on the same page, they assert, "the water users through their respective irrigation districts paid for all the costs of maintaining the facilities. Yet, the water users, after paying the significant costs of building and maintaining the facilities, bore the risk of water shortage due to drought."

Plaintiffs' discussion of how much of the project costs they paid effectively concedes the point that whether plaintiffs paid fair value for Klamath Project benefits is highly relevant to the resolution of their contract claims. Logically, if the amount of consideration paid by Plaintiffs is relevant to interpretation of the contracts in the sovereign acts context it also is relevant in the unmistakability context. Plaintiffs apparently would prefer that the Court resolve the issue by relying exclusively on their version of the accounting. However, because plaintiffs' statements are mere assertions, unsupported by evidence, and are directly contradicted by the evidence submitted by NRDC (to which Plaintiffs did not deign to respond), the Court should disregard Plaintiffs' assertions. The Court should conclude that the enormous subsidies received by Klamath Project water users support the conclusion that these contracts cannot reasonably be interpreted to contain an unmistakable commitment on the part of the United States not to exercise its sovereign powers.

As NRDC's factual presentation demonstrated, it is simply not correct, as Plaintiffs assert, that "the water users paid for the facilities." Setting aside a variety of other adjustments to the contract price that increased the level of the subsidy, the water users paid only a fraction of the actual cost of the project because they repaid the construction costs over many decades, without interest, leaving the U.S. taxpayer to bear the cost of deferred repayment. While NRDC's presentation apparently goes further than any previous study in actually documenting

the magnitude of the subsidies for the Klamath Project, the massive public subsidies involved in Bureau projects in general, and the Klamath Project specifically, have been well recognized and thoroughly documented for many years. See e.g., Government Accounting Office, "Bureau of Reclamation: Information on Allocation and Repayment of Costs of Constructing Water Projects" (Report No. 96-109, July 1996).

Significantly, the U.S. Supreme Court recognized the legal significance of these subsidies in Ivanhoe Irrigation District v. McCracken, 357 U.S. 275 (1958). In that case the Court rejected various constitutional challenges to the Bureau of Reclamation's enforcement of the statutory requirement that water derived from the Central Valley Project not be sold for use on lands held by a single owner in excess of 160 acres. The Court affirmed as "beyond challenge" the general "power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges." Id. at 295. The Court explained that, with respect to that part of the project expense that was "reimbursable," one portion was paid for with hydroelectric revenues, and "[t]he other is irrigation, which pays the rest [of the reimbursable expense] without interest charge. In short, the project is a subsidy, the costs of which will never be recovered in full." Id. The "no interest" subsidy involved in the Klamath Project is essentially identical to the no interest subsidy involved in the Central Valley Project. The Supreme Court in Ivanhoe concluded by observing, "It is hardly a lack of due process for the Government to regulate that which it subsidizes." Id. at 296, quoting Wickard v. Filburn, 317 U.S. 111, 131 (1942). The same basic principle should govern the Court's analysis of the unmistakability defense in this case: it is entirely sensible as a matter of government contract law for the government to retain the right to regulate that which it subsidizes.

In the case of the Klamath Project, as NRDC has explained, the size of the public subsidy

is magnified by the fact that the Bureau of Reclamation entered into an unusual arrangement under which the operator of the Link River Dam supplied power to Klamath water users at below market rates. As NRDC previously discussed, one recent study estimated that in the 1990's this subsidy alone had a value of $10,000,000 per year.

II. The Unmistakability and Sovereign Acts Doctrines Are Distinct Legal Defenses in a Breach of Contract Action.

NRDC also explained in its opening memorandum that the sovereign acts and unmistakability doctrines, properly understood, should be viewed as separate and independent defenses to a claim of breach of contract. Plaintiffs attempt to dismiss the argument as worthy of consideration only "in a law review symposium." Pls.Suppl.Op. at 2. Plaintiffs' response is altogether too cavalier.

First, it is not correct that NRDC has "rejected" the reasoning of defendant's brief. To the contrary, NRDC acknowledged that the position set forth in the United States' motion for summary judgment on the sovereign acts and unmistakability defenses is consistent with certain Federal Circuit precedent and that the United States is entitled to prevail on its motion under this understanding of the law. NRDC simply sought, in keeping with its role as an amicus, to present an alternative understanding of the law which NRDC believes is more consistent with the underlying legal principles and governing Supreme Court precedent. To repeat, the position advanced by the United States represents an entirely reasonable reading of the applicable law upon which the Court can properly rely in disposing of these claims.

Also contrary to plaintiffs' assertion (Pl.Suppl.Op. at 3), NRDC's position on the relationship between the sovereign acts and unmistakability doctrines is hardly "iconoclastic." To the contrary, the United States itself, in argument before this Court and before the Federal

Circuit, has repeatedly taken the position that the sovereign acts and unmistakability doctrines represent separate defenses in breach of contract claims against the United States. See, e. g., First Nationwide Bank v. United States, 431 F.3d 1342, 1351 (Fed. Cir. 2005) ("The government proposes that the unmistakability doctrine and the sovereign acts doctrines are separate and that the... court in [Centex Corp. v. United States, 395 F.3d 1283, 1306-07 (Fed.Cir. 2005)], like the Court of Federal Claims, erred in stating that '[a] prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated.'"). Notwithstanding recent decisions by the Federal Circuit to the contrary, it apparently remains the official position of the U.S. Department of Justice that the sovereign acts and unmistakability doctrines are separate defenses.

Plaintiffs also are mistaken in asserting that NRDC "rejects" the reasoning of the Supreme Court in Winstar. To the contrary, NRDC's position on the relationship between the sovereign acts and unmistakability doctrines is consistent with and supported by Winstar. Of course, given the splintered decision-making, "one might struggle mightily to weave a controlling rule of law from the opinions in Winstar." Cuyahoga Metropolitan Housing Authority v. United States, 57 Fed. Cl. 751, 772 (2003). But the position advanced by NRDC seeks to implement, to the extent possible, the apparent majority position in Winstar.[3]

A careful parsing of Winstar - and other relevant Supreme Court precedent - reveals that the unmistakability doctrine is not simply a derivative of the sovereign acts doctrine. The sovereign acts doctrine holds that the United States "cannot be held liable for an obstruction to

[3] Plaintiffs adopt the approach of simply wishing away the division on the Court in Winstar and pretending that Justice Souter's opinion, which commanded only plurality support, actually represented the opinion for the Court. This approach is plainly impermissible. See. Cuyahoga, 57 Fed. Cl. at 773 n.29.

the performance of [a] particular contract resulting from its public and general acts as a sovereign." Horowitz v. United States, 267 U.S. 458, 461 (1925). Under the unmistakability doctrine, for a contract to prevent the government from exercising "a sovereign power," the agreement must "admit of no other reasonable interpretation." Winstar, 518 U.S. at 876-77. These doctrines are obviously related, in the sense that they both define circumstances where the government can avoid contract liability. But the best reading of the Supreme Court precedent does not support the conclusion that the kinds of "public and general acts" required for the sovereign acts doctrine are required for the unmistakability doctrine as well. Longstanding Supreme Court precedent also points in the opposite direction. See, e.g., Bridge Proprietors v. Hoboken Co., 68 U.S. (1 Wall) 166 (1883) (unmistakability defense applied when government granted exclusive bridge charter and then subsequently permitted construction of a second bridge); Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 9 L.Ed. 773 (1837) (same).[4]

And in Winstar a majority of the Justices concluded that these defenses are separate and distinct. The plurality deemed the unmistakability doctrine inapplicable based on the now widely repudiated theory that the defense has no relevance in breach of contract suits seeking damages. See Cuyahoga, 57 Fed.Cl. at 770. But a majority of the justices found that the doctrine did apply. While the various members of the majority disagreed about how to apply the doctrine to the facts of the case, they were in agreement that it applied without regard to whether the government action constituted a "public and general" act covered by the sovereign acts

---

[4] Citing a snippet of law review commentary, Plaintiffs suggest that Winstar effectively overruled Charles River Bridge. Pls. Suppl. Op. at 9. This is an extravagant and unwarranted inference from the splintered decisions in Winstar.

doctrine. Then Chief Justice Rehnquist, joined by Justice Ginsburg, found the unmistakability doctrine to be applicable without discussing whether the statute at issue met the "public and "general" test. Winstar, 518 U.S. at 924-31. He separately addressed the sovereign acts doctrine, and in that context discussed whether the statute was public and general, but without making any connection to the unmistakability issue. Id. at 931-33. Justice Scalia, in a concurring opinion, characterized the statute at issue as a "sovereign act," without specifically addressing whether it met the public and general test. Id. at 919-24. Rather, Justice Scalia's sovereign act characterization appears to be based upon the legislative and regulatory nature of the law, not its possible public and general nature. Id. at 920. In sum, a majority of the justices implicitly rejected the notion that the unmistakability doctrine can apply only when the sovereign acts doctrine is satisfied. Thus, the majority view in Winstar supports NRDC's position that these defenses are separate and distinct.

## III. The Sovereign Acts Defense is Not a Mere Prelude to Application of the Traditional Common Law Impracticability Defense.

Precedent as well as common sense refute Plaintiffs' position that the sovereign acts doctrine is merely a particularized application of the traditional common law doctrine of impracticability. As NRDC explained in its opening memorandum, the seminal Supreme Court decisions establishing the sovereign acts doctrine describe and define this defense as a free-standing legal doctrine. Recent decisions of the Federal Circuit describe the sovereign acts doctrine in the same fashion. See, e g., Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1575 (Fed. Cir. 1997); Commonwealth Edison Co. v. United States, 271 F.3d 1327

(Fed.Cir 1997); Centex Corp. v. United States, 395 F.3d 1283, 1307 (Fed. Cir. 2005).[5]

Plaintiffs base their argument that the sovereign acts doctrine is merely a subset of the doctrine of impracticability almost entirely on Justice Souter's plurality opinion in Winstar. But that opinion – which, contrary to Plaintiffs' position, does not represent the "holding" in Winstar – will not bear the weight Plaintiffs seek to place on it. To be sure, Justice Souter, speaking for himself and several other Justices, treated the sovereign acts doctrine as a subset of the impracticability doctrine. Under this understanding, the primary, if not the sole, function of the sovereign acts doctrine is to relieve the government of the normal requirement under impracticability that the breaching party demonstrate that it was not responsible for making performance impracticable. In his opinion, Justice Souter first concluded that the statute in Winstar did not meet the general and public requirement of the sovereign acts defense. But he also concluded that, even if the general and public requirement were satisfied, the government's defense would still fail because the government could not satisfy two other independent requirements of the impracticability doctrine. But no other Justice joined in Justice Souter's analysis to form a Court majority on this issue. Justice Scalia, in his separate concurring opinion, addressed the sovereign acts defense only briefly. After observing that the doctrine had been applied by the Supreme Court "in only a single case," he said that in his view the doctrine "adds little, if anything at all, to the 'unmistakability' doctrine, and is avoided whenever that one would be," that is, when the government has made an explicit commitment not to invoke its

---

[5] To be sure, lacking any support in Federal Circuit decisions, Plaintiffs cite (Pls. Suppl. Op, at 5-6) several Court of Federal Claims decisions that have adopted Plaintiffs' view. Those decisions obviously do not represent binding precedent for this Court. See Penzoil-Quaker State Co. & Subsidiaries v. United States, 62 Fed.Cl. 689, 696 (2004) (decisions by particular judges of the Court of Federal Claims not binding on other judges of the Court of Federal Claims).

sovereign powers. Winstar, 518 U.S. at 923-24. Given this reasoning, Justice Scalia's passing reference to the impracticability doctrine cannot be taken as a definitive embrace of plaintiffs' argument.[6]

Significantly, while commentators have recognized that Justice Souter adopted a clear and distinctive position linking the sovereign acts doctrine with the common law doctrine of impracticability, they have not interpreted the Scalia opinion as forming a clear majority position on this issue. See, e.g., Gregory C. Sisk, LITIGATING WITH THE FEDERAL GOVERNMENT: CASES AND MATERIALS 567 (2000); John Cibinic, Jr., "Retroactive Legislation and Regulations and Federal Government Contracts," 51 ALA.L.REV. 963, 971-72 (2000).

Most fundamentally, Plaintiffs' position should be rejected because it fails to account for the fact that the traditional doctrine of impracticability and the sovereign acts doctrine serve very different values and functions. The doctrine of impracticability, which grew up in the context of purely private contractual arrangements, seeks to balance the social utility of enforceable contractual arrangements with a recognition that, in some circumstances, "justice requires a departure from the general rule that a promisor bears the risk of increased difficulty of performance." Farnsworth, CONTRACTS 624 (4th Ed. 2004). Historically, the doctrine was frequently explained in terms of individual morality. See, e.g., James Gordley, "Impossibility and Changed and Unforeseen Circumstances," 52 AM.J.COMP.L. 513 (2004) (describing

---

[6] Plaintiffs also rely on a passing reference to "impossibility" in Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000), but that decision does not provide persuasive, much less controlling, authority on this question. The case did not involve an impracticability defense, and the Court expressly stated that the possible application of the sovereign acts defense was not in issue in the case before the Court. See Id. at 620. Thus, whatever Mobil had to say about the present issue is purest dictum.

canonical and natural law origins of the doctrine of impracticability). In the modern era, the doctrine has more frequently been characterized as an economically efficient risk allocation rule. See, e g., Robert Cooter & Thomas Ulen, LAW AND ECONOMICS 277-81 (1988).

By contrast, as this Court has previously explained, the sovereign acts doctrine, which grew up in the context of contracts involving the government, is designed " to shield exercises of the law making function that involves sovereign powers." Cuyahoga, 57 Fed Cl. at 774, n.31. As NRDC discussed in its opening memorandum on the contract issue (at 24-28) the distinctive function of the sovereign acts doctrine operates on at least two dimensions: first, by helping ensure that governmental commitments made in one time period do not exert dead-hand control over future public policy choices and, second, by preserving the autonomy of the legislative branch from executive branch incursion. Given the very different foundations of these doctrines, it is implausible as well as illogical to view the sovereign acts doctrine as simply a subset of traditional impracticability doctrine. The doctrines are obviously related in that both address, in a broad sense, the legal significance of supervening events for contractual relations. But given their distinctive origins and functions, it is entirely logical that they have a different substantive content.

In any event, to the extent there is some overlap between the sovereign acts doctrine and impracticability doctrine, the version of impracticability that would apply under the sovereign acts doctrine would not have the same requirements as the impracticability doctrine applied to private parties. For example, under the general rule of impracticability, a party cannot invoke the defense unless the non-occurrence of the event making performance of the contract impracticable was a basic assumption of the contract. See Restatement (Second) of Contracts § 261. But section 264 of the Restatement (Second) of Contracts recognizes a general presumption

that a new government "regulation or order" is not within contracting parties' assumptions. The courts have applied this special rule governing government actions affecting contractual relationships in a variety of contexts. See Louisville & Nashville RR Co. v. Mottley, 219 U.S. 467, 485 (1911) ("[Authorities] are numerous and are all one way. They support the view that, as the contract in question would have been illegal if made after the passage of the commerce act, it cannot now be enforced."); Eastern Associated Coal Corp. v. United Mine Workers of America, 531 U.S. 57, 69 (2000) (Scalia, concurring) ("Supervening law is always grounds for the dissolution of a contractual obligation."); City Line Joint Venture v. United States, 48 Fed.Cl. 837, 840 (2001) (referring to the general understanding that a contract is formed against a background of certain basic assumptions, including the presumption that "the law will not directly intervene to make performance impracticable when it is due," citing Restatement § 264 comment (a)). Because the sovereign acts doctrine, by definition, involves a supervening governmental action, the requirement of the impracticability doctrine that the defendant show that the action was not foreseeable would necessarily be beside the point in applying the sovereign acts doctrine.

Finally, again assuming the sovereign acts doctrine involves some variant of traditional impracticability doctrine, then the sovereign acts doctrine calls for a particularly narrow version of the impracticability doctrine requirement that the parties will remain bound, despite impracticability, if "the language or the circumstances [so] indicate." Restatement (Second) of Contracts § 261. The Federal Circuit in Yankee Atomic, which treated the sovereign acts and unmistakability doctrines as being linked, reasoned that, if the government act is public and general, then the sovereign acts defense applies, unless, under the unmistakability doctrine, the government has made an "unmistakable commitment" not to exercise its sovereign powers.

Thus, under this version of the impracticability doctrine, involving the government, the government remains bound by the contract, not merely if the language or the circumstances so indicate, but only if the government has made an "unmistakable commitment" to that effect. This variation on traditional impracticability doctrine would be consistent with the important value of preserving sovereign power. "[I]n grants by the public, nothing passes by implication," Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 9 L.Ed. 773 (1883), and "contracts should be construed, if possible, to avoid foreclosing exercise of the sovereign power." Bowen v. Public Agencies Opposed to Social Sec. Entrapment, 477 U.S. 51, 52-53 (1986). But this understanding of the law is certainly inconsistent with Justice Souter's assumption that the sovereign acts doctrine is simply a prelude to application of the ordinary impracticability doctrine.

## IV. The Endangered Species Act Represents a Public and General Act for the Purposes of the Sovereign Acts Doctrine.

Plaintiffs argue that the sovereign acts doctrine does not bar their contract claims because application of the Endangered Species Act ("ESA") in this case represents a "targeted" action rather than a "public and general" act. This contention is mistaken and should be rejected.

Adoption of plaintiffs' extreme position would trivialize the sovereign acts defense because, under their view, agency implementation of a legislative mandate could never qualify as a sovereign act. As to any particular regulated entity, the enforcement of any type of legal mandate can be viewed as being targeted at the entity. But the critical question for the purpose of the sovereign acts doctrine is not whether a legal mandate has individualized impacts but rather whether the government, whether in enacting legislation or implementing legislation, is acting in order to affect specific individuals or to implement broad, public-regarding objectives.

In this case, there can be no question that the Bureau of Reclamation applied the legal mandates of the Endangered Species Act to the Klamath Project, in the same way that it has been applied to numerous other facilities and activities across the country, in order to carry out a national policy of species protection and restoration.

Accordingly, so far as we are aware, every other court that has addressed the issue has concluded that agency implementation of the Endangered Species Act constitutes a public and general act that overrides project-specific contractual arrangements. Cf. Klamath Irrig. Dist. v. United States, 67 Fed.Cl. 504, 537 (2005) (observing that "several courts have concluded that the enactment and subsequent enforcement of the ESA should be viewed as sovereign acts that override the Bureau's obligation to provide water under various contracts"). Indeed, the courts have so ruled with respect to the Klamath Project in particular. In Klamath Water Users Protective Association v. Patterson, 204 F.3d 1206, 1213 (9th Cir. 2000), the Ninth Circuit stated, "[W]hen an agency, such as Reclamation, decides to take action, the ESA generally applies to the contract." The Bureau's responsibilities under the ESA, the Court continued, "include taking control of the Dam when necessary to meet the requirements of the ESA, requirements that override the water rights of the Irrigators." Id. See also Kandra v. United States, 145 F.Supp. 1192 (D. Or. 2001) (rejecting the claim that the Bureau of Reclamation's implementation of the ESA with respect to the Klamath Project breached plaintiffs' contracts, citing Patterson for the proposition that plaintiffs' "contract rights to irrigation water are subservient to ESA").

Other courts have reached the same conclusion in other cases involving application of the ESA to other Bureau projects. See, Rio Grande Silvery Minnow v. Keys, 333 F.3d 1109, 1138-41 (10th Cir. 2003); O'Neill v. United States, 50 F.3d 677, 684 (9th Cir. 1995); Natural Resources

Defense Council v. Houston, 146 F.3d 118, 1126 (9th Cir. 1998); Maricopa-Stanfield Irrigation & Drainage Dist. v. United States, 158 F.3d 428, 438-39 (9th Cir. 1998). And, as this Court has previously recognized, the courts have also recognized that implementation of the mandates of the Endangered Species Act represents a public and general act in other contexts. Klamath Irrig. Dist., 67 Fed Cl. at 537 (citing decisions).[7]

V. The Unmistakability Doctrine Precludes a Suit Seeking Damages for an Alleged Breach of Contract.

Plaintiffs also are mistaken (Pls.Suppl.Op. at 6-9) in contending that the unmistakability doctrine does not apply in this case. Again, Plaintiffs seek to place more weight on Justice Souter's plurality opinion than it will bear. Justice Souter did adopt the distinctive position embraced by Plaintiffs. See Winstar, 518 U.S. at 881-82. But, just as plainly, the remaining concurring Justices, see id. at 919 (Scalia, J., concurring), and dissenting Justices, see id at 926-28 (Rehnquist, dissenting), did not. Indeed, as this Court has stated, "[f]ive justices.... disagreed with [Justice Souter's interpretation of the unmistakability doctrine]..., with the three concurring justices opining that the plurality's approach clashed with precedent." Cuyahoga, 57 Fed Cl. at 770. Moreover, the Federal Circuit, in accordance with this Court's analysis, has also rejected

---

[7] Plaintiffs seek to bolster their challenge to the government's sovereign acts defense by, among other things, challenging the scientific judgments underlying application of the ESA to the Klamath Project and arguing that the Bureau's actions under the ESA were purely "voluntary." NRDC anticipates that defendant-intervenor Pacific Coast Federation of Fishermen's Associations ("PCFFA") will explain why those arguments lack any factual basis and NRDC joins in those arguments. In any event, Plaintiffs are barred by the doctrine of collateral estoppel from relitigating these issues, which have already been thoroughly ventilated in the Ninth Circuit. Finally, if Plaintiffs' basic objection is that the Bureau's implementation of the ESA was legally defective, then Plaintiffs' remedy lay in a suit for injunctive relief under the Administrative Procedures Act, not a claim for damages for breach of contract. Cf. Lingle v. Chevron USA, Inc., 544 U.S. 528 (2005) (proper claim for compensation under the Takings Clause presupposes the legitimacy of the government action).

Justice Souter's approach. See Yankee Atomic, 112 F.3d 1569, 1579 (Fed. Cir. 1997) ("Five justices disagreed with the plurality's conclusion that the unmistakability doctrine was not available simply because the contracts were risk-shifting agreements."); Franklin Federal v. United States, 431 F.3d 1360, 1367-68 (Fed. Cir. 2005) (same). See generally Joshua Schwartz, "The Status of the Sovereign Acts and Unmistakability Doctrines in the Wake of Winstar: an Interim Report," 51 ALA.L.REV. 1177, 1186 (2000) (explaining that the concurring and dissenting justices in Winstar rejected Justice Souter's version of the unmistakability doctrine). In sum, there is not a shred of authoritative support for Plaintiffs' position on this issue.

More fundamentally, Justice Souter's approach to unmistakability is inconsistent with the basic function of contract law, which is to assign the risk of financial liability in the event of a default. Justice Souter took the position that holding the United States financially liable based on the statute in Winstar did not interfere with the government's sovereign powers because a judicial ruling imposing financial liability does not directly bar the government from proceeding to implement the statute. But, as Justice Scalia correctly explained, "[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: 'The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,-and nothing else.' Holmes, The Path of the Law (1897), in 3 The Collected Works of Justice Holmes 391, 394 (S. Novick ed.1995)." Winstar, 518 U.S. at 919. Thus, there is also no theoretical support for Plaintiffs' position.

VI. The Contract Claims Should Also be Dismissed under the Reserved Powers Doctrine.

Finally, Plaintiffs' contract claims should be rejected under the reserved powers doctrine. Plaintiffs offer two arguments for not applying the doctrine, neither of which is persuasive.

First, echoing their argument regarding the unmistakability doctrine, Plaintiffs contend

that the reserved powers doctrine is irrelevant when a party sues for monetary as opposed to equitable relief. But there is no authoritative support of this position. To be sure, Justice Souter embraced this view. See Winstar, 518 U.S. at 889. But, contrary to plaintiffs' reading of Justice Scalia's opinion in Winstar, that opinion cannot plausibly be read as embracing Justice Souter's position. In the relevant part of his opinion Justice Scalia states:

> "The scope and force of the "reserved powers"... defense[]-which the principal opinion thinks inapplicable based on its view of the nature of the contracts at issue here, ... - ha[s] not been well defined by our prior cases. The notion of 'reserved powers' seems to stand principally for the proposition that certain core governmental powers cannot be surrendered, see, e.g., Stone v. Mississippi, 101 U.S. 814 (1880); thus understood, that doctrine would have no force where, as here, the private party to the contract does not seek to stay the exercise of sovereign authority, but merely requests damages for breach of contract. To the extent this Court has suggested that the notion of 'reserved powers' contemplates, under some circumstances, nullification of even monetary governmental obligations pursuant to exercise of 'the federal police power or some other paramount power,' Lynch v. United States, 292 U.S. 571, 579 (1934), I do not believe that regulatory measures designed to minimize what are essentially assumed commercial risks are the sort of "police power" or "paramount power" referred to."

Winstar, 518 at 922-23. In this passage, Justice Scalia plainly lays out two alternative readings of the reserved powers doctrine, declining to definitively embrace one or the other, ruling that the government could not prevail under either version of the defense. Thus, Justice Scalia cannot be counted as embracing the idea that the reserved powers doctrine is beside the point simply because money is stake. Moreover, such a reading of Justice Scalia's opinion would be

inconsistent with his understanding (correct, in our view) that "[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance." Winstar, 518 U.S. at 519.

Second, Plaintiffs mistakenly assert that because the federal government has specific delegated powers it cannot be regarded as exercising sovereign authority. In a variety of contexts, the Supreme Court has recognized that the federal government is a sovereign entity that exercises sovereign powers. See, e.g., Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Com'n, 430 U.S. 442, 456 (1997) (declining to interpret the scope of the federal government's "sovereign powers" narrowly). Moreover, we know of no authority for Plaintiffs' suggestion that a government of delegated powers cannot be regarded as exercising the kinds of sovereign authority covered by the reserved powers doctrine. The seminal reserved powers case, Stone v. Mississippi, 101 U.S. 814 (1880), draws no such distinction, but rather holds that the government "cannot bargain away" what have been characterized as "core governmental powers," Winstar, 518 U.S. at 922 (Scalia, J., concurring), or "essential" sovereign attributes. United States Trust v. New Jersey, 431 U.S. 1, 23 (1977). There is no logical reason why this principle should not be as fully applicable to the federal government as to the states.

CONCLUSION

For the foregoing reasons, for the reasons stated in NRDC's opening memorandum on the contract issues, and for reasons expressed by PCFFA and the United States, the Court should grant the United States' motion for summary judgment as to Plaintiffs' contract claims.

Respectfully submitted,

s/ John. D. Echeverria
John D. Echeverria
Sanju Misra
Georgetown Environmental Law & Policy Institute
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9863
(202) 662-9005 (fax)

Hamilton Candee
Natural Resources Defense Council
111 Sutter St, 20th Floor
San Francisco, CA 94104
(415) 875-6100
(415) 875-6161 (fax)

June 26, 2006

`