IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, Defendant-Intervenor. | No. 01-591 L<br>Judge Francis M. Allegra |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendant United States hereby provides this notice of supplemental authority regarding the decision recently issued in Casitas Municipal Water District v. United States, No. 05-168L, slip op. (Fed. Cl. Oct. 2, 2006) (Weise, J.). The Casitas decision addresses certain issues that are pending before the Court in this case, including the availability of a defense under the sovereign acts doctrine to a breach of contract claim involving a federal reclamation contract and compliance with the Endangered Species Act. A copy of the Casitas decision is attached.

Dated: October 5, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

s/Kristine S. Tardiff

KRISTINE S. TARDIFF
Attorney of Record for the Defendant
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583/Fax: (603) 225-1577
E-Mail: kristine.tardiff@usdoj.gov

ORIGINAL

# In the United States Court of Federal Claims

FILED
OCT 2 2006
U.S. COURT OF FEDERAL CLAIMS

No. 05-168L
Filed: October 2, 2006

| | |
|---|---|
| CASITAS MUNICIPAL WATER DISTRICT, Plaintiff, v. THE UNITED STATES, Defendant. | Contract: (1) Costs associated with the construction of a fish passage facility that was built to remedy the injurious effects resulting from the operation of the water reclamation project constitute operation and maintenance expenses. (2) The provision in the parties' contract entitling plaintiff to "the perpetual right to use all water that becomes available through the construction and operation of the project" merely recites a condition of the parties' exchange and imposes no affirmative obligation on the government to guarantee plaintiff's water supply. Sovereign Acts Defense: (1) Where an agency action has no effect on the government's economic interests as a contractor, the government may successfully invoke the sovereign acts defense. (2) The fact that a government agency had available to it alternatives to the action it ultimately took in the implementation of a statute does not preclude the government, acting in its role of contractor, from raising an impossibility defense. |

Roger J. Marzulla and Nancie G. Marzulla, Marzulla & Marzulla, Washington, DC, counsel for plaintiff.

Kathleen L. Doster and James D. Gette, with whom was Assistant Attorney General Sue Ellen Wooldridge, U.S. Department of Justice, Environment and Natural Resources Division, Natural Resources Section, Washington, DC, counsel for defendant.

**OPINION**

WIESE, Judge.

Plaintiff, Casitas Municipal Water District (formerly the Ventura River Municipal Water District), entered into a contract with the United States Bureau of Reclamation for the construction and operation of a water reclamation project on the Ventura River in Ventura County, California ("the Ventura River Project"). The contract, commonly referred to as the "repayment contract," contemplated the expenditure by the United States of an agreed-upon ceiling amount of $30.9 million in construction costs, which was to be repaid by plaintiff over a period of 40 years. The contract additionally specified that plaintiff would assume all operation and maintenance costs of the project from the time of its completion.

Plaintiff now alleges that the United States breached the contract by requiring plaintiff to (i) construct a fish passage facility at a cost over and above the explicit ceiling amount on construction costs contained in the contract, and (ii) provide 3,200 acre-feet of water annually from the Ventura River Project to protect the West Coast steelhead trout in contravention of plaintiff's alleged contract right to the use of all of the river flow for irrigation.[1] The parties have crossed-moved for summary judgment and the court heard oral argument on August 30, 2006. For the reasons set forth below, we grant defendant's motion for summary judgment and deny plaintiff's cross-motion.

FACTS

On March 1, 1956, Congress authorized the construction of the Ventura River Project, a facility designed to supply Ventura County, California, with water for the irrigation of farmland as well as for other municipal, domestic, and industrial uses. Pub. L. No. 423, 70 Stat. 32 (1956). Pursuant to that grant of authority, the Secretary of the Department of the Interior, acting through the Bureau of Reclamation ("BOR"), entered into a contract with plaintiff ("Casitas" or the "District") on March 7, 1956, providing for the construction of the project. Under the terms of the contract, Casitas agreed to "repay to the United States the actual reimbursable [construction] cost, but not in excess of . . . $27,500,000" (later amended to $30,900,000), and upon completion of the project, to "take over and at its own expense operate and maintain the project works." In addition, the contract provided

[1] In its complaint, plaintiff also asserts that the requirement that it divert a portion of the Ventura River Project water supply for fish preservation purposes constitutes a Fifth Amendment taking for which just compensation is due. Pursuant to the agreement of the parties, however, resolution of this issue has been deferred pending a ruling on plaintiff's contract claim.

that "the District shall have a prior right in perpetuity to the use of the water made available by the project works, subject only to existing vested rights." Title to the project works, however, remained with the United States.

Before construction of the project began, a question arose concerning the need for the installation of a fish passage facility to accommodate the migration of the West Coast steelhead trout. Initially, the California Department of Fish and Game maintained that such a facility should be included as part of the proposed construction. The Department later changed its position, however, accepting plaintiff's written assurance that "if and when [the] need develops our District will cooperate fully with your Department toward the installation of an adequate fish ladder." The project, as completed, thus contained no such fish passage facility.

Forty years after the construction of the project, the issue of fish protection again emerged. On May 27, 1994, the National Marine Fisheries Service ("NMFS") proposed listing the West Coast steelhead trout as an endangered species, 59 Fed. Reg. 102 (May 27, 1994), a step NMFS in fact took on August 18, 1997, 62 Fed. Reg. 159 (Aug. 18, 1997). As a result of this determination, it became unlawful under Section 9 of the Endangered Species Act ("ESA") "for any person subject to the jurisdiction of the United States to . . . take any such [endangered] species within the United States." 16 U.S.C. § 1538(a)(1) (2000).[2]

While NMFS was contemplating the classification of the steelhead trout as an endangered species, Casitas itself was concerned about the adverse effects of the project's operation on the steelhead population in the watershed and began planning for impending federal ESA requirements. Casitas ultimately joined with a number of its local water users to create a Habitat Conservation Plan to minimize the water supply impacts of listing the steelhead trout as an endangered species. This effort was cut short in December 1998, however, when Casitas received notice that California Trout, Inc., a nonprofit environmental group, intended to file suit charging both Casitas and BOR with violating the ESA by operating the project without a fish ladder or other means of ensuring the passage of migrating fish and without fish screens to prevent their capture and entrapment.

To address the concerns raised by California Trout, Casitas requested BOR to seek an informal consultation with NMFS pursuant to Section 7 of the ESA to enlist that agency's technical assistance in the design, construction, operation, and

[2] To "take" an endangered species as that term is used in the ESA means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19).

maintenance of a fish ladder and screen for the project.[3] Additionally, Casitas engaged the services of consulting engineers to develop a biological assessment of the project addressing, inter alia, the status of the steelhead trout in the Ventura River watershed, the measures necessary to mitigate the adverse effects of the project on the steelhead population in the watershed, and the design of a fish ladder and screen.

Over the next several years, Casitas, BOR, and NMFS held regular meetings to develop the design of a fish passage facility and new operations criteria for the project that would meet the needs of the steelhead trout. The results of this process were reflected in a final Biological Opinion issued by NMFS on March 31, 2003. That opinion concluded that construction of the fish passage facility as designed, together with a new set of operating criteria to facilitate upstream and downstream passage of the fish, were necessary to avoid jeopardy to the steelhead trout.

Thereafter, Casitas adopted a resolution agreeing to implement the requirements set forth in the Biological Opinion. That resolution, however, was conditioned upon Casitas's requesting and receiving from BOR a directive ordering it to proceed with the construction of the fish passage facility and to implement the related operational requirements set forth in the Biological Opinion. BOR provided such a directive on May 2, 2003, saying in part as follows:

> In order to be exempt from the Take Provisions of the ESA, non-discretionary terms and conditions have been established in the [Biological Opinion] and must be implemented.
>
> The Casitas Municipal Water District operates the Ventura Project on Reclamation's behalf, pursuant to Contract 14-06-200-5257 as amended, and as such must also comply with the Terms and Conditions of the [Biological Opinion].

In compliance with BOR's directive, Casitas constructed the fish passage facility for a total cost of approximately $9.1 million and implemented the revised operational criteria contained in the Biological Opinion, thus incurring an alleged water loss of up to 3,200 acre-feet per year. Casitas in turn filed suit in this court on January 26, 2005, seeking contract damages and/or just compensation pursuant to the

---

[3] Pursuant to Section 7 of the ESA, a "consultation with and with the assistance of the Secretary" is the first step in the process of determining whether any action that is authorized, funded, or carried out by a federal agency is "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

Fifth Amendment. As noted above, we limit the discussion below to plaintiff's breach of contract claim.

## DISCUSSION

Plaintiff contends that defendant breached the contract in 2003 when it required Casitas to build a $9.1 million fish passage facility and to relinquish a portion of the project water supply to assist the migratory passage of the steelhead trout in the Ventura River. Defendant counters that the costs at issue here were not incurred in the performance of work deemed necessary for completion of the project and therefore do not fall within the cost reimbursement limitations of the contract. Rather, defendant maintains, these costs are more appropriately regarded as operation and maintenance expenditures and as such are costs for which plaintiff is contractually responsible. Defendant additionally argues that the contract imposed no duty on the government to guarantee Casitas's water supply and that any reduction in that supply was the result of compliance with the ESA—a sovereign act for which the government in its role as a contractor is not responsible. We address these arguments in turn below.

### A.

Article 7 of the parties' contract (titled "Transfer of Operation and Maintenance to District") provides that upon notice of transfer of the project works by the United States, "[t]he District agrees to accept, upon the effective date of the transfer notice, the care, operation, and maintenance of the transferred works and thereafter, without expense to the United States, to care for, operate, and maintain the transferred works . . . ." Defendant maintains that the costs of constructing the fish passage facility are thus plaintiff's contractual responsibility since those costs are properly regarded as operation and maintenance expenditures.

In support of this argument, defendant relies on Nampa & Meridian Irrigation District v. Bond, 268 U.S. 50 (1925), a case in which, as here, the court was called upon to address the classification of construction costs under a repayment contract between an irrigation district and BOR. Therein, the Supreme Court determined that costs associated with the construction of a drainage system built to relieve the injurious effects of a rise in groundwater levels caused by the irrigation project constituted operation and maintenance expenditures that were chargeable to the irrigation district, rather than additional charges for construction for which the irrigation district was not contractually responsible. In reaching its conclusion, the Court drew a distinction between expenditures necessary to construct an irrigation system and those necessary "to remedy conditions brought about by the *use* of the system." Id. at 53. The latter, the Court declared, constituted operating charges. The Court explained its reasoning as follows:

> Section 4 of the Reclamation Extension Act . . . prevents an increase in the *construction* charges to be imposed upon the water users without the consent of a majority of them after the amount thereof has been fixed. But this is far from saying that, after the completion of the irrigation system in accordance with the original plan in respect of which the construction charges were fixed, should the need arise to remedy conditions brought about by the *use* of the system, the government must bear the expense if a majority of the water users withhold their consent. Expenditures necessary to construct an irrigation system and put it in condition to furnish and properly to distribute a supply of water are chargeable to construction: but, when the irrigation system is completed, expenditures made to maintain it as an efficient going concern, and to operate it effectively to the end for which it was designed are, at least generally, maintenance and operating expenses. The expenditure in question was not for extensions to new lands, or for changes in or additional to the system made necessary by faulty original construction in violation of contractual or statutory obligations, but was for the purpose of overcoming injurious consequences arising from the normal and ordinary operation of the completed plant which, so far as appears, was itself well constructed. The fact that the need of drainage for the district lands, already existing or foreseen, had been supplied, and the cost thereof charged to all the water users as a part of the original *construction*, by no means compels the conclusion that an expenditure of the same character, the necessity for which subsequently developed as an incident of operation, is not a proper *operating* charge. The same kind of work under one set of facts may be chargeable to construction and under a different set of facts may be chargeable to maintenance and operation.

Id. at 53–54 (citations omitted).

As in Nampa, we are concerned here with construction costs that were incurred after the irrigation project was satisfactorily completed to remedy injurious effects encountered as a consequence of the project's operation. Except for differences in the nature of the injuries involved—in Nampa, rising groundwater levels that impaired the agricultural usefulness of the land, and in the instant case, impediments to fish passage that threatened the survivability of the steelhead trout—the cases are identical. According to Nampa, then, the expenditures incurred

by Casitas in the construction of the fish passage facility must be regarded as operation and maintenance expenses.[4]

Plaintiff attempts to distinguish Nampa by asserting that the addition of a structure that was originally contemplated as part of a reclamation project but never built (i.e., the fish ladder and screen) is a construction cost, not an expense of ordinary maintenance and operation. In support of this proposition, plaintiff refers us to United States v. Fort Belknap Irrigation District, 197 F. Supp. 812, 821 (D. Mont. 1961), in which the court held that the construction of a new spillway could not be charged to operation and maintenance but was instead a construction charge because the spillway as originally planned and paid for by the irrigation districts was never completed and for more than 40 years the system had been operated without a spillway.

We do not believe, however, that Fort Belknap supports plaintiff's position. The spillway construction at issue in that case was intended to achieve what had originally been planned and paid for but never satisfactorily accomplished in the first instance—the construction of a functioning spillway. Fort Belknap, in other words, was not about adding a capability that may have been discussed but never constructed; it was, instead, about remedying a deficiency in the original construction. In simplest terms, Fort Belknap expresses the idea that an irrigation district should not have to pay twice for the same construction.

We do not encounter that situation in the instant case. As the facts reveal, the installation of a fish ladder and screen, though discussed, was never planned as part of the original construction and no funds to support such facilities were ever expended. At the time of its transfer to Casitas, then, the project was deemed to be complete without the addition of a fish ladder and screen. With the passage of time, however, operation of the project proved to be injurious to the steelhead trout. The decision in Nampa declares that such construction costs undertaken to correct the injurious effects of system operation are chargeable as operation and maintenance expenditures.

---

[4] Even if our resolution of this issue were not dictated by Nampa, we would be unable to accept plaintiff's contention that defendant breached the contract by requiring Casitas to expend $9.1 million in excess of its obligation under the contract to reimburse the United States for construction costs up to the maximum amount of $30.9 million. The contract provision upon which plaintiff relies (Article 5, titled "Payment By District") does not extend to all construction costs but rather is confined to the actual reimbursable costs incurred by the United States "in providing the project works." The reimbursement obligation, in other words, extends only to the construction costs incurred in the completion of the project and not to construction costs that may arise after completion. As to the latter, the contract is silent.

Plaintiff also cites Central Arizona Water Conservation District v. United States, 32 F. Supp. 2d 1117 (D. Ariz. 1998), to support the proposition that the installation of a fish ladder and screen qualifies as a construction cost rather than an operating and maintenance expenditure. In Central Arizona, the court held that a water district was not responsible for construction costs in excess of the contract's repayment ceiling amount, noting that the "cost estimates . . . did not take into consideration the full impact of new environmental legislation, including the Endangered Species Act." Id. at 1123. Plaintiff maintains that the quoted text affirms its position that construction costs made necessary by the ESA are properly chargeable to construction rather than maintenance and operation.

We cannot accept plaintiff's argument. Notably, the court's observation regarding the ESA was not central to its holding and as such may be disregarded as dicta. More importantly, however, the case does not address the question we now have before us—whether construction costs incurred after project completion to remedy later-recognized operational hazards are properly chargeable as operation and maintenance expenditures. The decision in Nampa tells us the answer is yes.

Despite the weight of the case law in the government's favor, however, plaintiff contends that defendant should be estopped from arguing that the costs in question are not chargeable to contract construction because defendant successfully argued in an earlier suit involving the same contract that all construction-related expenditures were chargeable as contract construction costs. United States v. Casitas Mun. Water Dist., 735 F.2d 1373 (9th Cir. 1984) (unpublished table decision). Plaintiff thus argues that defendant, having prevailed on its original argument, should not now be permitted to do an about-face and argue in favor of a different contract interpretation.

Plaintiff is of course correct that defendant may not assert a litigating position contrary to a position on which it had prevailed in an earlier litigation between the same parties involving the same subject matter. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996) (precluding a party who "successfully urges a particular position in a legal proceeding . . . from taking a contrary position in a subsequent proceeding where its interests have changed"). The instant case, however, is not one in which defendant is taking up a position contrary to the one on which it had earlier prevailed.

In the 1984 litigation, the United States sought a declaratory judgment to resolve the question of whether the costs of relocating a water main, initially placed by the United States alongside a state highway pursuant to a state-granted encroachment permit and later moved to accommodate highway reconstruction work, were chargeable, as the United States contended, as construction costs for which Casitas would be liable (up to the contractual limit of $30.9 million). Casitas argued

that the costs should not be classified as construction costs under the contract since they were incurred after Casitas had received notice of the contract's final reimbursable cost.[5] Holding that such costs were indeed chargeable to Casitas, the Ninth Circuit stated:

> Regardless of how one characterizes the relocation costs, the enabling legislation and the contract indicate that both Congress and the parties intended that Casitas pay all of the costs connected with the project. Article 9 of the contract clearly states, "the District's construction obligations shall embrace all expenditures of whatsoever kind in connection with, growing out of, or resulting from work performed in connection with the project."

Casitas, No. 83-6053, slip op. at 5 (9th Cir. May 4, 1984). The court additionally noted that "[b]oth parties knew that the cost[s] would be incurred before project completion" and that those costs "were not incurred to remedy conditions brought about by the use of the system." Id. at 4–5.

Given the basis for the court's conclusion—that the costs were construction costs because they were not incurred to remedy conditions resulting from the project's operation—we discern no inconsistency between the position defendant advanced in the earlier litigation and the argument it presents here. Although both situations involve construction costs, the critical distinction is that the instant costs were incurred to remedy problems arising from the operation of the project. Under the rule laid down in Nampa, 268 U.S. at 53–54, these costs must be regarded as operating costs chargeable to Casitas.

B.

Plaintiff's second principal argument focuses on Article 4 of the contract (titled "Permanent Right to the Use of Water") which provides that "the District shall have the perpetual right to use all water that becomes available through the construction and operation of the Project." Plaintiff maintains that defendant breached this contract provision by requiring Casitas to dedicate a portion of the irrigation system's water supply—up to 3,200 acre-feet per year—to the water passage needs of migratory fish in accordance with the requirements of the Biological Opinion. This forced relinquishment of use, plaintiff maintains, violated its

[5] Article 2 of the contract provided that the project would be deemed to be complete upon the contracting officer's written notification to Casitas either that "total expenditures have been made to the limit [specified in the contract], or so much thereof as the contracting officer considers necessary and useful for the construction of the project works."

unambiguous contract right to the exclusive use of "all water" made available by construction of the Ventura River Project.

In defendant's view, the diversion of project water to ensure the survival of the steelhead trout states no enforceable contract claim against the United States. In support of this position, defendant argues first that Article 4 is not a promise by BOR to supply water to Casitas, but is instead simply an acknowledgment of Casitas's existing right to the use of the project water as granted under a permit issued by the State Water Resources Control Board. Article 4, in other words, merely recites a condition of the parties' exchange and as such places no affirmative obligation on BOR to act as the guarantor of Casitas's water supply.[6] In addition, defendant argues that any implied obligation that BOR may have had under Article 4 to refrain from interfering with Casitas's water rights was not breached by the issuance of the May 2, 2003, directive advising Casitas that it was obligated to comply with the requirements of the Biological Opinion. Those requirements, defendant maintains, originated in a sovereign act—NMFS's issuance of the Biological Opinion under the ESA—that was as much binding on BOR as owner of the project as it was on Casitas as operator of the project. Given these circumstances, defendant contends that any intrusion by BOR upon Casitas's water rights originated in the need for compliance with the requirements of the Biological Opinion and not in the independent actions of BOR acting as a contracting party.

Plaintiff, for its part, maintains that the proper application of the sovereign acts doctrine requires a focus not on the ESA itself, but on the individual government actions taken pursuant to the ESA. Plaintiff thus argues that defendant may not invoke the sovereign acts defense to shield itself from liability for the loss of water caused by the change in the project's operational criteria because (i) the Biological Opinion, and ultimately BOR's letter of May 2, 2003, directing its implementation, do not qualify, as application of the sovereign acts defense would require, as governmental actions that are public and general in their reach but are instead actions specifically targeted at the project and its operation, and (ii) BOR's performance of

---

[6] Defendant's interpretation of Article 4 is confirmed by Article 25 of the contract (titled "United States Not Liable for Water Shortage") which provides in relevant part, as follows:

> (a) There may occur at times a shortage in the amount of water available for furnishing to the District through and by means of the Project, but in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage direct or indirect to the District or the water users, arising from a shortage on account of errors in operation, drought, or unavoidable cause.

its contract responsibilities was not rendered impossible by the ESA but rather by the requirements of a discretionary remedy imposed by NMFS (the construction of a fish ladder and screen in lieu of a financially more modest measure of relief, e.g., fish trapping and trucking). Based on these circumstances, plaintiff maintains that the sovereign acts defense is unavailable as a matter of law.

The sovereign acts doctrine is a defense to a breach of contract claim that may be invoked by the government, acting as a contracting party, where its performance of a contract duty is rendered impossible because of an intervening act of the government, acting in its sovereign capacity, that was not anticipated at the time the contract was entered into and the risk of which was not otherwise assumed. United States v. Winstar Corp., 518 U.S. 839, 891–92, 907–08 (1996). In essence, the sovereign acts doctrine extends to the government in its role as contractor the same principle of discharge of duty on grounds of impossibility of performance that applies in contracts between private parties. Restatement (Second) of Contracts §§ 261, 264 (1981).

An important limitation on the government's use of the sovereign acts defense, however, is that the sovereign act must be public and general in its reach; the government may not use its power as a sovereign to target contracts to which it is a party to bar performance of what it had contractually committed itself to do. Winstar, 518 U.S. at 895–98. Where that form of governmental self-help has occurred, the government as contractor may not avail itself of the sovereign acts defense to seek discharge on grounds of impossibility. Id. at 900–03. Instead, the failure to perform will be deemed a breach of contract. Id.

This last point takes us back to plaintiff's several arguments against the applicability here of the sovereign acts defense. Plaintiff maintains, first of all, that where governmental action affecting the performance of a contract is not specifically spelled out in the words of a statute but rests instead on the requirements prescribed by an executive agency acting in implementation of the statute's more broadly stated policy objectives, then it is those requirements that are to provide the baseline for determining whether the government may rely on the sovereign acts defense. And, therefore, the argument continues, when, as here, those requirements, even though prescribed in furtherance of broad public policy objectives, specifically target a particular contract to which the government is a party, then the sovereign acts defense is not available.

We agree with the proposition that for purposes of determining the applicability of the sovereign acts defense, the actions of an administrative agency taken in fulfillment of policy objectives declared in a statute must be examined in the same light as if Congress itself had directed those actions. This is the case because, as is generally recognized in administrative law, "[w]hen Congress enacts a statute

to be administered by an agency, it has delegated to the agency resolution of all policy disputes that arise under that statute that Congress did not itself resolve." Richard J. Pierce, Jr., Administrative Law Treatise § 3.3, at 144 (4th ed. 2002).[7]

Fundamentally, then, the actions of the agency are to be seen as the actions of Congress. It is therefore appropriate to proceed, as plaintiff contends, by examining the applicability of the sovereign acts defense in light of NMFS's actions under the ESA rather than in light of the ESA itself. That said, however, we do not agree with plaintiff's contention that because NMFS's Biological Opinion is specifically focused upon the Ventura River Project and its mode of operation, such targeting renders the sovereign acts defense unavailable to the government.

The targeting of a particular contract is not itself an action that would foreclose reliance on the sovereign acts doctrine. Rather, the defense is unavailable where the government's action also serves to relieve the government of its own contractual responsibilities. The Supreme Court explained this principle as follows:

> [G]overnmental action will not be held against the Government for purposes of the impossibility defense so long as the action's impact upon public contracts is . . . merely incidental to the accomplishment of a broader governmental objective. See O'Neill v. United States, 231 Ct. Cl. 823, 826 (1982) (noting that the sovereign acts doctrine recognizes that "the Government's actions, otherwise legal, will occasionally incidentally impair the performance of contracts"). The greater the Government's self-interest, however, the more suspect

[7] In Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843–44 (1984) (citation and footnotes omitted), the Supreme Court explained the role of an administrative agency acting in furtherance of a statutory purpose as follows:

> "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

> becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence, and where a substantial part of the impact of the Government's action rendering performance impossible falls on its own contractual obligations, the defense will be unavailable.

Winstar, 518 U.S. at 898 (footnote omitted). The Court went on to identify as governmental self-interest those "instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties." Id. at 896.

In the instant case, however, neither the Biological Opinion nor BOR's May 2, 2003, letter implementing it, effected the shifting of anticipated contract costs from BOR to Casitas—a circumstance that wholly undermines plaintiff's objection to defendant's sovereign acts defense. BOR, as we have said, had no obligation to supply water to Casitas, but only to respect the water rights that Casitas held under law. Nor was BOR's observance of that obligation affected by the issuance of the Biological Opinion. In short, no economic advantage accrued to the United States, as a contracting party, as a result of the issuance and implementation of the Biological Opinion so as to invalidate defendant's sovereign acts defense.

Even if the United States received no economic advantage from the Biological Opinion or from BOR's May 2, 2003, letter implementing it, however, plaintiff argues that the sovereign acts defense is nonetheless inapplicable because defendant cannot claim impossibility of performance when it had other options available to it. Specifically, plaintiff contends that its annual loss of 3,200 acre-feet of water was neither required by the ESA nor essential for the successful migratory passage of the steelhead trout, but was instead a discretionary remedy chosen by NMFS. A far less elaborate and less costly system (e.g., fish trapping and trucking), plaintiff maintains, would have accomplished NMFS's goals and, at the same time, permitted Casitas to retain a badly needed water supply. Given, then, both the absence of any specific directive in the ESA regarding the means of ensuring fish preservation and the availability of an alternative approach to accomplishing that goal without accompanying water loss, plaintiff contends that defendant's contractual obligation to honor Casitas's water rights was not rendered impossible by a sovereign act but rather was abridged by a wholly discretionary determination instigated by NMFS. Under such circumstances, plaintiff maintains, the defense of impossibility based on a sovereign act must fail.

This argument too is unavailing. The premise implicit in plaintiff's position—that BOR may not invoke the sovereign acts defense because it was responding to a discretionary directive on the part of NMFS—is not analytically sound. As noted above, for purposes of determining the applicability of the

sovereign acts defense, no meaningful distinction may be drawn between statutes whose implementing details have been spelled out by Congress and statutes whose implementation Congress has left for administrative determination. In either case, the governmental action is sovereign in character and where its effect is to render contract performance impossible (even though the action is otherwise public and general in its reach), the sovereign acts defense may be invoked. Thus, the fact that NMFS could have addressed the issue of ensuring fish passage by a means other than requiring the dedication of a certain water supply does not alter the sovereign character of its action any more than if that requirement had originated with Congress itself.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied.