# In The United States Court of Federal Claims

Nos. 01-591 L, 01-5910L through 01-59125 L

(Filed: March 16, 2007)

| | | |
|---|---|---|
| KLAMATH IRRIGATION DISTRICT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,<br><br>Defendant-Intervenor. | * | Motion for summary judgment under RCFC 56; Contracts for irrigation water from the Klamath Basin; Claimed breaches based upon refusal to deliver water during drought; Sovereign acts doctrine; Endangered Species Act is a sovereign act; Focus of sovereign acts doctrine; Relationship of sovereign acts doctrine to common law impossibility defense; *Winstar* plurality opinion compared to *Horowitz*, *Commonwealth Edison* and other Court of Claims and Federal Circuit decisions; Defense sustained; No breaches found; Cases dismissed. |

## OPINION

*Nancie Gail Marzulla and Roger J. Marzulla*, Marzulla & Marzulla, Washington, D.C., for plaintiffs.

*Kristine Sears Tardiff*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Sue Ellen Woolridge*, for defendant.

*Todd Dale True*, Earthjustice Legal Defense Fund, Seattle, Washington, and *Robert B. Wiygul*, Waltzer & Associates, Biloxi, Mississippi, for defendant-intervenor.[1]

[1] *Amicus curiae* memoranda in support of defendant were filed by John D. Echeverria, Georgetown Environmental Law & Policy Institute, Georgetown University Law School, on behalf of the Natural Resources Defense Council, and by Scott C. Williams, on behalf of the Yurok and Klamath Tribes. Other *amici* have participated in various stages of this litigation, including the State of Oregon, the Sierra Club, the Northcoast Environmental Center, Waterwatch of Oregon, the Oregon Natural Resources Council, the Klamath Forest Alliance, the Wilderness Society, and the Institute for Fisheries Resources.

**ALLEGRA, Judge**:

These consolidated cases have their genesis in temporary reductions made by the Department of Interior's Bureau of Reclamation (the Bureau) on the use, for irrigation purposes, of the water resources of the Klamath Basin of southern Oregon and northern California. In their amended complaints, plaintiffs aver that the Bureau's actions effectuated, alternatively, a takings and a breach of contract. Previously, this court held that plaintiffs' interests in the use of Klamath Basin water did not constitute cognizable property interests for purposes of the Takings Clause, and, therefore, that plaintiffs were not entitled to compensation under the Fifth Amendment. *Klamath Irr. Dist. v. United States*, 67 Fed. Cl. 504, 531-535, 539-40 (2005). The court instead held that plaintiffs' claims sound, if at all, in contract. *Id.* at 535-37. At issue in the pending motion is whether the so-called "sovereign acts doctrine" provides a complete defense to what are now viewed only as breach of contract claims. After carefully considering the extensive briefing on this issue, the court concludes that the doctrine, indeed, precludes plaintiffs from recovering in these actions.

## I. BACKGROUND

This court's prior opinion fully describes the factual background of this litigation and held that the facts listed therein would be deemed established for purposes of future proceedings under RCFC 56(d). *See Klamath Irr. Dist.*, 67 Fed. Cl. at 507 n.2, 507-14. Nonetheless, a brief recitation of those facts, insofar as is relevant here, is in order.

### A.

The plaintiffs in these consolidated actions are 13 agricultural landowners and 14 water, drainage or irrigation districts (the irrigation districts) in the Klamath River Basin area of Oregon and northern California. They receive, directly or indirectly, water from the Klamath Project irrigation works constructed and operated by the Bureau pursuant to the Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (codified, as amended, at 43 U.S.C. §§ 371 *et seq.*) (the Reclamation Act). The Reclamation Act gives the Secretary of the Interior (the Secretary) legal authority to reclaim arid lands in certain states through irrigation projects. Once land has been so claimed, the Department of the Interior, through the Bureau, is responsible for constructing reclamation projects and for administering the distribution of water to agricultural users. *See* Reclamation Act, §§ 2-10, 32 Stat. 388-90. The original terms of the Reclamation Act permitted the United States to enter into irrigation contracts with individual homesteaders, but, as a result of several amendments, current law provides that the United States may only enter into new water distribution contracts with organized irrigation districts. 43 U.S.C. §§ 423(e), 485h(d).

The Klamath River Basin, naturally a semi-arid region, is the site of extensive water reclamation and irrigation projects constructed pursuant to the Reclamation Act. *See Bennett v. Spear*, 520 U.S. 154, 158-59 (1997); *Tulelake Irrigation Distr. v. United States*, 342 F.2d 447, 448-49 (Ct. Cl. 1965). The Klamath Project, begun in 1905, provides water to about 240,000

acres of irrigable land and several national wildlife refuges. It is operated by the Bureau to "serve[] and affect[] a number of interests," including the supply of irrigation water to agricultural interests in the Klamath River Basin and the supply of water to the Tule Lake and Lower Klamath National Wildlife Refuges "for permanent and seasonal marshlands and irrigated crop lands." *Pacific Coast Federation of Fishermen's Ass'ns v. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1230 (N.D. Cal. 2001) (hereinafter *PCFFA*). Water for the project is stored primarily in Upper Klamath Lake, on the Klamath River in Oregon; the Link River Dam regulates water flows from Upper Klamath Lake into the lower portions of the Klamath River. *See Kandra v. United States*, 145 F. Supp. 2d 1192, 1196 (D. Or. 2001). The Klamath Project lacks a major water storage reservoir, and because Upper Klamath Lake is itself relatively shallow and "unable to capture and store large quantities of water from spring run-off," the Bureau is unable to store enough water during wet years for use in subsequent dry years – a fact that apparently makes the Klamath Project more vulnerable to droughts. *Id.* at 1197. In operating the Klamath Project, the Bureau prepares periodic streamflow forecasts and annual operating plans "in order to provide operating criteria and to assist water users and resource managers in planning for the water year." *Kandra*, 145 F. Supp. 2d at 1197.

The Endangered Species Act (ESA), compels the Bureau, like all federal agencies, to ensure that its operation of the Klamath Project is not "likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). Under the ESA, the Bureau is required to perform a biological assessment "for the purpose of identifying any endangered species which is likely to be affected" by the operations of the Klamath Project. 16 U.S.C. §1536(c)(1). If the Bureau determines that its proposed action may affect an endangered or threatened species, it must request a "formal consultation" with the National Marine Fisheries Service (NMFS) or the Fish and Wildlife Service (FWS), in response to which the appropriate agency will produce a biological opinion. *See* 16 U.S.C. §§ 1536(a)(2), 1536(b); 50 C.F.R. § 402.14. If that opinion concludes that the proposed action is likely to jeopardize a protected species, the Bureau must modify its proposal to alter that result.

For decades, Klamath Basin landowners generally received as much water for irrigation as they needed. In severe drought years, they simply received somewhat less. That changed in the spring of 2001, when several federal agencies produced studies indicating that water levels in the basin were so low as to threaten the health and survival of certain endangered species. Water forecasts for 2001 predicted that year would be "critical[ly] dry," with an inflow volume into Upper Klamath Lake of 108,000 acre-feet from April through September – "the smallest amount of inflow on record." *Kandra*, 145 F. Supp. 2d at 1198. In developing its operating plan for 2001, the Bureau performed a biological assessment and concluded that operation of the Project was likely to affect adversely three endangered species: the coho salmon, the shortnose suckerfish, and the Lost River suckerfish. Accordingly, the Bureau forwarded its biological assessments and requested the initiation of formal consultation with the NMFS and the FWS under section 7 of the ESA. *Id.* at 1198. Shortly thereafter, the agencies issued biological opinions consistent with the Bureau's assessments, concluding that continued operation of the Klamath Project would jeopardize the aforementioned species. The opinions recommended

"reasonable and prudent alternatives"[2] to address this threat. One such alternative was a reduction in the amount of water available during 2001 for irrigation from Upper Klamath Lake.

B.

The distribution of Klamath Project water is governed, in part, by contracts between the individual irrigation districts and the Bureau, which set forth, *inter alia*, the districts' respective priorities to water use within the Project in the event of a water shortage, and the United States's resultant liability therefor. The Bureau recognizes three basic types of contracts for reclamation water, designated, in descending order of priority, as "Class A," "Class B," and "Class C," respectively.

Class A contracts are entered into pursuant to Section 9(d) of the Reclamation Act, under which irrigation districts that receive deliveries of water from the Project are obligated to pay a proportionate share of the Project's initial construction costs and its annual operation and maintenance costs. *See* 43 U.S.C. § 485h(d). As exemplified by the Tulelake Irrigation District contract, these districts typically have a contractual right to receive "all water needed by the District for beneficial irrigation uses," and in times of a water shortage, the right of the district to water is "equal to those of others executing similar contracts under the Reclamation Act . . . and shall be prior to those rights conferred pursuant to contracts executed under . . . the Warren Act." Plaintiffs Tulelake Irrigation District and Klamath Irrigation District both have such "Class A" contracts with the Bureau.

One of the Class A contracts, that of Van Brimmer Ditch Company (VBDC), has first priority to irrigation water from the Project. VBDC was the first entity to contract with the Bureau for Klamath Project water, and by the terms of its original contract, was subject only to priorities established prior to reclamation by the United States and not to any priority of the United States or any party claiming through the United States. In 1922, VBDC's contract was superceded when the United States entered into a contract with the Klamath Irrigation District (KID), under which KID assumed liability for the annual cost of carrying and delivering water to VBDC. *Klamath Irr. Dist.*, 67 Fed. Cl. at 529. The successor contract retained for VBDC the highest priority among all the Klamath Project contracts.

Class B contracts are entered into pursuant to the Warren Act, Ch. 141, 36 Stat. 925, codified at 43 U.S.C. § 523, which permits the Secretary to contract for Project water to the extent that it has *excess* storage or carrying capacity. The Warren Act makes clear that these Class B contracts must "preserv[e] a first right to lands and entrymen under the project," *id.*, that is, to Class A contract holders. Accordingly, when there is no excess capacity, water is not provided to any irrigation districts holding Class B contracts. Among the Class B contracts,

---

[2] The ESA directs the Secretary of the Interior or the Secretary of Commerce to suggest "reasonable and prudent alternatives" when consulted about Federal activities that might adversely affect endangered species. *See Tulare Lake Basin Storage Dist. v. United States,* 49 Fed. Cl. 313, 315 n.2 (2001) (citing 16 U.S.C. § 1536(b)(3)(A)); *see also* 16 U.S.C. § 1532(15).

priority is determined by date of contracting. Such contracts were entered into by plaintiffs Klamath Drainage District, Poe Valley Improvement District, Sunnyside Irrigation District, Klamath Basin Improvement District, Midland District Improvement Co., Malin Irrigation District, Enterprise Irrigation District, Pine Grove Irrigation District, Westside Improvement District No. 4 (Colonial Realty Co.), and Shasta View Irrigation District.

Class C contracts are entered into with individual farmers for rental water on an "if and when available" status. They have third priority of use, and are the first to be deprived of water in the event of a shortage. None of the plaintiffs in this case have such contracts.

In all the contracts but that with VBDC, the United States expressly disclaims liability for water shortages attributable to drought. For example, in this regard, the Klamath Irrigation District contract states –

> On account of drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs and, while the United States will use all reasonable means to guard against such shortage, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom . . . .

Most of the other district contracts have identical provisions, while a few have similar provisions that do not include the phrase "or other causes" in the first line of the above quote.[3]

C.

This litigation arose not long after the Bureau issued its revised operation plan on April 6, 2001, in which it terminated altogether the delivery of irrigation water to plaintiffs.[4] On April 9, 2001, two of the plaintiffs herein, Klamath Irrigation District and the Tulelake Irrigation District, filed actions in the U.S. District Court for the District of Oregon, alleging, *inter alia*, breach of contract, challenging the validity of the biological opinions and seeking to enjoin the Bureau from implementing the revised operation plan. That court denied a preliminary injunction motion, and the two districts voluntarily dismissed their suit in early October 2001. On October

---

[3] *See* Tulelake Irrigation District contract, art. 26; Klamath Drainage District contract, art. 24; Sunnyside Irrigation District contract, art. 9; Klamath Basin Improvement District contract, art. 4; Malin Irrigation District contract, art. 11; Westside Improvement District No. 4/Colonial Realty Company contract, art. 13; Shasta View Irrigation District contract, art. 11. Others of the contracts contained water shortage clauses that are somewhat different from that in the Klamath District contract. *See* Poe Valley Improvement District contract, art. 11**;** Midland District Improvement Company contract, art. 5; Enterprise Irrigation District contract, art. 10 Pine Grove Irrigation District contract, art. 10

[4] Plaintiffs concede that defendant released 70,000 acre-feet of Klamath Project water to users in July of 2001, but assert that this water came too late to allow them to grow crops.

11, 2001, plaintiffs then brought suit in this court, raising two takings claims under the Fifth Amendment. On March 24, 2003, they filed an amended complaint, in which they added a breach of contract count.

In September 2003, plaintiffs filed a motion for partial summary judgment seeking a determination that their interests in Klamath Project water were not property interests at issue in an ongoing state-law adjudication of rights proceeding in Oregon state courts. On October 3, 2003, defendant filed a cross-motion for summary judgment on the issue of the nature and scope of plaintiffs' property interest in Klamath Project water and the question whether that interest was a compensable property interest for purposes of the Takings Clause of the Fifth Amendment. On November 13, 2003, this court, by unpublished order, granted plaintiffs' motion for partial summary judgment, but did not resolve defendant's outstanding cross-motion. Shortly thereafter, on January 27, 2004, plaintiffs filed a cross-motion for summary judgment on the issues of the nature and scope of their property interest, and whether the United States was liable to pay just compensation for the taking of that interest.

This case was transferred to the undersigned on December 9, 2004. On January 11, 2005, plaintiffs were permitted to file a second amended complaint, in which they reduced their damages claim. On February 28, 2005, the court granted a motion to intervene filed by the Pacific Coast Federation of Fishermen's Associations. *See Klamath Irr. Dist. v. United States*, 64 Fed. Cl. 328 (2005). On April 21, 2005, the court ordered the claims of the individual plaintiffs severed, but consolidated those cases for purposes of decision. On August 31, 2005, this court issued an opinion in which it found that plaintiffs had no cognizable property interests compensable under the Fifth Amendment. *See Klamath Irr. Dist.*, 67 Fed. Cl. at 514-40.[5]

As a result of this ruling, plaintiffs are left only with their claims for breach of contract. The water districts seek damages on their own behalf for breach of their contracts with the United States, while the landowning plaintiffs seek damages as beneficiaries of the district plaintiffs' contracts. On February 17, 2006, defendant filed a motion for summary judgment. Extensive briefing on that motion has been completed. After carefully considered the briefs of the parties and their respective positions, the court concludes that oral argument is unnecessary.

## II. DISCUSSION

Following the court's prior opinion, one question remains – did the Bureau breach the subject contracts? The court previously made several observations in this regard, which provide a helpful starting point.

---

[5] Subsequently the reasoning of this court was adopted by a California appellate court, *see Allegretti & Co. v. County of Imperial*, 138 Cal. App. 4th 1261, 1273-75, 42 Cal. Reptr. 3d 122 (Cal. App. 2006), *rev. denied*, 2006 Cal. LEXIS 9142 (Cal. July 26, 2006), *cert. denied*, 127 S.Ct. 960 (2007).

A.

First, the court observed that, under most of the district contracts, plaintiffs did not have an absolute contractual right to water, limited, as claimed, only by appurtenancy and beneficial use. "This is particularly true," the court concluded, "as to those contracts which provide, either in exact or similar terms, that the government shall not be liable for 'water shortages' resulting from 'drought or other causes.'" *Klamath Irr. Dist.*, 67 Fed. Cl. at 535. It further observed that "[t]he plain language of these provisions expressly absolves the United States from liability for all types of water shortages – not only the hydrologic causes, as claimed by plaintiffs, but also any other cause that impacts the availability of water through the system." *Id.* Citing numerous cases, but relying particularly on *O'Neill v. United States*, 50 F.3d 677, 682-84 (9th Cir.), *cert. denied*, 516 U.S. 1028 (1995), the court noted that "various courts have construed similar water shortage clauses as protecting the United States from damages based upon the enforcement of the ESA," with such courts particularly focusing on language typical in such clauses exempting the United States from damages arising from a shortage on account of "errors in operation, drought, or any other causes." *Klamath Irr. Dist*., 67 Fed. Cl. at 536. Almost identical language is found in many of the contracts at issue here. Indeed, with the exception of the VBDC contract, which lacks any liability-limiting clause, even those contracts that do not expressly absolve the United States for water shortages arising from "any other causes" arguably exempt defendant from liability here.

As it turns out, however, the court need not resolve these questions. Instead, they serve merely to frame the court's consideration of what turns out to be the controlling issue here, *to wit*, whether the contracts must be read to imply that the United States reserved its ability to exercise its sovereign powers without the threat of liability for failing to deliver water.

B.

1. This court previously observed that "even as to the contracts that do not contain broad water shortage clauses, it is at least arguable that any reductions ordered by the Bureau here did not result in a breach under the so-called sovereign acts doctrine." *Klamath Irr. Dist*., 67 Fed. Cl. at 536. As it explained, the latter doctrine "recognizes that 'the Government-as-sovereign must remain free to exercise its powers' . . . and shields the United States from contract liability based upon its 'public and general acts as a sovereign' . . . ." *Id.* (quoting *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997), *cert. denied*, 524 U.S. 591 (1998) and *Horowitz v. United States*, 267 U.S. 458, 461 (1925)). In terms of this argument, the court found that "[s]everal courts have concluded that the enactment and subsequent enforcement of the ESA should be viewed as sovereign acts that override the Bureau's obligations to provide water under various contracts." *Klamath Irr. Dist*., 67 Fed. Cl at 537 (citing, *inter alia*, *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 1999), *cert. denied*, 531 U.S. 812 (2000)). The court now joins these courts in concluding that the actions taken by the Bureau did not breach any of the contracts at issue under the sovereign acts doctrine. Obviously, a few words of elaboration on this critical conclusion are required.

The Supreme Court first recognized the sovereign acts doctrine in *Horowitz*. There, the Court found no breach of contract where a wartime embargo on certain railroad shipments interfered with a contractor's receipt of a shipment from a government agency. It reasoned that "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Id*. at 461. In so holding, the Court quoted approvingly from *Jones v. United States*, 1 Ct. Cl. 383, 384 (1865), in which the Court of Claims stated –

> The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons.

*Horowitz*, 267 U.S. at 461; *see also Yankee Atomic*, 112 F.3d at 1574; *Klamath Irr. Dist.*, 67 Fed. Cl. at 537 n.56. More recently, in *United States v. Winstar Corp*., 518 U.S. 839 (1996), a plurality of the Supreme Court emphasized that the United States, as sovereign, must remain free to exercise its powers, noting that the sovereign acts doctrine seeks to "balance[] the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor." *Id*. at 840; *see also Stockton East Water Dist. v. United States*, 70 Fed. Cl. 515, 529 (2006). The latter question calls for a "case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." *Yankee Atomic*, 112 F.3d at 1575; *see also Amber Resources Co. v. United States*, 68 Fed. Cl. 535, 556 (2005); *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 763 n.18 (2003).[6] Accordingly, for purposes of the sovereign acts doctrine, the critical threshold issue here is whether the ESA was passed for the benefit of the government-as-contractor or for the benefit of the public.[7]

---

[6] Commenting on this same inquiry, the plurality in *Winstar* stated –

> [G]overnmental action will not be held against the Government for purposes of the impossibility defense so long as the action's impact upon public contracts is, as in Horowitz, merely incidental to the accomplishment of a broader governmental objective. The greater the Government's self-interest, however, the more suspect becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence, and where a substantial part of the impact of the Government's action rendering performance impossible falls on its own contractual obligations, the defense will be unavailable.

518 U.S. at 898 (internal citations omitted).

[7] On brief, plaintiffs cite *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995), as holding that the ESA does not apply to preexisting contracts. But, that case merely holds that the ESA

2. The ESA "contains a variety of protections designed to save from extinction species that the Secretary of the Interior designates as endangered or threatened." *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687, 690 (1995). In *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978), the Supreme Court described the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *See also Babbitt*, 515 U.S. at 698. "The plain intent of Congress in enacting this statute," the Court recognized, "was to halt and reverse the trend toward species extinction, whatever the cost," a view "reflected not only in the stated policies of the Act, but in literally every section of the statute." *Hill*, 437 U.S. at 184. As noted in *Hill*, section 7 of the ESA, codified at 16 U.S.C. § 1536(a)(2), provides a "particularly good gauge of congressional intent." *Hill*, 437 U.S. at 181. That section requires each Federal agency to "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical."[8]

The findings provision of the statute emphasizes that this and other provisions of the ESA were passed because Congress found that "various species of fish, wildlife and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation" and that such species "are of esthetic, ecological, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. §§ 1531(a)(1), (3). Congress added that the development and maintenance of conservation programs is "key to meeting the Nation's international commitments and to better safeguarding,

---

does not apply where an agency has granted a third-party a right-of-way and has no ability to impact how the third party approaches a threatened species. *Id*. at 1508. By contrast, the court made quite clear that the ESA applied to a preexisting contract if, as here, "the project's implementation depended on an additional agency action." *Id*. It is difficult to understand how plaintiffs could have missed this distinction, since *Sierra Club* cites *O'Neill*, *supra*, as "explaining why section 7(a)(2) of the ESA applies to a preexisting water service contract where the United States must act each year to supply the water." *Id*. (citing 50 F.3d at 680-81).

[8] An action "jeopardize[s] the continued existence" of a species when the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. An action results in "destruction or adverse modification" when the action results in a "direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id*. As noted in the statute's legislative history, section 7 "requires the Secretary and the heads of all other Federal departments and agencies to use their authorities in order to carry out programs for the protection of endangered species, and it further requires that those agencies take the necessary action that will not jeopardize the continuing existence of endangered species or result in the destruction of critical habitat of those species." H.R. Rep. No. 93-412, at 14 (1973); *see also Hill*, 437 U.S. at 183-84 (further describing the legislative history of this section).

for the benefit of all citizens, the Nation's heritage in fish, wildlife and plants." *Id.* at § 1531(a)(5). Similar sentiments were echoed in the statute's purposes clause, *see id.* at 1531(b), as well as in its legislative history, making it amply clear that the ESA was enacted with the broadest possible public purposes in mind.[9] Conversely, nothing in the statute or its legislative history remotely suggests even the slightest intent to relieve the United States of any responsibilities under pre-existing contracts, particularly, water delivery contracts, and, especially, the contracts at issue.[10]

While the court must be vigilant to ensure that action designed to benefit the government is not couched in "vocabulary of the public weal," *McGrath v. Rhode Island Retirement Bd.*, 88 F.3d 12, 16 (1st Cir. 1997); *see also Cuyahoga*, 57 Fed. Cl. at 778, it seems beyond peradventure, given the language, structure and underlying legislative history of the ESA, that its passage was a sovereign act that cannot give rise to contract liability here. As noted earlier, the same observation has been made in a variety of legal settings. *See, e.g.*, *Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109, 1140-41 (10th Cir. 2003) (Seymour, J., concurring), *vacated on other grounds*, 355 F.3d 1215 (10th Cir. 2003) ("the duties imposed under the [ESA] . . . embody acts of sovereign authority"); *Precision Pine & Timber Co. v. United States*, 50 Fed. Cl. 35, 72-73 (2001); *Croman Corp. v. United States*, 44 Fed. Cl. 796, 806 (1999), *withdrawn, in part, on other grounds*, 49 Fed. Cl. 776 (2001), *vacated on other grounds*, 89 Fed. Appx. 237 (Fed. Cir. 2004) ("[t]he enactment of the ESA . . . and the implementation by the Forest Service of ESA requirements . . . all constituted sovereign acts").[11] As these opinions suggest, there is no

---

[9] *See* S. Rep. No. 93-307, at 1 (1973) ("The purpose of this bill is to provide for conservation, protection and propagation of endangered species of fish and wildlife by Federal action and by encouraging the establishment of State endangered species conservation programs.); *id.* at 2 ("It has become increasingly apparent that some sort of protective measures must be taken to prevent the further extinction of many of the world's animal species . . . . Consideration of this need to protect endangered species goes beyond the aesthetic [and includes] the need for biological diversity for scientific purposes."); H.R. Rep. No. 93-412, at 5, 6 (1973) (noting that the legislation is "in the best interests of mankind" and stating further – "The basic purpose of the Act is clearly stated in the legislation; to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, protected or restored.").

[10] The policy section of the ESA does state that "[i]t is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species." 16 U.S.C. § 1531(c). While this statement certainly indicates that Congress was aware that the ESA could impact water resources – after all, the statute was designed to protect fish – there is no indication that Congress considered the impact of the statute on the Bureau's water delivery contracts.

[11] Several other cases have held that the rights to irrigation water of the Klamath Irrigation District and the Tulelake Irrigation District "are subservient to ESA and tribal trust

indication whatsoever that the ESA was designed to eliminate the benefit of the bargain in any government contracts, let alone those at issue.[12] Described using the words of the *Winstar* plurality, the passage of the ESA was "relatively free of Government self interest," not tainted by "a governmental object of self-relief," and in no way "targeted" on the subject contracts. *Winstar*, 518 U.S. at 896. Rather, any impact that the enactment of the statute had on the contracts *sub judice* was "merely incidental to the accomplishment of a broader governmental objective." *Id.* at 898; *see also Centex Corp. v. United States*, 395 F.3d 1283, 1305-06 (Fed. Cir. 2005).

Based on the foregoing, it thus would appear preliminarily that the sovereign acts doctrine applies here, absolving defendant of any breaches that might otherwise have arisen when, as a result of the ESA, it failed to deliver irrigation water in 2001.

C.

Plaintiffs, however, mount a multi-front attack on this proposition.

1. Their first thrust asserts that the Bureau was not compelled by the ESA to diminish water deliveries in 2001. This claim, however, runs headlong into the host of rulings construing the ESA that essentially dictated the Bureau's decision – rulings largely ignored by plaintiffs in their brief. In the earliest of these cases, the Ninth Circuit rejected claims by some of the very plaintiffs in this action that the private operator of the Link River Dam did not have a duty to operate the dam to meet the Bureau's ESA obligations. *Patterson,* 204 F.3d at 1213. Affirming the district court's ruling that the irrigators' rights to water are subservient to the ESA, the Ninth Circuit concluded that the Bureau's responsibilities "include taking control of the Dam when necessary to meet the requirements of the ESA, requirements that override the water rights of the Irrigators." *Id.*

Later, in May of 2000, the PCFFA and others filed a lawsuit challenging the Bureau's plan to release water for irrigation, claiming that the agency had violated the ESA by failing to consider the impact of its plan on threatened coho salmon. The Klamath Water Users Association (KWUA) intervened in this action as a defendant. On April 3, 2001, the United

---

requirements." *Kandra*, 145 F. Supp. 2d at 1201 (purporting to resolve a government contract claim); *see also Patterson*, 204 F.3d at 1213-14.

[12] *Cf. Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 736 (2004) (no sovereign act where "Congress deliberately targeted the FmHA's contractual obligations under preexisting notes in an effort to obtain a better deal); *Cuyahoga*, 57 Fed. Cl. at 777 ("In passing the 1994 amendments, the Congress did not act to protect public safety, morals or the economy, through the exercise, for example, of its police powers. Rather, in an appropriations measure, it deliberately targeted, at HUD's behest, that agency's contractual obligations under preexisting . . . contracts in an effort to reduce outlays under the Section 8 program.").

States District Court for the Northern District of California found that the Bureau had failed to comply with the requirements of the ESA before implementing its 2000 operations plan for the Klamath Project. *PCFFA*, 138 F. Supp. 2d at 1242-47. It permanently enjoined the Bureau from sending water irrigation deliveries from the Project if the flows dropped below the minimum flows recommended in a report prepared by the NMFS, stating:

> the Bureau of Reclamation hereby is enjoined from sending irrigation deliveries from Klamath Project whenever Klamath River flows at Iron Gate dam drop below the minimum flows recommended in the [NMFS] report, until such time as the Bureau completes a concrete plan to guide operations in the new water year [2001], and consultation concerning that plan is completed, either by (1) formal consultation to a "no jeopardy" finding by the NMFS, or (2) the Bureau's final determination, with the written concurrence of the NMFS, that the proposed plan is unlikely to adversely affect the threatened coho salmon.

*Id*. at 1250. On April 6, 2001, three days after this injunction was issued, the FWS and the NMFS issued their 2001 biological opinions, which concluded that the low flow levels proposed by the Bureau for 2001 were likely to jeopardize the continued existence of coho salmon and suckers, and adversely modify their habit. On that same date, the Bureau issued its 2001 operations plan, which incorporated the conclusions and flow recommendations contained in the biological opinions.

Subsequently, several of the irrigation districts, the KWUA and others filed suit in the United States District Court for the District of Oregon, challenging the 2001 operating plan as violative of their contractual rights to irrigation water and seeking an order enjoining the Bureau from implementing the plan and instead requiring it to "release unspecified 'historic' amounts of irrigation water." *Kandra*, 145 F. Supp. 2d at 1195-96. On April 30, 2001, the district court denied the plaintiffs' request for a preliminary injunction, rejecting their claims, *inter alia*, that the NMFS had improperly determined that the ESA compelled agency action. *Id*. at 1207, 1211. Citing the Ninth Circuit's ruling in *Patterson*, the court found that "plaintiffs' contract rights to irrigation are subservient to ESA and tribal trust requirements," adding, "[t]herefore, plaintiffs cannot assert breach of contract based on Reclamation's allocation of water to protect the suckers and salmon." *Id*. at 1201. Thereafter, the *Kandra* plaintiffs voluntarily dismissed their claims.

Accordingly, in 2000 and 2001, the Bureau was caught in a crossfire of lawsuits, sued both parties seeking to preclude and to compel the release of irrigation water. The former won out, as the courts concluded that the ESA compelled the Bureau to reduce irrigation deliveries in 2001. *Compare Precision Pine & Timber*, 50 Fed. Cl. at 72-73 (Forest Service's compliance with ESA duties were "public and general" acts where an Arizona district court had "specifically directed the Forest Service . . . to comply with the ESA by suspending all timber harvesting activities . . . during consultations."). Subsequent cases have served to reinforce the restrictions imposed by the ESA on the Bureau's release of irrigation water. In one such case filed by the PCFFA, and in which certain of the plaintiffs here again participated as intervening-defendants,

the Ninth Circuit held that the Bureau's proposal to provide only 57 percent of the total water needs of threatened species for the first eight years of a ten-year operating plan was arbitrary and capricious. *PCFFA v. United States Bureau of Reclamation*, 426 F.3d 1082, 1090-95 (9th Cir. 2005). On remand, the United States District Court for the Northern District of California, finding that "the law is clear that injunctive relief to protect the listed species should issue," enjoined the Bureau from making any diversion to irrigators at the Klamath Project until completion of a new biological opinion. *PCFFA v. Bureau of Reclamation*, 2006 WL 798920 at *1 (N.D. Cal. Mar. 27, 2006), *modified*, 2006 WL 1469390 at *8-9 (N.D. Cal. May 25, 2006).

2. Again all but treating these cases as nonevents, plaintiffs would have this court revisit the issues addressed by these courts, contending, *inter alia*, that numerous alternatives to shutting down water deliveries were available to the Bureau and that, in particular, the decision to withhold water was not supported by sound biological science. But, this court must decline this open invitation to leap outside the realm of government contract law for at least two reasons.

First, while plaintiffs argue that the prior cases are not binding precedent, they seemingly overlook the fact that many of the plaintiffs herein also were involved in the prior litigation, making the rulings in those cases binding under the doctrine of *res judicata*. Under that doctrine, also known as "claim preclusion," "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 5 (1979); *see also In re Bose Corp.*, 2007 WL 416919, at *3 (Fed. Cir. Feb. 8, 2007). While some of the cases recited above involved only preliminary injunctions and did not result in judgments on the merits, *see, e.g.*, *Kandra*, 145 F. Supp. 2d at 1207, 1211, others yielded permanent injunctions and plainly constituted final rulings on the merits, *see*, *e.g.*, *PCFFA*, 138 F. Supp. 2d at 1250. Some of the named parties in those cases – for example, Klamath Irrigation District, Klamath Drainage District, Tulelake Irrigation District, and Lonny E. Baley – are also parties here. Others of the plaintiffs here were in privity with the parties in those cases. In particular, defendant alleges – and plaintiffs have not denied – that all the irrigation districts before the court are members of the Klamath Water Users Association (KWUA), which actively participated in the earlier cases as both a plaintiff and a third-party defendant. It was, of course, the claimed rights of these districts that gave the KWUA standing to participate in these earlier cases, and the decisional law makes clear that those districts thus should not be heard to argue that they are unfettered by the decisions rendered against their association in those cases.[13] Hence, most of the plaintiffs before the court are, in one fashion or

---

[13] Both Federal courts and the Restatement (Second) on Judgments recognize that an entity that expressly or impliedly gives a party authority to represent it may be bound by the rule of *res judicata* as though it were a party. *See*, *e.g.*, *Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 176 (3d Cir. 1994); *Meza v. General Batter Corp.*, 908 F.2d 1262, 1266-67 (5th Cir. 1990); *General Foods Corp. v. Mass. Dept. of Pub. Health*, 648 F.2d 784, 787 (1st Cir. 1981); *Southwest Airlines Co. v. Texas Int'l Airlines*, 546 F.2d 84, 95 (5th Cir.), *cert. denied*, 434 U.S. 832 (1977); Restatement (Second) on Judgments § 41 ("A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party.").

another, bound by the prior judicial rejections of their claims and are prohibited from relitigating whether the Bureau was bound by the ESA to reduce water deliveries in 2001.

Second, even to the extent this is not the case, the court rejects the notion that this contract case should be a vehicle for challenging the provenance and ultimate validity of every action taken by the Bureau and other Federal agencies leading up to and including the application of the ESA here. Under the Administrative Procedures Act, 5 U.S.C. §§ 702 *et seq*., those actions were reviewable – indeed, were reviewed – under a deferential arbitrary and capricious standard, applied based upon the administrative record before the agency. Plaintiffs, however, would subject these same determinations to a novel form of *de novo* review, framing the question not as whether the agencies acted rationally based upon the administrative record, but rather whether, over a course of years and based upon any evidence that could have been obtained, the agencies somehow could have avoided the sovereign act that impacted performance of the contracts. In particular, plaintiffs argue that the Bureau cannot be excused from liability because it could have taken actions prior to 2001 that, anticipating a drought, might have avoided the eventual application of the ESA – actions that would have, according to plaintiffs, caused more water to be available in the Klamath basin or, alternatively, increased the fish population beyond endangered or threatened levels.[14] Plaintiffs assert that material questions of fact exist in this regard, barring the granting of summary judgment and upon which they should be allowed to conduct discovery. Of course, if they are right, there should be no temporal limit either to their claims or the resulting discovery – seemingly, it would be equally relevant herein whether the Bureau, any other Federal agency, or even Congress could have taken actions in 1980, 1950, or perhaps even 1905, that would have increased the water (or fish) supply available in the Klamath Basin in 2001, thereby obviating the necessity for halting water deliveries under the ESA in order to protect endangered species.

But are such broad inquiries really relevant to the question at hand? Must the court, in order to apply the sovereign acts doctrine, consider the entire course of conduct that led up to the application of statute or, perhaps, even all the actions that led up to the passage of the statute itself, so as to determine that the United States had no other alternative but to violate the contract terms? Certainly, no decision has employed this *tour d'horizon* approach to the sovereign acts doctrine, despite ample opportunities to do so. Instead, the decisions have approached cautiously questions regarding what "caused" a sovereign act to occur. For example, in *Derecktor v. United States*, 128 F. Supp. 136 (Ct. Cl. 1954), *cert. granted*, 348 U.S. 926 (1955), *cert. denied*, 350

---

[14] Among the dozen or so steps that plaintiffs assert the Bureau should have taken in the decade or so prior to 2001 are: (i) instituting a water bank; (ii) compensating landowners for land idling; (iii) providing for groundwater substitution; (iv) instituting a conservation implementation program designed to promote fish recovery; (v) constructing screens and dam passages to protect suckerfish and enable them to migrate upstream to spawn; (vi) looking for water savings in other federal projects within the Klamath Basin (*e.g.*, the Klamath Marsh Wildlife Refuge); (vii) promoting well-drilling and water conservation; and (viii) taking other steps that "could have ameliorated the water shortage in 2001."

U.S. 802 (1955), the Court of Claims considered whether the United States Maritime Commission had breached a contract by failing to approve the transfer of a ship when the State Department determined that the transfer would seriously prejudice foreign relations with Britain. In holding that the sovereign acts doctrine prevented such a breach, the court did not conduct an in-depth analysis of foreign policy, but merely observed that the State Department had to have "probable cause" to believe as it did, ultimately concluding that "the State Department kept well within the boundaries of its responsibilities in refusing to let the ship get beyond the control of the Government."[15] *Id*. at 141- 42; *see also Miller v. United States*, 140 F. Supp. 789, 794 (Ct. Cl. 1956) (applying the "probable cause" standard in concluding that the national interests of the United States did not dictate violation of a contract). Later decisions have likewise refused to examine separately either the tasks leading up to an exercise of a sovereign act or the subsidiary tasks making up that exercise.[16] Rather, in defining what might be termed the "causation in fact"

---

[15] Indeed, the facts in *Derecktor* certainly suggest that there would have been room to debate whether the action taken by the State Department truly would have prejudiced foreign relations, as the transfer was prohibited because of concerns that the ship would be used to transfer Jews to Palestine. Nor did the court consider whether the State Department could have taken different actions before the Maritime Commission entered into the contract, so as to avoid the problem encountered.

[16] Thus, in *Walter Dawgie Ski Corp. v. United States*, 30 Fed. Cl. 115 (1993), the court held that, under the sovereign acts doctrine, a government road repair project did not violate a ski operator's license to use government property. While the resort operator admitted that the decision to reconstruct the road was a sovereign act, it asserted that various steps taken to effectuate that plan violated its license. Rejecting this claim, this court stated –

> This Court finds, however, that the sovereign acts doctrine, if applicable, applies to all aspects of the Government act. . . . Here, as the plaintiff admits, the reconstruction and improvement of the General Hitchcock Highway constitutes a sovereign act. As such, all the corresponding facets of that Government action likewise comprise a sovereign act. If this Court allowed the plaintiff to attack a single aspect of the action, such as the road closure schedule, this disintegration of the doctrine would subvert the justification for the precept. What would be next: where the engineers choose to locate the highway, when the majority of construction or demolition should take place, how the excavation crew should prosecute the blasting, or what process to use in transporting fill? While facially dubious, in challenging the daytime road closure schedule, the plaintiff in fact seems to challenge all of these aspects of the highway construction process. This Court, however, denies the plaintiff the opportunity to dissect this sovereign act. The subject road reconstruction and improvement comprise a sovereign act of public and general nature, as even admitted by the plaintiff, and this Court finds

component of the sovereign acts doctrine, courts merely have required that: (i) there be a causal connection between the sovereign act and the interference that brought about the nonperformance of the contract; and (ii) in appropriate circumstances, the sovereign act triggering this chain of events itself not be arbitrary, capricious or unauthorized. *See*, *e.g.*, *Horowitz*, 267 U.S. at 461 (government not liable for obstruction of the performance of a contract "resulting from" its sovereign acts); *Wah Chang Corp. v. United States*, 282 F.2d 728, 735 (Ct. Cl. 1960); *Ottinger v. United States*, 88 F. Supp. 881 883 (Ct. Cl. 1950) (sovereign act defense not available for unauthorized conduct); *Coast Federal Bank, FSB v. United States*, 48 Fed. Cl. 402, 429 (2000), *aff'd*, 323 F.3d 1035 (Fed. Cir. 2003) ("[t]he sovereign acts doctrine requires that the breaching act be viewed as the particular [statutory] provisions . . . causing the breach of plaintiff's contract"); *see also McCloskey & Co. v. United States*, 98 Ct. Cl. 90, 113 (1942). These requirements, of course, are met here.

As a matter of judicial economy, predictability and precedent, plaintiffs' argument leaves much to be desired. Their backward-looking approach threatens to convert every invocation of the sovereign acts doctrine into a far-reaching, *de novo* examination of agency or even Congressional conduct, likely putting this court in the position of having to second guess decisions rendered by other courts. Their approach would deprive defendant of any predictability in taking truly sovereign acts without fear of contract liability. If plaintiffs are correct, an agency riveted upon the public good, and unmotivated whatsoever by any desire to relieve itself of any contractual obligations, would still be subject to liability unless it could show that, over an extended period of time, perhaps spanning multiple Administrations, it could have chosen no path that would have avoided the sovereign act that violated the contract. Of course, in making this contention, plaintiffs disregard the possibility that these earlier actions themselves qualify as sovereign acts that would also be protected by the doctrine. Indeed, they do not assert that the Bureau or any other Federal agency failed to adopt the cited ameliorative steps with some view toward eventually violating the contracts or otherwise because of self-interest. Rather, they would predicate liability here based upon an extended concept of negligence (perhaps approaching strict liability) that hinges on a healthy dose of 20-20 hindsight – that the Bureau failed to appreciate and adopt, prior to 2001, alternatives which, if executed, would have avoided the breaching application of the ESA. But, no authority – certainly, nothing that plaintiffs cite – suggests that the sovereign acts defense, and, correspondingly, defendant's liability in contract, should hinge on such captious considerations.

---

> no authority for reviewing every minor decision that is made in implementing the sovereign act at issue.

*Id*. at 133.

3. Accordingly, while plaintiffs argue that discovery is now needed to resolve this case,[17] it is plain that discovery would served no purpose, at least in terms of producing evidence relevant to whether the sovereign acts doctrine applies here.

D.

Relatedly, plaintiffs next assert that the act which must be sovereign here is not the passage of the ESA, but rather the agency's application of that statute to their contracts. They contend that the latter actions "targeted" their contracts and should not qualify as sovereign acts. This claim, however, again fundamentally misconceives the nature of the sovereign acts defense. First, the critical focus here must be on the extent to which the ESA compelled the agency to act. If, as concluded above, the statute left the agency with little alternative but to deny water, it makes little sense legally to focus on the individual application of the law, rather than its passage, in applying the sovereign acts doctrine.[18] Every normative statute, after all, eventually is applied

---

[17] It is worth noting that, earlier in this case, plaintiffs seemingly took the position that the ESA dictated the Bureau's action. Thus, in previously seeking partial summary judgment herein, plaintiffs asserted that it was uncontroverted that the biological opinions issued by FWS and NMFS in 2001 "prohibited Reclamation from delivering water to plaintiffs in accordance with historical practices on the ground that it was 'likely to jeopardize the continued existence' of the Lost River and Shortnose sucker fish and the coho salmon." Such statements might well be viewed as "admissions on file" within the meaning of RCFC 56(c), so as to preclude plaintiffs from raising factual issues as to the same claims now, *see Woods v. City of Chicago*, 234 F.3d 979, 989 (7th Cir. 2000), *cert. denied*, 534 U.S. 955 (2001); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure §§ 2722, 2724. The court, however, has chosen to address directly the relevance of plaintiffs' current factual claims to make clear that they are irrelevant under the law.

[18] While plaintiffs assert that the Bureau had ample discretion not to follow the biological opinions, the main case that they cite for that proposition, *Bennett v. Spear*, 520 U.S. 154 (1997), in fact, emphasizes just how little, if any, discretion the Bureau had to deviate from the alternatives set forth in the opinions. In *Bennett*, Justice Scalia, writing on behalf of the court stressed the "powerful coercive" and "virtually determinative" effect of such biological opinions. *Id*. at 170. Indeed, he noted that an agency that disagrees with such opinion "does so at its own peril (and that of its employees)" because such a disagreement "ordinarily requires species and habitat investigations that are not within the agency's expertise" and risks "substantial civil and criminal penalties, including imprisonment." *Id*. at 169-70. Plaintiffs have not explained how, consistent with the dictates outlined in *Bennett*, the Bureau could have, during the few months it had and consistent with various court rulings, performed the sorts of studies that would have allowed it to avoid the alternatives in the biological opinions. Rather, they cite studies that post-date the period in question and that obviously were not fully credited by the courts that later continued to enjoin the Bureau from releasing irrigation water. And while plaintiff raise various other factual issues – for example, that the biological opinions themselves were defective – their

to an individual circumstance – either voluntarily by those subject to the law, administratively by an agency charged with administering the law, or via enforcement. The focus of, and result under, the sovereign acts doctrine should not shift depending upon how the law is applied – the analysis should not focus on the passage of the law for those who comply voluntarily, but upon the enforcement of the law for those who refuse to do so or debate the law's applicability. Rather, at least where the law does not imbue an agency with substantial discretion, the focus should remain fixed on what the law demands, not how it is applied. *Compare Yankee Atomic*, 112 F.3d at 1575 (the inquiry "focuses on the scope of the legislation").

It is further obvious that, in performing this analysis, the court should avoid semantics. While the sovereign act doctrine sometimes is framed as excluding actions that "target" a contract, the latter phrase, despite plaintiffs' claims, neither reflects any metonymic logic nor subsumes every action directed at a contract or taken by the government with knowledge thereof. The question instead is ***why*** a particular action is taken. If the violation of a contract occurs owing to the need to preserve the common good and the general welfare, rather than to relieve the United States of its contractual or financial responsibilities, the action should be viewed as sovereign in nature and covered by the implied contractual right of the government to meet its responsibilities to the citizenry at large, unless waived in unmistakable terms. As this court stated in *Casitas Municipal Water Dist. v. United States*, 72 Fed. Cl. 746 (2006), "[t]he targeting of a particular contract is not itself an action that would foreclose reliance on the sovereign acts doctrine," provided "'the action's impact upon public contracts is . . . merely incidental to the accomplishment of a broader governmental objective.'" *Id*. at 754 (quoting *Winstar*, 518 U.S. at 898).

E.

1. Lastly, plaintiffs asseverate that, even if applicable, the sovereign acts defense does not necessarily excuse defendant's nonperformance here, as defendant has not shown that it meets the common law test for impossibility of performance. There is certainly decisional support for this analysis. Thus, the plurality in *Winstar* clearly felt that the sovereign acts doctrine was merely a prelude to the application of a common law impossibility defense:

> As *Horowitz* makes clear, that defense simply relieves the Government as contractor from the traditional blanket rule that a contracting party may not obtain discharge if its own act rendered performance impossible. But even if the Government stands in the place of a private party with respect to "public and general" sovereign acts, it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach. As the Restatement puts it,

---

brief is more notable for what it does not say – that is, there is no assertion that the Bureau's application of the ESA to the contracts in question was done based on agency self-interest or with anything other than the public good in mind.

> "[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261.

> . . . . Thus, since the object of the sovereign acts defense is to place the Government as contractor on par with a private contractor in the same circumstances, *Horowitz*, 267 U.S., at 461 . . . the Government, like any other defending party in a contract action, must show that the passage of the statute rendering its performance impossible was an event contrary to the basic assumptions on which the parties agreed, and must ultimately show that the language or circumstances do not indicate that the Government should be liable in any case.

*Winstar*, 518 U.S. at 904 (citations omitted). Under this approach, defendant, in particular, would be obliged to show that the passage of the ESA was an event the "non-occurrence of which was a basic assumption on which the [water] contracts were made." *Id.*[19] Various cases in this court have applied a similar analysis.[20]

---

[19] As described by Professor Schwartz –

> In addition, the plurality reads preconditions into the sovereign acts doctrine that are traditionally associated with the common law impossibility doctrine applicable to private contracts. These include: (1) a requirement that the possibility of regulatory interference by governmental action must not have been foreseeable by the contracting parties and (2) a caveat that the sovereign acts doctrine creates only a rebuttable presumption that the government is immunized from liability for breach of contract arising from public and general regulatory change.

Joshua Schwartz, "The Status of the Sovereign Acts and Unmistakability Doctrines in the Wake of *Winstar*: An Interim Report," 51 Ala. L. Rev. 1177, 1191-92 (2000).

[20] *See Precision Pine*, 50 Fed. Cl. at 72-73; *Croman Corp. v. United States*, 49 Fed. Cl. 776, 781-82 (2001), *vacated*, 89 Fed. Appx. 237 (Fed. Cir. 2004); *Scott Timber Co. v. United States*, 40 Fed. Cl. 492, 507-08 (1998), *modified*, 44 Fed. Cl. 170 (1999), *aff'd*, *in part*, *rev'd*, *in part*, 333 F.3d 1358 (Fed. Cir. 2003).

But, the portion of the plurality's opinion quoted above did not enjoy the support of five justices and thus is not binding.[21] Indeed, given the fractured nature of the opinions in *Winstar*,[22] it is difficult to say whether referring to the sovereign acts doctrine as a "defense" is truly a misnomer, with the doctrine perhaps better described as a precondition to the application of a more traditional impossibility defense. *See* Gerard Wimberly & Kristin Amerling, "Sovereign Acts Doctrine After *Winstar*," 6 Fed. Cir. B.J. 127, 144 ("The Supreme Court in *Winstar* . . . did not produce a coherent doctrinal test for applying the sovereign acts defense."). Critically, the latter common law defense brings with it additional requirements regarding what the parties "basic assumptions" were in drafting the contract, requirements that have not been historically associated with the sovereign acts doctrine. While the plurality opinion obviously should be given considerable weight (and, indeed, in other respects, has been followed in this and many other opinions), there are many reasons why its treatment of the sovereign acts doctrine as being linked to the common law impossibility defense should not be viewed as the law – certainly, not in this circuit, where the sovereign acts doctrine first emerged.

2. For starters, with all due respect, *Horowitz* plainly enunciated an independent defense to government liability, not one subservient to the separate application of a common law

---

[21] Although the Federal Circuit has never directly dealt with this question, the decisional law unanimously holds that an opinion that does not draw the support of a majority of voting justices is not precedential. *See*, *e.g.*, *Texas v. Brown*, 460 U.S. 730, 737 (1983) (stating that a plurality view that does not command a majority is not binding precedent); *Hertz v. Woodman*, 218 U.S. 205, 213-14 (1910) ("[T]he principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in [the Supreme Court] or in inferior courts."); *see also Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 2007 WL 111343 at *3 (5th Cir. Jan. 18, 2007) (en banc); *Barbour v. Haley*, 471 F.3d 1222, 1229 (11th Cir. 2006) ("[p]lurality opinions are not binding on this court"); *DeStefano v. Emergency Housing Group, Inc.*, 247 F.3d 397, 418 (2d Cir. 2001); *compare Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001) (en banc), *cert. denied*, 535 U.S. 1096 (2002) (court obliged to follow the view of a majority of justices even if they are spread between a plurality and dissents).

[22] Justices Stevens and Breyer joined Justice Souter's full plurality opinion, while Justice O'Connor joined the opinion with the exception of two sections addressing the issue of whether the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1999), constituted a "public and general" act of the sovereign. *Winstar*, 518 U.S. at 843-910. Justice Breyer wrote a concurring opinion criticizing the unmistakability doctrine. *Id*. at 910-18. Justices Scalia, Kennedy, and Thomas, who concurred only in the result, argued that the unmistakability doctrine did apply but that the contracts at issue met its requirements. *Id*. at 919-24. Chief Justice Rehnquist and Justice Ginsburg dissented, concluding that the thrifts did not meet the unmistakability doctrine. *Id*. at 924-37. Chief Justice Rehnquist, in a section of the dissent in which Justice Ginsburg did not join, also concluded that the sovereign acts doctrine was not satisfied. *Id*. at 931-34; *see also Yankee Atomic*, 112 F.3d at 1575 n.5.

impossibility defense. The latter defense is neither mentioned nor even obliquely referenced in the one-page opinion in *Horowitz* – an observation made by Chief Justice Rehnquist in his dissent in *Winstar*. *See Winstar*, 518 U.S. at 931 (Rehnquist, C.J., dissenting) ("[b]ut neither *Horowitz*, nor the Court of Claims cases upon which it relies, confine themselves to so narrow a rule"). Second, in marking the boundaries of the sovereign acts defense, *Horowitz* relied heavily upon a series of Court of Claims decisions – *Deming v. United States*, 1 Ct. Cl. 190, 191 (1865); *Jones*, 1 Ct. Cl. at 384, and *Wilson v. United States*, 11 Ct. Cl. 513, 520-21 (1875) – none of which give the slightest hint that the sovereign acts doctrine should be viewed as a precondition to a common-law impossibility defense. For the plurality in *Winstar* to be correct, then, *Horowitz* would have to be viewed as having *sub silentio* modified the sovereign acts defense in a way unenvisioned by any of the Court of Claims decisions upon which it relied.[23] Nor was the sovereign acts doctrine ever viewed as a prong of a common law impossibility defense in the lengthy series of Court of Claims and Federal Circuit decisions that applied the doctrine during the interim between *Horowitz* and *Winstar*.[24] Many of these cases likely would not have been

---

[23] Indeed, the Supreme Court, in the year after *Horowitz* was decided, affirmed a decision of the Fourth Circuit, in which the latter applied the sovereign acts doctrine without any reference to the impossibility defense. *See Maxwell v. United States*, 3 F.2d 906, 911-12 (4th Cir. 1935), *aff'd*, 271 U.S. 647 (1926).

[24] A long and unbroken line of cases from the old Court of Claims and the Federal Circuit, many of which arose during or shortly after the Second World War, applied the sovereign acts defense without any mention or hint of the impossibility defense. *See, e.g.*, *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir.), *cert. denied*, 498 U.S. 811 (1990) (Uranium Mill Tailings Radiation Control Act "and its regulations are sovereign acts which the government has undertaken for the public good;" "[t]hose acts are not a contractual modification of the agreement . . . and cannot alone serve as the basis for a breach claim"); *Tony Downs Food Co. v. United States*, 530 F.2d 367, 370-71 (Ct. Cl. 1976) (sovereign acts doctrine barred price relief where excess costs were the result of an Executive order); *Bruno New York Indus. Corp. v. United States*, 342 F.2d 75, 79-80 (Ct. Cl. 1965) (adopting the opinion and recommendation of the Trial Commissioner on defendant's motion for summary judgment, who held that defendant was not liable to plaintiff for increased costs caused by Electronics Production Resources Agency directives which had the effect of restricting plaintiff's production of the contract items); *Gothwaite v. United States*, 102 Ct. Cl. 400 (1944) (sustaining defendant's demurrer to plaintiff's petition for damages based on delays caused by War Powers Board regulations which prevented plaintiff from obtaining necessary materials to perform under the contract, stating: "This was an Act of a general and public character affecting all persons situated similarly to plaintiff. It authorized the exercise of sovereign powers in the defense of the nation. That the Government is not liable for such acts needs no argument. We have so held from the creation of this court."); *J.F. Barbour & Sons v. United States*, 63 F. Supp. 349, 350-51 (Ct. Cl. 1945) (sustaining defendant's demurrer because plaintiff stated no cause of action when it complained that defendant's decision to direct materials plaintiff needed to perform under the contract to other projects, as a result of priorities dictated by world war, made it impossible for plaintiff to perform); *Standard Accident Ins. Co. v. United States*, 59 F. Supp. 407, 409-10 (Ct. Cl. 1945),

decided in the government's favor had the traditional impossibility defense, with its additional requirements, been employed.[25] Third, the only Federal Circuit decision to apply the sovereign acts doctrine since *Winstar* – *Yankee Atomic* – indisputably did so without conducting any impossibility analysis whatsoever, reversing a judgment against the United States in the process. Thus, upon concluding that the Energy Policy Act constituted a sovereign action – "a general exercise of Congress's taxing power for the purpose of addressing a societal problem" – the *Yankee Atomic* court immediately proceeded to consider whether the unmistakability doctrine applied. 112 F.3d at 1577. And upon finding that the contract in question did not unmistakably exempt the utility from subsequent sovereign acts, it held that the government was not liable. *Id*. at 1581-82; *see also Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29, 35-36 (2000), *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 1096 (2002).[26]

Treating the sovereign act doctrine as a prelude to a common law impossibility defense, indeed, clashes with the underlying rationale of that doctrine and of the unmistakability doctrine, as well. Both doctrines exist for reasons totally unrelated to those underlying the common law impossibility defense – reasons that stem from the responsibilities of government, rather than private, actors. First, unlike the common law impossibility defense, both doctrines hinge on the notion that the federal government, when acting in a contracting capacity, cannot be held liable directly or indirectly for the public acts of the United States as sovereign. *Jones*, 1 Ct. Cl. at 384

---

*cert. denied*, 326 U.S. 729 (1945) (sustaining defendant's demurrer on plaintiff's claim for excess costs it incurred as a result of government's decision to enter into other contracts pursuant to national defense statutes, which had the effect of making plaintiff's performance more expensive than originally contemplated); *Pearson, Dickerson, Inc. v. United States*, 115 Ct. Cl. 236 (Ct. Cl. 1950) (holding that plaintiffs were not entitled to recover damages when, *inter alia*, plaintiffs knew that this was a war contract, and that the War Department would have to set priorities for shortages of materials, and that delays might result); *Barnes v. United States*, 105 F. Supp. 817, 820 (1952) (dismissing plaintiff's claim for increased costs on a construction project which it incurred as a result of War Manpower Commission regulations affecting wage rates); *see also Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 967 (Ct. Cl. 1965); *Aragona Construction Co., Inc. v. United States*, 165 Ct. Cl. 382, 388 (1964); *compare Sun Oil Co. v. United States*, 572 F.2d 786, 817 (Ct. Cl. 1978).

[25] *See*, *e.g.*, *Amino Bros. Co. v. United States*, 372 F.2d 485, 490-91 (Ct. Cl.), *cert. denied*, 389 U.S. 846 (1967) (opening of flood gates that washed out contractors' work was sovereign act even though the contract included a "changed conditions" clause that allocated certain risks among the parties).

[26] *Dicta* in the recent decision of this court in *Stockton East Water Dist. v. United States*, 2007 WL 548819 (2007) could be read as indicating that the Federal Circuit has held that the sovereign acts doctrine applies only where performance is "objectively impossible." *Id*. at *59 (quoting *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002)). However, *Seaboard Lumber* did not consider the sovereign acts doctrine, but instead merely involved a contractor asserting an impossibility defense. 308 F.3d at 1294.

("The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other."); *Deming*, 1 Ct. Cl. at 191 ("The United States as a contractor are not responsible for the United States as a lawgiver.").[27] Second, the doctrines proceed upon the well-established principle that "[t]he sovereign act defense is an inherent element of every contract to which the government is a party, whether or not explicitly stated." *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 959 (Fed. Cir. 1993); *see also General Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 534 (2000); *Walter Dawgie Ski Corp.*, 30 Fed. Cl. at 131. In other words, unless the contract, in unmistakable terms, precludes the government from escaping liability for its sovereign acts, then the parties are presumed to have reserved to the United States the right to perform such acts without incurring liability. Viewed in this fashion, the sovereign act and unmistakability doctrines intertwine to create a "double helix" of contract interpretation applicable only to sovereign entities, *see Cuyahoga*, 57 Fed. Cl. at 776, no strand of which depends upon – or should depend upon – the existence of parameters uniquely related to a private common law defense, *to wit*, the common law version of the impossibility defense.

---

[27] Various cases holding that the common law impossibility requirements must be met mistakenly cite older Court of Claims cases for the proposition that the sovereign acts doctrine is designed to treat the government like a private individual, with the latter able to invoke the common law impossibility defense. In fact, the early cases suggest a different rationale to the sovereign acts defense – that a private individual would not be liable if the government passes a statute that prohibits performance and that the government should fare no worse simply it is a defendant in a contract action. Summarizing these older cases, the Court of Claims, in *O'Neill v. United States*, 231 Ct. Cl. 823 (1981), stated:

> From its earliest days, however, application of the sovereign act doctrine has proceeded from the recognition that in governing the country, the Government's actions, otherwise legal, will occasionally incidentally impair the performance of contracts. Were those contracts exclusively between private parties, the party hurt by such governing action could not claim compensation from the other party ***for the governing action***. Given the large number of contracts the Government enters, ***its*** contracts will sometimes be affected by those same governing acts. The policy underlying the sovereign act doctrine is that in those circumstances, ***the Government in its contracting role, like its private counterpart, should not incur liability for its act done in the governing role***.

*Id*. at 826 (emphasis in original); *see also Jones*, 1 Ct. Cl. at 384-85 ("Though [the government's] sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants."). Accordingly, the sovereign acts defense focuses only on a particular form of impossibility – that prompted by sovereign acts.

Grafting the sovereign acts doctrine onto a common law impossibility defense thus largely deprives the former of its *raison d'etre* – enabling "the government to serve the public and respond to crises without fear of liability for the incidental effects its actions may have on its wide range of contracts." "The Sovereign Acts Doctrine After *Winstar*," *supra*, at 130; *see Deming*, 1 Ct. Cl. at 191. Such an approach, moreover, raises serious interaction questions involving the common law impossibility defense and the unmistakability doctrine. Both concepts concern whether the parties anticipated that certain actions would render performance impracticable, but approach that issue with diametrically different presumptions: the unmistakability doctrine proceeds from the notion that, absent clear indication otherwise, the government reserves its sovereign powers, while at least the common-law version of the impossibility defense proceeds from the reverse assumption, that is, that unless the government can show otherwise, its sovereign powers were relinquished.[28] These two approaches cannot peacefully coexist where a contract anticipates that there will be some situations of government nonperformance, but does not absolve the government entirely of liability for every sovereign act. Under the traditional sovereign acts defense, the fact, for example, that the parties here undoubtedly did not consider the possibility of the passage of the ESA or a like statute is irrelevant. Under the common law impossibility test, however, the fact that the parties allocated some risks in the water shortage clauses seemingly would preclude invocation of the broader sovereign acts doctrine. *Cf. Precision Pine & Timber*, 50 Fed. Cl. at 72-73 (finding that the suspension of a contract owing to the ESA was a sovereign act, but that there was a breach because the contract anticipated that it could be suspended for other environmental reasons). The latter result makes little sense, if, as is true, the purpose of the sovereign acts doctrine is to retain the ability of the government to respond to unanticipated public needs without the specter of liability.

---

[28] To appreciate this, consider Justice Scalia's exegesis on how the sovereign acts and unmistakability doctrines interact –

> [I]t is reasonable to presume (***unless the opposite clearly appears***) that the sovereign does ***not*** promise that none of its multifarious sovereign acts, needful for the public good, will incidentally disable it or the other party from performing one of the promised acts . . . . Governments do not ordinarily agree to curtail their sovereign or legislative powers, and contracts must be interpreted in a common-sense way against that background understanding.

*Winstar*, 518 U.S. at 921 (Scalia, J., concurring); *see also* Joshua Schwartz, "Assembling *Winstar:* Triumph of the Ideal of Congruence in Government Contracts Law?," 26 Pub. Cont. L.J. 481, 554 (1997). An analytical approach that treats the sovereign acts doctrine as a prelude to an impossibility defense also creates problems for the reserved powers doctrine, which holds that some sovereign powers cannot be ceded even if the contractual intent to do so is patently clear. *See*, *e.g.*, *Atlantic Coast Line R. Co. v. City of Goldsboro*, 232 U.S. 548, 558 (1914); *see also Winstar*, 518 U.S. at 889 & n.34.

3. For these many reasons, the court concludes that there is no callus bridge between the scion of the sovereign acts doctrine and the stock of the traditional common-law impossibility defense. Rather, *Horowitz*, as well as a more than a dozen cases pre- and post-dating that decision, establish that if the sovereign acts doctrine is applicable, the government is not liable for contract violations caused by a sovereign act, unless the unmistakability doctrine is triggered. With all due respect, the plurality opinion in *Winstar* neither alters this conclusion nor upsets the phalanx of binding precedent from which it springs. Here, as plaintiffs readily admit, there are no unmistakable terms in any of the contracts precluding the government from exercising its sovereign powers – indeed, the water shortage clauses in most of the contracts reflect the opposite intent. Instead, plaintiffs assert that any silence of the contracts on this point should be read in their favor, as precluding the United States from enforcing the ESA. That claim, however, is decidedly contrary to the law regarding the unmistakability doctrine and, indeed, would turn that doctrine on its head. *See Winstar*, 518 U.S. at 872 ("Sovereign power governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless ***surrendered*** in unmistakable terms." (emphasis added)); *Cuyahoga*, 57 Fed. Cl. at 763.

Finding the remainder of plaintiffs' arguments unpersuasive, the court, therefore, concludes that sovereign acts occurred here that prevented defendant from performing under the contracts and that no breach of the contracts at issue occurred.

## III. CONCLUSION

This court need go no farther. Based on the foregoing discussion, the court **GRANTS** defendant's motion for summary judgment. The Clerk is hereby ordered to dismiss the complaints in question, with prejudice.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge