# In the United States Court of Federal Claims

Nos. 01-591L and 01-5910L through 01-29125L

(Filed:  November 22, 2013)

_____

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant, <br><br> PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, <br><br> Defendant-Intervenor. | Takings/contract case; Motion to dismiss for lack of subject matter jurisdiction – RCFC 12(b)(1); 28 U.S.C. § 1500; "Assignee"; Members of associations were not assignees for purposes of section 1500; *Tohono O'odham*; Same operative facts – concept examined; Comparison to jurisprudence under Rules 13, 15 and 20 of the Federal Rules of Civil Procedure; Four tests – elements enumerated; Issues of fact and law; Role of *res judicata*; Substantially the same evidence; Logical relationship; Claims in district court did not involve substantially the same operative facts as takings claim, but did have substantially the same operative facts as contract claim; Section 1500 applicable, in part. |

_____

## OPINION

_____

*Nancie G. Marzulla* and *Roger J. Marzulla,* Marzulla Law, LLC, Washington, DC, for plaintiffs.

*Kristine Sears Tardiff*, Environmental and Natural Resources Division, United States Department of Justice, Concord, New Hampshire, with whom was Assistant Attorney General *Ignacia S. Moreno,* for defendant.

*Todd D. True,* Earthjustice Legal Defense Fund, Seattle, WA, for Defendant-Intervenor.

**ALLEGRA, Judge:**

Section 1500 of Title 28 of the United States Code bars litigation in this court of the same dispute pending in another court.  Passed shortly after the Civil War, and long outliving its

original purpose, this gatekeeper provision has oft been described as an "anachronism"[1] and a "trap for the unwary."[2]  Yet, in recent years, it has experienced a *risorgimento*, triggered by the Supreme Court's decision in *United States v. Tohono O'odham Nation*, 131 S. Ct. 1723 (2011), and perpetuated by the United States' litigating positions.  Defendant, at times, seems to discover this jurisdictional issue exceedingly late in the game, often after considerable time and resources have been expended.  Such is the case with defendant's motion to dismiss under RCFC 12(b)(1) – filed more than a decade after the original complaint, after discovery was completed, and several merits decisions and a final judgment were rendered by this court, as well as after an appeal, a referral of questions by the Federal Circuit to the Oregon Supreme Court, a decision by that state court, and a remand by the Federal Circuit.  *See Klamath Irr. Dist. v. United States*, 635 F.3d 505 (Fed. Cir. 2011).[3]  Now, for the first time, defendant argues that, under section 1500, a

---

[1]  *See, e.g.*, *Lower Brule Sioux Tribe v. United States*, 102 Fed. Cl. 421, 424 n. 4 (2011); *Griffin v. United States*, 85 Fed. Cl. 179, 181 (2008), *aff'd*, 590 f.3D 1291 (Fed. Cir. 2009); *Nat'l Union Fire Ins. Co. v. United States*, 19 Cl. Ct. 188, 190 (1989); *Dwyer v. United States*, 7 Cl. Ct. 565, 567 (1985); *A.C. Seeman, Inc. v. United States*, 5 Cl. Ct. 386, 389 (1984); *see also Keene Corp. v. United States*, 508 U.S. 200, 217 (1993) ("The trial judge in this case was not the first to call this statute anachronistic."); *Passamaquoddy Tribe v. United States*, 82 Fed. Cl. 256, 262 (2008), *aff'd*, 426 Fed. Appx. 916 (Fed. Cir. 2011) ("The jurisdictional bar in § 1500 has been much criticized for being an awkward tool that has outlived its original purpose."); *see generally Griffin v. United States*, 621 F.3d 1363, 1366 (Fed. Cir. 2010) (Plager, J., dissenting from denial of petition for rehearing); Eric C. Bruggink, "A Modest Proposal," 28 Pub. Cont. L.J. 529, 539 (1999) ("Section 1500 remains something of a judicial coelacanth, still swimming around despite its Civil War era rationale."); David Schwartz, "Section 1500 of the Judicial Code and Duplicate Suits Against the Government and Its Agents," 55 Geo. L.J. 573 (1967) (hereinafter "Schwartz").

[2]  *See, e.g.*, *Low v. United States*, 90 Fed. Cl. 447, 455 (2009); *Berry v. United States*, 86 Fed. Cl. 24, 29 (2009); *Lan-Dale Co. v. United States*, 85 Fed. Cl. 431, 433 (2009); *Griffin*, 85 Fed. Cl. at 181; *d'Abrera v. United States*, 78 Fed. Cl. 51, 56 n. 10 (2007); *Vaizburd v. United States*, 46 Fed. Cl. 309, 309-10 (2000); *see also* Emily S. Bremer & Jonathan R. Siegel, "Clearing the Path to Justice:  The Need to Reform 28 U.S.C. § 1500," 65 Ala. L. Rev. 1, 37-38 (2013) (hereinafter "Bremer & Siegel"); Payson R. Peabody, Thomas K. Gump, Michael S. Weinstein, "A Confederate Ghost that Haunts the Federal Courts: The Case for Repeal of 28 U.S.C. § 1500," 4 Fed. Cir. B.J. 95 (1994) (hereinafter "Peabody, et. al, Confederate Ghost"); George W. Miller and Jonathan L. Abram, "A Survey of Recent Takings Cases in the Court of Federal Claims and the Court of Appeals for the Federal Circuit," 42 Cath. U. L. Rev. 863, 892 (1993) ("[t]hat rule is a trap for the unwary").

[3]  *See also Petro-Hunt v. LLC v. United States*, 105 Fed. Cl. 37, 44 n.7 (2012) (defendant moved to stay case in Court of Federal Claims while case was being litigated in district court and then, years later, when the filing of a new suit for the same years was barred by the statute of limitations, moved to dismiss the case in this court based upon the pendency of the district court action); *Central Pines Land Co. v. United States*, 99 Fed. Cl. 394, 407 (2011), *aff'd*, 697 F.3d

district court case filed in 2001 (and dismissed that same year) obliges this court to dismiss the complaint.  For the reasons that follow, the court **GRANTS**, **in part**, and **DENIES**, **in part**, defendant's motion.

**I.**

The Klamath River Basin is home to the Klamath Project – one of the first irrigation projects constructed under the Reclamation Act of 1902 (the Reclamation Act).[4]  Under authority of this Act, the Bureau of Reclamation (Bureau) entered into water rights contracts with individual landowners and irrigation districts.  In 1957, the states of California and Oregon entered into the Klamath River Basin Compact (Klamath Compact), which was ratified by the United States Congress, and allegedly governs the property rights related to the water from the Klamath Basin.

Prior to 2001, Klamath Basin landowners received all the water they needed under a combination of contracts with the United States and the Klamath Compact.  But, in the spring of 2001, several federal agencies produced studies indicating that water levels in the Basin were so low as to threaten the health and survival of three species in violation of the Endangered Species Act (ESA), 87 Stat. 884, 16 U.S.C. § 1531, *et seq*.  On April 6, 2001, responding to these concerns, the Bureau issued a revised Operation Plan (the 2001 Plan) for the Klamath Project that terminated the delivery of irrigation water to many individuals and irrigation districts for the year 2001.

On April 9, 2001, Steven Lewis Kandra, David Cacka, the Klamath Irrigation District (KID), the Tulelake Irrigation District (TID), and the Klamath Water Users Association (KWUA), hereinafter collectively the "*Kandra* plaintiffs," filed suit against the United States, Gale Norton (Secretary of the Interior), and Don Evans (Secretary of Commerce) in the United States District Court for the District of Oregon.[5]  In their complaint, the *Kandra* plaintiffs sought declaratory relief and a preliminary injunction preventing the Bureau from implementing the

---

1360 (Fed. Cir. 2012) (dismissing case at the attorney's fees stage in which plaintiffs had prevailed on a takings claim following thirteen years of litigation); *see also* Bremer & Siegel, 65 Ala. L. Rev. at 33-34.

[4]  In several prior opinions, this court has extensively discussed the underlying facts of this case.  *See*, *e.g.*, *Klamath Irrigation Dist. v. United States*, 75 Fed. Cl. 677 (2007); *Klamath Irrigation Dist. v. United States*, 67 Fed. Cl. 504 (2005).  The court describes here only the facts relevant to the pending motion to dismiss.

[5]  Lon Baley filed a motion to intervene on April 25, 2001, that was granted the following day, and thus also was a plaintiff in this suit.

2001 Plan.[6]  They alleged that in adopting the 2001 Plan, the defendant had breached existing contracts and violated reclamation law, the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U.S.C. § 4321 *et seq*., the ESA, and other federal laws.  Notably, the complaint averred that the *Kandra* plaintiffs were "not waiv[ing] any rights to seek damages in the Court of Federal Claims against the United States for any conduct of the federal defendants."  The complaint's "general allegations" segment included seventeen paragraphs of factual background, tracing the history of water rights and irrigation in the Klamath Project from the Reclamation Act of 1902 through the 2001 Plan.

On April 30, 2001, the district court denied the *Kandra* plaintiffs' motion for a preliminary injunction.  *Kandra v. United States*, 145 F. Supp. 2d 1192 (D. Or. 2001).  On October 15, 2001, the *Kandra* plaintiffs filed a document entitled "Notice of Dismissal" that docketed by the district court as a "Motion to Dismiss."  On November 27, 2001, the district court granted the motion to dismiss and entered judgment dismissing the action.

Meanwhile, on October 11, 2001, fourteen water, drainage, and irrigation districts, and thirteen agricultural landowners in Oregon and California (the "*Klamath* plaintiffs") filed this suit against the United States.[7]  The original complaint made two takings claims:  (i) that the United States took the water rights of plaintiffs without paying just compensation as required by the Fifth Amendment; and (ii) that the United States impaired plaintiffs' water rights, thereby violating the Klamath Compact, without paying just compensation as required by the Fifth Amendment.  On March 24, 2003, plaintiffs filed an amended complaint which added a third claim, *to wit*, that "beginning on or about April 10, 2001, and continuing through the remainder of water year 2001, defendant breached [various contracts between the Bureau and the plaintiffs] by failing and refusing to deliver to plaintiffs . . . the quantities of water required by their written contracts."  The basic factual allegations in the original and amended complaints are identical.

---

[6]  The district court complaint specified that KID and TID were authorized under law to "take any action necessary to protect [their] interests and those of [their] water users," and explained that KWUA is a non-profit corporation with a major purpose of protecting "the common interests of its members in the use of water for irrigation."  The KWUA has members including irrigation and drainage districts and individuals who obtain, deliver, and receive water through facilities constructed by the United States as part of the Klamath Project in question.

[7]  The fourteen district plaintiffs in this suit are:  Klamath Irrigation District, Tulelake Irrigation District, Klamath Drainage District, Poe Valley Improvement District, Sunnyside Irrigation District, Klamath Basin Improvement District, Klamath Hills District Improvement Co., Midland District Improvement Co., Malin Irrigation District, Enterprise Irrigation District, Pine Grove Irrigation District, Westside Improvement District No. 4, Shasta View Irrigation District and Van Brimmer Ditch Co.  The thirteen agricultural landowner plaintiffs in this suit are:  Fred A. Robison, Albert J. Robison, Lonny E. Baley, Mark R. Trotman, Baley Trotman Farms, James L. Moore, Cheryl L. Moore, Daniel G. Chin, Deloris D. Chin, Wong Potatoes, Inc., Michael J. Byrne, Daniel W. Byrne, and the Byrne Brothers.

In two separate summary judgment opinions, this court dismissed plaintiffs' Fifth Amendment takings claims, their claims under the Klamath Compact and their breach of contract claims. *See Klamath Irrigation Dist. v. United States*, 67 Fed. Cl. 504 (2005) (takings decision); *Klamath Irrigation Dist. v. United States*, 75 Fed. Cl. 677 (2007) (contract decision). Relying, in part, on the decision of the Oregon Supreme Court, the Federal Circuit vacated the judgment of this court and remanded the case to the court for further proceedings. *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 507 (Fed. Cir. 2011).

On August 22, 2011, defendant filed a motion to dismiss the complaint under RCFC 12(b)(1), claiming that this court lacked jurisdiction over this case under 28 U.S.C. § 1500. The defendant-intervenor in this case, Pacific Coast Federation of Fishermen's Associations, joined in support of this motion. Original briefing on this motion was completed in October, 2011, but on December 5, 2011, proceedings were stayed pending the resolution of a similar motion in *Petro-Hunt v. United States*, No. 00-512. After that decision was published, the parties submitted supplemental briefing on the motion to dismiss and oral argument was conducted.

## II.

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). In particular, the plaintiff must establish that the court has subject matter jurisdiction over its claims. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

Plaintiffs assert federal subject-matter jurisdiction in this court under the Tucker Act, 28 U.S.C. § 1491. That provision grants this court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). It is well-established that takings actions and breach of contract actions are both covered by this grant of jurisdiction. *See Keene Corp.*, 508 U.S. at 205; *Bywaters v. United States*, 670 F.3d 1221, 1224 (Fed. Cir. 2012). Defendant, however, claims that jurisdiction is lacking here because of 28 U.S.C. § 1500.

Section 1500 of Title 28 provides:

The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500.  "[T]he words of the statute are plain," the Supreme Court stated nearly ninety years ago, "with nothing in the context to make [its] meaning doubtful." *Corona Coal Co. v. United States*, 263 U.S. 537, 540 (1924); *see also Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1565 (Fed. Cir. 1988), *cert. denied*, 489 U.S. 1066 (1989).  Those words speak in terms of subject matter jurisdiction and "bar jurisdiction over the claim of a plaintiff who, upon filing [with the Court of Federal Claims], has an action pending in any other court 'for or in respect to' the same claim." *Keene Corp.*, 508 U.S. at 209; *see also Nez Perce Tribe v. United States*, 83 Fed. Cl. 186, 189 (2008).  To determine whether section 1500 applies here, the court must answer three questions:  (i) whether, and to what extent, "the plaintiff[s] or [their] assignee[s]" in this case are the same as those in the district court; (ii) whether the district court action was "pending" at the time jurisdiction under section 1500 is measured; and (iii) if so, whether the claims presented to the district court were the same as those in the instant case.  *See Brandt v. United States*, 710 F.3d 1369, 1373-74 (Fed. Cir. 2013); *Kaw Nation of Oklahoma v. United States*, 103 Fed. Cl. 613, 616-17 (2012); *Griffin v. United States*, 85 Fed. Cl. at 184.

Defendant argues that, under section 1500, **all** the claims filed by **all** the plaintiffs in this action should be dismissed for lack of jurisdiction.  In defendant's view, it is irrelevant that only three of the *Kandra* plaintiffs are also plaintiffs in this case because, in its view, the *Kandra* plaintiffs were assignees of all the plaintiffs herein.  In arguing for dismissal, defendant also fails to draw any meaningful distinction between the takings and breach of contract claim in this case. It contends that both claims are based upon substantially the same operative facts as the claims in *Kandra*.  The court will address defendant's assertions *seriatim*.

## A.

The threshold question here is whether "the plaintiff[s] or [their] assignee[s]" in this case are the same as those in the district court.  Of course, three of the named plaintiffs in this case were also *Kandra* plaintiffs – KID, TID and Mr. Baley.  For them, application of section 1500 moves   to the next stage.  But what of the other twenty-four plaintiffs in this case?

Defendant argues that the *Kandra* plaintiffs, particularly, the KWUA, were the "assignees" of all the plaintiffs here.  To reach this remarkable conclusion, defendant adopts a surpassingly broad definition of the word "assignee," asseverating that "[i]f the interests of the plaintiffs named in [this] action are represented in the district court action or those plaintiffs had a stake in the outcome of the district court action, there is sufficient identity in the parties pursuing the two suits for Section 1500 to apply."  Defendant cites little in support of this claim, however, relying principally upon fragments of *obiter dicta* in two opinions:  *Webb & Associates v. United States*, 19 Cl. Ct. 650 (1990) and *Lummi Tribe of the Lummi Reservation v. United States*, 99 Fed. Cl. 584 (2011).  But, these cases plainly are inapposite.

In *Webb Associates*, Judge Rader held that section 1500 applied when a plaintiff became the assignee of a defendant in a district court case in which, prior to the filing of the Claims Court suit, a counterclaim had been filed against the United States.  But, this case indisputably involved a formal assignment.  Reflecting that, Judge Rader understandably observed, in a footnote, that "[a]s assignee, plaintiff now has a stake in the outcome of the district court case."

*Id.* at 651 n.1.  In *Lummi Tribe*, Judge Wiese dismissed the claims of a plaintiff who had a case still pending before another court, but declined to dismiss the claims of other plaintiffs, noting that they "were not parties in the district court litigation (nor were their interests represented there)."  99 Fed. Cl. at n. 7.  Splicing these snippets together, defendant contends that these cases hold that one who has a stake in litigation or has interests represented therein is an "assignee" for purposes of section 1500.  But, neither case even intimates – let alone holds – this.  Nor does defendant's conclusion derive logically from the observations made in these cases.  *Per contra* – while assignees **do** have a stake in the outcome of litigation involving their assigned property, and while non-assignees do **not** (at least by virtue of their non-assignment), it does not follow that anyone with a stake in the outcome of litigation is an assignee.[8]  This is not the first time this court has reached this conclusion – nor, for that matter, the first time it has rejected defendant's reliance on these out-of-context snippets as support for its "stake in the outcome" argument.  *See Kingman Reef Atoll Invests., LLC v. United States*, 103 Fed. Cl. 660, 687-689 (2012) (rejecting the identical claims).[9]

Perhaps defendant, in attempting to stretch section 1500, has avoided more traditional interpretational tools for a good reason – as it is tolerably plain that none of the *Kandra* plaintiffs are "assignees," if that word is used in either its ordinary or legal sense.  Of course, there is absolutely no reason, from a statutory construction standpoint, not to begin our analysis with the plain meaning of the word "assignee."  *See Corona Coal*, 263 U.S. at 540; *Johns-Manville Corp.*, 855 F.2d at 1567; *see also Baldrige v. Shapiro*, 455 U.S. 345, 356 (1982); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 162-63 (1982).  Indeed, since "[t]he words of [section 1500] are plain," *Corona Coal*, 263 U.S. at 540,[10] numerous cases, including *Keene*, 508 U.S. at 210, have employed dictionaries in defining key terms in section 1500.[11]  While none of these cases

---

[8]  At least since the time of Aristotle, it has been well-established that the fact that all Spartans are Greek (*i.e.*, that all assignees have a stake in litigation) does not mean that all Greeks are Spartans (*i.e.*, that all with a stake in litigation are assignees).  Nor does it follow that because some cats are black, and because some black things are televisions, that some cats are televisions.

[9]  Nor, contrary to defendant's arguments, is this case anything like *Goodeagle v. United States*, 105 Fed. Cl. 164 (2012).  In that case, this court invoked section 1500 because the plaintiffs in this court were unnamed members of the certified class in *Cobell v. Salazar*, No. 1:96-cv-01285 (D.D.C.).  Nothing remotely similar is the case here.

[10]  *See also Central Pines Land Co.*, 697 F.3d at 1367; *Johns–Manville Corp.*, 855 F.2d at 1565; *Petro-Hunt, LLC v. United States*, 105 Fed. Cl. 37, 42 (2012).

[11]  *See, e.g., Brandt*, 710 F.3d at 1378; *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1550 n.13 (Fed. Cir. 1994); *Otoe-Missouria Tribe of Indians, Okla. v. United States*, 105 Fed. Cl. 136, 139 (2012); *Kaw Nation*, 103 Fed. Cl. at 619-20; *Pellegrini v. United States*, 103 Fed. Cl. 47, 50-51 (2012); *Griffin*, 85 Fed. Cl. at 186-87; *Yankton Sioux Tribe v. United States*,

has interpreted the word "assignee," the court sees no reason to deviate from the "plain meaning" rule in construing that term.

Dictionary.com defines an assignee as "a person to whom some right or interest is transferred, either for his or her own enjoyment or in trust." *See* Dictionary.reference.com (as last viewed on November 21, 2013). Likewise, Black's Law Dictionary defines an assignee as "[o]ne to whom property rights or powers are transferred by another." Black's Law Dictionary, Thomas Reuters 136 (9th ed. 2009) (hereinafter "Black's Law Dictionary"); *see also* Bouvier Law Dictionary, Walter Kluwer 82 (2012) ("One who assumes the duties and privileges of another . . . Accepting an assignment places the assignee completely in the role of the assignor."). Other familiar lexicons are to similar effect.[12]  In *Holywell Corp. v. Smith*, 503 U.S. 47 (1992), the Supreme Court applied this common usage in deciding that a liquidating trustee in bankruptcy was an "assignee" within the meaning of section 6102(b)(3) of the Internal Revenue Code, and had to file returns and pay taxes on the income attributable to the property of the debtors.  In reaching that result, the Supreme Court relied upon the definitions cited above – *to wit*, that an assignee is "one to whom a right or property is legally transferred," or "[a] person to whom an assignment is made" and an "assignment" as "[t]he act of transferring to another all or party of one's property, interest, or rights").  *Holywell*, 503 U.S. at 53 (quoting, respectively,

---

84 Fed. Cl. 225, 229 (2008), *aff'd*, 437 Fed. Appx. 938 (Fed. Cir. 2011); *see also Nez Perce Tribe v. United States*, 83 Fed. Cl. at 191.

[12]  *See, e.g.,* Webster's New World College Dictionary, Wiley 85 (4th ed. 2009) ("A person to whom a claim, right, property, etc. is transferred."); Webster's Unabridged Dictionary, Random House 126 (2d ed. 2001) ("A person to whom some right or interest is transferred, either for his or her own enjoyment or in trust."); The American Heritage Dictionary, Houghton Mifflin Company 109 (4th ed. 2000) ("A party to which a transfer of property, rights, or interest is made."); The Random House Dictionary of the English Language, Random House 90 (1981) ("Law.  One to whom some right or interest is transferred . . . .").  Seeking to deflect the Black's Law Dictionary definition quoted above, defendant claims that dictionary goes on to caveat that definition by indicating that "the term's actual usage is sufficiently widespread that courts must typically look to the intent of parties in particular cases to devise a more precise meaning."  But, the passage in Black's does not quite say this, but instead states–

> Use of the term is so widespread that it is difficult to ascribe positive meaning to it with any specificity.  Courts recognize the protean nature of the term and are therefore often forced to look to ***the intent of the assignor and assignee in making the assignment*** – rather than to the formality of the use of the term assignee – ***in defining rights and responsibilities***.

Black's Law Dictionary, at 136 (emphasis added).  The highlighted language makes clear – as defendant's statement on brief does not – that even as a "protean" term, an "assignee" arises only when there is an "assignment."

Webster's Third New International Dictionary 132 (1986) and Black's Law Dictionary 118-19 (6th ed. 1990)). Other courts have employed the same definitions in construing the term "assignee" in the context of a various other Federal statutes, including the Anti-Assignment Act.[13]

Defendant would have this court employ an isolated definition of "assignee" that appears in a few dictionaries, that is, "[a] person appointed to act for another." *See* Webster's Ninth New Collegiate Dictionary, Merriam-Webster, Inc. 109 (1985); *see also* The Oxford English Dictionary, Clarendon Press 713 (2d ed. 1989). Legally speaking, this definition conflates an "assignee" with an "agent," as the latter is defined by Black's Law Dictionary as "one who is authorized to act for . . . another." Black's Law Dictionary, at 72. Can it be that Congress intended this confusion? The court thinks not for several reasons.

First, the ordinary rule of construction is that a court should accept the mainstream definition of a word, rather than that which is uncommon. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 226-28 (1994) (holding that a court need not accept a dictionary definition that contradicts "virtually all other[ ]" definitions).[14] Tellingly, defendant cites no case that has ever relied upon this definition – and research reveals none. Second, defendant's broader usage ill fits the remainder of the statute's structure, which anticipates that the referenced assignee be the holder of a "claim." *See Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989) ("statutory language cannot be construed in a vacuum").[15] Had Congress

---

[13] *See First Nat. City Bank v. United States*, 548 F.2d 928, 934-35 (Ct. Cl. 1977) (Anti-Assignment Act, 31 U.S.C. § 3727); *Redding v. Capital One Bank (USA), N.A.*, 2011 WL 4340855, at *3-4 (D. Minn. Sep. 15, 2011) (Truth in Lending Act, 15 U.S.C. § 1601 *et. seq.*); *Rojo v. Bear Stearns Residential Mortg. Corp.*, 2011 WL 2601355, at *7 (E.D. Wis. June 30, 2011) (same); *King v. Long Beach Mortg. Co.*, 672 F. Supp. 2d 238, 248 (D. Mass. 2009) (same); *In re Thompson Boat Co.*, 230 B.R. 815, 825 (Bkrtcy. E.D. Mich. 1995) (Uniform Commercial Code); *Myers v. Citicorp Mortg., Inc.*, 878 F. Supp. 1553, 1557 (M.D. Ala. 1995) (Truth in Lending Act); *see also Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1075 (11th Cir. 2003); *Saint John Marine Co. v. United States*, 92 F.3d 39, 47 (2d Cir. 1996) (construing the Anti-Assignment Act); *In re J.R. Deans Co.*, 249 B.R. 121, 140 (Bkrtcy. D.S.C. 2000) (applying the South Carolina Anti-Assignment Act).

[14] *See also Comcation, Inc. v. United States*, 78 Fed. Cl. 61, 67 (2007) (rejecting an isolated definition of the word "with" as it was "an outlier and provides no basis for applying a 'plain meaning' analysis of the statute"); *Holt v. LivInn Suites, Inc.*, 2010 WL 5834046, *3 (D. Minn. May 21, 2010); *Turner v. Ticket Animal*, 2009 WL 1035241, at *3 (S.D. Fla. Apr. 16, 2009); *see generally,* Antonin Scalia, Bryan A. Garner, "A Note on the Use of Dictionaries," 16 Green Bag 2d 419 (2013).

[15] A court must interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995), and "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Bros.*, 359 U.S. 385, 389 (1959). *See also Leocal v.*

wanted to incorporate a broad agency principle into the statute's definition of claimant, it knew how to do so, as it incorporated just such a principle into the statute's definition of the types of suits against the United States that would trigger its provisions. Thus, section 1500 applies not just to suits against the United States, but also to suits against "any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States." Finally, forced to choose between a well-accepted, legal definition of the term "assignee," and the imprecise verbiage offered by defendant, the court must opt for the former, lest it blur long-standing legal distinctions made literally in dozens of cases. *See Neder v. United States*, 527 U.S. 1, 21 (1999) ("[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.").[16] Indeed, a contrary conclusion – that the statute reaches all forms of agency relating to a claim – would sweep within this provision a host of legal relationships, including trustees, licensees, bailees, brokers, lawyers, *etc.*, rendering an already cumbrous statute all the more unwieldy. There is no indication that Congress intended this.[17]

There is no evidence that the plaintiffs before this court transferred any of their property, interests or rights to the KWUA (or any of the other *Kandra* parties). It follows, *a fortiori*, that they are not "assignees" under the ordinary definitions of that term. In arguing otherwise, defendant claims that each of the parties here should be viewed as having assigned at least some

---

*Ashcroft*, 543 U.S. 1, 9 (2004) (a court should "construe [statutory] language in its context and in light of the terms surrounding it"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-133 (2000) (parallel citations omitted).

[16] *See Widenski v. Shapiro*, 147 F.2d 909, 910-11 (1st Cir. 1945) (copyright proprietor was a "licensee" not an "assignee"); *Jones v. Winsor*, 133 F. 2d 931, 935 (C.C.P.A. 1942) (nonexclusive licensee was not an "assignee"); *Connett v. City of Jerseyville*, 125 F.2d 121, 125 (7th Cir. 1941) (agent of mortgage certificate holders was not "assignee"); *Resonant Sensors, Inc. v. SRU Biosystems, Inc.*, 651 F. Supp. 2d 562, 573 (N.D. Tex. 2009) (licensee was not an "assignee" when owner retained substantial patent rights); *Baladevon, Inc. v. Abbott Labs., Inc.*, 871 F. Supp. 89, 95 (D. Mass. 1994) (conveyance of a "complete bundle of rights" was an assignment); *Public Varieties of Miss., Inc. v. Sun Valley Seed Co., Inc.*, 734 F. Supp. 250, 253-54 (N.D. Miss. 1990) (licensee possessing right to market seeds was not an "assignee").

[17] The word "assignee" was in the original version of the statute, passed in the aftermath of the Civil War to address duplicative litigation filed by farmers seeking compensation for cotton lost during the war. *See Keene*, 508 U.S. at 206; Peabody, *et al.*, "Confederate Ghost," 4 Fed. Cir. B.J. 95. Nothing in the legislative history of section 1500 suggests that the word "assignee" should have a unique meaning within the statute. *See Kaw Nation*, 103 Fed. Cl. at 624-28 (extensively discussing the legislative history of section 1500).

of their rights to the KWUA.  The KWUA is a nonprofit corporation comprising irrigation districts and agricultural businesses in the Klamath Basin.  According to the record, KWUA "provides representation and information to its members regarding matters that affect the availability of water for use on lands within the Klamath Project."  Defendant notes that earlier in this proceeding, this court held that the irrigation districts in this case were all members of KWUA, and thus were in sufficient privity with the association to be bound by the prior judicial rejection of the association's claims by the district court.  *Klamath Irr. Dist.*, 75 Fed. Cl. at 687.  But, it is one thing to say that the plaintiffs here were in privity with one or more of the associations litigating in *Kandra*, and quite another, to say that makes the *Kandra* associations "assignees" for purposes of section 1500.[18]  Indeed, it is well-accepted that associational standing does not stem from any actual assignment of rights, but hinges on the relationship between the association and the interests of its members.[19]  There would be no need for such a principle if, as defendant claims, members of associations were viewed, solely by virtue of their membership, as assigning their claims to the association.[20]

Taking a similar tack, various courts have rejected claims that an association is somehow automatically the assignee of its members' claims.  *See Texas Life, Acc. Health & Hosp. Serv.*

---

[18]  In this earlier ruling, this court relied upon the Restatement (Second) of Judgments.  It is thus interesting that, in discussing nonparty preclusion, the Restatement has separate provisions discussing the impact of an individual being an assignee, *see* Restatement (Second) of Judgments § 55 (1982), and being a member of an "unincorporated association," *see id.* at § 61.  *See Amos v. PPG Indus., Inc.*, 699 F.3d 448, 451 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 2008 (2013).

[19]  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 (1997); *United Food and Comm. Workers v. Brown Grp., Inc.*, 517 U.S. 544, 551-52 (1996); *Int'l Union, United Auto, Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281-88 (1986).

[20]  One of the factors relied upon by the Supreme Court in assessing associational standing is whether the individual organization's members would have standing to sue in their own right – a factor that could not be satisfied if, via membership, the members of association were viewed as having assigned their claims to the association.  *See Arizonans for Official English*, 520 U.S. at 65-66 ("An association has standing to sue or defend in such capacity, however, only if its members would have standing in their own right."); *Food and Comm. Workers*, 517 U.S. at 551-52; *Hunt v. Wash. St. Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  Indeed, in these associational standing cases, it has been emphasized that "[a]bsent the assignment of the damage claims of its members . . . , an association may only seek injunctive or declaratory relief."  *Int'l Woodworkers of Am., AFL-CIO, CLC v. Georgia-Pacific Corp.*, 568 F.2d 64, 66 (8th Cir. 1977) (citing *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975)); *see also United Food*, 517 U.S. at 546 ("an association's action for damages running solely to its members would be barred for want of the association's standing to sue"); *Nat'l Ass'n of Realtors v. Nat'l Real Estate Ass'n*, 894 F.2d 937, 941 (7th Cir. 1990).

*Ins. Guar. Ass'n v. Gaylord Entm't Co.*, 105 F.3d 210, 219 (5th Cir. 1997) (association not an assignee under ERISA and does not have derivative standing to bring an action); *N.J. Thoroughbred Horsemen's Ass'n, Inc. v. Alpen House, U.L.C.*, 2013 WL 1831883, at \*11 (D.N.J. May 2, 2013) (holding that associational standing issue mooted because each member "specifically assigned" a claim to the association); *In re Tarragon Corp.*, 2013 WL 1680046, at \*7 (Bkrtcy. D.N.J. Apr. 16, 2013) (association is not an assignee); *see also Am. Home Mort. Servicing, Inc. v. Donovan*, 2011 WL 2923978, at \*3  (N.D. Tex. July 20, 2011) (mortgagee not assignee of mortgage-servicer).  Accordingly, in the absence of a specific assignment of the claims at issue here – and, again, there is no evidence of such an assignment – KWUA should not be viewed as an "assignee" for purposes of section 1500.  A contrary rule would prevent members from bringing damages claims while associational cases are pending, even though they may have no control over the latter litigation.  It would also require this court to determine whether any of the parties in a case before it were members of an association that had pending, at the time the suit here was filed, a lawsuit that might conceivably be viewed as raising the same claim.  Without even an inkling of this result suggested in the statute's language, the court will not head up this *primula* path. [21]

Nor is there anything in section 1500 that suggests that the term "assignee" should have a broader meaning then than ordinary usage would suggest.  In asserting otherwise, defendant points out that *Tohono* indicated that courts ought not interpret section 1500 in a way that would render that statute "nugatory through construction." *Tohono*, 131 S. Ct. at 1729-30.  That language, however, is no invitation to contort the words of section 1500 to reach every situation in which there are successive lawsuits involving similar subject matters.  As the Supreme Court itself said in *Tohono*, "considerations of policy divorced from the statute's text and purpose could not override its meaning," *Tohono*, 131 S. Ct. at 1731.[22]  This admonition is a two-way street, aptly-applied to attempts both to constrict and expand the statute beyond its proper scope.  One must assume that Congress' choice of words was "not an uninformative consequence of the limited scope of the statute, but rather manifestation of a considered congressional judgment." *United States v. Fausto*, 484 U.S. 439, 448-49 (1988).  "While this court "enjoy[s] no 'liberty to add an exception [to section 1500] to remove apparent hardship,'" *Keene*, 508 U.S. at 217-18 (quoting *Corona Coal*, 263 U.S. at 540), it neither can augment the statute's scope, converting it

---

[21]  One is reminded of what Justice Holmes said of an argument seeking overly to expand the scope of the Mississippi statute of frauds – "Of course it could be argued that logically they had that scope, but common sense would revolt."  *Fauntleroy v. Lum*, 210 U.S. 230, 235 (1908).

[22]  In *Kaw Nation*, this court noted "the considerable hazards of construing section 1500 through the policy prism of an individual case."  103 Fed. Cl. at 633; *see also United Keetoowah Band of Cherokee Indians in Okla. v. United States*, 104 Fed. Cl. 180, 189 (2012).  The court highlighted the "unpredictability" that "stems from the fact that section 1500 is part of a complex jurisdictional mosaic, making any debate over attaining a policy goal, even one so lofty as avoiding duplicative litigation, irresolvable solely by reference to a single decisional tile."  103 Fed. Cl. at 633.

into a purse seine that indiscriminately sweeps in not only relevant catch, but hosts of other case species. *See Petro-Hunt*, 105 Fed. Cl. at 47 ("Congress did not intend section 1500 to be all-encompassing, that is, to prevent all forms of redundant litigation, however encountered.").[23]

    Accordingly, the court concludes that none of the *Kandra* plaintiffs were assignees of the plaintiffs here. Thus, only the three plaintiffs both cases hold in common – KID, TID, and Mr. Baley – are potentially subject to section 1500.

## B.

    There is little dispute that the district court action was still "pending" within the meaning of section 1500 at the time that the original complaint in this case was filed. *See Griffin*, 85 Fed. Cl. at 186; *Nez Perce Tribe*, 83 Fed. Cl. at 189. The "pending" requirement is examined as of the date of the filing of the complaint, making it irrelevant that the district court suit was later dismissed. *Keene*, 508 U.S. at 207; *Trusted Integration*, 659 F.3d at 1166 n.2; *Kaw Nation*, 103 Fed. Cl. at 621; *Griffin*, 85 Fed. Cl. at 187. To be sure, the breach of contract claims asserted in this case – which, as will be seen, prove problematic – were not raised until the complaint was amended on March 24, 2003. While the latter date was after the dismissal of the district court action, under RCFC 15(c)(1)(B), the amendment of the complaint relates back to the date of the original pleading as it "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." *See Krupski v. Costa*

---

[23] In *Kaw Nation*, this court rejected defendant's argument that broad policy considerations countenanced a strained reading of section 1500, stating –

> it is highly debatable whether such broad policy considerations should play much, if any, role here. Nearly eighty years ago, the Supreme Court, in dealing with the precursor of section 1500, made short shrift of policy arguments like these in *Matson Navigation*. Thus, in rejecting the claim that the statute should be interpreted "to prevent the prosecution at the same time of two suits against the government for the same cause of action," the Court stated that "[a]s the words of the section are plain, we are not at liberty to add to or alter them to effect a purpose which does not appear on its face or from its legislative history." *Matson Navigation*, 284 U.S. at 356, 52 S.Ct. 162; *see also Corona Coal*, 263 U.S. at 540, 44 S.Ct. 156. Later, the Supreme Court made similar observations in *Keene*, contending that the "proper theater" for policy arguments was Congress. *Keene*, 508 U.S. at 217-18, 113 S.Ct. 2035; *see also Johns–Manville Corp.*, 855 F.2d at 1565; *Forsgren v. United States*, 73 Fed. Cl. 135, 141 (2006). In the court's view, the same fate ought to await the arguments defendant now makes, which seek to wield ill-defined policy goals to withdraw jurisdiction Congress has otherwise conferred on this court.

103 Fed. Cl. at 629 (footnote omitted).

*Crociere S.P.A.*, 130 S. Ct. 2485, 2493 (2010).[24]  Therefore, it must be concluded that *Kandra* was "pending" when all of the claims in question were filed.

## C.

Finally, for section 1500 to apply to the claims raised by KID, TID, and Mr. Baley, the suit in question and that in the district court must be "for or in respect to" the same claims.  In *Tohono*, the Supreme Court held this requirement is met when two claims are "based on substantially the same operative facts, regardless of the relief sought in each suit."  131 S. Ct. at 1727; *see also Brandt*, 710 F.3d at 1373; *Trusted Integration*, 659 F.3d at 1164.  Subsequently, this court has emphasized that "determining whether two claims are 'based on substantially the same operative facts' requires more than a side-by-side comparison of the two complaints to see how much verbiage is in common."  *Petro-Hunt*, 105 Fed. Cl. at 43.  Before performing such comparisons, rather, the court must "first isolate the facts in the complaint that are 'operative.'"  *Id*.  This requires the court to distinguish between "operative" facts and what some courts have termed "background" facts.  *See Central Pines Land Co.*, 697 F.3d at 1364-65; *U.S. Home Corp. v. United States*, 108 Fed. Cl. 191, 195 (2012).

### 1.

This all begs an obvious question – which facts are "operative"?  In *Keene* and *Tohono*, the Supreme Court did not extensively address this issue[25] – perhaps because the facts relevant to both claims in those cases were virtually the same.  In *Tohono*, the tribal lawsuits "were 'for all practical purposes, identical,'" *Tohono*, 131 S. Ct. at 1731 (quoting *Tohono O'odham v. United States*, 79 Fed. Cl. 645, 656 (2007)) – and the remedies sought even overlapped (both suits sought an equitable accounting).  *See Tohono*, 131 S. Ct. at 1727 ("The CFC complaint described the same trust assets and the same fiduciary duties that were the subject of the District Court complaint.  And it alleged almost identical violations of fiduciary duty for which it requested monetary damages.").[26]  Likewise, in *Keene*, the multiple suits at issue there all sought

---

[24]  Unlike in some cases, plaintiffs' amendment was not a supplemental complaint that added an entirely new cause of action arising after the filing of their original complaint.  *Petro-Hunt*, 105 Fed. Cl. at 45 (distinguishing between supplemental complaints under RCFC 15(d) and amended complaints under RCFC 15(c)).

[25]  *See Kingman Reef Atoll Investments, LLC v. United States*, 103 Fed. Cl. 660, 690 (2012) ("The Supreme Court's opinion in *Tohono O'Oodham Nation* offers little specific guidance by way of defining what facts are operative . . . .").

[26]  It was because the Nation's two actions sought overlapping relief, that Justices Sotomayor and Breyer believed that the case was controlled by *Keene Corp.* and did not present the question whether section 1500 bars an action in this court when the plaintiff's actions share a common factual basis, but seek different forms of relief.  *Tohono*, 131 S. Ct. at 1732 (Sotomayor, J., concurring in the judgment).

compensation from the United States for amounts Keene paid to asbestos plaintiffs. 508 U.S. at 203-04. In both Supreme Court cases, then, the only thing that differed were the legal theories pursued – in *Tohono*, the two suits were based, respectively, on the Tucker Act and the other on the APA, *see* 131 S. Ct. at 1727;[27] in *Keene*, on the Tucker Act and the Federal Tort Claims Act, *see* 508 U.S. at 204-05. As such, in judging which facts were "operative," these cases proved relatively easy to decide, as one suit was merely a repackaged version of the other (hereinafter referred to as "repackaged suits").[28]

Other cases, unfortunately, are ***not*** so easy to decide. Generally, this is because the relief needed by a given claimant is multi-faceted and "sequential" – that is, for either legal or logical reasons, the relief is sought in a particular sequence. Often two cases are necessary to effectuate entirely the relief needed because while Congress has authorized the claims, it has not allowed them to be joined in a single action.[29]

---

[27] The door to the injunctive prong of these twin suits was swung open by *Bowen v. Massachusetts*, 487 U.S. 879 (1988), in which the Supreme Court examined a challenge filed by the State of Massachusetts in district court to the federal government's disallowance of certain health care expenditures under the Medicaid statute. In holding that this suit could be appropriately brought under the APA, the Court determined that certain forms of injunctions requiring the United States to pay money did not require the payment of "money damages" within the meaning of 5 U.S.C. § 702. It also concluded that, on the facts presented, the monetary relief available under the Tucker Act was not an adequate remedy within the meaning of 5 U.S.C. § 704. *See* Gregory C. Sisk, "The Jurisdiction of the Court of Federal Claims and Forum Shopping in Money Claims Against the Federal Government," 88 Ind. L. J. 83, 91-92 (2013) (hereinafter "Sisk"). In the repackaged suits described above, like the tribal trust cases at issue in *Tohono*, the plaintiffs seek to bring themselves within the rules established by *Bowen*. *Id.* at 101-06.

[28] *See also Central Pines*, 697 F.3d at 1365 ("Because plaintiffs filed two nearly identical complaints that, at best, repackaged the same conduct into two different theories, and at worst, alleged the same takings claim, we find that there is a substantial overlap of operative facts that implicates the § 1500 bar."); *Winnebago Tribe of Nebraska v. United States*, 101 Fed. Cl. 229, 234 n.3 (2011) ("In other words, the Tribe has merely taken its allegations of the United States' conduct from its suit in federal district court and repackaged them in its Court of Federal Claims suit."). For further examples of "repackaged suits," *see In re Skinner & Eddy Corp.*, 265 U.S. 86, 91-92 (1924) (seeking money damages against the United States in the Court of Claims and against a federal entity in state court); *Corona Coal Co.*, 263 U.S. at 539 (seeking money damages against the United States in the Court of Claims and against a federal agent in District Court); *British American Tobacco Co. v. United States*, 89 Ct. Cl. 438, 439-40 (1939) (*per curiam*), *cert. denied*, 310 U.S. 627 (1940) (seeking tort damages in the district court and contract damages in the Court of Claims); *see also* Sisk, 88 Ind. L. J. at 119-28.

[29] For some examples of these sorts of cases, *see* Bremer & Siegel, 65 Ala. L. Rev. at 34-35.

Consider a case in which a party must establish a factual or legal predicate elsewhere as a precursor to prevailing in this court.  In defendant's view, that occurs, for example, where a plaintiff alleges that the United States has taken a mineral servitude alleged to have existed on Federal land.  In the past, defendant has argued that the question whether such a servitude existed – in other words, whether the plaintiff had the property interest allegedly taken – must be resolved before this court may consider whether the actions of the United States constituted a takings.  *See Kaw Nation*, 103 Fed. Cl. at 631 (discussing this issue).  But, that property question is, at least *ab initio*, a matter reserved to the Department of Interior, with judicial review available in the district court if the claimant disagrees with the agency's decision.  *See* 28 U.S.C. §§ 1346(f), 2409a.[30]  At least one commentator has described this situation as involving suits that are "necessarily sequential,"[31] in the sense that the claimant has no choice but to pursue the property interest question first, before pressing the takings claim in this court.  While the facts underlying the overall dispute might seem largely the same (a conclusion that might be begged by how the complaints are drafted), the facts that are relevant to whether a property interest arose initially often are entirely unrelated to the conduct that allegedly gave rise to the takings – indeed, the two events might be separated by decades.

A variation on this theme occurs when the relief needed by a plaintiff is still sequential, but a prior issue need not be resolved as a predicate to bringing a successful suit in this court.  This scenario – which we will call "optionally sequential" – arises where a plaintiff objects to an agency decision and seeks to overturn it.  That same plaintiff may be prepared alternatively to pursue a takings claim in the event that the agency decision is deemed valid.  *See Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1364 (Fed. Cir. 1998).  This situation often arises in cases involving challenges to a decision by the Army Corps of Engineers not to issue a permit under the Clean Water Act.  The property owner wishes to overturn that decision, but that issue cannot be addressed here, but must instead be directed to a U.S. district court.[32]  If the plaintiff is unsuccessful in overturning the Corps' action, it then will pursue a lawsuit in this court, often arguing that the Corps' decision effectuated a regulatory takings.  *See, e.g., Loveladies Harbor*, 27 F.3d at 1547; *Alaska v. United States*, 32 Fed. Cl. 689, 696 (1995).

---

[30]  *See Central Pines*, 697 F.3d at 1362; *see also Central Pines Land Co. v. United States*, 274 F.3d 881, 885 n.7 (5th Cir. 2001).  Although defendant has argued that the district court's jurisdiction over such property questions is exclusive, at least one decision by the Court of Claims appears to disagree.  *See Bourgeois v. United States*, 545 F.2d 727, 729 n.1 (Ct. Cl. 1976).

[31]  Craig A. Schwartz, "Footloose:  How to Tame the Tucker Act Shuffle After United States v. Tohono O'Oodham Nation," 59 UCLA L. Rev. Discourse 2, 5 (2011).

[32]  In the past, this situation sometimes has been referred to as the "Tucker Act Shuffle." *See* Hearings on H.R. 992, The Tucker Act Shuffle Relief Act of 1997, before Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 105th Cong. (1997).

Again, the facts underlying both disputes might overlap significantly, and might be portrayed as such in the complaints, but the facts that are relevant to whether a permit was properly denied might be very different than those relevant to whether, under the *Penn Central* test, the Corps effectuated a regulatory takings.[33]   The difference between this situation and the "necessarily sequential" situation described above is that in the former instance the claimant, at least in theory, has a choice – it may forego the direct challenge to the agency decision and, instead, proceed directly to the takings claim.[34]

Now, the Supreme Court obviously intended that its definition of "claim" would apply across-the-board, to all the cases to which section 1500 might apply, including the three categories described above – repackaged suits, necessarily sequential cases, and, lastly, optionally sequential cases.  We can safely assume this even though both *Keene* and *Tohono* were cases that plainly fell into only the first of these categories.  Given the Court's formulation, it thus falls to the definition of what facts are "operative" to distinguish between situations in which two suits may proceed *vel non* under section 1500.  This is especially so in the two "sequential" categories – necessarily or optionally – in which issues regarding whether the two claims involve substantially the same operative facts tend to be much thornier.

Recent cases offer a mixed bag on what is "operative" for purposes of section 1500.  To be sure, it is well-recognized that the fact that "two actions were based on different legal theories [does] not matter."  *Keene Corp.*, 508 U.S. at 212; *see also Brandt*, 710 F.3d at 1374.  More recently, the Federal Circuit has reiterated that "[i]mportantly, the legal theories underlying the asserted claims are irrelevant to this inquiry."  *Brandt*, 710 F.3d at 1374; *see also Trusted Integration*, 659 F.3d at 1164; *U.S. Home Corp.*, 108 Fed. Cl. at 195; *Rosebud Sioux Tribe v. United States*, 102 Fed. Cl. 429, 437 (2011).  It is equally established that the facts alleged in the two complaints need not be identical; "rather, the two complaints must stem from the same events."  *Cent. Pines Land*, 99 Fed. Cl. at 401 (citing *Griffin v. United States*, 590 F.3d 1291, 1294 (Fed. Cir. 2009)).  Yet, some Federal Circuit cases seem to determine what facts are "operative" based, in part, upon whether they are legally significant *vel non* in the context of a particular claim.

Consider *Trusted Integration*.  There, a dispute arose over a software product that the plaintiff sold to the Department of Justice.  659 F.3d at 1161.  Trusted Integration sued first in

---

[33]   The *Penn Central* reference, of course, is to the test established by the Supreme Court in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123-25 (1978).  Recently the Supreme Court cited that case in indicating that "most takings claims turn on situation-specific factual inquiries."  *Arkansas Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518 (2012) (citing *Penn Central*, 438 U.S. at 124).

[34]   If defendant is right, this "choice" is a Hobson's one and may prevent a plaintiff from obtaining all the relief to which it is entitled.  *See Tohono*, 131 S. Ct. at 1734 (Sotomayor, J., concurring); *see* Sisk, 88 Ind. L. J. at 135-38 (discussing this issue).

the district court and then in this court.  *Id*. at 1162.  The first and third claims in its complaint here asserted that the Justice Department had breached a contract to use the software in a government "excellence" competition.  *Id*. at 1165.  The Federal Circuit held that these claims were barred by section 1500 because they differed from the district court claims only in their "characterization of the relationship it claims gave rise to the legal duty it asserts DOJ breached."  *Id*.  The second claim in the complaint before this court, however, averred an alleged breach of Trusted Integration's software licensing agreement.  *Id*. at 1167.  Although all three claims stemmed from the Department's purchase and use of the software, the Federal Circuit held that this licensing claim was different than the claims at issue in the district court.  It concluded that the licensing claim, therefore, was not barred by section 1500, reasoning –

> Importantly, the facts that would give rise to breach of either of these agreements are not legally operative for establishing breach of the other.  Because the district court complaint is based on the fact that DOJ developed an alternative and promoted it, how the alternative was developed is not a legally operative fact.  Similarly, the fact that DOJ had a separate agreement to utilize TrustedAgent in CSAM is not relevant to whether DOJ breached the license agreement by accessing Trusted Integration's database to facilitate development of an alternative to TrustedAgent. The license agreement is not just an additional legal basis supporting Trusted Integration's claim to relief due to DOJ's development and promotion of CSAM without TrustedAgent; it is the source, and the only asserted source, for Trusted Integration's claim that DOJ was unlawfully using its property.  Accordingly, we find that Count II and the counts of the district court complaint are not based upon substantially the same operative facts.

*Id*. at 1168.  Invoking the *res judicata* principles emphasized in *Tohono*, the court further commented "[w]hile evidence relating to how the DOJ developed its TrustedAgent alternative would support the claims asserted in the district court complaint, this evidence would not both support ***and*** establish the district court counts, which was a prerequisite for application of" *res judicata*.  *Id*. at 1169-70 (emphasis in original).[35]  Accordingly, although many of the facts in the

---

[35]  The Federal Circuit added in this regard that:

> The evidence related to the license agreement, while relevant as part of the *res gestae* of DOJ's wrongful acts, would not establish that Trusted Integration and DOJ had a joint venture, nor that DOJ's conduct violated a fiduciary duty it owed Trusted Integration.  This evidence, therefore, would be insufficient to establish the claims alleged in the district court complaint, and vice versa.

659 F.3d at 1170.

two cases were the same – the same parties, the same software, the same transaction – the court held that the claim relating to the licensing agreement was distinct.[36]

Judges of this court have staked out differing views as to what *Trusted Integration* holds. Some, including the undersigned, have cited the Federal Circuit's opinion for the proposition that "operative" facts are "those that must be proven in order to recover on a given claim." *Petro-Hunt*, 105 Fed. Cl. at 43; *see also Stockton East Water Dist. v. United States*, 101 Fed. Cl. 352, 356 (2011) (noting that *Trusted Integration* distinguished two seemingly similar claims because "they were distinct claims based on distinct proofs").[37] Others, however, have rejected the notion that "operative facts" are those "necessary to establish the elements of a particular legal theory." *U.S. Home Corp.*, 108 Fed. Cl. at 199; *see, however*, *id*. at 195 ("[t]he term 'operative facts' in the context of § 1500, refers to facts alleging government conduct which gives rise to claims against the United States"). The latter decisions draw support from the Federal Circuit's decision in *Johns-Manville Corp.*, 855 F.2d at 1564, where the court stated that "[s]ince the legal theory is not relevant, neither are the elements of proof necessary to present a *prima facie* case under that theory." *See also Goodeagle*, 105 Fed. Cl. at 176. However, the Federal Circuit held that this ruling applied only "where both forums could grant the same relief, arising from the same operative facts." *Johns-Manville Corp.*, 855 F.2d at 1564; *see also Loveladies Harbor*, 27 F.3d at 1550; *Casman v. United States*, 135 Ct. Cl. 647, 650 (1956). Any distinction based on relief was, of course, eliminated by *Tohono*, leaving in doubt the meaning of this part of the *Johns-Manville* opinion.

---

[36] In an unpublished decision issued subsequent to *Trusted Integration*, the Federal Circuit confronted a tax refund suit that involved the same employment tax issues that had been raised in a Tax Court suit (*see Kovacevich v. Comm'r of Internal Revenue*, 98 T.C.M. (CCH) 1 (2009)). *Western Mgmt., Inc. v. United States*, 498 Fed. Appx. 10, 11 (Fed. Cir. 2012). The only difference was the tax years at issue in the respective cases – the Tax Court suit concerned the taxpayer's 1992 tax liability, while the suit in this court involved their 1994 and 1995 tax liabilities. *Id*. In a split decision, the majority concluded that section 1500 did not deprive this court of jurisdiction over the later-filed refund suit because "the 'operative facts' are not the same." *Id*. at 14 n.3. Although not apparent from the decision, the latter holding reflects a legal distinction in the tax law, *to wit*, that each tax year represents a separate cause of action. *See Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 598 (1948); *Prestop Holdings, LLC v. United States*, 96 Fed. Cl. 244, 254 n.23 (2010) (citing cases).

[37] *See generally*, *Allstate Financial Corp. v. United States*, 29 Fed. Cl. 366, 369 (1993) ("operative facts are those facts essential to the grievance for which recovery is sought"); *Ali v. Rutgers*, 765 A. 2d 714, 717 (N.J. 2000) ("The term 'operative facts,' on the other hand, signifies events or facts relevant to a cause of action."); *Herlihy Moving and Storage, Inc. v. Nickison*, 2010 WL 5550669, at *5 (Ohio App. Dec. 30, 2010) ("Operative facts are those facts which if proven would give rise to a meritorious defense or support the alleged grounds for relief from judgment.").

These divergent views illustrate the implacability of the quandary that has arisen as courts strive to apply the *Tohono* Court's definition. If one combines these cases with a few dozen more decided in recent years, you have the makings of a modern equivalent to King Gordius' knot of old. In untangling this concept (only Congress can play the part of Alexander), it makes sense to start with a few definitions. Black's Law Dictionary 670 (9th ed.) defines an "operative fact" as "[a] fact that affects an existing legal relation, esp. a legal claim" or "a fact that constitutes the transaction or event on which a claim . . . is based." In the context of our enquiry, this definition is a bit tautologous, as it defines what are operative facts by reference to what is a "claim," while our task, of course, is the reverse. Though in ways unfulfilling, this definition hints at something fundamental, something that *Trusted Integration* likewise suggests – that there may be a "legal" dimension to what is an operative fact – that such a fact must affect an existing "legal relation" or "legal claim." *See also* Restatement of Agency § 284a ("operative facts" are "[t]hose facts which constitute the transaction or event upon which a cause of action or defense is based").

## 2.

One intent upon exploring beyond these definitions must confront the notion that the Supreme Court in *Keene*, and later in *Tohono*, left lower courts adrift in using – without defining – the phrase "operative facts." But this charge proves, at least, overstated. First of all, in *Tohono*, the Supreme Court mapped out some of the contours of this analysis by stating that *res judicata* principles were relevant in determining what is "operative." *Tohono*, 131 S. Ct. at 1730. Beyond this, research strongly suggests that the Supreme Court may not have expounded upon what are "operative facts" because it knew that phrase has a well-defined meaning in the law. Indeed, for decades, courts have focused on whether two cases have substantially the same "operative facts" in applying various of the joinder rules found in the Federal Rules of Civil Procedure. Among these are: (i) Rule 13, dealing with compulsory counterclaims; (ii) Rule 15, dealing with the amendment of claims; and (iii) Rule 20, dealing with the joinder of defendants. What do all these rules have in common? Like section 1500, they all use the word "claim."[38] In

---

[38] There are eight rules of joinder in the Federal Rules of Civil Procedure governing the grouping of claims (Rules 13, 14 and 15), parties (Rules 19, 20, and 23); claimants (Rules 23 and 24), and actions (Rule 42). *See* Robin J. Effron, "The Shadow Rules of Joinder," 100 Geo. L.J. 759, 764 (2012). Each of these rules (perhaps with the exception of Rule 23) parallels rules of this court. Noting the relationship among the predecessors of these joinder rules, the Restatement of the Law of Judgments (1942), in discussing *res judicata*, observed:

The term 'cause of action' is used in many different situations as, for example, where the question is as to the effect of the joinder or nonjoinder of claims, or as to what are permissible counterclaims, or as to the extent of permissible amendments to a complaint, or as to the effect of the Statute of Limitations where pleadings have been amended.

an effort better to understand what are "operative facts," particularly in the two categories of sequential cases, the court will review how that concept has developed, over time, under these other rules.

**a.**

Under Rule 13(a)(1) of the Federal Rules of Civil Procedure, "[a] pleading must state as a counterclaim any claim that – at the time of its service – the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." *See also* RCFC 13(a)(1) (using identical language).[39] Accordingly, this rule "states that counterclaims must be included in responsive pleadings if they arise out of the same transaction or occurrence." *Office of Strategic Servs., Inc. v. Sadeghian*, 2013 WL 2677879, at *8 (4th Cir. June 14, 2013). Under this rule, a compulsory counterclaim must be asserted in responsive pleadings or it is "thereafter barred." *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974); *see also United States v. Dico, Inc.*, 136 F.3d 572, 577 (8th Cir. 1998); *Cleckner v. Republic Van & Storage Co.*, 556 F.2d 766, 768-69 (5th Cir. 1977).

Courts construing this rule have held that "[a] counterclaim is compulsory when both the original claim and counterclaim arise from the same aggregate of operative facts." *McDaniel v. Anheuser-Busch*, 987 F.2d 298, 304 (5th Cir. 1993) (quoting *Birmingham Fire Ins. Co. v. Winegardner & Hammons, Inc.*, 714 F.2d 548, 551 (5th Cir. 1983)); *see also Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 801 (Fed. Cir. 1999) ("Rule 13(a) recognizes that when disputed issues arise from the same operative facts, fairness as well as efficiency require that the issues be raised for resolution in the same action."). The Federal Circuit, as well as a number of other courts, have articulated a four-part test for determining whether a counterclaim involves the same operative facts as a suit.[40] The first question under this test is, are "the issues

---

*Id.* at Introductory Note to Title D. (What Constitutes the Same Cause of Action (What Claims Are Extinguished by Judgment)).

[39] Given the continuing dispute (at least insofar as defendant is concerned) over whether the "order of filing" rule in *Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), *cert.* denied, 382 U.S. 976 (1966), is still good law, *see, e.g., Kaw Nation*, 103 Fed. Cl. at 617, it is noteworthy that under Rule 13(a)(2)(A), the compulsory counterclaim rule does not apply if "when the action was commenced, the claim was the subject of another pending action."

[40] *See, e.g., Vivid Techs.*, 200 F.3d at 801; *Iglesias v. Mutual Life Ins. Co. of N.Y.*, 156 F.3d 237, 241 (1st Cir. 1998), *cert.* denied, 528 U.S. 812 (1999), *abrogated on other grounds by Global NAPs, Inc. v. Verizon New Eng. Inc.*, 603 F.3d 71, 86 n.18 (1st Cir. 2010); *Driver Music Co., Inc. v. Commercial Union Ins. Cos.*, 94 F.3d 1428, 1435 (10th Cir. 1996); *Park Club, Inc. v. Resolution Trust Corp.*, 967 F.2d 1053, 1058 (5th Cir. 1992); *Painter v. Harvey*, 863 F.2d 329,

of fact and law raised by the claim and counterclaim largely the same?"[41]  The second is "would *res judicata* bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?"[42]  Third, the court must ask "[w]ill substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?"[43]  And, finally, "[i]s there any logical relation between the claim and the counterclaim?"[44]  As formulated by the Federal Circuit, as well as other circuits, an affirmative answer to any of these questions "means that the counterclaim is compulsory."[45]  Other courts are more inclined to weigh the responses to these questions, with some courts giving more weight to the answers to the latter two questions (same

---

331 (4th Cir. 1988); *Cochrane v. Iowa Beef Processors, Inc.*, 596 F.2d 254, 264 (8th Cir.), *cert. denied*, 442 U.S. 921 (1979).

[41]   *See Vivid Techs.*, 200 F.3d at 801; *Iglesias*, 156 F.3d at 241; *Driver Music Co.*, 94 F.3d at 1435; *In Re Rebel Coal Co., Inc.*, 944 F.2d 320, 322 (6th Cir. 1991); *Tullos v. Parks*, 915 F.2d 1192, 1195 n.8 (9th Cir. 1990); *Plant v. Blazer Financial Servs., Inc. of Ga.*, 598 F.2d 1357, 1360 (5th Cir. 1979); *Cochrane*, 596 F.2d at 264; *Whigam v. Beneficial Finance Co. of Fayetteville, Inc.*, 599 F.2d 1322, 1323 (4th Cir. 1979); *see also* 6 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, Ada, N. Steinman, Fed. Prac. & Proc. Civ. § 1410 n. 7 (3d ed. 2013) (citing additional cases) (hereinafter "Wright & Miller").

[42]   *Vivid Techs.*, 200 F.3d at 801; *Tullos*, 915 F.2d at 1195 n.8; *McCaffrey v. Rex Motor Transp.*, 672 F.2d 246, 248 (1st Cir. 1982); *Plant*, 598 F.2d at 1360; *Cochrane*, 596 F.2d at 264; *see also* Wright and Miller, at § 1410.

[43]   *Vivid Techs.*, 200 F.3d at 801; *Tullos*, 915 F.2d at 1195; *McCaffrey*, 672 F.2d at 248; *Plant*, 598 F.2d at 1360; *Cochrane*, 596 F.2d at 264; *see also* Wright and Miller, at § 1410.

[44]   *Moore v. N.Y. Cotton Exch.*, 270 U.S. 593, 610 (1926); *Vivid Techs.*, 200 F.3d at 801; *Montgomery Elevator Co. v. Bldg. Engineering Servs. Co., Inc.*, 730 F.2d 377, 380 (5th Cir. 1984); *Santiago-Sepulveda v. Esso Standard Oil Co.*, 256 F.R.D. 39, 45 (D. Puerto Rico 2009). The Fifth Circuit has said that "[a] logical relationship exists when the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendants." *Montgomery Elevator*, 730 F.2d at 380 (quoting *Plant*, 598 F.2d at 1361).

[45]   *See Vivid Techs.*, 200 F.3d at 801 (noting that "any one of [the tests] can render a counterclaim compulsory"); *see also Underwriters at Interest on Cover Note JHB92M10482079 v. Nautronix, Ltd.*, 79 F.3d 480, 483 n.2 (5th Cir. 1996); *Feed Mgmt. Sys., Inc. v. Brill*, 518 F. Supp. 2d 1094, 1096 (D. Minn. 2007); *Minnetonka, Inc. v. Sani-Fresh Int'l, Inc.*, 103 F.R.D. 377, 379 (D. Minn. 1984); *cf. Painter*, 863 F.2d at 331 ("A court need not answer all these questions in the affirmative for the counterclaim to be compulsory.").

evidence and logical relationship).[46]  Conversely, where each of the four inquiries is answered in the negative, a counterclaim is ordinarily viewed as arising out of a different transaction or occurrence, and is thus not compulsory.  *See Plant*, 598 F.2d at 1360; *Kopf v. Chloride Power Elecs., Inc.*, 882 F. Supp. 1183, 1188 (D.N.H. 1995); 6 Wright & Miller, at § 1410.

**b.**

Under Federal Rule of Civil Procedure 15(c)(1)(B), an amended pleading "relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading."  *See Mayle v. Felix*, 545 U.S. 644, 656 (2005); *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 227 (2d Cir. 2006).  Relation back under this rule is not authorized when the new claims arise from an entirely different event or set of facts.[47]  To arise out of the same, conduct, transaction or occurrence, the claims must be "tied to a common core of operative facts."  *Mayle*, 545 U.S. at 664; *see also Glover v. FDIC*, 698 F.3d 139, 145 (3d Cir. 2012); *Dodd v. United States*, 614 F.3d 512, 515 (8th Cir. 2010); *Hodge v. United States*, 554 F.3d 372, 378 (3d Cir. 2009); *Slayton*, 460 F.3d at 228.[48]  So decided the Supreme Court in *Mayle*, where it applied Rule 15(c) to an amended habeas corpus petition.  *Mayle*, 545 U.S. at 656-67.

In interpreting this rule, courts generally hold that claims share a common core of operative facts if "the plaintiff will rely on the same evidence to prove each claim."  *Williams*, 517 F.3d at 1133.  This is essentially the same inquiry as is employed under other rules, including those dealing with compulsory counterclaims.  *See* 6A Wright & Miller, *supra*, at § 1497 ("As is true in a number of other contexts, such as compulsory counterclaims, crossclaims, and certain third-party claims, the search under Rule 15(c) is for a common core of operative facts in the two pleadings.").  As the Supreme Court stated in *Mayle*, the new claims cannot "assert[] a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth," 545 U.S. at 650; they cannot depend upon events "separate in

---

[46]  *See Pipeliners Local Union No. 798 v. Ellerd*, 503 F.2d 1193, 1199 (10th Cir. 1974) ("The 'logical relation' test is the most controlling.").  This view is consistent with that advocated by Professors Wright, Miller *et al*.  *See* 6 Wright & Miller, at § 1410.

[47]  *See Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 962 (10th Cir. 2012); *Slayton*, 460 F.3d at 228; *Oja v. U.S. Army Corps of Engineers*, 440 F.3d 1122, 1134-35 (9th Cir. 2006); *Miller v. American Heavy Lift Shipping*, 231 F.3d 242, 249 (6th Cir. 2000).

[48]  Because the rationale of this rule is to ameliorate the impact of the statute of limitations, in applying this provision, courts also inquire into whether the opposing party has been put on notice regarding the claim or defense raised by the amended pleading.  *See Krupski*, 130 S. Ct. at 2494.  This additional requirement, however, does not modify how courts approach the "operative facts" component of the rules eligibility test.

both time and type from the originally raised episodes," *id.* at 657; *see also Northern Assur. Co. v. Grand View Bldg. Ass'n*, 203 U.S. 106, 108 (1906); *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013); *United States v. Gonzalez*, 592 F.3d 675, 679 (5th Cir. 2009), *cert. denied*, 131 S. Ct. 231 (2010).

Under this approach, courts can more readily distinguish between a new legal theory based on different facts, as opposed to one depending on the same facts. *See U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, 608 F.3d 871, 881 (D.C. Cir. 2010), *cert. denied*, 131 S. Ct. 244 (2011); *Williams*, 517 F.3d at 1133; *United States v. Hicks*, 283 F.3d 380, 388-89 (D.C. Cir. 2002). Accordingly, "[a] new pleading cannot relate back if the effect of the new pleading 'is to fault [the defendant] for conduct different from that identified in the original complaint,' even if the new pleading 'shares some elements and some facts in common with the original claim.'" *Full Life Hospice*, 709 F.3d at 1018 (quoting *Bill Harbert Int'l Constr.*, 608 F.3d at 881); *see also Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009); 6A Wright & Miller, at § 1497.

**c.**

Under Rule 20, which is entitled "Permissive Joinder of Parties," defendants may be joined in a single action only if: (i) the claims against them are "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences;" and (ii) a question of law or fact common to all defendants will arise in the action. Fed. R. Civ. P. 20(a)(2); *see United States v. Mississippi*, 380 U.S. 128, 142-43 (1965). The Federal Circuit recently held that "independent defendants" can be joined under Rule 20 only if the claims against them "share an aggregate of operative facts." *In re EMC Corp.*, 677 F.3d 1351, 1358-60 (Fed. Cir. 2012). A variety of courts, including the Supreme Court, have employed this same approach. *See United States v. Mississippi*, 380 U.S. at 142-43; *N.Y. Life Ins. Co. v. Deshotel*, 142 F.3d 873, 882 (5th Cir. 1998); *Iglesias*, 156 F.3d at 242; *see also Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997).

In defining when claims are based upon substantially the same "operative facts," courts focusing on the transaction-or-occurrence prong of Rule 20 have relied upon cases construing the similar requirement in Rule 13(a) for compulsory counterclaims. *In re EMC Corp.*, 677 F.3d at 1357-58; *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1323 (11th Cir. 2000); *Mosley v. Gen. Motors Corp.*, 497 F. 2d 1330, 1333 (8th Cir. 1974); *Malibu Media, LLC v. John Does 1-6*, 291 F.R.D. 191, 201 (N.D. Ill. 2013); *see also* 7 Wright & Miller, at § 1653. Hence, some courts have concluded that, like Rule 13, Rule 20 applies where there is a "logical relationship" between the claims." *In re EMC Corp.*, 677 F.3d at 1358; *see also Republic Health Corp. v. Lifemark Hosps. of Fla.*, 755 F.2d 1453, 1455 (11th Cir. 1985). In this regard, the Federal Circuit has adumbrated that "[t]he logical relationship test is satisfied if there is a substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant," adding that "pertinent factual considerations" include "whether the alleged acts . . . occurred during the same

time period." *In re EMC Corp.*, 677 F.3d at 1358, 1359-60.[49]  In *EMC*, the Federal Circuit explained that "[t]o be part of the 'same transaction' requires shared, overlapping facts that give rise to each cause of action, and not just distinct, albeit coincidentally identical facts."  *Id.*[50] Other courts have said that the required logical relationship exists "if the claims rest on the same set of facts or the facts, on which one claim rests, activate additional legal rights supporting the other claim."  *Smith v. Trans-Siberian Orchestra*, 728 F. Supp. 2d 1315, 1319 (M.D. Fla. 2010) (citing *Republic Health Corp.*, 755 F.2d at 1455).

## III.

So what can be distilled from this *tour d'horizon*?  A review of these cases reveals that courts have been remarkably consistent not only in defining what are the same "claims" by reference to the underlying "operative facts," but also in providing guidance for determining whether two claims present the same or substantially similar "operative facts."  Cases construing these concepts in different legal settings have arrived at similar formulations – not coincidentally, as the cases have explicitly recognized that the standards applicable to some rules ought to apply to others.[51]  These cases yield a set of enquiries, forming a battery of tests that

---

[49]  *See also Tank Insulation Int'l, Inc. v. Insultherm, Inc.*, 104 F.3d 83, 85-86 (5th Cir. 1997), *cert. denied*, 522 U.S. 907 (1997) (two claims satisfy the transaction-or-occurrence test where, *inter alia*, the issues of fact and law "largely are the same" and "whether substantially the same evidence" will support or refute the claims); *Third Degree Films v. Does 1-47*, 286 F.R.D. 188, 194 (D. Mass. 2012).

[50]  *See also Ameranth, Inc. v. Pizza Hut, Inc.*, 2012 WL 3223694, at *3 (S.D. Cal. Aug. 6, 2012); *Net Nav. Systems, LLC v. Cisco Sys., Inc.*, 2012 WL 7827543, at *2 (E.D. Tex. Aug. 12, 2012) (applying the same principle to the joinder rules of the American Invents Act, 35 U.S.C. § 299); *H-W Tech., L.C. v. Apple, Inc.*, 2012 WL 3072776, at *4 & n.1 (N.D. Tex. July 5, 2012) (applying *EMC*).

[51]  Courts have employed similar considerations in determining whether a Federal court may exercise pendent or supplemental jurisdiction under 28 U.S.C. § 1367(a).  *See Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214, 221 (5th Cir. 2012); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011); *Palmer v. Hosp. Auth. of Randolph County*, 22 F.3d 1559, 1563-64 (11th Cir. 1994); *see generally United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  Indeed, some courts have explicitly adopted the standards employed under rules like Rule 13(a) in deciding whether there is the intersection of "operative facts" that would authorize a court to exercise jurisdiction under this statute.  *See Beltran v. Medcure, Inc.*, 2013 WL 3833208, at *2-3 (M.D. Fla. 2013); *see also Ambromovage v. United Mine Workers of Am.*, 726 F.2d 972, 990 n. 54 (3d Cir. 1984); *see generally,* Mark Jay Altschuler, Note, "The Res Judicata Implications of Pendent Jurisdiction," 66 Cornell L. Rev. 608, 614 (1981).  Reflecting the relationship between the standard in the rule and that for pendent jurisdiction, it has been observed that "[c]ourts automatically have supplemental jurisdiction over compulsory counterclaims."  *Scott v. A&Z General Cleaning Servs., Inc.*, 2011 WL 3516075, at *2 (M.D.

may be employed in determining whether two claims present substantially similar "operative facts." Through the prism of these tests, the Supreme Court's definition of the word "claim" in the context of section 1500 comes into better focus, particularly as applied to difficult cases.

So what are those enquiries? In deciding whether two claims are the same for purposes of section 1500, the cases discussed above suggest that the court should ask and ultimately answer four questions:

(i)      Are the issues of fact and law raised by the two claims largely the same?

(ii)     If an adverse merits decision were rendered on the earlier claim, would the doctrine of *res judicata* bar a subsequent suit on the later-filed claim?

(iii)    Will the plaintiff rely on substantially the same evidence to support each of the two claims?

(iv)     Is there any other logical relationship between the two claims?

Reflecting the majority view of the circuits (including that of the Federal Circuit), the court believes that an affirmative answer to any one of the questions should lead to two claims being viewed as the same for purposes of section 1500. *See, e.g.*, *Vivid Techs.,* 200 F.3d at 801.

As can be seen, these queries strongly resemble those employed under Federal Rules of Civil Procedure 13, 15 and 20. And why not? It seems entirely appropriate to borrow from the cases construing these rules as there is no apparent reason why the words "claim" in section 1500 – and, subsidiarily, the phrase "operative facts" – should be ascribed meanings that differ from those given the same words and phrases in the context of the civil rules. While different legal provisions, including statutes passed by different Congresses, can use the same words to mean different things, *see United States v. Memphis Cotton Oil Co.*, 288 U.S. 62, 67-68 (1933), the word "claim" does not comfortably bear different meanings here, as all of the provisions at issue are rooted in preventing duplicative litigation and assuring a degree of consistency in judgments.

---

Fla. July 18, 2011) (quoting *James D. Hinson Elec. Contracting Co. v. Bellsouth Telecomm., Inc.*, 2011 WL 2448911, at *1 (M.D. Fla. Mar. 28, 2011)); *see also King v. Hainje's, Inc.*, 2008 WL 3075756, at *2 (S.D. Ala. July 22, 2008).

The same four factors are also applied in determining whether a governmental entity has waived its immunity as to a given claim under the Bankruptcy Code. *See* 11 U.S.C. § 106(b); *see also In re Kaiser Grp. Intern., Inc.*, 399 F.3d 558, 569 (3d Cir. 2005); *Tank Insulation*, 104 F.3d at 85-86. Notably, the Federal Circuit cited the *Tank Insulation* case in support of its construction of Federal Rule of Civil Procedure 20, providing further evidence of the interrelationship between these various provisions. *In re EMC Corp.*, 677 F.3d at 1358.

In like instances, where provisions have been linked by an animating principle, the Supreme Court has carried its constructions of key phrases from one statutory context to another. Such has been the case, for example, in fee-shifting provisions. *See Buckhannon Bd. and Care Home, Inc. v. W. Va. Dept. of Health and Human Res.*, 532 U.S. 598, 603 n.4 (2001) (noting that the Court has interpreted the phrase "prevailing party" consistently across fee-shifting provisions); *Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983) (same); *compare Atl. Cleaners & Dryers, Inc. v. United States*, 286 U.S. 427, 433 (1932). Neither the language, structure nor legislative history of section 1500, nor, for that matter, any of the cases discussed above, hints at the notion that what is a "claim" for purposes of section 1500 is somehow idiosyncratic – that Congress had something different in mind than the drafters of the rules.[52]  Frankly, if the Supreme Court had intended to draw such distinctions, it presumably would not have defined the word "claim" in terms of "operative facts," as this, of course, is also the initial step of the analysis under each of the rules.

That said, it makes eminent sense to pause and reflect on whether this battery of tests is consistent with the teachings in *Tohono*, *Keene* and the Federal Circuit's recent pronouncements in this area. The answer, it would appear, is "yes." For example, this multi-pronged approach's use of *res judicata* principles, outlined above, makes perfect sense in light of *Tohono*. That case holds that if a decision in the first case would be preclusive in the second, section 1500 ought to apply; if that preclusion is not the case, the court must look at other factors that serve to determine whether the cases present a single claim or different claims. *See Tohono*, 131 S. Ct. at 1730; *see also Trusted Integration*, 659 F.3d at 1164. And that is how the enquiries listed above work – particularly, if one employs the *res judicata* tests that were in effect at the time section 1500 was enacted. Indeed, the historical tests for *res judicata* adopted by the Supreme Court in *Tohono* have features that overlap with some of the other enquiries stated above – focusing, for example, on whether "the same evidence support[s] and establish[es] both the present and the former cause of action?" *Tohono*, 131 S. Ct. at 1730 (quoting Henry Black, A Treatise on the Law of Judgments, § 726 (1891) (hereinafter "Black's Judgments")).

Although initially it might not seem so, the multi-pronged approach above is also consistent with decisions holding that the legal theory employed in a given case is "irrelevant." Care must be taken lest this instruction be misconstrued and misapplied. A careful reading of the Federal Circuit's cases reveals that they hold that a single claim may not be split through the guise of pleading alternate legal theories as to why a recovery is appropriate. They do not hold that the converse is true – that is, that distinct claims become the same ***because*** they embody different legal theories. Indeed, it is hard to conceive of distinct claims that would not incorporate different legal theories – often the difference in this regard is fundamental. The Supreme Court recognized as much in *Tohono*, stating that "[t]he form of relief matters less, ***except insofar as it affects what facts the parties must prove***." 131 S. Ct. at 1730 (emphasis

---

[52]  For an extensive discussion of the legislative history of section 1500, *see Kaw Nation*, 103 Fed. Cl. at 623-29; *see also Tecon*, 343 F.2d at 946-50.

added).[53]  In the court's view, neither *Brandt* nor *Trusted Integration* meant to undercut this view when they said "legal theories underlying the asserted claims are irrelevant to this inquiry." *Brandt*, 710 F.3d at 1374; *Trusted Integration*, 659 F.3d at 1164.  So viewed, the language in these cases is consonant with the phalanx of cases that has focused on the relevancy of facts to a particular cause of action in determining what are separate "claims" with distinct "operative" facts for purposes of Rules 13, 15 and 20.

<h2 style="text-align:center">IV.</h2>

With this framework in mind, let us turn back to the facts of the case *sub judice*.  Before applying the tests listed above, it is important to recognize that this case involves not one, but two claims – the first (actually a set) alleging that the failure to deliver water effectuated a takings; the second asserting that the same failure effectuated a breach of numerous water contracts.

The takings claims fall into the category of being "optionally sequential."  The *Kandra* plaintiffs did not have to challenge the actions taken by the Bureau, but could have proceeded immediately to this court with their takings claims, as did the other plaintiffs in this case.  As to the breach of contract claim, however, this case is not sequential and bears a stronger resemblance to a "repackaged claim."  While *Kandra* and this case differ somewhat in the nature of the breaches alleged (and the relief sought), they both involve the same contracts.  Thus, the question is whether the "operative facts" underlying the district court breach claim are substantially the same as those underlying this action.  As *Trusted Integration* illustrates, that question must be answered on a claim-by-claim basis.  *See Trusted Integration*, 659 F.3d at 1165.  Viewed in this fashion, and based upon the battery of tests described above, the court

---

[53]  In *Loveladies Harbor*, 27 F.3d at 1551 n.17, the Federal Circuit, while discussing prior cases such as *Keene* and *Johns-Manville*, addressed the "operative facts" inquiry as follows:

> Despite its lineage, it can be argued that there is a basic epistemological difficulty with the notion of legally operative facts independent of a legal theory.  Insofar as a fact is 'operative' – i.e., relevant to a judicially imposed remedy – it is necessarily associated with an underlying legal theory, that is, the cause of action.  For example, without legal underpinning, words in a contract are no different from casual correspondence.

Various courts have commented that, in so observing, *Loveladies* did not deviate from the standard set forth in *Keene*.  *See Ramah Navajo School Bd., Inc. v. United States*, 83 Fed. Cl. 786, 793 (2008) (citing cases).  Defendant does not appear to disagree fundamentally with this approach.  Taking note of many of the same cases, defendant took the position, in a supplemental filing, that "operative facts" are "those constituting the factual predicate for the cause of action."

concludes that, insofar as the takings claims are concerned, section 1500 does not apply.  As will be seen, however, the case is otherwise as to the breach claims here.

### A.

Under the identity-of-issues test, the focus is on whether the issues of fact and law raised by the two claims are "largely the same."  *Tank Insulation*, 104 F.3d at 85-86.  As the word "largely" implies, this test "does not require a complete overlap between" the claims.  7 Wright & Miller, *supra*, at § 1410; *see also Papadopoulos v. Douglas*, 268 F.3d 1063 (5th Cir. 2001) (per curiam); *CheckPoint Fluidic Sys. Intern., Ltd. v. Guccione*, 2011 WL 3268386, at *7 (E.D. La. July 28, 2011).  To be sure, there are inherent limitations in applying this test early in a case, as it may be difficult for a court to compare claims on which little factual development has occurred.  7 Wright & Miller, at § 1410.  That, however, is less of a problem in this case given defendant's ten-year delay in raising the section 1500 issue.

In terms of the takings claim, the issues of fact and law raised by the *Kandra* complaint and the plaintiffs' complaint here have little in common.  In *Kandra*, the plaintiffs sought an injunction enjoining the Bureau from implementing a revised plan, issued April 6, 2001, that terminated the delivery of irrigation water to many individuals and irrigation districts for the year 2001.  *See Kandra*, 145 F. Supp. 2d at 1195-96.  In that lawsuit, the plaintiffs also argued that "the 2001 Plan breache[d] their contractual rights to irrigation water and [was] arbitrary and capricious under the Administrative Procedure Act . . . in that its implementation violates the National Environmental Policy Act . . . and the Endangered Species Act."  *Id.*  More specifically, the plaintiffs alleged that the Bureau "violated NEPA by issuing the 2001 Plan without preparing an Environmental Impact Statement," and that the Fish and Wildlife Service and the National Marine Fisheries Service "violated the ESA by failing to utilize the best scientific evidence available in their respective [biological opinions]."  *Id.* at 1202.  It is these issues of fact and law that the district court addressed in denying the plaintiff's motion for a preliminary injunction.  *Id.* at 1204-10.  There were no claims in *Kandra* relating to whether the plaintiffs had a property interest in the water itself, nor certainly any assertions that the Bureau's action effectuated a takings under the Fifth Amendment to the U.S. Constitution.  Indeed, a review of the complaint in that action reveals no direct challenge to the manner in which the plan was being implemented – the purpose of the suit, rather, was to prevent the plan from being implemented.  *See* Complaint in 01-6124 TC, at paras. 40-41.

By comparison, the takings claim here essentially alleges that the implementation of the plan effectuated a takings without just compensation.  *See Klamath Irrigation Dist.*, 67 Fed. Cl. at 513-14.  The complaint filed herein challenges the propriety neither of the 2001 Plan nor the underlying biological opinions – indeed, the complaint could not do so if it wanted to plead successfully a takings.  Nor does the complaint even mention, let alone rely upon, the provisions of NEPA and ESA that were the focal point of the district court injunctive action.  Rather, plaintiffs seek just compensation under the Takings Clause of the Fifth Amendment because the agency's actions in implementing the 2001 plans had taken "the water rights . . . appurtenant to land," which "are recognized as property under the laws of the states of Oregon and California."  Complaint in 01-591, at para. 32; *see also Klamath Irrigation Dist.*, 67 Fed. Cl. at 514.  In

addition, the complaint asserts that defendant's actions had "impaired the irrigation water rights of plaintiffs or the landowners they represent." Complaint in 01-591, at para. 40. In both instances, the complaint alleges that defendant had "not paid such just compensation to plaintiffs." *Id.* at para. 34, 40. Accordingly, it would appear that the Bureau's issuance of the report and subsequent cutting off of the water represented "two separate wrongs that gave rise to two separate causes of action." *Del Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1364 (Fed. Cir. 1998); *see also Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1330 (Fed. Cir. 2006); *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1365 (Fed. Cir. 2001), *cert. denied*, 536 U.S. 598 (2002).

In this fashion, this case is reminiscent of *Fire-Trol Holdings, LLC v. United States*, 65 Fed. Cl. 32 (2005). There, the plaintiff initially filed a complaint in the federal district court in Arizona challenging the Forest Service's new regulations for chemical retardants and alleging that the Forest Service violated various laws when it amended its 2005 procurement rules. The complaint alleged, in particular, that the regulations were invalid because the Forest Service failed to comply with the rule-making procedures laid out in the APA, 5 U.S.C. § 553. The propriety of the dismissal of that action was pending before the Ninth Circuit (*see Fire-Trol Holdings, LLC v. United States Forest Service*, 209 Fed. Appx. 625 (9th Cir. 2006)), when the same party filed a bid protest objecting to an invitation for bids (IFB) and a request for proposals (RFP) involving fire retardants that incorporated the amended specifications and revised qualified products lists. This time, plaintiff complained that the IFB and RFP violated the Competition in Contracting Act, 31 U.S.C. § 3553. Denying defendant's motion seeking to dismiss the action in this court under section 1500, the court agreed "that the operative facts in the District Court case are based on the failure of the Forest Service to comply with statutory and regulatory requirements for rulemaking in amending the specification in 2000, while the action in this Court is based on the invitation of solicitations for fire retardants based on the 2005 amended specifications as improperly limiting the bidding to one manufacturer." *Id.* at 34-35. Like the plaintiff in *Fire-Trol Holdings*, the affected plaintiffs here did not transgress section 1500 in seeking, first, to challenge the validity of the Bureau's plan and, alternatively, to obtain damages for a takings if the plan was upheld.[54]

---

[54] Defendant's view of the law – which requires some claimants to forfeit district court review of agency decisions to obtain jurisdiction in this court – clashes with the Supreme Court's holding in *Pennsylvania R.R. Co. v. United States*, 363 U.S. 202 (1960). In that case, the plaintiff railroad sued in the Court of Claims to recover an underpayment of shipping charges. In defense, the United States challenged the validity of the relevant tariff. The Court of Claims stayed the case and referred the issue regarding the tariffs to the Interstate Commerce Commission (ICC), which had primary jurisdiction over that question. After the ICC struck down the tariff, the railroad sought judicial review of the ICC order in district court. *Id.* at 203. The United States then moved the Court of Claims to dismiss the case under section 1500. *Id.* at 203-04. The Court of Claims denied this motion and instead lifted the stay and entered judgment consistent with the ICC's order. *Id.* at 204. The Supreme Court reversed. While noting that the United States had not challenged the Court of Claims' ruling on section 1500 grounds, the Court, nonetheless, held that it was error for the Court of Claims to render judgment based on the ICC's

The story, though, is quite different as to the breach of contract claims.  In the court's view, the issues of fact and law raised by these two claims – that in the district court and that in the amended complaint here – are largely the same.  For one thing, both lawsuits involved breaches allegedly committed by the same party (the Bureau) and required the court to construe the same contracts:  the KID and TID contracts with the Bureau, as well as the Klamath Compact.  And in both cases, Mr. Baley claimed he was a third-party beneficiary of those contracts.  Moreover, both cases obliged the respective courts to determine what those contracts guaranteed in terms of water deliveries.  To be sure, the two claims alleged slightly different breaches – in *Kandra*, the plaintiffs claimed that the issuance of the plan effectuated the breach, while here they averred that the actual termination of the water deliveries had that effect.  But, in the court's view, this is only a slight distinction as the adoption of the plan preordained the termination of the water.  Ultimately, then, the only real difference between the two breach claims is the relief requested – injunctive relief in the district court; monetary relief in this court.  But, that difference is salvific neither under the Supreme Court's general jurisprudence in this area, *see Tohono*, 131 S. Ct. at 1727, nor under the identity-of-issues test.

Because the issues of fact and law raised by the two takings claims are not largely the same as the claims raised in *Kandra*, the takings claims are not disqualified under the first test for what is "operative."  By contrast, there is an identity of issues between the breach of contract claims in both cases, leading the court to conclude that under this first test, those two claims are "based on substantially the same operative facts."  *Id.* at 1727.

------

ruling, instead of staying its proceeding pending district court review of the ICC's order.  Rejecting the notion that the railroad could be "held bound by the Commission's order although completely denied any judicial review of that order," *id.*, the Supreme Court reasoned:

> [W]e conclude that the Railroad was entitled to have this Commission order judicially reviewed. We have already determined, however, that the power to review such an order cannot be exercised by the Court of Claims. That jurisdiction is vested exclusively in the District Courts. . . . It necessarily follows, of course, that since the Railroad had a right to have the Commission's order reviewed, and only the District Court had the jurisdiction to review it, the Court of Claims was under a duty to stay its proceedings pending this review.

363 U.S. at 205.  In cases involving sequential relief, adopting defendant's view of section 1500 could lead to the exact result that the Supreme Court rejected in *Pennsylvania R.R.*, *to wit*, having the claimant "held bound by [an agency's] order although completely denied any judicial review of that order."  More broadly, it should not be overlooked that if defendant is right about the scope of section 1500, then the Supreme Court was wrong in ordering the Court of Claims to suspend its proceedings awaiting the result of the district court challenge to the ICC ruling.

**B.**

The second question in this four-part formulation focuses on whether a hypothetical or actual adverse merits decision on the earlier claim would trigger the doctrine of *res judicata*, so as to bar a subsequent suit on the later-filed claim.

The doctrine of *res judicata* bars "repetitious suits involving the same cause of action" once "a court of competent jurisdiction has entered a final judgment on the merits." *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 597 (1948); *see also Bush v. United States*, 717 F. 3d 920, 926 (Fed. Cir. 2013). In *Tohono*, the Supreme Court indicated that the claim comparison "can be informed by how claims are defined for *res judicata* purposes." *Trusted Integration*, 659 F.3d at 1164 (citing *Tohono*, 131 S. Ct. at 1730); *see also Petro-Hunt*, 105 Fed. Cl. at 42; *Muscogee (Creek) Nation of Oklahoma v. United States*, 103 Fed. Cl. 210, 215 (2011). In *Trusted Integration*, the Federal Circuit emphasized that the *res judicata* principles relevant for this purpose are those "which were in force at the time the predecessor to § 1500 was enacted," and not the modern tests for claim preclusion. The court identified two versions of the test that could be applied – the "act or contract test" and "the evidence test." 659 F.3d at 1168-69 (citing *Tohono*, 131 S. Ct. at 1730); *see also Goodeagle*, 105 Fed. Cl. at 176 n.9. While the court made clear that the consideration of such *res judicata* principles is a secondary inquiry, 659 F.3d at 1164, 1170 n.5, *see also U.S. Home Corp.*, 108 Fed. Cl. at 196, 198, ordinarily designed to "test" a conclusion that section 1500 applies, *id.,* it should not be overlooked that the *res judicata* doctrine has direct relevance to what the Supreme Court in *Keene* and then *Tohono* meant by the phrase "operative facts."

As described in *Tohono*, the "act or contract" test makes a "distinction between demands or rights of action which are single and entire, and those which are several and distinct, . . . that the former immediately arise out of one and the same act or contract, and the latter out of different acts or contracts." 131 S. Ct. at 1730 (quoting J. Wells, Res Adjudicata and Stare Decisis § 241, p. 208 (1878)); *see also Trusted Integration*, 659 F.3d at 1169; *U.S. Home Corp.*, 108 Fed. Cl. at 197. Under this test, "where the respective demands grow out of independent acts, contracts or transactions, they cannot be treated as parts of a single cause." *Danciger v. Am. Express Co.*, 179 S.W. 806, 808 (Mo. App. 1915); *see also United States v. Cal. & Ore. Land Co.*, 192 U.S. 355, 358-59 (1904); *Kallberg v. Newberry*, 170 N.W. 113, 114-15 (N.D. 1918); *Brice v. Starr*, 161 P. 347, 349 (Wash. 1916); *see generally,* Corpus Juris Secondum § 1000 (2013) ("It has been said that as a general proposition whether or not a judgment is a bar to a subsequent action under the rule against splitting causes of action depends on whether the claim arises out of one and the same act or contract, or whether the several parts arise from distinct and different acts or contracts.").[55]

---

[55] Versions of the "act or contract" test are still in use in some states. Thus, under Illinois law, a cause of action for purposes of *res judicata* is defined as follows:

> [A] cause of action consists of a single core of operative facts which give the plaintiff a right to seek redress for the wrong concerned. Even though one group

By comparison, under the evidence test for *res judicata*, the question asked was "would the same evidence support and establish both the present and the former cause of action?" *Tohono*, 131 S. Ct. at 1730 (quoting 2 Black's Judgments § 726); *see also Trusted Integration*, 659 F.3d at 1169; *U.S. Home Corp.*, 108 Fed. Cl. at 197.  "If so, the former recovery is a bar; if otherwise, it does not stand in the way of a second action."  2 Black's Judgments § 726; *see also* 1 Henry M. Herman, Commentaries on the Law of Estoppel and Res Judicata § 111, pp. 110-11 (1886) ("In order to make a judgment effectual as an estoppel, the cause of action must be substantially the same; it must be sustained by the same evidence, although the form of the action may be different.").  The original Restatement of Judgments stated a similar rule:

> Where a judgment is rendered in favor of the plaintiff or where a judgment on the merits is rendered in favor of the defendant, the plaintiff is precluded from subsequently maintaining a second action based upon the same transaction, if the evidence needed to sustain the second action would have sustained the first action.

Restatement of Judgments, § 61 (1942); *see also Herendeen v. Champion Intern. Corp.*, 525 F.2d 130, 135 (2d Cir. 1975).  According to commentary in the Restatement, the rule stated above "is not applicable where the actions are not based upon the same transaction."  *Id.* at cmt. c; *see also id.* at § 63 ("Where a judgment on the merits is rendered in favor of the defendant, the plaintiff is precluded from subsequently maintaining an action on the same cause of action although he presents a ground for the relief asked other than those presented in the original action . . . .").

While Black's cites many decisions in support of this evidence test, *see* 2 Black's Judgments § 726 at n. 262, it prominently quotes from an 1871 decision of the Supreme Court of California, involving a dispute between two mining partners over the construction of a mill for crushing rock, for which the parties had a contract.  In a first case, the plaintiff sued upon an "an account stated" and a promise, apart from the contract, to pay that sum, while the second suit involved a suit based upon the contract itself.  The court held that a judgment in the prior case did not preclude the second suit, observing:

> Unquestionably the judgment in the former action is well pleaded as a bar in this suit, provided the cause of action is the same, although the form of action has been changed.  The cause of action is said to be the same where the same evidence will support both actions; or, rather, the judgment in the former action will be a bar, provided the evidence necessary to sustain a judgment for the

---

> of facts may give rise to different claims for relief upon different theories of recovery, there remains a single cause of action.

*Morris v. Union Oil Co. of Cal.*, 421 N.E. 2d 278, 285 (Ill. App. 1981); *see also Gasbarra v. Park-Ohio Indus.*, 655 F.2d 119, 121 (7th Cir. 1981) (courts have sought to discovery "whether the entire amount claimed to be due plaintiff arises out of one and the same act or contract").

plaintiff in the present action would have authorized a judgment for the plaintiff in the former.

*Taylor v. Castle*, 42 Cal. 367 (Cal. 1871); *see also Buddress v. Schafer*, 41 P. 43, 44 (Wash. 1895); *Baker v. State ex rel. Mills*, 9 N.E. 711, 717 (Ind. 1887).[56]   Consistent with this view, the Federal Circuit indicated in *Trusted Integration*, that the evidence test is not met if the "evidence [in the suit before this court] would be insufficient to establish the claims alleged in the district court complaint, and vice versa."  659 F.3d at 1170.

Accordingly, both historical tests cited by the Supreme Court, as informing the section 1500 inquiry, focus on whether the legally-determinative facts in the two suits were roughly the same.  *Trusted Integration*, 659 F.3d at 1168-69; *see also Western Mgmt., Inc. v. United States*, 498 Fed. Appx. at 18 (Newman, J., dissenting); *Petro-Hunt*, 105 Fed. Cl. at 43.  Such is not the case with the takings claims here.  Rather, the facts needed to prove the takings action before this court overlapped only slightly with those needed to prove the validity and breach of contracts claims alleged in the *Kandra* complaint, and *vice versa*.  This should come as no surprise as, outside of cases in the *Bowen v. Massachusetts* mold, it would seem unlikely that the legally determinative facts in a case that challenges, under the APA, the validity of government action would also suffice to establish that the same action, presumed to be valid, effectuated either a physical or regulatory takings under the Fifth Amendment.[57]   The word-processing-driven fact that the two complaints may – or may not – include a lot of similar verbiage should not be determinative, nor even relevant, under the preclusive doctrines cited by the Supreme Court.

---

[56] Reiterating the point about varying forms of action, Black's later stated that "[i]t is a well-settled rule, and one that is supported by a multitude of authorities, that a party cannot, by varying the form of action, or adopting a different method of presenting his case, escape the operation of the principle that one and the same cause of action shall not be twice litigated between the same parties or their privies."  Black's Judgments § 729.  Amplifying this point, this section stated that "[u]nder this principle, we may cite the familiar rule that one who has been defeated, on the merits, in an action at law, cannot afterwards resort to a bill in equity upon the same facts for the same redress," adding that a party may not "found two separate actions upon a transaction which justifies but one suit."  *Id.*  "Upon the same principle," the section continues, "'in all cases where the plaintiff has his option in the outset to bring tort or contract to recover damages for one and the same injury, upon a state of facts which will support either, an adjudication in one, whichever he may elect, is upon principle a bar to the other.'"  *Id.* (quoting *Norton v. Doherty*, 3 Gray 372 (Mass. 1855)); *see also id.* at § 733.

[57] In *Central Pines Land Co.*, the Federal Circuit suggested that a district court quiet title action might prime a subsequent takings action in this court.  697 F.3d at 1365.  But, the court's holding that this court lacked jurisdiction hinged on the fact that the plaintiff in that case had raised exactly the same takings claim in the district court before it filed that claim in this court.  *Id.*

There is little doubt, however, that under the historical preclusion doctrines identified by the Supreme Court, a final merits judgment in the district court on the breach of contract claims there would have been *res judicata* as to the breach claims here. Both claims "immediately arise out of one and the same . . . [set of] contract[s]," *Tohono*, 131 S. Ct. at 1730. Moreover, the evidence needed to sustain the first breach claim is largely the same as that required to support the second. *Id.* Hence, it appears that, under either the "act or contract" or "same evidence" formulations of *res judicata*, the breach of contract claims at issue involve substantially the same "operative facts." Indeed, it is worth noting that, even under modern formulations of the doctrine of *res judicata*, a "series of breaches of the same contract, all occurring before filing suit, should be brought in that suit." *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1270 (11th Cir. 2002); *see also* Restatement (Second) of Judgments § 24 cmt. d (1982) ("When a defendant is accused of successive but nearly simultaneous acts, or acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action."); *Prime Mgmt. Co., Inc. v. Steinegger*, 904 F.2d 811, 816 (2d Cir. 1990) (holding that "res judicata will preclude the party's subsequent suit for any claim of breach that had occurred prior to the first suit"); *see generally*, *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005).

In sum, then, plaintiffs' takings claims pass muster on the *res judicata* test, but their breach of contract claims do not.

## C.

The third test above focuses on whether the plaintiff(s) will rely on substantially the same evidence to support each of the two claims. Such has been held not to be the case if the facts relating to the subsequent claim "differ in both time and type from those" in the original claim. *Mayle*, 545 U.S. at 650; *see also Full Life Hospice*, 709 F.3d at 1018; *Bill Harbert Intern. Const.*, 608 F.3d at 881. Under this formulation, two claims are not the same if the second claim "is to fault [the defendants] for conduct different from that identified in the original complaint," even if the new claim "shares some elements and some facts in common" with the original claim. *Jones*, 557 F.3d at 674; *see also Full Life Hospice*, 709 F.3d at 1018; 6AWright & Miller, *supra*, at § 1497.

A review of the filings in *Kandra*[58] reveals that the evidence presented by the plaintiffs in the various stages of that case, including plaintiffs' motion for a preliminary injunction, focused

---

[58] A few of the documents in *Kandra* were attached to the parties' briefs in this case. The court also takes judicial notice of various documents available through the docket of that case. The information in these documents constitutes "adjudicative fact[s]" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" under Federal Rule of Evidence 201(b)(2). *See United States v. Booker*, 543 U.S. 220, 244 (2005); *United States v. Perkins*, 548 F.3d 510, 515-16 (7th Cir. 2008); *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007), *cert. denied*, 552 U.S. 1023 (2007).

on the alleged failure of the Bureau to comply with NEPA and ESA, as well as allegations that the 2001 Plan was issued pursuant to a process that was arbitrary, capricious and otherwise contrary to law.  It was based on these claims that plaintiffs sought a preliminary injunction "enjoining defendants from operating or directing the operation of Klamath Project facilities to deprive of water any historically irrigated lands in the Klamath Project, or otherwise acting or failing to act in a manner that deprives such land of water."  *See* Motion for Preliminary Injunction, *Kandra*, No. 01-6124-TC (D. Ore. Apr. 11, 2001).  In support of their case, the plaintiffs filed an extensive number of documents tracking the development of the 2001 Plan attempting to demonstrate that the plan had its roots in policy changes made by the Bureau in 1995; tracing the development of the plan through an earlier lawsuit involving NEPA, documenting discussions that occurred between the plaintiffs, the Bureau and the National Marine Fisheries Service; and, ultimately, focusing on the biological opinions and other actions that led to the issuance of the 2001 Plan.[59]  Their evidence also included expert reports challenging the biological opinions.[60]  To be sure, additional evidence was presented in support of the claim that the Bureau's actions in issuing the plan offended the plaintiffs' water and contract rights.  *See* Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction, *Kandra*, No. 01-6124-TC (D. Ore. Apr. 11, 2001).  Nevertheless, very little of the evidence provided by plaintiffs in support of the preliminary injunction had anything to do with the parameters of the property rights owned by the individuals, either directly or as water rights.

As per the takings claim, the evidence in this case is very different.  To support their takings claims, plaintiffs have introduced evidence that:  (i) they had cognizable property interests in Klamath Project water; and (ii) defendant prevented the release of Project water during the 2001 growing season.  As to the first point, plaintiffs relied on a variety of declarations from the landowners, together with patent deeds relating to the properties.  They also introduced text from the Klamath Compact.  As to the second point, plaintiffs relied upon declarations describing the water that was made available by the Bureau in 2001.  To support their damage claims, they also introduced government documents detailing the value of agricultural products enabled by the Project's water.  Their evidence did include copies of the 2001 biological opinions, as well as the Bureau's plan, but only as background documents.  The evidence did not include the extensive administrative record leading up to the issuance of the 2001 Plan.

---

[59]  *See, e.g.*, Declaration of Paul S. Simmons, *Kandra*, No. 01-6124-TC (D. Ore. Apr. 11, 2001) (to which were attached 44 exhibits); Declaration of Steven Kandra, No. 01-6124-TC (D. Ore. Apr. 11, 2001); Declaration of David Cacka, No. 01-6124-TC (D. Ore. Apr. 11, 2001); Declaration of Donald D. Russell, No. 01-6124-TC (D. Ore. Apr. 11, 2001)

[60]  *See, e.g.*, Declaration of Alex J. Horne, Ph. D., *Kandra*, No. 01-6124-TC (D. Ore. Apr. 11, 2001) (to which were attached 8 exhibits).

In this regard, this case resembles others in which this court has held that an earlier-filed district court case did not prime a later-filed case in this court.  Thus, in *d'Abrera* v. *United States*, 78 Fed. Cl. 51 (2007), this court found that while plaintiff's Lanham Act claim involved allegations that the defendant misrepresented that the plaintiff's photographs were his own, the plaintiff's copyright infringement claim involved allegations that defendant reproduced and distributed plaintiff's photographs without permission.  *Id.* at 58-59.  Both cases involved the same photographs, yet this court held that jurisdictional bar of section 1500 was not triggered.  *Id.* at 58-59; *see also Eastern Shawnee Tribe of Okla. v. United States*, 82 Fed. Cl. 322, 327 (2008), *rev'd*, 582 F.3d 1306 (Fed. Cir. 2009), *cert. granted, judgment vacated*, 131 S. Ct. 2872 (2011), *aff'd on remand*, 438 F. App'x 896 (Fed. Cir. 2011).  Similarly, in *Cooke v. United States*, 77 Fed. Cl. 173, 177-78 (2007), the plaintiff's claim under the Fair Labor Standards Act filed in this court involved "later and different conduct" than her Equal Pay Act claim, which had previously been filed in a district court.  *Id.* at 177-78.  The court noted that while "gender discrimination" was "at the root of . . . the [EPA claim]," such discrimination had nothing to do with the FLSA claim in this court.  *Id.* at 177.  Likewise, in *Heritage Minerals, Inc. v. United States*, 71 Fed. Cl. 710 (2006), this court retained jurisdiction over a takings claim relating to the installation and maintenance of groundwater-monitoring wells on the plaintiffs' property, even though at the filing of this suit, an action was pending in the Third Circuit alleging that the Navy had contaminated the groundwater on their property.  *Id.* at 716.  The court noted that the installation and maintenance of the monitoring wells, which primarily dated to 2001, was much more recent than the contamination of the ground water, which allegedly began in 1958.  *Id.* at 715.  In all these cases – and more[61] – the courts concluded that the evidence needed to support the relevant claims was substantially different and that a material difference existed in the time and type of facts related to the relevant claims.  Such is the case with the takings claims here.

For many of the reasons already stated, however, it would appear that the breach of contract claims involve much the same evidence that related to the comparable breach claims in

---

[61]  *See also Williams v. United States*, 71 Fed. Cl. 194, 200 (2006) (section 1500 did not apply because the plaintiff "specifically and successfully endeavored to plead different factual elements in each case"); *Fire-Trol Holdings*, 65 Fed. Cl. at 34-35; *Branch v. United States*, 29 Fed. Cl. 606, 609-10 (1991) (section 1500 did not apply where district court action was for fraudulent transfer while Court of Federal Claims action was takings claim based on a later assessment made by the FDIC); *Lucas v. United States*, 25 Cl. Ct. 298, 305 (1992) (district court and Claims Court actions based on "two entirely separate contracts with distinct terms"); *see also Mastrolia v. United States*, 91 Fed. Cl. 369, 378-80 (2010); *Low v. United* States, 90 Fed. Cl. 447,  (2009) ("Unlike the plaintiffs in *Cooke* and *Heritage Minerals*, [the plaintiff's] allegations cover the same time span, involve the same parties, and discuss the same conduct.").  While, in past cases, defendant has argued that these cases "conclude *ipse dixit*" that the two claims are distinct, *see*, *e.g.*, *Trusted Integration*, Second Corrected Brief of Defendant-Appellee, Fed. Cir. No. 2010-5142, at 28 (2010 WL 5311495, at *28 (Fed. Cir. Dec. 1, 2010)), as can be seen, these decisions instead are well-grounded in the standards other courts have regularly used in deciding whether the "operative facts" of two claims are substantially the same.

*Kandra*.  Accordingly, under this test, it again appears that those two sets of claims involve substantially the same operative facts.

### D.

The final test here asks if there is any other logical relationship between the two claims. Using this test in other contexts, some courts have examined issues that replicate the other tests above – for this reason, in a few cases this last factor is viewed as the only test, albeit one that subsumes the earlier ones.  *See Sanders v. First Nat'l Bank & Trust Co. in Great Bend*, 936 F.2d 273, 277 (6th Cir. 1991).  Where, as here, a court separately asks whether the first three tests are satisfied, it makes little sense to rehash those same questions as part of this fourth enquiry (and even less sense to come out with a different conclusion on this fourth test than on the first three). Logic would suggest, then, that this fourth test is designed to determine whether there is some logical relationship between the two claims that is not revealed by the first three tests.

Reflecting its interstitial role, the hallmark of this final test is flexibility.  *See Bd. of Regents of Univ. of Wisc. Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 470 (7th Cir. 2011); *In re Prempro Prods. Liability Litig.*, 591 F.3d 613, 622 (8th Cir. 2010), *cert. denied*, *sub nom.*, *Wyeth, LLC v. Kirkland*, 131 S. Ct. 474 (2010); *see also* Wright & Miller, *supra*, at § 1653.  The requisite relationship thus may exist where a given "transaction may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."  *In re Kaiser Grp. Intern.*, 399 F.3d 558, 569 (3d Cir. 2005) (quoting *In re Gordon Sel-Way, Inc.*, 270 F.3d 280, 287 (6th Cir. 2001)); *see generally, Moore*, 270 U.S. at 610.  Nevertheless, this test is not infinitely elastic.  The Federal Circuit has stated that "[t]he logical relationship test is satisfied if there is substantial evidentiary overlap in the facts giving rise to the [causes] of action."  *In re EMC*, 677 F.3d at 1358.  Such a relationship has also been deemed to exist where "separate trials on each of the claims would 'involve a substantial duplication of effort and time by the parties and courts."  *Barefoot Architect, Inc. v. Bunge*, 632 F. 3d 822, 836 n.9 (3d Cir. 2011) (quoting *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978)).  Lastly, this test is said to be triggered where the "facts, upon which one claim rests, [activate] additional legal rights" supporting the other claim.  *Repub. Health Corp.*, 755 F.2d at 1455; *see also Iglesias*, 156 F.3d at 242; *Montgomery Elevator Co. v. Building Eng'g Serv.*, 730 F.2d 377, 380 (5th Cir. 1984).

Insofar as plaintiffs' takings claims are concerned, none of the circumstances that would trigger this final test appear present.  While both actions at issue relate to the biological opinions and the plan issued by the Bureau, the district court action focused upon the validity of the plan and the rationality of the processes that produced it, *see Kandra*, 145 F. Supp. 2d at 1196, while the case here focuses upon the impact of the plan's execution.  The former has little to do with the specifics of the property rights possessed by the plaintiffs in this case; the latter has everything to do with the parameters of those water rights, such as they exist.  *See Klamath Irr. Dist.*, 635 F.3d at 519-20; *see also Estate of Hage v. United States*, 687 F.3d 1281 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 2824 (2013).  Even if the district court case had proceeded, and not been dismissed six weeks after this action was filed, there is little to suggest that separate

trials in both cases would have "involve[d] a substantial duplication of effort and time by the parties and courts."  *Xerox Corp.*, 576 F.2d at 1059.

On the other hand, perhaps not surprisingly, plaintiffs' breach of contract claims also violate this final test.  Unlike plaintiffs' takings claims, "there is substantial evidentiary overlap in the facts giving rise to the cause[s] of action."  *In re EMC*, 677 F.3d at 1358.  Moreover, it is readily apparent that separate trials on each of these breach claims would have involved a substantial duplication of time and effort by the parties and the courts involved.  *See Barefoot Architect*, 632 F.3d at 836 n.9 (quoting *Xerox Corp.*, 576 F.2d at 1059).  Thus, in the court's view, there is also a logical relationship between the breach of contract claim before the district court and the breach claims here, sufficient to provide yet another basis upon which to conclude that both claims involved substantially the same operative facts.

*          *          *          *          *

Based on the foregoing, the court concludes that the takings claims in this case are not "for or in respect to" the claims filed in the district court.  As such, section 1500 does not apply to them.  However, the court is compelled to conclude that the breach of contract claims asserted by the three *Kandra* plaintiffs in question are "for or in respect to" the breach claims those same plaintiffs filed in the district court.  Consequently, as to those plaintiffs, their breach of contract claims must be dismissed for lack of jurisdiction.

## V.

This court need go no farther.  Based on the foregoing, the court hereby **GRANTS, in part**, and **DENIES, in part,** defendant's motion to dismiss.  Specifically, the court dismisses the breach of contract claims insofar as they relate to the following three plaintiffs:  the Klamath Irrigation District, the Tulare Irrigation District and Mr. Lon Baley.  On or before December 9, 2013, the parties shall file a joint status report indicating how this case should proceed, with a proposed schedule.  The status report shall reference with specificity the issues that this court must address in response to the Federal Circuit's remand decision, and jointly propose a proper procedural course for dealing with those issues.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge