# In the United States Court of Federal Claims

Nos. 1-591L; 7-194C; 7-19401C; 7-19402C; 7-19403C; 7-19404C; 7-19405C; 7-19406C; 7-19407C; 7-19408C; 7-19409C; 7-19410C; 7-19411C; 7-19412C; 7-19413C; 7-19414C; 7-19415C; 7-19416C; 7-19417C; 7-19418C; 7-19419C; 7-19420C

Filed: December 21, 2016

* * * * * * * * * * * * * * * * * *

KLAMATH IRRIGATION, et al., and
JOHN ANDERSON FARMS, INC., et al.,

      Plaintiffs,

v.

UNITED STATES,

v.

      Defendant,

PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,

      Defendant-Intervenor.

* * * * * * * * * * * * * * * * * *

Water Rights; Physical vs. Regulatory Takings; Endangered Species Act; Motions in Limine.

**Nancie G. Marzulla**, Marzulla Law, LLC, Washington, DC for plaintiffs. With her was **Roger G. Marzulla**, Marzulla Law, LLC. Of counsel was **William M. Ganong**, Special Counsel, Klamath Irrigation District, Klamath Falls, OR.

**Kristine S. Tardiff**, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Concord, NH, for defendant. With her was **John C. Cruden**, Assistant Attorney General, Environment and Natural Resources Division, and **Stephen M. MacFarlane** and **Edward C. Thomas**, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice.

**Todd D. True**, Earthjustice, Seattle, WA for defendant-intervenor.

# O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

Before the court are the parties' cross-motions in limine regarding the proper legal framework for analyzing plaintiffs' takings claims in the above-captioned cases. Plaintiffs in the above-captioned cases are individual landowners, irrigation districts and similar government agencies, and private corporations in Oregon and California who allege that the defendant, acting through the United States Bureau of Reclamation, effected a taking of their alleged water rights in 2001. In the motions presently before the court, defendant argues that plaintiffs' takings claims should be analyzed as regulatory takings, while plaintiffs argue that their claims should be analyzed as physical takings.

Plaintiffs are users of water in the Klamath River Basin. "Located in southern Oregon and northern California, the Klamath River Basin is the drainage basin of the Klamath River, the Lost River, and the Link River, as well as various other rivers." Klamath Irr. Dist. v. United States, 635 F.3d 505, 508 (Fed. Cir. 2011). The Klamath Irrigation Project (the Klamath Project), an irrigation project straddling the southern Oregon and northern California borders, supplies water to hundreds of farms, comprising approximately 200,000 acres of agricultural land, including those in the Klamath River Basin. The Klamath Project is managed and operated by the United States Bureau of Reclamation. Water is generally diverted and delivered by the Klamath Project pursuant to state law (to the extent it is not inconsistent with federal law) and pursuant to perpetual repayment contracts between the Bureau of Reclamation and irrigation districts. See Klamath Irr. Dist. v. United States, 67 Fed. Cl. 504, 511 (2005), rev'd, 635 F.3d 505. The property rights claimed by the individual landowner plaintiffs in this litigation relate to water that is diverted from the Upper Klamath Lake, a large, shallow lake in which water is stored by means of a dam (the Link River Dam), and from locations downstream of the Upper Klamath Lake and the Link River Dam on the Klamath River in Oregon. See id. at 509. The water is diverted out of the Upper Klamath Lake and the Klamath River and then conveyed through canals and laterals to individual farms and ranches in both states for irrigation use, as well as for use on certain national wildlife refuge lands within the Klamath Project. The works which divert the water were constructed and are owned by the United States. The operation and maintenance of all the federally owned diversion works downstream of the headgates of the Upper Klamath Lake, as well as works that divert water directly from the Klamath River, however, have been transferred to two of the irrigation district plaintiffs by contract, subject to the rules and regulations of the Secretary of the Interior. In addition, the irrigation district plaintiffs operate and maintain works that distribute this diverted water to serve benefitted lands. The individual, landowner plaintiffs (or their lessees) apply the diverted water to irrigate crops.

"In light of its dual purposes of serving agricultural uses and providing for the needs of wildlife, the Klamath Project is subject to the requirements of the Endangered Species Act. See Pub.L. No. 93–205, 87 Stat. 884 (1973) (codified, as amended, at 16 U.S.C. § 1531 et seq.) (the 'ESA')." Klamath Irr. Dist. v. United States, 635 F.3d at 508. "Pursuant

2

to the ESA, the Bureau [of Reclamation] has an obligation not to engage in any action that is likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of the critical habitat of such a species." Id. at 509 (citing 16 U.S.C. § 1536(a)(1)). "In a 1999 Ninth Circuit decision, the interests of [Klamath] Project water users were declared subservient to the ESA, the result being that, as necessary, the Bureau has a duty to control the operation of the Link River Dam in order to satisfy the requirements of the ESA." Id. at 508 (citing Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1213 (9th Cir. 1999), amended by 203 F.3d 1175 (9th Cir. 2000)). Klamath Project operations potentially affect three species of fish protected under the Endangered Species Act: the endangered Lost River sucker; the endangered shortnose sucker; and the threatened Southern Oregon/Northern California Coast (SONCC) coho salmon. The Lost River sucker and the shortnose sucker reside in Upper Klamath Lake and nearby waters, while the SONCC coho salmon use the mainstream and tributaries of the Klamath River downstream from the Upper Klamath Lake and the Link River Dam.

"For decades, Klamath Basin landowners generally received as much water for irrigation as they needed. In severe drought years, they simply received somewhat less." Klamath Irr. Dist. v. United States, 67 Fed. Cl. at 512. As the Bureau of Reclamation developed its operating plan for the 2001 water year, however, water supply forecasts indicated that it would be a "critically dry" year due to drought conditions. See Kandra v. United States, 145 F. Supp. 2d 1192, 1198 (D. Or. 2001). In response, the Bureau of Reclamation performed a biological assessment of the Klamath Project's operations on the Lost River sucker and the shortnose sucker, and a similar assessment regarding the SONCC coho salmon. See Klamath Irrigation Dist. v. United States, 67 Fed. Cl. at 513 (citing Kandra v. United States, 145 F.Supp.2d at 1198). "Both assessments concluded that operation of the Project was likely to affect adversely the three species in violation of the ESA, 16 U.S.C. § 1531, et seq." Id. On January 22, 2011, the Bureau of Reclamation forwarded its biological assessment regarding the SONCC coho salmon to the United States National Marine Fisheries Service (NMFS) and requested the initiation of a formal consultation with the NMFS pursuant to section 7(a)(2) of the Endangered Species Act. On February 13, 2011, the Bureau of Reclamation similarly forwarded its biological assessment regarding the Lost River sucker and the shortnose sucker to the United States Fish and Wildlife Service (FWS) and requested the initiation of a formal consultation with the FWS.

On April 5, 2001, the FWS, acting in furtherance of its statutory duties under the Endangered Species Act, issued a final biological opinion concluding that the proposed 2001 operation plan for the Klamath Project threatened the continued existence of the shortnose and Lost River sucker fish. The next day, April 6, 2001, the NMFS issued a final biological opinion concluding that the proposed operation plan threatened the SONCC coho salmon. As required by the Endangered Species Act, 16 U.S.C. §1536(b)(3)(A) (2012), the biological opinions of both agencies included "reasonable and prudent alternatives" to address the threat to the three fish species. FWS's reasonable and prudent alternative required, among other actions, that the Bureau of Reclamation "not divert water from UKL [Upper Klamath Lake] for irrigation purposes if surface elevations are anticipated to go below [certain minimum levels], regardless of inflow year

type." The NMFS's reasonable and prudent alternative required that the Bureau of Reclamation operate the Klamath Project in such a way so as to provide certain levels of "minimum IGD [Iron Gate Dam] water releases" into the Klamath River between April and September 2001.[1]

On April 6, 2001, the Bureau of Reclamation issued a revised operation plan that incorporated the reasonable and prudent alternatives proposed by the FWS and the NMFS. With regard to deliveries to Klamath Project water users, the 2001 operation plan stated that "[d]ue to the requirements of the biological opinions and the ESA and the current drought conditions, only limited deliveries of Project water will be made for irrigation." On the same day, the Department of the Interior issued a news release stating that based on the FWS and NMFS opinions "and the requirements of [the] Endangered Species Act, the Bureau of Reclamation announced today that no water will be available from Upper Klamath Lake to supply the farmers of the Klamath Project." Ultimately, the delivery of irrigation water from Upper Klamath Lake to the plaintiffs in the above-captioned cases was totally terminated until July 2001, when the Bureau of Reclamation was able to release approximately 70,000 acre-feet of water, an amount that plaintiffs allege came too late in the growing season to allow them to grow crops. Klamath Irrigation Dist. v. United States, 67 Fed. Cl. at 513 & n.10.[2]

The procedural history of the above-captioned cases is long and complicated. The plaintiffs in Klamath Irrigation, et al. v. United States, case number 1-591L, a mixture of irrigation districts, corporations, and individual landowners, filed their initial complaint on October 11, 2001, an amended complaint on March 24, 2003, and a second amended complaint on January 31, 2005. The case was initially assigned to Judge Diane G. Sypolt, but was re-assigned to Judge Francis Allegra on December 9, 2004. In their second

---

[1] "In addition, at this time, the Bureau was subject to a preliminary injunction order issued by the U.S. District Court for the Northern District of California in the *Pacific Coast* [*Federation of Fishermen's Associations v. United States Bureau of Reclamation,* 138 F.Supp.2d 1228 (N.D. Cal. 2001)] case." Klamath Irr. Dist. v. United States, 635 F.3d at 509. "The order barred the delivery of Klamath Project water for irrigation purposes when water flow was below certain minimum levels, until the Bureau complied with ESA consultation requirements." Id. (citing Pac. Coast Fed'n of Fishermen's Ass'ns v. United States Bureau of Reclamation, 138 F.Supp.2d at 1251).

[2] During late June and early July 2001, there were also three unauthorized releases of water from Upper Klamath Lake. In each of the three instances trespassers entered onto federal property at the Link River Dam, opened one of the gates at the head works of the dam, and released water into a Klamath Project canal. After the first incident, the Bureau of Reclamation requested that the Klamath Irrigation District cease the diversion, as Reclamation believed the Irrigation District was required to do under its contract with Reclamation. After the Klamath Irrigation District refused to do so, Reclamation employees closed the gate to the canal. Reclamation employees again shut the gates after the next two releases, and then, ultimately, disabled the gates to prevent future unauthorized releases.

amended complaint, plaintiffs alleged that the government's actions in terminating their water deliveries through the Klamath Project in 2001 constituted a taking of their water rights without just compensation in violation of the Fifth Amendment to the United States Constitution, an impairment of their water rights in violation of the Klamath River Basin Compact, Pub. L. No. 85–222, 71 Stat. 497 (1957), an interstate compact adopted by California and Oregon, and ratified by the United States, in 1957, and the breach of certain contracts between the Bureau of Reclamation and the plaintiffs. Judge Allegra entered summary judgment in favor of the defendant on the takings and Klamath Compact claims on August 31, 2005, see Klamath Irrigation Dist. v. United States, 67 Fed. Cl. 504, and summary judgment in favor of the defendant on the breach of contract claims on March 16, 2007, see Klamath Irrigation Dist. v. United States, 75 Fed. Cl. 677 (2007), rev'd, 635 F.3d 505. Plaintiffs filed a timely appeal with the United States Court of Appeals for the Federal Circuit, which, on July 16, 2008, certified three questions to the Oregon Supreme Court regarding the nature of plaintiffs' alleged water rights.[3] See Klamath Irrigation Dist. v. United States, 532 F.3d 1376. After the Oregon Supreme Court issued an opinion answering the certified questions,[4] see Klamath Irrigation Dist. v. United States, 227 P.3d

---

[3] The three questions certified by the Federal Circuit were:

> 1. Assuming that Klamath Basin water for the Klamath Reclamation Project "may be deemed to have been appropriated by the United States" pursuant to Oregon General Laws, Chapter 228, § 2 (1905), does that statute preclude irrigation districts and landowners from acquiring a beneficial or equitable property interest in the water right acquired by the United States?
>
> 2. In light of the statute, do the landowners who receive water from the Klamath Basin Reclamation Project and put the water to beneficial use have a beneficial or equitable property interest appurtenant to their land in the water right acquired by the United States, and do the irrigation districts that receive water from the Klamath Basin Reclamation Project have a beneficial or equitable property interest in the water right acquired by the United States?
>
> 3. With respect to surface water rights where appropriation was initiated under Oregon law prior to February 24, 1909, and where such rights are not within any previously adjudicated area of the Klamath Basin, does Oregon State law recognize any property interest, whether legal or equitable, in the use of Klamath Basin water that is not subject to adjudication in the Klamath Basin Adjudication?

Klamath Irrigation Dist. v. United States, 532 F.3d at 1376, 1377–78 (Fed. Cir. 2008).

[4] The Oregon Supreme Court answered the Federal Circuit's three certified questions as follows:

> 1. The 1905 Oregon act did not preclude plaintiffs from acquiring an equitable or beneficial property interest in a water right to which the United

1145, the Federal Circuit, on February 17, 2011, issued an opinion vacating the judgment of the Court of Federal Claims and remanding the case to the Court of Federal Claims for further proceedings. See Klamath Irrigation Dist. v. United States, 635 F.3d 505. With regard to plaintiffs' takings and Klamath Compact claims, the Federal Circuit instructed that:

> On remand, the Court of Federal Claims should proceed as follows: First, it should determine, for purposes of plaintiffs' takings and Compact claims, whether plaintiffs have asserted cognizable property interests. . . . To the extent the Court of Federal Claims determines that one or more plaintiffs have asserted cognizable property interests, it then should determine whether, as far as the takings and Compact claims are concerned, those interests were taken or impaired. That determination will turn on existing takings law.

Klamath Irr. Dist. v. United States, 635 F.3d at 519–20 (footnotes omitted). On remand, on November 22, 2013, Judge Allegra dismissed the breach of contract claims of three plaintiffs on 28 USC § 1500 (2012) grounds. See Klamath Irr. Dist. v. United States, 113

---

> States holds legal title. Moreover, under the 1905 act, a formal written release from the United States is not necessary for plaintiffs to have acquired an equitable or beneficial property interest in the water right that the United States appropriated.
>
> 2. Under Oregon law, whether plaintiffs acquired an equitable or beneficial property interest in the water right turns on three factors: whether plaintiffs put the water to beneficial use with the result that it became appurtenant to their land, whether the United States acquired the water right for plaintiffs' use and benefit, and, if it did, whether the contractual agreements between the United States and plaintiffs somehow have altered that relationship. In this case, the first two factors suggest that plaintiffs acquired a beneficial or equitable property interest in the water right to which the United States claims legal title, but we cannot provide a definitive answer to the court's second question because all the agreements between the parties are not before us.
>
> 3. To the extent that plaintiffs assert only an equitable or beneficial property interest in the water right to which the United States claims legal title in the Klamath Basin adjudication, plaintiffs are not "claimants" who must appear in that adjudication or lose the right. As a general rule, equitable or beneficial property interests in a water right to which someone else claims legal title are not subject to determination in a state water rights adjudication.

Klamath Irrigation Dist v. United States, 227 P.3d 1145, 1169 (Or. 2010).

Fed. Cl. 688 (2013). On June 3, 2014, Judge Allegra, at plaintiffs' request, dismissed all remaining plaintiffs' contract claims, without prejudice.

The plaintiffs in John Anderson Farms, et al., v. United States, case numbers 7-194C, 7-19401C, 7-19402C, 7-19403C, 7-19404C, 7-19405C, 7-19406C, 7-19407C, 7-19408C, 7-19409C, 7-19410C, 7-19411C, 7-19412C, 7-19413C, 7-19414C, 7-19415C, 7-19416C, 7-19417C, 7-19418C, 7-19419C, 7-19420C, who are all individual landowners, filed their original complaint on March 22, 2007. The cases were initially assigned to Judge Allegra. On August 2, 2007, Judge Allegra stayed the cases pending resolution of the appeal in Klamath Irrigation, et al. v. United States. The stay was lifted on August 25, 2011 and an amended complaint was filed on October 4, 2011. In their amended complaint, the John Anderson Farms plaintiffs alleged that the government's actions constituted breach of contracts between the government and the plaintiffs and a taking of plaintiffs' property, in the form of their water rights, without compensation in violation of the Fifth Amendment to the United States Constitution. On March 13, 2014, Judge Allegra granted plaintiffs' motion to voluntarily dismiss their breach of contract claims with prejudice.

On June 25, 2015, after significant discovery had already been taken, the above-captioned cases were re-assigned to the undersigned judge, and are scheduled to go to trial in January 2017. Defendant has filed motions in limine in both of the above captioned cases, in which it requests that the court find that "plaintiffs' takings claims in both cases should be analyzed as regulatory takings, rather than physical takings." Intervenor-defendant Pacific Coast Federation of Fishermen's Associations (PCFFA) also filed a memoranda in support of defendant's motions. Plaintiffs have filed oppositions to defendant's motions and cross-motions in which they request that the court deny defendant's motions in limine and, instead, find that "the proper legal framework for analyzing Klamath's water rights takings claim is the per se or physical taking test" in both cases. Defendant filed replies in support of its motion and oppositions to plaintiffs' cross-motions, and PCFFA filed a reply in support of defendant's motions in limine. Thereafter, plaintiffs filed a reply in support of their cross-motions.

**DISCUSSION**

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), recognized by Hageland Aviation Servs., Inc. v. Harms, 210 P.3d 444 (Alaska 2009); see also Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123-24, reh'g denied, 439 U.S. 883 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005); E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2009), cert. denied, 130 S. Ct. 1501 (2010); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Res.

7

Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009); Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified").

  Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

  To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). "The issue of whether a taking has occurred is a question of law based on factual underpinnings." Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

  The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Klamath Irr. Dist. v. United States, 635 F.3d at 511; Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)), reh'g denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. Then, the court must determine whether the government action is a "'compensable taking of that property interest.'" Huntleigh USA Corp v. United States, 525 F.3d at 1377 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372).

  To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v.

8

Gen. Motors Corp., 323 U.S. 373 (1945)); CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2459 (2011); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002) and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) and M & J Coal Co. v. United States, 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381 and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005). Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372).

In the present cases, the issue of whether or not plaintiffs have cognizable property interests in the subject of their alleged takings, the right to use certain waters provided by the Klamath Project, remains open to dispute and is not at issue in the present cross-motions in limine. In the cross-motions currently before the court, the parties ask the court to rule as to whether plaintiffs' claims for a taking of their alleged property rights should be analyzed under the framework of physical or regulatory takings. As described by the United States Court of Appeals for the Federal Circuit: "Decisions of the Supreme Court have drawn a clear line between physical and regulatory takings. The former involve a physical occupation or destruction of property, while the latter involve restrictions on the use of the property." CRV Enters., Inc. v. United States, 626 F.3d at 1246 (citing cases). "The distinction is important because physical takings constitute per se takings and impose a 'categorical duty' on the government to compensate the owner, whereas regulatory takings generally require balancing and 'complex factual assessments,' utilizing the so-called *Penn Central* [*Transportation Co. v. City of New York*, 438 U.S. 104] test." Id. (quoting Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322–23 (2002)). The United States Court of Appeals for the Federal Circuit has held that "our focus should primarily be on the character of the government action when determining whether a physical or regulatory taking has occurred." Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1289 (Fed. Cir. 2008).

As further summarized by the United States Court of Appeals for the Federal Circuit, in a trilogy of cases, International Paper Company v. United States, 282 U.S. 399 (1931), United States v. Gerlach Live Stock Company, 339 U.S. 725 (1950), and Dugan v. Rank, 372 U.S. 609 (1963), the Supreme Court "provides guidance on the demarcation between regulatory and physical takings analysis with respect to [water] rights." Casitas

9

Mun. Water Dist. v. United States, 543 F.3d at 1289. According to the Federal Circuit, in each of these cases: "the United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property"; "the diverted water was dedicated to government use or third party use which served a public purpose"; and "the Supreme Court analyzed the government action . . . as a *per se* taking." Id.; see also Washoe Cty., Nev. v. United States, 319 F.3d 1320, 1326 (Fed. Cir. 2003) ("In the context of water rights, courts have recognized a physical taking where the government has physically diverted water for its own consumptive use or decreased the amount of water accessible by the owner of the water rights." (citing Dugan v. Rank, 372 U.S. at 625–26; Int'l Paper Co. v. United States, 282 U.S. at 407–08; and Tulare v. United States, 49 Fed. Cl. 313, 320 (2001)).

In International Paper, the plaintiff held the right to draw water from a canal owned by the Niagara Falls Power Company. See Int'l Paper Co. v. United States, 282 U.S. at 405. In order to support "national security and defence [sic]," the federal government requisitioned all the electrical power the power company was capable of producing and, in order to increase the amount of power produced, ordered the power company to "cut off the water being taken" from the canal by the plaintiff. See id. at 405-06. In holding that the government's actions constituted a taking of the plaintiff's water rights, Justice Holmes found that:

> The petitioner's right was to the use of the water; and when all the water that it used was withdrawn from the petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take the use.

Id. at 407.

In Gerlach Live Stock Company, the plaintiffs were holders of riparian rights along the San Joaquin River who alleged that they were deprived of these rights by the construction of the Friant Dam in California. See United States v. Gerlach Live Stock Co., 339 U.S. at 727-28. The Friant Dam "arrested" the waters of San Joaquin Rivers, diverting its waters into a system of irrigation canals, and leaving, "except for occasional spills, only a dry river bed" in the area below the dam where plaintiffs held their rights. See id. at 729. Plaintiffs alleged that, by operation of the Dam, the government had taken their right to "annual inundations" from the river, which they used to "moisten[] and enrich[]" their lands. See id. at 730. After finding that "[t]he waters of which claimants [were] deprived" had been "taken for resale largely to other private land owners not riparian to the river" in order that "private lands will be made more fruitful, more valuable, and their operation more profitable," id. at 752, the Court held that the plaintiffs were entitled to compensation for the loss of their water rights. See id. at 755.

Like Gerlach Live Stock Company, Dugan v. Rank also involved the government's operation of the Friant Dam. See Dugan v. Rank, 372 U.S. at 610. As noted by the Federal Circuit, "[i]n *Dugan,* landowners along the San Joaquin River, owning riparian and other water rights in the river, alleged that the BOR's [Bureau of Reclamation] storage of water upstream behind Friant Dam left insufficient water in the river to supply their water rights."

Casitas Mun. Water Dist. v. United States, 543 F.3d at 1290 (citing Dugan v. Rank, 372 U.S. at 614, 616). The Supreme Court in Dugan concluded that, based on plaintiffs' allegations, the operation of the Dam had effected "a partial taking of respondents' claimed rights." Dugan v. Rank, 372 U.S. at 620. In coming to this conclusion, the Court held that "[a] seizure of water rights need not necessarily be a physical invasion of land. It may occur upstream, as here." Id. at 625.

In the above-captioned cases, defendant asks that this court hold that plaintiffs' takings claims should be analyzed as regulatory, rather than physical, takings. In support of this position, defendant characterizes plaintiffs' claims as being "based on the restriction on the use of a natural resource—water—resulting from government regulation." Defendant states that precedential cases have "consistently applied" a regulatory takings analysis to restrictions on the use or development of property, including natural resources. In particular, defendant points to the United States Supreme Court's decisions in Penn Central Transportation Company v. City of New York, 438 U.S. 104 (1978), United States v. Central Eureka Mining Company, 357 U.S. 155 (1958), and Keystone Bituminous Coal Association v. DeBenedictis, 480 U.S. 470 (1987), as well as the United States Court of Appeals for the Federal Circuit's decision in Forest Properties, Inc. v. United States, 177 F.3d 1360 (Fed. Cir. 1999). Defendant next argues that the Federal Circuit has rejected attempts to characterize restrictions involving compliance with the Endangered Species Act as a physical taking, citing Boise Cascade Corporation v. United States, 296 F.3d 1339 (Fed. Cir. 2002) and Seiber v. United States, 364 F.3d 1356 (Fed. Cir. 2004). Defendant also argues that the trilogy of Supreme Court cases discussing the taking of water rights as physical takings, International Paper Company v. United States, 282 U.S. 399, Dugan v. Rank, 372 U.S. 609, and United States v. Gerlach Live Stock Company, 339 U.S. 725, are distinguishable because, in each of them, the government took the plaintiffs' water rights for the government's own use or for that of a third party, while in the present cases the government's actions merely restricted plaintiffs' right to use the water at issue. Finally, defendant argues that the Federal Circuit's decision to apply a physical takings framework in Casitas Municipal Water District v. United States, 543 F.3d 1276, 1282 (Fed. Cir. 2008) is not controlling in the present cases because it was premised on the government's concession that the plaintiff had a right not only to use the water at issue, but, unlike in the present cases, to divert the water as well.

Plaintiffs ask this court to reject defendant's motion and, instead, hold that plaintiffs' takings claims should be analyzed as physical takings. In support of this position, plaintiffs characterize the government actions at issue as "t[aking] physical control" of the water in Upper Klamath Lake to which plaintiffs held a beneficial right of use, "divert[ing]" some of that water into the Klamath River to support the SONCC coho salmon, and "impound[ing]" the rest of the water in Upper Klamath Lake in order to support the Lost River and shortnose sucker fish. Plaintiffs reject the cases cited by defendant, arguing that defendant has failed to cite "a single case holding that water rights takings cases should be analyzed under a regulatory taking test." (emphasis omitted). According to plaintiffs, the Supreme Court has, in fact, "uniformly" analyzed takings of water rights as physical, rather than regulatory takings in its water rights cases, International Paper Company v. United States, Dugan v. Rank, and United States v. Gerlach Live Stock Company. Plaintiffs argues that the facts in the present cases are closely analogous to those the

11

Supreme Court analyzed as physical takings in Dugan v. Rank, and United States v. Gerlach Live Stock Company, because those cases also involved the government "impounding water" and "refusing to release it to irrigators." Plaintiffs further argue that Casitas Municipal Water District v. United States is "controlling" based on the allegedly similar facts in the present cases.

The Federal Circuit's decision in Casitas Municipal Water District v. United States is a binding precedent on this court, which, as discussed above, interpreted and implemented several, relevant, binding decisions issued by the United States Supreme Court. Casitas concerned an irrigation project in California, the Ventura River Project, which combined water from two sources, the Coyote Creek and the Ventura River, into a reservoir, Lake Casitas. See Casitas Municipal Water District v. United States, 543 F.3d at 1280. The water in the Ventura River was diverted from the river by the Robles Diversion Dam and carried into Lake Casitas via the Robles-Casitas Canal. See id. For the purpose of the Casitas appeal, the government conceded that the plaintiff, the Casitas Municipal Water District (Casitas), had "a right both to divert 107,800 acre-feet of water" from the Ventura River Project and "to use 28,500 acre-feet of such diverted water." Id. at 1288. In 2003, in order to comply with its obligations under the Endangered Species Act to protect the endangered West Coast steelhead trout, the Bureau of Reclamation issued a directive ordering Casitas to: "(1) construct a fish ladder facility . . . located at the intersection of the Ventura River, Robles Diversion Dam, and the Robles–Casitas Canal; and (2) divert water from the Project to the fish ladder, resulting in a permanent loss to Casitas of a certain amount of water per year." Id. at 1282. Casitas complied with this directive, but subsequently filed suit against the government alleging that the government's actions constituted a compensable taking of its water rights. See id.

The government in Casitas argued that its actions were distinguishable from those the Supreme Court had found to be physical takings in International Paper Company, Gerlach Live Stock Company, and Dugan because "it did not seize, appropriate, divert, or impound any water, but merely required water to be left in the stream." Id. at 1290. The Federal Circuit rejected this argument, finding that:

> the government did not merely require some water to remain in stream, but instead actively caused the physical diversion of water away from the Robles–Casitas Canal—after the water had left the Ventura River and was in the Robles–Casitas Canal—and towards the fish ladder, thus reducing Casitas' water supply.

Id. at 1291-92. In coming to this conclusion, the court specifically noted that the operation of fish canal involved closing an "overshot gate" located in the Robles–Casitas Canal, which diverted water out of the canal and into the fish ladder. Id. at 1291. The court also noted that "the appropriate reference point in time to determine whether the United States caused a physical diversion" was not, as the government argued, "before the construction of the [Ventura River] Project but instead the status quo before the fish ladder was operational," at which point water had been flowing down the Casitas-Robles Canal "since the late 1950s." Id. at 1292 n.13. The court also rejected the government's argument that its actions were distinguishable from the Supreme Court's trilogy of water rights takings

cases because it had not appropriated "the water for its own use or for use by a third party," finding that there was "little doubt" that the purpose of the government's actions, "the preservation of the habitat of an endangered species," constituted a government and public use of Casitas's water. Id. at 1292. Based on these determinations, the Federal Circuit held that "[t]he government requirement that Casitas build the fish ladder and divert water to it should be analyzed under the physical takings rubric." Id. at 1296.

The facts in the present cases are very similar to those in Casitas. Although there remain outstanding questions regarding plaintiffs' water rights in the cases presently before the court, to the extent plaintiffs held such rights, all parties agree that plaintiffs' rights would have been to use water from the Klamath Project. Thus, as in Casitas, in Klamath Irrigation and John Anderson Farms, the government has taken an action that had the effect of preventing plaintiffs from enjoying the right to use water provided by an irrigation project, to the extent they held such rights. As in Casitas, the plaintiffs in the present cases had been able to use these water rights more or less fully for years prior to the government's action. Further, in both Casitas and the present cases, the government's action was implemented by a similar physical means, in Casitas, by closing an "overshot gate" to divert water out of the canal used by the plaintiffs, see id. at 1291, and, in the present cases, by using the Klamath Project works to prevent water from travelling out of Upper Klamath Lake and the Klamath River and into project canals used by the plaintiffs. Finally, the water ultimately was used for the same purpose in each of the cases, to preserve the habitat of certain fish and meet the government's obligations under the Endangered Species Act. In Casitas, the Federal Circuit stated plainly that "there is little doubt that the preservation of the habitat of an endangered species is for government and third party use—the public—which serves a public purpose." Id. at 1292 (citing Kelo v. City of New London, 545 U.S. 469, 485 (2005)).

Defendant attempts to distinguish Casitas on two grounds. First, defendant notes that the government in Casitas conceded, for the purpose of appeal, that Casitas held not only a right to use water, but also a right to divert water from the Ventura River Project, and, therefore, argues that the Federal Circuit's holding was premised on a finding that Casitas's right to divert water, rather than its right merely to use water, had been taken. This argument finds no support in the text of the Casitas opinion, which, after mentioning that Casitas held a right to divert 107,800 acre-feet of water from the Ventura River Project, see id. at 1288, never describes the government's actions as having interfered with Casitas' right to divert water. By contrast, the opinion does state that, as a result of the government's actions, "[t]he water [diverted by the government], and Casitas' right to use that water, is forever gone." Id. at 1296 (emphasis added). Moreover, after quoting a statement from the Supreme Court's opinion in International Paper that:

> [t]he petitioner's right was to the use of the water; and when all the water that it used was withdrawn from the petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take the use,

the Federal Circuit stated "[s]imilar to the petitioner in *International Paper*, Casitas' right was to the use of the water, and its water was withdrawn from the Robles–Casitas Canal and turned elsewhere (to the fish ladder) by the government." Id. at 1292 (emphasis

13

added) (quoting Int'l Paper Co. v. United States, 282 U.S. at 407). At the very least, these statements demonstrate that the United States Court of Appeals for the Federal Circuit concluded that the government's water diversions in Casitas resulted in a permanent taking of Casitas' right to use the diverted water. See also CRV Enters., Inc. v. United States, 626 F.3d at 1247 ("Thus, the prior water rights cases finding a physical taking involved instances where the 'United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property' such that water was removed entirely and the plaintiffs 'right to use that water, [was] forever gone.'" (alteration in original) (emphasis added) (quoting Casitas v. United States, 543 F.3d at 1290, 1296)).

    Defendant also attempts to distinguish Casitas by arguing that, in the present cases, the Bureau of Reclamation's actions did not amount to a physical diversion of Klamath Project water, but instead constituted only regulatory restrictions prohibiting the removal of water by plaintiffs from Upper Klamath Lake, the equivalent of what the court in Casitas termed "merely requir[ing] some water to remain in stream" as opposed to "actively caus[ing] the physical diversion of water." See Casitas v. United States, 543 F.3d at 1291. Defendant's argument ignores the Federal Circuit's determination in Casitas that "the appropriate reference point in time to determine whether the United States caused a physical diversion" is the "status quo" before the challenged government action. Id. at 1292 n.13. In the present cases, in prior proceedings before Judge Allegra, there was a finding that the status quo prior to the government's actions was that the plaintiffs "generally received as much water for irrigation as they needed," except for in drought years when they received "somewhat less." Klamath Irrigation Dist. v. United States, 67 Fed. Cl. at 512. By refusing to release water from Upper Klamath Lake and Klamath River, the government prevented water that would have, under the status quo ante, flowed into the Klamath Project canals and to the plaintiffs. The government's actions "arrested" and "divert[ed]" waters destined for the plaintiffs in the same manner the Supreme Court found to have effected a physical taking in Gerlach Live Stock Company and Dugan. See United States v. Gerlach Live Stock Co., 339 U.S. at 729; Dugan v. Rank, 372 U.S. at 623 ("[The] expressed purpose of the construction of the dam [was] to store and divert to other areas the waters of the San Joaquin [River] . . . .").[5] Thus, while the government's actions in the

---

[5] Defendant attempts to distinguish Gerlach Live Stock Company and Dugan on the grounds that, unlike in the present cases, the landowners in both of those cases held riparian water rights and the government attempted and failed to either purchase plaintiffs' rights or enter into some sort of an agreement with them. These alleged distinctions, however, cannot lessen the applicability of these two cases, as neither the nature of the alleged water rights, nor the government's prior attempts to obtain those rights was dispositive for the Supreme Court's holdings in Gerlach Live Stock Company or Dugan, which instead focused on the government's appropriation of private water rights for its own use without compensation. See United States v. Gerlach Live Stock Co., 339 U.S. at 752-53 ("No reason appears why those who get the waters should be spared from making whole those from whom they are taken. Public interest requires appropriation; it does not require expropriation."); Dugan v. Rank, 372 U.S. at 625-26 ("[W]hen the Government acted here 'with the purpose and effect of subordinating' the respondents' water rights to the Project's uses 'whenever it saw fit,' 'with the result of depriving the owner of its profitable use, (there was) the imposition of such a servitude (as) would

14

present cases may not have amounted to as obvious a physical diversion as in Casitas, where water was re-directed out of a canal and into a newly built fish ladder, see Casitas Mun. Water Dist. v. United States, 543 F.3d at 1282, the government's retention of water in Upper Klamath Lake and Klamath River did amount to a physical diversion of water according to the standards set by the United States Court of Appeals for the Federal Circuit and the United States Supreme Court. See Casitas Mun. Water Dist. v. United States, 543 F.3d at 1289-90 (characterizing the government's "storage of water upstream behind Friant Dam" in Dugan v. Rank as involving a "physical diversion of water for third party use"). Under the applicable law, therefore, if plaintiffs, as they allege, held a right to use this water, then the government's actions should be analyzed as physical takings.

In addition to disputing the applicability of Casitas, defendant also argues that "[t]he precedential rulings that guide this Court's analysis have consistently applied a regulatory takings analysis to restrictions on the use or development of property, including property comprising natural resources that provide benefits for the common good." The cases on which defendant relies, however, are distinguishable and do not help defendant because the nature and character of the government action in each, involving some sort of government regulation that restricted a private party's use of their own property, was distinctly different from the government's actions in the present cases. Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. at 107 (historic preservation statute "plac[ing] restrictions on the development of individual historic landmarks"); United States v. Cent. Eureka Mining Co., 357 U.S. at 156 (wartime order "ordering nonessential gold mines to close down"); Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. at 475-76 (statute and regulation imposing a "set of restrictions on the amount of coal that may be extracted" by mining companies); Forest Props., Inc. v. United States, 177 F.3d at 1362 (denial of "a permit to dredge and fill certain underwater lake-bottom property"). By contrast, in the present cases, a government regulation, the Endangered Species Act, required the government to take certain actions which resulted in the retention of water in the Upper Klamath Lake. It was the government actions which denied plaintiffs the use of water they otherwise allege they were entitled to use. Thus, it is not, as in the cases cited by defendant, a government regulation alone that is alleged to have effected a taking, but rather physical actions which the government itself took to meet the requirements of that regulation.

Defendant also cites Boise Cascade Corp. v. United States and Seiber v. United States in support of its argument that the Federal Circuit has rejected attempts to characterize restrictions involving compliance with the Endangered Species Act as a physical taking. In Boise Cascade, the government, after determining that logging on plaintiff's land could harm the endangered spotted owl, sought and received an injunction barring plaintiff from logging on its property without first receiving an incidental take permit

---

constitute an appropriation of property for which compensation should be made.'" (quoting Peabody v. United States, 231 U.S. 530, 538 (1913); and Portsmouth Co. v. United States, 260 U.S. 327, 329 (1922)).

15

from the Fish and Wildlife Service under section 10 of the Endangered Species Act.[6] See Boise Cascade Corp. v. United States, 296 F.3d at 1341-42. The Boise Cascade plaintiff alleged that the government's action constituted a per se physical taking under Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982),[7] because the government action prevented plaintiff from excluding spotted owls from its property. See Boise Cascade Corp. v. United States, 296 F.3d at 1352. The Federal Circuit ultimately determined that the "nature of the intrusion complained of in this case does not make out a per se takings claim under *Loretto*." See id. In particular, the court found that the government "merely prevented Boise from logging its land without a permit, which—as a regulation imposed upon Boise's use of the property—is a restriction on private use of the land and not a per se taking by the government." Id. at 1354. The court specifically rejected plaintiff's argument that Loretto should apply because the occupation of its land by wild spotted owls was "indistinguishable from a forced government intrusion upon its land" because "the government has no control over where the spotted owls nest, and it did not force the owls to occupy Boise's land." See id. at 1354-55. By contrast, in the present cases, the interference with plaintiffs' alleged property rights did not result from the actions of some third party over whose actions the government had no control, but, instead, was due to actions taken by the government itself. It was the government's decision to retain water in Upper Klamath Lake and Klamath River, preventing the release of the water into the canals of the Klamath Project, that led plaintiffs to lose the benefit of whatever rights they may have had to use that water. This physical retention, in a system that was owned and, as the government's actions in the present cases show, ultimately controlled by the government, amounts to something more than the "restriction on private use of . . . land" at issue in Boise Cascade, see id. at 1354, making Boise Cascade distinguishable from the present cases.

The second case cited by defendant, Seiber v. United States, involved facts very similar to those in Boise Cascade. In Seiber, the plaintiff owned a parcel that was a habitat of the endangered spotted owl and was denied an incidental take permit by the United

---

[6] The Federal Circuit has described the purpose of an incidental take permit as follows:

> The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544 (2000), prohibits the "take" of an endangered species, *id.* § 1538(a)(1)(B), which includes harassing, harming, pursuing, wounding or killing such an animal, *id.* § 1532(19). . . . The ESA also provides a permitting mechanism to allow the "incidental take" of an endangered or threatened species in certain circumstances, authorizing "any taking otherwise prohibited . . . if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

Seiber v. United States, 364 F.3d at 1359 (second omission in original).

[7] "The Court in *Loretto* held that a permanent physical occupation of property, no matter how slight, is a per se taking." Boise Cascade Corp. v. United States, 296 F.3d at 1352 (citing Loretto v. Teleprompter Manhattan CATV Corp.*,* 458 U.S. at 441).

16

States Fish and Wildlife Service authorizing plaintiff to log this land. See Seiber v. United States, 364 F.3d at 1360-61. The court rejected plaintiff's allegation that the government's actions amounted to a physical taking of its property, determining that the holding of Boise Cascade was "directly on point." Id. at 1366. The Federal Circuit also rejected plaintiff's argument that the Supreme Court's statement in Brown v. Legal Foundation of Washington, 538 U.S. 216 (2003), that "[a] law that requires . . . funds be transferred to a different owner for a legitimate public use . . . could be a *per se* taking requiring the payment of 'just compensation,'" suggested that Boise Cascade was wrongly decided. Seiber v. United States, 364 F.3d at 1366-67 (quoting Brown v. Legal Foundation of Washington, 538 U.S. at 240). In doing so, the Federal Circuit found that "[t]he governmental protection of owls . . . is not comparable to a government authorization to third parties to utilize property." Id. at 1367. Similar to Boise Cascade, Seiber does not assist defendant because the cases presently before the court involve allegations that the actions of the government itself, rather than a third party, effected a physical withholding, and, therefore, a taking of plaintiffs' alleged water rights.

Finally, both defendant and third party intervenor Pacific Coast Federation of Fisherman's Associations also cite to Hudson County Water Company v. McCarter, 209 U.S. 349 (1908), for support, with defendant arguing that the case "supports the position of the United States on multiple grounds" and PCFFA arguing that the case contradicts plaintiffs' argument that the Supreme Court has never treated the taking of a water right as a regulatory taking. In Hudson County, the state of New Jersey passed a law prohibiting the transportation of fresh water from any lakes or rivers in New Jersey into any other state. See id. at 353. The defendant had been found to own riparian rights to a river in New Jersey by a lower court and contracted with New York City to furnish water drawn from that river to Staten Island. See id. at 353-54. After the plaintiff sought to enjoin the defendant from being allowed to draw water, defendant challenged the New Jersey law as unconstitutional including on the grounds that the New Jersey law took property without due process of law. See id. at 354. After noting that "[t]he problems of irrigation have no place here," Justice Holmes wrote for the Court that "it appears to us that few public interests are more obvious, indisputable, and independent of particular theory than the interest of the public of a state to maintain the rivers that are wholly within it substantially undiminished, except by such drafts upon them as the guardian of the public welfare may permit for the purpose of turning them to a more perfect use." Id. at 356. According to Justice Holmes such a "public interest" is "fundamental" and "the private property of riparian proprietors cannot be supposed to have deeper roots." Id. As such, Justice Holmes found "it quite beyond any rational view of riparian rights, that an agreement, of no matter what private owners, could sanction the diversion of an important stream outside the boundaries of the state in which it flows." Id. The Supreme Court, therefore, upheld the constitutionality of the law at issue. See id. at 358. Justice Holmes's conclusion that the law did not effect a taking was, thus, premised on his understanding that the contractor, as a holder of riparian water rights, never actually held the right allegedly taken, which would have been "quite beyond any rational view of riparian rights." Id. at 356. As such, Hudson County concerns the extent of riparian water rights, rather than whether the government's actions depriving parties of such water rights should be

17

analyzed as a physical or regulatory taking, and is, thus, inapplicable to the present motions.[8]

## CONCLUSION

For the reasons discussed above, the United States Court of Appeals for the Federal Circuit's holding in Casitas Municipal Water District v. United States, 543 F.3d 1276, and the United States Supreme Court decisions on which Casitas relies, are controlling in the cases presently before the court. As in Casitas, the government's actions in the present cases "should be analyzed under the physical takings rubric." Casitas Mun. Water Dist. v. United States, 543 F.3d at 1296. Therefore, defendant's motion in limine is **DENIED** and plaintiffs' cross-motion in limine is **GRANTED**. The court notes, however, that in making this decision, it is in no way making any determinations as to the nature or scope of plaintiffs' alleged property rights, which remain at issue in the above-captioned cases.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[8] For the first time in its response and reply to plaintiffs' cross-motions in limine, defendant requested, that, "in the event that the Court finds it necessary to determine the nature and scope of the Plaintiffs' alleged property rights in order to determine the proper analytical framework . . . briefing on that contested, threshold legal question be scheduled." The court does not find it necessary to first determine the nature and scope of plaintiffs' alleged property rights in order to rule on the cross-motions in limine currently before the court. In determining whether a physical or a regulatory taking has occurred, "our focus should primarily be on the character of the government action." Casitas Mun. Water Dist. v. United States, 543 F.3d at 1290. In the present cases, although the nature and scope of plaintiffs' alleged property rights remain in dispute, the relevant facts related to the character of the government's actions are not, having either been stipulated to by the parties or not disputed in the briefs submitted to the court. Thus, it is possible to first rule on the nature of the alleged takings, as was briefed by the parties, prior to determining the exact nature of plaintiffs' property rights. Indeed, such an approach was adopted by the Supreme Court in Dugan v. Rank, in which the Supreme Court determined that the government's actions would constitute a taking of the plaintiffs' alleged water rights, but also stated that, in doing so, the Court "d[id] not in any way pass upon or indicate any view regarding the validity of respondents' water right claims." Dugan v. Rank, 372 U.S. at 626.