# In the United States Court of Federal Claims

**Nos. 1-591L; 7-194C; 7-19401C; 7-19402C; 7-19403C; 7-19404C; 7-19405C; 7-19406C; 7-19407C; 7-19408C; 7-19409C; 7-19410C; 7-19411C; 7-19412C; 7-19413C; 7-19414C; 7-19415C; 7-19416C; 7-19417C; 7-19418C; 7-19419C; 7-19420C**

**Filed: September 29, 2017**

* * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| **LONNY BALEY, <u>et al.</u>,[1] and JOHN ANDERSON FARMS, INC., <u>et al.</u>, For Themselves, and as Representatives of a Class of Similarly Situated People,** | **Takings, Physical or Regulatory Taking, Permanent or Temporary Taking, Water Rights, Tribal Rights, Endangered Species Act, Federal Reserved Rights; Motions for Reconsideration.** |

**Plaintiffs,**

**v.**

**UNITED STATES,**

**v.**

**Defendant,**

**PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,**

**Defendant-Intervenor.**

* * * * * * * * * * * * * * * * * *

**Nancie G. Marzulla**, Marzulla Law, LLC, Washington, D.C. for plaintiffs. With her was **Roger G. Marzulla**, Marzulla Law, LLC. Of counsel were **William M. Ganong**, Special Counsel, Klamath Irrigation District, Klamath Falls, OR and Alan I. Saltman and Kathleen H. Barron, Smith Currie & Hancock LLP, Washington, D.C.

**Kristine S. Tardiff**, Trial Attorney, for defendant. With her were **Jeffrey H. Wood**, Acting Assistant Attorney General, and **Edward C. Thomas**, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice,

---

[1] As discussed below, case number 1-591L was re-captioned from <u>Klamath Irrigation District, et al. v. United States</u> to <u>Lonny Baley, et al. v. United States</u> by order of the court on February 14, 2017 after the claims of Klamath Irrigation District, along with a number of plaintiffs were dismissed from the case.

Washington, D.C. Of counsel were **Stephen Palmer**, Office of the Regional Solicitor, United States Department of the Interior, Sacramento, CA, and **Christopher Keifer**, Office of the General Counsel, National Oceanic and Atmospheric Administration, Long Beach, CA.

      **Todd D. True**, Earthjustice, Seattle, WA for defendant-intervenor.

      **Susan Y. Noe**, Native American Rights Fund, Boulder, CO for amicus Klamath Tribes.

## FINDINGS OF FACT

Plaintiffs in the above-captioned cases are a consolidated class of farmers in southern Oregon and northern California, who claim they held a right to receive water from the United States Department of the Interior, Bureau of Reclamation's Klamath River Basin reclamation project (the Klamath Project) in 2001. The cases arise from the government's actions in 2001, when defendant, acting through the United States Department of the Interior, Bureau of Reclamation, temporarily terminated water deliveries to the plaintiffs in order to meet the requirements of the Endangered Species Act, 16 U.S.C. § 1531, et seq. (2000), as outlined in two Biological Opinions from the United States Fish and Wildlife Service (FWS) and the United States National Marine Fisheries Service (NMFS), and its tribal trust obligations to several Native American tribes. After multiple opinions issued by earlier assigned judges, and, following appeal of one of those earlier decisions to the United States Court of Appeals for the Federal Circuit, remand to this court, and reassignment to this judge, a trial was held leading to the instant decision. Plaintiffs allege, in their remaining claims, that the government's actions constituted compensable takings of their property under the Fifth Amendment to the United States Constitution by depriving them of their alleged rights to use Klamath Project water, as well as an impairment of their rights under the Klamath River Basin Compact, Pub. L. No. 85-222, 71 Stat. 497 (1957) (the Klamath Compact).

### I.   The Klamath Project

The Klamath Project, an irrigation project straddling the southern Oregon and northern California borders, supplies water to hundreds of farms, comprising approximately 200,000 acres of agricultural land, including those in the Klamath River Basin, as well as to certain National Wildlife Refuge lands owned by the United States. The agricultural irrigation water is used by the farmers and ranchers in the Klamath Project area to grow a variety of crops, including alfalfa, irrigated pasture, small grains, potatoes, onions, sugar beets, as well as several other miscellaneous crops. The Klamath Project is managed and operated by the United States Bureau of Reclamation. The Bureau of Reclamation also manages the Klamath Project to protect tribal trust resources that depend on Klamath Project Water, including the Lost River and shortnose suckers and the Southern Oregon/Northern California Coast (SONCC) coho salmon, all three of which species that are also protected under the Endangered Species Act.

### A. **Appropriation of Klamath Project Water Rights by the United States**

The Klamath Project is one of the earliest federal reclamation projects. Engineering investigations for the Klamath Project began in 1903, and, in 1905, the United States Congress authorized the Klamath Project pursuant to the Reclamation Act of 1902, which provided for federal financing, construction, and operation of water storage and distribution projects. See Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388 (codified as amended at 43 U.S.C. § 371, et seq. (2012)). Section 8 of the Act requires the Secretary of the Interior to comply with state law regarding the appropriation of water for irrigation (to the extent it is not inconsistent with federal law). See 43 U.S.C. § 383. Section 8 also provides that: "The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 43 U.S.C. § 372.

On February 22, 1905, the Oregon legislature enacted a statute specifically related to appropriations of water for Reclamation Act projects, such as the Klamath Project. See 1905 Or. Gen. Laws 401-02. The statute provided:

> Whenever the proper officers of the United States, authorized by law to construct works for the utilization of water within this State, shall file in the office of the State Engineer a written notice that the United States intends to utilize certain specified waters, the waters described in such notice and unappropriated at the time of the filing thereof shall not be subject to further appropriation under the laws of this State, but shall be deemed to have been appropriated by the United States; *provided*, that within a period of three years from the date of filing such notice the proper officer of the United States shall file final plans of the proposed works in the office of the State Engineer for his information; *and provided further*, that within four years from the date of such notice the United States shall authorize the construction of such proposed work.

Id. (emphasis in original). Pursuant to the terms of the 1905 Oregon statute, on May 17, 1905, the United States Reclamation Service, the predecessor to the United States Bureau of Reclamation, filed a notice with the Oregon State Engineer stating that "the United States intends to utilize . . . [a]ll of the waters of the Klamath Basin in Oregon, constituting the entire drainage basins of the Klamath River and Lost River, and all of the lakes, streams and rivers supplying water thereto or receiving water therefrom" for purposes of "the operation of works for the utilization of water . . . under the provisions of the . . . Reclamation Act." Also pursuant to the terms of the 1905 Oregon statute, the Reclamation Service subsequently filed with the State Engineer plans of proposed works and proof of authorization of the Klamath Project. Prior to the development of the Klamath Project, private landowners and irrigation companies in the area ultimately to be served by the Klamath Project had begun to divert water for irrigation purposes. The Reclamation Service acquired the interests of such entities in most of these pre-Klamath Project water rights or appropriations and integrated them into the Klamath Project.

The property rights claimed by the plaintiffs in this litigation relate to water that is diverted from Upper Klamath Lake, a large, shallow lake in which water is stored by means of a dam (the Link River Dam), and from locations downstream of Upper Klamath Lake and the Link River Dam on the Klamath River in Oregon. The water is diverted out of Upper Klamath Lake and the Klamath River and then conveyed through canals and laterals to individual users in both California and Oregon within the Klamath Project. The works which divert the water were constructed by the United States between 1906 and 1966 and are currently owned by the United States. The operation and maintenance of all of the federally owned diversion works downstream of the headgates of Upper Klamath Lake, as well as works that divert water directly from the Klamath River, however, have been transferred to two Irrigation Districts, the Klamath Irrigation District and the Tulelake Irrigation District, by contract, subject to the rules and regulations of the United States Secretary of the Interior. These two Irrigation Districts operate and maintain works that distribute this diverted water to serve benefitted lands. Other Irrigation Districts and individuals that constructed and own their own diversion and delivery facilities also are parties to contracts with the United States for water made available by the Klamath Project. The individual plaintiff landowners (or their lessees) apply the diverted water to irrigate crops.

### B. Contracts Between the United States and Klamath Project Water Users

Water is generally diverted and delivered by the Klamath Project pursuant to state law (to the extent it is not inconsistent with federal law) and pursuant to perpetual repayment contracts between the Bureau of Reclamation and Irrigation Districts, or Warren Act contracts between the Bureau of Reclamation and Irrigation Districts or individuals. Water also is delivered to a smaller number of users pursuant to settlement contracts and as part of lease agreements for lands in the National Wildlife Refuges located within the Klamath Project.

### 1. Repayment Contracts

The Bureau of Reclamation has entered into repayment contracts with two large Irrigation Districts, the Klamath Irrigation District, which covers the "Main Division" of the Klamath Project, the approximately 40,000 acres of land that were the first developed for irrigation as part of the Klamath Project, and the Tulelake Irrigation District, which covers approximately 63,000 acres of reclaimed lands formerly submerged by Tule Lake in California.[2] Related to these contracts, however, are several other contracts that were entered into in the early years of the Klamath Project.

### a. Form A and B Applications

Prior to the establishment of Irrigation Districts, the Department of the Interior had adopted two forms of applications to receive water from reclamation projects such as the

---

[2] Although Tule Lake is spelled as two words, the name of the Tulelake Irrigation District does not include the space between the two words.

Klamath Project, "Form A" and "Form B." See Laws and Regulations Relating to the Reclamation of Arid Lands, 45 L.D. 385, 406-08 (May 18, 1916). The Form A application was to be entered into by homesteaders settling within reclamation project lands. Id. at 406. As part of the Klamath Project, Tule Lake was dewatered and its reclaimed lands were opened to homesteaders in segments between 1922 and 1948. Pursuant to the terms of the Homestead-Reclamation Act, Pub. L. No. 62-256, 37 Stat. 265 (1912), these homesteaders were permitted to settle these lands in exchange for payments, which varied over time, designed to repay Klamath Project costs. Twenty eight of these Form A applications, entered into by the predecessors of class members owning property within the Tulelake Irrigation District, were admitted into evidence during the trial. The Form A application was titled "APPLICATION FOR PERMANENT WATER RIGHT," (capitalization in original), and contained the following provision describing the "water right" at issue in the application:

> 3. **Description of water right**.—The quantity of water to be furnished hereunder shall be that quantity which may be applied beneficially in accordance with good usage in the irrigation of the land described in paragraph 2: *Provided*, That in case of a shortage at any time the amount to be furnished shall be an equitable proportionate share, as nearly as practical operations will permit, of the water actually available at the time for all of the area being watered from the same source of supply, such proportionate share to be determined by the project manager. . . . On account of drought, inaccuracy in distribution, or other cause, there may occur at times a shortage in the water supply, and while the United States will use all reasonable means to guard against such shortages, in no event shall any liability accrue against the United States, its officers, agents, or employees, for any damage direct or indirect arising therefrom.

 (emphasis in original). Additionally, a provision of the Form A application titled: "**Conditions of application to be continuing**" stated: "All of the within terms and conditions, in so far as they relate to said land, shall be a charge upon said land to run with the title to same." (emphasis in original).

Upon completion of the homesteading process, the United States issued a patent deed to the homesteader. Twenty eight patent deeds were admitted into evidence at trial, one for each of the parcels for which a Form A application was admitted into evidence. Twenty seven of the twenty eight patent applications admitted at trial involved land in California and the other patent deed involved land in Oregon. Each of these patent deeds states:

> NOW KNOW YE, That the UNITED STATES OF AMERICA, in consideration of the premises, and in conformity with the several Acts of Congress in such case made and provided, HAS GIVEN AND GRANTED, and by these presents DOES GIVE AND GRANT, unto the said [name] and to his heirs, the Tract above described, together with the right to the use of water from the Klamath Reclamation Project as an appurtenance to the irrigable lands in said tract; TO HAVE AND TO HOLD the same, together

> with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging, unto the said [name] and to his heirs and assigns forever . . . but excepting, nevertheless, and reserving unto the United States, rights of way over, across, and through said lands for canals and ditches constructed, or to be constructed, by its authority . . . .

(capitalization in original). Additionally, some of the patent deeds contained clauses reserving to the United States "all uranium, thorium or any other material which is or may be determined to be peculiarly essential to the production of fissionable materials" or rights of way for the maintenance of power transmission lines.

The Form B application was to be entered into by owners of private lands that were included as part of reclamation projects. See Laws and Regulations Relating to the Reclamation of Arid Lands, 45 L.D. 385, 406-07. One Form B application was admitted into evidence at trial. Regarding the water to be provided to the applicant, Form B stated:

> 2. The quantitative measure of the water right hereby applied for is that quantity of water which shall be beneficially used for the irrigation of said irrigable lands up to, but not exceeding [a quantity which varied by applicant] acre-fee per acre per annum, measured at the land; and in no case exceeding the share, proportionate to irrigable acreage, of water supply actually available as determined by the Project Engineer or other proper officer of the United States, or of its successors in the control of the project, during the irrigation season for the irrigation of lands under said unit. . . .

Under the Department of Interior regulations which governed Form B applications, upon acceptance by the Bureau of Reclamation, a Form B application "becomes a water-right contract." 45 L.D. 385, 408.

### b. Klamath Water Users Association

Form B also included a provision requiring that Form B applicants enter into a contract with a water users' association, stating:

> This application must bear the certificate, as hereto attached, of the water users' association under said project, which has entered into contract with the Secretary of the Interior . . . . If the Secretary of the Interior has made no contract with a water users' association under said project, the applicant agrees to file, upon his direction, evidence of membership in the water users' association organized under the said project . . . .

George Moss Driscoll, who, at the time of trial, held the position of senior water and land specialist for the Bureau of Reclamation's Klamath Basin area office, and previously was a water contracts specialist for the Bureau of Reclamation, testified at trial that, "in addition to the form A/form B water right applications, [the Bureau of] Reclamation as a matter of policy initially intended to contract" with such water users associations, which "would be the entity through which Reclamation intended to directly work with and communicate with water users on the project." In the case of the Klamath Project, the relevant

association was the Klamath Water Users Association (KWUA). The contract between the United States and the KWUA, dated November 6, 1905, was admitted into evidence at trial. Under the contract, KWUA guaranteed payments for the Klamath Project works, to be apportioned among its members. In exchange, only members of the KWUA would be accepted as applicants for water rights in the Klamath Project. Regarding such rights, the contract specified:

> That the aggregate amount of such rights to be issued shall, in no event, exceed the number of acres of land capable of irrigation by the total amount of water available for the purpose . . . and that the Secretary of the Interior shall determine the number of acres so capable of such irrigation as aforesaid, his determination to be made upon due and expert consideration of all available data, and to be based upon and measured and limited by the beneficial use of water.

The KWUA contract entitles the signor to receive a specified number of shares in the KWUA. These shares, as well as "all rights and interest represented thereby or existing or accruing by reason thereof or incident thereto," were to be "inseparably appurtenant" to the real estate parcels specified in the contract. Ownership of KWUA shares entitled their holder to "the right to have such water delivered to the owner thereof by the Association for the irrigation of said lands, as the Association shall from time to time acquire or control means for that purpose." A copy of the stock subscription and contract used by KWUA also was admitted into evidence at trial.

### c. Klamath Irrigation District and Tulelake Irrigation District Repayment Contracts

The November 6, 1905 contract between the United States and the KWUA was eventually supplanted by a July 6, 1918 repayment contract between the United States, the KWUA, and the newly formed Klamath Irrigation District. The July 6, 1918 contract "dissolved" KWUA and transferred to the Klamath Irrigation District, an Oregon municipal corporation, all irrigable lands for which water rights applications to the United States had been made and/or which were covered by stock subscriptions with the KWUA, as well the entirety of KWUA's liability to the United States for Klamath Project construction costs. The July 6, 1918 contract was supplemented by a November 29, 1954 "Amendatory Contract" between the United States and the Klamath Irrigation District. The preamble of the November 29, 1954 contract states that "the District is obligated, among other things, to repay to the United States that part of the expenditures made by the United States in the construction of the Project which is properly allocable to the District" and that "the District, as the duly authorized representative of the water users within its geographic boundaries, desires to enter into an amendatory contract with the United States, which would provide for the District to take over the operation and maintenance of certain of the Project works." Under the November 29, 1954 repayment contract, the Klamath Irrigation District assumed responsibility for the operation and maintenance of certain works in the Klamath Project from the United States and agreed to provide water and drainage services through those works to certain other Irrigation Districts, including the Tulelake Irrigation District, and certain individuals located outside the Klamath Irrigation District.

The November 29, 1954 contract also contained the following provision regarding water shortages:

<u>UNITED STATES NOT LIABLE FOR WATER SHORTAGE</u>

26. On account of drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs and, while the United States will use all reasonable means to guard against such shortage, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom and the payments to the United States provided for herein shall not be reduced because of any such shortages.

(capitalization in original). The November 29, 1954 contract between the United States and the Klamath Irrigation District was in effect in 2001.

The Tulelake Irrigation District, a California municipal corporation, services water users in the reclaimed lands of Tule Lake that were opened to homesteaders between 1908 and 1948. These homesteaders would have submitted a Form A application to receive their water rights from the Klamath Project. The preamble of the contract between the Tulelake Irrigation District and the United States states:

[T]he District desires to contract, pursuant to the Federal reclamation laws and the laws of the State of California, for the furnishing by the United States of a water supply form the [Klamath] Project works and for the repayment of the construction charges hereinafter set forth, less such credits as are applicable under the Federal reclamation laws and the provisions of this contract; and . . . the parties desire by this contract to provide, in accordance with and subject to the terms and conditions hereinafter provided, for the transfer to the District of the operation and maintenance of works and properties used or useful for the delivery of water to and protection of the lands within the District . . . .

Similar to the Klamath Irrigation District, under a September 10, 1956 contract with the United States, the Tulelake Irrigation District assumed responsibility for the operation and maintenance of Klamath Project works used to supply water to the lands within the district. The September 10, 1956 contract contained a water shortage provision that was identical to the one contained in the November 29, 1954 contract between Klamath Irrigation District and the United States. The September 10, 1956 contract between the United States and the Tulelake Irrigation District was in effect in 2001.

## 2. <u>Warren Act Contracts</u>

Warren Act contracts were made with both individual water users and Irrigation Districts which supplied water to individuals within their boundaries. Warren Act contracts cover lands that, unlike those within the Klamath Irrigation District and Tulelake Irrigation District, were not part of the Klamath Project when it was originally developed. Geographically, these lands are scattered throughout the Klamath Project. These

8

contracts were made pursuant to the Warren Act of 1911, Pub. L. No. 61-406, 36 Stat. 925 (codified at 43 U.S.C. §§ 523-25 (2012)). The Warren Act authorizes the Secretary of the Interior "to cooperate with irrigation districts, water-users' associations, corporations, entrymen, or water users for the construction or use of such reservoirs, canals, or ditches as may be advantageously used by the Government and irrigation districts, water-users' associations, corporations, entrymen, or water users for impounding, delivering, and carrying water for irrigation purposes." 43 U.S.C. § 524. In the Klamath Project, water is delivered to Warren Act contractors through works operated by the Klamath Irrigation District and the Van Brimmer Ditch Company, an Oregon business discussed below. Irrigation Districts relevant to this action who have Warren Act contracts with the United States include: the Enterprise Irrigation District; the Klamath Basin Improvement District; the Klamath Drainage District; the Malin Irrigation District; the Midland District Improvement Company; the Pine Grove Irrigation District; the Poe Valley Improvement District; the Shasta View Irrigation District; the Sunnyside Irrigation District; and the Westside Improvement District. Warren Act contracts for each of these Irrigation Districts were admitted into evidence at trial. These Irrigation District contracts were entered into between 1920 and 1962, although some individual contracts were entered into as early as 1915.

The Warren Act contracts entered into by the Irrigation Districts all contain similar or identical language in several key provisions relevant in the current cases. In each of the contracts, the Irrigation District agrees to pay the United States a specified sum of money in exchange for delivery of Klamath Project water. All of these contracts contain language stating that rights to the use the water acquired under the contracts are inferior to prior rights reserved for the lands of the Klamath Project. The Bureau of Reclamation has interpreted this to mean that these rights are junior to those held by the Van Brimmer Ditch Company, Klamath Lake Irrigation District, and Tulelake Irrigation District and, in the case of a drought, would receive Klamath Project water only after the rights of users of these three entities had been fully satisfied. Each of the contracts defines an upper limit to the amount of water the Irrigation District is entitled to receive, although, the exact limit varies by contract. The contracts for the Malin Irrigation District, the Sunnyside Irrigation District, the Shasta View Irrigation District, the Enterprise Irrigation District, and the Pine Grove Irrigation District limit the amount to "two acre feet per acre of irrigable land during the usual irrigation season." The contracts for the Malin Irrigation District, the Sunnyside Irrigation District, and the Shasta View Irrigation District contain additional language stating that the amount of water provided "shall not exceed the amount that can be furnished, as determined by the Secretary, at a cost of Thirty-four Dollars ($34.00) . . . and in no event shall it exceed 0.6 acre-feet of water per irrigable acre in any one month." The Westside Improvement District's contract entitles them to receive a maximum of "two and one-half (2 ½) acrefeet per-acre per annum," while the Klamath Basin Irrigation District's contract limits them to an amount of water "not to exceed an average of three and six-tenths (3.6) acrefeet per irrigable acre." Finally, the contracts for the Klamath Drainage District, Midlands Irrigation District, and Poe Valley Irrigation District simply limit them to the amount of water that can be put to beneficial use for irrigation on the irrigable lands within their districts.

Finally, each of the Warren Act contracts for Irrigation Districts admitted into evidence at trial also contains a provision limiting the United States' liability in the event of water shortages, although there are two different forms this language takes. Those contracts entered into by the Klamath Drainage District, Malin Irrigation District, the Klamath Basin Improvement District, the Shasta View Irrigation District, the Sunnyside Irrigation District, and the Westside Improvement District contain language relating to shortages caused by droughts or "other cause," stating, in language similar to that of the contract with the Malin Irrigation District, with only minor, non-relevant variations, that:

> On account of drought, inaccuracy in distribution or other cause, there may occur at times a shortage in the quantity of water provided for herein, and while the United States will use all reasonable means to guard against such shortage, in no event shall any liability accrue against the United States, its officers, agents or employees, for any damage, direct or indirect, arising therefrom, and the payments due hereunder shall not be reduced because of any such shortage.

The shortage provisions in the rest of the contracts, including for the Enterprise Irrigation District, the Midland District Improvement Company, the Poe Valley Improvement District, and the Pine Grove Irrigation District, however, are missing the "other causes" language and state:

> The United States shall not be liable for failure to supply water under this contract caused by hostile diversion, unusual drought, interruption of service made necessary by repairs, damages caused by floods, unlawful acts or unavoidable accidents.

At trial, three Warren Act contracts between the United States and individuals, under which three named plaintiffs received water in 2001, were also admitted into evidence. Named Baley plaintiffs Daniel G. and Delores Chin owned two parcels that received water pursuant to individual Warren Act contracts in 2001 entered into by their predecessor-in-interest. Named John Anderson Farms plaintiff Hill Land & Cattle LLC owned one parcel that received water pursuant to an individual Warren Act contract in 2001 that was entered into by its predecessor-in-interest. The Warren Act contracts for these three parcels are identical, or close to identical, in almost all respects and very similar to the Warren Act contracts entered into by the Malin Irrigation District, the Sunnyside Irrigation District, and the Shasta View Irrigation District. Like those Irrigation District contracts, the three individual Warren Act Contracts place upper limits on the water that will be furnished, "two acre-feet per acre of irrigable land during the usual irrigation season" for one of the Chin parcels and "two and one-half (2 1/2 ) acre-feet per acre of irrigable land during the usual irrigation season) for the Hill Land & Cattle LLC parcel and the other Chin Parcel, while also further stating that this amount "shall not exceed the amount that can be furnished, as determined by the Secretary, at a cost of Thirty-four Dollars ($34.00) . . . and in no event shall it exceed 0.6 acre-feet of water per irrigable acre in any one month." The individual Warren Act contracts also contain the same shortage provision as those Irrigation Districts immunizing the United States from liability in the event of a droughts or "other cause." Finally, each of the three individual

Warren Act Contracts has a provision stating: "The terms of this contract shall inure to the benefit of and be binding upon the successors in interest and assigns of the parties hereto."

### 3.   Settlement Contracts: the Van Brimmer Ditch Company

The third type of contract governing delivery of water in the Klamath Project, settlement contracts, covers the distribution of water to lands that held a water right or a claim to a water right, prior to the Klamath Project's inception. George Driscoll testified at trial that the settlement contractors are a "very minor group" that, among the original named plaintiffs at the time of trial, includes only the Van Brimmer Ditch Company. The Van Brimmer Ditch Company is not an Irrigation District, but is instead an Oregon business corporation that delivers irrigation water to landowners. Each share of Van Brimmer Ditch Company stock corresponds with one acre of irrigable land with an appurtenant right to receive water from the company. As a former president of the Van Brimmer Ditch Company, James Moore, a named plaintiff in the Baley case, testified at trial, the Van Brimmer Ditch company traces its history back to the 1880s, prior to the genesis of the Klamath Project, when its founders, the Van Brimmer brothers, posted notices of appropriation and started drawing water from White Lake, which was associated with Lower Klamath Lake, via trenches they and others had dug. Subsequently, the creation of the Klamath Project resulted in the draining of White Lake and the Van Brimmer Ditch Company entered into a contract with the United States to receive water from Upper Klamath Lake instead.

The contract between Van Brimmer Ditch Company and the United States, entered into on November 6, 1909, begins by recognizing that "the changing by the United States of the course or water-level of the . . . Lower Klamath Lake [as a result of the construction of the Klamath Project] will in all probability completely destroy or impair the present source of water supply used for irrigation purposes of the [Van Brimmer Ditch] Company" and that "the Company claims that it has established a vested right to the use of fifty second-feet of water for irrigation purposes from the water of Lower Klamath Lake." In the contract, the Van Brimmer Ditch Company agreed to "waive[] and renounce[] to the use and benefit of the United States any and all of its riparian rights, in relation to the waters and shores of Lower Klamath Lake appurtenant or incident to the lands now being irrigated by the Company," and, in exchange, the United States agreed to "deliver to the Company during each and every irrigation season . . . a quantity of water, not to exceed fifty second feet." The United States also "recognize[d] the right as existing in the Company to the perpetual use of said fifty (50) second feet of water." Named plaintiffs James and Cheryl Moore are landowner-shareholders in Van Brimmer Ditch Company. In 2001, the Moores owned 135 shares of stock in the Van Brimmer Ditch Company, each of which corresponded with one acre of irrigable land with an appurtenant right to receive irrigation water.

### 4.   Leased Lands in the National Wildlife Refuges

The Klamath Project also administers federal lease contracts with farmers on about 23,000 acres of land within two national wildlife refuges that sit within the Klamath

Project, the Tule Lake and the Lower Klamath Wildlife Refuges, pursuant to the Kuchel Act, Pub. L. No. 88-567, 78 Stat. 850 (1964). These lands are among the most productive lands in the Klamath Basin. Contracts in the refuges are issued for five to eight years, but require annual renewal. The Bureau of Reclamation uses a standard lease contract on these lands. The leases do not specify an amount of water to which the lessor is entitled, but instead state that: "[t]he Bureau of Reclamation will handle all deliveries of irrigation water to the leased premises and all draining of the leased premises." The leases also contain the following shortage provision: "[T]he United States, its officers, agents and employees, and its successors and assigns shall not be held liable for damages because irrigation water is not available or because of an inability to drain the leased premises in a timely manner." Of the named plaintiffs, only one, James Frank, alleges that he received water through a lease contract for lands in one of the National Wildlife Refuges within the Klamath Project. A lease signed by Mr. Frank on April 19, 1999, and renewable up to October 31, 2003, for lands in a National Wildlife Refuge was admitted into evidence at trial.

## C.   Tribal Rights in Klamath Project Waters

Three Native American tribes, the Klamath, Yurok, and Hoopa Valley Tribes, (collectively, the Tribes) hold rights to take fish from Klamath Project waters. The rights of the Klamath Tribes are derived from an 1864 treaty between the Klamath Tribes and the United States, in which the Klamath Tribes "relinquished its aboriginal claim to some 12 million acres of land in return for a reservation of approximately 800,000 acres in south-central Oregon." United States v. Adair, 723 F.2d 1394, 1398 (9th Cir. 1983). Among other provisions, the treaty guaranteed the Klamath Tribes "the exclusive right of taking fish in the streams and lakes" that were included as part of the Klamath Indian Reservation.[3] See Treaty Between the United States of Am. & the Klamath & Moadoc Tribes & Yahooskin Band of Snake Indians, Art. I., Oct. 14, 1864, 16 Stat 707. The Klamath Tribes' reservation abutted Upper Klamath Lake and included several of its tributaries. Based on the language of the 1864 treaty, a federal court water rights adjudication determined that the Klamath Tribe holds "[a] water right to support game and fish adequate to the needs of Indian hunters and fishers." United States v. Adair, 723 F.2d at 1411. This right is "non-consumptive," meaning that the Klamath Tribes are "not entitled to withdraw water from the stream for agricultural, industrial, or other consumptive uses," but instead hold "the right to prevent other appropriators from depleting the streams['] waters below a protected level in any area where the non-consumptive right applies." Id. (citing 1 R. Clark, Waters and Water Law § 55.2, at 578–81 (1967) and Cappaert v. United States, 426 U.S. 128, 143 (1976)). Because the 1864 Treaty amounted to "a recognition of the Tribe's aboriginal water rights," the Klamath Tribes' water rights "carry a priority date of time immemorial." Id. at 1414. The Klamath Tribes' water rights in Upper Klamath Lake had not been quantified in 2001.

---

[3] The Klamath Indian Reservation was terminated in 1954 pursuant to an act of Congress, but the act explicitly preserved the Klamath Tribes' water rights. See United States v. Adair, 723 F.2d at 1411-12 (quoting 25 U.S.C. § 564m(a) (1976)).

The rights of the Yurok and Hoopa Valley Tribes are derived from three presidential Executive Orders issued in 1856, 1876, and 1891, which established, extended, and combined the Klamath and Hoopa Valley Reservations in California. The first Executive Order, signed by President Franklin Pierce on November 16, 1855, established the Klamath Reservation in California. See Charles J. Kappler, Indian Affairs: Laws and Treaties 817 (1904). The second, signed by President Ulysses Grant on June 23, 1876, created the Hoopa Valley Indian Reservation, declaring certain lands in California to be "withdrawn from public sale, and set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in California, by act of Congress approved April 8, 1864." Id. at 815. The third Executive Order, signed by President Benjamin Harrison on October 16, 1891, combined the Klamath and Hoopa Valley reservations into a single Hoopa Valley reservation by extending the Hoopa Valley reservation to include additional portions of the Klamath River. See id. Ultimately, the combined reservation "ran along both sides of the Klamath River, from the mouth of the Trinity River [in California] down to the Pacific Ocean." Parravano v. Babbitt, 70 F.3d 539, 542 (9th Cir. 1995) (citing Mattz v. Arnett, 412 U.S. 481, 493–94 (1973)).[4] Federal and California state courts have recognized that the right of the Yurok and Hoopa Valley Tribes "to take fish from the Klamath River was reserved to the Indians when the [Hoopa Valley] reservation was created." United States v. Eberhardt, 789 F.2d 1354, 1359 (9th Cir. 1986) (citing Blake v. Arnett, 663 F.2d 906, 911 (9th Cir.1981); People v. McCovey, 685 P.2d 687, 697 (Cal.), cert. denied, 469 U.S. 1062 (1984)); see also Parravano v. Babbitt, 70 F.3d at 547 ("The 1876 and 1891 executive orders that created the extended Hoopa Valley Reservation and the 1988 Hoopa–Yurok Settlement Act vested the Tribes with federally reserved fishing rights . . . ."). "[T]he right reserved includes fishing for ceremonial, subsistence, and commercial purposes." United States v. Eberhardt, 789 F.2d at 1359. The Department of the Interior, in a July 25, 1995 memorandum prepared by the Department's Regional Solicitor for the Pacific Southwest Region, recognized that "[t]he Yurok and Hoopa Valley Tribes have federal Indian reserved fishing rights to take anadromous fish[5] within their reservations in California" and that "[t]hese rights were secured to the Yurok and Hoopa Indians by a series of nineteenth century executive orders." A January 9, 1997

---

[4] In 1988, Congress enacted the Hoopa–Yurok Settlement Act, 25 U.S.C. § 1300i, to divide the extended Hoopa Valley Reservation into the Yurok Reservation and the Hoopa Valley Reservation. "One of the concerns of Congress at the time of the 1988 partitioning was to protect the [Yurok and Hoopa Valley] Tribes' fisheries." Parravano v. Babbitt, 70 F.3d at 542. "Although the 1988 Hoopa–Yurok Settlement Act did not explicitly set aside fishing rights, it did make clear that the partitioning would not dispossess the Tribes of their assets." Id. at 546.

[5] "Anadromous fish hatch in fresh water, migrate to the ocean where they are reared and reach mature size, and eventually complete their life cycle by returning to the fresh-water place of their origin to spawn." Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 662, modified sub nom. Washington v. United States, 444 U.S. 816 (1979). Salmon are a species of anadromous fish. See id. at 663.

memorandum by the Department of the Interior's Regional Solicitors for the Pacific Southwest and Pacific Northwest Regions recognized that the Yurok and Hoopa Valley Tribes "hold adjudicated water rights which vested at the latest in 1891 and perhaps as early as 1855." In a letter the Yurok Tribe submitted to the NMFS on March 23, 2001 commenting on the NMFS' draft Biological Opinion regarding Klamath Project operations, the Yurok Tribe maintained that it held a federally reserved water right with a priority date of time immemorial. There is no evidence in the record that the rights held by the Yurok and Hoopa Valley Tribes have ever been quantified as water rights.

### D. **The Klamath Compact**

On August 30, 1957, Congress gave its consent to the Klamath Compact, an interstate compact between the states of California and Oregon, which plaintiffs allege defendant has violated. See 71 Stat. 497, 497-508. The stated purposes of the Klamath Compact are, "with respect to the water resources of the Klamath River Basin": "[t]o facilitate and promote the orderly, integrated, and comprehensive development, use, conservation, and control thereof for various purposes"; and "[t]o further intergovernmental cooperation and comity with respect to these resources and programs for their use and development and to remove causes of present and future controversies." Id. at 497. Article III of the Klamath Compact recognizes certain water rights within the Klamath basin, stating:

> A. There are hereby recognized vested rights to the use of water originating in the Upper Klamath River Basin validly established and subsisting as of the effective date of this compact under the laws of the state in which the use or diversion is made, including rights to the use of waters for domestic and irrigation uses within the Klamath Project. There are also hereby recognized rights to the use of all waters reasonably required for domestic and irrigation uses which may hereafter be made within the Klamath Project.

> B. Subject to the rights described in subdivision A of this article and excepting the uses of water set forth in subdivision E of Article XI [regarding waterfowl management areas], rights to the use of unappropriated waters originating within the Upper Klamath River Basin for any beneficial use in the Upper Klamath River Basin, by direct diversion or by storage for later use may be acquired by any person after the effective date of this Compact by appropriation under the laws of the state where the use is to be made, as modified by the following provisions of this subdivision B and subdivision C of this article, and may not be acquired in any other way . . . .

Id. at 498. Article XIII of the Klamath Compact contains the language regarding the United States obligations not to "impair" water rights without just compensation, which plaintiffs allege defendant has violated, stating:

> The United States shall not, without payment of just compensation, impair any rights to the use of water for use (a) [domestic use] or (b) [irrigation use] within the Upper Klamath River Basin by the exercise of any powers or

rights to use or control water (i) for any purpose whatsoever outside the Klamath River Basin by diversions in California or (ii) for any purpose whatsoever within the Klamath River Basin other than use (a) or (b).

Id. at 507. Article XIII, however, limits this obligation of the United States to pay just compensation to those rights acquired after the effective date of the Klamath Compact, stating:

But the exercise of powers and rights by the United States shall be limited under this paragraph 2 only as against rights to the use of water for use (a) or (b) within the Upper Klamath River Basin which are acquired as provided in subdivision B of Article III after the effective date of this compact, but only to the extent that annual depletion in the flow of the Klamath River at Keno resulting from the exercise of such rights to use water for uses (a) and (b) do not exceed 340,000 acre-feet in any one calendar year.

Id. Finally, with respect to the rights of Native Americans tribes, Article X of the Klamath Compact states: "Nothing in this compact shall be deemed . . . [t]o deprive any individual Indian, tribe, band or community of Indians of any rights, privileges, or immunities afforded under Federal treaty, agreement or statute." Id. at 505.

### E.  The Klamath Adjudication

In 1975, pursuant to the Water Rights Act of 1909, the Oregon Water Resources Department initiated the Klamath Basin General Stream Adjudication (the Klamath Adjudication), a general adjudication to determine the ownership of rights to the waters of the Klamath Basin. The Klamath Adjudication covers pre-1909 state-based surface water rights not previously adjudicated, as well as federal reserved water rights in the Klamath Basin. Claims were filed beginning in 1990, and administrative hearings were initiated in 2001. On March 7, 2013, the adjudicator for the Klamath Adjudication issued orders of determination on all claims filed in the Klamath Adjudication. On February 28, 2014, the adjudicator issued amended and corrected versions of the orders of determination, which have been submitted to Oregon state courts for judicial confirmation.[6]

Case 003 in the Klamath Basin Adjudication addressed water rights associated with the Klamath Project. Three claims in case 003, claims 298, 321-6 and 321-7, concerned the water rights appropriated by the Van Brimmer brothers and subsequently at issue in the 1909 contract between the Van Brimmer Ditch Company and the United States. Claim 298 was filed by the United States, which "assert[ed] that it own[ed] the water right appropriated because Van Brimmer transferred the right to the United States" as part of the November 6, 1909 contract. In the corrected partial order of determination

---

[6] The findings of the Klamath Adjudication are available on the Oregon Water Resources' Department website at http://www.oregon.gov/owrd/Pages/adj/ACFFOD.aspx.

for case 003,[7] the adjudicator denied the government's claims on the grounds that, although, in the 1909 contract, the Van Brimmer Ditch Company transferred its riparian rights to the government, the 50 cubic feet per second (cfs) of water identified in the agreement were appropriative water rights, rather than riparian rights, and nothing in the agreement could be construed as transferring Van Brimmer's appropriative rights to the government. Claims 321-6 and 321-7 were brought by the Van Brimmer Ditch Company along with a number of other Klamath Project water users. The two claims were "essentially duplicative," but based on different appropriation dates. Claim 321-6 was based on a second notice of appropriation made by the Van Brimmer brothers on September 4, 1883. The adjudicator granted this claim to the Van Brimmer Ditch Company with a priority date of September 4, 1883, but limited it "to a quantity of 50 cfs, as defined in a 1909 contract between Van Brimmer and the United States," on the grounds that any additional water rights held at that time were abandoned by the Van Brimmer Ditch Company. Claim 321-7 was based on a second notice of appropriation filed by the Van Brimmer brothers on September 19, 1884. The adjudicator denied the claim on the grounds that the earlier priority date was supported by the evidence. [8]

## II.   Events in 2001

### A.   The Endangered and Threatened Fish

"In light of its dual purposes of serving agricultural uses and providing for the needs of wildlife, the Klamath Project is subject to the requirements of the Endangered Species Act. *See* Pub.L. No. 93–205, 87 Stat. 884 (1973) (codified, as amended, at 16 U.S.C. § 1531 et seq.) (the 'ESA')." Klamath Irr. Dist. v. United States, 635 F.3d at 508. "Pursuant to the ESA, the Bureau [of Reclamation] has an obligation not to engage in any action that is likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of the critical habitat of such a species." Id. at 509 (citing 16 U.S.C. § 1536(a)(1)). "In a 1999 Ninth Circuit decision, the interests of [Klamath] Project water users were declared subservient to the ESA, the result being that, as necessary, the Bureau has a duty to control the operation of the Link River Dam in order to satisfy the requirements of the ESA." Id. at 508 (citing Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1213 (9th Cir. 1999), amended by 203 F.3d 1175 (9th Cir. 2000)). Of relevance to this litigation, Klamath Project operations potentially affect three species of fish protected under the Endangered Species Act: the endangered Lost River sucker; the endangered shortnose sucker; and the threatened SONCC coho salmon. The Lost River and short nose suckers were listed

---

[7] The corrected order of partial determination for case 003 is available at http://www.oregon.gov/owrd/ADJ/ACFFOD/KBA_ACFFOD_07017.PDF.

[8] In a joint status report filed October 28, 2014, the parties informed the court that, in 2014, the Klamath Adjudication also issued an order of partial determination finding that "the United States, BIA [Bureau of Indian Affairs], as trustee for the Klamath Tribes, holds a water right for specified elevations in Upper Klamath Lake with a priority date of 'time immemorial.'"

as endangered in 1988, see Final Rule, Determination of Endangered Status for Shortnose Sucker and Lost River Sucker, 53 Fed. Reg. at 27130 (July 18, 1988), while the SONCC coho salmon was listed as threatened in 1997. See Final Rule, Threatened Status for Southern Oregon/Northern California Coast Evolutionary Significant Unit (ESU) of Coho Salmon, 62 Fed. Reg. 24588 (May 6, 1997). The Lost River and shortnose suckers reside in Upper Klamath Lake and nearby waters, while the SONCC coho salmon use the mainstream and tributaries of the Klamath River downstream from the Upper Klamath Lake and the Link River Dam.

## B.  Importance of the Fish to the Tribes

Evidence was presented at trial regarding the importance of the Lost River and short nose suckers and of the SONCC coho salmon to Native American tribes living in the Klamath basin. Dr. Ronald Larson, a retired FWS biologist, who had served for fourteen years as the lead biologist for consultations dealing with the endangered suckers in FWS's Klamath Falls office, testified that the two species of suckers are considered tribal trust species for the Klamath Tribes because of their long history with the fish. In the Klamath language the Lost River suckers are known as "c'waam" and the shortnose suckers as "qapdo." According to Dr. Larson, prior to the beginning of the Klamath Project, the Klamath and Modoc Indians would harvest suckers during the spring time when the fish were spawning. An April 5, 2001 Biological Opinion issued by FWS for the Klamath Project, discussed in more detail below, similarly noted that the suckers were once abundant and important seasonal foods for Native Americans in the upper Klamath basin. The July 25, 1995 memorandum prepared by the Regional Solicitor for the Pacific Southwest Region of the Department of the Interior regarding the rights and obligations related to the Klamath Project noted that the Klamath Tribes held treaty-based rights to fish, hunt, and gather on the lands that were formerly part of their reservation along the Upper Klamath Lake and its tributaries. The memorandum also noted that "[t]he Tribes' primary interest is in the operation of Upper Klamath Lake because it serves as habitat for fish protected by their treaty rights, including two endangered species of fish, the Lost River and shortnose suckers. These fish are a traditional food source for the Tribes."

Don Reck, at the time of the trial, a fisheries biologist at NMFS, whose primary responsibility was to implement the Endangered Species Act, and who has worked on Klamath Basin fishery issues since 1994, testified that the Yurok Tribe and Hoopa Valley Tribes, both located downstream of the Iron Gate Dam along the Klamath River, have a federally-recognized reserve fishery right for SONCC coho salmon and other fish species. The July 25, 1995 Department of the Interior Solicitor's Office memorandum similarly stated that the Yurok and Hoopa Valley Tribes held "federal Indian reserved fishing rights to take anadromous fish within their reservations in California." Mr. Reck noted that, when he had previously served as NMFS's area manager for the Klamath Basin office from 1996 to 2001, he had dealt with both the Yurok and Hoopa Valley Tribes and that they were "very interested in project operations" and were concerned that the Bureau of Reclamation pay sufficient attention to their reserved water rights and water level issues. Consistent with this concern, the Yurok Tribe sent the NMFS a letter on March 23, 2001 with extensive comments on NMFS' draft 2001 Biological Opinion in which they stated that they "concur[red] with NMFS that despite the presence of other factors that have

contributed to the decline of the Klamath River's coho and other anadromous resources, the Klamath Project was and continues to be a major factor in the decline of these resources." The final April 6, 2001 Biological Opinion prepared by NMFS regarding the SONCC coho salmon, discussed in more detail below, noted that "Indian tribes in the Klamath River Basin . . . have a profound interest in water management" and that "[d]ownstream tribal reserved water rights consist of an instream flow sufficient to protect the right to take fish within their reservations."

**C. The Revised 2001 Operations Plan**

Prior to 2001, the Klamath Project had been through wet and dry years, including two recent dry years, 1992 and 1994, that were even drier than was 2001. Numerous plaintiff water users, including Lonny Baley, Frank Anderson, Keith Buckingham, Michael Byrne, John Frank, Harold Hartman, Luther Horsley, Edwin Stastny, Jr., and Robert Unruh, testified at trial, however, that even during those earlier, severe drought years Klamath Project water users still received all of the water they needed. As the Bureau of Reclamation developed its operating plan for the 2001 water year, water supply forecasts indicated that it would be a "critical dry" year due to drought conditions. See Kandra v. United States, 145 F. Supp. 2d 1192, 1198 (D. Or. 2001). In response, the Bureau of Reclamation performed a biological assessment of the Klamath Project's operations on the Lost River sucker and the shortnose sucker, and a similar assessment regarding the SONCC coho salmon. See Klamath Irrigation Dist. v. United States, 67 Fed. Cl. 504, 513 (2005) (citing Kandra v. United States, 145 F. Supp. 2d at 1198). "Both assessments concluded that operation of the Project was likely to affect adversely the three species in violation of the ESA, 16 U.S.C. § 1531, *et seq.*" Id. On January 22, 2001, the Bureau of Reclamation forwarded its biological assessment regarding the SONCC coho salmon to NMFS and requested the initiation of a formal consultation with the NMFS pursuant to section 7(a)(2) of the Endangered Species Act. On February 13, 2001, the Bureau of Reclamation similarly forwarded its biological assessment regarding the Lost River sucker and the shortnose sucker to the FWS and requested the initiation of a formal consultation with the FWS.

On March 2, 2001, the Bureau of Reclamation sent out a letter, signed by Karl Wirkus, to the Irrigation Districts in the Klamath Project notifying them of the status of the Endangered Species Act consultation process and that no water was to be diverted or used until a revised operations plan for 2001 was finalized. In relevant part, the March 2, 2001 letter stated:

Reclamation is in the process of developing the 2001 Annual Operations Plan. Biological opinions resulting from current consultations will be a critical part of the plan's formulation. While it is possible that there may be drastic reductions in project agriculture and refuge deliveries in 2001, Reclamation is working diligently to avoid such an outcome. However, until Reclamation completes the consultation process, no diversion of Project water may occur that would result in a violation of Section 7(d) of the ESA which prohibits ". . . *any irreversible or irretrievable commitment of resources . . .*" pending completion of consultation. To date, Reclamation has not made a

determination as to whether and to what extent Project water could be delivered in advance of completed consultations. Thus, until such a determination is made or the consultations are completed, no Project water may be diverted or used unless expressly authorized by Reclamation.

(emphasis in original).

On March 30, 2001, the Bureau of Reclamation sent out a similar letter to the Irrigation Districts, also signed by Mr. Wirkus, updating Klamath Project water users on the status of the Endangered Species Act consultation process. The March 30, 2001 letter stated, in relevant part:

We had previously indicated that a new Annual Operations Plan would be announced on April 1, 2001. We will not be announcing any new Operating Plan at that time. We anticipate announcing such a plan by April 6, 2001. We will continue to keep everyone advised of our progress in this regard. Once again, however, **until such a determination is made or the consultations are completed, no Project water shall be diverted or used unless expressly authorized by Reclamation.**

(emphasis in original).

On April 5, 2001, the FWS, acting in furtherance of its statutory duties under the Endangered Species Act, issued a final Biological Opinion (the FWS Biological Opinion), concluding that the Bureau of Reclamation's proposed 2001 operation plan for the Klamath Project was "likely to jeopardize the continued existence of the LRS [Lost River sucker] and SNS [shortnose sucker] and adversely modify their proposed critical habitat." On the next day, April 6, 2001, NMFS issued its final Biological Opinion (the NMFS Biological Opinion) concluding that the proposed operation plan was "likely to jeopardize the continued existence of SONCC coho salmon" and "to adversely modify critical habitat for the SONCC coho salmon." As required by the Endangered Species Act, 16 U.S.C. § 1536(b)(3)(A), the Biological Opinions of both agencies included "reasonable and prudent alternatives" to address the threat to the three species. FWS' reasonable and prudent alternatives required, among other actions, that the Bureau of Reclamation maintain "not divert water from UKL [Upper Klamath Lake] for irrigation purposes if surface elevations are anticipated to go below [certain minimum levels], regardless of inflow year type." The FWS Biological Opinion determined that "[i]mplementation of the [Klamath] Project with these minimum elevations is necessary to avoid jeopardy and adverse modification of proposed critical habitat" for the Lost River and short nose suckers. The NMFS' only reasonable and prudent alternative required the Bureau of Reclamation to operate the Klamath Project in such a way so as to provide certain levels of "minimum IGD [Iron Gate Dam, a dam downstream from the Link River Dam,] water releases" into the Klamath River between April and September 2001. The NMFS Biological Opinion stated that this reasonable and prudent alternative was "intended to

prevent further decline of the listed fish . . . while longer-term protections can be implemented to affect the recovery of the species."[9]

On April 6, 2001, the Bureau of Reclamation issued a revised 2001 operations plan for the Klamath Project (the Revised 2001 Operations Plan) that incorporated the reasonable and prudent alternatives proposed by the FWS and the NMFS Biological Opinions. The Revised 2001 Operations Plan listed four "**Guiding Principles and Objectives**" which it stated were "described" in the July 25, 1995 memorandum from the Department of the Interior's Regional Solicitor for the Pacific Southwest Region, and "further addressed" in a second memorandum, dated January 9, 1997, prepared by the Department of the Interior's Regional Solicitors for the Pacific Northwest and Pacific Southwest Regions. (emphasis in original). The principles and objectives were: "Meeting the Requirements of the Endangered Species Act"; "Trust Responsibility of the United States to Federally Recognized Tribes Within the Klamath River Basin"; "Providing Deliveries of Project Water"; and "Conserving Wetland and Wildlife Values." With regard to the Endangered Species Act, the Revised 2001 Operations Plan stated: "The Lost River and shortnose suckers, coho salmon, and bald eagles are listed under the ESA. Reclamation will manage Project water supplies in accordance with the April, 2001, [sic] biological opinions issued by NMFS and the U.S. Fish and Wildlife Service (FWS) for this year's Project operation. . . ." With regard to the tribal trust responsibilities, the Revised 2001 Operations Plan stated, in full:

> The trust responsibility to the Klamath Basin Tribes is shared by all federal agencies that undertake activities in the Klamath Basin. Fishery and other resources in the Klamath River, Upper Klamath Lake (UKL), and nearby lakes and streams are important tribal trust resources to the Klamath Basin tribes. Reclamation's Plan provides flow regimes and lake levels for protection of tribal trust resources within the limitations of the available water supply.

With regard to deliveries to Klamath Project water users, the Revised 2001 Operations Plan stated: "Due to the requirements of the biological opinions and the ESA [Endangered Species Act] and the current drought conditions, only limited deliveries of Project water will be made for irrigation." The Revised 2001 Operations Plan summarized its ultimate decisions regarding operation of the Klamath Project, as follows:

---

[9] "In addition, at this time, the Bureau was subject to a preliminary injunction order issued by the U.S. District Court for the Northern District of California in the *Pacific Coast [Federation of Fishermen's Associations v. United States Bureau of Reclamation,* 138 F. Supp. 2d 1228 (N.D. Cal. 2001)] case." Klamath Irr. Dist. v. United States, 635 F.3d at 509. "The order barred the delivery of Klamath Project water for irrigation purposes when water flow was below certain minimum levels, until the Bureau complied with ESA consultation requirements." Id. (citing Pac. Coast Fed'n of Fishermen's Ass'ns v. United States Bureau of Reclamation, 138 F. Supp. 2d at 1251).

Reclamation prepared the 2001 Plan . . . for certain UKL [Upper Klamath Lake] levels and Klamath River flows at Iron Gate Dam consistent with the guiding principles and objectives. . . .

Prior to listing of endangered and threatened species and the increased scientific understanding of the needs of ESA-listed species and tribal trust resources, the Project was operated to optimize irrigation diversions, with UKL releases and resulting flows at Iron Gate Dam (IGD) targeted to meet Federal Energy Regulatory Commission (FERC) minimums. Lake elevations were the result of hydropower releases judged against irrigation demand.

Minimum UKL levels and Klamath River flows have been specified as a result of ESA consultation on listed species. . . . As a result, current conditions indicate water deliveries to farms and refuges within the Project service area will be severely limited. Under the current hydrology, the UKL levels and river flows under this Plan are consistent with requirements of the ESA and Reclamation's obligation to protect Tribal trust resources.

At trial, Karl Wirkus, the Area Manager of the Bureau of Reclamation's Klamath Basin area office and the author of the Revised 2001 Operations Plan, testified that as he put the Revised 2001 Operations Plan together and "ran the numbers," he determined that meeting the minimum Upper Klamath Lake levels and Klamath River flows set forth in the FWS and NMFS Biological Opinions would require all available Klamath Project water and that there would not be any additional quantity of water available to meet other obligations.

On the same day the Revised 2001 Operations Plan was released, April 6, 2001, the Department of the Interior issued a news release stating that, based on the FWS and NMFS Biological Opinions "and the requirements of [the] Endangered Species Act, the Bureau of Reclamation announced today that no water will be available from Upper Klamath Lake to supply the farmers of the Klamath Project." The news release continued:

To provide some assistance to farmers affected by what is expected to be one of the driest years since the Project began in 1907, the United States Department of Agriculture (USDA) announces that most crops in the affected area are eligible for Federal crop insurance (if it had been purchased before the sales closing date) or other assistance. . . . For producers carrying coverage, a portion of their otherwise irrigated crop losses resulting from the determination announced by the Bureau of Reclamation may be eligible for prevented planting payments. . . . Assistance is also provided through the Non-insured Crop Disaster Assistance Program (NAP) to producers growing crops that are currently uninsurable.

After the issuance of the Revised 2001 Operations Plan, on April 9, 2001, a group of Klamath Project water users, including the Klamath and Tulelake Irrigation Districts,

filed a lawsuit in the United States District Court for the District of Oregon seeking to enjoin the Bureau of Reclamation from implementing the Revised 2001 Operations Plan and an order requiring the Bureau of Reclamation "to release unspecified 'historic' amounts of irrigation water." See Kandra v. United States, 145 F. Supp. 2d 1192, 1195-96 (D. Or. 2001). Plaintiffs alleged that the Revised 2001 Irrigation Plan "breache[d] their contractual rights to irrigation water and [was] arbitrary and capricious under the Administrative Procedure Act ('APA'), 5 U.S.C. § 706, in that its implementation violate[d] the National Environmental Policy Act ('NEPA'), 42 U.S.C. § 4321, et seq., and the Endangered Species Act ('ESA'), 16 U.S.C. § 1531, et seq." Id. at 1196. With respect to their allegations regarding the Endangered Species Act, the Kandra plaintiffs alleged that a number of provisions of the FWS and NMFS Biological Opinions violated the Endangered Species Act, and therefore, that the adoption of the findings of the Biological Opinions as part of the Revised 2001 Operation Plan rendered the Revised 2001 Operations Plan arbitrary and capricious. See id. at 1206. The Kandra plaintiffs' alleged issues with the Biological Opinions included that "FWS failed to consider scientific evidence of variable lake elevations and the impact on sucker fish populations" and that "NMFS relied on a lack of relevant information about the effects of variable flow regimes on salmon and the salmon's utilization of the Klamath River." Id. The District Court rejected the Kandra plaintiffs' request for a preliminary injunction, holding that they had failed to show a likelihood of success on the merits of their claims or that they were entitled to injunctive relief. See id. at 1211. On October 15, 2017, the Kandra plaintiffs filed a notice to voluntarily dismiss their claims, and the District Court dismissed the case on October 27, 2017. See Notice of Dismissal, Kandra v. United States, No. 01-6124 (D. Or. Oct. 15, 2017); Order of Dismissal, Kandra v. United States, No. 01-6124 (D. Or. Oct. 27, 2017).

## D. **Effect on Farmers in the Klamath Basin**

Ultimately, the delivery of irrigation water from Upper Klamath Lake to the plaintiffs in the above-captioned cases was totally terminated following the issue of the Revised 2001 Operations Plan in April 2001 until July 2001, when the Bureau of Reclamation released approximately 70,000 acre-feet of water. At trial, plaintiffs consistently testified that this late release of water was of very little, or more often, no use. Moreover, some individual plaintiffs testified that they never received any of this water. For example, farmer David Cacka testified that the water was of no use to him in July because his crops had already died due to lack of water. Similarly, Mark Stuntenbeck, the assistant manager of Klamath Irrigation District in 2001, testified that, in his District, "there were an awful lot of farmers that had no need for the water at that point" because, "[s]ince they were denied water early in the irrigation season, a lot of farmers did not plant any crops. And those that unfortunately did, the crops did not survive without any water." Even those who received some water, such as Malin Irrigation District manager Harold Hartman, whose District received 10% of its normal delivery, described the amount as "not overall beneficial" because it was "[v]ery difficult to wet the system," which had dried out due to lack of water deliveries. At best, in the words of Don Russell, a ditch rider for over forty years in the Klamath Project, who served the farmers of the Enterprise Irrigation District

and the Pine Grove Irrigation District in 2001,[10] for the farmers of the Klamath Basin, the July 2001 water deliveries were "too little, too late."

Evidence introduced at trial also indicated that at least some of the plaintiffs received payments from various federal government programs after water deliveries were cut off in 2001. Many of the plaintiffs testified that they applied for funds from the Klamath Basin Water Conservation Program, a federal program administered by the Farm Service Agency which paid farmers $129.00 per irrigable acre for which no water was received. Several plaintiffs testified that they received payments under the Klamath Basin Emergency Operation and Maintenance Act of 2001, Pub. L. No. 107-349, 116 Stat. 2973 (2002), which reimbursed farmers for the operation and maintenance costs they had paid for water deliveries in 2001. Other plaintiffs testified that they received payments from the federal government's crop disaster program, the federal government's non-insured assistance program, and for placing cover crops on fields through the Emergency Conservation Program. Finally, some plaintiffs also received payments from the Risk Management Agency's crop insurance program.

## III.   Procedural History

### A.   Lonny Baley, et al., v. United States

The procedural history of the above-captioned cases is long and complicated, including assignment to and review by multiple judges in the United States Court of Federal Claims and review by the United States Court of Appeals for the Federal Circuit, which resulted in a remand, and reassignment after the remand, to the undersigned judge. The plaintiffs in Lonny Baley, et al., v. United States, case number 1-591L, were initially a mixture of Irrigation Districts and individual water users. The Baley plaintiffs filed their initial complaint on October 11, 2001, an amended complaint on March 24, 2003, and a second amended complaint on January 31, 2005. In their second amended complaint, plaintiffs alleged that the government's actions in terminating their water deliveries through the Klamath Project in 2001 constituted a taking of their water rights without just compensation in violation of the Fifth Amendment to the United States Constitution, an impairment of their water rights in violation of the Klamath Compact, and a breach of certain contracts between the Bureau of Reclamation and the named plaintiffs.

The case was initially assigned to Judge Diane G. Sypolt. On May 10, 2002, defendant filed a motion requesting that the case be stayed pending completion of the Klamath Adjudication, discussed above. In its motion, defendant argued that

> because a number of the core elements of Plaintiffs' takings claims turn on state law – and because these state law issues are presently the subject of

---

[10] As Mr. Russell explained, a ditch rider takes water requests from farmers and other water users and inspects the conditions in canals and other works to ensure that they will not prevent the delivery of water.

the ongoing Klamath Basin Adjudication, in which both sides are participating – a stay of this case pending final resolution of the Adjudication is fully justified . . . .

On June 14, 2002, plaintiffs filed a response opposing defendant's motion in which they argued that "plaintiffs' water rights are vested under Oregon law and do not depend upon the adjudication for recognition."

To resolve this issue, on May 12, 2003, Judge Sypolt, ordered plaintiffs to

file a motion for summary judgment on the question of whether their water rights . . . are property that is compensable under the Fifth Amendment . . . notwithstanding any adverse determination, including a retroactive one, regarding the existence, extent, or character of such rights by the Hearing Officer Panel in Case No. 003 of the State of Oregon's ongoing Klamath Basin Adjudication.

Accordingly, on September 22, 2003, plaintiffs filed a motion for partial summary judgment seeking a finding that the property rights determination in the Klamath Adjudication was irrelevant to plaintiffs' interest in the litigation, in support of which plaintiffs stated that, "regardless of the outcome of the Adjudication, plaintiffs will retain the beneficial interest in the Klamath Project water because plaintiff water users, not the government, put the water to beneficial use." On November 3, 2003, defendant filed an opposition to plaintiffs' motion for partial summary judgment.

On November 13, 2003, Judge Sypolt, in a very brief and somewhat unclear motion, granted plaintiffs' revised motion for partial summary judgment and denied defendant's motion to stay, stating that:

It appears from their motion for partial summary judgment that plaintiffs not only assert no property interest determinable in the Adjudication, but also concede that they claim no legal title to, but only "vested beneficial interests" in, the Klamath Basin Project water. Defendant, far from disputing this assertion, makes it the basis for its cross-motion for summary judgment, that these beneficial interests consist of contract rights that are not compensable as takings.

Accordingly, plaintiffs' motion for partial summary judgment that their water interests are not property interests at issue in the Adjudication is granted and defendant's motion for a stay pending the outcome of the Adjudication is denied. Based on plaintiffs' assertion that no rights or interests in this case are affected by the Adjudication, plaintiffs are barred from making any claims or seeking any relief in this case based on rights, titles, or interests that are or may be subject to determination in the Adjudication.

The <u>Baley</u> case was re-assigned to Judge Francis Allegra on December 9, 2004 after Judge Sypolt retired from the United States Court of Federal Claims. Subsequently, on August 31, 2005, Judge Allegra entered summary judgment in favor of the defendant

on the takings and Klamath Compact claims, <u>see</u> <u>Klamath Irr. Dist. v. United States</u>, 67 Fed. Cl. 504, and, on March 16, 2007, summary judgment in favor of the defendant on the breach of contract claims. <u>See</u> <u>Klamath Irr. Dist. v. United States</u>, 75 Fed. Cl. 677 (2007), <u>rev'd</u>, 635 F.3d 505 (2011). Plaintiffs filed a timely appeal with the United States Court of Appeals for the Federal Circuit, which, on July 16, 2008, certified three questions to the Oregon Supreme Court regarding the nature of plaintiffs' alleged water rights under Oregon law.[11] <u>See</u> <u>Klamath Irr. Dist. v. United States</u>, 532 F.3d 1376 (Fed. Cir. 2008). The Oregon Supreme Court issued an opinion answering the certified questions on March 11, 2010.[12] <u>See</u> <u>Klamath Irr. Dist. v. United States</u>, 227 P.3d 1145 (Or. 2010). Thereafter,

---

[11] The three questions certified by the Federal Circuit were:

> 1. Assuming that Klamath Basin water for the Klamath Reclamation Project "may be deemed to have been appropriated by the United States" pursuant to Oregon General Laws, Chapter 228, § 2 (1905), does that statute preclude irrigation districts and landowners from acquiring a beneficial or equitable property interest in the water right acquired by the United States?

> 2. In light of the statute, do the landowners who receive water from the Klamath Basin Reclamation Project and put the water to beneficial use have a beneficial or equitable property interest appurtenant to their land in the water right acquired by the United States, and do the irrigation districts that receive water from the Klamath Basin Reclamation Project have a beneficial or equitable property interest in the water right acquired by the United States?

> 3. With respect to surface water rights where appropriation was initiated under Oregon law prior to February 24, 1909, and where such rights are not within any previously adjudicated area of the Klamath Basin, does Oregon State law recognize any property interest, whether legal or equitable, in the use of Klamath Basin water that is not subject to adjudication in the Klamath Basin Adjudication?

<u>Klamath Irr. Dist. v. United States</u>, 532 F.3d at 1377–78.

[12] The Oregon Supreme Court answered the Federal Circuit's three certified questions as follows:

> 1. The 1905 Oregon act did not preclude plaintiffs from acquiring an equitable or beneficial property interest in a water right to which the United States holds legal title. Moreover, under the 1905 act, a formal written release from the United States is not necessary for plaintiffs to have acquired an equitable or beneficial property interest in the water right that the United States appropriated.

> 2. Under Oregon law, whether plaintiffs acquired an equitable or beneficial property interest in the water right turns on three factors: whether plaintiffs

on February 17, 2011, the United States Court of Appeals for the Federal Circuit issued an opinion vacating Judge Allegra's Court of Federal Claims decision and remanding the case back to the Court of Federal Claims for further proceedings. See Klamath Irr. Dist. v. United States, 635 F.3d 505. With regard to plaintiffs' takings and Klamath Compact claims, the Federal Circuit instructed that:

> On remand, the Court of Federal Claims should proceed as follows: First, it should determine, for purposes of plaintiffs' takings and Compact claims, whether plaintiffs have asserted cognizable property interests. . . . To the extent the Court of Federal Claims determines that one or more plaintiffs have asserted cognizable property interests, it then should determine whether, as far as the takings and Compact claims are concerned, those interests were taken or impaired. That determination will turn on existing takings law.

Id. at 519–20 (footnotes omitted). After the remand, on November 22, 2013, Judge Allegra dismissed the breach of contract claims of three plaintiffs, the Klamath Irrigation District, the Tulare Irrigation District, and Lonny Baley, on 28 U.S.C. § 1500 (2012) grounds. See Klamath Irr. Dist. v. United States, 113 Fed. Cl. 688 (2013). On June 3, 2014, Judge Allegra, at plaintiffs' request, dismissed all remaining plaintiffs' contract claims, without prejudice.

### B. John Anderson Farms, et al., v. United States

The plaintiffs in John Anderson Farms, et al. v. United States, case numbers 7-194C, 7-19401C, 7-19402C, 7-19403C, 7-19404C, 7-19405C, 7-19406C, 7-19407C, 7-

---

put the water to beneficial use with the result that it became appurtenant to their land, whether the United States acquired the water right for plaintiffs' use and benefit, and, if it did, whether the contractual agreements between the United States and plaintiffs somehow have altered that relationship. In this case, the first two factors suggest that plaintiffs acquired a beneficial or equitable property interest in the water right to which the United States claims legal title, but we cannot provide a definitive answer to the court's second question because all the agreements between the parties are not before us.

3. To the extent that plaintiffs assert only an equitable or beneficial property interest in the water right to which the United States claims legal title in the Klamath Basin adjudication, plaintiffs are not "claimants" who must appear in that adjudication or lose the right. As a general rule, equitable or beneficial property interests in a water right to which someone else claims legal title are not subject to determination in a state water rights adjudication.

Klamath Irr. Dist. v. United States, 227 P.3d 1145, 1169 (Or. 2010).

19408C, 7-19409C, 7-19410C, 7-19411C, 7-19412C, 7-19413C, 7-19414C, 7-19415C, 7-19416C, 7-19417C, 7-19418C, 7-19419C, 7-19420C, who are all individual water users, filed their original complaint on March 22, 2007. The cases were initially assigned to Judge Allegra. Although, initially, the Baley and John Anderson Farms cases were assigned to separate attorneys in different divisions of the United States Department of Justice, reporting to different Assistant Attorney Generals, more recently, the Department of Justice counsel of record responsibilities in both cases were assigned to the above-listed attorney of record. On August 2, 2007, Judge Allegra stayed the John Anderson Farms cases pending resolution of the appeal to the Federal Circuit in the then-named Klamath Irrigation District, et al. v. United States case, number 1-591L. The stay was lifted on August 25, 2011 and an amended complaint was filed on October 4, 2011. In their 2011 amended complaint, the John Anderson Farms plaintiffs alleged that the government's actions constituted breach of contracts between the government and the plaintiffs and a taking of plaintiffs' property, in the form of their water rights, without compensation in violation of the Fifth Amendment to the United States Constitution. On March 13, 2014, Judge Allegra granted plaintiffs' motion to voluntarily dismiss all remaining breach of contract claims with prejudice.

## C. The Consolidated Cases Before the Undersigned Judge

On June 25, 2015, after a significant amount of discovery following the remand had already occurred, the above-captioned cases were re-assigned to the undersigned judge upon Judge Allegra's illness and subsequent passing. On July 22, 2015, after holding a status conference with the parties, the court issued an order, which modified a previous May 7, 2015 order issued by Judge Allegra. The new order set a trial date and set various pretrial deadlines. On January 12, 2016, after holding a status conference with the parties, the court issued an order consolidating the Baley and John Anderson Farms cases. The parties subsequently filed cross-motions in limine on the issue of whether plaintiffs' takings claims should be analyzed as regulatory or physical takings, which, on December 21, 2016, the court decided. In its December 21, 2016 Opinion, the court found in favor of the plaintiffs, holding that "the government's actions in the present cases 'should be analyzed under the physical takings rubric.'" Klamath Irr. Dist. v. United States, 129 Fed. Cl. 722, 737 (2016) (quoting Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1296 (Fed. Cir. 2008)). The court was careful to note, however, "that in making this decision, it is in no way making any determinations as to the nature or scope of plaintiffs' alleged property rights, which remain at issue in the above-captioned cases." Id.

The parties subsequently finished discovery, submitted their pretrial filings, and filed a series of additional motions in limine regarding various issues. The court ruled on a number of these at a status hearing on January 4, 2017 and at the pretrial conference on January 10, 2017. On January 5, 2017, plaintiffs filed a renewed motion for class certification in both the consolidated Baley, case no. 1-591L, and John Anderson Farms, case no. 7-194C and 7-19401-19419C, cases. Judge Allegra had previously denied, without prejudice, a class certification request in the Baley case. This court granted the

consolidated class certification motion at the January 10, 2017 pretrial conference.[13] The court granted the renewed motion for class certification in order to ensure that all parties would be included in the event of a future appeal should either party choose to do so after this court issues its current, trial opinion. As subsequently modified by the parties, and approved by this court, the consolidated class in the above-captioned cases is comprised of:

> All owners (or their lessees) of agricultural land who claim an appurtenant right to receive and put to beneficial use water from the Klamath Project in 2001, and allege a Fifth Amendment taking of their right to receive and use such water in 2001 and impairment of their water right in violation of the Klamath River Basin Compact. This includes owners or lessees of land located within or receiving Klamath Project water from the following districts:

> Enterprise Irrigation District

> Klamath Basin Improvement District

> Klamath Drainage District

> Klamath Hills District Improvement Company

> Klamath Irrigation District

> Malin Irrigation District

---

[13] The January 5, 2017 motion sought to renew an earlier motion to certify a class filed by the plaintiffs in case number 1-591L on October, 11, 2001, along with their initial complaint in case number 1-591L. In their October 11, 2001 motion, plaintiffs sought to certify a class comprised of: "All landowners who possess appurtenant water rights in the Klamath Basin and who receive their irrigation water from the Upper Klamath lake through the Link River Dam." On the same day, October 11, 2001, plaintiffs in case number 1-591L filed a motion to hold their motion for class certification in abeyance until the issue of liability was determined. On December 10, 2001, defendant filed an unopposed motion requesting that the issue of class certification be addressed after the close of discovery. The earlier motions relating to class certification before Judges Sypolt and Allegra were apparently not addressed before Judge Allegra decided the issue of liability, the case was appealed to the Federal Circuit, and then remanded to this court. On June 25, 2014, plaintiffs filed a motion before Judge Allegra renewing their October 11, 2001 motion for class certification in case number 1-591L. On October 2, 2014, Judge Allegra denied the renewed motion for class certification, without prejudice, on the grounds that "such a certification would require that discovery in this case be reopened, further delaying resolution of this matter." In the view of Judge Allegra, "the better course [was] to complete discovery as to the plaintiffs currently before the court, with the hopes of bringing at least some of the issues in this case to completion."

Midland District Improvement Company

Pine Grove Irrigation District

Poe Valley Improvement District

Shasta View Irrigation District

Sunnyside Irrigation District

Tulelake Irrigation District

Van Brimmer Ditch Company

Westside Improvement District No. 4

Excluded from the class are landowners (or their lessees) located on the east side of the Klamath Project who received Klamath Project water in 2001 from Gerber and Clear Lake Reservoirs.[14]

On January 10, 2017, plaintiffs filed a motion to amend their amended complaint in the John Anderson Farms case to include a claim for a violation of the Klamath Compact, in order to conform the allegations in the John Anderson Farms case with those in the Baley case. The court granted plaintiffs motion on January 27, 2017.

A trial was held in the above-captioned cases in Washington, D.C. over the course of ten days, which included an opportunity for a selection of the affected farmers to testify and be heard. After a separate post-trial hearing on a pre-trial motion filed by defendant to dismiss the Irrigation Districts as plaintiffs from the Baley case, plaintiffs filed a motion to voluntarily dismiss the Irrigation Districts as plaintiffs. The court granted the motion, and, because the previous lead plaintiff in case number 1-591L, Klamath Irrigation District, was among those dismissed, also ordered that case number 1-591L be re-captioned from Klamath Irrigation District, et al. v. United States to Lonny Baley, et al. v. United States. Defendant filed a motion to dismiss, or in the alternative for summary judgment, on the claims of any shareholders in the Van Brimmer Ditch Company, including those of named plaintiffs James and Cheryl Moore, which was briefed by the parties. The issue raised in this motion is addressed in the current opinion.

Just prior to trial, defendant and plaintiffs also filed cross-motions for partial summary judgment on the nature of plaintiffs' beneficial interest in the use of Klamath Project water, and the possible effect of the contracts governing delivery on that interest. In its motion, defendant asked the court to hold that "plaintiffs' appurtenant right to receive

---

[14] The class originally proposed by the plaintiffs and approved by the court on January 10, 2017 contained slightly different language. The parties subsequently modified the class definition to the version quoted above as part of their joint proposed class notice filed on February 27, 2017, which the court approved on the same day.

and use Klamath Project water is defined and limited by the contracts between the districts and the United States and any individual Warren Act contracts that remain in place" and that "plaintiffs' interest in Project water, to the extent it may exist separately from those contracts, cannot be severed from plaintiffs' respective ownership of land for the purposes of the Fifth Amendment." In their cross-motions, plaintiffs asked the court to hold that their alleged water rights were "property protected by the Fifth Amendment, established under Oregon law, and that these property rights were unmodified by contract in 2001 at the time of the taking." This motion also is addressed in this opinion.

Defendant, plaintiffs, and third-party intervenor Pacific Coast Federation of Fisherman's Associations simultaneously filed post-trial briefs. The Klamath Tribes filed a motion for leave to file a memorandum as amicus curiae, which was granted by the court. Defendant, plaintiffs, and third-party intervenor subsequently filed their post-trial reply briefs, with defendant filing a sur-reply on issues raised for the first time in plaintiffs' reply brief. On May 22, 2017, plaintiffs filed a third amended complaint that reflected the class certification approved by the court and the class notice plan subsequently approved by the court. As noted above, in order to allow plaintiffs to begin the process of perfecting the class in the event of a favorable decision or an appeal of this court's decision, along with their amended complaint, plaintiffs filed an entry of appearance list listing 1,151 landowners or lessees (or their representatives) who had submitted timely entry of appearance forms.[15]

## DISCUSSION

As noted above, defendant's motion to dismiss or for summary judgment as to the claims of any shareholders of the Van Brimmer Ditch Company was deferred to trial and remains outstanding. The court will turn to that motion first. The court will then proceed to the merits of the case, plaintiffs' claims that the government's actions in 2001 constituted takings under the Fifth Amendment to the United States Constitution or, as it relates to some of the plaintiffs, a violation of the Klamath Compact.

---

[15] At the request of the court, on September 8, 2017, defendant filed a status report summarizing the initial results of its review of the entry of appearance forms. In its status report, defendant states that its review of the entry of appearance forms indicates that there are over 3,600 individual parcels of land identified by the claimants in their entry of appearance forms. Defendant states that it has no objection to the claims based on 709 of these parcels. Defendant states that there are additional claims for which it does not object to the initial eligibility of the claimant who submitted the form, but notes that there is more than one landowner identified for the parcel on the relevant Irrigation District's assessment roll. For those claims, defendant states that additional information and clarification will be required. Finally, defendant notes that it has stated objections to the initial eligibility to claims based on hundreds of other parcels.

## I.   Claims of Van Brimmer Ditch Company Shareholders

Although defendant's motion regarding the claims of the Van Brimmer Ditch Company shareholders is titled as a motion to dismiss or alternatively for summary judgment, the motion never cites the standard of review for a motion to dismiss under Rule 12 of the Rules of the Rules of the United States Court of Federal Claims (RCFC) (2017) or the particular provision of RCFC 12 under which defendant seeks to bring its motion. Indeed, defendant's motion never even mentions RCFC 12. Instead, the only standard of review discussed by defendant in its motion is the standard for summary judgment under RCFC 56. Moreover, certain evidence defendant cites in support of its motion, such as a declaration submitted by former Van Brimmer Ditch Company President Gary Orem, the 1909 contract between the Van Brimmer Ditch Company and the United States, and even the trial testimony of James Moore, would generally be inappropriate to consider under a motion to dismiss under RCFC 12. The court, therefore, will treat defendant's motion as one for summary judgment under RCFC 56.

RCFC 56 is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a) (2017); Fed. R. Civ. P. 56(a) (2017); see also Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. at 744; Arranaga v. United States, 103 Fed. Cl. at 467-68; Thompson v. United States, 101 Fed.

Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. at 611; Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d at 1372; Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992) (citation omitted); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 806 (Fed. Cir. 1999) ("The purpose of summary judgment is not to

deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."); Metric Constr. Co., Inc. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Group, Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 131 S. Ct. 69 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807. "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565,

1569 (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; RQ Squared, LLC v. United States, No. 12-527C, 2015 WL 170230, at *6 (Fed. Cl. Jan. 14, 2015). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Florida Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Rasmuson v. United States, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968–69 (Fed. Cir. 2009); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378, (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010); cert. denied, 131 S. Ct. 2990 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338–39 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Oswalt v. United States, 85 Fed. Cl. 153, 158 (2008); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. See B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1148; Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d at 2; Rogers v. United States, 90 Fed. Cl. at 427; Reading & Bates Corp. v. United States, 40 Fed. Cl. at 748.

Defendant moves for the dismissal of the claims of any plaintiffs who are shareholders of the Van Brimmer Ditch Company on the grounds that such claims are barred by Judge Sypolt's November 13, 2003 Order. Among the named plaintiffs, only James and Cheryl Moore were shareholders of the Van Brimmer Ditch Company, although the decision on defendant's motion applies to any and all plaintiff class members who receive their water as shareholders of the Van Brimmer Ditch Company. According to defendant, the November 13, 2003 Order remains in effect because it was not challenged by plaintiffs on appeal and the Federal Circuit ultimately declined to rule on defendant's argument that Van Brimmer's claim was barred by the November 2003 Order. See Klamath Irr. Dist. v. United States, 635 F.3d at 519 n.10. Defendant argues that both the claims in the present cases of plaintiffs who are shareholders in the Van Brimmer Ditch Company and those that were at issue in case 003 of the Klamath Adjudication are based on the right to use the 50 cfs of water identified in Van Brimmer's 1909 contract with the United States. Defendant argues that for plaintiffs who are shareholders of the Van Brimmer Ditch Company, such as James and Cheryl Moore, their shares in Van Brimmer Ditch Company stock are the source of their right to receive Klamath Project water. According to defendant, this means that, unlike other plaintiffs in these cases, the plaintiffs who are shareholders of the Van Brimmer Ditch Company do not claim a beneficial interest in Klamath Project waters, but, instead, hold a proportionate share of the 50 cfs of water that was the subject of the Van Brimmer Ditch Company's 1909 contract with the United States. According to defendant, these rights are identical to the rights asserted by the Van Brimmer Ditch Company in the Klamath Adjudication and, therefore, barred by Judge Sypolt's November 13, 2003 Order.

Plaintiffs reject defendant's argument that the November 13, 2003 Order remains valid and continue to argue that the rights asserted by the Van Brimmer shareholders are not the same as those that were at issue in the Klamath Adjudication. Plaintiffs argue that the Judge Sypolt's November 13, 2003 Order "no longer serves any legitimate purpose" because "[t]he reason for the 2003 order no longer exists." According to the plaintiffs, the purpose of Judge Sypolt's November 13, 2003 Order was to address defendant's May 10, 2002 motion to stay the then-titled Klamath Irrigation District case, now identified as the Baley case, case number 1-591L, until the Klamath Adjudication was decided, and because the Klamath Adjudication was completed on February 28, 2014, the Order is "now moot." Plaintiffs also argue that the claims of the Moores and other plaintiffs who are Van Brimmer Ditch Company shareholders are not based on their ownership of Van Brimmer Ditch Company stock, but, instead, are based on their beneficial interests in Klamath Project waters just like all other plaintiffs in the above-captioned cases.

The court turns first to plaintiffs' argument that Judge Sypolt's November 13, 2003 Order is "now moot" because it was intended only to address defendant's May 10, 2002 motion to stay case number 1-591L, pending the conclusion of the Klamath Adjudication. Initially, the court notes that the plain language of the November 13, 2003 Order contains no language describing its effects as temporary. Instead, the Order appears to impose, without qualification, a permanent bar on the types of claims plaintiffs may bring, stating: "plaintiffs are barred from making any claims or seeking any relief in this case based on rights, titles, or interests that are or may be subject to determination in the Adjudication," clearly referring to the Klamath Adjudication.

Although Judge Sypolt's Order is extremely short and not the clearest, the language of the November 13, 2003 Order does not support plaintiffs' argument that the only purpose of the Order was to address defendant's motion so stay. The November 13, 2003 Order decided both defendant's May 10, 2002 motion to stay the case on the grounds that issues relevant to the case were the subject of the then ongoing Klamath Adjudication and plaintiffs' September 22, 2003 motion for summary judgment that the property rights determination in the Klamath Adjudication was irrelevant to plaintiffs' interest in the then-titled <u>Klamath Irrigation District</u> case. After finding, in favor of plaintiffs, that "it appear[ed]" that plaintiffs in <u>Klamath Irrigation District</u> "assert no property interest determinable in the Adjudication" and, therefore, denying defendant's motion to stay the case and granting plaintiffs' summary judgment motion, the court added language barring claims subject to the Klamath Adjudication, stating that it was doing so "[b]ased on plaintiffs' assertion that no rights or interests in this case are affected by the Adjudication." This language from Judge Sypolt's November 13, 2003 Order indicates that a purpose of the Order was to prevent plaintiffs from later disavowing their assertion that none of the rights they asserted in the <u>Klamath Irrigation District</u> case would be affected by the Klamath Adjudication, the basis on which Judge Sypolt made her decision. To hold now that the November 13, 2003 Order is no longer binding on the parties would not only be contrary to its plain language, but also would undermine its apparent intent of holding plaintiffs accountable for the statements they made in order to receive the benefit of the court's decision and avoid the stay sought by defendant. The court, therefore, holds that the November 13, 2003 Order remains in effect and continues to bar plaintiffs from "from making any claims or seeking any relief in this case based on rights, titles, or interests that are or may be subject to determination in the Adjudication."[16]

Having determined that the November 13, 2003 Order remains in effect, the court now turns to the issue of whether the claims of the Van Brimmer Ditch Company's shareholders are "based on rights, titles, or interests that are or may be subject to determination in the [Klamath] Adjudication" and, thus, are barred by the November 13, 2003 Order. In claims 298, 321-6, and 321-7 of case 003 of the Klamath Adjudication, the Van Brimmer Ditch Company and the United States brought competing claims based on

---

[16] The court notes that, although the November 13, 2003 Order was addressed only to plaintiffs in the <u>Klamath Irrigation District</u> case (the <u>John Anderson Farms</u> had not yet been filed on November 13, 2003), a single class has since been certified for all of the consolidated cases, <u>Baley</u> and <u>John Anderson Farms</u>.

the water rights appropriated by the Van Brimmer brothers in 1883 and 1884, and subsequently at issue in the 1909 contract between Van Brimmer and the United States. The Klamath adjudicator granted the Van Brimmer Ditch Company's claim and denied the claim of the United States, finding that the Van Brimmer Ditch Company held appropriative water rights to 50 cfs of water, with a priority date of September 4, 1883, and that the 1909 agreement limited Van Brimmer's water rights to 50 cfs, but did not transfer these rights to the United States. In a July 16, 2003 declaration submitted in case 1-591L in this court, Van Brimmer Ditch Company President Gary D. Orem describes the water rights held by the Van Brimmer Ditch Company as arising in a virtually identical way to the water rights the Van Brimmer Ditch Company claimed and was awarded in the Klamath Adjudication. In his declaration, Mr. Orem describes the Van Brimmer brothers' 1883 and 1884 notices of appropriation of water from Lower Klamath Lake, the completion of an irrigation ditch and beginning of irrigation in 1886, the conveyance of the Van Brimmer brothers' water rights to the Van Brimmer Ditch Company in 1903, and the 1909 contract between the Van Brimmer Ditch Company and the United States, in which the United States Agreed to deliver 50 cfs of water from Lower Klamath Lake to the Van Brimmer Ditch Company for irrigation purposes. Mr. Orem alleges, consistent with the Van Brimmer Ditch Company's claims in the Klamath Adjudication, that in the 1909 contract the United States "recognized" the Van Brimmer Ditch Company's "vested right to the use of fifty second feet of water for irrigation purposed from the water of Lower Klamath Lake" and that the Van Brimmer Ditch Company's right to the 50 cfs of water "was never owned by the United States." **Based on the declaration of its own president, therefore, the Van Brimmer Ditch Company's claims in the present case appear to be based on the same water rights that were at issue in the Klamath Adjudication.**

Despite this evidence, plaintiffs argue that **plaintiffs who are Van Brimmer Ditch Company shareholders** claims in the present litigation differ from those that were before the Klamath Adjudication because, in the present cases, these plaintiffs' claims are based solely on their beneficial rights to Klamath Project water, rather than on their shares in the Van Brimmer Ditch Company. The evidence, however, demonstrates that any interests that the Van Brimmer Ditch Company's users may have in Klamath Project water are simply derivative of the Van Brimmer Ditch Company's water rights. The Van Brimmer Ditch Company's articles of incorporation state that its purpose was to use the waters of Lower Klamath Lake "as has heretofore been appropriated and used" by the Van Brimmer brothers for irrigation purposes, and that each share was to be distributed for one acre of irrigable land dependent upon the Van Brimmer Ditch Company ditch for its water supply. Today, the Van Brimmer Ditch Company continues to distribute water to its users based on the number of shares they hold in the company, with each share corresponding to the right to receive water for one acre of irrigable land. Thus, the water rights held by the Van Brimmer Ditch Company's users are to a portion of the water rights held by the Van Brimmer Ditch Company, i.e., to a portion of the water that was at issue in claims 298, 321-6, and 321-7 of case 003 of the Klamath Adjudication. As such, any claims brought by the Van Brimmer Ditch Company's users in the present litigation would be based on water rights that were at issue in the Klamath adjudication and barred by the Judge Sypolt's November 13, 2003 Order. Defendant's motion for summary judgment is granted, and plaintiffs who are shareholders of the Van Brimmer Ditch Company, such as James and Cheryl Moore, therefore, are barred from bringing any claims based on their rights to

receive Klamath Project water based on these shares. The claims of such plaintiffs are dismissed.

## II.   **Plaintiffs' Takings and Klamath Compact Claims**

Turning to the merits of the takings and Klamath Compact claims, the remaining plaintiffs in the class actions allege that the government's actions in 2001 constituted a taking under the Fifth Amendment to the United States Constitution of their beneficial interest in Klamath Project water and an impairment of their right to receive Klamath Project water in violation of the Klamath Compact, for which they are owed just compensation. In its February 17, 2011 decision remanding case number 1-591 to this court, the United States Court of Appeals for the Federal Circuit instructed this court to proceed with plaintiffs' takings and Klamath Compact claims using the following two-step process:

> First, it should determine, for purposes of plaintiffs' takings and Compact claims, whether plaintiffs have asserted cognizable property interests. . . . To the extent the Court of Federal Claims determines that one or more plaintiffs have asserted cognizable property interests, it then should determine whether, as far as the takings and Compact claims are concerned, those interests were taken or impaired.

Klamath Irr. Dist. v. United States, 635 F.3d at 519-20.

### A.   **Have Plaintiffs Asserted Cognizable Property Interests**

The court turns first to the issue of "whether plaintiffs have asserted cognizable property interests." Id. at 519. In response to a certified question sent by the Federal Circuit in case number 1-591, the Supreme Court of Oregon set forth the following three factor test for determining, "[u]nder Oregon law, whether plaintiffs acquired an equitable or beneficial property interest in the water right":

> whether plaintiffs put the water to beneficial use with the result that it became appurtenant to their land, whether the United States acquired the water right for plaintiffs' use and benefit, and, if it did, whether the contractual agreements between the United States and plaintiffs somehow have altered that relationship. In this case, the first two factors suggest that plaintiffs acquired a beneficial or equitable property interest in the water right to which the United States claims legal title, but we cannot provide a definitive answer to the court's second question because all the agreements between the parties are not before us.

Klamath Irr. Dist. v. United States, 635 F.3d at 515 (quoting Klamath Irr. Dist. v. United States, 227 P.3d at 1169). In its February 17, 2011 decision, the Federal Circuit instructed that, in determining whether plaintiffs have asserted cognizable property interests, this court "should direct its attention to the third part of the three-part test set forth by the Oregon Supreme Court in response to our certified question 2." Id. at 519. The Federal Circuit explained:

That is because it is not disputed that, in this case, the first two parts of the three-part test have been met. Specifically, the parties do not dispute that plaintiffs have put Klamath Project water to beneficial use and that the United States acquired the pertinent water rights for plaintiffs' use and benefit.

Id. With regard to the third part of the Oregon Supreme Court's test, the Federal Circuit instructed this court to "address whether contractual agreements between plaintiffs and the government have clarified, redefined, or altered the foregoing beneficial relationship so as to deprive plaintiffs of cognizable property interests for purposes of their takings and Compact claims." Id. The Federal Circuit specified that this court

should give the government the opportunity to demonstrate how plaintiffs' beneficial/equitable rights to the use of Klamath Project water have been clarified, redefined, or altered. In that context, it will be the government's burden to demonstrate with specificity how the beneficial/equitable rights of one or more plaintiffs have been clarified, redefined, or altered. After the government has come forward with its showing, plaintiffs will have the opportunity to respond.

Id. at 519–20 (footnotes omitted).

As instructed by the Federal Circuit, the court turns to the issue of whether "contractual agreements between plaintiffs and the government have clarified, redefined, or altered the foregoing beneficial relationship so as to deprive plaintiffs of cognizable property interests for purposes of their takings and Compact claims." Id. at 519. Defendant argues that plaintiffs' beneficial rights have been altered by language, including the various shortage provisions, contained in the various contracts governing delivery of Klamath Project water, in particular the Form A and B applications, the repayment contracts with the Klamath Irrigation District and the Tulelake Irrigation District, the Warren Act contracts, and the leases for lands in the National Wildlife Refuges. Plaintiffs reject defendant's assertion that the contracts have altered plaintiffs' rights, on the grounds that plaintiffs never signed any of the contracts that allegedly altered their rights, nor are they in privity with anyone who did.

Initially, the court notes that, throughout its post-trial brief, defendant alleges that the contracts governing the delivery of water from the Klamath Project "created" any property rights in the Klamath Project water plaintiffs may have held. As a matter of law, this is incorrect. Although it is unclear precisely what defendant means by this statement, the Oregon Supreme Court explained in its March 11, 2010 decision that, "[u]nder Oregon law, the water right became appurtenant to the land once the persons taking the water from the Klamath Project applied to their land and put it to beneficial use." Klamath Irr. Dist. v. United States, 227 P.3d at 1163. The Oregon Supreme Court went on to note that any contractual agreements between plaintiffs and the United States could have "clarified, redefined, or even altered" the relationship between the United States and the plaintiffs on whose behalf the United States originally appropriated the waters of the Klamath Project. Id. at 1165. For instance, such agreements could have caused plaintiffs to have

either acquired or lost rights to water that had also been put to beneficial use. See id. ("For instance, we cannot foreclose the possibility that plaintiffs could have bargained away any equitable or legal right to the water in return for a reduced payment schedule or forgiveness of their debt. Conversely, the United States may have granted plaintiffs either patents, water rights, or contractual rights that would be sufficient, as a matter of state law, for plaintiffs to have acquired at a minimum an equitable property interest in the water."). The contracts, could not, however, by themselves create a right to beneficial use in water. See id. at 1169 (setting forth the three factors that, under Oregon law, determine "whether plaintiffs acquired an equitable or beneficial property interest in the water right"). The court now turns to the specifics of each of the contracts governing the delivery of Klamath Project water in order to determine if they clarified, redefined, or altered the rights held by plaintiffs in Klamath Project water. Because the various agreements defendant alleges affected plaintiffs' rights differ significantly in history and language, the court examines each set of contracts separately.

### 1. Form A and B Applications

The court first reviews the Form A and B applications. These applications for water rights were used by the United States Department of the Interior in the early days of the Klamath Project, prior to the establishment of Irrigation Districts. See Laws and Regulations Relating to the Reclamation of Arid Lands, 45 L.D. 385, 406-8. The Form A application was to be used by homesteaders settling into reclaimed lands, while the Form B application was to be used by owners of private lands. Id. Defendant does not allege, and there is no evidence in the record to suggest, that any of the plaintiffs signed any of these applications. Instead, defendant argues that, because the terms and conditions of the contracts continue to run with the land, the plaintiffs who are the successors-in-interest to the signors of the Forms A and B applications remain bound by these terms and conditions.

In support of its argument that the terms and conditions of Form A applications run with the land, defendant points to the provision in the Form A applications which states: "All of the within terms and conditions, in so far as they relate to said land, shall be a charge upon said land to run with the title to same." The meaning of the word "charge" in this clause appears to be: "An encumbrance, lien, or claim." Charge, Black's Law Dictionary 282 (10th ed. 2014) ("<a charge on property>"). Thus, it would appear, based on this provision, that all of the applications' provisions, including the shortage provisions, were intended to run with the lands the applications concerned, and, therefore, bind the signors' successors-in-interest in those lands.

In response to the evidence offered by the defendant, plaintiffs point out that after homesteaders who signed Form A applications completed the homesteading process, they were issued patent deeds giving them ownership over the lands they homesteaded. Such patent deeds were issued for each of properties identified with each of the Form A applications admitted during trial. These patent deeds conveyed to the homesteaders

> the Tract above described [in the patent deed], together with the right to the use of water from the Klamath Reclamation Project as an appurtenance to

the irrigable lands in said tract; TO HAVE AND TO HOLD the same, together with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging, unto the said [name] and to his heirs and assigns forever . . . but excepting, nevertheless, and reserving unto the United States, rights of way over, across, and through said lands for canals and ditches constructed, or to be constructed, by its authority . . . .

(capitalization in original). The patent deeds, thus, conveyed the land and an appurtenant water right, while reserving the right of the United States to enter the lands for Klamath Project purposes. Additionally, some of the patent deeds contained clauses reserving to the United States any "fissionable" minerals contained in the lands or rights of way for the maintenance of power transmission lines. The deeds make no mention, however, of any other conditions on the property rights.

Although defendant argues that the "water right" conveyed by these patents "is the water right described and defined by the Form A contract," there is no indication in the patent deeds that they were intended to incorporate the terms of the Form A applications. "The general rule, long recognized in California, is that '"where a deed is executed in pursuance of a contract for the sale of land, all prior proposals and stipulations are merged, and the deed is deemed to express the final and entire contract between the parties."'" Ram's Gate Winery, LLC v. Roche, 235 Cal. App. 4th 1071, 1079, (Cal. App. 2015) (quoting Bryan v. Swain, 56 Cal. 616, 618 (1880); Riley v. North Star Mining Co. 93 P. 194 (Cal. 1907); Palos Verdes Corp. v. Housing Authority, 202 Cal. App. 2d 827, 836 (Cal. App. 1962)). Similarly, in Oregon, "[t]he general rule is that, when a deed to property is delivered and accepted, that deed embodies the entire agreement of the parties to a property sale. Any prior agreements or understandings regarding 'title, possession, quantity, or emblements of the land' merge into the deed and are superseded by the deed's terms." Winters v. Cty. of Clatsop, 150 P.3d 1104, 1108 (Or. App. 2007) (citing City of Bend v. Title & Trust Co., 134 Or. 119, 126-27 (1930); Archambault v. Ogier, 194 Or. App. 361, 369 (2004))). Thus, any obligations that encumbered the lands for which Form A applications were signed were extinguished by the patent deeds unless they also were included in the patent deeds. The Form A applications do not, therefore, alter the plaintiffs' equitable interests in Klamath Project water.

The Form B application does not contain a provision similar to the Form A application stating that its conditions run with title to the lands. The only evidence defendant offers in support of its contention that the provisions in the Form B applications run with the land is that both the Form A and Form B applications were recorded in the county records and that a Bureau of Reclamation senior water and land specialist, George Driscol, testified at trial that the Bureau of Reclamation continues to refer to provisions of the applications concerning the government's rights to use the lands for constructing Klamath Project facilities. It is not obvious why recording a contract with a county recorder would bind anyone other than the signor of that contract to its terms, nor does defendant offer an explanation. Further, general statements about the policies of the Bureau of Reclamation regarding records are not evidence as to the legal significance of those

records. As such, the court holds that the Form B applications do not alter any plaintiffs' beneficial interests in Klamath Project water.

## 2. Repayment Contracts with Klamath Irrigation District and Tulelake Irrigation District

Defendant also argues that the provisions of the repayment contracts between the United States and the Klamath Irrigation District and between the United States and Tulelake Irrigation District, including their shortage provisions, alter the water rights of plaintiffs who receive water from these Irrigation Districts. Defendant's reasoning is essentially identical with respect to both of these contracts. Initially, defendant concedes that no landowners within the Klamath Irrigation District or the Tulelake Irrigation District are signatories to the Districts' contracts with the United States. With regard to landowners within the Klamath Irrigation District, defendant notes that plaintiffs' predecessors-in-interest, after filing their Form B applications, formed the Klamath Irrigation District. Defendant then asserts that, when the Klamath Irrigation District entered into a contract with the government on November 29, 1954, these landowners lands, and their appurtenant water rights, became "subject to the terms and conditions contained in the KID [Klamath Irrigation District] contract." Similarly, with regards to those plaintiffs within the Tulelake Irrigation District, defendant notes that plaintiffs' predecessors-in-interest, after filing their Form A applications, subsequently formed the Tulelake Irrigation District and included their lands within the Tulelake Irrigation District. Defendant then asserts that, when the Tulelake Irrigation District entered into a contract with the government in 1956, these landowners' lands, and their appurtenant water rights, became "subject to the terms and conditions contained in the TID [Tulelake Irrigation District] contract."

The November 28, 1954 contract between the Klamath Irrigation District and the United States was signed by these two parties only, and does not purport to bind any third parties. Similarly, the September 10, 1956 contract between the Tulelake Irrigation District and the United States is signed by these two parties only, and does not purport to bind any third parties. Further, the only purposes of the contracts appear to have been to have the Irrigation Districts assume the costs of repaying the United States for the construction of the Klamath Project and to transfer to the Irrigation Districts the operation of the Klamath Project works delivering the water to the lands within the Irrigation Districts. The preamble to the Klamath Irrigation District's contract states that the District is "obligated . . . to repay to the United States that part of the expenditures made by the United States in the construction of the Project which is properly allocable to the District" and that "the District . . . desires to enter into an amendatory contract with the United States, which would provide for the District to take over the operation and maintenance of certain of the Project works." Similarly, the preamble to the Tulelake Irrigation District's contract states that it is entering into the contract for "furnishing by the United States of a water supply from the [Klamath] Project works and for the repayment of the construction charges" of the Klamath Project, and that because both parties wanted to provide "for the transfer to the District of the operation and maintenance of works and properties used or useful for the delivery of water to and protection of the lands within the District." The

contracts then set forth the respective obligations of the Irrigation Districts and the United States in operating these works.

Nowhere do the contracts purport to alter or otherwise impact any landowner's water rights, which defendant admits were already appurtenant to the lands within the Klamath Irrigation District and the Tulelake Irrigation District prior to the creation of these Irrigation Districts. Further, it is not correct to argue that the individual landowners within the Klamath and Tulelake Irrigation Districts are subject to the terms of the contracts, which are addressed directly to the Irrigation Districts and relate to activities the Irrigation Districts would have to carry out in their corporate capacities. For instance, both contracts require that, "[t]he District shall, at its expense . . . maintain all water measuring and controlling devices and gauges as have been constructed or installed by the United States or by the District in connection with the transferred works," and that, "[t]he District shall, at its own expense, keep a reasonably accurate record of all crops raised . . . on District lands." Nor does defendant provide alternative legal grounds arising outside of the language of the contracts as to why individual landowners would be bound by their terms. That the plaintiffs' predecessors-in-interest created the Klamath Irrigation District and the Tulelake Irrigation District, does not, as defendant asserts, imply that the plaintiffs' lands are "subject to the terms and conditions" of the contracts entered into between these Irrigation Districts and the United States. Defendant has failed to meet its burden of demonstrating that plaintiffs' rights have been altered by the November 29, 1954 contract between the Klamath Irrigation District and the United States or by the September 10, 1956 contract between the Tulelake Irrigation District and the United States.

### 3. Warren Act Contracts

Defendant also argues that the rights of plaintiffs who receive their water under individual Warren Act contracts or from an Irrigation District receiving water pursuant to a Warren Act contract, are altered by the terms of these contracts, including their shortage provisions. Warren Act contracts governing the delivery of water to ten Irrigation districts, the Enterprise Irrigation District, the Klamath Basin Improvement District, the Klamath Drainage District, the Malin Irrigation District, the Midland District Improvement Company, the Pine Grove Irrigation District, the Poe Valley Improvement District, the Shasta View Irrigation District, the Sunnyside Irrigation District, and the Westside Improvement District, were admitted into evidence at trial. Additionally, three Warren Act contracts governing the delivery of water to the predecessors-in-interest of two named plaintiffs in the above-captioned cases were also admitted into evidence at trial. With regard to both sets of contracts, defendant argues that "the right of the landowner to receive water . . . is defined and limited by the terms of the applicable Warren Act contract." Plaintiffs argue that the Warren Act contracts entered into by the Irrigation Districts cannot affect the rights of individual plaintiffs because the plaintiffs themselves were not a party to these contracts.

Unlike the contracts entered into between the Klamath Irrigation District and the Tulelake Irrigation District with the United States, the Warren Act contracts do not focus only on repayment to the United States for the construction of Klamath Project works and the operation of these works. Instead, the Warren Act contracts demonstrate an additional desire of the Irrigation Districts to secure water for their members. For instance, the

contract with the Malin Irrigation District states that, "the District was organized for the purpose of securing and distributing water for the irrigation of its lands, and desires the United States to construct certain irrigation works and supply irrigation water from the Klamath project for such district lands." Further, unlike the Klamath Irrigation District and Tulelake Irrigation District repayment contracts, the Warren Act contracts go beyond describing the logistics of distributing water to define and set limits on the amount of water that will be furnished by the United States to the Districts. For instance, the contract of the Malin Irrigation District specifies the Klamath Project canal through which the United States will release the water and sets three limits on the amounts that can be released, stating that the amount: "shall not exceed the amount that can be furnished . . . at a cost of Thirty-four Dollars ($34.00) per acre"; "nor shall it exceed two acre-feet per acre of irrigable land during the usual irrigation season"; "and in no event shall it exceed 0.6 acre-feet of water per irrigable acre in any one month." Finally, the contracts set a priority for the water vis-à-vis other Klamath Project appropriators, stating that the use rights acquired by the contract are inferior to the rights of prior appropriators, such as the Klamath Irrigation District, the Tulelake Irrigation District, and the Van Brimmer Ditch Company. These contracts do not, therefore, simply alter the rights the United States was appropriating on behalf of the Irrigation Districts or the individual contractors, they define these rights. Because any right in Klamath Project water acquired by plaintiffs who received water from an Irrigation District with a Warren Act contract could not have been greater than the rights acquired by the Irrigation District, the water rights of such plaintiffs are limited by the provisions of the Warren Act contracts.

The individual Warren Act contracts, like the Form A applications, and unlike the Form B applications, make clear that their terms run with the land, stating: "The terms of this contract shall inure to the benefit of and be binding upon the successors in interest and assigns of the parties hereto." The terms and obligations imposed by the individual Warren Act contracts, thus, continue to bind the successors-in-interest of the signors of the contract, including named plaintiffs Daniel G. and Delores Chin and Hill Land & Cattle LLC. Similar to the Warren Act contracts entered into by Irrigation Districts, for which the terms are identical or essentially identical to those included in the terms of the individual Warren Act contracts, these individual Warren Act contracts do not just alter, but also define, the water rights currently held by these successors-in-interest.

Defendant argues that the shortage provisions contained in the Warren Act contracts mean that plaintiffs who receive water under an individual or Irrigation District Warren Act contract "had no right to receive and use any water from the Klamath Project in 2001."[17] The shortage provisions in the Warren Act contracts appear in two separate

---

[17] Defendant also argues: "The Court should further hold that the 'beneficial interest' in Klamath Project water resulting from the use of Project water delivered under these Warren Act contracts is not a compensable property right separate and apart from contracts and that plaintiffs' claims sound in contract." Such a conclusion would be contrary to the Federal Circuit's binding February 17, 2011 decision. In that decision, the Federal Circuit quoted the Oregon Supreme Court's three factor test for determining whether plaintiffs had acquired a right of beneficial use in Klamath Project water:

forms. In the first, the United States is immune from liability resulting from water shortages caused "[o]n account of drought, inaccuracy in distribution or other cause." The other contracts, however, do not include the phrase "other cause," stating: "The United States shall not be liable for failure to supply water under this contract caused by hostile diversion, unusual drought, interruption of service made necessary by repairs, damages caused by floods, unlawful acts or unavoidable accidents."

In the circumstances of the present cases, the presence or absence of the two words "other cause" in a Warren Act contract is dispositive. Although 2001 was a dry year, the Bureau of Reclamation's statements in 2001 make clear that the reason the Bureau refused to supply water to the plaintiffs in 2001 was not because of drought, but because of what it perceived as the requirements of the Endangered Species Act as set forth in the FWS and NMFS Biological Opinions and of its tribal trust obligations towards the Klamath, Yurok and Hoopa Valley Tribes. The Revised 2001 Operations Plan stated that "water deliveries to farms and refuges within the Project service area" would be "severely limited" as a result of the "Minimum UKL [Upper Klamath Lake] levels and Klamath River flows [which] have been specified as a result of ESA consultation on listed species," and that these minimum Upper Klamath Lake levels and Klamath River flows "are consistent with requirements of the ESA and Reclamation's obligation to protect Tribal trust resources." Similarly, the Department of the Interior news release announcing the curtailment of water deliveries issued the same day as the release of the Revised 2001 Operations Plan, April 6, 2001, stated that no water was available for release to farmers

---

[W]hether plaintiffs put the water to beneficial use with the result that it became appurtenant to their land, whether the United States acquired the water right for plaintiffs' use and benefit, and, if it did, whether the contractual agreements between the United States and plaintiffs somehow have altered that relationship.

Klamath Irr. Dist. v. United States, 635 F.3d at 515 (quoting Klamath Irr. Dist. v. United States, 227 P.3d at 1169). The Federal Circuit then concluded that in case 1-591 it was undisputed that plaintiffs had met the first two parts of the test: "that plaintiffs have put Klamath Project water to beneficial use and that the United States acquired the pertinent water rights for plaintiffs' use and benefit." Id. at 519. Given the undisputed testimony of the plaintiffs regarding their prior use of Klamath Project water on their land and the undisputed evidence that the purpose of the Klamath Project was to provide water to farmers like the plaintiffs, the first two factors of the Oregon Supreme Court's test remain undisputed. That leaves only the third factor, "whether the contractual agreements between the United States and plaintiffs somehow have altered that relationship." Id. While a contractual arrangement could certainly serve to entirely eliminate a parties' right to beneficial use of Klamath Project water, see Klamath Irr. Dist. v. United States, 227 P.3d at 1165, the Warren Act contracts display no such intent. Indeed, while the contracts place limits and conditions upon plaintiffs' water rights, their stated intent is for the United States to furnish water to plaintiffs.

because of the FWS and NMFS Biological Opinions "and the requirements of [the] Endangered Species Act." With regard to the Endangered Species Act, the Revised 2001 Operations Plan states:

> The Lost River and shortnose suckers, coho salmon, and bald eagles are listed under the ESA. Reclamation will manage Project water supplies in accordance with the April, 2001, [sic] biological opinions issued by NMFS and the U.S. Fish and Wildlife Service (FWS) for this year's Project operation. . . ."

With regard to its tribal trust obligations, the Revised 2001 Operations Plan states that "Reclamation's Plan provides flow regimes and lake levels for protection of tribal trust resources within the limitations of the available water supply." The statements in these contemporary documents are consistent with the testimony heard at trial. Jason Cameron, who at the time of the trial was the deputy area manager of the Bureau of Reclamation's Klamath Basin area office, and who, in 2001, served as a water quality technician at the Bureau of Reclamation, monitoring water quality related to the endangered sucker fish, testified that the Bureau of Reclamation's drought plan for the Klamath Project, which is triggered when there is "an insufficient water supply," was not implemented in 2001 because there was no water supply available. Although Mr. Cameron did not explain why no water was available, Karl Wirkus, the Area Manager of the Bureau of Reclamation's Klamath Basin area office in 2001 and the author of the Revised 2001 Operations Plan, testified that the reason no water was available in 2001 was because all Klamath Project water was needed to satisfy the satisfy the requirements of the reasonable and prudent alternatives set forth in the FWS and NMFS Biological Opinions.

The Bureau of Reclamations' decision to curtail water deliveries to plaintiffs in 2001, therefore, was, according to its own statements, not caused by a "hostile diversion, unusual drought, interruption of service made necessary by repairs, damages caused by floods, unlawful acts or unavoidable accidents." Therefore, the shortage provisions in the Warren Act Contracts that do not contain the phrase "other cause" are inapplicable in the present cases. As such, plaintiffs whose claims arise from water they receive from Irrigation Districts whose contracts with the United States contain such shortage provisions, including the Klamath Drainage District, the Malin Irrigation District, the Klamath Basin Improvement District, the Shasta View Irrigation District, the Sunnyside Irrigation District, and the Westside Improvement District, hold beneficial rights to receive Klamath Project water for which they may seek compensation under the Fifth Amendment or the Klamath Compact. Additionally, the claims of any class members that are based on parcels for which plaintiffs or plaintiffs' predecessors-in-interest signed such a Warren Act contract also hold beneficial rights to receive Klamath Project water for which they may seek compensation under the Fifth Amendment or the Klamath Compact.

By contrast, the court finds that the phrase "other cause" in certain Warren Act shortage provisions is broad enough to encompass shortages caused by the United States' tribal trust and Endangered Species Act obligations. Therefore, the shortage provisions in Warren Act contracts which immunize the United States from liability due to

"other causes" are applicable in the present case. As such, plaintiffs whose claims arise from water they receive from Irrigation Districts whose contracts with the United States contain such shortage provisions, including the Enterprise Irrigation District, the Midland District Improvement Company, the Poe Valley Improvement District, and the Pine Grove Irrigation District, have had their beneficial rights to receive Klamath Project water altered in such a way that they are barred from seeking compensation for a taking under the Fifth Amendment or an impairment under the Klamath Compact of those rights in 2001. Additionally, the claims of any class members that are based on parcels for which plaintiffs or plaintiffs' predecessors-in-interest signed such a Warren Act contract, including at least claims for two parcels owned by Daniel G. and Delores Chin and one parcel owned by the Hill Land & Cattle LLC in 2001, also are barred from seeking compensation for a taking under the Fifth Amendment or an impairment under the Klamath Compact of those rights in 2001.

### 4. Leased Lands in the National Wildlife Refuges

Defendant also argues that the water rights of plaintiffs who received their water through leases for lands in the National Wildlife Refuges that sit within the Klamath Project have been altered by the provisions of these leases, including their shortage provisions.[18] Plaintiffs do not attempt to rebut this argument.

These leases entitle their leaseholder to lease a defined parcel of land, "with privileges and appurtenances," and, thus, include the water rights appurtenant to the land. Unlike the Warren Act contracts, the leases do not include any language defining the leaseholder's water right. The leases, however, state that they are leases made between the Bureau of Reclamation and the lessee, and, that "in consideration for the rents and covenants" contained in the leases, the Bureau of Reclamation will provide deliveries of water to the leased premises. The leases, thus, are clearly intended to define the relationship between the plaintiff lessees and the United States regarding the appropriation of Klamath Water. As such, the water rights of plaintiffs who hold such leases were altered by and subject to the provisions of the leases.

---

[18] Regarding the Warren Act contracts, defendant appears to argue that plaintiffs who leased lands from the United States have no property right in their right to use Klamath Project water and that the court should find that their claims "sound[] in contract." For the same reasons as for the Warren Act contracts, the court finds that such a holding would contradict the instruction of the Federal Circuit's February 17, 2011 decision in this case. See generally Klamath Irrigation Dist. v. United States, 635 F.3d 505. It is undisputed that plaintiffs on the leased lands had applied Klamath Project water to these lands for beneficial use in the past and that the United States had appropriated water for plaintiffs' benefit. While the leases defined the extent of these plaintiffs' property rights, there is no evidence that they were intended to totally eliminate plaintiffs' rights to beneficial use of Klamath Project water.

Among other provisions, the leases state that "the United States . . . shall not be held liable for damages because irrigation water is not available." The provision contains no language requiring that water be unavailable due to specific causes. Because their property right was subject to this provision and irrigation water was unavailable in 2001, plaintiffs who leased lands in the National Wildlife Refuges are barred from recovering damages based on the denial of water to those lands.

## B. Were Plaintiffs' Interests Taken or Impaired

There, therefore, are a group of class members who have asserted cognizable property interests for which they may seek compensation from defendant, for which reason, the court turns to the next step in the Federal Circuit's instructions, "whether, as far as the takings and Compact claims are concerned, those interests were taken or impaired." Klamath Irr. Dist. v. United States, 635 F.3d at 519-20. The parties have raised a number of separate issues that impact this question: whether defendant's actions should be analyzed as either a regulatory or physical taking and, if as a physical taking, then whether as a permanent or temporary taking, as well as the potential existence of senior water rights to Klamath Project water held by the Klamath, Yurok, and Hoopa Valley Tribes. The court examines each of these issues in turn.

### 1. Takings Framework

Initially, the parties dispute whether the government's actions should be analyzed as regulatory rather than physical takings, and, also that, if the court decides to analyze the claims as physical, whether it should analyze the takings as temporary rather than permanent physical takings. Plaintiffs argue that their claims should be analyzed as permanent physical takings. The distinction is important because the framework for analyzing each type of taking varies significantly. A permanent physical taking involves a "permanent physical occupation of property" and is treated as a per se taking for which the government must pay compensation regardless of the circumstances. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 441 (1982). By contrast, the standards for determining whether government actions constitute compensable regulatory or temporary physical takings are more complex. Regulatory takings involve "restrictions on the use of . . . property," and determining whether such restrictions constitute a compensable taking requires "balancing and 'complex factual assessments,' utilizing the so-called Penn Central test." CRV Enterprises, Inc. v. United States, 626 F.3d 1241, 1246 (Fed. Cir. 2010) (quoting Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322–23 (2002)); see also Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 105, 124 (1978). Similarly, temporary physical takings involve "temporary invasions of property" which "'are subject to a more complex balancing process to determine whether they are a taking.'" Arkansas Game & Fish Comm'n v. United States, 568 U.S. 23, 36 (2012) (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. at 435 n.12). The standard for identifying temporary physical takings was recently summarized and clarified by the United States Supreme Court in the case of Arkansas Game and Fish Commission v. United States, 568 U.S. at 38-39.

a. **Physical or Regulatory Taking**

The issue of whether plaintiffs' claims should be analyzed as physical or regulatory takings, although not whether they should be analyzed as permanent or temporary, was briefed by the parties in motions in limine prior to the trial and decided by the court in its December 21, 2016 Opinion. See Klamath Irrigation v. United States, 129 Fed. Cl. 722. In that decision, the court held the government's actions in the present cases "should be analyzed under the physical takings rubric." Id. at 737 (quoting Casitas Mun. Water Dist. v. United States, 543 F.3d at 1296). The court began its analysis in its December 21, 2016 Opinion by noting the distinctions between physical and regulatory takings and that the Federal Circuit has held that, in distinguishing between the two "'our focus should primarily be on the character of the government action.'" Klamath Irrigation v. United States, 129 Fed. Cl. at 730 (quoting Casitas Mun. Water Dist. v. United States, 543 F.3d at 1289). The court then proceeded to summarize the "trilogy of cases, International Paper Company v. United States, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931), United States v. Gerlach Live Stock Company, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950), and Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)," in which "the Supreme Court 'provides guidance on the demarcation between regulatory and physical takings analysis with respect to [water] rights.'" Id. (quoting Casitas Mun. Water Dist. v. United States, 543 F.3d at 1289). The court noted that "[a]ccording to the Federal Circuit, in each of these cases: 'the United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property'; 'the diverted water was dedicated to government use or third party use which served a public purpose'; and 'the Supreme Court analyzed the government action . . . as a per se taking.'" Id. (quoting Casitas Mun. Water Dist. v. United States, 543 F.3d at 1289).

After summarizing the parties' arguments, the court proceeded to summarize the Federal Circuit's decision in Casitas Municipal Water District v. United States, "a binding precedent on this court." Id. at 732. The court then found that the "[t]he facts in the present cases are very similar to those in Casitas." Id. at 733. In particular, the government had "taken an action that had the effect of preventing plaintiffs from enjoying the right to use water provided by an irrigation project," "plaintiffs in the present cases had been able to use these water rights more or less fully for years prior to the government's action," the government's action was "implemented by a similar physical means," and the water was used for "'the preservation of the habitat of an endangered species,'" a "'government and third party use.'" Id. (quoting Casitas Mun. Water Dist. v. United States, 543 F.3d at 1292). After rejecting defendant's attempts to distinguish Casitas and the trilogy of Supreme Court water rights cases, see id. at 733-34 & 734 n.5, the court held that "Casitas Municipal Water District v. United States, 543 F.3d 1276, and the United States Supreme Court decisions on which Casitas relies, are controlling in the cases presently before the court. As in Casitas, the government's actions in the present cases 'should be analyzed under the physical takings rubric.'" Id. at 737 (quoting Casitas Mun. Water Dist. v. United States, 543 F.3d at 1296). The undersigned was careful to note, however, "that in making this decision, it is in no way making any determinations as to the nature or scope of plaintiffs' alleged property rights, which remain[ed] at issue in the above-captioned cases." Id.

Both defendant and defendant-intervenor, after trial, now request that this court reconsider its December 21, 2016 Opinion and hold that the government's actions in the present cases are properly analyzed as regulatory rather than physical takings. Defendant argues that the court's decision was wrong because plaintiffs failed to prove at trial that the government actually took any physical actions that resulted in the deprivation of Klamath Project water that plaintiffs allege constituted the taking at issue Defendant-intervenor makes a different argument, asserting that impairments on a use right, such as plaintiffs' water rights in the present cases, can never constitute a physical taking, regardless of the nature of government action.

Neither defendant nor defendant-intervenor discuss the standard to be applied to for motions for reconsideration. Pursuant to RCFC 59:

> The court may, on motion, grant a new trial or a motion for reconsideration on all or some of the issues—and to any party—as follows:
>
> **(A)** for any reason for which a new trial has heretofore been granted in an action at law in federal court;
>
> **(B)** for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court; or
>
> **(C)** upon the showing of satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done to the United States.

RCFC 59(a)(1) (2017). The United States Court of Appeals for the Federal Circuit has stated that: "The decision whether to grant reconsideration lies largely within the discretion of the [trial] court." Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir.), reh'g denied (Fed. Cir. 1990); see also Carter v. United States, 207 Ct. Cl. 316, 318, 518 F.2d 1199, 1199 (1975), cert. denied, 423 U.S. 1076, reh'g denied, 424 U.S. 950 (1976); Osage Tribe of Indians of Okla., 97 Fed. Cl. 345, 348 (2011) (discussing RCFC 59(a) and 60(b)); Oenga v. United States, 97 Fed. Cl. 80, 83 (2011) (discussing RCFC 59(a)); Webster v. United States, 92 Fed. Cl. 321, 324, recons. denied, 93 Fed. Cl. 676 (2010) (discussing RCFC 60(b)); Alpha I, L.P. ex rel. Sands v. United States, 86 Fed. Cl. 126, 129 (2009) (discussing RCFC 54(b) and 59(a)); Banks v. United States, 84 Fed. Cl. 288, 291-92 (2008) (discussing RCFC 54(b) and 59(a)); Corrigan v. United States, 70 Fed. Cl. 665, 667-68 (2006) (discussing RCFC 59(a)); Tritek Techs., Inc. v. United States, 63 Fed. Cl. 740, 752 (2005); Keeton Corr., Inc. v. United States, 60 Fed. Cl. 251, 253 (2004) (discussing RCFC 59(a)); Paalan v. United States, 58 Fed. Cl. 99, 105 (2003), aff'd, 120 F. App'x 817 (Fed. Cir.), cert. denied, 546 U.S. 844 (2005); Citizens Fed. Bank, FSB v. United States, 53 Fed. Cl. 793, 794 (2002) (discussing RCFC 59(a)).

"Motions for reconsideration must be supported 'by a showing of extraordinary circumstances which justify relief.'" Caldwell v. United States, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (quoting Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 300 (1999)), reh'g en banc denied (Fed. Cir.), cert. denied, 546 U.S. 826 (2005) (discussing RCFC 59(a)); see also Oenga v. United States, 97 Fed. Cl. at 83; Seldovia Native Ass'n Inc. v.

United States, 36 Fed. Cl. 593, 594 (1996), aff'd, 144 F.3d 769 (Fed. Cir. 1998) (discussing RCFC 59(a)).

Courts must address reconsideration motions with "exceptional care." Carter v. United States, 207 Ct. Cl. at 318, 518 F.2d at 1199; see also Global Computer Enters. v. United States, 88 Fed. Cl. 466, 468 (2009) (discussing RCFC 59(a)). "The three primary grounds that justify reconsideration are: '(1) an intervening change in the controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice.'" Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC, 597 F.3d 1374, 1383 (Fed. Cir. 2010); see also Griffin v. United States, 96 Fed. Cl. 1, 7 (2010), mot. to amend denied, appeal dismissed, 454 F. App'x 899 (Fed. Cir. 2011) (discussing RCFC 59(a)); Totolo/King Joint Venture v. United States, 89 Fed. Cl. 442, 444 (2009) (quoting Stockton E. Water Dist. v. United States, 76 Fed. Cl. 497, 499 (2007), aff'd in part, vacated in part, rev'd in part on other grounds, 583 F.3d 1344 (2009) (citation omitted) (discussing RCFC 59(a))) appeal dismissed, 431 F. App'x 895 (Fed. Cir.), reh'g denied (2011) (discussing RCFC 59(a)); Dairyland Power Coop. v. United States, 90 Fed. Cl. 615, 652 (2009), recons. denied, No. 04-106C, 2010 WL 637793 (Fed. Cl. Feb. 22, 2010), aff'd in part, vacated in part on other grounds, 2011 WL 2519519 (Fed. Cir. June 24, 2011) (discussing RCFC 59(a)); Matthews v. United States, 73 Fed. Cl. 524, 526 (2006) (citations omitted) (discussing RCFC 59); Prati v. United States, 82 Fed. Cl. at 376 (discussing RCFC 59(a)); Tritek Techs., Inc. v. United States, 63 Fed. Cl. at 752; Bannum, Inc. v. United States, 59 Fed. Cl. 241, 243 (2003) (discussing RCFC 59(a)); Citizens Fed. Bank, FSB v. United States, 53 Fed. Cl. at 794; Strickland v. United States, 36 Fed. Cl. 651, 657, recons. denied (1996) (discussing RCFC 59(a)). "Manifest," as in "manifest injustice," is defined as "clearly apparent or obvious." Ammex, Inc. v. United States, 52 Fed. Cl. 555, 557 (2002), aff'd, 384 F.3d 1368 (Fed. Cir. 2004), cert. denied, 544 U.S. 948 (2005) (discussing RCFC 59). "Where a party seeks reconsideration on the ground of manifest injustice, it cannot prevail unless it demonstrates that any injustice is 'apparent to the point of being almost indisputable.'" Griffin v. United States, 96 Fed. Cl. at 7 (quoting Pac. Gas & Elec. Co. v. United States, 74 Fed. Cl. 779, 785 (2006), aff'd in part, rev'd in part on other grounds, 536 F.3d 1282 (Fed. Cir. 2008)). "A court, therefore, will not grant a motion for reconsideration if the movant 'merely reasserts . . . arguments previously made . . . all of which were carefully considered by the court.'" Ammex, Inc. v. United States, 52 Fed. Cl. at 557 (quoting Principal Mut. Life Ins. Co. v. United States, 29 Fed. Cl. 157, 164 (1993), aff'd, 50 F.3d 1021 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1995)) (emphasis in original); see also Griffin v. United States, 96 Fed. Cl. at 7; Bowling v. United States, 93 Fed. Cl. 551, 562, recons. denied (2010) (discussing RCFC 59(a) and 60(b)); Webster v. United States, 92 Fed. Cl. at 324 (discussing RCFC 59(a) and 60(b)); Pinckney v. United States, 90 Fed. Cl. 550, 555 (2009); Tritek Techs., Inc. v. United States, 63 Fed. Cl. at 752.

In sum, it is logical and well established that, "'[t]he litigation process rests on the assumption that both parties present their case once, to their best advantage;' a motion for reconsideration, thus, should not be based on evidence that was readily available at the time the motion was heard." Seldovia Native Ass'n Inc. v. United States, 36 Fed. Cl. at 594 (quoting Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 376, aff'd, 39 F.3d 1198 (Fed. Cir. 1994) (table)).

Defendant argues that the court should revisit its earlier decision because plaintiffs failed to prove at trial that the government "took any physical action with regard to" any of the "points of diversion" from Upper Klamath Lake or the Klamath river to the Klamath Project works supplying water to the plaintiffs' lands.[19] With respect to Upper Klamath Lake, defendant argues that evidence at trial demonstrated that although the Bureau of Reclamation, through its March 2, 2001 letter to the Irrigation Districts and Revised 2001 Operations Plan, instructed that no Klamath Project water be diverted without its authorization, it was the Klamath Irrigation District, which, under contract with the United States, operates the A Canal through which water is diverted from Upper Klamath Lake, that ultimately declined to physically open the headgates releasing water out of Upper Klamath Lake. According to defendant, the same was true with regard to diversions from the Klamath River, such as the North Canal, operated by the Klamath Drainage District, whose board member Luther Horsely testified at trial that "probably we were instructed to close those [diversion] gates [on the North Canal], and Joe, our manager at that time, would have went and closed them because the Bureau of Reclamation did not do it." According to defendant, these facts show that no physical taking by the government occurred because "instructions are not physical actions."

Initially, the court notes that its December 21, 2016 Opinion did not assume or make any factual finding that Bureau of Reclamation personnel physically operated the Klamath Project works diversion points from Upper Klamath Lake or the Klamath River. See Klamath Irr. Dist. v. United States, 129 Fed. Cl. at 726 (finding that, under the Revised 2001 Operations Plan, "only limited deliveries of Project water" would be made and then that "delivery of irrigation water from Upper Klamath Lake to the plaintiffs in the above-captioned cases was totally terminated until July 2001," but making no findings as to the details of how the delivery termination was carried out); id. at 736 ("Further, in both Casitas and the present cases, the government's action was implemented by a similar physical means, . . . in the present cases, by using the Klamath Project works to prevent water from travelling out of Upper Klamath Lake and the Klamath River and into project canals used by the plaintiffs."). The court did indicate that the Klamath Project system was "ultimately controlled by the government," id. at 735, a conclusion that was consistent with the timing of the termination of water deliveries immediately after the Revised 2001 Operations Plan was issued and the Bureau of Reclamation's decision to release 70,000 acre-feet of water in July 2001. See id. at 726. The court's finding that the release of water from the Klamath Project was ultimately controlled by the government is bolstered by the March 2, 1001 and March 30, 2001 letters from the Bureau of Reclamation to the Irrigation Districts telling the Irrigation Districts that no Klamath Project water could be diverted or used prior to the issuance of the Revised 2001 Operations Plan without the Bureau of

---

[19] Defendant also argues that the court's earlier decision "assume[d], without deciding that plaintiffs' rights to use of the water was exactly as they alleged" and now that it has allegedly been show that plaintiffs "did not hold legal title and had no right to divert water from UKL or the Klamath River" the government's actions "cannot be regarded as a seizure or physical taking" of the water or plaintiffs' right to use the water. As discussed above, the court has found that plaintiffs hold rights to use Klamath Project water from Upper Klamath Lake and/or the Klamath River.

Reclamation's express authorization. The court's finding is also bolstered by the trial testimony cited by defendant which establishes that the various Irrigation Districts either closed or refrained from opening the diversion points they were contractually obligated to operate only after the government ordered them to do so.

Further, defendant's argument that "instructions" from the government that result in the diversion of water cannot result in a physical taking because they are not "physical actions" is incorrect as a matter of law. In language quoted in this courts' December 21, 2016 Opinion, the Federal Circuit in Casitas stated that, in the three United States Supreme Court cases involving physical takings of water rights, International Paper Co. v. United States, 282 U.S. 399 (1931), United States v. Gerlach Live Stock Co., 339 U.S. 725 (1950), Dugan v. Rank, 372 U.S. 609 (1963), "the United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property." Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1290 (Fed. Cir. 2008) (emphasis added). Causing water to be diverted away from the plaintiffs' property is exactly what the government did in the present cases. By invoking the various Irrigation Districts' contractual obligations towards the United States and requiring them to close or keep closed the various diversion points in the Klamath Project, the Bureau of Reclamation caused Klamath Project water to be diverted away from plaintiffs' lands and towards Upper Klamath Lake and the Klamath River. The circumstances in the present cases are actually quite analogous to International Paper Co., in which the United States Secretary of War wrote to a New York power company requisitioning all the electricity it could produce and ordering it to use "all waters diverted or capable of being diverted through your intake canal" to produce electricity, which the power company interpreted as requiring it to deny the plaintiff paper mill its right to divert 730 cubic feet per second of water from the its intake canal to which it was entitled under New York Law. Int'l Paper Co. v. United States, 282 U.S. at 405. Despite the fact that it was the power company, rather than the United States government, that took the physical action that actually deprived the paper mill of its water right, Justice Holmes held that the government's actions amounted to a taking of the paper mill's right to use the water:

> The petitioner's right was to the use of the water; and when all the water that it used was withdrawn from the petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take the use.

Id. at 407. Just as in International Paper Co., the government's actions in the present cases caused the withdrawal of water used by plaintiffs and, thereby, deprived them of their right to use that water.

Defendant-intervenor, Pacific Coast Federation of Fisherman's Associations, makes a different argument, that "[a] takings claim based on an alleged impairment of the right to use property must be analyzed as a potential regulatory taking, regardless of what caused the restriction." (emphasis in original). As it relates to water law, this proposed bright line rule is obviously incorrect. Each of the three Supreme Court cases which found a physical taking of water, as well as Casitas, involved a right to use water. See id. at 407 ("The petitioner's right was to the use of the water . . . ."); United States v. Gerlach Live

Stock Co., 339 U.S. at 752 (noting that plaintiffs riparian rights entitled them to "so much of the flow of the San Joaquin as may be put to beneficial use consistently" with California's water law); Dugan v. Rank, 372 U.S. at 614 ("The named plaintiffs claimed to represent a class of owners of riparian as well as other types of water rights."); Casitas Mun. Water Dist. v. United States, 543 F.3d at 1294 ("When the government diverted the water to the fish ladder, it took Casitas' water. The water, and Casitas' right to use that water, is forever gone.").[20]

---

[20] Defendant-intervenor argues that Casitas is distinguishable from the present cases because it involved "an unusual set of facts where the court *assumed* the plaintiff owned the water it had diverted into a private canal." (emphasis in original). This court rejected this precise argument in its December 21, 2016 Opinion, writing:

> [D]efendant notes that the government in Casitas conceded, for the purpose of appeal, that Casitas held not only a right to use water, but also a right to divert water from the Ventura River Project, and, therefore, argues that the Federal Circuit's holding was premised on a finding that Casitas's right to divert water, rather than its right merely to use water, had been taken. This argument finds no support in the text of the Casitas opinion, which, after mentioning that Casitas held a right to divert 107,800 acre-feet of water from the Ventura River Project, see [Casitas Mun. Water Dist. v. United States, 543 F.3d] at 1288, never describes the government's actions as having interfered with Casitas' right to divert water. By contrast, the opinion does state that, as a result of the government's actions, "[t]he water [diverted by the government], and Casitas' right to use that water, is forever gone." Id. at 1296 (emphasis added). Moreover, after quoting a statement from the Supreme Court's opinion in International Paper that:
>
>> [t]he petitioner's right was to the use of the water; and when all the water that it used was withdrawn from the petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take the use,
>
> the Federal Circuit stated "[s]imilar to the petitioner in *International Paper*, Casitas' right was to the use of the water, and its water was withdrawn from the Robles–Casitas Canal and turned elsewhere (to the fish ladder) by the government." Id. at 1292 (emphasis added) (quoting Int'l Paper Co. v. United States, 282 U.S. at 407, 51 S.Ct. 176). At the very least, these statements demonstrate that the United States Court of Appeals for the Federal Circuit concluded that the government's water diversions in Casitas resulted in a permanent taking of Casitas' right to use the diverted water. See also CRV Enters., Inc. v. United States, 626 F.3d at 1247 ("Thus, the prior water rights cases finding a physical taking involved instances where the 'United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property' such that water was removed

In support of this proposed bright line rule, defendant-intervenor cites to a single case, CRV Enterprises, Inc. v. United States, 626 F.3d 1241 (Fed. Cir. 2010), which it alleges demonstrates that "the fact that the government implemented the requirements of the Endangered Species Act, at least in part, through physical operation of the Klamath Project does not change the fact that the government action merely resulted in a restriction on the plaintiffs' ability to use water."[21] The plaintiffs in CRV Enterprises held

_____

> entirely and the plaintiffs 'right to use that water, [was] forever gone.'" (alteration in original) (emphasis added) (quoting Casitas v. United States, 543 F.3d at 1290, 1296)).

Klamath Irr. Dist. v. United States, 129 Fed. Cl. at 733. Nothing in defendant-intervenor's present argument even addresses the reasoning of the court's December 21, 2016 Opinion, let alone supports that it was made in clear error.

[21] Defendant-intervenor also criticizes the court's December 21, 2016 Opinion for "suggest[ing] that the facts of this case are comparable to the facts of Casitas because the regulatory mandate that required water not to be diverted from the river for irrigation purposes altered the 'status quo ante.'" In the portion of the opinion defendant-intervenor is apparently referencing (no citation is provided by defendant-intervenor), the court rejected defendant's attempt in its motion in limine to distinguish the present cases from Casitas on the grounds that "the Bureau of Reclamation's actions did not amount to a physical diversion of Klamath Project water, but instead constituted only regulatory restrictions prohibiting the removal of water by plaintiffs from Upper Klamath Lake, the equivalent of what the court in Casitas termed 'merely requir[ing] some water to remain in stream' as opposed to 'actively caus[ing] the physical diversion of water.'" Klamath Irr. Dist. v. United States, 129 Fed. Cl. at 733–34 (quoting Casitas v. United States, 543 F.3d at 1291). In rebutting this argument, this court applied the Federal Circuit's determination in Casitas that "'the appropriate reference point in time to determine whether the United States caused a physical diversion' is the 'status quo' before the challenged government action" to find that the government's actions amounted to a physical diversion because they "prevented water that would have, under the status quo ante [i.e., the status quo before], flowed into the Klamath Project canals and to the plaintiffs" from doing so. Id. at 734 (quoting Casitas Mun. Water Dist. v. United States, 543 F.3d at 1291 n.13). In arguing that the court's reasoning "contradicts" Casitas, defendant-intervenor cites to the same language from Casitas that defendant did in its motion in limine, but fails in any way to discuss or even recognize the other portions of Casitas that formed the basis for the court's reasoning. Defendant-intervenor, thus, has failed to demonstrate that the court's reasoning was in clear error.

Defendant-intervenor also claims that the court's reasoning amounts to "the idea that the imposition of a new regulatory constraint on the use of land, water, or any other resource should be regarded as a physical taking simply because it changes the status quo ante." The court finds no support for such a proposition in its December 21, 2016 Opinion. Nor does defendant-intervenor's argument, again, made without specific

riparian rights, which, among other considerations, entitled them to access the navigable portions of a man-made waterway adjacent to their property. See CRV Enterprises, Inc. v. United States, 626 F.3d at 1243-44. In CRV Enterprises, as part of an environmental remediation effort, the United States Environmental Protection Agency installed a log boom that prevented plaintiffs from navigating a portion of the waterway, which the plaintiffs alleged amounted to a physical taking of their riparian rights. See id. at 1245. The Federal Circuit ultimately held that the government's actions did not amount to a physical taking because "plaintiffs cannot show that the government has physically appropriated its water rights by removing water entirely." Id. at 1248. In doing so, the Federal Circuit noted that "the prior water rights cases finding a physical taking involved instances where the 'United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property' such that water was removed entirely and the plaintiffs 'right to use that water, [was] forever gone.'" Id. at 1247 (quoting Casitas Mun. Water Dist. v. United States, 543 F.3d at 1290, 1296). This is precisely the approach adopted by this court in its December 21, 2016 Opinion, which based its decision in large part on the finding that "the government's retention of water in Upper Klamath Lake and Klamath River did amount to a physical diversion of water according to the standards set by the United States Court of Appeals for the Federal Circuit and the United States Supreme Court." Klamath Irr. Dist. v. United States, 129 Fed. Cl. at 734 (citing Casitas Mun. Water Dist. v. United States, 543 F.3d at 1289–90). Thus, CRV Enterprises actually bolsters the court's December 21, 2016 Opinion, rather than showing it amounted to a clear error.

### b. **Permanent or Temporary Taking**

The issue of whether the government's actions should be analyzed as a permanent or temporary taking was not briefed in the parties' motions in limine and, therefore, not discussed in the court's December 21, 2016 Opinion. In their post-trial briefs, defendant and defendant-intervenor argue that, if the court declines to reconsider its December 21, 2016 Opinion holding that the government's actions be analyzed as physical takings, it should analyze the actions as temporary, rather than permanent takings, applying the framework set forth in Arkansas Game and Fish, 568 U.S. 23. By contrast, plaintiffs argue that the government should treat them as permanent, per se takings for which compensation is due regardless of the circumstances.

Defendant argues that the government's actions must be analyzed as a temporary taking because plaintiffs' water rights are appurtenant to their properties and are of permanent duration in time. With regard to the appurtenant nature of plaintiffs' water rights, defendant argues that "black letter law" requires the court to evaluate the effect of the government's actions on their property as a whole, including fee ownership of the lands to which the property rights are appurtenant. With regard to the permanent nature

---

citations to the court's opinion, provide any such support. Defendant-intervenor's argument, thus, fails.

of plaintiffs' water rights, defendant argues that, even if the court finds that "appurtenancy can be severed from the fee for the purposes of this claim, because the appurtenant 'right' to receive [Klamath] Project water is a permanent right, and plaintiffs are only alleging a taking of that right in 2001, that claim must be analyzed as a temporary taking." Defendant-intervenor similarly argues that it is "apparent" that the government's actions should be analyzed as a temporary taking because the government's water restrictions were in place for less than a year.

It is undisputed that plaintiffs' water rights were appurtenant to their land. This fact was pled in plaintiffs' second amended complaint, and a number of plaintiffs testified to it at trial during questioning by defendant, including Frank Anderson, John Frank, Donald Russel, Harold Hartman, Edwin Stastny, Jr., James Moore, Gary Wright, Claude Hagerty, Steven L. Kandra, and David A. Cacka. Defendant's argument that the court should analyze the effect of the government's actions on plaintiffs' property as a whole, including the fee estates to which their water rights were appurtenant, rather than the effect on their water rights alone, however, is incorrect as a matter of law. This court has determined that the government's actions should be analyzed as a physical rather than regulatory taking, and with regard to physical takings, the Federal Circuit has held that "[t]he size and scope of a physical invasion is immaterial to the analysis; even if the government only appropriates a tiny slice of a person's holdings, a taking has occurred, and the owner must be provided just compensation." <u>Casitas Mun. Water Dist. v. United States</u>, 543 F.3d at 1288 (citing <u>Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency</u>, 535 U.S. 302, 322 (2002)); <u>see also</u> <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1015 (1992) ("In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation."). The two cases cited by defendant in support of its argument, <u>Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency</u>, 535 U.S. 302, and <u>Keystone Bituminous Coal Association v. DeBenedictis</u>, 480 U.S. 470 (1987), are not to the contrary because, unlike the present cases both involved regulatory, rather than physical, takings. <u>See</u> <u>Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency</u>, 535 U.S. at 331 ("Petitioners' 'conceptual severance' argument is unavailing because it ignores <i>Penn Central's</i> admonition that in regulatory takings cases we must focus on 'the parcel as a whole.'" (quoting <u>Penn Cent. Transp. Co. v. City of New York</u>, 438 U.S. at 130–131)); <u>Keystone Bituminous Coal Ass'n v. DeBenedictis</u>, 480 U.S. at 493 ("[P]etitioners have not shown any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking. For this reason, their takings claim must fail."). The standards and precedents to be used in the context of regulatory takings are inapplicable in the context of potential physical takings. <u>See</u> <u>Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency</u>, 535 U.S. at 323 ("This longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." (footnote omitted)). Thus, in the present cases, the fact that the government's actions may have deprived plaintiffs of only a portion of their entire property rights is simply irrelevant to the issue of whether a taking occurred. <u>See</u> <u>id.</u> at 322 ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former

owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. (citation omitted)); Casitas Mun. Water Dist. v. United States, 543 F.3d at 1292 ("Although Casitas' right was only partially impaired, in the physical taking jurisprudence any impairment is sufficient." (citing Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. at 322)).

That plaintiffs' water rights are permanent in duration also is undisputed and supported by substantial evidence admitted at trial. For instance, the 1905 KWUA contract, the rights and obligations of which were incorporated into Klamath Irrigation District's contracts with the United States, states that the KWUA members right to use Klamath Project water "shall be . . . forever appurtenant to designated lands owned by [KWUA's] share-holders." Similarly, the Warren Act contracts state an amount of water that the United States shall furnish each year to the contractor from the various works of the Klamath Project. Defendant's argument (and defendant-intervenor's related argument) that the government's actions should be analyzed as a temporary taking because they only affected plaintiffs' water rights for one year, while plaintiffs' water rights are perpetual, is, however, in direct contradiction with the Federal Circuit's decision in Casitas. In Casitas the Federal Circuit, addressing whether the government's actions should be treated like the temporary moratorium at issue in Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, held that the government's water diversions were "not temporary" and had "permanently taken that water away from Casitas" because "[t]he water, and Casitas' right to use that water, is forever gone." Casitas Mun. Water Dist. v. United States, 543 F.3d at 1296. In an earlier footnote, the Federal Circuit explained why it had found that "[t]he water, and Casitas' right to use that water, is forever gone," stating:

> The California license governing Casitas' use of water for the Project permits Casitas to divert up to 107,800 acre-feet per year from the Ventura River and to put to beneficial use each year 28,500 acre-feet of the diverted water. The water diverted to the fish ladder facility is gone forever, as the license does not allow Casitas to make up this amount in subsequent years.

Casitas Mun. Water Dist. v. United States, 543 F.3d at 1294 & 1294 n.15. This language demonstrates that the Federal Circuit viewed the relevant property right for the purposes of a takings analysis as the water that the Casitas plaintiff was entitled to in a single year because, once the opportunity to use that water had passed, it was "gone forever." Id. This was true despite the fact that, as in the present cases, Casitas' water right was permanent. See id. at 1281–82 ("Additionally, the contract [between the United States and Casitas] provided in Article 4 that Casitas 'shall have the perpetual right to use all water that becomes available through the construction and operation of the Project.'"). The United States Supreme Court took a similar view in International Paper Co., in which Justice Holmes found that the government had effected a taking by depriving plaintiffs of their right to take the water at issue for ten months, between February 7, 1918 and November 30, 1918, despite the fact the plaintiffs' right to the water was perpetual, "a

corporeal hereditament[[22]] and real estate," under New York law. Int'l Paper Co. v. United States, 282 U.S. at 405-06.[23]

Similar to the facts in Casitas, in the present cases, the plaintiffs held rights to receive the amount of Klamath Project water they could put to beneficial use each year, which in some cases was capped at a specific amount in terms of acre-feet per second. Neither Oregon or California law, nor the various contracts plaintiffs and Irrigation Districts entered into with the Bureau of Reclamation, allowed them to make up the amounts they were deprived of in 2001 in subsequent years. Therefore, as in Casitas, the water plaintiffs were deprived of in 2001 is "gone forever." Casitas Mun. Water Dist. v. United States, 543 F.3d at 1294 n.15. As such, the government's diversion of water away from the plaintiffs in 2001 was not temporary and should be analyzed as a permanent physical taking. See id. at 1296.

---

[22] A corporeal hereditament is defined as a "tangible item of property, such as land, a building, or a fixture." Corporeal hereditament, Black's Law Dictionary 842 (10th ed. 2014).

[23] Defendant argues that Casitas should be discounted because it predates the Supreme Court's decision in Arkansas Game and Fish Commission v. United States, 568 U.S. 23, and that International Paper Co. should be discounted because it predates both Arkansas Game and Fish and Loretto v. Teleprompter Manhattan CATV Corp, 458 U.S. 419. While Arkansas Game and Fish clarified the test to be applied to determine whether temporary physical invasions constitute temporary takings, the decision recognized that it was Loretto that had "distinguished permanent physical occupations from temporary invasions of property, expressly including flooding cases, and said that 'temporary limitations are subject to a more complex balancing process to determine whether they are a taking.'" Arkansas Game and Fish Comm'n v. United States, 568 U.S. at 36 (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. at 436 n.12). Further, while Loretto was the first case in which the Supreme Court explicitly stated that temporary and permanent limitations on property are subject to different tests to determine whether they constitute takings, Loretto identified that it was not creating a new rule, but merely recognizing a distinction that Supreme Court cases had drawn since at least the beginning of the twentieth century. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. at 428 ("Since these early cases, this Court has consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other. A taking has always been found only in the former situation." (citing United States v. Lynah, 188 U.S. 445, 468–470 (1903); Bedford v. United States, 192 U.S. 217, 225 (1904); United States v. Cress, 243 U.S. 316, 327–328 (1917); Sanguinetti v. United States, 264 U.S. 146, 149 (1924); United States v. Kansas City Life Ins. Co., 339 U.S. 799, 809–810 (1950)). Thus, both Casitas and International Paper Co., were decided at times when the distinction between permanent and temporary takings was understood and, as such, remain good law for the purpose of determining the type of taking which exists.

2.  **Effect of Tribal Rights**

The parties also dispute the effect of any rights the Tribes may have to Klamath Project water on plaintiffs' claims. Defendant argues that the government's actions did not constitute a taking of the plaintiffs' water rights because the plaintiffs' water rights were subordinate to those of the Klamath, Yurok, and Hoopa Valley Indian Tribes. According to defendant, the amount of Klamath Project water needed to satisfy the Tribes' rights was at least equal to the quantity needed to satisfy the requirements of the Endangered Species Act with respect to the Lost River and shortnose suckers and the SONCC coho salmon in 2001. Defendant also argues that the Bureau of Reclamation's Revised 2001 Operations Plan indicates that its decision regarding water availability in 2001 was based, at least in part, on the government's obligation to satisfy its trust obligation towards the Tribes to supply the water needed to meet their senior water rights. According to defendant, because there was not even enough water to fully satisfy the Tribes' senior water rights in 2001, plaintiffs, as junior rights holders, were not entitled to receive any water and, thus, no taking occurred. In their amicus brief filed with this court, the Klamath Tribes, similarly argue that, to satisfy the Klamath Tribes' rights, "the amount of water required to remain in the [Upper Klamath] Lake, although unquantified in 2001, could not have been less than that required by the ESA [Endangered Species Act], as the ESA only seeks to avoid extinction whereas the Tribal water right is needed to promote species populations that can support tribal harvest."

Plaintiffs argue that defendant has not shown that the 2001 curtailment of water deliveries was necessary to protect the Tribes' water rights because those rights are unquantified, making such proof impossible, and because post-2001 evidence shows that the water curtailment did not actually protect the threatened and endangered fish. Plaintiffs also argue that the evidence offered at trial shows that the Bureau of Reclamation's decision to withhold water deliveries from the plaintiffs' in 2001 was based entirely on its obligations under the Endangered Species Act, rather than to comply with its trust obligations to satisfy the Tribes' water rights. Plaintiffs further argue that the Bureau of Reclamation had trust obligations towards not only to the Tribes, but also to the plaintiff water users and that, under the Supreme Court's opinion in Nevada v. United States, 463 U.S. 110 (1983), the Bureau of Reclamation was not free to favor the Tribes over the plaintiffs.

Both Oregon, where the Klamath Tribe is based, and California, where the Yurok and Hoopa Valley Tribes are based, follow the doctrine of prior appropriation for water rights. See Irwin v. Phillips, 5 Cal. 140, 143 (1855) (establishing the doctrine of prior appropriation in California); Teel Irr. Dist. v. Water Res. Dep't of State of Or., 919 P.2d 1172, 1174 (Or. 1996) ("Oregon's current scheme of ground and surface water allocation is rooted in the doctrine of prior appropriation for a beneficial use."). "The doctrine provides that rights to water for irrigation are perfected and enforced in order of seniority, starting with the first person to divert water from a natural stream and apply it to a beneficial use (or to begin such a project, if diligently completed)." Montana v. Wyoming, 563 U.S. 368, 375–76 (2011) (citing Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 98 (1938); Arizona v. California, 298 U.S. 558, 565–66 (1936); Wyo. Const., Art. 8, § 3); see also United States v. State Water Res. Control Bd., 182 Cal. App.

3d 82, 101 (Cal. Ct. App. 1986) ("The appropriation doctrine confers upon one who actually diverts and uses water the right to do so provided that the water is used for reasonable and beneficial uses and is surplus to that used by riparians or earlier appropriators."). "In periods of shortage, priority among confirmed rights is determined according to the date of initial diversion," which is referred to as a priority date. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 805 (1976). Essentially, the rule of priority is that "as between appropriators the one first in time is the first in right." Wishon v. Globe Light & Power Co., 110 P. 290, 292 (Cal. 1910); see also Teel Irr. Dist. v. Water Res. Dep't of State of Or., 919 P.2d at 1174 ("Under this doctrine, a person may acquire an appropriative right on a 'first come, first served' basis by diverting water and applying it to a beneficial use."). The result is that "[a] junior appropriator's water right cannot be exercised until the senior appropriator's right has been satisfied." Benz v. Water Res. Comm'n, 764 P.2d 594, 599 (Or. 1988); see also United States v. State Water Res. Control Bd., 182 Cal. App. 3d at 101–02 ("The senior appropriator is entitled to fulfill his needs before a junior appropriator is entitled to use any water.").

The water rights held by the Klamath, Yurok and Hoopa Valley Tribes are reserved federal rights. "[W]hen the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." Cappaert v. United States, 426 U.S. at 138; see also United States v. New Mexico, 438 U.S. 696, 702 (1978) ("Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water."). "In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators." Cappaert v. United States, 426 U.S. at 138. Reserved rights are "[f]ederal water rights," which "are not dependent upon state law or state procedures." Id. at 145. "Thus, reserved rights represent an exception to the general rule that allocation of water is the province of the states." F. Cohen, Handbook of Federal Indian Law 19.01[1] at 1204 (2012) (citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 800; Winters v. United States, 207 U.S. 564, 577 (1908)). Although "[i]t is appropriate to look to state law for guidance . . . the 'volume and scope of particular reserved rights . . . [remain] federal questions.'" Colville Confederated Tribes v. Walton, 752 F.2d 397, 400 (9th Cir. 1985) (quoting Colorado River Water Conservation District v. United States, 424 U.S. at 813) (citing Colorado v. New Mexico, 459 U.S. 176, 184 (1982)) (second omission and second alteration in original). Reserved rights "need not be adjudicated only in state courts." Cappaert v. United States, 426 U.S. at 145. Instead, "federal courts have jurisdiction under 28 U.S.C. s 1345 to adjudicate the water rights claims of the United States." Id.

"An implied reservation of water for an Indian reservation will be found where it is necessary to fulfill the purposes of the reservation." Colville Confederated Tribes v. Walton, 647 F.2d 42, 46 (9th Cir. 1981) Although Indian reservations were generally created by treaties prior to 1871 and through executive orders after 1871, the reserved water rights resulting from treaties and executive orders "are substantively the same, at least with respect to non-federal interests." Parravano v. Babbitt, 70 F.3d at 545. The

priority date of reserved rights is "no later than the date on which a reservation was established, which, in the case of most Indian reservations in the West, is earlier than the priority of most non-Indian water rights." F. Cohen, Handbook of Federal Indian Law 19.01[1] at 1206. In certain cases, however, courts have recognized that "uninterrupted use and occupation of land and water created in the Tribe aboriginal or 'Indian title' to all of its vast holdings." United States v. Adair, 723 F.2d at 1413 (citing United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 345 (1941); United States v. Klamath and Modoc Tribes, 304 U.S. 119, 122–23 (1938); Holden v. Joy, 84 U.S. (17 Wall.) 211, 244 (1872)). When recognized by a treaty, "[s]uch water rights necessarily carry a priority date of time immemorial." Id. at 1414.

The Tribes' reserved rights are senior to those of any of the plaintiff users of the Klamath Project water. The Klamath Tribes' rights hold a priority date of "time immemorial," meaning they are senior to any other possible rights holder. See United States v. Adair, 723 F.2d at 1414; see also F. Cohen, Handbook of Federal Indian Law 19.03[3] at 1216 ("[T]ime immemorial rights are always first in priority."). Although the Yurok and Hoopa Valley Tribes' reserved rights have not previously been assigned a priority date, the rights must hold a priority date of at least 1891, the year of the last executive order creating their reservation, and possibly even earlier. See Parravano v. Babbitt, 70 F.3d at 547 ("The 1876 and 1891 executive orders that created the extended Hoopa Valley Reservation and the 1988 Hoopa–Yurok Settlement Act vested the Tribes with federally reserved fishing rights . . . ."). By contrast, under Oregon law, because the United States did not post notice that it was appropriating the waters of the Klamath Project until 1905, the priority dates for the rights to use Klamath Project water held by the remaining plaintiffs, on whose behalf the United States appropriated the water, must be 1905 or later. Klamath Irr. Dist. v. United States, 227 P.3d at 1152 ("[U]nder Oregon law, the persons who used water that another person had appropriated had the same priority date (the date of the notice) as long as the later user put the water to beneficial use within a reasonable time and the use came within the scope of the original plan set out in the appropriator's notice." (citing Nevada Ditch Co. v. Bennett, et al. 45 P. 472 (Or. 1896)). Thus, the priority dates of the remaining plaintiffs' water rights must be at least a decade or more later than the latest possible priority date for any of the Tribes' water rights at issue in the present cases. See Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d at 1214 (holding that the water rights of the Klamath, Yurok and Hoopa Valley Tribes "take precedence over any alleged rights of the Irrigators," who use Klamath project water).

The Klamath Tribes hold a "non-consumptive" right in the waters of Upper Klamath Lake and its tributaries entitling them to prevent other appropriators from depleting these waters below levels that would prevent them from "support[ing] game and fish adequate to the needs of Indian hunters and fishers." United States v. Adair, 723 F.2d at 1410-11. The Lost River and short nose suckers are tribal resources of the Klamath Tribes and uncontested evidence presented at trial demonstrated that the fish have played an important role in the Klamath Tribes' history. While the court does not have sufficient evidence in front of it to determine the minimum amount of Lost River and shortnose suckers that would be "adequate to the needs" of the Klamath Tribes, see id. at 1410, at the very least it must be some number greater than zero. Thus, the Klamath Tribes'

aboriginal right to take fish entitles them to prevent junior appropriators from withdrawing water from Upper Klamath Lake and its tributaries in amounts that would cause the extinction of the Lost River and short nose suckers. See United States v. Anderson, 591 F. Supp. 1, 5-6 (E.D. Wash. 1982) (holding that, because "one of the purposes for creating the Spokane Indian Reservation was to insure the Spokane Indians access to fishing areas and to fish for food," the tribe was entitled to a flow of water in a creek sufficient "sufficient to maintain the water temperature at 68°F or below," the temperature needed to preserve their fisheries), aff'd in part, rev'd in part, 736 F.2d 1358 (9th Cir. 1984).

The Yurok and Hoopa Valley Tribes hold the right "to take fish from the Klamath River . . . for ceremonial, subsistence, and commercial purposes." United States v. Eberhardt, 789 F.2d at 1359. The SONCC coho salmon is a tribal trust resource for the Yurok and Hoopa Valley Tribes and evidence presented at trial demonstrated that the fish have played an important part in the Yurok and Hoopa Valley Tribes' history. Indeed, other courts have found that, at the time the Yurok and Hoopa Valley Tribes' reservation was created, "the [Yurok and Hoopa Valley] Tribes' salmon fishery was 'not much less necessary to [their existence] than the atmosphere they breathed.'" Parravano v. Babbitt, 70 F.3d at 542 (quoting Blake v. Arnett, 663 F.2d 906, 909 (9th Cir. 1981)) (alteration in original). Although previous courts have not been confronted with the issue of whether the Yurok and Hoopa Valley Tribes reserved fishing rights include a commensurate water right, reserved rights include a sufficient quantity of water to accomplish the purpose of the reservation. See United States v. New Mexico, 438 U.S. 696, 698–700 (1978); see also United States v. Adair, 723 F.2d at 1410 ("[A]t the time the Klamath Reservation was established, the Government and the [Klamath] Tribe intended to reserve a quantity of the water flowing through the reservation not only for the purpose of supporting Klamath agriculture,[24] but also for the purpose of maintaining the Tribe's treaty right to hunt and fish on reservation lands."). As the Ninth Circuit held in Adair, regarding the Klamath Tribes' water rights, because "[a] water right to support game and fish adequate to the needs of Indian hunters and fishers," such as that held by the Yurok and Hoopa Valley Tribes, is "basically non-consumptive," such a water right "consists of the right to prevent other appropriators from depleting the streams['] waters below a protected level." United States v. Adair, 723 F.2d at 1410-11 (citing Cappaert v. United States, 426 U.S. at 143); see also Cappaert v. United States, 426 U.S. at 143 ("Thus, since the implied-reservation-of-water-rights doctrine is based on the necessity of water for the purpose of the federal reservation, we hold that the United States can protect its water from subsequent diversion, whether the diversion is of surface or groundwater."); Joint Bd. of Control of Flathead, Mission & Jocko Irr. Districts v. United States, 832 F.2d 1127, 1132 (9th Cir. 1987) ("To the extent that the Tribes enjoy treaty-protected aboriginal fishing rights, they

---

[24] The court notes that the existence and extent of any possible federal reserved water rights that may be held by the Tribes for the purposes of supporting agriculture are not dispositive in the present cases. Such reserved water rights for agricultural purposes are distinct from water rights held for the purpose of maintaining their fishing rights and their extent is determined according to the so-called "practicably irrigable acreage" standard set forth by the Supreme Court in Arizona v. California. See Arizona v. California, 373 U.S. 546, 600-601 (1963).

can 'prevent other appropriators from depleting the streams (sic) waters below a protected level.'" (quoting <u>United States v. Adair</u>, 723 F.2d at 1411) (citing <u>Montana v. Confederated Salish and Kootenai Tribes</u>, 712 P.2d 754, 764 (Mont. 1985))). In <u>Adair</u>, the "protected level" of waters that the Klamath Tribes were entitled to enforce was the stream flow "required to support the fish and game that the Klamath Tribe take in exercise of their treaty rights." <u>United States v. Adair</u>, 723 F.2d at 1411. As holders of federal reserved rights to take fish from the Klamath River, the Yurok and Hoopa Valley Tribes, like the Klamath Tribes, also hold a non-consumptive water right, which entitles them to prevent other appropriators from depleting the flows of the Klamath River below levels required to support the fish they take in exercise of their treaty rights. Similar to the Klamath Tribes, the Yurok and Hoopa Valley Tribes' non-consumptive water rights must, therefore, entitle them, at a minimum, to prevent junior appropriators from withdrawing water from Klamath River and its tributaries in amounts that would cause the endangerment and extinction of their tribal trust resource, the SONCC coho salmon.

Defendant and amicus Klamath Tribes argue that the quantity of water needed to protect these water rights held by the Tribes in 2001 was, at a minimum equal to the quantity needed to satisfy the Bureau of Reclamations' obligations under Section 7 of the Endangered Species Act. In 2001, as in the present day, Section 7 of the Endangered Species Act required federal agencies to, "in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." 16 U.S.C. § 1536(a)(2) (2000). In 2001, as in the present day, under the regulations implementing Section 7, to "jeopardize the continued existence" of a species meant "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (2000). In the cases presently before the court, the Bureau of Reclamation, pursuant to its obligations under Section 7, initiated formal consultations with the NMFS regarding the SONCC coho salmon on January 22, 2001 and with the FWS regarding the Lost River and shortnose suckers on February 13, 2001. The results of these consultations were the biological assessments issued by the NMFS and the FWS, which found that the Bureau of Reclamation's proposed 2001 operations plan for the Klamath Project, which would have provided the plaintiffs with water deliveries in line with historic practices, was "likely to jeopardize the continued existence" of the Lost River and shortnose suckers and the SONCC coho salmon. To avoid jeopardizing the fish, the NMFS and FWS determined it would be necessary to implement certain "reasonable and prudent alternatives," including not releasing water for irrigation purposes from Upper Klamath Lake in order to maintain certain minimum elevations and releasing additional water into Klamath River to maintain certain flow rates. The Bureau of Reclamation subsequently implemented the reasonable and prudent alternatives proposed in the NMFS and FWS Biological Opinions in its Revised 2001 Operations Plan, resulting in the total denial of water deliveries to plaintiffs until July 2001.

The Bureau of Reclamation, thus, withheld water from plaintiffs in order to retain what it believed was the amount of water in Upper Klamath Lake and the Klamath River needed to avoid "jeopardiz[ing] the continued existence," that is "reduc[ing] appreciably

the likelihood of . . . the survival," of the Lost River and shortnose suckers and the SONCC coho salmon. See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. The quantity of water that would have been necessary to retain in Upper Klamath Lake and in the Klamath River in order to prevent the extinction of the Lost River and shortnose suckers and the SONCC coho salmon cannot have been any less than the quantity that would have been needed to avoid "reduc[ing] appreciably the likelihood of . . . the survival" of these same fish, which is essentially a similar standard. The Tribes' water rights, therefore, entitled the Bureau of Reclamation to prevent the diversion of least as much water from Upper Klamath Lake and the Klamath River as was necessary to fulfill the Bureau of Reclamation's Endangered Species Act obligations in 2001.

Plaintiffs do not directly challenge defendant's conclusions regarding the priority dates and extent of the Tribes' water rights. Instead, plaintiffs argue that that the government has failed to prove that the Tribes' senior water rights precluded deliveries to the plaintiffs in 2001. In support of this argument, plaintiffs point to the lack of quantification of the Tribes' water rights, arguing that "[w]ithout knowing how much water the Tribes are entitled to, the Government cannot show that all (or any portion) of the water in Upper Klamath Lake belonged to the Tribes—and not the Klamath farmers." Initially, the court notes that unquantified reserved rights are not automatically unenforceable. See Winters v. United States, 207 U.S. 564 (affirming injunction restraining appellants from diverting water away from Fort Belknap Indian Reservation based on the unquantified tribal reserved rights); Kittitas Reclamation Dist. v. Sunnyside Valley Irr. Dist., 763 F.2d 1032, 1034-35 (9th Cir. 1985) (affirming district court's order requiring that water be released from a reservoir in order to preserve nests of salmon eggs based on unquantified tribal fishing rights). That being said, in order for the court to find that satisfaction of the Tribes' water rights required a denial of all water to plaintiffs for most of the 2001 irrigation season, the court must understand the quantity of water to which the Tribes were entitled.

The court has concluded that the Tribes' water right entitled them to keep at least as much water in Upper Klamath Lake and the Klamath River as was necessary to prevent jeopardizing the continued existence of the Lost River and shortnose suckers and the SONCC coho salmon. Determinations as to the minimum elevation in Upper Klamath Lake and the minimum flows into the Klamath River that would be necessary to avoid jeopardizing the continued existence of these fish were set forth in the NMFS and FWS Biological Opinions. Plaintiffs, however, challenge the accuracy of the determinations set forth in at least the NMFS Biological Opinion, pointing to a summary of a government report contained in an unpublished 2006 United States District Court opinion, Pac. Coast Fed'n of Fisherman's Ass'ns v. United States Bureau of Reclamation, No. C 02-2006, 2006 WL 1469390, at *3-4 (N.D. Cal. May 25, 2006), aff'd, 226 F. App'x 715 (9th Cir. 2007), that they claim is evidence that the government's actions in 2001 actually "did not protect the tribal fish resources."[25] Defendant rejects plaintiffs' argument as an "invitation to conduct an improper, hindsight inquiry into the validity of the government's actions in

---

[25] The court notes that plaintiffs raised this argument for the first time in their post-trial reply brief and failed to present evidence at trial to support the argument.

2001 in this case." According to defendant, because plaintiffs have elected to bring a takings claim, they are barred from challenging the validity of government actions such as the conclusions in the NMFS and FWS Biological Opinions and the Revised 2001 Operations Plan.

"[A]n uncompensated taking and an unlawful government action constitute 'two separate wrongs [that] give rise to two separate causes of action,' and . . . a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims." Rith Energy, Inc. v. United States, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (quoting Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1364 (Fed.Cir.1998)). The users of Klamath Project water, including the Klamath and Tulelake Irrigation Districts, have already had an opportunity to challenge the reasonableness of the Bureau of Reclamation's decision to implement the determinations of the NMFS and FWS Biological Opinions in the Revised 2001 Operations Plan before the United States District Court in the District of Oregon in Kandra v. United States, 145 F. Supp. 2d 1192. Because plaintiffs have chosen to bring the present cases as takings actions before the United States Court of Federal Claims, they are "required to litigate [their] takings claim[s] on the assumption that the administrative action was both authorized and lawful." Rith Energy, Inc. v. United States, 247 F.3d at 1366; see also Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993) ("[C]laimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act, 28 U.S.C. § 1491." (citing Florida Rock Indus., Inc. v. United States, 791 F.2d 893, 899 (Fed. Cir. 1986), cert. denied, 479 U.S. 1053 (1987); Deltona Corp. v. United States, 228 Ct. Cl. 476 (1981), cert. denied, 455 U.S. 1017 (1982))).

Plaintiffs, thus, must assume the lawfulness of the Bureau of Reclamation's actions in 2001. This means that plaintiffs must assume that the Bureau of Reclamation acted reasonably when it determined that it was required under the Endangered Species Act to implement the determinations of the NMFS and FWS Biological Opinions in the Revised 2001 Operations Plan, as the United States District Court for the District of Oregon determined in Kandra v. United States, 145 F. Supp. 2d at 1211. It does not follow, however, that plaintiffs must assume that the Bureau of Reclamation's determination, or those contained in the FWS and NMFS Biological Opinions, were completely factually correct. See Cebe Farms, Ind. v. United States, 83 Fed. Cl. 491, 497 (2008) ("Defendant cannot circumvent this bedrock constitutional provision [the Just Compensation Clause of the Fifth Amendment to the United States Constitution] by resorting to the circular logic that by conceding the legality of the government's action in order to maintain a takings claim, plaintiffs must also concede that the government was correct in all of its determinations . . . ."). Plaintiffs, therefore, are free to point out how the elevation levels and minimum release flows set forth in the FWS and NMFS Biological Opinions were not, in fact, correct and necessary to prevent jeopardizing the existence of the Lost River and shortnose suckers and the SONCC coho salmon, as implemented by the Bureau of Reclamation.

The FWS Biological Opinion begins with a 43 page description of the historical operation of the Klamath Project and the Bureau of Reclamation's proposed actions for

the Klamath Project in 2001, including summaries of historic elevations in Upper Klamath Lake and other reservoirs in above average water years, below average water years, dry years, critical dry years, detailed descriptions of how the Bureau of Reclamation historically operated the various Klamath Project works and facilities and how it intended to operate them in 2001, and summaries of the various contractual relationships between the Bureau of Reclamation and water users. The FWS Biological Opinion then moves to a 167 page section titled "Biological/Conference Opinions Regarding Operation of the Bureau of Reclamation's Klamath Project and its Effects on the Endangered Lost River Sucker, Endangered Shortnose Sucker, and Proposed Critical Habitat for the Suckers."[26] This section contains a 58 page summary on the status of the fish and their habitats, a 39 page "Environmental Baseline," describing the effects of past and ongoing human and natural factors leading to the current status of the fish, a 36 page analysis of the expected effects of the Bureau of Reclamation's proposed Klamath Project operations on the fish, an 8 page analysis of the cumulative effect of other human activities on the fish, and a 10 page discussion of FWS' proposed reasonable and prudent alternatives to the Bureau of Reclamation's proposed operations of the Klamath Project in 2001. A bibliography at the end of the FWS Biological Opinion lists 225 pieces of literature and 19 personal communications the FWS used to formulate the conclusions set forth in the FWS Biological Opinion. Among the conclusions of the FWS Biological Opinion was that the maintenance of certain minimum elevations in Upper Klamath Lake were necessary "to avoid jeopardy and adverse modification of proposed critical habitat" for the Lost River and short nose suckers. These were the minimum elevations in Upper Klamath Lake that were, subsequently, implemented by the Bureau of Reclamation in 2001. Recognizing of course that length alone or the number of references consulted is not, in itself, validation of a study, the FWS Biological Opinion is a thorough review of the subject matter.

The NMFS Biological Opinion is not as lengthy as the FWS Biological Opinion, which is likely due, at least in part, to the fact that, unlike the FWS Biological Opinion, the NMFS Biological Opinion concerns only one species of fish. The NMFS Biological Opinion contains 3 pages of background on the Klamath Project and description of the Bureau of Reclamation's proposed plans for operating the Klamath Project in 2001, 7 pages describing the life cycle, population trends, and current status of the SONCC coho salmon, a 9 page "Environmental Baseline" describing the effects of past and ongoing human and natural factors leading to the current status of the fish, an 11 page analysis of the expected effects of the Bureau of Reclamation's proposed Klamath Project operations on the fish, a 1 page analysis of the cumulative effect of other human activities on the fish, and a 6 page discussion of NMFS' proposed reasonable and prudent alternative to the Bureau of Reclamation's proposed operations of the Klamath Project in 2001. The NMFS Biological Opinion ends with 14 charts and graphs summarizing the average flows and temperatures at various points in the Klamath River, as well as the effect of various levels of water discharges from the Klamath Project on the SONCC coho and other species of salmon. A bibliography in the NMFS Biological Opinion lists 74

---

[26] The FWS Biological Opinion also contains a separate analysis on the effect of the Bureau of Reclamation's proposed operations of the Klamath Project on the Bald Eagle, which is not relevant to the present cases.

pieces of literature the NMFS used to formulate the opinions set forth in the NMFS Biological Opinion. Among the conclusions of the NMFS Biological Opinion was that continued operation of the Klamath Project according to historic standards was likely to "jeopardize the continued existence of [the] SONCC coho salmon" and that certain minimum flows of water released from the Klamath Project were necessary "to prevent further decline" of the fish. These were the minimum flows of water into the Klamath River that were, subsequently, implemented by the Bureau of Reclamation in 2001.

Plaintiffs present nothing to challenge the conclusions of the FWS Biological Opinion. The only offer plaintiffs make to show that the conclusions in the NMFS Biological Opinion were flawed are passages from a 2006 unpublished decision of the United States District Court for the Northern District of California in the case of Pacific Coast Federation of Fisherman's Associations v. United States Bureau of Reclamation, which summarize portions of an after the fact February 6, 2002 report by the National Research Council, an arm of the National Academy of Sciences, titled: "Prepublication Copy, Interim Report, Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin (2002)." Pac. Coast Fed'n of Fisherman's Ass'ns v. United States Bureau of Reclamation, 2006 WL 1469390, at *3-4. The District Court summarized the February 6, 2002 National Research Council report as follows:

> The NRC [National Research Council] Report recognized that "the reduction in stocks of native coho salmon in the Klamath River Basin has been caused by multiple interactive factors." Changes in the physical habitat associated with inadequate flows and water temperature were cited as examples. However, the NRC Report found that there was not a sufficient basis to support the proposed flows in the 2001 NMFS Biological Opinion. The NRC Report also found that higher flows might disadvantage the young coho salmon between July and September because the additional flows would include water that had been warmed in retention lakes. High water temperature was found to be one of the reasons for the decline of coho salmon. The NRC Report also questioned whether the increased flows might have a detrimental effect upon thermal refugia, which was determined to be critical to the coho salmon's habitat.
>
> While the NRC Report did not find scientific support for the minimum flows proposed by NMFS, the NRC Report also found that the BOR's proposal in its 2001 biological assessment could not be justified. The NRC Report concluded that the BOR's 2001 biological assessment "could lead to more extreme suppression of flows than has been seen in the past, and cannot be justified either." Overall, the report concluded that "there is no convincing scientific justification at present for deviating from flows derived from operational practices in place between 1990 and 2000."

Id. The District Court opinion does not say whether the National Research Council report drew any similar conclusions regarding the Upper Klamath Lake elevation levels proposed in the 2001 FWS Biological Opinion.

The court considers the FWS and NMFS Biological Opinions relied upon by the Bureau of Reclamation in 2001, thoughtfully researched, clearly presented, credible decision-making documents, which drew on a wide body of scientific literature and displayed a strong grasp of the history and operation of the Klamath Project, the biological needs of the threatened and endangered fish, and the effects of the Klamath Project and other human activities on the lifecycles of the fish. Each of the Biological Opinions marshals its findings on these topics to explain, in depth, why the reasonable and prudent alternatives they set forth, including minimum elevation levels in Upper Klamath Lake and minimum water flows into the Klamath River, were necessary to avoid jeopardizing the continued existence of the Lost River and shortnose suckers and the SONCC coho salmon.

Plaintiffs have failed to offer or identify any specific evidence in the record which casts doubt on the scientific conclusions of the FWS Biological Opinion. Therefore, because the court finds the FWS Biological Opinion was reasoned and highly credible, the court accepts the conclusions of the FWS Biological Opinion, including that the elevation levels for Upper Klamath Lake set forth in the FWS Biological Opinion, which were subsequently adopted by the Bureau of Reclamation, were necessary to avoid jeopardizing the continued existence of the Lost River and shortnose suckers.

With regard to the NMFS Biological Opinion, plaintiffs offer only the summary of the February 6, 2002 National Research Council report in the unpublished opinion from the United States District Court for the Northern District of California in support of its allegations that the conclusions of the NMFS Biological Opinion are flawed. The District Court opinion states, without elaboration, that "the NRC Report found that there was not a sufficient basis to support the proposed flows in the 2001 NMFS Biological Opinion" and that the Klamath River flows proposed by the 2001 NMFS Biological Opinion "might disadvantage the young coho salmon between July and September" and "might have a detrimental effect upon thermal refugia, which was determined to be critical to the coho salmon's habitat." Pac. Coast Fed'n of Fisherman's Ass'ns v. United States Bureau of Reclamation, 2006 WL 1469390, at *3-4 (emphasis added). At best, the summary of the National Research Council report contained in the District Court's opinion demonstrates that a different government agency disagreed, in some, although perhaps not all, respects, with the conclusion in the NMFS Biological Opinion that the minimum flows set forth in the NMFS Biological Opinion were necessary to avoid jeopardizing the existence of the SONCC coho salmon. Because, however, the District Court's opinion contains only a brief summary of the National Research Council's conclusions and no description of the evidence or scientific research the National Research Council drew on to reach its conclusions, and because the National Research Council report itself has not been entered into evidence in this case, the court has no way of judging the validity of the criticisms of the NMFS Biological Opinion. The court, therefore, finds that the summary of the National Research Council report contained in the District Court's unpublished opinion is not sufficient to put into question the ultimate conclusions set forth in the NMFS Biological Opinion. Because the court finds the NMFS Biological Opinion reasoned and credible, and plaintiffs have offered no evidence casting doubt on its conclusions, the court accepts the conclusions of the NMFS Biological Opinion, including that the release of certain minimum flows of Klamath Project water set forth in the NMFS Biological

Opinion into the Klamath River, which were subsequently adopted by the Bureau of Reclamation in 2001, were necessary to avoid jeopardizing the continued existence of the SONCC coho salmon.[27]

---

[27] Although plaintiffs failed to present any evidence at trial concerning the Tribes' water rights or the conclusions of the FWS and NMFS Biological Opinions, the importance of these issues should not have come as a surprise to plaintiffs. With regard to the Tribes' water rights, defendant, in an earlier motion for summary judgment regarding the nature of plaintiffs' beneficial interest in the use of Klamath Project water and the subject contracts and its supporting memorandum, which were deferred to trial, argued:

> In 2001, as today, the Project's water right was junior in priority to the federal reserved water rights of the Klamath Tribes, and Reclamation's management of Project operations was further subject to its trust obligations to protect senior fishing rights of two tribes in the California portion of the Klamath River basin – the Yurok and Hoopa Valley Tribes.

Defendant further argued: "Reclamation's ESA Section 7 obligations overlapped with its trust obligations given that the Klamath Tribes hold water rights with a priority date senior to the Klamath Project's 1905 priority and the Hoopa Valley and Yurok Tribes hold fishing rights which also have senior priority dates." Based on these arguments, defendant requested:

> The Court should conclude here, as a matter of law, that because the plaintiffs' beneficial interest is derivative of the water rights appropriated by the United States for the Klamath Project, any 'right' to receive and use Project water is junior in priority to the senior tribal rights described above.

Plaintiffs responded to defendant's argument by arguing that the existence of the Tribes' water rights was irrelevant to the existence of plaintiffs' water rights and that "the Government's argument that the Endangered Species Act (ESA) is coextensive with Indian water rights or that ESA constraints somehow constitute a tribal right, unsupported by any authority, is simply bizarre." (footnote omitted). At the close of trial, the court informed the parties of certain issues that should be among the issues the parties ought to address in their post-trial briefs. The court specifically mentioned "the role of tribal water rights in any ultimate liability or damages calculation" and how the Tribes' water rights "impact the water rights at issue." The court also stated that "the tribal rights issue" needed to be "very clear" in the parties' post-trial submissions.

With regard to the conclusions of the FWS and NMFS Biological Opinions, prior to trial, on December 16, 2016, in a motion in limine, defendant argued to

> exclude from trial any written evidence or testimony that seeks to challenge, directly or indirectly, the conclusions reached by FWS and NMFS in their

Next, plaintiffs argue that the evidence presented at trial demonstrates that the Bureau of Reclamation's actions in 2001 were not intended to satisfy the Bureau of Reclamation's obligations to protect the Tribes' trust resources, but instead, solely to meet its obligations under the Endangered Species Act. In support of their argument, plaintiffs point to the following evidence: the testimony of a former Reclamation official, Jason Phillips that "the existence of the United States['] trust obligations to the Indians did not affect how the water was managed by the Bureau of Reclamation in 2001"; the testimony of Karl Wirkus that he did not release any more water into Klamath River than was required by the NMFS Biological Opinion or retain any more water in Upper Klamath Lake than was required by the FWS Biological Opinion; a statement in the July 25, 1995 memorandum prepared by the Department of the Interior Regional Solicitor for the Pacific Southwest Region that "[t]he standard to be applied in determining the quantity of water secured by this [the Tribes' reserved water] right has not been determined as of the date of this memorandum"; and the absence of any discussion or consideration of any tribal rights in the FWS and NMFS Biological Opinions.

Defendant, in its briefs before this court, rejects plaintiffs' argument and argues instead that the Tribes' reserved rights were a factor in the Bureau of Reclamations' decision to withhold water in 2001. In support of its argument, defendant points to the following evidence in the record: the statement in the Revised 2001 Operations Plan that "the UKL [Upper Klamath Lake] levels and river flows under this Plan are consistent with requirements of the ESA [Endangered Species Act] and Reclamation's obligation to protect Tribal trust resources"; the testimony of Jason Phillips that the Bureau of Reclamation would "go through the process to comply with the Endangered Species Act, and by complying with the Endangered Species Act, Reclamation would -- would then determine that its trust obligations to the fishery was also met"; and the testimony of Karl Wirkus that there was a "direct relationship" between protecting the endangered species and operating the Klamath Project to be protective of the tribal trust resources. In their

---

respective Biological Opinions regarding the proposed operation of the Klamath Project in 2001, and the determination by the Bureau of Reclamation regarding the operation of the Klamath Project in 2001, including its determination regarding the availability of Project water.

Defendant's argument in support of its motion in limine was similar to the one it makes in its post-trial brief, specifically, that "it is well-settled that a plaintiff may not challenge [a] government decision in the context of a Fifth Amendment takings claim." In a response to defendant's motion, filed January 3, 2017, plaintiffs argued that defendant's motion should be denied as moot. Plaintiff's stated that they conceded the validity of the government's actions and "agree[d] that the Bureau of Reclamation's action constituting the taking—its withholding of Klamath's water in 2001—was authorized by the Endangered Species Act (as were the biological opinions)." Plaintiffs, however, argued that this was "all Klamath is required to concede" and that "plaintiffs in this taking case are not required to concede every factual assertion the Government makes in support of its action."

amicus brief submitted to the court, the Klamath Tribes reject plaintiffs' argument, but on different grounds from defendant. According to the Klamath Tribes, the Bureau of Reclamation's motives for withholding water from the plaintiffs in 2001 are irrelevant for the purposes of this case because the plaintiffs, as junior water rights holders, had no right to receive any Klamath Project water before the water rights of the Tribes were fully satisfied. According to the Tribes, in 2001, because the quantity of water needed to fulfill the Tribes water rights was greater than that required by the Endangered Species Act, the Tribes water rights were not fully satisfied in 2001, and, thus, plaintiffs had no entitlement to receive any water.

The court agrees with the Klamath Tribes that the Bureau of Reclamation's motives are not dispositive in the present cases. It is a fundamental principle of water law in prior appropriation states that a senior water right "may be fulfilled entirely before . . . junior appropriators get any water at all." Montana v. Wyoming, 563 U.S. at 376; see also Joint Bd. of Control of Flathead, Mission & Jocko Irr. Dists v. United States, 832 F.2d 1127, 1131–32 (9th Cir. 1987) ("This contention ignores one of the fundamental principles of the appropriative system of water rights. . . . Montana water law requires that senior rights be fully protected, even though more economic uses could be made by junior appropriators." (citation omitted)). In the present cases, defendant has demonstrated that the Klamath, Yurok and Hoopa Valley Tribes held water rights to Klamath Project water that were senior to those of all plaintiff class members. Defendant also has demonstrated that the quantity of water necessary to satisfy the Tribes' senior rights was at least equal to the quantity of water the Bureau of Reclamation believed to be necessary to satisfy its obligations to avoid jeopardizing the existence of the Lost River and shortnose suckers and the SONCC coho salmon in conformance with the requirements of the Endangered Species Act in 2001. Ultimately, the Bureau of Reclamation's implementation of its obligations under the Endangered Species Act required all available project water and none was left over to deliver to plaintiffs. Because the Tribes, as senior rights holders, were entitled to have their water rights fully satisfied prior to any junior appropriators, and the entire quantity of Klamath Project water was necessary to satisfy these rights in 2001, plaintiffs, as junior rights holders, were not entitled to receive any water.[28] See Benz v.

---

[28] In support of its argument that the Bureau of Reclamations actions in 2001 were not motivated by existence of the Tribes' reserved rights, plaintiffs also make the related argument that "[u]nder its historic practice before 2001, even in the driest years, Reclamation was able to provide full deliveries to Klamath farmers without violating any senior water rights or tribal trust responsibilities." The court need not draw any conclusions about the actions of the Bureau of Reclamation in years other than the one at issue in the cases currently before the court. The past history of the enforcement or non-enforcement of the Tribes' reserved rights is irrelevant to the legal status of those rights in 2001. This is because, "[u]nlike appropriation rights, reserved rights are not based on diversion and actual beneficial use." F. Cohen, Handbook of Federal Indian Law 19.01[1] at 1205. "Instead, sufficient water is reserved to fulfill the purposes for which a reservation was established." Id. at 19.01[1] at 1205-06. Thus, any potential failure of the Tribes to exercise their reserved rights prior to 2001, or any potential failure by the Bureau of Reclamation to enforce those rights prior to 2001, would have no impact on the existence and nature of the Tribes reserved rights in this case. See id. at 19.01[2] at 1206

Water Res. Comm'n, 764 P.2d 594, 599 (Or. 1988) ("A junior appropriator's water right cannot be exercised until the senior appropriator's right has been satisfied.").

Plaintiffs also challenge the existence of the Yurok and Hoopa Valley Tribes' water rights, arguing that "[t]here is no Oregon water right for undetermined Hoopa Valley Tribe or Yurok Tribe use in California, and there never will be as no claim was filed by those Tribes or the Government in the Klamath River Adjudication for any Oregon water, and particularly for water stored in Upper Klamath Lake." Plaintiffs' argument regarding the nature of the Tribes' federal reserved rights fails. The absence of having made a timely submission in the Klamath Adjudication might have waived any water rights a claimant might have had arising out of Oregon state law and in that adjudication. The water rights held by the Yurok and Hoopa Valley Tribes, however, are federal reserved rights, arising out of federal, rather than state, law. See Cappaert v. United States, 426 U.S. at 139 (describing the process used by the federal government to reserve water rights and noting that the reservation of water rights "is empowered by the Commerce Clause, Art. I, s 8, which permits federal regulation of navigable streams, and the Property Clause, Art. IV, s 3, which permits federal regulation of federal lands"); Winters v. United States, 207 U.S. at 577 ("The power of the government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be."). "Federal water rights are not dependent upon state law or state procedures and need not be adjudicated only in state courts . . . ." Cappaert v. United States, 426 U.S. 12 at 145. Although reserved rights can be adjudicated by state bodies, and the Yurok and Hoopa Valley Tribes could have submitted claims to the Klamath Basin Adjudication, as the Klamath Tribes apparently did for their reserved rights, their failure to do so did not affect the existence or nature of their federal reserved rights. See id. at 145-46 (rejecting the argument that the Federal Government must "perfect its water rights in the state forum like all other land owners").

Plaintiffs further argue that, in managing Klamath Project water, the Bureau of Reclamation was not free to favor the Tribes over the plaintiffs. In support of this argument, plaintiffs quote language from the Supreme Court's opinion in Nevada v. United States holding that, in managing reclamation projects, the United States must balance its fiduciary obligations to both Native American tribes and other water users. See Nevada v. United States, 463 U.S. at 128 ("[I]t may well appear that Congress was requiring the Secretary of the Interior to carry water on at least two shoulders when it delegated to him both the responsibility for the supervision of the Indian tribes and the commencement of reclamation projects in areas adjacent to reservation lands. But Congress chose to do this . . . ."). With regard to the laws of takings and the property at issue in the present cases, however, these principles are irrelevant. The fact is that the Tribes' reserved water rights are senior to the water rights held by the plaintiffs and,

---

("Thus, a reservation established in 1865 that starts putting water to use in 1981 under its reserved rights has, in times of shortage, a priority that is superior to any non-Indian water right with a state-law priority acquired after 1865.").

therefore, plaintiffs had no entitlement to receive any water until the Tribes senior rights were fully satisfied. Any obligations the government had or might have had towards other users cannot effect the extent or nature of the Tribes' reserved rights. See Colville Confederated Tribes v. Walton, 752 F.2d at 405 ("Where reserved rights are properly implied, they arise without regard to equities that may favor competing water users." (citing Cappaert v. United States, 426 U.S. at 138–39)). While the result may seem unfair to the plaintiffs, who have perfected their water rights under state law and relied upon those rights, "[t]his merely reflects the tension between the doctrines of prior appropriation and Indian reserved rights." Id.; see also F. Cohen, Handbook of Federal Indian Law 19.03[1] at 1211 ("Because tribal reserved rights arise under federal law, and because they are often put to actual use long after appropriation rights are established, the exercise of tribal water rights has the potential to disrupt non-Indian water uses. The impact on junior state appropriators, however, cannot operate to divest tribes of their federal water rights.").

The court, therefore, holds that, because the Tribes held water rights to Klamath Project water that were senior to those held by all remaining plaintiff class members, and because the Tribes water rights were at least co-extensive to the amount of water that was required by defendant to satisfy its obligations under the Endangered Species Act concerning the Lost River and shortnose suckers and the coho salmon in 2001, plaintiffs had no entitlement to receive any water before the government had satisfied what it determined to be its obligations under the Endangered Species Act and its Tribal Trust responsibilities. Although the court recognizes that many plaintiffs, including those who testified before the court, were severely and negatively impacted by the government's actions, the government's decision in 2001 to withhold water from plaintiffs in order to satisfy its Endangered Species Act and Tribal Trust obligations did not constitute an improper taking of plaintiffs' water rights or an impairment of plaintiffs' water rights because plaintiffs junior water rights did not entitle them to receive any Klamath Project water in 2001. For the same reason, the government's actions did not improperly impair plaintiffs' right to Klamath Project water in violation of the Klamath Compact. See 71 Stat. 497, 507.

## CONCLUSION

For the reasons discussed above, defendant's motion to exclude the claims of any plaintiffs deriving water rights from the Van Brimmer Ditch Company is **GRANTED**. The claims of any class members whose alleged beneficial right to Klamath Project Water is derived from their ownership of shares held in the Van Brimmer Ditch Company are **DISMISSED**.

Regarding the remaining claims of the remaining class members, the court recognizes the hardships encountered by many plaintiffs as a result of the actions taken in 2001. The court also recognizes the unfortunate amount of time it has taken to resolve these claims, with two previous judges of this court assigned, followed by an appeal to the United States Court of Appeals for the Federal Circuit, and a remand to this court, some time after which the above-captioned cases were assigned to the undersigned. After the trial, the court now finds that all of the remaining class members, who can

ultimately prove they are properly in the class, held beneficial interests in receiving water from the Klamath Project in 2001. The issues are, however, more complicated. With regard to those class members, either individually or through an Irrigation District, who received water based on Warren Act contracts containing language immunizing the government from liability resulting from water shortages caused "[o]n account of drought, inaccuracy in distribution, or other cause" and for those class members who received water based on lease agreements to lease lands in the National Wildlife Refuges within the boundaries of the Klamath Project, the interests of such class members have been altered by contract in such a way that plaintiffs are barred from seeking compensation from the United States based on either a taking or impairment of such a claim. All other class members have asserted cognizable property interests. Based on the superior water rights held by the Klamath, Yurok, and Hoopa Valley Tribes, however, the remaining class members were not entitled to receive water in 2001. The government's actions in 2001, did not, therefore, constitute a taking of these plaintiffs' property under the Fifth Amendment to the United States Constitution or effect an impairment of their rights under the Klamath Compact.

**IT IS SO ORDERED**.

<div align="right">

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

</div>